Steve W. Berman (WSBA No. 12536)
Theodore Wojcik (WSBA No. 55553)
Stephanie A. Verdoia (WSBA No. 58636)
Xiaoyi Fan (WSBA No. 56703)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA  98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com
Email: tedw@hbsslaw.com
Email: stephaniev@hbsslaw.com
Email: kellyf@hbsslaw.com

*Attorneys for Plaintiff*

*[Additional Counsel Listed in Signature]*

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| MCKENNA DUFFY, individually and on behalf of all others similarly situated, | **CIVIL ACTION NO.: 23-cv-01391** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| YARDI SYSTEMS, INC., BRIDGE PROPERTY MANAGEMENT, LLC, CALIBRATE PROPERTY MANAGEMENT, LLC, CLEAR PROPERTY MANAGEMENT, LLC, DALTON MANAGEMENT, INC., HNN ASSOCIATES, LLC, LEFEVER MATTSON, MANCO ABBOTT, INC., MORGUARD CORPORATION, PILLAR PROPERTIES, LLC, SUMMIT MANAGEMENT SERVICES, INC., CREEKWOOD PROPERTY CORPORATION, LEGACY PARTNERS, INC., and JONES LANG LASALLE INCORPORATED, | **JURY TRIAL DEMANDED** |
| Defendants. | |

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ................................................................1

II.   PARTIES .........................................................................................11

      A.    Co-Conspirators and Agents .................................................14

III.  JURISDICTION AND VENUE ........................................................16

IV.   FACTUAL BACKGROUND ............................................................16

      A.    Yardi's RENTmaximizer is widely used in the national
            multifamily rental market to set lessors' prices. ....................16

      B.    Yardi and Operator Defendants conspired to eliminate competition
            by outsourcing independent pricing and supply decisions to
            RENTmaximizer. .................................................................26

      C.    Economic analysis confirms that usage of Yardi produces
            anticompetitive effects in the form of higher prices for
            RENTmaximizer users. ..........................................................33

      D.    Studies show that industry-wide usage of a shared pricing
            algorithm leads to anticompetitive effects. ...........................34

      E.    "Plus factors" indicate an existence of a price-fixing conspiracy...........37

V.    RELEVANT MARKET......................................................................39

VI.   CLASS ACTION ALLEGATIONS ..................................................41

VII.  CAUSES OF ACTION .....................................................................42

FIRST CLAIM FOR RELIEF VIOLATION OF SECTION 1 OF THE
      SHERMAN ACT FOR AGREEMENT IN RESTRAINT OF TRADE 15
      U.S.C. § 1 .......................................................................................42

SECOND CLAIM FOR RELIEF VIOLATION OF SECTION 1 OF THE
      SHERMAN ACT FOR CONSPIRACY TO EXCHANGE
      COMPETITIVE INFORMATION 15 U.S.C. § 1 ...............................43

REQUEST FOR RELIEF ..........................................................................45

JURY TRIAL DEMANDED.......................................................................46

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Plaintiff Mckenna Duffy brings this action on behalf of themself individually and on behalf of a class consisting of all persons who leased multifamily residential real estate units directly from a defendant or co-conspirator from September 8, 2019, through the present, in the nationwide multifamily housing rental market (hereinafter "the multifamily market"). Plaintiff brings this action for treble damages and injunctive relief under Section 1 of the Sherman Act. Plaintiff demands a trial by jury.

## I.      NATURE OF THE ACTION

1.      Plaintiff challenges an unlawful agreement among multifamily property managers, property owners, and property managers/owners ("Operator Defendants")[1] who colluded to coordinate pricing through the usage of a centralized pricing mechanism, "RENTmaximizer," created by Defendant Yardi Systems, Inc. ("Yardi"), a property management software company. Defendant Yardi and the Operator Defendants collectively used Yardi's "RENTmaximizer"[2] software to coordinate on setting supracompetitive pricing on multifamily properties across the nation.

2.      Operator Defendants manage multifamily rental properties across the United States. In a competitive market, these companies would compete on rental prices to attract renters—that is, they would set rents in accordance with the fundamentals of supply and demand. When demand surges, rents may go up. When demand falls, property management companies normally prioritize occupancy rates, and thus increase concessions (e.g., offering a first month free) to attract renters.

3.      In the absence of knowledge about competitors' pricing strategies, property managers can only make their best educated guesses and set their prices at optimal positions—

---

[1] Defendants Bridge Property Management, LLC, Calibrate Property Management, LLC, Clear Property Management, LLC, Dalton Management, Inc., HNN Associates, LLC, LeFever Mattson, Manco Abbott, Inc., Morguard Corporation, Pillar Properties, LLC, Summit Management Services, Inc., Creekwood Property Corporation, Legacy Partners, Inc., and Jones Lang Lasalle Inc., collectively are the "Operator Defendants" and together with Defendant Yardi Systems, Inc., the "Defendants."

[2] Yardi's website indicates that "RENTmaximizer" has been renamed "Revenue IQ." *See* "Revenue IQ", https://www.yardi.com/products/yardi-revenue-iq/. The domain https://www.yardi.com/rentmaximizer redirects users to the "Revenue IQ" page, which describes Revenue IQ as substantially similar to RENTmaximizer. All references herein to "RENTmaximizer" in this complaint also include by reference Revenue IQ.

usually a bit lower than what offered by competitors—to attract renters in the market. If a lessor wants to take a chance to raise rents regardless of market conditions, other competitors will soon take that lessor's business away by listing their units at competitive prices.

4.      Yardi, together with the Operator Defendants, has unlawfully solved this problem with a product called "RENTmaximizer." Launched in 2011, RENTmaximizer is an algorithmic pricing tool marketed to lessors that is intended to "automate" lessors' "rental pricing process" and thus help "multifamily property managers maximize rental income" by "increasing . . . revenue by 3 to 6 percent"[3]—that is, RENTmaximizer effectively outsources the management of rental pricing from a landlord to Yardi itself, which then implements higher prices collectively across a group of landlords. According to Terri Dowen, Yardi's senior vice president of sales, "[b]y automating rental pricing that factors in portfolio and market data, RENTmaximizer not only improves rental income while maintaining occupancy, it simplifies the process by *eliminating rent rate guesswork and traditional sales devices such as concessions and specials*."[4]

5.      In other words, Yardi's RENTmaximizer is specifically, and publicly, marketed as a means to eliminate the discounting that would occur in a competitive market. Operator Defendants who agree to use RENTmaximizer understand that its purpose is to foil the operation of the competitive market. Indeed, in marketing materials, Yardi advertises that "revenue grows on Yardi"[5] and that Yardi users "beat the market by a minimum of 2%" and "gain[] on average more than 6% net rental income."[6] Yardi even tells its users: "You manage your business, we manage your pricing":

---

[3] *See Yardi Adds Two Revenue Management Experts to its Yardi RENTmaximizer Team*, Business Wire (June 22, 2011), available at https://www.businesswire.com/news/home/ 20110622006700/en/Yardi-Adds-Two-Revenue-Management-Experts-to-its-Yardi-RENTmaximizer-Team.

[4] *The Rockbridge Group Increases Rent Revenue with Yardi RENTmaximizer*, Business Wire (June 21, 2016), https://www.businesswire.com/news/home/20160621005024/en/Rockbridge-Group-Increases-Rent-Revenue-Yardi-RENTmaximizer.

[5] Yardi, *Revenue Grows on Yardi: RENTmaximizer* (video), (June 19, 2017), https://www.facebook.com/Yardi/videos/revenue-grows-on-yardi-rentmaximizer/ 1501017369961971/.

[6] Yardi, *Yardi Multifamily Suite* (2019), available at https://resources.yardi.com/documents/ multifamily-suite-brochure/.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

## Better Results

Clients using RENTmaximizer have gained on average more than 6% net rental income growth while improving occupancy. And, RENTmaximizer properties consistently beat the market by a minimum of 2%. This intuitive, transparent pricing system empowers your sales force, provides clear and comprehensive reporting and promotes adoption throughout your organization. Leases are priced by the system daily, which allows for fast adjustment to market conditions and changes in your inventory and traffic, while adjusting for cost constraints such as vacancy loss, turnover costs, inventory hold days and lease expiration management.

## Better Service

You manage your business, we manage your pricing. Only Yardi provides you with a dedicated revenue manager with valuable industry experience along with your revenue management software. Your dedicated revenue manager will get to know your business processes, assets and goals to provide superior support and will work with you to maximize your returns. And as a RENTmaximizer client, you'll receive this service and training continuously to promote ongoing success.

6.     Marketing materials for Yardi's "Revenue IQ" product—which, on information and belief, is a rebranded version of RENTmaximizer—echo the same theme, boasting that lessors can use Yardi's pricing software to "[w]in at pricing" and "[c]onsistently beat the market"[7]:

# Win at pricing using integrated revenue intelligence

- Price new or renewal leases based on business goals, market conditions and inventory
- Consistently beat the market by utilizing revenue management instead of pricing yourself
- Enhance strategy and performance with built-in access to nationwide market intelligence

7.     According to Yardi's publicly-available promotional materials, a key input to Yardi's pricing algorithm, or "engine," is competitor pricing data. Specifically, RENTmaximizer asks users to input their data, such as rental rates and occupancy, into its system; meanwhile, the

---

[7] Yardi, *Revenue IQ*, https://www.yardielevate.com/multifamily/revenue-iq/ (last visited Sept. 7, 2023).

COMPLAINT FOR DAMAGES - 3
011188-11/2325303 V2



1  system automatically incorporates market-specific information on "comparative rent" to, in

2  Yardi's words, give users "accurate and timely information regarding your market—including

3  every comp and how you compete"[8]—or what it also calls "complete visibility," including

4  "performance benchmarking" "compared to the market, submarket, and competition":



8.  Leveraging data gathered from RENTmaximizer users as well as comparative

rent, RENTmaximizer's rental pricing algorithm then calculates a "rent recommendation" that

users can—and are encouraged to—automatically adopt. These prices are updated "daily." Yardi

also advertises (as noted above) that it gives lessors "complete visibility" into the market,

providing them with "property performance benchmarking (compared to the market, submarket

and competition)"[9]:

---

[8] Yardi Systems, Inc., *Yardi Elevate* (2020), available at https://resources.yardi.com/documents/elevate-suite-for-multifamily-brochure/.

[9] *Id.* Similar promotional materials for Yardi Revenue IQ state: "Get visibility into rent movement and operational performance. *Know your market in real time — including every comp and how you compete.* Daily management reports help you understand pricing changes and show you upcoming exposure along with traffic and trends. Provide extensive revenue intelligence for your operations team and give your managers confidence in the rental prices they offer. With this transparent system you'll see: Rental rates and occupancy data; Pricing options for prospects and residents; *Property performance benchmarking (compared to the market, submarket and competition).*" *See* Yardi Systems, Inc., *Revenue IQ*, https://www.yardi.com/products/yardi-revenue-iq/ (emphasis added) (last visited Sept. 7, 2023).

