The Honorable Robert S. Lasnik

1

2

3

4

5

6

7

8

9

**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

10 | MCKENNA DUFFY and MICHAEL BRETT, individually and on behalf of all others similarly situated,

11

Plaintiffs,

12

13

v.

14 | YARDI SYSTEMS, INC., BRIDGE PROPERTY MANAGEMENT, L.C., CALIBRATE PROPERTY MANAGEMENT, LLC, DALTON MANAGEMENT, INC., HNN ASSOCIATES, LLC, LEFEVER MATTSON PROPERTY MANAGEMENT, MANCO ABBOTT, INC., MORGUARD MANAGEMENT COMPANY, R.D. MERRILL REAL ESTATE HOLDINGS, LLC, SUMMIT MANAGEMENT SERVICES, INC., and CREEKWOOD PROPERTY CORPORATION,

Defendants.

15

16

17

18

19

20

21

Case No. 2:23-cv-01391-RSL

**DEFENDANTS' OMNIBUS MOTION TO DISMISS THE FIRST AMENDED CLASS ACTION COMPLAINT PURSUANT TO FRCP 12(b)(6)**

**NOTE ON MOTION CALENDAR: MARCH 15, 2024**

**ORAL ARGUMENT REQUESTED**

22

23

24

25

26

27

28

DEFS' OMNIBUS MOTION TO DISMISS
(Case No. 2:23–cv–01391-RSL)

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 4

I.    Yardi's revenue management product. ......................................................... 4

II.   The Lessor Defendants. ................................................................................ 5

III.  The alleged conspiracy. ............................................................................... 6

IV.   Plaintiffs' Sherman Act claims. .................................................................. 7

ARGUMENT .......................................................................................................... 8

I.    The FAC improperly relies on group pleading. ......................................... 10

II.   The FAC fails to state a *per se* Section 1 claim under the Sherman Act. ......................... 12

      A.    Plaintiffs fail to allege an agreement. ............................................. 13

            1.    No agreement to implement or abide by rent recommendations. ......................... 14

            2.    No allegations of who, did what, to whom, where, and when? ........................ 17

      B.    Plaintiffs fail to allege direct or circumstantial evidence of an unlawful conspiracy. .......... 20

            1.    No parallel conduct. .............................................. 20

            2.    The so-called "plus factors" do not plausibly allege a conspiracy. ........................ 24

III.  The FAC fails to state a claim under the rule of reason .................................. 31

      A.    Plaintiffs fail to plausibly allege a relevant market. ......................... 32

            1.    No plausible geographic market. .............................. 33

            2.    No plausible product market. ................................... 35

      B.    Plaintiffs fail to plausibly allege that Defendants have market power ........................ 37

            1.    Plaintiffs may not "aggregate" a "set of vertical agreements" to establish market power. ........ 39

            2.    Even if aggregation was permitted, Plaintiffs fail to allege direct evidence of market power. ......... 40

            3.    Plaintiffs fail to allege circumstantial evidence of market power. ....................... 41

IV.   Plaintiffs lack standing ............................................................................... 43

CONCLUSION ....................................................................................................... 45

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3
4
*Apple, Inc. v. Psystar Corp.*,
    586 F. Supp. 2d 1190 (N.D. Cal. 2008) ..................................................................36

5
*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................................9, 13

6
7
*Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983) .................................................................................................44

8
9
*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990)..................................................................................................44

10
*Bank of America, N.A. v. Knight*,
    725 F.3d 815 (7th Cir. 2013) ...................................................................................10

11
12
*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
    166 F. Supp. 3d 988 (N.D. Cal. 2015) .....................................................................18

13
14
*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................... *passim*

15
*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
    691 F. App'x 389 (9th Cir. 2017) ..........................................................................19, 24

16
17
*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)..................................................................................................28

18
19
*Bubar v. Ampco Foods, Inc.*,
    752 F.2d 445 (9th Cir. 1985) ...................................................................................44

20
*California Dental Ass'n v. FTC*,
    526 U.S. 756 (1999)..................................................................................................31

21
22
*California ex rel. Harris v. Safeway, Inc.*,
    651 F.3d 1118 (9th Cir. 2011) .................................................................................31

23
24
*Chapman v. New York State Div. for Youth*,
    546 F.3d 230 (2d Cir. 2008)......................................................................................35

25
26
*Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp.*,
    2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016),
    *aff'd*, 708 F. App'x 29 (2d Cir. 2017)......................................................................41

27
28
*Concord Assocs., L.P. v. Entm't Props. Tr.*,
    817 F.3d 46 (2d Cir. 2016)........................................................................................33

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

*Coronavirus Rep. v. Apple, Inc.*,
   2023 WL 7268325 (9th Cir. Nov. 3, 2023)..................................................35

*Coto Settlement v. Eisenberg*,
   593 F.3d 1031 (9th Cir. 2010) .....................................................................4

*Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.*,
   2013 WL 3337676 (C.D. Cal. June 28, 2013) ..........................................18, 19

*Dickson v. Microsoft Corp.*,
   309 F.3d 193 (4th Cir. 2002) ...................................................................39, 43

*Dominick v. Collectors Universe, Inc.*,
   2012 WL 4513548 (C.D. Cal. Oct. 1, 2012)..............................................38, 40

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
   504 U.S. 451 (1992)....................................................................................38

*Erie Cnty. v. Morton Salt, Inc.*,
   702 F.3d 860 (6th Cir. 2012) ......................................................................28

*Evanston Police Pension Fund v. McKesson Corp.*,
   411 F. Supp. 3d 580 (N.D. Cal. 2019) ....................................................30, 31

*Expert Masonry, Inc. v. Boone Cnty., Ky.*,
   440 F.3d 336 (6th Cir. 2006) ......................................................................12

*F.T.C. v. Whole Foods Mkt., Inc.*,
   548 F.3d 1028 (D.C. Cir. 2008)...................................................................36

*Flaa v. Hollywood Foreign Press Association*,
   55 F.4th 680 (9th Cir. 2022) ..................................................................32, 37

*Frost v. LG Elecs., Inc.*,
   801 F. App'x 496 (9th Cir. 2020) ................................................................20

*Gibson v. MGM Resorts Int'l*,
   2023 WL 7025996 (D. Nev. Oct. 24, 2023) ........................................... *passim*

*Gibson v. MGM Resorts Int'l*,
   2023 WL 7026984 (D. Nev. Oct. 24, 2023) ...................................................10

*Gold Medal LLC v. USA Track & Field*,
   187 F. Supp. 3d 1219 (D. Or. 2016),
   *aff'd*, 899 F.3d 712 (9th Cir. 2018)...............................................................37

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
   433 F. App'x 598 (9th Cir. 2011) ................................................................35

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

*Greater San Diego Cnty. Ass'n of Realtors, Inc. v. Sandicor Inc.*,
   2016 WL 4597536 (S.D. Cal. May 25, 2016) ........................................................44

*Hicks v. PGA Tour, Inc.*,
   897 F.3d 1109 (9th Cir. 2018) .................................................................32, 35

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
   733 F. App'x 380 (9th Cir. 2018) .............................................................37, 38

*Hirsch v. Arthur Andersen & Co.*,
   72 F.3d 1085 (2d Cir. 1995) .........................................................................34

*Hogan v. Pilgrim's Pride Corp.*,
   2018 WL 1316979 (D. Colo. Mar. 14, 2018) ................................................22

*Holmes v. Sec. Inv. Prot. Corp.*,
   503 U.S. 258 (1992) .....................................................................................45

*Honey Bum, LLC v. Fashion Nova, Inc.*,
   63 F.4th 813 (9th Cir. 2023) .........................................................................20

*In re Am. Express Anti-Steering Rules Antitrust Litig.*,
   19 F.4th 127 (2d Cir. 2021) ..........................................................................45

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
   2023 WL 6006525 (S.D.N.Y. July 31, 2023) ...............................................39

*In re Cal. Bail Bond Antitrust Litig.*,
   511 F. Supp. 3d 1031 (N.D. Cal. Jan. 5, 2021) ............................................10

*In re Cedar Shakes & Shingles Antitrust Litig.*,
   2020 WL 832324 (W.D. Wash. Feb. 20, 2020) ............................................30

*In re Citric Acid Litig.*,
   191 F.3d 1090 (9th Cir. 1999) .................................................................20, 30

*In re Citric Acid Litig.*,
   996 F. Supp. 951 (N.D. Cal. 1998),
   *aff'd*, 191 F.3d 1090 (9th Cir. 1999) ............................................................26

*In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*,
   906 F.2d 432 (9th Cir. 1990) ........................................................................25

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser
   Antitrust Litig.*,
   28 F.4th 42 (9th Cir. 2022) ....................................................................... *passim*

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007)......................................................................21, 30

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

*In re German Auto. Mfrs. Antitrust Litig.*,
   497 F. Supp. 3d 745 (N.D. Cal. 2020),
   *aff'd*, 2021 WL 4958987 (9th Cir. Oct. 26, 2021) ................................................36

*In re German Auto. Mfrs. Antitrust Litig.*,
   392 F. Supp. 3d 1059 (N.D. Cal. 2019) ................................................29

*In re German Auto. Mfrs. Antitrust Litig.*,
   612 F. Supp. 3d 967 (N.D. Cal. 2020) ................................................29, 32

*In re Graphics Processing Units Antitrust Litig.*,
   527 F. Supp. 2d 1011 (N.D. Cal. 2007) ................................................31

*In re GSE Bonds Antitrust Litig.*,
   396 F. Supp. 3d 354 (S.D.N.Y. 2019) ................................................23

*In re Hawaiian & Guamanian Cabotage Antitrust Litig.*,
   647 F. Supp. 2d 1250 (W.D. Wash. 2009) ................................................30

*In re Loc. TV Advert. Antitrust Litig.*,
   2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) ................................................27

*In re Musical Instruments & Equip. Antitrust Litig.*,
   798 F.3d 1186 (9th Cir. 2015) ................................................ *passim*

*In re Pork Antitrust Litig.*,
   2019 WL 3752497 (D. Minn. Aug. 8, 2019) ................................................23

*In re Se. Milk Antitrust Litig.*,
   739 F.3d 262 (6th Cir. 2014) ................................................33

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ................................................11, 20

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
   2010 WL 2629728 (N.D. Cal. June 29, 2010) ................................................30

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
   626 F.3d 1327 (11th Cir. 2010) ................................................41

*Jien v. Perdue Farms, Inc.*,
   2020 WL 5544183 (D. Md. Sept. 16, 2020) ................................................31

*Jones v. Micron Tech. Inc.*,
   400 F. Supp. 3d 897 (N.D. Cal. 2019) ................................................28, 30

*Kaufman v. Time Warner*,
   836 F.3d 137 (2d Cir. 2016) ................................................42

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

*Keithly v. Intelius Inc.*,
  764 F. Supp. 2d 1257 (W.D. Wash. 2011)................................................................8

*Kelsey K. v. NFL Enters., LLC*,
  254 F. Supp. 3d 1140 (N.D. Cal. 2017),
  *aff'd*, 757 F. App'x 524 (9th Cir. 2018)..............................................................19

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ................................................................... *passim*

*Kingray, Inc. v. NBA, Inc.*,
  188 F. Supp. 2d 1177 (S.D. Cal. 2002)................................................................40

*Lazy Y Ranch Ltd. v. Behrens*,
  546 F.3d 580 (9th Cir. 2008) ..............................................................................4

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007)............................................................................................12

*Lifeline Ltd. No. II v. Conn. Gen. Life Ins. Co.*,
  821 F. Supp. 1201 (E.D. Mich. 1993)................................................................16

*Llacua v. W. Range Ass'n*,
  930 F.3d 1161 (10th Cir. 2019) .........................................................................16

*Marcus v. ABC Signature Studios, Inc.*,
  279 F. Supp. 3d 1056 (C.D. Cal. 2017) ..............................................................6

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
  302 F.3d 1207 (11th Cir. 2002) .........................................................................39

*Marks v. Does*,
  2011 WL 1363761 (W.D. Wash. Mar. 16, 2011) .............................................6, 7

*McCarthy v. Intercontinental Exch., Inc.*,
  2022 WL 4227247 (N.D. Cal. Sept. 13, 2022) ..................................................44

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
  2019 WL 1767335 (N.D. Cal. Apr. 22, 2019),
  *aff'd*, 811 F. App'x 422 (9th Cir. 2020).......................................................40, 41

*MedioStream, Inc. v. Microsoft Corp.*,
  869 F. Supp. 2d 1095 (N.D. Cal. 2012) ............................................................19

*MLW Media LLC v. World Wrestling Ent., Inc.*,
  655 F. Supp. 3d 946 (N.D. Cal. 2023) ..............................................................36

*Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*,
  924 F.2d 1484 (9th Cir. 1991) ...........................................................................33

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

*Mosaic Health Inc. v. Sanofi-Aventis U.S., LLC*,
  2022 WL 4017895 (W.D.N.Y. Sept. 2, 2022) ...................................................22

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co.*,
  838 F.3d 421 (3d Cir. 2016)...........................................................................38

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
  795 F.3d 1124 (9th Cir. 2015) ...............................................................13, 19

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*,
  562 F. Supp. 3d 1073 (E.D. Cal. 2021)...........................................32, 33, 41, 44

*Newcal Indus., Inc. v. Ikon Off. Sol.*,
  513 F.3d 1038 (9th Cir. 2008) .........................................................................35

*Ojmar US, LLC v. Sec. People, Inc.*,
  2017 WL 3301214 (N.D. Cal. Aug. 2, 2017) ...................................................36

*Optivus Tech., Inc. v. Ion Beam Applications S.A.*,
  2004 WL 5700631 (C.D. Cal. Aug. 31, 2004)...................................................26

*Oracle Am., Inc. v. CedarCrestone, Inc.*,
  938 F. Supp. 2d 895 (N.D. Cal. 2013) .............................................................43

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
  911 F.3d 505 (8th Cir. 2018) ...........................................................................20

*PBTM LLC v. Football Nw., LLC*,
  2022 WL 670920 (W.D. Wash. Mar. 7, 2022) ...................................................31

*PBTM LLC v. Football Nw., LLC*,
  511 F. Supp. 3d 1158 (W.D. Wash. 2021).........................................................36

*Perkins v. LinkedIn Corp.*,
  53 F. Supp. 3d 1190 (N.D. Cal. 2014) .............................................................26

*Physician Specialty Pharmacy, LLC v. Prime Therapeutics, LLC*,
  2019 WL 1239705 (D. Minn. Jan. 24, 2019)...................................................34

*Prosterman v. Am. Airlines, Inc.*,
  747 F. App'x 458 (9th Cir. 2018) .....................................................................26

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc.*,
  890 F.2d 139 (9th Cir. 1989) ...........................................................................43

*Real Est. Exch., Inc. v. Zillow, Inc.*,
  2023 WL 5278115 (W.D. Wash. Aug. 16, 2023) .............................................20

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) ................................................................38, 39, 40

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

*Reilly v. Apple Inc.*,
    578 F. Supp. 3d 1098 (N.D. Cal. 2022) ................................................................ 36

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
    471 F. Supp. 3d 981 (N.D. Cal. 2020) .................................................................. 44

*Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*,
    2013 WL 5694452 (N.D. Cal. Oct. 18, 2013) ........................................................ 43

*Rick-Mik Enterprises, Inc. v. Equilon Enters. LLC*,
    532 F.3d 963 (9th Cir. 2008) ............................................................................ 15, 37

*Rock v. Nat'l Collegiate Athletic Ass'n*,
    928 F. Supp. 2d 1010 (S.D. Ind. 2013) ................................................................ 41

*S&W Forest Prod. Ltd. v. Shake*,
    2019 WL 3716457 (W.D. Wash. Aug. 7, 2019) ..................................................... 19

*Saint Alphonsus Medical Center-Nampa, Inc. v. St. Luke's Health Sys. Ltd.*,
    778 F.3d 775 (9th Cir. 2015) ................................................................................ 34

*Semertzides v. Bethesda N. Hosp.*,
    2014 WL 2573073 (S.D. Ohio June 9, 2014),
    *aff'd*, 608 F. App'x 378 (6th Cir. 2015) ................................................................ 34

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
    950 F.3d 911 (7th Cir. 2020) ................................................................................ 33

*Somers v. Apple, Inc*.,
    729 F.3d 953 (9th Cir. 2013) ........................................................................... 16, 44

*Stanislaus Food Prod. Co. v. USS-POSCO Indus.*,
    782 F. Supp. 2d 1059 (E.D. Cal. 2011) ................................................................ 18

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) .................................................................................. 8

*Tanaka v. Univ. of S. California*,
    252 F.3d 1059 (9th Cir. 2001) .............................................................................. 35

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006) .................................................................................................. 12

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*,
    346 U.S. 537 (1954) .............................................................................................. 10

*Top Rank, Inc. v. Haymon*,
    2015 WL 9948936 (C.D. Cal. Oct. 16, 2015) ................................................. 12, 43

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ........................................................13

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ...............................................................43

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    676 F.2d 1291 (9th Cir. 1982) ....................................................39

*U.S. v. Conn. Nat'l Bank*,
    418 U.S. 656 (1974) ....................................................................33

*U.S. v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) ....................................................................31

*Universal Grading Serv. v. eBay, Inc.*,
    2012 WL 70644 (N.D. Cal. Jan. 9, 2012),
    *aff'd sub nom. Universal Grading Serv., LLC v. eBay, Inc.*,
    563 F. App'x 571 (9th Cir. 2014) ................................................43

*Westlake Servs., LLC v. Credit Acceptance Corp.*,
    2015 WL 9948723 (C.D. Cal. Dec. 7, 2015) ...............................33

*White v. R.M. Packer Co.*,
    635 F.3d 571 (1st Cir. 2011) .......................................................29

*Wible v. Aetna Life Ins. Co.*,
    375 F. Supp. 2d 956 (C.D. Cal. 2005) .........................................26

*Wilcox v. First Interstate Bank of Oregon, N.A.*,
    815 F.2d 522 (9th Cir. 1987) .............................................1, 26, 44

*William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*,
    588 F.3d 659 (9th Cir. 2009) .........................................................9

*Winsor v. Sequoia Benefits & Ins. Servs., LLC*,
    62 F.4th 517 (9th Cir. 2023) ........................................................43

*Wound Care Concepts, Inc. v. Vohra Health Servs.*, P.A.,
    2021 WL 4990957 (S.D. Fla. Mar. 26, 2021)..............................34

*Yates v. Money Source, Inc.*,
    2023 WL 4305059 (E.D. Cal. June 30, 2023) ..............................12

*Zunum Aero, Inc. v. Boeing Co.*,
    2022 WL 2116678 (W.D. Wash. June 13, 2022)..........................33

**Statutes**

Sherman Antitrust Act Section 1, 15 U.S.C. § 1, *et seq.* .................................... *passim*

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1    Defendants jointly move to dismiss the First Amended Class Action Complaint ("FAC")

2    (Dkt. # 113) in full and with prejudice pursuant to Federal Rules of Civil Procedure 12(b)(1) and

3    12(b)(6).[1]

4    ### INTRODUCTION

5    Plaintiffs are attempting to manufacture a Sherman Act violation on the mere basis that

6    10 property management companies independently decided to use a revenue management

7    product licensed by Yardi, alleging they somehow thereby conspired to inflate apartment rents

8    nationwide. One of these property management companies is a California company that manages

9    "3,000 residential units in California." One is a Washington company that manages "52

10   properties" in Washington. One is an Ohio company that manages "4,000 units" in unspecified

11   locations in the United States. The only traits these disparate companies (the Lessor Defendants)

12   supposedly share is (1) they own or manage "multifamily rental properties" in a purported

13   "nationwide market" and (2) they "began using" Yardi's product, RENTmaximizer, at some time

14   in the past decade. Based on those threadbare allegations, Plaintiffs seek to drag Defendants into

15   a sprawling antitrust conspiracy case that could take many years and millions to litigate.

