The Honorable Robert S. Lasnik

1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

9  MCKENNA DUFFY and MICHAEL BRETT,
   individually and on behalf of all others
10 similarly situated,

11             Plaintiffs,

12      v.

13 YARDI SYSTEMS, INC., BRIDGE
   PROPERTY MANAGEMENT, L.C.,
14 CALIBRATE PROPERTY MANAGEMENT,
   LLC, DALTON MANAGEMENT, INC.,
15 HNN ASSOCIATES, LLC, LEFEVER
   MATTSON PROPERTY MANAGEMENT,
16 MANCO ABBOTT, INC., MORGUARD
   MANAGEMENT COMPANY, R.D.
17 MERRILL REAL ESTATE HOLDINGS,
   LLC, SUMMIT MANAGEMENT
18 SERVICES, INC., and CREEKWOOD
   PROPERTY CORPORATION,
19

20             Defendants.

Case No. 2:23-cv-01391-RSL

**DEFENDANTS' OMNIBUS REPLY IN**
**FURTHER SUPPORT OF MOTION TO**
**DISMISS THE FIRST AMENDED CLASS**
**ACTION COMPLAINT**

**NOTE ON MOTION CALENDAR:**
**MARCH 15, 2024**

**ORAL ARGUMENT REQUESTED**

21

22

23

24

25

26

27

28

DEFS' OMNIBUS REPLY
(Case No. 2:23–cv–01391-RSL)

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 3

I.   The Opposition confirms that the FAC fails to state a *per se* price-fixing claim.................................................................................................................................. 3

    A.   The *RealPage* and *Gibson* decisions support dismissal of the *per se* claim............................................................................................................................ 4

    B.   Plaintiffs cannot rely on a theory of "invitation and acceptance." ........................ 8

    C.   The Opposition confirms that the FAC fails to allege parallel conduct or plus factors. ......................................................................................... 11

        1.   The allegations of parallel conduct are deficient. ..................................... 11

        2.   The plus factors do not give rise to an inference of a conspiracy. ............................................................................................... 12

II.  The Opposition confirms that the FAC fails to state a claim under the rule of reason.............................................................................................................................. 16

    A.   Plaintiffs fail to plausibly allege a relevant market. ........................................... 16

        1.   No plausible geographic market. ............................................................... 17

        2.   No plausible product market. ..................................................................... 19

    B.   Plaintiffs fail to plausibly allege market power. ................................................. 20

        1.   "Aggregation" of vertical agreements is not permissible. ........................ 20

        2.   No direct evidence of market power............................................................ 21

        3.   No circumstantial evidence of market power. ........................................... 23

III. The Opposition confirms that Plaintiffs lack standing. .................................................. 24

IV.  Leave to amend the FAC should be denied. ................................................................... 25

CONCLUSION.................................................................................................................... 25

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*1-800 Contacts, Inc. v. FTC*,
    1 F.4th 102 (2d Cir. 2021) ..................................................................................................22

*A World Trade, Inc. v. Apmex, Inc*.,
    2021 WL 1502794 (C.D. Cal. Feb. 22, 2021), *aff'd*,
    2022 WL 1262010 (9th Cir. Apr. 28, 2022) .......................................................................25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................................3

*Barry v. Blue Cross of Cal.*,
    805 F.2d 866 (9th Cir. 1986) ................................................................................................9

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)..............................................................................................................3

*Blum v. Yaretsky*,
    457 U.S. 991 (1982)............................................................................................................25

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ............................................................................................22

*Brown v. Amazon.com, Inc.*,
    2023 WL 5793303 (W.D. Wash. Sept. 7, 2023)............................................................20, 21

*Brown v. JBS USA Food Co.*,
    2023 WL 6294161 (D. Colo. Sept. 27, 2023) ....................................................................23

*Brown v. Porter McGuire Kiakona & Chow, LLP*,
    2019 WL 254658 (D. Haw. Jan. 17, 2019) .........................................................................25

*Carolina Rest. Grp., Inc. v. Pepsico Sales, Inc.*,
    2015 WL 4250395 (W.D.N.C. July 13, 2015).....................................................................18

*Citizen Pub. Co. v. U.S.*,
    394 U.S. 131 (1969)............................................................................................................16

*City of Philadelphia v. Bank of Am. Corp.*,
    498 F. Supp. 3d 516 (S.D.N.Y. 2020)................................................................................22

*Copeland v. Energizer Holdings, Inc*.,
    2024 WL 511224 (N.D. Cal. Feb. 9, 2024) .........................................................................6

*Coronavirus Rep. v. Apple, Inc.*,
    85 F.4th 948 (9th Cir. 2023) ..............................................................................................20

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

*Coto Settlement v. Eisenberg*,
593 F.3d 1031 (9th Cir. 2010) ........................................................................5

*Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co.*,
2015 WL 1969380 (D.N.J. Apr. 29, 2015) ......................................................18

*Epic Games, Inc. v. Apple, Inc.*,
67 F.4th 946 (9th Cir. 2023) .....................................................................17, 18

*Fed. Trade Comm'n v. Microsoft Corp.*,
2023 WL 4443412 (N.D. Cal. July 10, 2023)..................................................20

*Fendelander v. Walt Disney C*o.,
2023 WL 6464134 (N.D. Cal. Sept. 29, 2023) ..................................................7

*Flaa v. Hollywood Foreign Press Assn*,
2021 WL 1399297 (C.D. Cal. Mar. 23, 2021), *aff'd*,
55 F.4th 680 (9th Cir. 2022) ..........................................................................25

*Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*,
386 F.3d 485 (2d Cir. 2004)............................................................................17

*Gibson v. MGM Resorts Int'l*,
2023 WL 7025996 (D. Nev. Oct. 24, 2023) ............................................ *passim*

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
433 F. App'x 598 (9th Cir. 2011) ...................................................................20

*Golden v. Intel Corp.*,
642 F. Supp. 3d 1066 (N.D. Cal. 2022), *aff'd*,
2023 WL 3262948 (Fed. Cir. May 5, 2023) ....................................................25

*Hernandez v. San Bernardino Cnty.*,
2023 WL 3432206 (C.D. Cal. Jan. 26, 2023) ...................................................9

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) ........................................................................19

*In re Aggrenox Antitrust Litig.*,
199 F. Supp. 3d 662 (D. Conn. 2016)..............................................................17

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
2023 WL 6006525 (S.D.N.Y. July 31, 2023) ..................................................21

*In re Broiler Chicken Antitrust Litig.*,
2023 WL 7220170 (N.D. Ill. Nov. 2, 2023) ....................................................14

*In re Broiler Chicken Antitrust Litig.*,
290 F. Supp. 3d 772 (N.D. Ill. 2017) .......................................................13, 14

*In re Cedar Shakes & Shingles Antitrust Litig.*,
  2020 WL 832324 (W.D. Wash. Feb. 20, 2020)..................................................................15

*In re Fresh & Process Potatoes Antitrust Litigation*,
  834 F. Supp. 2d 1141 (D. Idaho 2011) ..............................................................................6

*In re Lithium Ion Batteries Antitrust Litig.*,
  2014 WL 4955377 (N.D. Cal. 2014) ...................................................................................3

*In re Mushroom Direct Purchaser Antitrust Litig.*,
  2015 WL 5767415 (E.D. Pa. July 29, 2015)......................................................................19

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  42 F. Supp. 3d 231 (D. Mass. 2014)..................................................................................10

*In re Packaged Ice Antitrust Litig.*,
  723 F Supp. 2d 987 (E.D. Mich. 2010) .............................................................................15

*In re Petroleum Products Antitrust Litigation*,
  906 F.2d 432 (9th Cir. 1990) .............................................................................................13

*In re Travel Agent Comm'n Antitrust Litig.*,
  583 F.3d 896 (6th Cir. 2009) .............................................................................................11

*In Re: RealPage Inc., Rental Software Antitrust Litig. (No. II)* ("*RealPage*"),
  2023 WL 9004806 (M.D. Tenn. Dec. 28, 2023)......................................................... *passim*

*Intel Corp. v. Fortress Inv. Grp. LLC*,
  2020 WL 6390499 (N.D. Cal. July 15, 2020).....................................................................17

*Interstate Circuit v. U.S.*,
  306 U.S. 208 (1939).................................................................................................8, 9, 11

*Jien v. Perdue Farms, Inc.*,
  2022 WL 2818950 (D. Md. July 19, 2022).........................................................................19

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) ...................................................................................*passim*

*Lazy Y Ranch Ltd. v. Behrens*,
  546 F.3d 580 (9th Cir. 2008) ...........................................................................................5, 6

*LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022)..................................................................................10, 13, 21

*M.R. v. Dreyfus*,
  697 F.3d. 706 (9th Cir. 2012) ...........................................................................................15

*Markson v. CRST Int'l, Inc.*,
  2019 WL 6354400 (C.D. Cal. Mar. 7, 2019)......................................................................15

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

*McCarn v. HSBC USA Inc.*,
  2012 WL 7018363 (E.D. Ca. May 29, 2012)..................................................................9

*Med Vets Inc. v. VIP Petcare Holdings, Inc.*,
  2019 WL 1767335 (N.D. Cal. Apr. 22, 2019), *aff'd*
  811 F. App'x. 422 (9th Cir. 2020) .................................................................22, 23

*Meyer v. Kalanick*,
  174 F. Supp. 3d 817 (S.D.N.Y. 2016)...............................................................10, 11

*Meyer v. Uber Technologies, Inc.*,
  Case No. 01–18–0002–1956 (AAA Feb. 22, 2020)............................................11

*Name. Space v. Internet Corp.*,
  795 F. 3d 1124 (9th Cir. 2015) ......................................................................3

*NCAA v. Bd. of Regents of Univ. of Okla.*,
  468 U.S. 85 (1984)...................................................................................7

*North v. State of Wash., et al*,
  2023 WL 8281609 (W.D. Wash. Nov. 30, 2023) ...........................................9

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)................................................................................16

*Orchard Supply Hardware LLC v. Home Depot USA, Inc.*,
  967 F. Supp. 2d 1347 (N.D. Cal. 2013) ........................................................20

*Persian Gulf Inc. v. BP W. Coast Prods. LLC*,
  324 F. Supp. 3d 1142 (S.D. Cal. 2018).........................................................15

*Physician Specialty Pharmacy, LLC v. Prime Therapeutics, LLC*,
  2019 WL 1239705 (D. Minn. Jan. 24, 2019)..................................................18

*Plymouth Dealers' Ass'n of No. Cal. v. U.S.*,
  279 F.2d 128 (9th Cir. 1960) .....................................................................16

*Realcomp II, Ltd. v. F.T.C.*,
  635 F.3d 815 (6th Cir. 2011) .....................................................................17

*Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*,
  778 F.3d 775 (9th Cir. 2015) .....................................................................19

*Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*,
  947 F. Supp. 2d 88 (D.D.C. 2013)...............................................................18

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*,
  346 U.S. 537 (1954)................................................................................3

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001)...................................................................................13

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
    676 F.2d 1291 (9th Cir. 1982) ............................................................................20

*U.S. v. Am. Exp. Co.*,
    21 F. Supp. 3d 187 (E.D.N.Y. 2014) ..................................................................17

*U.S. v. Masonite*,
    316 U.S. 265 (1942)............................................................................................10

*U.S. v. Natl. Ass'n of Real Estate Bds.*,
    339 U.S. 485 (1950)............................................................................................16

*U.S. v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940)............................................................................................16

*Uretek USA, Inc. v. Applied Polymerics, Inc.*,
    2011 WL 6029964 (E.D. Va. Dec. 5, 2011) ......................................................18

*White v. R.M. Packer Co.*,
    635 F.3d 571 (1st Cir. 2011)...............................................................................11

*Yagman v. Kelly*,
    2018 WL 2138461 (C.D. Cal. Mar. 20, 2018) ...................................................12

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

# INTRODUCTION

The Opposition leaves no doubt about Plaintiffs' aims in this litigation: to impose unprecedented antitrust liability for mere use of revenue management software. But Plaintiffs' attempt to create liability for a technological advance should not obscure the black letter legal principles that support dismissal of the FAC. Defendants do not disagree that antitrust law prevents someone from using a revenue management tool to fix prices. But by the same token, antitrust law does not prohibit someone from using a revenue management tool to do that which is perfectly legal to do without such a tool. It is entirely permissible to make independent pricing decisions by using pen and paper (or a calculator or spreadsheet) to track rent trends, review one's own data, and consider *publicly available* rents of competing properties. That RENTmaximizer may gather and analyze such information more efficiently than a human being does not convert lawful behavior into an antitrust violation.

Boiled down, the question before the Court is whether the FAC alleges sufficient facts to plausibly infer a price-fixing conspiracy. It does not. First, there are no allegations that could render a conspiracy based on a nationwide housing market plausible, which alone is fatal. Second, there are no allegations that plausibly suggest the Lessor Defendants conspired together. Plaintiffs argue that they need not allege the Lessor Defendants ever communicated with each other, who participated in the conspiracy, "simultaneous action," a plausible relevant market, or market power. But where a complaint is missing *all* of those things, and more, it fails at the threshold. There is no agreement to abide by rent recommendations, nor a single communication or meeting on that subject. No properties alleged to compete in the same locations, and thus no motive to adopt a common price strategy. No anticompetitive changes to the Lessor Defendants' pricing practices or pattern of similar pricing behavior. No reduction in apartment supply. No measures to enforce compliance. The elements of an antitrust conspiracy are wholly absent.

DEFS' OMNIBUS REPLY– 1
(Case No. 2:23–cv–01391-RSL)

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

What is more, Plaintiffs' flawed campaign to render the use of revenue management products *per se* illegal has been rejected by two district courts.[1] *RealPage* squarely supports dismissal, though Plaintiffs neglect to mention that the court rejected *per se* treatment until page 41 of the Opposition. Not only did the court deem *per se* liability "not appropriate," but it rejected a nationwide student housing market as "confound[ing] . . . reality."[2] Plaintiffs appear to recognize the gaps in the FAC, as they attempt to embellish or mischaracterize their slim allegations to make them seem more compelling or rely instead on allegations from *RealPage*.

Not only are the allegations facially deficient, but the FAC is replete with content and cited materials that *undermine* the plausibility of the claims. These include documents describing RENTmaximizer as "completely configurable"[3] and "flexible and customizable,"[4] belying Plaintiffs' attempt to portray it as a single formula that spits out uniform recommendations. Given the product's variable and individualized nature, the lack of any allegation that the Lessor Defendants agreed to configure it the same way to coordinate their actions dooms the plausibility of any conspiracy. Further, the FAC and cited materials show the product's many legitimate uses—it efficiently processes data to analyze supply and demand, leading to improved forecasting, higher occupancy rates, and better lease terms—which also explains why users' revenue (which is different from tenants' rents) would increase independent of a conspiracy to engage in "supracompetitive" pricing. Sources cited in the FAC even acknowledge *pro-competitive* benefits of revenue management: "[p]ricing efficiency in markets can trickle down to the consumer . . . ."[5] Indeed, they also reflect that suggested rents are adjusted up *and* down.[6]

Once Plaintiffs' conclusory assertions and innuendo are stripped away, all that remains is a mere proposition that using a revenue management tool is an antitrust violation. That is not the law. The FAC should be dismissed with prejudice.

---

[1] *In Re: RealPage Inc., Rental Software Antitrust Litig. (No. II)* ("*RealPage*"), 2023 WL 9004806 (M.D. Tenn. Dec. 28, 2023) (dismissing *per se* claims and entire student housing complaint); *Gibson v. MGM Resorts Int'l*, 2023 WL 7025996 (D. Nev. Oct. 24, 2023) (dismissing complaint).
[2] 2023 WL 9004806 at *24, 31.
[3] FAC ¶ 77 n.87 (citing article).
[4] *Id*. ¶ 92 n.118 (citing article).
[5] *Id*. ¶ 27 n.29 (citing article).
[6] *Id*.

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1

**ARGUMENT**

2      Plaintiffs assert that a court should not "weigh competing plausible explanations."[7] This

3  argument presupposes that Plaintiffs have pleaded plausible claims, which they have not. To

4  state a plausible Section 1 claim, Plaintiffs must plead "factual content that allows the court to

5  draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

6  *Iqbal*, 556 U.S. 662, 678 (2009). This means alleging facts "plausibly suggesting (not merely

7  consistent with)" a conspiracy. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007). A court

8  "cannot . . . infer an anticompetitive agreement when factual allegations 'just as easily suggest

9  rational, legal business behavior.'" *Name. Space v. Internet Corp.*, 795 F. 3d 1124, 1130 (9th Cir.

10 2015) (quoting *Kendall v. Visa U.S.A., Inc*., 518 F.3d 1042, 1049 (9th Cir. 2008)).

11      As an initial matter, the Opposition does nothing to solve the FAC's failure to plausibly

12 allege that *each* Lessor Defendant participated in an unlawful conspiracy. The "crucial question"

13 is "whether the challenged anticompetitive conduct 'stem[s] from independent decision or from

14 an agreement.'" *Twombly*, 550 U.S. at 553 (*quoting Theatre Enters., Inc. v. Paramount Film*

15 *Distrib. Corp.*, 346 U.S. 537, 540 (1954)). An "allegation of parallel conduct and a bare assertion

16 of conspiracy will not suffice." *Id*. at 556. Plaintiffs' repeated assertions that the "Landlord

17 Defendants" joined an unlawful conspiracy are mere conclusory statements. Even assuming they

18 need not plead detailed defendant-by-defendant allegations, the FAC's bare bones allegations do

19 not "plausibly suggest" that "each individual defendant joined the alleged conspiracy and played

20 some role in it."[8] Plaintiffs are asking the Court to guess that a conspiracy existed and guess who

21 participated. This does not come close to meeting *Twombly's* plausibility standard.

22 **I.     The Opposition confirms that the FAC fails to state a *per se* price-fixing claim.**

23      The *per se* claim fails because antitrust claims premised on use of a revenue management

24 product do not fall within the limited category of claims meriting *per se* treatment. Beyond that,

25 Plaintiffs concede that they do not allege direct evidence of a price-fixing agreement. Instead,

26 they offer two theories based on "circumstantial" evidence. Both theories fail.

27  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
   [7]  Resp. in Opp'n, Dkt. 142 ("Opp.") at 5.
28  [8]  Opp. at 13 (citing *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *30–31
   (N.D. Cal. 2014)).

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

**A.    The *RealPage* and *Gibson* decisions support dismissal of the *per se* claim.**

Plaintiffs rely heavily on *RealPage*, but the ruling supports Defendants' arguments. There, the plaintiffs filed two complaints alleging that property lessors formed a conspiracy to inflate rents in multifamily and student housing markets by using a revenue management product, licensed by RealPage, which recommends rental rates. Noting that the *per se* standard applies "in limited circumstances," the court concluded that it did not apply to the plaintiffs' allegations. 2023 WL 9004806 at *7 n.8. The multifamily complaint failed to allege (*i*) a direct agreement or communications between the defendants; (*ii*) when each defendant joined the purported conspiracy; (*iii*) "an absolute delegation of [clients'] price-setting to RealPage"[9]; or (*iv*) an ability to enforce the alleged conspiracy by "removing an uncooperative member . . . or applying some other form of punishment." *Id*. at *23; *see also id*. at *24 (refusing to apply *per* se standard to student housing complaint filed by Plaintiffs' counsel that failed to allege a direct agreement or that "pricing recommendations were in any way binding or enforceable"). Given these "imperfections," the alleged conspiracy was not the "straightforward" or "traditional" form of horizontal price-fixing to which the *per se* standard applies.[10] *Id*. at *23–24 (explaining courts are hesitant to apply *per se* standard to new or novel ways of doing business).

*Gibson* also dismissed a complaint filed by Plaintiffs' counsel premised on an alleged conspiracy among hotel operators to use revenue management products that recommend hotel rates. 2023 WL 7025996, at *2. The court identified "numerous deficiencies" in the complaint, including failure "to plausibly allege Defendants entered into an agreement," such as who formed the agreement and when, or that they exchanged nonpublic information "through the algorithm." *Id.* at *2, 5. The complaint also failed to plausibly allege that the hotel operators were "required to accept the [recommended] prices," which was a "fatal deficiency." *Id*. at *3.

Each defect identified in *RealPage* and *Gibson* is even more prominent in the FAC.

---

[9]    Plaintiffs claim that *RealPage* rejected an argument that the defendants were not required to accept pricing recommendations. Opp. at 8. In fact, the court cited this pleading failure as one basis for dismissing the *per se* claim. 2023 WL 9004806, at *23.

[10]    Although the court permitted the multifamily complaint to go forward as a rule-of-reason claim, there were critical distinctions between that complaint and the FAC, as discussed further below. Notably, the court dismissed the student housing complaint premised on a nationwide market. *Id*. at *30–31, 37.

