UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MCKENNA DUFFY, *et al*.,

        Plaintiffs,

   v.

YARDI SYSTEMS, INC., *et al*.,

        Defendants.

CASE NO. 2:23-cv-01391-RSL

ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS

This matter comes before the Court on "Defendants' Omnibus Motion to Dismiss the First Amended Class Action Complaint Pursuant to FRCP 12(b)(6)." Dkt. # 138. Defendants, ten owners or operators of multifamily residential units and the property management software company they rely upon to manage revenues, argue that plaintiffs failed to adequately allege core elements of a Sherman Act violation and lack standing. Having reviewed the First Amended Class Action Complaint and the memoranda submitted by the parties, the Court finds as follows:

**BACKGROUND**

Plaintiffs allege that, beginning in 2011, defendants joined a conspiracy to share detailed, competitively sensitive, non-public information which would be used to establish

supracompetitive rental rates in the multifamily housing market in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Dkt. # 113 at ¶¶ 178-208. The combination and conspiracy allegedly involved (a) a set of vertical agreements between Yardi Systems, Inc., and each individual lessor defendant for the use of Yardi's revenue management software, (b) a continuing horizontal agreement between and among the lessor defendants to provide their commercially sensitive information to Yardi, to use Yardi's revenue management software, and to implement the recommendations generated, and (c) a shared understanding that Yardi would use the information provided to recommended rental rates above what would be earned in a competitive market. Plaintiffs' more specific allegations are discussed below in the context of the elements of a Section 1 cause of action.

## DISCUSSION

**A. Pleading Standard Under Fed. R. Civ. P. 12(b)(6)**

The question for the Court on a motion to dismiss is whether the facts alleged in the complaint sufficiently state a "plausible" ground for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In the context of a motion under Rule 12(b)(6), the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008) (citation omitted). The Court's review is generally limited to the contents of the complaint. *Campanelli v. Bockrath*, 100 F.3d 1476, 1479 (9th Cir. 1996). "We are not, however, required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of

fact, or unreasonable inferences." *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010).

> To survive a motion to dismiss under Rule 12(b)(6), a complaint must allege "enough facts to state a claim to relief that is plausible on its face." []*Twombly*, 550 U.S. [at 570]. A plausible claim includes "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *U.S. v. Corinthian Colls.*, 655 F.3d 984, 991 (9th Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Under the pleading standards of Rule 8(a)(2), a party must make a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). . . . A complaint "that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Thus, "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss." *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004).

*Benavidez v. Cty. of San Diego*, 993 F.3d 1134, 1144–45 (9th Cir. 2021). If the complaint fails to state a cognizable legal theory or fails to provide sufficient facts to support a claim, dismissal is appropriate. *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d 1035, 1041 (9th Cir. 2010).

**B. Section 1 Claim**

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. To state a claim under § 1, plaintiffs must plead "(1) a contract, combination or conspiracy among two or more persons or distinct business entities'; (2) which is intended to restrain or harm trade; (3) which actually injures competition; and (4) harm to the plaintiff from the anticompetitive conduct." *Name.Space, Inc. v. Internet Corp. for Assigned Names & Nos.*, 795 F.3d 1124, 1129 (9th Cir. 2015) (internal quotation mark and citation omitted). Defendants seek dismissal of plaintiffs' § 1 claim because the First Amended Class Action Complaint improperly relies on group pleading, fails to plausibly allege a contract, combination or conspiracy between the lessor

ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS - 3

defendants, fails to identify a relevant market that is defined in terms of both product and geography, and fails to plausibly allege that defendants have market power in the proposed market.

