Hon. Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| *In re YARDI REVENUE MANAGEMENT ANTITRUST LITIGATION.* | No. 2:23-cv-01391-RSL |
| MCKENNA DUFFY, individually and on behalf of all others similarly situated,<br><br>                                            Plaintiffs.<br><br>      v.<br><br>YARDI SYSTEMS, INC., *et al.*,<br><br>                                            Defendants. | **DEFENDANT YARDI SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>**NOTE ON MOTION CALENDAR: March 2, 2026**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>(Consolidated with Case Nos. 2:24-cv-01948; 2:24-cv-02053) |

YARDI SYSTEMS, INC.'S MOTION FOR SUMMARY
JUDGMENT (No. 2:23-cv-01391-RSL)

Duffy - Motion for Summary Judgment (REVISED)(1011698994.16).docx

1

## <u>TABLE OF CONTENTS</u>

Page

INTRODUCTION................................................................................................................1

STATEMENT OF FACTS..................................................................................................3

   I.   Overview of Yardi and Revenue IQ. ........................................................................3

   II.  Revenue IQ Calculates Pricing Outputs Through a Multi-Step Process Configured
       by Each Client at Each Property (Never by Yardi)...................................................4

       a. Revenue IQ Employs a Client-Driven Pricing Methodology. .............................4

       b. Revenue IQ Clients Employ (And Regularly Adjust) Their Own Unique
       Configurations.......................................................................................................11

   III. Revenue IQ Relies on a Client's Own Data and Publicly Available Data, Not
       Other Clients' Confidential Pricing Data................................................................12

   IV. Clients Have Complete Control and Can Modify or Disregard Pricing Outputs. ..15

   V.  The Individualized, Historical, Aggregated, Averaged, and Anonymized
       Benchmark Reporting Available to Clients Is Not Used by Revenue IQ to
       Generate Pricing Outputs.......................................................................................17

   VI. Yardi Provided Plaintiffs Open-Book Access to Revenue IQ Source Code and
       Supporting Documentation. ....................................................................................22

ARGUMENT .....................................................................................................................23

   I.   The Undisputed Facts Show that Plaintiffs Cannot Establish a Horizontal

       Price-Fixing Conspiracy. ........................................................................................24

       a. Revenue IQ Does Not Use the Confidential Information of One Client to
       Calculate Pricing Outputs for Any Other Client....................................................25

       b. Revenue IQ Does Not Employ a Common Pricing Formula.............................26

   II.  The Undisputed Facts Show that Plaintiffs Cannot Establish a Vertical Price-
       Fixing Agreement....................................................................................................29

   III. Plaintiffs Cannot Establish a Conspiracy to Unlawfully Exchange Confidential
       Information. ............................................................................................................33

       a. Yardi's Aggregated, Averaged, and Anonymized Benchmark Reporting Does
       Not Facilitate an Unlawful Information Exchange.................................................33

       b. The Multifamily Rental Housing Sector is Not Susceptible to Anticompetitive
       Effects....................................................................................................................36

CONCLUSION ..................................................................................................................39

# TABLE OF AUTHORITIES

*American Needle, Inc. v. NFL*,
  560 U.S. 183 (2010).................................................................28

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
  9 F.4th 1102 (9th Cir. 2021) ....................................................30

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................24

*Bus. Electr. Corp. v. Sharp Electr. Corp.*,
  485 U.S. 717 (1988).................................................................30

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986).................................................................23

*Clear Connection Corp. v. Comcast Cable Commc'n. Mgmt., LLC*,
  2020 WL 6742889 (E.D. Cal. Nov. 17, 2020)..........................25

*Cornish-Adebiyi v. Caesars Ent., Inc.*,
  2024 WL 4356188 (D.N.J. Sept. 30, 2024) ..............................25

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) ....................................................30

*Dreamstime.com, LLC v. Google LLC*,
  54 F.4th 1130 (9th Cir. 2022) ............................................33, 34

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023) ....................................................30

*Fed. Trade Comm'n v. Qualcomm Inc.*,
  969 F.3d 974 (9th Cir. 2020) ....................................................30

*Gibson v. Cendyn Grp., LLC*,
  148 F.4th 1069 (9th Cir. 2025) ...........................................*passim*

*Gibson v. Cendyn Grp., LLC*,
  2024 WL 2060260 (D. Nev. May 8, 2024), *aff'd in part*
  148 F.4th 1069 (9th Cir. 2025) ...........................................25, 31

*Gibson v. MGM Resorts Int'l*,
  2023 WL 7025996 (D. Nev. Oct. 24, 2023) ..............................25

*Goldfarb v. Va. State Bar*,
    421 U.S. 773 (1975)..................................................................................29

*Honey Bum, LLC v. Fashion Nova, Inc.*,
    63 F.4th 813 (9th Cir. 2023) ..................................................................25

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
    2023 WL 6006525 (S.D.N.Y. July 31, 2023) ..............................................30

*In re Broiler Chicken Antitrust Litig.*,
    702 F. Supp. 3d 635 (N.D. Ill. 2023) .........................................................39

*In re Citric Acid Litig.*,
    191 F.3d 1090 (9th Cir. 1999) ..................................................................34

*In re Loc. TV Advert. Antitrust Litig.*,
    2022 WL 3716202 (N.D. Ill. Aug. 29, 2022) ....................................33, 34, 39

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ..................................................24, 30, 32

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ..................................................................23

*Maple Flooring Mfrs.' v. United States*,
    268 U.S. 563 (1925)..........................................................................33, 34

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
    302 F.3d 1207 (11th Cir. 2002) ..............................................................30

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)................................................................................23

*Mularkey v. Holsum Bakery, Inc.*,
    146 F.3d 1064 (9th Cir. 1998) ..................................................................31

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
    210 F.3d 1099 (9th Cir. 2000) ..................................................................23

*Ohio v. Am. Express Co.*,
    585 U.S. 529 (2018)................................................................................30

*Olean Wholesale Grocery Coop., Inc. v. Agri Stats*,
    2020 WL 6134982 (N.D.Ill. Oct. 19, 2020)................................................39

*Portillo v. CoStar Grp., Inc.*,
    2025 WL 2495053 (W.D. Wash. Aug. 29, 2025)................................38, 39

*Sausalito Pharmacy, Inc. v. Blue Shield of California*,
    544 F. Supp. 230 (N.D. Cal. 1981) ................................................................ 32

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
    870 F.2d 397 (7th Cir. 1989) ......................................................................... 31

*Shadow Creek Apartments, L.L.C. v. Hartford Fire Ins. Co.*,
    44 F. App'x 640 (4th Cir. 2002) .................................................................... 37

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) .......................................................... 33, 34, 36, 38

*United States v. Masonite Corp.*,
    316 U.S. 265 (1942) ....................................................................................... 28

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ....................................................................................... 32

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) ....................................................................................... 34

1
2
3

Defendant Yardi Systems, Inc. ("Yardi") by and through its undersigned counsel, respectfully submits this Motion for Summary Judgment on Plaintiffs' Consolidated Class Action Complaint ("CCAC").

4

## **INTRODUCTION**

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Extensive discovery confirms what Yardi has maintained since the beginning of this case: **the central premise of Plaintiffs' claims is false**.  Revenue IQ (formerly RENTmaximizer, collectively "Revenue IQ") ***does not*** use confidential competitor data to set prices, ***and it never has***.  Revenue IQ relies entirely on a client's ***own*** data, individualized configuration settings, and, if the client chooses, publicly available asking rents for comparable properties ("comps") in generating pricing outputs for a particular unit. As Judge Markman concluded, following a thorough review of the Revenue IQ source code, "Yardi's forthright decision to produce its source code and related evidence in the initial phases of discovery" conclusively established that "the Revenue IQ source code does not use competitively sensitive (or otherwise confidential) information obtained by agreement from a property owner or manager and then use that information in connection with generating rental price recommendations by other property owners or managers."  *Mach* Order, at 14.  This Court should do the same.[1]  Software can only do what its source code directs.  The Revenue IQ source code establishes that Revenue IQ ***does not*** dictate pricing across clients.  Each client selects its own starting rents, sets limits for rent increases or decreases, chooses how heavily to weight property-specific trends, defines "health rules" to further adjust the pricing outputs, and applies additional pricing calibrations.  These myriad configurations ensure that each client receives individually tailored pricing outputs, based on their own goals and priorities, that reflect supply and demand for their properties.  No client's software configurations are shared with or used by any other client.  Clients are free

25

26

---

[1] *See* Declaration of Abraham Tabaie ("Tabaie Decl."), Ex. A (*Mach v. Yardi Systems, Inc.*, (Cal. Super. Ct. October 6, 2025) ("*Mach* Order")).

to modify or reject the resulting pricing output, including by offering concessions and discounts. There is no "automatic[] adopt[ion]" or "enforce[ment]" of Revenue IQ's pricing outputs. CCAC ¶¶ 16, 20, 105, 118. Indeed, undisputed evidence shows that clients depart from their pricing outputs 27.8% of the time.

Yardi forthrightly produced the Revenue IQ source code, which has been exhaustively reviewed by software experts. The result is clear: "The undisputed evidence is that ***no one is agreeing or cooperating with the sharing of commercially sensitive rental prices in order to get price recommendations***. The owners/managers are not giving anything to their competitors through Yardi, and they are not getting a price recommendation that is based on pricing data provided to Yardi by their competitors." *Mach* Order, at 7 (emphasis added). Revenue IQ merely "holds itself out as a tool in the struggle for commercial advantage; by itself, it does not take away that struggle." *See Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1083 (9th Cir. 2025).[2]

Plaintiffs recognize that the case they pled must fail; Revenue IQ does not function as they alleged (and never has), nor as they argued to survive a motion to dismiss. Plaintiffs have tried to pivot to other theories, primarily focused on Yardi's historical benchmark reporting.[3] These fallback theories also fail. ***First***, Revenue IQ does not use benchmarking information to calculate pricing outputs—period. Pricing outputs are based solely on a client's own data and, if a client (not Yardi) chooses, publicly available asking rents. ***Second***, Yardi provides only aggregated, anonymized, and averaged historical benchmarking. Clients *cannot* discern confidential pricing information pertinent to any other specific client from that high-level information. Yardi's benchmarking includes

---

[2] Unless noted, all emphasis is added, all citations, brackets, original alterations, and internal quotation marks are omitted from all quoted material, and subsequent history appears only in the Table of Authorities.

