Hon. Robert S. Lasnik

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF WASHINGTON

### AT SEATTLE

| | |
|---|---|
| *In Re* YARDI REVENUE MANAGEMENT ANTITRUST LITIGATION | No. 2:23-cv-01391-RSL |
| WYLIE DUFFY and MICHAEL BRETT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YARDI SYSTEMS, INC., *et al.*,<br><br>Defendants. | **PLAINTIFFS' OPPOSITION TO DEFENDANT YARDI SYSTEMS, INC.'S MOTION FOR SUMMARY JUDGMENT**<br><br>**NOTE ON MOTION CALENDAR: March 23, 2026**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**[FILED UNDER SEAL]**<br><br>(Consolidated with Case Nos.2:24-cv-01948; 2:24-cv-02053) |

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL)
011188-11/3190207 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................................ 1

II.   BACKGROUND .................................................................................................................. 7

    A.    Yardi operates a rent-setting system designed to increase rents. .............................. 7

    B.    Yardi standardizes and automates how landlords price. ........................................... 9

        1.    Data contribution is Yardi's price of admission. .............................................. 9

        2.    RevenueIQ implements uniform rules across clients. .................................... 10

            a.    Yardi automates pricing and limits deviation. ................................... 10

            b.    Yardi applies standardized rules and standardizes inputs. ............... 11

            c.    Yardi standardizes configurations. .................................................... 13

        3.    Benchmarking turns non-public competitor data into pricing
              signals. ........................................................................................................... 15

        4.    Yardi deploys TAMs as an enforcement mechanism. .................................... 17

            a.    Yardi uses CPD data to identify pricing "opportunities." ................. 18

            b.    Yardi translates "variances" into directives. .................................... 18

            c.    Yardi uses CPD data to push strategies based on RealPage
                  performance. ...................................................................................... 21

            d.    Yardi evaluates TAMs based on rent increases and
                  benchmark performance. .................................................................... 21

    C.    RevenueIQ users show pricing patterns consistent with algorithmic
          collusion. .............................................................................................................. 22

    D.    The *RealPage* Judgment Targets Practices Present Here. ....................................... 23

III.  LEGAL STANDARD ....................................................................................................... 25

IV.   ARGUMENT ..................................................................................................................... 25

    A.    Yardi functions as the hub of a horizontal conspiracy. ........................................... 25

        1.    RevenueIQ makes systematic use of pooled non-public
              information. .................................................................................................... 27

            e.    *Mach* does not exonerate Yardi. ....................................................... 30

        2.    RevenueIQ operates as a shared pricing mechanism. .................................... 32

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

B.     The facts support Plaintiffs' information exchange claim. ...................................... 38

1.     A jury could find an unlawful information exchange. ................................. 38

2.     Yardi's "deanonymization" defense targets a strawman. .............................. 40

V.     CONCLUSION ............................................................................................................... 42

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Needle, Inc. v. NFL*,
  560 U.S. 183 (2010) ................................................................................................................. 6

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................................................... 25

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ............................................................................................................... 25

*Gibson v. Cendyn Grp., LLC*,
  148 F.4th 1069 (9th Cir. 2025) ............................................................................................... 30

*In re Pork Antitrust Litig.*,
  781 F. Supp. 3d 758 (D. Minn. 2025) ......................................................................... 38, 39, 41

*Todd v. Exxon Corp.*,
  275 F.3d 191 (2d Cir. 2001) ........................................................................................ 38, 39, 41

## OTHER AUTHORITIES

90 Fed. Reg. 56286 (Dec. 5, 2025), available at
  https://www.federalregister.gov/documents/2025/12/05/2025-21966/united-states-
  of-america-et-al-v-realpage-inc-et-al-proposed-final-judgment-and-competitive-
  impact ...................................................................................................................................... 23

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – iii
011188-11/3190207 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

## I. INTRODUCTION

As the Court recognized, ECF No. 187 at 9-11, the central question is whether Defendants set prices on their own or instead replace independent judgment with a system that supplies a shared pricing formula, constrains deviation, pools and redistributes competitor information, and monitors adherence to produce concerted outcomes. Discovery reveals such a system: competing landlords provide Yardi non-public information and receive standardized pricing direction and discipline in return—mechanisms that reduce uncertainty, constrain independent decision-making, and deliver supracompetitive rents. A jury could find RevenueIQ is not an individualized pricing tool, but a shared pricing system through which competing landlords coordinate pricing.

RevenueIQ has three interlocking components: a pricing algorithm that almost all users deploy using a narrow range of standardized configurations and that auto-applies "recommendations"; benchmarking that converts non-public competitor performance data into signals showing whether a property is pricing below, at, or above peers; and a monitoring-and-enforcement layer, led by co-called "Technical Account Managers" ("TAMs"), who use non-public, cross-client information to review users' pricing relative to competitors, identify underperformance, and push them to raise rents.

RevenueIQ requires that landlords contribute non-public data as a condition of participation. Yardi aggregates that data in its Central Property Database ("CPD"), then deploys it through software, benchmarking, and advisor-led monitoring to identify deviations from peers and apply recurring pressure to raise rents. The record thus contains undisputed evidence Yardi uses non-public data to identify deviations and coordinate rent increases—practices Yardi largely ignores. Rather than expose Plaintiffs' allegations as "false," discovery validates them.

Yardi's use of confidential pricing information is systematic. In 2021, Yardi developed a "penalty" scoring system for RevenueIQ that relies upon non-public CPD data to compare clients' properties to competitor benchmarks, assigns points only when properties are priced lower, and then ranks all RevenueIQ properties, highlighting "worst performers." Yardi distributes these scores monthly—along with benchmark datasets derived from the same non-public data—to executives, who use this information to shape client-specific and cross-client strategy, including whether clients are "pricing new lease rents aggressively enough vs. control properties."

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 1
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Yardi turns that analysis into action through TAMs. In discovery, Yardi produced TAM "performance review" call notes documenting hundreds of instances where Yardi's TAM supervisor flagged properties as priced below competitors and framed those gaps as "opportunities." The pattern is consistent: use non-public data to identify underpricing, then press clients to raise rents and close the gap—an ethos reflected in the supervisor's 2019 "Secret Santa" request (Ex. 98): "rent increases, rent increases, and rent increases."

Yardi pairs this CPD-fueled monitoring/enforcement regime with a pricing engine designed to limit discretion. RevenueIQ prices "every unit every day" using a rules-driven algorithm that operates with substantial standardization across clients. RevenueIQ—unlike RealPage—automatically implements recommended rents unless clients intervene. Yardi touts this as a "competitive differentiator" that minimizes "reactionary" manual changes.

These features mirror the indicia of coordination the Court found probative (ECF No. 187 at 8-12, 15-17; ECF No. 278 at 2 n.2)—and the data confirms them. Plaintiffs submit the report of Professor Ioana Marinescu, former Principal Economist at the DOJ's Antitrust Division[1], who—using Yardi's data—finds RevenueIQ's core rule logic is implemented with striking uniformity and that across

---

[1] Cited herein as "Marinescu" and attached as Ex. 111.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 2
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

leases, Landlord Defendants' final rent is within 1.41% of RevenueIQ's recommended price. Marinescu ¶¶462–65, Fig.75.



Professor Marinescu also finds Yardi's TAM "performance review" notes are overwhelmingly oriented toward closing underpricing gaps—flagging below-benchmark pricing almost six times more often than above-benchmark pricing. Not only that: after the first call, properties flagged in these calls break with their pre-call trend and increase by 13.4% on average. Marinescu ¶¶353–91, Fig.62.



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

In other words, most clients use similar settings and virtually always charge RevenueIQ's "recommended" price. When they fall behind, Yardi intervenes—using non-public information—to push them to raise prices.

Marinescu tests whether RevenueIQ yields the signatures economists associate with coordinated pricing. If RevenueIQ just helps landlords track supply and demand, prices should move up and down with conditions—not ratchet upward as adoption spreads. Marinescu ¶¶15–22, §§3.1.2, 9. But that is not what the data shows. Instead, RevenueIQ users charge on average $40/month more than landlords using no revenue-management system, and as much—or more—than RealPage users. Marinescu §9.2.1. Relative to a market benchmark, Landlord Defendants charge a large and growing premium—roughly 20-30% by 2025. Marinescu §9.2.2. Critically, that premium widens as more leases are priced through RevenueIQ and as more RevenueIQ-using landlords operate in the same area—a pattern Marinescu confirms with a regression comparing Landlord-Defendant pricing in low- versus high-adoption areas. Marinescu §9.2.4.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 4
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Put otherwise—the more landlords use Yardi, the more their rents rise above what an inflation-adjusted yardstick would predict:



Marinescu Fig.88.

When a single system sets pricing direction, pressures compliance, and produces rising premiums as adoption expands, that is coordinated, supracompetitive pricing—not independent decisionmaking.

A jury could thus find the "key" horizontal agreement the Court previously identified: competitors entrust Yardi with competitively-sensitive information to obtain and implement supracompetitive rents through a shared, CPD-powered system of algorithmic recommendations and advisor-led monitoring. That inference is reinforced by the Government's November 24, 2025 proposed Final Judgment in *United States v. RealPage* ("*RealPage* Judgment"), which targets the same playbook and would prohibit at least seven practices mirroring Yardi's.

Yardi's motion and technical reports focus on narrow, isolated questions about how particular components of Yardi's software operate, while sidestepping the integrated ecosystem those features are a part of.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 5
011188-11/3190207 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

First, Yardi tries to reframe this case as a source-code dispute about whether cross-client data is fed directly into a single step of RevenueIQ's "comp" trend. MSJ 25-26. That misstates Plaintiffs' theory and sidesteps the record showing non-public data is used throughout Yardi's ecosystem to set pricing direction, identify deviations, and enforce adherence.

Second, Yardi claims coordination is "technologically impossible" and that outputs reflect clients' "independent choices." MSJ 26-29. But Yardi defaults to auto-acceptance, discourages overrides, channels clients toward uniform "best practices," deploys TAMs trained to treat price decreases as a "last resort," and internally reports that approximately 70% of clients show no "measure of independence." Section 1 does not require identical inputs or perfect adherence; it asks whether conduct joins otherwise separate decisionmakers by supplying shared expectations and constraints competitors predictably follow.[2] A jury could find this system does.

