# EXHIBIT 111

**[FILED UNDER SEAL]**

FILED UNDER SEAL

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| *In re Yardi Revenue Management Antitrust Litigation*<br><br>WYLIE DUFFY and MICHAEL BRETT, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>     v.<br><br>Yardi Systems, Inc. *et al.*,<br><br>                  Defendants. | No. 2:23-cv-01391-RSL |

**Expert Report of Ioana Marinescu, PhD**

**In Support of**

**Plaintiffs' Opposition to Yardi's Motion for Summary Judgment**

**February 9, 2026**

1

FILED UNDER SEAL

# Table of Contents

1.  Introduction ................................................................................................. 12

1.1  Qualifications & Compensation ........................................................... 12

1.2  Summary of Allegations and Summary Judgment Briefing ..................... 12

1.3  Assignment ....................................................................................... 13

2.  Summary of Conclusions ............................................................................ 14

2.1  Peer-Reviewed Economic Work Explains How Landlord Defendants Can Coordinate Via Yardi's Pricing Suite ........................................................ 15

2.2  Through Revenue IQ, Landlord Defendants Coordinate to Move List Prices In Parallel 17

2.3  Through its Account Managers, Yardi Uses Client Data To Ensure Upward Parallel Price Movements ....................................................................... 21

2.4  Yardi's Benchmarking Reports Aggregate Rival Data and Facilitates Collective Price Increases ........................................................................................ 25

2.5  Through Mutual Reinforcement Across its Pricing Suite, Landlord Defendants Overwhelmingly Transact at Revenue IQ's List Price ........................... 27

2.6  Landlord Defendants' Pricing Via Yardi Satisfy Economic Tests for Coordination Through a Hub-Algorithmic ....................................................... 29

2.7  Yardi's Defenses Are Economically Unavailing ................................... 33

3.  The Economic Theory of Algorithmic Collusion and Horizontal Information Exchanges .. 35

3.1  Collusion Through Algorithmic Price Recommendations ....................... 36

3.1.1  Empirical Work Shows That Hub-Algorithms Can Coordinate Prices Upward ..... 37

3.1.2  Economic Theory Explains How Pricing Algorithms Can Sustain Collusion Without Non-Public Data ................................................................ 39

3.1.3  Strategically Censored Information Exchanges Can Support Coordination in a Hub-And-Spoke Conspiracy .............................................................. 44

3.2  Collusion Through Information Sharing ............................................... 46

3.2.1  Pricing and Information About Demand States ................................ 46

3.2.2  Collusion with List Prices and Discounts ...................................... 48

3.2.3  Information Exchanges Can Themselves Constitute a Price-Increasing Agreement 52

3.3  Summary of Economic Literature On Algorithmic Collusion and Horizontal Information Exchanges ........................................................................................ 53

4.  Summary of Yardi's Pricing Suite ............................................................... 54

FILED UNDER SEAL

4.1    Revenue IQ Sets Clients' List Prices..........................................................55

    4.1.1    Revenue IQ Uses Four Primary Trend Rules to Determine When to Increase, Maintain, or Decrease Rents ................................................................. 57

    4.1.2    After Applying the Trend Rules, Revenue IQ Applies Optional Health Rules....... 60

    4.1.3    Clients May Apply Additional Settings & Options................................... 63

    4.1.4    Revenue IQ Automatically Updates Each and Every Unit's List Price Daily, Without Requiring Client Approval ................................................................ 63

    4.1.5    The Comp Trend Rule Relies on Clients' Concerted Information Exchange ......... 65

4.2    Landlord Defendants Contractually Agreed to Exchange Non-Public Data With Each Other & Yardi.................................................................................................74

4.3    Yardi's TAMs Use Non-Public, Disaggregated & Individually Identifiable Client Data to Recommend & Monitor Client Pricing.................................................................76

    4.3.1    Yardi Used Non-Public Client Data to Track Performance Reviews and Inform TAM Pricing Oversight............................................................................. 79

    4.3.2    Ms. Rao Used Non-Public Client Data to Calculate "Penalty Scores" & Inform TAM Pricing Oversight............................................................................. 82

4.4    Landlord Defendants Use Non-Public Information Exchanges to Observe Rival Pricing Through Yardi's Benchmarking Reports................................................................84

4.5    Yardi Designed & Marketed Its Pricing Suite As a Mutually Reinforcing System ..88

4.6    Stylized Economic Summary of Yardi's Pricing Suite.............................................93

5.    Revenue IQ's Role in Structuring and Limiting Landlord Pricing Discretion .................... 94

5.1    Landlord Defendants Use Substantively the Same Pricing Rule Book in Revenue IQ95

    5.1.1    Yardi Suggests Clients Adopt "Standard Practice" Default Settings in Revenue IQ 96

    5.1.2    Landlord Defendants Predominantly Configure the Same Trend Rule Weights .... 97

    5.1.3    Landlord Defendants Predominantly Configure the Same Health Rules ............. 102

    5.1.4    Mr. Yenikomshian's Analysis of Client Configurations is Flawed & Misleading 104

5.2    Revenue IQ's Comp Trend Rule Aligns List Prices Movements Across Rivals.....112

    5.2.1    Yardi Makes the Comp Trend Rule Clear to Revenue IQ Clients & Their Testimonials Emphasize Revenue IQ's Transparency & Ability to Increase Rents ...........114

    5.2.2    The Comp Trend Rule Asymmetrically Incentivizes Price Increases and Disincentivizes Price Decreases ...........................................................................117

5.3    Landlord Defendants Increased Transaction Prices in Parallel ...............................121

FILED UNDER SEAL

6.    Yardi's TAMs Use Non-Public, Disaggregated, and Individually Identifiable Landlord Defendant Data to Recommend Prices and Monitor Compliance "Penalty Scores" .................. 128

6.1    Yardi's TAM Pricing Oversight Relies on Disaggregated and Individually Identifiable Data  129

6.2    Through its TAMs, Yardi Asymmetrically Pushes Landlords to Increase Prices .... 132

6.3    Landlord Defendants Increased Prices Following TAM Price Recommendations . 144

7.    Landlord Defendants Used Non-Public and Horizontally Exchanged Benchmarking Reports to Increase Prices .......................................................................................................... 152

7.1    Yardi Requires That Landlord Defendants' Benchmark Sets Include their Revenue IQ Comp Set, Ensuring Price Visibility to Monitor Revenue IQ Adherence, TAM Oversight, and Pricing Opportunities ........................................................................................ 153

7.2    Benchmark Reports Helped Clients Identify & Charge "What the Market May Bear in the Way of Rents" ............................................................................................... 155

7.3    Yardi's Aggregation and Perturbations to its Benchmark Reports Do Not Undermine or Contradict Their Usefulness to an Anticompetitive Agreement ......................................... 159

8.    Revenue IQ's List Price Rules & Landlord Defendants' Non-Public Information Exchange Work in Concert to Increase Prices ............................................................................... 162

8.1    Yardi Creates Structural & Economic Barriers to Defecting From Revenue IQ's List Price  163

8.2    Landlord Defendants Overwhelmingly Transact at Revenue IQ's List Price ......... 171

8.2.1    Across All Lease Transactions, Landlord Defendants' Only Deviate 1.4% From Revenue IQ's List Price ....................................................................................... 171

8.2.2    Landlord Defendants Offer Small & Infrequent Concessions Compared to Non-RM Users    178

8.3    Landlord Defendants' Parallel List and Transaction Prices Overwhelmingly Increase Across Time (i.e., Across Different Demand States) ........................................................ 180

9.    Yardi & Landlord Defendants' Pricing Satisfies Economic Tests For Algorithmic Collusion    182

9.1    Revenue IQ Prioritizes Smooth Price Increases Over Dynamic Responses to Supply and Demand ........................................................................................................ 183

9.2    Landlord Defendants' Pricing Has The Characteristics of Collusion via a Hub-Algorithm Described in Harrington (2025) .................................................................... 185

9.2.1    Yardi's Internal Analysis Shows Revenue Management Users Generally, and Revenue IQ Users Specifically, Charge Higher Rents Than Non-Revenue Management Users    187

FILED UNDER SEAL

9.2.2    Landlord Defendants' Lease Prices Increase With The Adoption of Revenue IQ, Even Relative to Rent CPI .................................................................................... 194

9.2.3    A Case Study Shows Revenue IQ Adoption Led to Collusive Pricing ................. 201

9.2.4    Robust Econometric Estimation Confirms Landlord Defendants Achieve Higher Rents In Areas With More Alleged Co-Conspirators .......................................................... 211

9.3    Coinciding With Updates to Yardi's TAM Oversight, Yardi's Pricing Suite Became More Effective at Increasing Landlord Defendants' Rents ................................................. 215

10.    Conclusion ....................................................................................................... 218

Appendices ............................................................................................................... 220

A.    Industry Background ......................................................................................... 220

A.1.    Rental Housing .............................................................................................. 220

A.1.1.    Multifamily Housing Properties & Landlords .......................................... 221

A.1.2.    Recent Trends In U.S. Housing Rentals ................................................... 223

A.2.    How Renters Search for Apartments .............................................................. 223

A.3.    Revenue Management Software in Rental Housing .......................................... 224

B.    Client Configurations ........................................................................................ 226

B.1.    Yardi's Health Rule Configuration Analysis ................................................... 226

B.2.    Categorization of Mr. Yenikomshian's Reconfiguration analysis ..................... 227

C.    Call Notes Between Mr. Fazio and the TAMs .................................................... 238

C.1.    2020-2024, TAM Notes of Below-Benchmark Instances ................................. 238

C.2.    Post-2023 TAM Notes Relying on CPD Data ................................................ 238

C.3.    TAM Note Categorization Search Algorithm .................................................. 238

C.4.    Price Indices of Each Landlord Defendant Property Flagged in TAM Call Notes . 239

D.    Appendix to Section 9 ....................................................................................... 241

D.1.    Appendix to 9.2.1 .......................................................................................... 241

D.2.    Appendix to 9.2.2 .......................................................................................... 242

D.3.    Appendix to 9.2.3 .......................................................................................... 244

D.3.1.    PUMA 0606707: Sacramento County (West), CA .................................. 244

D.3.2.    PUMA 2602907: Oakland County (South Central), MI .......................... 245

D.4.    Appendix to 9.2.4 .......................................................................................... 247

E.    Materials Relied Upon ....................................................................................... 249

E.1.    Academic Articles .......................................................................................... 249

FILED UNDER SEAL

E.2.    Depositions..................................................................................................251

E.3.    Declarations.................................................................................................251

E.4.    Public Documents ........................................................................................251

E.5.    Bates number...............................................................................................253

F.    Datasets Relied Upon...........................................................................................256

F.1.    Landlord Defendant Lease Transaction Data ..............................................256

F.2.    Configuration Data......................................................................................273

G.    Curriculum Vitae..................................................................................................281

**Table of Figures**

Figure 1: Virtually All Landlord Defendants Apply the Same Default Set of Trend Rule Configurations....................................................................................................................18

Figure 2: Monthly Average Effective Rents Are Statistically Highly Correlated Across Landlord Defendant Properties, 1 Indicates Perfect Correlation..................................................20

Figure 3: Mr. Fazio's Call Notes With TAMs Asymmetrically Focused on Clients Pricing Below Their Benchmarks, Comprising More Than 2/3s of Notes...............................................23

Figure 4: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing .............................................................................................24

Figure 5: Across All Landlord Defendant Active Leases, Transaction Prices Only Deviate 1.4% From Revenue IQ's Recommended List Price, On Average.....................................................28

Figure 6: Revenue IQ Users Charge Similar Rents to RealPage Users & Higher Rents than Non-RM Users ......................................................................................................................30

Figure 7: Landlord Defendants Increase Rents Faster Than A Rent-Specific CPI .....................31

Figure 8: Landlord Defendants Increase Rent Prices Faster In Areas With More Fellow Revenue IQ Users ......................................................................................................................32

Figure 9: The Yardi Pricing Suite Includes Revenue IQ, Account Manager Oversight, and Benchmarking – All of Which Inform Client Pricing With Non-Public Rival Data ..................54

Figure 10: Yardi Clients Described Revenue IQ As "Transparent" ...........................................56

Figure 11: Revenue IQ Applies Four Trend Rules, Including "Asking Rents for Comparable Rental Units in the Area" ............................................................................................57

Figure 12: Yardi Marketed Revenue IQ As Providing Clients with "Full Visibility Into Pricing Movement" and "Market Positioning Using Real-Time Data" ..................................................58

Figure 13: In Addition to Revenue IQ's Pricing Output, Yardi Gives Clients Direct Visibility On it Trend Rule Inputs, Including Rival Rents ...............................................................................59

Figure 14: An Overview of Step Two in Revenue IQ's Calculation of Pricing Outputs ..............61

Figure 15: Yardi Trains its Predicted 30-Day Availability on Non-Public CPD Data ..................62

Figure 16: Following the Trend and Health Rules, Clients Can Apply Miscellaneous Additional Configurations.................................................................................................................63

FILED UNDER SEAL

Figure 17: Yardi Markets Revenue IQ's Automatic Daily Pricing Updates as a Value-Add to Clients ................................................................................................................................. 64
Figure 18: ███████████████████████████████ ................................................................. 64
Figure 19: "RENTmaxRefGuide_MarketSurveyRENTmax," 09/11/2024 .................................. 68
Figure 20: "RENTmaxRefGuide_MarketSurveyRENTmax," 09/11/2024 .................................. 68
Figure 21: "RENTmaxRefGuide_MarketSurveyRENTmax," 09/11/2024 .................................. 69
Figure 22: Screenshot of the Revenue IQ UI Showing the Floor Plan Mapping for a Selected Comp ......................................................................................................................................... 71
Figure 23: Landlords Describe Structured Information on Unit Floor Plans, Amenities, and Square Footage as "Not Public" ................................................................................................ 72
Figure 24: "RE: April 2023 Analysis," 05/31/2023 ................................................................... 77
Figure 25: Mr. Fazio's March 2024 Email Analysis .................................................................... 78
Figure 26: Mr. Fazio's October 2023 Email Analysis ................................................................. 78
Figure 27: Mr. Fazio's January 2022 Email Analysis .................................................................. 79
Figure 28: Mr. Fazio's Monthly Performance Analysis Relied on Property-Level Client Data ... 80
Figure 29: Ms. Rao's "Penalty Score" Analysis Relied on Non-Public Property-Level Client Data .................................................................................................................................................. 84
Figure 30: Yardi's Benchmarking Reports Gave Clients Visibility on Rivals' Pricing &* Occupancy, Among Other "KPI"s ............................................................................................... 86
Figure 31: Yardi Updates Its CPD Benchmarking Reports More Frequently In Response to Competitive Pressure from RealPage ......................................................................................... 87
Figure 32: "Product Class Breakout Sales Conference 2024_MF Elevate Bundle," 03/20/2024 89
Figure 33: "Capstone Slide Deck," 08/08/2023 ....................................................................... 90
Figure 34: "Essex Revenue IQ 062021," 10/24/2024 ................................................................ 91
Figure 35: Yardi Described The Combined Effect of Its "Intuitive, Rules-based Solution," "Improve[d] Visibility," and "Support From" "Technical Account Manager(s)" as Its Core "Value Statements" .............................................................................................................................. 92
Figure 36: Yardi Instructed Sales Staff Not to "Give Them a Choice!" When Discussing "Standard Practice" Configurations With New Clients ................................................................. 97
Figure 37: Virtually All Landlord Defendants Apply The Same Trend Rule Weights ................. 99
Figure 38: Virtually All Landlord Defendants Apply the Same Default Combination of Trend Rule Configurations ................................................................................................................. 100
Figure 39: Landlord Defendants Applied Similar Configurations Within the Comp Trend Rule .................................................................................................................................................. 101
Figure 40: Landlord Defendants Apply Broadly Similar Health Rule Configurations ............. 103
Figure 41: In Its Marketing Materials, Yardi Claims that "Revenue IQ Pricing Depends On Our Clients' Market Data" ............................................................................................................. 114
Figure 42: Yardi Plainly Explains the Four Trend Rules to Clients, Emphasizing the Comp Trend Rule ........................................................................................................................................ 115
Figure 43: Revenue IQ Client Testimonials Emphasize Revenue IQ's Transparency & Ability to Increase Rents ........................................................................................................................ 116

FILED UNDER SEAL

Figure 44: Revenue IQ Operates On a "Built-in, Proprietary Feedback Loop" .........................119
Figure 45: Price Indices Across Landlord Defendant Properties Are Visibly Correlated.......... 122
Figure 46: Monthly Average Effective Rents Across Landlord Defendant Properties Visibly Move in Parallel....................................................................................................................... 123
Figure 47: Landlord Defendants Charge Visually Clustered and Parallel Effective Rents, When Removing Property-Level Fixed Effects ................................................................................ 125
Figure 48: Monthly Average Effective Rents Are Statistically Highly Correlated Across Landlord Defendant Properties, 1 Indicates Perfect Correlation.............................................................. 126
Figure 49: Yardi's TAM Oversight Relies on Disaggregated & Individually Identifiable Data For Each Subject Property....................................................................................................... 129
Figure 50: "Client Performance February 2025_heatherg," 03/14/2025 .................................... 130
Figure 51: Yardi's TAM Oversight Relies On Data Beyond What Is Available in Benchmarking Reports ................................................................................................................................... 131
Figure 52: "Apr Meeting Notes_Lori," 06/13/2023.................................................................... 135
Figure 53: Mr. Fazio's Call Notes With TAMs Asymmetrically Focused on Clients Pricing Below Their Benchmarks, Comprising More Than 2/3s of Notes....................................................... 136
Figure 54: "Dec Meeting Notes_Lori," 02/20/2024 ................................................................... 137
Figure 55: "45453464," 12/18/2025 .......................................................................................... 139
Figure 56: "45466904," 12/18/2025 .......................................................................................... 139
Figure 57: "04_Apr 2022," 05/25/2022 ..................................................................................... 141
Figure 58: "04_Apr 2022," 05/25/2022 ..................................................................................... 142
Figure 59: Following TAM Calls Noting Below Benchmark Pricing, "█████████ Reversed a Downward Price Cycle and Increased Rents ........................................................................... 145
Figure 60: Following TAM Calls Noting Below Benchmark Pricing, "███████ Reversed a Downward Price Cycle and Increase Rents ............................................................................. 146
Figure 61: Following TAM Calls Noting Below Benchmark Pricing, "█████████" Increased The Growth Rate Of Rents ...................................................................................................... 147
Figure 62: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing ......................................................................................................... 148
Figure 63: In Its Marketing Materials, Yardi Explains How Clients Use Benchmarking Reports To Increase Rents ..................................................................................................................... 156
Figure 64: When Reviewing Benchmarking Reports, Yardi "Clients Like to See their Rent Higher Than Market" ............................................................................................................... 156
Figure 65: At The Yardi Marketing Forum, Landlord Defendant Grubb Explicitly Stated It Uses Yardi's Benchmarking Reports to "Understand What The Market May Bear In The Way of Rents".................................................................................................................................... 157
Figure 66: Yardi's Benchmarking Reports Give Asymmetric Positive Reinforcement to Above-Benchmark Pricing.................................................................................................................. 157
Figure 67: Landlord Defendant Grubb Also Uses Benchmarking To Reduce Discounts & Adjust Its Revenue IQ Configurations ................................................................................................ 158

FILED UNDER SEAL

Figure 68: Revenue IQ's Pricing Output Is "Immediately Upate[d]" In Voyager and RENTCafe .................................................................................................................................... 164

Figure 69: Yardi Described Automatic Acceptance of Revenue IQ's List Price as "Best Practice" .................................................................................................................................... 165

Figure 70: Yardi Imposes a Nine-Step Process on Clients Enabling Rent Override Permissions .................................................................................................................................... 166

Figure 71: Yardi Describes Overrides as a "Loss to Rental Growth" And Gives Clients An "Audit" To Track Deviations ........................................................................................... 167

Figure 72: Yardi Provides Clients with "Lease Audit Reports".................................... 168

Figure 73: Clients Allow Sales Staff to Raise, But not Decrease Rents ...................................... 169

Figure 74: Landlord Defendant Grubb Also Used Yardi's Tools To "Hold Teams Accountable" .................................................................................................................................... 169

Figure 75: Across All Landlord Defendant Active Leases, Transaction Prices Only Deviate 1.4% From Revenue IQ's Recommended List Price, On Average..................................... 174

Figure 76: Across Only Overridden Landlord Defendant Active Lease, Transaction Prices Only Deviate 6.95% From Revenue IQ's Recommended List Price, On Average ............................ 175

Figure 77: Over 90% of Landlord Defendant Active Leases Transact Within 5% of Revenue IQ's List Price Recommendation ........................................................................................... 176

Figure 78: 95% of Landlord Defendants Active Leases Were Within 10% of Revenue IQ List Price ................................................................................................................................. 177

Figure 79: Yardi's Internal Analysis Shows Revenue IQ Users Charge Similar (And Often Lower) Concessions as RealPage Users, and Consistently Smaller Concessions Than Non-RM Users ................................................................................................................................ 179

Figure 80: Landlord Defendants' Rent Changes Are Predominantly Increases......................... 181

Figure 81: Yardi Markets Price Stability As a Value-Add That Leads to "Consistent Growth". 184

Figure 82: "RM analysis Summary-Q4_2022- Excluded ███████," 01/13/2023 .............. 188

Figure 83: "RM analysis Summary-Q4_2022- Excluded ███████," 01/13/2023 .............. 189

Figure 84: "RM analysis Summary-Q4_2022- Excluded ███████," 01/13/2023 .............. 190

Figure 85: "Rev IQ Results Slides July 2023," 08/18/2023 ...................................... 191

Figure 86: Revenue IQ Users Charge Similar Rents to RealPage Users & Higher Rents than Non-RM Users .................................................................................................................... 192

Figure 87: Revenue IQ Achieves a Great New Lease Rent Change Percentage than Non-RM Users Across Metro-Areas ........................................................................................... 193

Figure 88: Landlord Defendants Increase Rents Faster Than A Rent-Specific CPI ................... 196

Figure 89: Yardi's Index Premium Relative to Rent CPI Increased With the Number of Participating Landlord Defendant Units .................................................................... 197

Figure 90: Revenue IQ's Adoption in Sacramento County (West), CA, Increased Dramatically In May 2021 ......................................................................................................................... 203

Figure 91: "███████" Entry Accounts For The Vast Majority of The May 2021 Increase in Revenue IQ Adoption in Sacramento County (West) ............................................... 205

FILED UNDER SEAL

Figure 92: When Revenue IQ Adoption Increased From One Landlord Defendant to Multiple in Sacramento County (West), Landlord Defendants Structurally Transitioned From Almost Flat Pricing To Parallel Increases ................................................................................................ 207

Figure 93: Lease Transaction Prices at " █████████████ " Broke Above Their Pre-Existing Trend By Approximately $100 Per Month When Revenue IQ Adoption Increased in May 2021 ......................................................................................................................... 210

Figure 94: Landlord Defendants Increase Rent Prices Faster In Areas With More Fellow Revenue IQ Users ...................................................................................................................... 212

Figure 95: The Growth Rate of the Yardi Index Premium Increased Notably Around 2021/22  216

Figure 96: Chow Tests Show Significant Structural Breaks in Landlord Defendants' Pricing In 2021/2022 ............................................................................................................................ 218

Figure 97: Revenue IQ Revenue Management Structure ....................................................... 225

Figure 98: Yardi's Internal Analysis of Health Rule Configurations Confirms My Conclusions in Section 5.1.3 ......................................................................................................................... 226

Figure 99: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing .......................................................................................................... 240

Figure 100: Revenue IQ Users Charge Similar Rents to RealPage Users & Higher Rents than Non-RM Users ....................................................................................................................... 241

Figure 101: Yardi Rent Index vs. Rent CPI & Yardi Approx. Unit Count .............................. 242

Figure 102: Yardi Index Premium as a Function of Approx. Unit Count ................................ 243

Figure 103: Steep Unit Increase in Sacramento County (West) – Measured by Active Leased Units ..................................................................................................................................... 244

Figure 104: " ██████ " Property Entry Accounts for Most of the May 2021 Increase In Revenue IQ Adoption in Sacramento County (West) .............................................................. 245

Figure 105: Steep Increase Revenue IQ Adoption in Oakland County (South Central), MI – Measured by Active Leased Units ........................................................................................... 246

Figure 106: When Revenue IQ Adoption Increased in Oakland County (South Central), MI, Landlord Defendants Transitioned From Almost Flat Pricing to Parallel ................................ 247

**Table of Tables**

Table 1: Categorization Shares Across Mr. Yenikomshian's Reconfiguration Tabulation, Excluding Insertions ............................................................................................................... 110

Table 2: An Interrupted Time Series Analysis Shows That TAM Oversight Is Associated with Landlord Defendant Price Increases ....................................................................................... 150

Table 3: Example of New Lease Override in Landlord Defendant Lease Transaction Data ...... 172

Table 4: Example of Renewal Lease Override in Landlord Defendant Lease Transaction Data 172

Table 5: The Yardi Index Premium Increased With Landlord Defendant Adoption of Revenue IQ ............................................................................................................................................. 199

FILED UNDER SEAL

Table 6: Revenue IQ Adoption by Landlord Defendants Led To Economically & Statistically Significant Increases In the Yardi Index Premium Relative to Rent CPI ................................... 200

Table 7: The May 2021 Pricing Change in Sacramento County (West) Constituted a Statistically Significant Structural Break........................................................................................................ 209

Table 8: Robust Econometric Estimation Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants ......................................................................................................................................... 214

Table 9: Share of Rental Properties by Ownership and Size, 2020 ............................................ 222

Table 10: Categorization Shares Across Mr. Yenikomshian's Reconfiguration Tabulation, Including Insertions ..................................................................................................................... 227

Table 11: Categorization of Configuration Settings................................................................. 227

Table 12: Robust Econometric Estimation – on First-Differences – Further Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants ............................................................................. 248

Table 13: Summary of Landlord Defendant Lease Transaction Data ......................................... 260

Table 14: Summary of Yardi Configuration Data .................................................................... 274

FILED UNDER SEAL

# 1. Introduction

## 1.1  Qualifications & Compensation

1.    I am an economist and an Associate Professor at the University of Pennsylvania's School of Social Policy & Practice, with secondary appointments in the Economics Department and the Wharton School of Business. I am also a Research Associate at the National Bureau of Economic Research (NBER). From July 2022 to June 2024, I served as the Principal Economist at the U.S. Department of Justice Antitrust Division, where I was responsible for the day-to-day supervision and oversight of the Expert Analysis Group casework. In this role, I advised on major antitrust enforcement actions (including RealPage) and labor market policy.

2.    My research focuses on labor market dynamics, with particular expertise in monopsony power and its implications for antitrust law. My work has been published in leading academic journals such as the *Review of Economic Studies* and the *Quarterly Journal of Economics*, where I also serve as an associate editor.

3.    My expertise is frequently called upon in public policy and private sector contexts. I have testified before Congress, the Federal Trade Commission and participated in White House roundtables. My research has also been featured in prominent media outlets, including the New York Times and the Washington Post. I am a member of Anthropic's Economic Advisory Council, and I have written an article on Artificial Intelligence for the Brookings Institution.

4.    I am compensated at an hourly rate of $1,000 and am supported by staff at Fideres USA Inc., who worked under my supervision. My compensation is not contingent on my opinions or the outcome in this matter. My Curriculum Vitae is attached as Appendix G.

## 1.2  Summary of Allegations and Summary Judgment Briefing

5.    I understand that Plaintiffs in this action are a putative class of persons and/or entities that leased multifamily housing in the United States from a landlord that used Yardi's "RENTmaximizer" (today, "Revenue IQ") software at any time from September 8, 2019 to the present. I understand that Plaintiffs allege that landlords jointly feed Yardi sensitive, nonpublic operating data, then rely on its pricing recommendations, benchmarking services, and pricing advisor (or "technical account manager") services to set their prices to charge supracompetitive prices.

6.    I understand that, on November 24, 2024, Yardi filed a Motion for Summary Judgment in this case, as well as supporting expert declarations, asking the Court to dismiss Plaintiffs' claims. I understand that the motion and declarations argue, among other things, that

FILED UNDER SEAL

Revenue IQ is individualized and configurable, so outputs reflect independent landlord choices rather than a "common price formula"; (2) nonpublic, cross-client data is not used as a direct input to RENTmaximizer's pricing engine; and (3) Yardi's benchmarking information is aggregated and anonymized such that there is no actionable exchange of confidential competitor information.

## 1.3 Assignment

7.    I have been asked to assess how Yardi's pricing suite (including Revenue IQ, account managers, and benchmarking services) affects price-setting behavior in rental housing markets. In particular, I have been asked to evaluate economic questions regarding the platform's pricing rule book, shared data inputs, and benchmarking outputs.

- **Common adoption:** whether landlords in practice select "substantially similar pricing rules and configurations of Revenue IQ (what I sometimes refer to below as a "rule book") indicative of (and implement Yardi's prices at a rate consistent with) collective pricing behavior rather than independent strategy.

- **Information exchange:** whether Revenue IQ facilitates the sharing and use of non-public or commercially sensitive information that would not ordinarily be disclosed among direct competitors, and whether such information contributes to aligned pricing outcomes.

- **Monitoring & enforcement:** whether Yardi's benchmarking dashboards and pricing advisors increase transparency among participants and reduce the incentive to deviate from collective pricing.

- **Coordinated pricing:** whether Revenue IQ's pricing rule book and default configurations serve to align rents across landlords rather than merely generate competitive, demand-responsive pricing.

- **Market effects:** whether the economic indicators that experts associate with collusion – including price parallelism, rising list prices with network size, and limited override behavior – are present here.

8.    I have not been asked to evaluate market power, market definition, or common impact to the class, or to measure damages.

9.    Counsel informs me that discovery in this matter is phased, meaning that a complete factual record is not currently available to me. Most notably, I understand there is currently no

FILED UNDER SEAL

documentary production from Landlord Defendants[1] while, conversely, the produced lease data (i.e., transactional data) only covers Landlord Defendants. Should the court deem it appropriate to open further discovery, I reserve the right to perform further economic work on a full record.

# 2. Summary of Conclusions

10.    Based on economic analysis of data and documents produced in this case, Yardi's Revenue IQ product – which contains three constituent features I collectively refer to as its "Pricing Suite" – appears to economically operate as an integrated coordination system that produces coordinated pricing behavior among competing landlords rather than independent, demand-responsive pricing decisions.

11.    I reach this conclusion by examining documentary evidence and data regarding how Landlord Defendants configure Revenue IQ, how Revenue IQ in turn determines their list prices, how Yardi incorporates their non-public data into pricing oversight, how Yardi and its clients claim to use benchmark reporting, and clients' overall adherence to Yardi's Pricing Suite. I then apply widely accepted econometric techniques to Landlord Defendants' lease transaction data to implement simple economic tests for coordination via a pricing algorithm that recent literature has proposed.  Doing so, I conclude that:

12.    Yardi's Pricing Suite contains three interlocking components which, when used by horizontally competing landlords, produce a coordination structure similar to that seen in previously prosecuted cartels:

- **First**, Landlord Defendants agree to common pricing rule book in the form of Revenue IQ's algorithm, which automatically – meaning, without necessitating client approval – updates Landlord Defendant list prices on a daily basis. The nature of this algorithm, including, in particular, its incorporation of competitor prices, produces parallel movement in participating landlords' list prices, i.e. the rents that are publicly posted on websites like RentCafe.

- **Second**, Yardi assigns account managers, or "TAMs", to participating landlords. These TAMs conduct recurring pricing calls, discourage overrides, and – at the direction of Yardi executives – use non-public and individually identifiable data (see below) to both supplement Revenue IQ's price recommendations and monitor price compliance. This monitoring helps ensure that clients' transaction prices keep up with a common benchmark based on competitors' non-public information,

---

[1] As used throughout this report, the term "Landlord Defendants" refers to the Landlord Defendants identified in Plaintiffs' operative legal complaint. *See In re Yardi Revenue Mgmt. Antitrust Litig.*, Consol. Class Action Compl. ¶¶ 39-83, No. 2:23-cv-01391-RSL (W.D. Wash. Mar. 5, 2025), ECF No. 226.

FILED UNDER SEAL

ultimately contributing to rising prices.

- **Third**, Landlord Defendants contractually agreed to exchange non-public data on final transaction prices and occupancy by agreeing to Yardi's "data use" clause, pursuant to which Yardi may "aggregate, compile, use and disclose" client data to "improve, develop, or enhance [Yardi's] Services[.]"[2] From this exchange, Yardi prepares benchmarking reports which clients say they use to identify "what the market may bear."

13.   The combined effect of Yardi's Pricing Suite and Landlord Defendants adoption thereof is observable in both the data and Yardi's own documents. When I analyze data produced in this case, I find that Landlord Defendants overwhelmingly transact at Yardi's algorithm Revenue IQ's list price and, as a result, move prices in parallel, charge higher rents than landlords who do not adopt Revenue IQ or equivalent RealPage products, and further increase rents as the adoption of Yardi's algorithm (i.e., the size of the alleged cartel) increases. In economic terms, this is strong evidence that Yardi's algorithm, data sharing, and compliance monitoring have the effect of coordinating landlords' pricing decisions and result in rental prices that are above a competitive level.

14.   As part of this summary of conclusions, I provide an overview of my findings regarding each of the three main components of Revenue IQ: (1) the Revenue IQ algorithm, (2) the role of Yardi account managers (TAMs), (3) the collection and exchange of non-public information through benchmarking and other mechanisms supervised by Yardi. Before turning to my analysis of the available documents and data, I first explain my methodology with reference to peer-reviewed economic research on algorithmic price determination, information sharing, and collusion.

## 2.1  Peer-Reviewed Economic Work Explains How Landlord Defendants Can Coordinate Via Yardi's Pricing Suite

15.   In recent years, economists have dedicated increasing attention to algorithmic price setting tools. A key concern is that common adoption of a central pricing algorithm by horizontal competitors (or a "hub-algorithm" as I will refer to it in this report) may coordinate prices, contrary to how they would price if they made purely unilateral decisions.

---

[2] *See* YARDI-DUFFY_00000169 at -172.

FILED UNDER SEAL

16.    Economists have two basic concerns about these algorithms:

- **First**, that a hub algorithm maximizes its own profits by maximizing the collective willingness to pay for the algorithm across its clients/prospective clients. This might mean maximizing users' collective, rather than unilateral, profit – which is typically how economists distinguish between collusion and competitive oligopoly.

- **Second**, firms could use a hub-algorithm to implement and automate an anticompetitive pricing rule book – or set of shared anticompetitive price rules – to which they all adhere through the hub-algorithm and its operator.

17.    The fundamental economic concern underpinning both arises when the hub-algorithm becomes a means for horizontal competitors to pursue (and achieve) a shared objective rather than pricing according to their unilateral incentives. (*see* Section 3.1).

18.    Information sharing among competitors – whether directly or via a central hub – can also support and facilitate coordination. Economic theory predicts that sharing information with your rivals is contrary to firms' unilateral self-interest if they expect their rivals will use that information to better compete against them. Firms therefore share information with their rivals when they expect they will collectively use this information to set higher prices than they otherwise would. (*see* Section 3.2).

19.    Notably, however, neither antitrust concern above depends on the exchange of non-public information across the hub-algorithm's clients, nor does either require the algorithm to set any client's price based on another client's non-public information. In the context of a hub-and-spoke conspiracy involving a hub-algorithm, recent economic work further suggests that it may be in a cartel's collective best interest to trust a hub-algorithm operator to mediate the conspiracy and optimally share only enough information to increase prices while limiting the information participants could use to profitably deviate from the conspiracy. (*see* Section 3.1.3).

20.    The role of information sharing in facilitating collusion also depends on a market's price structure. Many markets – including multifamily rental housing – have both public list prices alongside non-public discounts that determine final transaction prices. In such markets, firms can coordinate on public list prices – which then serve as an "anchor" point for final transaction prices – then exchange private information sufficient to monitor and ensure their co-conspirators are not deviating from the conspiracy with large discounts. Not only is collusion with list prices and discounting possible – in fact, a price structure with both list prices and discounts can lead to higher prices than when firms offer no discounts. (*see* Section 3.2.2).

21.    Given these concerns, economists have proposed a practical test to evaluate whether a hub-algorithm serves to facilitate coordination rather than help firms respond to supply and

FILED UNDER SEAL

demand more efficiently. Specifically, they ask whether (A) adoption of the hub-algorithm increases participants' prices compared to firms that do not adopt the algorithm and continue setting prices unilaterally, and (B) expansion of the algorithm's user base causes the algorithm to set higher prices – suggesting that the algorithms' pricing output is related to how well it can coordinate firms' prices. The core insight is that if an algorithm merely improves responsiveness to supply and demand, this should not lead to systematically higher prices. Instead, it should lead to prices that are more responsive to demand – in other words, prices that are sometimes higher and sometimes lower. (*see* Section 3.1).

22.   This framework is compelling because it maps closely onto the economic mechanisms at issue here and yields empirically testable predictions. If a hub-algorithm primarily improves firms' ability to unilaterally respond to supply and demand, we should observe greater price responsiveness rather than a persistent upward shift in price levels. By contrast, if a hub-algorithm coordinates participants, we should expect to see a systematic increase in adopters' prices and, importantly, a relationship between price outcomes and the algorithm's adoption – because more users should strengthen the algorithm's ability to profitably align their prices and sustain coordinated outcomes. These tests therefore use market data to provide a practical way to distinguish between efficiency-enhancing price optimization and coordination-facilitating conduct.

23.   With this conceptual framework in mind, I evaluate whether the economic evidence indicates that Revenue IQ facilitates a "shared objective" across participating clients. I then apply widely accepted econometric techniques to implement these empirical tests for coordination via hub-algorithm.

## 2.2   Through Revenue IQ, Landlord Defendants Coordinate to Move List Prices In Parallel

24.   The first component of Yardi's Pricing Suite is Revenue IQ's generation of recommended list prices – that is, the algorithm. Revenue IQ produces a recommended price every day for each client housing unit (or lease) by applying a set of algorithmic rules – principally, its (1) "Trend" and (2) "Health" rules. Senior Yardi executives describe "Revenue IQ [as] a trends- and rules-based system" with "three steps to the pricing calculation." "The first is a calculation of trends, the second is health rules, and the third is a series of additional settings or options." (*see* Section 4.1).

25.   Revenue IQ's Trend Rules review clients' unit availability, newly signed leases, traffic from prospective renters, and price ratios relative to a user-defined set of rival properties. With these four "Trends" it then determines whether to directionally raise, hold, or lower a unit's price from its "base" value on the prior day by taking a weighted average of the trends. Revenue IQ's Health Rules then modify and scale that directional output by applying optional health metrics for a property – several of which are based on the same measures

as the Trend Rules, such as occupancy or availability. (*see* Section 4.1.2).

26.    The economic implications of this process depend on how these rules are configured, the extent to which their implementation is standardized across clients, and whether resulting pricing outcomes are consistent with coordination via the hub-algorithm. In Section 5 I examine these questions by analyzing the structure, configuration, and observed effects of Revenue IQ's pricing rules (or what I sometimes refer to as its "rule book"), using documents and data produced in this case.

27.    Based on that analysis, I reach several conclusions.

28.    **Revenue IQ configurations are broadly standard across Landlord Defendants.** First, using data produced by Yardi, I evaluate the core Trend and Health Rule configurations that make up the first two steps in Revenue IQ's pricing logic. I find that Landlord Defendants apply broadly the same Trend and Health Rule configurations in Revenue IQ, meaning they use Yardi to adopt a standard pricing rule book.

29.    Specifically, I find that 89% of Landlord Defendants' property/unit type group combinations had jointly enabled Yardi's default Trend Rule weights, putting each trend at 25%, as shown below in Figure 1:

**Figure 1: Virtually All Landlord Defendants Apply the Same Default Set of Trend Rule Configurations**



- ⬤ Availability: 25; New Leases: 25; Traffic: 25; Comp Trend: 25: 89%
- ⬤ Availability: 50; New Leases: 25; Traffic: 25; Comp Trend: 0: 6%
- ⬤ Availability: 0; New Leases: 50; Traffic: 25; Comp Trend: 25: 4%
- ⬤ Other: 2%

30.    Moreover, more than 93.6% enabled the Comp Trend Rule. In sum, the vast majority of landlords use the same Yardi default configuration for the weights on their Trend Rules (*see* Section 5.1.2). Economists understand that rival firms agreeing to the same pricing rule book can coordinate prices and form the starting point of a price-fixing conspiracy.

FILED UNDER SEAL

31.    **Yardi's Comp Trend Rule uses competing clients' information to move clients' prices in parallel.** As explained in Section 5.2, Revenue IQ's "Comp Trend" Rule works to move clients' prices in parallel by linking a client's recommended list price changes to contemporaneous changes in their rivals' list prices. When rival landlords increase prices, the Comp Trend rule signals their nearby rivals to similarly increase prices. (*see* Section 5.2.1).

32.    From an economic perspective, this design can dampen the effect of the other Trend and Health Rules. Availability, new leases, and traffic reflect, in substantial part, consumer substitution between landlords: if a landlord increases rents when its competitor does not, it should expect to see all three indicators deteriorate. However, that substitution is significantly dampened if competitors all move prices in parallel: for example, if we all increase prices, my new leases are less likely to suffer because renters have nowhere else to go that is significantly cheaper. And if my new leases do not drop, I am more likely to persist with my price increase. Precisely the same logic applies to the other Health Rules. This means that, in practice, the Comp Trend rule may be a primary determinant of Revenue IQ's list price, even if it is weighted equally on paper. (*see* Section 5.2.2).

33.    Revenue IQ's parallel-pricing mechanism also depends on near-real-time information exchanged through RentCafe, a Yardi apartment listing website, and its "Matrix" phone surveys, as part of which Yardi surveyors call properties around the country to gather current information on rents. In Section 4.1.5, I explain that the Matrix data comports with the definition of non-public data in the DOJ's recent settlement with RealPage. I also explain that, although the RentCafe data is ostensibly public, replicating the form and timeliness of this data would not be practicable for landlords acting unilaterally. Individual landlords acting unilaterally could not practicably reproduce the way Revenue IQ uses RentCafe data.

34.    **Landlord Defendants price in parallel.** Based on the preceding discussion of Revenue IQ's common pricing rule book and the Comp Trend Rule in particular, I predict that use of Revenue IQ is likely to create meaningful co-movements in rental prices across adopting landlords. I test this prediction by estimating Pearson correlation coefficients between each and every Landlord Defendant in the produced lease transaction data – only omitting correlations between properties owned by the same client.

35.    A Pearson correlation coefficient is a standard statistical measure of the strength and direction of a linear relationship between two series of data – a value of +1 indicates a near perfect positive correlation.[3] This is relevant to the current question because it allows me to statistically measure the extent of co-movement between Landlord Defendant properties.

---

[3] "Pearson Correlation," *Science Direct*, available at https://www.sciencedirect.com/topics/computer-science/pearson-correlation (accessed February 5, 2026).

FILED UNDER SEAL

Figure 2 plots the distribution of these property-to-property pricing correlations:

**Figure 2: Monthly Average Effective Rents Are Statistically Highly Correlated Across Landlord Defendant Properties, 1 Indicates Perfect Correlation**



36.    I find 76.8% of price correlations between Landlord Defendant properties were positive, the median correlation was 0.72, 29% of correlations were above 0.9, and the most common correlation was 0.99 – where 1 indicates perfect correlation. These results are consistent with pronounced parallel co-movement in pricing across Landlord Defendants and inconsistent with significant heterogeneity in how Landlord Defendants use Revenue IQ. (*see* Section 5.3).

37.    Economic theory has long recognized that the kind of parallel pricing induced by the Comp Trend rule creates inflationary pressures because price decreases are immediately met with further prices decreases, whereas price increases are met with further price increases (*see* Section 5.2). Such a parallel pricing rule dissuades Landlord Defendants from initiating a price decrease because they expect an immediate price decrease from competitors, so the price decrease would not be able to attract many new renters. This dynamic dampens price competition for renters. Further, as I explain next, other features of Yardi's Pricing Suite which rely on non-public client data appear to complement this parallel pricing by

encouraging upward price cycles and limiting/reversing downward price cycles.

## 2.3  Through its Account Managers, Yardi Uses Client Data To Ensure Upward Parallel Price Movements

38.    Yardi implements the second component of its Pricing Suite through its Technical Account Mangers ("TAMs"). These are advisors Yardi assigns to Revenue IQ clients and who play a distinct role within the Revenue IQ ecosystem by receiving and analyzing detailed (i.e., individually identifiable and disaggregated) non-public information from multiple competing landlords.

39.    The anticompetitive significance, if any, of Yardi's TAMs depends on how they use this non-public information – and, in particular, on whether they push clients to set higher prices than they would through purely unilateral decision making. Before turning to the record, I note that economic theory expects that Yardi clients would not share non-public data with TAMs if they expected TAMs to encourage their rivals to undercut them based on this data. With that logic in mind, Section 6.3 evaluates the economic effects of Yardi's TAMs. I briefly summarize my conclusions here.

40.    As I explain in Section 6, documents produced in this case indicate that that TAMs use cross-client non-public information to actively monitor their pricing behavior, identify deviations from Revenue IQ's recommended list prices and deviations from benchmark competitors, and press clients to reduce discounts or raise rents. From an economic perspective, this oversight can support a conspiracy in at least two ways: (i) by reinforcing adherence to the parallel list-price recommendations generated by Revenue IQ; and (ii) by dampening downward price adjustments – specifically, by ensuring competitors' typically move prices upwards in parallel and that downward price cycles are rare.

41.    Using the factual record and data available to me, I evaluate each possibility and conclude that the evidence is consistent with Yardi's TAMs fulfilling both roles.

42.    **TAMs serve as a mechanism for monitoring participants' pricing behavior and reinforcing adherence to Revenue IQ's recommendations**. The record indicates that senior Yardi executives prepare detailed, property-level reports comparing clients' pricing performance relative to benchmark competitors. These reports are created using non-public Yardi client data. Notably, they also include so-called "penalty scores," an internal Yardi measure that uses this same non-public data to identify and internally rank clients that underperform their "benchmarks," or competitor properties. Notably, by underperform, Yardi means setting rents too low relative to benchmark. Yardi creates these data analyses and penalty scores each month and distributes them to its TAMs.

43.    By aggregating detailed, non-public benchmarking and performance data, TAMs can

observe pricing outcomes across competing landlords at a level of granularity that is not available to landlords themselves. This centralized visibility enables Yardi's executives, and its TAMs, to identify deviations from prevailing pricing trends and to respond with targeted guidance. (*see* Section 6.2).

44.    From an economic perspective, this type of monitoring reduces the incentives and opportunities for unilateral price cutting by increasing the likelihood that deviations will be detected and corrected, thereby supporting the persistence of aligned high prices over time. In Section 6.3, I provide empirical evidence that this TAM oversight – in conjunction with other commitment mechanisms – reinforces adherence to Revenue IQ's recommended list prices.

45.    **TAM interventions primarily target perceived underpricing and are associated with subsequent rent increases.** A separate and economically important question is whether TAM oversight not only reinforces adherence to standardized pricing, but also exerts asymmetric upward pricing pressure. If TAM interventions are disproportionately directed at perceived underpricing (rather than overpricing), and if those interventions are associated with subsequent rent increases, that would be consistent with the use of non-public, cross-firm information exchange to increase prices above the level that firms would unilaterally choose absent TAM oversight. This upward pricing pressure is particularly concerning when combined with Revenue IQ's parallel pricing features because it can ensure clients rarely engage in downward price cycles and consistently move prices upward in parallel (*see* Section 6.2).

46.    Yardi's internal compensation structure also reinforces this upward pricing dynamic. Yardi evaluates TAM job performance in substantial part depending on (i) whether the properties each TAM oversees price at/above their benchmark comp set, and (ii) the share of these properties with "rent increases." This discourages TAMs from acting in any individual client's unilateral interest to set competitive rents and instead encourages TAMs to push collective price increases in their cross-client oversight (*see* Section 6). In the context of prior economic research (*see* e.g., Harrington (2006)), this mechanism helps align incentives between sales staff, who may not be privy to an alleged conspiracy, and the collective interests of participants.

47.    To evaluate this empirically, I apply a search algorithm to a set of call notes between Yardi's TAM supervisor, Anthony Fazio, and Yardi's TAMs that were produced in this case. These notes memorialize monthly meetings between Mr. Fazio and Yardi's TAMs in which Mr. Fazio frequently identified individual Revenue IQ clients that were underpricing their benchmarks, then relayed his findings to individual TAMs. I further understand that Mr. Fazio performed this analysis using non-public, cross-client data, and also regularly received the "penalty scores" discussed above. (*see* Section 6.2).

48.    I use this algorithm to identify instances where Mr. Fazio (1) identified a client as underpriced (e.g., as priced "below" or "lagging" a benchmark); (2) identified a client as overpriced (e.g., as priced "above" or too high); and/or (3) made no price suggestion. I explain this methodology in further detail in Appendix C. Figure 3, below, depicts the results of this search algorithm:

**Figure 3: Mr. Fazio's Call Notes With TAMs Asymmetrically Focused on Clients Pricing Below Their Benchmarks, Comprising More Than 2/3s of Notes**



49.    Across all notes, I find that slightly over 2/3 (67.8%) identified when a property was underpricing benchmarks, 21.9% made no clear benchmark comparison, and only 18.8% identified when a property was overpricing benchmarks. This itself is noteworthy: Mr. Fazio's meetings with TAMs were more frequently silent on benchmark prices than used them to address overpricing. This is inconsistent with the idea that Yardi simply helps firms better respond to demand: if this were the case, TAMs should also frequently note when a client may be overpricing, suggesting their price is too high relative to demand from renters (*see* Section 6).

50.    Next, I use straightforward econometric techniques to evaluate whether TAM pricing oversight was followed by changes in Landlord Defendants' rental prices – specifically, whether properties flagged in Mr. Fazio's TAM call notes as priced below benchmark subsequently increase their prices. To do so, I asked counsel to collect a time series of Fazio-TAM call notes in which Yardi noted below-benchmark pricing. I then merged this with the Landlord Defendant lease transaction data by month and property and calculated a price index for the set of properties TAMs flagged in these notes. Figure 4 presents this

FILED UNDER SEAL

price index; the shaded region indicates the window during which 90% of properties were first flagged for sub-benchmark pricing in the TAM call notes:

**Figure 4: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing**



51.     Figure 4 indicates that Landlord Defendants' prices often exhibit a discrete increase around the time of the first TAM call in which underpricing is identified, and a sustained increase in their long run price trend. I assess whether these changes in prices are statistically significant by using an interrupted time series analysis. Across flagged properties, this shows that prices are 13.4% higher after the first TAM call, even after controlling for the overall time trend.  The post-call slope also increases: the upward post-call time trend in Landlord Defendants' effective rents increased by a statistically significant 0.9-1.1% per month compared to their pre-call trend. (*see* Section 6.3).

52.     These results are consistent with Yardi's Pricing Suite coordinating pricing through both algorithmic recommendations and the subsequent oversight performed by TAMs. They are also consistent with TAMs relying on non-public client data to reinforce adherence to Revenue IQ's recommended list price and apply asymmetric upward pricing pressure against underpricing. From an economic perspective, for the same reason we should be

concerned when a hub-algorithm recommends prices to multiple competitors, we should also be concerned when a human being does so.

## 2.4  Yardi's Benchmarking Reports Aggregate Rival Data and Facilitates Collective Price Increases

53.    The third component of Yardi's Pricing Suite is benchmarking reports that are built into Revenue IQ. These benchmarking tools provide participating landlords with confidential information about pricing and performance across a defined set of competing properties in the form of aggregated "Key Performance Indicators," or KPIs, including KPIs for values like in-place and effective rent, occupancy, concessions, and rent-change trends. Yardi purposefully aligns this set of competing properties to include the comp set clients use for purposes of Revenue IQ's "Comp Trend," i.e., to correspond to the competitor set used in Revenue IQ's pricing logic. Yardi then aggregates non-public rent and performance metrics across the constituent properties. The resulting outputs – delivered through dashboards or custom spreadsheets – allow participating landlords to compare themselves to competitors and adjust pricing and discounting accordingly. (*see* Section 7).

54.    From an economic perspective, firms can use better information on their rivals either to more efficiently compete, or to reduce competitive uncertainty and thereby increase prices to a supracompetitive level. Economic theory does not expect rational firms behaving in their unilateral self-interest to share information if they anticipate their rivals will use it to better compete. Consequently, economists only expect rivals to exchange non-public information if there is an offsetting benefit, and in particular the mutual expectation that they will collectively use this information to increase prices. (*see* Section 3.2.3).

55.    Consistent with this logic, economic theory recognizes at least two anticompetitive purposes of a horizontal information exchange:

- **First**, to support adherence to a price-fixing conspiracy. (*see* Section 3.2).

- **Second**, to serve as an anticompetitive agreement that rivals use to set higher prices than they would with purely unilateral information. (*see* Section 3.2).

56.    In Section 7, I evaluate whether the evidence presently available suggests Landlord Defendants used Yardi's benchmarking reports in either of these ways. I note that my ability to investigate this question is constrained by the lack of discovery from Landlord Defendants. I summarize my conclusions here.

57.    **Yardi and its clients explain that they use benchmark reporting to identify opportunities to increase prices**. The evidence I have reviewed is consistent with Revenue IQ clients using benchmark reporting for the second purpose above – that is, to

FILED UNDER SEAL

set higher prices than they would with purely unilateral information. For example, one Landlord Defendant stated at a Yardi "Marketing Forum" that it uses benchmarking information to identify "what the market may bear in the way of rents." Similarly**,** in marketing presentations prepared for prospective clients, Yardi gave "an excellent real life example of a client who … found they were way below market" using the benchmark reporting, then "put a plan in place to raise new leases and renewals" – i.e., to raise effective rents. More broadly, Yardi's executives internally explained that clients "like to see their rent higher than market." (*see* Section 7.2).

58.     From an economic perspective, this evidence is informative because it speaks to the incentives and mutual expectations that would make a horizontal information exchange attractive. If clients expected rivals to use Yardi's benchmarking reports to compete more aggressively and undercut each other, a rent level "higher than market" would be a source of concern because it could imply lost market share. That clients instead have a preference for seeing above-market rents in benchmark reports suggests clients use these reports to collectively increase prices over time, i.e., as a tool to support upward price movements rather than as a tool for competitive undercutting. Taken together, this documentary evidence therefore suggests that Yardi clients did not use benchmark reporting to more efficiently compete with one another, but instead to increase prices. (*see* Section 7.2).

59.     **Yardi's aggregation and perturbations do not undermine this anticompetitive use case**. I understand that Yardi applies "perturbations," or "controlled noise," to its underlying benchmarking data to prevent deanonymization. But identifying "what the market may bear in the way of rents" – that is, making competitive use of benchmarking information – does not require property-level attribution; aggregated market data across a set of relevant competitors can be sufficient so long as that aggregate number is reliable. Indeed, were this not true, it is unclear why Yardi would offer (and market) benchmarking as a component of Revenue IQ.

60.     In that respect, "perturbation" is broadly consistent with an aggregated reporting design. Under the Law of Large Numbers, the aggregation Yardi applies to individual perturbations will "average out" the individual adjustments such that the final aggregate figure nonetheless accurately reflects the group average. The stated purpose of perturbing the data is to prevent deanonymization, which is not necessary to achieve the anticompetitive use case Yardi and its client describe in the available documentary evidence. (*see* Section 7.3).

61.     This insight is particularly important when understood in the context of Yardi's broader Pricing Suite. As I explain below, the evidence available to me indicates that Yardi and its clients use a variety of tools to commit to Revenue IQ's list price. Yardi's benchmark reporting therefore need not serve as the primary tool for monitoring deviations from a conspiracy to be economically significant – it can still affect pricing by identifying

FILED UNDER SEAL

opportunities to raise rents relative to a benchmark group. To fully understand the economic operation of Yardi's Pricing Suite, it is therefore necessary to consider how each constituent feature works with the others. I do so in the following section.

## 2.5 Through Mutual Reinforcement Across its Pricing Suite, Landlord Defendants Overwhelmingly Transact at Revenue IQ's List Price

62.     To summarize the preceding conclusions, Yardi provides landlord clients with a three-part Pricing Suite. The existing evidence suggests that Landlord Defendants use this Pricing Suite in a manner consistent with coordinated pricing, i.e., they price above what economists would expect under purely unilateral price setting:

- **First**, Revenue IQ creates parallel price movements across Landlord Defendants by including a rule, the Comp Trend Rule, which is designed to maintain a constant rent ratio between rivals. (*see* Section 5.2). In addition, by adopting broadly the same settings for the core Trend and Health Rules (or pricing rule book), Landlord Defendants apply common pricing principles, which can allow them to act in their collective interest. (*see* Section 5.1).

- **Second**, Yardi's TAMs reinforce adherence to Revenue IQ's list prices and apply an asymmetric upward pressure to these parallel movements by disproportionately flagging instances in which landlords price below their competitors. The disproportionate emphasis on underpricing rather than overpricing also helps avoid downward price cycles. (*see* Section 6.2).

- **Third**, Yardi's benchmarking allows clients to identify "what the market may bear in the way of rents" and accordingly price more aggressively. (*see* Section 7.2).

63.     The starting and initial coordination point of this interlocking structure is Revenue IQ's recommended list price. A key economic question is whether adherence to those recommended list prices reliably translates into higher final transaction prices. In Section 8, I therefore examine the additional mechanisms Yardi uses to reinforce adherence to Revenue IQ's list prices and make the Suite's components mutually reinforcing, beyond the TAM oversight discussed above. These features include:

- Automatically updating Revenue IQ's list price on a unit's public listing, creating an "anchor" point for each unit's price, without requiring client approval. (*see* Section 8.1).

- Imposing a multi-step process for clients to enable rent overrides. (*see* Section 8.1).

- Ensuring frequent TAM oversight of client pricing, including by noting when

clients underprice their benchmarks. (*see* Section 8.1).

▪ Providing executives at client landlords with tools, including "New Lease Audits" and benchmark reports, to "hold teams accountable" for "pricing adjustments" away from Revenue IQ's list price. (*see* Section 7.2 and Section 8.1).

64.    In sum, these mechanisms demonstrably ensure that Revenue IQ's recommended list price is not merely advisory but also implemented in practice. I empirically evaluate this by simply comparing average Revenue IQ recommended list prices against average effective rents in the produced Landlord Defendant lease transaction data. Across Landlord Defendant leases, Landlord Defendants transact within 1.41% of Revenue IQ's list price on average. I show this below in Figure 5

**Figure 5: Across All Landlord Defendant Active Leases, Transaction Prices Only Deviate 1.4% From Revenue IQ's Recommended List Price, On Average**



65.    The data shows high adherence to Revenue IQ's list prices. Among other things:

▪ Even Yardi's expert agrees that Landlord Defendants adhere to Revenue IQ's recommended list price in at least 72% of lease transactions. (*see* Section 8.2.1).

▪ Even among transactions where landlords deviated from Revenue IQ's recommendation (e.g., overrides), 60.8% were within 5% of Revenue IQ's List Price. (*see* Section 8.2).

▪ In total, Landlord Defendants transact, on average, within 1.41% of Revenue IQ's list price recommendation across all leases. (*see* Section 8.2.1).

66.    In sum, Landlord Defendants rarely deviate from Revenue IQ's recommended list prices

FILED UNDER SEAL

by an economically meaningful amount – in substantial part because of commitment mechanisms both Yardi and its clients implement to ensure adherence. As I explain in Section 8.2, the small and infrequent deviations that I do observe are consistent with the economic literature on collusion and with the rental industry's general pricing structure.

## 2.6  Landlord Defendants' Pricing Via Yardi Satisfy Economic Tests for Coordination Through a Hub-Algorithmic

67.    Based on the foregoing, I conclude that Yardi's Pricing Suite – and Landlord Defendants' use of it – is likely to coordinate lease prices above the levels Landlord Defendants would unilaterally set. This conclusion follows from the documentary record and transaction data, evaluated in light of peer-reviewed economic research on algorithmic price setting and information sharing.

68.    I test this conclusion empirically. As I explain in Section 3.1.2, economists have proposed implementable empirical tests for coordination through a hub-algorithm that ask whether (i) adopters price above non-adopters and (ii) adopters' prices rise as adoption of the hub algorithm increases. Using the data currently available to me and standard econometric techniques, I implement these tests. I detail my methodological approach in Section 9.2. I conclude that:

69.    **Revenue IQ users price higher than non-adopters.**  I reach this conclusion by relying on Yardi's own data and studies, which it has conducted quarterly since approximately 2019. These compare the pricing of Revenue IQ users to the pricing of non-users of Revenue Management (RM), and consistently find both that Revenue IQ users charged $40 more per-month than non-users of Revenue Management (RM) and that they charged as much (sometimes more) than RealPage users.

70.    This analysis, which compiles Yardi's own data analyses over a several year period, is shown below in Figure 6. (*see* Section 9.2.1).

**Figure 6: Revenue IQ Users Charge Similar Rents to RealPage Users & Higher Rents than Non-RM Users**



71. **Landlord Defendants' lease prices increase with the adoption of Revenue IQ and exceed a market yardstick.** I also analyze Landlord Defendants' lease transaction data, i.e., data showing the prices they charged. This data shows that, as Revenue IQ adoption increased across Landlord Defendants, their rents rise above what a rent-inflation yardstick would predict. This premium widens by a statistically significant amount as more units are priced by Revenue IQ: I find that every 10,000-unit increase in Landlord Defendant adoption of Revenue IQ is associated with nearly a one percentage point increase in the Yardi Index Premium relative to a rental CPI. (*see* Section 9.2.2).

72. In other words, greater Revenue IQ adoption is associated with progressively higher rents above market. This is shown below in Figure 7. (*see* Section 9.2.2)

FILED UNDER SEAL

**Figure 7: Landlord Defendants Increase Rents Faster Than A Rent-Specific CPI**



‒ ‒ · CPI: Rent of Primary Residence, U.S. City Average    ⎯ Yardi Lease Price Index    ▨ Yardi Active Lease Count

73.  **This coordinating price effect of Yardi's Pricing Suite grows with the number of alleged co-conspirators in a given area.** I next find that, in local geographic areas (or "PUMAs") with no alleged co-conspirators (i.e., one Landlord Defendant), Landlord Defendants increased prices by $57.3 per month on average when a new lease became active (either a renewal or a new tenant). But when a second Landlord Defendant is present, the average increases rises to $68.5 per month – an $11 jump. This trend continues with the number of co-conspirators per PUMA, reaching nearly $93.6 in PUMAs with 5 or more alleged co-conspirators, an increase of $36.3 compared to PUMAs with no alleged co-conspirators. Interestingly, this result is broadly consistent with Yardi users' overall price premium relative to non-RM users in. (*see* Section 9.2.1).

74.  This pattern implies that Revenue IQ's rent recommendation rises with the number of competing landlords in the same area that are using it. That relationship – where the more firms who coordinate via the hub-algorithm, the larger its effect on prices – is what economists expect from coordination via a hub-algorithm and precisely what they don't expect in a non-collusive algorithm. I show a visualization of this below in Figure 8:

FILED UNDER SEAL

**Figure 8: Landlord Defendants Increase Rent Prices Faster In Areas With More Fellow Revenue IQ Users**



75. Given the importance of this finding to the economic analysis of algorithmic coordination, I confirm it by applying ten econometric panel regression estimations, including with two-way fixed-effects (TWFEs) and Newey-West standard errors. Doing so, I confirm that this "alleged co-conspirator effect" is both statistically significant and robust to including month/year and unit-level fixed effects, which account respectively for macro time trends/shocks common to all units (e.g. general change in the price of rentals in each month), and for time-invariant characteristics of units (e.g. square footage and location). (*see* Section 9.2.4).

76. Controlling for Rent CPI and unit-level fixed-effects, Landlord Defendants increase rents $5.3 per month for every additional alleged co-conspirator in their local area. (*see* Section 9.2.4).

77. Under the economic framework discussed in Section 3.1.2, these econometric results suggest Yardi's Pricing Suite facilitates coordinated pricing across competing landlords, rather than independent, demand-responsive algorithmic pricing. Together with evidence of purposefully parallel price movements, asymmetrically upward price oversight, and

information exchange that would likely not occur among fiercely competing rivals, the weight of the economic evidence supports the conclusion that Landlord Defendants coordinated prices through Yardi.

## 2.7  Yardi's Defenses Are Economically Unavailing

78.    Finally, I have reviewed Yardi's motion for summary judgment in this action and considered whether it alters any of my above conclusions. I understand it to make four conceptual arguments:

- **First**, that its pricing algorithm admittedly relies on competitor list prices, but that these list prices are public and therefore innocuous.

- **Second**, that Yardi clients may customize their algorithm not to align with competitor list prices.

- **Third**, that Yardi clients may deviate from Yardi's algorithmic price output.

- **Fourth**, that the benchmarking data Yardi shares is too aggregated to facilitate coordination.

79.    In support of these defenses, Yardi submits two expert declarations, one from Mihran Yenikomshian, who analyzes Revenue IQ source code, and one from Dr. Michael Mitzenmacher, who analyzes Yardi's benchmarking reports. They argue, among other things, that Revenue IQ does not rely on non-public data in its algorithmic price determination, and that the benchmarking reports are sufficiently aggregated, anonymized, and perturbed that clients cannot reverse engineer individually identifiable rival data.

80.    I do not find any of these four arguments persuasive. They are also generally inconsistent with the data and documents I have reviewed.

81.    **First**, Yardi's assertion that Revenue IQ uses only public information or clients' own data as an input to clients' pricing does not address economically significant information exchanges among rivals through Yardi, namely:

- Matrix Surveys used in Revenue IQ, whereby landlords respond to call-around questionnaires from both Yardi staff and direct calls from their local rivals. (*see* Section 4.1.5).

- Structured RentCafe data used in Revenue IQ, that clients would struggle to unilaterally recreate. (*see* Section 4.1.5).

- TAM oversight that relies on disaggregated and individually identifiable non-public client data on final transaction prices. (*see* Section 4.3). I note that the phrases "TAM" or "account manager" does not appear in Yardi's brief, Mr.

Yeniksomshian's declaration, or Dr. Mitzenmacher's Declaration.

■ Benchmark reports which both Yardi and its clients describe using to set supracompetitive prices – i.e., "what the market may bear." (*see* Section 7).

82.   In other words, Yardi's Pricing Suite contains multiple channels through which rivals' non-public data enters the system, including at least one channel Yardi does not acknowledge. This information flow is enabled by a non-negotiable data-use provision that conditions access to the Pricing Suite on clients authorizing Yardi to use competitively sensitive, non-public data to deliver its products and services. Internal Yardi communications treat this provision as essential: Yardi personnel state that its absence "would effectively curtail our ability to provide both the RENTmaximizer [Revenue IQ] service, and enhanced software and services." (*see* Section 4.2).

83.   **Second**, Yardi's claim that clients may customize their Revenue IQ configurations ignores that clients adopt essentially the same Trend and Health Rules in practice. Looking at these core Trend and Health Rules, 89% of Landlord Defendants set all Trend Weights to their default 25% weight, and 62% use the Availability Health Rule . (*see* Section 5.1.2).

84.   Economically, the relevant question is not whether there are myriad configurations that clients could use in principle, but whether the configurations clients actually use produce pricing consistent with independent, unilateral incentives rather than coordination. Yardi does not empirically test if clients' observed pricing outcomes show that landlords price individually in ways that would be difficult to reconcile with coordination. Yardi therefore did not quantitatively test its core assumption – i.e., that the configurations Mr. Yenikomshian analyzes actually result in independent client pricing outcomes.

85.   Using the lease transaction data and well-established techniques, I find high degrees of parallelism between Landlord Defendant properties, including highly correlated price movements. This is consistent with coordination via Revenue IQ. (*see* Section 5.3).

86.   **Third**, Yardi's contention that clients may deviate from Revenue IQ's list price ignores the several commitment mechanisms both Yardi and its clients implement. In practice, these result in overwhelming adherence: Landlord Defendants transact within 1.41% of Revenue IQ's recommendation, on average. (*see* Section 8.2.1).

87.   This argument also does not address a significant and well-established body of economic research that concludes collusion on list prices can still be effective at coordinating final transaction prices upward. Peer-reviewed economic research explains that markets with both public list prices and non-public discounts are not immune from effective collusion. In such markets, firms can either collude purely on list prices or collude on both list prices and discounts. Both coordination structures can be effective at pushing prices above a competitive level. Because Yardi does not address this economic research, its argument

FILED UNDER SEAL

does not alter my conclusion that the list price outcomes of Revenue IQ substantively determine Landlord Defendants' final transaction prices, even in the presence of some discounting.  (*see* Section 3.2.2).

88.    **Fourth**, Yardi does not dispute that its benchmark reporting distributes non-public data among rival participants; it argues only that this information cannot be deanonymized. That misses the economically relevant question: even anonymized information exchanges can reduce competitive uncertainty and therefore increase prices, and economists expect that firms will only agree to share their information with rivals if they expect to benefit from it, and in particular if they have a mutual expectation that prices will rise as a result. Neither Yardi's brief nor its expert declarations evaluate whether benchmark reporting could nonetheless serve anticompetitive ends, or the economic incentives that economists expect to motivate an information exchange.

89.    Yardi also does not evaluate how its benchmark reporting may interact with other features in its Pricing Suite, including TAM oversight. Because Yardi offers no analysis of TAMs, it does not address the possibility that TAMs function as compliance monitoring (*see* Section 6) – in which case benchmarking need not be deanonymized to support a conspiracy.

90.    Taken together, and for the reasons explained above and throughout this report, the documents and data I have reviewed are more consistent with landlord clients using Revenue IQ to achieve a shared objective – collective  price increases – than  with the sort of unilateral price-setting behavior economists associate with a non-collusive algorithm.

# 3. The Economic Theory of Algorithmic Collusion and Horizontal Information Exchanges

91.    Price collusion is widely considered to be the most pernicious form of anticompetitive conduct. One way such collusion can be implemented is via a market intermediary (or "hub") that helps coordinate pricing across horizontal rivals (or "spokes"), forming a "hub-and-spoke" conspiracy. Conduct fitting this pattern may therefore be subject to strict antitrust scrutiny.

92.    Here, as I discuss below in later sections, it is uncontested that Landlord Defendants used Revenue IQ and agreed to exchange non-public data, which Yardi then incorporated into TAM pricing oversight and benchmarking reports. The operative question is whether this uncontested conduct constitutes collusion, or sufficient evidence thereof. I therefore focus my review of the relevant economic literature on research specifically considering coordination via algorithmic price setting and horizontal information exchanges. Thus, my analysis is distinct from that in other cases where economists support the existence of

FILED UNDER SEAL

collusion by analyzing observed pricing behavior and distinguishing between collusion and competitive oligopoly.

93.     The discussion below considers a range of mechanisms through which coordinated pricing outcomes may arise. Economic theory and empirical work recognize that firms can sustain coordination through multiple structural arrangements, including mechanisms that facilitate price alignment and monitoring of deviations. Against this background, a central analytical question is whether algorithmic price-setting represents a distinct form of coordination or instead constitutes the implementation and automation of coordination mechanisms that are already well described in the economic literature. With this question in view, I first summarize the relevant economic research on algorithmic pricing and price-setting technologies.

## 3.1  Collusion Through Algorithmic Price Recommendations

**94.**     Algorithmic price setting is a new price determination method that might, in turn, raise new questions for antitrust enforcers. On the one hand, a truly "efficient" algorithm may make faster/more responsive pricing decisions than human beings, thereby improving market outcomes. On the other hand, an algorithm operator maximizes its own profits by also maximizing the collective willingness to pay for the algorithm summed across all its potential clients. Because the purpose of the algorithm is to set prices for the operator's clients, this creates a strong incentive for the algorithm to set prices that maximize clients' collective, rather than unilateral, profitability. Economists have long recognized that similar mechanisms can lead to collusion in hub-and-spoke conspiracies.

95.     Consider an example: two landlords, A and B, compete to rent multifamily units. Absent a hub-algorithm, they make independent decisions. If A attempts to set supracompetitive rents, B may opportunistically maintain lower rents to win market share. With a common algorithm, both outsource their pricing decision to the algorithm. If A attempts to set supracompetitive rents (or the algorithm tells it to), the algorithm operator has an incentive to also increase B's rent, to make sure that client A stays happy and does not excessively bleed renters to B.

96.     As a result, both A and B are better off setting supracompetitive than competitive rents, but B is worse off than opportunistically taking market share from A. The reason this collusive outcome is sustainable (e.g., the reason A and B solve the coordination problem in the prisoner's dilemma) is because they have outsourced their decision making to a third-party algorithm that cares more about the sum of their pay-outs than their unilateral profits. In other words, the algorithm blunts the competitive forces that would otherwise discipline prices.

97.     Because of these concerns and questions, there is a growing economic literature dedicated

FILED UNDER SEAL

to understanding the competitive effects of, and motivations for, competing firms choosing to adopt the same pricing algorithm. Before proceeding to summarize that literature, I note that a separate literature instead focuses on individual firms each using their own algorithm, and whether these distinct algorithms could learn to collude with each other. While this is an intriguing area of research, it is not directly relevant to the simpler questions in this case. Here, because many rival firms (Landlord Defendants) commonly use the same algorithm (Revenue IQ), operated by the same company (Yardi), the mechanisms and incentives for collusion via this central hub are comparatively obvious relative to the case of distinct algorithms autonomously learning to collude with one another.

98.     In this report, I therefore focus on the economics of collusion via a central algorithm acting as a hub, which I refer to as a "hub-algorithm." Using both empirical and theoretical methods, recent economic research has developed a deeper understanding of whether and how hub-algorithm adoption across competitors can lead to collusion. I begin by discussing leading empirical work in this space.

### 3.1.1   Empirical Work Shows That Hub-Algorithms Can Coordinate Prices Upward

99.     Assad et al. (2024) study adoption of a common pricing algorithm by German gas stations, comparing price effects in monopoly vs. oligopoly markets, e.g., highly consolidated vs moderately consolidated local geographic markets.[4] The German retail gasoline market was characterized by price transparency, instituted in August 2013, with changes in prices being reported to the German Market Transparency Unit for Fuels, and then shared to consumer-facing information service providers.[5]

100.    Assad et al. find that gas station profit margins increase by 38% post-adoption in oligopoly markets where all adopt vs. none adopt the hub-algorithm.[6] Critically, they also find hub-algorithm adoption had no effect on margins in monopoly markets. The authors use this finding to infer that the mechanism through which the pricing algorithm increased margins

---

[4] Stephanie Assad, Robert Clark, Daniel Ershov and Lei Xu, "Algorithmic Pricing and Competition: Empirical Evidence from the German Retail Gasoline Market," *Journal of Political Economy*, March, 2024, available at https://doi.org/10.1086/726906 (hereinafter, "Retail Gasoline Market") (accessed January 13, 2026).

[5] Retail Gasoline Market, *"Two features of the German market are important for our analysis. First, price transparency was instituted in August 2013 in response to concerns about high prices and tacit collusion by regulatory authorities. As part of this initiative, stations adjusting their price must report new prices in real time to the German Market Transparency Unit for Fuels (www.bundeskartellamt.de), which are then shared with consumer-facing information service providers and integrated into websites and mobile applications as well as into car GPS systems,"* p. 730; *"Our paper takes this environment as given, and so we study the additional effects of AP software in a market with price transparency, daily price variation, and price matching,"* p. 731.

[6] Retail Gasoline Market, *"Our oligopoly market-level results indicate that, relative to markets where no station adopts, markets where all do see a margin increase of 3.2 cpl, or roughly 38%,"* p. 727.

was coordination across gas stations that had previously been competing.[7] The authors explain:

> "*Together these results are striking and suggest a simple mechanism through which algorithmic competition maintains high prices and margins. Effectively, the algorithms meet any price decrease with an immediate price decrease of their own, teaching each other that undercutting is not profitable since the undercutter will always be followed to the lower price by the other station.*"[8]

101.   The logic behind this inference is that markets that are already monopolies are already setting monopoly prices, and so coordination will not further increase prices – precisely as their results observed.[9]

102.   Other recent work evaluated pricing algorithms in the industry relevant to this case – multi-family rental housing the United States. Calder-Wang & Kim (2024) study RealPage (a rival of Yardi) adoption by landlords. RealPage offers multiple revenue management services ("Yieldstar" and "Lease Rent Option") and the authors estimate that 6.7% of rental properties across all US metropolitan statistical areas use YieldStar, and 3.7% using Lease Rent Option, amounting to about 4.2 million units as of 2023.[10] In the period following the Great Recession, Calder-Wang & Kim find that market segments with higher algorithmic penetration experienced higher average rents and lower occupancies – with  average rents

---

[7] Retail Gasoline Market, "*These results show that market-wide AP* [algorithmic pricing] *adoption raises margins, suggesting that algorithms soften competition. The magnitudes of margin increases are consistent with previous estimates of the effects of coordination in retail gasoline market,*" p. 727; "*Together these results are striking and suggest a simple mechanism through which algorithmic competition maintains high prices and margins. Effectively, the algorithms meet any price decrease with an immediate price decrease of their own, teaching each other that undercutting is not profitable since the undercutter will always be followed to the lower price by the other station,*" p. 763.

[8] Retail Gasoline Market, p. 763.

[9] Retail Gasoline Market, "*The null estimated effects of adoption for monopolist stations naturally lead to questions about why they would have adopted in the first place. Of course, the null effect only shows that there is no change on the mean. There may well be substantial changes in prices at different points during the day, reflecting a monopolist station's ability to better price discriminate (as in Dubé and Misra 2023). These changes could average out to a daily null effect,*" p. 754; "*Monopolist AP* [algorithmic pricing] *adopters show a different pattern, likely reflecting an improved ability to temporally price discriminate and improve overall profits,*" p. 755.

[10] Sophie Calder-Wang and Gi Heung Kim, "Algorithmic Pricing in Multifamily Rentals: Efficiency Gains or Price Coordination?," August 16, 2024, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4403058 (hereinafter, "Multifamily Rental Markets") (accessed January 9, 2026), "*RealPage has disclosed that approximately 6.7% of rental properties across all US metropolitan statistical areas use its YieldStar and AI Revenue Management, and 3.7% uses LRO, which amounts to about 4.2 million units as of 2023. Although it only accounts for 10.4% of overall rentals in the US, it accounts for about 21% of multifamily rentals, and even more strikingly, over 30% of buildings with 20 or more units, which are more likely to be managed professionally and users of such ERP systems,*" p.8.

FILED UNDER SEAL

being around 4% higher in segments with the most algorithmic penetration.[11] I note that this pricing effect is similar to later estimates I provide in Section 9 of how the adoption or Revenue IQ increases Landlord Defendant prices.

### 3.1.2 Economic Theory Explains How Pricing Algorithms Can Sustain Collusion Without Non-Public Data

103.    One response to these empirical findings is that algorithms help their clients achieve "better" prices. What exactly this means can be unclear. If a hub-algorithm responded to changes in supply and demand more efficiently than human decision making, this would make prices more variable, not systematically higher. Do we therefore believe that sophisticated corporations have, for years, been serially and inefficiently underpricing before adopting hub-algorithms like Yardi or RealPage? If we don't believe this, how – if not through anticompetitive coordination – are these hub-algorithms increasing prices, where clients unilaterally could not? In this light, Assad et al.'s and Calder-Wang & Kim's findings raise two questions of particular importance to antitrust enforcers:

- **First**, how are hub-algorithms achieving higher prices than human pricing?

- **Second**, when should we consider this collusion?

104.    To date, the seminal economic theory tackling these questions is Harrington (2025).[12] Harrington provides a model and tests to infer whether firms' decisions on the adoption of a common pricing algorithm are coordinated (thereby inferring the presence of an unlawful agreement among adopters) based on the effect that the number of adopting firms has on prices.[13] The key result is that if firms decide whether or not to use the algorithm independently, then the average price of adopting firms is not affected by the adoption rate, while if firms coordinate on the adoption, the average price is positively related to the adoption rate.[14]

---

[11] Multifamily Rental Markets, *"during the recovery period (2014-2016), market segments with higher algorithmic penetration saw higher average rents and lower occupancies, with averages rents about 4% higher in segments with the most algorithmic penetration,"* p. 3.

[12] Joseph E. Harrington, "An economic test for an unlawful agreement to adopt a third-party's pricing algorithm," *Economic Policy*, January, 2025, available at https://academic.oup.com/economicpolicy/article-abstract/40/121/261/7772481 (hereinafter, "Harrington (2025)") (accessed January 13, 2026).

[13] Harrington (2025), *"These findings provide a test for determining whether there is an unlawful agreement between a third-party developer and adopting firms,"* p. 292

[14] Harrington (2025), *"If firms are independently deciding whether to adopt the pricing algorithm, the average price of adopting firms is predicted to be independent of the number of firms that adopt. If instead firms are coordinating their adoption decisions then the average price of adopting firms is predicted to be increasing in the number of firms that adopt,"* p. 292.

FILED UNDER SEAL

105.    To be specific, Harrington considers a setup of linear demand where demand for a firm is:

$$D = a + e_i p_i + e_j p_j \tag{1}$$

106.    Where $a$ is a stochastic demand state, $e_i$ is a coefficient on each firm's own price, $p_i$, and $e_j$ is a coefficient on rival firms' average price, $p_j$.[15] This leads to a standard symmetric Nash equilibrium where the price is increasing in the mean of the demand state variable – i.e., firms compete with each other but increase prices when demand is higher.[16]

107.    Importantly, information on the state of demand ("a") is not obtained through the sharing of non-public information among competitors, it is simply assumed that some competitors have this information while others do not. Thus, the collusive mechanism in Harrington's 2025 setting does not rely on information sharing.

108.    Without a hub-algorithm, average prices are the same across firms, but there is a subset of firms that can observe stochastic changes in demand, $a$, and price higher when demand is higher.[17] With a hub-algorithm, the operator seeks to recommend prices that will maximize firms' willingness to pay for the algorithm, which is the difference in profit from adopting vs. not adopting.[18] The optimal pricing then depends on the algorithm adoption rate, $\theta$.[19]

109.    Adoption of the hub-algorithm could be independent or coordinated: when adoption is coordinated, firms anticipate that their adoption affects other firms' adoption decisions. Such coordinated adoption implies:[20]

- Average price of adopters and non-adopters increases with the adoption rate – adopters because they are coordinating, non-adopters because a higher price by the adopters reduces the competitive constraints on non-adopters, sometimes referred to as an "umbrella effect." More colloquially, a rising tide lifts all boats.

- Average price of adopters is higher than that of non-adopters

---

[15] Harrington (2025), *"For tractability purposes, demand is assumed to be linear: a - bp_i + dP_{-i} where p_i is a firm's own price, P_{-i} is the average price of rival firms, and b>d >0,"* p. 269.

[16] Harrington (2025), *"a which is assumed to have a continuously differentiable cdf [...] with mean μ and variance σ² [...] A symmetric Nash equilibrium price p^N is defined by [...] p^N = (μ + bc)/2b-d),"* p. 269.

[17] Harrington (2025), *"when a fraction θ of firms can condition price on the demand state,"* p. 269; *"and the firms who set a uniform price choose [...] so average price is the same for all firms,"* p. 270.

[18] Harrington (2025), "*the third party is knowledgeable of the agreement and designs the pricing algorithm to maximize the WTP of the adopting firms. As their adoption decisions are joint—either all adopt or none adopt— their WTP for the pricing algorithm is an adopter's profit when a fraction θ of firms adopt minus a non-adopter's profit when no firms adopt,*" pp. 272, 273.

[19] Harrington (2025), *"Thus, when adoptions are coordinated, p^C has average price increasing in the adoption rate θ,"* p. 283.

[20] Harrington (2025), *"Under coordinated adoptions: i) the average price of adopters and non-adopters are increasing in the adoption rate; and ii) on average, the price of adopters exceeds the price of non-adopters,"* p. 275.

FILED UNDER SEAL

110.    Independent adoption conversely implies:[21]

- Average price of adopters and non-adopters is unrelated to the adoption rate

- Average price of adopters equals the price of non-adopters, all else equal.

111.    From these findings, Harrington suggests three empirical tests for algorithmic collusion, with the first being the most general and robust:[22]

- **First**, the average price of adopters increases in the adoption rate. More intuitively, as the cartel gets bigger (and the constraints on it comparatively smaller), the price of cartelists goes up.

- **Second**, the average price of non-adopters also increases in the adoption rate.

- **Third**, the average price of adopters exceeds the average price of non-adopters.

112.    Further if a higher adoption rate causes prices to rise for a very large share of demand states (as opposed to better identifying when/where demand is higher and can sustain higher prices), then the pricing algorithm is more likely to embody collusive conduct.[23] Here, the price is the rent, so a key question is whether Yardi's products lead to rent increases across demand states, i.e. do we see rent increases in most cases, regardless of local demand for rental units?

113.    In another 2025 paper, Harrington specifically argues that a hub-algorithm can achieve a "shared objective" of supracompetitive pricing, even without non-public data.[24] He considers recent proposed "remedies" regarding algorithmic pricing that center on the use of non-public data in a hub-algorithm. He criticizes this proposal on two dimensions:

- First, that an outright ban on non-public information use in algorithms could create

---

[21] Harrington (2025), *"Under independent adoptions: i) the average price of adopters and non-adopters are independent of the adoption rate; and ii) on average, the price of adopters equals the price of non-adopters,"* p. 279.

[22] Harrington (2025), pp. 284, 285, *"In conclusion, Test #1 is the most general and robust of the three tests and is the one recommended,"* p. 286.

[23] Harrington (2025), *"If a higher adoption rate causes price to rise for a very large share of demand states then the pricing algorithm is likely to have been designed as part of an unlawful agreement,"* p. 291.

[24] Joseph E. Harrington, "A Critique of Recent Remedies for Third-Party Pricing Algorithms and Why the Solution Is Not Restrictions On Data Sharing," *Journal of Competition Law & Economic*, August 19, 2025, available at https://doi.org/10.1093/joclec/nhaf022 (hereinafter, "Critique of Remedies") (accessed January 28, 2026), *"More specifically, a workaround is developed whereby a third party can result in firms charging supracompetitive prices while not using nonpublic competitor data,"* p.1; *"It has been shown that a third party can produce supracompetitive prices without relying on nonpublic competitor data,"* p. 15.

inefficiencies.[25]

- Second – "and more importantly" – "shared data are neither necessary nor sufficient for anticompetitive harm."[26]

114. In other words, Harrington argues that screening pricing algorithms using a non-public data use test is likely to erroneously absolve problematic algorithms while simultaneously producing inefficiencies. He argues that the true problem with hub-algorithms is when they seek to achieve a "shared objective" across horizontal competitors:

> *"The problem is that the remedy focuses on shared data when the source of harm is shared objective."*[27]

115. Harrington (2025) defines a shared objective as:

> *"A third party is said to have 'shared objective' when, in designing its pricing algorithm, it takes into account the common interest of subscribing firms."*[28]

116. In other words: firms can use a hub-algorithm to achieve the shared object of maximizing their collective profits, achieving their "common" vs unilateral interest. An information exchange may be indirectly informative of this (similar to how an information exchange is generally a plus factor in cartel analysis), but is not a necessary pre-requisite to achieve this shared objective. Firms adopting a hub-algorithm can achieve a shared objective to increase prices by progressively iterating on each other's past public prices. Harrington (2025) explains how a learning algorithm that iterates on its prior output can apply an "inflator" to participants' prices, and gradually increase this inflator across participants until they all charge supracompetitive prices:

> *"a firm's price depends only on its own data and rival firms' past prices, which are presumed to be public information. The third party [hub-algorithm] iterates on this process—each period, recalculating a firm's profit-maximizing price based on rival firm's previous period's price and inflating it—until firms' prices have settled down. Those prices will exceed competitive prices by slightly more than 1 percent. At that point, the third party [hub-algorithm] increases the*

---

[25] Critique of Remedies, *"The currently proposed and implemented remedies harm the efficiencies delivered by a third party because they reduce the amount of data it has, and data are the essential ingredient in data analytics,"* p. 10.

[26] Critique of Remedies, *"That is the source of harm, and shared data are neither necessary nor sufficient for there to be harm,"* p. 15.

[27] Critique of Remedies, p. 1.

[28] Critique of Remedies, p. 15.

FILED UNDER SEAL

> *inflator for all firms from 1 percent to, say, 2 percent. Again it iterates the process until prices settle down. Now, it compares a firm's average profit during the periods with the 2 percent inflator with its average profit during the periods with the 1 percent inflator. If the latter is higher then it keeps the inflator at 2 percent. If the former is higher then it raises the inflator to, say, 3 percent. Thus, some firms' inflators may become fixed (if their profit is not higher), and others are still being increased. This process continues until all firms' inflators are fixed."*[29]

117.    The process Harrington (2025) describes closely parallels the logic Yardi applies through Revenue IQ's Trend Rules. As I explain below in Section 5.2, when the Comp Trend Rule is enabled, Revenue IQ compares current prices against rivals' past prices – as Harrington describes. To these prices, Revenue IQ then applies step changes determined by several rules, including the Comp Trend Rule – also similar to what Harrington describes. The Comp Trend Rule then proliferates price increases across participating landlords until/unless their other Trend or Health Rules signal the price increases are no longer profitable – again as Harrington describes. By doing this across participating landlords, the demand signals that would normally trigger the Trend or Health Rules to intervene are dampened, as consumers face fewer low-price options across the board. As a result, clients of the hub-algorithm (Revenue IQ) set higher prices than they would but-for the collective adoption of this pricing rule book.

118.    In principle, a pricing algorithm could also automate complex processes that support better demand prediction and in turn better prices. However, there is evidence Revenue IQ does not do this. It primarily appears to be a "rule-based" algorithm, the stated purpose of which is to achieve smooth and consistent price increases, instead of rapid responses to changes in supply and demand (*see* Section 5).

119.    In a Competition Policy International (CPI) Antitrust Chronicle article, Professor Miklós-Thal and Professor Tucker argue that pricing algorithms can be "rule-based," meaning they align firm prices among competitors with a price matching algorithm, or "predictive," meaning they improve pricing performance with demand forecasts.[30] Intuitively, the former poses a more obvious threat to consumers because it achieves no pro-competitive purpose that human pricing does not, while aligning the pricing rule book across competitors. Even

---

[29] Critique of Remedies, p. 14.

[30] Jeanine Miklós-Thal and Catherine Tucker, "AI, Algorithmic Pricing, and Collusion," *CPI Antitrust Chronicle,* February, 2024, available at https://simon.rochester.edu/sites/default/files/2024-03/2-AI-ALGORITHMIC-PRICING-AND-COLLUSION-Jeanine-Miklos-Thal-Catherine-Tucker.pdf (accessed January 23, 2026), *"Our research suggests that rule-based pricing algorithms that allow firms to peg their prices to those of competitors, through a simple price matching algorithm for instance, are more likely to raise concerns than algorithms that improve sellers' pricing performance thanks to better demand forecasts,"* p. 3.

then, better demand prediction can play an important role in collusion, and therefore be fully consistent plaintiffs' allegations of collusion, as I further explain below.

### 3.1.3 Strategically Censored Information Exchanges Can Support Coordination in a Hub-And-Spoke Conspiracy

120.    One important lesson of this literature is that the economics of anticompetitive coordination via a hub-algorithm do not rely on the exchange of non-public information in that algorithm. A transition from unilateral to collective profit maximization can occur only because the hub-algorithm internalizes competitive dynamics that would otherwise erode prices to the competitive level and iteratively learn how to set supracompetitive prices.

121.    Nevertheless, information exchanges among adopters can nonetheless support and maintain coordination via a hub-algorithm, as I discuss in this section.

122.    Two theoretical papers study situations where a market intermediary (e.g., hub-algorithm) like Yardi both recommends prices and provides information to spokes. The core insight is that sharing information with an intermediary like Yardi, while keeping some of the information hidden from competitors, often best serves colluding firms.

123.    Sugaya & Wolitzky (2018, 2025) study a price recommendation product that combines information sharing and price recommendations, just as Yardi does. Specifically, they construct a theoretical model to consider "how a shared algorithm … optimally discloses information to facilitate collusion."[31] A key takeaway is that effective collusion does not always involve disclosing the most detailed information about the state of the market.[32] They endogenize not just the binary decision to share, or not share information, but the amount of information that the hub shares among the spokes. In other words, Sugaya & Wolitzky study the case of a pricing algorithm that observes the market with more information than is unilaterally available to firms, then optimally chooses how to disclose

---

[31] Takuo Sugaya and Alexander Wolitzky, "Maintaining Privacy in Cartels," *Journal of Political Economy,* December, 2018, available at https://www.jstor.org/stable/26550551 (hereinafter, "Maintaining Privacy in Cartels") (accessed January 14, 2026); Takuo Sugaya and Alexander Wolitzky, "Collusion with Optimal Information Disclosure," January 17, 2025, available at https://economics.mit.edu/sites/default/files/inline-files/disclosure%20January%202025%20final.pdf (hereinafter, "Information Disclosure") (accessed January 15, 2026).

[32] Maintaining Privacy in Cartels, *"in several recent cases cartels have instead worked to preserve the privacy of their participants' actions and outcomes. Toward explaining this behavior, we show that cartels can sometimes sustain higher profits when actions and outcomes are observed only privately, because better information can hinder collusion by helping firms devise more profitable deviations from the collusive agreement,"* p. 2569; Information Disclosure, *"This paper instead studies how a shared algorithm with demand information superior to the firms' optimally discloses information to facilitate collusion,"* p. 5; *"This paper has developed a simple model of an intermediary that possesses information on market demand or the cost of serving the market that is superior to that of the firms competing for the market and that selectively discloses this information to maximize the firms' profit in the best collusive equilibrium,"* p. 31.

FILED UNDER SEAL

information in order to maximize firms' collusive profit – when it is known *a priori* that firms are colluding via the hub-algorithm.  In their model, this leads to price rigidity and supra-monopoly prices. They find the optimal strategy is for the algorithm to report the specific demand state if it is low – and recommend the monopoly price, but, when demand is high, only report that demand is high without reporting the specific demand state – and still recommend the monopoly price.

124.    The lack of full information disclosure in high states is to avoid defection by firms as such defection is most tempting (profitable) when demand is high. From an economist's perspective, this is relevant to evaluating Yardi's claim that the benchmarking data Landlord Defendants receive is "anonymized and aggregated," which I discuss further in Section 4.4. Yardi's argument that its information is aggregated and/or anonymized does not imply that it cannot sustain collusive outcomes, since less precise information can better serve collusive outcomes. As I explain in Appendix A, there is evidence to suggest that multifamily rentals in the US have, generally speaking, been in a high demand state in recent years – meaning  that, within the context of an alleged conspiracy, Yardi has incentives to limit the information it discloses to rival landlords. Further, it has an incentive to asymmetrically tell them when they should increase prices, and not tell them to decrease prices. This finding will be relevant to my analysis of Yardi's Technical Account Managers in Section 6.

125.    Ortner, Sugaya & Wolitzky (2024) study the case of mediated collusion, e.g., collusion via a mediator without direct communication among the horizontally colluding firms.[33] The key point is that firms can maintain higher profits by communicating privately with a mediator (like Yardi) rather than publicly or not at all.[34] It can actually aid the cartel to not know the exact specific information about others' pricing, as this reduces the risk of deviation/undercutting and encourages firms to join the conspiracy in the first instance.[35] The mediator makes sure everyone benefits on average and firms don't undercut each other.[36]

126.    This setup helps us understand why a cartel may be better served by an intermediary like Yardi. Yardi's role is to make sure that competitors benefit from coordination, and, in

---

[33] Juan Ortner, Takuo Sugaya and Alexander Wolitzky, "Mediated Collusion," *Journal of Political Economy,* 2024, available at https://people.bu.edu/jortner/static/mediated%20collusion%20final%20one%20doc.pdf (hereinafter, "Mediated Collusion") (accessed January 13, 2026).

[34] Mediated Collusion, *"Mediation is essential: the cartel obtains strictly higher profits when firms privately communicate with a mediator, as compared to the case where firms can only communicate in public, or cannot communicate at all,"* p. 3.

[35] Mediated Collusion, *"auction formats that disclose so much bid information, despite the risk of facilitating collusion,"* p. 33.

[36] Mediated Collusion, *"the mediator cannot directly control the firms' bids, but it can impose a (limited) penalty on firms who deviate from their recommended bids, for example by triggering reversion to competitive bidding in future auctions,"* p. 7; *"the cartel benefits from the disclosure of losing bids only when it is assisted by a mediator, and the cartel benefits from employing a mediator only when losing bids are disclosed,"* p. 33.

FILED UNDER SEAL

particular, it does not reveal all the information when it could be harmful to the conspiracy. As a matter of economics, this undermines Yardi's argument that its aggregation and anonymization benchmarking reports are enough to avoid collusive outcomes, as that is precisely how economists expect a mediator like Yardi to behave when supporting a cartel, especially when combined with the sort of strategically asymmetric information disclosure Yardi's Technical Account Managers performed (*see* Section 6).

127.    In some cases, coordination can occur purely through an information exchange, or the information exchange can support a more canonical conspiracy. I summarize literature on this topic in the following section.

## 3.2    Collusion Through Information Sharing

128.    Information is generally a valuable commodity. Firms may unilaterally use information on supply/demand to set more efficient prices, or they may collectively exchange information to strategically increase prices – and sometimes they may do both. In this section, I therefore review economic literature on the following topics:

- The role of information on supply/demand in supporting collusion.

- How firms may collude in markets with both public and non-public prices (e.g., in markets with list prices and discounts).

- Concerted information exchanges as a coordination mechanism generally.

### 3.2.1    Pricing and Information About Demand States

129.    Early work has examined the role of demand conditions in maintaining or undermining tacit collusion. Staiger & Wolak (1992) theoretically examine tacit collusion in capacity constrained industry with demand fluctuations, which are observed by all firms each period.[37] Therefore, here, the price depends on the state of demand.[38] Stable market shares are a sign of effective collusion.[39]

130.    More recently, there has been growing interest in how an improvement in information and prediction of demand, e.g., via an algorithm, can facilitate collusion. Theoretical models by Miklós-Thal & Tucker 2019 and O'Connor & Wilson 2021 show that better demand

---

[37] Robert W. Staiger and Frank A. Wolak, "Collusive Pricing with Capacity Constraints in the Presence of Demand Uncertainty," *The RAND Journal of Economics*, 1992, available at https://www.jstor.org/stable/2555984 (hereinafter, "Capacity Constraints") (accessed January 13, 2026).

[38] Capacity Constraints, *"our equilibrium price wars can take either of two qualitatively distinct forms, depending on the state of demand for the period,"* p. 205.

[39] Capacity Constraints, *"our results suggest that intertemporal instability in market shares is a signal of relatively unsuccessful collusion,"* p. 217.

prediction can make collusion more or less likely in subtle ways depending on context.[40] Knowing demand better can make it more tempting to deviate from the collusive price, but conditional on collusion, better demand prediction raises profits (Miklós-Thal & Tucker 2019; O'Connor & Wilson 2021).[41]

131.    In another 2026 theoretical paper, Harrington similarly shows that an algorithm providing greater efficiency in demand responses facilitates collusion, as it increases the supercompetitive markup and incremental profits from collusion.[42] Indeed, average collusive prices are positively related to this efficiency, and increase with greater demand variance and adoption of the algorithm (as in Harrington (2025)).[43]

132.    Therefore, even if one of Revenue IQ's purposes is to improve demand prediction (and I note there is evidence to the contrary), this would still be fully consistent with a cartel

---

[40] Jeanine Miklós-Thal and Catherine Tucker, "Collusion by Algorithm: Does Better Demand Prediction Facilitate Coordination Between Sellers?," *Management Science*, April, 2019, available at https://www.jstor.org/stable/48760658 (hereinafter , "Collusion by Algorithm") (accessed January 13, 2026); Jason O'Connor and Nathan E. Wilson, "Reduced demand uncertainty and the sustainability of collusion: How AI could affect competition," *Information Economics and Policy*, 2021, available at https://www.sciencedirect.com/science/article/abs/pii/S0167624520301268 (hereinafter, "Reduced Demand Uncertainty") (accessed January 13, 2026).

[41] Reduced Demand Uncertainty, *"On the other hand, once firms have better knowledge of the true state of demand, they may better time their decision to deviate from a collusive agreement,"* p. 2; Collusion by Algorithm, *"We find that better demand prediction affects firms' ability to collude through two channels. First, it improves the cartel's ability to predict the joint profit-maximizing price in each period, which raises the maximum level of profit that the cartel can attain if collusion is successful toward the monopoly level. [...] Second, better prediction also affects the firms' incentives to deviate from a collusive strategy because it increases each firm's temptation to undercut price in periods when consumers are predicted to be willing to pay high prices,"* pp. 1552, 1553.

[42] Joseph E. Harrington, "Hub-and-Spoke Collusion With a Third-Party Pricing Algorithm," *The Journal of Industrial Economics*, January 13, 2026, available at https://onlinelibrary.wiley.com/doi/10.1111/joie.70017 (hereinafter, "Harrington (2026)") (accessed January 28, 2026), *"A novel finding is that the data analytics company's efficiency is a facilitating factor for collusion; a rise in this efficiency increases the supercompetitive markup and the incremental profit from collusion. Thus, markets in which a third party's services are solidly grounded in efficiency still warrant scrutiny by competition authorities because they are more prone to the emergence of collusion and anticompetitive harm,"* p. 1; *"We show that the supercompetitive markup is increasing in the efficiency delivered by the third party. The greater the efficiency, the more willing firms are to adopt the pricing algorithm, and that can be leveraged by the third party to set a higher markup. Given that the incremental profit from collusion is then higher, collusion is then predicted to be more likely when the efficiency is larger. To my knowledge, this is the first theory to show an efficiency to be a facilitating factor in collusion,"* p. 2; *"Hence, as the efficiency is greater, the third party can set a higher markup and still induce firms to adopt the pricing algorithm,"* p. 7; *"A novel finding of the theory is that a data analytics company's efficiency is a facilitating factor for collusion,"* p. 8; *"The third party's efficiency is a facilitating factor for collusion,"* p. 9.

[43] Harrington (2026), *"A novel finding is that the average collusive price depends on the efficiency delivered by the third party. Specifically, the greater the demand variance, the higher the supercompetitive markup from collusion,"* p. 7; *"In summary, when there is a hub-and-spoke collusive agreement, the average collusive price is increasing in the adoption rate and the demand variance,"* pp. 7-8; *"Thus, evidence that firms subscribing to a third party's services have a higher average price when more firms adopt, and when operating in markets with more variable demand supports the presence of collusion,"* p. 8; *"Markets with more variable demand provide greater scope for a data analytics company to deliver value to firms, and that higher value allows it to program in a higher supracompetitive markup when there is a collusive agreement,"* p. 9.

FILED UNDER SEAL

understanding demand to optimally set collusive prices.

133.    Information can also play a more direct role in collusion, as I explain in the following sections. I begin with a discussion of how firms may collude in a mixed setting of public list prices and non-public discounts.

## 3.2.2    Collusion with List Prices and Discounts

134.    In some contexts, markets may have both list prices and then negotiated discounts to final transaction prices. Multifamily rental housing has similar characteristics, given many renters start their search online (*see* Appendix A.2) then negotiate discounts or concessions to reach a final effective rent (*see* Appendix A.1). Such markets may still see collusion, often by fixing list prices which then directly impact final transaction prices. Economic theory has therefore worked to understand how this collusion works.

135.    Harrington (2006) reviews prosecuted cartels and, based on this evidence, discusses how firms can agree on a price rule book and then assess competitors' adherence to it, through monitoring and punishment if deviation occurs.[44] Through a common adoption of the same "price rules," cartelists can agree to offer specific prices conditioned on different scenarios, or to set a recommended and a minimum price.[45] Such agreement deviates from unilateral price setting, and consequently normal competitive forces that discipline prices to a competitive level.

136.    Boshoff & Paha (2021) discuss cases of list price collusion in the US and Europe. They consider how firms colluded in a two-stage process where they first define list prices, then

---

[44] Joseph E. Harrington, "How Do Cartels Operate?," *Foundations and Trends in Microeconomics,* 2006, available at https://joeharrington5201922.github.io/pdf/fnt06.pdf (hereinafter, "Harrington (2006)") (accessed February 4, 2026), *"When there was a wide array of feasible products, the cartel would either agree to a set of standardized products or use a sophisticated pricing rule that conditioned on the features of the product,"* p. 6; *"Towards deterring such cheating, cartel members' behavior was monitored and, if there was a significant deviation from the agreed-upon outcome, the deviator was punished and the harmed firms were possibly compensated,"* p. 43; *"In addition to the level of disaggregation, another important dimension to monitoring schemes was the frequency with which firms exchanged sales data and assessed compliance,"* p. 54.

[45] Harrington (2006), *"In all cartels, firms had common prices. When the product was homogeneous – such as vitamins or gases – this was a straightforward exercise. When there was a wide array of feasible products, the cartel would either agree to a set of standardized products or use a sophisticated pricing rule that conditioned on the features of the product. Collusion not only meant higher prices but typically fewer prices, with a smaller number of discounts and less variation in prices across customer types,"* p. 6; *"At the other end of the spectrum, the electrical and mechanical carbon and graphite products cartel instituted a sophisticated pricing rule which, in principle, allowed for many different prices depending on the particular characteristics of the product and the buyer.* […] *A second feature common to several cartels was that they would agree to a "target" (or "recommended") price and a "floor" (or "minimum" or "bottom") price which was lower than the target price,"* p. 7.

FILED UNDER SEAL

apply discounts to obtain transaction prices.[46] Firms can collude in both stages of price formation by fixing both list prices and discounts ("full collusion"), or they can collude on list prices only ("pure list price collusion").[47]

137.    To evaluate their proposed theory of harm, they consider its application in prior cartel cases. In cases of full collusion, discounts are centrally controlled to align transaction prices to list prices, as happened in the U.S. turbine generators, in the price collusion observed among senior executives in the citric acid industry between 1991 and 1995, or in the industrial thread cartel between 1990 and 2001.[48] Additional strategies consist in influencing salespeople, for example encouraging them to opt for lower discounts.[49] Note, this is relevant to my fact analysis of Yardi's account managers in Section 6.

138.    Boshoff & Paha also show that pure list price collusion can be an effective cartelization strategy.[50] List prices represent a "target function," a "starting point for discussion," and an "indicator from which a percentage discount could be deducted."[51] The authors cite three U.S. cases adopting this logic (the class action suit concerning high fructose corn syrup, the 1984 Fisher Brothers case, and the glassine and greaseproof paper antitrust litigation), concluding that list price collusion can raise transaction prices even when discounts are

---

[46] Willem H. Boshoff and Johannes Paha, "List Price Collusion," *Journal of Industry, Competition and Trade*, April 20, 2021, available at https://link.springer.com/article/10.1007/s10842-021-00360-w (hereinafter, "List Price Collusion") (accessed January 9, 2026), *"This article reviews cases of list price collusion in the USA and Europe, and it presents a theory of harm suggesting that a combination of anchoring, orientation on reference points, and loss aversion may render list price collusion effective in raising transaction prices—even if firms set transaction prices in a non-coordinated fashion,"* p. 393.

[47] List Price Collusion, *"To characterize agreements on list prices, we distinguish between full collusion, which involves coordination across both stages of price formation (i.e., the explicit fixing of both list prices and discounts), and pure list price collusion, where the firms only agree on list prices (i.e., the coordination is limited to the first stage of pricing),"* p. 394.

[48] List Price Collusion, *"Full list price collusion could be observed among senior executives in the citric acid industry between 1991 and 1995. [...] with the exception of the largest buyers, the agreement to avoid discounts implied that final transaction prices were meant to equal the list price [...] The European cartel in the market for industrial thread, which was already mentioned in the introduction, constitutes another example of full collusion. Seven firms were participating in this conspiracy, which lasted from 1990 until 2001 [...] the participants agreed on list prices and maximum rebates for closing the gap between the list prices and the actual net prices,"* p. 398; *"The U.S. turbine generators case provides another example of firms controlling discounting behavior,"* p. 399.

[49] List Price Collusion, *"These include strategies to centralize pricing authority or the introduction of incentives for salespeople to keep discounts small,"* p. 399; *"Competitors had adopted identical price lists and agreed on giving salespeople specific instructions to aim at these prices,"* p. 400.

[50] List Price Collusion, *"Similarly, in the industrial thread case, the European Commission asserted vaguely that "increasing list prices automatically had an influence on the level of the actual prices. [...] Consequently, they necessarily had at least a potential and even a likely influence on actual prices,"* p. 395.

[51] List Price Collusion, *"Even if there was no general fixed amount of rebates, the list prices had a target function and served as a starting point for discussion, as well as an indicator from which a percentage discount could be deducted,"* p. 395.

FILED UNDER SEAL

determined competitively.[52] The authors go further and suggest several mechanisms for how pure list price collusion can still inflate final transactions.

139.    Assorted literature – for example, experiments on the real estate sector (Northcraft & Neale (1987)), empirical works on art auctions (Beggs & Graddy (2009)), and negotiation literature (Ritov (1996)) – shows that list prices cause a behavioral "anchoring" effect. As list prices are starting points for negotiations, higher list prices consequently result in higher transaction prices.[53]

140.    Moreover, list price collusion affects consumers' definition of their reference prices.[54] Buyers may compare list prices to transaction prices.[55] If buyers are loss averse, and discounts are considered as gains, they can induce higher willingness to pay. Thus, list price collusion may help raise transaction prices.[56]

141.    Finally, the concept of price fairness discourages firms from raising list prices unilaterally. As suggested by Xia et al. (2004), customers might judge price differences between two transactions as unfair, making sellers reluctant to risk their reputation without confidence in how their rivals will respond to a price increase. List price collusion may help increase

---

[52] List Price Collusion, *"class action suit concerning High Fructose Corn Syrup. [...] The firms defended their conduct by arguing that the majority of HFCS sales were made at prices below the list price, so that a conspiracy aimed at raising the list prices could not have been effective. The court did not accept this argument, noting that "sellers would not bother to fix list prices if they thought there would be no effect on transaction prices. [...] U.S. courts struck a similar tone in the 1984 Fisher Brothers [...] "base prices are inflated by a conspiratorial agreement to keep them at a level higher than they would have been without the conspiracy, all purchasers are affected by the price artificially maintained even if the discounts from those base prices vary from purchaser to purchaser and from day to day, depending on a number of other factors. [...]" Glassine and Greaseproof Paper Antitrust Litigation. [...] The defendants in this private-damages case argued that list price collusion could have had an impact only on those customers paying list prices. The plaintiffs alleged that the conspiracy affected "the prices paid by both types of purchasers, and their interests would be congruent." The court accepted the latter position. [...] The findings of the court and the position of the defendants in each of the three cases focus on the second stage of pricing—the discounting or bargaining stage. The defendants in these cases argued that sales were made at prices below the list price and that discounts were determined competitively,"* pp. 396, 397.

[53] List Price Collusion, *"We now provide support to the hypothesis advanced by courts, namely that by serving as starting points for negotiations, higher list prices result in higher transaction prices. We propose that this may be the case because of a behavioral anchoring effect,"* p. 402; *"Northcraft and Neale found that the participants' estimates of the appraised value of the property varied significantly with the listing price. [...] Beggs and Graddy (2009) show empirically, for a dataset on Impressionist/Modern Art auctions and a dataset on Contemporary Art auctions, that paintings, which were sold at higher prices in the past, are typically also sold at higher prices in the present. [...] Anchoring effects are also observed in the negotiation literature. Ritov (1996) found, among others, that the initial offer in bilateral negotiations under experimental conditions serves as an anchor,"* p. 403.

[54] List Price Collusion, *"We propose that list price competition emerges because final prices are not only affected by anchoring effects but also by customers' orientation on reference points in combination with loss aversion,"* p. 404.

[55] List Price Collusion, *"In the following, we are mostly concerned with two types of reference prices. Firstly, a buyer may compare the transaction price actually charged to the posted list price of the same firm,"* p. 404.

[56] List Price Collusion, *"We suggest that higher list prices contribute to higher transaction prices because of the anchoring effect, whereas orientation on reference points and loss aversion causes list price competition, so that list price collusion may help raising transaction prices,"* p. 405.

the maximum accepted reference price.[57]

142.    Gill & Thanassoulis (2016) additionally explain how the separation of list prices and discounts can sustain collusion and actually push prices higher.[58] They provide a model of competition in list prices with discounts and show that the presence of discounts sustains higher prices.[59] A share of customers are bargainers and have the chance to obtain a discount, though it is only a chance, as bargaining may fail.[60] Other customers pay the list price.[61] List prices are first set and shared by firms, and then discounts offered to bargainers are chosen privately by firms.[62] The authors show that discounts help maintain collusion in a dynamic game: if a competitor lowers its list price, others can respond by lowering discounts, which makes defection to low list prices less profitable, thereby maintaining the conspiracy over high prices.[63] Their analysis provides a possible justification of experiments showing that prices are higher and efficiency is lower when consumers can negotiate a price lower than the posted one, as in Davis & Holt (1994) and Cason et al. (2003).[64]

---

[57] List Price Collusion, *"Price fairness was studied, for example, by Xia et al. (2004). [...] Under such circumstances, list price collusion may help shifting up the maximum reference price that customers are willing to accept,"* p. 405.

[58] David Gill and John Thanassoulis, "Competition in Posted Prices With Stochastic Discounts," *Oxford University Press*, August, 2016, available at https://www.jstor.org/stable/44076865 (hereinafter, "Stochastic Discounts") (accessed January 9, 2026).

[59] Stochastic Discounts, *"the potential to discount dampens competitive pressure in the market, thus raising all prices and increasing profits,"* p. 1528.

[60] Stochastic Discounts, *"a fraction of consumers (termed 'bargainers') can be strategically offered discounts off list prices that they receive with some probability,"* p. 1528; *"A bargainer receives a particular firm's reduced price offer with probability less than one. This assumption captures in a simple way the fact that bargaining is uncertain,"* p. 1529.

[61] Stochastic Discounts, *"'Price takers' buy at list prices,"* p. 1529.

[62] Stochastic Discounts, p. 1534.

[63] Stochastic Discounts, *"we extend our analysis to repeated interaction and demonstrate that bargaining facilitates firm collusion,"* p. 1531; *"Consider a market with N≥2 firms. When goods are perfect substitutes, the presence of bargainers facilitates collusion compared to the benchmark with only price takers: the critical discount factor that allows collusion to be subgame perfect is strictly lower with bargainers,"* p. 1545.

[64] Stochastic Discounts, "*Our results therefore provide a possible justification for the findings of Davis and Holt (1994) and Cason etal. (2003), whose experiments show that when consumers can haggle below a posted price, prices tend to be higher and efficiency lower,"* p. 1531; Douglas D. Davis and Charles A. Holt, "The effects of discounting opportunities in laboratory posted-offer markets," *Economics Letters*, 1994, available at https://www.sciencedirect.com/science/article/abs/pii/016517659300342L (accessed February 4, 2026); Timothy N. Cason, Daniel Friedman and Garrett H. Milam, "Bargaining versus posted price competition in customer markets," *International Journal of Industrial Organization*, 2003, available at https://www.sciencedirect.com/science/article/abs/pii/S0167718702000565 (accessed February 4, 2026).

FILED UNDER SEAL

### 3.2.3 Information Exchanges Can Themselves Constitute a Price-Increasing Agreement

143.  Of significant relevance to this case, Harrington (2022) bridges the literature on list price collusion with the literature on horizontal information exchanges.[65] He describes a game of information sharing about list prices, with the possibility of deviating from list prices in the final period. The key result is that collusion is stable when the cost of deviation from list prices is moderate.[66] Harrington's work helps us understand that Yardi's clients should only be willing to share information if they expect prices to rise and that their competitors will not use the information exchange to better undercut each other.[67]

144.  In this paper (Harrington, 2022), initial prices are shared, and then there is an opportunity to change the final price at some cost. If the cost of changing prices is too low, collusion cannot be sustained because firms fall back to the competitive equilibrium, undercutting each other based on the information. Knowing this, they all begin by pricing low. If the cost of changing prices is too high, then firms have pre-committed and cannot react to the shared information, in particular by lowering the price if they learn that competitors have lowered the price. In this case, they would rather price low from the very beginning in order to avoid being undercut later.

145.  A moderate cost of deviation sustains high prices because deviations from low prices can be punished with a low price response (where the cost of changing price is not too high), but it is not so cheap to deviate that a given actor would always price low in response to the competitor sharing a high price (where the cost of changing price is not too low). Applied to this matter, I explain how Yardi achieves this "moderate" cost of deviation in Section 8.1.

---

[65] Joseph E. Harrington, "The Anticompetitiveness of a Private Information Exchange of Prices," *International Journal of Industrial Organization*, 2022, available at https://joeharrington5201922.github.io/pdf/ijio22.pdf (hereinafter, "Harrington (2022)") (accessed January 13, 2026).

[66] Harrington (2022), *"The main finding is that a private information exchange of prices by competitors is harmful to consumers when the cost of adjusting price is neither too small nor too large which can be interpreted as the colluding executives having some but not full control over the final price. [...] when the executive has some limited control - as reflected in a moderately-valued adjustment cost to price - sharing prices is anticompetitive,"* p. 3; *"as in the two-price setting, the harm from sharing prices is greatest when the adjustment cost is moderate,"* p. 10.

[67] Harrington (2022), *"When they have an agreement to share prices, an executive will set a supracompetitive price because the executive knows that, should it be learned that other firms have set lower prices, they will have the opportunity and means to respond by lowering price. This anticipation that other firms would respond to a low price incentivizes executives to select and share supracompetitive prices,"* p.3; *"Due to the anticipation of sharing prices and that rival firms are able, to some limited extent, to respond to the prices that are shared, firms are incentivized to choose supracompetitive prices and, consequently, consumer pay supracompetitive prices,"* p. 8; *"a firm is incentivized to set and share a supracompetitive price, which could be in the form of a high list price or the addition of a surcharge. Notably, it is the information exchange agreement that creates harm for it is the anticipation of sharing prices that induces firms to initially set higher prices,"* p. 13.

FILED UNDER SEAL

## 3.3  Summary of Economic Literature On Algorithmic Collusion and Horizontal Information Exchanges

146.    Regardless of whether a hub-algorithm shares non-public information across rivals, its ability to coordinate prices among horizontal competitors – thereby damaging both competition and, in turn, consumers – is clear and well-founded in the economic literature. This literature proposes tests to evaluate whether such algorithms are collusive, which I implement preliminary versions of in this report.

147.    To summarize:

- **First**, a concerted exchange of non-public information among competitors can facilitate anticompetitive price increases across firms both as standalone conduct and in conjunction with a separate agreement it helps enforce.

- **Second**, the adoption of a common pricing algorithm that prioritizes collective profitability of the cartel over the unilateral profits of each firm can, even in the absence of private information sharing, anticompetitively coordinate pricing across firms.

148.    As a result, when either form of coordination is individually present, economic theory predicts a substantial risk that such conduct will undermine the competitive process and harm consumer welfare.

149.    With this conceptual framework in mind, I evaluate Yardi's Pricing Suite in the following section.

FILED UNDER SEAL

# 4. Summary of Yardi's Pricing Suite

150.    In this section, I summarize the core operations of Revenue IQ as I understand them from Yardi's public statements, documents, and filings in this matter. I therefore base my conclusions here and in later Sections on Yardi's own descriptions of its pricing algorithm. For each "subject property," Yardi applies a three-stage "Pricing Suite:"

**Figure 9: The Yardi Pricing Suite Includes Revenue IQ, Account Manager Oversight, and Benchmarking – All of Which Inform Client Pricing With Non-Public Rival Data**



151.    Throughout this report, I will frequently refer to this as the "Yardi Pricing Suite." In

FILED UNDER SEAL

Appendix A, I also provide a brief industry background, including definitions of widely used terminology, that may aid readers of this report. Here, I sequentially explain each facet of this Pricing Suite, commencing with Revenue IQ's algorithm and concluding with a stylized economic summary.

## 4.1  Revenue IQ Sets Clients' List Prices

152.    Revenue IQ is an example of Revenue Management software, i.e., software used to help landlords manage pricing and availability (*see* Appendix A.3). Revenue IQ was previously known as RENTMaximizer. Throughout this report I will use the name Revenue IQ but note that some internal documents which I cite to and which pre-date the rebrand use the name RENTMaximizer.

153.    This software uses algorithmic decision making to determine prices for multifamily rental units. RealPage is another notable example and competitor; I note it has also been subject to antitrust scrutiny in recent years, and is the defendant in a lawsuit brought by the United States Government. Throughout this report, I will sometimes refer to "RM" (or "revenue management") users to collectively refer to landlord users of either Yardi or RealPage, and "non-RM" users to refer to landlords who use neither service. As discussed below, Yardi uses these same terms in its own internal documents.

154.    Before proceeding I note that Yardi's brief and declarations present Revenue IQ as a highly complex pricing tool. This appears to be in tension with how it markets Revenue IQ as a "transparent" tool to the public. Client testimonials Yardi displays on its website describe "Revenue IQ [as] a transparent system that takes revenue management beyond the black box:"

FILED UNDER SEAL

**Figure 10: Yardi Clients Described Revenue IQ As "Transparent"**[68]



155. In the sections that follow, I describe Revenue IQ by synthesizing Yardi's own public descriptions with additional detail drawn from Yardi's internal documents and filings in this matter. Consistent with Yardi's portrayal, Liana Rao, a Yardi executive previously responsible for Revenue IQ "implementation and support," described Revenue IQ as a "trend- and rules-based system" with "three steps:"

> **Q:** It's correct that the Revenue IQ system is a trends-based system; correct?
>
> […]
>
> **A:** So I believe that I was saying **Revenue IQ is a trends- and rules-based system**. And by that, I mean we talk about how **there are three steps to the pricing calculation in Revenue IQ**. The first is a calculation of trends, the second is health rules, and the third is a series of additional settings or options.[69] (emphasis added)

156. I use Ms. Rao's structural summary to organize my discussion of Revenue IQ below.

---

[68] "Revenue IQ," Yardi, available at https://www.yardi.com/product/revenue-iq/ (hereinafter, "Revenue IQ Yardi") (accessed February 4, 2026).
[69] November 14, 2025, Deposition of Liana Rao, deposed by Rio Pierce (for Plaintiffs) and by David Sarratt (for Defendants) (hereinafter, "November 14, 2025, Rao Deposition"), 207:22 – 209:24.

FILED UNDER SEAL

### 4.1.1   Revenue IQ Uses Four Primary Trend Rules to Determine When to Increase, Maintain, or Decrease Rents

157.    The first step in Revenue IQ's list price recommendation is its four "Trend Rules": (1) unit availability; (2) interest from prospective renters; (3) new leases signed; and (4) rivals' asking rents. In its public materials, Yardi summarizes this to clients as:[70]

**Figure 11: Revenue IQ Applies Four Trend Rules, Including "Asking Rents for Comparable Rental Units in the Area"[71]**

# Adjusting day-to-day pricing upward, downward, or not at all.

Each day, a rent rate is generated for every rental unit at an apartment community that uses Revenue IQ. This rent rate might be higher, lower, or the same as the previous day's rent. There are four basic data elements (or "trends") in Revenue IQ that help landlords decide when to adjust the price.

1. Unit availability (supply)
2. Interest from prospective renters (demand)
3. New leases generated (demand)
4. Publicly available asking rents for comparable rental units in the area

Trends 1, 2, and 3 are based solely on the apartment community's own information. Trend 4 consists solely of publicly available asking rents. If a majority of these trends are moving in the same direction, Revenue IQ will recommend increasing or decreasing the asking rent. If not, Revenue IQ will recommend leaving the current pricing unchanged.

158.    Yardi made the "trends and rules based system" nature of Revenue IQ explicit to clients and markets the system as transparent. To that end, Yardi provides clients with "full visibility into pricing movement[s]" by allowing them to see the inputs to the Trend Rules and how those inputs affect the algorithm's pricing output, including visibility into "competitor asking rents":

---

[70] November 24, 2025, Declaration Of Michael Gaeta In Support Of Defendant Yardi Systems, Inc.'S Motion For Summary Judgment (hereinafter, "November 24, 2025, Gaeta Declaration"), ¶ 15.
[71] "How Revenue IQ Apartment Unit Pricing Works,"  Yardi, August 16, 2024, available at https://www.yardi.com/news/legal-news/how-revenue-iq-apartment-unit-pricing-works/ (hereinafter, "How Revenue IQ Works") (accessed February 4, 2026).

FILED UNDER SEAL

**Figure 12: Yardi Marketed Revenue IQ As Providing Clients with "Full Visibility Into Pricing Movement" and "Market Positioning Using Real-Time Data"[72]**



159.    In other presentations, Yardi described Revenue IQ as "intuitive, rules-based solution."[73] Specifically, users can view variables such as their own "asking rents vs comps," "availability," and "traffic" in Revenue IQ dashboards:

---

[72] Revenue IQ Yardi.
[73] YARDI-DUFFY_00067102, at -123.

FILED UNDER SEAL

**Figure 13: In Addition to Revenue IQ's Pricing Output, Yardi Gives Clients Direct Visibility On it Trend Rule Inputs, Including Rival Rents[74]**



160.    Each of the four trends are calculated by comparing "current" pricing factors against "previous" values of the same variables. For example, one such pricing factor is the number of available units within a pricing group. If the current number of available units is lower than the number of available units at some previous point in time, and if this decrease is a non-negligible amount, then the "available unit" trend will be positive. For each of the four trends, a "positive" trend indicates that that conditions are suitable for raising prices while a "negative" trend indicates that conditions are suitable for lowering prices.

161.    As part of the Revenue IQ configuration process, clients are able to adjust the importance of each trend by configuring a "weight", which is a value between 0 and 100. As Ms. Rao

---

[74] Revenue IQ Yardi.

explained, clients can only configure these weights at discrete values of 0, 25, and 50:[75]

> **Q:** Okay. So they have four trends, and they can choose how they want to use them; right?
>
> **A:** They have up to four trends. They can choose which ones they use, and they can choose how they define each trend.
>
> **Q:** Is it correct that each trend can be weighted at 0, 25, or 50 percent?
>
> **A:** Each of the four trends can be weighted at 0, 25, 50, I believe also 75. And I've never personally tried to weight a trend at 100 to see if it would work, but it might be possible that it could be weighted at 100 percent.[76]

162.    Revenue IQ then multiplies each trend value by its corresponding weight to create four "weighted trends". Finally, Revenue IQ calculates an average value of the four weighted trends to determine whether or not to raise rents, lower rents, or keep rents the same.

### 4.1.2    After Applying the Trend Rules, Revenue IQ Applies Optional Health Rules

163.    After provisionally determining if/how to change rent prices based on the Trend Rules, Revenue IQ validates this initial output by applying Health Rules.[77] In functional terms, the Health Rules operate a guardrails: they evaluate whether the Trend-Rule recommendation is consistent with a property's current leasing "health," and they can constraint, modify, or amplify the initial recommendation. The premise is that a property must be sufficiently "healthy" to increase prices, and that "healthy" properties may warrant larger price increases – and that, conversely, weaker conditions may warrant smaller increases, no increase, or a decrease.

---

[75] November 24, 2025, Declaration Of Mihran Yenikomshian In Support Of Yardi Systems, Inc.'S Motion For Summary Judgment, (hereinafter, "November 24, 2025, Yenikomshian Declaration"), footnote 104 ("*Revenue IQ clients are able to choose the weight assigned to each trend from a discrete set of weight options. Only specific combinations of weights are allowed by the software (e.g., 25-25- 25-25, 25-25-50-0, 0-0-50-50) and their sum must equal 100%. Clients can further choose to set a weight to zero to disable a trend. When the weight of any trend is set to zero, the client will have to redistribute the weight originally allocated to that trend among the remaining trends*"). *See also* November 24, 2025, Gaeta Declaration, ¶ 64, footnote 104.

[76] November 14, 2025, Rao Deposition, 211: 6-20.

[77] November 24, 2025, Yenikomshian Declaration, ¶ 30, (*"The second step ("Step Two") optionally incorporates the client's business objectives, also known as "Health Rules," into the provisional pricing output from the first step. Clients select and configure these Health Rules to further align the provisional pricing output from Step One with the client's unique priorities and business objectives."*)

164.    Specifically, these Health Rules include:

- Availability Percent
- Predicted 30 Day Trend
- 30 Day Predicted Availability
- Leased Percent
- Occupancy Percent
- Vacant Unrented Percent
- Forecasted Vacant Units
- 30 Day Exposure Count.[78]

**Figure 14: An Overview of Step Two in Revenue IQ's Calculation of Pricing Outputs[79]**



165.    Of these Health Rules, most rely purely on clients' own data, but the 30 Day Predicted Availability relies on regression models trained on availability/occupancy data across clients.[80]

---

[78] November 24, 2025, Gaeta Declaration, ¶ 18-23; ¶ 26, footnote 12 ("*The current Revenue IQ code base contains logic for Vacancy Forecast, Vacancy Percent and Predicted 30-Day Occupancy, which are Health Rules that have been phased out since 2021 and are no longer accessible to Revenue IQ users".)*

[79] November 24, 2025, Yenikomshian Declaration, ¶ 71.

[80] November 24, 2025, Gaeta Declaration, ¶ 25, ("*The data for all the optional Health Rules comes exclusively from the individual client except for Predicted 30-Day Availability, which is intended to help clients manage seasonal*

FILED UNDER SEAL

166.    Yardi trains and calibrates its Predicted 30-Day Availability Rule using non-public CPD data, including data on undecided renewals, predicted notices, and average available days using cross-client data:[81] This step (referred to as "model training") produces a set of variables ("model parameters") that serve as a simplified representation of the original non-public CPD data.

**Figure 15: Yardi Trains its Predicted 30-Day Availability on Non-Public CPD Data[82]**



167.    Within Revenue IQ, the Predicted 30-Day Availability Rule uses these "model parameters" (generated during the "model training" calibration process) to make a prediction of the number of units in a client's inventory that will be available at 30 days in the future. In

---

*fluctuations and anticipate what their availability is likely to be in the near future. It does this by taking their own property's current availability, adding to it a prediction for the number of residents that are expected to give notice to move out at their property, and subtracting from it a prediction for the number of new leases expected to be signed inclusive of seasonality at their property. A Revenue IQ client who chooses to apply Predicted 30-Day Availability receives an availability prediction that is determined by applying model coefficients—and only model coefficients—to that client's own data in order to form a prediction of what the availability at that particular property is likely to be in 30 days. Revenue IQ makes this prediction daily by taking metrics exclusively from a property's own data related to traffic, availability, unit turnover, and resident retention and multiplies that data against a set of coefficients, which reflect how much each metric from a property's own data should be weighted to form that property's prediction. These coefficients are generated by **logistic regression modeling** trained on nationwide, aggregated and anonymized data based on the same type of traffic, availability, unit turnover and resident retention metrics, none of which include any rent amount or rental rate data.") (emphasis added)*

[81] YARDI-DUFFY_00337134 at -35.
[82] YARDI-DUFFY_00198023 at -38.

FILED UNDER SEAL

other words, the 30 Day Predicted Availability Health Rule is a source of non-public rival data in Revenue IQ.

168.    I note that Yardi describes the purpose of the Predicted 30-Day Availability Rule as avoiding discounting. Specifically, the notes from a 2022 "RIQ script for sales conference" describe the rule as a competitive differentiator intended to "push rates in advance to not leave any money on the table."[83]

### 4.1.3   Clients May Apply Additional Settings & Options

169.    After applying the Trend and Health Rules, Revenue IQ permits clients to select additional configuration options that affect how the recommendations are implemented or to make limited, rule-governed adjustments in specific circumstances. These include variables such as "lease length" and "move-in date" that are not obviously related to the economic analysis of collusion:

**Figure 16: Following the Trend and Health Rules, Clients Can Apply Miscellaneous Additional Configurations[84]**



# Important factors such as move-in dates, lease lengths, etc.

In addition to the daily rate adjustments, Revenue IQ calculates a range of prices from which consumers can choose. These prices are based on other important factors selected by the apartment community, such as move-in date options, lease length, existing lease expiration dates, and the like. Examples:

- Giving prospective renters the option of choosing a longer lease for a lower price (longer leases are often less costly than shorter ones due to lower vacancy risk, turnover costs, etc.).
- Discounting units that have been unrented for an extended time.

Each apartment community has the sole discretion to decide if and when to use these optional components. Revenue IQ ensures that configuration settings and decisions are kept strictly confidential and are not shared between communities.

### 4.1.4   Revenue IQ Automatically Updates Each and Every Unit's List Price Daily, Without Requiring Client Approval

170.    The output of this process is a daily recommended list price for every unit covered by Revenue IQ, including units that are not currently available. These prices are then "immediately" propagated across Yardi's systems – updating the client's Voyager databases and, if units are listed online, RentCafe, which is a Yardi online listing platform. As Yardi explains it, this automation updates online listings daily so that "clients don't have to

---

[83] YARDI-DUFFY_00340500 at -501.
[84] How Revenue IQ Works.

approve pricing." Yardi promotes this automated, system-wide propagation of daily pricing updates as a core value-add of Revenue IQ:

**Figure 17: Yardi Markets Revenue IQ's Automatic Daily Pricing Updates as a Value-Add to Clients[85]**

> **11. I need to approve the pricing before it goes out so I don't hit my staff with too much of a change.**
> Our system is in place so that you don't have to approve pricing daily. Our methodology gives you visibility and faith in the system.

171.    For properties that use both RentCafe and Revenue IQ, the integration is designed to be continuous: each night, Revenue IQ automatically (a) pushes its recommended rents to a property's RentCafe listings and also (b) pulls in the most current RentCafe listing information for designated competitor properties for use as part of the "comp" trend. Yardi depicts this process in the slides below:



172.    Unless clients actively and frequently intervene, Revenue IQ's algorithmically produced list price will therefore be shown on each unit's public listing overnight each and every day. Indeed, Revenue IQ prices every unit's price every day, even if it is not currently

---

[85] YARDI-DUFFY_01274219.
[86] YARDI-DUFFY_00198624 at -31.

available. Revenue IQ's list price then becomes the starting point, or "anchor," of negotiations with every prospective renter for the Landlord Defendants. Consistent with this, I explain below that data shows Landlord Defendants on average transact within 1.41% of Revenue IQ's list price recommendation in Section 8.

### 4.1.5 The Comp Trend Rule Relies on Clients' Concerted Information Exchange

173.    To implement the Comp Trend Rule overnight every day for every unit, Revenue IQ requires near real-time structured data on pricing and unit characteristics (e.g., floor plans). To compare each unit's price against its comp set, Revenue IQ relies on two primary sources of competitor data:

- Yardi Matrix (or Matrix Surveys): call-around surveys Yardi performs at least monthly.[87]

- RentCafe data: structured data underlying public apartment listings on the RentCafe listing service.[88]

174.    According to Yardi, "[i]n the past, surveys of competitor properties were done by the site staff call all of the communities around them and asking them what their rents and specials were."[89] Although Yardi also permits users to input their own competitor survey data – that is, information obtained by calling competitor properties to inquire about their rents (something I discuss below at 4.1.5.1) – it encourages users to use its "auto-survey" feature, whereby Revenue IQ automatically pulls in the most up-to-date data available from either RentCafe or Matrix.[90] Yardi explains that "[t]his automated survey data will Save [sic] your team TIME so they can focus on leasing,"[91] and urges clients that the "1st choice is ALWAYS RENTmax/REV IQ auto surveys …. Only if those are not an option would you do [manual] surveys."[92]

175.    Through the pricing rule book I discuss further below in Section 5.1, this data informs Revenue IQ's list price. Before proceeding to a detailed discussion of how Yardi utilizes

---

[87] November 24, 2025, Yenikomshian Declaration, ¶ 59, ("*For Comp Trend, Revenue IQ compares the average of publicly available asking rents for client-selected comparable units from other properties to the client's rental rates and how this ratio changes between trend periods. Comp data can be entered manually by the client or sourced from one of two data sources. **The first source is the RentCafe database**.*") (emphasis added)

[88] November 24, 2025, Yenikomshian Declaration, ¶ 61, ("***The second data source is the Matrix database**, which stores data collected through public market surveys conducted by Yardi employees—either by calling properties to inquire about rent prices and promotions or by reviewing publicly advertised pricing information on property websites.*") (emphasis added)

[89] *See* YARDI-DUFFY_00013973 at -81.

[90] *See* YARDI-DUFFY_00013973 at -81; YARDI-DUFFY_00035860 at -66–71, -82–83.

[91] YARDI-DUFFY_00197492 at -501.

[92] YARDI-DUFFY_00206847 at -61.

FILED UNDER SEAL

this data (and whether its pricing rule book coordinate pricing outcomes), I pause to explain these data inputs in further detail, including whether they are competitively sensitive or public. I note that in the DOJ's recent settlement with RealPage in a case involving similar economic questions, it defined public data as:

> "`Public Data`" means information (including on a rental unit's asking price, publicly offered concessions, amenities, and availability) that is readily accessible to the general public, such as on the property's website, at a physical building, in brochures, or on an internet listing service.

> Public Data includes information on a rental unit's asking price, concessions, amenities, and availability provided by a Property Manager or a Property Owner to any natural person who reasonably presents himself as a prospective renter. Public Data does not include any Competitively Sensitive Information obtained through any communication between RealPage and one or more Property Managers or Property Owners or from any other Person, unless such information is also readily accessible to the general public."[93]

176.  Under this definition, Revenue IQ relies on a combination of public and non-public rival pricing data.

### 4.1.5.1  *Revenue IQ Bases Price Recommendations on Non-Public Rival Data From Matrix Surveys and Clients' Own "Call-Arounds"*

177.  Yardi supplies Revenue IQ clients with data from call-around surveys wherein Yardi call center employees make hundreds of thousands of calls every year to landlords. Yardi calls this information service "Yardi Matrix."[94]  Specifically, three times a year, Yardi conducts surveys for all of the approximately 120,000 apartment communities for which it maintains profiles; it also conducts monthly "stratified surveys" of a sample subset of these properties, conducting between 12,000-13,500 additional surveys each month.[95]  Among other things, Yardi collects data on competitor properties' current rents (often by unit type/floor plan), specials, and lease terms, as well as other property details that are used to populate Matrix property profiles and feed Revenue IQ's comp trend.[96]

178.  Matrix is a centralized market survey program that systematizes rival-to-rival information

---

[93] *Proposed Final Judgment, United States v. RealPage, Inc.*, No. 1:24-cv-00710-WO-JLW, (M.D.N.C. Nov. 24, 2025), Document No. 159-1, at 7-8.
[94] November 24, 2025, Yenikomshian Declaration, ¶ 61.
[95] YARDI-DUFFY_01268511 at -32-33.
[96] *See* YARDI-DUFFY_00229292 at -307–08; YARDI-DUFFY_00229770 at -70.

FILED UNDER SEAL

collection and redistribution.[97] Yardi call-center staff contact leasing offices for designated competing properties and record the information into the Matrix database (e.g., rents by floor plan, availability/occupancy indicators, and concessions/specials). Yardi training materials note that callers represents themselves as prospective renters in many instances and as calling from Yardi/Matrix in others.[98] In either case, the objective is the same – obtaining up-to-date, property-level information.

179.    More recently, the DOJ (successfully) challenged similar conduct by RealPage, alleging that RealPage operated a so-called "Market Analytics" service through which it collected non-public, competitively sensitive information – such as rents, occupancy, and concessions – by conducting "over 50,000" monthly call-around communications with competing property managers, then used that information to support and inform algorithmic rent recommendations.[99]

180.    Documents produced in this case indicate that, since the DOJ's complaint, RealPage has shut down its call centers[100] and that its proposed settlement with the DOJ would explicitly prohibit this conduct in the future by barring RealPage from "us[ing], shar[ing], publish[ing], disclos[ing], or otherwise provid[ing] to Unaffiliated Properties, (i) in Revenue Management Product(s) or (ii) otherwise for purposes of recommending a Subject Property's Floor Plan pricing, unit level pricing, or occupancy levels, data or information on rental occupancy, availability, or prices collected through Market Surveys conducted, commissioned, or otherwise obtained by [RealPage] after September 30, 2024."[101] Consistent with this, in an email exchange between a Yardi Matrix executive and a prospective client, Cortland, named as a defendant in the *RealPage* lawsuit, a Cortland representative wrote that "per our agreement with the DOJ we cannot sign with anyone who phone surveys" – and added, after Yardi protested that its callers were "no different than mystery shoppers" – that "For what it is worth [the Government] have also banned mystery shops and we will not be doing them."[102]

181.    Finally, I also note that, in addition to its automatic market surveys, Yardi also offers clients the ability to conduct their own surveys of competitor properties (e.g., by calling rivals'

---

[97] November 24, 2025, Yenikomshian Declaration, ¶ 44, (*"Matrix is Yardi's subscription-based market research product designed for real estate investors to gain market intelligence and evaluate potential acquisitions Matrix has its own database, the **Matrix database, which stores data collected through public market surveys**. The data in this database covers properties across the United States and is not limited to Yardi clients and properties."*) (emphasis added).

[98] YARDI-DUFFY_00229301 at -307–08; YARDI-DUFFY_00229770 at -70, -73; YARDI-DUFFY_00229769; YARDI-DUFFY_00229767.

[99] First Amended Complaint, United States v. RealPage, Inc., No. 1:24-cv-00710-WLO-JLW, ¶ 27 (M.D.N.C. Jan. 7, 2025).

[100] *See* YARDI-DUFFY_00973739 at -41.

[101] *Proposed Final Judgment, United States v. RealPage, Inc*., No. 1:24-cv-00710-WO-JLW, Document No. 159-1, Section IV, Letter E, at 13-14 (M.D.N.C. Nov. 24, 2025).

[102] YARDI-DUFFY_00973739 at -40-41.

FILED UNDER SEAL

directly to obtain rental rates or concessions) and input this information directly into Revenue IQ for use in the Comp Trend Rule. In instructional presentations, Yardi recognizes that landlords commonly perform such manual surveys, and provides detailed instructions regarding data input and collection – encouraging clients to "always ask the same question when gathering data:"[103]

**Figure 19: "RENTmaxRefGuide_MarketSurveyRENTmax," 09/11/2024[104]**



**Figure 20: "RENTmaxRefGuide_MarketSurveyRENTmax," 09/11/2024[105]**



---

[103] YARDI-DUFFY_00035860 at -73, -74.
[104] YARDI-DUFFY_00035860, at -73.
[105] YARDI-DUFFY_00035860, at -74.

FILED UNDER SEAL

182.   Yardi also encourages clients to perform these surveys under certain conditions. The same presentation states that "[i]t's a good idea to have at least one manual survey in place even if using automated surveys" and, in a separate slide, lists "[m]aintain relationships with nearby communities" as a reason for performing them[106]:

**Figure 21: "RENTmaxRefGuide_MarketSurveyRENTmax," 09/11/2024[107]**



183.   In connection with the *RealPage* lawsuit (and consistent with the internal Yardi email discussed above), the Government has entered proposed Final Judgments prohibiting landlords from conducting these types of competitor surveys. A proposed final judgment with landlord Cortland Management LLC, for example, includes the following prohibition:

> Defendant must not, directly or indirectly, as part of setting rental prices or generating rental pricing recommendations for any Cortland Property (1) disclose Nonpublic Data to any other Property Manager or Property Owner (except to the Property Owner of the particular Cortland Property); (2) solicit External Nonpublic Data from any other Property Manager or Property Owner (except from the Property Owner of the particular Cortland Property); or (3) use External Nonpublic Data obtained from another Property Manager or Property Owner (except from the Property Owner of the particular Cortland Property). For avoidance of doubt, the restrictions set forth in this Paragraph include Nonpublic Data obtained through any form of communication, whether directly or through an intermediary, including call arounds or market surveys,

---

[106] YARDI-DUFFY_00035860 at -85.
[107] YARDI-DUFFY_00035860 at -85.

FILED UNDER SEAL

in person meetings, calls, text messages, chat communications, emails, surveys, spreadsheets, shared documents (e.g., Google documents and SharePoint documents), industry meetings (e.g., user groups), online fora, private meetings, Revenue Management Product, or information-exchange service.[108]

184. Both Yardi's Matrix call arounds – as well as Yardi clients' (including Landlord Defendants') manual collection of rental information from one another for use in Revenue IQ – therefore constitute a non-public data exchange. The data exchange can facilitate higher prices among colluding sellers, consistent with the theory of harm economists recognize and which I explain in Section 3.2.

### 4.1.5.2 Revenue IQ Bases Price Recommendations on Rival Data From RentCafe, Which Is Not "Readily Accessible To The General Public"

185. In addition to the Matrix Surveys, Yardi informs the Comp Trend Rule using data from its RentCafe listing service. Yardi "RentCafe" is an online apartment listing, marketing, and leasing platform that is used by thousands of multifamily properties to advertise available units to prospective renters and to manage inquiries and applications. For renters, RentCafe appears as a consumer-facing website showing available apartments and advertised prices[109]; for participating landlords, it is a system through which asking rents, floor plans, and availability are published and updated.[110]

186. As I use the term here, "RentCafe data" is the stream of advertised rent information that exists because of this platform. Participating properties publish their current asking rents and unit/floor-plan details (e.g., which floor plans are available and the advertised prices for those plans) through RentCafe listings; Yardi then retrieves this information for use in Revenue IQ's comp trend. In practical terms, RentCafe therefore functions as both (a) a public-facing advertising channel for apartments and (b) an underlying database of standardized listing information that can be pulled into other Yardi products.

187. It is not obvious that the RentCafe data, specifically as used by Revenue IQ, is truly "public." Revenue IQ does not "scrape" the public RentCafe web pages for each apartment listing – it queries the internal Yardi databases which creates those listings. That means that

---

[108] *Proposed Final Judgment, United States v. Cortland Mgmt., LLC*, No. 1:24-cv-00710-LCB-JLW (M.D.N.C. filed Jan. 7, 2025), ECF No. 49-1.

[109] *See* "Rent Your Happy Place," RentCafe, available at https://www.rentcafe.com/ (accessed February 4, 2026).

[110] November 24, 2025, Gaeta Declaration, ¶ 45, (*"RentCafe is a Yardi product suite available as an add-on to Yardi residential clients using Yardi Voyager Residential software that comprises several optional products and services, including property marketing websites, RentCafe.com, online lease execution, and others."*). *See also* November 24, 2025, Gaeta Declaration, ¶ 46, (*"RentCafe.com is a publicly available nationwide apartment listing website, or "internet listing service" ("ILS"). RentCafe property marketing websites are websites that are hosted by Yardi but appear as a client's own property website."*).

FILED UNDER SEAL

Revenue IQ has access to structured RentCafe data in a format and degree of accessibility that the public (and competing landlords) does not. The public and competing landlords would have to scrape the website daily to obtain this quantity of information with this degree of detail; depending on the site's anti-bot settings and request rate, such activity is commonly throttled or blocked by rate-limiting and bot-management systems.

188.    Revenue IQ's unrivalled access to RentCafe data has meaningful implications for its functionality as a pricing tool, as both landlords and Yardi itself explain in some detail. In particular, Revenue IQ is designed to match a client's units to comparable units at competing properties using detailed floor plan characteristics, which are difficult to scrape from the RentCafe website into a usable clean dataset:

**Figure 22: Screenshot of the Revenue IQ UI Showing the Floor Plan Mapping for a Selected Comp[111]**



---

[111] November 24, 2025, Yenikomshian Declaration, ¶ D. 91, Figure D. 29 (*"To narrow down the Comp selection, the client can apply various criteria, such as distance from the subject property or the number of units. The "Comp*

71

FILED UNDER SEAL

189.    In a newspaper article forwarded internally by Yardi employees in January 2025, one landlord explained that "figuring out the floor plans, the relevant levels of amenities, the square footage … that's a huge undertaking. And that information, in most cases, is not public":

**Figure 23: Landlords Describe Structured Information on Unit Floor Plans, Amenities, and Square Footage as "Not Public"[112]**

> "If you're trying to figure out what units are going for in a competitive area, figuring out the floor plans, the relevant levels of amenities, the square footage, all the things that factor into how valuable an apartment is, that's a huge undertaking. And that information, in most cases, is not public," said Drew Hamrick, general counsel with the Colorado Apartment Association.

190.    In other words, automated pricing tools require clean and structured data as inputs. At any single point in time, Revenue IQ relies on many RentCafe pricing observations and associated apartment/property characteristics that have been standardized through Yardi's internal process. A member of the public simply viewing a web page does not have access to "data" of the nature or quality that Revenue IQ relies upon. As a direct consequence, Landlord Defendants could not unilaterally recreate Revenue IQ's use of RentCafe data in the Comp Trend rule. In this sense, Revenue IQ's implementation of the Comp Trend Rule is only practically feasible because of Landlord Defendants' both providing their RentCafe data to Revenue IQ and their responses to Matrix surveys.

191.    Put simply, if a landlord wants to track and respond to rivals' pricing across hundreds of properties and unit types on a daily basis – as the Comp Trend Rule is designed to do – it has two practical options. It can either (i) collect that information unilaterally (for example, though automated scraping of public listings) or (ii) obtain it though a concerted agreement among rivals to exchange this information in near real-time in a standardized and structured format.

192.    Through Revenue IQ, Landlord Defendants appear to have chosen the latter. The operative economic point is that Revenue IQ's Comp Trend Rule relies on a horizontal information exchange that would be difficult for landlords to recreate unilaterally at comparable scale

---

*Properties" page then displays the properties matching the selected criteria, allowing the client to add them to the Comp set or remove them as preferred.  For each selected Comp, the client must manually match the Comp's floorplan to their subject property's Unit Type Group. For instance, the client can align the Comp's one-bedroom floorplan with their subject property's one-bedroom, two-bedroom, or any other Unit Type Group based on their preference, as depicted in Figure D.29."*)
[112] YARDI-DUFFY_00998305.

FILED UNDER SEAL

and frequency.

193.     Consistent with this, Yardi has actively emphasized to users the unique value of its RentCafe data—value that, as a practical matter,  landlords could not obtain without using Yardi products. For example, in one email to a potential client, a Yardi representative explained:

> "With RENTCafe being as highly adapted as it is today, we're able to pull comp pricing from other RENTcafe users to use with Rentmax pricing. Our RENTCafe pricing is much more current as well, so a great advantage we have."[113]

194.     Yardi's present stance that its RentCafe data is purely public and instills no distinct competitive edge is difficult to reconcile with these contemporaneous representations that the data are uniquely current, drawn from other RentCafe users, and promoted as a "great advantage" of adopting Yardi's system.

195.     Applied to the definition of public data in the DOJ's settlement with RealPage, RentCafe data – including the unit- and floor-plan characteristics necessary to match comparable apartments across competing properties – is not "readily accessible to the general public."

196.     In any event, my conclusions do not depend on whether RentCafe data is "public." As I establish in Section 3.1.2, peer-reviewed economic literature shows that hub-algorithms can facilitate coordination and create supracompetitive prices even when they only rely on public data. And even if RentCafe were treated as fully public, it can still be an important input to list price coordination: Revenue IQ uses competitor asking rents to move list prices in parallel, and those list prices then operate as an "anchor" in subsequent negotiations with prospective renters – particularly because Landlord Defendants permit Revenue IQ to automatically update online listing prices without approval and implement commitment mechanisms I discuss further in Section 4.1.4. Separately, the record reflects that Yardi also uses and disseminates additional information that is non-public and competitively sensitive through its Matrix surveys, TAM oversight, and benchmarking reports, including information (Matrix surveys) that informs Revenue IQ's pricing. I address these additional mechanisms below.

---

[113] YARDI-DUFFY_00149297 at -99.

FILED UNDER SEAL

## 4.2 Landlord Defendants Contractually Agreed to Exchange Non-Public Data With Each Other & Yardi

197.    Yardi's RENTmaximizer service agreements contain a "data use" provision that requires clients provide "current and relevant data to Yardi regarding the properties/units/items for which Yardi provides Services" and agree that Yardi "may aggregate, compile, use, and disclose Client data provided to Yardi as part of the Services in order to improve, develop or enhance the Services" so long as that data cannot be traced to specific clients. The provision states:

> Data Use; Data Provision.
>
> (i) Data Use. Client acknowledges and agrees that Yardi may aggregate, compile, use, and disclose Client data provided to Yardi as part of the Services in order to improve, develop or enhance the Services; provided that no Client data is identifiable as originating from, or can be traced back to, Client or a Client customer in such aggregated form.
>
> (ii) Data Provision. Client agrees to provide current and relevant data to Yardi regarding the properties/units/items for which Yardi provides Services.[114]

198.    Yardi stored this client data in "Voyager" databases, which Mr. Fazio confirmed housed non-public information.

> **Q:** Okay. Well, Yardi's -- the Yardi client data that it houses in Voyager is not publicly available; right?
>
> **A:** Not that I'm aware of.[115]

199.    These client-specific Voyager databases then feed into the Central Property Database, or "CPD." Ms. Rao provides a definition of CPD:

> **Q:** And just for the record, we've -- we've used "CPD" sort of in passing a lot. But can you just define clearly for -- for the jury, what is the CPD and -- and where the data in the CPD comes from?
>
> **A:** Sure. CPD stands for Central Property Database. The data comes

---

[114] *See* YARDI-DUFFY_00000155 at -158 (2019 RentMaximizer agreement); *see also* YARDI-DUFFY_00028395 (2024 internal Yardi email discussing provision).
[115] November 5, 2025, Deposition of Anthony Fazio, deposed by Rio Pierce (for Plaintiffs) and by Abraham Tabaie (for Defendants) (hereinafter, "November 5, 2025, Fazio Deposition"), at 98: 17-20.

FILED UNDER SEAL

> from three sources. CPD includes data from Voyager clients. **So each client has their own Voyager database. And CPD has an extract that is a subset of tables and fields from Voyager combined together across all of the clients** that we're extracting data from in North America. The second source is the RentCafe database, and the third source is Matrix data..[116] (emphasis added)

200.    As I discuss further in Section 4.3, Yardi routinely relied upon CPD in preparing data for its account managers and benchmarking reports, meaning it used non-public data for those aspects of its Pricing Suite.[117]

201.    Yardi does not allow clients to opt out of this provision and describes it as a "standard part of [its] contracts."[118] According to Yardi's interrogatory responses, it is "not aware of any Revenue IQ client that has not agreed to Yardi's standard contractual provision relating to use of aggregated data."[119] Yardi internal documents also state that, were clients allowed to "opt out" of this provision, it "would effectively curtail [Yardi's] ability to provide both the RENTmaximizer service, and enhanced software and services, to" its clients.[120]

202.    Ms. Rao also testified that a client may only license Revenue IQ if the client is also using Yardi Voyager:

> **Q:** A Revenue IQ customer, someone using Revenue IQ, they also have to be using the Yardi Voyager product. Is that correct?
>
> **A:** You can only license Revenue IQ if you are using Voyager, correct.[121]

203.    Given Yardi's benchmarking data is sourced from CPD, which itself sources from clients' Voyager databases, this means that Yardi clients can only access the benchmarking reports Yardi prepares if they agree to contribute their own data to those reports.[122]

---

[116] November 14, 2025, Rao Deposition, 100: 5-24.

[117] November 24, 2025, Yenikomshian Declaration, ¶ 46, (*"The Central Property Database, or "CPD," is a Yardi back-end database. It contains subsets of data from Voyager databases, the RentCafe database, and the Matrix database. A portion of the data collected in CPD (i.e., nationwide training data) is used to train the logistic regression models in connection with the optional Predicted 30-Day Availability Health Rule."*)

[118] YARDI-DUFFY_00028790 at -90.

[119] Defendant Yardi Systems, Inc.'s Responses and Objections to Plaintiffs' Second Set of Interrogatories to Defendant Yardi, McKenna Duffy et al. v. Yardi Systems, Inc. et al., No. 2:23-cv-01391-RSL (W.D. Wash. Aug. 12, 2024), at 9.

[120] YARDI-DUFFY_01260225 at -37.

[121] November 14, 2025, Rao Deposition, 42: 5-15.

[122] November 24, 2025, Yenikomshian Declaration, ¶ 128, (*"Yardi's Benchmarking is a reporting functionality that enables clients to compare their properties to a selected group of peers using aggregated and anonymized*

## 4.3  Yardi's TAMs Use Non-Public, Disaggregated & Individually Identifiable Client Data to Recommend & Monitor Client Pricing

204.  With this non-public competitor data in hand, the second stage of Yardi's rent recommendation to landlords is implemented through Yardi's Technical Account Managers, or "TAMs." Yardi's TAMs – previously referred to within Yardi as "revenue managers"[123] – are client-facing personnel who support implementation and ongoing use of Revenue IQ, including assisting clients with property setup and configuration. TAMs conduct recurring review calls and periodic performance reviews with clients.[124] Among other things, TAMs are also instructed in pricing call training materials to discourage manual pricing changes, describing these as "reactionary,"[125] built "trust" in Yardi's "system,"[126] discourage "lowering price" (which training materials describe as a "last resort" and "last course of action"[127]), and evaluate whether clients can "push" their rents "a bit more based" on the performance of comparable properties.[128]

205.  Based on my review of the record in this case, I understand that Yardi executive Anthony Fazio, who supervised Yardi's TAMs until approximately 2024, held monthly one-on-one meetings with Yardi's TAMs that used the "same basic analytical framework" and involved (1) Mr. Fazio receiving a "data pull" from Yardi's CPD and (2) building an excel file for each TAM that included "benchmark detail report[s]" containing comparisons with client properties.[129]  Mr. Fazio testified that these meetings were intended to identify "opportunities or risks" for specific clients, and that before these calls he would "identify[] variances to benchmarks" on a "client-by-client and sometimes property-by-property basis[.]"[130] Mr. Fazio recorded this feedback in contemporaneous written notes of his calls with TAMs, which I discuss further below.

206.  Documents indicate that the CPD data reviewed by Mr. Fazio was not used only for client-facing support, but also to inform internal management review and escalation. Specifically, in addition to creating TAM-specific benchmark comparisons, the record indicates Mr. Fazio and other Yardi personnel – including Yardi executive Liana Rao – prepared monthly

---

Benchmarking key performance indicators ("Benchmarking KPIs"). These comparisons are based on aggregated data that are retrieved from CPD and support reporting activities related to financials, operations, and leasing prospects.").

[123] YARDI-DUFFY_00073037 at -38, -45.
[124] YARDI-DUFFY_00165009 at -26.
[125] YARDI-DUFFY_00806448 at p.43.
[126] YARDI-DUFFY_00806448 at p.43.
[127] YARDI-DUFFY_00338837 at p.66; YARDI-DUFFY_00806448 at p.29.
[128] YARDI-DUFFY_00164470 at -95; YARDI-DUFFY_00806448 at p.29.
[129] November 5, 2025, Fazio Deposition, at 11:8–39:4; 90:9–23; 136:8–154:14.
[130] *Id.* at 34:22–39:3; 95:6–96:2; 155:23–165:15.

FILED UNDER SEAL

summaries analyzing this data, and that included what Mr. Fazio described as cross-client "threats" and "opportunities" – as well as comparisons between Yardi's performance and RealPage. For example, in an "April analysis" sent to Ms. Rao and Michael Gaeta, another Revenue IQ executive, Mr. Fazio provided detailed feedback on both cross-client and individual client performance:

**Figure 24: "RE: April 2023 Analysis," 05/31/2023[131]**

Hi Liana,

I just sent over the April analysis via TEAMs.

I decided to change it up this month and give a bullet point summary instead of the lengthy write up.  Let me know if you like this better, would like me to revert to the past format, or if you would like me to include anything else you feel is important that I may be missing.

•    Occupancy remains relatively flat when comparing YTD & T3 to last period, and we appear to be in line with the benchmark comps with a slight favorable variance of between 20 & 30 bps respectively.

•    T3 asking rent is still negative (-.5%) and we appear to be losing ground to the benchmark comps.  Whereas last month our T3 asking rent was -.3% discounted to benchmark comps on a consolidated basis, this month we are -.4%.  The benchmark comps appear to be increasing asking rent faster over the last 4 months.

•    One change I made to this analysis is the addition of consolidated average new lease and renewal lease benchmark pricing.  I have also compared this to the client benchmark average asking rent to give a like kind comparison to our new lease and renewal lease % comparison to our asking rent.  We appear to be in line with benchmark comparisons, with some opportunity on the T3 new lease comparisons with the benchmarks achieving on average 2.6%

of their asking rent while RIQ is achieving 2.3% of our average asking rent.  That said this variance could be immaterial and due to unit types and timing.

•    Our T3 average in-place rent per unit is trailing the benchmark comps by -2.5%.  The larger clients with the biggest discount are: ███████████████████████████ ████████ These same clients are also trailing the benchmark comps for rental income as well (aside from ████████ ████████ I plan on focusing on these clients during my review with the team.

I hope this helps.  Please let me know if you need anything else.

Thank you,

Anthony

---

[131] YARDI-DUFFY_00025354, at -55, -56.

FILED UNDER SEAL

207.    Other analyses follow a similar format:

**Figure 25: Mr. Fazio's March 2024 Email Analysis[132]**

- **Emerging Trends**
- Renewal rent per unit continues to be higher than new lease rent.
- Asking rent trailing behind benchmarks.
- The % of properties realizing occupancy gains is increasing.
- Occupancy favorable vs benchmarks

- **Opportunities**
- Asking rent may be below benchmarks on a consolidated basis.

- **Potential threats**
- Softening rental income vs prior year.
- T3 renewal rates are increasing while benchmarks are decreasing.

**Figure 26: Mr. Fazio's October 2023 Email Analysis[133]**

I just sent over the long-awaited August analysis via TEAMs. Going forward I thought it might be more beneficial to break this write-up into three distinct categories as listed below.

- **Emerging Trends**
- YTD net rental income is softening.
- YTD asking rent is negative for the first time this year.
- T3 occupancy and asking rent is softening, however slightly outperforming benchmark comps

- **Opportunities**
- We continue to see opportunities on our renewal pricing, which is discounted to overall benchmarks.
- Opportunity to improve occupancy as T3 asking & new lease rent priced slightly above benchmark.

- **Potential threats**
- In place rent discounted to benchmark comps
- Asking rent has decreased and is softening compared to July's analysis.
- Clients

---

[132] YARDI-DUFFY_00344844.
[133] YARDI-DUFFY_00585483.

**Figure 27: Mr. Fazio's January 2022 Email Analysis[134]**

From: Anthony Fazio ███████████████████████████
Sent: Friday, January 14, 2022 1:15 PM
To: Blaine Davis ████████████████
Subject: Q4 RENTmax performance

Hey Blaine,

One thing that I'm concerned about after reviewing Cassie's data this quarter, is the reversal of our position as leaders in the rental income per unit, in-place rent per unit, and new lease rent per unit categories when compared to our RM peers. I'm wondering if this may be somewhat attributed to the lease term settings for our clients that may have been put in place at the start of COVID.

Attached is some analysis that I put together to help quantify and see how many of our clients have base lease terms and max lease terms set at > 15 months.

208. Finally, I also understand that, in approximately 2021 (as discussed below in 4.3.2), Yardi developed a so-called "penalty scoring" framework. According to Ms. Rao, who created this scoring system, Yardi created these rankings each month, then distributed them to Mr. Fazio as well as individual TAMs, who received monthly spreadsheets incorporating these scores.[135]

## 4.3.1 Yardi Used Non-Public Client Data to Track Performance Reviews and Inform TAM Pricing Oversight

209. Until 2024, Mr. Fazio job duties including partially supervising the Revenue IQ TAMs.[136] Prior to that role, Mr. Fazio worked as "Revenue Manager" for Revenue IQ,[137] reporting to Yardi executives Blaine Davis (previously the head of RENTmaximizer) and subsequently Liana Rao.[138] At Yardi, Mr. Fazio prepared analyses of client data, which he shared with Yardi's TAMs.[139] Specifically, Mr. Fazio analyzed property/client performance for Revenue IQ users, considering several performance indicators, such as occupancy level, and net rental income. As Mr. Fazio explained:

> **Q:** It was -- it was data from Yardi clients? Is that what you're saying?
>
> **A:** For -- yeah. For revenue I- -- or RENTmax clients.

---

[134] YARDI-DUFFY_00915629.
[135] November 14, 2025, Rao Deposition, 221:10-247:6; 266:9–268:14; YARDI-DUFFY_00911814; YARDI-DUFFY_00912450.
[136] November 5, 2025, Fazio Deposition, at 10: 14-20.
[137] November 5, 2025, Fazio Deposition, 11: 1-20.
[138] November 5, 2025, Fazio Deposition, 14: 24 – 15: 7.
[139] November 5, 2025, Fazio Deposition, 12: 8-15.

**Q:** What kinds of analysis did you perform based on the TDM files?

**A:** I would look at clients' analysis. I would -- I would consolidate based -- or **look at individual properties that were on Revenue IQ**, or RENTmax at the time. And part of that data consisted of different metrics.

**Q:** What kind of metrics?

**A:** I don't know if it was met- -- I don't know if metrics is the right word. But it was just -- **it was client performance, internal performance data like occupancy, net rental income**, I believe, things like that.[140] (emphasis added)

210. Mr. Fazio and the TAMs then incorporated this analysis of "individual properties" and their "net rental income" into monthly reviews.[141] The original data source for this analysis was "TDM" files (acronym undefined).[142] YARDI-DUFFY_00607260, screenshot below, is an example of one such monthly review performed in May 2022.[143]

**Figure 28: Mr. Fazio's Monthly Performance Analysis Relied on Property-Level Client Data[144]**



211. Mr. Fazio testified that, at some point in 2022, he transitioned his analysis and began using CPD as a data source.[145] Mr. Fazio's analysis for Yardi's TAMs therefore relied, in part, on

---

[140] November 5, 2025, Fazio Deposition, 13:8 – 14:1.
[141] November 5, 2025, Fazio Deposition, 21: 10-25.
[142] November 5, 2025, Fazio Deposition, 140:23 – 141:18.
[143] November 5, 2025, Fazio Deposition, 27:16-23; 30:8-33:13.
[144] YARDI-DUFFY_00607260, observing the "detail" tab.
[145] November 5, 2025, Fazio Deposition, 143:22 – 144:8.

non-public client data at least after this point in time.

212.    The purpose of these monthly reviews was to identify "opportunities or risks," including based on a comparison between "subject properties" and "benchmarks:"

> **Q:** What was the purpose of the monthly meetings that you would have with account managers to go over the performance of their properties?
>
> **A:** The purpose was to show -- to go over the analysis and look for opportunities or risks that may be -- that they may want to discuss with the client.
>
> …
>
> **Q:** Okay. And so the opportunities and risks that you were generally identifying would be opportunities and risks, at least in part, in relation to things like the rent that they were charging, the amount of occupancy that they had, the total net rental income they were generating?
>
> **A:** They would look at variances within their internal performance on those metrics.
>
> **Q:** Variances to what?
>
> **A:** The starting point.
>
> **Q:** Sorry. Could you say that one more time?
>
> **A:** Their starting point. So if they were comparing, say, year-to-date amounts, they -- they would look at those to see where -- how they were trending.
>
> **Q:** During these calls, would you also go over, when appropriate, variances between subject properties and benchmarks with respect to occupancy and asking rent?
>
> **A:** I think the -- that would get calculated, and we would -- I -- I wouldn't say we do it -- did it for all of them, but there were times when we would view it.[146]

213.    Following these meetings, Mr. Fazio would summarize his feedback to TAMs as a "resource for [the TAMs] to look at and review" in written call notes[147] These notes often

---

[146] November 5, 2025, Fazio Deposition, 34:22 – 37:1.
[147] November 5, 2025, Fazio Deposition, 41: 8-21.

indicated when a property was priced below rival benchmarks,[148] which Mr. Fazio testified a TAM "may bring it up with the client."[149] I analyze these notes further in Section 6.

## 4.3.2  Ms. Rao Used Non-Public Client Data to Calculate "Penalty Scores" & Inform TAM Pricing Oversight

214.    Mr. Fazio's monthly reviews were also accompanied by a formal scoring framework that Yardi used to assess pricing performance across Revenue IQ. Documents and deposition testimony in this case indicate that, in approximately 2021, Yardi executive Liana Rao developed an "overall penalty score" methodology to rank the performance of each Revenue IQ property. The resulting ranking was distributed "each month for the last several years" to Yardi executives and TAMs.[150]

215.    Ms. Rao explained that Yardi calculated these penalty scores based on a rent comparison against benchmark properties:

> **Q:** The scoring algorithm. The scoring algorithm is based on -- entirely on comparisons to benchmarks and how  the -- the subject property's RIPU [rental income per unit] is growing compared to the benchmark RIPU?
>
> **A:** The scoring map is based on, again, the data that we had available to us doing the analysis, which was **the rental income per unit compared to benchmarks**.[151] (emphasis added)

216.    At deposition, Ms. Rao also explained the high-level methodology Yardi used to calculate the "Overall Penalty" score, stating that the calculation involves comparing the rental income per unit for each property against various benchmarks:

> **Q:** And that calculation is based on comparing specific properties with groups of other properties; correct?
>
> **A:** The overall penalty number is calculated. At a high level, **the methodology is comparing the rental income per unit of each of those properties versus** aggregated **-- different aggregated, anonymized benchmarks for each property**.[152] (emphasis added)

217.    YARDI-DUFFY_00031203 provides a detailed explanation of the methodology Yardi

---

[148] November 5, 2025, Fazio Deposition, 186: 9-24.
[149] November 5, 2025, Fazio Deposition, 50:20 – 52:13.
[150] November 15, 2025, Rao Deposition, 230: 10-12 (*"A: My recollection is that we did run a version of this spreadsheet each month for the last several years."*).
[151] November 14, 2025, Rao Deposition, 251:16 – 252:1.
[152] November 14, 2025, Rao Deposition, 224: 6-16.

FILED UNDER SEAL

applied to calculate the "overall penalty score." Yardi performed this comparison against three groups: other Revenue IQ users, RealPage users, and non-RM users:

> **Q:** And the benchmark groups that are -- it's being compared to, one of those groups is properties that are using YieldStar or LRO; correct?

> **A:** It looks like there are three -- or there are three different aggregated, anonymized benchmark sets that we're looking at for each property, an overall aggregated, anonymized benchmark, an aggregated, anonymized benchmark of properties using a revenue management tool, and an aggregated, anonymized benchmark of properties not using a revenue management tool.[153]

218.    Ms. Rao also confirmed that Yardi would individually calculate this score for "each Revenue IQ property:"

> **Q:** And each property receives its own performance score; correct?

> […]

> **A:** What I'll say is that this is an -- a spreadsheet of internal analysis that lists **each Revenue IQ property**, has a number of measures about those properties, and has a column K that's titled "Overall Penalty."[154] (emphasis added)

219.    In sum, the documentary evidence and deposition testimony demonstrate that each month for each Revenue IQ property, Yardi calculated an "overall penalty score" by using non-public CPD data to compare rents against benchmark properties. Figure 29 below is one such exemplar calculation across a wide range of properties:

---

[153] November 14, 2025, Rao Deposition, 224:17 – 225:5.
[154] November 14, 2025, Rao Deposition, 223: 8-17.

FILED UNDER SEAL

**Figure 29: Ms. Rao's "Penalty Score" Analysis Relied on Non-Public Property-Level Client Data[155]**

| | | Property Attributes | | | | | | | Performance Score | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| SourcePropertyI | PIN | | VoyagerPropertyId | | RmsPropertie | | RmsLiveDa | PropertyRating | MarketName | OverallPenalty | PerformanceRank |
| 1.01082E+14 | 100069073 | | 18 | | 886628 | | 12/9/2020 | C | Baltimore | 439.46 | 1 |
| 1.00735E+14 | 100036463 | | 2137 | | 1186232 | | 11/6/2019 | C | Urban Chica | 437.38 | 2 |
| 1.01082E+14 | 100069073 | | 43 | | 886652 | | 1/20/2020 | C+ | Baltimore | 437.33 | 3 |
| 1.00211E+14 | 100034656 | | 123 | | 128520 | | 5/3/2018 | B+ | Urban Twin | 433.09 | 4 |
| 1.00572E+14 | 100051082 | | 360 | | 890996 | | 3/5/2018 | A | Northern Ne | 431.84 | 5 |
| 1.00735E+14 | 100036463 | | 1737 | | 1186229 | | 11/6/2019 | A | Urban Chica | 430.85 | 6 |
| 1.00227E+14 | 100063635 | | 1138 | | 1720172 | | 10/8/2020 | B- | Tacoma | 428.23 | 7 |
| 1.00735E+14 | 100036463 | | 2691 | | 1186291 | | 11/6/2019 | C- | Urban Chica | 371.34 | 8 |
| 1.00543E+14 | 100029627 | | 678 | | 1986226 | | 6/4/2020 | C+ | Denver | 368.51 | 9 |
| 1.00761E+14 | 100055788 | | 164 | | 1547208 | | 11/27/2018 | C | Urban Twin | 359.60 | 10 |
| 1.00901E+14 | 100059563 | | 250 | | 551744 | | 1/30/2015 | B | North Dallas | 356.48 | 11 |
| 1.00735E+14 | 100036463 | | 3052 | | 1277466 | | 11/6/2019 | A- | Urban Chica | 351.69 | 12 |
| 1.00694E+14 | 100065198 | | 68 | | 1030133 | | 2/3/2021 | C+ | Nashville | 340.28 | 13 |
| 1.01082E+14 | 100069073 | | 41 | | 886650 | | 7/7/2020 | C | Baltimore | 338.64 | 14 |
| 1.00211E+14 | 100034656 | | 1356 | | 1082678 | | 3/6/2019 | B- | St Louis | 327.73 | 15 |
| 1.00735E+14 | 100036463 | | 1709 | | 1093664 | | 2/5/2019 | C | Denver | 327.67 | 16 |
| 1.01423E+14 | 100070989 | | 115 | | 1671734 | | 2/12/2020 | B+ | Denver | 326.40 | 17 |
| 1.00637E+14 | 100034707 | | 82 | | 1113453 | | 7/24/2014 | B | Metro Los A | 312.56 | 18 |
| 1.00721E+14 | 100056610 | | 214 | | 541653 | | 5/17/2017 | A- | Washington | 311.54 | 19 |
| 1.01499E+14 | 100082858 | | 32 | | 1575126 | | 7/1/2019 | B | Portland | 309.91 | 20 |
| 1.00302E+14 | 100035957 | | 844 | | | | 12/20/2019 | A- | Richmond - | 308.30 | 21 |
| 1.00211E+14 | 100034656 | | 286 | | 128555 | | 5/14/2018 | B | St Louis | 307.67 | 22 |
| 1.00761E+14 | 100055788 | | 239 | | 2043516 | | 7/6/2020 | C- | Urban Twin | 307.48 | 23 |
| 1.00302E+14 | 100035957 | | 584 | | 1607005 | | 1/18/2019 | A | Richmond - | 306.02 | 24 |
| 1.01053E+14 | 100034187 | | 56 | | 871297 | | 5/10/2017 | C+ | Northern Vir | 303.53 | 25 |
| 1.00211E+14 | 100034656 | | 102 | | 128512 | | 5/7/2018 | B | St Louis | 294.13 | 26 |
| 1.00551E+14 | 100033329 | | 15 | | 108830 | | 5/11/2018 | C | Urban Chica | 293.01 | 27 |
| 1.00551E+14 | 100033329 | | 82 | | 231857 | | 4/5/2018 | B- | Urban Chica | 291.71 | 28 |

220.    As I explain further in Section 6.2, Yardi only "penalizes" when properties underprice their benchmark, and do not penalize overpricing.

221.    Throughout this report, I will sometimes use the "TAM" acronym to refer to Yardi's pricing oversight administered through TAMs, inclusive of the data analysis Ms. Rao and Mr. Fazio performed.

## 4.4  Landlord Defendants Use Non-Public Information Exchanges to Observe Rival Pricing Through Yardi's Benchmarking Reports

222.    Yardi's "benchmarking" feature is a reporting function within Revenue IQ that uses aggregated performance data from Yardi's CPD to generate so-called key performance indicators ("KPIs"), or numerical values for various metrics, for a client-defined set of comparable properties and displays those KPIs alongside the client's own performance.[156]

223.    Benchmarking outputs are delivered through in-platform dashboards and emailed performance reports and may include metrics such as in-place rent, effective rent, concessions, occupancy/leased percentage, renewal rates, availability, and related trends, with calculated "variances" and visual indicators showing how a property compares to its

---

[155] YARDI-DUFFY_00028365.
[156] November 24, 2025, Yenikomshian Declaration, ¶ 128, (*"Yardi's Benchmarking is a reporting functionality that enables clients to compare their properties to a selected group of peers using aggregated and anonymized Benchmarking key performance indicators ("Benchmarking KPIs"). These comparisons are based on aggregated data that are retrieved from CPD and support reporting activities related to financials, operations, and leasing prospects."*)

FILED UNDER SEAL

benchmark set over time.[157] A client selects its benchmark set subject to minimum criteria (including thresholds for the number of properties/owners for which CPD data must be available), and the system can also provide suggested benchmark sets; additionally, when a client selects comps for Revenue IQ pricing, those comps are automatically included in the benchmark set by default.[158]

224.    Ms. Rao explained that, for any given benchmark set, Yardi's benchmarking report only returns data for those that have non-public information included in CPD:

> **Q:** Now, I just want to make sure the record is clear. You keep saying, "Matrix properties they pick for their benchmark." But we have agreed, right, that the underlying -- a lot of the underlying data for -- that ultimately is used in the benchmarking analysis comes from the CPD. Is that correct?

> **A:** I think it's important to clarify, which is why I'm saying Matrix properties, that **they pick a super set of Matrix properties that they are** interested including -- **interested in included in their benchmark**. And for any given benchmark that get -- piece of data that gets returned, **it is composed of some subset of those properties that have data for that specific time period in CPD based on Voyager data that is aggregated and anonymized**.[159] (emphasis added)

225.    Yardi then displays reports such as the following, which can be viewed by users within Revenue IQ's interface:

---

[157] November 24, 2025, Yenikomshian Declaration, ¶ 128, footnote 220, (*"The Benchmarking KPIs encompass a broad range of measures capturing financial, operational, and leasing performance, such as "Occupied Percent," "In Place Rent Per Unit," "Renewal Lease Rent Per Unit," and "Average Total Days Vacant".")*

[158] November 24, 2025, Yenikomshian Declaration, ¶ 129, (*"To configure a Benchmarking report, a client first defines a benchmark set—a group of properties selected either by the client or suggested by Yardi as potential peers for reporting purposes.227 Benchmark sets can vary widely in composition, but are subject to certain constraints: for example, a client must select at least ten benchmark properties."*)

[159] November 14, 2025, Rao Deposition, 46:20 – 47:16.

FILED UNDER SEAL

**Figure 30: Yardi's Benchmarking Reports Gave Clients Visibility on Rivals' Pricing &\***
**Occupancy, Among Other "KPI"s[160]**





226.   Before 2021, these benchmarking reports were updated on a monthly basis, i.e., the
       underlying values were updated (and the relevant KPIs re-calculated) each month.
       However, Yardi faced competitive pressure from RealPage to increase the frequency of

---

[160] YARDI-DUFFY_00789075, pp. 16-17.

FILED UNDER SEAL

their benchmarking data to daily. In a 2021 email to Jeff Adler and Michael Gaeta, Ms. Rao explained that "one of the big reasons we lose vs. [RealPage] is their touting of daily real-time updates to benchmarking:"

**Figure 31: Yardi Updates Its CPD Benchmarking Reports More Frequently In Response to Competitive Pressure from RealPage[161]**



227.    As a direct response to this pressure, Yardi worked on "introducing this" – that is, real-time updating – in "CPD." At deposition, Ms. Rao confirmed that Yardi updated its benchmarking to update daily with month-to-date figures:

> **Q:** Okay. So what's your understanding of what daily realtime updates to benchmarking consists of in the context of introducing it to CPD?
>
> **A:** I can talk about it in the context of CPD. So when we originally introduced CPD data -- so data for a given month -- first, I should say all data in CPD is always aggregated to at least monthly averages or multi-month averages depending on the filter criteria a client chooses. In that context, when we first introduced CPD, we waited until a month was fully completed, and several weeks after that we would add the new month to our aggregated, anonymized data. So right now, it's November 14th. We would around now be adding the averages for October to the set of months available in CPD. At some point, it looks like based on this e-mail in 2021, we got feedback from clients that that was a long lag time for operational data, and so we added the ability for clients to see their own data and average monthly numbers for months that were in process, so the average occupancy for November month to date for my own property versus the average aggregated, anonymized benchmark, if available.[162]

---

[161] YARDI-DUFFY_00303968.
[162] November 14, 2025, Rao Deposition, 104:19 – 106:15.

FILED UNDER SEAL

## 4.5  Yardi Designed & Marketed Its Pricing Suite As a Mutually Reinforcing System

228.    Yardi's briefing characterizes the components of its Pricing Suite as predominantly separate products that do not interact with one another. Based on my review of the relevant documentary materials, this description does not fully reflect how the Pricing Suite operates in practice

229.    In a marketing presentation from 2024, Yardi explained that "revenue management" – or "rules-driven pricing proven to help empower properties to meet their business goals" – and "performance monitoring" – or "regularly verify[ing] and track[ing] how well and how consistently properties are performing against operational targets" – are two parts of the "asset optimization" process for properties, noting that "benchmarking data" gives clients "insight into how they are doing in comparison to their neighbors"[163]:

---

[163] YARDI-DUFFY_00077173 at -78, -81.

FILED UNDER SEAL

**Figure 32: ''Product Class Breakout Sales Conference 2024_MF Elevate Bundle,'' 03/20/2024[164]**



LL Clients using our asset reporting dashboards can keep on top of the key performance indicators of their portfolio and where they have benchmarking data, that also gives them insight to how they are doing in comparison to their neighbors. Martin----

FILED UNDER SEAL

230.    Similarly, in other materials, Yardi describes Revenue IQ as a "Revenue Management Service" that it offers to clients, explaining that "With Yardi, you get a product (RENTmax or Revenue IQ) and a service (an expert Yardi employee)"[165]:

**Figure 33: "Capstone Slide Deck," 08/08/2023[166]**



Yardi's Revenue Management Services

◇ "The primary goal of Revenue Management is selling the <u>right product</u> to the <u>right customer</u> at the <u>right time</u> for the <u>right price</u>."

◇ With Yardi you get a product (<u>RENTmax</u> or Revenue IQ) and a service (an expert Yardi employee).

◇ <u>RENTmaximizer</u> was built in 2011, and currently prices 600k+ units

◇ We are now transitioning to Revenue IQ
  ◇ This is a similar product with a new look/ interface

231.    Consistent with this, in another marketing presentation prepared for a client, Yardi identified "daily benchmarking" and "client configured pricing calls" as integrated pieces of the Revenue IQ service:[167]

---

[165] YARDI-DUFFY_00338837 at p.11.
[166] YARDI-DUFFY_00338837 at p.11.
[167] YARDI-DUFFY_00072967 at -72.

FILED UNDER SEAL

**Figure 34: "Essex Revenue IQ 062021," 10/24/2024[168]**



232.    Another presentation describing the "value statement" for Revenue IQ similarly explains that "performance monitoring" (benchmarking) goes hand in hand with "revenue management" (algorithmic pricing).[169] Yardi's TAMs also contribute to this "integrated product:"

---

[168] YARDI-DUFFY_00072967 at -72.
[169] YARDI-DUFFY_00077173.

FILED UNDER SEAL

**Figure 35: Yardi Described The Combined Effect of Its "Intuitive, Rules-based Solution," "Improve[d] Visibility," and "Support From" "Technical Account Manager(s)" as Its Core "Value Statements"[170]**



233.    These "value statements" included "better revenue" and "pricing" "using an intuitive rule-based solution" supported by "knowing local market conditions" and "ongoing support from a dedicated Revenue IQ Technical Account Manager" – i.e., TAMs. Indeed, Yardi's own presentation visually emphasizes Revenue IQ's "intuitive rules" working together with benchmarking and TAMs to deliver on Yardi's "value statements."

234.    In the sections that follow, I explain how Revenue IQ's pricing engine, benchmarking tools, and TAMs operate together as an integrated product suite. Yardi's TAMs convert cross-client non-public data into directional signals to increase rents by focusing their interventions disproportionately on clients underpricing their benchmarks, i.e., competitors, *see* Section 6.2.  Benchmarking reinforces these signals by rewarding above-benchmarking pricing (with a green "thumbs up") and flagging below-benchmark pricing (with a red "thumbs down") – *see* Section 7.2. Revenue IQ's Comp Trend Rule links recommended list-price movements to competitor list prices and helps transmit upward price movement across competing properties, blunting the adverse effects of rent increases on availability performance and making rent increases across all competitors more sustainable – *see* Section 5.2. In combination, these mechanisms appear to increase adherence to Revenue IQ's recommended list prices, reduce incentives to deviate through discounting or override, and thereby support a self-reinforcing upward price cycle of the type Yardi promotes to its clients.

---

[170] YARDI-DUFFY_00067102, at -123.

FILED UNDER SEAL

## 4.6  Stylized Economic Summary of Yardi's Pricing Suite

235.  Based on the preceding summary of Revenue IQ and Landlord Defendants' pricing strategy, in this section I present a stylized economic model that distills these into mathematical notation that will be relevant to my analysis in later sections. I start with Revenue IQ's pricing algorithm, then proceed to link that to Landlord Defendant's final transaction prices.

236.  The inputs to Revenue IQ's list prices can be summarized as:

$$List_{u,t} = f(\rho_{u,t}, \rho_{u,t-1}, X_{p,t}, \omega_{p,t}) \qquad (2)$$

237.  Where:

- $List_{u,t}$ is each unit's ($u$) list price at time $t$, automatically updated without manual client approval on a daily basis.

- $f(\rho_{u,t}, \rho_{u,t-1}, X_{p,t}, \omega_{p,t})$ is a common function ($f()$) used across all Landlord Defendants' and denoting Yardi's algorithmic rules. It takes inputs $\rho_{u,t}$ (each unit's rent ratio relative to its comps at time $t$), $\rho_{u,t-1}$ (the unit's previous rent ratio relative to its comps), $X_{p,t}$ (a vector of property measures, such as availability and traffic), and $\omega_{p,t}$ (client weights).

238.  $X_{p,t}$ reflects idiosyncratic property characteristics (like occupancy and availability) that vary across time and properties, which can be applied both in the trend and health rules. I discuss $\rho_{u,t}$ and $\rho_{u,t-1}$ (and their relevance to plaintiffs' claims) further in Section 5.2.

239.  This formula is purposefully simplified to reflect the *inputs* into Landlord Defendants' pricing via Revenue IQ, rather than provide a detailed explanation of its rules, which are denoted by $f()$. Note, Revenue IQ does not rely on any inputs that are clearly related to cost and therefore does not appear to base its list prices on cost.

240.  From Revenue IQ's list prices, Landlord Defendants reach final lease transaction prices that can be expressed as:

$$Final_{l,t} = List_{u,t} + \delta_{l,t} \qquad (3)$$

$$Final_{l,t} = f(\rho_{u,t}, \rho_{u,t-1}, X_{p,t}, \omega_{p,t}) + \delta_{l,t} \qquad (4)$$

241.  Where:

- $Final_{l,t}$ reflects the final rental price for lease $l$ at time $t$.

FILED UNDER SEAL

- $\delta_{l,t}$ reflects the sum of discounts and concessions from list price ($List_{u,t}$) to the final effective rent in that unit's lease.

242.    In other words, Landlord Defendants' final lease pricing is a function of Revenue IQ's list price and any discounts/concessions they offer on the final lease ($\delta_{l,t}$). As I explain in Section 8, this fact is relevant in understanding how Revenue IQ's algorithm and benchmarking work together. And as I explain Section 8.1, Yardi and Landlord Defendants make significant efforts to limit $\delta_{l,t}$ – i.e., deviations from Revenue IQ's list price. As explained in the economic literature Section 3, we do expect some deviations as part of a collusive scheme, as not allowing for any deviation at all would often make collusion unsustainable.

243.    In the following sections, I combine this factual background with the peer-reviewed economic literature I summarized in Section 3 to analyze the principal components of Yardi's Pricing Suit – Revenue IQ's algorithm, TAM oversight, and benchmark reporting – both individually and as a cohesive and mutually reinforcing strategy. I then assess whether, in combination, these mechanisms increase adherence to Revenue IQ's recommended list price and reduce deviations through discounts or overrides, resulting in higher effective rents. Finally, I apply econometric tests for collusion via a hub-algorithm discussed in recent economic literature.

# 5. Revenue IQ's Role in Structuring and Limiting Landlord Pricing Discretion

244.    The first step in Yardi's Pricing Suite is Revenue IQ's daily list price recommendation. As explained above, Revenue IQ generates a recommended list price each day for each unit based primarily on its "Trend" and "Health" rules and related settings. From an economic perspective, if competing landlords adopt substantially similar rule configurations and rely on the same comp-linked outputs, a hub-algorithm of this kind can align their prices and reduce the extent to which pricing reflects independent decision-making. In this Section, I evaluate these questions and find:

- **Common adoption of a standard pricing rule book:** The record indicates that Landlord Defendants apply substantially the same Trend and Health Rule configurations in Revenue IQ, such that Revenue IQ functions as a common pricing rule book across competitors. Economists recognize that such shared, standardized rules can coordinate prices and form the starting point of a price-fixing conspiracy. *See* Section 3.

- **A "Comp Trend" Rule that transmits parallel movements:** One specific rule – the Comp Trend Rule – works to move clients' prices in parallel. Such parallel

FILED UNDER SEAL

movements are based on clients' near real-time information exchange through RentCafe and Matrix. Economists recognize that such parallel pricing discourages price reductions and encourages price increases. *See* Section 5.2.

- **Observed price co-movement inconsistent with meaningful individualized customization:** In the data produced in this case, Revenue IQ leads to parallel price co-movements among Landlord Defendants that are difficult to reconcile with the meaningful customization of Revenue IQ across Landlord Defendants. *See* Section 5.3.

245.   I explain each of these conclusions sequentially in the following sections.

## 5.1   Landlord Defendants Use Substantively the Same Pricing Rule Book in Revenue IQ

246.   As I explained in Section 4.1, the core pricing logic of Revenue IQ relies on "transparent" Trend and Health rules, which clients can configure in different ways. If clients choose to have sufficiently similar settings within Revenue IQ, they may have effectively agreed to abide by the same pricing rule book i.e., agreeing to use the same logic to update their pricing. Applied to the present matter, this raises two empirical questions:

- **First**, have Landlord Defendants adopted essentially the same pricing rule book in Revenue IQ?

- **Second**, do their price movements reflect adoption of a standardized pricing rule book?

247.   Yardi's contemporaneous documents identify algorithm standardization across clients as a goal. For example, one presentation, instructs TAMs to not "give them [clients] a choice!" whether to enable Yardi's predicted 30-day availability health rule, and referenced their "Standard Practice" "set up."[171] Consistent with this, in other documents, Yardi refers to "standard" configurations of both its Trend and Health rules: one document states that it is "standard practice" for clients to weight each of Yardi's four trends at 25%[172], while another states that Yardi "ha[s] a standard configuration" of its "optimization" (health) rules "that incorporates AI-driven predicted availability and expiration management."[173]

248.   I understand that Yardi asserts in its summary judgment briefing that Revenue IQ is "individually configure[d] to yield pricing outputs tailored to achieve" clients' "business

---

[171] YARDI-DUFFY_00223748 at -55.
[172] YARDI-DUFFY_00177520 at -26.
[173] YARDI-DUFFY_00023964 at -73.

FILED UNDER SEAL

goals."[174] This assertion is in tension with my empirical analysis. Consistent with its contemporaneous descriptions of Revenue IQ, I find that:

▪ Virtually all Landlord Defendants adopt the same default Trend Rule weights, including activation of the Comp Trend Rule.

▪ Virtually all Landlord Defendants adopt broadly the same Health Rules.

▪ Yardi's expert, Mr. Yenikomshian, includes a large number of configurations that are not meaningfully informative when analyzing price co-movement across rivals. This inclusion suggests meaningful variation in pricing behavior, which is misleading and renders his resulting analysis uninformative for assessing coordinated pricing.

249.   I stress-test these conclusions by statistically evaluating if and/or to what extent Landlord Defendants moved prices in parallel in Section 5.3. My hypothesis is that high co-movement in rental prices across properties is consistent with landlords adopting a common rule book through Revenue IQ, and inconsistent with a high degree of impactful customization in Revenue IQ. I conclude that Landlord Defendants' prices co-move in parallel in a visually discernible manner, with the most common statistical correlation being near perfect across Landlord Defendant properties – supporting my conclusion that Landlord Defendants adopt substantively the same pricing rule book in Revenue IQ.

250.   In the following subsections, I explain how I reach these conclusions.

## 5.1.1 Yardi Suggests Clients Adopt "Standard Practice" Default Settings in Revenue IQ

251.   Before analyzing clients' actual Revenue IQ configurations, I note that Yardi appears to actively work to standardize configurations across participants. For example, one marketing presentation instructed sales staff not to give prospective Yardi clients a choice regarding its "most powerful rule:"

---

[174] Defendant Yardi Systems, Inc.'s Motion for Summary Judgment, *In re Yardi Revenue Management Antitrust Litigation*, No. 2:23-cv-01391-RSL, (W.D. Wash. Nov. 24, 2025), Document No. 474, at 4.

FILED UNDER SEAL

**Figure 36: Yardi Instructed Sales Staff Not to "Give Them a Choice!" When Discussing "Standard Practice" Configurations With New Clients[175]**



252.  Consistent with a goal for clients to use standard configurations, Revenue IQ contains a set of "default" settings that TAMs encourage clients to adhere to. In the following sections, I empirically evaluate if Landlord Defendants did, in fact, adopt Yardi's standard and default Trend and Health Rules, concluding that they did.

## 5.1.2  Landlord Defendants Predominantly Configure the Same Trend Rule Weights

253.  To analyze clients' configurations of Revenue IQ, I begin by analyzing data produced by Yardi tracking the Trend Weights used by Landlord Defendants, i.e., the specific weightings they assign to each of Revenue IQ's four trends (the "configuration dataset").

254.  As part of this litigation, Yardi produced "configuration data" showing new configurations and changes to clients' existing configurations starting in January 2019.[176] It does not show configurations that were set and then left unchanged prior to January 2019.[177] E.g., if a client set-up a property with Revenue IQ in December 2018 and set the default 25, 25, 25,

---

[175] YARDI-DUFFY_00223748.
[176] *See* Appendix F.2.
[177] October 30, 2025, Deposition of Michael Thompson, deposed by Theodore Wojcik (for Plaintiffs) and by David Sarratt (for Defendants) (hereinafter, "October 30, 2025, Thompson Deposition"), at 163: 12-25.

FILED UNDER SEAL

25 Trend Rule weights then never changed them, this does not appear in the data Yardi produced.  This is problematic because it skews the configuration data towards properties that made active changes on/after January 2019, and simply does not report data for properties that made their initial configuration prior to that date and then never changed them. This may explain why some 32% of Landlord Defendant properties in the produced lease transaction data do not appear in the configuration data at all.

255.  These data shortcomings already speak to flaws in Mr. Yenikomshian's analysis of Revenue IQ configurations – a topic I return to later in Section 5.1.4. The data Yardi has produced is censored to exclude properties that set their configurations before January 2019 and then never change them, so it does not include many properties with perfectly static – and likely standard default – configurations.[178] Mr. Yenikomshian has not, and could not, account for this because of the shortcomings in the data Yardi produced, which means his results are very likely to overstate the degree of variation in clients' configurations of Revenue IQ. At this stage, there simply is not an adequately complete factual record to fully address this problem.

256.  To address this issue within the confines of the produced configuration data, I therefore limit my analysis to Landlord Defendant properties who I know (from the lease transaction data) became active on Revenue IQ on or after January 2019. This limits the universe of properties I study but allows me to make significantly more accurate and confident statements about their configurations, because I know I have a substantially more complete factual record of their configuration history. Unless otherwise noted, the configuration statistics I report in the follow sections refer to this sub-population of Landlord Defendants for whom I have sufficiently complete data.

257.  Applying this method, I find that – between January 2019 and March 2025 – more than 94.4% of clients' weights of the four Trend Rules were 25%. Figure 37, below, shows:

- **First**, the vast majority of Yardi clients enabled the same Trend Rule weights.

- **Second**, the vast majority of Yardi clients commonly adopt the same default settings of 25, 25, 25, 25.

- **Third**, these client settings were stable across time.

---

[178] I say "likely standard default" because this configuration accounts for the vast majority of client configurations I have reliable visibility on, as explained later in this section.

FILED UNDER SEAL

**Figure 37: Virtually All Landlord Defendants Apply The Same Trend Rule Weights[179]**



258.    I note that, together, more than 93.6% of Landlord Defendants configurations enabled the Comp Trend Rule (i.e., set a weight of 25 or 50 for the Comp Trend rule, noted above). Similarly, YARDI-DUFFY_01275908 shows that less than 10% of active Revenue IQ users had disabled the Comp Trend Rule.

---

[179] Sources: Configuration Data; Lease Data. I filter the Configuration Data to include only Landlord Defendant properties, and for Field Name values: "iAvailabilityTrendWeighting," "iNewLeasesTrendWeighting," "iDemandToSupplyTrendWeighting," "iRentRatioTrendWeighting." A configuration is a unique combination of property ("hProperty") and unit type ("hUnitTypeGroup").

FILED UNDER SEAL

259. Considering the clients' joint combination of the four Trend Rules – I find that combined, more than 89% of Landlord Defendant weights had jointly enabled Yardi's default configurations of 25, 25, 25, 25 for each of the Trend Rules. Conceptually, this is slightly lower than the 94.4% likelihood of any individual Trend weight being set to 25 because 89% reflects the joint likelihood of all four Trend Rules simultaneously being set to 25:

**Figure 38: Virtually All Landlord Defendants Apply the Same Default Combination of Trend Rule Configurations[180]**



Availability: 25; New Leases: 25; Traffic: 25; Comp Trend: 25: 89%

Availability: 50; New Leases: 25; Traffic: 25; Comp Trend: 0: 6%

Availability: 0; New Leases: 50; Traffic: 25; Comp Trend: 25: 4%

Other: 2%

260. Within the Comp Trend rule, four additional configurations determine how clients react to their rivals' pricing:

- **DegreeOfChangeCompRent**. This setting applies a threshold change amount in the rent ratio to trigger the Comp Trend Rule – e.g., it only triggers the Comp Trend Rule if a client's rent ratio changes by more than 0.01. When this configuration takes the value of 0, any change in relative prices will trigger the Comp Trend Rule.[181]

- **UseNetEffectiveRentRatio**. This setting specifies whether or not concession amounts are to be considered when comparing one's rent prices to competitors' rent prices.

---

[180] Sources: Configuration Data; Lease Data. I filter the Configuration Data to include only Landlord Defendant properties, and for Field Name values: "iAvailabilityTrendWeighting," "iNewLeasesTrendWeighting," "iDemandToSupplyTrendWeighting," "iRentRatioTrendWeighting."

[181] November 24, 2025, Yenikomshian Declaration, ¶ D.76 (d), (*"DegreeOfChangeRequiredCompRent: This variable defines the minimum 'RentRatioTrendDifference' value necessary to return a positive or negative trend. It is populated using a variable from the 'UnitTypeGroupConfig' class instance, which contains only client-provided, property-specific data. Revenue IQ clients have the choice to configure this threshold for the Comp rent ratio change.If not configured, the threshold defaults to zero."*)

FILED UNDER SEAL

- **BaseLeaseTerm**. This setting specifies a client's desired lease term in months, e.g., 12 months or 15 months.

- **SamplePeriodLength**. This setting specifies the time period across which Revenue IQ will analyze trends, e.g., how far back in time to pull data on each of the Trend Rules, most frequently taking values of one or two weeks (7 or 14 days).

261.    Figure 39 below shows Landlord Defendants' configurations of these settings:

**Figure 39: Landlord Defendants Applied Similar Configurations Within the Comp Trend Rule[182]**



262.    Across    Landlord    Defendants,    the    "UseNetEffectiveRentRatio"    and "DegreeOfChangeCompRent" configurations were almost perfectly identical. Moreover, more than 99% of Landlord Defendants configured the "DegreeOfChangeCompRent"

---

[182] Sources: Configuration Data; Lease Data. I filter the Configuration Data for Field Name values: "dDegreeOfChangeCompRent," "bUseNetEffectiveRentRatio," "iBaseLeaseTerm," "iSamplePeriodLength."

FILED UNDER SEAL

variable to be 0. This means that any change in their rent ratio relative to the comp set will trigger the Comp Trend Rule. Virtually all Landlord Defendant configurations of UseNetEffectiveRentRatio were identical.

263.    While there is slightly more variation in clients' base lease term and sample period length settings, over 93.3% had set their base lease term between 12 and 15 months (inclusive). I do not consider this to be meaningful variation that would contradict or undermine a conspiracy.

264.    To summarize:

- Landlord Defendants predominantly adopt the same Trend Rule weights, with approximately 89% jointly setting all Trend Weights to their default 25% weight in the period for which I have data.

- Nearly all (more than 93.6%) Landlord Defendants configurations activated the Comp Trend Rule.

- Within the Comp Trend Rule, clients apply the same settings, including more than 99% choosing to activate the Comp Trend Rule for any change in their rent ratio relative to rivals.

265.    Having established that Landlord Defendants apply broadly the same standard settings in the first core step in Revenue IQ's pricing logic (the Trend Rules), I turn to their configurations of the second core step in Revenue IQ (the Health Rules) below.

## 5.1.3  Landlord Defendants Predominantly Configure the Same Health Rules

266.    I next analyze data produced by Yardi tracking the Health Rules used by Landlord Defendants. As I explain further below, I find that a significant majority of Landlord Defendants use only the "Availability" Health Rule. Figure 40, below, summarizes these configurations:

FILED UNDER SEAL

**Figure 40: Landlord Defendants Apply Broadly Similar Health Rule Configurations[183]**



267. Given the aforementioned shortcomings in Yardi's configuration data, I also cross-reference these figures against an analysis of clients' Health Rule configurations Yardi internally circulated for June, August, and September 2022 - presented in Appendix B.1. Yardi's own internal analysis similarly shows 63% of Landlord Defendants (filtering to those first active on/after January 2019) use only the Availability Health Rule. For those same set of properties and narrowed time frame, I estimate 62% use only the Availability Health rule. In other words, both my analysis and Yardi's own analysis show there is not substantial variation in Landlord Defendants' configuration of the Health Rules.

---

[183] Sources: Configuration Data; Lease Data. I filter the Configuration Data for Field Name value "sPriceRule," which takes the eight health rules in the chart as values; and "NULL," which I categorize into the "No Health Rule" category. To compute the shares in the exhibit, I consider the unique hProperty:hUnitTypeGroup combinations that have each health rule active. When filtering for defendants, the "sPriceRule" variable never takes value "VACANTUNRENTED" for the corresponding health rule. I therefore consider that this rule was always inactive for defendant properties.

FILED UNDER SEAL

268.    In culmination of my analysis in Section 5.1.2 and Section 5.1.3 (discussing the Trend and Health Rules respectively), I next consider how clients configure the "combination" of these Trend and Health Rules. I.e., what is the most prevalent set of Trend and Health Rule configurations when combined and considered together – and how much of the data do these combinations account for?

269.    Combining my analysis of my analysis of clients' Trend Weights with Yardi's internal analysis of clients' Health Rules - I find that the Default Trend Rules (25,25,25,25) + Availability Health Rule combination alone accounts for nearly 60% of Landlord Defendant configurations, and the primary notable variation thereafter is whether clients also use the Leased Health Rule – which is conceptually just the flipside of the Availability Rule. These two combinations alone account for 71.9% of configurations. Approximately 83.3% of Landlord Defendant configurations are the Default Trend Rules plus one of: Availability, Availability and Leased, or Predicted 30 Day Availability Health Rules.

270.    In sum, my review of the core Trend and Health Rules that comprise Revenue IQ's "trends-and rules-based system"[184] indicates that clients' configurations are broadly uniform across properties, consistent with Yardi's stated goals. From an economic perspective, these findings suggest that clients effectively use Revenue IQ to adopt a common pricing rule book. In the next section, I examine Mr. Yenikomshian's conclusion to the contrary.

### 5.1.4  Mr. Yenikomshian's Analysis of Client Configurations is Flawed & Misleading

271.    In support of its motion for summary judgment, Yardi submits the report of Mr. Mihran Yenikomshian, who concludes that Revenue IQ is highly configurable and that clients' settings vary substantially across properties and over time. Relying on Yardi's "Configuration Audit History" dataset, which spans January 2019 to March 2025, Mr. Yenikomshian reports over 4,000,000 configuration-change events across the dataset (averaging 468 changes per property) and emphasizes that Yardi's optional-setting structure permits a large number of distinct configuration combinations, which he interprets as evidence of individualized client implementation rather than a uniform set of configurations.[185]

272.    Specifically, when analyzing the data, Mr. Yenikomshian considers a subset of 195 configuration settings out of the total 299 present in the Configuration Data.[186] In particular, he focuses on: 9 fields that he classifies as "Compulsory" (defined as a mandatory user

---

[184] November 14, 2025, Rao Deposition, 207:22 – 209:24.

[185] *See* November 24, 2025, Yenikomshian Declaration § V.B.1.

[186] November 24, 2025, Yenikomshian Declaration, ¶ 99, footnote 161, (*"The analyses in this section focus on a subset of all configuration settings contained in the Configuration Data. Specifically, I considered 195 of the 299 settings captured in the dataset."*)

FILED UNDER SEAL

input that is always required and used in the pricing calculation), 31 fields under "Optional-1st Layer," and the remaining 155 under "Optional-2nd Layer" (where the former is defined as "the initial layer of toggle that can hide or unhide the configurations so that pricing calculation does not use the input in Option-2nd layer").[187] He concludes this means "Revenue IQ clients modify their configuration settings regularly, reinforcing the system's flexible and individualized nature."[188]

273.    At the beginning of Section 5.1.2, I already explained that substantial issues in the configuration data Yardi produced limit the conclusions Mr. Yenikomshian can reach from the current record. Specifically, the produced configuration data is biased towards overstating the degree of variability in client configurations, because it does not show any data for properties that signed up for Revenue IQ before January 2019 and did not change their configurations thereafter. In other words, it omits a large portion of clients who would show stable configurations during the putative class period, were they reported in the data.

274.    Setting this data limitation aside, in this section, I explain two further central flaws in Mr. Yenikomshian's analysis which render his conclusions misleading:

- **First**, Mr. Yenikomshian overestimates the number of configuration changes in the data by including insertions (which include the entry of a property in the data) and deletions (which include the exit of a property from the data). When I only count unambiguous configuration changes by removing insertions and deletions, I find that the number of changes shrinks by about two-thirds (64%).

- **Second**, Mr. Yenikomshian places undue conceptual emphasis on "additional settings or options" and does not evaluate if the extent of reconfiguration he measures is meaningful in the context of clients' total Revenue IQ setup. Indeed, over 95% of the configurations Dr. Yenikomshian analyzes are, even by his own description, "optional" first- or second-layer configurations that do not speak to Revenue IQ's core pricing logic.

275.    I explain each in further detail below.

276.    **First**, Mr. Yenikomshian's data analysis is flawed because it overestimates the number of relevant observations. Mr. Yenikomshian implies that Yardi clients have made more than 4,000,000 changes to Revenue IQ settings.[189] But Mr. Yenikomshian's practical

---

[187] *See* the "Configuration Input Classification.xlsx" excel file under Mr. Yenikomshian's backup folder: "Analyses\configuration_analysis\Input."

[188] November 24, 2025, Yenikomshian Declaration, ¶ 21.

[189] November 24, 2025, Yenikomshian Declaration, ¶ 98, (*"To perform this analysis, I relied on the Revenue IQ Configuration Audit History dataset ("Configuration Data") produced by Yardi, which records configuration events made by Revenue IQ clients. My analysis of the Configuration Data shows that Revenue IQ clients made over 4,000,000 changes between January 2019 and March 2025."*)

FILED UNDER SEAL

implementation is flawed. Specifically, Mr. Yenikomshian says that Yardi's configuration data contains 4,000,000 configuration-change events. But this significantly overstates the degree of active re-configuration – that is, active changes – by clients because it includes "insertions" and "deletions" as "changes." In other words, Mr. Yenikomshian counts it as a "change" when a new property enters the data with initial configurations and later exits the data, and therefore does not isolate the subset of events that reflect clients revising previously set configurations.[190]

277.    Given the number of properties and unit type groups that use Revenue IQ, the sheer count of configurations is not a very informative number. For example, considering Landlord Defendants alone, there are 2,283 unique property IDs in the produced lease transaction data. Within those, properties will additionally have multiple unit type groups – each with their own configuration entries. Even if every Landlord Defendant only ever enabled the default Trend Rules and one Health Rule for every property and unit type group configuration, we should expect to see many identical entries in the configuration data. This is before considering additional variables that are bound to vary over time – such as date configuration and target lease expirations (I discuss these further below). Moreover, many of these "changes," by their nature, are not relevant to evaluating whether Yardi offers "flexibility" to Revenue IQ clients. As Mr. Yenikomshian acknowledges, an "insertion" record does not necessarily mean a client changed an existing setting from one value to another. Rather, insertions can occur in multiple circumstances, including when a client initially configures Revenue IQ for a new property and when a client begins using a new rule (e.g., a new Health Rule), and the relevant Yardi dataset contains no field distinguishing between these scenarios.[191] For that reason, treating all insertions as "changes" in the ordinary sense – i.e., revisions to existing settings – overstates the active reconfiguration of Revenue IQ. Similarly, deletion occurs when a configuration setting is removed, which can occur for several reasons – such as a property exiting the data or disabling an optional configuration.[192] In other words, neither "insertions" nor "deletions" necessarily reflect a client revising an existing setting, though they can indicate toggling on/off an optional configuration.

278.    Mr. Yenikomshian appears to recognize this problem but only shares an improved estimate in a footnote of his report. Specifically, using the data's "AuditType" variable (which classifies changes under "I" for insertions, "U" for updates, and "D" for deletions), Mr.

---

[190] November 24, 2025, Yenikomshian Declaration, ¶ 98, footnote 160, (*"The Configuration Data logs configuration changes for Revenue IQ properties between January 2, 2019 and March 24, 2025, including insertions, updates, and deletions, as indicated by the 'AuditType' field. YARDI-DUFFY_00106927."*)

[191] November 24, 2025, Yenikomshian Declaration, ¶ 98, footnote 160.

[192] October 30, 2025, Thompson Deposition, at 160:25–161:9, (*"A: I'll direct you to column D, which is labeled "AuditType." This indicates what -- what kind of audit this is -- is reporting. It should be an I for an insert into the table, meaning a new record was created, a new configuration was -- was added by a client or -- or a technical account manager. U would indicate an update of an existing record, and D a delete."*)

Yenikomshian filters out insertions and specifies that, of the 4 million "changes" in the configuration dataset, only 1.58 million are updates or deletions. I further notice that 12% of that 1.58 million are deletions.[193,194]

279.   This methodological choice is significant because it means that Mr. Yenikomshian overstates the number of true "changes" made by Yardi clients – that is, "changes" to settings that do not simply reflect the initial configurations of a given property. Mr. Yenikomshian's presentation of the data invites the reader to infer extensive, ongoing client-driven customization from a count that is, by construction, over-inclusive. Presenting the entire 4 million event count as "changes," while relegating the more informative breakdown to a footnote, is materially misleading and does not provide a reliable basis to infer widespread, active re-configuration.

280.   When I limit the configuration data only to strictly coded updates (no deletions or insertions), I find that the number of changes shrinks by over 2.6 million, or about a two-thirds (64%) reduction from Mr. Yenikomshian's estimate, showing that Mr. Yenikomshian overstates the variability in clients' configurations over time. This comparison indicates that, once a client has signed up for Revenue IQ, real, unambiguous changes are far less frequent than what Mr. Yenikomshian estimates.

281.   Even setting these issues aside, Mr. Yenikomshian's own analysis shows that active reconfiguration of the core Trend and Health Rules is extremely limited – accounting for less than 5% of the 1.58 million reconfigurations he tabulates. Despite the changes Mr. Yenikomshian tabulates, these configurations remain broadly homogeneous across clients over time, as I have explained in the preceding sections. This is why it is important to evaluate them as a whole, and why Yardi's omission of pre-2019 configurations that remain active in the relevant period is problematic and limits the substantive meaning of Mr. Yenikomshian's findings.

282.   Since less than 5% of the configuration changes counted by Mr. Yenikomshian refer to the core Trend and Health Rules, this indicates that over 95% of the reconfigurations Mr. Yenikomshian tabulates are other additional configurations. We may therefore want to know more about these additional configurations Mr. Yenikomshian analyzes, as I proceed to do in the following paragraphs.

283.   **Second**, Mr. Yenikomshian's analysis does not contextualize what the sheer count of configurations means and places undue importance on "additional settings or options" (as Ms. Rao described them) within Revenue IQ that likely do not affect its directional logic

---

[193] October 30, 2025, Thompson Deposition, at 160:25–161:9; November 24, 2025, Yenikomshian Declaration, footnote 160.

[194] November 24, 2025, Yenikomshian Declaration, ¶ 98, footnote 160, ( *"Of the records in the Configuration Data, more than 1.57 million reflect updates or deletions as identified by the aforementioned 'AuditType' field."*).

or the ability of clients to coordinate via Revenue IQ.

284.    For example, the most common configuration change in Mr. Yenikomshian's analysis is a client-determined "FloorRent," which is not particularly informative of whether clients agree to the same pricing rule book through Revenue IQ or whether they use Revenue IQ to coordinate prices upward. Even under collusion, each property and unit can have a different price level (and therefore floor) due to differences in characteristics like square footage and location. Indeed, if a conspiracy is effective at increasing rents over time, economists can expect the floor price to rise and therefore be "updated." Similarly, Mr. Yenikomshian includes several client configurations that only speak to the term length of a lease – i.e., how long a tenancy lasts. Most puzzlingly, Mr. Yenikomshian includes nearly 250,000 updates to targeted lease expiration months (e.g. a targeted expiration in May vs June) and rental unit characteristics that are not client configurations of the algorithm (the clearest example being active status – bActive – i.e., whether a property and unit type group is currently being actively priced by Revenue IQ).

285.    Mr. Yenikomshian's analysis is akin to taking a single recipe book and treating the same recipe as different dishes simply because it is cooked in different pots or because it allows for ingredient substitutions that do not affect the final dish. The recipe (the instructions and functional ingredients that determine the outcome) remains the same. Counting these differences as substantive differences across time/clients creates a misleading appearance of variation, even though the resulting dish is largely unchanged.

286.    To quantitatively evaluate the share of configuration changes that may not affect the directional logic of the algorithm or the ability of clients to coordinate via Revenue IQ, I apply a categorizing search to Yardi's names for each of the configurations. This categorization aims to give a broad sense of the types of information users enter when they use Revenue IQ; in the absence of more documentation from Yardi, I cannot ascertain the exact meaning of each of these configurations.

287.    To construct the different categories of information users enter, I specifically I search for:

288.    **Lease expiration targets** (e.g. "dLeaseExpirationTargetMay" or "dLeaseExpirationTargetJun") – which appear to relate to clients attempting to smooth their lease expirations throughout the year or target specific times of year for their units to become available. Given their temporal nature, these are bound to update over time, and therefore including changes in these parameters overstates meaningful changes.

289.    **Minimum price settings** (e.g., "FloorRent") – which naturally correspond to and adjust with the price level of a property, even if landlords are directionally coordinating prices upward. If a conspiracy is effective at raising prices over time, we may expect clients to be updating their floor rent to lock in higher prices. Critically, "FloorRent" is the single most

FILED UNDER SEAL

common configuration change in Mr. Yenikomshian's analysis – regardless of whether I consider his 1.58 million or 4 million configuration changes estimate.

290.    **Lease term** (e.g., "iLeaseTerm" or "bCalcLeaseTermsByMonth") – which appear to govern the length of tenancy contracts a landlord will agree to, rather than pricing.

291.    **Vacancy/Stale Units** (e.g. "bUseStaleUnitPricing" and "iDaysVacant") – which appear to relate to how landlords treat vacancies and units that have been available for extended periods of time.

292.    **Date values** (e.g. "dtStartDate" or "dtEndDate") – which will naturally vary across time, and therefore including changes in these parameters overstates meaningful changes.

293.    **Value estimates** (e.g. "dEstimatedTrafficAug" or "dEstimatedTrafficMay") – which appear to relate to the algorithm's data inputs rather than the pricing logic applied, and therefore do not speak to whether or not clients enable coordinated pricing via Revenue IQ.

294.    **Active status** in "bActive" – which simply indicates if a property and unit type group configuration is currently active in Revenue IQ.

295.    Using this keyword-based categorization, I tabulate the share of reconfigurations in each category below in Table 1. I find that these categories encompass approximately 45% of the reconfigurations Mr. Yenikomshian tabulates:

FILED UNDER SEAL

**Table 1: Categorization Shares Across Mr. Yenikomshian's Reconfiguration Tabulation, Excluding Insertions[195]**

| Category | Reconfiguration: | |
|---|---|---|
| | Count | Share |
| Lease Expiration Targets | 270303 | 17% |
| Price Floor/Minimums | 125458 | 8% |
| Lease Term | 101043 | 6% |
| Vacancy/Stale Units | 91960 | 6% |
| Date Values | 49699 | 3% |
| Value Estimates | 40374 | 3% |
| Active Indicator | 31272 | 2% |
| Un-Categorized | 795760 | 50% |

296.    In Table 1, I focus the presented results only on those categories that do not seem to affect the directional logic of the algorithm nor the ability of clients to coordinate via Revenue IQ. The purpose of this exercise is not to go through each configuration in Mr. Yenikomshian's analyses line-by-line and precisely say: "this one matters and this one doesn't." The purpose is instead to explain how Mr. Yenikomshian's attempt to do so has led to misleading results. I therefore holistically evaluated the types of configurations in his analysis, whether they appear relevant to the directional logic of Revenue IQ's price recommendation, and whether any reconfigurations are substantive in the total universe of Revenue IQ configurations. In doing so, I observe that many are not clearly related to whether or not landlords coordinate via Revenue IQ. Moreover, some – such as minimum prices – may be a byproduct of coordination among rivals. Without having considered these points, Mr. Yenikomshian's analysis is not particularly informative for the economic analysis of coordination and therefore does not alter my conclusions.

297.    Further, Yardi's current production in this matter limits both my and Mr. Yenikomshian's options in evaluating the precise configurations of Revenue IQ clients in at least two ways:

▪    First, as I have already explained, Yardi has not produced a complete configuration history. It does not show configuration values originally configured before January 2019 – even if those configurations are still active and determining prices in the

---

[195] Source: Configuration Data; Appendix F.2. Note that this table is based on the number of updates and deletions made by Yardi clients, estimated at more than 1.57 million computed by Mr. Yenikomshian in fn 160 of his report. I exclude the configuration settings that I consider clearly relevant for the pricing output generated by Revenue IQ, i.e., "iAvailabilityTrendWeighting," "iNewLeasesTrendWeighting," "iDemandToSupplyTrendWeighting," "iRentRatioTrendWeighting," "sPriceRule," "dDegreeOfChangeCompRent," "bUseNetEffectiveRentRatio," "iBaseLeaseTerm," "iSamplePeriodLength.". I provide more details of my categorization of each configuration setting in Appendix B.2. I present an alternative version of this table in Appendix B.2 considering the "over 4,000,000 changes" estimated by Mr. Yenikomshian (*see* Yenikomshian Declaration, paragraph 98).

FILED UNDER SEAL

present day – as evidenced by the fact that almost a third of Landlord Defendant properties do not appear in the produced configuration data.

- ▪ Second, clients make configurations for each property and unit type group but the produced lease transaction data does not have a unit type group identifier. It is therefore not possible to precisely align the produced lease transaction data with the produced configuration data – even if Yardi had produced a more comprehensive configuration history. As a result, I cannot rigorously evaluate whether a change in a particular configuration is associated with a price change.

298.    Using the data that is available, I implement tests in later sections of this report – which I consider more informative of this question than Mr. Yenikomshian's analysis – by evaluating if Landlord Defendants' observed pricing outcomes exhibit the economic characteristics published literature associates with coordination via a hub-algorithm. I find that they do.

299.    Further, one could – and as I have done in the preceding sections – analyse Revenue IQ in the light Yardi and its staff describes it to clients and in depositions: as a "trends and rules-based system." Doing so, I find the core Trend and Health Rules in Revenue IQ are largely standardized across clients, and that there is no meaningful heterogeneity across clients.

300.    Mr. Yenikomshian's analysis of changes in configuration data therefore appears to rest on a conceptual misunderstanding of plaintiffs' claims and of how economists evaluate collusion. In economic terms, coordinated conduct does not require firms to set identical prices. Rather, collusion exists when competing firms constrain their independent pricing decisions and increase prices in a way they would not absent concerted conduct. Plaintiffs allege that Landlord Defendants coordinated to anticompetitively inflate rental prices through Yardi. That coordination need not eliminate pre-existing price differences across properties or units. To the contrary, the price of any given unit or property at the time of Revenue IQ adoption already reflects substantial, persistent heterogeneity relative to rival units and properties – differences in location, amenities, quality, and tenant mix. As Yardi itself explains at length, properties and units are differentiated and therefore require distinct price levels. Economic coordination operates on top of this heterogeneity: landlords can increase prices together, preserving relative price differences while nonetheless raising the overall level of rents in parallel. The relevant economic question is therefore not whether Revenue IQ users charge identical prices, but whether their pricing decisions are structured in a way that produces coordinated price increases relative to the competitive counterfactual.

301.    Therefore, to effectuate a profitable conspiracy, Yardi and Landlord Defendants need only increase in parallel the prices that already sufficiently reflect their differentiation. Yardi's

FILED UNDER SEAL

internal documents and algorithm design appear to adopt similar reasoning.[196] Returning to my earlier example: clients individually setting their own price floors is perfectly consistent with collusion via a hub-algorithm, given differences in the level of prices across properties. Mr. Yenikomshian's suggestion that these disparate floors undermine a conspiracy is simply not an economically plausible argument.

302. Therefore, for the purpose of evaluating these allegations, the configurations that truly matter are those which impact the algorithm's directional logic, specifically the logic that dictates how you respond to your competitor's price changes. In the preceding sections, I have already presented my analysis of these configurations based on the key configurations that determine the Trend and Health Rules clients use and how they implement the Comp Trend Rule in particular. To further empirically evaluate if Revenue IQ, in practice, directionally moves Landlord Defendants' rents in parallel, I present further econometric evidence in Section 5.3.

## 5.2 Revenue IQ's Comp Trend Rule Aligns List Prices Movements Across Rivals

303. In the prior section, I explained that Landlord Defendants' adoption of essentially the same pricing rule book via Revenue IQ mirrors conduct economists understand can coordinate prices, and which has previously led to antitrust enforcement. Yardi takes an additional step by including a "Comp Trend" rule among its four core Trend Rules that form the starting point of its price recommendation.

304. This Comp Trend Rule compares rents across rivals, calculating a "ratio" of rent prices for each unit relative to its comp set every day. [197] When the ratio increases, the unit is becoming more expensive relative to its comps – spurring a negative trend adjustment. When the ratio decreases, the unit is becoming less expensive relative to its comps – spurring a positive trend adjustment.[198] The Comp Trend Rule therefore works to maintain constant rent ratios across participating units by telling clients to decrease prices when they

---

[196] November 24, 2025, Gaeta Declaration, ¶ 8, ¶ 14. Revenue IQ generates pricing outputs starting from reference rents supplied by the client, where the Reference Rent is inputted by the client for each unit type of a property. See Gaeta Declaration, paragraphs 8 and 14. *See* also YARDI-DUFFY_01274345, showing a Reference Rent Change Amount for each unit type (for 3-bedroom and 2-bedroom units in this example). *Also see* November 24, 2025, Yenikomshian Declaration, paragraph D.60, ("For each Unit Type Group [clients] have the option to increase or decrease the current base rent by either a specific dollar amount or a percentage of their choice.")

[197] November 24, 2025, Yenikomshian Declaration, ¶ D.90, (*"As referenced in Appendix D, Section III.A.1.d above, one factor determining the Comp Trend in Step One is the rent ratio ('RentRatio'). This variable is calculated as the Unit Type Group's average rent ('MyAvgEffectiveRent') divided by the average rent of the matched Comp Unit Type of comparable properties ('MyAvgCompEffectiveRent').*")

[198] November 24, 2025, Yenikomshian Declaration, ¶ 63, (*"If the Unit Type Group under consideration has become more expensive over time relative to its Comps, this indicates a negative directional trend (or a trend of "-1" in the pricing calculation). Conversely, if prices of the Comps have risen relative to the Unit Type Group, this indicates a positive trend (or a trend value of "1" in the pricing calculation).*")

FILED UNDER SEAL

become more expensive than comps and to increase prices when they are not keeping pace with their rivals' price increases; the Comp Trend Rule maintains such constant rent rations unless it is overridden by one of the other Trend or Health Rules in Revenue IQ.

305.    The Comp Trend Rule therefore has the purpose of moving participating landlords' prices in parallel. From an economic perspective, this rule incentivizes participants to set supracompetitive prices based on clients' near-real time information exchange through RentCafe and Matrix. The logic is simple: if I know my competitor will instantly match my price drop, I also know I will gain limited, if any, market share from reducing my price. On the other hand, I won't lose much, if any, market share from increasing my price, as my rival will do the same. I therefore have an incentive to set higher prices. This agreement to parallel pricing therefore dampens the competitive effects that would otherwise incentivize firms to set lower competitive prices.

306.    Given these concerns, I dedicate the remainder of this section to further analyzing the role of the Comp Trend Rule in facilitating coordination across Landlord Defendants. I conclude that:

- Yardi's marketing explains the Comp Trend Rule in detail to clients. These clients then note Revenue IQ's transparency in their testimonials, suggesting active awareness and understanding of the Comp Trend Rule.

- Revenue IQ implements the Trend Rule using pricing and floor-plan characteristic data exchanged among landlord clients through Matrix Surveys and RentCafe. Revenue IQ's use of RentCafe data depends on access to underlying, structured information that multiple landlords provide to Yardi pursuant to agreements permitting cross-client use. The available evidence indicates that individual landlords could not readily assemble or replicate this same dataset on a unilateral basis.

- This parallel pricing rule book – of which clients appear to be aware, and which is only implementable due to their information exchange – reduces incentives for individual landlords to undercut rivals while simultaneously encouraging price increases.

307.    I explain each conclusion in the following sections.

FILED UNDER SEAL

### 5.2.1 Yardi Makes the Comp Trend Rule Clear to Revenue IQ Clients & Their Testimonials Emphasize Revenue IQ's Transparency & Ability to Increase Rents

308. A 2023 Yardi marketing presentation to clients (Figure 41 below) explains that "Revenue IQ pricing depends on our clients' market data" through a "Rent Ratio" that "[measures] the gap not necessarily matching rates" across participating clients' properties:

**Figure 41: In Its Marketing Materials, Yardi Claims that "Revenue IQ Pricing Depends On Our Clients' Market Data"[199]**



309. This "dependence" on "clients' market data" occurs through the Comp Trend Rule. When explaining the four Trend Rules to clients, some Yardi marketing presentations place particular emphasis on the Comp Trend Rule. Yardi explains that it calculates "the ratio of subject property average rent to competitor's average rent" with the ultimate goal of asking, "is it [the ratio] growing or shrinking":

---

[199] YARDI-DUFFY_00206847, p. 11.

FILED UNDER SEAL

**Figure 42: Yardi Plainly Explains the Four Trend Rules to Clients, Emphasizing the Comp Trend Rule[200]**



310.    The Comp Trend Rule uses this ratio (or "gap") to determine whether clients "should raise" prices (when the gap is growing) or "drop" prices (when the gap is shrinking). The central logic is that clients "should raise" rents if they "are not moving at the same pace" as their comps. Yardi then tells clients the Comp Trend Rule "should" increase their rents "at the same pace" as their comps.[201]

311.    In these presentations, Yardi shows clients the underlying logic if the Comp Trend Rule through exemplar data, which displays "Avg Reference Rent," "Avg Comp Rent," "Comp Rent Ratio," and the final "Comp Rent Trend" output. By revealing both the inputs and the calculation that links competitors' rents to the client's own pricing adjustment, these presentations make clear to actual and prospective clients that the rule is designed to translate rivals' pricing movements into parallel price changes.

312.    Consistent with Yardi's efforts, landlord clients describe Revenue IQ as a "transparent system that takes revenue management beyond the black box" and achieves "a lift in rent growth:"

---

[200] YARDI-DUFFY_00206847, p. 12.
[201] YARDI-DUFFY_00206847, p. 13.

115

FILED UNDER SEAL

**Figure 43: Revenue IQ Client Testimonials Emphasize Revenue IQ's Transparency & Ability to Increase Rents[202]**



313.    With Revenue IQ and its Comp Trend Rule in hand, clients state they "can push the envelope … allowing for the greatest possible growth outcomes." These results rely on "constant analysis of every lease …. vs. market." From an economic perspective, these materials are informative because they reflect how Yardi and its clients understand and describe the system's mechanism and expected effects. In particular, they indicate that Revenue IQ is marketed and described as a rules-based tool that links pricing recommendations to competitor benchmarks and facilitates systematic, repeated price adjustments on a large scale.

---

[202] YARDI-DUFFY_00176321.

FILED UNDER SEAL

### 5.2.2 The Comp Trend Rule Asymmetrically Incentivizes Price Increases and Disincentivizes Price Decreases

314. In the preceding sections, I established that:

- Landlord Defendants apply substantially similar Trend and Health Rule configurations, resulting in broadly standardized pricing-rule logic across alleged co-conspirators.

- Virtually all Landlord Defendants enable the Comp Trend Rule and configure it to activate in response to any change in their rent ratio relative to rivals.

- The overnight daily implementation of the Comp Trend Rule is only feasible because of clients' agreement to share structured data on their pricing and unit characteristics.

- Yardi makes efforts to make this pricing logic clear to clients, and client-facing materials and testimonials describe Revenue IQ as "transparent" and effective at increasing rents.

315. From an economic perspective, this evidence has clear implications. Landlord Defendants commonly adopted a shared pricing rulebook that is practically implementable only through their exchange of data. That rulebook alters pricing incentives by encouraging parallel price increases while dampening incentives to reduce prices. These same incentives would be difficult (and potentially impossible) to recreate via purely unilateral conduct.

316. To express in mathematic notation, recall from Section 4.6 that Revenue IQ's function can be summarized as:[203]

$$List_{u,t} = f(\rho_{u,t}, \rho_{u,t-1}, X_{p,t}, \omega_{p,t}) \tag{5}$$

317. Where $\rho_{u,t}$ and $\rho_{u,t-1}$ are my list price divided by my competitors' list price today and yesterday respectively, or:

$$\rho_{u,t} = \frac{Base_{u,t}}{Comp_{u,t}} \tag{6}$$

---

[203] Throughout the remainder of this subsection, I will consider the case of clients with the Comp Trend Rule enabled.

FILED UNDER SEAL

318. Where:

- $Base_{u,t}$ represents the unit's existing list price, as it was last priced by Revenue IQ. This can also be denoted as $List_{u,t}$.

- $\overline{Comp}_{u,t}$ represents the average list price of each unit's comp set.

319. The first bullet above means $\rho_{u,t}$ can also be expressed as:

$$\rho_{u,t} = \frac{List_{u,t}}{\overline{Comp}_{u,t}} \tag{7}$$

320. Which means $List_{u,t}$ can also be expressed as:

$$List_{u,t} = f\big(\rho_{u,t}, \rho_{u,t-1}, X_{p,t}, \omega_{p,t}\big) \tag{8}$$

$$List_{u,t} = f\big(\frac{List_{u,t}}{\overline{Comp}_{u,t}}, \frac{List_{u,t-1}}{\overline{Comp}_{u,t-1}}, X_{p,t}, \omega_{p,t}\big) \tag{9}$$

321. In other words, Revenue IQ determines each unit's current list price by reference to its own prior list price *and* to competitors' prior list prices.[204] When multiple Landlord Defendants include each other in their Revenue IQ comp sets, each landlord's pricing decision becomes an input into the others' subsequent recommendations. A price increase at one property therefore feeds into the recommended prices at rival properties, which in turn feeds back into subsequent recommendations at the original property. This recursive process creates a feedback loop that can systematically ratchet prices upward and sustain prices above the competitive level. Indeed, Yardi has explained that Revenue IQ was designed with a "built-in" and "continuous" "proprietary feedback loop" that "[increases] effective rents" – explaining that is a "key" reason they "should have named this PROFITmaximizer:"

---

[204] With the exception of the first time Revenue IQ prices a unit, when it takes base rent from the client.

FILED UNDER SEAL

**Figure 44: Revenue IQ Operates On a "Built-in, Proprietary Feedback Loop"[205]**



322.    To understand how this distorts and undermines normal competitive forces, consider a toy example with two competitors using Revenue IQ and focusing on the impact of the Comp Trend Rule alone (all other things equal). If both firms are pricing "high" and know their competitor uses Revenue IQ, they are disincentivized to reduce prices because the Comp Trend Rule will make their competitor automatically follow with their own rent decrease. This limits willingness set a lower rent, including by overriding Revenue IQ.

323.    Critically, on the other hand, if both rivals first price low, and then one rival increases its price, it can do so with confidence (thanks to Revenue IQ) because the Comp Trend Rule pushes its competitor to also raise their rent. Therefore, both rivals can confidently increase prices without fear of losing significant market share, because they know the other will follow them. Maskin & Tirole (1988) present a theory that formalizes what happens in such a case: prices are above the competitive level when rivals react via simple rules to the other's immediate past price (Markov).[206]

324.    Economists sometimes evaluate these incentives in the context of a competitive oligopoly, but there is a critical distinction here: these incentives specifically exist in this case because Landlord Defendants adopt the same hub-algorithm and supply that hub-algorithm with structured data that would not be practically feasible to unilaterally recreate without adoption of Revenue IQ – *see* Section 4.1.5. In the context of economic literature I discuss previously in Section 3.1.2 (namely Harrington 2025), Revenue IQ therefore appears to closely recreate an algorithmic coordination structure that peer-reviewed economic

---

[205] YARDI-DUFFY_00531106.
[206] Eric Maskin and Jean Tirole, "A Theory of Dynamic Oligopoly, II: Price Competition, Kinked Demand Curves, and Edgeworth Cycles," *Econometrica*, May, 1988, available at https://www.jstor.org/stable/1911701 (accessed February 3, 2026).

literature has identified as problematic (and which does not require non-public data to coordinate participants' prices upward).

325. More simply, through the transparent and standardized adoption of Revenue IQ and its data sharing, Yardi and Landlord Defendants artificially create incentives to increase prices and reduce incentives to lower prices.

326. Additional features of Yardi's Pricing Suite (which rely on non-public information from Yardi clients) further exacerbate these incentives. To return to the toy example above, next introduce the role of Yardi and its TAMs. As I explain later in Section 6, Yardi's TAMs asymmetrically monitor and intervene when a participating property prices below benchmarks and rarely intervene when a property is more expensive than benchmarks. Specifically, they are 5.7x more likely to tell a client that they are pricing below benchmark than to tell them that they are pricing above benchmark. Indeed, the "Penalty Scores" Ms. Rao calculates appear to explicitly bake this logic into their methodology – pricing above comps gives no penalty, while pricing below comps does. The outcome of their oversight is two-fold:

- To exacerbate upward pricing cycles by consistently encouraging landlords to increase rents.

- To limit downward cycles by intervening when a landlord underprices its benchmark set.

327. Returning to Maskin and Tirole (1988), they explain that prices can sometimes go down because a rival finds it profitable to undercut, even when everyone is generally pricing in parallel. Yardi's TAMs (using non-public data) ensure such undercutting typically doesn't happen, creating another important distinction between Yardi's Pricing Suite and a competitive oligopoly. The upward asymmetry in TAM's pricing oversight therefore makes it more likely that landlords avail themselves of the incentives Revenue IQ creates to increase rents, which are then automatically propagated overnight to their comps' pricing via the Comp Trend Rule. TAM's pricing oversight makes upward pricing spirals more likely while reducing price wars.

328. Finally (and importantly), implicit in the above discussion is an important insight – common adoption of the Comp Trend Rule alters the informational environment on which Revenue IQ's other Trend and Health Rules rely. It generally dampens the effect of the other Trend and Health Rules. Indicators such as availability, new leases, and traffic are generated by renter substitution across competing properties. When a single landlord raises rents relative to rivals, these indicators ordinarily reflect that divergence through reduced leasing activity or traffic. However, that substitution is significantly dampened if competitors all move prices in parallel. If we all increase prices, my new leases are less

FILED UNDER SEAL

likely to suffer because renters have nowhere else to go that is significantly cheaper.[207] And if my new leases do not drop, I am more likely to persist with my price increase. Precisely the same logic applies to the Health Rules. This means that, in practice, the Comp Trend rule may be a primary determinant of Revenue IQ's list price, even if it is weighted equally on paper.

329.    These insights from economic theory lead to a set of empirically testable hypotheses:

- Do Landlord Defendants, in fact, co-move prices in parallel? (*see* Section 5.3).

- Do Yardi's TAMs asymmetrically highlight underpricing and therefore impose upward pressure on co-movements? (*see* Section 6.2).

- Are these parallel co-movements predominantly upward, and are downward cycles uncommon? (*see* Section 8.3).

330.    In the following section, I begin by answering the first question above.

## 5.3   Landlord Defendants Increased Transaction Prices in Parallel

331.    Consistent with the above theory and predictions, I observe that Landlord Defendants increased their transaction prices in parallel in a both visible and statistically discernible manner. This has at least two relevant implications:

- If Revenue IQ coordinates pricing, I expect to see substantial correlations in pricing outcomes across Landlord Defendants.

- If, as my prior discussion in Section 5.2 anticipates, Revenue IQ creates parallel upward price movements through common rules generally and the Comp Trend Rule in particular, this should be discernible in Landlord Defendants' pricing behavior.

332.    I begin this analysis with a simple visual inspection. Figure 45 below shows price indices (methodology detailed later in Section 9.2.2) for Landlord Defendants in the produced lease data between 2011 and 2025. I individually plot the price indices for the top 8

---

[207] Jeffrey M. Perloff, "Microeconomics," Seventh Edition, *Pearson Education*, Inc., 2015, available at https://unitimesofficial.wordpress.com/wp-content/uploads/2021/03/microeconomics-seventh-edition-by-jeffrey-m.-perloff.pdf (hereinafter, "Perloff") (accessed February 6, 2026). "*The residual demand curve the firm faces in panel a is much flatter than the market demand curve in panel b. As a result, the elasticity of the residual demand curve is much higher than the market elasticity. If the market has n identical firms, the elasticity of demand, $\varepsilon_i$ , facing Firm i is $\varepsilon_i = n\varepsilon - (n - 1)\eta_o$, (8.2) where $\varepsilon$ is the market elasticity of demand (a negative number), $\eta_o$ is the elasticity of supply of each of the other firms (typically a positive number), and n - 1 is the number of other firms (see Appendix 8A for the derivation). As Equation 8.2 shows, a firm's residual demand curve is more elastic the more firms, n, are in the market, the more elastic the market demand, $\varepsilon$, and the larger the elasticity of supply of the other firms, $\eta_o$,*" p. 225.

FILED UNDER SEAL

Landlord Defendants (measured by unique unit count in the lease transaction data), and then group all other Landlord Defendants into "Other" for readability. Finally, I rebase each client's index to August 2025 (so, for example, 0.8 means the price was 80% of the price observed in August 2025), given clients have different price levels, and their indices are only directly comparable when normalized to the same point in time.

**Figure 45: Price Indices Across Landlord Defendant Properties Are Visibly Correlated[208]**



333.    Next, I further break down this data into the property-level average prices that ultimately create the above indices. I plot a line for each property in the produced lease data below, splitting the figure into four subplots for each quartile of the distribution (form the least to the most expensive 25% of units):

---

[208] Sources: Expanded Lease Data. Notes: I show a line for each of the top 8 Landlord Defendants by active lease count (computed as the unique number of "Revenue IQ Unit Id"s for each), and categorize the remaining Defendants into "Other". For each Landlord Defendant in the figure, I compute the price index applying Equation 16 to the monthly effective rents of their leased units.

FILED UNDER SEAL

**Figure 46: Monthly Average Effective Rents Across Landlord Defendant Properties Visibly Move in Parallel[209]**



Monthly Average per LD prop, filtered for >50% occupancy or at least 30 units

334.　　While essentially all properties are becoming more expensive, and appear to be doing so in parallel, there is a substantial spread in the average effective rent per property. This is unsurprising and consistent with Plaintiffs' allegations: as I explain in Section 5.2, the object of Yardi's Pricing Suite is not to set the same price level across Landlord Defendants – their properties and units are heterogenous, making such a policy irrational – but rather to move prices upward in parallel. Indeed, Yardi explains to clients that the purpose of the "Rent Ratio" is "measuring the gap not necessarily matching rates" (*see* Section 5.2.1).

335.　　One way to further evaluate this data is to remove persistent price differences across properties and focus on how prices move over time *relative to each property's own*

---

[209] Sources: Expanded Lease Data. Notes: Lease Data standard cleaning, expanded and geocoded. I average "Monthly Effective Rent" across all active leases each month. I filter for active leases that have an occupancy rate exceeding 50% or when there are more than 30 active leases to ensure representativeness. I categorize each property into one of four groups, according to the value of its average rent across the whole period. Accordingly, the "Min to First Quartile" quadrant features properties with an overall average rent that falls between the minimum of the average monthly rents across all properties, and their first quartile (i.e., the value in the dataset such that 25% of the observations are at or below it); and similarly for the other quadrants, where the second and third quartiles are such that, respectively, 50% and 75% of observations are at or below it. I apply a log10 scale transformation to the y-axis.

FILED UNDER SEAL

*baseline*, also known as demeaning the prices. This is done by calculating an average price for each property over the relevant period and subtracting that average from the property's price in each month. This transformation places all properties on a common scale, allowing their price movements to be compared directly. This is the same transformation economists routinely use in fixed-effects panel regressions to remove time-invariant differences examine how outcomes evolve over time. If clients truly adopt a common pricing rule book through Yardi – and Revenue IQ's Comp Trend Rule in particular – we should expect to see these demeaned prices move in parallel across Landlord Defendant properties. Figure 47 below shows this calculation for Landlord Defendant properties during the class period:

FILED UNDER SEAL

**Figure 47: Landlord Defendants Charge Visually Clustered and Parallel Effective Rents, When Removing Property-Level Fixed Effects[210]**



Demeaned Monthly Average per LD prop, filtered for >50% occupancy or at least 30 units

336.    Adjusting for property-level average rents, Figure 47 shows that Landlord Defendants:

▪ Moved their prices in visible synchrony for over 5 years.

▪ Increased the speed of their parallel price increases in 2021/2022, a phenomenon potentially linked to Yardi's benchmarking and TAM oversight, as I discuss further in Section 6.

337.    To corroborate my visual inspection above, I calculated 3,498 Pearson correlation coefficients between Landlord Defendant properties during the class period, measuring how correlated average rents were across Landlord Defendant properties, where each observation is an average rent for a property and month, filtered for >50% occupancy or at

---

[210] Sources: Expanded and Geocoded Lease Data. Notes: I average "Monthly Effective Rent" across all active leases each month. I filter for active leases that have an occupancy rate exceeding 50% or when there are more than 30 active leases to ensure representativeness. I filter the lease data to focus on the relevant class period, i.e., after September 8th, 2019. I demean each property's monthly average prices by subtracting from them the average rent across the full time period considered.

least 30 leases.[211] I calculate correlations between properties in the same PUMA – as these properties are plausibly competing with each other – and exclude correlations between properties owned by the same landlord (identified using the client pin variable). Applying this method, I find over 76% of correlations were positive, the median correlation was 0.72, 29% of correlations were above 0.9, and the most common correlation was 0.99 – where 1 indicates perfect correlation.[212]

**Figure 48: Monthly Average Effective Rents Are Statistically Highly Correlated Across Landlord Defendant Properties, 1 Indicates Perfect Correlation[213]**



338.    Where correlations are close to 1, this means that month-to-month rent movements across different properties are not just broadly similar but nearly synchronized. In practical terms, this looks like properties' rents are being steered in the same direction at the same time, rather than each property's rents evolving individually in response to its own competitive conditions.

339.    This analysis allows me to evaluate empirical evidence against Yardi's contention that the

---

[211] I apply this filter because there appears to be an "onboarding" period when a new property enters the data new leases are priced by Revenue IQ for that property. Before this is complete, there may be few lease observations, making the property-level average misleadingly "noisy." I discuss this further in Section 9.2.3 with reference to specific case studies.

[212] I do not consider within-landlord coefficients, i.e., correlation coefficients between properties managed by the same Landlord Defendant.

[213] Sources: Expanded and Geocoded Lease Data. Notes: I average "Monthly Effective Rent" across all active leases each month. I filter for active leases that have an occupancy rate exceeding 50% or when there are more than 30 active leases to ensure representativeness.

FILED UNDER SEAL

individual configurability of Revenue IQ means Landlord Defendants either cannot or do not use it to coordinate. Under collusion, and especially given the Comp trend rule, we expect prices to move in parallel over time, so that any two property prices should be highly positively correlated; though not perfectly correlated because, as outlined in my review of the economics literature, some deviations are consistent with effective collusion. To economically support its contention that configurations in Revenue IQ are inconsistent with collusion, it would make sense for Yardi to validate its contention by showing low pricing correlations among Landlord Defendants, which would suggest each Landlord Defendant responds to their own idiosyncratic goals and market conditions. I observe the contrary: Landlord Defendants' pricing is highly correlated both visually and statistically. This empirical finding is consistent with landlords using a common pricing rule book by:

- Revenue IQ having four primary Trend Rules and a narrow set of optional Health Rules.

- Landlord Defendants having broadly similar configurations of these Trend and Health Rules.

- Almost all Landlord Defendants having enabled the Comp Trend Rule, which in turn dampens the effect of the other Rules.

340. Of equal importance, this finding is in tension with Mr. Yenikomshian's conclusion that collusion is implausible due to the variability in configurations and affirms my prior conclusion that he includes many extraneous configurations which do not materially affect the co-movement of Revenue IQ's clients' list prices.

341. In the economics literature, sustained and unusually high pricing correlations among rivals—particularly when accompanied by price increases relative to broader market benchmarks (*see* Section 9.2) — are commonly interpreted as evidence that pricing decisions may be interdependent rather than independent. Such patterns are not, on their own, determinative, but they are informative when evaluated together with other evidence related to firms' conduct. In the following section, I discuss how the evidence regarding Landlord Defendants' information exchange are indicative of coordinated pricing strategies.

FILED UNDER SEAL

# 6. Yardi's TAMs Use Non-Public, Disaggregated, and Individually Identifiable Landlord Defendant Data to Recommend Prices and Monitor Compliance "Penalty Scores"

342.   Yardi's role in client pricing does not end with Revenue IQ's daily list price recommendation. Instead, as discussed above, its Pricing Suite also includes benchmarking and TAM intervention, and the record indicates that Yardi and senior personnel describe these components as mutually reinforcing. In this section, I analyze the second component of Yardi's Pricing Suite: TAM oversight.

343.   From an economic perspective, in the context of a conspiracy, Yardi's TAMs would function as a trusted mediator with disaggregated and individually identifiable data used to support the alleged cartel. As a trusted cartel-mediator with such data, TAMs' specific purpose would be two-fold:

- **First**, to strategically recommend price increases which are then disseminated to rival properties through Revenue IQ's Comp Trend Rule, helping facilitate an upward pricing spiral while avoiding price wars.

- **Second**, to monitor and enforce compliance with those price increases on a more granular level than in Yardi's benchmarking reports. This is consistent with the theory in Sugaya & Wolitzky (2018, 2025) and Ortner, Sugaya, & Wolitzky (2024), which emphasize that withholding full price information from competitors helps avoid undercutting, while the mediator can use the full information to ensure compliance with coordinated pricing.[214]

344.   In other words, the record indicates that Yardi recommends prices to clients through both Revenue IQ's automated recommendations and TAM oversight, with the latter drawing on extensive non-public client data. From an economic perspective, for the same reason we should be suspicious when an algorithm does this, we should remain suspicious when human beings also do it. Put differently: the relevant concern is not the identity of the decisionmaker (algorithmic or human), but the structure of the arrangement – a hub that aggregates competitor information and uses it to shape and reinforce rivals' pricing behavior to accomplish a shared objective.

345.   As noted above and discussed further in Section 3.1, it is often in a hub-and-spoke cartel's best interest to rely on this hub-based coordination structure, rather than directly share the most detailed information with its spokes. Doing so reduces opportunities for rivals to

---

[214] Information Disclosure; Maintaining Privacy in Cartels; Mediated Collusion.

FILED UNDER SEAL

undercut each other, while still using their information to increase prices and ensure compliance, which solves the coordination problem that could otherwise prevent collusion. This mediated structure then encourages firms to join a conspiracy in the first instance, as it reduces the risks in doing so.

346. While it is in the firms' collective interest to adopt this strategy, agreeing to provide TAMs with non-public data they use to oversee rivals' pricing is contrary to firms' unilateral self-interest, and is typically only rational given an offsetting benefit to collective profitability. The mechanism that generally makes a horizontal information exchange contrary to firms' unilateral incentives similarly applies to information landlords provide to Yardi's TAMs. It is contrary to firms' unilateral self-interest to share information with other firms if they expect it will help their rivals better compete against them.

347. Those collective incentives appear to be reflected in the data TAMs use to oversee landlords' pricing and how they employ that data. I discuss this in the following subsections.

## 6.1 Yardi's TAM Pricing Oversight Relies on Disaggregated and Individually Identifiable Data

348. As I summarize in Section 4.3, the record indicates that, each month through at least early 2024, Yardi conducted performance reviews with TAMs using CPD data to "identify variances to benchmarks," and meanwhile distributed penalty scores to TAMs for each subject property, for each Revenue IQ client. The below penalty score report makes visually clear that Ms. Rao and Mr. Fazio review fully identifiable property-level data when preparing for TAM calls:

**Figure 49: Yardi's TAM Oversight Relies on Disaggregated & Individually Identifiable Data For Each Subject Property[215]**



349. Further, the same data is sent directly to Yardi's TAMs each month. The screenshot below

FILED UNDER SEAL

is from a February 2025 spreadsheet for clients belonging to "HeatherG"[216]:

**Figure 50: "Client Performance February 2025_heatherg," 03/14/2025[217]**



| Property Attributes | | | | | | Performance Score and Drivers | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | SourcePropertyPIN | | VoyagerPropertyIsAffordable | | ice Date | Property Quality | LocationQuali | Metric Property Completed Year | Overall Penalty | Rank | Property Rental Income Per Unit - Current Quarter | Property % Inc/-Dec | Benchmark Rental Income Per Unit - Current Quarter | Benchmark % Inc/-Dec |
| 2046840 | 1014144000K 100032829 | 162 | 0 | | 11/27/2023 | | | 437 | 4062 | 701 | -20.4% | 799 | -3.0% |
| 1780349 | 1014144000K 100032829 | 83 | 0 | | 6/6/2023 B+ | | 2002 | 432 | 4045 | 1,008 | -11.8% | 1,383 | 0.2% |
| 1780387 | 1014144000K 100032829 | 127 | 0 | | 2/14/2024 | | | 430 | 4054 | 1,123 | -9.1% | 911 | 1.2% |
| 2046841 | 1014144000K 100032829 | 163 | 0 | | 11/27/2023 | | | 430 | 4032 | 1,046 | -13.9% | 850 | -0.9% |
| 1404876 | 1011384000K 100055433 | 26 | 0 | | 8/23/2018 B+ | C+ | 1998 | 376 | 4024 | 935 | -14.5% | 1,080 | 1.4% |
| 1627974 | 1014144000K 100032829 | 45 | 0 | | 11/27/2023 | | | 290 | 3993 | 762 | -12.5% | 798 | -2.1% |
| 1780397 | 1014144000K 100032829 | 137 | 0 | | 2/14/2024 | | | 219 | 3955 | 1,010 | -8.5% | 929 | 0.7% |
| 1780383 | 1014144000K 100032829 | 123 | 0 | | 2/14/2024 | | | 216 | 3923 | 1,065 | -5.7% | 929 | 0.7% |
| 1780343 | 1014144000K 100032829 | 77 | 0 | | 8/23/2023 | | | 215 | 3914 | 785 | -6.6% | 926 | 0.9% |
| 2046127 | 1014144000K 100032829 | 176 | 0 | | 6/12/2023 C | C+ | 1964 | 163 | 3870 | 646 | -8.8% | 705 | -0.7% |
| 262377 | 1006589000K 100054339 | 39 | 0 | | 1/6/2022 C+ | B | 1979 | 147 | 3824 | 1,193 | -5.3% | 1,210 | 1.6% |
| 262380 | 1006589000K 100054339 | 42 | 0 | | 9/30/2021 B | B+ | 1980 | 146 | 3821 | 1,055 | -6.0% | 1,397 | -0.2% |
| 1937578 | 1014144000K 100032829 | 192 | 0 | | 10/11/2023 | | | 128 | 3772 | 943 | -9.1% | 1,011 | -1.5% |
| 2038335 | 1006589000K 100054339 | 336 | 0 | | 6/17/2021 B- | B | 1988 | 117 | 3754 | 1,480 | -3.4% | 1,299 | 1.1% |
| 1780318 | 1014144000K 100032829 | 27 | 0 | | 6/27/2021 C | C+ | 1967 | 113 | 3736 | 898 | -5.0% | 943 | 2.8% |
| 1780325 | 1014144000K 100032829 | 43 | 0 | | 2/17/2024 | | | 113 | 3734 | 1,143 | -6.4% | 911 | 1.2% |
| 1780322 | 1014144000K 100032829 | 37 | 0 | | 6/23/2023 | | | 113 | 3732 | 1,141 | -9.0% | 776 | -1.9% |

350.    Each landlord only sees their own detailed information and the aggregate CPD benchmark, but Yardi's TAMs and their managers see the detailed information for all landlords and use it to make price recommendations. When a client reviews Yardi's benchmark reporting, it can observe how its own property performs relative to the aggregate benchmark. When Yardi conducts its internal reviews, however, it performs this same property-level analysis separately for each subject property across its client base. Figure 51 visualizes how TAMs rely on an enriched dataset compared to Yardi's benchmarking reports:

---

[216] YARDI-DUFFY_00912430.
[217] YARDI-DUFFY_00912430.

FILED UNDER SEAL

**Figure 51: Yardi's TAM Oversight Relies On Data Beyond What Is Available in Benchmarking Reports**



351.    There is an important economic distinction between the benchmark reports provided to landlord clients and the information used by Yardi's TAMs. Benchmark reports allow each client to observe only how its own property performs relative to an aggregate CPD

131

FILED UNDER SEAL

benchmark. TAMs, by contrast, review property-level outcomes across multiple client properties and can therefore observe, on a property-by-property basis, whether pricing remains aligned with benchmark levels over time. TAMs can thus systematically monitor individual deviations from benchmark pricing (and Yardi uses it for this purpose, as I explain below in Section 6.2). To the extent this benchmark pricing reflects a collusive price, TAMs are essentially asking if each property is adhering to the cartel price, then intervening with the ones that do not. This enables Yardi, via its TAMs, to track individual deviations from cartel pricing in a way that the benchmark reports it shares with clients cannot. Tracking these deviations only requires disaggregated data on each subject property compared against its CPD benchmarks (which may reflect a cartel price) and does not require subject-property to subject-property comparisons. The key insight is that the TAMs act as mediators, monitoring each participants' adherence to the benchmark, making sure that landlords do not undercut collusive pricing by pricing meaningfully below benchmarks.

352.    By repeating the subject property to benchmark comparison for each and every subject property, Yardi – through its TAMs – can therefore monitor individual deviations from an alleged agreement in a way that clients reviewing benchmarking reports cannot. Intuitively, if I am a Yardi client and I review the benchmarking report Yardi provides, then see the benchmark fall, I cannot tell which, if any, of my rivals is deviating from collusive prices to intervene accordingly. But Yardi can, and demonstrably does, as I explain in the following section.

## 6.2  Through its TAMs, Yardi Asymmetrically Pushes Landlords to Increase Prices

353.    Consistent with the economic theory outlined in Section 3 and incentives explained above in Section 5.2, the record indicates that Yardi's TAMs use clients' non-public information to identify underpricing and impose an upward asymmetry on price recommendations, which are then realized in Landlord Defendant leases (discussed further below in Section 6.3).

354.    The asymmetric nature of TAMs' pricing begins at a methodological level. For example, the penalty scores Ms. Rao calculates only penalize properties that underpriced benchmarks. Ms. Rao testified that properties received a positive penalty if they underpriced benchmark, but "zero" penalty if their increased rents "faster than … benchmark:"

> **Q:** Okay. So if you grow -- if the -- if the subject property grows its income, its net income, slower than the group, it will get some kind of penalty score; correct?

FILED UNDER SEAL

**A:** In this particular methodology that's being used to calculate a score, if -- and in -- **if a property -- it's growing its rental income per unit faster than an aggregated anonymized benchmark**, the score in this document, **it's given a zero**.

**Q:** Okay. And if it is growing slower than an aggregated and anonymized benchmark, it will get some type of penalty score; correct?

**A:** If the difference is negative, so if the rental income per unit of the subject property is growing more slowly than an aggregated, anonymized benchmark, then there is some sort of positive score on this document.

**Q:** So there's only a penalty score if the subject property grows its income slower than the benchmark; correct?

**A:** As I said, in the scenarios in this document with the score that is created, **if the rental income per unit growth is slower than the aggregated, anonymized benchmarks, then there is a score**.[218] (emphasis added)

355.    Ms. Rao stated that a property is "doing well" if its rent was growing faster than benchmark properties:

> **Q:** Okay. And do you see where you write, "The basic concept is that Rental Income Per Unit is the ultimate metric, which incorporates all other (measures rent and occupancy)"?
>
> **A:** I see that sentence.
>
> **Q:** And you wrote, "**A subject property is doing well if its RIPU grows faster than benchmark properties**." Correct?
>
> **A:** That's what this sentence says, yes.[219] (emphasis added)

356.    Ms. Rao also testified that these rankings were created to "help" Mr. Fazio, consistent with contemporaneous documents in which Ms. Rao requested that an employee create a "1 paragraph version of the [penalty] methodology description for Anthony [Fazio], so he can understand it"[220]:

> **Q:** And you wrote, "A subject property is doing well if its RIPU grows faster than

[218] November 14, 2025, Rao Deposition, 241:8 – 242:18.
[219] November 14, 2025, Rao Deposition, 247:15 – 248:23.
[220] YARDI-DUFFY_00031203 at -04.

133

FILED UNDER SEAL

benchmark properties." Correct?

**A:** That's what this sentence says, yes.

**Q:** Okay. What did you mean by "doing well"?

**A:** So I think it's important to understand the context of creating this. The -- the -- and the -- or the -- set of data that Anthony Fazio was looking at each month was an attempt to try to help the technical account managers know which properties might be more or less happy with their overall performance. We didn't have the benefit of knowing what each property's goals were, which are very different property by property. Some properties might have occupanc- -- specific occupancy goals. Other properties might have goals around renewal retention. Other properties might have rent goals. And without having those goals, we were trying to figure out whether we could give Anthony and the technical account managers some sort of summary to help them understand which properties might be more likely to not be meeting their goals, in addition to the detailed data about each individual subject property that was in Anthony's -- the spreadsheet that Anthony would use.[221]

357.    Yardi's use of non-public rival data to inform TAM oversight is therefore designed to asymmetrically flag below benchmark pricing. These design decisions are also apparent in the final output of Mr. Fazio's calls with Yardi's TAMs.

358.    At my request, counsel prepared a de-duplicated set of call notes Yardi produced between Mr. Fazio and TAMs from January 2023 onward. I choose this January 2023 start-date as a conservative starting point based on Mr. Fazio's testimony that, beginning at some point in 2022 (precise date unknown), he began preparing performance reviews of client properties using a "CPD-based data set," having previously relied on what Yardi documents as "performance benchmark detail reports" (*see* Section 4.3.1).[222] This set coves 1,606 unique call/client note combinations. These call notes take a standardized form and generally include feedback on specific properties. A sample set of call notes from June 2023 is shown below:[223]

---

[221] November 14, 2025, Rao Deposition, 248:18 – 250:1.
[222] November 5, 2025, Fazio Deposition, 152:9–153:8
[223] YARDI-DUFFY_00923993.

FILED UNDER SEAL

**Figure 52: "Apr Meeting Notes_Lori," 06/13/2023[224]**



359.   To analyze this set of call notes, I then applied a string search algorithm to identify notes where Mr. Fazio (1) identified a client as underpriced (e.g., as priced "below" or "lagging" a benchmark); (2) identified a client as overpriced (e.g., as priced "above" or too high);

---

[224] YARDI-DUFFY_00923993.

and/or (3) made no price suggestion. I explain this methodology in further detail in Appendix C.3. Figure 53, below, depicts the results of this search algorithm:

**Figure 53: Mr. Fazio's Call Notes With TAMs Asymmetrically Focused on Clients Pricing Below Their Benchmarks, Comprising More Than 2/3s of Notes[225]**



360.   Across all notes, I find that slightly over 2/3 (67.8%) identified when a property was underpricing benchmarks, 21.9% made no clear benchmark comparison, and only 18.8% identified when a property was overpricing benchmarks. Notably, Mr. Fazio's meetings with TAMs more frequently omitted discussion of benchmark prices than raised them to address possible overpricing.

361.   Of relevance to the economic incentives I explained in Section 3.2, this suggests Yardi's TAMs do not use clients' information exchange to suggest more efficiently undercutting their rivals, and instead primarily use this information to identify opportunities to increase prices.

362.   When I further filter these notes to only include notes in which a benchmark price comparison appears (i.e., notes in which Mr. Fazio flags properties as either above or below benchmarks), 85.2% of call notes include language identifying prices as low relative to benchmark, while just 14.8% include language identifying prices as high.

363.   In other words, Mr. Fazio's calls with TAMs identify below-benchmark pricing with 5.7x

---

[225] Sources: TAM Notes Post-2023. In the set of TAM call notes considered, I apply the search logic detailed in Appendix C.3.

more frequently than above-benchmark pricing. This again suggests that Yardi's TAMs asymmetrically use clients' non-public data to identify properties with lower pricing as potential price-raising opportunities, rather than using this data to improve unilateral competition.

364. Counsel informs me that, on January 20, 2026, roughly three weeks before the filing of this report, Yardi produced approximately 14,500 documents to plaintiffs, most of which appear to be written notes summarizing calls between TAMs and clients that had not been previously produced. Given the voluminous and late nature of this production, I have not had sufficient time to meaningfully analyze these notes and incorporate them into my analysis.

365. However, my preliminary review of some of these documents reveals two relevant findings:

- **First**, the sheer number of these call notes, which memorialize interactions between TAMs and Yardi clients, alone indicates frequent and consistent communication between Yardi's TAMs and landlords.

- **Second**, these TAM notes appear to often copy-and-paste text from the Fazio-TAM call notes I analyze above (sometimes verbatim), i.e., they reveal that TAMs paste Mr. Fazio's feedback directly into the template they use for client calls. This underscores the relevance of Mr. Fazio's analysis to TAMs' subsequent communications with landlords.

366. For example, in a "December 2023" Performance Review (sent in February 2024) of a TAM named Lori Maki, Mr. Fazio wrote of a client called ▮▮▮▮▮▮[226]

**Figure 54: "Dec Meeting Notes_Lori," 02/20/2024[227]**

- ▮▮▮▮▮
  - Continue to work with client to see if there is opportunity to increase asking rent where discounted to benchmarks.
  - Net rental income below benchmarks on consolidated basis
  - Asking rent below benchmarks
  - In place, new lease, and renewals discounted to benchmark

367. TAM notes produced by Yardi for Ms. Maki for what appears to be an April 10, 2024 call with Gaines include identical language:

---

[226] YARDI-DUFFY_00350459; YARDI-DUFFY_00350458.
[227] YARDI-DUFFY_00350459.

FILED UNDER SEAL

**Figure 31: TAMs Used Non-Public Data to Tell Clients When "There Is Opportunity to Increase Asking Rent"[228]**



368. Similarly, other documents directly note or incorporate Mr. Fazio's feedback. For example, one set of September 2021 notes includes the comment "per Anthony, full now so keep pricing going & reduce concessions,"[229] while another set includes the comment, "per Anthony review, rates low to benchmarks."[230]

---

[228] YARDI-DUFFY_01320776.
[229] YARDI-DUFFY_01385214 at -216.
[230] YARDI-DUFFY_01392173 at -180.

Figure 55: "45453464," 12/18/2025[231]



Figure 56: "45466904," 12/18/2025[232]



369.  Other TAM-client notes provide further confirmation that, consistent with Mr. Fazio's feedback and approach, TAMs use benchmark data to identify and target opportunities to raise rates. For example, one set of notes produced in this case states of a Yardi client that

139

its "rates [were] still lower than our competitors so it will make sense that we are increasing rates faster than they might be." The same document also lists "more aggressive increases for new lease" in a separate column labeled "areas we can improve upon":

**Figure 32: TAMs Also Used Non-Public Data to Intervene When Clients Underpriced Comps[233]**



370.    Finally, I note that the record indicates that Yardi has previously evaluated TAM job performance based, in part, on whether TAMs' properties achieve above-market rent growth. Specifically, Yardi produced-documents contain a quantitative scorecard Yardi used to rank its TAMs by assigning points tied to specific criteria. In relevant part, this scorecard assigned the highest weight – or 34% - to a category called "market comparison," which assigns points to a TAM based on whether their properties are priced higher than the market:[234]

---

[231] YARDI-DUFFY_01385214 at -216.
[232] YARDI-DUFFY_01392173 at -180.
[233] YARDI-DUFFY_00391751 at -51.
[234] YARDI-DUFFY_01275878 (tab "Blaine YTD Grouped Rank").

FILED UNDER SEAL

**Figure 57: "04_Apr 2022," 05/25/2022[235]**

| vs Market | Count of Properties | Count of Properties with Increase | % of Prop with Increase vs Market | % Prop vs Mkt Rank | vs Sub Market | Count of Properties | Count of Properties with Increase | % of Prop with Increase vs Sub Market | % Prop vs Sub Mkt Rank | vs Similar Rating | Count of Properties | Count of Properties with Increase | % of Prop with Increase vs Similar Rating | % Prop vs Similar Rank | % vs Mkt Increase AVG | % vs Mkt Increase AVG Rank | Sum % Increase | Rank | Total Rank |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0.54% | 111 | 64 | 57.7% | 1 | -0.05% | 109 | 51 | 46.8% | 1 | 0.55% | 90 | 49 | 54.4% | 2 | 53.0% | 1 | 1.44% | 1 | 1 |
| 0.34% | 56 | 28 | 50.0% | 2 | -0.46% | 54 | 25 | 46.3% | 2 | 0.59% | 58 | 26 | 42.1% | 6 | 46.1% | 2 | -1.39% | 5 | 5 |
| -2.24% | 122 | 43 | 35.2% | 4 | -1.97% | 122 | 45 | 26.9% | 4 | -1.34% | 89 | 31 | 34.0% | 8 | 35.7% | 7 | -5.55% | 8 | 8 |
| -1.24% | 109 | 36 | 33.0% | 7 | -0.32% | 109 | 46 | 42.2% | 3 | -0.34% | 76 | 42 | 55.3% | 1 | 43.5% | 3 | -1.22% | 2 | 2 |
| -1.05% | 169 | 56 | 33.1% | 6 | -0.67% | 167 | 54 | 32.3% | 7 | -1.06% | 101 | 49 | 48.5% | 4 | 38.0% | 5 | -2.98% | 5 | 5 |
| -1.52% | 57 | 21 | 36.8% | 5 | -1.26% | 57 | 21 | 36.8% | 6 | 0.38% | 41 | 21 | 51.2% | 3 | 41.6% | 4 | -3.18% | 6 | 6 |
| -1.17% | 99 | 33 | 33.3% | 5 | -1.14% | 99 | 33 | 33.3% | 6 | -0.49% | 61 | 22 | 36.1% | 7 | 34.2% | 8 | -2.79% | 4 | 4 |
| -2.15% | 100 | 28 | 28.0% | 8 | -1.99% | 100 | 32 | 32.0% | 8 | -1.02% | 68 | 31 | 47.0% | 5 | 35.7% | 6 | -5.16% | 7 | 7 |
| 3.72% | 2 | 2 | 100.0% | 1 | 3.11% | 2 | 2 | 100.0% | 1 | 3.14% | 1 | 1 | 100.0% | 1 | 100.0% | 1 | 6.96% | 1 | 1 |
| 1.39% | 14 | 8 | 57.1% | 2 | 0.89% | 14 | 9 | 64.3% | 2 | 2.65% | 8 | 6 | 66.7% | 4 | 62.7% | 2 | 4.93% | 2 | 2 |
| 1.72% | 3 | 0 | 0.0% | 10 | -1.86% | 3 | 0 | 0.0% | 10 | -0.43% | 2 | 0 | 0.0% | 10 | 0.0% | 10 | -4.01% | 6 | 6 |
| -1.46% | 42 | 13 | 31.0% | 8 | -0.80% | 42 | 13 | 31.0% | 8 | -3.15% | 28 | 14 | 50.0% | 6 | 37.3% | 7 | -2.12% | 5 | 5 |
| -1.78% | 15 | 5 | 33.3% | 6 | -0.83% | 15 | 9 | 60.0% | 4 | 1.60% | 15 | 10 | 76.9% | 2 | 56.8% | 4 | -1.60% | 4 | 4 |
| -0.34% | 64 | 27 | 42.2% | 4 | -0.66% | 64 | 26 | 40.6% | 5 | 0.34% | 26 | 17 | 65.4% | 5 | 49.4% | 5 | -0.26% | 3 | 3 |
| -1.46% | 40 | 12 | 30.0% | 9 | -1.42% | 40 | 14 | 35.0% | 7 | -1.47% | 28 | 12 | 42.9% | 8 | 36.0% | 8 | -4.35% | 7 | 7 |
| -2.60% | 8 | 4 | 50.0% | 3 | -2.00% | 8 | 5 | 62.5% | 3 | -0.99% | 7 | 5 | 71.4% | 3 | 61.3% | 3 | -5.74% | 9 | 9 |
| -1.88% | 40 | 14 | 35.0% | 5 | -1.83% | 40 | 13 | 32.5% | 7 | -1.06% | 20 | 9 | 45.0% | 7 | 37.5% | 6 | -4.72% | 8 | 8 |
| -2.63% | 15 | 3 | 23.3% | 6 | -2.64% | 15 | 4 | 26.7% | 9 | -1.81% | 13 | 3 | 23.1% | 9 | 27.7% | 9 | -6.09% | 10 | 10 |
| -1.77% | 6 | 0 | 0.0% | 18 | -0.82% | 6 | 2 | 33.3% | 12 | -0.46% | 10 | 5 | 50.0% | 9 | 27.8% | 17 | -3.09% | 11 | 11 |
| -1.19% | 1,072 | 599 | 57.2% | | -1.01% | 1,066 | 404 | 37.9% | | -0.41% | 711 | 339 | 47.7% | | 40.9% | | -2.60% | | |

371. Further, the same spreadsheet also assigns a 16% weight to a category called "reference rent and amenities," which awards points based on the percentage of a TAMs' properties with "rent increases:"[236]

---

[235] YARDI-DUFFY_01275878 (tab "Blaine YTD Grouped Rank").
[236] YARDI-DUFFY_01275878 (tab "Blaine YTD Grouped Rank").

FILED UNDER SEAL

**Figure 58: "04_Apr 2022," 05/25/2022[237]**

| Reference Rent + Amenities | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Amount | Change | | | | | | | |
| Reference Rent + Amenities | $ | % | % Inc Rank | Count of Properties with Increase | % of Prop with Rent Increase | % Property Rank | Avg Rank | Total Rank |
| $1,992 | $41 | 2.1% | 2 | 91 | 77.8% | 1 | 2 | 1 |
| $1,170 | $30 | 2.7% | 1 | 66 | 71.0% | 2 | 2 | 1 |
| $1,197 | $13 | 1.1% | 5 | 82 | 66.7% | 6 | 6 | 6 |
| $1,399 | $18 | 1.3% | 3 | 82 | 67.8% | 5 | 4 | 4 |
| $1,577 | $14 | 0.9% | 7 | 115 | 63.2% | 7 | 7 | 7 |
| $1,186 | $12 | 1.1% | 6 | 42 | 70.0% | 4 | 5 | 5 |
| $1,540 | $17 | 1.1% | 4 | 74 | 70.5% | 3 | 4 | 3 |
| $1,337 | ($1) | 0.0% | 8 | 63 | 50.0% | 8 | 8 | 8 |
| | | | | | | | | |
| $1,285 | $61 | 5.0% | 1 | 2 | 100.0% | 1 | 1 | 1 |
| $1,492 | $49 | 3.4% | 3 | 15 | 83.3% | 2 | 3 | 2 |
| $1,345 | $48 | 3.7% | 2 | 3 | 75.0% | 4 | 3 | 3 |
| $1,521 | $12 | 0.8% | 8 | 22 | 48.9% | 8 | 8 | 8 |
| $1,217 | $16 | 1.3% | 6 | 7 | 38.9% | 10 | 8 | 8 |
| $1,492 | $23 | 1.6% | 5 | 47 | 65.3% | 6 | 6 | 5 |
| $1,510 | $24 | 1.6% | 4 | 28 | 60.9% | 7 | 6 | 5 |
| $1,654 | ($4) | -0.3% | 9 | 11 | 73.3% | 5 | 7 | 7 |
| $1,100 | $14 | 1.3% | 7 | 32 | 76.2% | 3 | 5 | 4 |
| $1,736 | ### | -2.5% | 10 | 7 | 46.7% | 9 | 10 | 10 |
| | | | | | | | | |
| $1,254 | ($4) | -0.3% | 18 | 4 | 50.0% | 15 | 17 | 19 |
| $1,424 | $17 | 1.2% | | 793 | 65.4% | | | |
| 16% | | | | | | | | |

372. In other words, the compensation structure Yardi created for its TAMs creates economic incentives for these TAMs to use Mr. Fazio and Ms. Rao' analysis of non-public CPD data to collectively push landlord clients to increase prices. This compensation structure is economically relevant because it both incentivizes price-increasing activity and discourages sales-staff (who may not be privy to an alleged agreement) from encouraging unilateral price cutting that may individually benefit clients.

373. Taken as a whole, the evidence in this section describes a coherent and economically intuitive monitoring framework. Yardi's TAM function is structured around repeated, property-level comparisons to aggregate benchmarks using non-public client data. Those

---

[237] YARDI-DUFFY_01275878 (tab "▮▮▮▮ YTD Grouped Rank").

comparisons are asymmetrically oriented toward identifying instances in which a property's pricing lags benchmark levels, while largely treating above-benchmark pricing as satisfactory or "doing well." This asymmetry is present at multiple levels of the system: in the construction of penalty scores, in the characterization of property performance, in the content of supervisory reviews, and in the guidance transmitted to TAMs and, ultimately, to landlord clients.

374.    From an economic perspective, this structure is well suited to detecting and responding to downward deviations from benchmark-aligned pricing, but it is not designed to promote price competition through undercutting. The relevant information – whether a property is priced below a benchmark – is centrally observed, repeatedly flagged, and operationalized through TAM oversight. By contrast, instances of above-benchmark pricing are neither systematically penalized nor framed as requiring corrective action. As a result, the monitoring process operates with a built-in upward asymmetry: it identifies opportunities to raise prices while largely ignoring opportunities to reduce them.

375.    The incentive structure facing TAMs further reinforces this dynamic. Performance metrics that reward above-market pricing and rent increases align TAM objectives with identifying and encouraging upward price adjustments, rather than with promoting competitive price reductions. In combination with the recurring use of benchmark-based reviews, these incentives would be expected to shape TAM behavior toward emphasizing benchmark laggards and encouraging convergence toward higher price levels.

376.    In economic terms, the TAM function therefore operates as a monitoring and reinforcement mechanism that can cause and sustain supra-competitive pricing. Given the structure of the data reviewed, the metrics emphasized, and the incentives applied, an economist would expect TAM interactions to disproportionately focus on price increases and to exert limited pressure in the opposite direction.

377.    The next section examines whether this monitoring and intervention framework has observable effects on realized lease prices, as would be predicted if TAM oversight meaningfully influences client pricing behavior.

FILED UNDER SEAL

## 6.3 Landlord Defendants Increased Prices Following TAM Price Recommendations

378.    Having documented the upward asymmetry in TAM pricing oversight, I next examine whether—and how—Landlord Defendants' pricing responds following TAM calls. To do so, I asked counsel to compile an expanded dataset of call notes between Mr. Fazio and TAMs, limited to instances in which Mr. Fazio identified a property as priced below its benchmark.[238]

379.    I then merge this dataset with the Landlord Defendant lease data Yardi produced in this matter, creating a flag in the data every time Mr. Fazio discusses a Landlord Defendant's property underpricing its benchmark with TAMs. Finally, I calculate a price index of effective rents for each property (a methodology I detail later in Section 9.2.2). With this data in hand, I evaluate if the level and/or trend of Landlord Defendants' pricing changed coinciding with TAM call notes. I begin with illustrative case studies of individual properties before turning to broader patterns in the data.

380.    In my review of the record, I have identified several instances in which a landlord client had been visibly reducing prices until Mr. Fazio discussed their pricing with a TAM. Proximate to the first call noting underpricing at that property, the downward trend reversed and the property began to increase prices. For example, in the 18 months leading up to the first TAM call in May 2022, Landlord Defendant property "████████" had reduced prices by 4.4%. Then, in May 2022, Mr. Fazio discussed its underpricing with a Yardi TAM, stating in the relevant part of the note: "RIQ YTD new lease and renewal lease below benchmarks." In the 12 months after that call, ████████ increased prices by 7.7%. Figure 59 shows this reversal:

---

[238] Counsel has informed me that Yardi produced call notes between Mr. Fazio and Yardi TAMs span the period between approximately March 2020 and March 2024.

FILED UNDER SEAL

**Figure 59: Following TAM Calls Noting Below Benchmark Pricing, "████████"
Reversed a Downward Price Cycle and Increased Rents**[239]



381.    Landlord Defendant property "██████" tells a similar story. Between August 2020 and
April 2022, it had reduced prices by 3.3%. Then, in May 2022, Mr. Fazio discussed its
pricing with a TAM, stating that the "RIQ YTD new lease and renewal lease [were] below
benchmarks". In the 12 months after, ██████ increased prices by 5.8%, as shown below
in Figure 60:

---

[239] Sources: Expanded Lease Data; TAM Notes of Below-Benchmark Instances. Notes: I compute an index applying
Equation 16 to the pricing data pertaining to the property considered, and plot a vertical line for each month
corresponding to a TAM call note where the property is mentioned for pricing below benchmark.

FILED UNDER SEAL

**Figure 60: Following TAM Calls Noting Below Benchmark Pricing, "▬▬▬▬" Reversed a Downward Price Cycle and Increase Rents[240]**



382.    In these cases, the TAM's intervention appears to be preventing downward price cycles (i.e., price wars). When a client starts to deviate from "high" prices, the TAMs observe this and, proximate to their observation, the Landlord Defendant begins to increase its prices again.

383.    In other instances, Landlord Defendants do not clearly reduce prices before TAMs note their underpricing, but they may not be increasing rents as quickly as their comps. This can still trigger an intervention by Yardi's TAMs. For example, Landlord Defendant property "▬▬▬▬▬▬" shows a client steadily increasing prices for several years before Mr. Fazio's call notes indicate underpricing, but – coinciding with the first call notes identifying underpricing – the rate of rent increases at visibly hastens, as shown below:

---

[240] Sources: Expanded Lease Data; TAM Notes of Below-Benchmark Instances. Notes: I compute an index applying Equation 16 to the pricing data pertaining to the property considered, and plot a vertical line for each month corresponding to a TAM call note where the property is mentioned for pricing below benchmark.

FILED UNDER SEAL

**Figure 61: Following TAM Calls Noting Below Benchmark Pricing, "▮▮▮▮▮▮▮▮▮"
Increased The Growth Rate Of Rents[241]**



384.    The above illustrative examples are useful to intuitively understand how TAMs may
intervene in client pricing, but do not establish that TAM oversight had a comprehensive
effect. To evaluate whether the above instances for "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮ are isolated events, In Figure 62, I therefore plot a joint index across all client
properties identified in Mr. Fazio's call notes mentioning below-benchmark pricing, and
highlight the months in which 90% of properties were first noted as underpricing. I also
present price indices for each of the constituent client properties in Appendix C.4.

---

[241] Sources: Expanded Lease Data; TAM Notes of Below-Benchmark Instances. Notes:  I compute an index applying
Equation 16 to the pricing data pertaining to the property considered, and plot a vertical line for each month
corresponding to a TAM call note where the property is mentioned for pricing below benchmark.

FILED UNDER SEAL

**Figure 62: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing[242]**



385.   The "population" level index (population referring just to subject properties flagged for underpricing) in Figure 62 shows an obvious jump after the first TAM call for this set of properties following by a sustained upward time trend thereafter. Importantly, this price increase following TAM calls far outpaces the rent CPI: before the first TAM call, properties' prices were growing roughly in line with the rent CPI, but after the first TAM call, we see a marked upward trend relative to the rent CPI.

386.   I verify these findings and reach more precise inferences through an Interrupted Time Series Analysis. Simply put, this calculates a time trend in Landlord Defendants' price indices (each plotted in Figure 99 of Appendix C.4), then tests if – at a candidate treatment

---

[242] Sources: Expanded Lease Data;  TAM Notes of Below-Benchmark Instances; Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average (CUUR0000SEHA) available at: https://fred.stlouisfed.org/series/CUUR0000SEHA# (hereinafter, "Rent CPI") (accessed February 5, 2026). Notes: I compute the index by applying Equation 16 to the lease data filtering for the population of properties identified from Mr. Fazio's TAM call notes as pricing below benchmark. For 14 properties mentioned in the TAM notes, the same property name corresponds to two different property ID's (Revenue IQ Property ID). I filter these out for the current analysis. The shaded grey area in the chart goes from March 2020 to March 2023, i.e., the 10% and the 90% quantile of the distribution of first TAM call notes for the properties considered, respectively.

FILED UNDER SEAL

event – either this time trend changes or if prices shift in a way that a constant time trend cannot explain (or both). I apply this regression to the constituent price indices for each property that comprises the population line above with property-level fixed effects – visually depicted in Appendix C.4.

387.    I present the results of this regression analysis below in Table 2, with the key results being presented in models 11-13. All regressions include property-level fixed effects, but omit month/year fixed effects as they would introduce collinearity with the time-trend I am interested in studying. The four regressions I estimate in Table 2 below have the following specifications:

$$I_{i,t} = \beta_1 \delta + \epsilon_{i,t} \tag{10}$$

$$I_{i,t} = \beta_1 \delta + \beta_2 T_i + \epsilon_{i,t} \tag{11}$$

$$I_{i,t} = \beta_1 \delta + \beta_2 T_i + \beta_3 (\delta \cdot T_i) + \epsilon_{i,t} \tag{12}$$

$$I_{i,t} = \beta_1 \delta + \beta_2 T_i + \beta_3 (\delta \cdot T_i) + \beta_4 CPI_t + \epsilon_{i,t} \tag{13}$$

388.    Where:

- $I_{i,t}$ is the index of property $i$ at month $t$;

- $\delta$ is a dummy variable that equal 1 after the month of the property's first TAM call, and corresponds to the "After First TAM Call" variable in Table 2;

- $T_i$ is a variable counting the number of months before and after the first TAM call for each property, and corresponds to the "Months From First Call" variable in Table 2.

- $CPI_t$ is the Rent CPI at month $t$, i.e., a market-wide Rent CPI for "Rent of Primary Residence" reported by the Federal Reserve ("FRED").

389.    The "After First TAM Call" variable in Table 1 is an indicator variable equal to 1 for the periods after the first TAM call of each property, so column 1 shows prices are 43.8% higher after a TAM call – though does not separate this price increase from any general upward time trend (e.g., inflation), which I do in the following regressions. The variable "Months From First Call" (with estimates in columns 11 to 13) is the time trend; specifically, it is the number of months before or after the call (negative before the call, positive after). The coefficient in column 11 on "Months From First Call" indicates that, on average, prices increase 0.694% per month, and the "After First TAM Call" variable in column 11 shows that prices are overall 13.42% higher after the first TAM call, after accounting for the overall time trend.

FILED UNDER SEAL

**Table 2: An Interrupted Time Series Analysis Shows That TAM Oversight Is Associated with Landlord Defendant Price Increases**[243]

| | (10) | (11) | (12) | (13) |
|---|---|---|---|---|
| After First TAM Call | 43.800*** | 13.418* | 3.516 | 1.629 |
| | (4.635) | (5.782) | (7.068) | (8.181) |
| Months From First Call | | 0.694*** | 0.375*** | 0.142 |
| | | (0.079) | (0.055) | (0.313) |
| After First TAM Call X Months From First Call | | | 1.131*** | 0.939** |
| | | | (0.331) | (0.340) |
| Rent CPI | | | | 0.636 |
| | | | | (0.785) |
| Num.Obs. | 10434 | 10434 | 10434 | 10434 |
| R2 | 0.337 | 0.343 | 0.347 | 0.347 |
| R2 Adj. | 0.328 | 0.335 | 0.338 | 0.338 |
| R2 Within | 0.024 | 0.034 | 0.039 | 0.039 |
| R2 Within Adj. | 0.024 | 0.033 | 0.038 | 0.038 |
| RMSE | 128.79 | 128.14 | 127.79 | 127.79 |
| Std.Errors | Newey-West (L=3) | Newey-West (L=3) | Newey-West (L=3) | Newey-West (L=3) |
| FE: revenueiq.property.id | X | X | X | X |
| + p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001 | | | | |

390.  Table 2 also shows that – across Landlord Defendant properties identified as underpricing in this set of Mr. Fazio's call notes – the upward time trend in Landlord Defendants' effective rents increased by a statistically significant 1.13% per month compared to their pre-call trend. Controlling for Rent CPI, this falls slightly but remains statistically significant with an estimate of 0.94%. In other words, TAM calls are associated with a statistically significant trend break in subject property's pricing, with prices increasing

---

[243] Sources: Expanded Lease Data; TAM Notes of Below-Benchmark Instances; Rent CPI. Notes: I compute an index applying Equation 16 for each property that is mentioned in the TAM call notes considered (which point to below-benchmark pricing). The regressions use Newey-West (HAC) standard errors, correcting for potential heteroskedasticity and autocorrelation. The lag length is set to 3, meaning that the correction takes into account autocorrelation of the errors up to three periods back.

faster after the first TAM call.

391.    Although 0.94%-1.13% may appear modest in isolation, it represents a monthly increase in the *rate* of rent growth. At that pace, effective rents rise by additional 11%–14% over a year, holding other factors constant – consistent with my other finding that the level of prices shifted up by 13.4% following these TAM calls. Even small monthly changes therefore translate into economically meaningful price effects over relatively short horizons. To put this magnitude in concrete terms, for an apartment renting at $2,500 per month, a 0.94%-1.13% faster monthly growth rate corresponds to roughly $20–$30 more per month ($280-$340 per year) within a year than would have occurred absent the trend break. Across a portfolio, these differences accumulate rapidly.

392.    This is consistent with both Mr. Fazio's deposition testimony and the documentary evidence discussed above, including Yardi's recurring framing of below-benchmark pricing as an "opportunity," the fact that TAMs reproduced Mr. Fazio's feedback directly into client-call notes, and Yardi's TAM performance scorecards, which materially rewarded above-market pricing and rent increases. This record evidence supports the inference that these calls functioned as an intervention to both commit participants to supracompetitive pricing and further push prices up.

393.    In summary, through Mr. Fazio and Ms. Rao, Yardi's TAM pricing oversight relies on disaggregated and individually identifiable non-public client data. Yardi's executives use this data, via TAMs, to asymmetrically note when clients are underpriced relative to benchmark, and TAMs appear to intervene and increase prices accordingly. TAMs' performance is rated more favorably when prices are higher or increase faster. This is an economically significant finding because – but-for TAM interventions – standard economic principles would expect these lower-pricing properties to serve as price disciplining force on other landlords. By countering this force, Yardi's TAMs limits downward price cycles (discussed further in Section 6.2) and apply an upward asymmetry to the parallel pricing dynamic Revenue IQ creates (*see* Section 6.2).

394.    In this sense, Yardi appears to act as a trusted cartel mediator, using a full set of participants' data to best serve their collective interests. To achieve this transition from unilateral to collective profit maximization, clients must trust and adhere to TAMs suggestions and set aside their unilateral incentives (e.g., to stop gaining share from rivals by undercutting them). This is where Yardi's benchmarking reports are also relevant.

FILED UNDER SEAL

# 7. Landlord Defendants Used Non-Public and Horizontally Exchanged Benchmarking Reports to Increase Prices

395.    Landlord defendants need not blindly trust Yardi's TAM oversight. Yardi also directly shares non-public rival data with clients through its benchmarking reports. This non-public information gives clients comprehensive visibility on rivals' pricing and allows them to strategically increase prices. Two features of Yardi's benchmarking reports are particularly relevant to the economic role these reports can play in shaping clients' pricing decisions:

- ▪ Yardi structurally requires that clients' benchmarking comp set include the properties Revenue IQ uses for the Comp Trend Rule. This aligns clients' algorithm and benchmarking sets to include the same properties that clients themselves identify as their closest competitors. If a TAM tells a client they are underpricing their benchmarks and should increase prices, clients can therefore verify this across multiple relevant benchmarks – including list prices, transaction prices, discounts, and occupancy.

- ▪ Presently available evidence (absent Landlord Defendant discovery) suggests that clients used this information to identify and charge "what the market may bear in the way of rents."

396.    As I explained in Section 3.1.3, and as will be relevant throughout my analysis of Yardi's benchmarking reports, when a central hub mediates collusion among participating spokes, it may be in all cartelists' collective interest to limit the information available to the spokes – instead trusting the hub to mediate the conspiracy with a full information set. This allows the cartel to use participants' non-public data both to monitor adherence and identify the right price (in this case through TAMs), while limiting the ability of participants to strategically defect by setting lower prices.

397.    Benchmarking data can therefore be used in the context of a collusive agreement to help co-conspirators maintain high prices. If instead landlords were starting from a competitive stance, data sharing would typically be against their unilateral interests. As demonstrated by the economic theory I discussed in Section 3.2.3, competitors do not typically divulge their non-public pricing information if they expect rivals will use that information to undercut them, because this is against their unilateral self-interest. Instead, they only share this information if they expect participating firms will use it to their benefit and in particular to collectively increase prices – otherwise they are better off not sharing their information and competing as normal. This is why economists describe horizontal information exchanges as typically inconsistent with unilateral conduct and consistent with collective profit maximization.

398.    I begin my analysis of Yardi's benchmarking reports by summarizing their preparation.

FILED UNDER SEAL

## 7.1 Yardi Requires That Landlord Defendants' Benchmark Sets Include their Revenue IQ Comp Set, Ensuring Price Visibility to Monitor Revenue IQ Adherence, TAM Oversight, and Pricing Opportunities

399. As I explain further in Section 4.4, Yardi prepares benchmarking reports containing non-public client data in several steps:

- Clients select a set of properties to be included in their benchmark.

- Yardi checks which of these properties has data in CPD, requiring at least 2 unique clients and 5 properties have CPD data to return a report.

- Yardi applies "perturbations" to each property's KPIs (such as effective rent), then averages the result into an aggregate benchmark figure.

- Using Revenue IQ's benchmarking features, clients can then compare each of their property's KPIs against the benchmark for their desired time-span.

400. As alluded to in the final bullet above, clients have multiple access points to benchmarking reports across Yardi's Pricing Suite, including in dashboards built into Revenue IQ. I understand that the benchmarking available in Revenue IQ and AssetIQ, a separate Yardi product used by some Revenue IQ users, are essentially the same, but that AssetIQ contains some additional KPIs that are not relevant to my analysis here.[244] I therefore primarily focus my analysis on Revenue IQ, but will occasionally make reference to Yardi materials that discuss benchmarking in the context of AssetIQ where that functionality also appears in Revenue IQ.

401. At the first stage, when clients select their benchmark set of properties, Yardi requires that client's benchmark sets include their comp set from Revenue IQ's Comp Trend Rule. According to Ms. Rao, the stated logic behind this is that these are "the properties that

---

[244] November 14, 2025, Rao Deposition, 85:15 – 86:19 ("***Q:*** *Now, we've talked about how there's some level of, you know, integration between Revenue IQ and Asset IQ. Is the benchmarking set -- if a user selects a benchmarking set in Asset IQ and they're also a Revenue IQ user, will that be the same benchmark that they get for, you know, the historical performance dashboard that they see in Revenue IQ?* ***A:*** *If a user is licensed for both Asset IQ and Revenue IQ for the same property and they pick a Yardi suggested -- or they -- sorry -- they pick a benchmark set of properties, of Matrix properties, those benchmark -- those -- those benchmark properties are the ones that will be used as the super set every time a client runs a report, whether that report is in Asset IQ or Revenue IQ. And like we talked about earlier, then each time that report is run, a call is made to CPD and at that time, in an Asset IQ report or a Revenue IQ report, all of the checks are made to make sure that there is at least five properties from CPD contributing to the benchmark and at least two clients and looking at the KPI being requested and the time period that that KPI is being requested for.").* See also 273:24 – 274:20 for a similar discussion.

FILED UNDER SEAL

they're competing with directly."[245]

402. This requirement is visible in the API usage data Yardi produced in this litigation, which shows that landlords' Revenue IQ Comp Set is included in their benchmark set in more than 99% of configurations. Combined, the list price information clients can view in Revenue IQ's algorithm interface and the final transaction price information clients can view through its benchmarking reports therefore give clients substantial visibility into their rivals' pricing and price structure.

403. Recall from Section 4.6 that Landlord Defendants reach final lease transaction prices that can be expressed as:

$$Final_{l,t} = List_{u,t} + \delta_{l,t} \tag{14}$$

$$Final_{l,t} = f(\rho_{u,t}, \rho_{u,t-1}, X_{p,t}, \omega_{p,t}) + \delta_{l,t} \tag{15}$$

404. Where:

- $Final_{l,t}$ reflects the final rental price for lease $l$ at time $t$.

- $List_{u,t}$ reflects Revenue IQ's list price.

- $\delta_{l,t}$ reflects the sum of discounts and concessions from list price ($List_{u,t}$) to the final effective rent in that unit's lease.

405. By (A) contractually agreeing to share competitively sensitive data, and (B) then aligning the comp set landlords use in Revenue IQ's algorithm and benchmarking reports, Landlord Defendants gain visibility into their rivals' list prices, final transaction prices, discounts, and concessions, among other KPIs. Yardi's system therefore provides Landlord Defendants with uniquely comprehensive visibility into their competitors' pricing structure, creating a funnel of data showing everything from competitors' list to transaction prices:

- Online list prices (asking rents) on RentCafe, through Revenue IQ.

- Call-around prices from Matrix surveys, through Revenue IQ.

- Gross contract rents, through benchmarking reports.

- Concessions amounts, through benchmarking reports.

- Transactions prices (effective rents), through benchmarking reports.

406. This is further supplemented with additional data on property performance, such as

---

[245] November 14, 2025, Rao Deposition, 88:24–91:16.

occupancy rates. Yardi's benchmarking therefore enables clients to:

- Identify opportunities to increase prices, which the Comp Trend Rule then propagates across participants. In other words: firms can identify when they are pricing below benchmark and increase their pricing in a way they could not but-for the information exchange.

- Verify TAM oversight when an account manager notes that they are pricing below benchmark.

407. The limitation of benchmarking is that it does not allow Landlord Defendants to monitor individual deviations and enforce the agreement accordingly. Instead, that is where Yardi's TAMs are relevant, as explained above in Section 6.

408. In other words, clients may use benchmark reports for several possible anticompetitive ends – even though the KPIs shown are aggregated and anonymized. These different ends interact with other features of Yardi's Pricing Suite, underscoring that it is important not to analyze each piece of Yardi's Pricing Suite in isolation. I return to this point later in Section 8.

409. In the absence of discovery from Landlord Defendants, comprehensive evidence on how clients used Yardi's benchmarking reports in practice is unavailable. However, the available evidence indicates Landlord Defendants used benchmarking reports to strategically increase their prices, as I explain below.

## 7.2  Benchmark Reports Helped Clients Identify & Charge "What the Market May Bear in the Way of Rents"

410. With improved information on rivals' pricing, firms have two general options: use this information to undercut each other or use this information to collectively increase prices. As a theoretical matter, economists do not expect firms to incur the costs of information sharing if they anticipate undercutting (*see, e.g.*, Harrington (2022)). In this section, I compare this economic prediction against the available record evidence.

411. Yardi's marketing materials confirm what economic theory predicts, i.e., the intuition that firms will be willing to participate in (and pay for) information-sharing arrangements only if they expect a benefit and in particular collective price increases. For example, one marketing presentation (screenshot below) explains that:

- Yardi noted "clients that are complaining about the cost" of information sharing.

- In response to these client complaints, Yardi gave "an excellent real life example of a client who … found they were way below market."

155

FILED UNDER SEAL

- Upon learning this, the client "put a plan in place to raise new leases and renewals" – i.e., to raise effective rents.

- The final result of which: "objections [Yardi] faced when [it] first rolled out Asset IQ are no longer objections."

**Figure 63: In Its Marketing Materials, Yardi Explains How Clients Use Benchmarking Reports To Increase Rents[246]**

The objections we faced when we first rolled out Asset IQ are no longer objections as we update operational KPI's and benchmarks every night and financial data timing is sufficient for what our clients need.
For clients that are complaining about the cost, I have an excellent real life example of a client who during their budgeting process with FIQ, noticed their studio rents were budgeted flat for the year. They went back to Asset IQ and found they were way below market so put a plan in place to raise new leases and renewals throught the next year and budgeted for it and are now looking at Revenue IQ. Those that are happy with their current tools, really see the power of the Big 3 when they see our Elevate MF solution- everything at your fingertips in one platform.

412.   This narrative illustrates how Yardi's benchmarking reports work in concert with the rest of its Pricing Suite and closely aligns with the economic theory in Harrington (2022) (*see* Section 3.2.3). In particular, it reflects the logic that participation in an information-exchange mechanism depends on an expectation of net benefit: absent an expectation that Yardi's information exchange will help inform or support rent increases, clients may be unwilling to participate and pay for that exchange. However, these objections diminish once Yardi clients are given concrete examples of benchmarking being used to increase pricing.

413.   Consistent with this, Yardi's executives internally explained that clients "like to see their rent higher than market:"

**Figure 64: When Reviewing Benchmarking Reports, Yardi "Clients Like to See their Rent Higher Than Market" [247]**

Total rev/unit vs comps --- our goal is to maximize the revenue our clients get – so strike the right balance of increasing rents while not impacting occupancy – this metric is comparing the rent we're suggesting vs Matrix/CPD market.  Our clients like to see their rent higher than market.

414.   From an economic perspective, this evidence is informative because it speaks to the incentives and mutual expectations clients have when choosing to share information with each other. If clients expected their rivals would, in practice, use Yardi's benchmarking reports to undercut each other, a rent level "higher than market" would be a source of concern because it could imply lost market share. That clients instead have a preference for seeing above-market rents in the benchmark reports suggests clients use these reports to

---

[246] YARDI-DUFFY_00096779 at -10.
[247] YARDI-DUFFY_00024629 at -31.

collectively increase prices over time, i.e., as a tool to support upward price movements rather than as a tool for competitive undercutting.

415.    Consistent with this, at a Yardi Marketing Forum among several Yardi clients, one Landlord Defendant (Grubb) told other Yardi clients that it uses Yardi's benchmarking to "understand what the market may bear in the way of rents:"

**Figure 65: At The Yardi Marketing Forum, Landlord Defendant Grubb Explicitly Stated It Uses Yardi's Benchmarking Reports to "Understand What The Market May Bear In The Way of Rents"[248]**

Includes leveraging benchmark data to understand what the market may bear in the way of rents, view renewal and occupancy trends, operating expenses, etc.
Asset Intelligence aggregates all of these things to provide prescriptive and predictive analysis of the data you are collecting
Outliers in data integrity are more obvious because of the ability to pull all of this together and compare it against your submarket, comps, or portfolio/submarket

416.    To show how this worked, Grubb provided the following screenshot of benchmarking KPIs:

**Figure 66: Yardi's Benchmarking Reports Give Asymmetric Positive Reinforcement to Above-Benchmark Pricing[249]**



417.    Figure 66 shows that, in at least some iterations of its benchmarking functionality, Yardi used visual indicators that evaluate client rent growth relative to benchmark, displaying a green thumbs up when clients increased rents faster than benchmark (see "new lease rent

---

[248] YARDI-DUFFY_00185213, at -19.
[249] YARDI-DUFFY_00185213, at -28.

FILED UNDER SEAL

growth") and a red thumbs down when they did not (see "renewal rent growth"). From an economic perspective, this presentation is informative: it reflects a design decision to frame above-benchmark growth as desirable and below-benchmark growth as undesirable. The framing is directionally asymmetric: it rewards faster-than-benchmark growth while implicitly discouraging slower growth, even when absolute rent levels or other performance metrics are not declining. This design feature is consistent with other record evidence suggesting that Yardi's tools and metrics focus attention on perceived underpricing relative to peers, including the Penalty Score methodology described above. Taken together, these features suggest a system that systematically focuses user attention on upward pricing adjustments.

418.    Clients could implement the price increase opportunities they identify through benchmarking in several ways. As Grubb explained in the same presentation, its properties' pricing could respond to the information in benchmarking reports through several means. Specifically, Grubb could:

▪    "Hold Teams Accountable for the recommendations they make regarding pricing adjustments and specials" – i.e., monitor and reduce their teams' deviations from Revenue IQ's list price. I note this is also relevant to the theory in Harrington (2022) discussed in Section 8.1 below.

▪    "[G]et a lot more strategic with specials [incentives] offered" – i.e., potentially offering fewer/smaller discounts/concessions.

▪    "[M]ake adjustments to [their] revenue management system" – i.e., change their Revenue IQ configurations to more or less aggressively increase prices.

**Figure 67: Landlord Defendant Grubb Also Uses Benchmarking To Reduce Discounts & Adjust Its Revenue IQ Configurations[250]**

Hold Teams Accountable for the recommendations they make regarding pricing adjustments and specials. You can quickly determine if the issue is a sales problem or something else.
Drive Incentives: we can get a lot more strategic with specials offered, how long we hold off on adjusting rates, or if we need to make adjustments to our revenue management system to make sure we're not inflating rates prematurely.

419.    These descriptions bear on the economic significance of benchmarking: they indicate that benchmarking outputs can be – and are – used as actionable inputs to rent-setting and discounting decisions. In the next section, I therefore address Yardi's argument that the manner in which it aggregates or anonymizes benchmarking data renders these reports economically innocuous.

---

[250] YARDI-DUFFY_00185213, at -28.

## 7.3 Yardi's Aggregation and Perturbations to its Benchmark Reports Do Not Undermine or Contradict Their Usefulness to an Anticompetitive Agreement

420.    If, as the evidence above suggests, clients use Yardi's benchmarking reports to charge "what the market may bear," an aggregated and anonymized horizontal information exchange can still achieve this use-case and push prices above their level but-for the exchange. A horizontal information exchange can still influence pricing even when it provides aggregated comparative signals, because those signals can guide rent movements and discounting decisions relative to a group of comparable properties and therefore support parallel adjustments over time.

421.    This also speaks to Dr. Mitzenmacher's claim that the "perturbations" Yardi applies significantly limits the usefulness of the benchmark reports. Specifically, in support of its motion for summary judgment, Yardi has submitted the report of Michael Mitzenmacher, a computer science professor. Professor Mitzenmacher opines that Yardi's benchmarking incorporates multiple technical and operational safeguards, including minimum property thresholds, aggregation, and controlled "noise," or what he describes as "controlled 'perturbation[s]' designed to prevent any single property's data from being inferred" – that are intended to prevent clients from disaggregating benchmark outputs (i.e., back-engineering the specific values that make up a given KPI).[251] Professor Mitzenmacher also opines that these measures entail "information loss," a concept he describes as follows: "Once individual values are collapsed into a single average, their distinguishing variation is lost, leaving only a summary that reflects the group's overall level but not its internal diversity."[252]

422.    The usage of aggregation and perturbation to prevent de-anonymization broadly falls under a set of techniques known as "Statistical Disclosure Control". These techniques are designed to make it difficult to infer specific values in the underlying dataset by aggregating data and adding controlled statistical variations ("noise") that, by design, preserve important statistical properties (such as the average and standard deviation).

423.    From an economic perspective, however, the presence of aggregation or noise does not imply that benchmarking outputs are uninformative or irrelevant for decision-making. Firms routinely rely on aggregated signals – such as industry indices, peer benchmarks, and survey-based metrics – precisely because such measures can still convey economically meaningful information about relative performance, trends, and positioning, even when

---

[251] November 24, 2025, Declaration Of Michael Mitzenmacher In Support Of Yardi Systems, Inc.'S Motion For Summary Judgment, (hereinafter, "November 24, 2025, Mitzenmacher Declaration"), ¶ 39.

[252] November 24, 2025, Mitzenmacher Declaration, ¶ 75.

individual data points are obscured.

424.  The record evidence is consistent with this view. Yardi actively developed, marketed, and maintained benchmarking tools with dashboards, KPIs, and performance indicators, and a substantial majority of Revenue IQ users availed themselves of these benchmarking features.[253] This observed adoption and use is difficult to reconcile with the characterization of benchmarking outputs as having little or no utility for downstream decisions. At a minimum, it suggests that Yardi and its clients viewed these benchmarks as sufficiently informative to guide evaluation and discussion of pricing outcomes, notwithstanding the presence of aggregation and perturbation. Indeed, it is economically irrational for Yardi to incur the costs of building a benchmarking product, complete with dashboards, KPIs, and mechanisms for flagging relative performance, only to sell customers a product that cannot be used – and even less rational for clients to both pay for this product and explain its benefits to fellow clients. In the real world, firms do not purchase analytic tools they believe have no utility; they purchase tools that, consistent with Yardi's marketing of benchmarking (discussed above) are helpful in making decisions.

425.  In this sense, Professor Mitzenmacher's description of information loss addresses a technical limitation of benchmarking data in that it cannot be deanonymized, but it does not establish that the benchmarks lack economic relevance. The appropriate economic question is not whether benchmarking outputs permit exact inference of individual competitors' prices, but whether they provide actionable signals about relative performance. The record indicates that Yardi's benchmarking tools were used and interpreted as providing such signals.

426.  Indeed, as Dr. Mitzenmacher and Yardi itself explains (see above), the purpose of these perturbations is to prevent disaggregation, not to undermine the functionality of benchmarking itself.

427.  This distinction is well understood in statistics and econometrics. When random noise is added to individual observations before aggregation, the noise does not systematically bias the resulting average so long as it is centered and applied symmetrically. According to the Law of Large Numbers, if I randomly sample a distribution enough times, the average of my samples will converge on the "true" population average as their count increases.

428.  Conceptually, that is similar to the "random" perturbations that Yardi applies. In other words, given enough random perturbations, Yardi's aggregation "averages out" the noise. Intuitively, if I average two firms' prices but first randomly perturb one price by +$5 and the other by -$5, I will still get the correct average – but I can't infer any individual firm's price. With larger samples, the cancelation effect becomes even stronger - and as Mr.

---

[253] November 24, 2025, Yenikomshian Declaration, ¶ 181. Yardi's expert, Mr. Yenikomshian, concluded that at least 87.7% ((6352-781)/6352) of Revenue IQ users actively used Yardi's benchmarking.

FILED UNDER SEAL

Yenikomshian explained, clients typically configured benchmark sets including approximately 29.2 properties on average.[254]

429.    As I explained in prior sections (*see* e.g. 3.1.3), this is consistent with how a hub-and-spoke cartel may optimally share information across spokes. Yardi limits clients' ability to reverse-engineer individual information from benchmarks, potentially because such information could help clients undercut each other. Because Yardi uses a significantly broader information set on individual landlords to inform TAM oversight and provides aggregated benchmarks to support collective price increases, clients would only need individually disaggregated information if they wanted to defect from either:

- ▪ TAM's pricing suggestion, or

- ▪ A collective agreement to increase prices.

430.    In sum, to the extent Yardi's "controlled noise" is designed to preserve the accuracy of the aggregated KPIs shown to users (even if individual underlying values have been "perturbed"), the competitive utility of this value is not diminished: Yardi prevents reverse engineering while leaving the value clients actually use intact. Two points follow from this:

- ▪ As long as that benchmark aggregate remains reliable, perturbation of individual constituent values which are then averaged do not undermine its anticompetitive effects. To the contrary, they may be purposefully designed to limit defection from an agreement.

- ▪ Aggregated and anonymized benchmark data can still be consistent with an anticompetitive agreement – and indeed may be the optimal information sharing strategy within a hub-and-spoke cartel.

431.    More generally, the capability of Yardi's benchmarking data to anticompetitively coordinate prices upward is well documented in both the economic literature and clients' descriptions of how they use benchmark reports. From an economic standpoint, aggregation, anonymization, and perturbation limit the inference of individual data points, but they do not eliminate the capacity of benchmark information to shape pricing behavior, particularly when that information is transmitted and interpreted through a centralized intermediary. The relevant question is therefore not whether individual prices can be reverse-engineered, but whether the benchmarking framework facilitates interdependent pricing decisions. In the following section, I explain why economists generally believe

---

[254] November 24, 2025, Yenikomshian Declaration, ¶ 164 (*"As discussed above, Benchmarking KPI outputs are single summary values produced by aggregating many underlying KPI inputs from multiple benchmark properties.* ***In practice, clients often select benchmark sets that include many properties (the selected sets averaged 29.2 properties)****, but only a subset of those properties have available KPI inputs that actually contribute to any given calculation (the Effective Benchmark Set averaged 9.4 properties*.") (emphasis added)

clients can only achieve higher prices by acting against their unilateral self-interest and instead collectively increasing prices.

432.    In the preceding sections, I have therefore covered three aspects of Yardi's Pricing Suite (Revenue IQ, TAMs, and benchmarking). I have also alluded to how they can mutually reinforce each other. Because of the importance of this mutual reinforcement, I dedicate further attention to it in the following section, before proceeding to an empirical analysis of how this coordination structure manifests itself in Landlord Defendants' upward pricing behavior in Section 9.

# 8. Revenue IQ's List Price Rules & Landlord Defendants' Non-Public Information Exchange Work in Concert to Increase Prices

433.    As discussed above, the record evidence is consistent with a three-part mechanism through which Yardi coordinates pricing across participating landlord clients in a three-stage process, with each component reinforcing the others:

▪    First, Revenue IQ creates parallel price movements across Landlord Defendants by including a rule, the Comp Trend Rule, that seeks to maintain a constant rent ratio between rivals. *See* Section 5.2). Further, by implementing substantially similar rule configurations, Landlord Defendants use the same principles for setting their prices, which can allow them to act in their collective interest.

▪    Second, Yardi's TAMs encourage adherence to list prices and apply an upward asymmetry to these parallel movements by predominantly noting when landlords price below their comps. The disproportionate emphasis on underpricing also helps avoid downward price cycles. *See* Section 6.2).

▪    Third, Yardi's benchmarking allows clients to identify "what the market may bear in the way of rents" and accordingly price more aggressively. *See* Section 7.2).

434.    This mutually reinforcing structure appears to be deliberate (*see* Section 4.5). Yardi then commits clients to this coordination through structural and economic barriers to deviation, such as:

▪    Automatically updating Revenue IQ's list price on a unit's public listing, creating an "anchor" point for each unit's price, without requiring client approval. (*see* Section 8.1).

▪    Imposing a multi-step process to enable rent overrides (*see* Section 8.1).

FILED UNDER SEAL

- ▪ Ensuring frequent TAM oversight of client pricing, including by noting when clients underprice their benchmarks. (*see* Section 8.1).

- ▪ Providing executives at client landlords with tools, including "New Lease Audits" and benchmark reports, to "hold teams accountable" for "pricing adjustments" away from Revenue IQ's list price. (*see* Section 7.2 and Section 8.1).

435. The result of these efforts is observable in the data: as I show below, Landlord Defendants transact within 5% of Revenue IQ's list price in more than 90% of leases (*see* Section 8.2.1), on average transact within 1.41% of Revenue IQ's list price, and these parallel price movements through Revenue IQ are upward in more than 74% of lease changes.

436. In the following sections, I explain each of these conclusions in more detail.

## 8.1  Yardi Creates Structural & Economic Barriers to Defecting From Revenue IQ's List Price

437. As I explained in Section 3, an important theme in the economic analysis of collusion is that the cost of defecting from an agreement must be sufficiently high to induce compliance, but not so high as to prevent firms from joining the collusive agreement in the first instance. In the context of coordinated information exchanges used to increase prices, Harrington (2022) gives the example of colluding executives having only indirect control over price changes.[255] After agreeing to share information and set prices, subsequent price adjustment involves internal communication costs that help commit executives to the high prices they set.[256]

438. Applied to this matter and consistent with this economic theory, the evidence indicates that Yardi's Pricing Suite creates substantial frictions that impose costs on clients' deviations from Revenue IQ's list price and therefore limit these deviations. This design feature is consistent with economic models of coordination. At the same time, these frictions fall short of uniformly prohibiting deviation, which economic theory explains could actually

---

[255] Harrington (2022), *"Second, after sharing prices, those executives have limited influence when it comes to either changing the prices that were shared or influencing the internal pricing process that translates those prices (such as list prices) into the prices faced by consumers (which encompass any discounts off of the list price). In our model, this second assumption is modelled by assuming an executive can change the subsequent prices but only at a cost. This cost captures having to go outside of standard protocol - such as changing the list price which the firm had already decided upon - or exerting pressure on other employees who have more authority over the subsequent pricing process - such as sales managers who control discounts,"* p. 4.

[256] Harrington (2022), *"The managerial costs of price adjustment increase with the size of the adjustment because the decision and internal communication costs are higher for larger price changes. First, the increased costs occur because more people are involved.... Second, the increased costs occur because larger price changes lead to more internal discussions.... Third, the increased cost occurs because larger price changes lead to more attention and controversy. [...] Given the length of time to decide on a new list price and then inform and explain it to other company employees, it could be a costly task for an executive to subsequently change it,"* p. 5.

FILED UNDER SEAL

undermine a conspiracy because it discourages firms from joining and risking being undercut without a recourse option. Specifically:

- Yardi automatically reflects Revenue IQ's list price on public apartment listings overnight every night without requiring client approval.

- Yardi imposes a multi-step process for clients to enable overrides and provides "audit" reporting for executives to monitor "variances from what RENTmax recommended and what is actually charged in Voyager."

- TAM oversight identifies below benchmark pricing.

- Benchmark and audit reporting is used to "hold teams accountable" for "pricing adjustments," thus creating organizational costs to deviating from Revenue IQ's list price.

439. I previously explained how Revenue IQ automatically applies its list prices on public apartment listings in Section 4.1.4, and that Yardi describes this as an "important advantage" of Revenue IQ:

**Figure 68: Revenue IQ's Pricing Output Is "Immediately Upate[d]" In Voyager and RENTCafe[257]**

An important advantage is there is no delay in deploying new pricing
Voyager is immediately update, as is RENTCafé
RENTCafé syndication will feed new prices to listing sites on next sync
Typically this happens in the early morning so all pricing is in place across all platforms by opening of business.

One single system means consistent data

440. I therefore focus the analysis below on the role of structural barriers, audit reporting, benchmarking, and TAM oversight in committing clients to Revenue IQ's list price.

441. Within its Pricing Suite, Yardi imposes several structural barriers on client "overrides" (i.e., deviations) from Revenue IQ's list price. The record further indicates that Yardi emphasizes strict adherence to Revenue IQ's list price by discouraging overrides at clients' initial set-up, including through guidance instructing site managers not to override rates and that automatic acceptance of Revenue IQ's list price is "best practice:"

---

[257] YARDI-DUFFY_00165009, at -16.

FILED UNDER SEAL

**Figure 69: Yardi Described Automatic Acceptance of Revenue IQ's List Price as "Best Practice"[258]**



442.    Yardi formalizes this discouragement by imposing a nine-step process to enable override permissions:

[258] YARDI-DUFFY_00175223.

FILED UNDER SEAL

**Figure 70: Yardi Imposes a Nine-Step Process on Clients Enabling Rent Override Permissions[259]**



443. Yardi also provides clients' managers with tools to commit their comparatively junior staff to adhere to Revenue IQ's list price: the record indicates that it trains clients to use a "lease audit" tool that identifies "any variances from what RENTmax [Revenue IQ] recommended and what is actually charged." Yardi explains that "this is important" to ensure "that prices are not being overridden which could result in loss to rental growth:"

---

[259] YARDI-DUFFY_00327241.

FILED UNDER SEAL

**Figure 71: Yardi Describes Overrides as a "Loss to Rental Growth" And Gives Clients An "Audit" To Track Deviations[260]**

The next few sections are only visible when using Yardi RENTmaximizer. You will get an account manager assigned to give you additional training and information for this product.

Asking Rent
- available apartments and renewal proposals.
- click on the details to view the asking rents and see potential growth by unit.

New Lease Audits
- showing you any variances from what RENTmax recommended and what is actually charged in Voyager. This is important since you've made an investment into these products and want to be sure that the prices are not being overridden which could result in loss to rental growth.
- You can view the details of each lease here.

444.    This allows clients to monitor the extent to which their leasing teams are adhering to or deviating from Revenue IQ's list price when agreeing effective rents in finalized tenancy agreements. Notably, this "audit" tool shows, on a resident-by-resident basis, whether tenants are "paying the rent RENTmaximizer has suggested," flags in green where they are doing so, and flags in red where they are not:[261]

---

[260] YARDI-DUFFY_00806629 at -31.
[261] YARDI-DUFFY_01230207 at -23.

FILED UNDER SEAL

**Figure 72: Yardi Provides Clients with "Lease Audit Reports"[262]**



**Lease Audit Report**

Use the new Lease Audit report to monitor when and why differences between lease rents and RENTmaximizer prices occur at your properties. The report highlights each resident's rent in red or green to indicate a change:

⇨ **Green** Resident is paying the rent that RENTmaximizer has suggested for the day.

⇨ **Red** Resident is paying a different rent than that which RENTmaximizer has suggested.

From the report, you can click the **Pricing** link to view the pricing grid for the resident's move-in date.

You can click the resident's code to view the resident history record and determine who changed the resident's rent and why.

Lease Audit for 085 - ▓▓▓▓▓ for 7/14/2014 to 7/16/2014

| Unit Type | Unit | Resident Name | Current Term | Current Rent (excluding concessions) | Pricing on App Submitted Date | Pricing on App Approved Date | Pricing on App Lease Signed Date | Difference | RMS Pricing | App Submitted Date | Move In Date | Resident Status | Resident History |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 85-1x1i | G0116 | | 12 | 704.00 | 662.00 | 662.00 | 662.00 | 42.00 | Pricing | 7/14/2014 | 7/25/2014 | Future | 10046476 |
| 85-1x1h | G0907 | | 12 | 629.00 | 585.00 | 585.00 | 585.00 | 44.00 | Pricing | 7/15/2014 | 7/25/2014 | Future | 10046501 |
| 85-1x1h | G0909 | | 12 | 650.00 | 650.00 | 650.00 | 650.00 | 0.00 | Pricing | 7/15/2014 | 7/18/2014 | Future | 10046538 |
| 85-1x1h | G1207 | | 12 | 530.00 | 585.00 | 585.00 | 585.00 | -55.00 | Pricing | 7/15/2014 | 7/25/2014 | Future | 10046544 |
| 85-2x2e | G1704 | | 12 | 670.00 | 845.00 | 845.00 | 845.00 | -175.00 | Pricing | 7/15/2014 | 7/25/2014 | Future | 10046550 |
| 85-1x1d | G1914 | | 12 | 565.00 | 595.00 | 595.00 | 595.00 | -30.00 | Pricing | 7/15/2014 | 7/15/2014 | Future | 10046527 |
| 85-1x1j | H0622 | | 12 | 590.00 | 590.00 | 590.00 | 590.00 | 0.00 | Pricing | 7/15/2014 | 7/26/2014 | Future | 10046558 |
| 85-1x1b | H0801 | Redacted for PII | 12 | 735.00 | 735.00 | 735.00 | 735.00 | 0.00 | Pricing | 7/15/2014 | 7/25/2014 | Future | 10046557 |
| 85-1x1g | H2802 | | 12 | 575.00 | 575.00 | 575.00 | 575.00 | 0.00 | Pricing | 7/15/2014 | 7/25/2014 | Future | 10046526 |
| 85-1x1j | V0105 | | 12 | 680.00 | 680.00 | 680.00 | 680.00 | 0.00 | Pricing | 7/14/2014 | 8/1/2014 | Future | 10046471 |
| 85-1x1j | V0116 | | 12 | 539.00 | 590.00 | 590.00 | 590.00 | -51.00 | Pricing | 7/15/2014 | 7/18/2014 | Future | 10046514 |
| 85-1x1e | V0112 | | 12 | 585.00 | 585.00 | 585.00 | 585.00 | 0.00 | Pricing | 7/15/2014 | 7/25/2014 | Future | 10046514 |
| 85-2x2h | V0903 | | 0 | 793.00 | | | | | Pricing | 7/14/2014 | 7/25/2014 | Future | 10046478 |
| 85-1x1e | V2412 | | 12 | 585.00 | 585.00 | 585.00 | 585.00 | 0.00 | Pricing | 7/14/2014 | 7/18/2014 | Future | 10046473 |
| 85-2x2f | W1705 | | 12 | 785.00 | 785.00 | 785.00 | 785.00 | 0.00 | Pricing | 7/14/2014 | 7/25/2014 | Future | 10046474 |
| 85-1x1l | W2202 | | 12 | 559.00 | 635.00 | 635.00 | 635.00 | -76.00 | Pricing | 7/15/2014 | 7/25/2014 | Future | 10046545 |

445.    Consistent with this, the record indicates that Yardi clients make use of these permissions. One set of notes on a client called ▓▓▓▓ a Landlord Defendant here, explains that ▓▓▓▓ had limited the ability of subordinates to lower rents while preserving their ability to raise them, stating: "Mgrs can raise rents but any decrease or other changes must be approved by a Regional or ▓▓▓▓

[262] YARDI-DUFFY_01230207 at -23.

FILED UNDER SEAL

**Figure 73: Clients Allow Sales Staff to Raise, But not Decrease Rents[263]**



446.    To these leasing teams, this dynamic can create a meaningful cost to deviating from Revenue IQ's list price, to the extent employees are even given permission to do so. As reflected in the record, the "Lease Audit" tool enables deviations from recommended pricing to be reviewed and questioned by supervisors, requiring frontline teams to justify departures from algorithmic guidance.

447.    From an economic perspective, a natural question is how pricing alignment can persist at the leasing-team level, where frontline staff might otherwise respond to local conditions or attempt to gain share through price reductions. The record described above points to one mechanism: internal monitoring and accountability systems that increase the economic friction of unilateral deviations from centrally generated pricing recommendations.

448.    The record described above provides one mechanism. As noted in Section 7.2), at a Yardi "Marketing Forum, the now-COO of Landlord Defendant Grubb[264] explained to other Yardi users that Grubb uses benchmarking to "identify what the market may bear" and then "hold teams accountable for the recommendations they make regarding pricing adjustments and specials."

**Figure 74: Landlord Defendant Grubb Also Used Yardi's Tools To "Hold Teams Accountable"[265]**

> Hold Teams Accountable for the recommendations they make regarding pricing adjustments and specials. You can quickly determine if the issue is a sales problem or something else.
> Drive Incentives: we can get a lot more strategic with specials offered, how long we hold off on adjusting rates, or if we need to make adjustments to our revenue management system to make sure we're not inflating rates prematurely.

449.    In Grubb's framing, "pricing adjustments and specials" – that is, ordinary discounts and deviations – are treated less as ordinary competitive responses and more as a "sales problem" to be diagnosed and corrected, thus allowing management to discipline on-site teams toward benchmark-aligned pricing. This framing, coupled with benchmarking and

---

audit-based oversight, can discipline on-site teams towards compliance with Yardi's pricing and reduce the scope for discounting. From an economic perspective, such internal accountability mechanisms can help sustain aligned pricing outcomes at the leasing-team level even if frontline employees are not themselves aware of the broader coordination mechanism.

450.   Yardi's TAM oversight adds a second, reinforcing source of friction. By repeatedly monitoring "variances" (i.e., deviations) from benchmark pricing and pressing clients to close gaps, TAMs impose additional pressure against discounting and deviation from Revenue IQ's recommended prices.

451.   To connect this to the economic theory I explained in Section 3 and previewed above, these structural and economic barriers to deviating from Revenue IQ's list price work to commit clients to Yardi's prices, without banning deviations outright. This sort of high, but imperfect, commitment to higher pricing closely follows the coordination structure Harrington (2022) describes. Indeed, perfect commitment to Revenue IQ's pricing could actually undermine a conspiracy.

452.   The idea that imperfect commitment can be a feature rather than a bug may seem counterintuitive, but it is standard in the economics of collusion. Specifically, economic descriptions of collusion typically require firms to be able to respond to other firms' deviation from cartel pricing – otherwise firms would be committing to losing clients to any cartel member who defects. Firms simply would not opt-in to a conspiracy if they were completely unable to respond to cartel defectors. Perfect commitment to Revenue IQ's pricing would therefore undermine the viability of an alleged conspiracy. At the same time, commitment must be high enough to prevent opportunistic discounting from cascading into price wars.

453.   The structural and economic frictions in this case – including tools that allow landlords' executives (and Yardi advisors) to identify and police subordinates' deviations – create exactly this kind of intermediate regime: deviation is possible, but sufficiently costly that coordinated, higher pricing can be sustained, i.e., a conspiracy to increase prices.

454.   Consistent with this record evidence and economic theory, I observe that Landlord Defendants do in fact typically transact precisely at (or very near) Revenue IQ's list price. I explain this in the following section.

FILED UNDER SEAL

## 8.2  Landlord Defendants Overwhelmingly Transact at Revenue IQ's List Price

455.    In markets such as multifamily rental housing, prices are typically set through a combination of posted list prices and negotiated adjustments. In these settings, economic coordination need not result in uniform transaction prices or perfect adherence to a single price point. Instead, the relevant economic question is whether the posted list price functions as a shared reference point – or "anchor" – from which deviations are limited in both frequency and magnitude.

456.    As explained in Section 8.1, Landlord Defendants accept Yardi's list price recommendation automatically and by default, and must actively override it if they wish to charge a different rent. And, as explained in Section 8.1, Yardi imposes several additional frictions that allow senior executives to police and limit their subordinates' price deviations. The cumulative effect of this conduct is that, during the class period:

- ▪ Even Mr. Yenikomshian agrees that Landlord Defendants adhere to Revenue IQ's recommended list prices in at least 72% of lease transactions. I note this figure relies on conservative assumptions.

- ▪ Of these deviations, 60.8% were within 5% of Revenue IQ's List Price.

- ▪ Across all transactions, 91.3% of Landlord Defendant leases transacted within 5% of Revenue IQ's List Price.

- ▪ In total, Landlord Defendants transact, on average, within 1.41% of Revenue IQ's list price recommendation across all leases, remaining within 6.95% even when only considering overridden leases.

457.    In other words, virtually no Landlord Defendant leases meaningfully deviate from Revenue IQ's list prices. True to the literature I discuss in Section 3.2.2, the Revenue IQ list price therefore serves as an important "anchor" (or starting point of negotiations) from which Landlord Defendants rarely deviate, and only by small amounts when they do. As I explain in Section 8.2.1, the small and infrequent deviations that do arise are consistent with industry characteristics and with economic models of collusion.

## 8.2.1  Across All Lease Transactions, Landlord Defendants' Only Deviate 1.4% From Revenue IQ's List Price

458.    Across all transactions in the produced lease data, 22% include an override date with accompanying notes. In the transaction data Yardi produced, this indicates individual lease entries where Revenue IQ's rent was overridden and includes an accompanying note specifying the nature and scale of this override, for example:

FILED UNDER SEAL

**Table 3: Example of New Lease Override in Landlord Defendant Lease Transaction Data[266]**

|   | Lease Type | New Lease Rent Override Date | New Lease Rent Override Notes |
|---|---|---|---|
| 1 | New Lease | 1/22/2016 | Rent changed from 3663 to 3636 (suggested rent was 3901) |
| 2 | New Lease | 1/9/2016 | Rent changed from 2756 to 2550 (suggested rent was 2475) |
| 3 | New Lease | 1/10/2016 | Rent changed from 2636 to 2481 (suggested rent was 2500) |
| 4 | New Lease | 1/13/2016 | Rent changed from 2680 to 2514 (suggested rent was 2500) |
| 5 | New Lease | 1/12/2016 | Rent changed from 2859 to 2673 (suggested rent was 2890) |
| 6 | New Lease | 3/2/2016 | Rent changed from 3400 to 3250 (suggested rent was 3611) |
| 7 | New Lease | 3/6/2016 | Rent changed from 2404 to 2504 (suggested rent was 2525) |
| 8 | New Lease | 6/1/2016 | Rent changed from 2739 to 2690 (suggested rent was 2500) |
| 9 | New Lease | 5/25/2016 | Rent changed from 2475 to 2650 (suggested rent was 2619) |
| 10 | New Lease | 5/25/2016 | Rent changed from 2600 to 2650 (suggested rent was 2834) |

**Table 4: Example of Renewal Lease Override in Landlord Defendant Lease Transaction Data[267]**

|   | Lease Type | Renewal Proposal Rent Override Date | Renewal Proposal Original Rent |
|---|---|---|---|
| 1 | Renewal | 5/31/2013 | 1957 |
| 2 | Renewal | 7/19/2022 | 2917 |
| 3 | Renewal | 7/24/2013 | 4482 |
| 4 | Renewal | 5/18/2013 | 1607 |
| 5 | Renewal | 5/4/2015 | 2164 |
| 6 | Renewal | 7/23/2015 | 1618 |
| 7 | Renewal | 3/31/2018 | 1395 |
| 8 | Renewal | 12/16/2014 | 1585 |
| 9 | Renewal | 2/25/2013 | 1658 |
| 10 | Renewal | 2/3/2013 | 1870 |

459.    At face value, this raises questions about Mr. Yenikomshian's claim that 27.8% of leases were overridden by clients, because his methodology appears to classify as "overrides" certain transactions that Yardi's own data does not. The discrepancy between Mr. Yenikomshian's claim that 27.8% of lease transactions have an override – and  the lease data indicating an override in only 22% of observations – appears to stem from Mr. Yenikomshian's decision to classify any lease with a concession as an override, even where the dataset does not otherwise indicate an override event.

460.    The produced lease transaction data does not clearly indicate when concessions constitute an override of Revenue IQ's list price. Many rows show a concession but do not explicitly

---

[266] *See* Appendix F.1.
[267] *See* Appendix F.1.

indicate an override – which itself raises question given the data has an explicit override date column which is "NA" for such observations. Simultaneously, several hundred leases show both a concession and that the client adhered to Revenue IQ's list price – underscoring the conceptual point that landlords can sometimes offer a concession while still achieving Revenue IQ's net recommendation. Despite this, Mr. Yenikomshian indiscriminately assumes that all leases with concession indicate a client override – even when the data itself does not. In doing so, this means about 1/3 of the overrides Mr.Yenikomshian identifies – or 10% of all Landlord Defendant leases – are the result of a data assumption that favors Yardi's narrative. I also note that, at my request, plaintiffs' counsel asked Yardi questions on this ambiguity, and Yardi declined to provide further clarification.

461.    Even taking Mr. Yenikomshian's estimate at face value, his analysis implies that a substantial majority – at least 72% – of Landlord Defendant leases transact exactly at Revenue IQ's recommended list price. That degree of adherence is itself economically significant. The more economically informative question, however, is not merely whether an override occurred, but the magnitude of any deviation from Revenue IQ's recommendation: an override that differs from the recommended rent by 1% has markedly different competitive implications than an override that differs by 20%. For that reason, my analysis focuses on the size of deviations from Revenue IQ's recommend list prices, rather than only on their frequency.

462.    In Figure 75 below, I present four related plots, each comparing the average Revenue IQ recommended rent (in orange) against the average Landlord Defendants final effective rent (in dark blue), for each of the following groups:

- "Accepted + Overridden, New Leases": average recommended vs effective rents across all new leases, regardless of whether the landlord accepted or overrode the recommendation.

- "Accepted + Overridden, Renewals": average recommended vs effective rents across all renewal leases, regardless of whether the landlord accepted or overrode the recommendation.

- "Overridden Only, New Leases": average recommended vs effective rents across only overridden new leases.

- "Overridden Only, Renewals": average recommended vs effective rents across only overridden renewal leases.

FILED UNDER SEAL

**Figure 75: Across All Landlord Defendant Active Leases, Transaction Prices Only Deviate 1.4% From Revenue IQ's Recommended List Price, On Average[268]**



463.     Figure 76 shows the same conceptual information, but narrowed just to leases with an override:[269]

---

[268] Sources: Expanded Lease Data. Notes: I filter out implausible values of the Revenue IQ list price considered. In particular, filtering for positive values of monthly effective rent (part of the standard lease data cleaning), I also filter for positive values of the recommended rents (variables " Renewal Proposal Original Rent" and values stored in the "New Lease Rent Override Notes"). For the recommended rents, I observe that some values are implausibly low or high. E.g., suggested rent of $10 when the effective rent is $3,476.00, or suggested rent of $ 1,149,024 vs. effective of $1,975. I therefore filter out observations of variables that are lower than $20 and higher than $100,000. Here I present new leases and renewals.

[269] Sources: Expanded Lease Data. I categorize a lease as a "Clear Override" if there is an override date associated to the lease and the effective rent does not equal the recommended rent at the initial time of application and does not equal the recommended rent when the lease was finalized.

**Figure 76: Across Only Overridden Landlord Defendant Active Lease, Transaction Prices Only Deviate 6.95% From Revenue IQ's Recommended List Price, On Average[270]**



464.    Figure 75 and Figure 76 show that:

▪    Across all Landlord Defendant leases, the difference between Revenue IQ's recommendation and Landlord Defendants' final effective rent is small – indeed, it is almost visually imperceptible for both new and renewal leases.

▪    Even among leases flagged with an override, Landlord Defendants' final effective rent track Revenue IQ's recommended rents extremely closely, with the two series moving in near lockstep. This pattern is consistent with economic theory's predictions regarding price-fixing on list prices: when list prices are aligned and deviation is constrained, observed transaction prices will largely track (and inherit the structure of) the original list price recommendations. (*see* Section 3.2.2).

465.    Simply put, Landlord Defendants' effective rents track Revenue IQ's recommended prices extremely closely, even when client overrides are taken into account. Viewed in light of the coordination structure described in prior sections and the empirical results in the above figures, the observed override behavior is not inconsistent with coordinated pricing

---

[270] Sources: Expanded Lease Data. Notes: I filter out implausible values of the Revenue IQ list price considered. In particular, filtering for positive values of monthly effective rent (part of the standard lease data cleaning). I also filter for positive values of the recommended rents (variables " Renewal Proposal Original Rent" and values stored in the "New Lease Rent Override Notes"). For the recommended rents, I observe that some values are implausibly low or high. E.g., suggested rent of $10 when the effective rent is $3,476.00, or suggested rent of $ 1,149,024 vs. effective of $1,975. I therefore filter out observations of variables that are lower than $20 and higher than $100,000. Here I present new leases and renewals. Note that data are further filtered for overrides, *see* fn. 269.

FILED UNDER SEAL

outcomes. Indeed, focusing only on leases with an override, average Landlord Defendant effective rents are within 6.95% of Revenue IQ's recommendation. Across all leases, the average deviation is smaller still, at approximately 1.41% of Revenue IQ's recommendation. Consistent with these averages, persistently more than 91% of Landlord Defendants' leases transacted within 5% of Revenue IQ's list price during the putative class period:

**Figure 77: Over 90% of Landlord Defendant Active Leases Transact Within 5% of Revenue IQ's List Price Recommendation[271]**



466. Moreover, the percentage of Landlord Defendant leases that were within 5% of Revenue IQ's recommendation was broadly stable at slightly more than 90% during the putative class period. In total during the class period, 91% of active leases were within 5% of Revenue IQ list price, and only 4% deviated by more than 10%, as Figure 78 below shows:

---

[271] Sources: Expanded Lease Data. Notes: I filter out implausible values of the Revenue IQ list price considered. In particular, filtering for positive values of monthly effective rent (part of the standard lease data cleaning), I also filter for positive values of the recommended rents (variables " Renewal Proposal Original Rent" and values stored in the "New Lease Rent Override Notes"). For the recommended rents, I observe that some values are implausibly low or high. E.g., suggested rent of $10 when the effective rent is $3,476.00, or suggested rent of $ 1,149,024 vs. effective of $1,975. I therefore filter out observations of variables that are lower than $20 and higher than $100,000.

FILED UNDER SEAL

**Figure 78: 95% of Landlord Defendants Active Leases Were Within 10% of Revenue IQ List Price[272]**



467.    In short, these findings indicate that Landlord Defendants are tightly anchored to Revenue IQ's list prices, consistent with the enforcement mechanisms I explained above in Section 8.1. In the following section, I compare this adherence to Revenue IQ's list prices to other multifamily rental pricing strategies (namely RealPage and non-RM use).

---

[272] Sources: Expanded Lease Data. Notes: Considering Landlord Defendants' active leases, I compute the percentage deviation of monthly effective rent from Revenue IQ list price.

FILED UNDER SEAL

### 8.2.2 Landlord Defendants Offer Small & Infrequent Concessions Compared to Non-RM Users

468.    In a market like this characterized by posted list prices and negotiated transaction terms, concessions represent one of the primary remaining margins through which landlords can compete on price. Even when list prices are aligned, landlords retain the ability to deviate by offering discounts, specials, or other concessions that reduce the effective rent paid by tenants. From an economic perspective, systematic use of concessions would therefore be a natural mechanism for defection from coordinated pricing, while constrained or limited concessions would be consistent with transaction prices remaining anchored to a common list pricing rule book.

469.    Because Yardi automatically posts Revenue IQ's list prices on public apartment listings, one of the primary mechanisms clients could use to deviate from these list prices is to offer discounts and concessions. I therefore focus this section on the scale of discounts that Landlord Defendants offer their tenants and evaluate if their concessions are consistent with collusion.

470.    In multifamily rental housing, some baseline level of concessions is standard and to be expected, even in the presence of a conspiracy (*see* Appendix A.1). Tenants negotiate with landlords, but the starting point of their negotiations can be shifted upward by a conspiracy. This pricing structure is common in industries characterized by list prices and discounts to final transactions prices. Nonetheless, a conspiracy may seek to limit these discounts, and anomalously high discounts may undermine a conspiracy.

471.    Here, Yardi's internal documents and internal analyses (which I discuss in more detail below in Section 9) show that Revenue IQ users offer consistently lower concessions than "non-RM" landlords (that is, those who do not use revenue management software) and similar concessions to RealPage users,[273] depicted below in Figure 79:

---

[273] RealPage operates both "Yieldstar" and "LRO" revenue management software.

FILED UNDER SEAL

**Figure 79: Yardi's Internal Analysis Shows Revenue IQ Users Charge Similar (And Often Lower) Concessions as RealPage Users, and Consistently Smaller Concessions Than Non-RM Users[274]**



472.    Yardi performed this analysis by measuring concessions as a percent of total rent for Yardi, YieldStar (RealPage), Rainmaker (RealPage's LRO), and non-RM users based on its CPD data. Its findings shows that concessions as a percent of total rent were consistently between 3–5% for Revenue IQ users, and lower than non-RM users in every month.

473.    The evidence is consistent with Revenue IQ clients offering smaller concessions than would be expected but-for their use of Revenue IQ. This evidence is in turn consistent with the structural and economic frictions described above operating to reduce discounting and keeping transaction prices closely anchored to Revenue IQ's recommended prices.

---

[274] Sources: Quarterly Performance Analyses. Notes: I am able to locate data for "Concession Percent of Total Rent" in a performance analysis spreadsheet that compares Yardi to non-RM users, YieldStar (the software owned by RealPage), and Rainmaker (RealPage's software LRO: "Lease Rent Operations") from February 2018 to January 2019. I understand the underlying data to include landlord ██████████████ in the analysis.

FILED UNDER SEAL

## 8.3  Landlord Defendants' Parallel List and Transaction Prices Overwhelmingly Increase Across Time (i.e., Across Different Demand States)

474.  The evidence above establishes that Landlord Defendants overwhelmingly transact at (or very near) Revenue IQ's list price, and that effective rents move up in near lock-step with Revenue IQ's recommendation – consistent with the structural frictions discussed in Section 8.1 that limit discounting and override behavior. The record further indicates that Revenue IQ is designed to move clients' list prices in parallel, and that Yardi's TAMs and benchmark reports introduce an upward asymmetry to these co-movements by using clients' non-public data. Together, these features can create a self-reinforcing cycle: demand rules in Revenue IQ will send a weaker signal to decrease (or maintain flat) prices when all landlords are simultaneously increasing prices together (something I discussed previously in Section 5.)

475.  There are many economic reasons to expect that the predominant effect of Yardi's Pricing Suite (and Landlord Defendants' participation therein) is coordinated upward price movements, such as:

- Revenue IQ's common pricing rule book generally, and the Comp Trend Rule specifically, creating parallel price movements across Landlord Defendants – which in turn incentivize price increases and disincentivize price decreases (*see* Section 5).

- Yardi's TAM oversight using non-public cross-client data to asymmetrically flag below-benchmark pricing – which is statistically associated with realized increases in Landlord Defendants' pricing. (*see* Section 6).

- Yardi and clients' stated description of using the benchmark reporting to identify opportunities to increase prices. (*see* Section 7).

- Yardi and clients' assorted commitment mechanisms operating to discourage discounting and binding participating landlords to the higher list prices this cohesive system collectively produces. (*see* Section 8.1).

476.  Consistent with this, I observe that Landlord Defendants increase effective rents in more than 74% of their lease changes (i.e., when a new lease is signed, inclusive of both renewals and new tenants), as I visualize in Figure 80. The relevance of this pattern is not just that rents increase more often than they decrease (as generally happens across time), but that price decreases and meaningful discounting appear comparatively rare, even in circumstances where competitive pressure may ordinarily be expected to produce them.

FILED UNDER SEAL

**Figure 80: Landlord Defendants' Rent Changes Are Predominantly Increases[275]**



477. By contrast, Landlord Defendants reduced unit prices in only 19% of lease changes. Of note, this share fell by approximately half from 40% in 2011 to 20% in 2025, when the data ends. One plausible explanation – explored further in Section 9.2.2 – may be growing adoption of Revenue IQ. In any event, downward pricing cycles appear uncommon, have become less common, and – when they do occur – TAMs intervene to address perceived underpricing (*see* Section 6).

478. This raises the next empirical question: are these observed rent increases above what we would expect absent collusion, i.e., under independent, competitive pricing? I turn to this question in the following section.

---

[275] Sources: Lease Data. Notes: For each unit in the lease data (identified by the "Revenue IQ Unit ID" variable), I compute the difference of the associated effective rent from a month when a new lease is signed (either by the same tenant or by a new one) to the next. I categorize each resulting lease rent change in the "Increase," "No change," and "Decrease" category according to whether the difference is positive, signaling an increase in rent, zero, or negative, respectively, and I count the share of leases that fall into each category by lease start year.

FILED UNDER SEAL

# 9. Yardi & Landlord Defendants' Pricing Satisfies Economic Tests For Algorithmic Collusion

479.    The key takeaway from Sections 5-8 is that Yardi has designed a mutually reinforcing pricing strategy where pricing recommendations, TAM oversight, and benchmarking visibility work together across rivals, including by leveraging their non-public data to charge "what the market may bear." If this strategy is effective at coordinating prices across rivals, this should be visible in Landlord Defendants' pricing. In this Section, I therefore test for pricing indicators economists associate with collusion via a hub-algorithm. Doing so, I conclude that:

- **Design and implementation:** Yardi's materials emphasize stable, persistent rent growth and treat downward price adjustment as a last resort, which is inconsistent with a procompetitive "rapid demand-response" rationale often advanced for pricing algorithms. (Section 9.1.)

- **Internal benchmarking comparisons:** Yardi's own analyses report that Revenue IQ users price above non–revenue-management users and at levels similar to RealPage users. (Section 9.2.1.)

- **Adoption intensity and pricing:** Using lease transaction data, effective rents rise with measures of local Revenue IQ adoption intensity, including in specifications that account for differences in the characteristics of rental units and for aggregate trends across time common to all rental units. (Section 9.2.2.)

- **Localized case studies:** In small geographic areas, pricing exhibits discrete changes in level/trend that coincide with the transition from a single adopting property to multiple adopting properties in the same area, consistent with increased strategic interdependence. (Section 9.2.3.)

- **Robustness:** Across multiple specifications (including TWFE and first-difference models with appropriate standard errors), the adoption-intensity coefficient remains positive and statistically significant. (*see* Section 9.2.4.)

- **Higher Pricing linked to Participation:** Controlling for Rent CPI and unit-level fixed-effects, Landlord Defendants increase rents $5.3 per month for every additional alleged co-conspirator in their local area. (*see* Section 9.2.4).

- **Higher Pricing linked to changes in Yardi's product:** There was a statistically significant structural break in Landlord Defendants ability to outpace CPI coinciding with overhauls to Yardi's TAM oversight. (*see* Section 9.3.)

480.    In economic terms, these factors suggest Yardi's Pricing Suite serves to coordinate pricing across firms, contrary to what economists expect to see in a non-collusive algorithm.

FILED UNDER SEAL

Combined with evidence of purposefully parallel price movements, asymmetrically upward price oversight using cross-client non-public data, and information exchange used to identify opportunities for more aggressive pricing (which I explain in Sections 5-7), this provide substantial economic evidence consistent with coordinated pricing outcomes mediated by Yardi.

## 9.1  Revenue IQ Prioritizes Smooth Price Increases Over Dynamic Responses to Supply and Demand

481.    As explained in Section 3.1, economists consider that pricing algorithms may be procompetitive when they allow firms to more efficiently update prices in response to changes in supply and demand. This typically appears as more volatile pricing relative to non-algorithmic price setting, because prices respond to high-frequency changes in demand. Conversely, economists consider that pricing algorithms, particularly a hub-algorithm, may be anticompetitive when they instead centralize pricing decisions, increasing prices to reflect collective, rather than unilateral, profit maximization across participants.

482.    In this case, Yardi does not tout how it helps clients adapt to demand states or market conditions better and faster, but rather advertises to clients and Landlord Defendants that its algorithm leads to "consistent growth" and "stable, predictable pricing:"

**Figure 81: Yardi Markets Price Stability As a Value-Add That Leads to "Consistent Growth"[276]**



483.    Similarly, in other presentations, Yardi explains that "There will be bad and good days. Stay strong and consistent with your messaging about manual changes and eventually we will get there!"[277] Further, in TAM training materials, Yardi instructs its TAMs that "[l]owering price should be [the] last resort when addressing demand issues."[278] In other words, Yardi instructs TAMs not to recommend changing prices in response to "demand issues." Such aversion to reducing prices in response to demand is consistent with a hub-algorithm designed to promote steady rent growth across users, rather than a tool intended primarily to support efficient demand-driven price adjustments.

484.    Yardi's materials emphasize pricing stability and persistence over frequent downward adjustments in response to short-run demand fluctuations. While Yardi also includes demand signals through Traffic, and New Leases Trend Rules, this clearly does not result in high frequency price changes, as it would go against Yardi's stated goal of price stability. This apparent lack of responsiveness to high-frequency changes in demand is consistent with my economic prediction that the Comp Trend rule is likely to dampen the practical

---

[276] YARDI-DUFFY_00028320, at -328.
[277] YARDI-DUFFY_00159005 at -11.
[278] YARDI-DUFFY_00338837 at p.66.

FILED UNDER SEAL

effect of demand signals and lead to sustained upward price movements.[279] From an economic perspective, this design choice suggests that the primary effect of Yardi's centralized pricing framework is to promote smooth, sustained rent increases rather than to facilitate rapid, symmetric price adjustments in response to supply-and-demand conditions. This emphasis differs from the primary procompetitive rationale for pricing algorithms in the literature I review in Section 3.1, which is improved responsiveness to changing market conditions.

## 9.2  Landlord Defendants' Pricing Has The Characteristics of Collusion via a Hub-Algorithm Described in Harrington (2025)

485.    Recall from Section 3.1.2 that Harrington (2025) proposes three tests for collusion via a hub-algorithm:

- **First**, the average price of adopters increases in the adoption rate. More intuitively, as the cartel gets bigger (and the constraints on it comparatively smaller), the price of cartelists goes up.

- **Second**, the average price of non-adopters also increases in the adoption rate.

- **Third**, the average price of adopters exceeds the average price of non-adopters.

486.    In the following sections, I therefore implement these tests using Landlord Defendants' lease transaction data and Yardi's own analysis of Revenue IQ users' pricing. I focus my analysis on tests #1 and #3 (the former of which Harrington (2025) describes as the most "general and robust").[280] I do this given the current lack of detailed data on non-adopters' lease transactions, i.e., landlords who do not use Revenue IQ and, ideally, also do not use RealPage. Such data, if available, would help provide a good comparison to Landlord Defendants. Helpfully for my analysis, Yardi collects and analyzes data on Revenue IQ users' performance compared to "non-revenue management" users' performance; aggregated versions of which have been produced and which I therefore rely on in my analysis below.

---

[279] Perloff, "*The residual demand curve the firm faces in panel a is much flatter than the market demand curve in panel b. As a result, the elasticity of the residual demand curve is much higher than the market elasticity. If the market has n identical firms, the elasticity of demand, $\varepsilon_i$ , facing Firm i is $\varepsilon_i = n_\varepsilon - (n - 1)\eta_o$, (8.2) where $\varepsilon$ is the market elasticity of demand (a negative number), $\eta_o$ is the elasticity of supply of each of the other firms (typically a positive number), and n - 1 is the number of other firms (see Appendix 8A for the derivation). As Equation 8.2 shows, a firm's residual demand curve is more elastic the more firms, n, are in the market, the more elastic the market demand, $\varepsilon$, and the larger the elasticity of supply of the other firms, $\eta_o$,"* p. 225.

[280] Harrington (2025), pp. 284, 285, *"In conclusion, Test #1 is the most general and robust of the three tests and is the one recommended,"* p. 286.

487.  Applying these tests, I conclude that:

- Yardi itself concluded, and advertised to clients, that Revenue IQ achieves higher pricing – by approximately $40 per month – than non-adopters. (*see* Section 9.2.1).

- Using econometric analysis of Yardi's data, I show that, for every 10,000 additional Landlord Defendant leases priced by Revenue IQ, their pricing premium relative to a rent CPI increased by approximately 1%, reaching a total premium of 29.2% by 2025. (*see* Section 9.3).

- The coordinating effect of Yardi's Pricing Suite is exemplified in individual case studies. Looking in small geographic areas, which may proxy geographic markets, Landlord Defendants' prices show a statistically significant structural break from almost flat pricing to parallel upward price co-movements when Revenue IQ adoption increases from one Landlord Defendant property to two or more, i.e., when collusion via Revenue IQ becomes possible within a localized area.

- These effects are pervasive: Landlord Defendants increase rents faster in local geographic areas with more alleged co-conspirators. In areas with only one Landlord Defendant, rents increase by an average of $57.3 per month when leases change. In areas with 5 or more Landlord Defendants, this rises to $93.6 dollars per month, on average.

- Applying 10 econometric estimations, including with two-way fixed-effects, TWFEs, and Newey-West standard errors, I confirm that this effect is both statistically significant and robust to including month/year and unit-level fixed effects, which account respectively for macro trends common to all units, and for time-invariant characteristics of units (e.g. square footage). (*see* Section 9.2.4).

- Controlling for Rent CPI and unit-level fixed-effects, Landlord Defendants increase rents $5.3 per month for every additional alleged co-conspirator in their local area. (*see* Section 9.2.4).

488.  These results are broadly consistent with Calder-Wang & Kim's analysis of RealPage, where they found rents were 4% higher in segments with the most hub-algorithm penetration. *See* Section 3.1.1.

489.  In short, there is abundant economic evidence, across multiple empirical approaches, that Landlord Defendants' prices are higher than non-adopters and increase with Revenue IQ adoption, satisfying the tests for collusion via a hub-algorithm that Harrington (2025) proposes.

490.  For the avoidance of doubt, these estimates are not intended to quantify damages. I have not been asked to calculate damages, and I do not have lease-level transaction data for a

FILED UNDER SEAL

granular comparison against non-Revenue IQ adoption. Accordingly, the foregoing analysis should not be understood as a "clean" but-for estimate of how Landlord Defendants would have priced but-for adopting Revenue IQ. Rather, I rely on cross-Landlord Defendant variation in pricing and show that Landlord Defendants set higher prices where and when there is greater adoption of Revenue IQ, i.e., when the size of the alleged cartel is bigger. From an economic perspective, this within-defendant variation is directly responsive to evaluating whether prices among adopters rise as adoption increases, i.e., Harrington (2025)'s first and most "general" test.

### 9.2.1 Yardi's Internal Analysis Shows Revenue Management Users Generally, and Revenue IQ Users Specifically, Charge Higher Rents Than Non-Revenue Management Users

491.    Based on my review of the record, I understand that, since at least 2019, Yardi has prepared quarterly analyses of its performance comparing Revenue IQ performance to control groups consisting of (a) landlords who do not use revenue management software ("non-RM users"), and (b) landlords who use either "Yieldstar" or "LRO" (formerly "RainMaker") software marketed by competitor RealPage.

492.    I also understand that Yardi is able to perform this analysis because, under the terms of its "Voyager" software agreement, landlords that use Yardi's Voyager property management software agree to a data use provision that is the similar to the one that appears in Revenue IQ contracts.[281] Because many Yardi clients use both Voyager and either (a) no revenue management software or (b) RealPage's revenue management software, Yardi is able to collect non-public data from these users regarding rent and occupancy and then compare this against the same data for Revenue IQ users. A sample spreadsheet analyzing data from 2022 describes how Yardi performs this analysis[282]:

---

[281] *See* YARDI-DUFFY_00000077 at -78 ("Data Use. Yardi may aggregate, compile, and use Client Data in order to improve, develop or enhance the Licensed Programs and/or other services offered, or to be offered, by Yardi; provided that no Client Data is identifiable as originating from, or can be traced back to, Client or a Client customer, tenant or resident in such aggregated form.")

[282] YARDI-DUFFY_00582522.

FILED UNDER SEAL

**Figure 82: "RM analysis Summary-Q4_2022- Excluded EdwardRose," 01/13/2023[283]**

**RM implemented 6+ months prior to KPI start & KPI averages of full 12 months**

**Analysis of Revenue Management software**
- Extract the Voyager properties using the three types of revenue management software (properties that stop using RM software were excluded).
- KPI data range from CPD: Jan 2022 - Dec 2022
- RM implemented before July 2021
- Only Voyager properties that are mapped to Matrix are in-scope analysis
- Voyager properties that are mapped to fully affordable Matrix properties are excluded from the analysis
- Voyager properties starting or ending revenue management between July 2021 and Dec 2022 are excluded from the analysis
- Voyager properties using revenue management software and without non-RM peers/ Non-RM peers < 5 are excluded
- Remove 75 properties that should not be included (Mike shared)
- **Remove the properties which are not unit pricing (Stellar query)**
- The client ████████████████████ was removed from the analysis

| RM Voyager Properties | Rainmaker | Yardi | Yieldstar |
|---|---|---|---|
| Total | 7,903 | 4,759 | 13,638 |
| Total with Unit Pricing | 5,315 | 4,040 | 6,649 |
| KPI Active in Jan 2022 -Dec 2022 | 2,736 | 2,237 | 3,851 |
| RM use Before July 2021 + KPI Active in Jan 2022 - Dec 2022 | 2,199 | 1,640 | 2,556 |
| RM use Before July 2021 + KPI Active in Jan 2022 -Dec 2022 + With non-RM Benchmark (>=5) | 1,836 | 1,411 | 2,196 |

493.    These analyses contrast Yardi's performance with RealPage and non-RM users' performance on several metrics, including rental income per unit, rental income per occupied unit, occupied percent, in place rent per unit, new lease rent per unit, new lease rent per unit, renewal lease rent per unit, expiring lease renewal percent, new lease rent change percent, and renewal lease rent change percent.[284]

---

[283] YARDI-DUFFY_00582522 (tab "By Vendor(████)").
[284] YARDI-DUFFY_00582522.

FILED UNDER SEAL

**Figure 83: "RM analysis Summary-Q4_2022- Excluded ███████ 01/13/2023**[285]

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Occupied Percent** | | | | | | | | | | | | |
| Non-RM Peers | 93.01% | 93.25% | 93.41% | 93.31% | 93.10% | 93.09% | 92.83% | 92.63% | 92.11% | 91.90% | 92.05% | 91.79% |
| RainMaker | 94.58% | 94.50% | 94.49% | 94.20% | 93.78% | 93.60% | 93.06% | 92.73% | 92.12% | 91.91% | 92.17% | 92.18% |
| Yardi | 94.63% | 94.60% | 94.70% | 94.50% | 94.23% | 94.13% | 93.69% | 93.29% | 92.39% | 92.39% | 92.11% | 91.79% |
| Yieldstar | 94.75% | 94.62% | 94.54% | 94.26% | 93.88% | 93.72% | 93.23% | 92.87% | 92.16% | 91.83% | 92.04% | 91.94% |
| **In Place Rent Per Unit** | | | | | | | | | | | | |
| Non-RM Peers | $1,115.84 | $1,125.17 | $1,138.00 | $1,152.16 | $1,167.53 | $1,188.76 | $1,209.73 | $1,226.71 | $1,239.71 | $1,250.86 | $1,259.78 | $1,266.15 |
| RainMaker | $1,160.57 | $1,171.50 | $1,187.31 | $1,203.95 | $1,224.07 | $1,251.04 | $1,278.72 | $1,299.26 | $1,311.44 | $1,321.55 | $1,327.52 | $1,330.93 |
| Yardi | $1,173.98 | $1,184.05 | $1,198.13 | $1,214.58 | $1,231.63 | $1,254.60 | $1,277.53 | $1,296.95 | $1,309.05 | $1,320.27 | $1,328.04 | $1,332.98 |
| Yieldstar | $1,170.89 | $1,181.87 | $1,196.82 | $1,213.53 | $1,232.19 | $1,255.72 | $1,280.72 | $1,299.51 | $1,311.73 | $1,322.79 | $1,330.34 | $1,335.33 |
| **New Lease Rent Per Unit** | | | | | | | | | | | | |
| Non-RM Peers | $1,286.27 | $1,245.07 | $1,296.47 | $1,298.23 | $1,342.42 | $1,403.68 | $1,391.18 | $1,384.11 | $1,356.46 | $1,344.24 | $1,347.78 | $1,349.69 |
| RainMaker | $1,362.30 | $1,306.70 | $1,366.85 | $1,368.17 | $1,424.97 | $1,483.50 | $1,465.28 | $1,458.31 | $1,400.93 | $1,386.43 | $1,381.45 | $1,369.35 |
| Yardi | $1,399.19 | $1,342.47 | $1,399.66 | $1,396.43 | $1,445.98 | $1,515.53 | $1,496.79 | $1,503.26 | $1,445.63 | $1,427.18 | $1,422.16 | $1,415.44 |
| Yieldstar | $1,361.48 | $1,308.30 | $1,369.39 | $1,374.83 | $1,438.43 | $1,500.12 | $1,490.26 | $1,467.58 | $1,411.77 | $1,391.86 | $1,375.24 | $1,369.33 |
| **Renewal Lease Rent Per Unit** | | | | | | | | | | | | |
| Non-RM Peers | $1,119.88 | $1,153.88 | $1,150.63 | $1,185.35 | $1,224.71 | $1,291.79 | $1,289.62 | $1,279.38 | $1,309.59 | $1,270.12 | $1,260.56 | |
| RainMaker | $1,200.54 | $1,230.75 | $1,234.88 | $1,268.32 | $1,306.74 | $1,374.40 | $1,371.76 | $1,358.75 | $1,369.86 | $1,402.37 | $1,348.67 | $1,335.86 |
| Yardi | $1,188.87 | $1,212.73 | $1,196.69 | $1,248.48 | $1,269.82 | $1,347.72 | $1,344.40 | $1,338.54 | $1,352.09 | $1,388.70 | $1,343.54 | $1,340.81 |
| Yieldstar | $1,185.91 | $1,221.25 | $1,223.62 | $1,257.50 | $1,306.06 | $1,382.46 | $1,387.11 | $1,379.90 | $1,387.03 | $1,400.62 | $1,363.49 | $1,334.58 |
| **Expiring Lease Renewal Percent** | | | | | | | | | | | | |
| Non-RM Peers | 67.33% | 65.04% | 66.01% | 64.14% | 71.57% | 67.18% | 66.85% | 64.50% | 67.09% | 68.19% | 63.61% | 59.19% |
| RainMaker | 66.60% | 65.03% | 66.36% | 63.67% | 73.09% | 68.10% | 68.72% | 66.05% | 67.41% | 67.32% | 64.88% | 62.60% |
| Yardi | 68.84% | 67.60% | 68.87% | 65.66% | 74.84% | 70.55% | 70.83% | 68.09% | 69.83% | 72.52% | 67.56% | 64.95% |
| Yieldstar | 67.18% | 65.70% | 67.74% | 63.93% | 70.67% | 66.27% | 66.04% | 63.71% | 67.21% | 68.30% | 65.01% | 64.20% |
| **New Lease Rent Change Percent** | | | | | | | | | | | | |
| Non-RM Peers | 10.15% | 10.69% | 11.45% | 11.97% | 12.10% | 12.62% | 12.67% | 11.98% | 11.48% | 10.60% | 9.76% | 8.40% |
| RainMaker | 12.93% | 12.88% | 13.69% | 14.48% | 14.74% | 15.25% | 15.31% | 13.54% | 10.63% | 7.64% | 4.88% | 2.82% |
| Yardi | 12.25% | 12.65% | 13.06% | 13.67% | 14.55% | 15.39% | 15.70% | 15.52% | 12.74% | 10.35% | 7.91% | 5.92% |
| Yieldstar | 12.07% | 12.58% | 13.40% | 14.35% | 14.92% | 15.06% | 15.38% | 13.70% | 10.44% | 7.36% | 4.67% | 2.69% |
| **Renewal Lease Rent Change Percent** | | | | | | | | | | | | |
| Non-RM Peers | 5.77% | 6.27% | 6.52% | 6.73% | 6.98% | 7.29% | 7.43% | 7.45% | 7.49% | 7.63% | 7.53% | 7.47% |
| RainMaker | 9.02% | 9.32% | 9.83% | 9.97% | 10.09% | 10.03% | 10.13% | 9.75% | 9.05% | 8.45% | 7.72% | 7.08% |
| Yardi | 5.88% | 6.14% | 6.41% | 6.69% | 6.78% | 7.10% | 7.38% | 7.61% | 7.73% | 7.54% | 7.14% | 6.80% |
| Yieldstar | 7.73% | 8.24% | 8.66% | 8.91% | 9.25% | 9.36% | 9.51% | 9.58% | 9.28% | 8.88% | 8.16% | 7.42% |

494. They also contain data comparing Yardi's new lease rent growth, measured as the percentage increase in new rents, with rent growth achieved by Yieldstar and LRO (sometimes referred to as "competitor 1" and "competitor 2") in major "common markets" (e.g., Boston, Chicago, Los Angeles, Atlanta), noting the markets in which Yardi is the "best:

---

[285] YARDI-DUFFY_00582522 (tab "Monthly by Vendor(█████)").

**Figure 84: "RM analysis Summary-Q4_2022- Excluded ▮▮▮▮▮▮ 01/13/2023[286]**

| New Lease Rent Change Percent | Market | Competitor 1 | Yardi | Competitor 2 | Competitor1 Best | Yardi Best | Competitor2 Best |
|---|---|---|---|---|---|---|---|
| | Atlanta | 10.1% | 15.0% | 10.9% | FALSE | TRUE | FALSE |
| | Atlanta - Suburban | 13.6% | 15.8% | 14.3% | FALSE | TRUE | FALSE |
| | Austin | 14.0% | 19.8% | 13.2% | FALSE | TRUE | FALSE |
| | Baltimore | 9.8% | 13.2% | 8.8% | FALSE | TRUE | FALSE |
| | Bay Area - East Bay | 5.7% | 6.3% | 6.3% | FALSE | FALSE | TRUE |
| | Boston | 11.3% | 17.7% | 11.4% | FALSE | TRUE | FALSE |
| | Carolina Triangle | 13.5% | 17.2% | 13.5% | FALSE | TRUE | FALSE |
| | Charlotte | 14.1% | 13.0% | 13.9% | TRUE | FALSE | FALSE |
| | Chicago | 10.0% | 8.2% | 10.1% | FALSE | FALSE | TRUE |
| | Dallas - North | 13.8% | 18.9% | 12.1% | FALSE | TRUE | FALSE |
| | Dallas - Suburban | 13.5% | 16.1% | 14.0% | FALSE | TRUE | FALSE |
| | Denver | 10.0% | 13.0% | 11.2% | FALSE | TRUE | FALSE |
| | Fort Worth | 12.5% | 17.3% | 12.1% | FALSE | TRUE | FALSE |
| | Los Angeles - Metro | 10.5% | 10.3% | 10.1% | TRUE | FALSE | FALSE |
| | Los Angeles County - Eastern | 15.7% | 16.9% | 13.4% | FALSE | TRUE | FALSE |
| | New Jersey - Northern | 12.6% | 17.0% | 14.6% | FALSE | TRUE | FALSE |
| | Orange County | 15.8% | 19.6% | 16.0% | FALSE | TRUE | FALSE |
| | Orlando | 18.5% | 17.7% | 17.4% | TRUE | FALSE | FALSE |
| | Philadelphia - Suburban | 13.5% | 16.7% | 12.3% | FALSE | TRUE | FALSE |
| | Phoenix | 14.0% | 16.0% | 12.5% | FALSE | TRUE | FALSE |
| | Portland | 13.0% | 14.4% | 12.1% | FALSE | TRUE | FALSE |
| | Sacramento | 10.2% | 11.0% | 8.6% | FALSE | TRUE | FALSE |

495.  Yardi appears to perform these analyses quarterly, using a one-year lookback period each time it does so. Yardi uses the results of these analyses to prepare both internal presentations as well as marketing materials that claims "properties using revenue management, regardless of provider, experience on average 7.4% higher rental income per unit:"[287]

---

[286] YARDI-DUFFY_00582522 (tab "Commom Markets(▮▮▮▮▮)").
[287] YARDI-DUFFY_00031613.

FILED UNDER SEAL

**Figure 85: "Rev IQ Results Slides July 2023," 08/18/2023[288]**



496.    Yardi internally circulated excel spreadsheets containing the underlying, but aggregated, data that created this analysis. I have directed my staff to collect this for each quarter for which there is data. With this data, I present the average rent for Revenue IQ users compared to the average rent of RealPage users (Yieldstar and LRO) and non-RM users below in Figure 86, spanning 2018 through 2024:

---

FILED UNDER SEAL

**Figure 86: Revenue IQ Users Charge Similar Rents to RealPage Users & Higher Rents than Non-RM Users[289]**



497.   For every month of Yardi's analysis, Yardi users charged higher rents non-RM users, on average by about $40 during the putative class period. Further, in many months, Yardi users also charged either higher rents than RealPage users, or the difference between Yardi and RealPage pricing was visually imperceptible.

498.   The limitation of this analysis is that it is a nationwide average, potentially muddling geographic pricing differences. To account for this, Yardi also reported rolling year-on-year new lease rental growth rates for top "markets," i.e., different metropolitan areas. Taking,

---

[289] Sources: Quarterly Performance Analyses. Notes: I am able to locate 20 performance analyses spreadsheets that contain data for "In Place Rent Per Unit," spanning a period from January 2018 to September 2024, and missing months from February to June 2019. Each spreadsheet contains monthly averages for a specific period of twelve months. I collect data on "In Place Rent Per Unit" under the tab named "Monthly by Vendor," where data is provided for Yardi, non-RM users, YieldStar (the software owned by RealPage), and Rainmaker (RealPage's software LRO ("Lease Rent Operations")). Starting in July 2021, I find spreadsheets that exclude landlord "███████ ████████" from the analysis, and, after an overlapping period from July 2021 until March 2022, I can only locate analyses that exclude the landlord from the calculations. Accordingly, starting in July 2021, this chart presents the data that excludes ██████████. I present an alternative version that also shows the data inclusive of ██████████ until March 2022 in Appendix D.1. Whenever multiple performance analyses workbooks contain data on the same variable for the same months, and data differs slightly, I consider the average of those values.

FILED UNDER SEAL

for example, Yardi's analysis for the period from July 2021 to June 2022, I find that Yardi's rent growth rate exceeded that of non-RM users in 93% of metropolitan areas Yardi studied. Of relevance to the economic theory I explained in Section 3, this suggests Revenue IQ overwhelmingly increases rents across regions with different demand states – another indirect indicator of collusion via a hub-algorithm. In Figure 87, I plot Yardi's analysis for the top nine largest metro areas in its spreadsheets:

**Figure 87: Revenue IQ Achieves a Great New Lease Rent Change Percentage than Non-RM Users Across Metro-Areas[290]**



499.   In sum, according to Yardi's internal analyses, Revenue IQ clearly, pervasively, and

---

[290] Sources: Quarterly Performance Analysis. Notes: I collect the underlying data of this figure from the "Market Data (███)" sheet of YARDI-DUFFY_00024130. Based on the name of the sheet, I infer that Yardi did not

consistently achieves higher prices than non-RM users (i.e., non-adopters). It also achieves rent growth comparable to – and sometimes exceeding – RealPage's. From an economic perspective, these patterns are consistent with Harrington (2025)'s third diagnostic for hub-algorithm interdependence—namely, that adopters price above non-adopters. This evidence supports the conclusion that Revenue IQ adoption is associated with systematically higher pricing outcomes relative to non-adoption. Furthermore, these findings align with the pricing patterns economists would expect to observe if adoption of a shared pricing platform increases strategic interdependence among users.

## 9.2.2 Landlord Defendants' Lease Prices Increase With The Adoption of Revenue IQ, Even Relative to Rent CPI

500. Having established that Revenue IQ users charge higher rents than non-adopters, I next turn to what Harrington (2025) describes as the most "general and robust" test for collusion via a hub-algorithm: whether the price of adopters (i.e., colluding firms) increases with adoption of the hub-algorithm (i.e., as the cartel gets bigger). I begin by comparing time-series variation in three relevant metrics:

- A price index for Landlord Defendants.

- A market-wide Rent CPI for "Rent of Primary Residence" reported by the Federal Reserve ("FRED").

- The adoption of Revenue IQ by Landlord Defendants, measured by both number of active leases and total units (including unoccupied units).

501. Figure 88 compares an index of Yardi rental unit pricing against a Rent CPI published by FRED. I calculate the Yardi rental index as:

$$Index_{Effective\ Rent,\ Landlord\ Defendants} = \prod \overline{\left(\frac{r_{u,t}}{r_{u,t-1}}\right)_t} \tag{16}$$

---

include landlord ▮▮▮▮▮▮▮▮▮▮ from its analysis. Yardi includes data on "New Lease Rent Change Percent" for over 130 "markets," corresponding to a city or a metro area, e.g., Phoenix, or Eastern Los Angeles County. I consider markets that have data for all four vendors (Yardi, Non-RM users, Rainmaker and Yieldstar) and that were in the Top 20 metropolitan areas by population in 2023. *See* "Population of the largest metropolitan areas in the United States in 2023," Statista, available at https://www.statista.com/statistics/183600/population-of-metropolitan-areas-in-the-us/ (accessed February 5, 2026. From the first sheet, named "By Vendor," I understand each data point to be an average across the 12 months from July 2021 to June 2022.

FILED UNDER SEAL

502.  Where:

- $Index_{Effective\ Rent,\ Landlord\ Defendants}$ is the Yardi Rent Index I calculate across Landlord Defendant properties.

- $r_{u,t}$ is the effective rent for unit $u$ in month $t$.

- $r_{u,t-1}$ is that same unit's effective rent in the prior month.

503.  More intuitively:

- I calculate each unit's change in effective rent relative to the prior month, including no changes when a unit is still under the same contract and therefore has the same effective rent.

- I then average these changes across units (indicated by the "bar") in each month, meaning I calculate an average month-on-month change in Landlord Defendants' effective rents.

- Finally, I take the cumulative product of these month-on-month changes (indicated by capital Pi), to show the total percentage change from the beginning to the end of the data time period (2011 to 2025). I.e., I sequentially multiply each of the month-on-month changes to show a cumulative growth rate in effective rents.

504.  In other words, I aggregate within unit price changes across Landlord Defendants, and only show a change in the index when the price of an individual unit changes. This adopts the "chain indexing" approach widely used by national statistical agencies to calculate CPI – the appeal of which is that it allows new housing units to enter the "basket" of goods, which is not possible when taking a fixed base time period.[291] By calculating the period-on-period changes and then accumulating these, I can add units to the index which do not appear in the data until, e.g., 2019, while still starting the index in 2011.

505.  Figure 88 shows that, at the start of the data (in 2011), Yardi rental units increased in price more slowly than CPI (compare orange line for Yardi with the orange dotted line for the rent CPI). In 2015, this reversed and Yardi overtook CPI. This gap continued to widen through the end of the produced data, and is correlated with stark increases in the adoption of Revenue IQ by new clients (grey bars):[292]

---

[291] Robert Cage, John Greenlees, and Patrick Jackman, "Introducing the Chained Consumer Price Index," U.S. Bureau of Labor Statistics, 2003, available at https://www.bls.gov/cpi/additional-resources/chained-cpi-introduction.pdf (accessed February 4, 2025).

[292] Appendix D.2 shows that the gap between Yardi's Index and the Rent CPI also increased in parallel to an increase in Yardi total unit count, as approximated by the "Approx. Unit Count" variable of the Lease Data.

FILED UNDER SEAL

**Figure 88: Landlord Defendants Increase Rents Faster Than A Rent-Specific CPI[293]**



- · - CPI: Rent of Primary Residence, U.S. City Average     — Yardi Lease Price Index     ▨ Yardi Active Lease Count

506.    Before proceeding, I note that the above is an informative, but imperfect, approximation of Revenue IQ adoption: I only have structured lease transaction data for Landlord Defendants, but not all Revenue IQ users are currently named defendants in this matter. This means that the above will tend to understate Revenue IQ adoption.

507.    With this effective rent index, I next define a "Yardi Index Premium" as the Landlord Defendants' rental unit price index minus the FRED Rent CPI. Very simply:

$$\text{Yardi Index Premium}$$
$$= Index_{Effective\ Rent,\ Landlord\ Defendants} - CPI_{Rent\ of\ Primary\ Residence} \tag{17}$$

---

[293] Sources: Expanded Lease Data; Rent CPI. Notes: I compute the Yardi lease price index applying equation 16 to the monthly effective rents of Landlord Defendants' units, identified by the "Revenue IQ Unit ID" variable of the lease data. I rebase the rent CPI to start in February 2011, i.e., the first lease month in the Lease Data for which I can compute the Yardi lease price index. I compute the active lease count, displayed in the blue bars behind the two indices' orange lines, by counting the unique unit IDs (identified by the "Revenue IQ Unit ID" variable in the lease data) with an active lease each month. Figure 101 in Appendix D.2 presents an alternative version of this chart, with the same two lines for the indices, but where the blue bars show the total number of units in Landlord Defendants' properties instead of the count of units with an active lease. For more information on how the rent CPI is calculated, *see* "Measuring Price Change in the CPI: Rent and Rental Equivalence," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/cpi/factsheets/owners-equivalent-rent-and-rent.htm (hereinafter, "Bureau of Labor Statistics") (accessed February 5, 2026).

FILED UNDER SEAL

508.    This captures how much more Landlord Defendants' effective rents have grown relative to the market base. By 2025, this premium reached 20-30%. In Figure 89, below, I then plot this Yardi Index Premium as a function of the total number of Yardi rental units (measured by active leases):

**Figure 89: Yardi's Index Premium Relative to Rent CPI Increased With the Number of Participating Landlord Defendant Units[294]**



509.    In Figure 89, the x-axis shows the number of active leases in the produced Landlord Defendant lease transaction data, and the y-axis shows the Yardi Index Premium relative

---

[294] Sources: Expanded Lease Data; Rent CPI. Notes: Each point in the chart corresponds to a month, from February 2011 to August 2025, with the corresponding number of active leases and Yardi premium as x and y coordinates, respectively. I compute the Yardi lease price index applying equation 16 to the monthly effective rents of Landlord Defendants' units, identified by the "Revenue IQ Unit ID" variable of the lease data. I rebase the rent CPI to start in February 2011, i.e., the first lease month in the Lease Data for which I can compute the Yardi lease price index. I compute the active lease count, on the x-axis, by  counting the unique unit IDs (identified by the "Revenue IQ Unit ID" variable in the lease data) with an active lease each month. Notice that the top right corner of the chart shows a higher dispersion of the Yardi Premium, meaning that months with a similar active unit count (higher than 270,000) correspond to different Premium values. Figure 102 in Appendix D.2 presents an alternative version of this chart, where the x-axis shows the total number of units in Landlord Defendants' properties instead of the count of units with an active lease.

FILED UNDER SEAL

to a rent CPI. In Appendix D.2 , I repeat this process, instead taking the unit count per property (i.e., including both occupied and unoccupied units, as opposed to just actively leased units) as indicated in the same Landlord Defendant lease transaction data. Visibly, the Yardi Index Premium is correlated with the adoption of Yardi by Landlord Defendants, increasing with the number of Landlord Defendant leases.

510.    Interestingly, the strength of the positive upward relationship between Revenue IQ adoption and the Yardi index premium appears to significantly increase as active Landlord Defendant leases reach between 250,000 and 300,000 on a monthly basis – shown on the right side of the graph. Put another way: coinciding with the number of Landlord Defendants' active Revenue IQ leases reaching approximately 250,000, Landlord Defendants became noticeably "better" at increasing their effective rents relative to a rent CPI. This appears to be linked to changes Yardi made to its TAMs and benchmarking starting in 2021, as I discuss below in Section 9.3.

511.    I also present the data from Figure 88 and Figure 89 below on an annualized basis in Table 5:

FILED UNDER SEAL

**Table 5: The Yardi Index Premium Increased With Landlord Defendant Adoption of Revenue IQ[295]**

| Year | Units | Yardi Index | Rent CPI | Yardi Premium |
|------|-------|-------------|----------|---------------|
| 1/1/2011 | 10 | 100 | 100 | 0 |
| 1/1/2012 | 3219 | 99.76 | 102.34 | -2.58 |
| 1/1/2013 | 7146 | 101.54 | 105.11 | -3.57 |
| 1/1/2014 | 18649 | 105.13 | 108.14 | -3 |
| 1/1/2015 | 30736 | 111.06 | 111.81 | -0.75 |
| 1/1/2016 | 51432 | 117.25 | 115.95 | 1.29 |
| 1/1/2017 | 68275 | 123.22 | 120.51 | 2.71 |
| 1/1/2018 | 85514 | 129.77 | 125 | 4.76 |
| 1/1/2019 | 113609 | 136.4 | 129.29 | 7.1 |
| 1/1/2020 | 145985 | 142.4 | 134.15 | 8.25 |
| 1/1/2021 | 242181 | 148.51 | 136.9 | 11.61 |
| 1/1/2022 | 279334 | 159.3 | 142.06 | 17.24 |
| 1/1/2023 | 280956 | 177.27 | 154.22 | 23.04 |
| 1/1/2024 | 280933 | 189.67 | 163.61 | 26.06 |
| 1/1/2025 | 287981 | 199.76 | 170.55 | 29.2 |

512.    To quantify the relationship between Landlord Defendant adoption of Revenue IQ and the Yardi Index Premium, I estimate the following equation using standard ordinary-least squares (OLS) regression:

$$Yardi\ Index\ Premium = \beta_0 + \beta_1 \left( \frac{Active\ Lease\ count_{Landlord\ Defendants}}{10,000} \right) + \epsilon \tag{18}$$

---

[295] Sources: Expanded Lease Data; Rent CPI. Notes: The table shows, for the first month of each year, the active lease count (in the "Units" column); Yardi's lease price index ("Yardi Index"); the CPI for "Rent of Primary Residence" ("Rent CPI"); and the "Yardi Premium," i.e., the difference between the Yardi Index and the Rent CPI. I present the lowest values of the premium in red and the highest (when the Yardi index exceeds the rent CPI by a larger margin) in green. I compute the Yardi lease price index applying equation 16 to the monthly effective rents of Landlord Defendants' units, identified by the "Revenue IQ Unit ID" variable of the lease data. I rebase the rent CPI to start in February 2011, i.e., the first lease month in the Lease Data for which I can compute the Yardi lease price index. I compute the active lease count, displayed in the blue bars behind the two indices' orange lines, by counting the unique unit IDs (identified by the "Revenue IQ Unit ID" variable in the lease data) with an active lease each month. For more information on how the rent CPI is calculated, *see* Bureau of Labor Statistics.

199

FILED UNDER SEAL

513.  Where:

- $\beta_0$ represents the regression intercept (intuitively, the value the Yardi Index Premium takes at 0 adoption.)

- $\beta_1$ represents the marginal effect of Landlord Defendant adoption of Revenue IQ on the Yardi Index Premium, for every 10,000 additional active leases.

514.  I present the results of this estimation below in Table 6, repeating this specification also for every 10,000 Landlord Defendant units (including unoccupied units):

**Table 6: Revenue IQ Adoption by Landlord Defendants Led To Economically & Statistically Significant Increases In the Yardi Index Premium Relative to Rent CPI[296]**

|  | Yardi Index Premium | |
| --- | --- | --- |
|  | Model 1 | Model 2 |
| Intercept | -3.577799*** | -3.614903*** |
|  | (0.182480) | (0.188365) |
| **Active Lease Count, per 10k Leases** | **0.925439*** | |
|  | (0.026773) | |
| **Approx. Unit Count, per 10k Units** | | **0.744539*** |
|  | | (0.021669) |
| Num.Obs. | 175 | 175 |
| R2 | 0.909 | 0.898 |
| R2 Adj. | 0.909 | 0.897 |
| RMSE | 3.27 | 3.48 |

Active Lease Count and Approx. Unit Count are each scaled back by 10,000.

+ p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001

---

[296] Sources: Expanded Lease Data; Rent CPI. Notes: I regress the Yardi Index Premium on the active lease count in Model 1, and on the approximate number of total units in Model 2. Both models are linear and use HC1

FILED UNDER SEAL

515.    I observe a statistically significant relationship between the Yardi Index Premium and Landlord Defendant adoption of Revenue IQ, based on both active leases and total units. The first column in Table 6 shows that a 10,000 active unit increase in Landlord Defendant adoption of Revenue IQ is associated with nearly a one percentage point increase in the Yardi Index Premium relative to a rental CPI, shown in Figure 89 above.[297] Moreover, Landlord Defendant adoption of Revenue IQ can explain more than 90% of variation in the Yardi Index Premium.

516.    This raises a question: how, in practice, does this increase in Landlord Defendants' rent premium relative to market occur? I examine this in the following sections, beginning with a case study, before presenting more comprehensive and robust econometric results.

### 9.2.3   A Case Study Shows Revenue IQ Adoption Led to Collusive Pricing

517.    To study if, and how, Landlord Defendants' pricing changes when Revenue IQ coordinates their pricing with fellow adopters, I searched the Landlord Defendant lease transaction data for a natural case study wherein Revenue IQ adoption in a local area increased from only one Landlord Defendant to two or more. My hypothesis is that if plaintiffs' allegations are true, Landlord Defendants' pricing should change when they transition from having no nearby rivals who use Revenue IQ, to having at least one. The logic is simple: a landlord cannot use Revenue IQ to collude with itself.

518.    At this stage, I have not been asked to define the relevant geographic market(s) for this matter. Nonetheless, because competition for multifamily rental housing is commonly understood to have a local component, I group the Landlord Defendant lease transaction data by public use microdata areas, or "PUMA"s. These are "non-overlapping, statistical geographic areas that partition each state or equivalent entity into geographic areas containing no fewer than 100,000 people each"[298] and "identif[y] … where the housing

---

heteroskedasticity-robust standard errors.  The Yardi Index Premium is computed as the difference between the Yardi's Price Index and the Rent CPI. I compute the active lease count by  counting the unique unit IDs (identified by the "Revenue IQ Unit ID" variable in the lease data) with an active lease each month. I compute the approximate total unit count ("Approx. Unit Count" in the table)  by summing the "Approx Unit Count" of each property by month. The variable is defined as the "Count of apartment unit records entered into Voyager for the associated property." As indicated by Yardi, this is "an approximation of the total number of units in the subject property and may differ from the actual total" (see YARDI-DUFFY_00913148). For the purpose of this analysis, I scale back, i.e., divide, the active lease count and the approximate total unit count by 10,000.

[297] The "Approx Unit Count" value is "an approximation of the total number of units in the subject property and may differ from the actual total" (YARDI-DUFFY_00913148). Note that for 6.2% observations of the Lease Data (YARDI-DUFFY_00913149), the "Approx Unit Count" variable equals zero. From "Duffy - Yardi May 17, 2024 Production Cover Letter," [t]his could be because a client ceased operating the property at some point and may have inactivated the property in their Voyager system or marked all of the units as "Excluded," which prevents them from being counted. – NB: this is a cover letter not of the lease data, but of other csv's queried from RevIQ and also having the approx. unit variable.

[298]"Public Use Microdata Areas (PUMAs)," United States Census Bureau, available at https://www.census.gov/programs-surveys/geography/guidance/geo-areas/pumas.html (accessed February 2, 2026).

FILED UNDER SEAL

unit was located," and are defined and maintained by the Census Bureau.[299] PUMAs are widely used in economics and other social science research that studies geographic variation in data prepared by the Census Bureau, such as the Census itself and the American Community Survey (ACS).

519.    I use PUMAs, rather than census tracts or Metropolitan Statistical Areas (MSAs), because census tracts comprise "between 1,200 and 8,000 people, with an optimum size of 4,000 people"[300], and may therefore be too narrow. Further, MSAs are broad metro areas that can span multiple counties and may therefore be too broad. PUMAs balance these countervailing concerns and allow me to test localized competition without undertaking a full market definition exercise at this juncture.

520.    Within these PUMAs, I next identify candidates for case studies to understand whether and how prices increase when there is a transition from just one Landlord Defendant to two or more:

▪  Filter the lease transaction data for the putative class period, i.e., after September 9th, 2019.

▪  Tabulate the increase in Landlord Defendant unit count, as indicated by the produced lease transaction data, in the "Approx Unit Count" variable.

▪  Filter to the top 50 PUMAs with the largest percentage increase in Landlord Defendant unit count. This is to focus on clear changes that should have visually identifiable effects; further analysis discussed below will include a broader sample of PUMAs.

▪  Identified any PUMAs that had only one Landlord Defendant property for at least 10 months, then saw adoption increase to two or more Landlord Defendant Revenue IQ-using properties in that area.

521.    Using this search logic, I identified two PUMAs. I present the results for both in this report, including one in Appendix D.3 and one in the body of this section. I reach similar conclusions from each.

522.    In Sacramento County (West), CA, there was only one Landlord Defendant property with active units priced by Revenue IQ for roughly a year from May 2020 to May 2021. This PUMA transitioned to having multiple Landlord Defendant properties, with a significant

---

[299] "Public Use Microdata Area: Description," IPUMS USA, available at https://usa.ipums.org/usa-action/variables/PUMA#description_section (accessed February 2, 2026).

[300] "2020 Census Tracts," Data.gov, available at https://catalog.data.gov/dataset/census-tracts (accessed February 2, 2026).

FILED UNDER SEAL

increase in local adoption in May 2021. I show this by plotting the approximate Landlord Defendant unit count in Sacramento County (West) below in Figure 90:

**Figure 90: Revenue IQ's Adoption in Sacramento County (West), CA, Increased Dramatically In May 2021[301]**



Tot. Unit Count in PUMA 0606707

"Approx Unit Count" defined as the "Count of apartment unit records entered into Voyager for the associated property."
As indicated by Yardi, this is "an approximation of the total number of units in the subject property and may differ from the actual total"
(see YARDI-DUFFY_00913148).

523.    Between May 2020 and early 2021, the only Landlord Defendant property using Revenue IQ in Sacramento Country (West) was ███████████████████ The next Landlord

---

[301] Sources: Expanded and Geocoded Lease Data. Notes: I apply the Lease data standard cleaning; plus: 1. I filter the lease data to PUMA 0606707, corresponding to Sacramento County (West)--Sacramento City (Central/Downtown & Midtown), California, both according to the 2010 and the 2020 ACS geographic boundaries 2. I consider the "Approx Unit Count" variable to compute the cumulative unit count in the considered PUMA. 3. "Approx Unit Count" is defined as the "Count of apartment unit records entered into Voyager for the associated property." As indicated by Yardi, this is "an approximation of the total number of units in the subject property and may differ from the actual total"(see YARDI-DUFFY_00913148).  I apply the following criteria to search for PUMAs that would be eligible for the event study: (1) I look into the top 50 PUMAs in the lease data, ordered by the percentage increase in total unit count (measured by the "Approx. Unit Count" variable of the lease data), considering the relevant period, i.e., from September 9th, 2019 on. (2) Within those, I focus on PUMAs where Yardi properties are in the dataset for at least 3 years since the lease start date, to ensure enough observations and an appropriate timespan for the analysis. (3) I further filter for PUMAs for which, before the date of the highest increase detected, there was already a Landlord Defendant property for at least 10 months, and whose active unit count stayed fairly stable in the 12 months after the first increase. This is to ensure that any change in rents I see after the price increase is not due to

FILED UNDER SEAL

Defendant property to adopt Revenue IQ in this area was "███████████," though it was small in comparison to ███████████ (*see* Figure 90). Then, in May 2021, "███████" property adopted Revenue IQ, which more than doubled Revenue IQ adoption in Sacramento County (West) in a single month, from 429 to 1,235 units. In Figure 91, I break-out this growth property-by-property, plotting their "active leases" instead of their approximate unit count:



---

properties entering or exiting the dataset at different points in time, in which case the different composition in the level of rents would influence the average effective rent in the PUMA. (5) For the PUMAs that I focus on based on the above rationale, I consider those for which, in addition to the total unit count, the number of active leases also increases following the entry of a property, and where the jump in active leases is mainly due to the entry of one specific property, which stays in the dataset until the end of the period considered. The PUMAs resulting from this search are: PUMA 606707, presented here, and PUMA 2602907. For the latter, the pre-existing property ("███████ ███████████████") presents an "Approx. Unit Count" of zero, even if its active units count is positive. The lease data dictionary specifies that the approx. unit count "serves as an approximation of the total number of units in the subject property and may differ from the actual total." (YARDI-DUFFY_00913148). Given the ambiguous units data entry, I present the count of active leases and the average rents in PUMA 2602907 in Appendix D.3.2.

FILED UNDER SEAL

**Figure 91: "████████" Entry Accounts For The Vast Majority of The May 2021 Increase in Revenue IQ Adoption in Sacramento County (West)[302]**



524.    Active leases differ from unit count in two important respects:

- First, on a conceptual level, "active leases" refers to occupied units with a signed lease that is still in the agreed lease term, whereas unit count simply refers to the total number of units in a property, regardless of whether they are leased or not.

- Second, on a practical level, the Landlord Defendant lease transaction data that Yardi produced appears to only include leases priced by Revenue IQ. When a client first adopts Revenue IQ, there is consequently a visible onboarding period wherein leases transition to Revenue IQ from their old system – appearing in Figure 91 as a gradual increase in active leases when a new property enters the data, compared to the discrete "jumps" in unit count I show in Figure 90.

---

[302] Sources: Expanded and Geocoded Lease Data. Notes: I apply Lease data standard cleaning; plus: 1. I filter the lease data to PUMA 0606707, corresponding to Sacramento County (West)--Sacramento City (Central/Downtown & Midtown), California, both according to the 2010 and the 2020 ACS geographic boundaries 2. To estimate the number of active units, I count the unique number of unit ID's (identified by the "Revenue IQ Unit ID" variable in the lease data) considering the active leases at any month in the dataset.

FILED UNDER SEAL

525.  By either metric, there is a stark and apparent increase in Revenue IQ adoption in Sacramento County (West) in May 2021, with the two largest properties (████████████ ████████████) accounting for 71% of Landlord Defendant leases in the second half of 2021 in this area.

526.  Bringing this full circle to the original question that spurred this case study: is a discrete increase in local Revenue IQ adoption associated with a change in pricing behavior at affected properties? Figure 92  plots these two properties' average prices between August 2020 and May 2022:[303]

---

[303] I begin ████████████ price line in August, rather than May 2020 due to the aforementioned "onboarding period." I wait until the property has enough leases reflected in the produced data for any average of those leases to be indicative.

FILED UNDER SEAL

**Figure 92: When Revenue IQ Adoption Increased From One Landlord Defendant to Multiple in Sacramento County (West), Landlord Defendants Structurally Transitioned From Almost Flat Pricing To Parallel Increases[304]**



527.    Visually, between August 2020 and May 2021, the pricing at ████████████████████ was almost flat, perhaps with a modest upward trend in late 2020/early 2021. In May 2021, coinciding with the entry of ██████████, its pricing began to trend sharply upward. And importantly, the new upward price trend for ██████████████████ was matched by a parallel upward trend in ██████████.

---

[304] Sources: Expanded and Geocoded Lease Data. Notes: I apply Lease data standard cleaning; plus:  Property "██████████████████" enters the dataset in May 2020. I filter the data to start in August 2020, i.e., the first month when there are more than 85 leased units (25% of the "Approx. Unit Count.")

FILED UNDER SEAL

528. To statistically verify these visual observations, I estimate a simple interrupted time series model:

$$r_t = \beta_0 + \beta_1 t + \beta_2 PostEntry + \beta_3(t * PostEntry) + \epsilon_t \qquad (19)$$

529. Where:

- $r_{p,t}$ is the average effective rent at time $t$ (measured in months).

- $\beta_0$ is the regression intercept.

- $\beta_1$ is the monthly time trend ($t$), showing the average month-to-month change.

- $\beta_2$ is the average change in the price level after ███████ entry (indicated by dummy variable $PostEntry$) that is not explained by the time trends in $\beta_1$ or $\beta_3$

- $\beta_3$ is the additive change in the time trend in the period following ███████ entry.

530. I apply this model only to ███████████ pricing, as it is the only property in Sacramento County (West) that has meaningful data before ███████ entry. Table 7 shows the OLS estimation of this regression:

208

FILED UNDER SEAL

**Table 7: The May 2021 Pricing Change in Sacramento County (West) Constituted a Statistically Significant Structural Break[305]**

|  | Monthly Effective Rent Avg. |
|---|---|
| Intercept | 1566.011*** |
|  | (4.661) |
| Time Trend, Months | 2.180* |
|  | (0.870) |
| After Entry of " ▮ " Property | -48.732** |
|  | (13.128) |
| Interaction | 7.295*** |
|  | (1.116) |
| Num.Obs. | 22 |
| R2 | 0.978 |
| R2 Adj. | 0.975 |
| RMSE | 7.40 |
| + p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001 | |

531.    Coinciding with ▮ May 2021 entry, ▮ saw a statistically significant upward trend break in its pricing, wherein its upward time trend increased by $7.3 per month. In Figure 93, I visualize this departure from trend by showing ▮ ▮ actual prices in the solid orange line, and the pre-entry trend in the dashed orange line:

---

[305] Sources: Expanded and Geocoded Lease Data. Notes: I apply Lease data standard cleaning; plus: Property " ▮ " enters the dataset in May 2020. I filter the data to start in August 2020, i.e., the first month when there are more than 85 leased units (25% of the "Approx. Unit Count.")

FILED UNDER SEAL

**Figure 93: Lease Transaction Prices at "████████████████" Broke Above Their Pre-Existing Trend By Approximately $100 Per Month When Revenue IQ Adoption Increased in May 2021[306]**



532. By May 2022 (one year after ████████ entry) this trend-break was worth nearly $200 per month in average rent increases. These price increases cannot plausibly be explained by any procompetitive effect of Revenue IQ recommending "better" prices to clients, because "████████████" had already used Revenue IQ for approximately one year. Further, the number of units priced by Revenue IQ stabilized around May 2021 (*see* Figure 93 above), and thus the price increase after May 2021 cannot plausibly be explained by a change in the composition of units.

533. In Appendix D.3.2, I repeat this analysis on the second PUMA my search method identified. I observe a similar pattern where a single Landlord Defendant property had mostly flat pricing in the 12 months preceding further Revenue IQ adoption by two other alleged co-conspirators. Following Revenue IQ adoption by these two additional Landlord Defendants, all three increased prices in parallel.

---

[306] Sources: Expanded and Geocoded Lease Data. Notes: I apply Lease data standard cleaning; plus: Property "████████████" enters the dataset in May 2020. I filter the data to start in August 2020, i.e., the first month when there are more than 85 leased units (25% of the "Approx. Unit Count.")

FILED UNDER SEAL

534. The foregoing case studies indicates that when two Landlord Defendants use Revenue IQ to price properties that are in the same local area, their prices move upward in parallel. As with any localized case study during the COVID period, these patterns may reflect the interaction of multiple forces, including broader pandemic-related demand shifts affecting the multifamily housing market. For this reason, the Sacramento County (West) example is not intended to isolate the causal effect of Revenue IQ adoption from contemporaneous macroeconomic conditions. Rather, it serves to intuitively illustrate how pricing behavior changes when local adoption increases from one to multiple Revenue IQ users, holding constant the institutional and geographic context. However, the remaining question is whether this effect is widespread and robust to controlling for other potentially confounding variables, or whether the ███████████████ and █████████ are outliers.

## 9.2.4 Robust Econometric Estimation Confirms Landlord Defendants Achieve Higher Rents In Areas With More Alleged Co-Conspirators

535. To evaluate whether this pattern generalizes beyond any single location, is robust to controlling for pandemic-specific shocks, and to account explicitly for any other time-varying shocks common to all units, I next turn to panel regressions with unit and time fixed effects. These models absorb macroeconomic trends – including COVID-era demand shifts – as well all time-invariant unit characteristics (such as size and location) with the ultimate purpose of isolating the relationship between local Revenue IQ adoption intensity and pricing outcomes.

536. To answer that question, I generalize my analysis by using widely accepted econometric techniques to estimate how Landlord Defendant effective rents respond to the number of co-conspirators in a local area, in this case a PUMA. I start by defining the number of alleged co-conspirators per PUMA as:

$$\mu_{p,t} = N_{p,t} - 1 \qquad (20)$$

537. Where:

- $\mu_{p,t}$ is the number of alleged co-conspirators available to each Landlord Defendant property in PUMA $p$ at time $t$.

- $N_{p,t}$ is the number of Landlord Defendant properties in PUMA $p$ at time $t$.

538. This is a simple calculation. I present it primarily for its relevance to subsequent regression formulas. Intuitively, the number of co-conspirators in a PUMA is 0 when there is only one Landlord Defendant property in that PUMA, then 1 when there are two landlords, 2 when there are three landlords, and so on.

FILED UNDER SEAL

539.    I then plot effective rent changes, i.e., how much the rent of a unit changes when the lease changes (either through a renewal or new tenant), against the number of Landlord Defendant alleged co-conspirators in a PUMA. Distilling these effective rent changes into their averages (and 95% confidence intervals), Figure 94 shows how they respond to the number of alleged co-conspirators in a PUMA:

**Figure 94: Landlord Defendants Increase Rent Prices Faster In Areas With More Fellow Revenue IQ Users[307]**



540.    In PUMAs with no alleged co-conspirators (i.e., 1 Landlord Defendant), Landlord Defendants increased prices by $57.3 per month on average when the lease changed. Even adding just one additional co-conspirator, this increased by $11 to $68.5 per month, with no overlap in the confidence interval.  This indicates the significance of the price increase. This trend continues upward with the number of co-conspirators per PUMA, reaching

[307] Sources: Expanded and Geocoded Lease Data. I compute the rent increases as the difference of the "Monthly Effective Rent" from its previous value for each unit (identified from the "Revenue IQ Unit ID" variable). For each unit and active month, I compute the number of co-conspirator properties (counting the unique "Revenue IQ Property ID"'s) that are in the same PUMA of the unit (excluding the property the unit of interest belongs to). I map each unit into one of the categories on the x-axis, i.e., by number of Landlord Defendant property co-conspirators, and average the effective rent changes for each category, plotted in the y-axis of the figure, together with their 95% confidence intervals.

FILED UNDER SEAL

nearly $93.6 in PUMAs with 5 or more alleged co-conspirators, an increase of $36.3 compared to PUMAs with no alleged co-conspirators.

541.  I note that, generally, both rental prices and the number of Landlord Defendant users of Revenue IQ have increased across time. Moreover, some Landlord Defendant properties and units may, for idiosyncratic reasons I cannot currently observe, simply be more likely to increase rents and/or to increase rents by larger amounts, perhaps because they are in a high demand location or have particular amenities for which consumers are willing to pay a premium. I therefore isolate the "co-conspirator" effect on Landlord Defendants pricing by estimating five regressions (columns 1-5 in Table 6 below), given by:

$$r_{u,t,p} = \beta_0 + \beta_1 \mu_{t,p} + \epsilon_{u,t} \tag{21}$$

$$r_{u,t,p} = \alpha_u + \beta_1 \mu_{t,p} + \epsilon_{u,t} \tag{22}$$

$$r_{u,t,p} = \alpha_u + \tau_t + \beta_1 \mu_{t,p} + \epsilon_{u,t} \tag{23}$$

$$r_{u,t,p} = \beta_0 + \beta_1 \mu_{t,p} + \beta_2 CPI_t + \epsilon_{u,t} \tag{24}$$

$$r_{u,t,p} = \alpha_u + \beta_1 \mu_{t,p} + \beta_2 CPI_t + \epsilon_{u,t} \tag{25}$$

542.  Where:

- $r_{u,t,p}$ is effective rent for unit $u$ at time $t$ in PUMA $p$.

- $\beta_0$ is the intercept (not applicable to fixed-effect models).

- $\beta_1 \mu_{t,p}$ is the marginal effect ($\beta_1$) of the number of $co$-conspirators ($\mu_{t,p}$) increasing by 1 at time $t$ in PUMA $p$.

- $\alpha_u$ are unit level fixed-effects, calculated as $\alpha_u = \overline{r_u}$.

- $\tau_t$ are month/year fixed-effects, calculated as $\tau_t = \overline{r_t}$.

- $\beta_2 CPI_t$ is a control for general increases in rent CPI.

- $\epsilon_{u,t}$ is an error term for each lease observation.

543.  In each specification, $\beta_1$ is the parameter of interest showing if, and to what extent, Landlord Defendants charge higher prices in local areas (PUMAs) with higher Revenue IQ adoption. I estimate each of these five models using OLS on Landlord Defendants' active lease prices.

544.  Before proceeding to summarize my econometric findings, I note that all of these models are conservative estimates in that they compare effective rents across Landlord Defendants, rather than against a non-RM control group. In that sense, they do not measure the total

213

FILED UNDER SEAL

effect of an alleged conspiracy, but rather how much *more* effective the alleged conspiracy is in local areas with more co-conspirators.

545.    Even by this conservative methodology, I identify a persistent and statistically significant co-conspirator effect on Landlord Defendants' pricing, presented below in Table 8:

**Table 8: Robust Econometric Estimation Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants[308]**

|  | (21) | (22) | (23) | (24) | (25) |
|---|---|---|---|---|---|
| Intercept | 1292.239*** |  |  | -25.609*** |  |
|  | (0.156) |  |  | (0.961) |  |
| Number of Co-Conspirator Properties | 47.661*** | 39.257*** | 1.843*** | 41.167*** | 5.280*** |
|  | (0.046) | (0.287) | (0.070) | (0.044) | (0.164) |
| Rent CPI |  |  |  | 9.124*** | 10.264*** |
|  |  |  |  | (0.007) | (0.014) |
| Num.Obs. | 23302150 | 23296808 | 23296808 | 23302150 | 23296808 |
| R2 | 0.062 | 0.917 | 0.961 | 0.128 | 0.959 |
| R2 Adj. | 0.062 | 0.915 | 0.960 | 0.128 | 0.958 |
| R2 Within |  | 0.037 | 0.000 |  | 0.528 |
| R2 Within Adj. |  | 0.037 | 0.000 |  | 0.528 |
| Std.Errors | Heteroskedasticity-robust | by: revenue.iq.unit.id | Newey-West (L=3) | Heteroskedasticity-robust | by: revenue.iq.unit.id |
| FE: revenue.iq.unit.id |  | X | X |  | X |
| FE: month |  |  | X |  |  |
| + p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001 | | | | | |

546.    In all five models, the co-conspirator count indicated in the "Number of Co-Conspirator Properties" row has a positive and statistically significant effect on Landlord Defendants' prices. Models 23 and 25 are the most robust because they contain explicit controls for both cross-unit heterogeneity in e.g. square footage (through unit fixed-effects) and cross-time variation (through month/year fixed-effects and a nationwide rent CPI control respectively). Given the collinearity between time and Revenue IQ adoption, model 23 is

---

[308] Sources: Expanded and Geocoded Lease Data; Rent CPI. Notes: The Model 23 uses Newey-West (HAC) standard errors, correcting for potential heteroskedasticity and autocorrelation. The lag length is set to 3, meaning that the correction takes into account autocorrelation of the errors up to three periods back.

FILED UNDER SEAL

potentially conservative, as the month/year fixed effects may absorb a meaningful portion of the true co-conspirator effect on prices.

547.    Model 25 estimates that Landlord Defendant prices increase by $5.3 per month on average for every additional co-conspirator in their PUMA, after accounting for the rent CPI control. With 5 co-conspirators, this would increase to $26.5 per month. This model, which controls for co-conspirator count, rent CPI, and unit fixed-effects, explains approximately 96% of variation in Landlord Defendants' pricing, and 53% of pricing variation within units.

548.    To address concerns that these results reflect the propensity for some units to systematically increase prices rather than coordinated behavior, I re-estimate the same five specifications using first differences – examining changes in rents at the time leases are signed rather than rent levels, and in some specifications controlling via fixed effects representing each unit's average rent increase over the period. (*see* Appendix D.4). When I do this, I reach essentially the same (and indeed stronger) conclusion: Landlord Defendants increase monthly rents by a statistically significant $4.3-$15 more than their long-run average rent increase with every additional co-conspirator in their PUMA.

549.    Taken together, these results provide consistent econometric evidence that Landlord Defendants' pricing responds systematically to the presence of additional co-conspirators in their local markets. The estimated effects appear across multiple specifications and persists when controlling for unit-level fixed effects and macroeconomic conditions, and when accounting for different units' average propensity to increase prices. From an economic perspective, the robustness of these findings indicates that the observed price increases are unlikely to be driven solely by common trends or local demand shocks. Instead, the results are consistent with a pricing process in which Revenue IQ links competitors' pricing decisions and facilitates coordinated price movements across properties.

## 9.3  Coinciding With Updates to Yardi's TAM Oversight, Yardi's Pricing Suite Became More Effective at Increasing Landlord Defendants' Rents

550.    In the preceding sections, I showed – based on my analysis and Yardi's internal analysis – that that Landlord Defendants' pricing satisfies economic tests for collusion via a hub-algorithm: (i) adopters price higher than non-adopters; and (2) adopters' prices increase as the adoption rate of Revenue IQ also increases. Within those findings, an additional pattern emerges: Landlord Defendants' ability to set these collusive prices seems to have markedly improved in 2021/2022 (*see* Section 6).

FILED UNDER SEAL

551.    This is noteworthy because of changes Yardi made to its Pricing Suite at the same time. As explained above, the record indicates that, in the period between 2021 and 2022, Yardi made two significant changes: it (i) began calculating "penalty" scores and (ii) it began using CPD data in its TAM pricing oversight. (*see* Section 6).

552.    Recall from Section 9.2.2 that I calculate a Yardi Index Premium as the difference between a Landlord Defendant effective rent index and a FRED rent CPI index. Plotted from the beginning of the Landlord Defendant lease transaction data (in 2011) to the end (in 2025), the Yardi Index Premium was, and is, consistently increasing, but the upward trend appears to hasten around 2021 – shown below in Figure 95:

**Figure 95: The Growth Rate of the Yardi Index Premium Increased Notably Around 2021/22[309]**



Yardi Index Premium (Yardi Index - Rent CPI)

553.    To confirm the visual impression using data, in the 4 years between 2017 and 2021, the Yardi Index Premium increased by 8.9 points from 2.7% to 11.6%. In the four years

---

[309] Sources: Expanded Lease Data; Rent CPI. Notes: The linechart shows, for each month, Yardi's Index Premium, i.e., the difference between the Yardi lease price index and the Rent CPI. I compute the Yardi lease price index applying equation 16 to the monthly effective rents of Landlord Defendants' units, identified by the "Revenue IQ Unit ID" variable of the lease data. I rebase the rent CPI to start in February 2011, i.e., the first lease month in the Lease Data for which I can compute the Yardi lease price index. I compute the active lease count, displayed in the

between 2021 and 2025, the Premium's growth rate nearly doubled – increasing by 17.6 points from 11.6% in 2021 to 29.2% in 2025.

554.    To statistically test this, I perform a series of 144 Chow tests (or parameter instability tests). These essentially ask if the parameter estimates (i.e., "coefficients") in a regression meaningfully change between two samples. When splitting data into two different time periods, economists use the Chow Test to identify a "structural break" in the relationship between two variables – here the Yardi Index Premium and Revenue IQ adoption. Specifically, I re-apply the following estimation from Section 9.2.2:

$$Yardi\ Index\ Premium$$
$$= \beta_0 + \beta_1 \left( \frac{Active\ Lease\ count_{Landlord\ Defendants}}{10{,}000} \right) + \epsilon \qquad (18)$$

555.    The output of these Chow Tests is a test statistic – intuitively, this tells you how much explanatory power you lose by trying to fit one model, instead of two, across your two samples. A high test-statistic means you lose a lot of explanatory power by pooling the samples instead of modeling them separately – and therefore indicates a structural break in the data. I apply these Chow Tests for every month between January 2019 and December 2022 – searching for an unknown break date by looking for the month(s) with the greatest test statistics. Figure 96 plots these test statistics across time, with their associated p-values:

---

blue bars behind the two indices' orange lines, by  counting the unique unit IDs (identified by the "Revenue IQ Unit ID" variable in the lease data) with an active lease each month.

FILED UNDER SEAL

**Figure 96: Chow Tests Show Significant Structural Breaks in Landlord Defendants' Pricing In 2021/2022[310]**



556.    Plotting the results of these Chow Tests, Figure 96 shows two local maxima in the test statistics – March 2021 and July 2022. These structural break points appear to neatly correspond to changes in Yardi's TAM Oversight (specifically the introduction of penalty scores and CPD data) in 2021 and 2022.

# 10.   Conclusion

557.    Based on the economic and factual predicates I establish in Sections 3 and 4 respectively:

▪    In Section 5, I evaluate whether clients use Revenue IQ's algorithm to adopt a substantially common pricing rule book and whether this rule book promotes parallel pricing. I conclude that it does and that this parallelism incentivizes price increases and disincentivizes price decreases.

▪    In Section 6, I examine the role of Yardi's Technical Account Managers' (TAMs) Oversight in using non-public cross-client data to complement Revenue IQ's list price. I find that TAMs asymmetrically identify and talk to clients about individual downward deviations from benchmark pricing, thereby imposing an upward pressure on clients' pricing and preventing/reversing downward price cycles.

---

[310] Sources: Expanded Lease Data; Rent CPI. Notes: The chart shows the test statistics and p-values of Chow tests computed for a set of possible candidate break dates, i.e., each month from January 2019 to December 2022, for the model regressing the Yardi Index Premium on the active lease count scaled back by 10,000. A Chow test tests whether the relationship between two variables changes at a specific point in the data. In particular, it compares a single regression over the whole sample to two separate regressions before and after a chosen breakpoint. *See* Gregory C. Chow, "Tests of Equality Between Sets of Coefficients in Two Linear Regressions," *Econometrica*, July, 1960, available at https://www.jstor.org/stable/1910133?seq=1 (accessed February 5, 2026), pp. 591 – 605.

FILED UNDER SEAL

- In Section 7, I explain how firms can generally use non-public benchmark reporting and compare this to how both Yardi and its clients describe doing so in practice. I show that presentations to both prospective clients and fellow Yardi users explain using non-public benchmarking to increase prices.

- In Section 8, I quantify overall adherence to this pricing structure given the mutually reinforcing nature of Yardi's Pricing Suite and the commitment mechanisms both Yardi and clients implement. I find that Landlord Defendants transact precisely at, or very near, Revenue IQ's list price in virtually all leases.

- In Section 9, I apply widely accepted econometric methods to empirically test for indicia economic theory associates with coordination via a hub-algorithm. I find that Landlord Defendants charge higher prices than non-adopters, and that Landlord Defendants' prices rise with the adoption of Revenue IQ.

558. Evaluating this evidence in its totality, I conclude it is most economically consistent with Landlord Defendants using Revenue IQ to achieve a "shared objective" of collective price increases, rather than competitive unilateral price determination.

T. Marinasco

February 9, 2026

FILED UNDER SEAL

# Appendices

## A.  Industry Background

### A.1.  Rental Housing

559.  Rental housing refers to temporary occupancy of a housing unit by a tenant, typically with a written lease specifying monthly rental payment amounts in exchange for the housing.[311] There are several relevant price measures for rental housing, including:

- List price: which represents the advertised rents posted on apartment listing platforms and property management websites and constitute the primary price signal observed by prospective tenants at the outset of their housing search. Some economic literature refers to this as a "posted" price.

- Gross contract rent: which refers to the monthly rent payments specified in lease agreements and may differ from listing prices because of negotiated discounts.[312]

- Concessions: which refer to incentives landlords may offer to attract or retain tenants, such as free rent periods, waived fees, or added amenities.[313] Concessions are typically applied *after* the gross contract rent.

- Effective rent: captures the final net rental cost borne by the tenant after spreading the monetary value of concessions over the duration of the lease term.[314]

560.  As I explain in other sections of this report, each of these measures is relevant to how Landlord Defendants coordinate their pricing via Yardi's pricing suite, and indeed the different measures work in concert to sustain coordination, consistent with economic theory I explain in Section 3.

561.  The residential rental sector also encompasses a wide range of property types, reflecting differences in their structural characteristics. According to the U.S. Census Bureau, residential properties can be classified into two main structural categories, single-family and multifamily housing.[315] Single-family properties correspond to one-unit structures,

---

[311] "12 U.S.C. §1713 - Rental Housing Insurance," Cornell Law School, Legal Information Institute, available at https://www.law.cornell.edu/uscode/text/12/1713#a_6 (accessed February 2, 2026).

[312] "Definitions & Source Links," The Data Center Research, available at https://www.datacenterresearch.org/data-resources/neighborhood-data/definitions/ (accessed February 2, 2026).

[313] "Revenue Methods Multi family," Indusmen, available at https://www.indusmen.com/article/revenue-methods-multi-family/ (hereinafter, "Revenue Methods Multi family") (accessed February 2, 2026).

[314] Revenue Methods Multi family.

[315] "Survey of Construction (SOC) Definitions," United States Census Bureau, available at https://www.census.gov/construction/soc/definitions.html (hereinafter, "Survey of Construction") (accessed February 2, 2026).

and, within this category, the Census includes fully detached, semidetached (semi-attached, side-by-side), row houses, and townhouses. Multifamily properties, by contrast, consist of structures containing multiple housing units and are further classified according to the number of units within the building – which I discuss further below.[316]

### A.1.1.  Multifamily Housing Properties & Landlords

562.    As the name suggests, multifamily housing refers to residential properties comprising multiple, self-contained dwelling units within a single structure. Industry practice and regulatory frameworks, including those adopted by the U.S. Department of Housing and Urban Development (HUD) and the Federal Housing Administration (FHA), generally limit this classification to properties containing at least five or more dwelling units within a single building.[317] However, Yardi's publicly available statements and methodological disclosures often set the threshold for multifamily housing at 50 residential units.[318] At this stage of the litigation, I have not been asked to define a relevant product market (as I explain in my assignment in Section 1.3) and therefore have not further evaluated the appropriate threshold to apply for multifamily housing.

563.    Of relevance to this case, the ownership of multifamily properties differs significantly from properties with fewer units. On November 29, 2022, the U.S. Department of Housing and Urban Development (HUD), together with the U.S. Census Bureau, released the 2021 Rental Housing Finance Survey (RHFS), a triennial survey of the nation's rental housing stock.[319] The 2021 Rental Housing Finance Survey offers data on the rental housing inventory as of 2020, covering aspects such as ownership and management structures, unit layouts and available amenities, financial characteristics, and participation in government subsidy programs.[320]

---

[316] Survey of Construction.

[317] "Types of Multifamily Housing," HelloData.ai, available at https://www.hellodata.ai/help-articles/types-of-multifamily-housing (accessed February 2, 2026).

[318] "Multifamily Market Data and Analysis," Yardi Matrix, available at https://www.yardimatrix.com/Property-Types/Multifamily (accessed February 2, 2026); "Multifamily Property Ratings," Yardi Matrix, available at https://www.yardimatrix.com/About-Us/Our-Methods/How-We-Define-The-Apartment-Supply/Property-Ratings (accessed February 2, 2026).

[319] Mark P. Keightley, "Ownership of the U.S. Rental Housing Stock by Investor Type: In Brief,", Congress.gov, December 13, 2022, available at https://www.congress.gov/crs-product/R47332 (hereinafter, "Ownership") (accessed February 2, 2026).

[320] Ownership.

**Table 9: Share of Rental Properties by Ownership and Size, 2020[321]**

| Current Ownership of Property | All | 1 unit | 2 to 4 units | 5 to 24 units | 25 to 49 units | 50 to 99 units | 100 to 149 units | 150 units or more |
|---|---|---|---|---|---|---|---|---|
| Total | 100% | 100% | 100% | 100% | 100% | 100% | 100% | 100% |
| Individual investor | 70% | 73% | 64% | 31% | 16% | 7% | 9% | 4% |
| Trustee for estate | 3% | 2% | 7% | 5% | 3% | 0% | 0% | 0% |
| LLP, LP, or LLC | 15% | 14% | 16% | 44% | 49% | 53% | 55% | 67% |
| Tenant in common | 3% | 3% | 1% | 0% | 0% | 0% | 0% | 0% |
| General partnership | 1% | 1% | 1% | 2% | 4% | 7% | 0% | 2% |
| Real Estate Investment Trust (REIT) | 1% | 1% | 0% | 1% | 0% | 0% | 0% | 4% |
| Real estate corporation | 1% | 0% | 1% | 3% | 5% | 7% | 9% | 4% |
| Housing cooperative organization | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 0% |
| Nonprofit organization | 1% | 1% | 1% | 5% | 7% | 7% | 9% | 2% |
| Other | 1% | 1% | 2% | 2% | 3% | 0% | 0% | 2% |
| Not reported | 5% | 4% | 6% | 8% | 12% | 13% | 9% | 13% |

564.    Based on the ownership shares of properties comprising a minimum of five dwellings units, the results indicate that multifamily ownership is largely concentrated among professional and institutional actors.

565.    This structure in turn affects the competitive dynamics of multifamily rental housing. Rather than a large number of unsophisticated individual owners competing to rent a few (or even just one) housing units, a comparatively smaller number of sophisticated corporations - each with a substantial housing stock, potentially across different geographic markets - compete using sometimes complex tools with repeated interactions. These characteristics significantly increase the scope for anticompetitive behavior to occur. I

---

[321] Sources: U.S. Department of Housing and Urban Development and U.S. Census Bureau, Rental Housing Finance Survey, 2021. Notes: According to the Glossary of RHFS Terms, "a property includes all housing units and structures commonly financed. A property may consist of one building at one address, or a property may consist of more than one building or more than one street address, if these structures are commonly owned and financed, geographically proximate, and considered part of the same property." *See* "2021 Rental Housing Finance Survey Glossary of Terms", U.S. Department of Housing and Urban Development and U.S. Census Bureau, available at https://www2.census.gov/programs-surveys/rhfs/technical-documentation/glossary/2021/2021-RHFS-Glossary-5-24-21.pdf (accessed February 8, 2026).

explain common tools multifamily landlords use to price their units in the following sections.

### A.1.2.  Recent Trends In U.S. Housing Rentals

566.  In recent years, the U.S. rental industry has seen a period of elevated rent growth and heightened affordability pressure, resulting in market conditions that favor landlords. Following the Covid-19 pandemic, rents increased rapidly across many metropolitan areas, driven by sustained demand and structural constraints on housing supply.[322] Several recent lawsuits, this matter included, contend that price coordination across landlords also contributed to rent price increases. From the start of the pandemic through the third quarter of 2021, the number of renter households also grew by over 870,000, reaching a total of 44 million, according to the Housing Vacancy Survey (HVS).[323] According to data from RealPage, apartment rent growth accelerated sharply during this period, with annual increases peaking at approximately 15 percent in the first quarter of 2022. These increases were well above the average rent growth observed over the preceding decade, reflecting an unusually strong rental market environment.

567.  Following the heated rental markets of 2021 and 2022, signs of moderation finally emerged. According to data from RealPage, apartment rent growth accelerated sharply during this period, with annual increases peaking at approximately 15 percent in the first quarter of 2022. These increases were well above the average rent growth observed over the preceding decade, reflecting an unusually strong rental market environment. Beginning late 2022, rent growth slowed substantially, rising by only 0.4 percent year over year by the third quarter of 2023, consistent with a broader market normalization.[324]

## A.2.  How Renters Search for Apartments

568.  With the advent of the digital economy, renters' search behavior has increasingly shifted toward online channels, reflecting the central role of online platforms in the apartment selection process. Evidence from at least as early as 2014, including a joint study by Google and Apartments.com, already indicated that 72% of respondents, out of a total of 1,500,

---

[322] Gabriel Melmed, "What's Happening to the Cost of Rent in the United States," Economics Observatory, May 7, 2025, available at https://www.economicsobservatory.com/whats-happening-to-the-cost-of-rent-in-the-united-states?hl=en-US (accessed February 2, 2026).

[323] Whitney Airgood-Obrycki, "The Record-Breaking Rental Market," Harvard University Joint Center for Housing Studies, February 1, 2022, available at https://www.jchs.harvard.edu/blog/record-breaking-rental-market (accessed February 2, 2026).

[324] Whitney Airgood-Obrycki and Sophia Wedeen, "Six Takeaways from America's Rental Housing 2024," Harvard University Joint Center for Housing Studies, January 25, 2024, available at https://www.jchs.harvard.edu/blog/six-takeaways-americas-rental-housing-2024 (accessed February 2, 2026).

FILED UNDER SEAL

initiated their housing search online.[325] More recent data from 2024 confirms the persistence of this pattern, as findings from Apartments.com survey conducted, based on responses from approximately 30,000 current and prospective renters, show that approximately 73% of renters rely on internet listing platforms as their primary search too, while 53% consult apartment community or property management websites and 46% use general search engines during the search process.[326]

569.    Internet listing platforms have therefore attained a prominent position for rental housing. Platforms such as RentCafe, a nationwide online listing service operated by Yardi, allows users to search and compare apartments and houses for rent across the United States.[327] Within this territory, RentCafe hosts listings for approximately 68,000 rental buildings, providing users with tools to search and compare rental housing and access property information.[328]

## A.3.    Revenue Management Software in Rental Housing

570.    Property owners and managers have increasingly adopted specialized software solutions to manage pricing and availability across their housing portfolios, shaping how rental prices are set, updated, and communicated to prospective tenants.

571.    Revenue management software for multifamily properties is a class of technology used by property owners and managers to price and adjust rental rates and optimize financial performance across a portfolio of units. Instead of relying on fixed or manually set rents, these systems claim to use data-driven analysis to align pricing with market conditions, demand patterns, local economic trends, and each property's financial goals.[329] Vendors such as Yardi represent that these systems analyze property-level operational data, such as availability, leasing traffic, new leases and competitive pricing, and apply predictive models and configurable optimization rules to the generate recommended rents across multiple lease terms and move-in dates.[330]

---

[325] "Online Search Behavior and Trends of Apartment Renters: A Joint Study by Apartments.com and Google," Apartments.com and Google, 2015, available at
https://www.shelterrealty.com/docs/Apartments_Google_WhitePaper.pdf (accessed February 2, 2026).
[326] "What do today's renters want?," Apartments.com, available at
https://www.apartments.com/grow/sites/apartments.com.advertise/files/2024-07/renter-survey-q2-2024.pdf
(hereinafter, "Renters Want") (accessed February 2, 2026).
[327] Renters Want.
[328] "Listings," RentCafe, available at https://www.rentcafe.com/sitemaps/listings/ (accessed February 2, 2026).
[329] Michael Zimmerman, "The Complete Guide to Multifamily Revenue Management," RentVision, August 27, 2025, available at https://www.rentvision.com/blog/the-complete-guide-to-multifamily-revenue-management
(accessed February 2, 2026).
[330] YARDI_DUFFY 00023964, p. 10.

FILED UNDER SEAL

**Figure 97: Revenue IQ Revenue Management Structure[331]**



572.    Revenue management software of this type often relies on algorithmic pricing models that use data inputs to generate rent recommendations for landlords. Depending on the configuration, certain systems may incorporate aggregated market or competitor data to inform pricing decisions across rental property portfolios.

573.    Within the revenue management software industry, Yardi Systems and RealPage are consistently recognized as established providers. RealPage, provides a range of technology-enabled services for property management, including several revenue management products such as YieldStar, AI Revenue Management, and Lease Rent Options ("LRO").[332] Yardi offers an integrated suite of digital products to support rental housing landlords. Among its offerings is a revenue management solution known as Revenue IQ, which is designed to assist property owners and managers in setting and adjusting rental rates and which integrates with its apartment listing service, RentCafe. I discuss Revenue IQ in further detail above in Section 5.

---

[331] YARDI_DUFFY 00023964, at -73.

[332] "United States of America et al. v. RealPage, Inc. et al.; Proposed Final Judgment and Competitive Impact Statement," Federal Register, December 5, 2025, available at https://www.federalregister.gov/documents/2025/12/05/2025-21966/united-states-of-america-et-al-v-realpage-inc-et-al-proposed-final-judgment-and-competitive-impact (accessed February 2, 2026).

FILED UNDER SEAL

# B.    Client Configurations

## B.1.    Yardi's Health Rule Configuration Analysis

574.    As mentioned in Section 5.1.3, I cross-check my analysis of clients' Health Rule configurations against an internal analysis Yardi prepared for June, August, and September of 2022. I present these results below:

**Figure 98: Yardi's Internal Analysis of Health Rule Configurations Confirms My Conclusions in Section 5.1.3[333]**



FILED UNDER SEAL

## B.2.    Categorization of Mr. Yenikomshian's Reconfiguration analysis

575.    In Table 10 below I tabulate the configuration changes estimated by Mr. Yenikomshian using the categorization explained in Section 5.1.4. Differently from Table 1 in Section 5.1.4, where I consider update and insertion changes, I base the following calculations on the count of configuration changes that include insertions, as estimated by Mr. Yenikomshian, at more than 4 million.

**Table 10: Categorization Shares Across Mr. Yenikomshian's Reconfiguration Tabulation, Including Insertions**[334]

| Category | Reconfiguration: | |
| --- | --- | --- |
| | Count | Share |
| Value Estimates | 492350 | 12% |
| Lease Expiration Targets | 491398 | 12% |
| Vacancy/Stale Units | 307062 | 8% |
| Price Floor/Minimums | 182736 | 5% |
| Lease Term | 176394 | 4% |
| Date Values | 100070 | 2% |
| Active Indicator | 48774 | 1% |
| Un-Categorized | 2005987 | 50% |

576.    Table 11 below shows the category to which I assign each configuration setting considered for my analysis in Section 5.1.4.

**Table 11: Categorization of Configuration Settings**[335]

| Table Name | Field Name | Category |
| --- | --- | --- |
| | dLeaseExpirationTargetMay | Lease Expiration Targets |
| | dLeaseExpirationTargetJun | Lease Expiration Targets |
| | dLeaseExpirationTargetJul | Lease Expiration Targets |

---

[334] Source: Configuration Data, Yenikomshian's Backup Materials.

[335] Source: Configuration Data. I exclude the configuration settings that I consider clearly relevant for the pricing output generated by Revenue IQ, i.e., "iAvailabilityTrendWeighting," "iNewLeasesTrendWeighting," "iDemandToSupplyTrendWeighting," "iRentRatioTrendWeighting," "sPriceRule," "dDegreeOfChangeCompRent," "bUseNetEffectiveRentRatio," "iBaseLeaseTerm," "iSamplePeriodLength."

| Table Name | Field Name | Category |
|---|---|---|
| | dLeaseExpirationTargetApr | Lease Expiration Targets |
| | dLeaseExpirationTargetAug | Lease Expiration Targets |
| | dLeaseExpirationTargetMar | Lease Expiration Targets |
| | dLeaseExpirationTargetSep | Lease Expiration Targets |
| | dLeaseExpirationTargetFeb | Lease Expiration Targets |
| | dLeaseExpirationTargetOct | Lease Expiration Targets |
| | dLeaseExpirationTargetJan | Lease Expiration Targets |
| | dLeaseExpirationTargetNov | Lease Expiration Targets |
| | dLeaseExpirationTargetDec | Lease Expiration Targets |
| | bUseLeaseExpirationManagement | Lease Expiration Targets |
| | bUseLeaseExpirationTargets | Lease Expiration Targets |
| | sLeaseExpirationCountType | Lease Expiration Targets |
| | FloorRent | Price Floor/Minimums |
| | dMinInc | Price Floor/Minimums |
| | dMinSurchargeAmount | Price Floor/Minimums |
| | bUseMinSurchargeAmount | Price Floor/Minimums |
| | dMinInc | Price Floor/Minimums |
| | iLeaseTermsOfferedMax | Lease Term |
| | iLeaseTermsOfferedMin | Lease Term |
| | bUseVariableLeaseTerms | Lease Term |

228

| Table Name | Field Name | Category |
|---|---|---|
| | iRenewalShortLeaseTerm | Lease Term |
| | bUseVariableNewLeaseTerms | Lease Term |
| | bUseNewLeaseTermPremium | Lease Term |
| | iLeaseTerm | Lease Term |
| | iRenewalFullLeaseTerm | Lease Term |
| | bCalcLeaseTermsByMonth | Lease Term |
| | iDaysVacant | Vacancy/Stale Units |
| | bUseStaleUnitPricing | Vacancy/Stale Units |
| | bUseAvgVacantDaysSeasonality | Vacancy/Stale Units |
| | bUseHistoricalAvgVacantDays | Vacancy/Stale Units |
| | sStaleUnitDiscountType | Vacancy/Stale Units |
| | bUseHistoricalDaysVacantCaps | Vacancy/Stale Units |
| | iHistoricalDaysVacantMaxCap | Vacancy/Stale Units |
| | iHistoricalDaysVacantAvgCap | Vacancy/Stale Units |
| | iHistoricalDaysVacantMinCap | Vacancy/Stale Units |
| | bEnableStaleUnitPriceRuleDiscountConditions | Vacancy/Stale Units |
| | sHistoricalDaysVacantTimeInterval | Vacancy/Stale Units |
| | bHistoricalDaysVacantAvgMed | Vacancy/Stale Units |
| | bUseOnlyVacantUnitsForSupply | Vacancy/Stale Units |

229

FILED UNDER SEAL

| Table Name | Field Name | Category |
|---|---|---|
| | bUseVacantAvailableUnits | Vacancy/Stale Units |
| | dtStartDate | Date Values |
| | dtEndDate | Date Values |
| | sStaleUnitDiscountStartDate | Date Values |
| | dtEndDate | Date Values |
| | dtStartDate | Date Values |
| | dtOccupancyDate | Date Values |
| | dEstimatedRenewalProb | Value Estimates |
| | dEstimatedAvgVacantDaysDec | Value Estimates |
| | dEstimatedAvgVacantDaysJan | Value Estimates |
| | dEstimatedAvgVacantDaysNov | Value Estimates |
| | dEstimatedAvgVacantDaysJun | Value Estimates |
| | dEstimatedAvgVacantDaysSep | Value Estimates |
| | dEstimatedAvgVacantDaysOct | Value Estimates |
| | dEstimatedAvgVacantDaysMay | Value Estimates |
| | dEstimatedAvgVacantDaysFeb | Value Estimates |
| | dEstimatedAvgVacantDays | Value Estimates |
| | dEstimatedAvgVacantDaysAug | Value Estimates |
| | dEstimatedAvgVacantDaysApr | Value Estimates |

FILED UNDER SEAL

| Table Name | Field Name | Category |
|---|---|---|
| | dEstimatedAvgVacantDaysJul | Value Estimates |
| | dEstimatedAvgVacantDaysMar | Value Estimates |
| | bUseEstimatedLEMConversionRatio | Value Estimates |
| | dEstimatedTrafficAug | Value Estimates |
| | dEstimatedTrafficMay | Value Estimates |
| | dEstimatedTrafficJun | Value Estimates |
| | dEstimatedTrafficMar | Value Estimates |
| | dEstimatedTrafficApr | Value Estimates |
| | dEstimatedTrafficSep | Value Estimates |
| | dEstimatedTrafficJul | Value Estimates |
| | dEstimatedTrafficFeb | Value Estimates |
| | dEstimatedLEMConversionRatio | Value Estimates |
| | dEstimatedTrafficOct | Value Estimates |
| | dEstimatedTrafficJan | Value Estimates |
| | dEstimatedTrafficNov | Value Estimates |
| | dEstimatedTrafficDec | Value Estimates |
| | bActive | Active Indicator |
| | dMarketRentStepAmount | Un-Categorized |
| | dPriceImpactModifier | Un-Categorized |
| | dMaxInc | Un-Categorized |

FILED UNDER SEAL

| Table Name | Field Name | Category |
|---|---|---|
| | iPriceMax | Un-Categorized |
| | iPriceMin | Un-Categorized |
| | dIncrease | Un-Categorized |
| | dAmount | Un-Categorized |
| | iTermNumber | Un-Categorized |
| | iUnitHoldSurchargeDays | Un-Categorized |
| | dMakeReadyAverageCost | Un-Categorized |
| | iRenewalRuleRangeMax | Un-Categorized |
| | bCarryForwardUndecidedExp | Un-Categorized |
| | iRenewalRuleRangeMin | Un-Categorized |
| | bIncreaseToNewLeaseRent | Un-Categorized |
| | bUseNoticePremium | Un-Categorized |
| | bCreateMTMRenewal | Un-Categorized |
| | iRentOverride | Un-Categorized |
| | iCeilingRent | Un-Categorized |
| | bUseNewLeaseBestPriceOverride | Un-Categorized |
| | dNoticePremiumAmount | Un-Categorized |
| | sPriceRuleImpactType | Un-Categorized |
| | dStrongPositiveTrendsMultiplier | Un-Categorized |
| | dStrongNegativeTrendsMultiplier | Un-Categorized |

FILED UNDER SEAL

| Table Name | Field Name | Category |
|---|---|---|
| | bUseRenewalPriceRules | Un-Categorized |
| | dRenewalPricingRulesMTMCapAmount | Un-Categorized |
| | bAllowRentDecreaseShortToFullTerms | Un-Categorized |
| | dAmount | Un-Categorized |
| | bUseApprovedApplicationsWithLEM | Un-Categorized |
| | sUnitHoldSurchargeCalculationMethod | Un-Categorized |
| | iLeaseExpManagementWeightingYear1 | Un-Categorized |
| | dMaxSurchargeAmount | Un-Categorized |
| | bUseMaxSurchargeAmount | Un-Categorized |
| | sHistoricalDataTimeInterval | Un-Categorized |
| | bUseHistoricalRenewalProb | Un-Categorized |
| | bAllowLowerPricesForAboveNewLease | Un-Categorized |
| | iLeaseExpManagementWeightingYear2 | Un-Categorized |
| | sTrafficDemandIndicator | Un-Categorized |
| | bUseMinLeaseLossGain | Un-Categorized |
| | bAllowLowerPricesForBelowNewLease | Un-Categorized |

FILED UNDER SEAL

| Table Name | Field Name | Category |
|---|---|---|
| | iLeaseExpManagementWeighting Year3 | Un-Categorized |
| | dMaxDec | Un-Categorized |
| | sRenewalPricingRulesMTMCapType | Un-Categorized |
| | sAllowLowerRentForAboveCurrentTermMax | Un-Categorized |
| | bUseRenewalRatiosWithLEMTargets | Un-Categorized |
| | bUseReferenceRentChangeSchedule | Un-Categorized |
| | bAllowLowerRentForAboveNewLeaseGreaterTerm | Un-Categorized |
| | sAllowLowerRentForBelowCurrentTermMax | Un-Categorized |
| | bUseProtectedTerms | Un-Categorized |
| | sCounty | Un-Categorized |
| | bUseMaxMonthsToSurcharge | Un-Categorized |
| | bUseRenewalPricing | Un-Categorized |
| | bAllowLowerRentForBelowNewLeaseGreaterTerm | Un-Categorized |
| | bUseUnitHoldSurcharge | Un-Categorized |
| | iTermNumber | Un-Categorized |
| | sNewLeaseCountType | Un-Categorized |
| | bUseHistoricalTraffic | Un-Categorized |

FILED UNDER SEAL

| Table Name | Field Name | Category |
|---|---|---|
| | bUseAutomatedRENTmaximizerSurveys | Un-Categorized |
| | bApplyMinIncreaseToAllRenewalTerms | Un-Categorized |
| | bApplyMaxIncreaseToAllRenewalTerms | Un-Categorized |
| | bUseRenewalPercentWithCarryForwardUndecidedExp | Un-Categorized |
| | bPriceWaitlistUnits | Un-Categorized |
| | iProtectedTermMin | Un-Categorized |
| | bRemoveTurnCostFromLongerTerms | Un-Categorized |
| | iProtectedTermMax | Un-Categorized |
| | iMaxMonthsToSurcharge | Un-Categorized |
| | dMinLeaseLossGain | Un-Categorized |
| | bUseRentCeiling | Un-Categorized |
| | sCompDataSource | Un-Categorized |
| | iRemoveTurnCostsAtAndAboveTerm | Un-Categorized |
| | bDeactivate | Un-Categorized |
| | sHistoricalRenewalProbabilityTimeInterval | Un-Categorized |
| | sAllowLowerRentForAboveCurrentTermMin | Un-Categorized |
| | bUseRentControl | Un-Categorized |

FILED UNDER SEAL

| Table Name | Field Name | Category |
|---|---|---|
| | sRoundingBehaviorType | Un-Categorized |
| | sAllowLowerRentForBelowCurrentTermMin | Un-Categorized |
| | dDegreeOfChangeAvailability | Un-Categorized |
| | bUseCustomTermForCarryForwardUndecidedExp | Un-Categorized |
| | iUnitHoldDaysForOccupiedNoNotice | Un-Categorized |
| | bUseHealthOfLeaseResidencyLengthPriceRules | Un-Categorized |
| | bUseCustomHoldDaysForOccupiedNoNotice | Un-Categorized |
| | bApplyMaxDecreaseToAllRenewalTerms | Un-Categorized |
| | iAutomatedRENTmaximizerSurveyFrequency | Un-Categorized |
| | dPercent | Un-Categorized |
| | bUsePropertyLevelUnitCounts | Un-Categorized |
| | iRentCeilingTermType | Un-Categorized |
| | dNewMarketBaseRent | Un-Categorized |
| | sRentRatioType | Un-Categorized |
| | sCondition | Un-Categorized |
| | bUseResidencyLengthPriceRules | Un-Categorized |

FILED UNDER SEAL

| Table Name | Field Name | Category |
|---|---|---|
| | iCustomTermForCarryForwardUndecidedExp | Un-Categorized |
| | dScheduledMarketRentStepAmount | Un-Categorized |
| | sHealthPriceRuleImpactType | Un-Categorized |
| | bUseRentCeilingForRenewals | Un-Categorized |
| | sAutomatedSurveySource | Un-Categorized |
| | dShortToFullTermRentDecreaseCapAmount | Un-Categorized |
| | bCapRentDecreaseShortToFullTerms | Un-Categorized |
| | bUseCalculatedMinDemand | Un-Categorized |
| | bUseConcessionRecovery | Un-Categorized |
| | dMaxInc | Un-Categorized |
| | dPriceImpactModifier | Un-Categorized |
| | iTermNumber | Un-Categorized |
| | sTrafficConversionType | Un-Categorized |
| | dPriceImpactModifier | Un-Categorized |
| | iMaxResidencyMonths | Un-Categorized |

| Table Name | Field Name | Category |
|---|---|---|
| | iMinResidencyMonths | Un-Categorized |
| | sPriceRuleImpactType | Un-Categorized |
| | iResidencyMonths | Un-Categorized |
| | dMaxDec | Un-Categorized |

## C.  Call Notes Between Mr. Fazio and the TAMs

### C.1.  2020-2024, TAM Notes of Below-Benchmark Instances

577.  Counsel collected and shared with me TAM notes dated from March 2020 to March 2024, focusing on instances where Mr. Fazio commented about properties pricing below their benchmarks. The complete list is provided in my backup materials.

578.  Of these, I consider notes referring to Landlord Defendant properties, based on matching the property names mentioned in the notes with the "Property Name" values of the Lease Data.

### C.2.  Post-2023 TAM Notes Relying on CPD Data

579.  Counsel collected TAM notes from January 2023 to March 2024, i.e., approximately after Mr. Fazio transitioned to using the CPD data for his analysis. This set of notes includes both instances where Mr. Fazio noted properties pricing below and above benchmark, and no benchmark comparison. The complete list is provided in my backup materials.

### C.3.  TAM Note Categorization Search Algorithm

580.  To identify notes between Mr. Fazio and the TAMs where they made efforts to record a property pricing below its benchmark, I search for entries explicitly noting prices or rents below or lagging their benchmark set, with the following two search expressions:

FILED UNDER SEAL

- ▪ "(priced|price|pricing|income|per                                    unit amount|NRI|rent).+(below|lagging|trails|trailing) (matrix|market|sim|comp|benchmark|average)"

- ▪ "(discounted|discount) (to|vs) (matrix|market|sim|comp|benchmark)"

581. To identify above benchmark pricing notes, I apply the inverse search logic and further broaden this to also include any reference to prices being "too high" even without a benchmark comparison using the following expressions:

- ▪ "(priced|price|pricing|income|per        unit        amount|NRI|rent).+(above) (matrix|market|sim|comp|benchmark|average)"

- ▪ "(priced|price|pricing|income|per unit amount|NRI|rent).+too high"

582. In the above search expressions, parentheses `()` indicate groups of text separated by OR statements via `|`. This allows any item within that parenthesis to satisfy the search criteria. The `.+` allows any string of text to come between two sets of `()` - otherwise the search algorithm simply looks for a space between words.  The search criteria looks for matching strings of text where any item in a `()` grouping is next to any item in an adjoining `()` grouping.

## C.4.  Price Indices of Each Landlord Defendant Property Flagged in TAM Call Notes

583. The chart below plots a price index for each of the Landlord Defendant properties mentioned in Mr. Fazio's TAM call notes. Rather than plotting months on the x-axis, I normalize to show the months before and after each property's first TAM call.

**Figure 99: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing**[336]



---

[336] Sources: Expanded Lease Data; TAM Notes of Below-Benchmark Instances. Notes: I compute an index applying Equation 16 to the lease data to each property I find mentioned in the TAM call notes (for pricing below the benchmark) and across all those considered properties. The chart plots the index vs. the number of months leading to and following the first TAM call received by each property ("Months From Call" in the x axis), with a vertical line at zero for the month of the first call for each property. For 14 properties mentioned in the TAM notes, the same property name corresponds to two different property ID's (Revenue IQ Property ID). I filter these out for the current analysis.

FILED UNDER SEAL

## D.  **Appendix to Section 9**

### D.1.  **Appendix to 9.2.1**

**Figure 100: Revenue IQ Users Charge Similar Rents to RealPage Users & Higher Rents than Non-RM Users[337]**



---

[337] Sources: Quarterly Performance Analyses. Notes: I am able to locate 20 performance analyses spreadsheets that contain data for "In Place Rent Per Unit," spanning a period from January 2018 to September 2024, and missing months from February to June 2019. Each spreadsheet contains monthly averages for a specific period of twelve months. I collect data on "In Place Rent Per Unit" under the tab named "Monthly by Vendor," where data is provided for Yardi,  non-RM users, YieldStar (the software owned by RealPage), and Rainmaker (RealPage's software LRO ("Lease Rent Operations")), Starting in July 2021, I find spreadsheets that exclude landlord "███████ ████████" from the analysis, and, after an overlapping period from July 2021 until March 2022, I can only locate analyses that exclude the landlord from the calculations. This chart presents both the data including and excluding ████████ until March 2022. Whenever multiple performance analyses workbooks contain data on the same variable for the same months, and data differs slightly, I consider the average of those values.

241

### D.2.    Appendix to 9.2.2

584. Below, I repeat my analysis from Figure 88 above, but use the "approx unit count" instead of the number of Landlord Defendant active leases.[338]

**Figure 101: Yardi Rent Index vs. Rent CPI & Yardi Approx. Unit Count[339]**



─ ─  CPI: Rent of Primary Residence, U.S. City Average    ──── Yardi Lease Price Index    ▮ Yardi Approx. Tot. Unit Count

---

[338] The "Approx Unit Count" value is "an approximation of the total number of units in the subject property and may differ from the actual total" (YARDI-DUFFY_00913148). Note that for 6.2% observations of the Lease Data (YARDI-DUFFY_00913149), the "Approx Unit Count" variable equals zero. From "Duffy - Yardi May 17, 2024 Production Cover Letter," [t]his could be because a client ceased operating the property at some point and may have inactivated the property in their Voyager system or marked all of the units as "Excluded," which prevents them from being counted. – NB: this is a cover letter not of the lease data, but of other csv's queried from RevIQ and also having the approx. unit variable.

[339] Sources: Expanded Lease Data; Rent CPI. Notes: I compute the Yardi lease price index applying equation 16 to the monthly effective rents of Landlord Defendants' units, identified by the "Revenue IQ Unit ID" variable of the lease data. I rebase the rent CPI to start in February 2011, i.e., the first lease month in the Lease Data for which I can compute the Yardi lease price index. I compute the approximate total unit count, displayed in the blue bars behind the two indices' orange lines, by summing the "Approx Unit Count" of each property by month. The variable is defined as the "Count of apartment unit records entered into Voyager for the associated property." As indicated by Yardi, this is "an approximation of the total number of units in the subject property and may differ from the actual

**Figure 102: Yardi Index Premium as a Function of Approx. Unit Count[340]**



total" (see YARDI-DUFFY_00913148). Figure 88 in Section 9.2.2 presents an alternative version of this chart, with the same two lines for the indices, but where the blue bars show the count of units with an active lease in Landlord Defendants' properties instead of the total number of units. For more information on how the rent CPI is calculated, *see* Bureau of Labor Statistics.

[340] Sources: Expanded Lease Data; Rent CPI. Notes: Each point in the chart corresponds to a month, from February 2011 to August 2025, with the corresponding number of total units (using the "Approx Unit Count" variable of the lease data) and Yardi premium as x and y coordinates, respectively. I compute the Yardi lease price index applying equation 16 to the monthly effective rents of Landlord Defendants' units, identified by the "Revenue IQ Unit ID" variable of the lease data. I rebase the rent CPI to start in February 2011, i.e., the first lease month in the Lease Data for which I can compute the Yardi lease price index. I compute the approximate total unit count, displayed in the blue bars behind the two indices' orange lines, by summing the "Approx Unit Count" of each property by month. The variable is defined as the "Count of apartment unit records entered into Voyager for the associated property." As indicated by Yardi, this is "an approximation of the total number of units in the subject property and may differ from the actual total" (see YARDI-DUFFY_00913148). Figure 89 in Section 9.2.2 presents an alternative version of this chart, where the x-axis shows the count of units with an active lease instead of the total number of units in Landlord Defendants' properties.

FILED UNDER SEAL

### D.3.    Appendix to 9.2.3

#### D.3.1.   PUMA 0606707: Sacramento County (West), CA

**Figure 103: Steep Unit Increase in Sacramento County (West) – Measured by Active Leased Units[341]**



[341] Sources: Expanded and Geocoded Lease Data. Notes: I filter the lease data to PUMA 0606707, corresponding to Sacramento County (West)--Sacramento City (Central/Downtown & Midtown), California, both according to the 2010 and the 2020 ACS geographic boundaries (*see* "2010 PUMA Names File," U.S. Census Bureau, available at https://www2.census.gov/geo/pdfs/reference/puma/2010_PUMA_Names.pdf (accessed February 8, 2026) and "2020 PUMA Names File," U.S. Census Bureau, available at https://www2.census.gov/geo/pdfs/reference/puma2020/2020_PUMA_Names.pdf (accessed February 8, 2026)). To estimate the number of active units, I count the unique number of unit ID's (identified by the "Revenue IQ Unit ID" variable in the lease data) considering the active leases at any month in the dataset.

244

**Figure 104: "_____" Property Entry Accounts for Most of the May 2021 Increase In Revenue IQ Adoption in Sacramento County (West)[342]**



"Approx Unit Count" defined as the "Count of apartment unit records entered into Voyager for the associated property."
As indicated by Yardi, this is "an approximation of the total number of units in the subject property and may differ from the actual total"
(see YARDI-DUFFY_00913148).

### D.3.2.    PUMA 2602907: Oakland County (South Central), MI

585.    In addition to Sacramento County (West), I identify an additional PUMA, i.e., PUMA 2602907, corresponding to Oakland County (South Central), in Michigan, where I notice a steep increase in active unit count, followed by a transition from approximately stable to parallel pricing for Landlord Defendant properties. I present this case study in an appendix rather than in Section 9.2.3 since the "Approx Unit Count" variable for the pre-existing property ("_____" below) takes value zero in the Lease Data. There is no clear explanation for this data anomaly in the produced lease transaction data.

---

[342] Sources: Expanded and Geocoded Lease Data. Notes: I apply Lease data standard cleaning; plus: 1. I filter the lease data to PUMA 0606707, corresponding to Sacramento County (West)--Sacramento City (Central/Downtown & Midtown), California, both according to the 2010 and the 2020 ACS geographic boundaries 2. I consider the "Approx. Unit Count" variable to compute the cumulative unit count in the considered PUMA 3. "Approx Unit Count" is defined as the "Count of apartment unit records entered into Voyager for the associated property." As indicated by Yardi, this is "an approximation of the total number of units in the subject property and may differ from the actual total" (see YARDI-DUFFY_00913148).

FILED UNDER SEAL

**Figure 105: Steep Increase Revenue IQ Adoption in Oakland County (South Central), MI –
Measured by Active Leased Units[343]**



[343] Sources: Expanded and Geocoded Lease Data. Notes: I filter the lease data to PUMA 2602907, corresponding to Oakland County (South Central) - Farmington & Southfield Area, Michigan, both according to the 2010 and the 2020 ACS geographic boundaries (*see* "2010 PUMA Names File," U.S. Census Bureau, available at https://www2.census.gov/geo/pdfs/reference/puma/2010_PUMA_Names.pdf (accessed February 8, 2026) and "2020 PUMA Names File," U.S. Census Bureau, available at https://www2.census.gov/geo/pdfs/reference/puma2020/2020_PUMA_Names.pdf (accessed February 8, 2026). To estimate the number of active units, I count the unique number of unit ID's (identified by the "Revenue IQ Unit ID" variable in the lease data) considering the active leases at any month in the dataset.

FILED UNDER SEAL

**Figure 106: When Revenue IQ Adoption Increased in Oakland County (South Central), MI, Landlord Defendants Transitioned From Almost Flat Pricing to Parallel[344]**



### D.4. Appendix to 9.2.4

586.    In this appendix, I repeat my econometric specification from Section 9.2.4 but estimate my regressions on the first-differences of Landlord Defendants' lease pricing, defined as:

$$\Delta r_{u,t,p} = r_{u,t,p} - r_{u,t-1,p} \qquad (26)$$

587.    "First-differences" means the period-on-period change, i.e. change in rental prices when the lease changes (either a new or renewal lease). That yields the following equations:

$$\Delta r_{u,t,p} = \beta_0 + \beta_1 \mu_{t,p} + \epsilon_{u,t} \qquad (27)$$

---

[344] Sources: Expanded and Geocoded Lease Data. Notes: I filter the lease data to PUMA 2602907, corresponding to Oakland County (South Central) - Farmington & Southfield Area, Michigan, both according to the 2010 and the 2020 ACS geographic boundaries (*see* "2010 PUMA Names File," U.S. Census Bureau, available at https://www2.census.gov/geo/pdfs/reference/puma/2010_PUMA_Names.pdf (accessed February 8, 2026) and "2020 PUMA Names File," U.S. Census Bureau, available at https://www2.census.gov/geo/pdfs/reference/puma2020/2020_PUMA_Names.pdf (accessed February 8, 2026).

FILED UNDER SEAL

$$\Delta r_{u,t,p} = \alpha_u + \beta_1 \mu_{t,p} + \epsilon_{u,t} \tag{28}$$

$$\Delta r_{u,t,p} = \alpha_u + \tau_t + \beta_1 \mu_{t,p} + \epsilon_{u,t} \tag{29}$$

$$\Delta r_{u,t,p} = \beta_0 + \beta_1 \mu_{t,p} + \beta_2 CPI_t + \epsilon_{u,t} \tag{30}$$

$$\Delta r_{u,t,p} = \alpha_u + \beta_1 \mu_{t,p} + \beta_2 CPI_t + \epsilon_{u,t} \tag{31}$$

588.    I present these estimates below in Table 12:

**Table 12: Robust Econometric Estimation – on First-Differences – Further Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants[345]**

|  | (27) | (28) | (29) | (30) | (31) |
|---|---|---|---|---|---|
| Intercept | 60.585*** |  |  | 127.825*** |  |
|  | (0.462) |  |  | (2.583) |  |
| Co-Conspirator Count Per PUMA | 4.333*** | 11.495*** | 4.288*** | 4.867*** | 15.674*** |
|  | (0.125) | (0.591) | (0.643) | (0.127) | (0.630) |
| Rent CPI |  |  |  | -0.470*** | -0.999*** |
|  |  |  |  | (0.019) | (0.040) |
| Num.Obs. | 436334 | 294851 | 294850 | 436334 | 294851 |
| R2 | 0.003 | 0.257 | 0.345 | 0.004 | 0.259 |
| R2 Adj. | 0.003 | -0.173 | -0.035 | 0.004 | -0.170 |
| R2 Within |  | 0.002 | 0.000 |  | 0.005 |
| R2 Within Adj. |  | 0.002 | 0.000 |  | 0.005 |
| Std.Errors | Heteroskedasticity-robust | by: revenue.iq.unit.id | Newey-West (L=3) | Heteroskedasticity-robust | by: revenue.iq.unit.id |
| FE: revenue.iq.unit.id |  | X | X |  | X |
| FE: month |  |  | X |  |  |

+ p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001

---

[345] Sources: Expanded Lease Data; Rent CPI. Notes: The third regression uses Newey-West (HAC) standard errors, correcting for potential heteroskedasticity and autocorrelation. The lag length is set to 3, meaning that the correction takes into account autocorrelation of the errors up to three periods back.

FILED UNDER SEAL

# E.   Materials Relied Upon

## E.1.   Academic Articles

| |
|---|
| David Gill and John Thanassoulis, "Competition in Posted Prices With Stochastic Discounts," Oxford University Press, August, 2016, available at https://www.jstor.org/stable/44076865 (accessed January 9, 2026). |
| Douglas D. Davis and Charles A. Holt, "The effects of discounting opportunities in laboratory posted-offer markets," Economics Letters, 1994, available at https://www.sciencedirect.com/science/article/abs/pii/016517659300342L (accessed February 4, 2026). |
| Eric Maskin and Jean Tirole, "A Theory of Dynamic Oligopoly, II: Price Competition, Kinked Demand Curves, and Edgeworth Cycles," Econometrica, May, 1988, available at https://www.jstor.org/stable/1911701 (accessed February 3, 2026). |
| Gregory C. Chow, "Tests of Equality Between Sets of Coefficients in Two Linear Regressions," Econometrica, July, 1960, available at https://www.jstor.org/stable/1910133?seq=1 (accessed February 5, 2026). |
| Jason O'Connor and Nathan E. Wilson, "Reduced demand uncertainty and the sustainability of collusion: How AI could affect competition," Information Economics and Policy, 2021, available at https://www.sciencedirect.com/science/article/abs/pii/S0167624520301268 (accessed January 13, 2026). |
| Jeanine Miklós-Thal and Catherine Tucker, "AI, Algorithmic Pricing, and Collusion," CPI Antitrust Chronicle, February, 2024, available at https://simon.rochester.edu/sites/default/files/2024-03/2-AI-ALGORITHMIC-PRICING-AND-COLLUSION-Jeanine-Miklos-Thal-Catherine-Tucker.pdf (accessed January 23, 2026). |
| Jeanine Miklós-Thal and Catherine Tucker, "Collusion by Algorithm: Does Better Demand Prediction Facilitate Coordination Between Sellers?," Management Science, April, 2019, available at https://www.jstor.org/stable/48760658 (accessed January 13, 2026). |
| Jeffrey M. Perloff, "Microeconomics," Seventh Edition, Pearson Education, Inc., 2015, available at https://unitimesofficial.wordpress.com/wp-content/uploads/2021/03/microeconomics-seventh-edition-by-jeffrey-m.-perloff.pdf (accessed February 6, 2026). |
| Joseph E. Harrington, "A Critique of Recent Remedies for Third-Party Pricing Algorithms and Why the Solution Is Not Restrictions On Data Sharing," Journal of Competition Law & Economic, August 19, 2025, available at https://doi.org/10.1093/joclec/nhaf022 (accessed January 28, 2026). |

FILED UNDER SEAL

Joseph E. Harrington, "How Do Cartels Operate?," Foundations and Trends in Microeconomics, 2006, available at https://joeharrington5201922.github.io/pdf/fnt06.pdf (accessed February 4, 2026).

Joseph E. Harrington, "Hub-and-Spoke Collusion With a Third-Party Pricing Algorithm," The Journal of Industrial Economics, January 13, 2026, available at https://onlinelibrary.wiley.com/doi/10.1111/joie.70017 (accessed January 28, 2026).

Joseph E. Harrington, "The Anticompetitiveness of a Private Information Exchange of Prices," International Journal of Industrial Organization, 2022, available at https://joeharrington5201922.github.io/pdf/ijio22.pdf (accessed January 13, 2026).

Joseph E. Harrington, "An economic test for an unlawful agreement to adopt a third-party's pricing algorithm," Economic Policy, January, 2025, available at https://academic.oup.com/economicpolicy/article-abstract/40/121/261/7772481 (accessed January 13, 2026).

Juan Ortner, Takuo Sugaya and Alexander Wolitzky, "Mediated Collusion," Journal of Political Economy, 2024, available at https://people.bu.edu/jortner/static/mediated%20collusion%20final%20one%20doc.pdf (accessed January 13, 2026).

Robert W. Staiger and Frank A. Wolak, "Collusive Pricing with Capacity Constraints in the Presence of Demand Uncertainty," The RAND Journal of Economics, 1992, available at https://www.jstor.org/stable/2555984 (accessed January 13, 2026).

Sophie Calder-Wang and Gi Heung Kim, "Algorithmic Pricing in Multifamily Rentals: Efficiency Gains or Price Coordination?," August 16, 2024, available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4403058 (accessed January 9, 2026).

Stephanie Assad, Robert Clark, Daniel Ershov and Lei Xu, "Algorithmic Pricing and Competition: Empirical Evidence from the German Retail Gasoline Market," Journal of Political Economy, March, 2024, available at https://doi.org/10.1086/726906 (accessed January 13, 2026).

Takuo Sugaya and Alexander Wolitzky, "Collusion with Optimal Information Disclosure," January 17, 2025, available at https://economics.mit.edu/sites/default/files/inline-files/disclosure%20January%202025%20final.pdf (accessed January 15, 2026).

Takuo Sugaya and Alexander Wolitzky, "Maintaining Privacy in Cartels," Journal of Political Economy, December, 2018, available at https://www.jstor.org/stable/26550551 (accessed January 14, 2026).

Timothy N. Cason, Daniel Friedman and Garrett H. Milam, "Bargaining versus posted price competition in customer markets," International Journal of Industrial Organization, 2003, available

FILED UNDER SEAL

| at https://www.sciencedirect.com/science/article/abs/pii/S0167718702000565 (accessed February 4, 2026). |
| --- |
| Willem H. Boshoff and Johannes Paha, "List Price Collusion," Journal of Industry, Competition and Trade, April 20, 2021, available at https://link.springer.com/article/10.1007/s10842-021-00360-w (accessed January 9, 2026). |

## E.2.   Depositions

| October 30, 2025, Deposition of Michael Thompson, deposed by Theodore Wojcik (for Plaintiffs) and by David Sarratt (for Defendants) |
| --- |
| November 5, 2025, Deposition of Anthony Fazio, deposed by Rio Pierce (for Plaintiffs) and by Abraham Tabaie (for Defendants) |
| November 14, 2025, Deposition of Liana Rao, deposed by Rio Pierce (for Plaintiffs) and by David Sarratt (for Defendants) |

## E.3.   Declarations

| November 24, 2025, Declaration Of Michael Gaeta In Support Of Defendant Yardi Systems, Inc.'S Motion For Summary Judgment |
| --- |
| November 24, 2025, Declaration Of Mihran Yenikomshian In Support Of Yardi Systems, Inc.'S Motion For Summary Judgment |
| November 24, 2025, Declaration Of Michael Mitzenmacher In Support Of Yardi Systems, Inc.'S Motion For Summary Judgment |

## E.4.   Public Documents

| "12 U.S.C. §1713 - Rental Housing Insurance," Cornell Law School, Legal Information Institute, available at https://www.law.cornell.edu/uscode/text/12/1713#a_6 (accessed February 2, 2026). |
| --- |
| "2010 PUMA Names File," U.S. Census Bureau, available at https://www2.census.gov/geo/pdfs/reference/puma/2010_PUMA_Names.pdf (accessed February 8, 2026). |
| "2020 Census Tracts," Data.gov, available at https://catalog.data.gov/dataset/census-tracts (accessed February 2, 2026). |
| "2020 PUMA Names File," U.S. Census Bureau, available at https://www2.census.gov/geo/pdfs/reference/puma2020/2020_PUMA_Names.pdf (accessed February 8, 2026). |
| "2021 Rental Housing Finance Survey Glossary of Terms," U.S. Department of Housing and Urban Development and U.S. Census Bureau, available at https://www2.census.gov/programs-surveys/rhfs/technical-documentation/glossary/2021/2021-RHFS-Glossary-5-24-21.pdf (accessed February 8, 2026). |
| "American Community Survey and Puerto Rico Community Survey Design and Methodology," December 20, 2024, available at https://www2.census.gov/programs- |

FILED UNDER SEAL

surveys/acs/methodology/design_and_methodology/2024/acs_design_methodology_ch13_2024.pdf (accessed Febraury 8, 2026).

Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average (CUUR0000SEHA), Federal Reserve Bank of St. Louis, available at https://fred.stlouisfed.org/series/CUUR0000SEHA# (accessed February 5, 2026).

''Definitions & Source Links,'' The Data Center Research, available at https://www.datacenterresearch.org/data-resources/neighborhood-data/definitions/ (accessed February 2, 2026).

First Amended Complaint, United States v. RealPage, Inc., No. 1:24-cv-00710-WLO-JLW (M.D.N.C. Jan. 7, 2025).

Gabriel Melmed, ''What's Happening to the Cost of Rent in the United States,'' Economics Observatory, May 7, 2025, available at https://www.economicsobservatory.com/whats-happening-to-the-cost-of-rent-in-the-united-states?hl=en-US (accessed February 2, 2026).

''How Revenue IQ Apartment Unit Pricing Works,'' Yardi, August 16, 2024, available at https://www.yardi.com/news/legal-news/how-revenue-iq-apartment-unit-pricing-works/ (accessed February 4, 2026).

''Listings,'' RentCafe, available at https://www.rentcafe.com/sitemaps/listings/ (accessed February 2, 2026).

Mark P. Keightley, ''Ownership of the U.S. Rental Housing Stock by Investor Type: In Brief,'' Congress.gov, December 13, 2022, available at https://www.congress.gov/crs-product/R47332 (accessed February 2, 2026).

''Measuring Price Change in the CPI: Rent and Rental Equivalence,'' U.S. Bureau of Labor Statistics, available at https://www.bls.gov/cpi/factsheets/owners-equivalent-rent-and-rent.htm (accessed February 5, 2026).

Michael Zimmerman, ''The Complete Guide to Multifamily Revenue Management,'' RentVision, August 27, 2025, available at https://www.rentvision.com/blog/the-complete-guide-to-multifamily-revenue-management (accessed February 2, 2026).

''Multifamily Market Data and Analysis,'' Yardi Matrix, available at https://www.yardimatrix.com/Property-Types/Multifamily (accessed February 2, 2026).

''Multifamily Property Ratings,'' Yardi Matrix, available at https://www.yardimatrix.com/About-Us/Our-Methods/How-We-Define-The-Apartment-Supply/Property-Ratings (accessed February 2, 2026).

''Online Search Behavior and Trends of Apartment Renters: A Joint Study by Apartments.com and Google,'' Apartments.com and Google, 2015, available at https://www.shelterrealty.com/docs/Apartments_Google_WhitePaper.pdf (accessed February 2, 2026).

''Our Team and Board,'' Grubb Properties, available at https://www.grubbproperties.com/about-us/our-team-and-board (accessed February 3, 2026).

''Pearson Correlation,'' Science Direct, available at https://www.sciencedirect.com/topics/computer-science/pearson-correlation (accessed February 5, 2026).

''Population of the largest metropolitan areas in the United States in 2023,'' Statista, available at https://www.statista.com/statistics/183600/population-of-metropolitan-areas-in-the-us/ (accessed February 5, 2026).

| Proposed Final Judgment, United States v. Cortland Mgmt., LLC, No. 1:24-cv-00710-LCB-JLW (M.D.N.C. filed Jan. 7, 2025), ECF No. 49-1. |
| Proposed Final Judgment, United States v. RealPage, Inc., No. 1:24-cv-00710-WO-JLW, (M.D.N.C. Nov. 24, 2025), Document No. 159-1. |
| ''Public Use Microdata Area: Description,'' IPUMS USA, available at https://usa.ipums.org/usa-action/variables/PUMA#description_section (accessed February 2, 2026). |
| ''Public Use Microdata Areas (PUMAs),'' United States Census Bureau, available at https://www.census.gov/programs-surveys/geography/guidance/geo-areas/pumas.html (accessed February 2, 2026). |
| ''Rent Your Happy Place,'' RentCafe, available at  https://www.rentcafe.com/ (accessed February 4, 2026). |
| ''Revenue IQ,'' Yardi, available at https://www.yardi.com/product/revenue-iq/ (accessed February 4, 2026). |
| ''Revenue Methods Multi family,'' Indusmen, available at https://www.indusmen.com/article/revenue-methods-multi-family/ (accessed February 2, 2026). |
| Robert Cage, John Greenlees, and Patrick Jackman, ''Introducing the Chained Consumer Price Index,'' U.S. Bureau of Labor Statistics, 2003, available at https://www.bls.gov/cpi/additional-resources/chained-cpi-introduction.pdf (accessed February 4, 2025). |
| ''Survey of Construction (SOC) Definitions,'' United States Census Bureau, available at https://www.census.gov/construction/soc/definitions.html (accessed February 2, 2026). |
| ''Types of Multifamily Housing,'' HelloData.ai, available at https://www.hellodata.ai/help-articles/types-of-multifamily-housing (accessed February 2, 2026). |
| ''United States of America et al. v. RealPage, Inc. et al.; Proposed Final Judgment and Competitive Impact Statement,'' Federal Register, December 5, 2025, available at https://www.federalregister.gov/documents/2025/12/05/2025-21966/united-states-of-america-et-al-v-realpage-inc-et-al-proposed-final-judgment-and-competitive-impact (accessed February 2, 2026). |
| ''What do today's renters want?,'' Apartments.com, available at https://www.apartments.com/grow/sites/apartments.com.advertise/files/2024-07/renter-survey-q2-2024.pdf (accessed February 2, 2026). |
| Whitney Airgood-Obrycki and Sophia Wedeen, ''Six Takeaways from America's Rental Housing 2024,'' Harvard University Joint Center for Housing Studies, January 25, 2024, available at https://www.jchs.harvard.edu/blog/six-takeaways-americas-rental-housing-2024 (accessed February 2, 2026). |
| Whitney Airgood-Obrycki, ''The Record-Breaking Rental Market,'' Harvard University Joint Center for Housing Studies, February 1, 2022, available at https://www.jchs.harvard.edu/blog/record-breaking-rental-market (accessed February 2, 2026). |

### E.5.  Bates number

| YARDI-DUFFY_00000077 |
| YARDI-DUFFY_00000155 |
| YARDI-DUFFY_00000169 |

FILED UNDER SEAL

| |
|---|
| YARDI-DUFFY_00013973 |
| YARDI-DUFFY_00023964 |
| YARDI-DUFFY_00024130 |
| YARDI-DUFFY_00024629 |
| YARDI-DUFFY_00025354 |
| YARDI-DUFFY_00028320 |
| YARDI-DUFFY_00028365 |
| YARDI-DUFFY_00028395 |
| YARDI-DUFFY_00028790 |
| YARDI-DUFFY_00031203 |
| YARDI-DUFFY_00031613 |
| YARDI-DUFFY_00035860 |
| YARDI-DUFFY_00067102 |
| YARDI-DUFFY_00072967 |
| YARDI-DUFFY_00073037 |
| YARDI-DUFFY_00077173 |
| YARDI-DUFFY_00096779 |
| YARDI-DUFFY_00149297 |
| YARDI-DUFFY_00159005 |
| YARDI-DUFFY_00164470 |
| YARDI-DUFFY_00165009 |
| YARDI-DUFFY_00175223 |
| YARDI-DUFFY_00176321 |
| YARDI-DUFFY_00177520 |
| YARDI-DUFFY_00185213 |
| YARDI-DUFFY_00197492 |

FILED UNDER SEAL

| |
|---|
| YARDI-DUFFY_00198023 |
| YARDI-DUFFY_00198624 |
| YARDI-DUFFY_00206847 |
| YARDI-DUFFY_00223748 |
| YARDI-DUFFY_00229292 |
| YARDI-DUFFY_00229767 |
| YARDI-DUFFY_00229769 |
| YARDI-DUFFY_00229770 |
| YARDI-DUFFY_00303968 |
| YARDI-DUFFY_00327241 |
| YARDI-DUFFY_00337134 |
| YARDI-DUFFY_00338837 |
| YARDI-DUFFY_00340500 |
| YARDI-DUFFY_00344844 |
| YARDI-DUFFY_00350458 |
| YARDI-DUFFY_00350459 |
| YARDI-DUFFY_00391751 |
| YARDI-DUFFY_00531106 |
| YARDI-DUFFY_00582522 |
| YARDI-DUFFY_00585483 |
| YARDI-DUFFY_00607260 |
| YARDI-DUFFY_00789075 |
| YARDI-DUFFY_00806448 |
| YARDI-DUFFY_00806629 |
| YARDI-DUFFY_00911814 |
| YARDI-DUFFY_00912430 |

FILED UNDER SEAL

| |
|---|
| YARDI-DUFFY_00912450 |
| YARDI-DUFFY_00913148 |
| YARDI-DUFFY_00913149 |
| YARDI-DUFFY_00915629 |
| YARDI-DUFFY_00923993 |
| YARDI-DUFFY_00973739 |
| YARDI-DUFFY_00998305 |
| YARDI-DUFFY_01230207 |
| YARDI-DUFFY_01260225 |
| YARDI-DUFFY_01268511 |
| YARDI-DUFFY_01274219 |
| YARDI-DUFFY_01274345 |
| YARDI-DUFFY_01275878 |
| YARDI-DUFFY_01320776 |
| YARDI-DUFFY_01385214 |
| YARDI-DUFFY_01387830 |
| YARDI-DUFFY_01392173 |

# F.  Datasets Relied Upon

## F.1.  Landlord Defendant Lease Transaction Data

589.  I refer to document YARDI-DUFFY_00913149 ("2025-08-15 - COR - Duffy - List Of All Duffy Defendant Properties Leases And Overrides During RIQ Use As Of 2025-08-15") as "Lease Data" throughout my report.

590.  The Lease Data provides information on each executed lease signed between Landlord Defendants and tenants in the period from January 2011 until August 2024. In particular, each row corresponds to a lease for a specific unit (i.e., apartment) and indicates the unit's rent and information on whether the rent recommended by Yardi's algorithm was overridden by the client. The document covers data for 44 distinct Yardi clients and 2,283 properties.

FILED UNDER SEAL

591. Throughout the report, I refer to "new lease" as a new contract being signed, either by a new tenant or the pre-existing tenant, unless otherwise specified or noted when presenting analysis that distinguishes between lease types "New Lease" and "Renewal" as specified in the "Lease Type" variable of the data.

592. I consider the following variables as relevant for my analysis of Yardi's Lease Data, followed by each field's definition, as reported by Yardi in document YARDI-DUFFY_00913148 (in the "Data Dictionary" sheet):

- "Yardi Client PIN:" "Yardi-issued client identification number for the associated Revenue IQ client." "I use this field as the identifier for Revenue IQ clients.

- "Revenue IQ Client Name:" Name of the Revenue IQ client.

- "Revenue IQ Property Id:" Property ID in Revenue IQ. I use this variable as the property identifier in my analysis.

- Property-specific variables: "Property Name," "Property Address," "Property City," "Property State," "Property Zip Code".

- "Approx Unit Count:" "Count of apartment unit records entered into Voyager for the associated property, which are not flagged as "Excluded" or "Waitlist", as of the date the data was pulled. This value serves as an approximation of the total number of units in the subject property and may differ from the actual total. For example, some property management companies choose to flag all units as "Excluded" after they no longer manage or own the property.

- "Revenue IQ Pricing Start Date:" "The first date that Revenue IQ calculated a suggesting pricing recommendation for the property."

- "Revenue IQ Pricing Live Date:" "The first date that Revenue IQ's suggested pricing recommendations for the property were downloaded to the client's Voyager database and used by the client. Date entered manually by Revenue IQ support team member in most cases so some values represent an estimate or have been set to match the Revenue IQ Pricing Start Date value."

- "Last Revenue IQ Date Priced:" "The most recent date that Revenue IQ calculated asking rents for the property, as of the date of the data pull."

- "Revenue IQ Unit Id:" "Unit ID for the executed lease in Revenue IQ."

- "Lease Start Date:" Start date of the executed lease.

- "Lease Term:" "Lease length expressed as a number of whole months."

- "Lease Type:" "Lease type (New Lease, Renewal, Transfer, or Unknown)."

FILED UNDER SEAL

- "Monthly Gross Rent:" "Monthly rent amount specified by the executed lease."

- "Monthly Effective Rent:" "Monthly effective rent is the monthly gross rent adjusted for concessions."

- "Monthly Concession Amount:" "Monthly concession amount."

- "Total Concession Amount:" "Total amount of concessions associated with the executed lease, as specified by the property manager. A negative value means the lessor was offered a discount, resulting in a monthly effective rent which is lower than the monthly gross rent. A positive value means the lessor was charged a premium; for example, there may be an additional fee associated with leases of a certain length."

- "New Lease Rent Override Date:" "Date of New Lease Rent Override." I refer to this as the "override date" throughout the report for contracts signed with new tenants.

- "Renewal Proposal Rent Override Date:" "Date when override rent amount (Renewal Proposal Modified Rent) was entered into Voyager." I refer to this as the "override date" throughout the report for renewed leases.

- "New Lease Rent Override Notes:" "Notes generated when a property manager manually overrides the Revenue IQ recommended rent for a prospective tenant for a given unit, move-in date, and lease term. The notes typically contain the system-generated text patterns "Rent changed from X to Y (suggested rent was Z)" or "Rent changed from X to Y", in addition to other notes entered by the property manager at the time of the override. For records that contain system-generated patterns:

  -- 'X' is the original Revenue IQ recommended rent for the selected unit, lease term, and lease start date at the time the application was initiated.

  -- 'Y' is the override rent amount manually entered by the property manager.

  -- 'Z' is the Revenue IQ recommended rent for the selected unit, lease term, and lease start date at the time of the override.

  This type of override may also be applied to "Transfer" and "Unknown" lease types, in addition to New Leases."

- "Renewal Proposal Original Rent:" "Revenue IQ recommended rent for the selected unit, lease term, and lease start date when the renewal proposal was generated."

- "Renewal Proposal Modified Rent:" "Override rent amount manually entered by the property manager."

FILED UNDER SEAL

593.    I apply the following data cleaning, valid for all exhibits with Lease Data as one of the sources. I filter the raw lease data for units priced by Revenue IQ. In particular, I filter for leases whose "Lease Start Date" is between the "Revenue IQ Pricing Start Date" and the "Last Revenue IQ Date Priced." This leads to dropping less than 0.01% of rows. I filter for leases with a positive effective rent, thus filtering out 0.25% rows of the raw lease data.

594.    The lease data includes leases that are marked as "Transfer" and "Unknown" in the "Lease Type" variable. I keep these observations as a default in my analyses, unless otherwise specified. Such observations account for approximately 2% of the rows in the raw lease data.

595.    For some of the analysis presented, I "expand" the Lease Data by converting each lease into multiple monthly observations. Specifically, for each lease, I create one row for each month in which the lease is active, from the lease start month to the lease end month (estimated by adding the number of months indicated in the "Lease Term" variable to the "Lease Start Date"). I repeat the relevant lease-level variables for each monthly row. I then restrict the expanded data to observations up to the last available lease date, i.e., August 2025, since no information on new leases is available after that point. I refer to this dataset as the "Expanded Lease Data" throughout the report.

596.    When required by the specific analysis, I geocode the addresses of the properties included in the lease data, i.e., for each address, I use the R package "tidygeocoder" to assign the specific coordinates (latitude and longitude) of the address. Throughout the report, I refer to lease data that has been geocoded as "Geocoded Lease Data" or, if also expanded, "Expanded and Geocoded Lease Data." The geocoding allows me to categorize each address into the geographic areas used by the American Community Survey ("ACS"), i.e., into PUMAs, census tracts, and CBSAs as relevant for my analysis.

597.    The US Census Bureau redefines PUMA boundaries after each decennial census, and the new PUMAs are introduced into the ACS in years ending in "2," so that "ACS PUMAs records through 2021 have the 2010 PUMAs, and the ACS records from 2022 on have the 2020 PUMAs." I assign PUMAs to each address taking this change into account.[346]

---

[346] "American Community Survey and Puerto Rico Community Survey Design and Methodology," December 20, 2024, Section 13.5, available at: https://www2.census.gov/programs-surveys/acs/methodology/design_and_methodology/2024/acs_design_methodology_ch13_2024.pdf (accessed February 8, 2026).

FILED UNDER SEAL

### Table 13: Summary of Landlord Defendant Lease Transaction Data

**Dimensions**: 2159446 x 30
**Duplicates**: 0

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|---|---|---|---|---|---|---|
| 1 | Yardi Client PIN [integer] | Mean (sd) : 100047224 (16077.5) min ≤ med ≤ max: 100012458 ≤ 100039385 ≤ 100093926 IQR (CV) : 31842 (0) | 44 distinct values | | 2159446 (100.0%) | 0 (0.0%) |
| 2 | RevenueIQ Client Name [character] | | 390445 ( 18.1% ) 171942 ( 8.0% ) 163443 ( 7.6% ) 147507 ( 6.8% ) 140323 ( 6.5% ) 99944 ( 4.6% ) 84110 ( 3.9% ) 83595 ( 3.9% ) 77741 ( 3.6% ) 55814 ( 2.6% ) 744582 ( 34.5% ) | | 2159446 (100.0%) | 0 (0.0%) |

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|----|----------|----------------|--------------------|-------|-------|---------|
| | | ████████ | | | | |
| 3 | RevenueIQ Property Id [integer] | Mean (sd) : 979535.1 (843003.8) min ≤ med ≤ max: 1210 ≤ 777774 ≤ 3852894 IQR (CV) : 1011973 (0.9) | 2283 distinct values | | 2159446 (100.0%) | 0 (0.0%) |
| 4 | Voyager Property Id [integer] | Mean (sd) : 751.5 (1656.1) min ≤ med ≤ max: 1 ≤ 144 ≤ 23951 IQR (CV) : 680 (2.2) | 1406 distinct values | | 2159446 (100.0%) | 0 (0.0%) |

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|----|----------|----------------|--------------------|-------|-------|---------|
| 5 | Property Name [character] | █████████████ [ 2233 others ] | 14205  ( 0.7% )<br>9796  ( 0.5% )<br>7865  ( 0.4% )<br>6604  ( 0.3% )<br>6357  ( 0.3% )<br>6306  ( 0.3% )<br>6302  ( 0.3% )<br>5987  ( 0.3% )<br>5977  ( 0.3% )<br>5965  ( 0.3% )<br>2084082 ( 96.5% ) | | 2159446 (100.0%) | 0 (0.0%) |

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|---|---|---|---|---|---|---|
| 6 | Property Address [character] | ██████████ [ 2144 others ] | 14205  ( 0.7% )<br>9796  ( 0.5% )<br>7865  ( 0.4% )<br>6604  ( 0.3% )<br>6503  ( 0.3% )<br>6357  ( 0.3% )<br>6306  ( 0.3% )<br>6302  ( 0.3% )<br>6255  ( 0.3% )<br>6209  ( 0.3% )<br>2083044 ( 96.5% ) | | 2159446 (100.0%) | 0 (0.0%) |

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|----|----------|----------------|--------------------|-------|-------|---------|
| 7 | Property City [character] | ███████ | 35133 ( 1.6% )<br>34721 ( 1.6% )<br>32954 ( 1.5% )<br>31929 ( 1.5% )<br>30005 ( 1.4% )<br>24017 ( 1.1% )<br>23021 ( 1.1% )<br>22485 ( 1.0% )<br>21483 ( 1.0% )<br>20671 ( 1.0% )<br>1883027 ( 87.2% ) | | 2159446 (100.0%) | 0 (0.0%) |
| 8 | Property State [character] | ███████ | 334531 ( 15.5% )<br>241695 ( 11.2% )<br>217352 ( 10.1% )<br>135770 ( 6.3% )<br>121871 ( 5.6% )<br>113771 ( 5.3% )<br>109947 ( 5.1% )<br>105547 ( 4.9% )<br>96237 ( 4.5% )<br>95494 ( 4.4% )<br>587231 ( 27.2% ) | | 2159446 (100.0%) | 0 (0.0%) |

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|---|---|---|---|---|---|---|
| 9 | Property Zip Code [character] | 1. 92821<br>2. 48111<br>3. 48393<br>4. 92694<br>5. 22202<br>6. 48038<br>7. 60654<br>8. 92630<br>9. 07302<br>10. 92688<br>[ 1234 others ] | 18481   ( 0.9% )<br>17517   ( 0.8% )<br>17437   ( 0.8% )<br>17214   ( 0.8% )<br>15268   ( 0.7% )<br>14205   ( 0.7% )<br>13944   ( 0.6% )<br>13747   ( 0.6% )<br>13719   ( 0.6% )<br>12637   ( 0.6% )<br>2005277 (92.9%) | | 2159446 (100.0%) | 0 (0.0%) |
| 10 | Approx Unit Count [integer] | Mean (sd) : 363 (299.5)<br>min ≤ med ≤ max:<br>0 ≤ 294 ≤ 2387<br>IQR (CV) : 242 (0.8) | 535 distinct values | | 2159446 (100.0%) | 0 (0.0%) |
| 11 | Property Type [character] | 1. Multifamily | 2159446 ( 100.0%) | | 2159446 (100.0%) | 0 (0.0%) |
| 12 | Has Affordable Programs [character] | 1. No<br>2. Yes | 2064277 ( 95.6%)<br>95169   ( 4.4% ) | | 2159446 (100.0%) | 0 (0.0%) |

265

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|---|---|---|---|---|---|---|
| 13 | Revenue IQ Pricing Start Date [IDate, Date] | min : 2011-01-19<br><br>med : 2019-06-20<br><br>max : 2025-08-12<br><br>range : 14y 6m 24d | 984 distinct values | | 2159446 (100.0%) | 0 (0.0%) |
| 14 | Revenue IQ Pricing Live Date [character] | 1. 2020-01-21<br>2. 2019-10-22<br>3. 2019-11-12<br>4. 2020-02-18<br>5. 2017-08-08<br>6. 2019-12-30<br>7. 2013-06-17<br>8. 2014-09-30<br>9. 2013-07-19<br>10. 2023-01-20<br>[ 866 others ] | 109373  ( 5.1% )<br>95923  ( 4.4% )<br>73390  ( 3.4% )<br>70325  ( 3.3% )<br>36613  ( 1.7% )<br>33053  ( 1.5% )<br>32084  ( 1.5% )<br>25771  ( 1.2% )<br>24178  ( 1.1% )<br>23667  ( 1.1% )<br>1635069 (75.7%) | | 2159446 (100.0%) | 0 (0.0%) |
| 15 | Revenue IQ Currently Active? [character] | 1. No<br>2. Yes | 656720  (30.4%)<br>1502726 (69.6%) | | 2159446 (100.0%) | 0 (0.0%) |
| 16 | Last Revenue IQ Date Priced [IDate, Date] | min : 2014-10-02<br><br>med : 2025-08-14<br><br>max : 2025-08-14 | 415 distinct values | | 2159446 (100.0%) | 0 (0.0%) |

266

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|----|----------|----------------|---------------------|-------|-------|---------|
| | | range : 10y 10m 12d | | | | |
| 17 | Revenue IQ Tenant Id [integer] | Mean (sd) : 139436550 (66451067) min ≤ med ≤ max: 288892 ≤ 159109351 ≤ 245785264 IQR (CV) : 111745860 (0.5) | 1224054 distinct values | | 2159446 (100.0%) | 0 (0.0%) |
| 18 | Revenue IQ Unit Id [integer] | Mean (sd) : 17344304 (15282475) min ≤ med ≤ max: 98776 ≤ 11524031 ≤ 62608600 IQR (CV) : 21928865 (0.9) | 490160 distinct values | | 2159446 (100.0%) | 0 (0.0%) |
| 19 | Lease Start Date [IDate, Date] | min : 2011-01-19 med : 2021-11-22 max : 2025-08-14 range : 14y 6m 26d | 5289 distinct values | | 2159446 (100.0%) | 0 (0.0%) |

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|----|----------|----------------|---------------------|-------|-------|---------|
| 20 | Lease Term [integer] | Mean (sd) : 12 (3.3)<br><br>min ≤ med ≤ max:<br><br>0 ≤ 12 ≤ 208<br><br>IQR (CV) : 1 (0.3) | 81 distinct values | | 2159446 (100.0%) | 0 (0.0%) |
| 21 | Lease Type [character] | 1. New Lease<br>2. Renewal<br>3. Transfer<br>4. Unknown | 933513 (43.2%)<br>1177610 (54.5%)<br>31199 (1.4%)<br>17124 (0.8%) | | 2159446 (100.0%) | 0 (0.0%) |
| 22 | Monthly Gross Rent [numeric] | Mean (sd) : 1451 (609.4)<br><br>min ≤ med ≤ max:<br><br>0 ≤ 1350 ≤ 30000<br><br>IQR (CV) : 724 (0.4) | 8680 distinct values | | 2159446 (100.0%) | 0 (0.0%) |
| 23 | Monthly Effective Rent [numeric] | Mean (sd) : 1443.3 (631.8)<br><br>min ≤ med ≤ max:<br><br>-171194.3 ≤ 1339 ≤ 25000<br><br>IQR (CV) : 718 (0.4) | 125317 distinct values | | 2159446 (100.0%) | 0 (0.0%) |

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|---|---|---|---|---|---|---|
| 24 | Monthly Concession Amount [numeric] | Mean (sd) : -7.7 (173.9) min ≤ med ≤ max: -173544.3 ≤ 0 ≤ 7881 IQR (CV) : 0 (-22.6) | 34788 distinct values | | 2159446 (100.0%) | 0 (0.0%) |
| 25 | Total Concession Amount [numeric] | Mean (sd) : -79.1 (2394.7) min ≤ med ≤ max: -2256076 ≤ 0 ≤ 101400 IQR (CV) : 0 (-30.3) | 59992 distinct values | | 2159446 (100.0%) | 0 (0.0%) |
| 26 | New Lease Rent Override Date [character] | 1. NULL 2. 2020-07-13 3. 2021-05-10 4. 2023-05-02 5. 2020-06-23 6. 2022-03-23 7. 2021-04-16 8. 2021-06-08 9. 2020-07-28 10. 2022-06-01 [ 4767 others ] | 1830089 ( 84.7% ) 248 ( 0.0% ) 248 ( 0.0% ) 241 ( 0.0% ) 239 ( 0.0% ) 238 ( 0.0% ) 237 ( 0.0% ) 236 ( 0.0% ) 235 ( 0.0% ) 235 ( 0.0% ) 327200 ( 15.2% ) | | 2159446 (100.0%) | 0 (0.0%) |

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|---|---|---|---|---|---|---|
| 27 | New Lease Rent Override Notes [character] | 1. NULL 2. Rent changed from 1642.00 3. Rent changed from 0.00 to 4. Rent changed from 1008.00 5. Rent changed from 1441.00 6. Rent changed from 0.00 to 7. Rent changed from 1500.00 8. Rent changed from 983 to 9. Rent changed from 1457.00 10. Rent changed from 1748.00 [ 291514 others ] | 1830106 ( 84.7% ) 32 ( 0.0% ) 28 ( 0.0% ) 27 ( 0.0% ) 25 ( 0.0% ) 24 ( 0.0% ) 24 ( 0.0% ) 24 ( 0.0% ) 23 ( 0.0% ) 22 ( 0.0% ) 329111 ( 15.2% ) | | 2159446 (100.0%) | 0 (0.0%) |

270

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|----|----------|----------------|--------------------|-------|-------|---------|
| 28 | Renewal Proposal Rent Override Date [character] | 1. NULL<br>2. 2020-04-15<br>3. 2020-04-14<br>4. 2021-02-25<br>5. 2022-02-10<br>6. 2020-04-01<br>7. 2020-05-28<br>8. 2021-04-23<br>9. 2020-04-16<br>10. 2020-04-27<br>[ 3847 others ] | 2012659 ( 93.2% )<br>388 ( 0.0% )<br>249 ( 0.0% )<br>247 ( 0.0% )<br>200 ( 0.0% )<br>198 ( 0.0% )<br>198 ( 0.0% )<br>196 ( 0.0% )<br>192 ( 0.0% )<br>190 ( 0.0% )<br>144729 ( 6.7% ) | | 2159446 (100.0%) | 0 (0.0%) |
| 29 | Renewal Proposal Original Rent [character] | 1. NULL<br>2. 0.00<br>3. 1430.00<br>4. 1325.00<br>5. 1550.00<br>6. 1450.00<br>7. 1300.00<br>8. 1428.00<br>9. 1475.00<br>10. 1425.00<br>[ 4588 others ] | 2012659 ( 93.2% )<br>177 ( 0.0% )<br>166 ( 0.0% )<br>164 ( 0.0% )<br>158 ( 0.0% )<br>157 ( 0.0% )<br>154 ( 0.0% )<br>153 ( 0.0% )<br>153 ( 0.0% )<br>150 ( 0.0% )<br>145355 ( 6.7% ) | | 2159446 (100.0%) | 0 (0.0%) |

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|----|----------|----------------|--------------------|-------|-------|---------|
| 30 | Renewal Proposal Modified Rent<br><br>[character] | 1. NULL<br>2. 1300.00<br>3. 1400.00<br>4. 1350.00<br>5. 1500.00<br>6. 1100.00<br>7. 1600.00<br>8. 1200.00<br>9. 1250.00<br>10. 1275.00<br>[ 3853 others ] | 2012659 ( 93.2% )<br>332 ( 0.0% )<br>299 ( 0.0% )<br>295 ( 0.0% )<br>294 ( 0.0% )<br>292 ( 0.0% )<br>282 ( 0.0% )<br>280 ( 0.0% )<br>271 ( 0.0% )<br>259 ( 0.0% )<br>144183 ( 6.7% ) | | 2159446<br><br>(100.0%) | 0<br><br>(0.0%) |

272

FILED UNDER SEAL

## F.2.    **Configuration Data**

598.    I refer to document YARDI-DUFFY_00106927 ("Revenue IQ Config Audit History 20190101 to 20250324") as "Configuration Data" throughout my report. In the Configuration Data, each record corresponds to a log from a client changing a configuration settings, with the new values inputted by the client stored in the "NewValue" column of the data. The data covers the period between January 2019 and March 2025 and 8,989 properties

599.    I understand the "FieldName" variable to take the name of the configurations' names as they appear in Yardi's system, and filter this variable accordingly for the purpose of my analyses. In particular:

600.    I consider the value "iAvailabilityTrendWeighting" of the "FieldName" variable to correspond to the Availability trend rule, "iNewLeasesTrendWeighting" to the New Leases trend rule, "iDemandToSupplyTrendWeighting" to the Traffic trend rule, and "iRentRatioTrendWeighting" to the Comp trend rule.

601.    I consider the data resulting from filtering "FieldName" to equal "sPriceRule" to correspond to data on changes to the Health Rules. In fact, applying this filtering, the "NewValue" column takes values: "AVAILABILITY," "LEASED." "30DAYPREDAVAIL," "OCC," "EXPOSURE," "FORECAST," "PRED30DAYTREND," "VACANTUNRENTED," each corresponding to one of the health rules, and "NULL."

602.    I consider the following values of "FieldName" to correspond to configurations that have a direct impact on the Comp trend rule ("iRentRatioTrendWeighting"): "dDegreeOfChangeCompRent," "bUseNetEffectiveRentRatio," "iBaseLeaseTerm," "iSamplePeriodLength"

603.    I understand the dataset to include also non-Landlord Defendants' properties. Throughout my analysis, I focus on Landlord Defendant properties that also figure in the Lease Data. In particular, based on my review of the source code, I understand the property ID's stored in the "hProperty" variable of the Configuration Data to line up with "Revenue IQ Property Id" of the Lease Data and filter the Configuration Data accordingly. I filter for the set of Landlord Defendant properties that are in the Lease Data starting from January 2019, i.e., the first month covered by the Configuration Data.  As a result, 68% of Defendant Properties in the Lease Data also figure in the Configuration Data.

604.    I extend the Configuration Data to cover all dates between the first and last date. In doing so, I take the most recent record by unique combination of property ("hProperty"),  unit type ("hUnitTypeGroup") and date ("dtDate"), and forward-fill the "NewValue" variable,

FILED UNDER SEAL

assuming the configuration setting remains unchanged until the next configuration change logged by the client.

### Table 14: Summary of Yardi Configuration Data

**Dimensions**: 36599918 x 14

**Duplicates**: 0

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|----|----------|----------------|-------------------|-------|-------|---------|
| 1 | hMy<br><br>[integer] | Mean (sd) : 71643191 (11531327)<br><br>min ≤ med ≤ max:<br><br>41242999 ≤ 71723275 ≤ 91302996<br><br>IQR (CV) : 19726272 (0.2) | 36599918 distinct values | | 36599918<br><br>(100.0%) | 0<br><br>(0.0%) |
| 2 | TransactionId<br><br>[character] | 1. 1FDDFA8B-CA08-44BB-A032-1<br><br>2. BA3E33B2-9B21-48A5-A32F-3<br><br>3. 9112F0BF-0A36-46F4-B6BB-A<br><br>4. bacea382-6c56-4c87-9cf1-e<br><br>5. 9378AC2D-BE64-4B7B-B88E-3<br><br>6. 38BE7B04-EA95-4B4B-A4F0-2<br><br>7. 3A94A0AC-BDF1-4B48-8067-1<br><br>8. abf79b2e-bf09-46f9-a1e9-c<br><br>9. 3896E217-C432-4FC4-9AF8-0 | 780408 ( 2.1% )<br>234396 ( 0.6% )<br>183199 ( 0.5% )<br>158156 ( 0.4% )<br>128250 ( 0.4% )<br>113760 ( 0.3% )<br>105106 ( 0.3% )<br>100934 ( 0.3% )<br>98820 ( 0.3% )<br>84469 ( 0.2% )<br>34612420 ( 94.6% ) | | 36599918<br><br>(100.0%) | 0<br><br>(0.0%) |

274

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|---|---|---|---|---|---|---|
| | | 10. 8BFA09FC-3E36-449B-993B-E<br><br>[ 999093 others ] | | | | |
| 3 | AuditType<br>[character] | 1. D<br>2. I<br>3. U | 330218 ( 9.0% )<br>1<br>236640 ( 64.7 )<br>91 %<br>963364 ( 26.3 )<br>6 % |  | 3659991<br>8<br>(100.0%) | 0<br><br>(0.0%) |
| 4 | TableName<br>[character] | ███████ | 186627 ( 51.0 )<br>13 %<br>709806 ( 19.4 )<br>6 %<br>365429 ( 10.0 )<br>8 %<br>294644 ( 8.1% )<br>7<br>110373 ( 3.0% )<br>4<br>617052 ( 1.7% )<br>504303 ( 1.4% )<br>473149 ( 1.3% )<br>378936 ( 1.0% )<br>300448 ( 0.8% )<br>860772 ( 2.4% ) |  | 3659991<br>8<br>(100.0%) | 0<br><br>(0.0%) |

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|---|---|---|---|---|---|---|
| | | ■■■■■ | | | | |
| 5 | PrimaryKeyField [character] | ■■■■■ | 365999 ( 100.0 ) 18      % | | 3659991 8 (100.0%) | 0 (0.0%) |
| 6 | PrimaryKeyValue [integer] | Mean (sd) : 55006992 (198623847) min ≤ med ≤ max: 1 ≤ 27235015 ≤ 2095811617 IQR (CV) : 60759473 (3.6) | 4712387 distinct values | | 3659991 8 (100.0%) | 0 (0.0%) |
| 7 | FieldName [character] | ■■■■■ | 437608 ( 12.0 ) 6      % 391628 ( 10.7 ) 3      % 390573 ( 10.7 ) 4      % 234070 (6.4%) 9 229476 (6.3%) 0 229476 (6.3%) 0 134462 (3.7%) 7 964728 (2.6%) 892290 (2.4%) | | 3659991 8 (100.0%) | 0 (0.0%) |

276

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|---|---|---|---|---|---|---|
| | | | 754701 ( 2.1% ) | | | |
| | | | 135152 40 ( 36.9 ) % | | | |
| 8 | OldValue [character] | 1. NULL | 243300 05 ( 66.5 ) % | | 3659991 8 (100.0%) | 0 (0.0%) |
| | | 2. 0 | 504401 ( 1.4% ) | | | |
| | | 3. -1 | 322028 ( 0.9% ) | | | |
| | | 4. 12 | 210315 ( 0.6% ) | | | |
| | | 5. 0.000 | 133985 ( 0.4% ) | | | |
| | | 6. 0.00 | 127142 ( 0.3% ) | | | |
| | | 7. AVAILABILITY | 93950 ( 0.3% ) | | | |
| | | 8. 1 | 63953 ( 0.2% ) | | | |
| | | 9. 101.00 | 53872 ( 0.1% ) | | | |
| | | 10. 14 | 53055 ( 0.1% ) | | | |
| | | [ 459393 others ] | 107072 12 ( 29.3 ) % | | | |
| 9 | NewValue [character] | 1. NULL | 337576 4 ( 9.2% ) | | 3659991 8 (100.0%) | 0 (0.0%) |
| | | 2. 0 | 163876 2 ( 4.5% ) | | | |
| | | 3. -1 | 870486 ( 2.4% ) | | | |
| | | 4. 0.00 | 373750 ( 1.0% ) | | | |
| | | 5. 1 | 367292 ( 1.0% ) | | | |
| | | 6. AVAILABILITY | 270227 ( 0.7% ) | | | |
| | | 7. 0.0000 | 261344 ( 0.7% ) | | | |
| | | 8. 12 | 257327 ( 0.7% ) | | | |
| | | 9. 0.000 | 244618 ( 0.7% ) | | | |
| | | 10. 2 | 192968 ( 0.5% ) | | | |
| | | [ 510126 others ] | | | | |

277

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|----|----------|----------------|--------------------|-------|-------|---------|
|  |  |  | 287473 ( 78.5 ) 80 % |  |  |  |
| 10 | dtDate [POSIXct, POSIXt] | min : 2019-01-02 08:04:06.867<br><br>med : 2022-05-03 14:46:58.54<br><br>max : 2025-03-24 16:56:10.783<br><br>range : 6y 2m 22d 8H 52M 3.9S | 2150724 distinct values |  | 36599918<br><br>(100.0%) | 0<br><br>(0.0%) |
| 11 | hForeignDb [integer] | Mean (sd) : 2248.5 (3083.7)<br><br>min ≤ med ≤ max:<br><br>3 ≤ 1246 ≤ 16547<br><br>IQR (CV) : 2709 (1.4) | 476 distinct values |  | 36599918<br><br>(100.0%) | 0<br><br>(0.0%) |
| 12 | hProperty [integer] | Mean (sd) : 1707294 (1030952)<br><br>min ≤ med ≤ max:<br><br>1072 ≤ 1721896 ≤ 3647629<br><br>IQR (CV) : 1784793 (0.6) | 8989 distinct values |  | 36599918<br><br>(100.0%) | 0<br><br>(0.0%) |

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|---|---|---|---|---|---|---|
| 13 | hUnitTypeGroup [character] | 1. 25025<br>2. 12360<br>3. 12361<br>4. 12362<br>5. NULL<br>6. 14716<br>7. 26675<br>8. 16712<br>9. 14715<br>10. 12127<br>[ 22849 others ] | 303700 ( 0.8% )<br>262116 ( 0.7% )<br>262109 ( 0.7% )<br>262100 ( 0.7% )<br>171089 ( 0.5% )<br>160618 ( 0.4% )<br>115803 ( 0.3% )<br>94242 ( 0.3% )<br>76628 ( 0.2% )<br>62540 ( 0.2% )<br>348289 ( 95.2 73 % ) | | 36599918 (100.0%) | 0 (0.0%) |
| 14 | Property State [character] | 1. CA<br>2. TX<br>3. IL<br>4. CO<br>5. WA<br>6. FL<br>7. VA<br>8. OH<br>9. MI<br>10. NC<br>[ 50 others ] | 726498 ( 19.8 1 % )<br>2884450 ( 7.9% )<br>2021559 ( 5.5% )<br>1821058 ( 5.0% )<br>1515009 ( 4.1% )<br>1363925 ( 3.7% )<br>1354256 ( 3.7% )<br>1318850 ( 3.6% )<br>1304947 ( 3.6% ) | | 36599918 (100.0%) | 0 (0.0%) |

279

FILED UNDER SEAL

| No | Variable | Stats / Values | Freqs (% of Valid) | Graph | Valid | Missing |
|----|----------|----------------|--------------------|-------|-------|---------|
|    |          |                | 128522 ( 3.5% ) 6 <br><br> 144656 ( 39.5 ) 57       % |       |       |         |

FILED UNDER SEAL

# G.   Curriculum Vitae

# IOANA E. MARINESCU

School of Social Policy & Practice, 3701 Locust Walk, Philadelphia PA, 19104-6214

ioana.marinescu@gmail.com ◇ www.marinescu.eu

## EMPLOYMENT

| | |
|---|---|
| 2021 - present | Associate Professor (with tenure), School of Social Policy & Practice, University of Pennsylvania |
| 2024 - present | Associate Professor (secondary appointment), Economics Department, University of Pennsylvania. |
| 2022 - present | Associate Professor (secondary appointment), Wharton School of Business - Business Economics and Public Policy, University of Pennsylvania. |
| 2022 - 2024 | Principal Economist at the United States Department of Justice Antitrust Division. |
| 2017 - 2021 | Assistant Professor, School of Social Policy & Practice, University of Pennsylvania |
| 2007 - 2017 | Assistant Professor, Harris School of Public Policy, University of Chicago |
| 2006 - 2007 | Visiting Professor, Harris School of Public Policy, University of Chicago |
| 2005 - 2006 | Postdoctoral Researcher, department of economics, Harvard University |

## CURRENT PROFESSIONAL AFFILIATIONS & ACTIVITIES

| | |
|---|---|
| 2023 - present | Faculty director of the Master of Science in Social Policy, and the Master of Science in Social Policy with Data Analytics, School of Social Policy & Practice, University of Pennsylvania. |
| 2022 - present | Associate Editor, *Quarterly Journal of Economics* |
| 2021 - present | Research Associate, Labor Studies, National Bureau of Economic Research. |
| 2012 - present | Research Fellow, IZA. |

## ADVISORY POSITIONS

| | |
|---|---|
| 2025 - present | Member, Economic Advisory Council, Anthropic |

## EDUCATION

| | |
|---|---|
| Ph.D | Economics, London School of Economics, 2007 |
| Doctorat (Ph.D) | Economics, EHESS Paris, 2005 |
| DEA (M.Phil) | Economic analysis and policy, EHESS Paris, 2002 |
| Maîtrise (Masters) | Econometrics, Paris-I Panthéon-Sorbonne, 2001 |
| Maîtrise (Masters) | Philosophy, Paris-I Panthéon-Sorbonne, 2001 |
| | École Normale Supérieure, Paris, student, 1999-2005. |

## PUBLICATIONS

### Refereed Articles

1. Choi, Hyeri, and Ioana Marinescu. 2025. "Work Attendance Anxiety, Precarious Work Schedules, and Job Satisfaction of Essential Retail Workers during the Early COVID-19 Pandemic." *PLOS ONE* 20 (3): e0318586.

2. Athey, Susan, Alex Gross, Ioana Marinescu, and Jennifer Shanefelter. 2024. "The Year in Review: Economics at the Antitrust Division 20232024." *Review of Industrial Organization*, November.

Ioana E. Marinescu, February 2026

3. Gonalons-Pons P., & Marinescu I. 2024. "Care Labor Demand Shocks and Inequality: How Childcare Costs Exacerbate Inequality among American Families," *American Sociological Review*, 89 (6), 1075-1103.

4. Choi, Hyeri, and Ioana Marinescu. 2024. "The Labor Demand Side of Involuntary Part-Time Employment." In *Research in Labor Economics* Big Data Applications in Labor Economics, Part A, 52A:3570. Emerald Publishing Limited.

5. Choi, Hyeri, and Ioana Marinescu. 2024. "Data for Labor Market Concentration Using Lightcast (Formerly Burning Glass Technologies)." *Data in Brief* 55 (August):110647.

6. Athey, Susan, Mark Chicu, Malika Krishna, and Ioana Marinescu. 2024. "The Year in Review: Economics at the Antitrust Division, 2022 - 2023." *Review of Industrial Organization*.

7. Azar J., Huet-Vaughn E., Marinescu I., Taska B., & Von Wachter T. 2023. "Minimum Wage Employment Effects and Labor Market Concentration." *Review of Economic Studies*.

8. Corcoran, J., Ivey A., and Marinescu I.. 2023. "A Systematic Review and Meta-Analysis of United States Depression Prevalence in African American Women Living in Low-Income Circumstances." *Journal of the Society for Social Work and Research*, August.

9. Marinescu I., Tan F., & Greeson J. 2023. "Economic conditions and the number of children in foster care.". *Children and Youth Services Review* 144 (January).

10. Marinescu I., Triantafillou S., & Kording K., "Regression Discontinuity Threshold Optimization", *PLOS ONE*, 17 (11), 2022.

11. Anderson S., Marinescu I., & Shor B.. 2023. Can Pigou at the Polls Stop US Melting the Poles?, *Journal of the Association of Environmental and Resource Economists*, 10 (4), 903-945.

12. Hafiz H. & Marinescu I., "Labor Market Regulation and Worker Power" 2023. *The University of Chicago Law Review*, Vol. 90, 2, 2023.

13. Jones, D., and Marinescu I. 2022. "Universal Cash Transfers and Inflation." *National Tax Journal* 75 (3): 62753.

14. Jones D. & Marinescu I. (2022), The Labor Market Impacts of Universal and Permanent Cash Transfers: Evidence from the Alaska Permanent Fund. *American Economic Journal: Economic Policy* 14 (2): 31540.

15. Corcoran J., Marinescu I., Vogelsang C., Kim J. (2022), "Prevalence of depression during pregnancy and postpartum periods in low-income women in developed countries", *Journal of Public Health*, January 2022.

16. Azar J., Marinescu I., & Steinbaum M. (2022). Labor Market Concentration. *Journal of Human Resources* no. S (2022): S167-S199. University of Wisconsin Press.

17. Corcoran J., Marinescu I., Vogelsang C., Kim J., Morgan S., Watson-Baker L. (2021), "Prevalence of Depression in Low-Income Women in Developed Countries", *Depression and Anxiety*, 2021.

18. Marinescu, Ioana, Daphné Skandalis, and Daniel Zhao (2021). "The Impact of the Federal Pandemic Unemployment Compensation on Job Search and Vacancy Creation." *Journal of Public Economics*, 200 (August 2021): 104471.

19. Marinescu I., Skandalis, D. (2021). "Unemployment Insurance and Job Search Behavior". *The Quarterly Journal of Economics*, 136, no. 2 (May 1, 2021): 887931.

20. Marinescu I., Ouss I., & Pape L.-D. (2021) "Wages, Hires, and Labor Market Concentration", *Journal of Economic Behavior & Organization*, 184 (April 1, 2021): 506605.

21. Marinescu I., Klein N., Chamberlain A., & Morgan Smart (2021). Incentives Can Reduce Bias in Online Reviews, *Journal of Experimental Psychology: Applied*, March 25, 2021.

22. Gaggl P., Gray R., Marinescu I., & Morin M. (2021) "Does Electricity Drive Structural Transformation? Evidence from the United States". *Labour Economics*, 68 (January 1, 2021): 101944.

23. Naidech A., Lawlor P.N., Xu H., Fonarow G.C., Xian Y., Smith E., Schwamm L., Matsouaka R., Prabhakaran S., Marinescu I., Kording K. (2020). Probing the Effective Treatment Thresholds for Alteplase in Acute Ischemic Stroke with Regression Discontinuity Designs . *Frontiers in Neurology.* 11 (2020).

24. Azar J., Steinbaum M., Marinescu I., & Taska B. (2022). Concentration in US Labor Markets: Evidence from Online Vacancy Data. *Labour Economics* 66 (October 1, 2020): 101886.

25. Marinescu I. & Posner E. (2020) Why Has Antitrust Law Failed Workers? *Cornell Law Review* 105 (September 2020).

26. Marinescu I. & Wolthoff R. (2020). Opening the Black Box of the Matching Function: The Power of Words. Previously circulated under the title "Wages, Applications and Skills", *Journal of Labor Economics*, vol. 38, no. 2.

27. Marinescu I. & Hovenkamp H. (2019). Anticompetitive Mergers in Labor Markets. *Indiana Law Journal*, vol. 94, 2019.

28. Marinescu I., Lawlor P., Kording K. (2018). Quasi-experimental causality in neuroscience and behavioral research. *Nature Human Behavior*, 2 (12): 891.

29. Baker R., Bettinger E., Jacob B. & Marinescu I. (2018). The Effect of Labor Market Information on Community College Students Major Choice. *Economics of Education Review*, 65 (August): 1830.

30. García Pérez J. I., Marinescu I., & Vall Castello J. (2018). Can Fixed-Term Contracts put Low Skilled Youth on a Better Career Path? Evidence from Spain. *Economic Journal*, May 2018.

31. Marinescu I. & Rathelot R. (2018). Mismatch Unemployment and the Geography of Job Search. *American Economic Journal: Macroeconomics*, 10 (3): 4270.

32. Marinescu I. (2017). The General Equilibrium Impacts of Unemployment Insurance: Evidence from a Large Online Job Board. *Journal of Public Economics*, 150, pp. 14-29.

33. Marinescu I. (2016). Divorce: what does learning have to do with it? *Labour Economics*, 38 (2016), pp. 90-105.

34. Marinescu I. & Triyana M. (2016). The sources of wage growth in a developing country. *IZA Journal of Labor & Development*, 5:2.

35. Marinescu I. (2014). HIV, Wages and the Skill Premium. *Journal of Health Economics*, 37, pp. 181-197.

36. Azuara O. & Marinescu I. (2013). Informality and the Expansion of Social Protection Programs: The Case of Mexico. *Journal of Health Economics*, 32, pp. 938-950.

37. Marinescu I. (2011). Are Judges Sensitive to Economic Conditions? Evidence from UK Employment Tribunals. *Industrial and Labor Relations Review*, July 2011 (Vol. 64, No. 4).

38. Marinescu I. (2009). Job Security Legislation and Job Duration: Evidence from the U.K. *Journal of Labor Economics*, vol. 27, no. 3 (p. 475-486).

39. Aghion P. & Marinescu I. (2007) Cyclical budgetary policy and growth: what do we learn from OECD panel data? *NBER Macroeconomics Annual* Volume 22 (p. 251 - 278).

Ioana E. Marinescu, February 2026

40. Aghion P., Bond S., Klemm A., & Marinescu I. (2004). Technology and Financial Structure: Are Innovative Firms Different? *Journal of the European Economic Association*, MIT Press, vol. 2(2), pages 277-288, April 2004.

## Other Publications

41. Ioana Marinescu (2025). Resilient by Design: Dual Safety Nets for Workers in the AI Economy. The Digitalist Papers.

42. Azar, José, and Ioana Marinescu. 2024 "Monopsony Power in the Labor Market" *Handbook of Labor Economics*, Volume 5, 2024, Pages 761-827.

43. Azar, José, and Ioana Marinescu. 2024. "Monopsony Power in the Labor Market: From Theory to Policy." *Annual Review of Economics* 16 (Volume 16, 2024): 491518.

44. Drory D. & Marinescu I. (2023), "The law and economics of no-poach agreements", in Sofia Rodrigues, Ana, Eric Posner, Sarah Roberts, Daniel Oakes, Ioana Marinescu, Rochella Davis, Lindsey Strang, et al. 2023. "No-Poach Agreements - Closing the Enforcement Gap." *Concurrences Review*, no. N 4-2023 (November).

45. Marinescu I., & Rosenfeld J., "Worker Power and Economic Mobility: A Landscape Report," Workrise, Urban Institute, 2022.

46. Curtis E. M. & Marinescu I. (2022) "Green Energy Jobs in the US: What Are They, and Where Are They?", Environmental and Energy Policy and the Economy 2022, National Bureau of Economic Research.

47. Marinescu I. (2021b), "Fighting Monopsony, A Lack of Competition that Harms Workers", chapter 4 in *Inequality and the Labor Market: The Case For Greater Competition*, edited by Sharon Block and Benjamin H. Harris, Brookings Institution, 2021.

48. Marinescu I. (2021a), "Boosting wages when U.S. labor markets are not competitive", in *Boosting Wages for U.S. Workers in the New Economy*, Washington Center for Equitable Growth, 2021.

49. Azar J., Marinescu I., & Steinbaum M. (2019). Marinescu, I., & "Measuring Labor Market Power Two Ways," *AEA Papers and Proceedings*, 2019.

50. Marinescu, I., & Posner E.. 2019. "A Proposal to Enhance Antitrust Protection Against Labor Market Monopsony." *Roosevelt Institute*.

51. Klein N., Marinescu I., Chamberlain A., & Morgan Smart (2018). Online Reviews Are Biased. Here's How to Fix Them. *Harvard Business Review*.

52. Marinescu I. (2017). Job search monitoring and assistance for the unemployed. *IZA World of Labor*.

53. Calderon V. & Marinescu I. (2011). The impact of Colombia's pension and health insurance systems on informality. *IDB Publications* 62338, Inter-American Development Bank.

## Articles under revision

54. Marinescu, I., Qiu Y., and Sojourner A.. "Wage Inequality and Labor Rights Violations." SSRN Scholarly Paper. Rochester, NY: Social Science Research Network, August 13, 2020. Revise & resubmit *Industrial and Labor Relations Review*.

## Working Papers

55. Konrad Kording, Ioana Marinescu (2025). "(Artificial) Intelligence saturation and the future of work", Brookings working paper.

Ioana E. Marinescu – February 2026

56. Skandalis D., Marinescu I., Massenkoff M., "Racial Inequality in the U.S. Unemployment Insurance System," NBER Working Paper No. w30252, 2022.

57. Handy F., Marinesu I., & Zheng L., "Racial Inequality in Volunteering and Employment," SSRN working paper 4143587, 2022.

58. Azar J., Berry S. & Marinescu I. "Estimating Labor Market Power, SSRN Scholarly Paper ID 3456277. Rochester, NY: Social Science Research Network, 2019.

59. Marinescu I. (2017). No Strings Attached: The Behavioral Effects of U.S. Unconditional Cash Transfer Programs. New York, NY, USA: *Roosevelt Institute*, 2017. [Link].

## HONORS AND AWARDS

| | |
|---|---|
| 2025 | Devah Pager Outstanding Article Award from the Inequality, Poverty and Mobility Section of the American Sociological Association |
| | *Journal of Policy Analysis and Management*'s annual Excellence in Refereeing Award. |
| 2021 | Jerry S. Cohen award for Best Paper in Labor Antitrust for Marinescu I. & Posner E. "Why Has Antitrust Law Failed Workers?" *Cornell Law Review* 105 (September 2020). |
| | *Labour Economics* Best Paper Award for Azar J., Steinbaum M., Marinescu I., & Taska B. "Concentration in US Labor Markets: Evidence from Online Vacancy Data" *Labour Economics* 66 (October 1, 2020): 101886. |
| 2019 | *Labour Economics* Best Reviewer Award |
| 2018 | University of Pennsylvania School of Social Policy & Practice Excellence in Teaching Award |
| 2015 | *Labour Economics* Certificate of Excellence in Reviewing |
| 2012 | Inter American Conference on Social Security Research Award (CISS Award 2012), 3rd place winner, "The Impact of Colombia's Pension and Health Insurance Systems on Informality" (with Valentina Calderon) |

## GRANTS AND FELLOWSHIPS

| | |
|---|---|
| 2024 | Schmidt Sciences grant: AI at work |
| | United States Department of Agriculture (USDA) grant: 2024 Poultry Grower Competition Analysis |
| 2022-2024 | United States Department of Justice Intergovernmental Personnel Act (IPA), as principal economist, Antitrust Division. |
| 2021-2024 | Washington Center for Equitable Growth for "Green Jobs or Lost Jobs? The Distributional Implications for U.S. Workers in a Low Carbon Economy" |
| 2020-2023 | Sloan Foundation: grant to study the impact of labor market concentration on labor market outcomes. PI. With PhD student Hyeri Choi. |
| 2020 | Washington Center For Equitable Growth for "Competition Policy and Market Structure: Boosting Wage Growth" |
| 2019 | National Institute of Health, RO1, for "Quantifying causality for neuroscience", co-investigator with Maria Geffen (co-investigator) and Konrad Kording (principal investigator) . |
| 2018 | Kleinman Center for Energy Policy, for "The Politics of Carbon Taxes at the State Level". |
| | Hopewell Fund for "Will a Universal Basic Income be Offset by Increasing Prices?", co-principal investigator with D. Jones. |
| | Fostering Media Connections for a project on the economics of foster care, co-principal investigator with J. Greeson & D. Schilling Wolfe. |

| 2016 | Sloan Foundation grant for the Center for Data Science & Public Policy, co-principal investigator. |
| 2010 | CIDE (Centro De Investigaacion y Docencia Economicas, A.C.) grant for comprehensive research of the Seguro Popular program in Mexico. |
| 2008 | University of Chicago, Center for Human Potential and Public Policy, Faculty Development Award. |
| 2004 | Arthur Sachs and Harvard Club de France Fellowship. |
| 2002 | Marie Curie Fellowship (European Doctoral Program). |

## KEYNOTE AND INVITED PRESENTATIONS

### Keynote Presentations

| 2026 | 2026 AI, Health & Well-Being Conference, University of Pittsburgh, February 2026. |
| 2025 | Annual Scientific Conference of Romanian Academic Economists from Abroad ERMAS 2025, Iasi, Romania, July 2025. |
| | Canadian Labour Economics Forum, Toronto, Canada, April 2025. |
| 2023 | COFECE (Comisión Federal de Competencia Económica, Mexican Competition Authority) - 10th Anniversary Conference, Mexico City, Mexico, September 2023. |
| 2022 | European Central Bank - Centre for Economic Policy Research (CEPR) 2022 Labour Market Workshop, Frankfurt, Germany, 21-22 November 2022. |
| 2019 | IZA/CAIS Workshop: Matching Workers and Jobs Online, Bochum, Germany, September 20-21 2019. |
| | Big Data in Social Sciences and Public Policy, El Colegio de Mexico, Mexico City, Mexico, May 16-17 2019. |
| 2013 | WISE Labor 2013 International Symposium on Contemporary Labor Economics, Xiamen University, China, December 7-8 2013. |

### Invited Presentations

| 2025 | University of Massachusets, Amherst, November 2025. |
| 2025 | Central Bank of Chile, Santiago, Chile, August 2025. |
| | Duke University, Sanford School of Public Policy, March 2025. |
| | Carnegie Mellon University & University of Pittsburgh, February 2025. |
| 2024 | Federal Reserve Bank of Cleveland, October 2024. |
| | University of British Columbia, Vancouver School of Economics, March 2024. |
| 2023 | Harvard Kennedy School, Seminar in Environmental Economics and Policy, March 2023. |
| 2022 | Yale University Law School, February 2022. |
| | Williams College, economics department, January 2022. |
| 2021 | Boston College and McGill University, Labor Seminar, November 2021. |
| | London School of Economics, November 2021. |
| | University of Maryland Smith School of Business, October 2021. |
| | Georgetown McDonough School of Business. October 2021. |
| | RWI Leibniz Institute for Economic Research, Germany, September 2021. |
| | Universidad Diego Portales, Santiago, Chile, September 2021. |
| | Cornell University, September 2021. |
| | Sciences Po Summer Workshop: Labor, Paris, France. June 2021. |
| | FAU Nuremberg, Germany, April, 2021. |
| | Imperial College London, April 2021. |
| | Singapore Management University, March 2021. |
| | Harvard University, February 2021. |
| | University of Utah, January 2021. |

Ioana E. Marinescu - February 2026

| | |
|---|---|
| 2020 | Columbia University, November 2020. |
| | Drexel University, Philadelphia, October 2020. |
| | Duke University, October 2020. |
| | Université du Québec à Montréal (UQAM), October 2020. |
| | CREST Paris, October 2020. |
| | University of California, Irvine. March 2020. |
| | |
| 2019 | Harvard Kennedy School, November 2019. |
| | Harvard Law School, May 2019. |
| | University College London, March 2019. |
| | OECD, Paris, France, March 2019. |
| | University of Illinois Urbana-Champaign, March 2019. |
| | Princeton University, February 2019. |
| | Harvard Business School, February 2019. |
| | |
| 2018 | Microsoft Research New York City, July 2018. |
| | Boston University, July 23rd 2018. |
| | American Antitrust Institute, June 21st 2018. |
| | Harvard University Law School, June 13th 2018. |
| | Federal Reserve Bank of Philadelphia, May 1st 2018. |
| | University of Minnesota, April 27 2018. |
| | Federal Reserve Bank of Minneapolis, April 26 2018. |
| | Rutgers University, April 2018. |
| | University of Toronto, Toronto, Canada, March 27 2018. |
| | University of York, Toronto, Canada, March 26 2018. |
| | University of Tokyo, GRIPS, Tokyo, Japan, March 14 2018. |
| | Rutgers University, February 2018. |
| | OECD, Paris, France, January 19 2018. |
| | Paris School of Economics, Paris, France, January 18 2018. |
| | IZA, Bonn, Germany, January 16 2018. |
| | |
| 2017 | IEEE International Conference on Data Mining (ICDM) 2017, Data Science for Human Capital Management Workshop, November 18 2017, New Orleans. |
| | Temple University, economics department, October 13 2017. |
| | ENSAI Economic Days, June 15-16, Rennes, France. |
| | University of Pittsburgh, economics department, March 1st 2017. |
| | University of Pennsylvania, school of social policy and practice, February 15th 2017. |
| | |
| 2016 | Stanford University, economics department, December 6th 2016. |
| | University of Western Ontario, economics department, November 30th 2016. |
| | University of Maryland, school of public policy, November 7th 2016. |
| | University of Montreal, economics department, October 19th 2016. |
| | Federal Reserve Bank of Chicago, October 13 2016. |
| | HEC Montreal, September 27th 2016. |
| | University of Maryland, economics department, August 31st 2016. |

Ioana E. Marinescu – February 2026

| 2015 | Louisiana State University, economics department, November 16 2015. |
|------|---|
| | Brigham Young University, economics department seminar, October 2 2015. |
| | 30th Annual Congress of the European Economic Association, Mannheim 2015: Invited Session "Social Insurance Programs and the Labor Market", August 27 2015. |
| | Upjohn Institute for Employment Research, June 16 2015. |
| | University of Massachusetts Amherst, Applied Micro Workshop, April 30 2015. |
| | Georgetown University, Public Policy and Massive Data Seminar, April 24 2015. |
| | The George Washington University, Microeconomics Seminar, April 8 2015. |
| | Bureau of Labor Statistics, April 7 2015. |
| | University of California, Berkeley, Department of Economics, Joint Labor-Public Seminar, February 5th 2015. |
| 2014 | Princeton University, Industrial Relations Section, Labor Economics Seminar, November 10th 2014. |
| | Regional and Urban Economics Seminar in Paris, France, January 15 2014. |
| 2013 | London School of Economics, CEP Labour Market Workshop Series, February 26th 2013. |
| | Queen Mary University of London, February 25th 2013. |
| | Sciences Po Paris, the Interdisciplinary Research Centre for the Evaluation of Public Policies (LIEPP) seminar, February 20th 2013. |
| | Paris School of Economics, Applied Economics lunch seminar, February 19th 2013. |
| 2012 | Purdue University, November 12th 2012. |
| | University of California, Santa Barbara, October 5th 2012. |
| | University of British Columbia, September 27th 2012. |
| | University of Wisconsin-Madison, September 17th 2012. |
| | Chicago Fed, March 12th, 2012. |
| 2011 | CIDE, Mexico City, July 12th 2011. |
| 2010 | Paris School of Economics, Applied Economics lunch seminar, June 15th 2010. |
| 2009 | University of Houston-Rice University, empirical micro workshop, December 1st 2009. |
| | Sciences Po Paris, lunch seminar, September 23rd 2009. |
| 2007 | UIC, Economics Department seminar, September 7th 2007. |

## CONFERENCE PRESENTATIONS

| 2026 | Columbia Business School, "Market Power in Transition: Antitrust in the Age of Digital and AI-Driven Markets," February 2026. |
|------|---|
| 2026 | Tri-state Public Finance at Princeton University, January 2026. |
| 2026 | ASSA meetings, Philadelphia, PA, January 2026. |
| 2025 | Stanford University, The Digitalist Papers Volume 2: The Economics of Transformative AI, December 2025. |
| 2025 | American Antitrust Institute, "26th Annual Policy Conference  The State of the Antitrust Technocracy," Washington DC, May 2025. |
| 2025 | American Bar Association 2025 Antitrust Spring Meeting, "Has Competition in the US Been Declining?", April 2025. |
| 2025 | ASSA meetings, San Francisco, CA, January 2025. |
| 2024 | 2024 Labor Conference, University of Rochester Simon Business School, May 2024. |
| | GCR (Global Competition Review) Live: Law Leaders Global 2024, "Mergers: New US merger guidelines" February 2024. |

Ioana E. Marinescu — February 2026

| | |
|---|---|
| 2023 | Public Workshop on the Department of Justice and Federal Trade Commission 2023 Draft Merger Guidelines, University of Chicago, November 2023. |
| | Concurrences Global Antitrust Economics Conference, November 2023. "Competition and Artificial Intelligence" |
| | The New Merger Guidelines: Controlling Case Law and New Economics, University of Utah, October 2023. |
| | 50th Annual Conference on International Antitrust Law and Policy, Fordham University, September 2023. |
| | 2023 Antitrust and Competition Conference, Stigler Center, University of Chicago Booth School of Business, April 2023. |
| | Economics for Inclusive Prosperity inaugural conference, Harvard Kennedy School, March 2023. |
| | Policy Perspectives on Market Power, Columbia Business School, March 2023. |
| | Flagship Conference on Competition, International Finance Corporation (IFC), World Bank Group, January 2023. |
| 2022 | Fourteenth Annual Northwestern Conference on Antitrust Economics and Competition Policy, Northwestern University Pritzker School of Law, September 2022. |
| | 49th Annual Conference on International Antitrust Law and Policy, Fordham University, September 2022. |
| | NBER Summer Institute, Labor Studies, July 2022. |
| | ASSA meetings online, January 2022. |
| 2021 | The Oxford University Antitrust Enforcement Symposium, United Kingdom, June 2021. |
| | ASSA meetings, Chicago (virtual), January 2021. |
| 2019 | ASSA meetings, Atlanta, January 2019. |
| 2018 | Monopsony in Labor Markets, Sundance, October 2018. |
| | NBER: The Rise of the Megafirm: Causes and Consequences for Labor and Product Markets, October 2018. |
| | Federal Reserve Bank of Atlanta, 9th Annual Employment Conference, October 2018. |
| | NBER Summer Institute, Personnel Economics. |
| | NBER Summer Institute, IT & Digitization. |
| | NBER Summer Institute, Industrial Organization. |
| | NBER Labor Studies Program Meeting, San Francisco, CA, February 16 2018. |
| | ASSA meetings in Philadelphia, PA, January 2018. |
| 2017 | Society of Labor Economists meetings, Raleigh, May 5-6 2017. |
| | NBER Labor Studies Program Meeting, San Francisco, CA, February 24 2017. |
| | ASSA meetings in Chicago, IL, January 2017. |
| 2016 | IZA Workshop on the Economics of Education: Higher Education, Bonn, September 30 - October 1, 2016. |
| | NBER Trans-Atlantic Public Economics Seminar, Mannheim, Germany, June 13-15 2016. |
| | ASSA meetings in San Francisco, CA, January 3-5 2016. |
| 2015 | IZA/OECD Employment Seminar, Paris, France, October 2015. |
| | NBER Summer Institute, Macro Perspectives, Boston, MA, July 17 2015. |
| | Society of Labor Economists meetings, joint with European Association of Labour Economists, Montreal, June 26-28 2015. |
| | NBER Labor Studies Program Meeting, San Francisco, CA, February 20 2015. |

Ioana E. Marinescu — February 2026

| | |
|---|---|
| 2014 | NBER Summer Institute, Labor Studies joint with Public, Cambridge, MA, July 22nd 2014. |
| | NBER Summer Institute, Economics of IT and Digitization, Cambridge, MA, July 18th 2014. |
| | Search and Matching Research Group annual conference 2014, University of Edinburgh, United Kingdom. Plenary talk. 8-10 May 2014. |
| | ASSA meetings in Philadelphia, PA, January 3rd 2014. |
| 2013 | Society of Labor Economists meetings, Boston, May 2-4 2013. |
| 2012 | European Central Bank / CEPR Labour Market Workshop 2012, Frankfurt, December 17-18 2012. |
| | Society for Economic Dynamics Annual Meeting, 22-24 June 2012, Limassol, Cyprus. |
| | 11th IZA/SOLE Transatlantic Meeting of Labor Economists, May 31 – June 3 2012 in Buch/Ammersee, Germany. |
| | Society of Labor Economists meetings, Chicago, May 4-5 2012. |
| 2011 | Summer Meetings of the Econometric Society, Saint Louis, June 9-12 2011. |
| 2010 | IDEP (Institute for Public Economics), the 9th Journees Louis-Andre Gerard-Varet, Marseille, France, June 21st 2010. |
| | SOLE annual meeting 2010, London, U.K., June 17th 2010. |
| | ASSA meetings 2011, Denver, January 2010. |
| 2009 | NBER Summer Institute, Workshop on Macro Perspectives, Cambridge MA, July 13th 2009. |
| | Society of Labor Economists meetings, Cambridge MA, May 8th 2009. |
| 2008 | 10th IZA/CEPR European Summer Symposium in Labour Economics (ESSLE); Ammersee, Germany 9-11 October 2008. |
| | ASSA meetings, New Orleans, January 4th 2008. |
| 2007 | Bank of England, Great Stability Conference: On the source(s) of Macroeconomic Stability, London, United Kingdon, 13 and 14 September 2007. |
| | Society of Labor Economists meetings, Chicago, May 5th 2007. |
| | NBER macro annual, Cambridge, MA, March 30-31 2007. |

## INVITED TESTIMONY & POLICY TALKS

### Invited testimony

| | |
|---|---|
| 2022 | U.S. Congressional Budget Office, seminar, December 2022. |
| 2021 | U.S. Government Accountability Office, Unemployment Insurance Risk and Transformation Panel, (July 2021). |
| | U.S. Government Accountability Office, seminar, (June 2021). |
| 2019 | U.S. House of Representatives, Committee on the Judiciary, Subcommittee on Antitrust, Commercial and Administrative Law. "Antitrust and Economic Opportunity: Competition in Labor Markets". [Link], October 29th 2019. |
| | Department of Justice, Antitrust Division, intervention at the Competition in Labor Markets workshop, [Link], September 23rd 2019. |
| | General Assembly of Maryland, Ways and Means Committee, intervention on House Bill 1089, March 1st 2019 [Link]. |
| 2018 | Federal Trade Commission, Hearings on Competition and Consumer Protection in the 21st Century, Washington DC, October 2018. |
| | White House Roundtable on Leveraging Data as a Strategic Asset, Washington DC, May 2018. |
| 2017 | Pennsylvania House of Representatives Democratic Policy Committee, Philadelphia PA, November 2017. |

10

**Policy talks & panels**

| | |
|---|---|
| 2025 | International Monetary Fund, Economics of Transformative AI/IMF Scenario Planning Workshop. December 2025. |
| 2025 | Paris Workshop on Labour Market Power and Competition, University of Chicago Center in Paris, December 2025. |
| 2025 | FAR.AI & Tarbell Journalism Workshop: AGI Impacts and Governance - DC, November 2025. |
| 2025 | Drexel Economic Forum, Philadelphia, PA, October 2025. |
| 2024 | Law Leaders Global, Global Competition Review, on panel "Mergers: New US merger guidelines", Miami, January 2024. |
| 2023 | National Association of Attorneys General, Eastern Region Meeting, August 2023. |
| 2023 | The FTC's Ban on Non-Competes: A Hot Tub Debate, American Bar Association Antitrust Section, February 2023. |
| 2022 | Philippines Competition Commission, USFTC Workshop on Merger Review and Analysis, December 2022. |
| | American Bar Association Antitrust Section Webinar: Antitrust Questions in New Labor Markets, November 2022. |
| 2021 | 11th Annual Ellen Bellet Gelberg Tax Policy Lecture, University of Florida Levin College of Law. |
| 2020 | OECD Global Forum on Productivity, Berlin, Germany, May 2020 *Unable to deliver, canceled due to COVID-19 outbreak..* |
| | University of Southern California, Institute for Economic Policy Research, Los Angeles, March 2020. *Unable to deliver, canceled due to COVID-19 outbreak.* |
| | The Lunch  DC, government of the District of Columbia, January 2020. |
| | Brookings Institution Roundtable on Regional Divergence, January 2020. |
| 2019 | Washington Center For Equitable Growth, Job Search and Technology. |
| | Columbia University, "The Green New Deal: Visionary or Misguided?", October 2019. |
| 2018 | Who Cares - Economic Barriers and Foster Family Recruitment, House of Representatives Rayburn House Office Building, November 2018. |
| | Penn Wharton Public Policy Initiative, B School for Public Policy, Washington DC, September 2018. |

## TEACHING EXPERIENCE

### University of Pennsylvania School of Social Policy & Practice

"AI and Public Policy," 2026.

"Economics for Social Policy," 2017-2021, 2024.

"Quantitative reasoning," 2017-2021.

"Social Policy Through Podcasting," 2022.

### University of Chicago Harris School of Public Policy

"Labor Market Institutions and Unemployment," 2006-2015.

"Matching, Efficiency, and Inequality," 2006-2017.

"Theories of Justice and the Common Good," 2006-2017.

## PROFESSIONAL SERVICE

### Peer Review and Editing

Associate Editor, *Quarterly Journal of Economics.*

Referee for *the Quarterly Journal of Economics, American Economic Review, Journal of Political Economy, Review of Economic Studies, Journal of Labor Economics, Journal of Finance, Economic Journal, Review of Economics and Statistics, Journal of Public Economics, Journal of Development Economics, Journal of Human Resources, Industrial and Labor Relations Review, Labour Economics, Journal of Law and Economics, Oxford Economic Papers, Journal of Human Capital, B.E. Journal of Macroeconomics, Review of Income and Wealth, Economic Inquiry, Journal of Institutional and Theoretical Economics, Economic of Transition.*

**University of Pennsylvania: University and School Service**

Faculty director of the Master of Science in Social Policy 2023-present.

Master of Science in Social Policy governance committee 2017-2022.

PhD student supervision: Hyeri Choi 2019-2022, Christopher Wodicka, 2022-present.

SP2 PhD admissions committee 2017-2019, 2021.

Graduate Council of the Faculties at the University level, 2018-2022.

## NON-ACADEMIC WORK

**Podcasting, Newspaper Articles and Blogging**

"Just Economics" podcast co-host, 2022. [Link]

Monthly op-ed in the French newspaper *Libération*. [Link]. 2013-2021.

Monthly blog posts on The Hiring Site Blog, by CareerBuilder.com. 2012-2017.

## MEDIA COVERAGE & TWITTER

**Media coverage (selected)**

*Business Insider*, 2025. "AI Pay Gains Could Peak Soon, but a Penn Professor Sees a Way Out." By Thibault Spirlet. [Link].

*Fortune*. 2025. "Elon Musk Says That in 10 to 20 Years, Work Will Be Optional and Money Will Be Irrelevant Thanks to AI and Robotics." By Sasha Rogelberg. [Link].

*Forbes*, 2025. "More Americans Staying On Unemployment Amid Slight Slowdown Of Economy." By Zachary Folk. July 4, 2025. [Link].

*The New York Times*, 2025. "Economists Are in the Wilderness. Can They Find a Way Back to Influence?" By Ben Casselman. [Link].

*Bloomberg, 2024.* Odd Lots podcast interview, "How a DOJ Economist Approaches Antitrust" [Link].

*CNN* 2022. "Opinion: Heres How to Make It Easier for Workers to Find Better Jobs" By Todd Greene, Ioana Marinescu, Jake Rosenfeld and Elisabeth Jacobs. CNN Business. September 14, 2022. [Link]

*The New York Times*, 2022. "Did Democrats Just Save Civilization?" By Paul Krugman. August 8 2022, sec. Opinion [Link].

*The New York Times*, 2022. "A New Legal Tactic to Protect Workers' Pay" By Eduardo Porter. April 14 2022, sec. Economy. [Link].

*The New York Times*, 2021. "Monopoly's Bad Cousin." By Binyamin Appelbaum. November 15, 2021, sec. Opinion. [Link].

*The New York Times*, 2021. "Cutoff of Jobless Benefits Is Found to Get Few Back to Work.". By Ben Casselman. August 20, 2021, sec. Business. [Link].

Ioana E. Marinescu — February 2026

*The New York Times*, 2021. A Minimum Wage Can Create Jobs. By Peter Coy. August 16, 2021, sec. Opinion. https://www.nytimes.com/2021/08/16/opinion/minimum-wage-jobs.html.

*The New York Times*, 2021. "Unemployment Is High. Why Are Businesses Struggling to Hire?", by Neil Irwin, April 16, 2021, sec. The Upshot. [Link].

*Financial Times* , 2020. "US Workers Brace as Coronavirus Ripples through Real Economy." by Edgecliffe-Johnson, Andrew, and Brendan Greeley. March 16, 2020. [Link].

*USA TODAY* Dickman, Marco della Cava, Cassie. 2020. California City Gives Residents $500 a Month. Is This the Future of Progressive Politics? Dickman, Marco della Cava, Cassie. [Link].

*The New York Times.* 2019. "Opinion — Economic Incentives Dont Always Do What We Want Them To.", by Esther Duflo and Abhijit Banerjee. October 26, 2019. [Link].

*Washington Post.* 2019. "Is a recession looming? Heres what experts on the economy are watching.", by Philip Bump. August 15, 2019. [Link]

*Forbes.* 2019. "Why Carbon Taxes Are So Hard To Pass", by Howard Gleckman. August 15, 2019.[Link]

*Bloomberg.* 2019. "A $15 Minimum Wage Isnt So Scary." by Noah Smith. July 11, 2019. [Link].

*Bloomberg.* 2019. "Economists Get Serious About the Harm From Monopolies." by Noah Smith. January 11, 2019. [Link].

*Financial Times.* 2019. "What Exactly Is 'Slack'?" Financial Times Alphachat, January 5, 2019. [Link]

*Washington Post.* 2018."Politicians Have Caused a Pay 'Collapse' for the Bottom 90 Percent of Workers, Researchers Say.", by Christopher Ingraham. December 17, 2018. [Link]

*The Economist.* 2018. "Economists Think Antitrust Policy Should Pay More Attention to Workers," October 25, 2018. [Link]

*National Public Radio NPR Marketplace* 2018. Do Superstar Companies Hold down Wages?. Interview with Reema Khrais. [Link]

*The New York Times* 2018. "Opinion — When Companies Supersize, Paychecks Shrink." By Bryce Covert, May 13, 2018. [Link]

*The New York Times* 2018. "Why Is Pay Lagging? Maybe Too Many Mergers in the Heartland.", by Noam Schieber and Ben Casselman, January 25, 2018. [Link]

*The Economist.* 2018. "What Amazon Does to Wages," January 20, 2018. [Link] .

*CNN Money* 2018. "Big Companies Used to Pay the Best Wages. Not Anymore." by Lydia DePillis. January 18, 2018. [Link]

*Wall Street Journal* 2018. "Giving Alaskans Free Money Didn't Stop Them From Working." by Ben Leubsdorf. February 20, 2018. [Link]

*Bloomberg* 2017. "Monopolies May Be Worse for Workers Than for Consumers." by Noah Smith. December 29, 2017. [Link]

**Social media**

    **X (formerly Twitter)** @mioana 30.1k followers as of 01/23/2025.

    **Bluesky** imarinescu.bsky.social 4.1k followers as of 01/23/2025.

## LANGUAGES

Ioana E. Marinescu – February 2026

French: native reading, writing, speaking.
English: fluent reading, writing, speaking.
Romanian: native reading, excellent writing, native speaking.
German: excellent reading, intermediate writing, conversational speaking.