Hon. Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| *In re YARDI REVENUE MANAGEMENT ANTITRUST LITIGATION*. | No. 2:23-cv-01391-RSL |
| MCKENNA DUFFY, individually and on behalf of all others similarly situated,<br><br>                                   Plaintiffs.<br><br>      v.<br><br>YARDI SYSTEMS, INC., *et al.*,<br><br>                                   Defendants. | **DEFENDANT YARDI SYSTEMS' REPLY IN SUPPORT OF SUMMARY JUDGMENT**<br><br>**Filed Contemporaneously With:**<br><br> (1) **REBUTTAL DECLARATION OF CATHERINE TUCKER, PHD;**<br> (2) **REBUTTAL DECLARATION OF MIHRAN YENIKOMSHIAN;**<br> (3) **REBUTTAL DECLARATION OF MICHAEL MITZENMACHER, PHD; AND**<br> (4) **DECLARATION OF ABRAHAM A. TABAIE.**<br><br>**NOTE ON MOTION CALENDAR: March 23, 2026**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>(Consolidated with Case Nos. 2:24-cv-01948; 2:24-cv-02053) |

YARDI SYSTEMS' REPLY ISO SUMMARY JUDGMENT
(No. 2:23-cv-01391-RSL)

# TABLE OF CONTENTS

**PRELIMINARY STATEMENT** ...................................................................................................1

**ARGUMENT** ...............................................................................................................................2

    I.   Plaintiffs Fail to Advance Evidence of a Conspiracy ...................................................2

    II.  Marinescu's Admitted Data Errors Negate Her Supracompetitive Pricing
        Conclusions ...................................................................................................................5

        A.      Marinescu Miscalculated Her YLPI .................................................................5

        B.      Marinescu Fails to Control for Clients Managing Multiple Properties .........7

    III. Clients Cannot Delegate Decisionmaking to RIQ's Pricing Mechanism ...................8

        A.      Plaintiffs' Comp Trend Analysis Falsely Assumes RIQ Users' Comps Are
              Other RIQ Properties ........................................................................................8

        B.      Client-Selected (and Frequently Updated) "Reference Rents" Defeat
              Plaintiffs' Theory That RIQ Functions as a Common "List Price" ............10

        C.      RIQ Does Not Employ a Common Formula .................................................11

        D.      RIQ Clients Freely Deviate from the Bespoke Pricing Outputs RIQ
               Calculates ........................................................................................................14

    IV. Yardi's Benchmark Reporting Aligns with Precedent .............................................15

        A.      Benchmarking Does Not Facilitate a "Give-to-Get" Amongst RIQ Clients
              ..........................................................................................................................15

        B.      Benchmarking Is Untethered to RIQ Pricing Outputs and Cannot Facilitate
              Realtime Pricing Decisions .............................................................................16

    V.  Yardi Does Not Police RIQ Use ...............................................................................18

    VI. Plaintiffs' Conspiracies Ultimately Fail Under *Gibson* ...........................................20

**CONCLUSION** .........................................................................................................................21

**TABLE OF AUTHORITIES**

*Barnes v. Adren Mayfair, Inc.*,
   759 F.2d 676 (9th Cir. 1985)...........................................................................................3

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)..........................................................................................................3

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984)..........................................................................................................7

*Fisher Bros. v. Mueller Brass Co.*,
   102 F.R.D. 570 (E.D. Pa. 1984) .....................................................................................10

*Gibson v. Cendyn Grp., LLC.*,
   148 F.4th 1069 (9th Cir. 2025 ................................................................................ *passim*

*Gibson v. MGM Resorts Int'l*,
   No. 2:23-CV-00140-MMD-DJA, 2023 WL 7025996
   (D. Nev. Oct. 24, 2023) ..................................................................................................14

*Goldfarb v. Virginia State Bar*,
   421 U.S. 773 (1975)........................................................................................................11

*Guidroz-Brault v. Missouri Pac. R.R. Co.*,
   254 F.3d 825 (9th Cir. 2001)............................................................................................4

*In re Citric Acid Litig.*,
   191 F.3d 1090 (9th Cir. 1999)......................................................................................3, 4

*In re Glassine & Greaseproof Paper Antitrust Litig.*,
   88 F.R.D. 302 (E.D. Pa. 1980) ......................................................................................10

*In re High Fructose Corn Syrup Antitrust Litig.*,
   295 F.3d 651 (7th Cir. 2002)..........................................................................................10

*In re Pork Antitrust Litig.*,
   781 F. Supp. 3d 758 (D. Minn. 2025).......................................................................16, 17

*In re: RealPage, Inc., Rental Software Antitrust Litig.*,
   709 F. Supp. 3d 478 (M.D. Tenn. 2023)........................................................................14

*O.S.C. Corp v. Apple Computer*,
   792 F.2d 1464 (9th Cir. 1986)..........................................................................................2

*People of Guam v. Guerrero*,
   290 F.3d 1210 (9th Cir. 2002)..........................................................................................9

*Portillo v. CoStar Grp., Inc.*,
    No. C24-229RSL, 2025 WL 2495053
    (W.D. Wash. Aug. 29, 2025) (Lasnik, J.) .................................................................... 16, 17

*Richards v. Neilson Freight Lines*,
    810 F.2d 898 (9th Cir. 1987) ....................................................................................... 20

*Stanislaus Food Prods. Co. v. USS-POSCO Indus.*,
    803 F.3d 1084 (9th Cir. 2015) ........................................................................................ 3

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) ......................................................................................... 16

*U.S. v. Masonite Corp.*,
    316 U.S. 265 (1942) ...................................................................................................... 11

*U.S. v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940) ...................................................................................................... 11

**PRELIMINARY STATEMENT**

Plaintiffs do not dispute Yardi's presentation proving how Revenue IQ ("RIQ") calculates pricing outputs based on a client's own data and publicly available asking rents, requiring myriad client choices and individual customizations. This matters, because Plaintiffs' Consolidated Class Action Complaint ("CCAC") at its heart falsely alleges that RIQ uses one client's confidential data to generate pricing outputs for another client. CCAC[1] ¶¶20. 24, 104-07, 119, 145, 172; MTD Order[2] 7 ("Yardi's system works as advertised, however, only if each lessor client divulges its confidential and commercially sensitive pricing, inventory, and market data, allows Yardi to determine the price of each new and renewal lease, and adopts that price with very little, if any, second guessing."). By not contesting Yardi's proof, Plaintiffs concede that their core allegation fails.[3]

Instead, Plaintiffs tasked labor economist Dr. Ioana Marinescu to consider whether executed lease data could possibly suggest a conspiracy and then work backwards to theorize how such a conspiracy *might* operate *despite* RIQ's actual functionality—functionality that led the court in *Mach* to grant summary judgment for Yardi. Plaintiffs' last-ditch pivot also fails.

