**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| *In Re YARDI REVENUE MANAGEMENT ANTITRUST LITIGATION* | Case No.: 2:23-cv-01391-RSL |
| MCKENNA DUFFY, individually and on behalf of all others similarly situated, | **DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.** |
| Plaintiffs, | |
| v. | |
| YARDI SYSTEMS, INC., *et al.*, | |
| Defendants. | |

# TABLE OF CONTENTS

I. ASSIGNMENT AND QUALIFICATIONS..................................................................... 4

II. SUMMARY OF OPINIONS ............................................................................... 5

III. DR. MARINESCU DOES NOT CONTEST MY SOURCE CODE ANALYSIS, INCLUDING THAT CLIENT-SELECTED CONFIGURATION AND CLIENT-SPECIFIC DATA DRIVES PRICING OUTPUTS .......................................................................................... 7

IV. DR. MARINESCU'S ANALYSIS CONFIRMS YARDI'S CLIENTS FREQUENTLY DEVIATE FROM REVENUE IQ PRICING OUTPUTS THROUGH OVERRIDES AND CONCESSIONS AT A RATE OF ABOUT 35% .............................................................................................. 9

V. DR. MARINESCU'S CONFIGURATION ANALYSIS IS FLAWED AND CREATES A FALSE APPEARANCE OF COMMONALITY ........................................... 11

    A. Dr. Marinescu's Widespread Exclusion of Configuration Data Fields is Arbitrary and Unsupported by the Revenue IQ Source Code ................................... 12

        1. Dr. Marinescu Excludes Health Rule Settings That Have a Material Impact on Pricing Outputs ........................................... 16

        2. Dr. Marinescu Excludes All Step Three Configurations .......................... 18

    B. Insertions and Deletions in the Configuration Data Are Relevant, And Configuration Data Shows Substantial Customization Even Without Them ................................................................................................ 19

    C. Dr. Marinescu's Analysis of Client-Selected Configurations Is Unreliable and Based on a Fundamental Misunderstanding of Revenue IQ and Its Source Code, Which She Admits She Did Not Review or Analyze ............................................................................................. 20

VI. DR. MARINESCU'S CLAIM THAT THE COMP TREND "RATCHETS" PRICES UPWARD IS INCORRECT AND UNSUPPORTED ......................................... 21

-2-

A.    Dr. Marinescu's Characterization of the Comp Trend as an Upward Price Ratchet Relies on False Assumptions.................................................... 23

    1.    Landlord Defendants Typically Do Not Select Other Revenue IQ Clients as Comps ................................................... 23

    2.    The Comp Trend Does Not Operate in Isolation ................................... 25

    3.    The Comp Trend is Calculated Based on Lagged Data and its Influence on Revenue IQ Pricing Outputs is Capped by Client-Configured Step Size .................................................... 30

VII.    DR. MARINESCU'S BENCHMARKING THEORY IS CONTRADICTED BY THE SOURCE CODE AND EMPIRICAL USAGE DATA AND IS UNSUPPORTED.......................................................................................... 32

A.    Dr. Marinescu Fundamentally Misunderstands the Benchmarking System.................................................................................................. 32

B.    Dr. Marinescu Is Wrong to Assume Comp Sets Are Always in a Subject Property's Effective Benchmark Set.............................................. 34

VIII.    DR. MARINESCU'S TAM ENFORCEMENT ANALYSIS IS NOT REPRODUCIBLE .......................................................................................... 36

IX.    DR. MARINESCU'S DATA PROCESSING IS FUNDAMENTALLY FLAWED.......................................................................................................... 38

## I.    ASSIGNMENT AND QUALIFICATIONS

1.    On November 24, 2025, I filed a declaration in this matter ("Opening Report")[1] in which I reviewed the Revenue IQ source code and data sets produced in this matter from September 8, 2019, through the time of my report filing, and assessed:[2]

    a.    How the Revenue IQ pricing outputs are generated.

    b.    The extent, if any, to which client-provided, property-specific data and client-selected settings directly determine the rental pricing outputs in Revenue IQ.

    c.    Which data, if any, is shared between Revenue IQ clients to calculate rental pricing outputs.[3]

    d.    The role and impact of statistical learning, if any, and the logistic regression models in Revenue IQ.

    e.    The frequency with which Revenue IQ clients adopt or deviate from Revenue IQ's pricing outputs.

    f.    The functionality and use of the Benchmarking system.

2.    I have now been asked to review the Expert Report of Dr. Ioana Marinescu, filed on February 9, 2026, ("Marinescu Report"),[4] and to provide analysis of its conclusions and analyses

---

[1]    Declaration of Mihran Yenikomshian in Support of Yardi Systems, Inc.'s Motion for Summary Judgment, *McKenna Duffy, individually and on behalf of all others similarly situated, Plaintiffs, v. Yardi Systems, Inc., et al., Defendants, United States District Court, Western District of Washington at Seattle*, 2:23-CV-01391-RSL, November 24, 2025 ("Yenikomshian Opening Report").

[2]    Unless otherwise indicated, I use the same terminology in this Report as in my Opening Report, and terms have the same meanings as defined therein.

[3]    As in my Opening Report, when I refer to "clients" in this Declaration, I am referring to an individual customer of Yardi's Revenue IQ (or other) products. In practice, one "client" may involve multiple employees at a Yardi customer that are given access to the same underlying property data or the property data for multiple different properties via their own login credentials.

[4]    Expert Report of Ioana Marinescu, Ph.D. in Support of Plaintiffs' Opposition to Yardi's Motion for Summary Judgment, *Wylie Duffy and Michael Brett, individually and on behalf of all others similarly situated, Plaintiffs, v. Yardi Systems, Inc., et al., Defendants, United States District Court, Western District of Washington at Seattle*, 2:23-CV-01391-RSL, February 9, 2026 ("Marinescu Report").

-4-

as they relate to my Opening Report. Further, I have been asked to review and analyze statements in a memorandum filed by Plaintiffs that refers to and cites the Marinescu Report ("Plaintiffs' Opposition Brief").[5]

3.    I described my full qualifications in my Opening Report.[6] A copy of my most current curriculum vitae is attached as **Appendix E** to this report, and the list of testimony I have given in the past four years is attached as **Appendix F**.

4.    The materials that I relied upon in forming my opinions are listed in the attached **Appendix G**. I have also included a copy of the figures in this Report in full-page format in **Appendix H**. Should additional relevant documents or information be made available to me, I reserve the right to adjust or supplement my opinions as appropriate.

## II.    SUMMARY OF OPINIONS

5.    Based on the information I reviewed, including my analysis of the Marinescu Report and backup materials, I have reached the following opinions:

6.    Dr. Marinescu does not dispute my technical findings regarding how Revenue IQ pricing outputs are generated. She does not analyze the Revenue IQ source code and does not identify any portion of the system that operates differently than described in my Opening Report. Nor does she contest the central role of client configuration and property-specific data in Revenue IQ's pricing logic. *See* **Section III**.

7.    Dr. Marinescu's own analysis is consistent with my finding that Landlord Defendants frequently deviate from Revenue IQ's pricing outputs through overrides and concessions. In her deposition, she testified that concessions constitute deviations. When concessions are included in her analysis, deviations occur in approximately 35% of transactions. *See* **Section IV**.

---

[5]    Plaintiffs' Opposition to Defendant Yardi Systems, Inc.'s Motion for Summary Judgment, *Wylie Duffy and Michael Brett, individually and on behalf of all others similarly situated, Plaintiffs, v. Yardi Systems, Inc., et al., Defendants, United States District Court, Western District of Washington at Seattle*, 2:23-CV-01391-RSL, February 9, 2026 ("Plaintiffs' Opposition Brief").

[6]    Yenikomshian Opening Report, **Section I.A**.

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                    CASE NO.: 2:23-CV-01391-RSL

8.      Dr. Marinescu testified that she did not identify any technical errors in my analysis of Revenue IQ's configurability and acknowledged that her opinion is based on economic interpretation rather than any analysis of the software or how it functions. Her configuration analysis is therefore not grounded in any examination of the Revenue IQ source code. Instead, she excludes numerous configuration settings based on incorrect assumptions about their meaning and relevance. This approach omits relevant configurations and produces an incomplete and distorted view of the system, creating an artificial appearance of similarity across Landlord Defendants that is not grounded in how Revenue IQ actually operates. *See* **Section V**.

9.      Dr. Marinescu's characterization of the Comp Trend as a mechanism that "ratchets" prices upward is not grounded in any review of the Revenue IQ source code and reflects a fundamental misunderstanding of how the Comp Trend Rule operates. Her opinion also disregards the available empirical data produced, which she did not examine and which directly contradicts her conclusions. Her conjecture lacks both a technical and empirical foundation and is false. *See* **Section VI**.

10.      Dr. Marinescu's claim that Benchmarking provides "comprehensive visibility on rivals' pricing" is not grounded in any review of the Benchmarking source code and reflects a fundamental misunderstanding of how the system operates. She incorrectly asserts that Benchmarking provides visibility into actual prices or discounts offered by other properties, when in fact Benchmarking outputs consist of aggregated and anonymized statistics computed after the application of noise to an Effective Benchmark Set that is not observable or known to the client. Her analysis also disregards the available empirical data produced, which she did not examine and which, as I show, directly contradicts her assumptions, including her claim that Comp properties are broadly included in Benchmarking outputs. As a result, her conclusions lack both a technical and empirical foundation and therefore are unsupported and unreliable. *See* **Section VII**.

11.      Dr. Marinescu's theory of Yardi's Technical Account Managers ("TAMs") serving as a "monitoring-and-enforcement" mechanism relies on a dataset that does not contain interactions

between clients and TAMs and on another dataset created by Plaintiffs' counsel, leaving her results unreproducible. *See* **Section VIII**.

12.     Dr. Marinescu's "Yardi Lease Price Index," which she relies on to infer sustained rent increases and TAM-related effects, is mechanically flawed and produces erroneous and artificial results. She fails to remove "implausible" rent values (e.g., a rent of *40 cents or $1.00* per month) and improperly treats gaps in lease terms as consecutive observations, which generates extreme and distorted month-to-month rent changes. These errors mechanically create the spikes and growth patterns she interprets as evidence of coordinated pricing. When these errors are corrected using what she agrees are standard data-cleaning approaches, what she claims to be increases in Revenue IQ rents relative to the U.S. Consumer Price Index ("CPI"), and the patterns she attributes to TAM activity and Revenue IQ, disappear. Her conclusions based on the "Yardi Lease Price Index" are therefore unreliable. *See* **Section IX**.

**III.     DR. MARINESCU DOES NOT CONTEST MY SOURCE CODE ANALYSIS, INCLUDING THAT CLIENT-SELECTED CONFIGURATION AND CLIENT-SPECIFIC DATA DRIVES PRICING OUTPUTS**

13.     Dr. Marinescu's opinions are based on a flawed understanding of Yardi's Revenue IQ and Benchmarking systems, and as a result her conclusions do not withstand scrutiny. Dr. Marinescu did not analyze or engage with any of the produced source code that implements Revenue IQ's pricing logic or the Benchmarking calculations.[7] Instead, her conclusions are derived primarily from flawed analysis of historical client configuration datasets and false characterizations of how she assumes the Revenue IQ and Benchmarking systems function, which are untethered

---

[7]     Deposition Transcript of Ioana Marinescu, Ph.D., *McKenna Duffy, individually and on behalf of all others similarly situated, Plaintiffs, v. Yardi Systems, Inc., et al., Defendants, United States District Court, Western District of Washington at Seattle*, 2:23-CV-01391-RSL, March 9, 2026 ("Marinescu Deposition"), at 60:6-10 ("Q. But you don't have a basis to dispute Mr. Yenikomshian's review of the source code itself. Is that right? A. I did not review the source code."), at 56:13-23 ("Q. […] Did he ever tell you that Mr. Yenikomshian's source code analysis was wrong? A. […] I haven't myself looked at the source code."), at 46:20-24 ("Q. Okay. But you're not relying on your own review of the source code. Correct? A. I am not relying on my own review of the source code in it.").