## Complete Visibility

RENTmaximizer provides holistic revenue intelligence for your operations team. With this transparent system you'll see everything from rental rates and occupancy data to property performance benchmarking (compared to the market, submarket and competition). Prospects and residents will gain various pricing options, while your managers will enjoy greater confidence that you are delivering the best possible rental prices.

9.      Furthermore, Yardi provides RENTmaximizer users "with a dedicated revenue manager" who works closely with individual lessors to hone their usage of RENTmaximizer by "get[ting] to know your business processes, assets, and goals to provide superior support and . . . work[ing] with you to maximize your returns."[10] Promotional materials for Yardi's "Revenue IQ" product similarly advertise the assistance of "dedicated Yardi expert[s]" who "help manage pricing" and assist lessors in "[g]et[ting] pricing recommendations and control[ling] pricing at the property level"[11]:

## Get hands-on support from a technical account manager

- Rely on a dedicated Yardi expert to help manage pricing
- Get pricing recommendations and control pricing at the property level
- Continuously advance algorithms with an integrated propriety feedback loop

10.     These revenue managers help further Operator Defendants' coordination by facilitating their implementation of the common pricing scheme produced by usage of RENTmaximizer and giving them "confidence" in their pricing decisions. As Adam Goldfarb, vice president for lessor Manco Abbott, stated in a 2015 press release: "Having a dedicated revenue manager working with us from the Yardi RENTmaximizer team is a huge benefit. If our

---

[10] *Yardi Elevate*, *supra* note 8.

[11] *See Revenue IQ*, *supra* note 7.

COMPLAINT FOR DAMAGES - 5
011188-11/2325303 V2



**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

staff or property owners question any of our rates, we have our Yardi RENTmaximizer expert who can dig deeper to support our pricing — and that gives our organization and clients great confidence."[12]

11.     The result of this scheme is that Operator Defendants outsource their once-independent pricing and supply decisions to a single decisionmaker, RENTmaximizer, and need not directly disclose their pricing strategies to each other in order to fix rent prices. Instead, Operator Defendants collectively adopt a coordinated pricing strategy implemented and enforced by Yardi's RENTmaximizer product.

12.     Lessors have spoken openly and enthusiastically about Yardi's market-beating results and ability to take the "guesswork" out of setting rents and imposes "discipline" on pricing decisions. As Philip Nored, owner and managing partner of lessor HNN Associates described it in a 2017 press release, "RENTmaximizer has *taken the guesswork* out of our rental pricing and lease terms, and boosts pricing performance through an intelligent system of measurements, fixed factors *and discipline*."[13] Another has stated bluntly: "[t]hanks to RENTmaximizer, we have *eliminated all concessions and specials*."[14] Another has written: "RENTmaximizer *eliminates the fear factor of exposure* that is a natural concern for property and regional managers. RENTmaximizer factors in historical and relevant data to assure us that we will get the traffic and leases we need to meet our revenue goals."[15]

13.     Other lessors have been even more frank, acknowledging that with RENTmaximizer, they can "aggressively" raise rents in a way that would have previously been impossible. For example, Brantley White, the president of lessor Ardmore Residential, stated in a

---

[12] *Manco Abbott Inc. Achieves Rental Growth, Gains Expert Pricing Insight with Yardi RENTmaximizer*, Business Wire (Nov. 10, 2015), https://www.businesswire.com/news/home/20151110005039/en/.

[13] *HNN Associates, LLC Optimizes Rental Pricing Performance with Yardi RENTmaximizer*, Business Wire (Feb. 17, 2015), https://www.businesswire.com/news/home/20150217005101/en/HNN-Associates-LLC-Optimizes-Rental-Pricing-Performance-with-Yardi-RENTmaximizer (emphasis added).

[14] *See Rockbridge Group*, *supra* note 4 (emphasis added).

[15] *Beztak Grows Rental Income with Yardi RENTmaximizer*, Business Wire (June 16, 2017), available at https://www.businesswire.com/news/home/20170616005099/en/Beztak-Grows-Rental-Income-with-Yardi-RENTmaximizer (emphasis added).

2016 Yardi press release that Ardmore was able to raise rents 5-6% since its implementation of Yardi RENTmaximizer in 2016, explaining that "RENTmaximizer has allowed us to *push rents more aggressively* and takes more human error out of the process."[16] He candidly acknowledged that "[w]e simply wouldn't have raised rents that much or that quickly on our own."[17]

14.     Confidential witnesses echo this and recognize that RENTmaximizer gives lessors an unfair advantage. For example, Confidential Witness 1 ("CW 1")[18], who worked as a former leasing consultant for Bridge Property Management, stated that she regularly used Yardi to set prices for the apartments she managed. Specifically, she would input the square footage of an apartment, its location, and Yardi's system would then offer listing prices that she "just went for" without "question[ing]." CW 1 explained further that Yardi would show comparative pricing at specific competitor apartment locations and that, in her opinion, this "was not fair for renters." She stated bluntly: "It was ridiculous. We were supposed to be helping these people who couldn't afford a home. Instead, we were raising rents."

15.     Similarly, Confidential Witness 2 ("CW 2")[19], another former employee at Bridge Property Management, stated that the prices generated by Yardi were never questioned and could change daily. He stated that this pricing practice gave "an unfair advantage" to lessors because they "all know what they should be renting for" by using the same pricing platform.

16.     Lessors have also explicitly and publicly praised (a) the insight into competitors' pricing that Yardi provides (i.e., Yardi's ability to facilitate a direct exchange of current pricing information between competitors) and (b) the supracompetitive returns it generates—indeed, much of this praise is found in scores of Yardi press releases touting RENTmaximizer's achievements in raising rents for clients in the multifamily market. For example, in a 2016 press release, Jeffrey Denson, the owner and COO of lessor Dalton Management, stated that Dalton

---

[16] *Ardmore Residential Raises Rents 5-6% with Yardi RENTmaximizer*, Business Wire (Apr. 21, 2016), https://www.businesswire.com/news/home/20160421005001/en/Ardmore-Residential-Raises-Rents-5-6-with-Yardi-RENTmaximizer (emphasis added).

[17] *Id.*

[18] CW 1 worked as a leasing consultant for Bridge Property Management in San Antonio, Texas, from January 2013 to June 2014.

[19] CW 2 worked as a leasing consultant for Bridge Property Management in Kent, Washington, from November 2019 to June 2020.



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Management was able to increase rent per unit without losing business to its competitors as "RENTmaximizer has . . . made Dalton Management better aware of how its properties compare to the rest of the market," explaining further that Dalton was "able to raise rents at a property we thought was keeping up—now we're getting $100 more per unit and maintaining occupancy."[20]

17.     Similarly, a "success story" available on Yardi's website states that lessor Avesta had seen "a significant gain [in revenue] after only six months" of implementing automated RENTmaximizer pricing and that, for every dollar it invested in the RENTmaximizer system, Avesta "achieved a return of nearly $30." The press release quotes Will Newton, Director of Support Systems at Avesta, as stating: "[T]hanks to the revenue and leasing metrics, along with the support of our dedicated Yardi RENTmaximizer pricing specialist, we don't leave money on the table"[21]:

> The Story
>
> **Automated Pricing Increases Revenue**
> After implementing RENTmaximizer, Avesta saw a significant gain after only six months. For every dollar they invested in the system, they achieved a return of nearly $30. Will Newton, director of support systems, explained that as a resident-focused company, Avesta is delighted that RENTmaximizer makes it easy to offer customers a variety of lease terms and movein dates, so each resident can choose what works best for them and their budget.
>
> Newton elaborated further, saying that the revenue and leasing metrics Avesta gets from RENTmaximizer — along with the support of a dedicated RENTmaximizer revenue expert — ensure they consistently make profitable pricing decisions for every property.

18.     In addition to their use of RENTmaximizer, Defendants also engaged in direct communications with their competitors regarding their pricing in furtherance of their conspiracy. Confidential witness interviews reveal that certain individual Operator Defendants implemented a regular strategy of engaging in "market surveys" of their competitors. As part of this strategy, employees of Defendants would call their competitors, often on a weekly basis, and specifically ask what prices those competitors were charging. For example, CW 1, a former leasing

---

[20] *Dalton Management Reports Increased Revenue Using Yardi RENTmaximizer*, Business Wire (May 19, 2016), https://www.businesswire.com/news/home/20160519005003/en/Dalton-Management-Reports-Increased-Revenue-Using-Yardi-RENTmaximizer

[21] Yardi, *Success Stories – Avesta*, https://www.yardi.com/about-us/success-stories/avesta/ (last visited Sept. 7, 2023).



consultant for Bridge Property Management, stated that she regularly conducted market surveys by "shopping" other apartment complexes, where she would gather information on pricing. Similarity, CW 2, another former employee at Bridge Property Management, recalled that he would call competitors' complexes and ask their leasing agents for rent prices.

19.     RENTmaximizer is today widely used throughout the United States to set multifamily rental prices. In 2013, for instance, Dharmendra Sawh (then Yardi's "principal for revenue management") stated publicly that RENTmaximizer was used to manage 8 million residential units around the world[22]—a number that is likely far higher today.[23] Consistent with this, a test run economic analysis confirms that collective usage of Yardi RENTmaximizer leads to higher prices. Public rent data was collected over a period of several weeks in August 2023 from Seattle, Charlotte, and Phoenix. A regression analysis was then performed in zip codes where usage of Yardi RENTmaximizer was higher than 15% of available units. The regression analysis controlled for various property and geographic features, such as (1) size of the unit, (2) number of bathrooms, (3) census average rent in the zip code, and (4) median income in the zip code. Across over 23,000 units, the regression found an average overcharge of 6% on units priced using RENTmaximizer as compared to units not priced using RENTmaximizer, including for studio, 1-bedroom, 2-bedroom, and 3-bedroom apartments. This is closely consistent with Yardi's repeated public statements that usage of RENTmaximizer led to a 6% average increase in net rental income:

---

[22] Patrick Nelson, *Algorithms for Rent: The Price is Right*, Tech News World (Mar. 12, 2013), https://www.technewsworld.com/story/algorithms-for-rent-the-price-is-right-77498.html

[23] Guy Lyman, *Don't Miss This! Unveiling of "AIRM" AI Revenue Management at RealWorld*, RealPage, Inc. (Sept. 8, 2020), https://www.realpage.com/blog/dont-miss-this-unveiling-of-airm-ai-revenue-management-at-realworld/. By contrast, in September 2020, Yardi's leading competitor RealPage—which also makes a product that automatically sets residential real estate lease prices—claimed that its own revenue management software was used to set the price for "over four million [multifamily] units." *Id.*