16   Plaintiffs' ill-conceived lawsuit is premised on fundamental misconceptions about

17   Yardi's product and how it works. But even setting aside those deficiencies, the FAC is devoid

18   of any allegation or even a plausible inference that the Lessor Defendants conspired with each

19   other or relinquished control of their pricing decisions to RENTmaximizer. They are not alleged

20   to have set the same rents, or raised their rents, or to have done so at the same time. And the

21   claims are facially implausible. There is no such thing as a nationwide market for multifamily

22   housing—an apartment in Miami is not interchangeable with an apartment in Salt Lake City.

23   And there is no allegation that the Lessor Defendants compete with each other, and thus would

24   have any conceivable incentive or ability to inflate rents across the country. Rule 12 is designed

25   to weed out cases such as this. The Court should dismiss this lawsuit for at least five reasons.

26

27   ---
     [1] This motion is brought by all Defendants. HNN and R.D. Merrill ("Pillar") are also filing individual
     Rule 12(b)(6) motions consistent with this Court's order re: Motion to Dismiss Briefing (Dkt. # 118).

28

DEFS' OMNIBUS MOTION TO DISMISS – 1
(Case No. 2:23–cv–01391-RSL)

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1     ***First***, Plaintiffs improperly rely on group pleading. They lump together the Lessor

2     Defendants and make conclusory assertions about how they supposedly behaved. But the FAC is

3     utterly devoid of allegations about how *each* Lessor Defendant *specifically* behaved. Plaintiffs do

4     not even try to make the requisite showing. The most they allege is the location of the Lessor

5     Defendants' headquarters, bare details about some of their property locations and units, and that

6     they each started using RENTmaximizer at some point in the past decade. There is no way, based

7     on these limited allegations, to infer that any of the Lessor Defendants participated in an

8     anticompetitive conspiracy. The FAC strains "group pleading" well beyond its limits.

9     ***Second***, Plaintiffs fail to allege the core element of a price fixing claim: an agreement.

10    Their lawsuit hypothesizes that the Lessor Defendants conspired to drive up nationwide rents by

11    handing over all pricing decisions to RENTmaximizer. But fatally absent are any allegations that

12    the purported "competitors"—the Lessor Defendants—agreed with each other to do anything.

13    Indeed, despite having purportedly gathered information from nine former employee

14    "confidential witnesses," Plaintiffs cannot muster a statement from even one of them alleging an

15    agreement to fix rental rates. The FAC also contradicts its own allegations at every turn.

16    Plaintiffs allege in conclusory fashion that RENTmaximizer uses non-public rent information to

17    formulate recommendations, and yet acknowledge that rental rates are publicly available and

18    indeed rely on "[p]ublic rent data" themselves. FAC ¶ 27. Plaintiffs allege that the Lessor

19    Defendants agreed with Yardi to relinquish their independent pricing decisions, and yet

20    acknowledge that RENTmaximizer's recommendations are just that—*recommendations*, which

21    users are free to reject. *Id.* ¶ 13. One need look no further than Plaintiffs' own leases to see that

22    the Lessor Defendants make independent pricing decisions, as they each received a different and

23    substantial rent concession. Plaintiffs' lease concessions entirely undermine the FAC's core

24    theory that Defendants agreed to employ RENTmaximizer to eliminate price competition.

25    ***Third***, Plaintiffs fail to allege circumstantial evidence of an unlawful conspiracy, such as

26    "parallel conduct" by each Defendant and "plus factors" to support those allegations. With

27    respect to parallel conduct, for example, the FAC lacks any allegations whatsoever about the

28    Lessor Defendants' actual rental rates. Indeed, there is nothing to suggest each Lessor Defendant

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1   increased its rents or set them at above-market levels, let alone that they did so at the same time.

2   The allegations of purported plus factors similarly fail; the FAC recognizes numerous reasons

3   why the Lessor Defendants would independently decide to use RENTmaximizer consistent with

4   rational and competitive independent business behavior. Mere independent conduct, such as

5   deciding to use a particular product, cannot ever be a basis for inferring an antitrust conspiracy.

6       ***Fourth***, the FAC fails to state a claim under a rule of reason analysis. It does not

7   plausibly allege a relevant product or geographic market or that the Lessor Defendants possess

8   "market power." By their own admission, Plaintiffs' geographic market fails. They allege a

9   *nationwide* market for multifamily rentals, suggesting that someone who works in *Boston* might

10  look for an apartment in *San Francisco*. Yet, Plaintiffs contradict this illogical theory by

11  admitting—consistent with common sense—that "renters . . . choose to live within certain

12  geographic locations, such as somewhere close to their offices, schools, and communities." *Id*. ¶

13  147. Plaintiffs' multifamily housing-only product market also fails. They suggest that someone

14  would not consider renting a single-family home instead of an apartment—even if one is better

15  or cheaper than the other. The Court need not, and should not, check its common sense at the

16  door. Plaintiffs also fail to allege that the Lessor Defendants possess market power—*i.e.*, the

17  power to manipulate market-wide supply and pricing *across the entire United States*. Indeed,

18  Plaintiffs cannot even allege that they *do business* on a nationwide basis, much less control an

19  overwhelming (or even meaningful) share of all multifamily rentals in the country.

20      ***Finally***, Plaintiffs lack standing, an essential element of their claims. Despite their

21  conclusory allegation that the Lessor Defendants "outsourced" their pricing decisions to

22  RENTmaximizer, the FAC critically does not—and cannot—allege that the rates in Plaintiffs'

23  leases were set by RENTmaximizer. Nor can they plausibly allege that their rental rates stemmed

24  from an agreement to eliminate price competition. The FAC does not allege that any Lessor

25  Defendant or co-conspirator owns or manages a multifamily rental property that competes with

26  the buildings in downtown Seattle where Plaintiffs rented apartments.

27      Simply put, Plaintiffs have brought a sprawling antitrust conspiracy case against Yardi

28  and 10 of its customers based on nothing more than the fact that those customers independently

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1  decided to start using a Yardi product at some point in the past decade. Plaintiffs' thoroughly

2  implausible claims fail as a matter of law and should be dismissed with prejudice.

3  **BACKGROUND**

4  **I.      Yardi's revenue management product.**

5      Yardi licenses real estate investment management and property management software,

6  including the Voyager platform, which allows multifamily residential property managers to

7  "[c]entralize operational, financial, leasing, and maintenance management . . . in a single

8  database," and manage "marketing, screening, insurance, revenue management, business

9  intelligence, and more[.]" FAC ¶¶ 60–61.[2] Among the products offered by Yardi is a revenue

10 management tool called RENTmaximizer,[3] which became available in 2011 as an optional

11 product integrated into the Voyager platform. *Id.* ¶ 65. RENTmaximizer helps property managers

12 simplify the rental pricing process by analyzing trends of supply, demand, market conditions,

13 and property managers' own goals and preferences. *Id.* ¶¶ 65, 71, 75. At the same time, Yardi

14 "encourage[s] [its] clients to be actively engaged in their pricing activity" to ensure that "the

15 overall pricing activity supports [a] company's business objectives." *Id.* ¶ 67.

16     RENTmaximizer users input their own data and preferences, including property history,

17 rental rates, occupancy, move-in timeframe, and lease term. *Id.* ¶¶ 71, 75. The product analyzes

18 the property's own data and comparative asking rents and suggests rental rates. *Id.* ¶¶ 13, 71–72.

19 Comparative rent data is available from public sources, including property managers' websites.[4]

20 RENTmaximizer suggests adjusting rental rates up and down, *id.* ¶ 27 n.29,[5] balancing a

21 property's real-time inventory, traffic, and market conditions. *Id.* ¶ 68. Rates are recommended

22

---

23  [2]   The FAC's factual allegations are accepted as true solely for the purpose of this motion, except to the
24  extent they are contradicted by documents cited in the FAC or documents of which the Court may take
    judicial notice. *See Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

25  [3]   Plaintiffs say RENTmaximizer was renamed Revenue IQ and that the FAC's references to
    RENTmaximizer refer to both iterations. FAC ¶ 2 n.5. This motion uses RENTmaximizer for both.

26  [4]   *See, e.g.*, FAC ¶ 36 n.35 (Bridge, https://www.bridgepm.com/searchlisting); *id.* ¶ 40 n.42
    (LeFever Mattson Property Management, https://propertysearch.lmpropertymanagement.com/);
27  *see also id.* ¶ 118 (describing analysis conducted by Plaintiffs using "[p]ublic rent data").

28  [5]   *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010) (noting court may consider
    materials incorporated into complaint when ruling on a motion to dismiss).

DEFS' OMNIBUS MOTION TO DISMISS – 4
(Case No. 2:23–cv–01391-RSL)

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1  daily, allowing for fast adjustment to market conditions and changes in a property's inventory

2  and traffic, while adjusting for cost constraints such as vacancy loss, turnover costs, inventory

3  hold days, and lease expiration management. *Id*. ¶¶ 71–72. Multiple pricing options fit customer

4  needs and address fair housing concerns, *id*., making it easy to offer a variety of lease terms and

5  move-in dates so residents can choose what works best for them and their budget. *Id*. ¶ 24. Yardi

6  revenue managers meet regularly with customers, get to know their business, assets, and goals,

7  and assist them in using the product. *Id*. ¶¶ 14, 78; *see also id*. n.72 (citing Yardi article: "The

8  revenue manager support team has many configuration options at its disposal in order to

9  establish a performance level that meets the strategic objectives for pricing your property.").

10  Importantly, customers are free to reject or override the product's recommended rents. *Id.* ¶ 76.

11       Yardi Matrix is a separate commercial real estate product that compiles data on economic

12  trends and performance, including markets and submarkets, competition, developments, rents,

13  occupancy, loans, and new supply pipeline information. *Id*. ¶¶ 10–11. Unlike RENTmaximizer,

14  Yardi Matrix is not a revenue management product that recommends rental prices. *Id*.

15  Recommendations generated by RENTmaximizer may be based in part on "public information"

16  collected through Matrix surveys, in which Yardi employees pose as members of the public and

17  contact properties to collect information about advertised rental rates. *Id*. ¶¶ 11, 108, 113.

18  **II.    The Lessor Defendants.**

19       Each of the Lessor Defendants allegedly owns or manages multifamily rental properties

20  and used RENTmaximizer at unspecified properties for indeterminate time periods beginning

21  anywhere between 2012 and 2023. FAC ¶¶ 36–45. The FAC contains little else about the Lessor

22  Defendants. It merely alleges the location of their corporate headquarters, basic information

23  about some of their areas of operation or number of units, and for some, high-level snippets of

24  press release quotes, often taken out of context, about their use of various Yardi products.

25       Plaintiffs allege that the Lessor Defendants have properties in a single state, a handful of

26  states or, more vaguely, "in four states," "across the country," or "throughout the United States,"

27

28  DEFS' OMNIBUS MOTION TO DISMISS – 5
(Case No. 2:23–cv–01391-RSL)

and in two cases they fail to identify any location at all.[6] *Id.* Other than alleging that Plaintiffs rented apartments in Seattle, the FAC fails to allege the cities or neighborhoods where any Lessor Defendant owns or manages properties or the types of properties or amenities they offer.

For half the Lessor Defendants, Plaintiffs fail to allege the number of units they manage. The other half allegedly collectively own or manage approximately 61,000 units. *Id.* As of 2021, the U.S. Census Bureau estimated there were 28.3 million occupied multifamily rental units in the country.[7] Even assuming the FAC alleged that the Lessor Defendants used RENTmaximizer to price all of their leases—which it does not—these Lessor Defendants for whom unit volume is alleged apparently represent well under 1% (~0.22%) of nationwide multifamily rental units.

## III.    The alleged conspiracy.

Plaintiffs allege that the Lessor Defendants devised a strategy in 2011 to "collectively adopt a coordinated pricing software implemented and enforced by Yardi." FAC ¶ 85. They allegedly agreed to "outsource their once-independent pricing and supply decisions to a single decisionmaker, RENTmaximizer" by "implementing and abiding by a common pricing algorithm" to set above-market rents in a nationwide multifamily rental market and thereby eliminate "traditional sales devices such as concessions and specials." *Id.* ¶¶ 17, 66, 68, 90. The Lessor Defendants further allegedly agreed, together with five non-defendant "co-conspirators," to provide "competitively sensitive" non-public information to Yardi, including "current supply, production, and pricing plans," and understood that information provided to Yardi would be

---

[6]  Bridge ("throughout the [U.S.]"); Calibrate ("four states"); Creekwood (Arizona, Colorado, Florida, Louisiana, Texas); Dalton (California, Oregon, Washington); HNN (Washington); LeFever Mattson Property Management (California); Manco Abbott (unidentified); Morguard ("throughout the [U.S.]"); Pillar (unidentified); Summit ("across the country," although only "over 4,000" units in total). FAC ¶¶ 36–45.

[7]  *See*        https://www.census.gov/programs-surveys/ahs/data/interactive/ahstablecreator.html?s_areas= 00000&s_year=2021&s_tablename=TABLE1&s_bygroup1=2&s_bygroup2=3&s_filtergroup1=3&s_f iltergroup2=1 (reflecting structures with 2 to 4 units (7,234,000 units total); structures with 5–9 units (5,070,000 units total); structures with 10–19 units (6,482,000 units total); structures with 20–49 units (4,031,000 units total); and structures with 50 or more units (5,489,000 units total)). The court may take judicial notice of U.S. Census records. *See Marcus v. ABC Signature Studios, Inc*., 279 F. Supp. 3d 1056, 1063 (C.D. Cal. 2017) ("United States census data is an appropriate and frequent subject of judicial notice." (quotations and internal citations omitted)); *see also Marks v. Does*, 2011 WL 1363761, at *2 (W.D. Wash. Mar. 16, 2011) (Lasnik, J.) (noting court may take judicial notice of public records outside the pleadings (citation omitted)).

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1    incorporated into Yardi Matrix and "used, in aggregated fashion, to provide pricing
2    recommendations through RENTmaximizer." *Id*. ¶¶ 112, 199–202.

3         Notably, the FAC does not (*i*) allege that any Lessor Defendant agreed with Yardi, or each
4    other, to adhere to RENTmaximizer's suggestions or (*ii*) explain when or how each Lessor
5    Defendant joined the purported conspiracy. Likewise, Plaintiffs fail to allege any specific details
6    about the "competitively sensitive" information the Lessor Defendants supposedly exchanged that
7    was allegedly used in pricing recommendations. The only concrete examples they offer involve
8    "public information," such as asking rents being advertised at a property. *See, e.g., id.* ¶ 11.

9         On the other hand, the FAC *does* include allegations that contradict and undermine
10   Plaintiffs' conspiracy theory at every turn, including acknowledgment that rent suggestions are not
11   obligatory, *id*. ¶¶ 13, 72, 76, that many individualized factors go into formulating rent
12   recommendations, *see, e.g., id.* ¶¶ 71–72, and that RENTmaximizer users are encouraged to play
13   an active role in determining rents. *See, e.g., id.* ¶ 67. Similarly, the plausibility of a conspiracy
14   premised on fixing rents in a 28.3-million-unit, nationwide multifamily rental market is negated by
15   the FAC's acknowledgement that tenants seek to live "in reasonable proximity to their work,
16   school, or home." *Id*. ¶ 149. Furthermore, Plaintiffs *themselves* received concessions on their
17   leases, which blows apart their theory that RENTmaximizer "eliminates" concessions, as well as
18   any suggestion that the Lessor Defendants gave up independent pricing decisions. *See infra*
19   Background § IV. In addition to the parade of allegations undermining Plaintiffs' own claims,
20   the FAC identifies numerous independent business reasons for using RENTmaximizer, including
21   improving revenue, increasing occupancy, facilitating flexible leasing terms and longer leases for
22   high-quality tenants, filling stale units, reducing bad debt, eliminating rent rate guesswork,
23   reducing human error, and enhancing efficiency. *See, e.g., id.* ¶¶ 66, 71, 77, 90.