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

**No agreement**. The FAC fails to allege any facts evidencing an agreement among the Lessor Defendants, such as a specific communication,[11] meeting, or individuals involved. To the contrary, the fact that the Lessor Defendants operate in mostly non-overlapping locations and allegedly started using the product at different times over the course of 11 years undermines any inference of an agreement.[12] Nor is there an allegation that the Lessor Defendants agreed on how to use the product. Plaintiffs use terms like "automated pricing algorithm" to imply that RENTmaximizer imposes a static set of rules to generate rent recommendations for all Yardi customer properties.[13] But there are no allegations about how the supposed "algorithm" does this—and more critically, the FAC together with its cited materials explain that the product is independently configured to reflect each customer's individual goals:

- RENTmaximizer is "completely configurable at the property and unit-type levels";[14]
- Users "vary their models within a property to meet their objectives";[15]
- RENTmaximizer "target[s] the specific goals for each asset";[16]
- "Get even more control with adjustable pricing metrics to achieve your goals";[17]
- "The revenue manager support team has many configuration options at its disposal in order to establish a performance level that meets the strategic objectives for pricing your property";[18]
- Yardi "encourage[s] [its] clients to be actively engaged in their pricing activity" to ensure that "the overall pricing activity supports [a] company's business objectives";[19]
- "[A] dedicated revenue analyst is made available to help configure the product according to users' internal business rules and goals";[20] and

---

[11] Plaintiffs suggest the allegation that the Lessor Defendants conducted "market surveys" suffices as a "communication." Opp. at 11. In reality, the FAC cites two former employees of *one* Lessor Defendant who allegedly claimed they contacted *unnamed* properties to ask about pricing, never alleging they obtained *non-public* information or that the properties even used *RENTmaximizer*. FAC ¶ 26.

[12] Motion at 13–19. Plaintiffs concede that temporality is relevant in analyzing the existence of an agreement. Opp. at 16. Although it may be only "one factor," its absence underscores the lack of plausibility. *RealPage*, 2023 WL 9004806, at *11. Plaintiffs do not offer any examples of a court finding an inference of collusion based on adoption of a product over the course of 11 years. Opp. at 16–17. Their cited authority generally analyzed actions occurring over the course of one to two years.

[13] Opp. at 15, 17.

[14] FAC ¶ 77 n.87 (citing article). The court may consider materials incorporated into the FAC when ruling on a motion to dismiss, *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010), and need not accept as true allegations contradicted by documents cited therein. *See Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

[15] FAC ¶ 77 n.87 (citing article).

[16] *Id*. ¶ 24 n.25 (citing article).

[17] *Id*. ¶ 2 n.4 (citing brochure).

[18] *Id*. ¶ 67.

[19] *Id*.

- Customer "sought a more flexible and customizable option for revenue management . . . . We love that . . . RENTmaximizer gives us the option to pick and choose the features that work best for us."[21]

Although Plaintiffs concede that the product is customizable, the FAC does not allege—nor could it—that each Lessor Defendant agreed to configure the product the same way and thus agreed to the same pricing formula, even as a starting point.

Conclusory allegations of an "algorithmic pricing scheme" cannot overcome these flaws and do not meet the Ninth Circuit's pleading standard. Plaintiffs claim it is sufficient to allege that "Yardi and Landlord Defendants (the who) engaged in an algorithmic pricing scheme (did what) . . . ."[22] These are merely "labels and conclusions," which are insufficient.[23] Plaintiffs' cited cases do not suggest otherwise. *Copeland* and *In re Fresh & Process Potatoes Antitrust Litigation* merely held that a plaintiff is not required to plead "every possible detail about an agreement"[24] or "every single act that the [] defendants allegedly took to implement the scheme"[25] when analyzing complaints containing far more detailed allegations.

**No delegation of pricing**. There is no plausible allegation that the Lessor Defendants delegated their pricing to Yardi. As described above, on the front end—when deciding how to use the product—the FAC and cited materials reflect that each customer configures the product differently to meet its own objectives. On the back end—when customers decide whether to follow recommendations—the allegations are even more threadbare than in *Gibson* and *RealPage*, where plaintiffs alleged an 80–90% adoption rate.[26] The FAC has no such allegations. Instead, Plaintiffs try to make it seem as if the suggestions are mandatory by citing unnamed

---

[20] *Id*. ¶87 (quoting blog).
[21] *Id*. ¶ 92 n.118 (citing article).
[22] Opp. at 10.
[23] *Kendall*, 518 F.3d at 1046 (citation omitted); *see also* Motion at 18.
[24] *Copeland v. Energizer Holdings, Inc*., 2024 WL 511224, at *1–2, 4 (N.D. Cal. Feb. 9, 2024) (alleging specific complaints from Walmart to Energizer about wholesaler price-undercutting; that Energizer monitored and enforced pricing by threatening to terminate wholesaler agreements; and specific communications between sales representatives and wholesalers showing Walmart controlled pricing).
[25] *In re Fresh & Process Potatoes Antitrust Litigation*, 834 F. Supp. 2d 1141, 1163–64 (D. Idaho 2011) (alleging defendants agreed at Fall 2004 meeting in Blackfoot, Idaho to form cooperative to reduce potato supply and stabilize prices and took specific actions to implement conspiracy, including planting fewer potatoes). The court dismissed multiple defendants whom plaintiffs did not connect to the Idaho meeting or sufficiently allege "played some role" in the conspiracy. *Id*. at 1165–75.
[26] *Gibson*, 2023 WL 7025996, at *3; *RealPage*, 2023 WL 9004806, at *2.

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

leasing agents who said they "just went for" or "never questioned" the recommendations, or that a deviation required corporate approval, which was never sought.[27] These are not plausible allegations that they were *prevented* from offering other rates or *punished* if they did so, let alone that their employers agreed with other Lessor Defendants to abide by the recommendations.

Indeed, one need look no further than Plaintiffs' lease concessions and other materials cited in the FAC to see that recommendations are not binding. *See, e.g.*, FAC ¶ 16 n.14 (citing article explaining RENTmaximizer "empowers our leasing agents with multiple pricing options, which makes negotiations with prospects much more engaging and successful"); *id.* ¶ 43 n.47 (citing webpage stating RENTmaximizer provides information enabling customers to "make educated decisions on the best course of action"). And even assuming that a price-fixing conspiracy does not require complete adherence, the fact that the representatives chosen to act "on behalf of all others similarly situated"[28] did not pay rates suggested by the product is another example of how the allegations actually undermine the existence of a conspiracy.

**No disciplinary mechanism**. The FAC's innocuous assertions about Yardi revenue managers do not plausibly allege punitive consequences if the Lessor Defendants failed to adopt suggested rents.[29] Notably, *RealPage* found detailed allegations of "aggressive" monitoring—absent here—insufficient to support a *per se* claim, including that RealPage generated exception reports for non-compliant employees. 2023 WL 9004806, at *4, 23–24 (finding alleged efforts relied on monitoring and internal enforcement, not a way for lessors to discipline each another).

This Court should follow the lead of *Gibson* and *RealPage* and dismiss the *per se* claim. There is no basis to conclude that use of RENTmaximizer invariably raises prices, reduces supply, has no legitimate justification, or lacks any redeeming competitive purpose.[30]

---

[27] Opp. at 8–9; FAC ¶ 21; *see also* Opp. at 8 (citing FAC ¶ 76 referencing slide relating to lease *renewals* indicating "property pricing is controlled by Revenue Management").
[28] FAC ¶ 32.
[29] Motion at 16–17.
[30] *See, e.g., Fendelander v. Walt Disney C*o., 2023 WL 6464134, at *9 (N.D. Cal. Sept. 29, 2023) (noting *per se* standard applies to agreements that facially appear to almost always tend to restrict competition and decrease output and rejecting *per se* standard where agreement on its face did not lack any redeeming value) (citing *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 100 (1984)).

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

**B.      Plaintiffs cannot rely on a theory of "invitation and acceptance."**

Plaintiffs' circumstantial theory based on "invitation and acceptance" is flawed legally and factually. They base the argument on *Interstate Circuit v. U.S.*, 306 U.S. 208 (1939), a case cited extensively to the *RealPage* and *Gibson* courts. The theory is that even though the Lessor Defendants independently contracted with Yardi and did not communicate with each other, their participation in a conspiracy can nonetheless be inferred. But in every case Plaintiffs cite, there were compelling factual allegations that permitted an inference of illegality. No such facts are alleged here. An attempt to stretch the *Interstate Circuit* line of cases to the mere licensing of a product, at different times over several years, by non-competing companies, does not cut it.

In *Interstate Circuit*, two motion picture exhibitors sent a joint letter to eight distributors, naming each as an addressee, seeking compliance with two demands as a condition of continued exhibition of their films.[31] Each distributor agreed to impose the restrictions for the upcoming season.[32] The Supreme Court held that the "singular unanimity" of the distributors' actions in response to the exhibitors' demand sufficiently evidenced an unlawful conspiracy.[33] The Court emphasized that each of the distributors, who were in "active competition," knew that the proposal—which reflected a "radical departure" from past practice—was under consideration by the others and that they risked a substantial loss of business without unanimous action.[34] The distributors thus had a "strong motive for concerted action."[35]

Plaintiffs' attempt to shoehorn their conclusory allegations into the *Interstate Circuit* mold fails at each step. Contrary to their unfounded assertions, the FAC does not allege that each Lessor Defendant manages properties across the United States or that they competed with each other before licensing RENTmaximizer.[36] In reality, the Lessor Defendants operate in mostly non-overlapping states, faced no business risk if they failed to comply with any hypothetical

---

[31]  306 U.S. at 216–17.
[32]  *Id.* at 218.
[33]  *Id.* at 221–23.
[34]  *Id.* at 221–22.
[35]  *Id.* at 222.
[36]  Opp. at 3 (describing the "Landlord Defendants" as managers of properties "across the United States" who "used to compete with one another . . . .").

DEFS' OMNIBUS REPLY– 8
(Case No. 2:23–cv–01391-RSL)

"invitation," and had no "strong motive" to do so.[37] Nor did they implement "far-reaching changes in their business methods."[38] Plaintiffs misleadingly suggest that the Lessor Defendants charge higher rents than they used to.[39] But other than citing a reference to a single property in 2016, the FAC says nothing about the Lessor Defendants' rental rates or any changes thereto.[40] Plaintiffs' attempts to embellish the FAC's allegations merely highlight their deficiencies.[41]

Nor is there an equivalent letter or demand from Yardi. Plaintiffs assert, with no basis, that Yardi "invited" the Lessor Defendants "to provide competitively sensitive data to it in return for providing supra-competitive rental pricing determinations based on that data—with the stated purpose to raise prices above the prevailing competitive level."[42] The FAC does not cite a single communication from Yardi to the Lessor Defendants. Plaintiffs instead rely on broad statements in marketing materials, such as RENTmaximizer helps "manage pricing," produces "better results than the market," and clients "gain on average more than 6% net rental income."[43] None of these materials—nor any cited in the FAC—say anything about providing competitively sensitive data to Yardi, let alone using it to recommend rental rates to competitors.