### 1. Improper Group Pleading

Defendants argue that plaintiffs have failed to allege that each of the named lessor defendants participated in an individual capacity in the alleged anti-competitive scheme. Although plaintiffs often refer to the lessor defendants as a collective in the First Amended Class Action Complaint, they individually identify each lessor, their corporate headquarters, and the year in which they began using Yardi's revenue management software. Dkt. # 113 at ¶¶ 36-45. For most of the lessor defendants, plaintiffs also specify the number of units or apartment complexes owned/operated and the geographical breadth of their operations. Plaintiffs allege that the lessor defendants and other Yardi clients engaged in a coordinated effort, organized through Yardi, to fix rental prices at supracompetitive rates. The allegation is that all of the lessor defendants engaged in the same anti-competitive scheme, namely entering into express agreements with Yardi with the understanding that their collective actions would allow them to restrain trade. In such circumstances, there is no need to provide defendant-specific allegations beyond those that raise a plausible inference that they each joined the anti-competitive scheme. The fact that some of the lessor defendants made public statements regarding aspects of the coordinated plan that were included in the First Amended Class Action Complaint does not detract from the sufficiency of the allegations related to other lessor defendants.

Defendants make no effort to show that there is an ambiguity regarding what one or more of them is alleged to have done or what theory of liability is being asserted against them. The First Amended Class Action Complaint adequately informs defendants of the nature of the claims

asserted against them and allows them to form a meaningful response. Defendants' "group pleading" argument is unpersuasive.

**2. Contract, Combination or Conspiracy**

Section 1 applies only to concerted action that restrains trade: independent market decisions and conduct are not enough, even if there are parallels in timing or activities. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010); *Twombly*, 550 U.S. at 557. The agreement to act in concert need not be formal or written. *Interstate Cir. v. United States*, 306 U.S. 208, 227 (1939). "All that is required is 'a conscious commitment to a common scheme designed to achieve an unlawful objective.'" *PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 842 (9th Cir. 2022), *cert. denied sub nom. The Nat'l Ass'n of Realtors v. The PLS.com, LLC*, __ U.S. __ 143 S. Ct. 567 (2023)) (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). Plaintiffs must provide "plausible grounds to infer an agreement," *Twombly*, 550 U.S. at 556, but they are not required to show that an agreement is probable or to "allege a fact pattern that tends to exclude the possibility of lawful, independent conduct," *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110 (9th Cir. 2022) (quoting *Erie Cnty. v. Morton Salt, Inc.*, 702 F.3d 80, 869 (6th Cir. 2012)).

Evidence of concerted, rather than independent, action among market competitors can include direct evidence of horizontal agreements between competitors, *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015), the acceptance of an invitation to participate in a common scheme that restrains trade, *Interstate Circuit*, 306 U.S. at 226-27; *PLS.com*, 32 F.4th at 843, or the existence of parallel conduct coupled with some further factual circumstance pointing towards a meeting of the minds, *Musical Instruments.*, 798 F.3d at 1194. An allegation of parallel conduct, such as raising prices or reducing output in reaction to or

ORDER DENYING DEFENDANTS' JOINT MOTION TO
DISMISS - 5

anticipation of the conduct of competitors in a concentrated market, coupled with a bare assertion of conspiracy does not give rise to a plausible inference of unlawful agreement. *Twombly*, 550 U.S. at 556-57. In order to nudge the allegations of unlawful conspiracy from merely possible to plausible, plaintiffs must allege additional "plus factors," such as "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of inter-firm communications," *Ross v. Citigroup, Inc.*, 630 F. App'x 79, 82 (2d Cir. 2015), as corrected (Nov. 24, 2015), that provide "a context that raises a suggestion of preceding agreement," *Twombly*, 550 U.S. at 557. "[P]lus factors are economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *Musical Instruments*, 798 F.3d at 1194.

Defendants assert that plaintiffs' allegations of a conspiracy rest entirely on the fact that the lessor defendants contracted with Yardi to use its revenue management product, "RENTmaximizer." Defendants argue that this conduct reflects each lessor's independent business decision to seek professional assistance in a competitive rental market.[1] While it is undoubtedly true that participants in an interdependent market may, without violating § 1, rationally and in the spirit of competition engage in parallel conduct, s*ee In re Musical Instruments*, 798 F.3d at 1193–94, plaintiffs have alleged more than simply parallel conduct. Defendants' argument ignores