[3] Across five depositions, Plaintiffs—rather than focusing on how Revenue IQ works—devoted most of their questioning to theories of confidential information exchange that are both wrong and not alleged in the CCAC.

features that data privacy experts recognize as best practices designed to prevent any exchange of confidential information, and testing proves that clients do not engage in any of the extraordinary machinations necessary to even attempt to reverse engineer any confidential information about a competitor. The generalized and historical information provides a 10,000-foot view of broad marketplace trends, not day-to-day insight into how to price each individual unit. Yardi's provision of this information to Revenue IQ clients is entirely lawful.

There can be no dispute of fact about the operation of Revenue IQ. The source code for Revenue IQ and Yardi's benchmark reporting confirms that they do not—and cannot—do what Plaintiffs allege. Plaintiffs thus cannot establish their alleged price-fixing and information-sharing claims. Yardi is entitled to summary judgment on all causes of action.

## STATEMENT OF FACTS

### I.    Overview of Yardi and Revenue IQ.

Yardi develops and licenses property and investment management software to real estate customers.[4] Its Voyager web-based platform includes Voyager Residential, which allows clients to centralize operational, financial, leasing, and maintenance management for their residential properties in a single, dedicated database for each client.[5] Clients using Voyager may also license one or more products in the Yardi Multifamily Suite, including Asset IQ, Forecast IQ, and Revenue IQ.[6] Yardi developed Revenue IQ to help clients manage the rental pricing process for their multifamily residential properties.[7] Revenue IQ, formerly "RENTmaximizer," has been known by that name since 2020.[8]

---

[4] Declaration of Michael Gaeta ("Gaeta") ¶33.

[5] *Id*.

[6] *Id*.

[7] *Id*. ¶¶4, 8.

[8] *Id*. ¶¶3, 6, 13.

Yardi designed Revenue IQ as a transparent, flexible revenue management product that each client individually configures to yield pricing outputs tailored to achieve the client's business goals.[9]  Directed by a client's independently-selected configurations throughout its multi-step pricing process, Revenue IQ calculates pricing outputs for each unit offered by a property.[10]  Revenue IQ analyzes supply and demand for each floor plan using property-specific data provided by the client and, at the client's option, publicly available asking rents for client-selected comps.[11]

Revenue IQ's value is in analyzing data traditionally considered by property managers using pen and paper (or spreadsheet) more efficiently.[12]  Yardi licenses Revenue IQ to clients at a predetermined rate that has no relationship to whether a client adopts the pricing outputs or to how much a client decides to charge for apartment rentals.[13]

## II.  Revenue IQ Calculates Pricing Outputs Through a Multi-Step Process Configured by Each Client at Each Property (Never by Yardi).

### a.  Revenue IQ Employs a Client-Driven Pricing Methodology.

The Revenue IQ pricing process begins with **_the client_** (not Yardi) setting an initial asking rent for each unit type at a property, which is referred to as the "Reference Rent."[14]  Yardi does not instruct clients on what their reference rents should be; this starting point is selected by the client using exclusively their own information.[15]  Yardi does not share any

---

[9] *Id*. ¶¶5, 8, 12.

[10] *Id*. ¶¶4, 8; Declaration of Mihran Yenikomshian (hereinafter "Yenikomshian") ¶¶51–53, Figure 3, 56.

[11] Gaeta ¶¶8, 42; Yenikomshian ¶19; Tabaie Decl. Ex. D (Rao Dep. 26:24–27:5) (hereinafter "Rao").

[12] Gaeta ¶4; Rao 26:22–27:9.

[13] Tabaie Decl. Ex. B (Bradford Dep. 45:16–46:3) (hereinafter "Bradford").

[14] Gaeta ¶14; Yenikomshian ¶¶30, 51, Figure 3; Figure 3 n.73; *id*., Appx. D ¶D.60.

[15] Gaeta ¶14.

client's reference rents with any other client.[16]  Starting with the reference rents, Revenue IQ calculates pricing outputs using a three-step process driven by the client's individually selected configurations.[17]

**Step 1: Trends**.  At Step 1, Revenue IQ's Trends Analysis calculates a provisional pricing direction—either an increase, decrease, or no change from the Reference Rent— using exclusively the client's own data and, at the client's option, publicly available asking rent information.[18]  The Trends Analysis analyzes up to four trends using weights selected by the client:  (1) unit availability at the client's property; (2) the volume of applications submitted or approved or new leases signed at the property; (3) traffic from potential renters at the property; and (4) the change in the average publicly available asking rents for a set of client-selected comps relative to the change in reference rents of the client's own units ("Comps Trend").[19]  For the first three trends, Revenue IQ analyzes only property-specific data provided by the client.[20]  For the Comps Trend, Revenue IQ analyzes publicly available asking rents for client-selected comps pulled either from Yardi's Matrix or RentCafe databases or manually entered by the client at the client's option.[21]

Clients choose which of the four trends they want Revenue IQ to consider and how much weight to give each one within increments of 25% (*e.g.*, if a client uses all four trends

---

[16] *Id*. ¶¶8, 17, 31–32; Rao 306:6–17.

[17] Gaeta ¶¶12, 15–31; Yenikomshian ¶¶30, 51, Figure 3; Rao 209:13–24.

[18] Gaeta ¶15; Yenikomshian ¶¶51, Figure 3, 58, 70, Figure 8; *id*., Appx. D ¶¶D.61–65.

[19] Rao 212:15–213:2; Gaeta ¶¶9, 15; Yenikomshian ¶¶57, 64, 64 n.104, 66; *id*., Appx. D ¶D.89. This trend considers the *ratio* of change for comp properties; i.e., whether the asking rents for the client's property are moving similarly to selected comp properties. Gaeta ¶15; Yenikomshian ¶59.

[20] Gaeta ¶¶9, 15; Yenikomshian ¶¶51, 56, 56 n.82; *id*., Appx. D ¶¶D.61, D.89; Rao 26:22–27:9.

[21] Rao 271:18–272:10; Gaeta ¶¶9, 15, 42–43; Yenikomshian ¶¶59–61; *id*., Appx. D ¶¶D.78, D.78 n.161; D.91, D.97.

and weights them equally, each trend is weighted 25%).[22]  Revenue IQ analyzes whether each trend is moving in a positive or negative direction, and applies the relative weights selected by the client.[23]  Revenue IQ calculates an overall trend, arriving at one of three provisional pricing directions: (1) an increase, (2) a decrease, or (3) no change.[24]

Clients individually select a "step size," which determines the percentage increase or decrease in Reference Rent that Revenue IQ calculates based on the Trends Analysis.[25] The magnitude of any preliminarily calculated change is adjusted based on the client's individually selected "step size," which is the percentage of their reference rents they are comfortable increasing or decreasing in response to the overall trend.[26]  Some clients prefer incremental pricing changes over more volatile ones.[27]  Yardi does not share any client's selected Trends configurations or step size with any other client.[28]

Overall, Revenue IQ begins by analyzing up to four trends to establish the directionality of its pricing outputs, based entirely on a client's own data and publicly available asking rents, and tailored by the client's individual selections, including the magnitude of acceptable increases or decreases.[29]

*Step 2: Health Rules*.  At Step 2, Revenue IQ provides clients with options to adjust the provisional pricing outputs calculated by the Trends Analysis by applying one or more rules ("Health Rules") that are fully configurable by the client to align with their goals for

---

[22] Rao 211:13–20; Gaeta ¶9, 16 Yenikomshian ¶¶64, 64 n.104, 66, Tables 3–5; *id*., Appx. D ¶¶D.79–D.80, D.80 n.162.

[23] Gaeta ¶16; Yenikomshian ¶¶58, 63–64; Rao 213:3–215:20.

[24] Gaeta ¶16; Yenikomshian ¶64; Rao 213:3–215:20.

[25] Gaeta ¶17; Yenikomshian ¶65; *id*., Appx. D ¶¶D.29, Figure D.5, D.38–D.39, D.87–D.89.

[26] Gaeta ¶¶12, 17; Yenikomshian ¶65; *id*., Appx. D ¶¶D.86, Figure D.26, D.89.

[27] Gaeta ¶¶17, 31.

[28] *Id*. ¶¶15, 17; Yenikomshian, Appx. D ¶D.79; Rao 306:6–9.

[29] Gaeta ¶16; Yenikomshian ¶¶70, 82; Rao 212:5–215:20.

the health of each property: (1) percentage of units currently leased ("Leased Percent"); (2) percentage of units currently occupied ("Occupancy Percent"); (3) percentage of units currently available ("Availability Percent"); (4) percentage of units with expiring leases ("Exposure Percent"); and (5) the estimated percentage of units that will be available in 30 days ("Predicted 30-Day Availability").[30]

Each Health Rule applies a metric reflecting the client's own definition of property "health" to adjust the magnitude of the Step 1 provisional pricing output.[31] For example, if a majority of a client's trends are negative and Revenue IQ calculates a provisional price decrease after analyzing the four trends, clients can configure their Health Rules to ensure that the decrease is accepted, reduced, magnified, or not taken, depending on their own definition of "health."[32] Health Rules ensure that any incremental pricing adjustment indicated in Step 1 is consistent with and helps improve the overall health of the individual property.[33]

Clients can elect to activate as many Health Rules as they wish.[34] If activated, the client configures the Health Rule by creating specific tiers to modify or eliminate the magnitude of the provisional rent adjustment from Step 1 by a multiplier if the metric falls within a client-defined range.[35] For example, a client activating the Availability Percent Health Rule might prioritize higher occupancy over rate increases by defining availability rates above 10% as "unhealthy," and applying a multiplier of 0.50 to any suggested rent

---

[30] Gaeta ¶¶9, 18, 19–23; Yenikomshian ¶¶51, 71–74, 83; *id.*, Appx. D ¶D.119.

[31] Gaeta ¶18; Yenikomshian ¶¶51, 74, *id.*, Appx. D ¶D.121; Bradford 131:17–132:17.

[32] Gaeta ¶18; Yenikomshian ¶91, Table 7; *id.*, Appx. D ¶¶D.119–D.121.

[33] Gaeta ¶18; Yenikomshian ¶71; Bradford 131:17–132:17.

[34] Gaeta ¶24; Yenikomshian ¶83; *id.*, Appx. D ¶D.126; Tabaie Decl., Ex. C (Ivinskas Dep. 109:12–18) (hereinafter "Ivinskas").