Third, Yardi attacks Plaintiffs' information exchange claim on the premise that an exchange is legally immune unless a client can reverse-engineer a rival's rents from aggregated outputs. MSJ 33-39. But the law does not require that Landlord A can back-engineer Landlord B's rent. Nor is this Plaintiffs' theory. They allege competitors agree to feed Yardi nonpublic performance data; Yardi returns it as benchmarking information; and Yardi operationalizes that data, including by identifying and intervening when clients lag benchmarks. A jury could find this exchange unreasonably restrains trade.

Finally, Yardi invokes *Mach v. Yardi* as an exoneration. It is not. *Mach* was litigated as a source-code case, confined to whether RevenueIQ's code uses competitors' confidential information "in connection with generating" recommendations. ECF No. 475-1 ("*Mach*") 14. Because plaintiffs did not obtain discovery into Yardi's broader ecosystem—its mandatory data-use clause, CPD-based benchmarking, or TAMs—*Mach* proceeded on factual premises that the record here refutes, including that there was "no evidence" Yardi uses non-public customer data to inform other customers' pricing and no "explicit or implicit agreement" for use of that data in setting rivals' prices. *Id.* 6–8. Whatever

---

[2] *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195 (2010); ECF No 149-2 at 2, 5.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 6
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

*Mach* decided on that constrained record, it does not speak to—let alone foreclose—a finding of agreement based on the coordination architecture shown here.

Limited discovery has not absolved Yardi; it has produced triable evidence Defendants agreed to substitute independent pricing judgment with a shared, CPD-powered system that short-circuits competition.

## II.    BACKGROUND

**A.    Yardi operates a rent-setting system designed to increase rents.**

Since 2011, Yardi has licensed "RENTmaximizer," now "RevenueIQ." Ex. 1, -53.[3] Alongside RealPage, Yardi is one of two major providers of revenue-management tools for landlords.

Although Yardi says RevenueIQ is "tailored to achieve [a] client's business goals," MSJ 4, its documents describe a simpler aim: revenue maximization through automation. The service originated after customers asked Yardi's CEO at a "user group meeting" to develop a revenue-management tool and was created to "produce the highest cash flow … while growing the base rates of the units and increasing overall value." Ex. 2, -76–77. One document puts it bluntly: "We should have named this PROFITmaximizer." Ex. 3.

Internal communications emphasize that "clients like to see their rent higher than market" (Ex. 4, -31) and portray automation as essential—one executive wrote, responding to an article criticizing revenue management: "[T]o think that leasing agents and property managers are who should be setting the price for a $50M asset to me is laughable." Ex. 5, -34. Externally, Yardi markets RevenueIQ as an automated alternative to "manual pricing" that "removes the emotional aspect" (Ex. 6, -34) and

---

[3] All exhibits are attached to the Declaration of Steve Berman filed herewith.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 7
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

delivers a "lift of 4-6% in [net rental income]." Ex. 1, -49. Internal analyses show Yardi users raise rents as fast or faster than RealPage virtually everywhere (Ex. 7, p.10[4]; Ex. 8, p.2; Marinescu §9.2.1):

[INTERNAL]
Revenue Management Trailing 12-month Results
(October 2023 through September 2024)

Properties using revenue management, regardless of provider, experience on average ~7% higher revenue per unit

Market Analysis Trailing 12 months Results
(August 2022 through July 2023)

Executives frame the rivalry bluntly: "Most of RealPage is just better advertising for stuff we're also doing." Ex. 10, -32. And after RealPage was sued in 2022, Yardi "review[ed] all marketing" and removed or diluted references to automation, "maximizing" rents, "manag[ing] your pricing," eliminating concessions, benchmarking, and "beating the market"—meanwhile adding emphases on

---

[4] "Competitor 1" and "Competitor 2" are RealPage's "YieldStar" and "LRO" products. Ex. 9, -50.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 8
011188-11/3190207 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

"individual business goals" and "occupancy" and renaming "revenue managers" "Technical Account Managers." Ex. 11, -89–90; Ex. 12, -37–42, -47–48; Ex. 13, -34. Its CEO even instructed Yardi to stop "actively marketing" RevenueIQ. Ex. 14, -52.

But the underlying service did not change. Ex. 15, 171:21–172:12.

**B.    Yardi standardizes and automates how landlords price.**

RevenueIQ has three interlocking components: (1) a pricing engine that applies a common ruleset to generate daily recommendations, automatically accepted unless overridden; (2) benchmarking tools that provide competitor performance measures and flag underperformance; and (3) TAMs, who reinforce the system's outputs by pressing clients to close gaps to benchmarks and discouraging overrides.



Ex. 110, -67. All three are powered in part by non-public client data aggregated in Yardi's CPD.

**1.    Data contribution is Yardi's price of admission.**

To license RevenueIQ, clients must accept Yardi's "data use clause." This authorizes Yardi to "aggregate, compile, use, and disclose" client data—including non-public rent and occupancy data— to "improve, develop or enhance [Yardi's] Services," so long as it cannot be traced to clients, and requires clients provide "current and relevant data." Ex. 16, -172; Ex. 15, 148:22. Similar provisions appear across Yardi contracts. Ex. 17, -78; Ex. 18, -97.

This provision is mandatory. When a client concerned with "data viewing/sharing due to the RealPage lawsuits" asked whether it could "not share their data for others to aggregate and anonymize," Yardi executive Liana Rao responded: "no, this is a standard part of our client contracts."

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 9
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Ex. 19, -90; *see* Ex. 23. Internally, Yardi warned "allowing some or all clients to opt out would effectively curtail our ability to provide both the RENTmaximizer service, and enhanced software and services, to [clients][.]" Ex. 20, -37. Rao also helped "sell[]" the data use clause (Ex. 15, 143:4-152:1) and could not remember telling a client "you don't have to share your data" (*id.*, 153:9–156:17)—nor could Yardi (Ex. 21, p.9).

Clients understood the competitive implications. In 2022, a prospective client objected its concern was not "anonymity" but "using our information/data to empower our competitors," concluding: "We don't want that data dispersed … in any way give [sic] our competitors a greater understanding of the market from us …. We want to be a closed system, no sharing, no playing nice." Ex. 22, -37–39.

This data forms the backbone of Yardi's Central Property Database—"CPD"—which it calls a "key differentiator." Ex. 24, -93–94. CPD consolidates non-public pricing and performance data from Yardi's property-management systems, refreshed daily and normalized by a 20-person team. Ex. 25, -87, -91; Ex. 26, -22. Yardi markets CPD as a "big data set" of "12 [million]+ units" (Ex. 27, -49) that "can show your properties' performance compared to the market." Ex. 28, 18:25; Ex. 29, p.40.

### 2. RevenueIQ implements uniform rules across clients.

#### a. Yardi automates pricing and limits deviation.

RevenueIQ generates recommendations continuously—"every unit every day"—so there is "no delay" when units become available. Ex. 30, -70. Yardi markets "stable, more predictable pricing" that helps rents move steadily upwards. *Id.*, -72. Unlike RealPage, which requires affirmative acceptance, Yardi's auto-applies recommendations—a "selling point" and "competitive differentiator." Ex. 31, 208:11–209:13. Yardi explains: "our system is in place so that you don't have to approve pricing daily." Ex. 108, -26.

Yardi discourages and monitors overrides. It tells users they "don't want [s]ite [m]anager[s] to be overriding … rates" (Ex. 32); imposes a nine-step process to enable override permissions (Ex. 33); and trains clients to use a "lease audit" tool to identify "variances from what RENTmax recommended" (Ex. 34, -31) that flags in red when tenants pay non-recommended rents (Ex. 35. -23).

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 10
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Lease-level data confirms that Yardi is effective at discouraging meaningful deviation from its recommendations. Marinescu finds over 91% of Landlord Defendants' leases are within 5% of Yardi's recommended price, and that—across millions of leases—Defendants' rents are, on average, within 1.41% of RevenueIQ's recommendation. Marinescu §8.2. In sum, RevenueIQ's "recommendations" effectively function as the price.

### b. Yardi applies standardized rules and standardizes inputs.

RevenueIQ applies a common decision framework with two primary steps. It first determines the direction of pricing—whether rents should increase or decrease—using four trends—availability, traffic, new-lease acceptance, and competitor ("comp") rents—then adjusts the magnitude of the change using "health" rules.

**Step 1**: For each trend, RevenueIQ compares a current period to a prior period, assigns a positive/negative/neutral value, then combines values under a uniform ruleset to compute direction. Ex. 36, -61. Although clients can adjust trend weights in 25% increments, Yardi identifies equal weighting as "standard practice" used in "most cases." Ex. 37, -26; Ex. 38, -02.

Competitor inputs are central. Yardi states pricing "depends on our clients' market data" and "understanding your competitive environment is … crucial[.]" Ex. 39, -57. Clients select "3-5 comps per unit type" representing where a lease "might be lost" (Ex. 40, -63–65). The "comp" trend then calculates a rent "ratio": if comps rise faster, the trend pushes RevenueIQ towards an increase to keep pace. Ex. 39, -58; Ex. 38, -02.

Yardi reduces friction in gathering competitor data, offering automated comp collection. Ex. 41, -81; Ex. 42, -99; Ex. 40, -66–71, -82–83. Each day, the system draws competitor rent data from one of two sources. Ex. 40, -82; Ex. 39, -63. The first is Yardi's online apartment-listing platform "RentCafe." RevenueIQ uploads recommended rents to RentCafe nightly, and RentCafe feeds advertised comp rents back for the comp trend (Ex. 43, -16; Ex. 1, -62; Ex. 30, -78)—an integration Yardi calls a "great [competitive] advantage" because it yields "much more current" data. Ex. 42, -99; Marinescu ¶¶185–195.