***First***, Plaintiffs' complete reliance on Marinescu's opinions backfires given her error-ridden analyses. In particular, the RIQ pricing effects Marinescu describes are the product of obvious data errors, and correcting them erases her claimed pricing effects. The backward-looking theory Marinescu devised to explain her invalid observations thus falls away.

***Second***, even ignoring Marinescu's errors, Plaintiffs' argument requires the Court to infer a convoluted collusion theory based on unilateral landlord conduct. Among other flaws, Plaintiffs ignore that clients individually choose (and frequently change) Reference

---

[1] Dkt. 226.
[2] Dkt. 188.
[3] Motion for Summary Judgment ("MSJ") (Dkt. 474), 12-15; Plaintiffs' Opposition ("Opp.") (Dkt. 519-2), 11-13.

Rents (the RIQ starting points), incorrectly assume that RIQ users' Comps are also RIQ customers (overwhelmingly they are not), and argue that only a fraction of RIQ's configurations are economically relevant (despite Yardi's undisputed evidence of their impact). Plaintiffs also ignore critical limits in Yardi's separate aggregated and anonymized Benchmark Reporting and fail to identify anything resembling enforcement of a price-fixing cartel. On this evidence, no reasonable fact finder could infer such an illogical conspiracy. Plaintiffs' sole counterargument relies on plainly irrelevant government-filed Statements of Interest in other cases and a RealPage settlement.[4] Moreover, Plaintiffs ignore that the government describes "honest providers of revenue management"—like Yardi—as *victims* of RealPage's "predatory and exclusionary" conduct.[5]

In sum, the undisputed facts reveal only a series of ordinary software licenses, running straight into the Ninth Circuit's binding decision in *Gibson v. Cendyn Grp., LLC.*, 148 F.4th 1069 (9th Cir. 2025). Yardi is therefore entitled to summary judgment.

## **ARGUMENT**

### I.    **Plaintiffs Fail to Advance Evidence of a Conspiracy**

Yardi proved that its RIQ and Benchmarking software cannot be a vehicle for collusion, thus easily carrying its summary judgment burden to offer "an entirely plausible and justifiable explanation of its conduct that is consistent with proper business practice." *O.S.C. Corp v. Apple Computer*, 792 F.2d 1464, 1468 (9th Cir. 1986). Through analysis of source code and structured data, and Michael Gaeta's declaration (RIQ's system architect), Yardi proved that RIQ (1) does not use the confidential information of one client to calculate pricing outputs for any other client; and (2) requires individualized configurations that dictate a client's own pricing. Declaration of Mihran Yenikomshian ("Yenikomshian") (Dkt. 478), ¶¶81-106; Declaration of Michael Gaeta (Dkt. 476), ¶¶8-9. Yardi also proved that clients in practice make *different choices* at *different times* with no synchronicity.

---

[4] *Infra* 10, 12.

[5] *U.S. v. RealPage, Inc.*, Case No. 24-cv-710 (Dkt. 47) (M.D.N.C. Jan. 7, 2025), ¶11.

Yenikomshian ¶¶98-103.  Yardi's software simply enables clients to more efficiently price their units according to their individually chosen pricing strategy.  As in *Gibson*, "[r]ather than eliminating competition, pricing...in a manner calculated to maximize profits is how one competes"; Yardi's software is "a tool in the struggle for commercial advantage" rather than "tak[ing] away that struggle."  148 F.4th at 1083.

Since Yardi carried its burden, the burden shifts to Plaintiffs to advance "specific factual support [for] its allegations" that "tends to exclude" the possibility of independent behavior.  *Barnes v. Adren Mayfair, Inc.*, 759 F.2d 676, 680 (9th Cir. 1985).  "Conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy."  *In re Citric Acid Litig.*, 191 F.3d 1090, 1094 (9th Cir. 1999); *Stanislaus Food Prods. Co. v. USS-POSCO Indus.*, 803 F.3d 1084, 1092 (9th Cir. 2015) (pricing evidence was not specific and did not exclude independent behavior).

Plaintiffs have abandoned their allegations that RIQ uses non-public competitor data for anticompetitive pricing purposes and do not dispute how RIQ or benchmarking functions.  Plaintiffs do not offer a competing source code expert, despite retaining one.  3/23/2026 Declaration of Abraham Tabaie, Ex. F ("Marinescu Tr."), 46:20-47:21.  In fact, Marinescu conceded that she did not review Yardi's source code and adopted Yenikomshian's findings about that code as true.  *Id*. 45:2-46:24, 58:6-60:21.

Plaintiffs instead argue that Yardi creates an anticompetitive "ecosystem" resulting in pricing effects that would be expected in the case of a coordinated conspiracy, anchored by Marinescu's flawed opinions.  Opp. 6.  Evidence of price increases alone does not permit an inference of conspiracy, however.  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 237 (1993).  The "relevant economic question is not whether these outcomes are consistent with collusion, but whether they are more consistent with collusion than with plausible unilateral explanations."  Catherine Tucker, PhD Rebuttal Declaration

("Tucker Rebuttal") ¶¶82-85 (*E.g.*, Marinescu failed to "test alternative unilateral and competitive explanations"). Even if Plaintiffs advanced evidence of parallel pricing (they do not, *see infra*), they fail to proffer evidence more consistent with collusion than lawful use of Yardi's software. *See In re Citric Acid Litig.*, 191 F.3d at 1094 (*supra* 3). Plaintiffs' support for their three-part ecosystem requires ignoring undisputed evidence about how RIQ and Yardi's benchmark reporting works[6] or ascribing nefarious enforcement motives to Yardi's standard software support.[7] For this reason alone, Yardi's Motion should be granted.