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                    CASE NO.: 2:23-CV-01391-RSL

from how Yardi's systems work. Dr. Marinescu's assumptions are wrong and contrary to what the source code shows.

14.    In my Opening Report I included detailed analyses of Revenue IQ and Revenue IQ User Interface ("UI") codebases,[8] and of the Benchmarking source code and system architecture.[9] Dr. Marinescu does not dispute these analyses. Specifically, Dr. Marinescu does not dispute:

    a.    My descriptions that Revenue IQ's pricing outputs are driven by client-selected configuration settings.[10] These client settings show how clients are in full control of their own pricing.[11]

    b.    My conclusion that Revenue IQ's pricing calculations are driven by client-provided, property-specific data.[12]

    c.    My description of Yardi's Benchmarking system architecture, showing how Benchmarking generates aggregated, anonymized, historical Key Performance Indicator ("KPI") outputs and operates independently from Revenue IQ's pricing logic.[13]

    d.    My empirical analyses and findings that support Yardi's Benchmarking safeguards that limit the information available to users.[14,15]

---

[8]    Yenikomshian Opening Report, **Appendix D**, **Section II.A**.

[9]    Yenikomshian Opening Report, **Sections VII.A-VII.B** and **Appendix D, Section IV**.

[10]    Yenikomshian Opening Report, **Sections V.A-V.B**.

[11]    Marinescu Report, ¶ 246.

[12]    Marinescu Report, ¶¶ 165, 236-238.

[13]    Yenikomshian Opening Report, **Sections VII.A-VII.B**. *See also*, Marinescu Deposition, at 202:13-17 ("Q. But you don't mean visibility into any specific competitor's price. Correct? A. I mean visibility on the average of competitors.").

[14]    Yenikomshian Opening Report, ¶¶ 150, 156-160, 190.

[15]    Marinescu Deposition, at 204:20-207:4 ("Q. Do you dispute Mr. Yenikomshian's conclusion that, for new lease rent benchmarking, the median average deviation between the underlying KPI inputs and the corresponding KPI outputs was nearly 12 percent, or $205.85? […] You don't dispute that figure in your report. Correct? […] A. […] I have not independently recalculated this figure and I have, in that sense, no basis to confirm or disconfirm. But I am happy to take it for what it is and explain what -- my analysis of what it means."), at 207:5-16 ("Q. And

-8-

## IV.   DR. MARINESCU'S ANALYSIS CONFIRMS YARDI'S CLIENTS FREQUENTLY DEVIATE FROM REVENUE IQ PRICING OUTPUTS THROUGH OVERRIDES AND CONCESSIONS AT A RATE OF ABOUT 35%

15.   Dr. Marinescu and I agree that Revenue IQ clients frequently deviate from Revenue IQ's pricing outputs,[16] and that these deviations include both Override Deviations (i.e., manual changes to monthly effective rent) and Concession Deviations (i.e., one-time discounts such as a free month).[17,18,19] Despite this, Dr. Marinescu incorrectly reports an override-based Deviation Rate

[16]   Yenikomshian Opening Report, ¶ 24; Marinescu Report, ¶ 459. Dr. Marinescu calculates an override rate of 22%, indicating a deviation rate of at least 22%.

[17]   In **Section 8.2.1**, Dr. Marinescu discusses overrides as a mechanism for Landlord Defendants to deviate from Revenue IQ's "list price." In **Section 8.2.2**, Dr. Marinescu describes concessions as a way for clients to deviate from Revenue IQ's list prices: "Because Yardi automatically posts Revenue IQ's list prices on public apartment listings, one of the primary mechanisms clients could use to deviate from these list prices is to offer discounts and concessions." In addition, earlier in her report, Dr. Marinescu does in fact group concessions (or discounts) and overrides together when discussing deviations. "I then assess whether, in combination, these mechanisms increase adherence to Revenue IQ's recommended list price and **reduce deviations through discounts or overrides**, resulting in higher effective rents." (emphasis added). Marinescu Report, ¶ 243.

[18]   Yenikomshian Opening Report, ¶ 115.

[19]   Marinescu Deposition, at 230:21-231:20 ("Q. And you would agree that a rental concession is a form of deviation from the Revenue IQ pricing output. Correct? A. What my analysis is looking at here is the total all-in-all price including the concession. And the point is that, you know, that total all-in-all price, you know, is more likely to be consistent with the recommended Revenue IQ price than just the pre-concession price. And I think, you know, I think that that's a better way of looking at it. But, you know, different people might disagree. I do feel like, you know, the final price is really -- I mean, we're talking about what matters to the renter, whether it's concession or whatever it is. In the end, the final price is important. And so that's -- the adjustment is to look at the final price. And it seems like there's even less deviation there, but, you know, even if you take Mr. Yenikomshian's number at face value, deviations are fairly limited.").

in this same line of analysis of Mr. Yenikomshian, Paragraphs 172 to 174, and 173 […] 'The range between the minimum and maximum KPI inputs is on average 62.5 percent, median, 39.2 percent of the benchmarking KPI output.' And am I correct that you didn't independently evaluate that or dispute that in your report? A. I did not independently evaluate this."), at 208:22-209:14 ("Q. Do you recall Mr. Yenikomshian's analysis that the average number of properties in the requested benchmarked sets of Revenue IQ users is about 29? A. Where is that? Q. Paragraph 147. I think the figure might be in Note 265 […] A. Thank you. Yes, I see that. It says, 'I found the benchmark sets requested by clients obtained an average of 29.2 properties.' Q. And, again, that's not something that you independently are disputing. Correct? A. I have not re-analyzed this.").

-9-

of 22% in her report.[20] While this figure is broadly consistent with the 27.8% Deviation Rate I calculated in my Opening Report,[21] it excludes deviations arising from concessions. When concessions are included, consistent with Dr. Marinescu's testimony that they constitute deviations,[22] her approach yields a Deviation Rate of approximately 35%, an increase of roughly 13 percentage points.[23,24]

16.    Dr. Marinescu also agrees that deviations are, on average, downward relative to the Revenue IQ pricing output. Her own Figure 76, shown below, demonstrates that what she calls the "Effective Rent" (due to deviations) has consistently been lower than the Revenue IQ

---

[20]    Marinescu Report, ¶ 459.

[21]    Dr. Marinescu mistakenly states that my Opening Report "claim[s] that 27.8% of leases were overridden by clients," which mischaracterizes my finding. My Opening Report found that 27.8% of leases contain *deviations*, which includes both overrides *and* concessions. Dr. Marinescu's approach only focuses on the override date field, and thus only captures leases with overrides only or leases with both overrides and concessions. However, leases that are concession only are excluded from Dr. Marinescu's analysis because these records do not have an override date. Marinescu Report, ¶ 459; Marinescu Backup, "03. Analysis/05. Lease Overrides/override_analysis_ext_filt.R"; Yenikomshian Opening Report, Table 9.

[22]    Marinescu Deposition, at 230:21-231:20.

[23]    Dr. Marinescu's calculation of an override rate of 22% only counts leases that have a non-missing override date. This approach excludes records where the Monthly Effective Rent differs from the Revenue IQ pricing output only because of concessions. I adjusted Dr. Marinescu's calculation to include leases that I identified in my Opening Report as containing only a concession. I then recalculated her overall deviation rate (inclusive of concessions) as 35%. Marinescu Report, ¶ 459; Backup to Marinescu Report, "02. Code/03. Clean Acceptance Data/clean_accept.R" and "03. Analysis/05. Lease Overrides/override_analysis_ext_filt.R".

The difference between the 27.8% deviation rate from my Opening Report and Dr. Marinescu's recalculated 35% deviation rate results from differences in data-cleaning rules and my more restrictive definition of an override deviation. For example, in addition to requiring a non-missing override date, I require that both the modified and original rents are positive, that the modified rent differs from the original rent, and that the ratio of modified to original rent lies between 0.5 and 2, among other conditions described in **Section VI** of my Opening Report.

[24]    I also tested an alternative approach using the methodology under which Dr. Marinescu classifies leases into "Clear Overrides," "Ambiguous," and "Clear Acceptance." I counted all leases identified as "Clear Overrides" and added any "Ambiguous" leases that I identified in my Opening Report as containing only a concession. When calculated using this method, the deviation rate is 31%. *See*, Yenikomshian Surrebuttal Report, Backup Calculations at "Analyses/marinescu_executed_lease_data_analysis;" Backup to Marinescu Report, "03. Analysis/05. Lease Overrides/ override_analysis_ext_filt.R".

-10-

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                    CASE NO.: 2:23-CV-01391-RSL

"Recommended Rent" since at least 2012, for both New Leases and Renewals. Dr. Marinescu calculates that the deviation is 6.95% on average for leases with a deviation,[25] which is equivalent to $1,251 over the course of a 12-month, $1,500/month lease.[26]

**Figure 1**
**Dr. Marinescu's Figure 76 Agrees that Deviations on Average Downwardly Adjust the Revenue IQ Pricing Output**



Figure 76: Across Only Overridden Landlord Defendant Active Lease, Transaction Prices Only Deviate 6.95% From Revenue IQ's Recommended List Price, On Average[270]

17.    Finally, Dr. Marinescu does not address or rebut my finding that "the observed deviations across clients and their properties vary substantially in both frequency and size."[27]

## V.    DR. MARINESCU'S CONFIGURATION ANALYSIS IS FLAWED AND CREATES A FALSE APPEARANCE OF COMMONALITY

18.    In my Opening Report, I analyzed the Revenue IQ Configuration Audit History dataset ("Configuration Data") produced by Yardi, which records configuration changes made by

---

[25]    Dr. Marinescu also reports a smaller average deviation of approximately 1.4% when measured across all transactions, including those with no deviation. Because this calculation includes leases with no deviation in the denominator, it understates the magnitude of deviations among the subset of leases in which a deviation actually occurs. Marinescu Report, ¶¶ 463-465.

[26]    ($1,500 × 12) × 6.95% = $1,251.

[27]    Yenikomshian Opening Report, ¶ 124.

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                    CASE NO.: 2:23-CV-01391-RSL

Revenue IQ clients.[28] Using this Configuration Data, I showed that Revenue IQ clients modify their configuration settings regularly, reflecting the system's flexible and individualized nature.[29]

19.    Dr. Marinescu does not contend that my analysis of the Configuration Data is technically incorrect.[30] She instead presents her own analysis, ignoring the actual Revenue IQ source code and excluding large numbers of user-selected configuration settings.[31] After ignoring these user-selected configuration settings, Dr. Marinescu then claims there is "no meaningful heterogeneity across clients."[32] Dr. Marinescu's conclusions rest on unsupported assumptions about the roles and functions of these settings, which leads to many errors in her analysis.[33]

A.    **Dr. Marinescu's Widespread Exclusion of Configuration Data Fields is Arbitrary and Unsupported by the Revenue IQ Source Code**

20.    Dr. Marinescu did not review or analyze the Revenue IQ source code and therefore lacks a technical basis for determining which configuration settings are relevant to how pricing

---

[28]    Yenikomshian Opening Report, ¶¶ 97-98; YARDI-DUFFY_00106927.