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX



20.     Further, economic research confirms that the use of pricing algorithms leads to anticompetitive effects, including elevated prices. Modern algorithms can use artificial intelligence to reach the objective of maximizing profits without the need for human intervention. For example, a 2021 empirical study found, in line with the predictions of theoretical models, that when gas stations in Germany used algorithms to set prices, their margins increased by approximately 9%. Critically, the authors found that algorithm use only raised prices above competitive levels in places where competitors adopted algorithms jointly, and thus that "algorithmic pricing software adoption raises margins *only through its effects on competition.*"

21.     Government regulators have long raised concerns about industry-wide use of algorithmic pricing. Earlier this year, for example, the Principal Deputy Assistant Attorney General of the Antitrust Division for the Department of Justice stated: "Where competitors adopt the same pricing algorithms, our concern is only heightened. Several studies have shown that these algorithms can lead to tacit or express collusion in the marketplace, potentially resulting in

higher prices, or at a minimum, a softening of competition."[24] Similarly, Maureen Ohlhausen, when serving as acting Chairperson of the Federal Trade Commission, explained in 2017 how multiple firms outsourcing pricing decisions to a single third-party actor—just as lessors have done with RealPage—raises significant antitrust concerns and is little different from funneling confidential pricing information through a "guy named Bob":

> Imagine a group of competitors sub-contracting their pricing decisions to a common, outside agent that provides algorithmic pricing services. Each firm communicates it pricing strategy to the vendor, and the vendor then programs its algorithm to reflect the firm's pricing strategy. But because the same outside vendor now has confidential price strategy information from multiple competitors, it can program its algorithm to maximize industry-wide pricing. In effect, the firms themselves don't directly share their pricing strategies, but that information still ends up in common hands, and that shared information is then used to maximize market-wide prices. . . . **Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either.**[25]

22.     The conspiracy Plaintiff challenges is unlawful under Section 1 of the Sherman Act. Plaintiff brings this action as a Class Action on behalf of a class of individuals to recover damages, trebled, as well as injunctive and other appropriate relief, detailed *infra*, on behalf of all others similarly situated.

## II.     PARTIES

23.     Plaintiff Mckenna Duffy is a citizen and resident of the State of Washington. Plaintiff Duffy rented multifamily residential units in properties managed by Operator Defendant Pillar Properties. Plaintiff Duffy had a lease with The Wave from 2021 to 2022, then with The Nolo from 2022 to the present.

---

[24] U.S. Dep't of Justice, *Principal Deputy Assistant Attorney General Doha Mekki of the Antitrust Division Delivers Remarks at GCR Live: Law Leaders Global 2023* (Feb. 2, 2023), available at https://www.justice.gov/opa/speech/principal-deputy-assistant-attorney-general-doha-mekki-antitrust-division-delivers-0.

[25] Maureen K. Ohlhausen, *Should We Fear The Things That Go Beep In the Night? Some Initial thoughts on the Intersection of Antitrust law and Algorithmic Pricing*, Federal Trade Commission (May 23, 2017), https://www.ftc.gov/system/files/documents/public_statements/1220893/ohlhausen_-_concurrences_5-23-17.pdf.



24.     Defendant Yardi Systems, Inc. ("Yardi") is a California corporation headquartered in Barbara, California. Yardi provides industry-leading property management software and services to the multifamily real estate industry, including the RENTmaximizer/Revenue IQ revenue management software described herein.

25.     Operator Defendant Bridge Property Management, LLC ("Bridge Property") is a Utah limited liability company headquartered in Sandy, Utah. Bridge Property manages over 50,000 multifamily rental units throughout the United States.[26] Bridge Property is one of Yardi's clients and uses its RENTmaximizer revenue management software.

26.     Operator Defendant Calibrate Property Management, LLC ("Calibrate") is a Washington limited liability company headquartered in Kirkland, Washington. Calibrate manages approximately 1,900 units in four states and is "rapidly growing."[27] Calibrate is one of Yardi's clients and uses its RENTmaximizer revenue management software.

27.     Operator Defendant Clear Property Management, LLC ("Clear") is a limited liability company headquartered in Austin, Texas. Clear manages 11 multifamily rental properties in Texas.[28] Clear is one of Yardi's clients and uses its RENTmaximizer revenue management software.

28.     Operator Defendant Dalton Management, Inc. ("Dalton") is an Oregon corporation headquartered in Beaverton, Oregon. Dalton manages over 15 apartment complexes throughout California, Oregon, and Washington.[29] Dalton is one of Yardi's clients and uses its RENTmaximizer revenue management software.

29.     Operator Defendant HNN Associates, LLC ("HNN") is a Washington limited liability company headquartered in Bellevue, Washington.  HNN manages the 52 properties owned by Devco Residential Group, LLC in Washington state.[30] HNN is one of Yardi's clients and uses its RENTmaximizer revenue management software.

[26] https://www.bridgepm.com/ (last visited Sept. 7, 2023).
[27] https://calibratemanagement.com/ (last visited Sept. 7, 2023).
[28] https://www.clearpm.com/properties (last visited Sept. 7, 2023).
[29] https://daltonmngt.com (last visited Sept. 7, 2023)
[30] https://www.lifeisbetterhere.com/ourproperties.aspx (last visited Sept. 7, 2023).



30.     Operator Defendant LeFever Mattson is a California corporation headquartered in Citrus Heights, California. LeFever Mattson manages over 3,000 residential units in California.[31] LeFever Mattson is one of Yardi's clients and uses its RENTmaximizer revenue management software.

31.     Operator Defendant Manco Abbott, Inc. ("Manco Abbott") is a California corporation headquartered in Fresno, California. Manco Abbott is one of Yardi's clients and uses its RENTmaximizer revenue management software.

32.     Operator Defendant Morguard Corporation is a Canadian Corporation headquartered in Mississuaga, Ontario. Morguard Corporation's wholly owned subsidiary, Morguard Management Company, Inc. ("Morguard"), manages rental properties throughout the United States and is a Louisiana corporation headquartered in Metairie, Louisiana. Morguard is one of Yardi's clients and uses its RENTmaximizer revenue management software.

33.     Operator Defendant Pillar Properties, LLC ("Pillar Properties") is a Washington limited liability company headquartered in Seattle, Washington. Pillar Properties manages 2,114 units.[32] Pillar Properties is one of Yardi's clients and uses its RENTmaximizer revenue management software.

34.     Operator Defendant Summit Management Services, Inc. ("Summit") is an Ohio corporation headquartered in Akron, Ohio. Summit manages over 4,000 units across the country.[33] Summit is one of Yardi's clients and uses its RENTmaximizer revenue management software.

35.     Operator Defendant Creekwood Property Corporation ("Tonti Properties") is a Texas corporation headquartered in Dallas, Texas. Creekwood Property Corporation's trade name is Tonti Properties. Tonti Properties manages 17 properties in Arizona, Colorado, Florida, Louisiana, and Texas. Tonti Properties is one of Yardi's clients and uses its RENTmaximizer revenue management software.

---

[31] https://www.lefevermattson.com/ (last visited Sept. 7, 2023).
[32] https://www.pillarproperties.com (last visited Sept. 7, 2023).
[33] https://summitmanagementliving.com/ (last visited Sept. 7, 2023).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

36.     Operator Defendant Legacy Partners, Inc. ("Legacy Partners") is a Delaware corporation headquartered in Foster City, California. Legacy Partners manages over 50 multifamily communities with more than 12,000 rental units.[34] Legacy Partners is one of Yardi's clients and uses its RENTmaximizer revenue management software.

37.     Operator Defendant Jones Lang Lasalle Incorporated ("JLL") is a Maryland corporation headquartered in Chicago, Illinois. JLL provides property management services for multifamily communities throughout America.[35] JLL is one of Yardi's clients and uses its RENTmaximizer revenue management software.

A.     **Co-Conspirators and Agents**

38.     Co-conspirator Alco Management, Inc. ("Alco") is a Tennessee corporation headquartered in Memphis, Tennessee. During the Class Period, Alco and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates managed more than 6,000 rental units throughout nine states.[36] Alco is one of Yardi's clients and uses its RENTmaximizer revenue management software.

39.     Co-conspirator McWhinney Property Management, LLC ("McWhinney Property") is a Colorado corporation headquartered in Denver, Colorado. During the Class Period, McWhinney Property and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates managed approximately 19 multifamily properties in its portfolio.[37] McWhinney Property is one of Yardi's clients and uses its RENTmaximizer revenue management software.

40.     Co-conspirator KRE Group, Inc. ("KRE Group") is a New Jersey corporation headquartered in Jersey City, New Jersey. During the Class Period, KRE Group and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates managed approximately 22 rental properties in New Jersey and Pennsylvania. KRE Group is one of Yardi's clients and uses its RENTmaximizer revenue management software.

---

[34] https://legacypartners.com/about/ (last visited Sept. 7, 2023).

[35] Jenna Sharp, *JLL Property Management expands services to multifamily*, JLL (Sept. 21, 2022), https://www.us.jll.com/en/newsroom/jll-property-management-expands-services-to-multifamily.

[36] https://www.alcomgt.com/ (last visited Sept. 7, 2023)

[37] https://mcwhinney.com/portfolio/?company=multifamily (last visited Sept. 7, 2023).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

41.     Co-conspirator Towne Properties is an Ohio domestic for-profit corporation headquartered in Cincinnati, Ohio. Towne Properties manages more than 12,000 units in Ohio, Kentucky, Indiana and North Carolina.[38] Towne Properties is one of Yardi's clients and uses its RENTmaximizer revenue management software.

42.     Co-conspirator Tribridge Residential, LLC ("Tribridge") is a Georgia limited liability company headquartered in Atlanta, Georgia. During the Class Period, Tribridge and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates managed over 30 properties over five states. Tribridge is one of Yardi's clients and uses its RENTmaximizer revenue management software.

43.     Defendants' officers, directors, agents, employees, or representatives engaged in the conduct alleged in this Complaint in the usual management, direction or control of Defendants' business or affairs.

44.     Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers and acquisitions.

45.     When Plaintiff refers to a corporate family or companies by a single name in this Complaint, they are alleging that one or more employees or agents of entities within that corporate family engaged in conspiratorial acts on behalf of every company in that family. The individual participants in the conspiratorial acts did not always know the corporate affiliation of their counterparts, nor did they distinguish between the entities within a corporate family. The individual participants entered into agreements on behalf of their respective corporate families. As a result, those agents represented the entire corporate family with respect to such conduct, and the corporate family was party to the agreements that those agents reached.