24   **IV.    Plaintiffs' Sherman Act claims.**

25        Duffy entered into two leases with Pillar-managed properties in Seattle, one at The Wave
26   from 2021 to 2022 and one at The Nolo from 2022 to the present. FAC ¶ 33. Brett entered into a
27   lease at The Wave from August 2020 to November 2021. *Id*. ¶ 34. Neither Plaintiff describes
28   their lease terms, and aside from alleging in conclusory fashion that they paid "inflated rental

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1   prices as a result of [Pillar's] usage" of RENTmaximizer, *id*. ¶¶ 33–34, the FAC includes no

2   allegations linking any purported overcharges to the alleged antitrust conspiracy.

3          In contrast to the FAC's repeated allegation that the Lessor Defendants' collusive use of

4   RENTmaximizer eliminates the need to offer rent concessions, *see*, *e.g.*, *id*. ¶ 90, both Plaintiffs

5   received substantial concessions. Duffy's 24-month lease at The Wave included a $6,435 rent

6   concession, equivalent to three months' rent. *See* Defendant R.D. Merrill Real Estate Holdings,

7   LLC's Motion to Dismiss at 2–3, filed contemporaneously herewith (citing Norbury Decl. Ex. 1

8   at 13, § 3). Brett's 12-month lease included a $2,942 rent concession, equivalent to one month's

9   rent. *Id*. (citing Norbury Decl. Ex. 3 at 13, § 3).[8] The FAC disingenuously omits this information.

10         Plaintiffs bring three claims under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1,

11  *et seq*. Claim 1 alleges that Defendants engaged in a continuing agreement to use

12  RENTmaximizer "to artificially inflate price in the nationwide market for multifamily rental

13  housing." FAC ¶ 180. Plaintiffs assert that this hub-and-spoke conspiracy is *per se* unlawful, or

14  alternatively, violates Section 1 under a "quick look" or rule of reason analysis. *Id*. ¶¶ 164–

15  65, 183. Claim 2 alleges that Yardi and the Lessor Defendants adopted a set of vertical

16  agreements to use RENTmaximizer to set rents for multifamily housing, which is analyzed under

17  the rule of reason. *Id*. ¶ 186. Claim 3 alleges that Defendants and certain co-conspirators entered

18  into a continuing agreement "to regularly exchange detailed, timely, competitively sensitive, and

19  non-public information" about "current supply, production, and pricing plans," which is also

20  analyzed under the rule of reason. *Id*. ¶¶ 193, 199.

21                                        **ARGUMENT**

22         To state a *prima facie* Section 1 claim, Plaintiffs must allege "evidentiary facts which, if

23  true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct

24  business entities; (2) by which the persons or entities intended to harm or restrain trade or

25

26  ─────────────────────
    [8]  In ruling on a Rule 12(b)(6) motion, courts may consider "a writing referenced in a complaint but not
27  explicitly incorporated therein if the complaint relies on the document and its authenticity is
    unquestioned." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007); *see also Keithly v. Intelius
28  Inc.*, 764 F. Supp. 2d 1257, 1261 (W.D. Wash. 2011) (Lasnik, J.) (noting courts may consider
    documents forming the basis of plaintiffs' claims on a motion to dismiss).

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1    commerce . . . ; (3) which actually injures competition" in a relevant market. *Kendall v. Visa*

2    *U.S.A., Inc.*, 518 F.3d 1042, 1047–48 (9th Cir. 2008).

3        Allegations of an antitrust conspiracy must state a claim that is "plausible" on its face,

4    *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009), and must raise "a right to relief above the

5    speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must

6    establish "more than a sheer possibility that a defendant acted unlawfully." *Iqbal*, 556 U.S. at

7    678; *see also Twombly*, 550 U.S. at 546 ("It is one thing to be cautious before dismissing an

8    antitrust complaint in advance of discovery . . . but quite another to forget that proceeding to

9    antitrust discovery can be expensive."); *Kendall*, 518 F.3d at 1048 (emphasizing plausibility

10   standard because "discovery in antitrust cases frequently causes substantial expenditures and

11   gives the plaintiff the opportunity to extort large settlements even where he does not have much

12   of a case"). An antitrust claim also must be "'plausible' in light of basic economic principles."

13   *William O. Gilley Enterprises, Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (*citing*

14   *Twombly*, 550 U.S. at 556).

15       By every measure, the FAC fails the plausibility standard. There are no factual

16   allegations that the Lessor Defendants agreed—with Yardi or each other—to fix rental rates by

17   implementing or adhering to RENTmaximizer's suggestions or exchanging non-public pricing

18   information. Indeed, Plaintiffs fail to allege a shred of evidence for alleged conspiracies that

19   purportedly included multiple companies in multiple states. This is remarkable, but not

20   surprising, because any such conspiracy is wholly implausible. Neither precedent nor common

21   sense supports the existence of a nationwide multifamily rental market, nor do Plaintiffs

22   plausibly allege that the Lessor Defendants, with their limited locations and units, compete with

23   each other in such a market. For the same reasons, Plaintiffs fail to plead the elements of a rule

24   of reason claim. They do not plausibly allege a relevant market in terms of product or geography,

25   and fail to allege that the Lessor Defendants possess market power in *any* market. Finally,

26   Plaintiffs lack standing because they do not allege a plausible causal connection between their

27   purported injuries and an unlawful conspiracy.

28       For all of these reasons, the FAC should be dismissed in its entirety, with prejudice.

DEFS' OMNIBUS MOTION TO DISMISS – 9
(Case No. 2:23–cv–01391-RSL)

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

I.       **The FAC improperly relies on group pleading.**

As an initial matter, the FAC should be dismissed because it lumps together the Lessor Defendants instead of plausibly alleging that they *each* participated in an unlawful conspiracy.

Section 1 of the Sherman Act targets "contract[s]," "combination[s]," and "conspirac[ies]" "in restraint of trade or commerce." 15 U.S.C. § 1. Consequently, the "crucial question" is "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement.'" *Twombly*, 550 U.S. at 556 (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)). But there is another equally crucial question that a plaintiff must answer: did each defendant "actively participate[] in an *individual capacity* in the scheme"? *Gibson v. MGM Resorts Int'l*, 2023 WL 7026984, at *2 (D. Nev. Oct. 24, 2023) (emphasis added) (citation omitted). To answer this question, the FAC must "include allegations specific to *each* defendant alleging *that* defendant's role in the alleged conspiracy." *In re Cal. Bail Bond Antitrust Litig.*, 511 F. Supp. 3d 1031, 1047 (N.D. Cal. Jan. 5, 2021) (emphasis added) (citation and internal quotations omitted); *see also Bank of America, N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013) ("An allegation that *someone* looted a corporation does not propound a plausible contention that *a particular person* did anything wrong." (emphasis in original)).

Plaintiffs do not even try to make the requisite showing. They allege *zero facts* about what role any of the 10 Lessor Defendants played in the alleged conspiracy. Plaintiffs mention Calibrate, Creekwood, and LeFever Mattson Property Management in only single paragraphs that allege where the companies are located and that they use RENTmaximizer. FAC ¶¶ 37, 40, 45. Plaintiffs add two or three additional paragraphs for Dalton, HNN, Manco Abbott, Morguard, Pillar, and Summit, *id*. ¶¶ 16, 23, 38–39, 41–44, 77, 81, 90, 92–93, consisting mainly of vague language about the companies' experience using RENTmaximizer many years ago. *See, e.g.*, *id*. ¶ 92 (in 2016, "RENTmaximizer . . . made Dalton Management better aware of how its properties compare to the rest of the market"; in Q4 of 2015, Morguard "implemented RENTmaximizer" and saw "[g]ood strong rents growth"). And Plaintiffs mention Bridge in only eight paragraphs. *Id*. ¶¶ 21, 22, 26, 36, 91, 92, 93, 140.

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

*None* of these allegations directly implicates a particular Lessor Defendant in the purported conspiracy. There is, for example, no "admission by an employee of [a Lessor Defendant] . . . that officials of the defendant had met and agreed explicitly [with another Lessor Defendant] on the terms of [the] conspiracy." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010) (defining direct evidence). Instead, the allegations consist of stale statements from a handful of Lessor Defendants and confidential witnesses. That is not enough. A cryptic statement from 2015 that "RENTmaximizer has taken the guesswork out of our rental pricing and lease terms" evidences only use of the product, not an ongoing agreement among Lessor Defendants. FAC ¶ 90. The same is true of a witness's claim that—nearly 10 years ago— she gathered unspecified information on "pricing" by "shopping" unidentified apartment complexes managed by unnamed companies. *Id.* ¶¶ 21, 26. Indeed, she does not even claim the information was non-public or that she gathered it *from another Lessor Defendant*.[9]

Plaintiffs also fail to allege parallel conduct that might circumstantially implicate particular Lessor Defendants. They do not identify when each Lessor Defendant started using RENTmaximizer, how often each Lessor Defendant accepts or rejects pricing recommendations, whether each Lessor Defendant raised rents to above-market levels, or whether each Lessor Defendant eliminated concessions and discounts. In fact, Plaintiffs do not identify a *single rental rate that a particular Lessor Defendant charged*. These details are essential to understanding whether particular Lessor Defendants engaged in "*similar* policies around the *same* time in response to *similar* market conditions." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015) (emphasis added) (defining parallel conduct).

For example, consider the minimal allegations about Calibrate and Creekwood. Plaintiffs allege that Calibrate is headquartered in Washington, manages approximately 1,900 "units" in four unnamed states, and began using RENTmaximizer in "at least 2023." FAC ¶ 37. Plaintiffs allege that Creekwood is headquartered in Texas, manages 17 "properties" in five states, and

---

[9] Similarly, naming "Co-conspirators John Does 1–100" as unknown Yardi clients who used RENTmaximizer, FAC ¶ 51, is an improper attempt to artificially broaden the scope of the supposed conspiracy without actually alleging any facts or well-pleaded allegations about such purported clients.

DEFS' OMNIBUS MOTION TO DISMISS – 11
(Case No. 2:23–cv–01391-RSL)

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6880

1    began using RENTmaximizer in "at least 2016." *Id.* ¶ 45. These bare bones allegations provide

2    no basis upon which to infer that Calibrate and Creekwood entered into an agreement to use

3    RENTmaximizer to artificially inflate nationwide rents for multifamily rental housing.

4    Reliance on group pleading does not suffice, and the FAC should be dismissed.[10]

5    **II.    The FAC fails to state a *per se* Section 1 claim under the Sherman Act.**

6    In Claim 1, Plaintiffs purport to allege a hub-and-spoke conspiracy whereby Defendants

7    agreed to use RENTmaximizer to unlawfully restrain trade by artificially inflating multifamily

8    housing rents across the country, which Plaintiffs assert is *per se* unlawful. FAC ¶¶ 31, 180. But

9    the FAC contains no allegations sufficient to allege a *per se* Section 1 violation.

10    Courts presumptively apply the "rule of reason" to Section 1 claims. *See Texaco Inc. v.*

11    *Dagher*, 547 U.S. 1, 5 (2006) (citations omitted). Under this analysis, a plaintiff must

12    demonstrate not only an agreement between parties, but also that the agreement "is in fact

13    unreasonable and anticompetitive." *Id*. (citations omitted). Certain horizontal agreements among

14    competitors, however, may be so "plainly anticompetitive" as to violate Section 1 simply

15    through proof of their existence, and require no "elaborate study of the industry" to consider their

16    impact; such agreements are *per se* violations. *Id*. at 5.[11] To state a *per se* claim, Plaintiffs must

17    adequately allege an agreement that is both horizontal—*i.e.,* between competitors at the same

18    level of the market—and that "clearly and unquestionably" falls into "one of the handful of

19    categories that have been collectively deemed" anticompetitive, such as price fixing between

20    competitors. *See Expert Masonry, Inc. v. Boone Cnty., Ky*., 440 F.3d 336, 343–44 (6th Cir.

21    2006). Plaintiffs have, by any rational measure, failed to do so.

22

23

24    [10]  *See Yates v. Money Source, Inc.*, 2023 WL 4305059, at *4 (E.D. Cal. June 30, 2023) (rejecting allegations that lumped together defendants "indiscriminately" under "a blanket 'assertion of
25    conspiracy'" (quoting *Twombly*, 550 U.S. at 556)); *Top Rank, Inc. v. Haymon*, 2015 WL 9948936, at *9 (C.D. Cal. Oct. 16, 2015) (dismissing Section 1 claim where, among other things, complaint relied
26    on "[g]roup pleading" instead of "alleg[ing] the specific conduct engaged in by each" defendant).

26    [11]  *See also Leegin Creative Leather Prod., Inc. v. PSKS, Inc*., 551 U.S. 877, 886–87 (2007) (finding *per
27    se* treatment permissible only where courts have considerable experience with the restraint's impact on the modern American economy and can predict with confidence the restraint would be invalidated "in
28    all or almost all instances under the rule of reason").

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1    The FAC fails at the first step because it does not allege that the purported horizontal

2  "competitors"—the Lessor Defendants—agreed with each other to do anything. A mere

3  allegation that they used RENTmaximizer cannot fill this void. A series of independent, vertical

4  agreements to use a product, without more, does not come close to plausibly alleging a

5  conspiracy to use that product for the purpose of fixing prices. The FAC also fails to allege

6  circumstantial evidence of a price-fixing conspiracy. Not only do Plaintiffs fail to allege parallel

7  pricing or supply reductions, but their alleged "plus factors" are unavailing. There are no

8  plausible allegations that RENTmaximizer uses non-public pricing data from other users in its

9  recommendations. The other "plus factors" are simply market descriptors or otherwise irrelevant.

10       **A.    Plaintiffs fail to allege an agreement.**

11    The FAC should be dismissed because it fails to allege the basic requirement for a

12  horizontal price-fixing claim—an agreement among competitors. *See In re Musical Instruments*,

13  798 F.3d at 1192 (noting such a claim "depends on establishing those horizontal agreements").

14  Indeed, far from alleging a horizontal agreement among competitors, the sole trait common to

15  the Lessor Defendants is their decision to use Yardi's revenue management product.

16    *Twombly*, an antitrust conspiracy case, has particular relevance here. Section 1 prohibits

17  agreements to restrain trade; it does not reach unilateral conduct or independent decision-

18  making. 550 U.S. at 553–54. Thus, "[t]he crucial question" in assessing Section 1 claims "is

19  whether the challenged anticompetitive conduct stem[s] from independent decision or from an

20  agreement." *Id*. at 553. To avoid dismissal, Plaintiffs must allege facts that "plausibly suggest an

21  unlawful agreement," as opposed to conduct equally consistent with rational, unilateral behavior.

22  *Iqbal*, 556 U.S. at 680 (discussing *Twombly*). Moreover, "the critical issue for establishing a *per*

23  *se* violation with the hub and spoke system is how the spokes [in a hub-and-spoke conspiracy]

24  are connected to each other." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue*

25  *Shield*, 552 F.3d 430, 436 (6th Cir. 2008).[12] Plaintiffs "must plead not just ultimate facts (such as

26  ───────────────

27  [12] *See also In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig*., 28 F.4th
    42, 46 (9th Cir. 2022) (hereinafter, "DRAM") (noting claim "must contain sufficient factual matter,
    taken as true, to plausibly suggest that an illegal agreement was made"); *Name.Space, Inc. v. Internet*

28  *Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1129 (9th Cir. 2015) (noting plaintiff must

DEFS' OMNIBUS MOTION TO DISMISS – 13
(Case No. 2:23–cv–01391-RSL)

1    a conspiracy), but evidentiary facts" establishing each defendant's participation in the alleged

2    conspiracy: "who, did what, to whom (or with whom), where, and when?" *Kendall*, 518 F.3d at

3    1047–48 (explaining complaint must "allege facts such as a 'specific time, place, or person

4    involved in the alleged conspiracies' to give a defendant . . . an idea of where to begin." (quoting

5    *Twombly*, 550 U.S. at 565 n.10)). The FAC lacks any facts establishing an unlawful agreement.

6              **1.    No agreement to implement or abide by rent recommendations.**

7              Plaintiffs do not plausibly allege an agreement, either between the Lessor Defendants and

8    Yardi or among the Lessor Defendants themselves, to implement or adhere to RENTmaximizer's

9    suggestions and thereby abdicate their independent decision-making over rental rates. In fact, the

10   FAC expressly contradicts any such agreement by (*i*) admitting that Yardi "encourage[s] [its]

11   clients to be actively engaged in their pricing activity," FAC ¶ 67, and (*ii*) suggesting that, at

12   most, RENTmaximizer users "can—and are encouraged to" adopt the recommendations.

13   *Id*. ¶¶ 13, 72; *see also id*. ¶ 152 (indicating RENTmaximizer pricing "allow[s] freedom of

14   choice"). Moreover, the fact that Defendant Pillar provided its own concessions in Plaintiffs'

15   own leases establishes that Pillar exercised independence in setting rental rates and did not

16   delegate its pricing decisions. *See supra* Background § IV.