There also is no plausible basis to infer that Yardi invited the Lessor Defendants to join a price-fixing conspiracy. References to net rental income growth are just that—references to *net income growth*. Plaintiffs consistently ignore the effect of improved occupancy rates and other

---

[37] *Interstate Circuit*, 306 U.S. at 225, 227; *see also* Motion at 15–16; *Barry v. Blue Cross of Cal.*, 805 F.2d 866, 869 (9th Cir. 1986) (noting a "showing of interdependence" is "a necessary condition" to infer a conspiracy under *Interstate Circuit*); *McCarn v. HSBC USA Inc.*, 2012 WL 7018363, at *6 (E.D. Ca. May 29, 2012) (rejecting application of *Interstate Circuit* where there was "nothing in the complaint, apart from conclusory allegations of 'collective' action, to suggest that the [defendants] would have had any financial motivation to act in concert"). Notably, even though the *RealPage* multifamily complaint alleged that the 49 defendants operated in the same areas (*i.e.*, 45 metropolitan statistical areas), the court still rejected *per se* liability. 2023 WL 9004806, at *23, 28.

[38] *Interstate Circuit*, 306 U.S. at 223.

[39] Opp. at 3.

[40] Motion at 21, 28.

[41] Plaintiffs repeatedly suggest they can fill the FAC's holes with "allegations of unidentified co-conspirators." *See, e.g.*, Opp. at 8 n.22. References to anonymous entities cannot supply the missing pieces in a conspiracy. *See North v. State of Wash., et al*, 2023 WL 8281609, at *1, *3 (W.D. Wash. Nov. 30, 2023) (dismissing claims against unnamed defendants that "serve[d] as a catch-all to encompass any possible additional party"); *Hernandez v. San Bernardino Cnty.*, 2023 WL 3432206, at *3 (C.D. Cal. Jan. 26, 2023) (rejecting blanket pleading of Doe defendants).

[42] Opp. at 8.

[43] FAC ¶¶ 6, 15, 122.

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

factors in boosting rental income. The FAC and its cited materials repeatedly suggest that RENTmaximizer improves occupancy, facilitates longer lease terms and higher-quality tenants, manages renewals more effectively, and reduces expenses.[44] Many factors other than pricing above competitive levels can lead to financial performance that is "better" than or "beats" the market average. Indeed, Plaintiffs omit the end of their quoted sentence: "Clients using RENTmaximizer have gained on average more than 6% net rental income growth ***while improving occupancy***."[45] There is no plausible basis to construe these statements as evidence of an invitation (let alone agreement) to unlawfully inflate prices. In fact, the *only* plausible conclusion is that the product helps clients make efficient sense and use of information already available to them, which is neither anticompetitive nor illegal by any measure.

Plaintiffs' other authority fares no better. *PLS.com, LLC v. National Association of Realtors*, 32 F.4th 824 (9th Cir. 2022), was about a group boycott, which often is a *per se* antitrust violation. The Ninth Circuit unremarkably applied *per se* treatment where the complaint alleged adoption of a uniform policy; members participated in "private interfirm communications" and meetings to discuss the policy and adopted it in short order following issuance of a white paper detailing competitive threats; non-compliant members faced "severe penalties," including fines and suspension; and defendants admitted the policy's purpose was to exclude a competitor.[46] Again, the FAC has no comparable allegations permitting a plausible inference that the Lessor Defendants "acted in concert rather than independently."[47]

---

[44]  Motion at 21 n.23, 22; *see also* FAC ¶ 23 n.24 (citing article: "pricing is based on lease expirations so we avoid too many in one month, which stabilizes occupancy levels"; noting turnover rate decreased 20%); *id.* ¶ 90 n.110 (citing article: "[s]igning different lease terms gives us longer leases with guaranteed revenue"); *id.* 73 n.79 (citing article: customer previously used "paper spreadsheets, market surveys and traffic," which was so cumbersome they only adjusted rents once a month), *available at* https://web.archive.org/web/20240208061326/https://www.linkedin.com/pulse/pricing-wins-interview-noam-hameiri-mba/; *id.* ¶ 43 n.47 (citing video: product enabled customer's record-high occupancy increase).

[45]  FAC ¶ 6 (emphasis added).

[46]  *PLS.com*, 32 F.4th at 830–31, 843.

[47]  *Id.* at 842; *see also U.S. v. Masonite*, 316 U.S. 265 (1942) (plausible conspiracy pleaded against sellers of building materials who competed in same markets and signed identical minimum pricing agreement); *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231 (D. Mass. 2014) (plausible conspiracy pleaded against companies who agreed to delay generic drug entry contingent on agreement by other manufacturers). *Meyer v. Kalanick*, 174 F. Supp. 3d 817 (S.D.N.Y. 2016), is distinguishable because Plaintiffs say they do not allege an "agreement to fix rents at the same price."

In sum, the FAC's allegations come nowhere close to permitting an "inference of agreement" akin to *Interstate Circuit* or others of its ilk. The sole commonality—use of an individually customizable revenue management product—falls fatally short.[48]

## C. The Opposition confirms that the FAC fails to allege parallel conduct or plus factors.

The second "circumstantial" theory, based on parallel conduct and plus factors, also fails.

### 1. The allegations of parallel conduct are deficient.

Plaintiffs try to piggy-back on *RealPage* by pivoting their theory of parallel conduct to an alleged change in pricing strategy, falsely claiming the allegations are "virtually identical."[49] The *RealPage* plaintiffs alleged that the defendants switched from a "heads in beds" strategy that prioritized occupancy to a "price over volume" strategy,[50] supported by defendant statements allegedly discussing a strategy change (including "pushing people out") and a regression analysis correlating vacancy and rental rates, which suggested that rents in certain submarkets correlated 83% with vacancy rates until 2016, when the conspiracy allegedly began, and then shrank to 19.3%.[51] Plaintiffs here do not—and cannot—allege a similar strategy change. By contrast, the FAC and its materials emphasize that RENTmaximizer *improves* occupancy.[52]

Plaintiffs also allege in conclusory fashion that the Lessor Defendants switched from "competitive" to "algorithmic" pricing,[53] another unsupported attempt to paint the mere use of revenue management software as automatically anticompetitive. To be clear, with the exception

---

[48] Opp. at 16, 21–22; *Meyer*, 174 F. Supp. 3d at 824 (alleging drivers agreed with Uber "to charge the same fares"). Moreover, an arbitrator later found "no evidence [Uber] drivers entered into any agreement . . . relating to surge pricing." Award of Arbitrator at 6, *In the Matter of the Arbitration between Meyer v. Uber Technologies, Inc*., Case No. 01–18–0002–1956 (AAA Feb. 22, 2020), *available at* Dkt. No. 1:15–cv–09796, ECF No. 182–16 (S.D.N.Y. May 22, 2020) (noting *Interstate Circuit* "is often ill suited to 21st Century technology . . . involving primarily vertical relationships").

[48] *See, e.g.*, *White v. R.M. Packer Co*., 635 F.3d 571, 576 (1st Cir. 2011) (noting *Interstate Circuit* applied where "the economic context" was clear that all defendants "needed to act uniformly or all would lose business" and all imposed the restrictions); *In re Travel Agent Comm'n Antitrust Litig*., 583 F.3d 896, 906 (6th Cir. 2009) (noting *Interstate Circuit* involved "salient evidence" of collusion).

[49] Opp. at 15. Plaintiffs also reference alleged information-sharing, but they cannot "double-count" those allegations as parallel conduct. *RealPage*, 2023 WL 9004806 at *20 n.15. Because the FAC treats alleged information-sharing as a plus factor, FAC ¶ 138, Defendants address it *infra* § II.C.2.

[50] 2023 WL 9004806 at *12.

[51] *Id*. at *12–13.

[52] *Supra* § I.B.

[53] Opp. at 15.

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

of quoting a press release referencing one building,[54] the FAC does not allege anything about the Lessor Defendants' actual rents, either before or after licensing the product. Plaintiffs try to fill this gap with a "regression analysis," from which they claim one can infer the Lessor Defendants charged anticompetitive rents.[55] But relying on zip codes from one month in three random cities says nothing about the Lessor Defendants' rental rates.[56] And again, Plaintiffs cannot remedy their factual holes by alluding to rents allegedly charged by anonymous "co-conspirators."[57]

> ### 2. The plus factors do not give rise to an inference of a conspiracy.

The alleged plus factors are irrelevant because the FAC fails to plead parallel conduct.[58] Regardless, the alleged plus factors do not plausibly suggest a conspiracy.[59]

**Alleged confidential data sharing**. Both *Gibson* and *RealPage* noted that an essential element of a hub-and-spoke theory based on "algorithmic pricing" is an "exchange of nonpublic data between competitors through the algorithm."[60] In *Gibson*, the allegations fell short.[61] In *RealPage*, they were "compelling."[62] The allegations here are just as deficient as those in *Gibson*.

The FAC asserts in conclusory fashion that competitor pricing data is an input into RENTmaximizer.[63] But there are no non-conclusory allegations that such data is *non-public* data collected from customers and used to make rent suggestions for *other* customers. Plaintiffs sprinkle the word "nonpublic" into the Opposition, but none of the cited sources supports an allegation that rent recommendations are based on competitors' non-public data.[64] They rely mainly on ambiguous witness comments strung together in a suggestive manner.[65] They also conflate references to benchmarking data in Yardi Matrix, a separate product, with data in

---

[54] FAC ¶ 23.
[55] Opp. at 15–16.
[56] Motion at 22–23; *see also infra* § II.B.2.
[57] *Supra* § I.B n.41.
[58] Motion at 24.
[59] Plaintiffs do not respond to Defendants' argument that alleged "opportunities to collude" at Yardi conferences is not a plausible plus factor. Motion at 29–30. The allegation is thus waived. *See e.g., Yagman v. Kelly*, 2018 WL 2138461, at *12 (C.D. Cal. Mar. 20, 2018).
[60] *Gibson*, 2023 WL 7025996, at *4; *RealPage*, 2023 WL 9004806, at *17 (citing *Gibson*).
[61] *Gibson*, 2023 WL 7025996, at *4.
[62] *RealPage*, 2023 WL 9004806, at *21.
[63] *See, e.g.*, FAC ¶ 9.
[64] Opp. at 19.
[65] Motion at 27.