---

[1] In the alternative, defendants argue that Yardi's services simply automated what each lessor could have done "using pen and paper (or a calculator or spreadsheet) to track rent trends, review one's own data, and consider publicly available rents of competing properties." Dkt. # 155 at 8. This argument flatly contradicts the allegations of the First Amended Class Action Complaint, which posit that the lessor defendants entrusted Yardi with their competitively sensitive price and supply information, that access to the competitors' nonpublic data allowed Yardi to recommend strategies to maximize revenue, and that the lessor defendants knew that Yardi would utilize competitor data to make recommendations. In the context of a motion to dismiss, the Court accepts the well-pleaded factual allegations of the complaint and assumes their veracity. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Defendants cannot obtain a dismissal at the pleading stage by ignoring or challenging the facts alleged.

ORDER DENYING DEFENDANTS' JOINT MOTION TO
DISMISS - 6

virtually all of plaintiffs' detailed allegations, discussed below, regarding how RENTmaximizer was advertised to landlords, how it works, the nature of the information the lessor defendants agreed to provide, and what they understood they would get in exchange. Taking the allegations in the light most favorable to plaintiffs, the First Amended Class Action Complaint plausibly alleges that the lessor defendants entered into express, individual contracts with defendant Yardi in circumstances showing an intent to participate in a concerted scheme or plan to fix rental prices and restrain trade.

As alleged in the First Amended Class Action Complaint, Yardi advertised its revenue management software to lessors as a means of increasing rates above those available in a competitive market. Dkt. # 113 at ¶¶ 2, 6-7, 66, 72, 88, and 119. Existing lessor clients publicly touted the success of Yardi's efforts to increase rental rates, the benefits of not having to guess at market conditions or to offer concessions/specials, and the elimination of concerns that they would be underbid, implicitly inviting other lessors to sign up and enjoy the same benefits. Dkt. # 113 at ¶¶ 90-92 and 95. Yardi's system works as advertised, however, only if each lessor client divulges its confidential and commercially sensitive pricing, inventory, and market data, allows Yardi to determine the price of each new and renewal lease, and adopts that price with very little, if any, second guessing. Dkt. # 113 at ¶¶ 12-13, 15, 65-68, 94, 139. Plaintiffs also allege, based on analyses performed by plaintiffs and Yardi, that the system worked as intended, resulting in above-market pricing for units using RENTmaximizer. Dkt. # 113 at ¶¶ 118-22. Yardi's existing and new clients understood how the system worked and what it could do for them. Dkt. # 113 at ¶¶ 94-95. As new clients signed up, they accepted the advertised invitation to trade their commercially sensitive information for the ability to charge increased rental rates without fear of being undercut by their competitors. Dkt. # 113 at ¶ 93-94.

ORDER DENYING DEFENDANTS' JOINT MOTION TO
DISMISS - 7

"Acceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful conspiracy under the Sherman Act." *PLS.com*, 32 F.4th at 843 (quoting *Interstate Cir.*, 306 U.S. at 227).

> It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it. Each distributor was advised that the others were asked to participate; each knew that cooperation was essential to successful operation of the plan. They knew that the plan, if carried out, would result in a restraint of commerce . . . and knowing it, all participated in the plan. The evidence is persuasive that each distributor early became aware that the others had joined. With that knowledge they renewed the arrangement and carried it into effect for the two successive years.

*Interstate Cir.*, 306 U.S. at 226–27 (1939). Plaintiffs have plausibly alleged an agreement in restraint of trade under the invitation and acceptance analysis set forth in *Interstate Circuit* and *PLS.com*. They have also adequately alleged an agreement under the parallel conduct and "plus factor" test of *Twombly* and *Musical Instruments*. Plaintiffs plausibly allege that the lessor defendants engaged in parallel conduct by agreeing to use Yardi's products, delegating their pricing decisions, and de-prioritizing occupancy in favor of algorithmic pricing during the relevant period. Dkt. # 113 at ¶¶ 87, 137, and 155. They have also identified "plus factors" suggesting that this parallel conduct was not the result of independent self-interest, but rather the result of an agreement to restrain trade. Dkt. # 113 at ¶ 138. As Chief Judge Waverly D. Crenshaw, Jr., found in a remarkably similar multi-district litigation pending in the Middle District of Tennessee, the