[35] Gaeta ¶24; Yenikomshian ¶¶71–74; *id.*, Appx. D ¶D.121.

increase when availability is between 10% and 20% (*i.e.*, directing the Health Rule to accept only 50% of a potential increase because the property is "unhealthy," muting any potential increase when availability is high).[36]  Another property manager could set that threshold at 5%, another at 30%, or not at all, depending on each property's own goals and preferences.[37]  Clients can configure each Health Rule to account for precise scenarios, such as configuring the Availability Percent Health Rule to accept 71% of a potential increase when the availability percent is at 19%, to accept 72% of a potential increase when availability rates are at 18%, and so on.[38]  Where a client chooses to "layer" their Health Rules by activating more than one,[39] the adjustments are averaged and then applied to the provisional output from Step 1.[40]

Each Health Rule relies on property-specific data provided by each client.[41]  Yardi does not determine what these Health Rules configurations should be, nor does it share any of the Health Rules configurations one client chooses with any other client.[42]  The Predicted 30-Day Availability Health Rule takes an individual property's own data and weights it by

---

[36] Yenikomshian ¶72; Gaeta ¶24.

[37] *Id.*

[38] *Id.*  Health Rules are configurable at the floor plan or "unit type group" level.  Yenikomshian ¶¶56, 83.  Properties typically will, initially, group units by bedroom and bathroom count, and may then split them into subgroups depending on attributes like square footage, layout, and other amenities (pool views, appliances, balcony access, etc.).  *Id.* ¶56; Gaeta ¶14 n.4.  The individual property configures the Health Rules, if at all, for each unit type group. Yenikomshian, Appx. D ¶D.121.

[39] Approximately 99.6% of Revenue IQ clients have activated one or more Health Rules. Gaeta ¶27.

[40] *Id.* ¶24, Yenikomshian ¶74; *id.*, Appx. D ¶D.126.  For example, if the Leased Percent Health Rule has a multiplier of 0.5, and the Occupancy Percent Health Rule has a multiplier of 0.6, then assuming both conditions are met, the final Health Rules multiplier value will be 0.55, the average of the two values (meaning the provisional output from Step 1 will be multiplied by 0.55, *i.e.*, the pricing output in Step 2 will adjust downward to accept only 55% of the potential adjustment).  Yenikomshian ¶74.

[41] Gaeta ¶¶9, 25; Yenikomshian, Appx. D ¶¶D.124–125.

[42] Gaeta ¶24; Yenikomshian, Appx. D ¶D.121.

a set of nationwide coefficients.[43]  Specifically, this Health Rule helps manage seasonal fluctuations by trying to predict how many tenants are likely to give notice and how many new leases are likely to be signed at a specific property in the next 30 days.[44]  To do so, this Health Rule analyzes a property's own data related to traffic, availability, unit turnover, and resident retention, and weights that data based on a set of model coefficients generated by a logistic regression model trained on nationwide, aggregated, and anonymized non-pricing data from a set of 25,000+ Voyager residential properties, unrestricted by geographic location or whether a property uses Revenue IQ.[45]  This process reduces millions of observations to a single set of coefficients, which are then applied as weights to an individual property's own data to project that property's available units in 30 days.[46] Approximately 25% of Revenue IQ clients have activated the Predicted 30-Day Availability Health Rule during the class period.[47]

   ***Step 3: Pricing Calibrations***.  At Step 3, Revenue IQ allows clients to apply additional "Pricing Calibrations" to further customize pricing outputs to account for additional factors, including seasonal vacancy, turn costs, lease expiration management, renewal pricing, and stale unit discounting.[48]  These client-specified discounts and premiums further customize the provisional pricing output from Steps 1 and 2 to meet the individual property's goals.[49]  For example, the "turn costs" setting allows clients to specify an adjustment to the pricing output to attempt to recover costs associated with making a

---

[43] Gaeta ¶25; Yenikomshian ¶106–07; *id*., Appx. D ¶D.164.

[44] Gaeta ¶25; Yenikomshian ¶107; *id*., Appx. D ¶D.143.

[45] Gaeta ¶25; Yenikomshian ¶¶106, 109; *id*., Appx. D ¶D.164, Figures D.60–D.67.

[46] Gaeta ¶25; Yenikomshian ¶¶107, 109.

[47] Yenikomshian ¶107.

[48] Gaeta ¶¶28–31; Yenikomshian ¶¶77–78; *id*., Appx. D ¶¶D.56, D.177.

[49] Gaeta ¶28; Yenikomshian ¶77; *id*., Appx. D ¶D.175.

newly vacated unit available, such as damage repair and painting.[50]  All data used to make any client-selected Pricing Calibrations comes from the client's property-specific data and the client's individual configuration choices.[51]  Yardi does not share any client's selected Pricing Calibrations with any other client.[52]

After Revenue IQ applies the client's property-specific data and configurations, clients can opt to post a daily matrix of pricing outputs for each unit to their property website that shows a combination of move-in dates and lease terms for prospective tenants to choose from.[53]  Prices are then used or overridden at the individual lease level at the complete discretion of each Revenue IQ client.[54]  Clients can update their configurations and calculate new pricing outputs at any time, as often as they like.[55]

Revenue IQ's combination of client-selected Trends and accompanying weights, Health Rules, and Pricing Calibrations make it possible for Revenue IQ clients to choose from a large number—potentially millions—of potential configurations.[56]  Each client, not Revenue IQ, decides if, when, and how to implement the individual configuration settings.[57]  A client's chosen configurations are not shared with any other client.[58]  Revenue IQ is designed to move in small steps, and clients choose the increments with which they are

---

[50] Gaeta ¶28 n.18; Yenikomshian ¶78; *id*., Appx. D ¶¶D.211–218.

[51]  Gaeta ¶28; Yenikomshian, Appx. D ¶D.175.

[52] Gaeta ¶31; Yenikomshian, Appx. D ¶D.15.

[53] Gaeta ¶30; Yenikomshian ¶52, Figure 4.

[54] Gaeta ¶31; Rao 272:25–273:5.

[55] Gaeta ¶30; Yenikomshian ¶100; Rao 209:13–24, 305:17–306:5.

[56] Gaeta ¶¶8, 31; Yenikomshian ¶98.

[57] Gaeta ¶¶28, 30; Rao 305:17–306:5.

[58] Gaeta ¶31; Yenikomshian ¶105; *id*., Appx. D ¶D.15; Rao 306:6–9.

comfortable for potential changes in their asking rental rates.[59]  Clients can change their configurations at any time, either independently or with Yardi's technical support—but *never* based on decisions made by Yardi.[60]

### b. Revenue IQ Clients Employ (And Regularly Adjust) Their Own Unique Configurations.

In practice, there is a wide variety in how clients choose to configure Revenue IQ.[61] Yardi data show that Revenue IQ clients deployed as many as 4 million different configurations.  Each individual property changed its configurations an average of 468 times between January 2019 and January 2025, with some recording as many as 3,605 adjustments.[62]  Based on the many configuration choices clients must make, it would be nearly impossible for any two clients to have the same reference rents and applied configurations.[63]  This is true even though, prior to implementation, Yardi activates a handful of base configurations to demonstrate the functionality of various features for the client.[64]  Yardi then spends two to four weeks working with the client to implement the client's desired configuration settings, including extensive client training on Revenue IQ's functionality, along with testing to ensure pricing outputs align with the client's goals.[65]

---

[59] Gaeta ¶¶16–17.

[60] *Id*. ¶31; Rao 254:16–22.  Before 2020, Yardi personnel had to manually execute changes for clients, which were always at the direction of the client.  In 2020, Yardi enhanced the user interface, and Yardi clients can now make changes directly.  Gaeta ¶13 n.3.

[61] Yenikomshian ¶100.

[62] *Id*. ¶¶97–100.

[63] *Id*. ¶¶66–69, Tables 3–5, 96; Gaeta ¶¶12, 31.

[64] Gaeta ¶24 n.9.  Yardi introduced demonstration settings within the last year to streamline implementation.  *Id*.  Yardi still walks through each setting with the client; the demonstration settings simply make the mechanics more efficient.  *Id.*  There are not broad "default settings" in Revenue IQ; Revenue IQ *cannot* be used "straight out of the box" without significant work by the client to configure the system.  *Id.* ¶¶5, 17 n.7.

[65] Gaeta ¶12; Ivinskas 248:21–249:2.

After implementation, Yardi Technical Account Managers ("TAMs") continue to train clients on the software and assist, as needed, with revising the client's configurations to meet each client's goals on an ongoing basis.[66]  Between January 2019 and January 2025, clients on average made roughly 32 configuration changes per month, per property.[67] Properties adjusted an average of 129 *different* configuration settings during this same period, demonstrating that their decisions are far from uniform.[68]  TAMs do not share the confidential information of one client with other clients.[69]

### III. Revenue IQ Relies on a Client's Own Data and Publicly Available Data, Not Other Clients' Confidential Pricing Data.

Revenue IQ's pricing output calculation relies on a property's own data, client-selected settings, and—optionally—publicly available asking rents.[70]  Revenue IQ's source code establishes that Revenue IQ does not use, share, or combine confidential or commercially sensitive pricing data provided by a client to generate pricing outputs for any other client, as demonstrated by Revenue IQ's use of the following data repositories.[71]

**Each client has its own Voyager database**:  Each Revenue IQ client has a Voyager database that stores information specific to that client's properties, such as tenant and leasing data.[72]  Revenue IQ uses data from a client's Voyager database to analyze the property-specific Trends in Step 1 and to calculate the client's individual Health Rules and

---

[66] Rao 300:7–301:1.

[67] Yenikomshian ¶¶97, 102.

[68] *Id.* ¶¶100, 103. Some adjusted as many as 181 different settings. *Id.* ¶100 n.165.

[69] Rao 306:6–17.

[70] Gaeta ¶¶8, 32; Yenikomshian ¶¶26, 81–83; Rao 26:22–27:9.

[71] Gaeta ¶¶15, 31, 42; Yenikomshian ¶105; *id.*, Appx. D ¶¶D.15, D.79, D.121; Rao 306:6–17.

[72] Gaeta ¶34; Yenikomshian ¶38.

Pricing Calibrations.[73]  The data from a client's Voyager database cannot be accessed by other clients.[74]

**Publicly available asking rents from Yardi's RentCafe database**:  At a client's option, Revenue IQ can pull publicly available asking rents for the client-selected comps used in the Step 1 Comp Trend analysis from Yardi's RentCafe database.[75]  Yardi's RentCafe database stores client data published to public websites maintained by clients of Yardi's RentCafe product suite, and data from RentCafe.com, a publicly available national Internet Listing Service ("ILS").[76]  RentCafe property websites and RentCafé.com are free, allowing anyone to search for rentals and view data such as advertised asking rents, photos, and floorplans.[77]

**Publicly available asking rents from Yardi's Matrix database**:  At a client's option, Revenue IQ can pull publicly available asking rents for the client-selected comps used in the Step 1 Comp Trend analysis from Yardi's Matrix database.[78]  As relevant here, Yardi's Matrix database stores historical publicly available asking rents obtained through Internet research and telephone surveys of properties, for which surveyors present as prospective renters.[79]  Yardi's surveys compile information equally available to any prospective tenant who contacts the property.[80]

---

[73] Yenikomshian ¶38.