The second is Yardi Matrix, which provides the "apartment industry's dominant participants" with "near up to the minute market information" (Ex. 44, -72) via extensive telephone surveys through

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 11
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

which Yardi collects current rent (and other information) for properties—with callers sometimes posing as renters (Ex. 45, -308) and sometimes as Yardi employees taught to "overcome objections" (like: "[b]y sharing this information with you, how will this benefit me?") by "offer[ing] competitor reports" (Ex. 46, -70, -73; Ex. 47; Ex. 48; Ex. 44, -72; Ex. 49, -32–33). Yardi maintains profiles for approximately 22 million units (Ex. 44, -72; Ex. 49, -32–33); Matrix covers 90% of U.S. metros (Ex. 39, -53–54; Ex. 49, -32–34).

Yardi calls Matrix-collected rents "public," MSJ 13, but Matrix mirrors RealPage's "Market Analytics" service, alleged by DOJ to gather "nonpublic, competitively sensitive" rent/occupancy data through phone surveys. Ex. 50, pp.11-12. The *RealPage* Judgment underscores the point by defining "public data" to include rents provided only to "any natural person who reasonably presents himself as a prospective renter" and prohibits using "market survey" data to "recommend[]" prices. Ex. 51, p.8; *infra* pp.23-25. Internal documents indicate Yardi's practices conflict with this language. In 2025, a prospective client—a *RealPage* defendant—wrote to Yardi of Matrix: "per our agreement with the DOJ we cannot sign with anyone who phone surveys" and that "[a]ll involved parties have already instructed property managers to stop answering the phone." Matrix's Vice President responded: "Would like to understand who at the DOJ is leading this misguided effort. We are not going to change our processes and procedures as I contend the DOJ is completely off base," adding: "[o]ur callers are no different than mystery shoppers." The client replied: "[T]hey have also banned mystery shops and we will not be doing them." Ex. 52, -40–41.

Yardi also encourages clients to conduct manual competitor "call-arounds" to collect data for the comp trend, explaining that "[i]t's a good idea to have one manual survey in place even if using automated surveys," these surveys can help "maintain relationships with nearby communities," and clients should standardize data collection by "always ask[ing] the same question[:] [w]hat is the rent for immediate move-in[?]" Ex. 40, -74, -85–87. The DOJ's separate settlements with *RealPage* landlords prohibit this "call-around" practice. Ex. 53, p.8. Yardi thus encourages clients to extract non-public pricing data from one another and feed it into RevenueIQ's comp trend. Marinescu ¶¶181–84.

**Step 2**: After direction is set, RevenueIQ applies "health" rules determining how "aggressively" to move rents. Ex. 30, -73. Notably, Yardi's "Predicted 30-Day Availability" rule (or

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 12
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

"P30A") adjusts recommendations based on a 30-day availability forecast trained using non-public CPD data (undecided renewals, predicted notices, and average available days), predictions Yardi claims are "2.5x more accurate." Ex. 54, -38; Ex. 6, -35.

Yardi says P30A is for "manag[ing]" seasonality. MSJ 9. But internal materials describe a different purpose: avoiding discounting and "push[ing] rates in advance to not leave any money on the table." Ex. 6, -35; Ex. 55, -43. Yardi trains employees that clients should not be given "a choice" about using its "MOST POWERFULE RULE!," describing it as a "crystal ball" that depends on "[r]obust CPD data … including data from your clients' market and benchmarks." Ex. 56, -55. Predicted availability values are displayed for all properties in RevenueIQ's interface even when the rule is not activated, including on a dashboard used for client-TAM calls; Yardi urges users to "[w]atch this [value] and use it to help plan for the future." Ex. 57, -919; Ex. 58, p.9; Ex. 59, pp.11-12.

### c. Yardi standardizes configurations.

Professor Marinescu confirms Landlord Defendants overwhelmingly use "standard" Trend-Rule weighting ("25/25/25/25")—89% of Defendants use the exact same trend rule weighting.



Availability: 25; New Leases: 25; Traffic: 25; Comp Trend: 25: 89%

Availability: 50; New Leases: 25; Traffic: 25; Comp Trend: 0: 6%

Availability: 0; New Leases: 50; Traffic: 25; Comp Trend: 25: 4%

Other: 2%

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Marinescu §5.1.2.

Health Rule use likewise clusters: most clients rely on the baseline "Availability" rule: Marinescu §5.1.3.



In sum, there is not substantial variation in Defendants' Trend or Health Rule configurations. Marinescu ¶¶268–70.

Consistent with this, Yardi documents describe "key changes" intended to reduce "numerous settings and configurations" that "led to suboptimal configurations," replacing them with "pre-configured best practices" to "ensure[] optimal performance." Ex. 61; Ex. 62, -95–96. Although Yardi

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 14
011188-11/3190207 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

argues that clients set initial rents (MSJ 4), onboarding instructs TAMs to evaluate whether starting rents are "good" by "review[ing] comps," and "discuss[ing] market rents." Ex. 62, -99. Yardi also tracks client "independence" and treats it as atypical: a 2024 document sets a goal that only 25% of users "make some of their own changes," defined as "any client showing a measure of independence." Ex. 63, -8965, -9017. Tracking data indicates roughly 30% meet that limited standard. Ex. 64 (sheet "historic weeks," column D).

### 3.    Benchmarking turns non-public competitor data into pricing signals.

The second component of RevenueIQ is "benchmarking," which Yardi presents as a core element of the system—describing "rules-driven pricing" and "performance monitoring" as interlocked components of "asset optimization." Ex. 65, -78.

Yardi says benchmarking solves a "pain point"—lack of "visibility into [the] performance of competing properties" (Ex. 72, -84, -92)—and tells users they cannot "truly understand[] performance" by "only comparing yourself to yourself as opposed to your neighbors" or only "looking at asking [public] rents and occupancies for competing data." Ex. 65, -207. Yardi emphasizes benchmarking draws on "actual Voyager data" rather than "reported numbers," "show[s] REAL income and expenses—no one else can do this!" and does "not show[] you asking rents; [it shows] actual achieved rent pulled from Voyager." Ex. 28, 18:25; Ex. 34, -31; Ex. 24, -93–94; Ex. 29, p.40. Consistent with this, Yardi describes benchmarking as a tool clients can use to answer the question "Can I be more aggressive with rent growth?" (Ex. 73, -41) and "identify[] opportunities" to "increase rents" (Ex. 74, p.1). One document explains: "[Clients] think they are doing well because they are getting higher rates. But if they look at AIQ[5] they will see that the neighbors may be doing even better." Ex. 75, -54.

Benchmarking translates aggregated, non-public competitor data from CPD into standardized "key performance indicators" ("KPIs") that show clients—and TAMs—how rents and performance compare to a competitive set. Critically, although clients can add properties to a benchmarking set, the

---

[5] Although some benchmarking-related promotional claims appear in marketing for AssetIQ, a separate product, benchmarking is implemented through "CPD code" "universal to all Yardi products" (Gaeta ¶53 n.45) and the benchmark-reporting "screen" is "the same for both AssetIQ and RevenueIQ clients." Ex. 15, 86:20–87:9. While AssetIQ users can access additional "key performance indicators," RevenueIQ contains the same core KPIs, including in-place rent and occupancy. *Id.*, 93:2–96:13.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 15
011188-11/3190207 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

RevenueIQ comps used for the comp trend are automatically included in every set and cannot be removed—because they are "the properties that they're competing with directly." Ex. 15, 88:24–91:11 Benchmarking appears in both RevenueIQ dashboards and emailed performance reports; KPIs include sensitive pricing information, including in-place and effective rent, concessions, occupancy, renewal rates, rent-change trends, and availability, for both the client and its benchmark set. Ex. 59, pp.16-17 (sample dashboard); Exs. 66–68 (sample reports). Dashboards calculate "variances" and track changes over time using visual indicators to flag where a property is "trailing the benchmark set" (red) or "trending above" (green). Ex. 34, -30; Ex. 59, pp.16-17; Ex. 69, -28.

Yardi also offers CPD-based "amenity pricing," providing recommended percentile ranges to determine whether clients are "over or under charging" for amenities "based on nearby comparable properties." Ex. 70, -31.

Benchmarking is current. In 2021, Yardi implemented nightly updates for certain KPIs (including rent and occupancy) in response to client demand. Ex. 15, 101:4–113:6. RealPage competition was a driver—one email notes a "big reason [Yardi] lose[s] vs. [RealPage]" was RealPage's "touting of daily real-time updates to benchmarking." Ex. 71, -68.

Yardi's expert confirms benchmarking is actively used by most clients—at least 88%. Yenikomshian ¶181.[6] The record indicates it is used to raise rents and eliminate competitive uncertainty. One presentation describes a client who reviewed benchmarking data, "found they were way below market," and "put a plan in place to raise new leases and renewals." Ex. 72, -810. In a Yardi-sponsored presentation, Landlord Defendant Grubb explained benchmarking helped it "understand what the market may bear." Ex. 69, -219. Notably, since this lawsuit, one Defendant

---

[6] This likely underestimates use: Yenikomshian only analyzes a one-year period (8/1/2024–7/25/2025) after this lawsuit during which 5571/6352 clients used benchmarking.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

(Sentinel) appears to have implemented a "policy" of no longer "look[ing] [at] or discuss[ing]" competitor data. Ex. 101.

### 4. Yardi deploys TAMs as an enforcement mechanism.

The third component of RevenueIQ is Yardi's pricing-advisor layer—Technical Account Managers. TAMs "set up and configure all your properties" (including "[s]elect[ing] competitors") and conduct "[w]eekly review calls with all properties" and "3 performance reviews/year" Ex. 77, -26; Ex. 78, p.10. Yardi describes TAMs as part of the RevenueIQ service—"With Yardi you get a product ([RevenueIQ]) and a service (an expert Yardi employee)" (Ex. 60, p.11)—and says TAMs "manage your pricing." Ex. 78, p.10. Yardi employs approximately 30 TAMs. Ex. 31, 42:23–43:22.

TAMs are trained to drive adherence to Yardi's pricing engine and push revenue-maximizing outcomes. They are instructed to "allow the pricing engine to do its job," to discourage "reactionary" "[m]anual pricing changes" (Ex. 63, -027–28; Ex. 79, p.43), and that "lowering price should be last resort" (Ex. 60, p.66; Ex. 79, p.29). Yardi also directs TAMs to ground guidance in competitor comparisons by asking "How do we stack up to our comps? Can we stand to push a bit more based on where they're pricing?" Ex. 79, p.24.