Moreover, Plaintiffs' supracompetitive pricing narrative falls apart when correcting the methodological errors that Marinescu concedes exist in her "Yardi Lease Price Index" ("YLPI"). Those corrections show that Landlord Defendants' pricing consistently tracks *at or below* the national rent Consumer Price Index ("CPI") over time. *Infra* §II.A. To avoid summary judgment, Plaintiffs must advance *admissible* evidence establishing a genuine issue of material fact. *Guidroz-Brault v. Missouri Pac. R.R. Co.*, 254 F.3d 825, 832 (9th Cir. 2001). As explained in Yardi's accompanying Daubert motion, Marinescu's opinions do not meet minimum admissibility standards and must be excluded.

There is no genuine dispute of material fact about how RIQ operates, and the Court should grant Yardi's Motion.

---

[6] *Infra* §§III, IV.
[7] *Infra* §V.

YARDI SYSTEMS' REPLY ISO
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – Page 4

## II. Marinescu's Admitted Data Errors Negate Her Supracompetitive Pricing Conclusions

### A. Marinescu Miscalculated Her YLPI

Plaintiffs' opposition centers around Marinescu's calculation of her YLPI.[8]  To create her YLPI, Marinescu reviewed lease prices for Landlord Defendants, and compared the rates of increase to the CPI over the same period.  She claims a purported sharp "divergence" between the two, which in her opinion indicates the existence of a conspiracy that she then tries to explain by reference to the RIQ "ecosystem."  Marinescu Tr. 225:22-226:19.  Marinescu includes numerous graphs purporting to show this divergence:



Figure 3.B: Marinescu Report's Original Figure 62 and Correction That Excludes Outliers and Updates the Calculation of the Price Index to Reflect Missing Rents According to Her Own Stated Methodology[86]

Tucker Rebuttal Figure 3.B.

Marinescu testified that her analysis should: (1) exclude implausible outlier data points as invalid—for example, a monthly rent of 40 cents, or $1.00—and (2)  account for

---

[8] Marinescu Tr. 238:22-239:1.

time gaps in available data, which she believed her team did.[9]  Her team, however, did not take these steps.[10]  Marinescu admitted at her deposition she was unaware of these errors.[11]

After addressing implausible outlier rents and time gaps in the lease data as Marinescu conceded should happen, the purported YLPI divergence does not just disappear, it actually tracks slightly ***below*** the CPI:



Tucker Rebuttal Figure 3.B.

Landlord Defendant's rental rates thus typically increased at the same pace or ***slower*** than national rent CPI.  Plaintiffs' Opposition exclusively relies on Marinescu's purported disproportionate increases as a proxy for anticompetitive effects (Opp. 3, 5, 22-23, 28-29), and without it Plaintiffs have zero evidence correlating RIQ use to supracompetitive prices.[12]   Plaintiffs thus cannot demonstrate any correlation between purported

---

[9] Marinescu Tr. 13:22-16:11, 242:9-258:11, 261:13-18, 265:18-266:10, 275:22-276:7.

[10] Mihran Yenikomshian Rebuttal Declaration ("Yenikomshian Rebuttal") §IX; Michael Mitzenmacher, PhD Rebuttal Declaration ("Mitzenmacher Rebuttal") §VII.A; Tucker Rebuttal §IV.A.1.

[11] Marinescu Tr. 249:22-250:10, 256:12-265:24, 258:6-11.

[12] Tucker Rebuttal ¶31.

supracompetitive rate increases and (1) any benchmark-based pricing guidance[13] or (2) RIQ adoption.[14]

### B.    Marinescu Fails to Control for Clients Managing Multiple Properties

Marinescu has further mistakes that overturn other of her key opinions. Marinescu opines that price "divergence" increases with the number of alleged co-conspirators in a geographic area, which she claims is "what economists expect from coordination via a hub-algorithm and precisely what they don't expect in a non-collusive algorithm." Marinescu ¶74. Marinescu's so-called "most robust" regressions measure this supposed price effect by estimating how effective rents react to differences in the number of alleged co-conspirator properties in a geographic area. *Id.* ¶546. She claims "Landlord Defendants increase rents $5.3[0] per month for every additional alleged co-conspirator in their local area." *Id.* ¶¶76, 479, 487.

But Marinescu erred here too. Her methodology incorrectly assumes that each Landlord Defendant manages only one property in a geographic area such that *all* properties within that area are alleged co-conspirators. That is incorrect—Landlord Defendants often manage multiple properties in an area[15]—and it is neither remarkable nor evidence of any conspiracy amongst the Landlord Defendants that a single one uses RIQ to manage its various properties.[16] *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984) (defining concerted action as "two or more entities that previously pursued their own interests separately [] combining to act as one"). When correcting to account for multiple properties being managed by the same party and using Marinescu's same methodology, this claim also entirely disappears. Tucker Rebuttal ¶65.

---

[13] Mitzenmacher Rebuttal ¶¶70-77, 80.

[14] Tucker Rebuttal ¶38.

[15] *Id.* ¶63. In fact, over 25% of the "PUMA-month" combinations cited by Marinescu as evidence of collusion contain a *single* Landlord Defendant managing multiple properties. *Id.*

[16] *Id.* ¶64.

### III.    Clients Cannot Delegate Decisionmaking to RIQ's Pricing Mechanism

Even ignoring the fatal flaws in Marinescu's analyses, Plaintiffs' convoluted "ecosystem" theory independently fails for at least four reasons.  *First*, Plaintiffs misstate how the Comps trend works and ignores it uses *public* data.  *Second*, Plaintiffs ignore that RIQ clients individually set (and frequently change) the "starting line" for RIQ's calculations.  *Third*, Plaintiffs' "common formula" theory requires that the Court ignore Yardi's substantial evidence of client customizations.  *Fourth*, Plaintiffs do not dispute that clients can, and do, deviate from their RIQ pricing outputs at a significant rate.  Plaintiffs therefore lack the requisite evidence that clients delegate their pricing autonomy to survive summary judgment.

#### A.    Plaintiffs' Comp Trend Analysis Falsely Assumes RIQ Users' Comps Are Other RIQ Properties

Focusing exclusively on RIQ's Comp Trend while ignoring the other three RIQ Trends, Plaintiffs argue that "competitor inputs are central" to RIQ's pricing mechanism.  Opp. 11.  Plaintiffs do not, however, dispute that the these "Comps" are *publicly available* asking rents.  Rather, they claim that publicly available asking rents obtained from RentCafe or Matrix surveys *in the aggregate* are somehow unlawful.  *Id*.  That is not the law.  *Gibson*, 148 F.4th at 1078 (Section 1 claim failed where the software "collect[ed] public pricing information" so that "competitor pricing [was] easily incorporated as a factor in setting pricing").