[29]    Yenikomshian Opening Report, ¶ 98.

[30]    Marinescu Deposition, at 52:1-17 ("Q. In parts of your report, you take issue with the configuration analysis that Mr. Yenikomshian performs. Does that ring a bell? […] A. Yes. But I want to clarify what I mean with take issue. It's, you know, it's a matter of, you know, reasonable disagreement and what I think is relevant for the economics. You know, I'm not saying that, you know, they did something that was plainly incorrect[.]").

[31]    Marinescu Report, ¶¶ 283-296.

[32]    Marinescu Report, ¶ 299.

[33]    As a preliminary matter, Dr. Marinescu mischaracterizes my use of the word "optional" in describing "optional first-layer" or "optional second-layer" configurations. I did not contend that these configuration settings are "optional" in the sense of being irrelevant to the Revenue IQ pricing output. The terms "first-layer" and "second-layer" were used to distinguish architectural groupings within the system, not to suggest that the associated settings lack operational consequence. These settings absolutely have operational consequence. Many of the fields Dr. Marinescu dismisses as "optional" are client-controlled configurations that directly and substantively affect either the magnitude or direction of how pricing outputs are calculated. *See*, Marinescu Report, ¶ 274; Yenikomshian Opening Report, Backup Calculations at "Configuration Input Classification.xlsx."

Dr. Marinescu also claims that I make arguments I do not. For example, she states that "Mr. Yenikomshian's suggestion that these disparate [price] floors undermine a conspiracy is simply not an economically plausible argument." Marinescu Report, ¶ 301. The extent to which configuration changes reflect changes that "undermine a conspiracy" is not an analysis I provided in my Opening Report.

-12-

outputs are generated. Instead, she arbitrarily excludes certain variables based on assumptions about their meaning and relevance, including her assertion that they "likely do not affect [Revenue IQ's] directional logic."[34]

21.   This approach is flawed both conceptually and in its implementation. It is conceptually flawed because disregarding magnitude is not a coherent way to analyze Revenue IQ, as Revenue IQ's outputs are defined by both direction and magnitude. It is a flawed implementation because, having not analyzed the source code, Dr. Marinescu lacks the technical basis for identifying which configurations affect direction and therefore cannot apply even her own "directional logic" framework reliably. Her resulting analysis is unreliable, not the product of a consistent or technically grounded methodology and unsupported by the operation of Revenue IQ.[35]

22.   Dr. Marinescu admits that she "cannot ascertain the exact meaning of each of these configurations,"[36] Rather than use the source code available, she applied a "keyword-based categorization."[37] By not grounding her analysis in the actual source code, her approach lacks a reliable technical foundation, and the resulting conclusions are unscientific and highly unreliable.

23.   Dr. Marinescu excludes settings that clients set to configure how Trends (Step One) and Health Rules (Step Two) work, as well as *everything* relating to Step Three of Revenue IQ's pricing calculations. In my Opening Report, I studied 195 configuration settings that Revenue IQ

---

[34]   Marinescu Report, ¶ 283.

[35]   Dr. Marinescu's analysis is further undermined by her failure to interpret configuration variables correctly, which stems from her not reviewing the Revenue IQ source code. For example, Dr. Marinescu claims that ▮▮▮▮ represents "whether a property and unit type group is currently being actively priced by Revenue IQ." Marinescu Report, ¶ 284.

This is false. In Revenue IQ, the ▮▮▮▮ variable included in my analysis is a configuration indicator that a Health Rule is enabled (turned on), not a marker of whether a property/unit-type group is actively priced by Revenue IQ. YARDI-DUFFY_00106939 (file path: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, lines (51-71), snapshot date: September 2024). See also, Yenikomshian Opening Report, Figure D. 44 which shows an "Active" toggle next to each individually configured Health Rule. See also, Yenikomshian Opening Report, Backup Calculations at "Configuration Input Classification.xlsx."

[36]   Marinescu Report, ¶ 286.

[37]   Marinescu Report, ¶ 295.

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                        CASE NO.: 2:23-CV-01391-RSL

clients can configure and that affect pricing outputs,[38] of which Dr. Marinescu only focused on nine (4.6% of the 195),[39,40] ignoring the remaining 186 without reviewing the source code to confirm their effect on Revenue IQ pricing outputs. **Figure 2,** below, presents just 20 examples of excluded configurations, each of which affects the pricing output.

---

[38]   Yenikomshian Opening Report, footnote 161. *See also,* Yenikomshian Opening Report, Backup Calculations at "Configuration Input Classifications.xlsx."

[39]   Based on my review of Dr. Marinescu's backup materials, she only includes the following nine configuration settings in the analysis described in Sections 5.1.2 and 5.1.3 of her report:

[REDACTED] *See, also,* Yenikomshian Opening Report, Backup Calculations at "Accounting of Relevant Variables from Revenue IQ User Interface."

[40]   Calculated as (9/195) x 100 = 4.6%

-14-

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                                 CASE NO.: 2:23-CV-01391-RSL



41    Configuration settings shown in this figure form a subset of the 195 configuration settings that I focused on in my configuration analysis described in **Section V.B** of my Opening Report. *See also*, Yenikomshian Opening Report, Backup Calculations at "Configuration Input Classifications.xlsx."

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                    CASE NO.: 2:23-CV-01391-RSL

24.     In the subsections that follow, I focus on two principal categories of configuration settings that Dr. Marinescu disregards entirely. This discussion is not intended to be exhaustive, as my Opening Report and Technical Appendix contain several hundred pages of analysis describing the various configuration settings and system components she excludes, but rather the goal is to illustrate the nature and significance of her errors and to place them in context.

### 1.     Dr. Marinescu Excludes Health Rule Settings That Have a Material Impact on Pricing Outputs

25.     Dr. Marinescu's analysis of Health Rules shows she does not understand how they, or Revenue IQ, work. Health Rules are an important source of heterogeneity across Revenue IQ clients. Rather than examining how these rules are configured, Dr. Marinescu's analysis focuses on only whether they are activated and uses that limited measure to assess similarity across properties. For example, she claims that approximately 62% of Landlord Defendants use the Availability Health Rule and treats that figure as evidence of commonality.[42] But that statistic does not establish commonality and instead reflects meaningful variation across clients.[43] In addition, by focusing only on activation, her analysis overlooks how Health Rules actually operate within Revenue IQ.

26.     As I explained in my Opening Report, Health Rules do not affect pricing outputs simply by being enabled; their impact depends on client-specific configuration settings, including thresholds and multipliers, which determine when the rule applies and by how much it adjusts pricing outputs.[44] Dr. Marinescu excludes these settings entirely from her analysis.

27.     Those excluded settings directly determine the magnitude of pricing outputs, in a material way. As explained in my Opening Report, Health Rules apply client-configured

---

[42]     Marinescu Report, ¶ 267.

[43]     If 62% of Landlord Defendants use the Availability Health Rule, 38% of Landlord Defendants do not. Further, Dr. Marinescu's backup materials show that she conducted this analysis at the Unit Type Group level, and not at the Landlord Defendant level (as she claimed). Marinescu Backup, "03. Analysis/01. Config Analysis/config_comm.R".

[44]     Yenikomshian Opening Report, **Section V.A.2**.

-16-

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                                    CASE NO.: 2:23-CV-01391-RSL

modification to the provisional pricing output from Step One.[45] For example, a client may configure a rule to reduce a provisional price change by half, or to increase it severalfold. Moreover, clients can enable and configure multiple Health Rules,[46] so even properties using the same rules may receive materially different provisional pricing outputs from Step Two depending on the specific configurations applied and how they interact with each other.

28.    Consider an example where after Step One in a Revenue IQ pricing calculation the provisional pricing output is a $10 decrease. Users can configure a Health Rule to activate if certain conditions are met, and if so, to increase or decrease that provisional pricing output by any percentage they want. That is, as shown in **Figure 3** below, one Revenue IQ client could use a setting to halve the provisional pricing output to a $5 decrease, and another could triple it to $15 decrease, even though all other inputs remain unchanged. This is the kind of setting that Dr. Marinescu excludes from her analysis altogether.

**Figure 3**
**Illustrative Example of Impact of Health Rule Multiplier**

|  | Revenue IQ Client A | Revenue IQ Client B |
|---|---|---|
| Provisional pricing output after Step One | - $10 | - $10 |
| Multiplier from **Client-defined** Health Rule | 50% | 150% |
| Provisional pricing output after Step Two | $-10 \times 50\% = -\$5$ | $-10 \times 150\% = -\$15$ |

29.    Dr. Marinescu's focus on whether Health Rules are activated, while disregarding how they are configured, provides a materially incomplete basis for assessing similarity across properties. By omitting the configuration settings that determine how Step Two pricing outputs are calculated, her analysis does not capture how Revenue IQ operates in practice and therefore does not support her conclusions regarding commonality.

---

[45]    Yenikomshian Opening Report, ¶¶ 72-73 ("Health Rules enable clients to modify the provisional pricing output from Step One (specifically, the amount to be added to or subtracted from the current base rent) by a multiplier if a specific metric […] falls within a client-defined range.").

[46]    Yenikomshian Opening Report, **Appendix D**, ¶ D.126.

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                                                   CASE NO.: 2:23-CV-01391-RSL

2.   *Dr. Marinescu Excludes All Step Three Configurations*

30.   Dr. Marinescu's treatment of Step Three settings further demonstrates her lack of understanding of Revenue IQ and how it functions. She excludes all variables that relate to Step Three of Revenue IQ's pricing calculations, even though Step Three can alter, and in some cases reverse, the direction of the final pricing output. As I explained in my Opening Report, Step Three is a core component of the pricing calculation, and its complete exclusion further undermines the reliability of her analysis.[47]

31.   Step Three applies client-controlled premiums, discounts, and surcharges to the provisional pricing output generated in Step Two. These adjustments do not only affect magnitude; depending on their configuration, they can change the direction of the final pricing output.[48] By excluding all Step Three variables, Dr. Marinescu omits an entire category of settings that can determine whether a price ultimately increases or decreases. This omission is directly inconsistent with her focus on "directional logic."[49]

32.   Indeed, Dr. Marinescu admitted in her deposition (but not in her report) that Step Three adjustments can affect the final Revenue IQ rent and, if sufficiently large, can outweigh the provisional directional output generated by earlier steps. Her analysis nevertheless excludes these settings entirely.[50]

---

[47]   Yenikomshian Opening Report, **Appendix D, Section III.C.**

[48]   Yenikomshian Opening Report, **Appendix D, ¶ D.242.**

[49]   Marinescu Report, ¶ 302.

[50]   Marinescu Deposition, at 100:14-23 ("Q. And if the output of Step 1 and Step 2, for example, say a $10 increase, and Step 3 includes a negative $25 adjustment for, say, turn costs, the final result would be a net decrease. Is that correct? A. So, in the case that these [Step Three] terms would be negative, and if they are big enough, it could outweigh the positive increase in that hypothetical.").