46.     Each of the Defendants acted as the agent of, co-conspirator with, or joint venture partner of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged in this Complaint. Each Defendant or co-conspirator that is a

---

[38] https://www.towneproperties.com/ (last visited Sept. 7, 2023).


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1   subsidiary of a foreign parent acted as the United States agent when agreeing to use Yardi

2   RENTmaximizer at multifamily rental properties managed in the United States.

### III.   JURISDICTION AND VENUE

4   47.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and

5   1337, as this action arises out of Section 1 of the Sherman Antitrust Act (15 U.S.C. § 1) and

6   Sections 4 and 16 of the Clayton Antitrust Act (15 U.S.C. §§ 15 and 26).

7   48.   This Court has personal jurisdiction over Defendants under Section 12 of the

8   Clayton Act (15 U.S.C. § 22), Federal Rule of Civil Procedure 4(h)(1)(A), and Washington's

9   long-arm statute, the Revised Code of Washington § 4.28.185.

10   49.   Defendants, directly or through their divisions, subsidiaries, predecessors, agents,

11   or affiliates, engage in interstate commerce in the sale of multifamily residential real estate

12   leases.

13   50.   Venue is proper in this District pursuant to Section 12 of the Clayton Act (15

14   U.S.C. § 22) and the federal venue statute (28 U.S.C. § 1391), because one or more Defendants

15   maintain business facilities, have agents, transact business, and are otherwise found within this

16   District and certain unlawful acts alleged herein were performed and had effects within this

17   District.

### IV.   FACTUAL BACKGROUND

**A.   Yardi's RENTmaximizer is widely used in the national multifamily rental market to set lessors' prices.**

51.   Defendant Yardi Systems, Inc. ("Yardi") develops, sells, and supports real estate

investment management and property management software. Its clients are managers of

residential rental apartments, to which it offers products for, among other things, managing

operations, executing leases, running analytics, and providing various resident and tenant

services.



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

52.     Yardi was founded in 1984. That same year, Yardi created "Basic Property Management" software for the Apple II computer.[39] Since that time, Yardi has developed a widely used property management software, Yardi "Voyager," that allows multifamily residential property managers to "[c]entralize operational, financial, leasing, and maintenance management . . . in a single database," as well as handle "marketing, screening, insurance, revenue management, business intelligence, and more[.]"[40] Yardi advertises its software as the "most advanced and widely adopted residential property management [software as a service[41]] platform with built-in accounting, real-time performance analysis and complete mobility."[42]

53.     In 2011, Yardi launched a new "revenue management system" integrated into the Yardi Voyager platform called "Yardi RENTmaximizer."[43] According to a press release announcing its release, RENTmaximizer was a tool intended to "automate[] the rental pricing process" and help "multifamily property managers maximize rental income" by "increasing a multifamily property owner's revenue by 3 to 6 percent"[44]—that is, RENTmaximizer effectively transfers the management of rental pricing from a landlord to Yardi itself. Specifically, the press release explained that RENTmaximizer:

> helps apartment owners and managers set prices directly from the trends of supply, demand and market conditions (i.e., market comparisons). Using pricing algorithms, this holistic trends-and-rules-based model helps multifamily property managers maximize

[39] Yardi, *Leadership Team*, https://www.yardi.com/about-us/leadership-team/ (last visited Sept. 7, 2023).

[40] *See* Yardi, *Voyager Residential*, https://www.yardi.com/products/yardi-voyager-residential/ (last visited Sept. 7, 2023).

[41] "Software as a service" ("SaaS") is a "cloud based software delivery model that allows end users to access software applications over the internet" via remote servers (e.g., via a web browser or mobile app) rather than requiring that the software be downloaded and installed. *See* SalesForce, *What is Saas?*, https://www.salesforce.com/in/saas/ (last visited Sept. 7, 2023). Yardi transitioned Voyager to a SaaS model in approximately 2012. *See* Yardi, Press Release, *Yardi Announces Voyager SaaS and Private Cloud Solutions* (Mar. 22, 2012), https://www.yardi.com/news/yardi-announces-voyager-saas-and-private-cloud-solutions/.

[42] *Voyager Residential*, *supra* note 40. Yardi also makes a separate program for multifamily property managers, Yardi "Elevate," that it advertises as an "all-in-one solution for asset management . . . . designed for CEOs, COOs, asset managers, and other operational managers." *See* Yardi, *Why Elevate?*, https://www.yardielevate.com/why-yardi-elevate/ (last visited Sept. 7, 2023).

[43] *Yardi Adds Two Revenue Management Experts to its Yardi RENTmaximizer Team*, *supra* note 3.

[44] *Id.*



rental income and occupancy by pricing each new and renewal lease for maximum revenue. Yardi RENTmaximizer also provides complete transparency into how the price was determined to further facilitate the leasing process.[45]

54.  According to Dharmendra Sawh, one of two experts Yardi had then recently hired to help launch RENTmaximizer, RENTmaximizer represented Yardi's attempt to make "automated rental pricing a key element of the [Yardi] platform."[46] Similarly, in a 2016 press release announcing one lessor's (the Rockbridge Group) adoption of RENTmaximizer, Terri Dowen, then Yardi's senior vice president of sales, explained that "[b]y automating rental pricing that factors in portfolio and market data, RENTmaximizer not only improves rental income while maintaining occupancy, it simplifies the process by eliminating rent rate guesswork and traditional sales devices such as concessions and specials."[47]

55.  On information and belief, RENTmaximizer is today widely used throughout the United States to set multifamily rental prices. In 2013, for instance, Dharmendra Sawh (then Yardi's "principal for revenue management") stated publicly that RENTmaximizer was used to price 8 million residential units around the world.[48] As a recognized "market leader in real estate technology,"[49] it is reasonable to believe that RENTmaximizer is used far more widely today. By contrast, in September 2020, Yardi's leading competitor RealPage—which also makes a product that automatically sets residential real estate lease prices—claimed that its own revenue management software was used to set the price for "over four million [multifamily] units."[50]

56.  According to Yardi's publicly-available promotional materials, a key input to RENTmaximizer's pricing algorithm, or "engine," is competitor pricing data. Specifically, RENTmaximizer asks users to input their data, such as rental rates and occupancy, into its

---

[45] *Id.*

[46] *Id.*

[47] *See Rockbridge Group*, *supra* note 4.

[48] Nelson, *supra* note 22.

[49] Redirect Consulting, *The Year in Yardi: 2017 Edition*, https://www.redirectconsulting.com/hubfs/eBooks/2017/yardi%202017/redirect_ebook_This-Year-in-Yardi_2018-06-27.pdf (last visited Sept. 7, 2023).

[50] Lyman, *supra* note 23.



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

system; meanwhile, the system automatically incorporates market-specific information on "comparative rent" to, in Yardi's words, give users "accurate and timely information regarding your market—including every comp and how you compete"[51]—or what it also calls "complete visibility," including "performance benchmarking" "compared to the market, submarket, and competition":

---

[51] *Yardi Elevate*, *supra* note 8.



# YARDI RENTMAXIMIZER

Increase rental income and improve occupancy with a dynamic revenue management system built into Yardi Voyager and Asset IQ. Designed to optimize revenue by pricing leases using the balance between your real-time inventory, traffic and market conditions from Yardi Matrix, RENTmaximizer provides complete visibility into your rent movement and your financial and operational performance. RENTmaximizer is intuitive and reacts to other operational activities, from site improvements to marketing. Get accurate and timely information regarding your market – including every comp and how you compete.



RENTmaximizer allows for fast adjustment to market conditions and changes in your inventory and traffic — while adjusting for cost constraints such as vacancy loss, turnover costs, inventory hold days and lease expiration management.

## COMPLETE VISIBILITY

RENTmaximizer provides holistic revenue intelligence for your operations team. With this transparent system you'll see everything from rental rates and occupancy data to property performance benchmarking (compared to the market, submarket and competition). Prospects and residents will gain various pricing options, while your managers will enjoy greater confidence that you are delivering the best possible rental prices.

## BETTER RESULTS

This intuitive, transparent pricing system empowers your sales force, provides clear and comprehensive reporting and promotes adoption throughout your organization. Leases are priced by the system daily, which allows for fast adaptation to market conditions and changes in your inventory and traffic, while adjusting for cost constraints such as vacancy loss, turnover costs, inventory hold days and lease expiration management.

## BETTER SERVICE

You manage your business, we manage your pricing. Only Yardi provides you with a dedicated revenue manager with valuable industry experience along with your revenue management software. Your dedicated revenue manager will get to know your business processes, assets and goals to provide superior support and will work with you to maximize your returns. And as a RENTmaximizer client, you'll receive this service and training continuously to promote ongoing success.



RENTmaximizer provides total visibility into your vacancy forecast.

Historical information and other metrics help you manage and forecast lease expirations.

## KEY FEATURES

- Industry benchmarking data provides complete visibility for more successful pricing

- Multiple pricing options fit customer needs and address fair housing concerns

- Predictable daily pricing allows for fast adjustment to market conditions and your inventory

- Analytical reporting provides complete intelligence on components that drive maximum revenue

- Superior service and ongoing training from experienced revenue managers

Clear and comprehensive metrics focus on all operational components that drive revenue including rental income, concessions, occupancy and rental rate, not just pricing. The Performance Benchmark Detail report allows you to view data across several months.

## MARKET INTELLIGENCE

Yardi Matrix provides nationwide intelligence on markets, submarkets, competition, developments, rents, occupancy and more. This data delivers accurate indicators of economic trends and performance and helps you price apartments profitably. When this market-specific data is incorporated with your RENTmaximizer data, you can accurately benchmark performance and factor it into rent projections and calculations which enhances your revenue management strategy and helps boost the performance of individual assets.



**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

1

2

3

4

5

6

7

8

9

10

11



12   57.   Leveraging data gathered from RENTmaximizer users as well as comparative

13  rent, RENTmaximizer's rental pricing algorithm then calculates a "rent recommendation" that

14  users can—and are encouraged to—automatically adopt. These prices are updated "daily." In an

15  alternative version of the same presentation above available on Yardi's website, Yardi

16  prominently advertises that RENTmaximizer's "pricing engine" operates on a positive "feedback

17  loop" that allow users to "beat the market by a minimum of 2%" and "gain[] on average more

18  than 6% net rental income"[52]:

19

20

## Better Results

21

Clients using RENTmaximizer have gained on average more than 6% net rental income growth while improving occupancy. And, RENTmaximizer properties consistently beat the market by a minimum of 2%. This intuitive, transparent pricing system empowers your sales force, provides clear and comprehensive reporting and promotes adoption throughout your organization. Leases are priced by the system daily, which allows for fast adjustment to market conditions and changes in your inventory and traffic, while adjusting for cost constraints such as vacancy loss, turnover costs, inventory hold days and lease expiration management.