17            Despite all of this, Plaintiffs assert in conclusory fashion that the Lessor Defendants

18   "outsource their once independent pricing and supply decisions." FAC ¶ 17. For support,

19   Plaintiffs point to generic Yardi marketing language, such as RENTmaximizer "automates

20   profitable decision-making across your organization." *Id*. ¶ 68. The same promotional piece

21   explains that RENTmaximizer is a "dynamic revenue management system" that recommends

22   rental rates "using the balance between your real-time inventory, traffic, and market conditions."

23   *Id*. The term "automation" thus most plausibly refers to a product that analyzes multiple data

24   points and performs calculations so that property managers need not do so manually. *Id*. ¶ 67

25

26

27   allege facts "plausibly suggesting (not merely consistent with) a conspiracy" (*citing Twombly*, 550
     U.S. at 556 (2007)); *Gibson v. MGM Resorts Int'l*, 2023 WL 7025996, at *2 (D. Nev. Oct. 24, 2023)
28   ("Sherman Act complaints must plausibly allege the existence of an agreement—at least a tacit one.").

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

("We [Yardi] think it is critical for a person to keep watch over any automated system to ensure that its inputs are in line with the pricing strategy for a property.").

Plaintiffs similarly try to cast in a sinister light a comment attributed to an HNN representative back in 2015 that RENTmaximizer "boosts pricing performance through an intelligent system of measurements, fixed factors *and discipline*." *Id*. ¶ 90 (emphasis in FAC). Again, the term "discipline" is consistent with a product that streamlines pricing decisions by analyzing multiple data inputs and "tak[ing] human error out of the process." *Id*.[13] Plaintiffs also quote a handful of former employees of certain Lessor Defendants who allegedly describe their personal experiences using RENTmaximizer, such as that they "just went for" suggested rates or "never questioned" them.[14] Such anecdotal comments do not plausibly allege that the Lessor Defendants agreed with each other to fix rental rates. In fact, the FAC alleges the opposite. *Id* ¶¶ 67, 76 (highlighting that Yardi "encourage[s] [its] clients to be actively engaged in their pricing activity" and that customers are free to reject or override a recommended price).

Indeed, the Lessor Defendants would have no motive or ability to engage in concerted action, given they do not operate in the same geographies. A *per se* unlawful conspiracy requires an agreement among *competitors*. *See Rick-Mik Enterprises, Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 976 (9th Cir. 2008). The FAC does not allege—nor could it—that the Lessor Defendants compete with each other, and thus offers no basis to infer that a failure to implement RENTmaximizer or abide by its recommendations would put them at risk of losing business. For example, HNN has properties in Washington, FAC ¶ 39; LeFever Mattson Property Management has properties in California, *id*. ¶ 40; and Creekwood has properties in Arizona, Colorado, Florida, Louisiana, and Texas. *Id*. ¶ 45. Only four Lessor Defendants are alleged to operate in overlapping states (and none in the same neighborhoods or with similar types of units, amenities,

---

[13] There is no allegation that this comment "was followed by increasing prices shortly thereafter," FAC ¶ 19 n.18, or other evidence suggesting collusion.

[14] FAC ¶ 93 (confidential witness ("CW") 1 stated that she "just went for" the suggested rates); *id*. (CW 2 said the suggested rates "were never questioned"); *id*. (CW 3 said she "never questioned the prices"); *id*. (CW 8 "would run a daily printout from Yardi of available apartment inventory and rent pricing[, which] was automatically set by Yardi and . . . [d]eviation . . . required corporate override approval").

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

or price ranges),[15] and others are alleged to manage a small number of units.[16] The FAC fails to allege any conceivable motive for Lessor Defendants to work together to inflate rental rates in areas where they have no properties, nor any conceivable ability to restrain competition in a nationwide market. *See Somers v. Apple, Inc.*, 729 F.3d 953, 964 (9th Cir. 2013) (finding claim "implausible in the face of contradictory market facts alleged in [the] complaint"); *Lifeline Ltd. No. II v. Conn. Gen. Life Ins. Co.*, 821 F. Supp. 1201, 1205–06 (E.D. Mich. 1993) (dismissing claims where "[t]he alleged conspiracy is 'practically and economically implausible'").

Equally deficient is the conclusory allegation that Defendants "appear to collectively monitor and enforce compliance" through "dedicated revenue managers." FAC ¶ 78. Plaintiffs never allege "evidentiary facts" to suggest that Yardi revenue managers pressure Lessor Defendants to adopt RENTmaximizer's suggested rates. *Kendall*, 518 F.3d at 1047 (emphasizing "[antitrust] claimants must plead not just ultimate facts (such as a conspiracy) but evidentiary facts"). Plaintiffs again rely solely on Yardi marketing language, such as revenue managers "will get to know your business processes, assets and goals to provide superior market support and will work with you to maximize your returns" and "help manage pricing," FAC ¶ 14, and innocuous statements from a confidential witness and press releases, such as revenue managers "basically went through all your properties and rates," "helped set some [unspecified] limits," and conducted a "pretty thorough review" of how clients were using the product and whether it was working for them. *Id.* ¶ 80.[17] None of these comments plausibly allege that revenue managers "collectively monitor and enforce compliance" with a price-fixing scheme as opposed to simply assisting clients in their use of the product. *See Llacua v. W. Range Ass'n*, 930 F.3d

---

[15] FAC ¶¶ 38, 40 (Dalton and LeFever Mattson Property Management have properties in California); *id*. ¶¶ 38, 39 (Dalton and HNN have properties in Washington); *id*. ¶¶ 33–34 (Plaintiffs leased from Pillar in Seattle).

[16] FAC ¶ 37 (Calibrate allegedly has 1,900 units); *id*. ¶ 40 (LeFever Mattson Property Management allegedly has "over 3,000" units); *id*. ¶ 43 (Pillar allegedly has 2,114 units); *id*. ¶ 44 (Summit allegedly has "over 4,000" units).

[17] *See also* FAC ¶ 81 (describing weekly phone calls and regular meetings where revenue managers provide "expert insight and valuable advice where pricing improvements can be made" and "dig deeper to support our pricing and that gives our organization and clients greater confidence").

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1161, 1180 & n.30 (10th Cir. 2019) (affirming dismissal where plaintiffs failed to allege a "key factor": "an enforcement mechanism, binding on all members" of alleged conspiracy).

Failure to allege an agreement by the Lessor Defendants to implement or abide by RENTmaximizer's suggestions is a "fatal deficiency" in Plaintiffs' claims. *Gibson*, 2023 WL 7025996, at *3. The *Gibson* decision is directly on point. The plaintiffs alleged that Las Vegas hotel lessors conspired to inflate hotel room prices by adopting common software that recommends pricing. *Id*. at * 1. In finding that the complaint failed to plausibly allege an agreement, the court explained that there was no allegation that the defendants were required to accept the software's recommended prices: "[W]ithout an agreement to accept the elevated prices recommended by the pricing algorithm, there is no agreement that could either support Plaintiffs' theory or otherwise make out a Sherman Act violation . . . ." *Id*. The same flaw dooms the FAC.

### 2.    No allegations of who, did what, to whom, where, and when?

The FAC is devoid of any other facts plausibly suggesting an agreement, such as "when" the agreement was formed or "who" specifically entered into the conspiracy. In the initial complaint, Duffy conceded that she had no idea when the alleged conspiracy was formed. Compl. ¶ 110 (alleging conspiracy began "at a time currently unknown to Plaintiff") (Dkt. # 1). The *Gibson* court then dismissed a similar complaint filed by Plaintiffs' counsel, finding no plausible inference that defendants began using pricing software at or around the same time or entered into an agreement to do so because the plaintiff failed to allege when the conspiracy began. 2023 WL 7025996, at *4. Plaintiffs subsequently filed the FAC, replacing the words "at a time currently unknown to Plaintiff" (the identical language used in the *Gibson* complaint) with "in 2011." FAC ¶ 179. This substitution does not solve the problem. Plaintiffs elsewhere suggest that each Lessor Defendant began using RENTmaximizer anywhere between 2012 and 2023. *Id*. ¶¶ 36–45. Plaintiffs' attempt to plead a start date for the alleged conspiracy is unsupported by any facts alleged in the FAC and is implausible in light of the FAC's other allegations.

The FAC also lacks allegations that the Lessor Defendants communicated with each other, much less facts establishing what they agreed to or how the conspiracy would operate. Plaintiffs merely assert that "individual participants entered into agreements on behalf of their

DEFS' OMNIBUS MOTION TO DISMISS – 17
(Case No. 2:23–cv–01391-RSL)

respective corporate families." *Id*. ¶ 54. But nowhere do Plaintiffs identify a single individual who had a discussion with another Lessor Defendant, not to mention entered into an agreement with them. *See Kendall*, 518 F.3d at 1047 (finding bare allegation that banks entered into conspiracy insufficient because banks "are large institutions with hundreds of employees entering into contracts and agreements daily"); *Gibson*, 2023 WL 7025996, at *4 ("While the Court is not persuaded that *Kendall* requires the names of specific employees . . . Plaintiffs must say more than 'Hotel Operators.'"); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 995 (N.D. Cal. 2015) (simply alleging insurance companies conspired "is not a sufficient allegation of the 'who'" because "Insurers are large organizations").[18]

The absence of any factual allegations supporting an alleged conspiracy is particularly noteworthy given Plaintiffs' access to confidential witnesses who would be aware of supporting facts, if any existed. Plaintiffs describe nine witnesses who were allegedly employed at Yardi or a Lessor Defendant. Yet, not a single one alleges an agreement among the Lessor Defendants to fix rental rates, or that RENTmaximizer used non-public competitor pricing data to generate rent recommendations. Indeed, none even mentions another Lessor Defendant. The former Bridge and Morguard employees simply describe how they personally used RENTmaximizer during their employment.[19] Their broad statements, such as "everybody was using [RENTmaximizer]" or unidentified persons "all know what they should be renting for," are not only woefully vague, but contain no reference to an agreement with other Lessor Defendants. FAC ¶ 93.[20] Three of the

---

[18] *See also Credit Bureau Servs., Inc. v. Experian Info. Sols., Inc.*, 2013 WL 3337676, at *8 (C.D. Cal. June 28, 2013) (dismissing claim where "[n]one of the factual allegations demonstrate that anyone at CoreLogic ever communicated with or even was in the same room as anyone at Experian, let alone that their communications involved an illicit agreement"); *Stanislaus Food Prod. Co. v. USS-POSCO Indus.*, 782 F. Supp. 2d 1059, 1075, 1081 (E.D. Cal. 2011) (dismissing allegations as "conclusory" where plaintiff failed to allege "specific agreements among and between defendants," including "the specific corporate players along with names of key executives" or "where the agreement was made").

[19] FAC ¶ 93 (CW 1 "stated that she regularly used Yardi to set prices for the apartments she managed"); *id*. (CW 2 "recalled that he regularly received printouts from Yardi on apartment pricing, which he used in listings he created"); *id*. (CW 3 "explained she frequently consulted Yardi's pricing recommendations to quote customers who applied for a rental"); *id*. (CW 8 "would run a daily printout from Yardi of available apartment inventory and rent pricing").

[20] An assertion that "everybody" was using RENTmaximizer is also implausible given that the units managed by the Lessor Defendants for whom unit volume is alleged represent far less than 1% of nationwide multifamily rentals, FAC ¶¶ 36–45; *see also supra* Background § II, and given the FAC's references to competitor RealPage, which allegedly engaged in "similar conduct." *See, e.g.*, FAC ¶ 26.

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

former Lessor Defendant employees also claim that they contacted other unidentified apartment complexes to ask about pricing. However, none claim (nor could they) that this information was non-public. And even assuming those other complexes used RENTmaximizer—which no witness alleges—such allegations have no relevance to Plaintiffs' claims against *the Lessor Defendants*. The remaining witnesses merely purport to provide general information about Yardi or RENTmaximizer, but say nothing about the Lessor Defendants' use of the product, let alone any agreement among them with respect to such use.

In sum, Plaintiffs fail to answer the "basic questions" required by the Ninth Circuit to allege an antitrust conspiracy, *i.e.*, "'who, did what, to whom (or with whom), where, and when?'" *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 390 (9th Cir. 2017) (quoting *Kendall*, 518 F.3d at 1048). A conclusory allegation that the Lessor Defendants "collectively adopt[ed] a coordinated pricing strategy" simply by using RENTmaximizer, FAC ¶ 17, is a "bare assertion of conspiracy" that "will not suffice." *Twombly*, 550 U.S. at 556; *see also Name.Space*, 795 F.3d at 1129 (finding mere speculation of collusive agreement insufficient to allege price-fixing claim); *Gibson*, 2023 WL 7025996, at *2 (requiring evidence of a tacit agreement in order to nudge claims based on adoption of pricing software across the line from possible to plausible); *S&W Forest Prod. Ltd. v. Shake*, 2019 WL 3716457, at *4–6 (W.D. Wash. Aug. 7, 2019) ("[T]here is no evidence adduced that such a plan actually existed; e.g., facts related to the time, place or content of any meetings between 'co-conspirators.").[21]

In the absence of plausible allegations of an agreement, the FAC is fatally deficient and should be dismissed for this reason alone.

---

[21] *See also Kelsey K. v. NFL Enters., LLC*, 254 F. Supp. 3d 1140, 1144 (N.D. Cal. 2017) ("For a conspiracy of the scale alleged by this complaint, one would expect at least some evidentiary facts to have been located and pled."), *aff'd*, 757 F. App'x 524 (9th Cir. 2018); *Credit Bureau Servs.*, 2013 WL 3337676, at *8 (dismissing complaint that "fail[ed] to put forth any facts indicating where, when, or who participated in the alleged agreement"); *MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1104 (N.D. Cal. 2012) (dismissing for failure to allege if agreements "are written, oral or tacit, when they were executed, who made the decisions, or with which [companies they] were made").

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

### B. Plaintiffs fail to allege direct or circumstantial evidence of an unlawful conspiracy.

Consistent with the failure to allege any agreement, Plaintiffs fail to plead direct or circumstantial evidence of an unlawful conspiracy to fix rental rates, which further supports dismissal. "Direct evidence is smoking-gun evidence that 'establishes, without requiring any inferences' the existence of a conspiracy." *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 822 (9th Cir. 2023) (quoting *In re Citric Acid Litig.*, 191 F.3d 1090, 1093 (9th Cir. 1999)). Direct evidence "usually take[s] the form of an admission by an employee of one of the co-conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy." *In re Text Messaging Antitrust Litig.*, 630 F.3d at 628–29.[22] No such admission or facts are alleged—by the confidential witnesses or otherwise—nor does the Lessor Defendants' mere use of RENTmaximizer establish direct evidence of a conspiracy for all of the reasons given above.

Absent direct evidence of a conspiracy, Plaintiffs would need to plead circumstantial evidence to avoid dismissal. To successfully plead such a claim, they must allege facts demonstrating both (1) "parallel conduct" by each Defendant and (2) "plus factors" to support those allegations. *In re Musical Instruments*, 798 F.3d at 1193–94. The FAC fails on both counts.

### 1. No parallel conduct.

A mere allegation of parallel conduct is insufficient to state a Section 1 claim. *See In re Musical Instruments*, 798 F.3d at 1193. But even if such an allegation was sufficient, Plaintiffs fail to plausibly plead even that minimal showing. As an initial matter, the FAC fails to specify when each Lessor Defendant used RENTmaximizer. The FAC merely alleges that they began using the product "in at least" various years ranging from 2012 to 2023. FAC ¶¶ 36–45. As *In re Musical Instruments* explained, parallel conduct means "competitors adopting *similar* policies around the *same* time in response to *similar* market conditions . . . ," and "[a]llegations of . . . slow adoption of similar policies does not raise the specter of collusion." 798 F.3d at 1193

---

[22] *See also Frost v. LG Elecs., Inc.*, 801 F. App'x 496, 497–98 (9th Cir. 2020) (holding "various statements made by defendants' employees" were not "direct evidence" of a conspiracy because they "require[d] inferences . . . to support the existence of a conspiracy"); *Real Est. Exch., Inc. v. Zillow, Inc.*, 2023 WL 5278115, at *6 (W.D. Wash. Aug. 16, 2023) ("[Direct evidence] may consist of written documents, audio or video recordings, or eyewitness testimony about what was said.").