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

RENTmaximizer.[66] For instance, they vaguely allege that Voyager clients[67] agree to share pricing and occupancy data with Yardi, and that Yardi uses "aggregated data" as "part of Matrix and RENTmaximizer."[68] But they tellingly do not—and cannot—allege that the "aggregated data" includes non-public pricing used to formulate rent recommendations. In fact, elsewhere they acknowledge that the Matrix data is *public* data obtained through phone surveys.[69] They also misleadingly suggest that a Yardi press release states that with "real-time access to competitors' nonpublic data . . . 'clients know their market in real time.'"[70] The press release says *nothing* about non-public data. It is Plaintiffs, not Defendants, who engage in "smoke and mirrors."[71]

Plaintiffs hedge their bets by citing *In re Petroleum Products Antitrust Litigation*, 906 F.2d 432, 447 (9th Cir. 1990), to argue that rent suggestions based on public data can support a conspiracy claim.[72] In *Petroleum*, defendant oil companies publicly announced their decisions to withdraw dealer assistance and restore tank wagon prices for the sole purpose of quickly informing competitors in the hopes they would follow the price move. *Id*. at 446–47. There is no plausible comparison to posting rents on websites such as Zillow and RentCafe, designed to assist *consumers* seeking an apartment, or responding to calls seeking publicly available information about asking rents. *Todd v. Exxon Corp*., 275 F.3d 191, 213 (2d Cir. 2001) ("Public dissemination is a primary way for data exchange to realize its procompetitive potential.").[73]

---

[66] Opp. at 20.
[67] Voyager is separate property management software that allows lessors to centralize the financial and operational aspects of their business. Motion at 4.
[68] FAC ¶ 12
[69] *Id*. ¶ 108. "The Rent Survey updates an apartment community's rents [and] current rent specials . . . . The process requires calling . . . communities and asking various questions. . . . Surveys must be conducted as a potential renter to ensure accuracy of information." *Id*. ¶ 103 n.128.
[70] *Id*. ¶ 86.
[71] Opp. at 20. Plaintiffs are correct that *RealPage* found allegations of confidential data sharing to be the "most compelling evidence" supporting a rule of reason claim, finding the multifamily complaint "unequivocally" alleged that the software "inputs a melting pot of confidential competitor information through its algorithm and spits out price recommendations based on that private competitor data." 2023 WL 9004806 at *17, 21. Unlike here, the data-sharing allegations in *RealPage* were concrete, so much so the court deemed them "undisputed." *Id*. *14–17, 19, 21; *see also RealPage*, No. 3:23–md–03071, Dkt. 530 (SAC) ¶¶ 4–6, 10–13, 31, 40–41, 225, 227, 247–49, 253, 287–91.
[72] Opp. at 20.
[73] The Agri Stats cases are also inapposite. Opp. at 19–20. Detailed allegations of information exchange were supplemented with other substantive allegations suggesting a conspiracy. *See, e.g., In re Broiler Chicken Antitrust Litig*., 290 F. Supp. 3d 772, 798 (N.D. Ill. 2017) ("There is simply too much unusual market movement, unusual public statements, unusual information sharing . . . and a coincidence of

---

**Alleged actions against self-interest**. Plaintiffs' arguments are premised on non-existent allegations. The FAC contains no plausible basis to suggest that the Lessor Defendants' use of RENTmaximizer would be irrational unless the other Lessor Defendants agreed to use it.[74] To the contrary, the FAC acknowledges many reasons why a rational lessor would use the product regardless of whether or where anyone else did.[75] And it is entirely in a Lessor Defendant's self-interest to increase revenue, whether by raising rental rates consistent with supply and demand, improving occupancy, decreasing turnover rates, signing longer leases, or reducing expenses.[76]

**Alleged monitoring**. Although not alleged as a plus factor in the FAC, Plaintiffs claim the Lessor Defendants monitor each other through RENTmaximizer and "market surveys."[77] The FAC does not plausibly allege an enforcement or disciplinary mechanism for non-compliance.[78]

**Alleged market characteristics**. Plaintiffs' arguments are full of contradiction. Bizarrely, they double-down on their acknowledgement that real estate markets are inherently local, claiming "there are no reasonable substitutes" because "renters prefer to live close to work and school . . . ."[79] Yet their nationwide market definition presumes renters have "fungible" options in 50 states.[80] Plaintiffs also criticize Defendants for saying a luxury three-bedroom Seattle high-rise is not a reasonable alternative for a Flagstaff basement studio because any comparison should account for "property characteristics."[81] Setting aside this concession that multifamily apartments are *not* fungible, Plaintiffs leave unaddressed the core problem in their theory—an apartment in *Seattle* is not reasonably interchangeable with one in *Flagstaff*, regardless of how many bedrooms each has. Plaintiffs' remaining arguments also fail.[82]

---

business strategies . . . ."). Notably, the *Broiler* court later found that Agri Stats reports contained only a producer's own production and pricing data and granted its summary judgment motion. *In re Broiler Chicken Antitrust Litig.*, 2023 WL 7220170, at *25–27 (N.D. Ill. Nov. 2, 2023).
[74] Opp. at 22,
[75] *Supra* § I.B. In addition to the benefits already noted, the FAC cites material noting that the product helps lessors comply with fair housing rules, FAC ¶ 71, which alone is a unilateral incentive to use it.
[76] *Supra* § I.B.
[77] Opp. at 23.
[78] *Supra* § I.A.
[79] Opp. at 24; *see also* FAC ¶¶ 146–47.
[80] Opp. at 24.
[81] *Id.*
[82] *Id.* at 23–24; Motion at 28–29.

DEFS' OMNIBUS REPLY– 14
(Case No. 2:23–cv–01391-RSL)

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1    **Investigation of RealPage**. In claiming that "government investigations support the

2  plausibility of a nationwide conspiracy,"[83] Plaintiffs cite cases involving investigations or

3  conduct of the *defendants* in the case being cited.[84] An investigation of a different company

4  (RealPage), with a different product, does not bolster a conspiracy claim in *this* case.[85]

5    Plaintiffs' reliance on DOJ's Statement of Interest in *RealPage* is also misplaced.[86]

6  Although DOJ argued that the complaints pleaded a *per se* violation,[87] the court dismissed the

7  *per se* claims without discussing the DOJ submission.[88] It is also notable that, unlike in

8  *RealPage*, DOJ does not argue in the Statement of Interest submitted in *this* action that the

9  Motion should be denied.[89] One explanation is that DOJ, like Plaintiffs, cannot explain how the

10  use of a product that is "completely configurable" such that users each "vary their models within

11  a property to meet their objectives"[90] can violate the antitrust laws absent an allegation (of which

12  there is none) that the Lessor Defendants agreed to program the product the same way.

13    Here, DOJ mostly recites a few basic antitrust principles, such as a conspiracy need not

14  be successful to be unlawful; that members need not fully comply; that members can exchange

15  confidential data through an intermediary; and that agreement to the same "starting point" (*i.e.*,

16  list prices) or "end point" or "pricing formula" can be unlawful.[91] Defendants do not disagree in

17  principle. Defendants *do* disagree that these precepts have any relevance here given that the FAC

18  fails to plead a plausible price-fixing conspiracy in the first instance.[92] There is no well-pleaded

---

19  [83] Opp. at 24–25 (cleaned up).

20  [84] *See Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 324 F. Supp. 3d 1142, 1156 (S.D. Cal. 2018) (investigation of defendants); *In re Packaged Ice Antitrust Litig.*, 723 F Supp. 2d 987, 1008 (E.D.

21  Mich. 2010) (investigations and guilty pleas of defendants); *see also Markson v. CRST Int'l, Inc.*, 2019 WL 6354400, at *4 (C.D. Cal. Mar. 7, 2019) (citing *Persian Gulf*).

22  [85] *See In re Cedar Shakes & Shingles Antitrust Litig.*, 2020 WL 832324, at *10 (W.D. Wash. Feb. 20, 2020) (allegations of industry investigations, without reference to defendants, did not advance claims).

23  [86] Opp. at 25.
   [87] DOJ Statement of Interest, Dkt. #149 ("Duffy SOI"), at 149–1 (attaching RealPage Statement of

24  Interest ("RealPage SOI")).
   [88] *RealPage*, 2023 WL 9004806, at *23–24. An SOI is treated like an amicus brief and accorded only the

25  weight a court deems appropriate. *See, e.g., M.R. v. Dreyfus*, 697 F.3d. 706, 735 (9th Cir. 2012).
   [89] *Compare* Duffy SOI *with* RealPage SOI at 23.

26  [90] FAC ¶ 77 n.87 (citing article).
   [91] Duffy SOI at 2–6.

27  [92] Defendants also disagree with the blanket assertion that "[i]t is per se illegal for competing landlords to jointly delegate key aspects of their pricing to a common algorithm," Duffy SOI at 3,

28  notwithstanding that the FAC fails to plausibly allege any such delegation.

agreement to "alter[] the starting point of prices" or "distort[] the competitive pricing process" from which a conspirator could deviate.[93] DOJ is so preoccupied with articulating what a price-fixing conspiracy does *not* require that it overlooks the one thing it inescapably *does* require: specific factual allegations from which a conspiracy can be plausibly inferred.

DOJ also opines on an allegedly "incorrect" legal argument in the Motion, but misconstrues Defendants' position. Defendants do not argue that "the landlord's retention of some pricing discretion dooms a price-fixing claim" or that a complaint "must allege a binding enforcement mechanism."[94] Rather, these are factors that assess whether a plausible conspiracy has been sufficiently alleged. Both *RealPage* and *Gibson* viewed them as material factors.[95] The lack of an agreement to adopt rent recommendations or punish non-compliant members renders any conspiracy highly implausible. A plaintiff may in theory overcome such deficits with other allegations raising a plausible inference of an unlawful agreement, but here there are none.[96]

In sum, the alleged plus factors—alone and as a whole—are consistent with "rational, legal business behavior" and fail to plausibly suggest collusion rather than independent action.[97]

## II.    The Opposition confirms that the FAC fails to state a claim under the rule of reason.

### A.    Plaintiffs fail to plausibly allege a relevant market.

Plaintiffs claim that because they have supposedly alleged "direct evidence" of anticompetitive effects, they are excused from having to plausibly allege a relevant market.[98] Not so. Every antitrust plaintiff asserting a rule of reason claim must plausibly define a relevant market. *See, e.g.*, *Ohio v. Am. Express Co.*, 585 U.S. 529, 543 n.7 (2018) (rejecting argument that plaintiffs "need not define the relevant market in this case because they have offered actual

---

[93] Duffy SOI at 6.

[94] *Id*. at 2, 6.

[95] *RealPage*, 2023 WL 9004806, at *23; *Gibson*, 2023 WL 7025996, at *3.

[96] DOJ's cited cases had ample evidence of collective rate-setting agreements. *See, e.g., Citizen Pub. Co. v. U.S.*, 394 U.S. 131, 135–36 (1969) (defendants formed profit-pooling entity to set rates); *U.S. v. Natl. Ass'n of Real Estate Bds.*, 339 U.S. 485, 488–89 (1950) (non-mandatory rates do not doom claim where agreement is shown by adherence to price schedule or proof of consensual action); *U.S. v. Socony-Vacuum Oil Co*., 310 U.S. 150, 172 (1940) (considering intent to stabilize rather than inflate prices where agreement was undisputed); *Plymouth Dealers' Ass'n of No. Cal. v. U.S.*, 279 F.2d 128, 133–34 (9th Cir. 1960) (competing dealers agreed on uniform list price to diminish pricing variance).

[97] *Kendall*, 518 F.3d at 1049.

[98] Opp. at 26–27.