> most persuasive evidence of horizontal agreement is the simple undisputed fact that each [lessor defendant] provided [Yardi] its proprietary commercial data, knowing that [Yardi] would require same from its horizontal competitors and use all of that data to recommend rental prices to its competitors. . . . It would clearly not be in any individual [lessor defendant's] economic self-interest to contribute its data to [Yardi] without knowing that it would benefit from its horizontal competitors doing

ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS - 8

the same. Put another way, the contribution of sensitive pricing and supply data for use by [Yardi] to recommend prices for competitor units is in [the lessor defendants'] economic self-interest if and only if [the lessor defendants] know they are receiving in return the benefit of their competitors' data in pricing their own units.

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, No. 3:23-MD-03071, 2023 WL 9004806, at *15 (M.D. Tenn. Dec. 28, 2023). The Court also finds persuasive the argument that raising rental prices regardless of occupancy and/or competitiveness would, in a competitive market, work against each lessor defendant's economic self-interest. It is only in the presence of a prior understanding that competitors would likewise raise rates that such conduct appears rational. These factors provide a context that suggests "a preceding agreement, not merely parallel conduct that could just as well be independent action." *Twombly*, 550 U.S. at 557.

      The fact that the lessor defendants did not meet as a group but rather used an intermediary, Yardi, to compile their commercially sensitive data and calculate the supracompetitive rental rate each participant would utilize does not preclude the existence of an agreement or change its unlawful nature. As former Federal Trade Commission chair Maureen Ohlhausen explained, a "group of competitors subcontracting their pricing decisions to a common, outside agent that provides algorithmic pricing services" amounts to a "hub-and-spoke conspiracy." Dkt. #113 at ¶ 29. This is so "because the same outside vendor now has confidential price strategy information from multiple competitors, [and] it can program its algorithm to maximize industry-wide pricing" even if "the firms themselves don't directly share their pricing strategies" with each other. *Id*. Competitors act in concert for purposes of a Section 1 claim when their conduct "joins together separate decisionmakers," such that their agreement "deprives the marketplace of

independent centers of decisionmaking." *Am. Needle*, 560 U.S. at 195. That is exactly what plaintiffs allege here.

Defendants argue that, in the absence of an allegation that the lessor defendants agreed to implement RENTmaximizer's pricing recommendations or were otherwise bound to do so, their parallel contracts with Yardi do not raise a plausible inference of a plan or conspiracy to restrain trade. Defendants would have the Court assume that the lessor defendants, having turned over their commercially-sensitive data and paid for the services Yardi offered, did not intend to use the information generated as a result. Taken in the light most favorable to plaintiffs, the allegations amply suggest that the lessor defendants intended to and, for the most part, did adhere to Yardi's pricing recommendations. Plaintiffs allege that Yardi advertised its services as automating the lessors' pricing decisions (Dkt. # 113 at ¶¶ 66-68 and 78), that the lessor defendants understood that implementing the system was critical to the success of the enterprise and therefore generally adopted Yardi's pricing recommendations (Dkt. # 113 at ¶¶ 22, 24, 76, and 93), that defendants engaged in conduct to facilitate and enforce the implementation of the pricing recommendations (Dkt. # 113 at ¶¶ 16 and 25), and that Yardi was, in fact, able to generate above-market prices using a system that required adoption of its recommendations for success (Dkt. # 113 at ¶¶ 27 and 118-22).

The Court finds that plaintiffs have plausibly alleged a conspiracy in violation of § 1 of the Sherman Act. That does not, of course, mean that a conspiracy in fact exists. There are factors which may not support an inference of concerted action. Defendants may ultimately be able to show that Yardi's services were advertised differently than as alleged, that they provided no commercially sensitive, non-public information, and/or that they ignored Yardi's pricing recommendations to such an extent as to make the allegations of concerted action unlikely. In

addition, defendants argue that they are geographically remote from each other or control too few multifamily housing units to impact rental prices and therefore lacked a common motive to conspire. But evidence of a few instances of negotiated concessions in rental prices, the total number of multifamily housing units in the United States, and/or the locations of each unit managed by the lessor defendants is not properly before the Court on this motion to dismiss, cannot be used to contradict or disprove the allegations of the complaint, and ignores plaintiffs' allegations regarding other, non-defendant, Yardi clients. Even if this evidence is considered at this stage of the proceeding, it does not change the fact that plaintiffs have adequately alleged both invitation and acceptance and sufficient plus factors to give rise to a plausible inference of a preceding agreement.