[74] *Id.*

[75] Gaeta ¶¶43, 48; Yenikomshian ¶¶42, 59–60; Rao 271:18–272:10.

[76] Gaeta ¶¶46, 47; Yenikomshian ¶¶41, 59.

[77] Yenikomshian ¶¶41–42.

[78] Gaeta ¶39; Yenikomshian ¶62; *id.,* Appx. D ¶¶D.91, D.107; Rao 271:18–272:10.

[79] Gaeta ¶¶38–39; Declaration of Carissa Wong-Schwab (hereinafter "Wong-Schwab") ¶¶5, 11, 14.

[80] Gaeta ¶38; Wong-Schwab ¶¶6–7, 11.

The *only* Matrix data used by Revenue IQ to calculate pricing outputs is the publicly available asking rent data described above.[81] Plaintiffs' allegations regarding other purportedly "near real-time" market intelligence data in the Matrix database, CCAC ¶¶ 131–141, have no bearing here because that data is not used by Revenue IQ's pricing output calculations.[82]

**Manually input client survey data:** Revenue IQ clients can manually enter market survey data they collect on their own for the comps used in the Step 1 Comp Trend analysis.[83] This data is not shared with other clients or used to calculate pricing outputs for other clients.[84]

**Central Property database**: The nationwide, aggregated, anonymized, non-price data used to train the model coefficients for the Predicted 30-Day Availability Health Rule and for Yardi's benchmark reporting is housed in Yardi's Central Property database, which is a secure database containing data for all Voyager clients, not just Revenue IQ clients.[85]

**Service Provider database**: All data used or generated by Revenue IQ to calculate pricing outputs is stored in a secure, back-end database called Service Provider, where it is segregated at the client and property level and only accessible by that client or property.[86] Service Provider segregates client-specific data through various mechanisms, including the use of robust unique identifiers, such as a property ID.[87] Queries that retrieve records for a given client or property incorporate these unique identifiers, ensuring that only the relevant

---

[81] Gaeta ¶¶38, 39; Yenikomshian ¶62; *id.,* Appx. D ¶¶102–107

[82] Rao 316:9–12; Gaeta ¶63; Yenikomshian ¶¶125, 134.

[83] Gaeta ¶¶42, 44; Yenikomshian, Appx. D ¶D.92, Figure D.31.

[84] Yenikomshian, Appx. D ¶D.92.

[85] Gaeta ¶41; Yenikomshian ¶46.

[86] Gaeta ¶36; Yenikomshian ¶39.

[87] *Id.*

data for a specific client or property is accessed, making it impossible for data from one property or client to be accessed by a query requesting information for a different client or property.[88] Data calculated by Revenue IQ in executing its logic is also stored in Service Provider, following standard practices for software applications performing numeric computations.[89] Yardi segregates data at the client/property level, ensuring that computation results specific to a client/property are accessible only by that client/property.[90]

## IV. Clients Have Complete Control and Can Modify or Disregard Pricing Outputs.

Revenue IQ clients are under no obligation to adopt the pricing outputs, which can be modified or rejected at the complete discretion of each client.[91] Clients can change their configurations to effect changes to their pricing outputs whenever they desire (even multiple times daily), and the data show that they do.[92] Revenue IQ clients can also modify or override Revenue IQ's pricing outputs, including by offering concessions or promotions on individual leases.[93]

Although clients can set internal permissions specifying which employees within their property management company have authority to change the pricing outputs, these limitations are at the client's discretion and are not controlled by Yardi.[94] Yardi collaborates with clients by reviewing historical reports to determine whether a client's Revenue IQ configurations are meeting the property's individual pricing needs.[95] While a surplus of

---

[88] *Id.*

[89] Yenikomshian ¶39.

[90] *Id.*; Gaeta ¶¶36–37.

[91] Gaeta ¶31; Yenikomshian ¶117; Rao 272:25–273:5.

[92] Gaeta ¶31; Yenikomshian ¶¶100–02; Rao 305:18–306:3; *supra* §II.b.

[93] Gaeta ¶¶28, 31; Yenikomshian ¶¶115–120.

[94] Gaeta ¶30; Bradford 213:17–21.

[95] Rao 254:5–256:4, 281:6–282:10, 298:25–299:23, 306:11–17.

manual changes to the pricing outputs might suggest that Revenue IQ settings could be adjusted to more closely align with that client's goals, Yardi does not control or police the rate at which Revenue IQ clients accept Revenue IQ-calculated pricing outputs.[96]

Indeed, the Landlord Defendants reject the pricing outputs 27.8% of the time on average, with an average deviation size of -$69.35 or, as a percent of monthly rent, an average deviation of -4.2%.[97]    In fact, Plaintiff Duffy's 24-month lease included a concession of three months' rent, and Plaintiff Brett's 12-month lease included a concession of one month's rent.  *See* Defendant R.D. Merrill Real Estate Holdings, LLC's Motion to Dismiss, ECF No. 139 at 2–3 (citing Norbury Decl. Ex. 1 at 13).  Across clients there is considerable variation in the size and the rate at which properties deviate.[98]  For example, when considering the distribution of the deviations across clients, the middle 50% of the deviations range anywhere from -6.4% to - 0.6%.[99]  The only commonality is that virtually all clients choose to modify the pricing outputs, with nearly 83% of properties rejecting the pricing outputs more than 10% of the time.[100]

In sum, Revenue IQ calculates pricing outputs based solely on a client's own property-specific data, the client's chosen settings, and publicly available data.[101]  Revenue IQ does not use confidential or commercially sensitive pricing data provided by its clients to calculate pricing outputs for other clients.[102]  No Revenue IQ client's confidential or competitively sensitive data or configuration settings are shared with or accessible to any

---

[96] Gaeta ¶31; Bradford 213:17–21; Rao 305:17–306:5.

[97] Yenikomshian ¶120.

[98] Yenikomshian ¶¶120–122, Table 9.

[99] *Id.*

[100] *Id.* ¶123 (noting that there is "no common or consistent rate of deviation").

[101] Gaeta ¶8; Yenikomshian ¶26; *id.*, Appx. D ¶D.15.

[102] Gaeta ¶8; Yenikomshian ¶¶26, 105; *id.*, Appx. D ¶D.15.

other Revenue IQ client.[103]   Nor do Yardi employees share this information outside of Revenue IQ.[104]   Revenue IQ is designed and implemented to ensure that a client's non-public, confidential data, inputs, and configuration settings are neither shared with nor accessible to anyone but that client.[105]   Clients remain in full control of their individual configurations, which offer practically innumerable configuration combinations,[106] and they may (and do) freely modify or reject Revenue IQ pricing outputs.

V.    **The Individualized, Historical, Aggregated, Averaged, and Anonymized Benchmark Reporting Available to Clients Is Not Used by Revenue IQ to Generate Pricing Outputs.**

Benchmark reporting is available to Yardi clients, including through the Asset IQ, Forecast IQ, and Revenue IQ products in Yardi's Elevate Multifamily Suite.[107]   When enabled by a Revenue IQ client, this feature provides aggregated, averaged, anonymized benchmark reports that allow the individual client to assess historic performance of the client's properties relative to comparable properties.[108]   Revenue IQ's source code establishes that, contrary to Plaintiffs' allegations, this benchmarking data does not provide inputs to, or otherwise influence, the calculations that generate Revenue IQ's pricing outputs.[109]

---

[103] Gaeta ¶32; Yenikomshian ¶22; *id*., Appx. D ¶D.15.

[104] Rao 306:6–9.

[105] Gaeta ¶¶8, 32; Yenikomshian ¶22; *id.,* Appx. D ¶D.15.

[106] Gaeta ¶8; Yenikomshian ¶¶20–21, 96; Ivinskas 109:12–18, 257:6–17.

[107] Yenikomshian ¶128.

[108] Gaeta ¶¶50–53; Yenikomshian ¶130; *id*., Appx. D ¶D.297; Declaration of Michael Mitzenmacher (hereinafter "Mitzenmacher") ¶20.

[109] Gaeta ¶63; Yenikomshian ¶¶125–133; *id*., Appx. D ¶D.284–D.290.  Plaintiffs' allegations that confidential, competitively sensitive benchmarking data is "incorporate[d]" into Revenue IQ's pricing outputs conflates the publicly available asking rents used in the first step of Revenue IQ's pricing process, *see supra* §II (discussing Comp Trend), and Yardi benchmarks, which are not used by Revenue IQ to calculate pricing outputs.

Yardi's aggregated, averaged, and anonymized benchmark reports do not provide real-time, property-level transparency; instead, they reflect historical, aggregated metrics subject to safeguards that prevent disaggregation and deanonymization.[110] These reports compile Key Performance Indicator ("KPI") values from client Voyager databases on a lagged schedule, meaning reported metrics summarize past events rather than contemporaneous activity.[111] Benchmarking outputs also undergo multiple layers of aggregation, anonymization, and "controlled noise" injection,[112] to safeguard against disclosure of the underlying raw Voyager input data.[113] As Professor Michael Mitzenmacher, former Harvard Computer Science Department Chair concluded, this process introduces "information loss": the variation present in the client property-level inputs is compressed into single summary statistics that obscure the underlying values.[114] Benchmarking reports are thus retrospective, high-level and anonymized, and serve only as broad comparative reference points.[115]

In developing its benchmark reporting, Yardi intentionally built a codebase designed to preclude clients from disaggregating and deanonymizing benchmarking data.[116] The efficacy of this code has been tested and confirmed.[117] Moreover, there is no evidence that

---

[110] Yenikomshian ¶¶134, 136; Mitzenmacher ¶44; Rao 306:18–307:12.

[111] Gaeta ¶57–58; Yenikomshian, Appx. D ¶D.341; Mitzenmacher ¶30.

[112] This noise adjusts each property's KPI value before aggregation by modifying the weighted KPI values according to predefined rules to obscure property-level data. Mitzenmacher ¶¶39–42; *id.*, Appx. D ¶¶D.12–D.13.

[113] Gaeta ¶59; Yenikomshian ¶¶135, 138; *id.*, Appx. D ¶¶D.371, D.381–D.386; Mitzenmacher ¶¶20–21, *id.*, Appx. D ¶¶D.12–D.27.

[114] Mitzenmacher ¶¶50, 71; *id.*, Appx. D ¶¶D.28–38.