Beginning in 2021, Yardi operationalized CPD-based monitoring through TAMs via "ranking rules" developed by executive Liana Rao, who previously worked on Yardi's CPD. Ex. 15, 14:5-15:8, 249:1–250:1. Under this framework—labeled "WorstPerformanceList" (Ex. 80, -60)—Yardi calculates a monthly, CPD-derived "penalty" score for each property by comparing rental-income growth to three non-public benchmark datasets: the property's own benchmark set; RealPage users; and non-revenue management users.[7] Ex. 15, 221:5–225:18; Ex. 80 (spreadsheet column K). Properties lagging benchmarks receive increasing penalties based on the pricing shortfall's size; properties whose pricing exceeds benchmarks receive no score. Ex. 15, 238:1–242:18; Ex. 81, -06. Yardi distributes rankings monthly to TAMs and management and has done so "each month for the

---

[7] Yardi obtains non-public rent data from certain RealPage and "non-RM" users because they use Yardi's "Voyager" software and share data pursuant to Yardi's data use provision. *Supra* p.9.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 17
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

last several years." Ex. 15, 221:10–247:6; 266:9–268:18; Ex. 82 (sample 2024 report); Ex. 83 (2025 report).

Rao testified these rankings were created to "help" the analysis performed monthly by Anthony Fazio, Yardi's then-TAM supervisor. Ex. 15, 249:1–250:1; Ex. 84 (February 2023, tab "PropertyRank"); Ex. 85 (January 2024 report).[8] Fazio likewise testified that, beginning in 2022, he used a monthly "CPD-based data set" to inform TAM oversight. Ex. 87, 136:8–153:8; Ex. 88, -91.

### a. Yardi uses CPD data to identify pricing "opportunities."

Each month, Yardi analyzes CPD data to identify "opportunities or risks" and "point[] out … where a Yardi user's property was above or below a benchmark" for metrics like occupancy, rent, and rental income—what Fazio called "variances." Ex. 87, 34:17–39:4, 152:4–156:15 Yardi then prepares monthly analyses for leadership identifying system-wide trends and client-specific underperformance, which repeatedly frame below-benchmark pricing as "opportunities" to be "more aggressive." For example, in March 2023, Fazio wrote there was "[an] opportunity to be more aggressive in our ability to keep up with the benchmark asking rent," noting "only 49% of client properties [were] priced at or above benchmark comps" and stating he would "focus on pricing and asking rent performance during my call with the reps and review this with them." Ex. 89, -33. In April 2023, he described clients "losing ground to" and "trailing" benchmarks, and recounted "annoy[ing]" a TAM about a client whose pricing was "so far discounted to their benchmark comps." Ex. 90, -54–56.

Yardi produced many similar analyses. Ex. 91 (listing "in-place rent discounted to benchmark comps" as "[p]otential threat"); Ex. 92 (same, and listing 155 "clients below benchmark" in spreadsheet); Ex. 93 (clients' rent "slightly discounted -.8% to benchmark[s]"); Exs. 94-95 (listing "asking rent may be below benchmarks" as "opportunity").

### b. Yardi translates "variances" into directives.

Until changing roles in 2024, Fazio held monthly one-on-one meetings with each TAM using the "same basic analytical framework[.]" Ex. 87, 12:8–19:15, 90:9–15. Each month, he received a CPD

---

[8] While Rao attempted to distance herself from penalty scores at her deposition, Ex. 15, 227:11–231:16, Yardi still sends them to TAMs monthly, and Rao herself used benchmark comparisons in client analyses. Ex. 86.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 18
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

"data pull" and created TAM-specific "Excel file[s]" with "benchmark detail report[s]" containing CPD-derived comparisons—materials he described as an "integral part" of reviews. *Id.*, 11:8–39:4, 136:8–154:16; Ex. 88, -88. The purpose of these meetings was to look for "opportunities or risks" for TAMs "to discuss with the client," including "variances." Ex. 87, 34:22–39:4, 155:23–165:16. Before calls, Fazio would "identify[] variances to benchmarks" on a "client-by-client and sometimes property-by-property basis[.]" *Id.*, 95:6–96:2. Fazio memorialized these meetings in written notes to TAMs summarizing feedback. *Id.*

The record supports the inference these calls functioned as a mechanism to identify "opportunities" to raise prices. One set reads:



Ex. 97, p.668.

This is not an isolated example. Exhibits 96-97[9] compile approximately 500 notes reflecting a standardized process of translating below-benchmark performance into rent-raising priorities, often using template-like phrasing ("rent discounted to benchmark") and quantifying "variances" ("priced 1.9% below similar rated comps"). E.g., Ex. 97, pp.157, 1024. Fazio's notes repeatedly frame gaps as opportunities to raise rents ("Opportunity to increase asking rent vs comps," "work with client to see if there is opportunity to increase asking rent where discounted to benchmarks.") (Ex. 97, pp.982, 1008, 1069, 1098, 1180, 1283)—consistent with his Christmas request for "rent increases" (Ex. 98).

---

[9] Exhibit 96 is a summary spreadsheet excerpting relevant call note language. Exhibit 97 compiles the notes.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 19
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

These notes contain hundreds of instances noting where properties/clients were priced below competitors. When Marinescu analyzes their content from January 2023 onwards, she finds an almost six-to-one skew: among notes making a price comparison, 85.2% identify below-benchmark pricing while 14.8% identify above-benchmark pricing. *Supra* p.3; Marinescu ¶¶359–63.



Other executives performed similar analyses. In January 2022, Rao compared a client's properties to "control" peers, flagged "upward room" for new-lease pricing because controls were "pricing higher," and suggested an "opportunity to increase growth a few points"—prompting the then-head of RevenueIQ to respond it might be "very helpful" to "somehow automate this." Ex. 86. Rao's penalty score system appears to be an instantiation of that.

TAM-client call notes confirm implementation of benchmark-based pricing guidance. On January 20, 2026, Yardi produced roughly 14,500 such notes—about 200,000 pages.[10] Berman Decl. ¶3. Even a preliminary review shows TAMs used these calls to suggest rent increases, sometimes pasting Fazio's directives verbatim into notes. *Compare* Ex. 99, -76 *with* Ex. 97, pp.156-67. One TAM recorded that, because a client's "rates [were] still lower than our competitors," it "ma[d]e sense that we are increasing rates faster," and identified "more aggressive increases for new lease" as an

---

[10] Before then, Yardi had produced approximately 600 TAM-client notes. Berman Decl. ¶3.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 20
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

improvement area. Ex. 76, -51. Another urged, after noting benchmark gaps: "I'd like to suggest pushing rates when we can." Ex. 100, -87; Marinescu ¶¶364–69.

Marinescu tests whether these calls are descriptive or operational. Matching Yardi's "performance review" notes to lease-level outcomes, she finds that properties identified in a Fazio-TAM note as underpriced experience an immediate, statistically significant upward inflection in rents—approximately 0.94-1.13% per month and 13.4% per year relative to their pre-call trend. Marinescu §6.3. Even a 0.94%-1.13% increase in the monthly rate of rent growth is economically meaningful, translating into roughly $280-$340 more per unit per year on a $2,500 apartment. Marinescu ¶391. That is enforcement: coordinated pressure that turns "variances" into significant rent increases.

### c. Yardi uses CPD data to push strategies based on RealPage performance.

Yardi also prepares quarterly summaries comparing RevenueIQ performance to RealPage (Marinescu §9.2.1) and uses TAMs to respond where Yardi lags. In 2022, for example, Fazio expressed "concern" over a "reversal" in RevenueIQ's leadership position versus "[revenue management] peers" and proposed "compressing the lease terms" from 15 to 12 months to "improve per-unit rent averages"—noting 15-month terms were typically priced lower. Ex. 102, -29, -31. Numerous subsequent notes instruct TAMs to "look for any opportunities to increase renewals as we are lagging other revenue management systems" (E.g., Ex. 97, pp.310, 634, 642, 644, 659, 664, 668, 681, 698, 710, 750, 764, 777, 785) and/or flag properties offering 15/18-month terms (*id.*, pp.371, 386, 461; Ex. 103, -89).

### d. Yardi evaluates TAMs based on rent increases and benchmark performance.

Yardi evaluates TAMs using a scorecard tied to rent-growth and performance versus market/benchmarks. Fazio developed this methodology at leadership's direction and regularly prepared rankings. Ex. 87, 241:23–250:3. Under this framework, "Reference Rent+Amenities" (which awards points based on the "% of [a TAM's] prop[erties] with rent increase[s]") carries a 16% weight, while "Market Comparison" (which awards points based on whether a TAMs' properties were "being priced higher than the market") carries the highest weighting at 34%. *Id.*, 243:19–250:3; Ex. 104 (2020



rankings); Ex. 105 (2022 rankings). This creates economic incentives for TAMs to use non-public CPD data to collectively push landlord clients to increase prices. Marinescu ¶¶370–72.

**C.      RevenueIQ users show pricing patterns consistent with algorithmic collusion.**

Professor Marinescu asks whether RevenueIQ produces the market signatures economists associate with hub-algorithm collusion. If RevenueIQ merely improves unilateral responsiveness to supply and demand, prices should move both up and down with conditions—not ratchet upward as adoption spreads. Marinescu ¶¶15–22, §§3.1.2, 9. Drawing on economic work on algorithmic collusion, she identifies two coordination signatures: "adopters" price above non-adopters; and rents rise as adoption expands. Marinescu §§3.1.2, 9.2. Both are present here.

First, Yardi's CPD-based analyses show RevenueIQ users price above non-users. Yardi defines "success" as beating manual pricing, and its data shows clients do so—and match or beat RealPage—both nationally and across major metros.



Marinescu §9.2.1.



Second, Marinescu benchmarks Defendants' rent growth against rent CPI (a market yardstick) and finds a large, widening premium—roughly 20-30% by 2025. Marinescu ¶¶500–11. The premium also exhibits a dose-response relationship: it increases about 1% for each additional 10,000 Landlord-Defendant leases priced through RevenueIQ. Marinescu ¶¶512–16. The same pattern appears locally: rent increases average about $57.3 where only one Defendant is present, but $93.6 where five or more are—with monthly rents increasing by a statistically significant $4.3-$15 for every additional co-conspirator. Marinescu §9.2.4. A premium that grows with adoption and local concentration is difficult to square with independent pricing. Marinescu ¶549.