In any event, the Comp Trend does not look at asking rents in the aggregate across the country (even if that were somehow a problem).  Instead, for each property, RIQ looks at a small group of Comps chosen by each client, using information equally available to any prospective tenant, and in ways each landlord could do manually.[17]  Further, Yardi Matrix surveys and manual market surveys draw from the market at large; a client's Comp

---

[17] Landlord Defendants choose an average of 4.9 Comps (Yenikomshian Rebuttal ¶44), which Plaintiffs do not dispute is a volume any prospective tenant or landlord could obtain on their own.

properties may not subscribe to any Yardi product at all.[18] As Judge Markman found, "the use of agents to take price information from landlords would seem to be the exact opposite of ... [a] 'give-to-get' scheme"; "no price information is given to Yardi by landlords under any explicit or implicit agreement for use in setting prices." 11/24/2025 Declaration of Abraham Tabaie (Dkt. 475), Ex. A at 8.[19]

Plaintiffs, via Marinescu, next argue that the Comp Trend facilitates collusion through a "feedback loop" that "ratchets up" rental prices by feeding asking rent information into competitors' pricing calculations.[20] But Marinescu assumes, without testing, that RIQ clients include only (or primarily) other RIQ client properties in their Comp Sets. Marinescu ¶¶304, 321; Marinescu Tr. 121:22-122:21. Undisputed facts prove this assumption wrong. In fact, Landlord Defendant properties' Comp Sets contain 4.9 properties on average, of which only 0.25 (5%) are RIQ properties from other RIQ clients.[21] Moreover, 81% of the Landlord Defendants' RIQ properties have no other RIQ properties in their Comp Sets.[22] And no Landlord Defendant has a Comp Set consisting exclusively of RIQ properties managed by other RIQ clients.[23]

It is also irrelevant that many RIQ users employ the Comp Trend. And it is unsurprising; most landlords would consider asking rents at nearby comparable properties

---

[18] Declaration of Carissa Wong-Schwab ¶¶5-17.

[19] Plaintiffs' reliance on the RealPage settlement is inaccurate and irrelevant. Opp. 23-25. First, the proposed final judgment restricts gathering *nonpublic data* though market surveys, a point Plaintiffs misrepresent. *See* Opp. Ex. 53, §II.R (defining "market surveys" as "collections of **Nonpublic Data**…"). Second, a settlement (much less a settlement regarding different parties and software) is not a statement of the law. *People of Guam v. Guerrero*, 290 F.3d 1210, n.20 (9th Cir. 2002) ("[W]e are not bound by legal concessions or stipulations made by the parties.").

[20] Marinescu §5.2.

[21] Yenikomshian Rebuttal ¶44. 193 Landlord Defendant properties do not have any Comps configured. *Id.* n.74.

[22] *Id.* ¶44.

[23] *Id.* n.75. When pressed to explain her "feedback loop," Marinescu hypothesized that the mere existence of RIQ clients in the market *could* indirectly inflate asking rents, even of non-RIQ users, which *could* in turn feed back into a client's Comps. Marinescu Tr. 125:2-127:19. She acknowledged that she did not test this theory, particularly if RIQ had minimal market share. *Id.* 164:23-165:16; *id.* 161:5-18 (conceding that article she relies on estimates the share of RIQ buildings to be in the "low single digits").

as part of a basic unilateral pricing strategy. Tucker Rebuttal ¶¶25, 27. Additionally, the Comp Trend considers only the degree to which the selected Comp properties are increasing or decreasing their publicly available asking rents; it does *not* peg a client's asking rent to match any Comp, much less any other RIQ client.[24]

### B.    Client-Selected (and Frequently Updated) "Reference Rents" Defeat Plaintiffs' Theory That RIQ Functions as a Common "List Price"

Plaintiffs concede that (1) clients individually set their Reference Rents and (2) these Reference Rents are the "starting line" or "departure point" for RIQ pricing calculations. Opp. 11, 33; Marinescu Tr. 71:13-22, 78:2-6, 83:15-25, 88:8-24. Yet, Marinescu never explains how these individualized starting points are compatible with Plaintiffs' "list price" collusion allegation. Marinescu §4.1. At her deposition, Marinescu initially asserted that RIQ clients *do not* manually adjust their Reference Rents but then admitted she did not investigate that issue in her analysis. Marinescu Tr. 78:2-12, 81:12-17, 86:16-24. Undisputed evidence shows this Marinescu assumption is false too. Landlord Defendants manually changed their Reference Rents *560,000* times between January 2019 and March 2025—*a monthly average of 261 times per Landlord Defendant property*.[25] These unique starting points and frequent changes defeat Plaintiffs' suggestion of "list price" collusion.[26]

Plaintiffs also do not dispute that RIQ's other Trends and Health Rules only consider a particular property's own information, including unit availability, application volume, submitted or approved or new leases signed at the property, and traffic from potential

---

[24] MSJ 5; Mitzenmacher Rebuttal ¶53 (Marinescu incorrectly defines rent ratios, as shown by the source code). Marinescu's model formulas are also mathematically flawed. Mitzenmacher Rebuttal §V.B-C.

[25] Yenikomshian Rebuttal ¶48.

[26] Marinescu cites articles referencing a series of cases for her "list price collusion" theory, (Marinescu ¶136), all of which emphasize the importance of a common *starting point* which does not exist here. *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. 2002) (contemplating "identical list prices"); *In re Glassine & Greaseproof Paper Antitrust Litig.*, 88 F.R.D. 302, 306 (E.D. Pa. 1980) (focusing on the "base price used as a starting point"); *Fisher Bros. v. Mueller Brass Co.*, 102 F.R.D. 570, 578 (E.D. Pa. 1984) (similar).

renters. Yenikomshian ¶¶82-83. Plaintiffs do not explain how these individualized inputs could be "standardized," (Opp. 11, 33), because they are not.