None of the nine configuration settings that Dr. Marinescu studied in her analysis of configuration heterogeneity are settings underlying Step Three logic. The nine configuration settings    are: ██████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████ *ee* Yenikomshian Opening Report, **Appendix D, Section III.C.**

33.     For example, Dr. Marinescu categorizes settings based on their names, such as those containing the substring "leaseterm," and excludes them on that basis.[51] This approach relies on superficial labeling rather than any analysis of how the settings function in the Revenue IQ source code. As is readily evident in the Revenue IQ source code the setting ███████████████ determines whether client-defined term premiums (i.e., adjustments reflecting how pricing varies with lease lengths) are applied in Step Three.[52] When enabled, it adjusts the provisional pricing output by adding or subtracting lease-term-specific premiums; when disabled, that adjustment is not applied. This client-controlled configuration can therefore affect both the magnitude and direction of the final pricing output.

**B.      Insertions and Deletions in the Configuration Data Are Relevant, And Configuration Data Shows Substantial Customization Even Without Them**

34.     As I explain in my Opening Report, the Configuration Data shows that Revenue IQ clients routinely modify a wide range of material configuration settings over time.[53] Among these configuration changes are insertions, which "can occur in multiple circumstances, including, e.g., when a client initially configures Revenue IQ for a property, or when a client begins to use a new health rule."[54] The Configuration Data also include deletions, which can occur when a property is no longer configured in Revenue IQ, or when a client stops using a rule (e.g., an existing Health Rule).[55] There is no disagreement between Dr. Marinescu and me about these facts.[56]

---

[51]     Marinescu Report, ¶ 290; Marinescu Backup, "03. Analysis/02. Config Changes Categorization/config_yenik_tab.R".

[52]     Yenikomshian Opening Report, **Appendix D, Section III.C.7**.

[53]     Yenikomshian Opening Report, ¶ 100.

[54]     Yenikomshian Opening Report, footnote 160.

[55]     Deposition of Michael Thompson, *Wylie Duffy, et al., individually and on behalf of all others similarly situated, Plaintiffs, v. Yardi Systems, Inc., et al., Defendants, United States District Court, Western District of Washington at Seattle*, 2:23-CV-01391-RSL, October 30, 2025 ("Thompson Deposition"), at 160:25-163:25.

[56]     Marinescu Report, ¶ 277.

-19-

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                              CASE NO.: 2:23-CV-01391-RSL

35. Dr. Marinescu argues that it is misleading to include insertions and deletions in some of my statistics.[57] However, activating or deactivating a Health Rule directly affects how pricing is calculated and is therefore relevant to assessing how clients customize their pricing. For example, as discussed above, a Health Rule can change the Step One provisional pricing output by halving it, or applying any other percentage chosen by the client. Changes of this kind reflect substantive modifications to how pricing is calculated, not only the "entry" and "exit" of a property in the data.[58] In addition, the initial setup of a new Revenue IQ property, which is reflected as an insertion, captures the client's initial configuration choices.

36. Regardless, even excluding both insertions and deletions, the Configuration Data contains more than 1.4 million "configuration updates" resulting in an average of about 167 configuration changes per property in the data.[59] My conclusion in my Opening Report remains the same: Either version of the analysis is sufficient to support my opinions that Revenue IQ clients regularly adjust their configuration settings.[60]

**C.    Dr. Marinescu's Analysis of Client-Selected Configurations Is Unreliable and Based on a Fundamental Misunderstanding of Revenue IQ and Its Source Code, Which She Admits She Did Not Review or Analyze**

37. The examples discussed above are illustrative of the methodological and technical flaws in Dr. Marinescu's configuration analysis. They are not intended to catalogue every instance in which her treatment of the Configuration Data is unsupported by the Revenue IQ source code or rests on speculative and unsupported assumptions about the meaning of particular data fields. My opinions in this Section address the principal defects that substantively affect her configuration

---

[57]   Marinescu Report, ¶ 274.

[58]   Marinescu Report, ¶ 274.

[59]   Marinescu Report, ¶¶ 277, 280. After filtering the Configuration Data to records reflecting updates as identified by the ▮▮▮▮▮▮ field, I find that there are 1,418,885 "configuration updates" across 8,521 properties, resulting in an average of 167 configuration changes per property. *See*, Yenikomshian Surrebuttal Report, Backup Calculations at "Analyses/configuration_change_counts."

[60]   Yenikomshian Opening Report, ¶¶ 100-101.

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                                                      CASE NO.: 2:23-CV-01391-RSL

analysis. Nothing in this discussion should be understood as an endorsement of the remainder of her analysis, and I reserve the right to identify additional errors, or unsupported assumptions at the appropriate time.

38.    In sum, Dr. Marinescu does not dispute the numerical results of my configuration analysis. Her conclusion is produced by excluding large numbers of configuration variables based on keyword searches and unsupported assumptions about their meaning, rather than examining the Revenue IQ source code that governs how those variables operate. That approach is not a reliable technical method for evaluating the system and does not support her conclusions.

## VI.    DR. MARINESCU'S CLAIM THAT THE COMP TREND "RATCHETS" PRICES UPWARD IS INCORRECT AND UNSUPPORTED

39.    Dr. Marinescu contends that the Comp Trend operates as a mechanism that structurally aligns price movements across rival landlords and can "systematically ratchet prices upward" over time.[61] Specifically, she describes the rule as creating a "feedback loop" that "maintains constant rent ratios," such that a price increase by one landlord automatically induces comparable increases by others, while downward adjustments are limited and disincentivized.[62] Dr. Marinescu illustrates this theory using a toy example involving two firms that include only one another in their Comp Set, thereby creating a bilateral structure in which each firm's pricing output depends exclusively on the other's prior price.[63]

40.    I previously explained the functioning of the Comp Trend in my Opening Report, based on a comprehensive review of the Revenue IQ source code to understand how it operates and how, when optionally selected by clients, it affects pricing outputs.[64] By contrast, Dr. Marinescu did not review the Revenue IQ source code, and her understanding of the Comp Trend lacks a

---

[61]    Marinescu Report, ¶ 321.

[62]    Marinescu Report, ¶¶ 304, 321.

[63]    Marinescu Report, ¶¶ 321-323.

[64]    Yenikomshian Opening Report, **Appendix D**, **Sections III.A.1.d** and **III.A.4**.

-21-

technical foundation, is unsupported, and is incorrect.[65] Dr. Marinescu's characterization rests on oversimplified and untrue assumptions about how the Revenue IQ source code governing the Comp Trend operates, and about Landlord Defendants' use of the Comp Trend.[66] In particular, Dr. Marinescu misunderstands or ignores the following facts:

a.    Landlord Defendants typically do not select other Revenue IQ properties as their Comps, and as a result, at least with respect to the limited impact of the Comp Trend on pricing, pricing outputs are driven overwhelmingly by non-Revenue IQ properties;

b.    The Comp Trend does not operate in isolation, but rather is one component within a much broader pricing framework that includes additional Trend Rules, Health Rules, property-specific base rent ("Reference Rent") values, and other configuration settings, all of which interact to create a Revenue IQ client's final pricing output; and

c.    Price changes at Comp properties are incorporated with a lag into Revenue IQ's pricing process, and cannot "instantly match" competitors' prices as Dr. Marinescu's claims.[67,68] Moreover, the rent price adjustments suggested by Revenue IQ are capped as a percentage of the property's current rent,

---

[65]    Marinescu Deposition, at 60:6-10 ("Q. But you don't have a basis to dispute Mr. Yenikomshian's review of the source code itself. Is that right? A. I did not review the source code.").

[66]    The dataset required to study Comp Set composition is YARDI-DUFFY_01275909, which is not included in the list of materials Dr. Marinescu relied on to support her opinions. *See,* Marinescu Report, **Appendix E "Materials Relied Upon."**

[67]    Marinescu Report, ¶ 305.

[68]    Yenikomshian Opening Report, **Appendix D,** footnote 189. The automated market survey generated for Comps are generated on a scheduled basis, with the update frequency (in days) configured by the client. As a result, there is an inherent lag between when a Comp property changes its price and when that change is incorporated into Revenue IQ, preventing instantaneous matching of price.

meaning that the rent change suggested by Revenue IQ in a period is limited, undermining Dr. Marinescu's unsupported instant matching conjecture.[69]

41.   Dr. Marinescu's opinion is inconsistent with both the operation of Revenue IQ's pricing logic and the empirical evidence. When the system's actual mechanics and observed usage patterns are considered, the upward "ratcheting" dynamic she describes is not supported.

**A.   Dr. Marinescu's Characterization of the Comp Trend as an Upward Price Ratchet Relies on False Assumptions**

42.   Dr. Marinescu's ratcheting theory falsely assumes that Comp Sets are composed of other Revenue IQ clients, that the Comp Trend operates in isolation, can recommend instantaneous rental changes of arbitrary magnitude (i.e., is uncapped), and that the Comp Trend allows for contemporaneous transmission of price changes. The Comp Trend satisfies none of these conditions.

*1.   Landlord Defendants Typically Do Not Select Other Revenue IQ Clients as Comps*

43.   Dr. Marinescu claims that the Comp Trend creates a "feedback loop" of prices between Landlord Defendants and the properties in their Comp Sets.[70] This claim rests on the false premise that Landlord Defendants include properties from other Landlord Defendants in their Comp Sets. In the absence of this bilateral relationship between the Landlord Defendants' Comp Sets, there is no structural mechanism that would drive Dr. Marinescu's hypothesized feedback loop. Dr. Marinescu made no attempt to assess the observed composition of Comp Sets configured in Revenue IQ despite this data being available to her.[71]

44.   My analysis of the Comp Set data produced in this matter shows that Landlord Defendant properties' Comp Sets contain 4.9 properties on average, of which only 0.25 (5%) are

---

[69]   Yenikomshian Opening Report, footnote 89.

[70]   Marinescu Report, ¶¶ 304, 321.

[71]   *See,* YARDI-DUFFY_01275909 (file path: "Revenue IQ Property Datasets/Revenue IQ Property Comp Properties 2025-08-19.xlsx").

-23-

other Revenue IQ properties.[72] Moreover, 1,042 out of 1,280 (81%) Landlord Defendant properties have zero Revenue IQ properties in their Comp Sets.[73,74,75] Comp Sets being empty or comprised almost entirely of non-Revenue IQ properties eliminates Dr. Marinescu's alleged pathway for an "information exchange" of publicly available asking rents between Landlord Defendant properties.[76] The generalized feedback loop between Landlord Defendants hypothesized by Dr. Marinescu is therefore structurally impossible given the observed composition of Landlord Defendants' Comp Sets.

[72] This analysis considers Landlord Defendants only. In my Opening Report, I opined that across all clients, the average is 6.0 properties. *See*, Yenikomshian Opening Report, ¶ 192. I excluded from each Landlord Defendant's Comp Set any Revenue IQ properties managed by that same Landlord Defendant. This analysis is based on Revenue IQ property data for "currently active" Revenue IQ properties (as of August 19, 2025), as reflected in the dataset "Revenue IQ Property Comp Properties 2025-08-19.xlsx", "Revenue IQ Property Benchmark Properties 2025-08-19.xlsx", and "Revenue IQ Properties without Benchmark or Comp Properties 2025-08-19.xlsx". *See,* Yenikomshian Surrebuttal Report, Backup Calculations at "Analyses/comp_set_composition;" YARDI-DUFFY_01275909; YARDI-DUFFY_00913149; YARDI-DUFFY_01275908 (file path: "Revenue IQ Client History Data/2025-10-15 - COR - Duffy - List Of All Revenue IQ Properties Since Nov 2010 As Of 2025-10-15.xlsx").