22

23

24

25

26

27

28   [52] *Yardi Multifamily Suite*, *supra* note 6.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

58.     Similarly, in a 2018 press release, Yardi noted that its pricing algorithm generates rents that "maximize rental income" for a user (including Property Defendants),[53] and that its process is "transparent" to property managers so that "they can understand what factors are influencing pricing."[54] Other Yardi promotional materials also emphasize the extent to which Yardi gives its clients access and insight into competitor data. For example, a separate 2017 Yardi press release touts the fact that RENTmaximizer "lets clients know their markets in real time, including how they compare with competing communities":

> Yardi RENTmaximizer helps clients drive revenue with clear, comprehensive metrics focusing on operational components including rental income, concessions, occupancy and rental rates — not just pricing. The system tracks rent movement and lets clients know their markets in real time, including how they compare with competing communities.
>
> According to Sarah Oglesby-Battle, executive vice president of Beztak's management division, "In the last 12 months, we've grown to over 17,000 multifamily units under management. With RENTmaximizer, we have a dynamic system that pushes rents without sacrificing occupancy, which gives our staff confidence. With automated pricing, RENTmaximizer eliminates the fear factor of exposure that is a natural concern for property and regional managers. RENTmaximizer factors in historical and relevant data to assure us that we will get the traffic and leases we need to meet our revenue goals."[55]

59.     A 2018 post discussing lessor DEELS Properties' "significant rental income games" as a result of RENTmaximizer use also emphasizes that Yardi's prices take into account "competitor rates":

> Having a mathematical process that determines and adjusts prices based on real data and ever-changing market conditions was critical for DEELS. According to Hameiri, DEELS now adjusts prices daily based on a set of criteria and formulas that streamline the process. *The result is up-to-date prices that take into consideration supply*

---

[53] *DEELS Properties Gets Results with Yardi RENTmaximizer*, Business Wire (Feb. 26, 2018), https://www.businesswire.com/news/home/20180226005236/en/DEELS-Properties-Gets-Results-with-Yardi-RENTmaximizer

[54] *Id.*

[55] *Beztak Grows Rental Income with Yardi RENTmaximizer*, *supra* note 15.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

*and demand broken down by traffic, competitor rates, vacancies and notices.*[56]

60.     A publicly available Yardi user manual created by property manager Towne Properties indicates how RENTmaximizer is used in practice to automatically set prices.[57] The manual explains that, to set price for a unit, a property manager needs to enter a specific move-in time frame and lease term into the RENTmaximizer system, and the system will populate the "best price" for that selected unit. It's as simple as Yardi's official brochure put it: "You manage your business, we manage your pricing."



61.     Similarly, other slides in the presentation indicate that, unless overridden, "property pricing is *controlled* by" RENTmaximizer:

[56] Noam Hameiri, *Pricing That Wings – Interview*, LinkedIn (June 29, 2018), https://www.linkedin.com/pulse/pricing-wins-interview-noam-hameiri-mba/ (emphasis added).

[57] *See* Towne Properties Yardi Manual, available at https://docplayer.net/186429673-Towne-properties-yardi-manual.html (last visited Sept. 7, 2023).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

62.     Public statements by other property managers indicate that RENTmaximizer is commonly used to fully automate pricing, consistent with Yardi's public statements and marketing materials. For example:

- Jennifer van Arcken, director of information systems for lessor BSR Trust, stated in a 2012 press release that with RENTmaximizer, "all [property managers] have to do is enter some market study data every month, and RENTmaximizer does the rest."[58] According to the press release, revenue across BSR Trust's 7,000 units increased by 3.34% after RENTmaximizer was implemented, and RENTmaximizer "improved business performance" by, among other things, "eliminating concessions":

> Yardi RENTmaximizer also improves BSR Trust's business performance by eliminating concessions, reducing bad debt and increasing occupancy. "By giving us the market rate for every unit, RENTmaximizer eliminates guesswork by our property managers," van Arcken said. "It also reduces incentive for residents to sign a lease just to get a move-in special, then leave soon after. Furthermore, we're signing more leases for 15 months rather than the usual 12 months, meaning that high-quality residents are here for the long haul."

---

[58] *BSR Trust LLC Increases Rental Income with Yardi RENTmaximizer*, Business Wire (July 19, 2023), https://www.businesswire.com/news/home/20120719006370/en/BSR-Trust-LLC-Increases-Rental-Income-with-Yardi-RENTmaximizer.

- Amanda McHugh, training and development manager of lessor Rockbridge Group, stated in a 2016 press release that Rockbridge's adoption of RENTmaximizer allowed it to "take the guesswork out of pricing" and "eliminate[] all concessions and specials."[59] As a result, Rockbridge "achieved an average 48% increase in gross potential rent."[60]

- Ryan Kissell, controller of lessor Summit Management Services, stated in a 2012 press release that "RENTmaximizer's automated pricing matrix has allowed us to eliminate concessions."[61]

63.     Finally, Operator Defendants and Yardi appear to collectively monitor and enforce compliance with Yardi's automated pricing. Specifically, Yardi promotional materials state that Yardi provides its RENTmaximizer users with "dedicated revenue managers" who regularly meet and communicate with property managers regarding their pricing improvements advice to "maximize returns"[62]:

## Better Service

You manage your business, we manage your pricing. Only Yardi provides you with a dedicated revenue manager with valuable industry experience along with your revenue management software. Your dedicated revenue manager will get to know your business processes, assets and goals to provide superior support and will work with you to maximize your returns. And as a RENTmaximizer client, you'll receive this service and training continuously to promote ongoing success.

64.     Consistent with this, Terri Dowen, senior vice president of sales for Yardi, stated in a 2017 press release that "[p]roperty managers are guided to pricing that meets business goals, with the support of a dedicated revenue manager included with our solution."[63]

---

[59] *Id.*

[60] *See Rockbridge Group, supra* note 4.

[61] *Yardi RENTmaximizer Gives Summit Management Services Inc. New Rental Pricing Insight*, Business Wire (Jan. 31, 2012), https://www.businesswire.com/news/home/20120131006159/en/Yardi-RENTmaximizer-Gives-Summit-Management-Services-Inc.-New-Rental-Pricing-Insight.

[62] *Yardi Multifamily Suite, supra* note 6.

[63] *Beztak Grows Rental Income with Yardi RENTmaximizer, supra* note 15.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

65.     Lessors have indicated in public statements that Yardi's pricing advisors are intimately involved in their business operations. Noam Hameiri, senior vice president of operations at lessor DEELS Properties, stated in a 2018 article that "the extensive reporting and the weekly phone call with our dedicated RENTmaximizer expert are some of the best parts of the system."[64] Similarly, Adam Goldfarb, vice president for lessor Manco Abbott, stated in a 2015 press release that "[h]aving a dedicated revenue manager working with us from the Yardi RENTmaximizer team is a huge benefit. If our staff or property owners question any of our rates, we have our Yardi RENTmaximizer expert who can dig deeper to support our pricing — and that gives our organization and clients great confidence."[65] A 2016 press release describing lessor Singh Management's use of RENTmaximizer likewise states that "[a]s part of using RENTmaximizer, Singh is provided a dedicated Yardi RENTmaximizer analyst. Regular meetings between the analyst and Singh's onsite staff and regional managers provide expert insight and valuable advice where pricing improvements can be made."[66]

**B.     Yardi and Operator Defendants conspired to eliminate competition by outsourcing independent pricing and supply decisions to RENTmaximizer.**

66.     In a competitive market, property managers in the multifamily market price rents independently based on their own assessment of how best to compete with other properties—for example, by offering concessions, specials, or otherwise lowering rents.

67.     As Yardi has acknowledged, competitive pressures effectively affect strategies employed by owners to optimize income.[67] When demand fell during COVID-19, for example, "to maintain occupancy rates," apartment owners employed strategies including "rolling over leases with no bump in rent and increasing use of concessions, mainly by offering periods of free

---

[64] Hameiri, *supra* note 56.

[65] *Manco Abbott Inc. Achieves Rental Growth, Gains Expert Pricing Insight with Yardi RENTmaximizer*, *supra* note 12.

[66] *Singh Management Gains Revenue and Occupancy Growth with Yardi RENTmaximizer*, Business Wire (Feb. 23, 2016), https://www.businesswire.com/news/home/20160223005007/en/Singh-Management-Gains-Revenue-and-Occupancy-Growth-with-Yardi-RENTmaximizer.

[67] Yardi Matrix, Bulletin, *The Rise and Fall of Concessions: Is the Market Resetting?* (Jan. 2021), available at https://www.yardimatrix.com/Publications/Download/File/1190-MatrixMultifamilyConcessionsBulletin-January2021.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

rent."[68] This emphasis on maintaining occupancy rates, instead of rental prices, makes economic sense because every day a unit is left empty is, in a competitive market, a financial loss to property owners.

68.     In addition, without knowing their competitors' pricing strategies, property management companies usually need to make a judgment call and set their prices within a range that optimizes their competitive position in attracting renters. Offering lower rates and concessions are among the most effective ways to win over the race. In other words, without collusion, a property manager could not unilaterally raise rents above market rates because doing so would result in tenants lost to competitors (who offered market rates). With collusion, however, this competition is avoided,

69.     To lessen competition for renters, Yardi and Operator Defendants came up a new strategy: collectively adopt a coordinated pricing software implemented and enforced by Yardi through RENTmaximizer. The software facilitates pricing collusion by—in the words of Yardi's own senior vice president of sales, Terri Dowen—"eliminating rent rate guesswork and traditional sales devices such as concessions and specials,"[69] and consequently increasing prices for Operator Defendants regardless of market conditions. What Ms. Dowen describes is the elimination of a pricing strategy characteristic of a competitive multifamily rental market.

70.     Specifically, Operator Defendants agree to provide their competitively sensitive data to RENTmaximizer with the understanding that such data will be shared with competitors. Yardi also proudly advertises that its database provides nationwide "clear and comprehensive" metrics on "markets, submarkets, competition, developments, rents, occupancy and more."[70] Such market-specific metrics then incorporate the data an individual RENTmaximizer user enters in the system, which enables Operator Defendants to "accurately benchmark performance."[71] As explained in a 2017 Yardi press release, with real-time access to

---

[68] *Id.*

[69] *See Rockbridge Group*, *supra* note 4.

[70] *Yardi Elevate*, *supra* note 8.