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1    (emphases added); *cf. Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505,

2    516–17 (8th Cir. 2018) (finding actions six months apart did not constitute parallel conduct). The

3    FAC fails to establish temporal proximity to support a claim of parallel conduct.

4          Similarly, Plaintiffs fail to allege parallel pricing or supply reductions. They allege in

5    conclusory fashion that use of RENTmaximizer enabled the Lessor Defendants to implement

6    unconstrained price increases and cease offering discounts and concessions. FAC ¶ 90. But this

7    allegation is belied by the substantial concessions Plaintiffs received on their own leases. *See*

8    *supra* Background § IV. Ironically, the FAC describes rent concessions as "the traditional and

9    legal form[] of competition found in a competitive market," FAC ¶ 90, and "the discounting that

10   would occur in a competitive market." *Id*. ¶¶ 5–6. The concessions given to Plaintiffs contradict

11   the FAC's core theory that RENTmaximizer was employed to enforce parallel pricing. And,

12   more generally, they render implausible Plaintiffs' theory that the Lessor Defendants' use of

13   RENTmaximizer eliminated price competition or independent price decisions.

14         The FAC is also silent on the Lessor Defendants' actual rental rates. There is not even an

15   allegation that each Lessor Defendant increased its rents, set them at above-market levels, or did

16   so at the same time. *See In re Elevator Antitrust Litig*., 502 F.3d 47, 52 (2d Cir. 2007) (affirming

17   dismissal of complaint alleging nationwide conspiracy to fix elevator prices where there were

18   "no allegations of the actual pricing of elevators . . . in the United States or changes therein

19   attributable to defendants' alleged misconduct"). The FAC's references to generic promotional

20   statements suggesting RENTmaximizer improved revenue or rental growth do not suffice. *See,*

21   *e.g*., FAC ¶ 90. There is no allegation that *each* Lessor Defendant's revenue rose, much less by

22   setting above-market rents as opposed to, for example, increasing occupancy rates.[23]

23

---

24   [23] Indeed, Plaintiffs acknowledge that increased revenue is driven by multiple factors other than rental
     rates, such as higher occupancy and longer lease terms. *See, e.g*., FAC ¶ 71 (operational components

25   driving revenue include "rental income, concessions, occupancy and rental rate, not just pricing"); *id*.
     ¶ 77 n.84 (article quoting BSR Trust representative: "[W]e're signing more leases for 15 months rather

26   than the usual 12 months, meaning that high-quality residents are here for the long haul."); *id*. ¶ 23
     n.24 (article quoting Dalton representative: "RENTmaximizer has decreased our turnover rate by

27   20%"); *id*. ¶ 44 n.52 (article quoting Summit representative: "[RENTmaximizer] gives us the
     flexibility to base prices on move-in date and lease term and other variables. . . . This produces

28   revenue, and profit, from an apartment that would otherwise sit vacant for days or weeks.").

DEFS' OMNIBUS MOTION TO DISMISS – 21
(Case No. 2:23–cv–01391-RSL)

1   Nor do Plaintiffs allege any impact on market supply. They merely assert that
2   maintaining occupancy rates "is the hallmark of a competitive market," *id*. ¶ 87, and offer an
3   unsupported allegation that the alleged conspiracy "reduced output." *Id*. ¶ 164. And yet
4   remarkably, the FAC repeatedly suggests that use of RENTmaximizer maintains or increases
5   properties' occupancy rates, once again undercutting Plaintiffs' own allegations. *See, e.g.,*
6   *id*. ¶¶ 5, 66 (RENTmaximizer improves rental income "while maintaining occupancy"); *id*. ¶ 71
7   ("Increase rental income and improve occupancy" with RENTmaximizer); *id*. ¶ 72
8   (RENTmaximizer users have gained rental income growth "while improving occupancy"); 
9   *id*. ¶ 91 ("Maximize rents and occupancy" with RENTmaximizer).

10  Plaintiffs also fail to identify a single instance in which any two rent recommendations
11  for Lessor Defendant properties were the same (or even similar), much less that they were
12  adopted. To the contrary, Plaintiffs acknowledge that the recommendations are simply that—
13  *recommendations*—which can be overridden, *id*. ¶¶ 13, 72, and which depend on multiple
14  individualized factors, undermining any suggestion that RENTmaximizer recommends parallel
15  rates. *See, e.g*., *id*. ¶ 72 ("Leases are priced by the system daily, which allows for fast adjustment
16  to market conditions and changes in your inventory and traffic, while adjusting for cost
17  constraints such as vacancy loss, turnover costs, inventory hold days and lease expiration
18  management."). Nor have Plaintiffs alleged the rate at which each Lessor Defendant accepted or
19  rejected the product's recommendations, or the frequency with which the product recommended
20  raising rents, as opposed to keeping them unchanged or reducing rates. *See Mosaic Health Inc. v.*
21  *Sanofi-Aventis U.S., LLC*, 2022 WL 4017895, at *6 (W.D.N.Y. Sept. 2, 2022) (finding policies
22  that were "different in their particulars, their timing, and their outcomes" were not parallel);
23  *Hogan v. Pilgrim's Pride Corp.*, 2018 WL 1316979, at *7 (D. Colo. Mar. 14, 2018) (dismissing
24  for failure to allege "how [a defendant's] actions compared with those of its co-conspirators").

25  Plaintiffs' purported "test run economic analysis" also fails to adequately allege parallel
26  conduct. They allege that an analysis of public rent data in zip codes in three cities—Charlotte,
27  Phoenix, and Seattle—where usage of RENTmaximizer was higher than 15% of available units,
28  showed "an average overcharge of 6%." FAC ¶ 118. As an initial matter, no Lessor Defendant or

DEFS' OMNIBUS MOTION TO DISMISS – 22
(Case No. 2:23–cv–01391-RSL)

1 named co-conspirator is alleged to have properties in Charlotte or Phoenix. As such, this analysis

2 is irrelevant.[24] Moreover, Plaintiffs rely exclusively on average pricing for all units in those

3 cities, as opposed to data specific to units offered by the Lessor Defendants. This offers no

4 insight into pricing *by the Lessor Defendants*, and thus fails to demonstrate *parallel* pricing

5 decisions. Further, allegations based on market averages are insufficient to plausibly establish

6 that each individual defendant's prices moved upward in parallel. *See In re Musical Instruments*,

7 798 F.3d at 1197 (rejecting analysis showing increase in "average retail price" of all goods sold,

8 instead of increase in price of goods "manufactured by defendants," noting "[a]s far as we can

9 tell . . . retail prices of defendants' products actually might have fallen during the class period. . .

10 ."); *see also In re GSE Bonds Antitrust Litig*., 396 F. Supp. 3d 354, 365 (S.D.N.Y. 2019) (finding

11 market-wide data insufficient to infer that each defendant was charging higher prices); *In re Pork*

12 *Antitrust Litig*., 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019) (refusing to infer that

13 individual defendants all contributed to decreased production where plaintiffs relied almost

14 exclusively on industry-wide data).

15      Finally, mere usage of RENTmaximizer is insufficient to allege parallel conduct. The

16 FAC identifies many reasons why Lessor Defendants would independently choose to use the

17 product, such as a desire to "improv[e] occupancy," including through increased transparency

18 into factors affecting occupancy rates; facilitate fast and flexible rate-setting; access strategies to

19 fill stale units; effectively manage lease expirations and renewals; and obtain clear and

20 comprehensive reporting. *See, e.g*., FAC ¶¶ 6, 71, 90. These benefits accruing to each user are

21 consistent with independent, unilateral decisions and undermine any inference of a conspiracy. In

22 other words, Plaintiffs have "indeed provided a context" for property managers' use of

23 RENTmaximizer, "but not one that plausibly suggests they entered into illegal horizontal

24 agreements." *In re Musical Instruments*, 798 F.3d at 1198.

25

26

---

27 [24] Although the Pillar properties The Wave and The Nolo are in downtown Seattle, only one other
   property in Seattle appears to be owned or managed by a Lessor Defendant or co-conspirator (HNN),

28 which is in a different zip code miles away in the Bryn Mawr neighborhood. FAC ¶ 39 & n.40.

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1   Absent allegations of parallel conduct, Plaintiffs cannot state a claim through

2   circumstantial evidence. *See In re Pork Antitrust Litig*., 2019 WL 3752497, at *7 ("[I]n the same

3   way that parallel conduct on its own is insufficient to establish an agreement, plus factors

4   without plausible allegations of parallel conduct are insufficient to establish an inference of an

5   agreement.").

6          **2.     The so-called "plus factors" do not plausibly allege a conspiracy.**

7          Because the FAC fails to plead parallel conduct, Claim 1 should be dismissed, and

8   Plaintiffs' alleged "plus factors" are irrelevant as a matter of law. *See Bona Fide Conglomerate*,

9   691 F. App'x at 391 ("'Plus factors' are relevant only if the complaint adequately alleges parallel

10  conduct among the defendants."); *Gibson*, 2023 WL 7025996, at *4 (same).

11         Even assuming Plaintiffs adequately alleged parallel conduct—which they do not—

12  courts distinguish permissible parallel conduct from an impermissible conspiracy by looking for

13  "plus factors," which are "economic actions and outcomes that are largely inconsistent with

14  unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical

15  Instruments*, 798 F.3d at 1194.[25] To adequately plead plus factors, Plaintiffs must offer factual

16  allegations that plausibly exclude the possibility of independent action. *See Kendall*, 518 F.3d at

17  1049 ("Allegations of facts that could just as easily suggest rational, legal business behavior by

18  the defendants as they could suggest an illegal conspiracy are insufficient."); *Gibson*, 2023 WL

19  7025996, at *6 (explaining that plaintiffs relying on allegations of parallel conduct "must allege

20  something more than conduct merely consistent with agreement in order to 'nudge[ ] their claims

21  across the line from conceivable to plausible'") (*citing DRAM*, 28 F.4th at 47).

22         The alleged plus factors, alone or in combination, fail to plausibly suggest a conspiracy

23  and instead are "in line with a wide swath of rational and competitive business strategy

24  unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554.

25

26

---

27  [25] Plus factors can include, for example, conduct against a company's apparent economic self-interest,
    unusual interfirm communications, or an abrupt change in a long-standing business practice or price

28  structure. *In re Musical Instruments*, 798 F.3d at 1195.

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

**Exchanging competitively sensitive information.** Plaintiffs make the conclusory allegation that the Lessor Defendants "agree[d] to provide their competitively sensitive data to RENTmaximizer with the understanding that such data will be shared with competitors." FAC ¶ 86.[26] As an initial matter, although the FAC alleges that "detailed" information was exchanged, *id*. ¶ 193, it never identifies what *specific* non-public information relevant to Plaintiffs' claims was shared *among the Lessor Defendants*, nor cites any example of non-public information being exchanged or used in a rent recommendation. The FAC merely refers in vague terms to an alleged exchange of "pricing and occupancy data" and "information about current supply, production, and pricing plans" among RENTmaximizer users generally. *Id*. ¶¶ 109, 199. As discussed further below, pricing information is available from numerous *public* sources.

Even if there were non-conclusory allegations that individual customers provide non-public pricing data to Yardi in connection with their use of some Yardi product, the FAC fails to plausibly allege that RENTmaximizer uses such information to propose rents to other Yardi clients. *See Gibson*, 2023 WL 7025996, at *4 (dismissing complaint where plaintiffs "never quite allege (though they suggest by implication)" that defendants received nonpublic information by using common pricing software). Plaintiffs merely point to generic statements in Yardi promotional materials, such as that RENTmaximizer allows users to see "how they compare with competing communities," FAC ¶ 73, and "take[s] into account 'competitor rates'." *Id.* ¶ 74; *see also id*. ¶ 93 (alleging Yardi "would show comparative pricing [at] specific competitor apartment locations" without alleging that such information is not otherwise publicly available).

Although Plaintiffs at times try to suggest impropriety in their references to use of "competitor rates" to generate pricing recommendations, other parts of the FAC acknowledge the obvious truth that information about rental rates (*i.e.*, "competitor rates") is available from many

---

[26] An agreement to exchange competitively sensitive information, if properly alleged, is evaluated under the rule of reason and only supports an antitrust claim when "(1) the exchange indicates the existence of an express or tacit agreement to fix or stabilize prices, or (2) the exchange is made pursuant to an express or tacit agreement that is itself a violation of § 1 under a rule of reason analysis." *In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*, 906 F.2d 432, 447 & n.13 (9th Cir. 1990). Not only do the allegations premised on information-sharing fail to support a *per se* claim as a "plus factor," but they also fail to state a claim under a rule of reason analysis. *See infra* Arg. § III.

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

public sources, such as public rental listings, property managers' websites,[27] and online sites such as Rent.com or Zillow.[28] Plaintiffs acknowledge, for instance, that Yardi Matrix employees, posing as potential renters, collect pricing information by contacting apartment communities, and that RENTmaximizer's suggestions may be based in part on the "public information" they collect. *Id.* ¶ 11. Likewise, Plaintiffs' "test run economic analysis" was performed using similar "[p]ublic rent data" from Charlotte, Phoenix, and Seattle, which apparently allowed their analyst to "control[] for various property and geographic features, such as (1) size of the unit [and] (2) number of bathrooms." *Id.* ¶ 118. In short, Plaintiffs acknowledge that there is much granular information about rental properties and pricing that is publicly available.

As the *Gibson* court concluded in the face of similar allegations: it is "unclear whether the pricing recommendations 'generated' to [Lessor Defendants] include that confidential information fed in; perhaps they only get their own confidential information back, mixed with public information from other sources." 2023 WL 7025996, at *5 (dismissing complaint and noting "[p]ublic pricing data is available from hotel websites, Expedia, and the like—that could be the information 'shopped' back to a client"). Obtaining and sharing information available to any member of the public does not support an inference of collusion in furtherance of a price-fixing conspiracy. *See Prosterman v. Am. Airlines, Inc*., 747 F. App'x 458, 462 (9th Cir. 2018) (affirming dismissal of claim premised on pricing information clearinghouse that made published airline fares available to industry members); *Wilcox v. First Interstate Bank of Oregon, N.A.*, 815 F.2d 522, 526 (9th Cir. 1987) (finding exchange of public information did not support inference of conspiracy); *In re Citric Acid Litig*., 996 F. Supp. 951, 959 (N.D. Cal. 1998) ("[T]he exchange of publicly available information does not support an inference of conspiracy." (citing *Wilcox*, 815 F.2d at 526)), *aff'd*, 191 F.3d 1090 (9th Cir. 1999).

---

[27] *See, e.g*., FAC ¶ 36 n.35 (Bridge, https://www.bridgepm.com/searchlisting); *id.* ¶ 40 n.42 (LeFever Mattson Property Management, https://propertysearch.lmpropertymanagement.com/).

[28] *See Perkins v. LinkedIn Corp*., 53 F. Supp. 3d 1190, 1204 (N.D. Cal. 2014) (noting courts may take judicial notice of publicly accessible websites); *see also, e.g*., *Wible v. Aetna Life Ins. Co*., 375 F. Supp. 2d 956, 965–66 (C.D. Cal. 2005) (taking judicial notice of third party web pages); *Optivus Tech., Inc. v. Ion Beam Applications S.A*., 2004 WL 5700631, at *18 n.15 (C.D. Cal. Aug. 31, 2004) (taking judicial notice of content embedded in third party websites).

1    The confidential witnesses also fail to support an allegation that non-public pricing

2 information was shared or used in rent recommendations. CW 6 allegedly stated that Voyager

3 clients (*i.e.*, not RENTmaximizer clients) agree to share unspecified "pricing and occupancy

4 data" with Yardi and to allow Yardi to use unspecified "aggregated data" as part of Matrix and

5 RENTmaximizer. FAC ¶ 12. Even assuming any aggregated data used by RENTmaximizer

6 included non-public rental rates—which CW 6 does not allege—"to plausibly infer that a [data-

7 aggregating intermediary] facilitated a conspiracy," Plaintiffs must offer "concrete allegations

8 that the conduit defendant compromised the ostensible anonymity of competitively sensitive

9 information." *In re Loc. TV Advert. Antitrust Litig.*, 2022 WL 3716202, at *6 (N.D. Ill. Aug. 29,

10 2022). CW 6 makes no such allegation. Plaintiffs also attempt to link two ambiguous statements

11 from CW 7 that Yardi clients were "very concerned about sharing their rental rates" and that

12 "[m]ost people appreciated the fact that if they shared data, they would get data from other

13 clients using things like RENTmaximizer, so that everybody was benefitting from the data."

14 FAC ¶ 139. Again, this ambiguous assertion fails to allege that users received *non-public pricing*

15 *data* from "other clients using things like RENTmaximizer," let alone disaggregated data.[29]

16    In sum, Plaintiffs' allegations are just as consistent with a product that uses publicly

17 available data together with a property's own data to propose rent options based on the

18 property's individual goals. In other words, this supposed "plus factor" just as easily suggests

19 rational, legal business behavior as opposed to an illegal conspiracy.

20    **Actions against economic self-interest.** Alleged actions against economic self-interest

21 are a plus factor only when the action would be "so perilous in the absence of advance agreement

22 that no reasonable firm would make the challenged move without such an agreement." *DRAM*,

23 28 F.4th at 49 ("Plaintiffs have not established that Defendants' supply cuts were the 'extreme

24 action against self-interest' contemplated by this circuit as a plus factor.").

25

26

---

27 [29] Plaintiffs also allege that three former employees of Lessor Defendants contacted other apartment
complexes for pricing information, but do not allege the information was not publicly available nor

28 explain how it is relevant to an alleged conspiracy involving RENTmaximizer. FAC ¶¶ 140–41.

DEFS' OMNIBUS MOTION TO DISMISS – 27
(Case No. 2:23–cv–01391-RSL)

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1    Plaintiffs assert that the Lessor Defendants engaged in a pricing strategy to "dramatically

2    increas[e] rents notwithstanding market conditions." FAC ¶ 143. As an initial matter, Plaintiffs

3    offer no facts to support this conclusory allegation. They do not allege what rental rates each

4    Lessor Defendant charged, whether or when those rates changed or what they changed to, or

5    what the contemporaneous market rates were. At most they suggest that *one* Lessor Defendant

6    raised rents at *one* property in 2016, *id.* ¶ 23, and that some of the Lessor Defendants had

7    revenue growth at some point. *Id.* ¶¶ 5 n.6, 36 n.36, 41 n.44, 43 n.47, 45 n.50.

8    Furthermore, raising rents is not inherently against economic self-interest, not to mention

9    "so perilous" that "no reasonable firm would make the challenged move without" an

10   anticompetitive agreement. *DRAM*, 28 F.4th at 49. To the contrary, increasing one's prices in

11   response to market conditions is entirely rational economic behavior. *See Brooke Grp. Ltd. v.*

12   *Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993) (explaining that increasing prices

13   does not alone "permit a rational reference of conscious parallelism or supracompetitive pricing"

14   and may be "equally consistent with growing product demand"). For instance, Plaintiffs cite an

15   article describing "all time low vacancy rates in the rental market." FAC ¶ 1 n.2. Rising rents in a

16   time of low rental-unit supply is economically rational, not evidence of a conspiracy.