DEFS' OMNIBUS REPLY– 16
(Case No. 2:23–cv–01391-RSL)

evidence of adverse effects on competition"); *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023) ("To prove a substantial anticompetitive effect directly, the plaintiff must provide 'proof of actual detrimental effects [on competition]' . . . ***in the relevant market***." (emphasis added) (internal citation omitted)); *Intel Corp. v. Fortress Inv. Grp. LLC*, 2020 WL 6390499, at *8–9 (N.D. Cal. July 15, 2020) (rejecting argument that plaintiffs need not plead a market definition where they allege direct evidence of anticompetitive effects).[99] Plaintiffs' failure to plausibly define relevant geographic and product markets is fatal to all three of their claims.[100]

### 1. No plausible geographic market.

Plaintiffs wrongly contend that a complaint should never be dismissed because the proposed geographic market is overbroad.[101] They cite authorities observing that an overbroad relevant market often harms the plaintiff by making it impossible to plausibly allege market power.[102] Nonetheless, the obligation to plausibly define a proper geographic market remains, and courts routinely dismiss complaints alleging implausibly overbroad market definitions, including *RealPage*. The rule of reason claims should be dismissed for this reason alone.

In *RealPage*, the court rejected a proposed nationwide geographic market for student housing rentals as implausible: "Plaintiffs' proposal of a nationwide market does not contend with, and in fact confounds" the reality that students need to live near campus.[103] Here too, Plaintiffs' proposed nationwide market confounds the reality that, as they admit, renters "choose

---

[99] Plaintiffs' cited cases do not say otherwise. Opp. at 26–27. *See, e.g.*, *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 827 (6th Cir. 2011) ("If adverse effects are clear, inquiry into ***market power*** is unnecessary." (emphasis added)); *Geneva Pharms. Tech. Corp. v. Barr Lab'ys Inc.*, 386 F.3d 485, 509 (2d Cir. 2004) ("[N]o need to show ***market power***" given evidence suggesting "a substantial impediment to competition" (emphasis added)); *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 668 (D. Conn. 2016) ("This case is ***very different*** from the typical Sherman Act case . . .; [Where] we have actual market data reflecting the impact of the introduction of a generic on the price of the patented drug, we do not need to do economic gymnastics to determine whether the defendant had ***market power*** . . . ." (emphases added)); *U.S. v. Am. Exp. Co.*, 21 F. Supp. 3d 187, 195–96 (E.D.N.Y. 2014) (defining a relevant market and finding plaintiffs could allege either actual adverse effects or market power). Plaintiffs agree. Opp. at 27 ("Consequently, if Plaintiffs plausibly allege reduced output, increased prices, or decreased quality ***in the relevant market*** . . . their rule of reason claim is sufficiently pled.").

[100] Even if Plaintiffs were correct about the legal standard, the FAC does not come anywhere close to pleading direct evidence of anticompetitive effects. *Infra* § II.B.2.

[101] Opp. at 37–38.

[102] *See, e.g.*, *RealPage*, 2023 WL 9004806, at *31.

[103] *See id.*

1  to live within certain geographic locations, such as somewhere close to their offices, schools,

2  communities."[104] *See Wound Care Concepts, Inc. v. Vohra Health Servs.*, P.A., 2021 WL

3  4990957, at *7 (S.D. Fla. Mar. 26, 2021) (rejecting national geographic market because

4  "[c]asting a broad net" could encompass more than the facilities in which the parties competed);

5  *Physician Specialty Pharmacy, LLC v. Prime Therapeutics, LLC*, 2019 WL 1239705, at *5 (D.

6  Minn. Jan. 24, 2019) (rejecting Alabama geographic market because "a patient who lives on the

7  western border of Alabama is unlikely to travel to the Florida/Alabama border" to obtain

8  pharmacy services), *report and recommendation adopted*, 2019 WL 1399571 (D. Minn. Mar. 28,

9  2019); *Debjo Sales, LLC v. Houghton Mifflin Harcourt Publ'g Co.*, 2015 WL 1969380, at *6

10  (D.N.J. Apr. 29, 2015) (rejecting national geographic market absent allegations "indicating that

11  school districts look to publishers across the nation when purchasing educational materials").[105]

12      Plaintiffs offer only two arguments addressing the substance of their geographic market

13  allegations. *First*, they rely almost entirely on two paragraphs in the FAC referring to the

14  "SSNIP test."[106] This is pure distraction. Plaintiffs ignore Defendants' authorities holding that

15  mere declarations that the SSNIP test is satisfied—which is all Plaintiffs provide here—are

16  insufficient to plausibly allege a relevant market.[107] Moreover, as Plaintiffs' allegations and

17  authorities make clear, the SSNIP test (when properly applied) is only capable of determining

18  that a proposed market definition is "too narrow"; the test has no bearing in a case like this,

19  where the alleged geographic market is implausibly broad.[108] Accordingly, the hypothetical

20  presented in the Opposition—if a single company controlled all multifamily rentals throughout

---

21  [104] FAC ¶ 147.

22  [105] *See also, e.g., Carolina Rest. Grp., Inc. v. Pepsico Sales, Inc.*, 2015 WL 4250395, at *7 (W.D.N.C.

23  July 13, 2015) (dismissing "conclusory" claim that "'North and South Carolina' [was] the relevant geographic market" absent explanation of competitive or economic significance of "broad region"); *Sky Angel U.S., LLC v. Nat'l Cable Satellite Corp.*, 947 F. Supp. 2d 88, 104 (D.D.C. 2013) (rejecting

24  national geographic market for distributors where "[i]t is not plausible that competition . . . occurs on a national level, because purchasers do not practicably turn to a national market for real-time,

25  multichannel video programming distribution services"); *Uretek USA, Inc. v. Applied Polymerics, Inc.*, 2011 WL 6029964, at *5 (E.D. Va. Dec. 5, 2011) (rejecting proposed relevant geographic market of

26  "the United States" as "too broad" and "unsupported by factual allegations").

[106] Opp. at 35–36; FAC ¶¶ 167–68.

27  [107] Motion at 36 (collecting authorities).

[108] *See, e.g.,* FAC ¶ 167 (SSNIP test determines whether "market is too narrowly defined"); *Epic Games,*

28  *Inc.*, 67 F.4th at 975 (SSNIP test assesses whether "the proposed market definition is too narrow").

---

the United States and increased prices by 5%, would consumers look elsewhere for rentals?—is irrelevant.[109] At best, this hypothetical suggests that foreign countries are outside the geographic market. It does not support the illogical contention that Fargo, North Dakota and Miami, Florida should be considered part of a single, nationwide rental market.

Even if it made sense to apply the SSNIP test to the geographic market here, the FAC makes no attempt to do so. Indeed, the two paragraphs about the SSNIP test *say nothing whatsoever about geography.* Instead, they purport to analyze (in entirely cursory terms) whether a price increase would cause consumers "to switch to other products or services," such that they should be regarded as "economic substitutes."[110] That is an attempted analysis of *product* market definition—a distinct pleading requirement—not geographic market definition.[111]

*Second*, Plaintiffs point to allegations about where Yardi does business or collects data, or where Defendants supposedly travel to attend social events or industry gatherings.[112] But this has nothing to do with the relevant issue when defining a relevant geographic market: "where buyers can turn for alternate sources of supply."[113] The only allegations that *do* speak to that key issue confirm that markets for multifamily rentals are inherently local, not national. *See, e.g.*, FAC ¶ 147 ("In most instances, despite price increases, renters still choose to live within certain geographic locations, such as somewhere close to their offices, schools, communities.").

## 2. No plausible product market.

The Opposition also confirms that Plaintiffs have no plausible support for a "multifamily housing"-only product market. They merely assert that there are differences between rentals and housing available for purchase, which is insufficient.[114] *First*, Plaintiffs ignore the authorities

---

[109] Opp. at 36; FAC ¶ 167.

[110] Opp. at 35–36; FAC ¶¶ 167–68.

[111] *See Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1120–21 (9th Cir. 2018) (explaining product market definition turns on identifying "economic substitutes").

[112] Opp. at 36–37 n.156.

[113] *Saint Alphonsus Med. Ctr.-Nampa Inc. v. St. Luke's Health Sys., Ltd.*, 778 F.3d 775, 784 (9th Cir. 2015). Plaintiffs rely solely on two cases involving geographic market allegations that bear no resemblance to the allegations here. *See Jien v. Perdue Farms, Inc.*, 2022 WL 2818950, at *10 (D. Md. July 19, 2022) (alleging wages were "set at similar levels across the country regardless of region"); *In re Mushroom Direct Purchaser Antitrust Litig.*, 2015 WL 5767415, at *19 (E.D. Pa. July 29, 2015) (alleging geographic market based on area where mushrooms could be practicably shipped and stored).

[114] Opp. at 35; FAC ¶ 166.

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

holding that they must allege a product market according to the cross-elasticity of demand, not even making a half-hearted attempt to engage with that concept.[115] *Second*, potential differences between rental apartments and other forms of housing are irrelevant. The issue is whether an increase in the price of one product would lead to an increase in demand for the other.[116] Plaintiffs do not engage with this question, which is another reason to dismiss their claims. *See Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, 433 F. App'x 598, 599 (9th Cir. 2011) ("The failure to allege a product market consisting of reasonably interchangeable goods renders the SAC 'facially unsustainable' and appropriate for dismissal.").

### B.    Plaintiffs fail to plausibly allege market power.

#### 1.    "Aggregation" of vertical agreements is not permissible.

Plaintiffs cannot aggregate the economic effects of independent vertical agreements between Yardi and the Lessor Defendants to establish market power.[117] The cases cited—which allowed aggregation in exclusive dealing and monopolization contexts—do not say otherwise.[118] Plaintiffs also concede there is no binding Ninth Circuit authority holding to the contrary: the superseded opinion in *William O. Gilley Enterprises, Inc v. Atlantic Richfield Co.* addressed whether it was proper to aggregate the "effects of *a single Defendant's*" agreements to establish the market power of "*a given Defendant*."[119] That fact pattern—which considered aggregation in

---

[115] Motion at 35–36; *see also Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 956 (9th Cir. 2023) (affirming dismissal absent any attempt to show cross-elasticity of demand for smart phone apps).

[116] *See Fed. Trade Comm'n v. Microsoft Corp.*, 2023 WL 4443412, at *9–10 (N.D. Cal. July 10, 2023) (noting product is deemed reasonable substitute for another when demand for it increases "in response to an increase in the price for the other. . . .  It doesn't matter whether [company's] products are fully interchangeable with those of its competitors because perfect fungibility isn't required. . . . [Otherwise] only physically identical products would be a part of the market.") (internal citation omitted)).

[117] Defendants do not "concede" that Plaintiffs are entitled to aggregate market shares in support of any of their three claims. Opp. at 44, n.189. Because Plaintiffs fail to plausibly allege a horizontal agreement in support of any of their claims, all three claims rely, at best, on alleged independent vertical agreements, which may not be aggregated to satisfy the market power requirement as a matter of law.