### 3. Unreasonable Restraint of Trade

The Supreme Court has interpreted § 1's bar against "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce" to bar only unreasonable restraints of trade. *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 98 (1984). Having found that the First Amended Class Action Complaint sufficiently alleges a conspiracy to restrain trade between defendants, the next question is whether the restraint is unreasonable. To make this determination, courts use one of two standards: the *per se* approach or the rule of reason.

> Some practices are "so harmful to competition and so rarely prove justified that the antitrust laws do not require proof that an agreement of that kind is, in fact, anticompetitive in the particular circumstances." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133 (1998). These practices are *per se* violations of the Sherman Act, and we presume that they are anticompetitive "without inquiry into the particular market context in which [they] are found." *Bd. of Regents of Univ. of Okla.*, 468 U.S. at 100.

> Most restraints, however, are subject to the rule of reason. *Hahn v. Or. Physicians' Serv.*, 868 F.2d 1022, 1026 (9th Cir. 1988). "The rule of reason requires courts to conduct a fact-specific assessment of 'market power and market structure ... to assess the restraint's actual effect' on competition." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (cleaned up) (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984)). A "three-step, burden-shifting framework" guides courts' analysis. *Id.* "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* "If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id.* "If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 542.

*PLS.com*, 32 F.4th at 833–34.

The conspiracy plaintiffs allege in this case involves express vertical agreements between Yardi and its clients,[2] but the key to plaintiffs' antitrust claims is the horizontal agreements between and among the lessor defendants to entrust Yardi with their sensitive commercial information in order to obtain and implement the supracompetitive rental rates generated by Yardi's algorithm.

> The Supreme Court has recognized that certain horizontal agreements "always or almost always tend to restrict competition and decrease output." *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 19–20 (1979). Classic examples include agreements among competitors to fix prices, divide markets, and refuse to deal. *See, e.g., United States v. Trenton Potteries Co.*, 273 U.S. 392, 397–98 (1927) (horizontal price fixing); *United States v. Topco Assocs.*, 405 U.S. 596, 608 (1972) (horizontal market division); *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 293–94 (1985) (concerted refusal to deal). Such inherently anticompetitive horizontal agreements violate the Sherman Act *per se*. Once the agreement's existence is established, no further inquiry into the practice's actual effect on the market or the parties' intentions is necessary to establish a § 1 violation. *See N. Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958).

---

[2] The Court, like the United States, is not convinced that the "vertical" label properly characterizes Yardi's relationship with the landlord defendants given that Yardi is not a supplier or distributor of housing units.

ORDER DENYING DEFENDANTS' JOINT MOTION TO
DISMISS - 12

*Musical Instruments*, 798 F.3d at 1191. Plausible allegations that defendants colluded to fix prices at above-market rates and impose those prices on customers is *per se* anticompetitive conduct. *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 48 (1990) ("Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*.") (citation omitted); *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, 20 F.4th 466, 479 (9th Cir. 2021) ("Horizontal price fixing and market allocation are *per se* Section 1 violations."); *Aurora Astro Prod. LLC v. Celestron Acquisition, LLC*, 691 F. Supp. 3d 1132, 1146 (N.D. Cal. 2023) (finding that an agreement between horizontal competitors to fix prices "is the very definition of *per se* anticompetitive conduct").