[115] Yenikomshian ¶¶134–137; Mitzenmacher ¶¶44, 77.

[116] Gaeta ¶¶59, 61–62; Yenikomshian ¶145; Mitzenmacher ¶21. Yardi's Revenue IQ licensing agreement explicitly prohibits the use of data that permits one client to trace information back to any other client. *See* Bustany Decl. Ex. A, ("Saas Agreement") Sec. 18(j).

[117] Gaeta ¶61; Mitzenmacher ¶¶45–69.

clients attempt to disaggregate or deanonymize the information. Any such effort would require a client to run an enormous number of inquiries through Revenue IQ's user interface.[118] Yardi's system is not designed to handle this volume of requests.[119] Moreover, Yardi's system notifies it when a client requests benchmark reports with more than three differing requested benchmark sets.[120]

In practice, Yardi's benchmark reporting is not uniformly used by Revenue IQ clients, and there is substantial variation in the benchmarking data requested by and reported to clients.[121] To obtain aggregated, averaged, and anonymized data, a client first defines a group of properties selected either by the client or suggested by Yardi based on geographic proximity and building rating selected by the client (the "Requested Benchmark Set").[122] Requested Benchmark Sets must contain at least 10 benchmark properties.[123]

In practice, Revenue IQ clients' Requested Benchmark Sets comprise an average of over 29 properties from across an average of 8.6 owners and/or operators.[124] The benchmark reporting will then return aggregated, averaged, anonymized metrics from a subset of the requested benchmark set—the "Effective Benchmark Set."[125] Clients do not and cannot know which subset of selected properties contribute data to the calculation of

---

[118] Mitzenmacher ¶¶56, 56 n.77 (Reverse engineering "a database with 400 subjects would require $2^{400}$ queries. . . $2^{332.2}$ is a googol, which is greater than the number of atoms in the observable universe.").

[119] Id. ¶¶56–57.

[120] Id. ¶57 & n.78; Gaeta ¶62.

[121] Yenikomshian ¶¶176–77, 180–85.

[122] Id. ¶¶129, 186–187; Gaeta ¶53; Mitzenmacher ¶29.

[123] Gaeta ¶59; Yenikomshian ¶¶129, 140, id., Appx. D ¶D.373; Mitzenmacher ¶¶30, 53.

[124] Yenikomshian ¶¶147, 147 n.265.

[125] Yenikomshian ¶¶148–150, 151; Mitzenmacher ¶34.

the aggregated, averaged, and anonymized benchmarks.[126]  On average, each client's Effective Benchmark Set returns information from 9.4 different properties, or approximately a third of the average-sized Requested Benchmark Set,[127] demonstrating that benchmarking presents anonymous metrics.

To guard against potential misuse, an auditing function circulates a notification if on any given day, a client runs benchmark reports that identify three or more different Requested Benchmark Sets.[128]  User log data shows that the maximum number of distinct Requested Benchmark Sets queried for an individual property on any given day is three, but 99.8% of the time, for any given property on any given day, clients run benchmark reports with only one Requested Benchmark Set.[129]  This is "orders of magnitude below what would generally be required to reconstruct the underlying property-specific data through any kind of coordinated reverse-engineering effort."[130]

Once the client selects a Requested Benchmark Set, the client then chooses: (1) one or more KPIs to evaluate; (2) a level of reporting (*e.g.*, property-level or bed-bath mix); and (3) a reporting window (*e.g.*, trailing three months, trailing six months, or year-to-date).[131]

---

[126] Gaeta ¶52; Yenikomshian ¶¶138, 141, 144, 148–51; *id.*, Appx. D ¶D.379; Mitzenmacher ¶¶20, 58–59; *id.*, Appx. D ¶D.6. Compare this with configuring Comp properties for the Comps trend. Not only do benchmark supersets and comp sets differ more than 88% of the time, but properties with Comps configured have comp sets of, on average, 6 properties.  Yenikomshian ¶192.

[127] Yenikomshian ¶150.

[128] Mitzenmacher ¶57 n.78.

[129] Mitzenmacher ¶66.

[130] *Id.* ¶66 n.88.

[131] *Id.* ¶29; *id.*, Appx. D. ¶D.4; Yenikomshian ¶¶130, 193; *id.*, Appx. D. ¶¶D.298–D.302, Figures D.102–D.103.  Of Revenue IQ's available KPIs, nearly 61% are available at only the property level. Yenikomshian ¶161.  Even bed-bath mix level KPIs are considerably less granular than the floorplan mapping required the Comps trend.  Yenikomshian ¶¶130 n.232, 146, 146 n.259, 161; *id.*, Appx. D. ¶D.320 n.742.  A specific property may have numerous *different* types of one-bedroom, one-bath floorplans. Rao 309:15–310:23.  There are *no* KPIs available at the floorplan level. Yenikomshian ¶¶146, 146 n.259; *id.*, Appx. D. ¶D.320 n.742, 743.

No client's benchmarking configurations are shared with or accessible to any other client.[132] Analysis of the requested reporting windows shows that clients are focused long-term: roughly 42% of all requests looked *at least* one year in the past, while clients otherwise look, on average, over 48 days in the past.[133]  In short, benchmarking, by design and in practice, is not used to help price units in real time.

As noted, individual property KPI values are not reported to clients.[134]  Rather, KPI values across the selected reporting period and the effective benchmark set are combined through weighted averaging; these weights are applied within the backend system and are not visible to end clients.[135]  Before any weighted average is reported to a client, the system applies additional adjustment rules that introduce "noise" into the reported value.[136]  These adjustments further obscure the relationship between any individual property's input and the final output.[137]  As a result, the reported KPI does not correspond exactly to the true average or weighted average of the underlying data.[138]

Revenue IQ does not use (and has never used) benchmarking data to generate pricing outputs.[139]  Further, the aggregated and anonymized benchmark KPIs are not current and do not reveal—nor can they be disaggregated and deanonymized to reveal—any price

---

[132] Gaeta ¶31.

[133] Yenikomshian ¶158.

[134] *Id*. ¶144; Mitzenmacher ¶¶20, 29.

[135] Yenikomshian ¶143; *id*., Appx. D ¶¶D.387–389; Mitzenmacher ¶39; *id.,* Appx. D ¶D.10.  KPI outputs are commonly weighted by considering the relative size of each property's number of units or square footage.  Mitzenmacher Appx. D at ¶D.10.

[136] Yenikomshian ¶135; *id*., Appx. D ¶¶D.381–D.386; Mitzenmacher ¶¶39–44; *id.*, Appx. D ¶¶D.12– D.27.

[137] Gaeta ¶60; Yenikomshian ¶¶143–144; *id*., Appx. D ¶D.381; Mitzenmacher ¶44.

[138] Yenikomshian ¶143.

[139] Gaeta ¶63; Yenikomshian ¶¶125–132; *id*., Appx. D ¶¶D.284–D.291.

charged or quoted for any rental unit, much less the most recent price charged or quoted.[140] It would be impossible for Yardi benchmarking data to be a vehicle for aligning property or unit-level pricing strategies, because the aggregated, anonymized, and averaged benchmarking data does not provide insight into how a client might choose to price any specific rental unit.

## VI.    Yardi Provided Plaintiffs Open-Book Access to Revenue IQ Source Code and Supporting Documentation.

Yardi produced the most direct evidence possible to show Plaintiffs claims are fatally flawed: the source code for Revenue IQ, other Yardi products that feed data into Revenue IQ, and Yardi's benchmark reporting.[141]  Yardi also produced supporting technical documents and specifications, and other information that establish that Revenue IQ does not generate pricing outputs using any competitor's confidential, non-public pricing data and that each client can and does uniquely configure Revenue IQ for its own needs.[142] Although documents cannot change what the software actually does and does not do, Yardi also produced, *inter alia*, over 210,000 custodial documents from Yardi employees, screenshots of the user interface, and structured data regarding (*i*) client configuration choices; (*ii*) client modification of their Revenue IQ pricing outputs; and (*iii*) how clients use the optional benchmark reporting.[143]  Yardi also provided a step-by-step tutorial of the Revenue IQ interface at Michael Gaeta's March 12, 2025 deposition in the *Mach* litigation and produced the full deposition transcript to Plaintiffs.[144]  This extensive discovery

---

[140] Gaeta ¶¶49–53, 57–59, Figure 3; Yenikomshian ¶¶136, 144, 152–156; *id.*, Appx. D ¶D.341; Mitzenmacher ¶20.

[141] Tabaie Decl. ¶¶6, 9.

[142] *Id.* ¶¶3, 5, 7, 8.

[143] *Id.* ¶¶8–13; Yenikomshian ¶¶97, 115, 118, 126.

[144] Tabaie Decl. ¶15.

YARDI SYSTEMS, INC.'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – Page 22

1    establishes conclusively that Plaintiffs' allegations were ill-conceived, and are now

2    definitively baseless.

3    ### ARGUMENT

4    Summary judgment is appropriate where a moving party demonstrates that "there is

5    no triable issue as to any material fact" and it is thus entitled to judgment as a matter of law.

6    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A moving defendant can satisfy its

7    *prima facie* burden to show the nonexistence of any genuine issue of material fact by:

8    (1) presenting "evidence negating an essential element" of the plaintiff's claim; or (2) by

9    showing that the plaintiff "does not have enough evidence of an essential element to carry

10   its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.,*

11   *Inc.,* 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the non-moving party

12   to show that a triable issue of one or more material facts exists. *In re Oracle Corp. Sec.*

13   *Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). The non-movant must show more than "some

14   metaphysical doubt as to the material facts" to demonstrate that the issue is "genuine."

15   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

16   The Revenue IQ source code makes clear there is no genuine dispute of material

17   fact here. ***First***, Plaintiffs' horizontal price-fixing conspiracy claim fails because

18   (*i*) Revenue IQ does not use confidential information from one client to calculate the pricing

19   output for any other client; (*ii*) clients employ individual configurations of Revenue IQ for

20   each property in accordance with their goals; and (*iii*) clients are free to—and regularly

21   do—ignore their pricing outputs entirely. ***Second***, Plaintiffs' vertical price-fixing

22   conspiracy claim fails because, in addition to suffering from the hub-and-spoke claim's

23   deficiencies, Yardi's independent, non-exclusive software licenses with each client do not

24   restrain trade in the multifamily rental housing market. ***Third***, Plaintiffs' fallback

25   information exchange claim fails because (*i*) benchmarking reports never feed into Revenue

26   IQ's calculation of pricing outputs; and (*ii*) Yardi's historical benchmarking reporting is

aggregated and anonymized, cannot be disaggregated, and therefore does not provide clients sensitive information on their competitors' pricing or any other metric.