Notably, Marinescu also finds parallelism consistent with coordination: Defendants' month-to-month rent changes move in near-lockstep. Marinescu §5.3. Together with the findings above, that synchronization is hard to reconcile with independent, property-specific pricing decisions made on different schedules. Marinescu ¶341.

Based on these signatures, Marinescu concludes RevenueIQ has the hallmarks of algorithmic collusion: it centralizes competitively-sensitive information, converts it into shared pricing signals, and—through default automation, benchmarking, and TAM interventions—limits deviation and sustains coordinated, supracompetitive rent increases over time. Marinescu ¶¶485–90.

**D.      The *RealPage* Judgment Targets Practices Present Here.**

In November 2025, the United States and RealPage filed a proposed Final Judgment (Ex. 51) ("*RealPage* Judgment") intended to "stop the exchange of competitively-sensitive data among competing landlords through RealPage and to deter exchanges of such data by other means[.]"[11] The Judgment does not merely prohibit feeding rivals' non-public data into an algorithm. It bars (i) making "Unaffiliated Property Data"—rivals' non-public data (§II.PP)—accessible to competing users "regardless of form, aggregation, anonymization, or age," (ii) recommending rents or rent ranges using such data, (iii) using pricing advisors to disseminate non-public data or market analyses derived from

---

[11] 90 Fed. Reg. 56286 (Dec. 5, 2025), https://www.federalregister.gov/documents/2025/12/05/2025-21966/united-states-of-america-et-al-v-realpage-inc-et-al-proposed-final-judgment-and-competitive-impact.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 23
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

it across clients, and (iv) incentivizing employees/agents to obtain acceptance of recommended prices. *Id.* §§ IV-VI.

Yardi's practices mirror the very conduct the Judgment forbids:

1. **Advisor-driven steering.** Yardi uses non-public data to identify and rank underperformance relative to competitors and then uses TAMs to press rent increases where clients lag. *Supra* pp.17-21. The *RealPage* Judgment bars "pricing advisors" from "disseminat[ing] Unaffiliated Property Data … (i) in Revenue Management Product(s) or (ii) otherwise for purposes of recommending" pricing. §§II.K, VI.A.

2. **Cross-client strategy propagation.** Yardi uses non-public data to identify system-wide trends and transmits those insights through TAMs to multiple clients. *Supra* pp.17-21. The Judgment prohibits using non-public data to "discuss or facilitate discussions about market analysis or trends based on Nonpublic Data … or pricing strategies" and then disseminate them through "pricing advisor" communications. §VI.B.

3. **Penalty scoring/ranking**. Yardi computes CPD-derived "penalty" scores and ranks properties based on lagging performance, then distributes them to TAMs/leadership. *Supra* pp.17-18. The Judgment prohibits using Unaffiliated Property Data "to calculate a Market Rent or Market Rank[.]" §IV.A.4.

4. **Benchmarking**. Benchmarking converts rivals' non-public data into KPIs and pricing signals visible to clients. *Supra* pp.15-17. The Judgment prohibits "shar[ing], publish[ing], disclos[ing], or otherwise provid[ing or mak[ing] accessible … to any licensee … any Unaffiliated Property Data … regardless of form, aggregation, anonymization, or age of the Unaffiliated Property Data[.]" §IV.B.

5. **Market-survey inputs.** Through Matrix call-arounds, Yardi collects rent information and feeds it into the comp trend. *Supra* pp.11-12. The Judgment prohibits the use of "prices collected through Market Surveys" in revenue-management products or "otherwise for purposes of recommending" property pricing. §IV.E.[12] Yardi also encourages clients to

---

[12] Matrix information is not "public data" within the Judgment's meaning. *Supra* p.11.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 24
011188-11/3190207 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

perform manual competitor surveys and input this information into RevenueIQ's comp trend—a practice prohibited both by the Judgment and by separate agreements between the Government and *RealPage* landlords. Ex. 53, pp.9-10; Ex. 52; *supra* p.12.

6. **Incentives to secure acceptance.** Yardi's TAM scorecard rewards rent increases and pricing "higher than the market," while TAM trainings discourage overrides and treat price decreases as a "last resort." *Supra* pp.17, 21-22. The Judgment prohibits "incentiviz[ing] any … employee or agent to solicit, request, or get a licensee or user to accept any recommended rental prices or range of prices." §V.C.

7. **Model training on non-public data.** Yardi's P30A rule is trained on CPD data, designed to "push" rates, and retrained "monthly" on data less than 12 months old.[13] *Supra* pp.12-13. The Judgment permits model training only on backward-looking "Unaffiliated Property Data" at least 12 months old (and not from "active" leases) and otherwise bars training on current or forward-looking rival data. §V.A.3.

## III.    LEGAL STANDARD

Summary judgment is proper if there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[14] The evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor.[15]

Plaintiffs do not pursue Count II (vertical restraints) at summary judgment and proceed solely on Counts I (horizontal agreement) and III (information exchange).

## IV.    ARGUMENT

**A.    Yardi functions as the hub of a horizontal conspiracy.**

Discovery establishes four facts. First, Yardi conditions participation on mandatory data sharing. Second, Yardi consolidates that data and, together with Matrix data, deploys it across RevenueIQ's algorithm, benchmarking, and TAMs to shape pricing. Third, RevenueIQ operates

---

[13] Gaeta Decl. (ECF No. 476) ¶25; Yenikomshian Decl. (ECF No. 479) ¶¶D.145–55.

[14] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

[15] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 25
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

through standardized pricing rules and configurations—reinforced by benchmarking and TAM pressure—that move rivals' rents together. Fourth, the system performs as intended: internal analyses—and Marinescu's testing—show tight, adoption-linked parallel rent increases that outpace CPI, intensify as more rivals in the same area adopt RevenueIQ, and rise after TAM interventions.

That is the agreement the Court previously identified. The Court emphasized that "the key to plaintiffs' antitrust claims is the horizontal agreements … to entrust Yardi with their sensitive commercial information" to "obtain and implement" supracompetitive rates. ECF No. 187 at 12. That agreement is not an agreement on a particular price, but an agreement to delegate pricing discretion to a shared system that predictably aligns rivals' pricing decisions. The record supports that inference: competitors provide non-public information to Yardi and receive standardized pricing direction and performance signals in return. Far from exposing Plaintiffs' allegations as "patently false" (MSJ 25), discovery reveals an integrated ecosystem in which pooled, non-public information is collected, operationalized, and returned to clients to reduce uncertainty and constrain independent pricing— through interlocking practices revealed in discovery.

A jury could find Yardi is the hub of a horizontal agreement implemented through modern tools. Competitors cede pricing discretion to a shared, data-driven system by contributing nonpublic data and relying on Yardi's outputs, benchmarking, and TAM guidance—knowing rivals do the same. And a jury could find Yardi's automation, benchmarking, and advisor-driven, CPD-fueled pressure— marketed enthusiastically until this suit, *supra* pp.8-9—provide monitoring and discipline that makes the arrangement durable.

The *RealPage* Judgment underscores why these mechanisms matter: it reflects the Government's view that an intermediary can facilitate coordination by pooling sensitive information, converting it into actionable pricing signals, and enforcing adherence through design, benchmarking, and advisors. Nor is the overlap incidental: "Most of RealPage is just better advertising for stuff [Yardi's] also doing." Ex. 10, -32.

Rather than confront this record, Yardi walls off its algorithm from the rest of its system. It recasts Plaintiffs' hub-and-spoke claim as turning solely on whether (1) cross-client data is a direct input to the "comp" trend at step one of RevenueIQ's pricing calculation; and (2) every client follows

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 26
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

a single, identical pricing equation. That framing purposefully and myopically misstates Plaintiffs' theory and evades the evidence.

**1.      RevenueIQ makes systematic use of pooled non-public information.**

Yardi argues Plaintiffs' allegations are "false" because RevenueIQ's "comp" trend does not use non-public cross-client client data as an input. MSJ 25–26. But discovery shows RevenueIQ relies on nonpublic information across training, forecasting, benchmarking, monitoring, and enforcement— and uses it to affect pricing outcomes, reduce uncertainty, and restrain competition.

Start with CPD. Landlords provide non-public data under Yardi's non-negotiable "data use" provision, understanding Yardi will use that data to "develop or enhance" its services. Yardi recognizes that allowing clients to "opt out" "would effectively curtail [its] ability to provide … the RENTmaximizer service[.]" *Supra* pp.9-10.

Next, Yardi uses CPD data to train the P30A rule. P30A's output is displayed to all users even when the rule is not enabled, and Yardi calls it its "most powerful"—a "crystal ball" that "depends on" "robust CPD data … including data from your clients' market and benchmarks," enabling clients to "push rates in advance." *Supra* pp.12-13. The *RealPage* Judgment prohibits this use of pooled competitor information. *Supra* p.25.

Meanwhile, Matrix harvests near-real-time rival pricing and feeds it into the comp trend. Yardi labels this information "public," but the *RealPage* Judgment reflects the Government's view that comparable survey and "call-around" data can be competitively sensitive and coordination-facilitating. Yardi separately encourages clients to conduct their own "call-arounds" of direct rivals and feed the results into RevenueIQ's comp trend—conduct prohibited in DOJ-landlord judgments. *Supra* pp.11-12, 24-25.

Next, Yardi pairs pricing recommendations with benchmarking that functions—by design—as a pricing signal: it translates CPD data into KPI and "variance" "indicators" that flag when a property is "trailing" benchmarks and recommends amenity pricing. Yardi touts benchmarking as powerful precisely because it is based on non-public data, and as tool for answering questions like "Can I be more aggressive with rent growth?" *Supra* pp.15-17. And it trains clients—and TAMs—to use benchmarking to adjust rents relative to competitors. *Supra* pp.15-21. The *RealPage* Judgment's

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

prohibition on making "Unaffiliated Property Data" accessible "regardless of form, aggregation, anonymization, or age" (*supra* p.11) drives home why this matters: aggregated metrics can facilitate coordination when used as performance signals.