### C.    RIQ Does Not Employ a Common Formula

Plaintiffs' argument that RIQ clients delegate "core pricing judgments" to Yardi fares no better. Opp. 37. In support of this novel antitrust theory, Plaintiffs repeatedly cite Statements of Interest ("SOIs") (Opp. 32, 37)[27] but fail to engage with the relevant law discussed therein. With good reason, as Plaintiffs produced no evidence that Landlord Defendants coordinated through Yardi to set prices through anything like the price lists,[28] fee schedules,[29] or standardized formulas[30] recognized in the law.

Regardless, undisputed facts contradict Plaintiffs' "core pricing judgment" theory. RIQ's pricing formula is not uniform; clients can and do individually configure RIQ, as Plaintiffs concede. Opp. 4, 26, 32-35; Yenikomshian Rebuttal §IV; Mitzenmacher Rebuttal §IV.B. Indeed, it takes *two to four weeks* for each client to configure their hundreds of RIQ settings to align with their individual goals before using RIQ. MSJ 11-12.

Plaintiffs' "core" definition boils down to the observation that (1) clients often weigh the four Step 1 Trends equally and (2) 62% of clients select the Availability Health Rule (one of five Step 2 rules). Opp. 36. Plaintiffs do not explain *why* these client-selected configurations—which accounts for only 4.6% of configurations[31]—constitute the universe of "core pricing judgments" while all other RIQ settings are relegated to a "discretion at the margins" bucket. *Id*. 37. Indeed, it makes no sense to argue that using the Availability rule

---

[27] SOIs are not legal authority. Dkt. 520 1-2.

[28] *U.S. v. Masonite Corp*., 316 U.S. 265, 275 (1942) (competing down-chain suppliers contracted with supplier to sell product at a fixed price).

[29] *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 776, 782-83 (1975) (bar association enforced set fee schedule from which members did not deviate).

[30] *U.S. v. Socony-Vacuum Oil Co*., 310 U.S. 150, 192 (1940) (refiners agreed to purchase oil from the same suppliers, at the same intervals, and priced using a formula that averaged high and low price quotes from two trade journals).

[31] Yenikomshian Rebuttal ¶23. Plaintiffs quibble with Yenikomshian's tallied number of configuration changes. Opp. 35. But Marinescu concedes there were at least 1.4m configuration changes, resulting in 167 average daily changes per property. Yenikomshian Rebuttal ¶36.

is a "core" pricing decision while conceding that 38% of clients do not use it.[32]  Arbitrarily rebranding swaths of RIQ's pricing methodology as "peripheral" writes off and misconstrues material aspects of the software.[33]  For example, focusing only on 40 material pricing metrics on one day, Landlord Defendants used 2,417 distinct configurations.[34]  Although Plaintiffs ignore many configurations, their omissions regarding Health Rules, Step Size, and Step 3 are particularly egregious.[35]

*First*, whether clients have a particular Health Rule selected says nothing about *how* that client is using it.  Two properties may both enable the Availability rule (or any other Health Rule) yet configure materially different thresholds and multipliers.  Yenikomshian Rebuttal ¶26.

Consider just the multipliers.  Assuming the same base rent, one client could configure a Health Rule in Step Two to take 50% of the pricing output from Step One, while another client set the magnifier to 150%, resulting in markedly different movements.[36]  Clients may also configure increase and decrease multipliers for different thresholds.  MSJ 7-8.  Yardi does not dictate which Health Rules a client enables, how the client configures them, or share the configurations among clients.  *Id.* 6-10.

---

[32] Plaintiffs cite marketing statements regarding the separate Predicted 30-Day Availability Health Rule as a distraction.  This rule analyzes a *property's own data*, weighting it via coefficients generated by a logistic regression model trained on nationwide, aggregated, and anonymized non-pricing data from a set of 25,000+ Voyager residential properties.  MSJ 8-9.  Undisputedly, no more than 25% of clients use this rule.  Marinescu ¶267.

[33] Mitzenmacher Rebuttal ¶¶26-31.

[34] *Id.* ¶30-31.

[35] *See also* Yenikomshian Rebuttal ¶51 (disregards three other Trend rules), ¶52-56 (pricing adjustments are lagged and capped); Yenikomshian ¶74 (client selection of multiple health rules).

[36] Yenikomshian Rebuttal ¶¶25-29.

**Second**, Plaintiffs ignore the eight additional discounts and premiums clients can configure as part of Step 3 to calibrate pricing, which include seasonal vacancy, turn costs, lease expiration management, and stale unit discounts. Yenikomshian Appx. D, §III.C. The practical impact of these choices is not hypothetical—RIQ does not calculate a *single* asking rent for a particular unit. Rather, it calculates a *range* of possible rates using Step 3 inputs, reflected in a "pricing grid" for each available unit:

**Figure D.69**
**Screenshot of the Revenue IQ UI Showing Unit Pricing Outputs Grid Generated by Revenue IQ Based on Start Dates and Term Lengths**[392]

1 (2959-8091)

Property: **Duffy Prop 1 (duffp1)**     Date Available: **January 1, 1900**     Amenities: **$60.00**
Unit Type: **3b2b (2959-60)**     Date Ready: **December 19, 2024**     Stale Discount: **$0.00**
Description: **3 bed 2 bath**     Vacant Days: **N/A**     Notice Premium: **$0.00**
Status: **Occupied No Notice**     Available Days: **N/A**

| | 03/14/2025 - 04/01/2025 | 04/02/2025 - 05/01/2025 | 05/02/2025 - 05/24/2025 | 05/25/2025 - 05/31/2025 | 06/01/2025 - 06/01/2025 | 06/02/2025 - 06/08/2025 | 06/09/2025 - 06/15/2025 |
|---|---|---|---|---|---|---|---|
| 15 Month | $1,836 | $1,836 | $1,836 | $1,864 | $1,869 | $1,897 | $1,926 |
| 14 Month | $1,842 | $1,842 | $1,842 | $1,873 | $1,877 | $1,907 | $1,938 |
| 13 Month | $1,849 | $1,849 | $1,849 | $1,882 | $1,886 | $1,919 | $1,952 |
| 12 Month | $1,857 | $1,857 | $1,857 | $1,893 | $1,898 | $1,933 | $1,969 |
| 11 Month | $1,867 | $1,867 | $1,867 | $1,905 | $1,911 | $1,950 | $1,989 |
| 10 Month | $1,878 | $1,878 | $1,878 | $1,921 | $1,927 | $1,970 | $2,012 |
| 9 Month | $1,892 | $1,892 | $1,892 | $1,939 | $1,946 | $1,994 | $2,041 |
| 8 Month | $1,910 | $1,910 | $1,910 | $1,963 | $1,971 | $2,024 | $2,077 |
| 7 Month | $1,932 | $1,932 | $1,932 | $1,993 | $2,002 | $2,063 | $2,124 |
| 6 Month | $1,962 | $1,962 | $1,962 | $2,033 | $2,043 | $2,115 | $2,186 |

Yenikomshian Appx. D, ¶D.176. The above figure shows that the calculated asking rent for one unit ranges from $1,836 to $2,186 a month. Marinescu concedes a rate differential of ~$350 would be relevant to a renter. Marinescu Tr. 110:7-111:10.