[73] This pattern holds broadly across all Revenue IQ properties and not only Landlord Defendants. 4,307 out of 5,461 (78.9%) Revenue IQ properties have no Revenue IQ properties in their Comp Set. As before, I excluded any Revenue IQ property from the Comp Set that is managed by the same client as the subject property. This proportion is even higher when considering only Landlord Defendant properties in Comp Sets. 1,117 out of 1,280 (87.3%) Landlord Defendant properties have zero properties from other Landlord Defendants in their Comp Sets. *See,* Yenikomshian Surrebuttal Report, Backup Calculations at "Analyses/comp_set_composition."

[74] These 1,042 properties include 193 Landlord Defendant properties that have zero properties in their Comp Sets. *See*, *See,* Yenikomshian Surrebuttal Report, Backup Calculations at "Analyses/comp_set_composition." As before, I excluded from each Landlord Defendant's Comp Set any Revenue IQ properties managed by that same Landlord Defendant.

[75] Moreover, there is not a single instance in which a Landlord Defendant's property has a Comp Set consisting exclusively of properties that are managed by other Landlord Defendant(s). Similarly, there is not a single instance in which a Landlord Defendant has a Comp Set consisting of exclusively Revenue IQ properties managed by other clients. *See,* Yenikomshian Surrebuttal Report, Backup Calculations at "Analyses/comp_set_composition."

[76] Marinescu Report, ¶ 305.

-24-

### 2.     The Comp Trend Does Not Operate in Isolation

45.     Dr. Marinescu's false theory about the Comp Trend "systematically ratchet[ing] prices upward"[77] would also require the absence of countervailing signals from other Health and Trend Rules as well as from any other configurations that may impact the pricing output of Revenue IQ.[78] Dr. Marinescu builds her theory of the Comp Trend's impact in a hypothetical world where the Comp Trend is the only rule impacting Revenue IQ's pricing outputs. This premise is false; the Comp Trend does not operate in isolation, as Dr. Marinescu herself claims.[79] The Comp Trend functions as one aspect within a broader pricing framework that includes three additional Trend Rules, Health Rule adjustments, and other configuration settings, all of which interact to determine the final pricing output.[80]

46.     The Comp Trend's limited effect on pricing outputs is also impacted by independently set configuration variables, in particular, the "Reference Rent." As I explained in my Opening Report, the configuration of the Reference Rent is the starting point for the Revenue IQ pricing process,[81] or as Dr. Marinescu calls it, it is the "departure point."[82] All subsequent Trend Rules, Health Rules, and other adjustments are applied to that Reference Rent. In her deposition,

---

[77]     Marinescu Report, ¶ 321.

[78]     Marinescu Report, ¶ 304 ("the Comp Trend Rule maintains such constant rent rations [sic] unless it is overridden by one of the other Trend or Health Rules in Revenue IQ.").

[79]     In Figure 38 of her report, Dr. Marinescu calculates that 93% of Landlord Defendants have at least two other Trend Rules configured in addition to the Comp Trend while an additional 6% don't use the Comp Trend at all.

[80]     *See also*, Yenikomshian Opening Report, **Section V.A**.

[81]     In my Opening Report, I refer to the Reference Rent using the term "base rent." "The calculation shown in Figure 3 above starts with the 'current base rent.' […] Steps One through Three, as described below, apply modifiers to the 'current base rent' to calculate a grid of pricing outputs." Yenikomshian Opening Report, ¶ 51.

[82]     Marinescu Deposition, at 71:13-22 ("Q. And is it correct that all the steps in Revenue IQ that take place are based off of each client's individually selected reference rent? A. That's the departure point from -- you know, the reference rent is in the departure point. And then it applies the trend rules and then the health rules. And so, indeed, the departure point is the reference rent. […]").

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                                                    CASE NO.: 2:23-CV-01391-RSL

Dr. Marinescu agreed that this is how Revenue IQ operates.[83] Importantly, Dr. Marinescu agrees that the Reference Rent is "determined in equilibrium" by the landlords based on "market conditions and […] whatever objectives the landlord is trying to achieve."[84]

47.    As with the Trend Rules in Step One, Dr. Marinescu's claims about the Comp Trend Rule depend on the assumption that clients do not modify the Reference Rent after it is established. During her deposition, she acknowledged that her conclusions apply only under this condition, stating that "thereafter, **[…] if [the clients] don't do anything,** then the reference rent […] is set by Yardi."[85, 86] This assumption is central to her theory. Under Dr. Marinescu's own logic, if clients instead modify the Reference Rent, which is permitted within Revenue IQ, then pricing outcomes reflect client-driven adjustments based on their own individual choices, rather than an effect of the Comp Trend Rule.

---

[83]    Marinescu Deposition, at 71:13-22.

[84]    Marinescu Deposition, at 71:13-72:8 ("Q. And is it correct that all the steps in Revenue IQ that take place are based off of each client's individually selected reference rent? A. […] But, importantly, you know, this reference rent itself, as an economist, we understand that it's determined in equilibrium, meaning depending on market conditions and, you know, whatever objectives the landlord is trying to achieve and whatever their understanding is as well of software that they might be using. So, it's set by the landlord, but not in a vacuum, you know, it's based on their strategy.").

[85]    Marinescu Deposition, at 88:16-89:11 ("Q. But those reference rents can't be characterized as shared, correct, because they're chosen by each individual landlord. Is that right? A. Well, the first time that the landlord will set the reference rent, you know, that's their -- something that they decide based on their strategic objectives and what they know of the market structure. But, thereafter, again, if they don't do anything, then the reference rent is shared by Yardi and, in that sense, it's -- sorry, not shared. I meant is set by Yardi. And is shared in the sense that all of the landlords who don't change their reference rent are moving forward with the Revenue IQ set reference rent. And it's shared in the sense that it has -- used the same recipe to arrive at the reference rent, broadly the same recipe, to arrive at the reference rent.").

[86]    Marinescu Deposition, at 77:25-80:9 emphasis added ("Q. Okay. So, then, I'll just start fresh. You would agree that clients are able to manually adjust the reference rent within Revenue IQ at any time? A. My understanding is that they can, indeed, adjust the reference rent; however, the -- it's important to know that, you know, if they don't proactively go in and do anything, then the Revenue IQ system automatically populates, you know, the next price in a completely automatic way without requiring any approval. Now, if you want to go in there and change, you can. […]").

-26-

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                                CASE NO.: 2:23-CV-01391-RSL

48.    Despite the importance of her assumption that clients do not change Reference Rent to her Comp Trend conjecture, Dr. Marinescu did not study changes to the Reference Rent.[87,88] In fact, my analysis of the frequency of changes to the Reference Rent[89] showed that Dr. Marinescu's assumption of Reference Rent staying unchanged is untrue. Cumulatively, Landlord Defendants adjusted their Reference Rents over 560,000 times between January 2, 2019 to March 24, 2025.[90]

---

[87]    Marinescu Deposition, at 86:16-86:24 ("Q. And what does your analysis show in terms of how frequently they actually do change the reference rents? A. I focused my analysis not on the changes in the reference rent, but on understanding what rules they are setting up as far as the trend rules, which is the first step of Yardi's -- sorry, of Revenue IQ's pricing system.").

[88]    Dr. Marinescu justified her lack of study of the Reference Rent by stating that she studied adherence to the pricing outputs instead. This reasoning is specious. As described in **Section VI.A.3**, the Comp Trend suggests a capped, percentage change to the pricing output based on the client's current Reference Rent. This change is most commonly only 0.25% of the Reference Rent. As a result, the provisional pricing output produced by the Comp Trend is affected by the underlying Reference Rent itself.

[89]    The Unit level Reference Rent is stored in the variable ██████████████ However, my review of the Configuration Data and underlying source code identified a second variable that stores changes to the Unit Type level Reference Rent ██████████████. ██████████████ stores the Reference Rent for the Unit Types, which is then used to ultimately calculate the Reference Rent for each Unit. Using the same methodology described in my Opening Report, **Appendix D, Section II**, I traced the system workflow for updates to Reference Rent made on the "Asking Rents" Revenue IQ UI page and found that these changes only update the ██████████████ field in the ██████████████ table.
YARDI-DUFFY 00108765 (file path: ████████████████████████████, lines (1124-1215), snapshot date: December, 2024); YARDI-DUFFY 00108765 (file path: ████████████████████████████ lines (101-126), snapshot date: December, 2024); YARDI-DUFFY_00108765 (file path: ████████████████████████████ lines (16-21), snapshot date: December, 2024); YARDI-DUFFY_00106927. *See*, Yenikomshian Opening Report, **Appendix D, Section II.A.**

[90]    Rapid, successive modifications to the same setting at the Unit Type level by the same property occurring within a ten-minute window were consolidated and treated as a single configuration change. In such instances, I retained the earliest recorded ██████████ and the most recent ██████████, and counted the sequence as one change. Only changes where the value increased (██████████ greater than ██████████) or decreased (██████████ less than ██████████) were included in the analysis. Insertions and deletions were excluded.
Unit Type level changes were identified using the combination of 'hProperty', ██████████, and ██████████. ██████████ stores the primary key of the

-27-

Put another way, on average, Landlord Defendant properties changed their Reference Rents 261 times over the time period.[91] In addition, **Figure 4** below demonstrates that these changes increased and decreased the Reference Rent in substantial numbers in both directions, in broadly balanced proportions.



affected record (i.e., the ███ value in the █████████████ table). Each ████ uniquely identifies a specific record in ███████████████, which corresponds to a particular Unit Type and pricing date. Based on this structure, I interpret ████████ as the record-level identifier for unit-type pricing changes on a given pricing date.

*See,* Yenikomshian Surrebuttal Report, Backup Calculations at "Analyses/config_base_rent_analysis;" YARDI-DUFFY_00913149; YARDI-DUFFY_00106927; YARDI-DUFFY_01275908 (file path: "Revenue IQ Client History Data/2025-10-15 - COR - Duffy - List Of All Revenue IQ Properties Since Nov 2010 As Of 2025-10-15.xlsx").

[91] This number was obtained by dividing the total number of changes (562,115) to the Reference Rent by the number of Landlord Defendant properties (2,155) identified in the executed lease data that were actively using Revenue IQ between January 2019 and March 2025. A property's active period was defined as the interval between the earlier of its "Revenue IQ Pricing Start Date" or "Revenue IQ Pricing Live Date" and its "Last Revenue IQ Pricing Date."

*See,* YARDI-DUFFY_00913149; YARDI-DUFFY_00106927; YARDI-DUFFY_01275908 (file path: "Revenue IQ Client History Data/2025-10-15 - COR - Duffy - List Of All Revenue IQ Properties Since Nov 2010 As Of 2025-10-15.xlsx").

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                                CASE NO.: 2:23-CV-01391-RSL

**Figure 4**
**Changes in Reference Rent From Jan 2, 2019, to Mar 24, 2025[92]**



49.    The individual changes to Reference Rents by the Landlord Defendants break the link between what Dr. Marinescu describes as the "automatically" updated Reference Rents which she ascribes to the Comp Trend and any resulting pattern of price increases. Dr. Marinescu's attribution of price ratcheting to the Comp Trend is therefore based on a false, hypothetical assumption of Reference Rents not being changed by clients, when in fact those Reference Rents are changed often by clients.