[71] *Id.*



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

competitors' nonpublic data, Yardi RENTmaximizer "lets clients know their markets in real time, including how they compare with competing communities."[72]

71.     Remarkably, Yardi's own promotional materials emphasize, as noted above, that Yardi allows RENTmaximizer users to "*beat the market*." And more broadly, Yardi prominently advertises RENTmaximizer, and its automatic pricing algorithm, as a means to achieve supracompetitive rent growth. A 2017 promotional video states, for example, that "revenue grows on Yardi" and that (consistent with other marketing materials) clients using RENTmaximizer "have gained on average more than 6% net rental income growth"[73]:



Revenue Grows on Yardi: RENTmaximizer

72.     Lessors have publicly praised, consistent with Ms. Dowen's comments, the fact that Yardi liberates them from the traditional and legal forms of competition found in a competitive market (e.g., discounts and concessions) and allows them to raise prices. In other words, by agreeing to implement and abide by a single, common pricing algorithm that incorporates shared competitively sensitive information provided by Operator Defendants, RENTmaximizer provides Operator Defendants with the confidence, or "discipline," to inflate rents without fearing such pricing strategy would be undercut by competitors. For example:

---

[72] *Beztak Grows Rental Income with Yardi RENTmaximizer*, *supra* note 15.

[73] *Revenue Grows on Yardi: RENTmaximizer* (video), *supra* note 5.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

- In a 2017 press release, Sarah Oglesby-Battle, executive vice president of lessor Beztak's management division, stated that "RENTmaximizer eliminates the fear factor of exposure that is a natural concern for property and regional managers. RENTmaximizer factors in historical and relevant data to assure us that we will get the traffic and leases we need to meet our revenue goals."[74]

- In a 2017 press release, lessor KRE Group stated that it used RENTmaximizer to price three New Jersey properties, and that it "appreciate[d] that RENTmaximizer takes the guesswork out of pricing and automates assessments using inventory and market data."[75] Jason Segal, director of residential leasing for KRE Group, stated that before using Yardi RENTmaximizer, "[t]here was always uncertainty about various factors including holding units, leasing notice units and structural vacancy, which really impacted the budget. With RENTmaximizer we have a tool to simplify those decisions and validate rents."[76]

- In a 2016 press release, Amanda McHugh, training and development manager of lessor Rockbridge Group, stated that with RENTmaximizer, Rockbridge "ha[d] achieved an average 48% increase in gross potential rent" and that "[t]hanks to RENTmaximizer, we have eliminated all concessions and specials."[77]

- In a 2015 press release, Philip Nored, owner and managing partner of Operator Defendant HNN Associates, LLC, stated that "RENTmaximizer has taken the guesswork out of our rental pricing and lease terms, and boosts pricing performance through an intelligent system of measurements, fixed factors *and discipline*."[78]

---

[74] *Beztak Grows Rental Income with Yardi RENTmaximizer*, *supra* note 15.

[75] *KRE Group Grows Profits and Occupancy with Yardi RENTmaximizer*, Business Wire (Mar. 14, 2017), https://www.businesswire.com/news/home/20170314005389/en/KRE-Group-Grows-Profits-and-Occupancy-with-Yardi-RENTmaximizer.

[76] *Id.*

[77] *See Rockbridge Group*, *supra* note 4.

[78] *HNN Associates, LLC Optimizes Rental Pricing Performance with Yardi RENTmaximizer*, *supra* note 13 (emphasis added).

- In a 2015 press release, Brad Minsley, co-owner of lessor 10 Federal, stated that, with RENTmaximizer, 10 Federal had seen "3.5% rental income growth, and 30% or greater improvement in their lease terms," and that "[t]hanks to RENTMaximizer we are signing new leases, our renewal rates are sustainable, and *we don't have to offer concessions*."[79]

- In a 2015 press release, Scott Brown, president of lessor Grubb Properties, stated that RENTmaximizer "gives our ownership groups much more confidence. Our clients can view comprehensive reports with drilldown into their pricing movement, which ensures complete trust in the system."[80] He reported that "[b]y providing detailed and transparent [pricing] reporting, Yardi RENTmaximizer has also enabled us to save time and gain efficiency by eliminating weekly pricing calls with our owners."

- Brantley White, president of lessor Ardmore Residential, announced in a 2016 press release that Ardmore Residential had raised rents 5-6% since its implementation of Yardi RENTmaximizer in 2016, and appreciated that "Yardi RENTmaximizer has allowed us to push rents more aggressively and takes more human error out of the process."[81] He candidly acknowledged that "[w]e simply wouldn't have raised rents that much or that quickly on our own."[82]

- As noted above, Ryan Kissell, controller of Operator Defendant Summit Management Services, stated in a 2012 press release that that "RENTmaximizer's automated pricing matrix has allowed us to eliminate concessions."[83] The same press release states that Summit Management Services saw a revenue increase of 4.63% in the third quarter of 2011 after the company adopted RENTmaximizer.[84]

---

[79] *Id.* (emphasis added).

[80] *Grubb Properties Maximizes Pricing, Achieves Longer Lease Terms with Yardi RENTmaximizer*, Business Wire (Dec. 1, 2015), https://www.businesswire.com/news/home/20151201005433/en/Grubb-Properties-Maximizes-Pricing-Achieves-Longer-Lease-Terms-with-Yardi-RENTmaximizer.

[81] *Ardmore Residential Raises Rents 5-6% with Yardi RENTmaximizer*, *supra* note 16.

[82] *Id.*

[83] *Yardi RENTmaximizer Gives Summit Management Services Inc. New Rental Pricing Insight*, *supra* note 61.

[84] *Id.*

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

73.     Lessors have also publicly praised (a) the insight into competitors' pricing that Yardi provides and (b) the supracompetitive returns it generates. Indeed, much of this praise is found in numerous Yardi press releases touting its achievements in raising rents for their clients in the multifamily market. For example:

- In a 2016 press release, Jeffrey Denson, the owner and COO of Operator Defendant Dalton Management, stated that Dalton Management was able to increase rent per unit without losing business to its competitors as "RENTmaximizer has . . . made Dalton Management better aware of how its properties compare to the rest of the market," explaining further that Dalton was "able to raise rents at a property we thought was keeping up—now we're getting $100 more per unit and maintaining occupancy."[85]

- A "success story" available on Yardi's website states that lessor Avesta had seen "a significant gain [in revenue] after only six months" of implementing RENTmaximizer."[86] Specifically, Avesta announced that for every dollar it invested in the RENTmaximizer system, it achieved a return of nearly $30. The press release quotes Will Newton, Director of Support Systems at Avesta, as stating: "[T]hanks to the revenue and leasing metrics, along with the support of our dedicated Yardi RENTmaximizer pricing specialist, we don't leave money on the table."

- A 2016 press release states that lessor CKR Property Management saw substantial rental revenue growth as a result of adopting RENTmaximizer. The press release quotes Caroline Kane, CEO of CKR: "Overall, our rental revenue is up 8% year over year . . . one property that previously struggled is up 28%. Yardi RENTmaximizer had a lot to do with that success."[87]

- According to a 2015 press release, Operator Defendant Bridge Property Management reported that the company used RENTmaximizer to price "approximately 27,000

---

[85] *Dalton Management Reports Increased Revenue Using Yardi RENTmaximizer*, *supra* note 20.

[86] *Avesta*, *supra* note 21.

[87] *CKR Property Management Grows Rental Revenue with Yard RENTmaximizer*, Business Wire (Oct. 27, 2016).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

multifamily units," and had reported 9.4% year-over-year rental income growth "for properties priced with Yardi RENTmaximizer."[88]

- According to a 2016 press release, within five months of using RENTmaximizer, lessor Singh Management found that properties that implemented RENTmaximizer performed at "7% higher" than the properties in the portfolio not yet using the system, and "by the fifth month, they reached rental growth of 18.5%."[89]

- Another "success story" available on Yardi's website states that Operator Defendant Pillar Properties' use of RENTmaximizer "drive[s] higher revenue, manage[s] costs and balance[s] risk."[90]

74. Confidential witness interviews provide further evidence that Operator Defendants outsource their independent price decisions to RENTmaximizer and achieve supracompetitive returns as a result. For example:

- CW 1, who worked as a former leasing consultant for Bridge Property Management, stated that she regularly used Yardi to set prices for the apartments she managed. Specifically, she would input square footage of the apartment, the location, and Yardi's system would offer listing prices that she "just went for" without "question[ing]," explaining that she "[j]ust went with whatever it told me." She explained further that Yardi would show comparative pricing specific competitor apartment locations and that, in her opinion, this "was not fair for renters." She stated: "It was ridiculous. We were supposed to be helping these people who couldn't afford a home. Instead, we were raising rents."

- CW 2, another former employee at Bridge Property Management, recalled that he regularly received printouts from Yardi on apartment pricing, which he used in listings he

---

[88] *Bridge Property Management Gains 9.4% Year-Over-Year Rental Growth with Yardi RENTmaximizer*, Business Wire (Sept. 29, 2015), https://www.businesswire.com/news/home/20150929005288/en/Bridge-Property-Management-Gains-9.4-Year-Over-Year-Rental-Growth-with-Yardi-RENTmaximizer.

[89] *Singh Management Gains Revenue and Occupancy Growth with Yardi RENTmaximizer*, *supra* note 66.

[90] Yardi, *Success Stories – Pillar Properties on Elevate*, https://www.yardi.com/about-us/success-stories/pillar-properties-on-elevate/ (last visited Sept. 7, 2023).



created for the apartment complex he managed. CW 2 stated that the prices generated by Yardi were never questioned and could change daily. He also stated that this pricing practice gave "an unfair advantage" to lessors because they "all know what they should be renting for" by using the same pricing platform.

- Confidential Witness 3 ("CW 3")[91], a former leasing agent at Bridge Property Management, explained that she frequently consulted Yardi's pricing recommendations to quote customers who applied for a rental. She stated that, in her time at Bridge, she never questioned the prices from Yardi—which came as daily printouts with prices that changed "daily"— and that "everybody was using it."

75.     Finally, on information and belief, RENTmaximizer users are aware that their competitors also use Yardi's price-setting software. CW 5, who worked as an Operations Analyst and Senior Operations Analyst at Yardi from 2013 to 2021, stated that she believed that many of Yardi's clients knew that their competitors or other companies were also using Yardi, and that some companies gave Yardi permission to disclose their relationship with it for marketing materials. (Consistent with this, as discussed throughout this Complaint, Yardi has issued a significant number of press releases touting lessors' use of RENTmaximizer, including their use of it to raise rents and eliminate concessions.) As discussed below, Operator Defendants and Yardi also have numerous opportunities to collude at the Yardi Advanced Solutions Conferences (YASC) and social events. YASC is a large-scale, well-attended social event that is open to Yardi clients only.

76.     In summary, the widespread adoption of RENTmaximizer has distorted the multifamily rental market by artificially inflating prices and sharply lessening competition.

## C.   Economic analysis confirms that usage of Yardi produces anticompetitive effects in the form of higher prices for RENTmaximizer users.