17   **Market characteristics.** Plaintiffs assert in conclusory fashion that the nationwide

18   multifamily rental market requires significant upfront costs, and thus high barriers to entry, and

19   entails high switching costs[30] should a tenant wish to move. FAC ¶¶ 144–45, 148–49. Even if

20   true, Plaintiffs' allegations "are simply descriptions of the market, not allegations of anything the

21   defendants did." *Erie Cnty. v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012) (concluding

22   market-characteristic allegations "d[id] not give rise to an inference of unlawful agreement");

23   *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 917 (N.D. Cal. 2019) ("[M]arket characteristics

24   are . . . neutral facts.").

25

26   ------

27   [30] Ironically, Plaintiffs claim that "disruptions to personal and work life" make it difficult to switch from one unit to another, and that renters "often do not have any lower-priced options available in reasonable proximity to their work, school, or home." FAC ¶¶ 148–49. Yet their antitrust conspiracy theory nonsensically hinges on tenants viewing apartments in far-flung states as interchangeable with those close to their personal and work lives.

28

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

Similarly, Plaintiffs suggest in conclusory fashion that nationwide multifamily rental units are fungible save for "a few key overarching property characteristics, such as bedroom and bathroom count, amenities, location, and building age." FAC ¶ 146. These "key" characteristics simply underscore that all apartments across the United States are not fungible. A luxury three-bedroom high rise in Seattle is not interchangeable with a modest basement studio in Flagstaff. Further, Plaintiffs fail to allege facts establishing that the apartments rented *by the Lessor Defendants* are fungible. They do not allege that the Lessor Defendants compete in the same locations with apartments sharing the same "key characteristics." In fact, in most cases, the geographies in which the Lessor Defendants allegedly operate do not overlap at all.

Even if Plaintiffs had plausibly alleged that a nationwide rental market has high entry barriers, high switching costs, or that apartments are fungible, such allegations are "no more consistent with an illegal agreement than with rational and competitive business strategies, independently adopted by firms acting within an independent market." *In re Musical Instruments*, 798 F.3d at 1189 (affirming dismissal). Courts routinely hold that such characteristics, standing alone, do not imply collusion. *See, e.g.*, *DRAM*, 28 F.4th at 52, 54 (affirming dismissal despite allegations of "extreme market concentration"); *White v. R.M. Packer Co.*, 635 F.3d 571, 582 (1st Cir. 2011) (finding allegations of "[h]igh barriers to entry and inelastic demand" do not "help[] to distinguish between agreement and mere conscious parallelism"); *In re German Auto. Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967, 983 (N.D. Cal. 2020) (noting allegations that market was "susceptible to collusion" are "of little help in pleading an antitrust conspiracy").

**Opportunities to collude.** Plaintiffs allege that Defendants "have numerous opportunities to collude at the Yardi Advance Solutions Conference (YASC) and social events," citing a confidential witness who allegedly describes the conference as "mostly 'a networking event.'" FAC ¶¶ 150–51. Yet, Plaintiffs fail to identify any employee or agent of any Lessor Defendant who attended such an event, let alone interacted with employees or agents of other Lessor Defendants, to say nothing of conspiring with them. These bald allegations are fatally insufficient. *See Gibson*, 2023 WL 7025996, at *4 (noting complaint failed to allege "that employees of any particular Defendant attended [networking conferences], much less provide

1    names or anonymized references to the individual employees from each Defendant who attended

2    and therefore could have entered into agreements"); *In re German Auto. Mfrs. Antitrust Litig.*,

3    392 F. Supp. 3d 1059, 1071–72 (N.D. Cal. 2019) (rejecting allegations that failed to "identify

4    what was agreed to in these [trade association] meetings and instead only vaguely refer to

5    'clandestine agreements to limit technological innovation'").

6        Moreover, it is well-established that, without more, merely attending a conference does

7    not support an inference of illegal activity. *See, e.g.*, *In re Musical Instruments*, 798 F.3d at 1196

8    ("[M]ere participation in trade-organization meetings where information is exchanged and

9    strategies are advocated does not suggest an illegal agreement").[31]

10       **RealPage Investigation.** Plaintiffs cite a report of an investigation of RealPage, a Yardi

11   competitor facing litigation over a "pricing algorithm," FAC ¶¶ 158–62, to imply that matters

12   involving an unrelated company and its unrelated product somehow suggest that Defendants in

13   this action unlawfully conspired together. Such speculation fails as a matter of law.

14       An alleged investigation of another company, with a different product, has no bearing on

15   the claims here. Courts rightly refuse to impute a conspiracy based on alleged conduct involving

16   other actors or the industry at large. *See, e.g., In re Elevator*, 502 F.3d at 52 ("Allegations of

17   anticompetitive wrongdoing in Europe . . . is merely to suggest (in defendants' words) that 'if it

18   happened there, it could have happened here.'"); *Evanston Police Pension Fund v. McKesson

19   Corp.*, 411 F. Supp. 3d 580, 597 (N.D. Cal. 2019) (finding investigation irrelevant to Section 1

20   claim where defendant was not named a party to any unlawful agreement); *In re TFT-LCD (Flat

21   Panel) Antitrust Litig.*, 2010 WL 2629728, at *6 (N.D. Cal. June 29, 2010) ("[T]he fact that

22   some defendants are under investigation for anticompetitive conduct in the cathode ray tube

23   market does not, on its own, state a claim for price-fixing" involving another industry product).

---

24   [31]  *See also In re Citric Acid*, 191 F.3d at 1097 (finding company's attendance at industry meetings with
25        competitors who admitted price-fixing did not support inference that company conspired with them);
         *In re Cedar Shakes & Shingles Antitrust Litig.*, 2020 WL 832324, at *6 (W.D. Wash. Feb. 20, 2020)
26        (finding complaints "devoid of any allegations which plausibly suggest that anyone actually conferred,
         discussed and/or consented to any plan of action to fix the prices . . . the fact there were opportunities
         to do so is not enough"); *In re Hawaiian & Guamanian Cabotage Antitrust Litig.*, 647 F. Supp. 2d
27        1250, 1257 (W.D. Wash. 2009) ("Attendance at industry trade shows and events . . . 'is presumed
         legitimate and is not a basis from which to infer a conspiracy, without more.'" (citation omitted)).

28

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1 Moreover, investigations typically are a non-factor in assessing an antitrust claim, as

2 "investigations that do not result in a finding of fact or admission suggest only that a government

3 body believed a circumstance appeared suspicious." *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d

4 897, 921 (N.D. Cal. 2019); *see also Evanston Police Pension Fund*, 411 F. Supp. 3d at 597

5 (noting "general rule" that "government antitrust investigations ordinarily carry no weight in

6 pleading an antitrust conspiracy"); *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp.

7 2d 1011, 1024 (N.D. Cal. 2007) (holding that investigation alone "carries no weight in pleading

8 an antitrust conspiracy claim").

9 In sum, Plaintiffs' "plus factors" do not plausibly allege a *per se* illegal horizontal

10 conspiracy to fix rental rates. To the contrary, the FAC amply demonstrates that use of

11 RENTmaximizer is equally consistent "with rational and competitive business strategies,

12 independently adopted by firms . . . ." *In re Musical Instruments*, 798 F.3d at 1189.

13 **III. The FAC fails to state a claim under the rule of reason.**

14 As explained above, the FAC fails to plausibly allege a *per se* antitrust violation.[32] The

15 FAC also fails to plausibly state a rule of reason claim.

16 Claim 2 alleges that Yardi and the Lessor Defendants entered into a set of vertical

17 agreements to use RENTmaximizer to fix rents. FAC ¶ 186. Claim 3 alleges that Defendants

18 agreed to "regularly exchange detailed, timely, competitively sensitive, and non-public

19 information about their operations" through Yardi. *Id.* ¶¶ 193, 200. Both claims must be

20 analyzed under the rule of reason. *Id.* ¶¶ 186, 208; *see also, e.g., U.S. v. U.S. Gypsum Co.*, 438

---

21 [32] For many of the same reasons that Plaintiffs fail to allege a *per se* violation, they also fail to allege a

22 form of anticompetitive conduct subject to "quick look" analysis. Similar to the *per se* rule, a quick

23 look analysis is only appropriate "where 'an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on

24 customers and markets.'" *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1134 (9th Cir. 2011) (quoting *California Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999)). Thus, courts have

25 consistently rejected the application of quick look analysis to the types of conduct asserted here. *See, e.g.*, *In re Musical Instruments*, 798 F.3d at 1191–92 & n.3 (recognizing that "a rimless hub-and-spoke

26 conspiracy is not a hub-and-spoke conspiracy at all" but is instead "a collection of purely vertical agreements" that should be analyzed "under the rule of reason"); *Jien v. Perdue Farms, Inc.*, 2020 WL

27 5544183, at *9 (D. Md. Sept. 16, 2020) (rejecting quick look analysis in context of "information sharing" because "sharing price information is presumptively lawful"); *see also PBTM LLC v.*

28 *Football Nw., LLC*, 2022 WL 670920, at *6 (W.D. Wash. Mar. 7, 2022) (Lasnik, J.) (dismissing claims failing to meet quick look standard).

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1    U.S. 422, 443 n.16 (1978) (analyzing alleged conspiracy to exchange competitively sensitive
2    information); *In re Musical Instruments*, 798 F.3d at 1191–92 & n.3 (noting that "collection[s] of
3    purely vertical agreements" are analyzed under the rule of reason). Plaintiffs also suggest that
4    Claim 1 be reviewed under the rule of reason in the alternative to *per se* treatment. FAC ¶ 183.
5    All three claims fail for the reasons already discussed, including that the FAC is devoid of facts
6    plausibly alleging that the Lessor Defendants agreed to implement or abide by
7    RENTmaximizer's recommendations or exchange competitively sensitive information. *See, e.g.*,
8    *id.* ¶¶ 67, 79 (acknowledging Lessor Defendants are "actively engaged in their pricing activity"
9    and can reject recommendations); *id.* ¶ 113 (acknowledging "current pricing information" is
10   "public"). Even if those flaws were not dispositive, the claims should be dismissed because the
11   FAC fails to satisfy the requirements for asserting a rule-of-reason claim.

12          To avoid dismissal, Plaintiffs must plausibly allege (*i*) a "relevant market" that is
13   plausibly defined in terms of both products and geography, in which (*ii*) Defendants possess
14   "market power"—*i.e.*, "the power to control prices or exclude competition" on a market-wide
15   basis. *Flaa v. Hollywood Foreign Press Association*, 55 F.4th 680, 693 (9th Cir. 2022) (affirming
16   dismissal of rule of reason claims). Because Plaintiffs fail to plausibly allege any of these
17   required elements, all three of their claims should be dismissed.

18          **A.      Plaintiffs fail to plausibly allege a relevant market.**

19          To state a rule of reason claim, Plaintiffs must adequately plead a relevant market. *See*
20   *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018). It is not enough merely to assert
21   that the relevant market issue is "fact-intensive"; Plaintiffs must define a relevant market *at the*
22   *pleading stage* that is facially plausible and consistent with the well-established legal principles
23   governing the definition of antitrust markets. *Id.* at 1120 ("[A] complaint may be dismissed
24   under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable.");
25   *see also In re German Auto. Manufacturers Antitrust Litig.*, 612 F. Supp. 3d at 979 ("Failure to
26   plead a relevant market is grounds to dismiss."). This includes plausibly defining the market in
27   terms of both relevant products and geographies. *Hicks*, 897 F.3d at 1120; *Netafim Irrigation,*
28   *Inc. v. Jain Irrigation, Inc.*, 562 F. Supp. 3d 1073, 1081 (E.D. Cal. 2021).

DEFS' OMNIBUS MOTION TO DISMISS – 32
(Case No. 2:23–cv–01391-RSL)

1    Plaintiffs devote a total of *four paragraphs* in their 208-paragraph FAC to the relevant
2    market, asserting that there is a single nationwide market for the rental of multifamily housing.
3    FAC ¶¶ 165–68. But simply alleging a nationwide market does not make it plausible, and for that
4    reason alone, Plaintiffs' claims should be dismissed.

5    **1.    No plausible geographic market.**

6    For antitrust purposes, a relevant geographic market is the "area of effective
7    competition . . . where buyers can turn for alternate sources of supply." *Netafim*, 562 F. Supp. 3d
8    at 1081 (quoting *Morgan, Strand, Wheeler & Biggs v. Radiology, Ltd.*, 924 F.2d 1484, 1490 (9th
9    Cir. 1991)); *see also In re Se. Milk Antitrust Litig*., 739 F.3d 262, 277 (6th Cir. 2014) ("Outlining
10   a geographic market entails mapping an area within which the defendant's customers who are
11   affected by the challenged practice can practicably turn to alternative suppliers if the defendant
12   were to raise its prices or restrict its output." (internal quotation marks and citation omitted)).
13   Thus, if buyers in one geographic area could not reasonably purchase from suppliers located in a
14   second geographic area, the two areas are not part of the same relevant market. *See, e.g.*, *Sharif
15   Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020) (noting a
16   "properly defined" geographic market "excludes other potential suppliers . . . whose product is . .
17   . too far away" to be a reasonable substitute for consumers) (alterations added) (quoting Phillip
18   E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their
19   Application* ¶ 530a (4th ed. 2019)); *see also U.S. v. Conn. Nat'l Bank*, 418 U.S. 656, 668 (1974)
20   (noting a properly defined geographic market "must be delineated in a way that takes into
21   account the local nature of the demand").

22   Here, in a one-sentence paragraph, Plaintiffs assert that multifamily housing rentals form
23   a single, unified market covering the entire United States—an assertion they do not attempt to
24   support with a *single relevant factual allegation*. FAC ¶ 165. This failure alone is fatal to all of
25   their claims. *See, e.g.*, *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 53 (2d Cir. 2016)
26   (affirming dismissal where plaintiffs "provided no basis on which to justify their proposed
27   geographic market definition"); *Zunum Aero, Inc. v. Boeing Co.*, 2022 WL 2116678, at *8
28   (W.D. Wash. June 13, 2022) (dismissing state antitrust claims where plaintiff failed to define

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

scope of alleged "national and international" relevant markets "in more than vague and conclusory terms"); *Westlake Servs., LLC v. Credit Acceptance Corp.*, 2015 WL 9948723, at *5 (C.D. Cal. Dec. 7, 2015) (holding that allegation that relevant geographic market was the United States—"absent any other factual allegations"—was "insufficient" to survive dismissal).

Nor could Plaintiffs credibly support such a market. It simply is not plausible that a renter, faced with a "small but significant" increase in the prices of apartments in Portland, Oregon, would instead rent an apartment in Portland, Maine.[33] Indeed, the proposed nationwide market is implausible and overbroad on its face, because—according to common sense *and Plaintiffs' own allegations*—housing markets are inherently local, not national. As Plaintiffs explain, consumers are unlikely to consider housing located far from family, friends, jobs, and schools, which would require them to uproot fundamental aspects of their lives. FAC ¶ 147 ("*In most instances, despite price increases, renters still choose to live within certain geographic locations, such as somewhere close to their offices, schools, communities*." (emphasis added)).

Courts routinely reject unsupported and self-contradicted geographic market definitions, and this Court should do the same. *See, e.g.*, *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) (explaining that "[g]eneral, conclusory allegations need not be credited" on a motion to dismiss "when they are belied by more specific allegations of the complaint"); *Physician Specialty Pharmacy, LLC v. Prime Therapeutics, LLC*, 2019 WL 1239705, at *5 (D. Minn. Jan. 24, 2019) (rejecting alleged geographic market covering Alabama because "by [plaintiff's] own reasoning, a patient who lives on the western border of Alabama is unlikely to travel to the Florida/Alabama border . . . to obtain pharmacy services" (alterations added)), *report and recommendation adopted*, 2019 WL 1399571 (D. Minn. Mar. 28, 2019).[34]

---

[33] *See Saint Alphonsus Medical Center-Nampa, Inc. v. St. Luke's Health Sys. Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015) ("A common method to determine the relevant geographic market . . . is to find whether a hypothetical monopolist could impose a 'small but significant nontransitory increase in price' ('SSNIP') in the proposed market.").

[34] *See also Wound Care Concepts, Inc. v. Vohra Health Servs.*, P.A., 2021 WL 4990957, at *7 (S.D. Fla. Mar. 26, 2021) (dismissing counterclaim alleging "national" geographic market, reasoning that "[c]asting a broad net to encompass all eligible Medicare Part B patients does not sufficiently define the relevant geographic market since this could encompass more than nursing home facilities in which [the parties] may compete" (alterations added)); *Semertzides v. Bethesda N. Hosp.*, 2014 WL 2573073,

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1

          **2.**      **No plausible product market.**

2

      Plaintiffs also fail to plausibly allege that the relevant product market should be limited to

3

multifamily housing rentals.

4

      To survive a motion to dismiss, a relevant product market must be defined to include all

5

products that have "reasonable interchangeability of use" with each other, such that consumers

6

may reasonably regard them as substitutes. *Hicks*, 897 F.3d at 1120 (explaining that a product

7

market definition "must encompass the product at issue as well as all economic substitutes for

8

the product"). Where a complaint either "fails to define its proposed relevant market with

9

reference to the rule of reasonable interchangeability and cross-elasticity of demand,"[35] or

10

"alleges a proposed relevant market that clearly does not encompass all interchangeable

11

substitute products," the market "is legally insufficient and a motion to dismiss may be granted."