[118] *See, e.g., Orchard Supply Hardware LLC v. Home Depot USA, Inc.*, 967 F. Supp. 2d 1347, 1363 (N.D. Cal. 2013) (permitting aggregation to assess a single defendant's power under an exclusive dealing theory, while finding aggregation "inappropriate" to establish collective market power of multiple defendants); *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1302–03 (9th Cir. 1982) (permitting aggregation for exclusive dealing claims); *Brown v. Amazon.com, Inc.*, 2023 WL 5793303, at *9–10 (W.D. Wash. Sept. 7, 2023) (applying exception to minimum margin agreements for monopolization theory).

[119] 561 F.3d 1004, 1011–13 (9th Cir. 2009) (emphasis added).

---

DEFS' OMNIBUS REPLY– 20
(Case No. 2:23–cv–01391-RSL)

the context of exclusive dealing and tying[120]—has nothing to do with the allegations here, which attempt to allege collective market power, not that a single defendant possesses market power.

Indeed, these cases are fully consistent with the view expressed by courts in other Circuits that aggregation should be prohibited *except* in cases involving exclusive dealing or monopolization.[121] Plaintiffs contend that courts have only adopted this principle where a plaintiff failed to allege that vertical agreements had a "cumulative effect," but that is false: many of the cited cases involved alleged cumulative effects, and the court nonetheless rejected aggregation. *See, e.g., In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *21, *25–26 (S.D.N.Y. July 31, 2023), *report and recommendation adopted*, 2024 WL 918030 (S.D.N.Y. Mar. 2, 2024) (rejecting aggregation where there was no plausible horizontal conspiracy so plaintiff was left with purely vertical agreements between spokes and hub).

Doubling down, Plaintiffs claim they can aggregate not just the market shares of the Lessor Defendants—which are nowhere defined—but of anonymous co-conspirators.[122] But the allegations about these "co-conspirators" are even more threadbare than those about the Lessor Defendants. Plaintiffs do not say who these "co-conspirators" are, much less plead a single act by them in furtherance of a supposed conspiracy, nor the details of their supposed vertical agreements with Yardi.[123] In short, as to these unknown "co-conspirators," Plaintiffs do not "answer the basic questions: who, did what, to whom (or with whom), where, and when?"[124]

### 2.    No direct evidence of market power.

To plead direct evidence of anticompetitive effects, Plaintiffs must allege that the Lessor Defendants imposed "actual detrimental effects [on competition], such as reduced output, increased prices, or decreased quality *in the relevant market*."[125] But they cannot point to a single well-pled fact suggesting the Lessor Defendants raised rents or restricted apartment

---

[120] *Id.* at 1010–11, 1013.
[121] Motion at 39 (collecting authorities).
[122] Opp. at 43–44.
[123] Motion at 40, n.39.
[124] *Kendall*, 518 F.3d at 1048; *see also supra* § I.B n.41.
[125] Opp. at 26 (*quoting PLS.Com*, 32 F.4th at 839) (emphasis added).

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

supply, let alone **across the United States**. Moreover, none of Plaintiffs' allegations bears any resemblance to what courts have regarded as direct evidence of market power.[126]

*First*, Plaintiffs baldly claim the Lessor Defendants kept their prices "artificially high."[127] But bare "allegations of increased rent prices are not plausible direct evidence of anticompetitive effects . . . ." *RealPage*, 2023 WL 9004806, at *28 (citing *1-800 Contacts, Inc. v. FTC*, 1 F.4th 102, 118 (2d Cir. 2021) (explaining claims based on direct evidence of increased prices requires showing "an actual anticompetitive change in prices after the restraint was implemented")).

*Second*, Plaintiffs' focus on a 2015 Yardi blog post describing an analysis of the product's value to customers, finding "better results than the market" between 2012 and 2014, is entirely misplaced.[128] Of course, Yardi and its customers believe the product is valuable in many ways, including by enhancing financial performance compared to those who do not have the benefit of the same tool. But that in no way creates a plausible inference that the product creates that value by facilitating a conspiracy to fix prices or illicit exchanges of confidential data. The cited materials make no reference, express or implied, to such anticompetitive means. Indeed, one of the cited documents opens with a description of the value of revenue management software "***in a competitive rental market***."[129] Further, vague quotes about the product helping clients "win at pricing" or get "better results"[130] do not plausibly allege that each Lessor Defendant engaged in anticompetitive pricing, let alone support an inference that they dominate a vast nationwide market and can move its pricing and supply at their whim.[131]

---

[126] Defendants are not insisting upon "comprehensive market analyses" or "*Daubert*-like analysis." Opp. at 32. To establish this as a rare case involving direct evidence of market power at the pleading stage, Plaintiffs must offer something more than conclusory boilerplate about prices. None of their cases say otherwise. *See, e.g.*, *Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1204 (9th Cir. 2012) (finding no harm to competition in tying case); *City of Philadelphia v. Bank of Am. Corp.*, 498 F. Supp. 3d 516, 524–32 (S.D.N.Y. 2020) (analyzing parallel conduct in *per se* case where plaintiffs alleged highly detailed and statistical analyses reflecting what rates would have been absent conspiracy).

[127] Opp. at 28.

[128] Opp. at 29–32.

[129] FAC ¶ 87 & n.101.

[130] Opp at 28–29, 31.

[131] *See Med Vets Inc. v. VIP Petcare Holdings, Inc.*, 2019 WL 1767335, at *6 (N.D. Cal. Apr. 22, 2019) (explaining market power must "correspond to the alleged market"), *aff'd* 811 F. App'x. 422 (9th Cir. 2020); *see also supra* § I.B.

DEFS' OMNIBUS REPLY– 22
(Case No. 2:23–cv–01391-RSL)

*Third*, Plaintiffs' so-called "regression analysis" purports to include data for *one month* in 2023 for *certain zip codes in three cities*. They make no attempt to explain how such a cursory analysis, even if otherwise properly performed, could directly prove the Lessor Defendants' control over *nationwide* pricing and supply for the entire class period.[132] Indeed, *RealPage* dismissed the student housing complaint containing similar allegations of "direct evidence," finding the "allegations are far too narrow to plausibly support Plaintiffs' claims of a 13–year conspiracy occurring in college towns and cities across the United States."[133] So too here.[134]

### 3.  No circumstantial evidence of market power.

The Opposition confirms the absence of plausible allegations of circumstantial evidence of market power. The issue is not that Plaintiffs have failed to plead "exact" market share figures with "pinpoint accuracy."[135] It is that they have not pled *anything* about market share at all, nor any other facts that could plausibly support an inference that the Lessor Defendants have the power to control the pricing and supply of apartment rentals throughout the United States.

To be sure, Plaintiffs point to certain figures, such as that RENTmaximizer allegedly "was used to price eight million residential units" globally in as early as 2013, and Yardi Matrix, a "separate product," collects benchmarking data for "90% of the U.S. population."[136] But those figures have nothing to do with the relevant question: what percentage of the relevant market did the Lessor Defendants actually control during the relevant time period? Plaintiffs do not address this question because they do not like the answer: the Lessor Defendants control at most a tiny fraction of an alleged nationwide apartment rental market.[137]

---

[132] *Med Vets Inc.*, 2019 WL 1767335, at *6.

[133] 2023 WL 9004806, at *33–34 (describing materials stating software "outperforms the market 2%–5%" and offering virtually identical "regression analysis" comparing publicly available rents in one month for student housing managed by defendants in four cities compared to non-defendants).

[134] At Opp. 33 n.133, Plaintiffs rely on *Brown v. JBS USA Food Co.*, 2023 WL 6294161, at *10 (D. Colo. Sept. 27, 2023), but the parallel conduct analysis there is not similar to the regression analysis offered here. *Id.* at *10, 14 (analyzing complaint alleging ***each Processor Defendant*** set internal compensation schedule based on job title and relevant experience and set wages in accordance with other Processor Defendants ***across the Class Period***).

[135] Opp. at 40 n.171.

[136] *Id.* at 39; FAC ¶ 98.

[137] Motion at 6.

DEFS' OMNIBUS REPLY– 23
(Case No. 2:23–cv–01391-RSL)

Plaintiffs also point to boilerplate allegations about "various characteries [sic] of the multifamily housing rental market" that purportedly make it susceptible to an exercise of market power, such as "high barriers to entry" and "high switching costs."[138] It is well-established that simply invoking these phrases without supporting substance does not plausibly allege market power—particularly in a case involving the expansive market definition here. Scattered assertions about the "dynamics" of a nationwide rental market fare no better. Plaintiffs contend there are "switching costs" involved in moving from one apartment to another, and that some apartments will no longer be available because they are already rented to someone else.[139] But those observations say nothing about the Lessor Defendants' ability to control market-wide pricing and supply notwithstanding their insignificant market shares. Plaintiffs also hypothesize that if "price increases" occurred "throughout" an entire market, renters would have no "lower-priced reasonably interchangeable options available."[140] But that just begs the question: because they cannot allege that the Lessor Defendants control a dominant share of any nationwide market, there is no basis for inferring they have the power to impose price increases "throughout" that market. Tellingly, Plaintiffs do not cite a single authority endorsing such bare assertions about market "dynamics" as sufficient to plausibly allege market power.

## III.     The Opposition confirms that Plaintiffs lack standing.

Plaintiffs' conclusory assertion that they "paid higher prices" cannot establish Article III standing or antitrust injury given the other allegations in the FAC.[141]

The FAC repeatedly alleges that RENTmaximizer furthers a conspiracy to automate pricing by abolishing discounts and rent concessions, thereby "eliminati[ng] . . . a pricing strategy characteristic of a competitive multifamily rental market" and "liberat[ing] [lessors] from the traditional and legal forms of competition."[142] Even assuming a conspiracy does not require full compliance, the problem is that *the only Plaintiffs before the Court* received the very

---

[138] Opp. at 39.
[139] *Id.* at 41.
[140] *Id.*
[141] *Id.* at 44.
[142] FAC ¶¶ 85, 90; *see also id.* ¶¶ 5, 19, 66, 77, 95.

**Matthew Carvalho,**
**Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

concessions characteristic of a competitive market that Plaintiffs allege RENTmaximizer eliminates.[143] They attempt to salvage the claims by suggesting their pre-concession rates might have been "inflated above competitive levels."[144] But the FAC contains no such allegations, nor any factual basis to infer that Plaintiffs' *post-concession* rent payments were unlawfully inflated.

Finally, Plaintiffs cannot invent competitors for their downtown Seattle high-rises by suggesting that discovery will reveal "John Doe co-conspirators."[145] Plaintiffs do not dispute that Pillar is the only Lessor Defendant with properties in downtown Seattle, and do not allege they would have considered an alternate apartment in some other area, let alone another state.