Defendants argue that "antitrust claims premised on the use of a revenue management product" are non-traditional and therefore "do not fall within the limited category of claims meriting *per se* treatment." Dkt. # 155 at 10. In support, defendants (a) argue that plaintiffs have failed to plausibly allege an agreement to restrain trade and (b) rely on *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, No. 3:23-MD-03071, 2023 WL 9004806 (M.D. Tenn. Dec. 28, 2023), and *Gibson v. MGM Resorts Int'l*, No. 2:23-cv-00140-MMD-DJA, 2023 WL 7025996 (D. Nev. Oct. 24, 2023), for the proposition that the use of a revenue management product in the housing market context is not a *per se* violation.

Defendants' first argument is a nonstarter. For the reasons discussed above, the Court finds that plaintiffs have adequately alleged that the lessor defendants entered into individual contracts with Yardi in circumstances showing an intent to participate in a concerted scheme to raise, fix, or peg multifamily housing rental prices. This fact distinguishes the First Amended Class Action

Complaint from the facts alleged in *Gibson*, in which the court found that plaintiffs had not adequately alleged a conspiracy to restrain trade. 2023 WL 7025996 at *3-6.

With regards to Chief Judge Crenshaw's determination that the *per se* standard did not apply to the price-fixing conspiracy alleged in *RealPage*, the Court respectfully disagrees. After reviewing the allegations of the complaint, Chief Judge Crenshaw determined that plaintiffs had adequately and plausibly alleged an illegal horizontal agreement to restrain trade. 2023 WL 9004806 at *16. He also acknowledged that price-fixing between horizontal competitors is a clear-cut case of trade restraint that is subject to the *per se* rule. 2023 WL 9004806 at *23. Nevertheless, when it came time to determine whether the alleged restraint on trade was unreasonable, the *RealPage* court went back and reevaluated the strength of plaintiffs' allegations regarding the existence of a conspiracy, noting that the allegations did not (1) identify when each landlord defendant joined the conspiracy, (2) allege an express agreement between the landlord defendants, and/or (3) allege an absolute delegation of price-setting authority to RealPage. 2023 WL 9004806 at *23. The point of the *per se* and rule of reason analyses is not to create a heightened pleading standard related to the existence or purpose of the conspiracy, but to determine whether the identified restraint on trade is "unreasonable" for purposes of § 1. *See RealPage*, 2023 WL 9004806 at *22. Chief Judge Crenshaw cites no authority for judging the reasonableness of an adequately alleged conspiracy to restrain trade by the strength of the conspiracy allegations.

The case law cited above and in *RealPage* suggests that if plaintiffs have raised a plausible inference of an unlawful agreement to restrain trade, the court presumes the existence of the alleged agreement when determining whether it is of the type that always or almost always tends to restrict competition and decrease output. Such is the case here. For over a century, courts have

ORDER DENYING DEFENDANTS' JOINT MOTION TO
DISMISS - 14

found that horizontal agreements among competitors with regards to pricing structures have predictable and pernicious anticompetitive effects and are therefore a classic example of a *per se* antitrust violation. *See United States v. Trenton Potteries Co.*, 273 U.S. 392 (1927) (collecting cases). That plaintiffs may ultimately have difficulty proving the existence of a horizontal price-fixing conspiracy is not the relevant inquiry regarding reasonableness or an appropriate consideration on a motion to dismiss.

      Finally, the *RealPage* court noted that fixing prices using a computerized algorithm is a novel way of doing business, suggesting that *per se* treatment is inappropriate because the impacts of the business model have not been "tested or studied by economists to conclusively determine that these types of conspiracies are *per se* anticompetitive." *RealPage*, 2023 WL 9004806 at *24 (citing *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011 (7th Cir. 2012)). When a conspiracy consists of a horizontal price-fixing agreement, no further testing or study is needed. Such agreements are subject to *per se* analysis because a collective's power to fix price structures is unreasonable and prohibited by the Sherman Act regardless whether the prices agreed upon are reasonable or unreasonable. *See Socony-Vacuum Oil Co.*, 310 U.S. at 220-23 ("The reasonableness of prices has no constancy due to the dynamic quality of the business facts underlying price structures. . . . Any combination which tampers with price structures is engaged in an unlawful activity."); *Trenton Potteries Co.*, 273 U.S. at 397 ("Our view of what is a reasonable restraint of commerce is controlled by the recognized purpose of the Sherman Law itself. Whether this type of restraint is reasonable or not must be judged in part at least, in the light of its effect on competition, for, whatever difference of opinion there may be among economists as to the social and economic desirability of an unrestrained competitive system, it cannot be doubted that the Sherman Law and the judicial decisions interpreting it are based upon the assumption that