Revenue IQ merely uses software to automate the same analytical processes landlords historically perform manually with pen and paper, just in the same way Microsoft Excel streamlined the process of accounting by handwritten entries in a leather-bound ledger. This is efficiency, not a conspiracy.

### I.   The Undisputed Facts Show that Plaintiffs Cannot Establish a Horizontal Price-Fixing Conspiracy.

The crucial question in assessing a purported conspiracy under the Sherman Act is whether the alleged conduct stems from independent decision-making or an unlawful agreement. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553–54 (2007). Plaintiffs allege a hub-and-spoke conspiracy. *See* CCAC ¶¶ 34, 228–33. "A traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes." *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1192 (9th Cir. 2015). Where the horizontal component, *i.e.*, the rim, of an alleged hub-and-spoke conspiracy is missing, a hub-and-spoke conspiracy claim fails as a matter of law. *See Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 821–22 (9th Cir. 2023) (affirming that a hub-and-spoke conspiracy requires an agreement among the spokes, and that "to survive summary judgment . . . [the plaintiff] must create a material dispute regarding an agreement among the spokes"); *Clear Connection Corp. v. Comcast Cable Commc'n. Mgmt., LLC*, 2020 WL 6742889, at *5 (E.D. Cal. Nov. 17, 2020) (finding no horizontal or hub-and-spoke restraint because "there is no evidence of a 'rim'—that is, horizontal agreements among the contractors").[145] Here, the undisputed facts demonstrate that the horizontal component of

---

[145] *See also Cornish-Adebiyi v. Caesars Ent., Inc.*, 2024 WL 4356188, at *7 (D.N.J. Sept. 30, 2024) (finding plaintiffs' "failure to plausibly allege the exchange of confidential information from one of

Plaintiffs' alleged hub-and-spoke conspiracy (*i.e.*, the purported agreement among the Landlord Defendants to "collectively adopt a coordinated pricing software" in which they "provide their competitively sensitive data to RENTmaximizer with the understanding that such data will be shared with competitors") is missing.  CCAC ¶¶ 118–19.

### a. Revenue IQ Does Not Use the Confidential Information of One Client to Calculate Pricing Outputs for Any Other Client.

The only thing the Landlord Defendants have in common is that they manage multifamily rental properties "across the United States" and licensed Revenue IQ at some point since September 8, 2019.  CCAC ¶¶ 3, 219.  Plaintiffs do not allege that the Landlord Defendants expressly agreed to fix prices.  Instead, Plaintiffs' hub-and-spoke conspiracy relies on a theory of "tacit" agreement, based solely on the false allegation that the Landlord Defendants shared a mutual "understanding" that Revenue IQ would cross-use competitors' confidential and competitively sensitive data to calculate supra-competitive pricing outputs. *See id.* ¶¶ 8, 10, 14–16, 34, 119, 123, 145, 168, 172, 228–33, 243; *id.* ¶ 196 ("Defendants' actions described herein constitute a single unlawful conspiracy to fix, raise, stabilize, or maintain the nationwide multifamily rental prices at artificially high levels.  This agreement was evidenced by Landlord Defendants' reciprocal exchange of competitively sensitive information through Yardi and outsourced their independent price decisions to a common decision maker.").

Discovery has confirmed that these allegations are patently false.  Revenue IQ does not calculate pricing outputs for a client by "leverage[ing]" or "incorporating" the

---

the spokes to the other through the hub's algorithms [a] fatal defect" to their horizontal claim and dismissing complaint); *Gibson v. MGM Resorts Int'l*, 2023 WL 7025996, at *3, 5 (D. Nev. Oct. 24, 2023) (dismissing action where it was "unclear whether the pricing recommendations generated . . . include [competitors'] confidential information" noting that "without an agreement to accept the elevated prices recommended by the pricing algorithm, there is no agreement that could support Plaintiffs' theory or otherwise make out a Sherman Act violation....")("*Gibson* I"); *Gibson v. Cendyn Grp., LLC,* 2024 WL 2060260, at *4, 5, 9 (D. Nev. May 8, 2024)(dismissing hub-and-spoke and vertical claim with prejudice where Defendants "never agreed to charge the prices [] recommended.")("*Gibson* II"), *aff'd in part* 148 F.4th 1069 (9th Cir. 2025) (affirming dismissal of vertical claim where Defendants dropped horizontal).

confidential competitively sensitive information of other clients, CCAC ¶ 10, 16, it does not impose a collective pricing strategy based on that information, *id.* ¶ 20, and, therefore, there can be no tacit agreement by the Landlord Defendants to use it for that purpose.  The *Mach* Court addressed this precise issue: "a hub-and-spoke conspiracy . . . requires some anti-competitive agreement . . ." but here "there is only a software license agreement between the alleged hub (Yardi) and the spokes (the owner/manager)"—"there is no agreement, implicit or explicit, between any of the spokes." *Mach* Order, at 8–9.  That conclusion is fatal to Plaintiffs' claims.

Revenue IQ's source code proves that the software calculates pricing outputs based solely on a client's own property-specific data, the individual software settings selected by the client, and, at the client's option, publicly-sourced asking rents for client-selected comps.  *Supra* Facts § III.  Furthermore, no client's confidential, competitively sensitive data is used to calculate pricing outputs for any other client's properties.  *Id*.  As *Mach* found, "[t]he information provided to the Revenue IQ system by landlords *cannot be used* by the system to generate price recommendations for other landlords." *Mach* Order, at 10.  To the contrary, Revenue IQ intentionally *prevents* any cross-mingling of data, and ensures that a client's non-public, confidential data, inputs, and configuration settings are neither shared with nor accessible to anyone but that client. *Id.*[146]

Defendants indisputably did not tacitly agree to use Revenue IQ to price apartments based on shared confidential or competitively sensitive data.

**b. Revenue IQ Does Not Employ a Common Pricing Formula.**

Plaintiffs try to support their "tacit collusion" theory by alleging that the Landlord Defendants "outsource their once-independent pricing and supply decisions to a single

---

[146] Objective evidence also proves that benchmark reporting cannot facilitate the alleged conspiracy. *See* supra §III.b.  Plaintiffs' purported conspiracy relies on Revenue IQ use, but Revenue IQ properties reflect only 3.3% of the properties selected by clients for inclusion in their benchmarking supersets, Yenikomshian ¶182, and some Revenue IQ clients do not even use benchmark reporting *at all*. *Id.* ¶181.

decisionmaker, RENTmaximizer." CCAC ¶¶ 20, 34, 118, 126, 196, 238. But the undisputed evidence establishes that clients **do not** abdicate pricing decision-making to Yardi. Revenue IQ is individually configured by each client to achieve their property's unique goals and objectives, with a nearly unfathomable number of unique configurations possible, starting with **clients entering their own reference rents**—that clients may update as often as they like—which Revenue IQ uses to conduct each step of the pricing process. *Supra* Facts § II.a. After a client sets their reference rents and Revenue IQ has conducted the initial Trends analysis based on a client's property-specific data and selected comps, clients can configure up to five Health Rules to adjust pricing outputs in precise, client-specified increments. *Id*. Clients can then apply various Pricing Calibrations to further tailor the pricing outputs. *Id*.

Expert analysis proves that Revenue IQ clients employ literally millions of different configurations. *See supra* Facts § II.b (observing approximately 4 million different configurations). Clients then continue to adjust their configurations regularly, with an average of 468 configuration adjustments per property from January 2019 to January 2025. *Id*. Some properties adjusted their settings as many as 3,605 times during this same period.[147] Clients adjust these configurations regularly, making an average of 32 adjustments per property, per month during that time period,[148] and they adjust a range of settings—on average, 129 different configuration settings from January 2019 to January 2025 per property per month, with some modifying up to 181 monthly.[149] Yardi *encourages* client use of unique configurations and regular adjustments to ensure that Revenue IQ's pricing outputs align with the client's individual goals.[150]

---

[147] Yenikomshian ¶100.

[148] *Id.* ¶102.

[149] *Id.* ¶100; ¶100 n.165.

[150] Gaeta ¶¶12, 15–30; Rao 207:18–209:24.

1    This Court questioned whether Defendants "having turned over their commercially-

2    sensitive data and paid for the services Yardi offered, did not intend to use the information

3    generated as a result." Order at 10. It is not that Defendants do not use information

4    generated by Revenue IQ—though they may freely modify or reject pricing outputs—

5    rather, Revenue IQ's outputs reflect a client's own unique data and choices, not (as accepted

6    as true at the pleading stage) confidential information of their competitors. Revenue IQ's

7    myriad configuration options and pricing calibrations enable client individualization, not

8    uniformity. Nor is there any evidence that Yardi employees circumvent this deliberate

9    design.[151] Revenue IQ clients retain decision-making authority at all times, and "concerted"

10   or "coordinated" action is technologically impossible. Order at 5, 10; CCAC ¶ 19. If a

11   Yardi client "accepts" a pricing output of Revenue IQ, it is simply using an output produced

12   by its own, independent choices regarding configuration of Revenue IQ's settings. This

13   case is not remotely like those finding unlawful delegation of decision-making supporting

14   a price-fixing conspiracy. *See, e.g.*, *American Needle, Inc. v. NFL*, 560 U.S. 183, 195

15   (2010) (finding violation where NFL teams acted as one unit and each received an

16   apportioned share of licensing revenue); *U.S. v. Masonite Corp.*, 316 U.S. 265, 275 (1942)

17   (considering competing down-chain suppliers that contracted with supplier to sell product

18   at a fixed price); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 776, 782–83 (1975) (finding bar

19   association enforced fee schedule and petitioners could find no lawyer who deviated from

20   it).

21   Here, there is no agreed-upon fixed price, shared fee schedule, or *any* concerted

22   action. Revenue IQ cannot produce anything like uniform pricing given the property-

23   specific data it analyzes and the configuration options set independently by each client.

24   Clients are not aware of the pricing outputs calculated for competitors or the configurations

25   selected by competitors. *Supra* Facts § IV. Nor is there any mechanism to "enforce"

26

---

[151] Gaeta ¶¶15, 31, 42; Rao 306:6–9.

compliance that might support the existence of a tacit agreement. The undisputed evidence shows that clients are free to override the pricing outputs (and frequently do), or simply adjust their configurations to reach different outputs, and that Yardi in no way seeks to ensure compliance with those outputs. *Id*.