Next, Yardi uses CPD data to identify and correct deviations. Each month, it assigns CPD-derived "penalty" scores ranking clients by how far their rents lag benchmarks and distributes rankings to TAMs/leadership—an organized mechanism for identifying laggards and quantifying deviation from peers, and the sort of "market rank" use the *RealPage* Judgment restricts. *Supra* pp.17-21, 24.

Yardi then uses its TAMs as a monitoring-and-correction layer. It trains TAMs to discourage overrides and treat price decreases as a "last resort," and uses monthly CPD-driven performance reviews to translate benchmark "variances" into client- and property-specific directives—repeatedly pressing clients to close gaps where properties are "discounted" to benchmarks. *Supra* pp.17-21. Yardi also uses CPD data to develop and propagate cross-client strategy, including strategy keyed to performance versus RealPage—and uses TAMs to implement it. *Supra* pp.18-21.

The resulting Fazio-TAM call notes reflect a standardized "close-the-gap" process executed at scale: hundreds of instances flagging clients/properties as priced below benchmarks/comps. *Supra* pp.19-21. Marinescu finds these notes flag underpricing almost six times more often than overpricing and are associated with statistically significant price increases. *Supra* pp.20-21. She further finds that, around 2021-2022—when Yardi implemented penalty scoring and CPD-based TAM reviews—Landlord Defendants' rents began outpacing the market even faster, with the Yardi "index premium" nearly doubling between 2021-2025:

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 28
011188-11/3190207 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX



Figure: A line chart showing "Yardi Index Premium (Yardi Index - Rent CPI)" from 2011 to 2026, with a vertical dashed line near 2021.

Marinescu §9.3.

This advisor layer pressures clients to converge on peer outcomes—effectively replicating an algorithm that uses non-public, cross-client data to steer rents. The *RealPage* Judgment targets this channel by restricting pricing-advisors from disseminating nonpublic competitor data—or analyses derived from it—reflecting DOJ's view that advisor-mediated enforcement facilitates coordination. *Supra* p.24.

Finally, Yardi ties TAM evaluations to rent-growth and market-performance, incentivizing the same employees tasked with "managing" client pricing to push higher rents and tighter adherence. *Supra* p.21. The *RealPage* Judgment targets the same dynamic by restricting incentives designed to secure acceptance of recommended rents. *Supra* p.24.

*** 

The record supports a finding that: participation requires confidential data; Yardi converts that data into forecasts, benchmarks, rankings, and pricing guidance; and Yardi supplies monitoring/discipline through an advisor layer that uses non-public data to identify deviations, press clients to close gaps, and propagate cross-client strategy.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 29
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

This is not parallel conduct or routine support. Competing landlords knowingly feed sensitive information into a shared platform, receive standardized pricing signals back, and adhere to Yardi's outputs because the platform supplies monitoring/discipline—making coordinated outcomes feasible without landlord-to-landlord communications. These facts also distinguish *Gibson*, which addressed only a vertical agreement theory (akin to Count II) and did not evaluate a hub-and-spoke theory grounded in the reciprocal exchange of competitors' nonpublic data through an intermediary—noting its analysis "might change" had plaintiffs alleged an exchange of sensitive information.[16]

This is the architecture the Court held could support concerted action. It is the architecture the Government targets in *RealPage*. And it is the evidence Yardi avoids. A jury could conclude the "agreement" here was competitors' decision to substitute independent judgment with a shared, data-driven mechanism that predictably aligns pricing outcomes.

### e.   *Mach* does not exonerate Yardi.

Yardi leans heavily on *Mach*, casting it as a factual exoneration. It was not. *Mach* was decided on a limited, algorithm-centered record and addressed a narrow question: whether RevenueIQ's "source code … use[s] competitively sensitive (or otherwise confidential) information … in connection with generating rental price recommendations by other property owners[.]" *Mach* 14. The court found no triable dispute on that point and—because plaintiffs offered no evidence of any other restraint—concluded they had not identified a viable price-fixing theory. *Id.*

But *Mach* was litigated as a source-code case. The court did not have—and was not asked to evaluate—the evidence here showing how Yardi's broader ecosystem functions as a coordination mechanism beyond (and including) the algorithm: Yardi's non-negotiable data-use provision; CPD-based benchmarking; TAM implementation, incentives, and recurring calls; or CPD-driven monitoring and discipline tools. The *Mach* record was correspondingly thin: Yardi produced approximately 39,000 documents—27,000 of them "junk" files—compared to the more than 319,000 produced here in response to RFPs seeking, among other things, information about Yardi's benchmarking, communications with landlords, and recommendation acceptance rate. Berman Decl. ¶4.

---

[16] *Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1083 n.8 (9th Cir. 2025).

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 30
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

That difference matters because the dispositive question here is not whether rivals' rent appears as a data input in one step of one trend. It is whether competing landlords collectively surrendered pricing discretion to a shared system powered in part by pooled non-public information and reinforced by monitoring/discipline. Plaintiffs have extensive evidence *Mach* did not address: mandatory contribution of nonpublic data; CPD outputs operationalized as benchmarking and "variance" signals; a monthly penalty-and-ranking regime; and advisor-led enforcement that presses rent increases while discouraging overrides and treating price decreases as a "last resort"—backed by expert analysis and lease-level data showing that this "close-the-gap" machinery is not aspirational, but operative: it produces near-lockstep adherence to recommended pricing and statistically significant post-intervention rent increases consistent with coordinated, supracompetitive pricing.[17] Marinescu §§6.3, 8.2.

This omission was also outcome-determinative. With no discovery into CPD-based benchmarking, penalty/ranking tools, or TAM-led enforcement, *Mach* proceeded on factual premises that the record here refutes—stating, for example, that there was "no evidence" Yardi uses non-public customer data "to inform pricing decisions for other customers," "no evidence" of horizontal information sharing, and no evidence that landlords provide pricing information to Yardi under any "explicit or implicit agreement" for use in setting other landlords' prices. *Mach* 6–8. Those statements may have followed from *Mach*'s constrained record; they cannot be reconciled with this one.

*Mach* cannot carry the weight Yardi assigns it. Summary judgment should be decided on the record here, under the framework the Court has already adopted.

---

[17] *Mach* also mentioned P30A only in passing—as a seasonal tool—and did not address the record here concerning its purpose, prevalence, or the Government's prohibition on such rules. *Mach* 7. *Mach* likewise acknowledged that Matrix call-around data can be "commercially sensitive," but reasoned that because Yardi sometimes collects it "surreptitiously," no agreement to provide it could be inferred (*id.* 6–7). That reasoning does not engage the separate agreement evidence here: landlords' collective participation in—and reliance on—Yardi's shared pricing-and-monitoring ecosystem, including its marketing of Matrix as an automated substitute for landlord call-arounds (Marinescu ¶174) and Yardi's encouragement of competitor surveying for RevenueIQ inputs—conduct the *RealPage* Judgment treats as coordination-facilitating.



### 2.     RevenueIQ operates as a shared pricing mechanism.

The Court has already rejected the premise that Plaintiffs must show explicit landlord-to-landlord communications, a promise to always accept recommendations, or perfect adherence. ECF No. 187 at 10, 17. Consistent with the Government's statement of interest (ECF No. 149), the Court held a jury may infer concerted action where landlords knowingly provide sensitive data to a vendor they understand is automating pricing, intend to use—and largely do use—the resulting outputs, and engage in conduct that facilitates implementation, even if some downstream decisions vary. ECF No. 187 at 10.[18] The question is functional: whether RevenueIQ supplies shared expectations and constraints competing landlords predictably follow, reducing independent price-setting.

Yardi responds that concerted action is "technologically impossible" because clients can set reference rents, select comps, adjust settings, and reject recommendations. MSJ 26–29. But the existence of knobs is not the point. The question is whether, in practice, RevenueIQ operates as a standardized pricing-and-discipline regime that aligns rivals' pricing decisions. Yardi's new "bespoke" narrative also conflicts with its pre-litigation internal documents and marketing—but tracks its post-litigation marketing redlines almost verbatim. *Supra* pp.8-9.

The record supports multiple reasons a jury could find RevenueIQ functions as a shared pricing mechanism.

**Common rule logic.** RevenueIQ applies the same "trend" framework and decision logic every day to generate recommended rents. Clients can adjust weights only in coarse (25%) increments; Yardi identifies equal weighting as "standard practice" used in "most cases." *Supra* p.11. Yardi likewise describes "a standard configuration" for "health" rules that "incorporates AI-driven predicted availability and expiration management." Ex. 30, -73. Consistent with this, Marinescu finds that Landlord Defendants use the default (25/25/25/25) weighting the overwhelming majority—89%—of the time, that 93.6% use the Comp Trend rule, and that there is not substantial variation in Defendants' configuration of Health Rules. Marinescu §5.1.2–3.

---

[18] The Court's phased discovery order also reflects this. ECF No. 278 at 2 n.2.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 32
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**Standardized use.** Yardi documents describe efforts to reduce "numerous settings and configurations" that "led to suboptimal configurations," replacing them with "pre-configured best practices" intended to "ensure[] optimal performance"—consistent with Marinescu's findings. *Supra* pp.13-15. Yardi also tracks "independence" and treats it as atypical: a 2024 document targets only 25% of clients "mak[ing] some of their own changes," defined as "any client showing a measure of independence." *Supra* p.15. Yardi cannot steer clients towards standardized "best practices," document that most clients show no "independence," and then rely on theoretical adjustability as proof of individualized pricing.

Yardi emphasizes clients individually set initial "reference rents." MSJ 27. But that is simply the starting line. What matters is what follows: a daily, automated pricing regime that applies common logic across properties and channels pricing decisions in the same direction over time—functionally coordinating how participating landlords adjust prices regardless of baseline. And Yardi trains TAMs to test and realign that baseline against competitive benchmarks by comparing "average in place [rents]" to "reference rent," "review[ing] comps," and "discuss[ing] market rents." *Supra* pp.14-15. That is not deference to bespoke client judgment; it is a built-in mechanism for harmonizing baselines to competitive benchmarks.