***Third***, Plaintiffs ignore that RIQ clients must individually select a "step size amount," which controls how much a unit's price can go up or down each day and can significantly affect pricing. MSJ 6.

**Figure D.26**
**Screenshot of the Revenue IQ UI Where Clients Can Input Reference Rent Change Amount**[173]

Asking Rent Changes

| Reference Rent Change Amount | ⓘ | | Schedule Different Reference Rent Change Amount | ⓘ |
|---|---|---|---|---|
| 3 bedrooms | 0.33% | | 3 bedrooms | 🔵 |
| 2 bedrooms | 0.33% | | 2 bedrooms | ⚪ |

Yenikomshian Appx. D, ¶D.87.

In short, after failing to dispute Yardi's evidence proving how RIQ works, Plaintiffs cannot ignore most of its functionality to suggest that RIQ constitutes a common formula.

### D. RIQ Clients Freely Deviate from the Bespoke Pricing Outputs RIQ Calculates

RIQ users are not required to approve daily pricing outputs precisely because RIQ utilizes each client's individually set Reference Rent, property specific data, and that client's own configurations to calculate their unique pricing outputs. MSJ 6. Even though pricing is client dictated, Plaintiffs concede that RIQ clients still deviate from those outputs ***between 22% and 35% of the time***.[37] *See In re*: *RealPage, Inc., Rental Software Antitrust Litig.*, 709 F. Supp. 3d 478, 519 (M.D. Tenn. 2023) (finding that a 10-20% deviation rate precluded finding "absolute delegation of [] price-setting"); *Gibson v. MGM Resorts Int'l*,

---

[37] Marinescu improperly excluded concession data from her analysis. Marinescu Tr. 230:6-232:4. Adjusting for concessions using Marinescu's methodology produces a deviation rate of 35%. Yenikomshian Rebuttal ¶15.

YARDI SYSTEMS' REPLY ISO
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – Page 14

2023 WL 7025996, at *3 (D. Nev. Oct. 24, 2023) (rejecting the inference that a 90% acceptance rate suggested pricing recommendations were mandatory).

Plaintiffs argue that clients' transaction prices tend to deviate only 1.4% on average from the calculated pricing outputs, but this misleading figure considers the entire population of executed lease data (*i.e.*, when clients deviate and when they do not).[38] Marinescu admits that when clients deviate from the daily calculated output, they do so by nearly 7% on average—a significantly higher number, particularly given that clients deviate roughly a third of the time. Yenikomshian Rebuttal ¶16. This undisputed evidence further proves that RIQ is not a vehicle for price collusion, as clients retain decisionmaking authority and regularly deviate from their own pricing outputs.

## IV. Yardi's Benchmark Reporting Aligns with Precedent

### A. Benchmarking Does Not Facilitate a "Give-to-Get" Amongst RIQ Clients

Plaintiffs argue that Yardi's Benchmark Reporting *could* violate antitrust law, describing it as a "'give-to-get' structure" based on "mandatory contribution paired with reciprocal redistribution inside a shared system." Opp. 38.[39]

Here too, Plaintiffs erroneously assume that RIQ clients collusively select *other* RIQ clients for their Benchmark Sets. Marinescu Tr. 121:22-122:21. Four undisputed facts stand in their way: *First*, clients individually select each Benchmark Set, with 98% of RIQ clients requesting unique Benchmark Sets. Yenikomshian ¶190. *Second*, only 12.2% of properties in Landlord Defendants' Effective Benchmark Sets are RIQ properties. Mitzenmacher Rebuttal ¶46. *Third*, Comps—which are *not* limited to other RIQ clients—

---

[38] Yenikomshian Rebuttal ¶16.

[39] Plaintiffs misleadingly characterize "Yardi's data use clause," as mandating "participation" in the purported conspiracy. Opp. 9, 25; Marinescu ¶12. But the contract does not refer to any confidential data exchange between clients. To the contrary, the clause in question *prohibits* confidential data sharing and requires data to be aggregated and anonymized such that it is not traceable to any client. Opp. Ex. 16. Moreover, Plaintiffs' conspiracy hinges on RIQ use, but this is Yardi's standard data use provision for all Yardi software. Declaration of Brady Bustany (Dkt. 473), ¶1.

YARDI SYSTEMS' REPLY ISO
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – Page 15

are *not* "automatically included" in every Effective Benchmark Set, as Marinescu claims.[40] In fact, of a Landlord Defendant's 4.9 average Comps, only 35% (approximately 1.7 properties) are included in Effective Benchmark Sets on average. Yenikomshian Rebuttal ¶65. **Fourth**, clients have no idea which selected properties are included in any Benchmark output, as they request 29 properties on average for their Benchmark Sets, while the Benchmarking results reflect data from an "effective" average of 9.4 properties. MSJ 19-20. Accordingly, no such give-to-get structure exists. *Cf. In re Pork Antitrust Litig.*, 781 F. Supp. 3d 758, 787 (D. Minn. 2025) (benchmarking was comprised solely of subscriber (*i.e.*, competitor) information and available only to subscriber/competitors, unlike here); *Todd v. Exxon Corp.*, 275 F.3d 191, 211-12 (2d Cir. 2001) (benchmark sets consisted "of as few as three competitors", while here they consisted of ~9.4); United States Statement of Interest, *In re Frozen Potato Prods. Antitrust Litig.*, Case No. 1:24-cv-11801 (Dkt. 266) (N.D. Ill. Feb. 27, 2026) (benchmarking platform available to and comprised of data from four subscribers who controlled nearly 100% of the market).