[92]    For each month, I counted the total number of increases and decreases made by Landlord Defendants (identified in the executed lease data). *See*, Yenikomshian Surrebuttal Report, Backup Calculations at "Analyses/config_base_rent_analysis;" YARDI-DUFFY_00913149; YARDI-DUFFY_00106927; YARDI-DUFFY_01275908 (file path: "Revenue IQ Client History Data/2025-10-15 - COR - Duffy - List Of All Revenue IQ Properties Since Nov 2010 As Of 2025-10-15.xlsx").

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                                                  CASE NO.: 2:23-CV-01391-RSL

50.    In addition to the changes to the Reference Rent, the Comp Trend is also affected by other Trend Rules. In Step One of the Revenue IQ pricing calculations, at least two Trend Rules need to be configured by a client,[93] and Dr. Marinescu herself shows in Figure 38 of her report that 89% of Landlord Defendants apply all four Trend Rules with only 25% weight assigned to the Comp Trend.[94] These additional Trend Rules could provide contrary trend signals to the one generated by the Comp Trend. In fact, when all Trend Rules are set with 25% weights, even if the ratio of the Comp Set properties' prices relative to the subject property's prices goes up, the system requires at least one other trend to move in the same direction as the Comp Trend for Step One to produce a provisional directional signal to increase or decrease prices.[95] This requirement makes it impossible for the Comp Trend to act in isolation from the Trend Rules.

51.    In sum, the Comp Trend does not, and cannot, independently determine the direction (much less the magnitude as discussed in **Section VI.A.3**) of Revenue IQ pricing calculations. Dr. Marinescu's conclusions about the impact of the Comp Trend on Revenue IQ pricing outputs are erroneous as they are based on a hypothetical reality where the impact of all other Trends, Rules, and configurations on the Comp Trend is ignored, as are Revenue IQ clients' many changes to Reference Rent.

> 3.    *The Comp Trend is Calculated Based on Lagged Data and its Influence on Revenue IQ Pricing Outputs is Capped by Client-Configured Step Size*

52.    Dr. Marinescu contends that the Comp Trend "maintain[s] constant rent ratios"[96] by "instantly match[ing]" [97] price changes through "near-real-time information exchanged." [98]

---

[93]    Yenikomshian Opening Report, footnote 104.

[94]    Marinescu Report, Figure 38.

[95]    Revenue IQ will not generate a provisional price increase or decrease unless the output of the Step One calculation is greater or equal to 0.5, or less than or equal to -0.5, respectively. Therefore, with weights configured to 25%, at least two Trends must have an output of one to have a positive provisional directional output. Yenikomshian Opening Report, **Appendix D**, **Figure D.25**.

[96]    Marinescu Report, ¶ 304.

[97]    Marinescu Report, ¶ 305.

[98]    Marinescu Report, ¶ 33.

-30-

Dr. Marinescu's claim is structurally impossible when one considers how the Comp Trend operates within Revenue IQ.

53.    For the Comp Trend to maintain constant price ratios and instant price matching, at least two things would have to be true: (1) the Comp Trend would need access to "real-time" data about properties in the Landlords Defendants' Comp Sets, and (2) the Comp Trend would have to generate arbitrarily large changes to Revenue IQ's pricing output, to "instantly match" price changes by competitors. My review of the code shows that neither of these prerequisites are true.

54.    First, the Comp Trend does not have contemporaneous publicly available asking rents from Comp Set properties for performing its calculations. Instead, it relies on lagged price data that is updated at a regular cadence as configured by the client.[99] Moreover, the data that the Comp Trend calculation relies on is averaged over a historical lookback window, defined by the Trend Comparison Periods (which is a configurable parameter, most frequently set to 14 days by Revenue IQ clients).[100]

55.    Second, the provisional pricing output from Step One Revenue IQ is bounded as a percentage of the property's *own* configured base rent (the "Reference Rent").[101,102]

56.    As a result of these two factors, if a competitor raises or lowers prices, the Comp Trend cannot match the magnitude of those changes. Because pricing adjustments are calculated as a percentage of each property's own configured Reference Rent, and those base rents differ across properties, the resulting price changes will differ in absolute terms (i.e., dollar amounts). There is

---

[99]    Yenikomshian Opening Report, **Appendix D**, footnote 189-190.

[100]    Yenikomshian Opening Report, ¶ 59 ("Revenue IQ compares the average of publicly available asking rents for client-selected comparable units from other properties to the client's rental rates and how this ratio changes between trend periods."). *See*, Yenikomshian Surrebuttal Report, Backup Calculations at "Analyses/configuration_change_counts."

[101]    As defined by the "Reference Rent Change Amount" variable. *See,* Yenikomshian Opening Report, ¶ 65 and **Appendix D, Section III.A.3**.

[102]    The median Reference Rent Change Amount set by clients is 0.25%, meaning that the maximum change in a period, at that median, is 0.25% of the property's own rent. *See,* Yenikomshian Opening Report, footnote 107.

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                            CASE NO.: 2:23-CV-01391-RSL

therefore no mechanism within the Comp Trend to match, whether instantly or with delay, the magnitude of competitors' pricing changes as required by Dr. Marinescu's theory.

## VII.   DR. MARINESCU'S BENCHMARKING THEORY IS CONTRADICTED BY THE SOURCE CODE AND EMPIRICAL USAGE DATA AND IS UNSUPPORTED

57.   Dr. Marinescu appears to misunderstand how Yardi's Benchmarking system works, and incorrectly characterizes the system as providing "comprehensive visibility on rivals' pricing [that] allows [clients] to strategically increase prices."[103] She also incorrectly assumes that the Comp sets are guaranteed to be included in the set of properties that actually contribute KPI input values to a Benchmarking output (the "Effective Benchmark Set"), reflecting a fundamental misunderstanding regarding the Effective Benchmark Set actually used to calculate a Benchmarking KPI output.[104] I discuss both of these issues in the sections below.

### A.   Dr. Marinescu Fundamentally Misunderstands the Benchmarking System

58.   When discussing Benchmarking, Dr. Marinescu makes broad, unsupported claims like those listed below.

> a.   "Landlord Defendants gain visibility into their rivals' list prices, final transaction prices, discounts, and concessions, among other KPIs."[105]

> b.   "This non-public information gives clients comprehensive visibility on rivals' pricing and allows them to strategically increase prices."[106]

59.   However, these statements are unsupported and false. First, Benchmarking KPI outputs do not provide visibility into the actual prices or discounts offered by other properties. Benchmarking KPI outputs are aggregated summary statistics computed from KPI inputs after

---

[103]   Marinescu Report, ¶ 395.

[104]   Marinescu Deposition, at 216:7-21 ("Q. But we don't know that all of the ones in the comp set have data […] to contribute to a particular KPI. Correct? A. So, you know, I believe that if they are in Revenue IQ, if they are in the comp set and they are in Revenue IQ, then they must be contributing data to the KPI. […] So, if there's a property in my comp set that uses Revenue IQ, then […] they are in the data.").

[105]   Marinescu Report, ¶ 405.

[106]   Marinescu Report, ¶ 395.

-32-

noise injection and aggregation using a weighted average, over an Effective Benchmark Set determined by data availability for the selected KPI and reporting period.[107] Further, Benchmarking KPI outputs mask data variation across individual properties.[108]

60.    Second, the set of properties used in the calculation of Benchmarking KPI outputs (i.e., the Effective Benchmark Set) is unknown and hidden from the client. Clients are not informed which selected properties were excluded due to missing data, how many properties ultimately contributed to the reported Benchmarking KPI, what weights were applied to contributing properties, or how perturbation (i.e., noise adjustments) affected the underlying inputs.[109] Clients would therefore have no way to determine whether a KPI movement reflects (a) pricing changes any particular benchmark properties, (b) generalized pricing movements across the benchmark universe, or (c) shifts in the composition of the Effective Benchmark Set itself. This uncertainty in the composition of properties means there is no way clients could attribute price changes to any individual property. Dr. Marinescu herself acknowledges that the system "does not allow Landlord Defendants to monitor individual deviations and enforce the agreement accordingly."[110]

61.    Dr. Marinescu does not explain or provide any evidence to show how, under these conditions, clients would be able to have the "comprehensive visibility" into competitors' prices that she purports. As a result, her claims are unsupported, speculative, and untethered to any reliable principles and method.

---

[107]    Yenikomshian Opening Report, ¶¶ 138-139, 184.

[108]    Yenikomshian Opening Report, **Section VII.B.4**. *See also*, Marinescu Deposition, at 205:20-207:16.

[109]    Yenikomshian Opening Report, ¶ 144. As I explained in my Opening Report, Yardi applies noise adjustments to the underlying KPI inputs before aggregating them into final Benchmarking KPI outputs. Yenikomshian Opening Report, **Appendix D**, ¶ D.370; Declaration of Michael Mitzenmacher in Support of Yardi Systems, Inc.'s Motion for Summary Judgment, *McKenna Duffy, individually and on behalf of all others similarly situated, Plaintiffs, v. Yardi Systems, Inc., et al., Defendants, United States District Court, Western District of Washington at Seattle*, 2:23-cv-01391-RSL, November 24, 2025, ¶¶ 39-42 and footnote 59 ██████████

[110]    Marinescu Report, ¶ 407.

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                    CASE NO.: 2:23-CV-01391-RSL

**B.    Dr. Marinescu Is Wrong to Assume Comp Sets Are Always in a Subject Property's Effective Benchmark Set**

62.    Dr. Marinescu assumes that "Yardi structurally requires that clients' benchmarking comp set include the properties Revenue IQ uses for the Comp Trend Rule."[111] Dr. Marinescu is wrong. She misunderstands and misstates the implications of this relationship. She claims that by "aligning the comp set landlords use in Revenue IQ's algorithm and Benchmarking reports, Landlord Defendants gain visibility into their rivals' list prices, final transaction prices, discounts, and concessions, among other KPIs."[112]

63.    According to Dr. Marinescu, the system is designed to guarantee that a client's chosen Comp properties will be included in that same client's Effective Benchmark set. Dr. Marinescu clearly has this false understanding because she also testified at her deposition that all properties in a subject property's Comp set will contribute data to the subject property's Benchmarking KPI requests:

    a.    "And we know that all of the ones in the comp set are going to be in there."[113]

    b.    "[A]ll the properties that are in the comp are also in the benchmark.  So, therefore, they contribute data to the benchmark kind of by definition of them being in the benchmark."[114]

    c.    "So, you know, I believe that if they are in Revenue IQ, they are in the comp set and they are in Revenue IQ, then they must be contributing data to the

---

[111]    Marinescu Report, ¶ 395.

[112]    Marinescu Report, ¶ 405.

[113]    Marinescu Deposition, at 215:19-216:5 ("Q. Sorry, where are you looking, Professor? A. Yes, Paragraph 150, Page 90. So, we can see there that the effective benchmark set contained an average of nine properties. So, earlier we were discussing that originally there were 23 -- 29, sorry, it says in the same paragraph, selected, but in the end, the average is over a relatively small number of properties. And we know that all of the ones in the comp set are going to be in there.").

[114]    Marinescu Deposition, at 200:5-16 ("Q. Did you analyze the extent to which Revenue IQ comp properties actually contributed data to the benchmarking KPI outputs that you reviewed? A. As I said by what you just read, the -- all the properties that are in the comp are also in the benchmark. So, therefore, they contribute data to the benchmark kind of by definition of them being in that benchmark.").