77.     Economic analysis confirms that collective usage of Yardi RENTmaximizer leads to higher prices. Public rent data was collected over a period of several weeks in August 2023

---

[91] CW 3 worked for Bridge Property Management as a leasing agent in Marietta, Georgia, from 2018 until 2023.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

from Seattle, Charlotte, and Phoenix. A regression analysis was then performed in zip codes where usage of Yardi RENTmaximizer was higher than 15% of available units. The regression analysis controlled for various property and geographic features, such as (1) size of the unit, (2) number of bathrooms, (3) census average rent in the zip code, and (4) median income in the zip code. Across over 23,000 units, the regression found an average overcharge of 6% on units priced using RENTmaximizer (blue) as compared to units not priced using RENTmaximizer (orange), including for studio, 1-bedroom, 2-bedroom, and 3-bedroom apartments. This is closely consistent with Yardi's repeated public statements that usage of RENTmaximizer led to a 6% average increase in net rental income.



D.   **Studies show that industry-wide usage of a shared pricing algorithm leads to anticompetitive effects.**

78.   Extensive economic research documents that the use of pricing algorithms leads to anticompetitive effects, including elevated prices. Modern algorithms can use artificial intelligence to reach the objective of maximizing profits without the need for human intervention.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

79.     A growing body of academic research documents that algorithms make it easier for competitors to coordinate on pricing and charge supracompetitive prices. For example, an experimental study published in the American Economic Review found that competing firms, using AI powered algorithmic pricing, would settle, over time, into an equilibrium model where each firm charged supracompetitive prices.[92] The result was robust to asymmetries in cost or demand, or changes in the numbers of players.

80.     Similarly, a 2021 empirical study found (in line with the predictions of theoretical models) that when gas stations in Germany used algorithms to set prices, their margins increased by approximately 9%. Critically, the authors found that algorithm use only raised prices above competitive levels in places where competitors adopted algorithms jointly, and thus that "algorithmic pricing software adoption raises margins *only through its effects on competition*"; by contrast, in areas where (1) a station had no competitors or (2) there were two stations but only one adopted algorithmic pricing, the authors found "no change in mean margins or pricing."[93] In other words, algorithm use among these stations raised prices not by driving efficiency or achieving some procompetitive result, but instead by undermining normal market competition.

81.     Uber also sets prices algorithmically, which users recognize in now-regular occurrences of "surge pricing" where prices spike (often to eyewatering levels) at times of high demand. This algorithmic pricing leads to higher prices for customers and higher revenue for Uber, even though Uber's costs do not change significantly during the surge pricing periods. As one academic has noted, even though drivers are theoretically independent contractors who could compete against each other, each driver has "agreed to have their prices coordinated and set by the algorithm." This could constitute, as the author puts it, a "twenty-first-century[] techno-

---

[92] Emilio Calvano et al., *Artificial Intelligence, Algorithmic Pricing and Collusion*, 110 AM. ECON. REV. 3267-97 (Oct. 2020), https://www.aeaweb.org/articles?id=10.1257/aer.20190623.

[93] *See* Stephanie Assad et al., *Autonomous algorithmic collusion: Economic research and policy implications* at 15, Toulouse School of Economics Working Paper (Mar. 2021), available at https://www.tse-fr.eu/sites/default/files/TSE/documents/doc/wp/2021/wp_tse_1210.pdf (emphasis added).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

1    cartel."[94] Areeda and Hovenkamp also state that a "practice of interseller price verification . . .

2    would appear to be a naked or at least a nearly naked restraint" in violation of antitrust law.[95]

3          82.    Government regulators around the world have also expressed concerns about

4    algorithmic pricing's effect on competition.

5          83.    Earlier this year, for example, the Principal Deputy Assistant Attorney General of

6    the Antitrust Division for the Department of Justice stated: "Where competitors adopt the same

7    pricing algorithms, our concern is only heightened. Several studies have shown that these

8    algorithms can lead to tacit or express collusion in the marketplace, potentially resulting in

9    higher prices, or at a minimum, a softening of competition."[96]

10         84.    Similarly, while serving as acting chairman of the Federal Trade Commission,

11   Maureen Ohlhausen explained in 2017 how multiple firms outsourcing pricing decisions to a

12   single third-party actor—just as lessors have done with Yardi—raises significant antitrust

13   concerns:

14                What if algorithms are not used in such a clearly illegal way, but
                  instead effectively become a clearing house for confidential pricing
15                information? Imagine a group of competitors sub-contracting their
                  pricing decisions to a common, outside agent that provides
16                algorithmic pricing services. Each firm communicates its pricing
                  strategy to the vendor, and the vendor then programs its algorithm
17                to reflect the firm's pricing strategy. But because the same outside
                  vendor now has confidential price strategy information from
18                multiple competitors, it can program its algorithm to maximize
                  industry-wide pricing. In effect, the firms themselves don't directly
19                share their pricing strategies, but that information still ends up in
                  common hands, and that shared information is then used to
20                maximize market-wide prices. Again, this is fairly familiar territory
                  for antitrust lawyers, and we even have an old fashioned term for it,
21                the hub-and-spoke conspiracy. Just as the antitrust laws do not allow
                  competitors to exchange competitively sensitive information
22                directly in an effort to stabilize or control industry pricing, they also
                  prohibit using an intermediary to facilitate the exchange of
23                confidential business information. Let's just change the terms of the
24
25

26   _____
     [94] Salil K. Mehra, *Antitrust and the Robo-Seller: Competition in the Time of Algorithms*, 100
     MINN. L. REV. 1323-75 (2015).

27   [95] Herbert Hovenkamp & Phillip E. Areeda, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST
     PRINCIPLES AND THEIR APPLICATION ¶ 2113 (4th and 5th Ed. 2018-2022).

28   [96] U.S. Dep't of Justice, *supra* note 24.

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

hypothetical slightly to understand why. Everywhere the word "algorithm" appears, please just insert the words "a guy named Bob**. Is it ok for a guy named Bob to collect confidential price strategy information from all the participants in a market, and then tell everybody how they should price? If it isn't ok for a guy named Bob to do it, then it probably isn't ok for an algorithm to do it either**.[97]

85.    Yardi here plays exactly the role of a guy named Bob. It collects price information from each of the Operator Defendants, and then tells them, through use of its algorithm, how to price multifamily housing.

**E.    "Plus factors" indicate an existence of a price-fixing conspiracy.**

86.    The multifamily market has numerous "plus factors" that render the industry susceptible to collusion and tend to exclude the possibility of independent action. These "plus factors" include (1) exchanges of competitively sensitive information, (2) actions against economic self-interest, (3) high barriers to entry, (4) fungible products subject to inelastic consumer demand, and (5) ample opportunities to collude.

87.    *Exchanges of competitively sensitive information*. Operator Defendants all agreed to submit their confidential business information to Yardi RENTmaximizer with the knowledge that the system would use that data to calculate rents for their competitors. Such an agreement of mutual sharing and receiving competitors' information makes sense for Operator Defendants only if they are assured that their competitors will not use the information provided to gain competitive advantage, i.e., lure renters away through reduced rents.

88.    Moreover, confidential witness interviews revealed that Operator Defendants regularly engaged in "market surveys" to exchange each other's competitively sensitive pricing information. For example, CW 1, a former leasing consultant for Bridge Property Management, stated that she regularly conducted market surveys by "shopping" other apartment complexes, where she would gather information on pricing. Similarity, CW 2, another former employee at Bridge Property Management, recalled that he would call competitors complexes and asked their leasing agents for rent prices.

---

[97] Ohlhausen, *supra* note 25.


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

89.     *Actions against economic self-interest*. Defendants' pricing strategy—dramatically increasing rents notwithstanding market conditions—is irrational and against self-interest in a competitive market. In the absence of changes in demand, no rational property managers would act alone to raise rents as they did here during the class period, because any empty units priced exceeding the competitive market price would soon be filled by competitors who offer renters at lower prices.

90.     *High barriers to entry*. Where there are significant barriers to entry, new entrants are less likely to enter the market. Thus, barriers to entry help to facilitate the formation and maintenance of a collusion. This holds true here. Property owners and operators face significant entry barriers due to the substantial upfront costs they need to invest in procuring properties, setting up property management systems, complying with regulations and incurring continued outlays for property upkeep. Even relatively modest rental properties require substantial investments. As a result, the multifamily leasing market is less attractive to new entrants, and businesses who just entered the market are less likely to be able to discipline cartel pricing.

91.     *Fungible products subject to inelastic consumer demand*. With an accounting of a few key overarching property characteristics, such as bedroom and bathroom count, amenities, location, and building age, residential properties in the multifamily housing market are susceptible to standardization and are fungible. This is especially true because the information exchanged by Operator Defendants through RENTmaximizer is unit-type specific and relates to properties with comparable configurations; thus, the fact that multifamily properties in general have various characteristics does not bear on the ability of Operator Defendants to coordinate rents through RENTmaximizer. Through the RENTmaximizer pricing algorithm and "dedicated revenue managers" who regularly meet and communicate with property managers, RENTmaximizer lets competitors know and respond in real time to one another's price.

92.     Additionally, renters' demand for renting multifamily homes is inherently inelastic. In most instances, despite price increases, renters still choose to live within certain geographic locations, such as somewhere close to their offices, schools, communities. Conversely, when the rents go down, renters will not lease more homes because of a price drop.

1    Thus, because Operator Defendants dominated the relevant market during the Class Period,

2    renters generally have limited realistic and low-cost alternatives to renting from an Operator

3    Defendant within the geographic limitations.

4           93.    *Ample opportunities to collude*. Operator Defendants and Yardi have numerous

5    opportunities to collude at the Yardi Advanced Solutions Conferences (YASC) and social events.

6    YASC is a large-scale, well-attended social event that is open to Yardi clients only.[98]

7    Confidential Witness 4 (CW 4),[99] a former senior event specialist at Yardi, stated that YASC "is

8    attended by about 2,000 people each time, who pay to participate."[100] According to CW 4, the

9    convention includes training sessions and panel discussions, but is mostly a "networking event."

10   YASC provides a designated "networking lounge" for attendees to meet with others who work in

11   the same specialized areas in real estate.

12          94.    Lastly, Yardi revenue managers have regular contact with RENTmaximizer

13   clients to directly help property managers with pricing and keep up to date on their competitors.

14   Further, property managers also call competitor properties to directly obtain pricing information

15   from them on a regular basis.

16                         **V.    RELEVANT MARKET**

17          95.    Defendants' actions described herein constitute a single unlawful conspiracy to

18   fix, raise, stabilize, or maintain the nationwide multifamily rental prices at artificially high levels,

19   and is *per se* illegal under the Sherman Act.  This agreement was evidenced by Operator

20   Defendants' reciprocal exchange of competitively sensitive information through Yardi and

21   outsourced their independent price decisions to a common decision maker.