12

*Chapman v. New York State Div. for Youth*, 546 F.3d 230, 238 (2d Cir. 2008) (internal quotation

13

marks and citation omitted); *see also Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, 433 F.

14

App'x 598, 599 (9th Cir. 2011) ("The failure to allege a product market consisting of reasonably

15

interchangeable goods renders the SAC 'facially unsustainable' and appropriate for dismissal.");

16

*Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (finding dismissal

17

appropriate if the "'relevant market' definition"—which "[f]irst and foremost . . . must be a

18

*product* market"—"is facially unsustainable" (alteration added; emphasis in original)).

19

      As with their geographic market definition, Plaintiffs do not seriously attempt to support

20

their proposed product market with well-pled factual allegations. They say nothing about the

21

cross-elasticity of demand and offer only a conclusory sentence declaring that single-family

22

housing cannot be a substitute for multifamily housing "because of amenities, security, and

23

availability." FAC ¶ 11. As courts routinely recognize, a conclusory allegation that two products

24

_____

25

at *4 (S.D. Ohio June 9, 2014) (dismissing complaint based on inconsistent allegations concerning geographic market), *aff'd*, 608 F. App'x 378 (6th Cir. 2015).

26

[35] Cross-elasticity of demand "refers to the extent to which consumers view two 'products [as] be[ing] reasonably interchangeable' or substitutable for one another." *Coronavirus Rep. v. Apple, Inc.*, 2023

27

WL 7268325, at *3 (9th Cir. Nov. 3, 2023) (citation omitted, alteration in original) (affirming dismissal where plaintiff app developers failed to "demonstrate the cross-elasticity of iOS end users'

28

demand either for [plaintiffs'] rejected apps as compared to other apps, or for apps in general").

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1    are not substitutes cannot survive a motion to dismiss. *See*, *e.g.*, *Tanaka v. Univ. of S. California*,

2    252 F.3d 1059, 1063 (9th Cir. 2001) (finding "conclusory assertion" insufficient); *In re German*

3    *Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745, 759 (N.D. Cal. 2020) ("Beyond bare allegations

4    and 'empirical evidence' of no value, IPPs have alleged nothing to contradict the commonsense

5    inference that diesel passenger vehicles compete with other passenger vehicles and do not

6    constitute a relevant submarket."), *aff'd*, 2021 WL 4958987 (9th Cir. Oct. 26, 2021).[36]

7          Plaintiffs' assertion that single-family housing cannot be a substitute for multifamily

8    housing is particularly implausible considering their assertions about the relevant *geographic*

9    market. In effect, they contend that housing consumers are largely apathetic about *where* in the

10   United States they live, but care so deeply about whether their housing is single-family or

11   multifamily that an increase in rental prices for single-family housing would not lead a

12   reasonable consumer to rent an apartment instead (or vice versa). That is implausible on its face.

13         Plaintiffs' only other attempt to support their proposed relevant product market consists

14   of two paragraphs citing the "Small but Significant Non-Transitory Increase in Price" (or

15   "SSNIP") test. FAC ¶¶ 167–68. Merely identifying this test and declaring it satisfied—as

16   Plaintiffs do here—is not enough to plausibly allege a relevant antitrust market. *See*, *e.g.*, *Ojmar*

17   *US, LLC v. Sec. People, Inc*., 2017 WL 3301214, at *7 (N.D. Cal. Aug. 2, 2017) (rejecting

18   "conclusory statements" that "a [SSNIP] of EKLs would not cause customers to switch enough

19   quantity of their purchases to another product so as to make the price increase unprofitable");

20   *Apple, Inc. v. Psystar Corp*., 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) (rejecting "conclusory

21   allegations" that a "[SSNIP] would not result in a change in demand for Mac OS").

22         Further, Plaintiffs do not even properly apply the SSNIP test as they describe it. In this

23   case, the SSNIP test would ask whether a price increase for renting single-family housing would

24

---

25   [36]  *See also MLW Media LLC v. World Wrestling Ent., Inc.*, 655 F. Supp. 3d 946, 951 (N.D. Cal. 2023)
     (dismissing claim lacking sufficient detail about substitute products); *Reilly v. Apple Inc.*, 578 F. Supp.
26   3d 1098, 1109 (N.D. Cal. 2022) (dismissing complaint that failed to allege "facts explaining why the
     products *included* in the market *are substitutes* for one another" or "facts explaining why seemingly
27   similar products excluded from the market *are not substitutes* for those in the market" (emphasis in
     original)); *PBTM LLC v. Football Nw., LLC*, 511 F. Supp. 3d 1158, 1181–82 (W.D. Wash. 2021)
28   (dismissing conclusory and implausible assertions of reasonable interchangeability).

---

DEFS' OMNIBUS MOTION TO DISMISS – 36
(Case No. 2:23–cv–01391-RSL)

1  cause consumers to switch to renting multifamily housing instead, and vice versa. *See F.T.C. v.*

2  *Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008) ("In the SSNIP method, one asks

3  whether a hypothetical monopolist controlling all suppliers in the proposed market could profit

4  from a small price increase. If a small price increase would drive consumers to an alternative

5  product, then that product must be reasonably substitutable for those in the proposed market and

6  must therefore be part of the market, properly defined." (citations omitted)).

7      But Plaintiffs do not discuss such a scenario. Instead, they base their "analysis" on a

8  single allegation referencing only the pricing of multifamily rentals, with no mention of any

9  effect on the demand for single-family rentals or any other type of housing. FAC ¶ 168 (citing *id.*

10  ¶ 6 & n.8). According to Plaintiffs, moreover, the SSNIP test is based on a hypothetical increase

11  in market price of 5%, *id.* ¶ 167, but they rely entirely on a single excerpt from a 2019 Yardi

12  brochure stating that users of RENTmaximizer increased their "net rental income" by an average

13  of 6% and "consistently beat the market by a minimum of 2%." *Id.* ¶ 168 n.163 (citing *id.* ¶ 6 &

14  n.8). That is not an allegation that market prices have increased; it is, at most, an allegation that

15  market prices were at least 2% *lower* than the prices charged by RENTmaximizer users.

16  Plaintiffs' purported application of the SSNIP test is not even internally consistent.

17      In sum, Plaintiffs fail to plausibly allege the geographic and product elements of a

18  properly defined relevant market. Instead, they "seem[] to have started out with what [they]

19  wanted to accomplish . . . and drawn up a relevant market to accomplish those ends." *Gold

20  Medal LLC v. USA Track & Field*, 187 F. Supp. 3d 1219, 1226–27 (D. Or. 2016) (alterations

21  added), *aff'd*, 899 F.3d 712 (9th Cir. 2018). That pleading method cannot avoid dismissal.

22      **B.    Plaintiffs fail to plausibly allege that Defendants have market power.**

23      Even if Plaintiffs had plausibly defined the relevant market, they fail to plausibly allege

24  that the Lessor Defendants possess "market power" in the proposed market. "A failure to allege

25  power in the relevant market is a sufficient ground to dismiss an antitrust complaint." *Flaa*, 55

26  F.4th at 693 (quoting *Rick-Mik Enters., Inc.*, 532 F.3d at 972); *see also Hip Hop Beverage Corp.

27  v. Monster Energy Co.*, 733 F. App'x 380, 381–82 (9th Cir. 2018) (affirming dismissal where

28  complaint "did not sufficiently allege" defendant "had a dominant share" of relevant market "or

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1   that existing competitors lacked the capacity to increase their output to offset" defendant's

2   "conduct"); *Dominick v. Collectors Universe, Inc.*, 2012 WL 4513548, at *7 (C.D. Cal. Oct. 1,

3   2012) ("As a result of this failure to satisfy the threshold requirement of market power, Plaintiffs

4   cannot state a cause of action" under Section 1).

5          Market power only exists if the Lessor Defendants, merely by restricting their own

6   output, "can restrict marketwide output and, hence, increase marketwide prices." *Hip Hop*

7   *Beverage Corp.*, 733 F. App'x at 381–82 (internal quotations omitted) (quoting *Rebel Oil Co.,*

8   *Inc. v. Atl. Richfield Co.,* 51 F.3d 1421, 1434 (9th Cir. 1995)). Only in "rare" cases is a plaintiff

9   able to allege "direct evidence" of market power: explicit examples of defendants manipulating

10  market-wide supply and pricing merely by manipulating their own output. *Mylan Pharms. Inc. v.*

11  *Warner Chilcott Pub. Ltd. Co*., 838 F.3d 421, 434 (3d Cir. 2016).[37] Thus, in most cases, plaintiffs

12  can only satisfy the market power requirement, if at all, by plausibly alleging "circumstantial

13  evidence"—*i.e.*, that Defendants possess a "dominant share" of the relevant markets, "there are

14  significant barriers to entry," and "existing competitors lack the capacity to increase their output

15  in the short run." *Hip Hop Beverage Corp.*, 733 F. App'x at 381–82; *see also Eastman Kodak*

16  *Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992) ("The existence of such power

17  ordinarily is inferred from the seller's possession of a predominant share of the market"); *Rebel*

18  *Oil*, 51 F.3d at 1434 (defining requirements to demonstrate market power circumstantially).

19         Here, Plaintiffs fail to allege market power through either of these methods. Indeed, for

20  half of the Lessor Defendants, Plaintiffs fail to allege how many units they have. For the other

21  half, the alleged unit volume amounts to well under 1% (~0.22%) of nationwide multifamily

22  rental units. *See supra* Background § II. Even if it was permissible to consider aggregated unit

23  volume—which it is not, as explained below—this miniscule percentage is woefully deficient.

24

25

26

---

27  [37]  *See also Rebel Oil*, 51 F.3d at 1434 (explaining plaintiffs can show "direct evidence of the injurious
    exercise of market power" through "evidence of restricted output and supracompetitive prices").

28

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1

### 1. Plaintiffs may not "aggregate" a "set of vertical agreements" to establish market power.

As a threshold matter, regardless of whether Plaintiffs pursue the "direct evidence" or "indirect evidence" method of alleging market power, they are necessarily—and explicitly—attempting to satisfy the market power requirement by "aggregating" a set of independent vertical agreements, which courts have held is impermissible as a matter of law.

As explained *supra* Arg. § II, Plaintiffs fail to plausibly allege a horizontal agreement to restrain trade between the Lessor Defendants. As such, the most they can allege for any of their claims is a "set of vertical agreements"—*i.e.*, a series of independent, bilateral agreements between Yardi and its customers. FAC ¶¶ 180, 186. Plaintiffs do not, and cannot, allege that any individual Lessor Defendant, by entering into an independent vertical agreement with Yardi, possessed the level of market power needed to plead a rule of reason claim. Instead, they contend that these independent vertical agreements should be analyzed "[i]n the aggregate." *Id*. ¶ 188 ("In the aggregate, the set of vertical agreements between [Lessor Defendants] and Yardi artificially inflated prices in the relevant market of multifamily rental housing in the United States.").

Plaintiffs' attempt to satisfy the market power requirement by "aggregating" market power across a "set of vertical agreements" is improper as a matter of law and provides another basis for dismissing all their claims. *See, e.g., Dickson v. Microsoft Corp.*, 309 F.3d 193, 210–11 (4th Cir. 2002) (rejecting aggregation where plaintiffs did not plausibly allege overarching conspiracy among all defendants, but only "discrete" bilateral conspiracies between individual defendants); *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1218 (11th Cir. 2002) (concluding "aggregation is inappropriate"); *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *25 (S.D.N.Y. July 31, 2023) (rejecting aggregation absent plausible horizontal conspiracy, leaving plaintiff with purely vertical agreements between spokes and hub).[38]

---

[38] The only recognized exception to the rule against aggregation is for cases alleging exclusive dealing, tying arrangements, or similar methods to wall off large segments of the market from competition, thus facilitating monopolization. *See, e.g.*, *Rebel Oil*, 51 F.3d at 1437 ("The aggregation of market shares of several rivals is justified if the rivals are alleged to have conspired to monopolize."); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1303 (9th Cir. 1982) (recognizing exception where aggregation is needed to accurately determine "the volume of commerce foreclosed

DEFS' OMNIBUS MOTION TO DISMISS – 39
(Case No. 2:23–cv–01391-RSL)

2.    **Even if aggregation was permitted, Plaintiffs fail to allege direct evidence of market power.**

To plausibly allege direct evidence of market power, Plaintiffs must allege that the Lessor Defendants,[39] merely by restricting their own output, are restricting output and inflating prices throughout the alleged relevant market. *See Med Vets Inc. v. VIP Petcare Holdings, Inc.*, 2019 WL 1767335, at *5 (N.D. Cal. Apr. 22, 2019), *aff'd*, 811 F. App'x 422 (9th Cir. 2020) (citing *Rebel Oil Co.*, 51 F.3d at 1434). Plaintiffs fail to allege that the Lessor Defendants have wielded such dominant power in a nationwide market for multifamily rentals.

With respect to restricted output, the FAC makes only a single conclusory reference to "reduced output." FAC ¶ 164. Such boilerplate is insufficient to plead market power as a matter of law. *See Dominick*, 2012 WL 4513548, at *7 (rejecting allegations of market power that were "conclusory at best"); *Kingray, Inc. v. NBA, Inc.*, 188 F. Supp. 2d 1177, 1186 (S.D. Cal. 2002) ("[T]he essential elements of a private antitrust claim must be alleged in more than vague and conclusory terms to defeat a motion to dismiss."). Moreover, any suggestion that the Lessor Defendants could collectively reduce the supply of nationwide multifamily units—given the tiny percentage of units they allegedly manage—is also facially implausible.

Nor do Plaintiffs plausibly allege that Defendants are artificially inflating *nationwide* rental prices. They merely allege, based on a "test run economic analysis," that for *one month* in 2023, tenants of unidentified Yardi customers in *certain zip codes in three cities*—Charlotte, Phoenix, and Seattle—paid a higher average monthly rent than tenants of non-Yardi customers. FAC ¶¶ 27, 118. Even assuming Plaintiffs' analysis was otherwise valid, cherry-picking a single month of average rent data from a miniscule portion of the alleged relevant market (there are over 41,000 zip codes in the United States) cannot possibly serve as direct evidence that the

---

by the particular contract or contracts in suit"); *Amazon*, 2023 WL 6006525, at *25 & n.21 (collecting cases). Plaintiffs allege no conduct tantamount to monopolization, exclusive dealing, or tying.

[39] Plaintiffs do not allege that the purported "co-conspirators" referenced in the FAC ever entered into vertical agreements with Yardi that violate Section 1. Thus, even if aggregation of vertical agreements was permitted, Plaintiffs can, *at best*, aggregate only those purported vertical agreements between Yardi and each of the 10 Lessor Defendants, which, as mentioned above, collectively represent far less than 1% of all multifamily rental properties nationwide. *See supra* Background § II.

DEFS' OMNIBUS MOTION TO DISMISS – 40
(Case No. 2:23–cv–01391-RSL)

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

Lessor Defendants—even assuming some of them operate in those cities—are so dominant that they are single-handedly manipulating rents nationwide. *See Rebel Oil*, 51 F.3d at 1434 (explaining a defendant has "sufficient market power when, by restricting its own output, it can restrict marketwide output and, hence, increase marketwide prices"); *Med Vets Inc.*, 2019 WL 1767335, at *6 (explaining market power must "correspond to the alleged market," not a different market); *see also Cinema Vill. Cinemart, Inc. v. Regal Ent. Grp.*, 2016 WL 5719790, at *4 (S.D.N.Y. Sept. 29, 2016) (holding plaintiff must allege facts "showing that the challenged action has had an actual adverse effect on competition as a whole in the relevant market" (citation omitted)), *aff'd*, 708 F. App'x 29 (2d Cir. 2017).

Plaintiffs' allegations are patently insufficient. *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1340 (11th Cir. 2010) (dismissing for failure to allege competition was "harmed by *marketwide* increased prices or reduced output" (emphasis added)).[40]

### 3.     Plaintiffs fail to allege circumstantial evidence of market power.

Even if Plaintiffs could "aggregate" their alleged "set of vertical agreements," and plausibly allege that the Lessor Defendants compete in a nationwide market, they would still fail to allege circumstantial evidence of market power—*i.e.*, the Lessor Defendants own "a dominant share" of the relevant market. *Netafim*, 562 F. Supp. 3d at 1085 (dismissing complaint).

Indeed, Plaintiffs do not merely fail to allege that the Lessor Defendants possess a "dominant" market share of all multifamily rentals in the United States—which is implausible on its face—*they fail to allege any actual market shares whatsoever.* While they mention various figures, none represent the Lessor Defendants' market shares in the proposed relevant market:

- Plaintiffs allege that "over 15 million units" are on Yardi's "platform." FAC ¶ 64. But this raw figure says nothing about the Lessor Defendants' *share* of a nationwide market for multifamily housing rentals. And the website cited by Plaintiffs makes explicit that

---

[40] *See also Rock v. Nat'l Collegiate Athletic Ass'n*, 928 F. Supp. 2d 1010, 1024 (S.D. Ind. 2013) (dismissing claim premised on nationwide market for collegiate athletics that "failed to plead facts demonstrating that" alleged anticompetitive effects were "true" market-wide, "for all NCAA schools or sports" across country).

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

the referenced "platform" figure relates to Yardi's *payment processing solutions*, not RENTmaximizer or Yardi Matrix. *Id.* ¶ 64, n.66.