## IV.    Leave to amend the FAC should be denied.

Plaintiffs' request for leave to amend should be denied. Leave is properly denied in the face of a repeated failure to cure deficiencies or where amendment would be futile. Plaintiffs already had one shot at amending the complaint. The FAC added a new plaintiff, a new claim, and 75 paragraphs of allegations. Yet the FAC remains fatally deficient—a "strong indication that the plaintiffs have no additional facts to plead."[146] Tellingly, Plaintiffs fail to identify any proposed amendments that would solve the FAC's defects.

## CONCLUSION

Defendants respectfully ask this Court to dismiss the FAC in full and with prejudice.

RESPECTFULLY SUBMITTED,

DATE: March 15, 2024

---

[143] *See, e.g., Brown v. Porter McGuire Kiakona & Chow, LLP*, 2019 WL 254658, at *4 (D. Haw. Jan. 17, 2019) ("It is not enough that the conduct of which the plaintiff complains will injure someone. . . . [The plaintiff] must also show that he is within the class of persons who will be concretely affected." (quoting *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982))).

[144] Opp. at 44–45.

[145] *Id.* at 45; *see also supra* § I.B n.41.

[146] *A World Trade, Inc. v. Apmex, Inc*., 2021 WL 1502794, at *3 (C.D. Cal. Feb. 22, 2021) (dismissing claim with prejudice where plaintiff had prior opportunity to cure deficiencies), *aff'd*, 2022 WL 1262010 (9th Cir. Apr. 28, 2022); *see also Flaa v. Hollywood Foreign Press Assn*, 2021 WL 1399297, at *9 (C.D. Cal. Mar. 23, 2021) (denying leave where "[w]hen given a second chance, Plaintiffs fashioned an antitrust theory that is creative but implausible and contradictory"), *aff'd*, 55 F.4th 680 (9th Cir. 2022). Lack of standing also supports a finding of futility. *See, e.g.*, *Golden v. Intel Corp*., 642 F. Supp. 3d 1066, 1073 (N.D. Cal. 2022) (denying leave where amendment would not change fact that Article III and antitrust standing were lacking), *aff'd*, 2023 WL 3262948 (Fed. Cir. May 5, 2023).

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888

1

**VAN KAMPEN & CROWE PLLC**

2

/s/ Al Van Kampen
3   Al Van Kampen (WSBA No. 13670)
P.O. Box 33632
4   Seattle, WA 98133
Telephone: (206) 441–1121
5   Email: avankampen@vkclaw.com

6   **VINSON & ELKINS LLP**

7   Michael W. Scarborough (*pro hac vice*)
Dylan I. Ballard (*pro hac vice*)
8   M. Kevin Costello (*pro hac vice*)
Madison Lo (*pro hac vice*)
9   555 Mission Street, Suite 2000
San Francisco, CA 94105
10  Telephone: (415) 979–6900
11  Email: mscarborough@velaw.com
Email: dballard@velaw.com
12  Email: kcostello@velaw.com
Email: mlo@velaw.com
13

14  Stephen Medlock (*pro hac vice*)
2200 Pennsylvania Avenue NW
15  Suite 500 West
Washington, DC 20037
16  Telephone: (202) 639–6500
17  Email: smedlock@velaw.com

18  Mackenzie Newman (*pro hac vice*)
1114 Avenue of the Americas
19  32nd Floor
New York, NY 10036
20  Telephone: (212) 237–0000
21  Email: mnewman@velaw.com

22  *Attorneys for Defendant Bridge Property*
*Management, L.C.*
23

24  **CABLE HUSTON LLP**

25

/s/ Brian S. Epley
26  Brian S. Epley (WSBA No. 48412)
Jon W. Monso (WSBA No. 43912)
27  1455 SW Broadway, Suite 1500
28  Portland, OR 97201–3412

**MATTHEW CARVALHO,**
**ATTORNEY AT LAW, PLLC**

/s/ Matthew A. Carvalho
Matthew A. Carvalho (WSBA No. 31201)
720 Seneca Street
Seattle, WA 98101
Telephone: (206) 799–6888
Email: matt@mattcarvalholaw.com

**DEBEVOISE & PLIMPTON LLP**

Maura K. Monaghan (*pro hac vice*)
Michael Schaper (*pro hac vice*)
Kristin D. Kiehn (*pro hac vice*)
66 Hudson Boulevard
New York, NY 10001
Telephone: (212) 909–6000
Email: mkmonaghan@debevoise.com
Email: mschaper@debevoise.com
Email: kdkiehn@debevoise.com

Abraham Tabaie (*pro hac vice*)
650 California Street
San Francisco, CA 94108
Telephone: (415) 738–5700
Email: atabaie@debevoise.com

*Attorneys for Defendant Yardi Systems, Inc.*

**BAILEY DUQUETTE PC**

/s/ Hozaifa Cassubhai
Hozaifa Cassubhai (WSBN No. 39512)
William Burnside (WSBN No. 36002)
500 Union Street, Suite 800
Seattle, WA 98101
Phone: (206) 225–2250
Fax : (866) 233–5869
Email: hozaifa@baileyduquette.com
        will@baileyduquette.com

*Attorneys for Defendant Calibrate Property*
*Management, LLC*

**FOGARTY LAW GROUP PLLC**

/s/ Paul E. Fogarty
Paul E. Fogarty (WSBN No. 26929)

DEFS' OMNIBUS REPLY– 26
(Case No. 2:23–cv–01391-RSL)

Telephone: (503) 224–3092
Email:  jmonson@cablehuston.com
Email:  bepley@cablehuston.com

*Attorneys for Defendant Dalton
Management, Inc.*

**SHOOK, HARDY & BACON L.L.P.**

*/s/ Steven Rich*
Steven Rich (WSBA No. 48444)
701 Fifth Avenue, Suite 6800
Seattle, WA 98104
Telephone: (206) 344–7600
Email:  srich@shb.com

Ryan Sandrock (*pro hac vice*)
555 Mission Street, Suite 2300
San Francisco, CA 94105
Telephone: (415) 544–1900
Email:  rsandrock@shb.com

*Attorneys for Defendant LeFever Mattson
Property Management*

**K&L GATES LLP**

*/s/ Christopher M. Wyant*
Christopher M. Wyant (WSBA No. 35561)
Tyler Lichter (WSBA No. 51090)
925 Fourth Avenue, Suite 2900
Seattle, WA 98104
Phone: (206) 623–7580
Fax: (206) 623–7022
Email: chris.wyant@klgates.com
        tyler.lichter@klgates.com

Lauren Norris Donahue (*pro hac vice*)
70 W. Madison St., Suite 3300
Chicago, IL 60602
Telephone: (312) 372–1121
Fax: (312) 827–8000
Email: lauren.donahue@klgates.com

Derek Sutton (*pro hac vice*)
301 Hillsborough St., Suite 1200

1904 Third Avenue, Ste 933
Seattle, WA 98101
Telephone: (206) 441–0172
Email: pfogarty@fogartylawgroup.com

**NORTON ROSE FULBRIGHT US LLP**

Michael Swarztendruber (*pro hac vice*)
2200 Ross Avenue, Suite 3600
Dallas, TX 75201
Telephone: (214) 855–8067
michael.swarztendruber@nortonrosefulbright.com

Eliot Turner (*pro hac vice*)
1301 McKinney, Suite 5100
Houston, TX 77010
Telephone: (713) 651–5113
Email: eliot.turner@nortonrosefulbright.com

*Attorneys for Defendant Creekwood Property
Corporation*

**PERKINS COIE LLP**

*/s/ David A. Perez*
David A. Perez (WSBA No. 43959)
Elvira Castillo (WSBA No. 43893)
Tiffany Lee (WSBA No. 51979)
Marten King (WSBA No. 57106)
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.6767
Email: DPerez@perkinscoie.com
Email: ECastillo@perkinscoie.com
Email: TiffanyLee@perkinscoie.com
Email: MKing@perkinscoie.com

Adrianna Simonelli (WSBA No. 58472)
1120 NW Couch Street, Tenth Floor
Portland, OR 97209–4128
Telephone: 503–727–2000
Facsimile: 503–727–2222
Email: ASimonelli@perkinscoie.com

*Attorneys for Defendant HNN Associates, LLC*

**Matthew Carvalho,
Attorney at Law, PLLC**
720 Seneca Street
Seattle, Washington 98101
206.799.6888

Raleigh, NC 27603
Telephone: (919) 743–7331
Fax: (919) 516–2122
Email: derek.sutton@klgates.com

*Attorneys for Defendant R.D. Merrill Real Estate Holdings, LLC*

**GORDON REES SCULLY MANSUKHANI, LLP**

*/s/ Todd A. Bowers*
Todd A. Bowers (WSBA No. 24638)
701 5th Avenue, Suite 2100
Seattle, WA 98104
Telephone: (206) 695–5197
Email: tbowers@grsm.com

**ROETZEL & ANDRESS**

Stephen W. Funk (*pro hac vice*)
222 South Main Street, Suite 400
Akron, OH 44308
Telephone: (330) 849–6602
Cell: (330) 819–5387
Email: sfunk@ralaw.com

*Attorneys for Defendant Summit Management Services, Inc.*

**STOKES LAWRENCE, P.S.**

*/s/ Mathew Harrington*
Mathew Harrington (WSBA No. 33276)
Valerie Walker (WSBA No. 52584)
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101–2393
Telephone: (206) 626–6000
Email: Mathew.Harrington@stokeslaw.com
Email: Valerie.Walker@stokeslaw.com

**SPENCER FANE LLP**

Jessica Nelson (*pro hac vice*)
Donald Heeman (*pro hac vice*)
100 South Fifth Street, Suite 2500
Minneapolis, MN 55402
Telephone: (612) 268–7000
Email: jnelson@spencerfane.com
Email: dheeman@spencerfane.com

*Attorneys for Defendant Manco Abbott, Inc.*

**BRADLEY BERNSTEIN SANDS LLP**

*/s/ Heidi B. Bradley*
Heidi B. Bradley (WSBA No. 35759)
2800 First Avenue, Suite 326
Seattle, WA 98121
Telephone: (206) 337–6551
Email: hbradley@bradleybernstein.com

*/s/ Darin M. Sands*
Darin M. Sands (WSBA No. 35865)
1425 SW 20th Ave., Suite 201
Portland, OR 97201
Telephone: (503)734–2480
Email: dsands@bradleybernstein.com

*Attorneys for Defendant Morguard Management Company Inc.*

## CERTIFICATION

I certify that this reply contains 10,569 words and consists of 25 pages, in compliance with this Court's Order granting the parties' Stipulated Motion re: Motion to Dismiss Briefing Schedule/Procedure (Dkt. # 118).

By:  */s/ Matthew Carvalho*

Matthew Carvalho,
Attorney at Law, PLLC
720 Seneca Street
Seattle, Washington 98101
206.799.6888