the public interest is best protected from the evils of monopoly and price control by the maintenance of competition."). The Supreme Court has expressly held that "the machinery employed by a combination for price-fixing is immaterial," and the Sherman Act declares all such horizontal agreements to tamper with price structures unlawful. *Socony-Vacuum Oil Co.*, 310 U.S. at 223.

Neither *RealPage* nor defendants offer any legal authority supporting the conclusion that an adequately alleged horizontal price-fixing agreement could be a reasonable restraint on trade. Because plaintiffs have alleged a *per se* violation of § 1 of the Sherman Act, the Court need not determine whether plaintiffs have also alleged unreasonableness under the rule of reason.

**C. Motion to Dismiss Under Fed. R. Civ. P. 12(b)(1)**

Defendants assert that the two named plaintiffs, McKenna Duffy and Michael Brett, lack standing to pursue the Sherman Act claims because the unlawful conspiracy did not cause them injury. "[S]tanding is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). In order to establish a federal court's jurisdiction over a case or controversy, plaintiffs must show that they "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct ..., and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S. at 560-61); *Perry v. Newsom*, 18 F.4th 622, 630 (9th Cir. 2021), *cert. denied sub nom*. *Hollingsworth v. Perry*, 143 S. Ct. 301 (2022)). A defendant challenging the Court's jurisdiction under Rule 12(b)(1) may do so either on the facts as alleged in the pleadings or by presenting extrinsic evidence of the true facts for the Court's consideration. *See Safe*

*Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) ("A Rule 12(b)(1) jurisdictional attack may be facial or factual.").

      Both of the named plaintiffs rented multifamily residential units from defendant R.D. Merrill Real Estate Holdings during the relevant period. Dkt. # 113 at ¶ 33-34. They allege that they paid inflated rental prices as a result of R.D. Merrill's use of Yardi's algorithmic pricing mechanism. *Id.* R.D. Merrill submitted copies of plaintiffs' leases with its separate motion to dismiss, and defendants cite those leases to argue that plaintiffs received rent concessions that (a) disprove plaintiffs' allegations of a conspiracy or (b) show that plaintiffs' rental rates were not impacted by the alleged conspiracy.

      Assuming, for purposes of this motion, that the leases can be incorporated into the First Amended Class Action Complaint by reference, the fact that R.D. Merrill made "concessions" does not mean that there was no conspiracy to manipulate rental prices. Plaintiffs' allegations of a nationwide system to collectively elevate rental prices without fear of being undercut by competitors are not disproved by evidence that an individual lessor defendant negotiated on the rental price. Yardi's recommended lease rate can be achieved in any number of ways, including presenting that rate to consumers as a straight per month charge or offering the unit at a higher price that is then reduced by a negotiated "concession."

      Even if the concessions identified in plaintiffs' leases represent a divergence from Yardi's recommended rental rate, there is no reason to assume at the motion to dismiss stage that the negotiated rate would bring the overall price of the rental to something

ORDER DENYING DEFENDANTS' JOINT MOTION TO
DISMISS - 17

approximating that which would have prevailed in ordinary market conditions. *See RealPage*, at \*35, n.26. To have standing, a litigant must seek relief for an injury that affects him in a "personal and individual way." *Lujan*, 504. U.S. at 560, n. 1. Plaintiffs' allegations state the necessary personal interest and injury arising from defendants' challenged conduct.

For all of the foregoing reasons, defendants' omnibus motion to dismiss (Dkt. # 138) is DENIED.

DATED this 4th day of December, 2024.

Robert S. Lasnik
United States District Judge

ORDER DENYING DEFENDANTS' JOINT MOTION TO DISMISS - 18