Revenue IQ thus does not use or share clients' confidential data to calculate pricing outputs, nor do clients delegate pricing to Yardi. In the absence of an unlawful agreement between the Landlord Defendants to use Revenue IQ to fix prices, there is no "rim" connecting the spokes of Plaintiffs' alleged hub-and-spoke conspiracy. Far from facilitating any agreement to fix prices, Revenue IQ's fully customizable approach to pricing rental units proves that Revenue IQ is merely a tool that enables each client to create their own distinct pricing algorithm.[152] On these undisputed facts, Plaintiffs cannot establish a Sherman Act claim, and summary judgment should be granted.

## II.    The Undisputed Facts Show that Plaintiffs Cannot Establish a Vertical Price-Fixing Agreement.

Plaintiffs' vertical price-fixing cause of action is premised on the same allegations as their horizontal claim and fails for the same reasons. *See* CCAC ¶¶ 196, 230, 236. "[T]he Supreme Court was clear: a wheel without a rim is not a single conspiracy." *Gibson*, 148 F.4th at 1088, n.12. The licenses here are nonexclusive, and do not remotely restrain client decision-making as to pricing in the multifamily rental market.[153] Where plaintiffs alleging a purported hub-and-spoke conspiracy cannot sustain a horizontal claim and are left with a collection of vertical agreements "none of which individually restrains trade," they may not

---

[152] Yenikomshian ¶86 (Revenue IQ is "flexible framework that enables the creation of distinct, client-specific algorithms, rather than imposing a standardized one").

[153] *See* Saas Agreement; *cf. Epic Games, Inc. v. Apple, Inc*., 67 F.4th 946, 968 (9th Cir. 2023) (citing specific contractual provisions that restricted developer decisionmaking); *see also supra* Facts §II.b; Argument §I.b.

use a vertical claim "as a backdoor" to an antitrust conspiracy between competitors. *Gibson*, 148 F.4th at 1087–88.[154]

This is particularly true where the alleged agreements are not actually vertical and do not restrain competition in the relevant market. A vertical restraint is a "restraint[ ] . . . imposed by agreement between firms at different levels of distribution." *Bus. Electr. Corp. v. Sharp Electr. Corp.*, 485 U.S. 717, 730 (1988); *Musical Instruments*, 798 F.3d at 1191 (describing vertical agreements as those "made up and down a supply chain, such as between a manufacturer and a retailer").[155] A Section 1 violation based on a vertical agreement requires a plaintiff to prove the agreement "has a substantial anticompetitive effect that harms consumers *in the relevant market*." *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 991 (9th Cir. 2020).

The Revenue IQ licenses are not vertical agreements because they are not between firms at different levels of distribution; Yardi licenses software, it does not supply rental units. Further, Plaintiffs cannot establish that the Revenue IQ licenses have an anticompetitive effect in the relevant market. Revenue IQ licenses do not restrain competition in Plaintiffs' alleged antitrust market, *i.e.*, the market for residential housing. They are merely standard software licensing agreements. *Cf. Mularkey v. Holsum Bakery, Inc.*, 146 F.3d 1064, 1065 (9th Cir. 1998) (finding Section 1 prohibits only *restraints* of

---

[154] *See also Dickson*, 309 F.3d 193, 210–11 (rejecting aggregation where only "discrete" bilateral conspiracies" were alleged); *Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1218 (11th Cir. 2002) (concluding "aggregation is inappropriate" for assessing market share); *In re Amazon.com, Inc. eBook Antitrust Litig.*, 2023 WL 6006525, at *25 (S.D.N.Y. July 31, 2023) (rejecting aggregation absent plausible horizontal conspiracy).

[155] The Supreme Court and Ninth Circuit have repeatedly defined vertical restraints as those imposed by an agreement between firms at different levels of distribution. *See, e.g.*, *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1108 (9th Cir. 2021).

1
2
trade).[156]  Accordingly, Plaintiffs cannot establish that Yardi's Revenue IQ licenses violate Section 1 of the Sherman Act.

3
4
5
6
7
8
9
10
11
12
13
Applying these bedrock principles, the Ninth Circuit affirmed dismissal of an antitrust claim based on strikingly similar allegations.  The *Gibson* plaintiffs claimed the software provider recommended hotel rates based on the cross-use of confidential information, which the hotel operators tacitly agreed to adopt, thereby driving up prices. *Gibson II*, at *6.  Plaintiffs argued to the Ninth Circuit that their vertical claim should proceed under the rule of reason.  *Gibson*, 148 F.4th at 1081.  But the court held that mere adoption of the same software was insufficient, as "obtaining information from the same source does not reduce the incentive to compete," *id.* at 1083, nor would it restrain a firm's ability to compete in the relevant market, *id.* at 1084–85.  There was no causal link between the individual software contracts and any alleged anticompetitive harm in the market for hotel rooms, and the claims failed.  *Id.* at 1088.

14
15
16
17
18
19
20
21
22
There can equally be no vertical price-fixing framework here, because Yardi's Revenue IQ licensing agreements do not restrain trade in the relevant market.  Vertical agreements are "agreements made up and down a supply chain, such as between a manufacturer and a retailer."  *Gibson*, 148 F.4th at 1080.  They are necessarily "between firms at different level of distribution."  *Id.* at 1081.  Here, Yardi is not a supplier or distributor of housing units; it is not "up or down the supply chain" or "contribut[ing] the raw materials, capital or labor necessary" for the production of multifamily rental properties constituting the alleged antitrust market.  *Id.* at 1082.[157]  Revenue IQ licensing agreements are nothing like the vertical agreements courts have found concerning.  *See, e.g., United*

23
24
25
---
[156] *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 397, 399 (7th Cir. 1989) (Easterbrook, J.) ("There can be no restraint of trade without a restraint . . . . [T]here is not even the beginning of an antitrust case, no reason to investigate further to determine whether the restraint is reasonable.").

26
[157] This Court, noting that Yardi "is not a supplier or distributor of housing units," was thus rightly skeptical that the vertical label would apply here. Order at 12 n.2.

*States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 179, 191 (1940) (finding a vertical agreement restraining trade where corporate oil refiners collectively agreed to purchase oil, at a particular price, from the same independent suppliers, at the same intervals, to their benefit).

Where a licensing agreement "is not horizontal (as it is not between competitors) and . . . it is not vertical (as the parties to the agreement do not operate at different levels of distribution in the relevant market)," it is an "ordinary sales contract" and does not unlawfully restrain trade in the relevant market. *Gibson*, 148 F.4th at 1082. As this Court recognized, "the key to plaintiffs' antitrust claims is the [alleged] horizontal agreements between and among the lessor defendants." Order at 12.

Plaintiffs' case would not be saved by pivoting to a theory based on the impact of Yardi's software licenses in the aggregate. *See Gibson*, 148 F.4th at 1087 (rejecting plaintiffs' argument that "the agreements restrain trade 'in the aggregate'" because any such claim would go to an agreement between competitors—i.e., a horizontal agreement."); *Sausalito Pharmacy, Inc. v. Blue Shield of California,* 544 F. Supp. 230, 236 (N.D. Cal. 1981) (finding that "the legality of the vertical arrangement depends on [the court's] findings on the claim of an illegal horizontal conspiracy"). As Judge Markman concluded, "Plaintiffs' hub-and-spoke theory [is] 'nothing more than a collection of independent, nonexclusive software licenses' which was the theory that the Ninth Circuit rejected in *Gibson*." *See Mach* Order, at 13.

"[A]dopting a common software application itself is not an antitrust violation." *Mach* Order, at 10 (citing *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1142 (9th Cir. 2022)); *see Gibson*, 148 F.4th at 1083 ("[T]hat an [unlawful] agreement between competitors to obtain and use [the software] would stifle competition does not render the individual Hotel Defendants' independent choices to use [the software] anticompetitive."). Yardi's software license agreements, like any other contract covering sales, licenses, and

information, are commonplace, and such contracts "do[] not restrain trade; indeed, without [them], trade would be impossible." 6 Areeda & Hovenkamp, Antitrust Law ¶ 1437(a) (5th ed. 2023). Accordingly, Plaintiffs cannot establish a vertical Sherman Act cause of action, and summary judgment should be entered for Defendants.

### III.    Plaintiffs Cannot Establish a Conspiracy to Unlawfully Exchange Confidential Information.

Plaintiffs' information exchange claim fails because neither Revenue IQ nor Yardi's benchmarking result in any unlawful exchange of confidential information and, in any event, the multifamily rental housing network is not a "susceptible" market for fungible products in which benchmarking data is potentially problematic. *In re Loc. TV Advert. Antitrust Litig.*, 2022 WL 3716202, at *3 (N.D. Ill. Aug. 29, 2022) (considering "the structure of the industry involved and the nature of the information exchanged").

### a.    Yardi's Aggregated, Averaged, and Anonymized Benchmark Reporting Does Not Facilitate an Unlawful Information Exchange.

Yardi's benchmarking feature does not facilitate any anticompetitive exchange of information. Courts have long recognized that exchanges of information and the use of industry benchmarks have legitimate business justifications and can be procompetitive. *See, e.g.*, *Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 582–83 (1925) (noting that the "gathering and dissemination" of market-level data leads to efficiency and transparency); *Dreamstime.com, LLC*, 54 F.4th at 1142 (holding that "using a competitive advantage gained from establishing a[] [data collection] infrastructure" that is "uniquely suited to serve its customers" is not unlawful or anticompetitive); *In re Citric Acid Litig.*, 191 F.3d 1090, 1098 (9th Cir. 1999) (distribution of "aggregate statistics" "served the legitimate purpose of informing members of worldwide [market] conditions"); *see also United States v. U.S. Gypsum Co*., 438 U.S. 422, 443 n.16 (1978) (noting that information exchanges can "increase economic efficiency and render markets more . . . competitive").

Courts weighing the "anticompetitive potential of [an] information exchange[]" consider the recency of the data and the specificity of the information exchanged. *Todd*, 275 F.3d at 211. "The exchange of past price data is greatly preferred," *id.*,[158] as is "aggregated information which avoid[s] transactional specificity." *In re Loc. TV Advert.*, 2022 WL 3716202, at *3.

Benchmarking reports irrefutably do not feed into Revenue IQ's pricing outputs in any way. Plaintiffs nonetheless allege that the benchmark reporting somehow provides a back door method of imparting confidential information from one Revenue IQ client to another, even though Revenue IQ client properties comprise only 3.3% of Requested Benchmark Sets.[159]  *Cf.* CCAC ¶¶ 8–10, 149. The benchmarking source code and usage data conclusively prove that this is yet another false assertion. As the Yenikomshian and Mitzenmacher expert declarations make crystal clear, the benchmark reporting has built-in protections that preclude disclosure of confidential information about any particular property's pricing, and usage data confirms that clients do not reverse engineer benchmarking reports to obtain any other client's confidential data. Benchmarking simply gives clients who elect to use it an overall sense of market trends in the form of aggregated, anonymized, averaged historical data, which courts have ruled enhances rather than suppresses competition.[160]

Clients do not know and cannot discern what properties make up their benchmark set when viewing reports, a phenomenon known in data privacy as the "secrecy of the sample."[161]  Yardi imposes a threshold requirement that clients select a minimum of ten

---

[158] *See Maple Flooring*, 268 U.S. at 573, 586 (finding no violation where reporting "dealt exclusively with past and closed transactions").