Indeed, when Yardi attempted to shift responsibility in a 2023 client-wide email—writing, "Asking rents used in RevenueIQ are from comparable properties chosen by you"—one client responded indignantly: "YARDI is attempting [sic] shifting potential liabilities to [us]. We followed specific instructions from YARDI representatives to set up [our property]. We were specifically asked to identify and provide competitors in [that property's] market. In fact, our YARDI representatives helped to provide competitors." Ex. 106, -11.[19]

Yardi also claims clients use "literally millions" of configurations. MSJ 27. That sounds dramatic, but it rests on a basic mischaracterization of how RevenueIQ works.

---

[19] This evidence contradicts *Mach*'s finding that RevenueIQ "does not select or recommend comparative properties" (*Mach* 7)—another respect in which *Mach* rests on a record that did not capture how RevenueIQ actually operates.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 33
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

RevenueIQ is a trends-and-rules system. Prices are generated by applying a small set of Trend and Health rules to market data. Those rules do the real work. And Yardi's own data shows roughly 83.3% of landlords rely on just one of three Trend/Health combinations. Marinescu ¶269. Whatever variation exists downstream begins only after those core rules generate an initial recommendation.

Against that backdrop, Yardi's "millions of configurations" claim collapses. Yardi's expert, Mr. Yenikomshian, does not identify millions of distinct pricing formulas; he counts entries in RevenueIQ's internal "audit log"—a system-generated change log that records an entry whenever a setting is enabled, modified, or deleted, not that a client made a pricing decision or altered the core rulebook—and labels each one a "change." Yenikomshian (ECF No. 474) ¶¶97–98. Treating that tally as evidence of bespoke pricing is misleading in at least two ways.

First, Yenikomshian concedes in a footnote that many "changes" simply reflect initial property onboarding—i.e., creating a new property in the system and populating its starting settings—rather than later, client-driven reconfiguration. Marinescu ¶¶274–79. When Marinescu limits the data to revisions of existing settings—"changes" in the ordinary sense—the count drops by more than 64%. Marinescu ¶¶274–82. This indicates that, once clients adopt RevenueIQ, most configuration settings remain stable. By presenting this inflated count as evidence of continual customization, Yardi invites a false inference of bespoke pricing. Marinescu ¶280.

Second, and more fundamentally, the count is mostly noise. Many "changes" concern peripheral inputs—lease terms, expiration months, unit attributes—not changes to the core Trend/Health rulebook that governs how RevenueIQ responds to market and competitor signals. Marinescu ¶¶283–96. Yenikomshian admits that over 95% of the settings he examines are "optional" first- or second-layer toggles and inputs, not changes to core rule logic. Marinescu ¶¶274, 281–82. And his own tabulation makes the point starker: active reconfiguration of the core Trend/Health Rules—the pricing engine itself—accounts for less than 5% of the 1.58 million "reconfigurations" he reports. Marinescu ¶¶281–82. In other words, Yardi's "millions" figure mostly measures housekeeping, not meaningful variation in the pricing rulebook. What matters is the content and variation of core configurations over time—configurations that, as Marinescu finds, generally remain the same across clients.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 34
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Adjusting peripheral inputs is no different from choosing lease lengths or seasonal preferences in any pricing system; it does not alter the rulebook that drives pricing decisions. Marinescu ¶¶283–96. For example, more than 250,000 of Yenikomshian's log entries simply pertain to changing lease-expiration month, and over 100,000 concern lease-length changes—administrative choices about timing and seasonality, not how prices are set. Marinescu ¶¶295–96. Indeed, several obvious (and non-exhaustive) categories in Yenikomshian's own list—minimum-price floors, target expiration months, lease-term offerings, date values, treatment of vacant/stale units, value estimates—account for nearly half his "updates." Marinescu ¶¶286–96. Nor does Yenikomshian address how many purported "client" changes were made—or induced—by TAMs, despite Yardi's finding that 70% of clients do not make their own changes and show no "independence."

In short, Yardi rebrands housekeeping as "customization," treating tweaks to peripheral inputs—and even non-pricing metadata—as if they were changes to RevenueIQ's pricing formula. But what matters in RevenueIQ is stable and broadly homogenous across Defendants: despite variation at the margins, clients apply the same core Trend-and-Health rulebook, including the same rival-referencing logic. Marinescu ¶¶298–302. Even if landlords can adjust peripheral settings, the dispositive question is who sets the rent; Professor Marinescu's lease-level analysis shows RevenueIQ's "recommended" price functions as the default price landlords follow, not a suggestion they routinely reconsider.

**Recommendations as default.** Even by Yardi's account, recommendations are rejected only 27.8% of the time, and the average deviation (-4.2%) is modest—consistent with a default regime that anchors rents near recommendations. MSJ 16, 28. The lease-level evidence is stronger still. Defendants' rents track RevenueIQ's recommendations with remarkable precision: on average, they are within 1.4% of RevenueIQ's recommended price, and 91.3% of active leases are priced within 5% of recommendations. Marinescu ¶¶462–67 & Fig.77. Even among overridden leases, prices deviate from recommendations by only 6.95% on average. Marinescu ¶¶463–65.

RevenueIQ thus does not just influence pricing decisions—it effectively sets the price around which landlords cluster rents. A reasonable jury could find that an average deviation of just 1.4% is not consistent with independent decision-making. *See* ECF No. 187 at 17-18.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 35
011188-11/3190207 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Further, RevenueIQ is designed to promote compliance, not discretion. Yardi auto-applies recommendations by default (a "competitive differentiator"); warns revenue-management "will only be of value" if recommendations are followed; and discourages overrides, imposing a multi-step override process, training clients to audit "variances" from recommended rents, and warning overrides "could result in loss to rental growth." *Supra* pp.10-11; Ex. 34, -31. At least one Defendant (Habitat) operationalizes that discipline: "Mgrs can raise rents but any decrease or other changes must be approved by a Regional." Ex. 107, -43.

**TAM enforcement/standardization.** The record shows that Yardi describes TAMs as "manag[ing] [clients'] pricing," arms them with CPD benchmarking data/penalty scores, and trains them to build "trust" in Yardi's system, discourage "reactionary" manual changes, and treat price decreases as a "last resort." *Supra* pp.17-18; Ex. 63, -028. TAMs also propagate best practices, press clients to close benchmark "variances" (and RealPage gaps), implement cross-client strategy, and are evaluated on rent-growth and pricing "higher than market." *Supra* pp.17-21. And Marinescu finds properties flagged in TAM "performance" call notes show a statistically significant upward inflection in rents after the first call. *Supra* pp.20-21.

Yardi's claim RevenueIQ has no enforcement mechanism (MSJ 28–29) cannot be squared with this evidence.

**Common outcomes.** The empirical record corroborates Plaintiffs' claims. Yardi's own analyses find RevenueIQ users price higher than non-users, even relative to RealPage—charging approximately $40/month more than non-revenue management users while also offering lower concessions. Marinescu §§8.2.2, 9.2.1. Further, Marinescu finds a large, widening Yardi-versus-market "premium"—roughly 20-30% by 2025—and a dose-response relationship: each additional 10,000 active leases priced by RevenueIQ is associated with roughly 1% more premium, an effect that strengthens where more landlords in the same area use RevenueIQ. *Supra* pp.4-5, 22-23.

That is what one would expect from a system designed to coordinate pricing through a shared platform—with its influence increasing as more participants use it. Marinescu also links these supracompetitive outcomes to RevenueIQ's operation: Defendants use largely uniform settings; effective rents track recommendations in near-lockstep; Defendants' rents move in tight parallel; and

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 36
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

TAM interventions accelerate rents when properties lag. *Id*. Under established economic principles, these are the signatures of hub-algorithm coordination: adopters price above non-adopters, rents rise further as adoption expands, and prices move in unusually synchronized parallel rather than idiosyncratically. *Supra* pp.22-23.

Yardi offers no empirical showing that its purported configurability yields independent pricing in practice. The evidence demonstrates the opposite.

\*\*\*

Yardi's argument rests on a false premise: Plaintiffs must prove identical inputs, universal acceptance, and zero discretion. That is not how revenue management systems operate, nor the Court's framework—"discretion" does not "doom[] a price-fixing claim."[20]

The question is functional: whether conduct "joins together otherwise-separate decisionmaking and thus deprives the market of independent centers of decisionmaking"[21]—not whether clients retain discretion at the margins. ECF No. 187 at 10, 17. Under the Court's practical framework—and settled Section 1 principles—a jury need not find perfect uniformity or mechanical adherence to conclude separate decisionmakers have been joined together and the market's decentralized price-setting mechanism disrupted: the Supreme Court has repeatedly held competitors violate Section 1 when they collectively fix a "starting point" for prices or delegate core pricing judgments to a common agent, even if some downstream decisions vary or enforcement logic is imperfect.[22] An unlawful agreement can exist where the challenged mechanism "exert[s] an influence" on the "starting point" for prices, even if some downstream decisions vary across firms or over time, because this "disrupts the [market's] decentralized price-setting mechanism[.]"[23]

That is what the evidence shows. Yardi links separate decisionmakers and displaces ordinary market price-setting. It does so by shaping and constraining clients' pricing baseline through a common

---

[20] ECF No. 149 at 1.

[21] ECF No 149-2 at 2, 5 (quoting *Am. Needle*, 560 U.S. at 195).

[22] ECF No. 149-2 at 5–6; ECF No. 149.

[23] ECF No 149 at 5–6; ECF No. 149-2 at 20 (quoting *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 776 (2d Cir. 2016) and collecting cases).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

engine (shared rule logic), common baselines (standardized configurations and "best practices" used by most), common discipline (automation, friction, override suppression), and common monitoring/reinforcement (TAM pressure). This results in coordinated pricing outcomes Plaintiffs' expert finds are consistent with algorithmic collusion.

A reasonable jury could find these features supply exactly the type of concerted structure the per se rule condemns.