**B.    Benchmarking Is Untethered to RIQ Pricing Outputs and Cannot Facilitate Realtime Pricing Decisions**

Plaintiffs do not contest that Yardi Benchmarking data consists of aggregated, anonymized, noisy weighted averages that cannot "reveal the actual price of any [rental unit]." *Portillo v. CoStar Grp., Inc.*, 2025 WL 2495053, at *5 (W.D. Wash. Aug. 29, 2025) (Lasnik, J.); *Todd*, 275 F.3d at 211-12 (favoring information that "'avoid[s] transactional specificity"). In one of the only cases cited in their opposition, Plaintiffs quote *In re Pork* on the ability of benchmarking to provide competitor "focal points" related to pricing. Opp. 40. But there, recipients of reports knew which competitors' data fed into their reporting, the reporting data was easily dis-aggregable, and defendants deanonymized the reports 60% of the time. *In re Pork*, 781 F. Supp. 3d at 867, 870. None of that is true here.

---

[40] Marinescu ¶223.

YARDI SYSTEMS' REPLY ISO
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – Page 16

Here, Landlord Defendants' inability to reverse engineer underlying data points is one among many relevant factors confirming that Yardi's Benchmarking is lawful. Plaintiffs ignore the significant information lost in aggregating the data, weighting the averages, and applying "noise" to each output. Mitzenmacher ¶71. Plaintiffs do not dispute the stark differences between individual inputs (none of which are revealed in Benchmarking) and Yardi Benchmarking outputs. Undisputed evidence shows that the average range between minimum and maximum individual Benchmarking KPI inputs is 62.5% of the output. Marinescu Tr. 207:5-16. For the "New Lease Rent Per Unit" KPI, the median average deviation between the underlying KPI inputs and the corresponding KPI outputs was nearly 12%, or $205.85. *Id.*[41] When asked about this spread, Marinescu testified that it was simply useful to know whether one was above or below the market. *Id.* 206:10-208:21. But that is precisely the level of generality at which this Court has found benchmarking information permissible. *CoStar Grp.*, 2025 WL 2495053 at *5 (reports did not permit "clients to determine 'the most recent price charged or quoted' for any individual hotel rooms"). Plaintiffs argue that Yardi regularly updates CPD, which houses the underlying benchmarking data (Opp. 39), but do not dispute that (1) KPI outputs are *only presented* historically in monthly increments[42]; (2) numerous KPIs are inherently time-lagged[43]; and (3) clients, in practice, seek dated information, with 59% of requests *ending* at least eight weeks in the past.[44] Yardi's Benchmarking is thus entirely distinct from *In re Pork*'s pushing of weekly and monthly easily dis-aggregable reports to all defendants, who did in fact regularly disaggregate them.[45]

---

[41] Marinescu's report claims that the "law of large numbers" has a smoothing effect on this data, Marinescu ¶427, but she assumes an average of 29 properties contribute to each KPI rather than the 9.4 that return results, which negates the law's relevance. Mitzenmacher Rebuttal ¶¶37-44.

[42] Yenikomshian ¶194.

[43] MSJ 35-36.

[44] Yenikomshian ¶157. Meaning, for example, a request made today would seek information from January 23, 2026 and earlier, but no more recent.

[45] *In re Pork*, 781 F. Supp. 3d at 832.

Yardi has thus proven beyond dispute that Benchmarking is useful for broad, backward-looking trends, *not* for pricing individual units. MSJ 33-35. The former is clearly permissible, as *Costar* makes clear. The latter RIQ undisputedly does not provide.

## V.    Yardi Does Not Police RIQ Use

In trying and failing to present a coherent conspiracy, Plaintiffs want to paint Yardi's TAMs as the police of the cartel but lack any evidence of the requisite enforcement or punishment. Tucker Rebuttal §V.C. The fact that Yardi TAMs might review a client's pricing with that client and identify instances where the client might not be pricing optimally according to their own strategy does not provide evidence of collusion with other landlords.[46] Marinescu does not identify evidence of any costs to landlords of ignoring configuration advice from TAMs, and fails to explain how TAM actions could reflect an enforcement mechanism to prevent participants from deviating from an alleged conspiracy.[47]

Plaintiffs' evidence merely shows that TAMs are "deployed" to provide basic client support.[48] ***First***, Yardi's reporting on "deviations" from pricing outputs (the "lease audit") permits: (1) supervisors *at a Yardi client* to see if their own strategic pricing policy is being implemented in practice *by its own employees*; and (2) TAMs to spot opportunities to align *a client's own* RIQ configurations with *its own* goals.[49] RIQ is designed to make pricing more efficient, and if a client regularly deviates from its own pricing outputs, TAMs  may

---

[46] *Id*. at ¶87.

[47] *Id*. at ¶88. Citing internal Yardi analyses, Plaintiffs use terms like "scorecard," "points," and "ranking" to suggest that RIQ clients were rewarded (or penalized) based on their adherence to pricing that aligned with their benchmarks. This is unsupported on the record. For example, Plaintiffs have latched on to the term "penalty" to claim that clients were penalized when properties fell below their benchmarks. Opp. 1, 17, 18, 24, 28, 31. But Yardi's Liana Rao explained this as a term of art applied to a metric demonstrating when a value is below a threshold pursuant to an excel formula. Opp. Ex. 15, 232:24-245:2. There is no evidence that these analyses were ever shared with any client, nor that they connected to any punishment. Further, the "ranking(s)" Plaintiffs cite rank a property's performance compared *against its own chosen benchmarks*. *Id*. 222:22-224:16.

[48] Tucker Rebuttal ¶87.

[49] 3/23/26 Tabaie Decl., Ex. J, Bradford Tr. 215:13-216:24.

suggest that configurations could be adjusted to align with a client's pricing goals.[50]  It is not controversial for Yardi to correlate actual RIQ *use* with client satisfaction.  Moreover, Plaintiffs lack any evidence that clients are constrained from deviating from their pricing outputs at will, as they do approximately a third of the time.  *Supra* 16.  Although Plaintiffs refer to Yardi tracking clients' "measure of independence," this is just a reference to clients changing their *own* configurations versus asking the TAM to click the buttons for them.[51]

   ***Second***, TAMs do not share confidential information between clients,[52] and Plaintiffs have no evidence suggesting otherwise.  Plaintiffs at best advance evidence that TAMs may, at a client's request, help a client interpret their *own* aggregated, anonymized Benchmarking reports reflecting the client's selected Benchmark Set,[53] which is entirely lawful.  Plaintiffs refer to "TAM call notes," which are simply internal meeting notes between Fazio and various TAMs (never clients), regularly discussing the various client-specific reasons a particular property might be priced in a certain manner (whether above, below, or in line with their own chosen benchmarks, not other client's information).[54]

   ***Third***, TAM-client meeting notes show TAMs providing individualized client support and often reflect client requests, not Yardi directives. Marinescu Figure 55 (YARDI-DUFFY_01385214); 2/24/2026 Declaration of Abraham Tabaie (Dkt. 509), ¶31, Ex. D (Bradford testimony that TAM support is tailored to whatever that particular client needs or wants); *id.* ¶¶34-37, Ex. E (Ivinskas testimony that many statements in call notes were statements made by clients).  Marinescu's two cited excerpts from these notes show that property-specific needs such as recent flooding and issues with HVAC caused a client to freeze pricing notwithstanding Benchmarking data.  Marinescu Figure 56 (YARDI-

---

[50] 2/24/26 Tabaie Decl. ¶¶34-35.

[51] *Id.* Ex. E 25:19-26:5.

[52] MSJ 12.

[53] 11/24/25 Tabaie Decl., Ex. D. 306:6-17.

[54] Marinescu Figure 52 (YARDI-DUFFY_00923993); 2/24/26 Tabaie Decl. ¶47, Ex. G (Fazio's testimony that his analyses considered only a client's own chosen benchmarks, and he did not have access to the underlying deanonymized data).

DUFFY_01392173).[55]  The handful of marketing documents Plaintiffs cite do not change this.  Since RIQ's inception, marketing documents have highlighted flexibility and configurability. Opp. Exs. 38, 78.  Marketing language emphasizing a product's ease of use or referring to "starter settings" or "best practices" (Opp. Exs. 32, 61, 62), does not reflect client constraints—it simply touts Yardi's ability to help clients implement configuration decisions efficiently.  Providing software support does not change the type or number of decisions clients must make before using RIQ, nor the type or number of changes they can and do make while using the product.

In sum, Plaintiffs fail to advance evidence of a TAM "policing" any client, and conjecture is insufficient to survive summary judgment. *Richards v. Neilson Freight Lines*, 810 F.2d 898, 902 (9th Cir. 1987).

## VI.   Plaintiffs' Conspiracies Ultimately Fail Under *Gibson*

Plaintiffs do not challenge Yardi's overwhelming evidence that, as Yardi has said over (and over) again, RIQ relies on a client's own information and publicly available asking rents, and applies client-selected configuration choices to calculate pricing outputs. Clients can then use, lose, or ignore those outputs entirely.  Independent from Plaintiffs' erroneous pricing impact analyses, these facts are incompatible with an agreement to mutually delegate decisionmaking to Yardi as the "hub" of a hub-and-spoke conspiracy, because there is no horizontal agreement "along the rim" to restrain trade.

Plaintiffs purport to abandon their vertical claim (Opp. 25) in a transparent attempt to escape *Gibson*.  But saying does not make it so. At bottom, Plaintiffs' claims depend entirely on facts going to agreements and interactions between Yardi and each of its software licensees. But Yardi and its clients do not and cannot have a "vertical" relationship for antitrust purposes.  *Gibson*, 148 F.4th at 1081-82 ("[V]ertical restraints operate up and

---

[55] Marinescu did not even know (1) Plaintiffs deposed two TAMs in this matter or (2) Yardi produced over 10,000 client emails and more than 600 client call notes by November 2025. Marinescu Tr. 63:21-64:7, 65:15-66:2; 67:8-18.

YARDI SYSTEMS' REPLY ISO
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – Page 20

down a supply chain" in the relevant market, and a software provider does not operate in the supply chain for hotel rooms.).  Plaintiffs are ultimately left with a collection of ordinary licenses, "none of which individually restrains trade" in any relevant market and they cannot use a vertical claim "as a backdoor" to an antitrust conspiracy between competitors.  *Id.* at 1087-88, n.12 ("[A] wheel without a rim is not a single conspiracy.").[56]

A rule that any software agreement with a standard data use provision would satisfy Section 1's "agreement" prong directly contradicts *Gibson*'s holding that an unlawful agreement must be one *to restrain trade*.  *Id.*  A non-exclusive software license is merely an agreement that one client may—but is not required—to use the software in question and it is not unlawful under the antitrust laws.

## CONCLUSION

Yardi respectfully requests that the Court grant summary judgment as to each cause of action.

RESPECTFULLY SUBMITTED this 23rd day of March 2026.

**McNAUL EBEL NAWROT & HELGREN PLLC**

By: */s/ Claire Martirosian*
Claire Martirosian, WSBA No. 49528
Richard W. Redmond, WSBA No. 58835
600 University Street, Suite 2700
Seattle, WA 98101
(206) 467-1816
cmartirosian@mcnaul.com
rredmond@mcnaul.com

**DEBEVOISE & PLIMPTON LLP**

By: */s/ Maura K. Monaghan*

Maura K. Monaghan (*pro hac vice*)
Michael Schaper (*pro hac vice*)
66 Hudson Boulevard
New York, NY 10001

---

[56] Plaintiffs' counsel here dropped their other client's hub-and-spoke claim on appeal in *Gibson*, presumably to avoid the Ninth Circuit rejection of their claims here.

YARDI SYSTEMS' REPLY ISO
SUMMARY JUDGMENT (No. 2:23-cv-01391-RSL) – Page 21

(212) 909-6000
mkmonaghan@debevoise.com
mschaper@debevoise.com

Abraham Tabaie (*pro hac vice*)
David Sarratt (*pro hac vice*)
650 California Street
San Francisco, CA 94108
(415) 738-5700
atabaie@debevoise.com
dsarratt@debevoise.com

*Attorneys for Defendant YARDI SYSTEMS*

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Yardi Systems, Inc., certifies that this brief contains 5,991 words, in compliance with LCR 7(e)(4) and the Parties' Joint Stipulation.

By: */s/ Claire Martirosian*

Claire Martirosian