-34-

KPI. So I think that's something that probably we can say. So, if there's a property in my comp set that uses Revenue IQ, then it surely has that. So at least for those, I believe that for those that do use Revenue IQ, then they are in the data."[115]

64.      As I explained in my Opening Report (the facts of which Dr. Marinescu does not contest), benchmark sets and Comp sets draw on different data sources. The Comp set relies on publicly available asking rents,[116] whereas Benchmarking KPI outputs are computed from aggregated CPD data that originates in Voyager.[117] While a property must exist in Matrix to be selectable in a benchmark set, it will only contribute data to a Benchmarking KPI output if it is also a Voyager property with relevant CPD KPI inputs available for the selected period.[118] Properties available for selection in a Comp set are not required to be Voyager clients, and thus are not guaranteed to contribute to a Benchmarking KPI.

65.      Dr. Marinescu appears to ignore this structural reality. She also fails to test her theory by analyzing the empirical data that Yardi produced.[119] Analysis of the CPD KPI Data

---

[115]    Marinescu Deposition, at 216:7-217:12 ("Q. But we don't know that all of the ones in the comp set have data to contribute KPI -- data to contribute to a particular KPI. Correct? A. So, you know, I believe that if they are in Revenue IQ, if they are in the comp set and they are in Revenue IQ, then they must be contributing data to the KPI. So, I think that's something that probably we can say. So, if there's a property in my comp set that uses Revenue IQ, then it surely has that. So, at least for those, I believe, that for those that do use Revenue IQ, then they are in the data. And there's a relatively small number of properties, so it's certainly possible. I'm not saying that you can't de-anonymize, I want to be clear about that. However, the benchmark does speak to, you know, to the extent that I have other Revenue IQ users in the comp set, it, you know, quite directly speaks to what they are pricing right now. I am not saying you can't de-anonymize, just that, you know, it's an average of a small number. And, in that sense, should my comp set include many Revenue IQ users, then, you know, the pricing I'm seeing in the KPI would be highly influenced by those users.").

[116]    Yenikomshian Opening Report, ¶¶ 59, 61.

[117]    Yenikomshian Opening Report, footnote 221.

[118]    Yenikomshian Opening Report, footnote 266 ("When KPI input values for a selected benchmark property are unavailable for a given KPI or reporting period, that property is automatically excluded from the aggregation for that KPI and reporting period.").

[119]    Yardi produced Benchmarking API Usage Logs (YARDI-DUFFY_01275904) and the CPD KPI Data (YARDI-DUFFY_01275894-903). Neither dataset appears among the materials Dr.

-35-

demonstrates that for Landlord Defendants, on average, only 35% of the Comp properties are included as part of the Effective Benchmark Sets.[120] This empirical analysis confirms that Comp sets and benchmark sets are not structurally aligned to guarantee Comp properties are included in the Effective Benchmark Set. This empirical analysis demonstrates that Dr. Marinescu is inaccurate in her description of the connection between properties using Revenue IQ and the properties used to calculate Benchmarking KPI outputs and that, therefore, her theories on the information that Benchmarking provides to Yardi clients are simply wrong.

## VIII.  DR. MARINESCU'S TAM ENFORCEMENT ANALYSIS IS NOT REPRODUCIBLE

66.    Dr. Marinescu claims that Yardi's TAMs function as a monitoring-and-enforcement mechanism that identify "underpricing" relative to benchmark and "asymmetrically" push clients to increase rents via calls, with subsequent rent increases purportedly observable in executed lease outcomes.[121] Plaintiffs' Opposition adopts this same narrative, characterizing Dr. Marinescu's

---

Marinescu relied on in forming her opinions. *See,* Marinescu Report, **Appendix E "Materials Relied Upon."**

[120]    For this analysis, I identify Comp properties included in the Effective Benchmark Set that belong to a different client than the subject property. When Comp properties from the same client are included the average overlap is 41%.  These analyses use the 1% alignment subset described in **Section VII.B.1** of my Opening Report. Each observation represents a single Benchmarking KPI output reported for Revenue IQ properties managed by Landlord Defendants that were active during the period of time where Benchmarking CPD KPI Data is available. I then identify all Comp properties in an effective benchmark set and divide that by the number of Comps in the requested benchmark set. Finally, I average this calculation across the different Benchmarking KPI outputs. I identified Comp properties using the August 19, 2025 snapshot. *See,* Yenikomshian Surrebuttal Report, Backup Calculations at "Analyses/overlap_between_comp_benchmark."

*See,* YARDI-DUFFY_01275894-903 ("CPD KPI Data"); YARDI-DUFFY_00913149; YARDI-DUFFY_01275908 (file path: "Revenue IQ Client History Data/2025-10-15 - COR - Duffy – List Of All Revenue IQ Properties Since Nov 2010 As Of 2025-10-15.xlsx"); YARDI-DUFFY_01275909 (file path: "Revenue IQ Property Datasets/Revenue IQ Property Comp Properties 2025-08-19.xlsx").

[121]    Marinescu Report, ¶ 353 ("Through its TAMs, Yardi Asymmetrically Pushes Landlords to Increase Prices: Consistent with the economic theory outlined in Section 3 and incentives explained above in Section 5.2, the record indicates that Yardi's TAMs use clients' non-public information to identify underpricing and impose an upward asymmetry on price recommendations, which are then realized in Landlord Defendant leases"); Marinescu Report, ¶ 343 ("TAM's specific purpose would be two-fold […] to monitor and enforce compliance with […] price increases.").

-36-

findings as evidence that benchmark "variances" are converted into "rent-raising priorities" and that properties flagged as "underpriced" exhibit an "immediate, statistically significant upward inflection."[122]

67.    Dr. Marinescu's theory of TAM enforcement is based on a dataset that does not contain interactions between clients and TAMs. Instead, she analyzes internal calls between TAMs and Mr. Fazio, a Yardi employee who looked at Revenue IQ data.[123,124] To the extent that Dr. Marinescu identified any pricing recommendations, she identifies them only in the internal communications between Mr. Fazio and the Yardi TAMs ("Fazio-TAM call notes"), and not in communications between clients and TAMs.[125,126]

68.    Dr. Marinescu also conducts an analysis of rental prices intended to show that "Landlord Defendants' pricing responds following TAM calls."[127] For this analysis, she again relies on a dataset of Fazio-TAM call notes, this time restricted to notes that discuss pricing below benchmarks, and again not calls with Revenue IQ clients. However, rather than constructing this

---

[122]    Plaintiffs' Opposition Brief, pp. 19, 21.

[123]    Deposition Testimony of Liana Rao, *Wylie Duffy, et al., individually and on behalf of all others similarly situated, Plaintiffs, v. Yardi Systems, Inc., et al., Defendants, United States District Court, Western District of Washington at Seattle*, 2:23-CV-01391-RSL, November 14, 2025 ("Rao Deposition"), at 256:13-16 ("So at the start of my tenure, Anthony Fazio spent probably half of his time in a role where he was looking at Revenue IQ data.").

[124]    Marinescu Report, ¶¶ 358, 359 ("At my request, counsel prepared a de-duplicated set of call notes Yardi produced between Mr. Fazio and TAMs from January 2023 onward […] To analyze this set of call notes, I then applied a string search algorithm"); Marinescu Deposition, at 63:21-64:7 ("Q. Okay.  So, I'm asking about the 600 TAM pricing call notes that were produced prior to November 2025. A. I don't recall hearing of those. Q. You didn't review those TAM call notes? I don't recall hearing of those specific call notes, if you're talking about TAM calls with clients, because -- Q. That is what I'm talking about. A. Yeah, I've been looking at the calls of Mr. Fazio with the TAMs.").

[125]    Dr. Marinescu uses the data in the sheet "Jan 2023 onwards" from her backup file "01. Data/01. Production/04. TAM Calls Notes/TAM Notes – combined and deduped.xlsx" for her script located in her backup file "03. Analysis/04. Fazio TAM Notes/tamnotes_searchalgo_with_graph.R," to perform the identification of pricing relative to benchmarks.

[126]    Marinescu Report, Figure 53 ("Mr. Fazio's Call Notes With TAMs Asymmetrically Focused on Clients Pricing Below Their Benchmarks").

[127]    Marinescu Report, ¶ 378.

-37-

dataset from the Fazio-TAM call notes she classified in her prior analysis, Dr. Marinescu asked Plaintiffs' counsel to create the dataset for her.[128] As a result, the dataset used in her analysis is not generated using the classification procedure she describes in her report.[129] Dr. Marinescu provides no description of the procedure used to create the dataset. It is therefore unclear what selection criteria Plaintiffs' counsel applied to restricting the data, or what, if any, instructions they received from Dr. Marinescu for constructing the dataset. This renders her analysis non-reproducible.

## IX.    DR. MARINESCU'S DATA PROCESSING IS FUNDAMENTALLY FLAWED

69.    Dr. Marinescu also made mechanical data processing errors in her data analysis. These mechanical data processing errors alone render key figures and conclusions in her report inaccurate and unsubstantiated.

70.    One of the largest mechanical errors concerns Dr. Marinescu's "Yardi Lease Price Index," a metric that she uses to infer sustained pricing increases relative to a CPI benchmark and to support her theory of TAM-related pricing effects.[130] This index is used across numerous figures and tables, including Figures 4, 7, 62, 88, 89, and 95 and Tables 2, 5, and 6.[131] In Dr. Marinescu's account, Yardi's "TAMs" are "advisors Yardi assigns to Revenue IQ clients" who in her view use non-public data to "identify underpricing and impose an upward asymmetry on price

---

[128]    Marinescu Report, ¶ 378 ("I asked counsel to compile an expanded dataset of call notes between Mr. Fazio and TAMs, limited to instances in which Mr. Fazio identified a property as priced below its benchmark").

[129]    Dr. Marinescu uses the data in the sheet "Jan 2023 onwards" from her backup file "01. Data/01. Production/04. TAM Calls Notes/TAM Notes – combined and deduped.xlsx" for her script located in her backup file "03. Analysis/04. Fazio TAM Notes/tamnotes_searchalgo_with_graph.R," to perform the identification of pricing relative to benchmarks. She subsequently uses the data from a different sheet "All notes" from her backup file "01. Data/01. Production/04. TAM Calls Notes/TAM Notes – combined and deduped.xlsx," in Line 14 of the script located in her backup file "02. Code/04. Clean TAM calls data/clean_tams.R" and in Line 27 of the script located in her backup file "03. Analysis/04. Fazio TAM Notes/tamnotes_reg.R".

[130]    Marinescu Report, ¶¶ 379, 385, 501-504.

[131]    Marinescu Report; Marinescu Deposition, at 238:22-239:1 ("Q. So the reliability of your Yardi lease price index is important to several of your central opinions in your report. Is that correct? A. I've used it multiple times, yes."). *See also*, Marinescu Deposition, pp. 234-239, which discusses multiple figures and tables that rely on the Yardi Lease Price Index.

recommendations" through pricing calls.[132] Dr. Marinescu defines the Yardi Lease Price Index as an "index of Yardi rental unit pricing," constructed to "show a cumulative growth rate in effective rents" over 2011 through 2025.[133] She then uses the index to assess whether prices "changed coinciding with TAM call notes," including whether there was a "discrete increase" and "sustained increase" after the first TAM call.[134] More broadly, she uses this index across multiple analyses to infer that rents increased more rapidly with the adoption of Revenue IQ.[135]

71.     Dr. Marinescu describes constructing her index in three steps. First, for each unit, it measures how much rent changes from one month to the next. Second, for each month, it averages those unit-level changes across units (and properties). Third, it carries those monthly averages forward to produce a running index from 2011 through 2025.[136] As shown below, however, her implemented data processing does not accurately perform these steps.

72.     Dr. Marinescu's index construction has numerous errors. For purposes of this report, I discuss two that are straightforward but consequential:[137]

   a.     **Outlier handling error.** Dr. Marinescu does not remove extreme low-value records (e.g., rent at 40 *cents* a month, $1.00 a month) that are, in Dr. Marinescu's words, "implausibly low" rents from her index

---

[132]     Marinescu Report, ¶¶ 38, 353.

[133]     Marinescu Report, ¶¶ 501, 503.

[134]     Marinescu Report, ¶¶ 51, 379.

[135]     Marinescu Report, ¶¶ 505, 510, 515.

[136]     Marinescu Report, ¶ 503.

[137]     These two errors are not the only issues with Dr. Marinescu's index. For example, there are additional problems with how her code defines monthly observations. When expanding the Executed Lease Data, her implementation generates monthly sequences by defining a lease end month as the lease start month plus the lease term and generating a sequence that includes both the start and end months. She then analyzes both the start and end month in full, ignoring that the lease was only active for a portion of each month. In some cases, this results in observations being attributed to an entire month after a lease has ended (e.g., a lease that ends on July 31st being treated as extending into August). There are also issues with how the code handles multiple leases for the same unit in the same month. In such cases, Dr. Marinescu's code retains the first lease appearing in the dataset, even when a later lease has already begun.

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                    CASE NO.: 2:23-CV-01391-RSL

calculation.[138] The resulting month-to-month ratios can be extreme when those records are followed by ordinary tenancy rents (e.g., $1,200, $2,500), creating artificial jumps that appear in her index as substantive price movements.

  b. **Lease-gap timing error.** Dr. Marinescu does not account for gaps between leases (e.g., vacancy periods or renovations), including gaps as long as 10 years.[139] Her implementation treats observations separated by such gaps as if they occurred in back-to-back months, which attributes multi-month or multi-year rent growth to a single month and falsely inflates her measured rent growth.

73. In deposition, Dr. Marinescu acknowledged that "to the extent that there are outliers that affect these numbers, analysis could be affected,"[140] and also admitted she "did [] no[t]" remove at least a 40 cent and a $1.00 monthly rent data point from the analysis used to produce her

---

[138] Marinescu Report, footnote 268 ("For the recommended rents, I observe that some values are implausibly low or high.").

[139] For example, Revenue IQ Unit ID 1624785 has an almost 10-year gap with one lease ending on 08/31/2015 and the next lease starting on 6/13/2025.

[140] Marinescu Deposition, at 239:2-240:7 ("Q. And if your Yardi lease price index is materially affected by unaddressed, implausible or outlier rent values, conclusions based on your Yardi lease price index could be materially affected. Correct? A. The conclusions could be affected, but without looking at the specifics of those values and, as I discussed earlier, it really depends […]. Q. Okay. But you said that the conclusions could be affected? A. Could be affected. Q. And that would include your TAM oversight opinion drawn from Figures 4 and Figure 62. A. Well, so to the, to the extent that there are outliers that affect these numbers, analysis could be affected; however, I would like to look at specific analyses because, in some cases, some of the ways that the analysis is performed is more robust to outliers than others.").

-40-

index.[141] She further testified that she did not investigate these outlier values.[142] She also testified that she "did not" investigate the time-gap issue,[143] and acknowledged several observed gaps in the data.[144]

74.    Notably, Dr. Marinescu herself—elsewhere in her report and at deposition—suggested potential fixes to correct these issues, but her own scripts do not apply them. For other analyses in her report, Dr. Marinescu "observe[d] that some values [were] implausibly low or high" and "therefore filter[ed] out observations of variables that are lower than $20 and higher than $100,000."[145] For lease-gaps, Dr. Marinescu testified that she intended to treat gaps as "some string of missing data,"[146] meaning that her index should not be calculated in months during the lease-gap or in the first month of a lease following a gap.

---

[141]    Marinescu Deposition, at 256:12-257:1 ("Q. As part of preparing your report, you did not investigate what was behind this 40 cents per month rental entry in the data you relied on. Correct? A. I did not look at this specific unit. Q. […] And you didn't remove this -- the data point for this [40 cent] Revenue IQ Unit 8692688 from your analysis. Correct? A. Since this wasn't in the note, I would infer that this wasn't removed."); 248:22-249:3 ("Q. Okay. So, just to be clear, you did not remove this $1 data point when you performed your analyses on -- that led to the Yardi lease price index. Correct? A. Based on the notes to those graphs, I did not.").

[142]    Marinescu Deposition, at 256:12-18 ("Q. As part of preparing your report, you did not investigate what was behind this 40 cents per month rental entry in the data you relied on. Correct? A. I did not look at this specific unit.")

[143]    Marinescu Deposition, at 285:7-285:21 ("Q. Did you do anything to investigate the issue of this time gap as part of preparing the analyses of the Yardi price index in your report? A. I did not. However, I would like to point out, again, […], this would have to exactly be timed in just the way that corresponds to when the first time calls happened.").

[144]    Marinescu Deposition, at 277:16-277:24 ("Q. Do you see here that the first lease start date is July 26th, 2013? A. Yes. Q. And then the next lease observation noted is May 30th, 2019. Do you see that? A. Yes. Q. So, that's a gap of 58 months? A. Yes."), 279:18-280:8 ("Q. Okay. And so if you would look at Revenue IQ Unit ID 1623904, the first entry point has a lease start date of June 1st, 2015. Correct? A. Yes. Q. And the next lease observation for that unit is July 1st, 2025, over ten years later. Do you see that? A. Yes. Q. And so that's a gap, after the initial 12 months, from June 2016 to July 2025, or 109 months. Correct? A. Yes.").

[145]    Marinescu Report, footnotes 268, 270, 271.

[146]    Marinescu Deposition, at 276:21-277:12 ("Q. Okay. But just to be clear, for this property, 339639, you would not just divide the two numbers, 1062 and 770, to come up with a ratio. Correct? A. Here, the way this is represented, there is a gap. […] If it's not under the same contract, then there would be some string of missing data.").

75.    To demonstrate the impact of Dr. Marinescu's mechanical errors, I recalculated the Yardi Lease Price Index after implementing two specific corrections consistent with Dr. Marinescu's own stated methodology and testimony. First, I excluded "implausible" rent observations by removing lease records with reported effective rent below $20 or above $100,000. Second, I modified the index construction to ensure that rent changes were not computed across gaps in the time series (i.e., where intervening months are missing), consistent with Dr. Marinescu's testimony that such gaps should be treated as missing data, thereby preventing multi-period rent changes from being attributed to a single month. These corrections substantively change the Yardi Lease Price Index itself, which serves as a key input to multiple analyses in Dr. Marinescu's report. I present the impact of such corrections on four of Dr. Marinescu's analyses below.

76.    As I discussed above in **Section VIII**, Dr. Marinescu's theory of TAM enforcement depends on analysis of the internal Fazio-TAM call notes instead of communication between Landlord Defendants and the TAMs.  To bolster her theory, Dr. Marinescu presents figures purportedly showing rent increases coinciding with Fazio-TAM calls. However, those figures, and the conclusions that Dr. Marinescu draws from them, are compromised by the data issues described above. For example, Dr. Marinescu uses Figure 62 (also numbered Figure 4) to opine that, after the first TAM call, there is an "obvious jump" followed "by a sustained upward time trend" that "far outpaces the rent CPI."[147] However, after correcting for her mechanical errors by excluding effective rent observations below $20 or above $100,000 and accounting for lease gaps in the time series, the "obvious jump" and sustained upward time trend outpacing the CPI completely disappear. Dr. Marinescu's findings are the result of her own data processing error. I demonstrate this correction in **Figure 5** below.

---

[147]    Marinescu Report, at ¶ 385.

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                    CASE NO.: 2:23-CV-01391-RSL

**Figure 5**
**Dr. Marinescu's "Figure 62": Original (Left) and Error-Corrected (Right)**
**"Landlord Defendants Visibly Increased Prices Coinciding with TAM Call Notes**
**Identifying Underpricing"**

 

77.    Similarly, Dr. Marinescu uses Figure 95 in her report to measure the difference between her (miscalculated) Yardi Lease Price Index and the CPI, arguing that it represents a "Yardi Index Premium."[148] Due to her miscalculations, Dr. Marinescu incorrectly argues that trend "nearly doubled" in 2021-2025, attributing this growth to "(i) [Yardi's] 'penalty scores' and (ii) [Yardi] using CPD data in its TAM pricing oversight." [149] However, after excluding rent

---

[148]    Marinescu Report, at ¶ 552.

[149]    Marinescu Report, at ¶¶ 551-553.

observations outside the $20–$100,000 range and correcting for lease gaps in the time series, this trend simply does not exist. I demonstrate this correction in **Figure 6** below.

**Figure 6**
**Dr. Marinescu's "Figure 95": Original (Left) and Error-Corrected (Right)**
**"The Growth Rate of the Yardi Index Premium Increased Notably Around 2021/22"**





78.      As I described in **Section VI** above, Dr. Marinescu also claims that Revenue IQ and its Comp Trend ratchet up prices. Her analyses are flawed due to her misunderstanding of how Revenue IQ works. However, Dr. Marinescu's conclusions about Revenue IQ adoption and upward price movement are again built on her own data processing mistakes. Dr. Marinescu uses her Figure 88 and Figure 89 to argue that "Yardi rental units increased in price" in a way that "overtook CPI" in 2015, and that this pattern "increased with the number of participating Landlord Defendant units."[150]

79.      As shown in **Figure 7** and **Figure 8** below, when correcting for these errors, Dr. Marinescu's observed patterns in both time trends and Landlord Defendant unit count simply vanish. In Figure 88, after correcting her errors, the Yardi Lease Price Index remains below the Rent CPI for almost the entire period she examined. Consistent with this pattern, Figure 89 also changes substantively. After correcting the data, the Yardi Index Premium (i.e., the difference between the Yardi Lease Price Index and Rent CPI) becomes negative throughout almost the entire

---

[150]      Marinescu Report, at ¶¶ 505-510.

period, and the previously positive correlation between the Yardi Index Premium and the number of active leases likewise disappears.

**Figure 7**
**Dr. Marinescu's "Figure 88": Original (Left) and Error-Corrected (Right)**
**"Landlord Defendants Increase Rents Faster Than A Rent-Specific CPI"**



**Figure 8**
**Dr. Marinescu's "Figure 89": Original (Left) and Error-Corrected (Right)**
**"Yardi's Index Premium Relative to Rent CPI Increased With the Number of Participating Landlord Defendant Units"**



80.    Because Dr. Marinescu's formulation of her Yardi Lease Price Index is reused across other figures, tables, and statistical analyses, these same mechanical defects propagate well beyond the figures above.[151] The affected analyses therefore do not provide a reliable basis for the

---

[151]    Dr. Marinescu applies the same pre-processing and Yardi Lease Price Index construction methodology in Figures 45, 59, 60, 61, 99, 101, and 102, and Tables 2, 5, and 6 of the Marinescu Report.

-45-

inferences and opinions that Dr. Marinescu comes to throughout her report. Dr. Marinescu's results are a result of her own improper data processing.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 23rd day of March, 2026, at Lexington, MA.

_____
Mihran Yenikomshian

DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.                                                              CASE NO.: 2:23-CV-01391-RSL