22          96.    Because of the horizontal nature of the alleged conspiracy, and because the

23   conduct alleged here increased prices and reduced output, if the Court declines to analyze this

24   case under the per se rule, the Court could conduct a "quick look" review. Under either mode of

25   _____

26   [98] https://www.yardi.com/yasc/north-america/ (last visited Sept. 7, 2023).

27   [99] From 2018 to 2022, CW 4 held various positions at Yardi, including as an account manager and event specialist in marketing.

28   [100] The ticket price for attending YASC North America is $1,195 USD.
     https://www.yardi.com/yasc/north-america/ (last visited Sept. 7, 2023).



1   analysis, Plaintiff is not required to prove that Defendants had market power in any defined

2   antitrust market.

3       97.   To the extent the Court decides to engage in the rule of reason analysis, the

4   relevant product market is the multifamily housing rental market, and the relevant geographic

5   market is the United States.

6       98.   Consumers do not consider housing available for purchase as substitutes for

7   multifamily rental apartment units because, among other reasons, purchase of real estate requires

8   a substantial financial investment for a down payment that often requires financing. In addition,

9   the short-term nature of leases is not equivalent to long-term permanent purchasing. Nor is

10  single-family real estate considered an economic substitute for multifamily residential real estate,

11  because of amenities, security, and availability.

12      99.   The multifamily rental market satisfies the test for market definition used by

13  federal antitrust enforcement agencies, widely known as the "SSNIP test." The test asks whether

14  a hypothetical monopolist in a proffered market could profitably impose a small but significant

15  (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number

16  of customers to switch to other products or services such that the SSNIP would be unprofitable to

17  the monopolist. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not

18  profitable, the market is too narrowly defined, and does not encompass sufficient economic

19  substitutes.

20      100.  Here, the SSNIP test is satisfied, and the market is properly defined. As described

21  above, pursuant to the Operator Defendants' agreement not to compete on price, Operator

22  Defendants are able to gain (according to Yardi) "on average more than 6% net rental income

23  growth,"[101] yet those increases have not driven enough renters out of the market such that the

24  SSNIP has become unprofitable to Operator Defendants.

25

26

27

---

28     [101] *Yardi Multifamily Suite*, *supra* note 6.



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

# VI.    CLASS ACTION ALLEGATIONS

101.    Plaintiff brings this action on behalf of themself and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) as representatives of the Class, which is defined as follows:

> All persons and entities in the United States that leased multifamily housing in the United States from a Defendant or Conspirator that used Yardi's RENTmaximizer or Revenue IQ software programs, or from a division, subsidiary, predecessor, agent, or affiliate of such Defendant or Conspirator, at any time during the period of September 8, 2019, until the Defendants and Conspirators' unlawful conduct and its anticompetitive effects cease to persist.

102.    The Class is so numerous that joinder of all members in this action is impracticable. There are thousands of members in the proposed Class.

103.    Plaintiff's claims are typical of those of the Class.

104.    Plaintiff and members of the Class were all inured by the same unlawful conduct, which resulted in all of them paying more for leases than they otherwise would have in a competitive market.

105.    Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are not antagonistic to the Class.

106.    Questions of law and fact common to the members of the Class will predominate over questions, if any, that may be individual to individual class members, since the Defendants have acted and refused to act on grounds generally applicable to the Class.

107.    Questions of law and fact common to the Class include:

    a.    Whether Defendants have entered into a formal or informal contract, combination, conspiracy, or common understanding to artificially inflate the price and/or artificially suppress the supply of multifamily housing real estate leases;

    b.    If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct violates Section 1 of the Sherman Act under the per se, quick look, or rule of reason modes of analysis;

    c.    If Defendants entered into such a formal or informal contract, combination, conspiracy, or common understanding, whether that conduct has in fact artificially inflated price and/or artificially suppressed supply of multifamily housing real estate leases from competitive levels;



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

d.     The proper measure of damages; and

e.     The contours of appropriate injunctive relief to remediate the anticompetitive effects of the challenged conduct in the future.

108.     Plaintiff and members of the Class are represented by counsel who are experienced and competent in the prosecution of complex antitrust and unfair competition class actions.

109.     Class action treatment is the superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method of obtaining redress for claims that might not be practicable for them to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

## VII.   CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### VIOLATION OF SECTION 1 OF THE SHERMAN ACT
### FOR AGREEMENT IN RESTRAINT OF TRADE
### 15 U.S.C. § 1

**(On Behalf of Nationwide Class for Injunctive and Equitable Relief and Compensatory Damages)**

110.     Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

111.     Beginning at a time currently unknown to Plaintiff and members of the Class, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

112.     The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement among Defendants to use Yardi's pricing algorithms to artificially inflate price in the nationwide market for multifamily rental housing.



113. The contract, combination, or conspiracy alleged herein has caused Plaintiff and Class members to suffer overcharge damages.

114. There are no procompetitive justifications for the Defendants' cartel, and any proffered justifications, to the extent legitimate, could have been achieved through less restrictive means.

115. Defendants' conspiracy is a *per se* violation of Section 1 of the Sherman Act. In the alternative, Defendants' conspiracy violates section 1 of the Sherman Act under either a quick look or rule of reason analysis.

**SECOND CLAIM FOR RELIEF**
**VIOLATION OF SECTION 1 OF THE SHERMAN ACT**
**FOR CONSPIRACY TO EXCHANGE COMPETITIVE INFORMATION**
**15 U.S.C. § 1**

**(On Behalf of Nationwide Class for Injunctive and**
**Equitable Relief and Compensatory Damages)**

116. Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

117. Beginning at a time currently unknown to Plaintiff, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators entered into a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information about their operations. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

118. Defendants' acts in furtherance of their combination or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

119. Defendants' anticompetitive acts involved United States domestic commerce and import commerce, and had a direct, substantial, and foreseeable effect on interstate commerce by raising and fixing prices for multifamily real estate leases.

120. The relevant product market is the market for the lease of multifamily real estate and the relevant geographic market is nationwide.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

121.   Defendants possess market power in the relevant antitrust market.

122.   Defendants could impose an increase in the price of leases collectively without causing many consumers to switch their purchases to another lease. Leases constitute a unique product market.

123.   The information regularly exchanged by Defendants pursuant to the agreement has consisted of detailed, competitively sensitive, and non-public information about current supply, production, and pricing plans regarding leasing.

124.   Operator Defendants' regular information exchanges through Yardi reflected concerted action between horizontal competitors in the market for leases.

125.   Each Operator Defendant furnished competitively sensitive information to other leasing companies with the understanding that it would be reciprocated in the form of pricing recommendations that utilized that data. These reciprocal exchanges of information between Operator Defendants constituted a horizontal exchange of information.

126.   The collective agreement to regularly exchange detailed and non-public information about current production, supply, and pricing of leases suppressed competition between the Defendants.

127.   When Defendants that are competing for the same consumers exchange competitive information, it reduces the incentives to compete on price. Accordingly, Defendants used the data obtained through Yardi RENTmaximizer to reduce the uncertainty that they each should have faced from not knowing what their competitors were offering and providing in the leasing market. This strategic information was a material factor in Defendants' decisions to inflate the prices that Plaintiff and Class members paid for leases during the Class Period.

128.   Defendants' unlawful agreements to exchange, and the actual exchanges of non-public, timely, and detailed data were not reasonably necessary to further any procompetitive purpose. The information exchanged between Defendants was current, easily traceable to its source, confidential, and related to a core characteristic of competition between them.



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

129.   The information-exchange agreement has had the effect of (1) reducing and suppressing competition among Defendants in the nationwide multifamily market, and (2) inflating the prices of leases during the Class Period.

130.   As a result of Defendants' unlawful conduct, Plaintiff and the members of the Class have been harmed by being forced to pay inflated prices for leases.

131.   As a direct and proximate result of Defendants' anticompetitive conduct, Plaintiff and members of the Class have been injured in their business or property and will continue to be injured in their business and property by paying more for leases than they would have paid and will pay in the absence of the conspiracy.

132.   This horizonal agreement to exchange information constitutes a violation of Section 1 of the Sherman Act under a rule of reason analysis.

<b>REQUEST FOR RELIEF</b>

WHEREFORE, Plaintiff, on behalf of themself and the Class of all others so similarly situated, respectfully request judgment against Defendants as follows:

A.   The Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint Plaintiff as Class Representative and their counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class, once certified;

B.   The unlawful conduct, conspiracy, or combination alleged herein be adjudged and decreed in violation of Section 1 of the Sherman Act;

C.   Plaintiff and the Class recover damages, to the maximum extent allowed under the applicable laws, and that joint and several judgments in favor of Plaintiff and the members of the Class be entered against Defendants in an amount to be trebled to the extent such laws permit;

D.   Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged

herein, or from entering into any other conspiracy or combination having a similar purpose or

effect, and from adopting or following any practice, plan, program, or device having a similar

purpose or effect;

E.     Plaintiff and the members of the Class be awarded pre- and post- judgment

interest as provided by law, and that such interest be awarded at the highest legal rate from and

after the date of service of this Complaint;

F.     Plaintiff and the members of the Class recover their costs of suit, including

reasonable attorneys' fees, as provided by law; and

G.     Plaintiff and the members of the Class have such other and further relief as the

case may require and the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

Dated: September 8, 2023.                HAGENS BERMAN SOBOL SHAPIRO LLP

                                         *s/ Steve W. Berman*
                                         Steve W. Berman (WSBA No. 12536)

                                         *s/ Theodore Wojcik*
                                         Theodore Wojcik (WSBA No. 55553)

                                         *s/ Stephanie A. Verdoia*
                                         Stephanie A. Verdoia (WSBA No. 58636)

                                         *s/ Xiaoyi Fan*
                                         Xiaoyi Fan (WSBA No. 56703)

                                         1301 Second Avenue, Suite 2000
                                         Seattle, WA 98101
                                         Telephone: (206) 623-7292
                                         Facsimile:  (206) 623-0594
                                         Email:  steve@hbsslaw.com
                                         Email: tedw@hbsslaw.com
                                         Email: stephaniev@hbsslaw.com
                                         Email: kellyf@hbsslaw.com


                                         Rio S. Pierce (*pro hac vice forthcoming*)
                                         HAGENS BERMAN SOBOL SHAPIRO LLP
                                         715 Hearst Avenue, Suite 300
                                         Berkeley, CA 94710
                                         Telephone: (510) 725-3000
                                         Facsimile:  (510) 725-3001
                                         Email: rios@hbsslaw.com

                                         *Attorneys for Plaintiff*