- Plaintiffs allege that "[a]s of 2016, more than eight million residential units were managed using Yardi software, and more than 1,650 property management customers are using Yardi Voyager 7S." *Id.* ¶ 64. Once again, these raw figures say nothing about *market share*. And according to the FAC, Voyager is an entirely different product from RENTmaximizer, meaning that use of Voyager tells us nothing about the market share of revenue management software users. *Id.* ¶ 61.[41]

- Plaintiffs allege that the data in Yardi Matrix, a "separate product" and "input to RENTmaximizer," covers "19+ million units, encompassing 90% of the U.S. Population." *Id.* ¶¶ 98, 101. But the scope of data allegedly included in Matrix, which collects information for benchmarking purposes, says absolutely nothing about the Lessor Defendants' market shares—*i.e.*, the percentage of nationwide multifamily housing rentals that they collectively control.

- Plaintiffs allege that "Yardi ha[s] a dominant market position in the property management software market." *Id.* ¶ 63. Plaintiffs are conflating two separate markets; Yardi's position in the market for *property management software*, which is undefined in the FAC, is irrelevant to whether any individual Lessor Defendant possesses market power in the nationwide market for *multifamily rental housing*.

Plaintiffs' attempt to satisfy the market power element with smoke and mirrors is not surprising: they know it is facially implausible that any handful of the 10 Lessor Defendants and five non-defendant co-conspirators controls a dominant percentage of all multifamily rentals in the country. By failing to allege market shares—much less a collectively "dominant" share of

---

[41] Sources cited in the FAC (and thus incorporated by reference) make clear that companies use different Yardi products, so it does not follow that because some use Voyager, they also use RENTmaximizer. *Compare* FAC ¶ 16, n.14 (claiming Manco Abbott used Yardi Voyager, RENTmaximizer, Yardi Payment Processing, Yardi Budgeting & Forecasting, RENTCafé and COMMERCIALCafé), *with id.* ¶ 19, n.19 (claiming Beztak (not a defendant or co-conspirator) uses RENTmaximizer, Yardi Utility Expense Management, RENTCafé, and Yardi Advanced Budgeting & Forecasting).

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1    such a market—Plaintiffs cannot plausibly allege market power through circumstantial evidence.

2    *See, e.g.*, *Kaufman v. Time Warner*, 836 F.3d 137, 148 (2d Cir. 2016) (dismissing complaint that

3    alleged "*no* particular facts bearing on [defendant's] share of the market" (emphasis in original));

4    *Dickson*, 309 F.3d at 208 n.19 (rejecting complaint that failed to allege "market share or market

5    power"); *Top Rank*, 2015 WL 9948936, at *8 (dismissing complaint that failed to allege "how

6    many [boxers] there [were], how many promoters promote[d] them, how many managers

7    manage[d] them, or how many of them the [] Defendants manage[d]" (alterations added)).[42]

8        For all of these reasons, the FAC falls woefully short of meeting *any* of the criteria for

9    stating a claim under a rule of reason analysis. All three claims should be dismissed.

10   **IV.    Plaintiffs lack standing.**

11       The FAC also should be dismissed because Plaintiffs lack standing. As a threshold

12   matter, they lack Article III standing.[43] Plaintiffs allege that they "paid inflated rental prices as a

13   result of [Pillar's] usage of" RENTmaximizer, FAC ¶¶ 33–34, which they claim is a mechanism

14   to enforce parallel pricing by "eliminat[ing] the discounting that would occur in a competitive

15   market," including concessions. *Id.* ¶¶ 6, 77. But Plaintiffs received substantial rent concessions

16   in their leases. *See supra* Background § IV. Even assuming their vague allegations were

17   sufficient to allege an injury-in-fact, Plaintiffs' rent charges are not "fairly traceable" to an

18   agreement to use RENTmaximizer to eliminate concessions or price competition more generally.

19       Plaintiffs also lack antitrust standing. *See R.C. Dick Geothermal Corp. v. Thermogenics,*

20   *Inc.*, 890 F.2d 139, 145 (9th Cir. 1989) ("If [antitrust] standing is not found, an essential element

21

---

22   [42] *See also Oracle Am., Inc. v. CedarCrestone, Inc.*, 938 F. Supp. 2d 895, 908 (N.D. Cal. 2013)
     (dismissing complaint that failed to allege "requisite market power"); *Rheumatology Diagnostics*

23   *Lab'y, Inc. v. Aetna, Inc.*, 2013 WL 5694452, at *12 (N.D. Cal. Oct. 18, 2013) (dismissing claim that
     failed to allege defendant's "market share in any of the five product and geographic markets");

24   *Universal Grading Serv. v. eBay, Inc.*, 2012 WL 70644, at *7 (N.D. Cal. Jan. 9, 2012) (concluding
     failure to identify cognizable market in which eBay has market power was fatal to conspiracy claim),

25   *aff'd sub nom. Universal Grading Serv., LLC v. eBay, Inc.*, 563 F. App'x 571 (9th Cir. 2014).

26   [43] Plaintiffs must adequately allege that (*i*) they suffered an injury in fact that is concrete and
     particularized; (*ii*) the alleged injury is fairly traceable to Defendants' conduct, which means alleging a

27   substantial probability that Defendants caused the alleged injury; and (*iii*) the alleged injury would
     likely be redressed by judicial relief. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203–04

28   (2021); *Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F.4th 517, 525 (9th Cir. 2023).

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

of the plaintiff's case is missing and the plaintiff's case fails."). The doctrine of antitrust standing prevents a plaintiff from "recover[ing] damages . . . merely by showing injury causally linked to an illegal presence in the market." *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) (internal quotation marks and citation omitted). To evaluate antitrust standing, courts consider the following factors: (1) the nature of the alleged injury—whether it was the type the antitrust laws were intended to forestall, (2) the directness of the injury, (3) the speculative measure of the harm, (4) the risk of duplicative recovery, and (5) the complexity in apportioning damages. *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 448 (9th Cir. 1985) (citing *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 538–45 (1983)). To satisfy the first factor, Plaintiffs must allege, among other things, an injury that "flows from that which makes the conduct unlawful" and "is of the type the antitrust laws were intended to prevent." *Reveal Chat Holdco, LLC v. Facebook, Inc*., 471 F. Supp. 3d 981, 997 (N.D. Cal. 2020) (quoting *Somers*, 729 F.3d at 963 (internal quotation marks omitted)). Plaintiffs' conclusory allegation of injury is insufficient for at least two reasons.

***First***, despite alleging that the Lessor Defendants "outsourced" their pricing decisions to RENTmaximizer, FAC ¶ 163, the FAC critically does not—and *cannot*—allege that Plaintiffs' rent charges were dictated by RENTmaximizer. Not only does the FAC acknowledge that rent suggestions are not binding, *id*. ¶¶ 13, 72, but Plaintiffs' lease terms were individually negotiated. *See supra* Background § IV. The FAC thus fails to plausibly allege links in a causal chain connecting Plaintiffs' rent payments to Pillar's alleged participation in a conspiracy to abide by RENTmaximizer's recommended prices. *See Greater San Diego Cnty. Ass'n of Realtors, Inc. v. Sandicor Inc*., 2016 WL 4597536, at *9 (S.D. Cal. May 25, 2016) (rejecting allegations that made it "difficult to examine how Plaintiff has been harmed or determine the causal link between" defendants' conduct and plaintiff's "particular injuries").[44] And without

---

[44]  See also *McCarthy v. Intercontinental Exch., Inc.*, 2022 WL 4227247, at *4 (N.D. Cal. Sept. 13, 2022) (dismissing claim against banks that allegedly conspired to fix interest rates where plaintiffs failed to adequately allege how they were injured, including "whether, and to what degree, the LIBOR rate was higher than what a competitive rate would have been in the absence of the LIBOR formula and methodology"); *Netafim*, 562 F. Supp. 3d at 1089 (finding bare references to "increased prices and reduced quality" insufficient to confer standing).

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

such allegations, Plaintiffs cannot establish the requisite "directness" of their alleged injury—*i.e.*, that it was proximately caused by the alleged unlawful conduct. *See In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 143 (2d Cir. 2021) (explaining that directness is the "key principle" because the antitrust standing inquiry is "fundamentally . . . one into proximate cause"); *see also Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 269 (1992) (explaining that remote causation theories make it impossible to separate harm "attributable to the violation, as distinct from other, independent, factors").

***Second***, even if Plaintiffs could plausibly allege that their rents were set by RENTmaximizer, that is not enough. Rather, what the FAC must do, but fails to do entirely, is allege facts connecting the allegedly inflated rents in Plaintiffs' leases to Pillar's purported agreement to fix prices or exchange competitively sensitive information with a competing Lessor Defendant or co-conspirator. Here, too, the FAC does not—and *cannot*—allege this because the FAC does not allege that any Lessor Defendant or co-conspirator owns or manages a multifamily rental property that competes with The Wave and The Nolo. Those two properties are located next to one another in downtown Seattle. FAC ¶¶ 33, 34, 43 & n.46. The only other Seattle property allegedly owned or managed by a Lessor Defendant is miles away in south Seattle. *Id.* ¶ 39 & n.40. As such, there can be no plausible inference that Plaintiffs were injured as a result of Pillar's alleged participation in an unlawful agreement that harmed competition.

The FAC should be dismissed for failure to adequately allege standing.

## CONCLUSION

The FAC should be dismissed with prejudice. As evidenced by Plaintiffs' first attempt at amendment, no number of attempts to re-plead can overcome the fact that their claims are wholly nonsensical and implausible. Leave to further amend would be futile and should be denied.

RESPECTFULLY SUBMITTED,

DATE: December 15, 2023

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1

**VAN KAMPEN & CROWE PLLC**

2

*/s/ Al Van Kampen*

3

Al Van Kampen (WSBA No. 13670)
P.O. Box 33632

4

Seattle, WA 98133
Telephone: (206) 441–1121

5

Email: avankampen@vkclaw.com

6

**VINSON & ELKINS LLP**

7

Michael W. Scarborough (*pro hac vice*)

8

Dylan I. Ballard (*pro hac vice*)
M. Kevin Costello (*pro hac vice*)

9

Madison Lo (*pro hac vice*)
555 Mission Street, Suite 2000

10

San Francisco, CA 94105
Telephone: (415) 979–6900

11

Email: mscarborough@velaw.com

12

Email: dballard@velaw.com
Email: kcostello@velaw.com

13

Email: mlo@velaw.com

14

Stephen Medlock (*pro hac vice*)

15

2200 Pennsylvania Avenue NW
Suite 500 West

16

Washington, DC 20037
Telephone: (202) 639–6500

17

Email: smedlock@velaw.com

18

Mackenzie Newman (*pro hac vice*)

19

1114 Avenue of the Americas
32nd Floor

20

New York, NY 10036
Telephone: (212) 237–0000

21

Email: mnewman@velaw.com

22

*Attorneys for Defendant Bridge Property*

23

*Management, L.C.*

24

**CABLE HUSTON LLP**

25

*/s/ Brian S. Epley*

26

Brian S. Epley (WSBA No. 48412)

27

Jon W. Monso (WSBA No. 43912)
1455 SW Broadway, Suite 1500

28

Portland, OR 97201–3412

**MATTHEW CARVALHO,
ATTORNEY AT LAW, PLLC**

*/s/ Matthew A. Carvalho*
Matthew A. Carvalho (WSBA No. 31201)
720 Seneca Street
Seattle, WA 98101
Telephone: (206) 799–6888
Email: matt@mattcarvalholaw.com

**DEBEVOISE & PLIMPTON LLP**

Maura K. Monaghan (*pro hac vice*)
Michael Schaper (*pro hac vice*)
Kristin D. Kiehn (*pro hac vice*)
66 Hudson Boulevard
New York, NY 10001
Telephone: (212) 909–6000
Email: mkmonaghan@debevoise.com
Email: mschaper@debevoise.com
Email: kdkiehn@debevoise.com

Abraham Tabaie (*pro hac vice*)
650 California Street
San Francisco, CA 94108
Telephone: (415) 738–5700
Email: atabaie@debevoise.com

*Attorneys for Defendant Yardi Systems, Inc.*

**BAILEY DUQUETTE PC**

*/s/ Hozaifa Cassubhai*
Hozaifa Cassubhai (WSBN No. 39512)
William Burnside (WSBN No. 36002)
500 Union Street, Suite 800
Seattle, WA 98101
Phone: (206) 225–2250
Fax : (866) 233–5869
Email: hozaifa@baileyduquette.com
        will@baileyduquette.com

*Attorneys for Defendant Calibrate Property*
*Management, LLC*

**FOGARTY LAW GROUP PLLC**

*/s/ Paul E. Fogarty*
Paul E. Fogarty (WSBN No. 26929)

DEFS' OMNIBUS MOTION TO DISMISS – 46
(Case No. 2:23–cv–01391-RSL)

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

Telephone: (503) 224–3092
Email: jmonson@cablehuston.com
Email: bepley@cablehuston.com

*Attorneys for Defendant Dalton Management, Inc.*

**SHOOK, HARDY & BACON L.L.P.**

*/s/ Steven Rich*
Steven Rich (WSBA No. 48444)
701 Fifth Avenue, Suite 6800
Seattle, WA 98104
Telephone: (206) 344–7600
Email: srich@shb.com

Ryan Sandrock (*pro hac vice*)
555 Mission Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 544–1900
Email: rsandrock@shb.com

*Attorneys for Defendant LeFever Mattson Property Management*

**K&L GATES LLP**

*/s/ Christopher M. Wyant*
Christopher M. Wyant (WSBA No. 35561)
Tyler Lichter (WSBA No. 51090)
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Phone: (206) 623–7580
Fax: (206) 623–7022
Email: chris.wyant@klgates.com
           tyler.lichter@klgates.com

Lauren Norris Donahue (*pro hac vice*)
70 W. Madison St., Suite 3300
Chicago, IL 60602
Telephone: (312) 372–1121
Fax: (312) 827–8000
Email: lauren.donahue@klgates.com

Derek Sutton (*pro hac vice*)
301 Hillsborough St., Suite 1200

1904 Third Avenue, Ste 933
Seattle, WA 98101
Telephone: (206) 441–0172
Email: pfogarty@fogartylawgroup.com

**NORTON ROSE FULBRIGHT US LLP**

Michael Swarztendruber (*pro hac vice*)
2200 Ross Avenue, Suite 3600
Dallas, TX 75201
Telephone: (214) 855–8067
michael.swarztendruber@nortonrosefulbright.com

Eliot Turner (*pro hac vice*)
1301 McKinney, Suite 5100
Houston, TX 77010
Telephone: (713) 651–5113
Email: eliot.turner@nortonrosefulbright.com

*Attorneys for Defendant Creekwood Property Corporation*

**PERKINS COIE LLP**

*/s/ David A. Perez*
David A. Perez (WSBA No. 43959)
Elvira Castillo (WSBA No. 43893)
Tiffany Lee (WSBA No. 51979)
Marten King (WSBA No. 57106)
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.6767
Email: DPerez@perkinscoie.com
Email: ECastillo@perkinscoie.com
Email: TiffanyLee@perkinscoie.com
Email: MKing@perkinscoie.com

Adrianna Simonelli (WSBA No. 58472)
1120 NW Couch Street, Tenth Floor
Portland, OR 97209–4128
Telephone: 503–727–2000
Facsimile: 503–727–2222
Email: ASimonelli@perkinscoie.com

*Attorneys for Defendant HNN Associates, LLC*

DEFS' OMNIBUS MOTION TO DISMISS – 47
(Case No. 2:23–cv–01391-RSL)

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

Raleigh, NC 27603
Telephone: (919) 743–7331
Fax: (919) 516–2122
Email: derek.sutton@klgates.com

*Attorneys for Defendant R.D. Merrill Real
Estate Holdings, LLC*

**GORDON REES SCULLY
MANSUKHANI, LLP**

*/s/ Todd A. Bowers*
Todd A. Bowers (WSBA No. 24638)
701 5th Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 695–5197
Email: tbowers@grsm.com

**ROETZEL & ANDRESS**

Stephen W. Funk (*pro hac vice*)
222 South Main Street, Suite 400
Akron, OH 44308
Telephone: (330) 849–6602
Cell: (330) 819–5387
Email: sfunk@ralaw.com

*Attorneys for Defendant Summit
Management Services, Inc.*

**STOKES LAWRENCE, P.S.**

*/s/ Mathew Harrington*
Mathew Harrington
Valerie Walker
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101–2393
Telephone: (206) 626–6000
Email: Mathew.Harrington@stokeslaw.com
Email: Valerie.Walker@stokeslaw.com

**SPENCER FANE LLP**

Jessica Nelson (*pro hac vice*)
Donald Heeman (*pro hac vice*)
100 South Fifth Street, Suite 2500
Minneapolis, MN 55402
Telephone: (612) 268–7006
Email: jnelson@spencerfane.com
Email: dheeman@spencerfane.com

*Attorneys for Defendant Manco Abbott, Inc.*

**BRADLEY BERNSTEIN SANDS LLP**

*/s/ Heidi B. Bradley*
Heidi B. Bradley (WSBA No. 35759)
2800 First Avenue, Suite 326
Seattle, WA 98121
Telephone: (206) 337–6551
Email: hbradley@bradleybernstein.com

*/s/ Darin M. Sands*
Darin M. Sands (WSBA No. 35865)
1425 SW 20th Ave., Suite 201
Portland, OR 97201
Telephone: (503)734–2480
Email: dsands@bradleybernstein.com

*Attorneys for Defendant Morguard Management
Company Inc.*

## CERTIFICATION

I certify that this motion contains 18,156 words and consists of 45 pages, in compliance

with this Court's Order granting the parties' Stipulated Motion re: Motion to Dismiss Briefing

Schedule/Procedure (Dkt. # 118).

By: */s/ Matthew Carvalho*

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888