[159] Yenikomshian ¶182.

[160] *See* cases cited *supra* §Argument III.a.

[161] Mitzenmacher ¶59.

properties for their benchmarking superset to get any benchmarking result.  In practice, clients configure Requested Benchmark Sets containing, on average, over 29 properties.[162]  But for whatever key performance indicators ("KPIs") the client selects, the reporting data returned will reflect data from only a *subset* of the Requested Benchmark Set.  On average, only 9.4 properties will yield data, meaning that, on average, roughly one third of the Requested Benchmark Set properties make up the "Effective Benchmark Set."[163]  Clients are not told and cannot reverse engineer which properties of the Requested Benchmark Set comprise the Effective Benchmark Set.[164]

As a further protection against revealing any individual client confidential data, the software introduces statistical noise in the form of a data perturbation designed to prevent any single property's data from being inferred.[165]  The software applies this noise to each individual input, and then the KPIs are aggregated as weighted averages of the values in the Effective Benchmark Set for the particular metric.[166]  These weighted, noisy averages do not reveal any property's particular value.  To the contrary, analysis of the data shows that the averages mask substantial variation such that the output is quite different from the inputs.[167]

Benchmarking data also does not reflect *current* pricing decisions.  The underlying individual inputs are calculated on fixed schedules and, for rental price KPIs, are based on when tenants move in, not when a lease is signed or an application is submitted (the point

---

[162] Yenikomshian ¶164.

[163] *Id.*

[164] Gaeta ¶52.  Nor do clients attempt to do so. *See supra* facts §V n.126.

[165] Mitzenmacher ¶¶39–44.

[166] *Id.* ¶¶39, Figure 2, 40–42; *id.*, Appx. D ¶D.10.

[167] Yenikomshian ¶¶167–74.

at which the price is set), which may be weeks earlier.[168]  Further, clients often view benchmarking information for a months- or year-long period (*e.g.*, 42% of requests are made for the trailing twelve months), or beginning long before the request was made (such as for the same month a year prior).[169]  A client viewing a benchmarking KPI therefore sees a backward-looking snapshot, based on data that are time-lagged and aggregated, not any contemporaneous pricing information.[170]

For all these reasons, Yardi's benchmarking tool is entirely lawful and simply cannot function as a real-time coordination device.

### b. The Multifamily Rental Housing Sector is Not Susceptible to Anticompetitive Effects.

Because of the robust protections built into Yardi's benchmarking feature, there is no exchange of confidential information.  Even if there were, for an exchange of information to be unreasonable it must occur in a "susceptible" market, meaning one with "fungible products subject to inelastic demand."  *Todd*, 275 F.3d at 208.  Information exchange cases predicated on benchmarking thus most commonly arise in commodity industries like pork, turkey, and broiler chickens, where purchasing decisions are made primarily on the basis of price alone.  Plaintiffs, incredibly, claim that nationwide multifamily rental units are fungible save for "a few key overarching property characteristics, such as bedroom and bathroom count, amenities, location, and building age."  CCAC ¶ 179.  One might just as well say that all novels are the same apart from the genre, plot, and order of the letters on the page.  Location, building quality, square footage, amenities, materials, appliances,

---

[168] *Id.* ¶¶136, 153, 154 n.276, 158, Figure 21; *see* Gaeta ¶58.

[169] Yenikomshian ¶159, Figure 21; *see supra* facts §V.

[170] Public dissemination of benchmarking information is not relevant here because the information most relevant to prospective tenants—asking rents and other details about properties—is publicly available.  There is no asymmetry between properties and prospective tenants of access to that information.  *C.f., Todd*, 275 F.3d at 196 (finding anticompetitive behavior due to information asymmetry in employers having broad visibility into mutual salary decisions while employees and potential employees did not).

views, and finishes are precisely the "key" bases on which landlords compete in the apartment rental market, and why apartments across the United States are *not* fungible to renters. *See Shadow Creek Apartments, L.L.C. v. Hartford Fire Ins. Co*., 44 F. App'x 640, 646 n.9 (4th Cir. 2002) (noting that "apartments are not necessarily considered fungible," as a lessee set on a "third-floor, south-facing apartment [] may not be willing to rent a vacant apartment on the first floor that faces north").

The proposition that apartments are not fungible—which is intuitive to anyone who has rented one—is borne out in Yardi's benchmarking data. For example, even when looking at similarly rated properties, for the benchmarking KPI "New Lease Rent Per Unit," the median average deviation between the underlying KPI inputs and the corresponding KPI outputs was nearly 12%, or $205.85, showing how far individual property's KPI inputs differ from the reported average.[171] The individual inputs for all benchmarking KPIs are similarly all over the map—the average range between minimum and maximum KPI inputs is 62.5% of the KPI output.[172] Yardi designed Revenue IQ as a flexible, configurable product precisely because of the lack of uniformity for rentals in the market.[173]

* * *

Plaintiffs, moving far afield from the "algorithmic pricing" theory alleged, ask the Court to speculate that Yardi clients manually game the system to disaggregate the benchmark KPIs—which indisputably have no influence on Revenue IQ's pricing output calculations. But as Professor Mitzenmacher explains, that would require clients to submit

---

[171] Yenikomshian ¶¶166–69.

[172] *Id*. ¶¶172–74. Yardi's KPI outputs do not disclose variation to clients or account for it in any way. *Cf. Todd*, 275 F.3d 210 (where the salary reporting at issue accounted for the variance amongst jobs by applying "sophisticated techniques" to "achieve a common denominator," including, for example, agreed-upon "offsets" that reflected the "specific differences between jobs as a percentage figure).

[173] Yenikomshian ¶56; Gaeta ¶14 n.4; Rao 311:12–25.

huge numbers of coordinated queries.[174] That does not happen. Usage logs demonstrate a pattern of client requests falling magnitudes below the level required to systematically disaggregate the benchmarking information to reverse engineer any property's confidential information.[175] Yardi also includes an audit function that flags any sign of excessive queries, but there have been none.[176] Rather, "[t]he API Usage Log data confirm that Yardi clients use the Benchmarking system as intended to obtain broad historical, aggregated, and anonymized summary statistics."[177] Benchmarking, like Revenue IQ itself, is designed to prevent, rather than facilitate, the sharing of confidential pricing information across clients while providing clients with *legal* technological efficiencies.

*CoStar* makes plain that historical benchmark reporting incapable of being deanonymized cannot support a viable information sharing claim. *See Portillo v. CoStar Grp., Inc.*, 2025 WL 2495053, *4–5 (W.D. Wash. Aug. 29, 2025). Benchmark reporting cannot be reverse engineered to determine "the most recent price charged or quoted" from any particular property. *See id.* at *5. The aggregated, averaged, and anonymized benchmarking outputs simply do not "inform Defendants about their competitor's production" or otherwise "deanonymize" it to do more than assess broad directional trends in the market. *Compare In re Broiler Chicken Antitrust Litig.*, 702 F. Supp. 3d 635, 675-78 (N.D. Ill. 2023) (finding insufficient evidence of conspiracy where discovery showed that defendants could not have learned their competitors' production and pricing information) *with Olean Wholesale Grocery Coop., Inc. v. Agri Stats*, 2020 WL 6134982, at *6 (N.D. Ill. Oct. 19, 2020) ("Defendants were able to infer which data corresponded to

---

[174] Mitzenmacher ¶¶56–57, 56 n.77.

[175] *Id.* ¶66. In fact, some Revenue IQ clients do not use benchmark reporting at all. Yenikomshian ¶¶180–81.

[176] Mitzenmacher ¶¶57, 57 n.78.

[177] *Id.* ¶67.

which Defendant"). Yardi's historic, aggregated, averaged, and anonymized benchmarking data merely provide clients "a picture of what is happening in the market as a whole" but lacks the "specificity" that would allow Defendants to "use it to police a secret or tacit conspiracy to fix prices." *In re Loc. TV Advert.*, 2022 WL 3716202, at *6–8 (dismissing claim against data-aggregating intermediary where plaintiffs did not allege "facts showing that the conduit's circulation of information enabled co-conspirators to tacitly communicate with one another" in a manner that "compromised 'the ostensible anonymity' of competitively sensitive information").

The undisputed facts show that Yardi's aggregated, averaged, and anonymized benchmark reporting is not anticompetitive, and it is thus "unclear . . . why [Plaintiffs'] alleged parallel conduct of contracting with [Yardi] would be of any significance." *CoStar Grp., Inc.*, 2025 WL 2495053, *5.

## CONCLUSION

For the foregoing reasons, Yardi respectfully requests that the Court grant summary judgment as to each cause of action. This case was brought without any evidence that Revenue IQ does what Plaintiffs have attempted to claim. Yardi has now shouldered the burden—through extensive discovery, painstakingly detailed data, and source code analysis—to prove that Plaintiffs' claims were unfounded, ill-conceived and should be dismissed.

RESPECTFULLY SUBMITTED this 24th day of November, 2025.

McNAUL EBEL NAWROT & HELGREN PLLC

By: */s/ Claire Martirosian*
Claire Martirosian, WSBA No. 49528
Richard W. Redmond, WSBA No. 58835
600 University Street, Suite 2700
Seattle, WA 98101
(206) 467-1816
cmartirosian@mcnaul.com
rredmond@mcnaul.com

**DEBEVOISE & PLIMPTON LLP**

By: */s/ Maura K. Monaghan*

Maura K. Monaghan (*pro hac vice*)
Michael Schaper (*pro hac vice*)
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000
mkmonaghan@debevoise.com
mschaper@debevoise.com

Abraham Tabaie (*pro hac vice*)
David Sarratt (*pro hac vice pending*)
650 California Street
San Francisco, CA 94108
(415) 738-5700
atabaie@debevoise.com
dsarratt@debevoise.com

*Attorneys for Defendant YARDI SYSTEMS, INC.*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Yardi Systems, Inc., certifies that this brief contains 11,933 words, in compliance with LCR 7(e)(4) and the Parties' Joint Stipulation.

By: _/s/ Claire Martirosian___

Claire Martirosian