**B.      The facts support Plaintiffs' information exchange claim.**

Count III alleges Defendants exchange competitively sensitive information through Yardi. Plaintiffs must show (a) an agreement to exchange information that (b) tends to harm competition. Plaintiffs need not prove a downstream price-fixing pact; the "concerted action" is the exchange architecture itself, and the question is whether the architecture reduces uncertainty and softens rivalry.[24]

**1.      A jury could find an unlawful information exchange.**

A jury could find the requisite agreement. Participation in RevenueIQ is conditioned on contributing non-public data under Yardi's non-negotiable data-use provision; Yardi aggregates and returns that information through the mechanisms above. This "give-to-get" structure—mandatory contribution paired with reciprocal redistribution inside a shared system—supports a reasonable inference of an agreement among competitors to exchange competitively sensitive information through Yardi.[25]

A jury could also find an anticompetitive tendency. "[C]ourts do not apply bright-line rules" in evaluating whether information exchanges harm competition; they assess them by looking "to the full circumstances to gauge anticompetitive potential,"[26] including the sensitivity, granularity, public

---

[24] *In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 867 (D. Minn. 2025) ("A standalone information exchange itself can constitute a § 1 violation, even without proof of an agreement to fix prices, if it tends to lead to anticompetitive effects."); *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001); Ex. 109, 4–10 (*In re Pork*, Statement of Interest of the United States).

[25] *Todd*, 275 F.3d at 198 (explaining "violation lies in the information exchange itself").

[26] Ex. 109, 3.



availability, and contemporariness of the information exchanged.[27] These factors cut strongly against Yardi.

The information is competitively sensitive. Courts are "especially suspicious when competitors exchange recent, current, or future price or output" because it "can 'stabilize prices' by encouraging or enabling competitors to match prices or to use each other as a benchmark in pricing."[28] Such exchanges "suggest[] that the information sharing will benefit only the competitors at the expense of consumers[.]"[29] The information exchanged here is competitively sensitive data about pricing and supply.

The information is current. Yardi updates certain benchmarking KPIs, including in-place rent and occupancy, daily; updates others at least twice monthly[30]; and runs CPD analyses and TAM reviews monthly. *Supra* pp.16-18. Courts have found harm where exchanges occur monthly or even "several times per year."[31]

The information is granular and localized. Yardi returns competitive-set summaries built from user-chosen comparable properties that automatically include RevenueIQ comps. *Supra* pp.15-16. These thus report performance against clients' closest competitors—the very context in which benchmarking becomes decision-relevant, allowing clients (and Yardi's TAMs) to "compare" their rents with "those of … particular competitors" and "consider what adjustments should be made[.]"[32]

Finally, the information is actionable. Courts ask whether the evidence "support[s] a reasonable finding that [the information exchanged] contain[s] competitor pricing and output data that participants could use to target higher prices and infer competitors' production in restraint of trade."[33] Yardi converts pooled competitor performance into focal-point signals—variance flags, "trailing/above"

---

[27] *Pork*, 781 F. Supp. 3d at 869 (collecting cases); Ex. 109, 12–17 (same).

[28] Ex. 109 at 13 (collecting cases).

[29] *Id.* at 16 (quoting *Todd*, 275 F.3d at 213).

[30] For example, if a user looks at a rent "KPI" on January 20, that value includes data through January 19. Ex. 15, 107:20–108:11; Yenikomshian ¶153.

[31] *Pork*, 781 F. Supp. 3d at 869 (monthly/weekly data); *Todd*, 275 F.3d at 196 ("several times per year"); Ex. 109, 17.

[32] *Todd*, 275 F.3d at 196, 212; Ex. 109, 15.

[33] *Pork*, 781 F. Supp. 3d at 870.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 39
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

indicators, benchmark deltas, penalty scores—and further operationalizes them through TAM intervention, as well as tools like P30A.

*Pork* is instructive: there, the court sustained an information-exchange claim where third-party benchmarking created actionable "focal points" for "industry action"—identifying "economic opportunities" to raise prices on items priced below peers.[34] The record supports the same inference: Yardi uses CPD data to identify below-benchmark performance, then deploys TAMs to pressure lagging clients to converge toward peer outcomes.

The record permits a finding that Defendants participate in an information-exchange that reduces uncertainty and softens rivalry.

**2.      Yardi's "deanonymization" defense targets a strawman.**

Yardi recasts Count III as a technical debate about whether users can reverse-engineer rivals' inputs from KPIs, arguing that because benchmarking cannot reveal "any property's particular value" there is "no exchange of confidential information." MSJ 33–37. That misses the mark.

First, Yardi says Plaintiffs have "pivot[ed]" to the "theory" that clients "game" benchmarks to disaggregate them and offers a separate report explaining Yardi injects "controlled noise" to prevent this. MSJ 2, 18, 34–38. But Plaintiffs' theory is not that Landlord X reverse-engineers Property Y's rent[35]; it is that Yardi pools nonpublic information and returns benchmarking data that reduce uncertainty and influence pricing. "Controlled noise" is therefore beside the point: this process prevents reverse-engineering of individual datapoints but preserves the integrity of the averaged values on which users actually rely. It reduces traceability, not the benchmark's accuracy or competitive usefulness. Marinescu §7.3.

Second, aggregation, anonymization, and/or "backward-looking" reporting do not immunize an exchange. There is "no categorical rule" that aggregation/anonymization make an exchange lawful: "[c]ourts do not require detailed or non-aggregated information if other circumstances indicate a tendency for anticompetitive harm," and have sustained claims where data is competitively sensitive,

---

[34] *Id.*

[35] Yardi appears to have mistakenly inferred this "theory" from certain deposition questions.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

delivered in narrow competitive-set summaries, updated frequently, and converted into focal points and discipline signals.[36] Nor is Yardi's data "historical" in any legal sense—it is even more current than the data in *Pork* and *Todd*.[37] While Yardi emphasizes (MSJ 36) that certain KPIs are time-lagged or viewed in trailing windows (e.g., trailing-12-months), this confuses format with staleness: rolling windows can smooth volatility while continuously reporting where a property sits relative to its competitive set. If underlying data is updated daily or monthly, it can still supply what rivals need: a focal point (am I above or below peers?) and a monitoring signal (am I gaining or losing ground?)— particularly when paired with TAM enforcement.

Yardi's factual gloss fares no better. It says benchmarking shows only "market trends," cannot facilitate coordination, and creates no information "asymmetry" because asking rents are public. MSJ 34, 36 & n.170. But benchmarking returns nonpublic metrics—effective rents, occupancy, concessions—not visible to renters, something Yardi markets as a competitive differentiator: visibility into "actual Voyager data," not "reported" numbers, showing where clients are "trailing" peers and "what the market may bear." *Supra* pp.15-17.[38] And Yardi's aggregation defense runs headlong into the *RealPage* Judgment, which forbids making rivals' nonpublic data accessible "regardless of form, aggregation, anonymization, or age" and restrict advisor-mediated dissemination of that data—and even analyses or "trends" derived from it—reflecting the view this structure harms competition. *Supra* p.24.

Yardi's assertion that benchmarking does not "feed into" RevenueIQ's "pricing outputs" (MSJ 34) fails for the same reason: as in *RealPage*, an information exchange need not be hard-coded into a single formula to restrain trade. Here, the algorithm, benchmarking, and TAM layer operate as a

---

[36] Ex. 109, 2, 14–15; *Pork*, 781 F. Supp. 3d at 870–71; *Todd*, 275 F.3d at 212. Yardi's cases (MSJ 33-34) involve materially different circumstances—typically broad, market-level, older data not paired with monitoring or enforcement—and nowhere hold that averaging/anonymization confers immunity.

[37] *Supra* n.33.

[38] Yardi also emphasizes requested benchmark sets average 29 properties, while effective benchmark sets average 9.4. MSJ 35. That is not exculpatory: it underscores that benchmarking delivers tight, local, comparable-set signals that can steer pricing even without "deanonymization."

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 41
011188-11/3190207 V1

feedback loop—recommendations, signals, enforcement—whose components each feed on Yardi's non-public exchange and together soften rivalry.[39]

Finally, Yardi argues apartments are too dissimilar for meaningful comparison. MSJ 36–37. But if heterogeneity made comparison useless, Yardi would not pool competitor performance data into KPIs, flag "variances" in TAM calls, calculate penalty scores, or even use "comps" in its pricing engine. Yardi's fallback point—that diverse inputs make benchmarking data too varied to facilitate coordination (MSJ 37)—is also economically backward. Benchmarking simplifies heterogeneous inputs by reducing them to a unified comparative measure. Yardi's pricing benchmarks then provide Landlord Defendants with a clear signal showing whether a property is priced above or below an average of comparable properties, and by how much. Because benchmarks track changes over time, they also show when and how quickly prices move. Yardi executives' use of these benchmarks to identify "opportunities" and press cross-client rent increases confirms the point.

## V.   CONCLUSION

The Court should deny Yardi's motion.

DATED: February 9, 2026

Respectfully submitted,

**HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Steve W. Berman*
Steve W. Berman (WSBA No. 12536)
*/s/ Theodore Wojcik*
Theodore Wojcik (WSBA No. 55553)
*/s/ Stephanie A. Verdoia*
Stephanie A. Verdoia (WSBA No. 58636)
*/s/ Xiaoyi Fan*
Xiaoyi Fan (WSBA No. 56703)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
tedw@hbsslaw.com
stephaniev@hbsslaw.com
kellyf@hbsslaw.com

---

[39] Further, CPD data does "feed" RevenueIQ—via the P30A rule.

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 42
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

Rio S. Pierce (pro hac vice*)
**HAGENS BERMAN SOBOL SHAPIRO LLP**
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
riop@hbsslaw.com

*Attorneys for Plaintiffs*

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 43
011188-11/3190207 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**CERTIFICATION OF COMPLIANCE**

I certify that this memorandum contains 11,987 words, in compliance with the Order Granting Stipulated Motion to File Over-Length Motions, ECF No. 467 (limiting Plaintiffs' summary judgment opposition to 12,000 words).

DATED: February 9, 2026                              **HAGENS BERMAN SOBOL SHAPIRO LLP**

*/s/ Steve W. Berman*
Steve W. Berman (SBN 12536)

*Attorney for Plaintiffs*

PLAINTIFFS' OPPOSITION TO YARDI'S MOTION FOR
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – 44
011188-11/3190207 V1



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX