**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| *In Re YARDI REVENUE MANAGEMENT ANTITRUST LITIGATION* | Case No.: 2:23-cv-01391-RSL |
| —————————————————————— | **EXPERT REPORT OF CATHERINE TUCKER, PH.D. IN REBUTTAL OF THE REPORT OF IOANA MARINESCU, PH.D.** |
| MCKENNA DUFFY, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| YARDI SYSTEMS, INC., et al., | |
| Defendants. | |

-1-

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................... 4

      A.    Qualifications ............................................................................................ 4

      B.    Parties and Allegations............................................................................. 6

            1.    Parties .............................................................................................. 6

            2.    Allegations ....................................................................................... 7

      C.    Assignment................................................................................................ 8

      D.    Summary of Conclusions .......................................................................... 8

II.   SUMMARY OF THE MARINESCU REPORT ................................................. 11

III.  THE MARINESCU REPORT IGNORES THE UNILATERAL
      INCENTIVES FIRMS HAVE TO ADOPT REVENUE MANAGEMENT
      SYSTEMS ......................................................................................................... 12

      A.    The Primary Goal of Revenue Management Systems Is for Individual
            Users to Optimize Both Occupancy and Price, and Common Use of
            Such Systems Does Not Imply Collusion................................................. 12

      B.    Yardi's Software Helps Landlords Optimize Rental Occupancy,
            Meaning They Have a Unilateral Incentive to Adopt It............................. 15

IV.   THE MARINESCU REPORT'S ANALYSES CONTAIN GRAVE
      ERRORS THAT, ONCE CORRECTED ACCORDING TO HER OWN
      STATED METHODOLOGY, ARE NOT SUPPORTIVE OF A
      CONSPIRACY ................................................................................................. 17

      A.    The Marinescu Report's Analyses Based on the Yardi Lease Price
            Index Suffer from Implementation Errors that, Once Corrected,
            Invalidate its Conclusions ...................................................................... 18

            1.    Removing Outliers ................................................................... 20

            2.    Adjusting for the Treatment of Missing Rent Values ............................. 32

-2-

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                CASE NO.: 2:23-CV-01391-RSL

B.   The Marinescu Report's Econometric Analysis Overcounts the Number of Alleged Co-Conspirator Properties, which, Once Corrected, Invalidates its Conclusions .................................................................. 46

V.   THE MARINESCU REPORT FAILS TO RELIABLY ESTABLISH ANY BASIS FOR THE ALLEGED CONSPIRACY ........................................... 54

A.   The Marinescu Report Misstates and Mischaracterizes the Academic Literature in Its Attempt to Establish a Conspiracy ...................................................... 54

1.  Assad et al. (2024) ................................................................. 55

2.  Calder-Wang and Kim (2024) ................................................ 57

3.  Sugaya and Wolitzky (2018) and Sugaya and Wolitzky (2025) ...................................................................................... 60

4.  Harrington (2025) .................................................................. 61

B.   The Marinescu Report Fails to Consider that Collusive and Unilateral Conduct Can Generate Observationally Similar Pricing Patterns .............................. 62

C.   The Marinescu Report Fails to Establish Any Valid Enforcement Mechanism to Maintain the Alleged Collusive Agreement ........................................ 65

1.  The Marinescu Report's Claimed "Structural and Economic Barriers to Deviation" Are Not Enforcement Mechanisms ...................... 65

2.  The Marinescu Report's Fazio-TAM Call-Note Analysis Is Flawed and Fails to Establish that TAM Oversight Was an Enforcement Mechanism .......................................................... 69

-3-

## I.    INTRODUCTION

### A.    Qualifications

1.    I am the Sloan Distinguished Professor of Management Science at MIT Sloan at the Massachusetts Institute of Technology ("MIT") in Cambridge, Massachusetts. I received an undergraduate degree in Politics, Philosophy, and Economics from Oxford University in the United Kingdom. I received a Ph.D. in Economics from Stanford University in 2005. I have been on the faculty at MIT since completing my Ph.D.

2.    My academic expertise lies in studying the competitive forces governing firms in the digital era, with a focus on artificial intelligence ("AI") and data-driven technologies. For nearly two decades, my research has examined how data, algorithms, and digital platforms affect firm strategy, market structure, innovation, and consumer welfare. Much of my recent work focuses on the economics of AI systems, including machine learning, data-enabled learning, pricing algorithms, and the competitive dynamics of AI-enabled markets. I have edited several books on topics spanning the evolution of antitrust in the digital era, the economics of digitization, blockchain, the economics of privacy, machine learning, and AI.

3.    I am the Director of Digital Economics and Artificial Intelligence initiatives at the National Bureau of Economic Research ("NBER").[1] I am currently a Senior Editor at *Marketing Science*. Previously, I served as Co-Editor at *Quantitative Marketing and Economics* and Associate Editor at *Management Science, Marketing Science*, and *Journal of Marketing Research*.

4.    I have published extensively in leading peer-reviewed journals, including *Science*, *Journal of Political Economy*, *RAND Journal of Economics*, *Management Science*, *Marketing Science*, *Information Systems Research*, and *Journal of Marketing Research*. My research has over 22,000 citations according to Google Scholar.[2]

---

[1]    MIT Management Sloan School, "Faculty - Catherine Tucker," https://mitsloan.mit.edu/faculty/directory/catherine-tucker, accessed on March 18, 2026; National Bureau of Economic Research, "Digital Economics and AI Meeting, Spring 2026," February 12, 2026, https://www.nber.org/conferences/digital-economics-and-ai-meeting-spring-2026.

[2]    Google Scholar, "Catherine Tucker," https://scholar.google.com/citations?user=MI6-6ZcAAAAJ&hl=en, accessed on March 12, 2026.

-4-

5.      In addition to my academic research, I regularly advise policymakers and international agencies on issues relating to AI governance and digital competition. I have testified twice before the United States Congress on issues relating to data, algorithms, and digital market power.[3] I have presented my research to the Federal Trade Commission, the Federal Communications Commission, the International Monetary Fund, the Organisation for Economic Co-operation and Development ("OECD"), and other regulatory bodies on matters relating to digital competition.

6.      I am the recipient of a National Science Foundation CAREER Award, the National Science Foundation's most prestigious award in support of junior faculty who "exemplify the role of teacher-scholars through outstanding research, excellent education, and the integration of education and research within the context of the mission of their organizations."[4]

7.      **Appendix A** to this report is a copy of my curriculum vitae, which includes a list of all publications I have authored, including during the previous 10 years. **Appendix B** to this report is a list of all the cases in which I have testified as an expert at deposition or trial during the previous four years.

8.      I am being compensated for my services in this matter at an hourly rate of $1,800. I have been assisted in this matter by certain staff at Analysis Group, Inc. ("Analysis Group") working under my direction. I receive compensation based on Analysis Group's professional fees in this matter. Neither my compensation nor that of Analysis Group is contingent on the outcome of this matter or the opinions I express in this report.

9.      My work on this matter is ongoing. I reserve the right to update, refine, or revise my opinions, or form additional opinions, including in response to Plaintiffs' expert(s) and any additional information I may receive.

---

[3]  Tucker, Catherine, "Testimony," House Committee on Energy and Commerce, November 29, 2017, https://www.congress.gov/115/meeting/house/106659/witnesses/HHRG-115-IF17-Wstate-TuckerC-20171129.pdf.

[4]  National Science Foundation, "Faculty Early Career Development Program (Career)," Wayback Machine, May 26, 2016, web.archive.org/web/20161001075217/https://www.nsf.gov/funding/pgm_summ.jsp?pims_id=503214.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

10.     **Appendix C** to this report lists the materials I have relied upon to date in developing my opinions in this report.

### B.     Parties and Allegations

#### 1.     Parties

11.     The Proposed Class includes "[a]ll persons and entities in the United States that leased multifamily housing in the United States from a landlord that used Yardi's RENTmaximizer or Revenue IQ software programs, or from a division, subsidiary, predecessor, agent, or affiliate of such Defendant or Conspirator, at any time during the period of September 8, 2019, until the Defendants and Conspirators' unlawful conduct and its anticompetitive effects cease to persist."[5]

12.     The named plaintiffs in this matter are Wylie Duffy and Michael Brett.

    a.     Wylie Duffy is a resident of Washington state and rented multifamily residential units in properties managed by R.D. Merrill Real Estate Holdings, including The Wave and The Nolo, from 2021 to present.

---

[5] Consolidated Class Action Complaint, *McKenna Duffy and Michael Brett, individually and on behalf of all others similarly situated v. Yardi Systems, Inc.; A. J. Dwoskin & Associates, Inc.; Affinity Property Management, LLC; Apartment Services, Inc.; Ardmore Residential, Inc.; Asset Living, LLC; Avenue5 Residential, LLC; Balaciano Group; Balke Brown Transwestern, Inc.; Banyan Living Ohio LLC; Bridge Property Management, L.C.; Calibrate Property Management, LLC; Concord Management, Ltd.; Creekwood Property Corporation; Dalton Management, Inc.; Dweck Properties, Ltd.; Edward Rose & Sons; Envolve Communities, LLC; FPI Management, Inc.; GHP Management Corporation; Goodman Real Estate, Inc.; GRE Management, LLC; Greystar Management Services, LLC; Grubb Properties, LLC; Guardian Management, LLC; HNN Associates, LLC; KRE Group, Inc.; Lumacorp, Inc.; Manco Abbott, Inc.; McWhinney Property Management, LLC; Morguard Management Company Inc.; Oakland Management Corp. d/b/a Beztak Management Company; PRG Real Estate Management, Inc.; RAM Partners, LLC; R.D. Merrill Real Estate Holdings, LLC; RPM Living, LLC; Sentinel Real Estate Corporation; Singh Management Co., L.L.C.; Southern Management Companies LLC; Summit Management Services, Inc.; The Habitat Company LLC; Towne Properties Asset Management Company, Ltd.; Walton Communities, LLC; Western National Securities d/b/a Western National Property Management; Willow Bridge Property Company National d/b/a Lincoln Property Company; Woodward Management Partners, LLC; and Fictitious Defendants John Does 1–100*, Case No. 2:23-cv-01391-RSL, March 5, 2025 ("Consolidated Class Action Complaint"), ¶ 219.

-6-

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                                    CASE NO.: 2:23-CV-01391-RSL

b.  Michael Brett is a resident of Washington state and rented a multifamily residential unit in The Wave property managed by R.D. Merrill Real Estate Holdings from August 2020 to November 2021.[6]

13.    The defendants in this matter are Yardi Systems ("Yardi") and several Yardi landlord clients that manage properties across the United States ("Landlord Defendants").[7]

### 2.    Allegations

14.    Plaintiffs allege that Yardi's Revenue IQ software, formerly known as RENTmaximizer, "effectively outsources the management of rental pricing from a landlord to Yardi itself, which then implements higher prices collectively across a group of landlords."[8] Plaintiffs claim that the purpose of Yardi's Revenue IQ / RENTmaximizer software is to eliminate price competition between landlords, ultimately leading to supracompetitive prices.[9] Plaintiffs further allege that landlord clients "agreed to provide their competitively sensitive data to RENTmaximizer with the understanding that such data will be shared with competitors" to inflate the rents they collectively charged.[10] As a result, Plaintiffs claim that Defendants' alleged misconduct is "centered on the coordination and setting of optimal pricing through a shared, centralized decisionmaker" and is "not meaningfully different than a traditional hub-and-spoke price-fixing conspiracy."[11]

15.    Plaintiffs also allege that Revenue IQ "includes extensive benchmarking data," including "actual leasing, operational, and financial data" from other Yardi clients, which Plaintiffs contend allows its Revenue IQ clients to benchmark pricing and performance against a set of "comparable properties."[12]

---

[6]    Consolidated Class Action Complaint, ¶¶ 36–37.
[7]    Consolidated Class Action Complaint, ¶¶ 38–83.
[8]    Consolidated Class Action Complaint, ¶ 5.
[9]    Consolidated Class Action Complaint, ¶¶ 5–7.
[10]    Consolidated Class Action Complaint, ¶¶ 119, 123, 238.
[11]    Consolidated Class Action Complaint, ¶ 34.
[12]    Consolidated Class Action Complaint, ¶ 10.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

**C.    Assignment**

16.    I have been asked by counsel for Yardi to evaluate from an economic perspective the opinions, arguments, and data in the Expert Report of Ioana Marinescu.[13] In doing so, I have focused on:

    a.    Evaluating whether the Marinescu Report accurately represents how revenue management systems work and are used, and whether the Marinescu Report considers the unilateral reasons that landlords have to use such systems;

    b.    Evaluating whether the key empirical analyses in the Marinescu Report are reliable, from a methodological and economic perspective, to support its conclusion that Yardi's Revenue IQ product "appears to economically operate as an integrated coordinated system that produces coordinated pricing behavior among competing landlords rather than independent, demand-responsive pricing decisions";[14] and

    c.    Evaluating whether the Marinescu Report has established any reliable basis in the relevant economic literature or otherwise for the alleged conspiracy involving Yardi and the Landlord Defendants.

**D.    Summary of Conclusions**

17.    Based on my review of documents and testimony associated with this case, and my expertise in competition economics, digital platforms, and algorithmic pricing, I have reached the following conclusions:

    a.    The Marinescu Report ignores the unilateral incentives that firms, especially those in industries characterized by fixed capacity and perishable inventory, have to adopt revenue management systems. Revenue management systems help individual users optimize both occupancy and price, and their common use does not imply collusion. Because capacity is fixed in the short run and demand factors vary across properties and over time, revenue management systems such as Yardi's Revenue IQ are

---

[13]    Expert Report of Ioana Marinescu, *In re Yardi Revenue Management Antitrust Litigation Wylie Duffy and Michael Brett, individually and on behalf of all others similarly situated, v. Yardi Systems, Inc. et al.*, No. 2:23-cv-01391-RSL, February 9, 2026 ("Marinescu Report").
[14]    Marinescu Report, ¶ 10.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.        CASE NO.: 2:23-CV-01391-RSL

particularly valuable for landlords in the multifamily rental housing sector to help them optimize occupancy. Landlords therefore have a unilateral incentive to adopt revenue management systems. See **Section III**.

b. The Marinescu Report's analyses contain grave errors that, once corrected according to her own stated methodology, are not supportive of a conspiracy. First, its calculation of the Yardi Lease Price Index suffers from at least two grave implementation errors. One error is that it includes outliers, that is lease records with implausibly low effective rents, such as $0.40 per month. These outliers have a substantial impact because of the way in which the index is calculated, resulting in large percentage changes, such as over 300,000 percent. Another error is that the Marinescu Report calculates the change in rent for a given month relative to the last recorded rent regardless of the number of months between those two values, despite many months of missing rent data between leases for certain units. Correcting these two errors following the methods advanced in the Marinescu Report and outlined by Dr. Marinescu in her deposition reverses the direction of the Marinescu Report's key empirical findings. This invalidates the empirical conclusion that Landlord Defendants' prices increase with the adoption of Revenue IQ. It also invalidates the empirical conclusion that internal calls with Yardi Technical Account Managers functioned as an enforcement mechanism and led to supracompetitive pricing. See **Section IV.A**.

c. Another category of grave empirical error in the Marinescu Report is that when testing whether increases in rents are correlated with the presence of more Landlord Defendants within a local geographic area, the Marinescu Report treats each additional property in a geographic area as an additional co-conspirator, including properties managed by the same Landlord Defendant. However, the data show that properties under common management tend to be priced higher than single-managed properties in a given area. This could be due, for instance, to properties

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

under common management being more professionally managed or being different types of properties. The Marinescu Report incorrectly attributes this pricing pattern to collusion with other Landlord Defendants, including in areas where just one Landlord Defendant manages multiple properties. Correcting this error – or, alternatively, using the number of alleged co-conspirators rather than their properties – reverses the Marinescu Report's conclusion that average rents increase as the adoption rate among landlords rises. See **Section IV.B**.

    d.    The Marinescu Report fails to reliably establish any basis for the alleged conspiracy. In addition to the errors that render the quantitative analyses and conclusions in the Marinescu Report unreliable, the Marinescu Report also suffers from additional conceptual flaws that further undermine the reliability of its conclusions. First, the Marinescu Report misstates and mischaracterizes the literature it cites to support its conclusion. An examination establishes that the cited literature is much narrower than the Marinescu Report's discussion suggests, that its characterizations are incomplete, overstated, or inapplicable to the setting here, and that it failed to adequately account for heterogeneity across rental units as well as the very small share of Yardi's Revenue IQ properties in the multifamily rental housing sector. Second, the Marinescu Report also fails to consider that collusive and unilateral conduct can generate observationally similar pricing patterns. Third, the Marinescu Report fails, both conceptually and empirically, to establish any valid mechanism of enforcement to maintain the alleged collusive agreement. The claimed "structural and economic barriers to deviation" described in the Marinescu Report are not enforcement mechanisms, and its analysis of internal Yardi call notes is flawed and fails to establish that Yardi technical account manager oversight was an enforcement mechanism. See **Section V**.

18.    This summary is presented with the aim of making it easier for the reader of this report. The full context and support for these opinions are found in the full report. The fact that I

-10-

do not reply to all points made in the Marinescu Report does not mean that I agree with those points. Analyses that I represent as "corrected" versions of the Marinescu Report's findings, which use methods that Dr. Marinescu testified were appropriate, should not be interpreted as an endorsement of those methods.

## II.    SUMMARY OF THE MARINESCU REPORT

19.    The Marinescu Report presents a hub-and-spoke theory in which Yardi acts as the intermediary (hub) that allegedly coordinates pricing among competing landlords (spokes). The Marinescu Report characterizes Yardi's "pricing suite" as a set of "three interlocking components which, when used by horizontally competing landlords, produce a coordination structure similar to that seen in previously prosecuted cartels."[15] The Marinescu Report describes 1) "Revenue IQ's algorithm, which automatically […] updates Landlord Defendants' prices on a daily basis" and allegedly "produces parallel movement in participating landlords' list prices,"[16] 2) Yardi's Technical Account Managers ("TAMs"), which allegedly "use non-public and individually identifiable data […] to both supplement Revenue IQ's price recommendations and monitor price compliance"[17] and to reinforce upward pricing, and 3) benchmarking reports that the Marinescu Report claims "provide participating landlords with confidential information about pricing and performance across a defined set of competing properties," thereby "allow[ing] participating landlords to compare themselves to competitors and adjust pricing and discounting accordingly."[18] The Marinescu Report concludes that the combined effect of these tools is to "economically operate as an integrated coordination system that produces coordinated pricing behavior among competing landlords rather than independent, demand-responsive pricing decisions."[19]

20.    The Marinescu Report analyzes data produced in the case and finds that "Landlord Defendants overwhelmingly transact at Yardi's algorithm Revenue IQ's list price and, as a result, move prices in parallel, charge higher rents than landlords who do not adopt Revenue IQ or

---

[15]  Marinescu Report, ¶ 12.
[16]  Marinescu Report, ¶ 12.
[17]  Marinescu Report, ¶ 12.
[18]  Marinescu Report, ¶ 53.
[19]  Marinescu Report, ¶ 10.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

equivalent RealPage products, and further increase rents as the adoption of Yardi's algorithm (i.e., the size of the alleged cartel) increases."[20] According to the Marinescu Report, these findings provide "strong evidence that Yardi's algorithm, data sharing, and compliance monitoring have the effect of coordinating landlords' pricing decisions and result in rental prices that are above a competitive level."[21]

## III.     THE MARINESCU REPORT IGNORES THE UNILATERAL INCENTIVES FIRMS HAVE TO ADOPT REVENUE MANAGEMENT SYSTEMS

21.     The Marinescu Report ignores the unilateral incentives that firms, especially those in industries characterized by fixed capacity and perishable inventory, have to adopt revenue management systems. Revenue management systems help individual users optimize both occupancy and price, and their common use does not imply collusion. Because capacity is fixed in the short run and demand factors vary across properties and over time, revenue management systems such as Yardi's Revenue IQ are particularly valuable for landlords in the multifamily rental housing sector to help them optimize occupancy. Landlords therefore have a unilateral incentive to adopt revenue management systems.

### A.     The Primary Goal of Revenue Management Systems Is for Individual Users to Optimize Both Occupancy and Price, and Common Use of Such Systems Does Not Imply Collusion

22.     Revenue management systems originated in the airline industry as a means to allocate the limited and perishable capacity of each plane.[22] Once a plane takes off, an empty seat cannot be used anymore. Revenue management systems have spread to other industries characterized by fixed capacity and perishable inventory, such as cruise lines and hotels.[23]

---

[20]   Marinescu Report, ¶ 13.
[21]   Marinescu Report, ¶ 13.
[22]   Ian Yeoman, "The Continuing Evolution Of revenue Management Science," *Journal of Revenue and Pricing Management*, Vol. 21, January 17, 2022, pp. 1–2 ("Yeoman (2022)"); Netessine, Serguei and Robert Shumsky, "Introduction to the Theory and Practice of Yield Management," *INFORMS Transcations on Education*, Vol. 3, No. 1, September 2002, pp. 34–44 at p. 34.
[23]   Yeoman (2022).

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

23.     In these settings, firms face the challenge of allocating limited and perishable inventory across heterogeneous consumers over time under uncertain demand. Forecasting demand, managing availability, and updating prices and offers to improve utilization and revenue have become well-established business practices for solving this optimization problem.[24] The key problem that revenue management systems try to solve is that it is expensive for a cruise ship company to sail away with empty cabins. However, the cruise ship company also has to set a price that evolves over time to fill a diverse offering of cabins and routes, so that it does not sell out its inventory too soon, meaning that customers who really value the cruise but only try to book later are not able to do so.[25]

24.     Pricing that more accurately reflects demand in a perishable-capacity and fluctuating-demand setting can improve economic efficiency.[26] When inventory is fixed in the short run and vacancies are costly, that is, the lost revenue from an empty seat, hotel room, or apartment unit cannot be recovered later, pricing that better reflects current demand conditions helps reduce inefficient vacancies and improves matching between available units and renters. In lower-demand periods, revenue management systems are designed to recommend lower prices and/or concessions to increase utilization; in higher-demand periods, higher prices help allocate scarce units to renters

---

[24] Klein, Robert et al., "A Review of Revenue Management: Recent Generalizations and Advances in Industry Applications," *European Journal of Operational Research*, Vol. 284, No. 2, July 16, 2020, pp. 397–412 at p. 397 ("Originating from passenger air transport, revenue management has evolved into a general and indispensable methodological framework over the last decades, comprising techniques to manage demand actively and to further improve companies' profits in many different industries.").

[25] See, e.g., Boston Consulting Group, "How TUI Cruises Used AI to Transform Pricing and Revenue Management," https://www.bcg.com/x/mark-your-moment/how-a-cruise-line-transformed-revenue-management, accessed on March 12, 2026 ("The RMS demonstrated potential early on when the pilot proved better at meeting consumers' willingness to pay than the legacy manual approach ever could. Price-sensitive passengers now had a better chance of finding good deals because the system automatically reduced prices on cruises that had seen only moderate uptake. Conversely, passengers interested in premium suites were more likely to find available inventory closer to their preferred departure dates because the system calibrated those prices to match demand. The RMS improved both yield and occupancy rates, while also strengthening cross-functional collaboration and decision-making.").

[26] Talluri, Kalyan T. and Garrett J. Ryzin, *The Theory and Practice of Revenue Management*, Springer New York, NY, 2005 ("Talluri and Ryzin (2005)"), Section 1.3.3, "Business Conditions Conducive to RM".

-13-

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                     CASE NO.: 2:23-CV-01391-RSL

who value them the most without relying on non-price rationing, such as delays, queues, or arbitrary screening.

25. Firms have a unilateral incentive to adopt revenue management systems. Without revenue management tools, firms need to rely on manual analysis of data on their own performance, and manual monitoring of demand conditions and competitor offerings, which can be time-consuming, incomplete, and less responsive to dynamically changing conditions. By contrast, a revenue management system can help automate these processes, including by consolidating internal performance data and publicly available market information to forecast demand and generate up-to-date pricing recommendations. Individual firms can benefit from the use of such revenue management tools through an improved ability to set prices optimally based on current and expected future market conditions.

26. Consistent with these benefits, the core objective described in early literature on revenue management systems is firm-level revenue optimization under uncertainty, not coordination with rivals. Importantly, even in industries where revenue management applications are mature and widely adopted, like airlines, economists document competitive pricing patterns such as substantial price dispersion, showing that the presence of revenue management tools does not, by itself, lead to collusion.[27]

27. The Marinescu Report fails to recognize that access to a common revenue management system does not imply coordination between market participants. Instead, the Marinescu Report takes the opposite view: it characterizes common use of Yardi's "Pricing Suite" as producing "a coordination structure similar to that seen in previously prosecuted cartels," and as "an integrated coordination system" rather than "independent, demand-responsive pricing decisions."[28] In competitive markets, a firm's profit-maximizing pricing decision incorporates information about its own performance and costs as well as publicly available information about rivals' prices. A revenue management system partially automates and adds structure to that

[27] See Borenstein, Severin and Nancy L. Rose, "Competition and Price Dispersion in the U.S. Airline Industry," *Journal of Political Economy*, Vol. 102, No. 4, 1994, pp. 653–683.
[28] Marinescu Report, ¶¶ 10–12.

-14-

individual profit-maximizing pricing decision. As such, widespread use of such systems across an industry is consistent with unilateral, procompetitive behavior and does not imply collusion between market participants.

**B.    Yardi's Software Helps Landlords Optimize Rental Occupancy, Meaning They Have a Unilateral Incentive to Adopt It**

28.    Revenue management systems are designed to solve constrained optimization problems under uncertainty.[29] They are therefore particularly valuable for landlords in the multifamily rental housing sector because capacity is fixed in the short run and demand factors vary across properties and over time. These factors include, but are not limited to, 1) unit characteristics such as size, layout, renovations, lease terms and expiration dates, and anticipated move-out dates, 2) building characteristics such as structure type (for example, attached vs. detached, large vs. small), age, and amenities, and 3) local geographic and neighborhood features such as school quality, employment opportunities, and access to transit.[30] Demand for rental housing can also vary substantially throughout the year. For example, in cities with multiple universities such as Boston, leasing activity often spikes during student move-in and move-out dates, creating seasonal patterns.[31] A pricing approach that does not account for these dynamic factors risks pricing too high, leaving units vacant unnecessarily, or pricing too low, foregoing revenue and profit opportunities.[32]

---

[29]  Talluri and Ryzin (2005), Section 1.1.2, "What's New About RM?".

[30]  Adams, Brian and Randal Verbrugge, "Location, Location, Structure Type: Rent Divergence within Neighborhoods," *Journal of Housing Economics*, Vol. 69, September 2025; Samarin, Mikhail et al., "Geographies and Determinants of Rent Burden: A Regional Economic Analysis of the U.S. Metropolitan Landscape," *Regional Science Policy & Practice*, Vol. 16, No. 7, June 3, 2024; FreddieMac Multifamily, "2025 Multifamily Outlook," January 2025, https://mf.freddiemac.com/research/market-trends/20250108-2025-multifamily-outlook; Kelleher, Susan, "When Is the Best Time to Rent an Apartment?," Zillow, September 25, 2025, https://www.zillow.com/learn/when-is-the-best-time-to-rent-an-apartment/.

[31]  See, e.g., Spot Easy, "Why Boston Rents Spike Each September [2025 Update]," September 8, 2025, https://www.spoteasy.com/blog/why-boston-rents-spike-each-september.

[32]  Talluri and Ryzin (2005), p. 1 ("You want the price to be right—not so high that you put off potential buyers and not so low that you lose out on potential profits.").

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                CASE NO.: 2:23-CV-01391-RSL

29.     Yardi's Revenue IQ software operates akin to a sophisticated calculator that applies revenue management logic to the multifamily rental housing setting in order to manage vacant rental units under uncertain and seasonal demand. Consistent with that objective, Revenue IQ's pricing recommendations are driven by client-provided, property-specific operational data, for example, leasing and availability conditions, client-selected configuration settings that allow each property manager to tailor pricing behavior to that property's business objectives and tolerance for vacancy risk, as well as publicly available pricing data on other rental properties.[33] As such, Revenue IQ is an optimization tool: it is designed to help landlords adjust pricing and occupancy in response to market conditions and property-level metrics rather than to implement any uniform, market-wide target or competitor-specific information. This role of Revenue IQ is supported by the Yenikomshian Declaration's source code review, which found that Revenue IQ clients "make a wide range of configuration choices […] enabl[ing] an individualized approach to pricing decisions."[34]

30.     The analyses provided in the Marinescu Report ignore the difficult revenue optimization problem Yardi's software is designed to help landlords solve, which is to capture important differentiation in demand and heterogeneity across apartments with different features such as location, size, or view. As a result, the Marinescu Report ignores the unilateral motives of properties altogether and how Yardi's Revenue IQ enables landlords to more efficiently set rents and optimize utilization.

[33] Declaration of Mihran Yenikomshian in Support of Yardi Systems, Inc.'s Motion for Summary Judgment, *In Re Yardi Revenue Management Antitrust Litigation McKenna Duffy, individually and on behalf of all others similarly situated v. Yardi Systems, Inc. et al.*, Case No. 2:23-cv-01391-RSL, November 24, 2025 ("Yenikomshian Declaration"), ¶¶ 19 and 30. See also Declaration of Michael Gaeta in Support of Defendant Yardi Systems, Inc.'s Motion for Summary Judgment, *In Re Yardi Revenue Management Antitrust Litigation. McKenna Duffy, individually and on behalf of all others similarly situated v. Yardi Systems Inc., et al.*, Case No. 2:23-cv-01391-RSL, November 21, 2025 ("Gaeta Declaration"), ¶¶ 14-31.
[34] Yenikomshian Declaration, ¶ 21. The Yenikomshian Declaration notes there are Revenue IQ features that allow landlords to optimize occupancy. See, e.g., Yenikomshian Declaration, ¶ 51 ("Revenue IQ applies optional 'Health Rules,' which are client-selected configurations to tailor the provisional pricing output to a client's goals. For example, some clients might prioritize stability with respect to occupancy level, even if it means accepting a relatively lower rent, while others may prefer to risk longer vacancies to achieve relatively higher rents.").

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

## IV. THE MARINESCU REPORT'S ANALYSES CONTAIN GRAVE ERRORS THAT, ONCE CORRECTED ACCORDING TO HER OWN STATED METHODOLOGY, ARE NOT SUPPORTIVE OF A CONSPIRACY

31. The Marinescu Report's analyses contain grave errors that, once corrected according to her own stated methodology, are not supportive of a conspiracy. First, its calculation of the Yardi Lease Price Index suffers from at least two grave implementation errors. One error is that it includes outliers, that is lease records with implausibly low effective rents. These outliers have a substantial impact because of the way in which the index is calculated, resulting in large percentage changes that artificially create the large "jumps" that the Marinescu Report attributes to collusion.[35] Another error is that the Marinescu Report calculates the change in rent for a given month relative to the last recorded rent regardless of the number of months between those two values, despite many months of missing rent data between leases for certain units. Correcting these two errors following the methods advanced in the Marinescu Report and outlined by Dr. Marinescu in her deposition reverses the direction of the Marinescu Report's key empirical findings. This invalidates the empirical conclusion that Landlord Defendants' prices increase with the adoption of Revenue IQ. It also invalidates the empirical conclusion that internal calls with Yardi Technical Account Managers functioned as an enforcement mechanism and led to supracompetitive pricing.

32. Another category of grave empirical error in the Marinescu Report is that when testing whether increases in rents are correlated with the presence of more Landlord Defendants within a local geographic area, the Marinescu Report treats each additional property in a geographic area as an additional co-conspirator, including properties managed by the same Landlord Defendant. However, the data show that properties under common management tend to be priced higher than single-managed properties in a given area. This could be due, for instance, to properties under common management being more professionally managed or being different types of properties. The Marinescu Report incorrectly attributes this pricing pattern to collusion with other Landlord Defendants, including in areas where just one Landlord Defendant manages multiple

---

[35] Marinescu Report, ¶ 385 ("Figure 62 shows an obvious jump after the first TAM call […].").

properties. Correcting this error – or, alternatively, using the number of alleged co-conspirators rather than their properties – reverses the Marinescu Report's conclusion that average rents increase as the adoption rate among landlords rises.

**A.    The Marinescu Report's Analyses Based on the Yardi Lease Price Index Suffer from Implementation Errors that, Once Corrected, Invalidate its Conclusions**

33.    The Marinescu Report conducts several analyses that rely on the construction of a Yardi Lease Price Index to test "whether the price of adopters (i.e., colluding firms) increases with adoption of the hub-algorithm (i.e., as the cartel gets bigger)."[36] Many of the Marinescu Report's conclusions are contingent on the results of these analyses.

34.    First, the Marinescu Report uses this index to claim that "Landlord Defendants' lease prices increase with the adoption of Revenue IQ and exceed a market yardstick."[37] The Marinescu Report presents several analyses of how Landlord Defendants' prices evolved over time relative to a national rental CPI to support this claim. For example, the Marinescu Report's Figure 88 presents a visual depiction of how Landlord Defendants' prices and adoption evolved over time and concludes that the "gap [between the Yardi Lease Price Index and rental CPI] continued to widen through the end of the produced data, and is correlated with stark increases in the adoption of Revenue IQ by new clients."[38] The Marinescu Report's Figure 89 graphs the "Yardi Index Premium," defined as the difference between the Yardi Lease Price Index and rental CPI, against the total number of Landlord Defendants' active leases. The Marinescu Report claims that this figure shows that "the Yardi Index Premium is correlated with the adoption of Yardi by Landlord Defendants, increasing with the number of Landlord Defendant leases."[39] The Marinescu Report's Table 6 presents a regression to "quantify the relationship between Landlord Defendant adoption of Revenue IQ and the Yardi Index Premium," and claims to find a "statistically significant relationship between the Yardi Index Premium and Landlord Defendant adoption of

---

[36]    Marinescu Report, ¶ 500.
[37]    Marinescu Report, ¶ 71.
[38]    Marinescu Report, Figure 88 and ¶ 505.
[39]    Marinescu Report, Figure 89 and ¶ 509.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

Revenue IQ, based on both active leases and total units."[40] Based on these analyses, the Marinescu Report concludes that "as Revenue IQ adoption increased across Landlord Defendants, their rents rise above what a rent-inflation yardstick would predict."[41]

35.    Second, the Marinescu Report also relies on the Yardi Lease Price Index to support the conclusion that calls by Yardi's TAMs "functioned as an intervention to both commit participants to supracompetitive pricing and further push prices up."[42] Specifically, the Marinescu Report identifies a subset of properties that were flagged by Mr. Anthony Fazio as "priced below its benchmark" in internal calls between Mr. Fazio and Yardi TAMs ("Fazio-TAM calls") and calculates a price index of effective rents for each of these properties to "evaluate if the level and/or trend of Landlord Defendants' pricing changed coinciding with TAM call notes."[43] The Marinescu Report presents a graphical comparison of how the "joint index across all client properties identified in Mr. Fazio's call notes mentioning below-benchmark pricing" evolved over time relative to the national rental CPI in Figure 62, as well as a regression analysis to "verify these findings and reach more precise inferences" in Table 2.[44] Based on these analyses, the Marinescu Report concludes that TAMs have "observable effects on realized lease prices."[45]

36.    The Marinescu Report's calculation of the Yardi Lease Price Index suffers from at least two grave implementation errors, among other flaws. Correcting these two errors following the methods advanced in the Marinescu Report and outlined by Dr. Marinescu in her deposition reverses the direction of the key empirical findings discussed in the prior two paragraphs: It invalidates the empirical conclusions that Landlord Defendants' prices increase with the adoption of Revenue IQ and that internal Fazio-TAM calls functioned as an enforcement mechanism and drove supracompetitive pricing.[46]

---

[40]  Marinescu Report, Table 6 and ¶¶ 512-515.
[41]  Marinescu Report, ¶ 71.
[42]  Marinescu Report, ¶ 392.
[43]  Marinescu Report, ¶¶ 378-379.
[44]  Marinescu Report, ¶¶ 384, 386, Figure 62, and Table 2.
[45]  Marinescu Report, ¶ 377.
[46]  See Marinescu Report, ¶ 505 ("Figure 88 shows that, at the start of the data (in 2011), Yardi rental units increased in price more slowly than CPI […]. In 2015, this reversed and Yardi

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                                    CASE NO.: 2:23-CV-01391-RSL

### 1.    Removing Outliers

37.    First, the Marinescu Report fails to consider or account for outlier rental prices in its construction of the Yardi Lease Price Index apart from removing leases with a zero or negative rent.[47]

38.    Outlier observations are data points that diverge from the rest of the data. These data points are often reflective of incorrect data entries, such as missing or added zeroes at the end of a dollar value, or other issues. In conducting economic analyses, it is standard practice to examine the data for outlier records and remove them from the analytical sample if their influence disproportionately impacts the estimated results. For example, Dr. Marinescu has undertaken such data cleaning efforts and removed outliers in her academic research, including, for example, by removing "the bottom and top 0.5 percent" of wages analyzed in an article she published in 2020.[48] Further, Dr. Marinescu testified in her deposition that data cleaning typically involves identifying potential outliers and examining "what would happen without these observations."[49]

---

overtook CPI. This gap continued to widen through the end of the produced data, and is correlated with stark increases in the adoption of Revenue IQ by new clients [.]"), ¶ 515 ("I observe a statistically significant relationship between the Yardi Index Premium and Landlord Defendant adoption of Revenue IQ, based on both active leases and total units. The first column in Table 6 shows that a 10,000 active unit increase in Landlord Defendant adoption of Revenue IQ is associated with nearly a one percentage point increase in the Yardi Index Premium relative to a rental CPI, shown in Figure 89 above.").

[47] Marinescu Report, ¶ 593 ("I filter for leases with a positive effective rent, thus filtering out 0.25% rows of the raw lease data.").

[48] Marinescu, Ioana and Ronald Wolthoff, "Opening the Black Box of the Matching Function," *Journal of Labor Economics*, Vol. 38, No. 2, April 2020, pp. 535–568 ("Marinescu and Wolthoff (2020)") at p. 546 ("To reduce the impact of outliers and errors, we clean the wage data by removing the bottom and top 0.5%."). See also Videotaped/Video-Teleconferenced Deposition of Ioana Marinescu, *In re Yardi Revenue Management Antitrust Litigation. McKenna Duffy, individually and on behalf of all others similarly situated v. Yardi Systems, Inc., et al.*, No. 2:23-cv-01391-RSL, March 9, 2026 ("Marinescu Deposition"), p. 234:1–12 ("Q. And if you turn to page 546, starting in the middle of the page, there's a discussion on, quote, Cleaning, closed quote. Correct? A. Um-hmm, yes. Q. And it says, the last sentence of that first paragraph says, 'To reduce the impact of outliers and errors, we cleaned the wage data by removing the bottom and top 0.5 percent.' Do you see that? A. Yes.").

[49] Marinescu Deposition, p. 13:5–11 ("Q. And does part of the data cleaning include checking for implausible or outlier values in the data? A. That's part of the data cleaning. We look at, you know, potential outliers since that can, you know, influence the results of analysis."), pp. 15:20-

-20-

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

39.     The Marinescu Report does not sufficiently address outlier values in the lease data underlying its calculation of the Yardi Lease Price Index. My examination of the Marinescu Report backup data reveals certain observations with very low rental prices, including prices of $1 or less. For example, unit ID 8692688 is associated with a lease starting in April 2019 with a monthly effective rent of $0.40, which Dr. Marinescu testified "seems very low" and would be a "rare event."[50] Extremely low rent values have a substantial impact on the Marinescu Report's calculated Yardi Lease Price Index because the index is calculated based on the change in effective rent relative to the effective rent for that unit in the prior month. The next observed lease for unit ID 8692688, for example, is associated with a monthly effective rent of $1,241.54, representing more than a 300,000 percent increase relative to the prior rent value and contributing to a large jump in the Marinescu Report's Yardi Lease Price Index in the month in which the price change occurs.[51] This example illustrates the importance of removing outlier rent values from the lease data before performing the Marinescu Report's index calculations.

40.     This methodological error is surprising because the Marinescu Report does acknowledge and remove "implausible values" in separate analyses based on the same lease data. In its analysis of the extent to which transaction prices differ from Revenue IQ's recommended list prices, the Marinescu Report notes that the lease data include "implausible values of the Revenue

---

16:8 ("Q. Because of these data cleaning issues we've just been talking about with outliers, am I correct that it's common practice to remove outliers from data? A. That's something that can be done, but, again, there is some judgment that is involved in terms of whether something is an outlier or is an interesting observation point that is just different from others. But, you know, certainly often it's part of the -- what would happen without these observations, what would happen with these observations, part of the regular process that you might want to do.").

50  YARDI-DUFFY_00913149; Marinescu Deposition, p. 255:4–13 ("Q. And you don't actually have reason to believe that this unit actually rented for 40 cents a month. Do you? […] THE WITNESS: Similarly to the prior example, the same idea applies. This seems very low and, therefore, it would be, I would think, a rare event. But, you know, we cannot rule this out, you know, it might be a special, you know, deal that the renter had.").

51  Calculated as ($1,241.52 ÷ $0.40) − 1. YARDI-DUFFY_00913149. See also Marinescu Deposition, pp. 258:12–259:2 ("Q. [T]he next lease for that same unit, 8692688, shows a monthly effective rent of $1,241.54. Do you see that? A. Yes. Q. And so under your methodology, to calculate the ratio for this unit, it would be $1,241.54 divided by 40 cents. Is that correct? A. Yes. Q. And that produces a ratio of approximately 3103.85 in the first month of the new lease. Correct? A. Yes. I take your calculation as correct.").

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

IQ list price" and addresses these values by "filter[ing] out observations of variables that are lower than $20 and higher than $100,000."[52]

41.    To account for outliers improperly included in the calculation of the Yardi Lease Price Index, I apply the same thresholds for "implausible values" to monthly effective rents and remove those lease observations from the produced lease dataset. Because the maximum effective rent observed in the produced lease dataset is $25,000, the upper threshold of $100,000 is never reached. As a result, only low-value outliers are dropped.[53] Applying the $20 threshold amounts to dropping 108 leases, or 0.005 percent of lease observations, used in the Marinescu Report's analysis.[54] In total, these leases account for 1,096 monthly observations, or 0.005 percent of total monthly observations, in the expanded lease data used in the Marinescu Report's analyses of the Yardi Lease Price Index.[55]

### a.    Analyses of the Relationship between Landlord Defendants' Lease Prices and Adoption of Revenue IQ

42.    I first correct Figure 88 from the Marinescu Report. That figure involves a graphical comparison of the Yardi Lease Price Index to the rental CPI over time. Because both indices are normalized to a common starting point, the trajectory of each line reflects the rate at which prices have changed over time. One line being higher than the other indicates that rents in that series grew faster relative to the starting point than rents in the other series. **Figure 1.A** contrasts the original analysis in Figure 88 of the Marinescu Report, shown in the first panel ("Original"), with the

---

[52]  Marinescu Report, footnote 268 ("I filter out implausible values of the Revenue IQ list price considered [...]. For the recommended rents, I observe that some values are implausibly low or high. E.g., suggested rent of $10 when the effective rent is $3,476.00, or suggested rent of $1,149,024 vs. effective of $1,975. I therefore filter out observations of variables that are lower than $20 and higher than $100,000."). See also Marinescu Report, footnotes 270 and 271. See implementation in the computer scripts in "03. Analysis/05. Lease Overrides/override_analysis_ext_filt.R" in Marinescu Backup Materials.

[53]  See YARDI-DUFFY_00913149.

[54]  The 0.005 percent of lease observations was calculated as 108 leases with positive rents less than or equal to $20 divided by 2,153,893 leases with positive rents used in the Marinescu Report's analysis. See Tucker Backup Materials.

[55]  The 0.005 percent of lease-month observations was calculated as 1,096 leases with positive rents less than or equal to $20 divided by 23,302,150 lease-month observations with positive rents used in the Marinescu Report's analysis. See Tucker Backup Materials.

-22-

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

analysis that removes these outliers, shown in the second panel ("Correction Excluding Outliers According to Her Own Stated Methodology"). As the figure shows, removing these outliers substantially reduces the Yardi Lease Price Index, and the difference in rental price growth is either negligible or much smaller than in the Marinescu Report's original analysis.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                                    CASE NO.: 2:23-CV-01391-RSL

**Figure 1.A: Marinescu Report's Original Figure 88 and Correction That Excludes Outliers According to Her Own Stated Methodology[56]**





**Notes**:

[1] The Marinescu Report sample consists of 2,153,893 leases identified in the Yardi lease data between January 2011 and August 2025 that were associated with Landlord Defendants. The Marinescu Report sample is filtered to only keep leases with positive monthly effective rents. In the corrected sample, leases with monthly effective rents less than or equal to $20 are also excluded. This results in the corrected sample consisting of 2,153,785 leases between January 2011 and August 2025.

[2] The left y-axis represents the Rent Price Index. For Yardi, the index is calculated, per the Marinescu Report, as the cumulative product of rent changes for each unit since February 2011. The Marinescu Report incorrectly calculates the change in the price of a unit between non-consecutive months, which is not corrected in these figures. For the rent CPI, the index is calculated by rebasing the national rental CPI to February 2011. The right y-axis represents active lease counts, calculated as the number of unique Yardi units with active leases. Units are identified based on the field Revenue IQ Unit ID.

-24-

43.     **Figure 2.A** contrasts the original analysis in Figure 89 of the Marinescu Report, shown in the first panel ("Original"), with the analysis that removes these outliers, shown in the second panel ("Correction Excluding Outliers According to Her Own Stated Methodology"). The figure shows that removing these outlier values also all but eliminates the step-like relationship between the Yardi Index Premium and Revenue IQ adoption.

---

[56] Marinescu Report Figure 88 and Backup Materials (YARDI-DUFFY_00913149; U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]", March 11, 2026, https://fred.stlouisfed.org/series/CUSR0000SEHA).

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

**Figure 2.A: Marinescu Report's Original Figure 89 and Correction That Excludes Outliers According to Her Own Stated Methodology[57]**



**Notes:**

[1] The Marinescu Report sample consists of 2,153,893 leases identified in the Yardi lease data between January 2011 and August 2025 that were associated with Landlord Defendants. The Marinescu Report sample is filtered to only keep leases with positive monthly effective rents. In the corrected sample, leases with monthly effective rents less than or equal to $20 are also excluded. This results in the corrected sample consisting of 2,153,785 leases between January 2011 and August 2025.

---

[57] Marinescu Report Figure 89 and Backup Materials (YARDI-DUFFY_00913149; U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]", March 11, 2026, https://fred.stlouisfed.org/series/CUSR0000SEHA).

-26-

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

[2] The y-axis represents the Yardi Index Premium, calculated as the Yardi Lease Price Index minus rent CPI, multiplied by 100. The Yardi Lease Price Index is calculated, per the Marinescu Report, as the cumulative product of rent changes for each unit since February 2011. The Marinescu Report incorrectly calculates the change in the price of a unit between non-consecutive months. The methodology is corrected to only calculate the month-over-month change in the price of a unit if months are consecutive. The rent CPI is calculated by rebasing the national rental CPI to February 2011.

[3] The x-axis represents active lease counts, calculated as the number of unique Yardi units with active leases. Units are identified based on the field Revenue IQ Unit ID.

[4] As described in the Marinescu Report, each point in the chart corresponds to a month, from February 2011 to August 2025, with the corresponding number of active leases and Yardi Index Premium as x and y coordinates, respectively.

44.     **Table 1.A** contrasts the original analysis for Model 1 and Model 2 in Table 6 of the Marinescu Report, shown in the "Original" columns, with the analysis that removes these outliers, shown in the "With Correction" columns.[58] Removing outliers substantially reduces the magnitude of the estimated effect of Landlord Defendants' adoption of Revenue IQ on the Yardi Index Premium.[59] For instance, for Model 1, the magnitude is reduced by about 60 percent, from 0.925 to 0.366. The estimates are reduced by a similar magnitude in Model 2.[60]

---

[58]   The full regression results with additional variables are included in **Appendix D** along with all other figures and tables in this report.

[59]   I present the corrected results adjusted to remove outliers for other figures and tables in the Marinescu Report in **Appendix E**.

[60]   $(0.366 \div 0.925) - 1 = -60.4\%$; $(0.294 \div 0.745) - 1 = -60.5\%$.

-27-

**Table 1.A: Marinescu Report's Original Table 6 and Correction That Excludes Outliers According to Her Own Stated Methodology[61]**

| | Yardi Index Premium | | | |
| --- | --- | --- | --- | --- |
| | Model 1 | | Model 2 | |
| | Original | With Correction | Original | With Correction |
| Active Lease Count, per 10k Leases | 0.925*** | 0.366*** | | |
| | (0.027) | (0.013) | | |
| Approximate Unit Count, per 10k Units | | | 0.745*** | 0.294*** |
| | | | (0.022) | (0.011) |
| Number of Observations | 175 | 175 | 175 | 175 |
| R2 | 0.909 | 0.854 | 0.898 | 0.840 |
| R2 Adjusted | 0.909 | 0.853 | 0.897 | 0.839 |
| RMSE | 3.27 | 1.69 | 3.48 | 1.77 |
| Standard Errors | Robust | Robust | Robust | Robust |

**Notes**:

[1] The Marinescu Report sample consists of 2,153,893 leases identified in the Yardi lease data between January 2011 and August 2025 that were associated with Landlord Defendants. The Marinescu Report sample is filtered to only keep leases with positive monthly effective rents. In the corrected sample, leases with monthly effective rents less than or equal to $20 are also excluded. This results in the corrected sample consisting of 2,153,785 leases between January 2011 and August 2025. The mean monthly-level Yardi Index Premium of the Marinescu Report and the corrected samples are 8.74 and 1.51, respectively.

[2] The Yardi Index Premium is calculated as the Yardi Lease Price Index minus rent CPI, multiplied by 100. The Yardi Lease Price Index is calculated, per the Marinescu Report, as the cumulative product of rent changes for each unit since February 2011. The Marinescu Report incorrectly calculates the change in the price of a unit between non-consecutive months, which is not corrected in this table. The rent CPI is calculated by rebasing the national rental CPI to February 2011.

[3] Statistical significance is denoted by *** $p < 0.01$, ** $p < 0.05$, and * $p < 0.10$.

### b.   Analyses of the Effect of Fazio-TAM Calls on Lease Prices

45.   The Marinescu Report's calculation of the Yardi Lease Price Index associated with a subset of Landlord Defendant properties, which the Marinescu Report refers to as "TAM Properties," and used in Figure 62 and Table 2, is also affected by several outlier observations with unrealistically low rental prices. These outliers drive large increases in the calculated index in certain months. Specifically, the noticeable increase in the Yardi Lease Price Index line in mid-2020 is driven by unit ID 8692688, which, as described above in **Section IV.A.1**, is associated with a lease with a monthly effective rent of $0.40 from April 2019 to May 2020 and a subsequent lease

---

[61]   Marinescu Report Table 6 and Backup Materials (YARDI-DUFFY_00913149; U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]", March 11, 2026, https://fred.stlouisfed.org/series/CUSR0000SEHA).

-28-

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

with a monthly effective rent of $1,241.54, representing more than a 300,000 percent increase in June 2020.[62] Similarly, the substantial increase in the Yardi Lease Price Index line in mid-2024 is driven by unit ID 38687674, which is associated with a lease with a monthly effective rent of $1.00 from November 2023 to August 2024 and a subsequent lease with a monthly effective rent of $2,554.58, representing more than a 255,000 percent increase in September 2024.[63]

46.    **Figure 3.A** contrasts the original analysis in Figure 62 of the Marinescu Report, shown in the first panel ("Original"), with the analysis excluding outliers, shown in the second panel ("Correction Excluding Outliers According to Her Own Stated Methodology"). As the figure shows, removing outlier observations eliminates both noticeable increases in the Yardi Lease Price Index shown in the Original analysis and substantially reduces any "sustained upward time trend thereafter."[64]

---

[62]  YARDI-DUFFY_00913149. The lease associated with a monthly effective rent of $1,241.54 has a start date of November 1, 2019 and a term of 13 months. When the timing of two leases overlap, as is the case here, the Marinescu Report uses the monthly effective rent from the earlier lease until its expiration. As a result, although the second lease is associated with a start date of November 1, 2019, the Marinescu Report's calculations realize the increase from $0.40 to $1,241.54 in June 2020, after the expiration of the first lease.

[63]  YARDI-DUFFY_00913149.

[64]  Marinescu Report, ¶ 385.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

**Figure 3.A: Marinescu Report's Original Figure 62 and Correction That Excludes Outliers According to Her Own Stated Methodology[65]**





**Notes:**

[1] The sample consists of 184 properties identified in the Yardi lease data between April 2011 and August 2025 that were flagged in Mr. Fazio's TAM call notes as priced below benchmark. The Marinescu Report sample is filtered to only keep leases with positive monthly effective rents. In the corrected sample, leases with monthly effective rents less than or equal to $20 are also excluded.

[2] The y-axis represents the Rent Price Index. For Yardi, the index is calculated, per the Marinescu Report, by averaging the monthly effective rent changes across units within each property-month, then taking the cumulative product of these average changes since May 2011. The Marinescu Report incorrectly calculates the change in the price of a unit between non-consecutive months, which is not corrected in these figures. For the rent CPI, the index is calculated by rebasing the national rental CPI to May 2011.

[3] The shaded area represents the months from March 2020 to March 2023, during which the central 90% of Mr. Fazio's TAM calls identifying underpricing were made.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

47.    Removing outlier observations also substantially reduces or eliminates the Marinescu Report's finding that Fazio-TAM calls are associated with a statistically significant increase in the subject property's prices. Specifically, Table 2 in the Marinescu Report presents the results of an analysis that "calculates a time trend in Landlord Defendants' price indices […] then tests if – at a candidate treatment event – either this time trend changes or if prices shift in a way that a constant time trend cannot explain (or both)."[66] Based on the estimated coefficient for the "After First TAM Call x Months From First Call" variable, the Marinescu Report concludes that, after the first Fazio-TAM call flagging a property as priced below benchmarks, "the upward time trend in Landlord Defendants' effective rents increased by a statistically significant 1.13% per month compared to their pre-call trend" in specification (12), which does not control for rental CPI. After controlling for rental CPI in specification (13), the Marinescu Report concludes that this effect "falls slightly but remains statistically significant with an estimate of 0.94%."[67]

48.    **Table 2.A** below contrasts the original analysis in Table 2 of the Marinescu Report, shown in the columns labeled "Original", with the analysis excluding outliers, shown in the columns labeled "With Correction." As the table shows, the estimated coefficient on the "After First TAM Call x Months From First Call" variable in column (12), which does not control for rental CPI, drops from 1.131 percent to 0.447 percent, meaning that the observed increase in the upward time trend in Landlord Defendants' effective rents decreases by 60 percent.[68] Similarly, after removing outliers, the estimated coefficient on the "After First TAM Call x Months From First Call" variable in column (13), which adds controls for rental CPI, changes from 0.939 percent to -0.054 percent and is no longer statistically significant, meaning there is no meaningful change in trend in the Landlord Defendants' effective rents following the first Fazio-TAM call. These results invalidate the Marinescu Report's conclusions that "[Fazio-]TAM calls are associated with

---

[65]    Marinescu Report Figure 62 and Backup Materials (YARDI-DUFFY_00913149; U.S. Bureau of Labor Statistics, Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]).
[66]    Marinescu Report, ¶ 386.
[67]    Marinescu Report, ¶ 390.
[68]    $(0.447 \div 1.131) - 1 = -60.5\%$.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

a statistically significant trend break in the subject property's pricing, with prices increasing faster after the first [Fazio-]TAM call."[69]

**Table 2.A: Marinescu Report's Original Table 2 and Correction That Excludes Outliers According to Her Own Stated Methodology[70]**

| | Property-Level Price Index | | | |
| | (12) | | (13) | |
| | Original | With Correction | Original | With Correction |
|---|---|---|---|---|
| After First TAM Call × Months From First Call | 1.131*** | 0.447*** | 0.939*** | -0.054 |
| | (0.331) | (0.101) | (0.340) | (0.075) |
| Number of Observations | 10,434 | 10,434 | 10,434 | 10,434 |
| R2 | 0.347 | 0.572 | 0.347 | 0.575 |
| R2 Adjusted | 0.338 | 0.566 | 0.338 | 0.569 |
| Rent CPI | | | Yes | Yes |
| Fixed Effects | Property | Property | Property | Property |
| Standard Errors | Newey-West (L=3) | Newey-West (L=3) | Newey-West (L=3) | Newey-West (L=3) |

**Notes:**

[1] The sample consists of 184 properties identified in the Yardi lease data between April 2011 and August 2025 that were flagged in Mr. Fazio's TAM call notes as priced below benchmark. The Marinescu Report sample is filtered to only keep leases with positive monthly effective rents. In the corrected sample, leases with monthly effective rents less than or equal to $20 are also excluded. The mean property-level indexes of the Marinescu Report and corrected samples are 130.73 and 121.97, respectively.

[2] This analysis regresses the average property-level price index across units at each month on an indicator variable set to one after the first Fazio-TAM call occurred. For Yardi, the property-level price index is calculated, per the Marinescu Report, by averaging the monthly effective rent changes across units within each property-month, then taking the cumulative product of these average changes since May 2011. The Marinescu Report incorrectly calculates the change in the price of a unit between non-consecutive months, which is not corrected in these tables. For the rent CPI, the index is calculated by rebasing the national rental CPI to May 2011.

[3] Statistical significance is denoted by *** $p < 0.01$, ** $p < 0.05$, and * $p < 0.10$.

### 2. Adjusting for the Treatment of Missing Rent Values

49. Second, the Marinescu Report does not calculate the Yardi Lease Price Index in the way the methodology is described in the Marinescu Report and outlined by Dr. Marinescu in her deposition. According to the Marinescu Report, index values for each unit are calculated based on

---

[69] Marinescu Report, ¶ 390.

[70] Marinescu Report Table 2 and Backup Materials (YARDI-DUFFY_00913149; U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]", March 11, 2026, https://fred.stlouisfed.org/series/CUSR0000SEHA).

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

"each unit's change in effective rent relative to the prior month,"[71] with the assumption that monthly effective rent is constant during the term of a lease.[72] Dr. Marinescu clarified in her deposition that the intended methodology involves imputing monthly rents during the term of a lease for a given unit, and would not impute rents for a given unit if there were a gap of more than a month between when one observed lease ends and the next observed lease begins. Instead, the rent for that unit would be treated as missing until the start date of the next observed lease, and the index would not be calculated for the first month of the new lease.[73] For example, if the data reflect two leases for a given unit, one for a 12-month lease term from January 1, 2022 through December 31, 2022, and another lease term from June 1, 2023 through May 31, 2024, the Marinescu Report's stated methodology would not impute monthly rents for that unit between January 1, 2023 and May 31, 2023. No change in the Yardi Lease Price Index would be calculated for that unit between these two lease terms.

50.    However, my examination of the Marinescu Report's computer scripts and backup data from the Marinescu Report reveals that Dr. Marinescu did not follow her stated methodology. Instead, the calculation behind the index shown in the Marinescu Report includes the change in

---

[71]  Marinescu Report, ¶ 503 ("I calculate each unit's change in effective rent relative to the prior month, including no changes when a unit is still under the same contract and therefore has the same effective rent.").

[72]  Marinescu Report, ¶ 595 ("[F]or each lease, I create one row for each month in which the lease is active, from the lease start month to the lease end month (estimated by adding the number of months indicated in the 'Lease Term' variable to the 'Lease Start Date'). I repeat the relevant lease-level variables for each monthly row.").

[73]  Marinescu Deposition, pp. 280:4-283:25 ("A. […] My understanding is that the way that my staff processed the data, based on our discussion, is that we only imputed rent as long as it was the same contract. So, here, you know, the data point would be missing in June 2025. So -- and then in July 2025, it would still be missing, because we don't know, like, relative to what, since there was no data before. And then starting in August 2025, so one month after this first, you know, new data point, then you would start to see a ratio of one or no price increase for the next 12 months, you know, until the end of this, of this lease. Q. You would agree that it would not be appropriate to attribute the entire difference between 1,045 and 1,382 to a change that happened in one month. Correct? […] THE WITNESS: So, as I said, given the procedure that we have discussed, there would be missing data in the middle and, therefore, there would not -- this property would not contribute to the index since it would have missing data, it would not contribute to the index until August of 2025, because that's the first time that we see the rent not changing since it's being propagated from the July 2025 new rent.").

-33-

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

rent for a given month relative to the last recorded rent *regardless* of the number of months between those two values. Doing so effectively assumes that rents remain constant at the prior lease levels until the start of the next observed lease, even when there is a longer time gap between those values.

51. For example, in the produced lease data, unit ID 1623904 is associated with a 12-month lease starting on June 1, 2015 with an effective monthly rent of $1,045. The next observed lease has a start date of July 1, 2025 with a monthly effective rent of $1,382. That is 9 years after the original lease ended. The lease data do not include any information on the monthly effective rent paid in between the two reported leases. According to Dr. Marinescu's testimony in deposition, the methodology intended to be used in her report should have been to assume that the $1,045 rent applied from June 2015 to June 2016, and then apply a missing value between the expiration of the first lease and the start of the second lease, from July 2016 to July 1, 2025.[74] Because the monthly effective rent would be treated as missing in June 2025, no Yardi Lease Price Index value would be calculated in July 2025.[75]

52. Instead, however, my examination of the underlying computer script reveals that the Marinescu Report calculated the index value in July 2025 based on the change between the $1,045 effective monthly rent for June 2016, the last month of the last observed lease, and the $1,382 effective monthly rent value for July 2025, despite the fact that these two datapoints are over 9

---

[74] Marinescu Deposition, pp. 279:18–280:18 ("Q. Okay. And so if you would look at Revenue IQ Unit ID 1623904, the first entry point has a lease start date of June 1st, 2015. Correct? A. Yes. Q. And the next lease observation for that unit is July 1st, 2025, over ten years later. Do you see that? A. Yes. Q. And so that's a gap, after the initial 12 months, from June 2016 to July 2025, or 109 months. Correct? A. Yes. Q. And then at the end of that, when you get to July 1, 2025, the rent increase is shown as from $1,045 to $1,382. Correct? A. No. My understanding is that the way that my staff processed the data, based on our discussion, is that we only imputed rent as long as it was the same contract. So, here, you know, the data point would be missing in June 2025.").

[75] Marinescu Deposition, p. 281:9–18 ("A: So, as I said, given the procedure that we have discussed, there would be missing data in the middle and, therefore, there would not -- this property would not contribute to the index since it would have missing data, it would not contribute to the index until August of 2025, because that's the first time that we see the rent not changing since it's being propagated from the July 2025 new rent.").

-34-

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

years apart.[76] This amounts to assuming that the monthly effective rent stayed constant at $1,045 between June 2016 and July 2025, the period for which no data are available, and attributing the entire increase to the month of July 2025, resulting in a substantial increase in the index for this unit in July 2025.

53.    As another example, unit ID 339629 is associated with a 12-month lease starting on November 1, 2017 with a monthly effective rent of $770. The next observed lease for this unit starts on June 1, 2024, 67 months after the November 2017 lease ended, with a monthly effective rent of $1,062, an increase of 37.9 percent.[77] Similarly, unit ID 99076 is associated with a 12-month lease starting on July 26, 2013 with a monthly effective rent of $918.82, and the next observed lease for this unit starts on May 30, 2019, 58 months after the first lease ended, with a monthly effective rent of $1,233.[78] This reflects an increase of 34.2 percent. Unit ID 1624785 is associated with a six-month lease starting March 1, 2015 with a monthly effective rent of $1,611.17, and the next observed lease for this unit starts on June 13, 2025, 117 months after the first lease ended, with a monthly effective rent of $2,337.[79] This reflects an increase of 45.0 percent. In each of these cases, the Marinescu Report calculates the index value for the first month of the new lease based on the change relative to the rent charged under the prior lease, despite the years-long gaps between them.

54.    This error affects 240,205 observations, or 1.03 percent of observations in the data relied on in the Marinescu Report for calculating the Yardi Lease Price Index.[80] To examine the impact of this error on the Marinescu Report's findings, I adjust the Yardi Lease Price Index calculations to follow the methodology for imputing rent values described in the Marinescu Report

---

[76]  Marinescu Deposition, pp. 279:18–280:3 ("Q. Okay. And so if you would look at Revenue IQ Unit ID 1623904, the first entry point has a lease start date of June 1st, 2015. Correct? A. Yes. Q. And the next lease observation for that unit is July 1st, 2025, over ten years later. Do you see that? A. Yes.").

[77]  YARDI-DUFFY_00913149.

[78]  YARDI-DUFFY_00913149.

[79]  YARDI-DUFFY_00913149.

[80]  Calculated as (240,205 unit-month observations where the preceding unit-month observation is not consecutive) ÷ (23,302,150 total unit-month observations in the Marinescu Report's sample). See Tucker Backup Materials.

and by Dr. Marinescu in her deposition, in addition to removing outliers as explained in **Section IV.A.1**.

**a.    Analyses of the Relationship between Landlord Defendants'
Lease Prices and Adoption of Revenue IQ**

55.    **Figure 1.B** contrasts the original analysis in Figure 88 of the Marinescu Report, shown in the first panel ("Original"), with the analysis removing outlier values in the manner advanced in the Marinescu Report and following her described, but not applied, methodology for treating missing rent values, shown in the second panel ("Correction Excluding Outliers and Updating Missing Rents Methodology According to Her Own Stated Methodology"). The comparison shows that the Yardi Lease Price Index is below the rental CPI over the entire period from January 2011 to August 2025, meaning that it grew more slowly than the rental CPI over that period.

-36-

**Figure 1.B: Marinescu Report's Original Figure 88 and Correction That Excludes Outliers and Updates the Calculation of the Price Index to Reflect Missing Rents According to Her Own Stated Methodology[81]**

**Original**



**Correction Excluding Outliers and Updating Missing Rents Methodology According to Her Own Stated Methodology**



**Notes:**

[1] The Marinescu Report sample consists of 2,153,893 leases identified in the Yardi lease data between January 2011 and August 2025 that were associated with Landlord Defendants. The Marinescu Report sample is filtered to only keep leases with positive monthly effective rents. In the corrected sample, leases with monthly effective rents less than or equal to $20 are also excluded. This results in the corrected sample consisting of 2,153,785 leases between January 2011 and August 2025.

[2] The left y-axis represents the Rent Price Index. For Yardi, the index is calculated, per the Marinescu Report, as the cumulative product of rent changes for each unit since February 2011. The Marinescu Report incorrectly calculates the change in the price of a unit between non-consecutive months. The methodology is corrected by only calculating the month-over-month change in the price of a unit if months are consecutive. For the rent CPI, the index is calculated by rebasing the national rental CPI to February 2011. The right y-axis represents active lease counts, calculated as the number of unique Yardi units with active leases. Units are identified based on the field Revenue IQ Unit ID.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

56.    **Figure 2.B** contrasts the original analysis in Figure 89 of the Marinescu Report, shown in the first panel ("Original"), with the analysis removing outlier values in the manner advanced in the Marinescu Report and following her described, but not applied, methodology for treating missing rent values, shown in the second panel ("Correction Excluding Outliers and Updating Missing Rents Methodology According to Her Own Stated Methodology"). Adjusting for these two implementation errors in the manner offered by Dr. Marinescu results in a negative relationship between the Yardi Index Premium and Revenue IQ adoption, effectively reversing the Marinescu Report's conclusion that "the Yardi Index Premium is correlated with the adoption of Yardi by Landlord Defendants, increasing with the number of Landlord Defendant leases."[82]

---

[81]    Marinescu Report Figure 88 and Backup Materials (YARDI-DUFFY_00913149; U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]", March 11, 2026, https://fred.stlouisfed.org/series/CUSR0000SEHA).
[82]    Marinescu Report, ¶ 509.

-38-

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

**Figure 2.B: Marinescu Report's Original Figure 89 and Correction That Excludes Outliers and Updates the Calculation of the Price Index to Reflect Missing Rents According to Her Own Stated Methodology[83]**

**Original**



**Correction Excluding Outliers and Updating Missing Rents Methodology According to Her Own Stated Methodology**



**Notes:**

[1] The Marinescu Report sample consists of 2,153,893 leases identified in the Yardi lease data between January 2011 and August 2025 that were associated with Landlord Defendants. The Marinescu Report sample is filtered to only keep leases with positive monthly effective rents. In the corrected sample, leases with monthly effective rents less than or equal to $20 are also excluded. This results in the corrected sample consisting of 2,153,785 leases between January 2011 and August 2025.

---

[83]    Marinescu Report Figure 89 and Backup Materials (YARDI-DUFFY_00913149; U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary

-39-

[2] The y-axis represents the Yardi Index Premium, calculated as the Yardi Lease Price Index minus rent CPI, multiplied by 100. The Yardi Lease Price Index is calculated, per the Marinescu Report, as the cumulative product of rent changes for each unit since February 2011. The Marinescu Report incorrectly calculates the change in the price of a unit between non-consecutive months. The methodology is corrected to only calculate the month-over-month change in the price of a unit if months are consecutive. The rent CPI is calculated by rebasing the national rental CPI to February 2011.
[3] The x-axis represents active lease counts, calculated as the number of unique Yardi units with active leases. Units are identified based on the field Revenue IQ Unit ID.
[4] As described in the Marinescu Report, each point in the chart corresponds to a month, from February 2011 to August 2025, with the corresponding number of active leases and Yardi Index Premium as x and y coordinates, respectively.

57.    **Table 1.B** contrasts the original analysis for Model 1 and Model 2 in Table 6 of the Marinescu Report, shown in the "Original" columns, with the analysis correcting for just these two implementation errors, shown in the "With Correction" columns. The table shows that the correction leads to a statistically significant *negative* relationship between the Yardi Index Premium and Landlord Defendant adoption of Revenue IQ,[84] reversing the Marinescu Report's conclusion that the Yardi Index Premium increases with adoption of Revenue IQ.

---

Residence    in    U.S.    City    Average    [CUSR0000SEHA]",    March    11,    2026, https://fred.stlouisfed.org/series/CUSR0000SEHA).
[84] I present the corrected results adjusted to remove outliers and apply the Marinescu Report's described methodology for treating missing rent values for other figures and tables in the Marinescu Report in **Appendix E**.

-40-

**Table 1.B: Marinescu Report's Original Table 6 and Correction That Excludes Outliers and Updates the Calculation of the Price Index to Reflect Missing Rents According to Her Own Stated Methodology[85]**

| | Yardi Index Premium | | | |
| | Model 1 | | Model 2 | |
| | Original | With Correction | Original | With Correction |
|---|---|---|---|---|
| Active Lease Count, per 10k Leases | 0.925*** | -0.163*** | | |
| | (0.027) | (0.013) | | |
| Approximate Unit Count, per 10k Units | | | 0.745*** | -0.133*** |
| | | | (0.022) | (0.010) |
| Number of Observations | 175 | 175 | 175 | 175 |
| R2 | 0.909 | 0.591 | 0.898 | 0.601 |
| R2 Adjusted | 0.909 | 0.589 | 0.897 | 0.598 |
| RMSE | 3.27 | 1.52 | 3.48 | 1.50 |
| Standard Errors | Robust | Robust | Robust | Robust |

**Notes**:

[1] The Marinescu Report sample consists of 2,153,893 leases identified in the Yardi lease data between January 2011 and August 2025 that were associated with Landlord Defendants. The Marinescu Report sample is filtered to only keep leases with positive monthly effective rents. In the corrected sample, leases with monthly effective rents less than or equal to $20 are also excluded. This results in the corrected sample consisting of 2,153,785 leases between January 2011 and August 2025. The mean monthly-level Yardi Index Premium of the Marinescu Report and the corrected samples are 8.74 and -5.76, respectively.

[2] The Yardi Index Premium is calculated as the Yardi Lease Price Index minus rent CPI, multiplied by 100. The Yardi Lease Price Index is calculated, per the Marinescu Report, as the cumulative product of rent changes for each unit since February 2011. The Marinescu Report incorrectly calculates the change in the price of a unit between non-consecutive months. The methodology is corrected by only calculating the month-over-month changes in the price of a unit if months are consecutive. The rent CPI is calculated by rebasing the national rental CPI to February 2011.

[3] Statistical significance is denoted by *** $p < 0.01$, ** $p < 0.05$, and * $p < 0.10$.

**b.    Analyses of the Effect of Fazio-TAM Calls on Lease Prices**

58.    Similarly to the issue with outliers, the Marinescu Report's calculation of the Yardi Lease Price Index associated with a subset of Landlord Defendant properties, which the Marinescu Report refers to as "TAM Properties," and used in Figure 62 and Table 2 is also affected by the treatment of missing rent values. **Figure 3.B** contrasts the original analysis in Figure 62 of the Marinescu Report, shown in the first panel ("Original"), with the analysis removing outliers and updating the calculation of the price index to reflect missing rents according to her own stated

[85]   Marinescu Report Table 6 and Backup Materials (YARDI-DUFFY_00913149; U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]", March 11, 2026, https://fred.stlouisfed.org/series/CUSR0000SEHA).

-41-

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                CASE NO.: 2:23-CV-01391-RSL

methodology, shown in the second panel ("Correction Excluding Outliers and Updating Missing Rents Methodology According to Her Own Stated Methodology"). As the figure shows, correcting for both implementation errors demonstrates that the rents of the Yardi properties did not grow as fast as the rental CPI, and shows no meaningful increase in trend following the first Fazio-TAM call.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

**Figure 3.B: Marinescu Report's Original Figure 62 and Correction That Excludes Outliers and Updates the Calculation of the Price Index to Reflect Missing Rents According to Her Own Stated Methodology[86]**

**Original**



**Correction Excluding Outliers and Updating Missing Rents Methodology According to Her Own Stated Methodology**



**Notes:**

[1] The sample consists of 184 properties identified in the Yardi lease data between April 2011 and August 2025 that were flagged in Mr. Fazio's TAM call notes as priced below benchmark. The Marinescu Report sample is filtered to only keep leases with positive monthly effective rents. In the corrected sample, leases with monthly effective rents less than or equal to $20 are also excluded.

[2] The y-axis represents the Rent Price Index. For Yardi, the index is calculated, per the Marinescu Report, by averaging the monthly effective rent changes across units within each property-month, then taking the cumulative product of these average changes since May 2011. The Marinescu Report incorrectly calculates the change in the price of a unit between non-consecutive months. The methodology is corrected by only calculating the month-over-month change in the price of a unit if months are consecutive. For the rent CPI, the index is calculated by rebasing the national rental CPI to May 2011.

[3] The shaded area represents the months from March 2020 to March 2023, during which the central 90% of Mr. Fazio's TAM calls identifying underpricing were made.

-43-

59.    **Table 2.B** contrasts the original analysis presented in Table 2 of the Marinescu Report, shown in the columns labeled "Original," with the analysis excluding outliers and updating the calculation of the price index to reflect missing rents according to her own stated methodology, shown in the columns labeled "With Correction." As the table shows, the estimated coefficient on the "After First TAM Call x Months From First Call" variable in column (12), which does not control for rental CPI, drops by 95 percent, from 1.131 percent to 0.052 percent.[87] The estimated coefficient on the "After First TAM Call x Months From First Call" variable in column (13), which adds controls for rental CPI, drops from 0.939 percent to -0.046 percent.

---

[86]    Marinescu Report Figure 62 and Backup Materials (YARDI-DUFFY_00913149; U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]", March 11, 2026, https://fred.stlouisfed.org/series/CUSR0000SEHA).

[87]    $(0.052 \div 1.131) - 1 = -95.4\%$.

-44-

**Table 2.B: Marinescu Report's Original Table 2 and Correction That Excludes Outliers and Updates the Calculation of the Price Index to Reflect Missing Rents According to Her Own Stated Methodology[88]**

| | Property-Level Price Index | | | |
| --- | --- | --- | --- | --- |
| | (12) | | (13) | |
| | Original | With Correction | Original | With Correction |
| After First TAM Call × Months From First Call | 1.131*** | 0.052*** | 0.939*** | -0.046* |
| | (0.331) | (0.019) | (0.340) | (0.026) |
| Number of Observations | 10,434 | 10,396 | 10,434 | 10,396 |
| R2 | 0.347 | 0.827 | 0.347 | 0.828 |
| R2 Adjusted | 0.338 | 0.824 | 0.338 | 0.826 |
| Rent CPI | | | Yes | Yes |
| Fixed Effects | Property | Property | Property | Property |
| Standard Errors | Newey-West (L=3) | Newey-West (L=3) | Newey-West (L=3) | Newey-West (L=3) |

**Notes:**

[1] The sample consists of 184 properties identified in the Yardi lease data between April 2011 and August 2025 that were flagged in Mr. Fazio's TAM call notes as priced below benchmark. The Marinescu Report sample is filtered to only keep leases with positive monthly effective rents. In the corrected sample, leases with monthly effective rents less than or equal to $20 are also excluded. The mean property-level indexes of the Marinescu Report and corrected samples are 130.73 and 114.22, respectively.

[2] This analysis regresses the average property-level price index across units at each month on an indicator variable set to one after the first Fazio-TAM call occurred. For Yardi, the property-level price index is calculated, per the Marinescu Report, by averaging the monthly effective rent changes across units within each property-month, then taking the cumulative product of these average changes since April 2011. The Marinescu Report incorrectly calculates the change in the price of a unit between non-consecutive months. The methodology is corrected by only calculating the month-over-month change in the price of a unit if months are consecutive. For the rent CPI, the index is calculated by rebasing the national rental CPI to May 2011.

[3] Statistical significance is denoted by *** $p < 0.01$, ** $p < 0.05$, and * $p < 0.10$.

60.　　As shown in the results presented in **Figure 3.B** and **Table 2.B**, correcting for these two sets of implementation errors in the manner advanced in the Marinescu Report and by Dr. Marinescu in her deposition invalidates the Marinescu Report's empirical finding that Fazio-TAM calls functioned as an effective "intervention to both commit participants to supracompetitive pricing and further push prices up."[89]

---

[88]　Marinescu Report Table 2 and Backup Materials (YARDI-DUFFY_00913149; U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]", March 11, 2026, https://fred.stlouisfed.org/series/CUSR0000SEHA).

[89]　Marinescu Report, ¶ 392.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.　　　　　　　　　　CASE NO.: 2:23-CV-01391-RSL

**B.**    **The Marinescu Report's Econometric Analysis Overcounts the Number of Alleged Co-Conspirator Properties, which, Once Corrected, Invalidates its Conclusions**

61.    Section 9.2.4 of the Marinescu Report explores an econometric framework, at the unit-month level of observation, to test whether increases in rents are correlated with the presence of more Landlord Defendants within a local geographic area and month (a PUMA-month combination) and are therefore "above what we would expect absent collusion."[90] The Marinescu Report asserts that its finding "where the more firms who coordinate via the hub-algorithm, the larger its effect on price […] is what economists expect from coordination via a hub-algorithm and precisely what they don't expect in a non-collusive algorithm."[91] However, this finding rests on a faulty analysis, and that conclusion no longer holds when a measurement error in the variable of interest is corrected. I focus my analysis below on this error but note that I have additional methodological concerns in the econometric framework that are not addressed here, including potential omitted variable bias and sample selection issues.

62.    The results of the panel regressions are reported in Table 8 of the Marinescu Report, in which effective rent is regressed against "the number of alleged co-conspirators available to each Landlord Defendant property" in a PUMA, as well as the rental CPI and unit and time fixed effects in some specifications.[92] The Marinescu Report's stated goal for this econometric framework is to "absorb macroeconomic trends – including COVID-era demand shifts – as well [as] all time-invariant unit characteristics (such as size and location) with the ultimate purpose of isolating the relationship between local Revenue IQ adoption intensity and pricing outcomes."[93]

63.    The key variable is measured as "the number of co-conspirator properties […] that are in the same PUMA of the unit (excluding the property the unit of interest belongs to)," or, equivalently, the total number of properties within a PUMA minus one.[94] However, the way this

---

[90]    Marinescu Report, ¶ 478.
[91]    Marinescu Report, ¶ 74.
[92]    Marinescu Report, ¶ 537 and ¶ 542.
[93]    Marinescu Report, ¶ 535.
[94]    Marinescu Report, ¶ 536 and footnote 307.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

variable is constructed is inherently flawed because it treats all properties within a PUMA as alleged co-conspirators, even those that are managed by the same Landlord Defendant. For example, if a Landlord Defendant has five properties in a PUMA, when measuring the effect of others' properties on a given property's rent, the Marinescu Report assumes that the Landlord Defendant's four other properties are "co-conspirators." This measurement error is especially relevant to the Marinescu Report's analysis because Landlord Defendants managing multiple properties within a PUMA is a common occurrence in the data: more than 40 percent of observed PUMA-month combinations include at least one Landlord Defendant with multiple properties.[95] More than 25 percent of observed PUMA-month combinations in the data have only one Landlord Defendant managing multiple properties.[96] The Marinescu Report's flawed methodology assumes potential collusion there as well, even though there are no other Landlord Defendants present, again undermining the reliability of the Marinescu Report's conclusion that more co-conspirators results in higher rents.

64.    The Marinescu Report's variable treats each additional property in the PUMA as an additional co-conspirator, including properties from the same Landlord Defendant. However, the data show that properties under common management tend to be priced higher than single-managed properties in a given area. This could be due, for instance, to properties under common management being more professionally managed or being different types of properties. Therefore, because of the way it combines all properties together in its analysis, the Marinescu Report incorrectly attributes this pricing pattern to collusion with other Landlord Defendants. Separating the effect of being managed by the same Landlord Defendant from the effect of having additional alleged co-conspirator Landlord Defendants and their properties in the same geographic area shows that the Marinescu Report's finding that "Landlord Defendants' pricing responds systematically [and positively] to the presence of additional co-conspirators in their local market" is wrongly driven by the first of these effects.[97]

---

[95]   See Marinescu Report Backup.
[96]   See Marinescu Report Backup.
[97]   Marinescu Report, ¶ 549; **Appendix E, Table E2**.

-47-

65.    To account for properties managed by the same Landlord Defendant present in "the number of co-conspirator properties," I redefine the Marinescu Report's variable as the total number of properties within a PUMA minus the number of properties managed by a given Landlord Defendant. **Table 3.A** contrasts the original analysis for Model 23 and Model 25 in Table 8 of the Marinescu Report, shown in the "Original" columns, with the analysis removing outliers and correcting the variable, shown in the "With Correction" columns. I focus on these two specifications because, according to the Marinescu Report, "Models 23 and 25 are the most robust because they contain explicit controls for both cross-unit heterogeneity in, for example, square footage or layout type (through unit fixed-effects) and cross time variation (through month/year fixed-effects and a nationwide rent CPI control respectively)."[98] The table shows that once the variable of interest is corrected, the estimated effect becomes negative in both instances, changing from 1.843 to -7.341 in Model 23 and from 5.280 to -2.091 in Model 25. These results mean that the number of co-conspirator properties within a PUMA becomes negatively correlated with effective rent for the Marinescu Report's two preferred specifications in Table 8, effectively reversing the findings that the Marinescu Report characterizes as particularly "importan[t] […] finding[s] to the economic analysis of algorithmic coordination."[99]

---

[98]    Marinescu Report, ¶ 546.
[99]    Marinescu Report, ¶ 75.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

**Table 3.A: Marinescu Report's Original Table 8 and Correction That Excludes Outliers According to Her Own Stated Methodology and Accounts for Properties Managed by the Same Landlord Defendant[100]**

| | Monthly Effective Rents | | | |
| --- | --- | --- | --- | --- |
| | (23) | | (25) | |
| | Original | With Correction | Original | With Correction |
| Number of Co-Conspirator Properties | 1.843*** | -7.341*** | 5.280*** | -2.091*** |
| | (0.070) | (0.089) | (0.164) | (0.216) |
| Number of Observations | 23,296,808 | 23,295,711 | 23,296,808 | 23,295,711 |
| R2 | 0.961 | 0.961 | 0.959 | 0.959 |
| R2 Adjusted | 0.960 | 0.960 | 0.958 | 0.959 |
| Rent CPI | | | Yes | Yes |
| Fixed Effects | Unit, Month | Unit, Month | Unit | Unit |
| Standard Errors | Newey-West (L=3) | Newey-West (L=3) | Clustered by Unit | Clustered by Unit |

**Notes:**

[1] The Marinescu Report's original sample consists of 2,153,893 leases identified in the Yardi lease data between January 2011 and August 2025 that were associated with Landlord Defendants. Public Use Microdata Areas ("PUMAs") are identified by combining United States Census Bureau data with the property address associated with a lease, identified based on the fields Property Address, Property City, Property State, and Property Zip Code. The Marinescu Report sample is filtered to only keep leases with positive monthly effective rents. In the corrected sample, leases with monthly effective rents less than or equal to $20 are also excluded. This results in the corrected sample consisting of 2,153,785 leases between January 2011 and August 2025. The mean monthly effective rents of the Marinescu Report and corrected samples are 1,434.87 and 1,434.94, respectively.

[2] The Marinescu Report calculates the number of co-conspirator properties in a PUMA-month as the number of unique properties in a given PUMA-month, identified based on the field Revenue IQ Property ID, minus one. This definition is corrected by taking the difference between the number of properties in a given PUMA-month and the number of properties managed by the unit's Landlord Defendant, identified based on the field Yardi Client PIN, in the same PUMA-month.

[3] Statistical significance is denoted by *** $p < 0.01$, ** $p < 0.05$, and * $p < 0.10$.

66. Correcting for this measurement error also eliminates the apparent jump in average effective rent changes from "adding just one additional co-conspirator" presented in Figure 94 of the Marinescu Report. The Marinescu Report calculates that average effective rent changes "increased by $11 to $68.5 per month" from "adding just one additional co-conspirator [property]" to a PUMA.[101] However, in addition to removing outlier values and following Dr. Marinescu's

---

[100] Marinescu Report Table 8 and Backup Materials (YARDI-DUFFY_00913149; U.S. Census Bureau, "Public Use Microdata Areas (PUMAs)", https://www.census.gov/programs-surveys/geography/guidance/geo-areas/pumas.html; U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]", March 11, 2026, https://fred.stlouisfed.org/series/CUSR0000SEHA).

[101] Marinescu Report, ¶ 540.

-49-

described methodology for treating missing rent values as described in **Section IV.A**, correcting for this measurement error results in average effective rent changes from adding one alleged co-conspirator property that are statistically equivalent, as shown by the overlapping 95 percent confidence intervals represented by the bars surrounding the point estimates in the right panel of **Figure 4**. That is, contrary to the Marinescu Report's conclusion, adding one more co-conspirator property has no statistically significant effect on effective rent changes in a given geographical area. **Figure 4** contrasts the impact of these corrections with the results of the Marinescu Report, where the left panel represents the results from the Marinescu Report's original Figure 94 from "adding just one additional co-conspirator [property],"[102] and the right panel represents the results after implementing these corrections.

---

[102] Marinescu Report, ¶ 540.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

**Figure 4: Fully Revising Marinescu Report's Original Figure 94 Estimates According to Her Own Stated Methodology: Changes in Average Effective Rent Increases from Adding One Co-Conspirator Property[103]**



**Notes:**

[1] The Marinescu Report's original sample consists of 2,153,893 leases identified in the Yardi lease data between January 2011 and August 2025 that were associated with Landlord Defendants. Public Use Microdata Areas ("PUMAs") are identified by combining United States Census Bureau data with the property address associated with a lease, identified based on the fields Property Address, Property City, Property State, and Property Zip Code. The Marinescu Report sample is filtered to only keep leases with positive monthly effective rents. In the corrected sample, leases with monthly effective rents less than or equal to $20 are also excluded. This results in the corrected sample consisting of 2,153,785 leases between January 2011 and August 2025.

[2] The y-axis represents the average change in the effective rent of a unit and the corresponding 95% confidence interval. The Marinescu Report incorrectly calculates the change in the price of a unit between non-consecutive months. The methodology is corrected by only calculating the month-over-month change in the price of a unit if months are consecutive.

67.    **Table 3.B** explores an alternative correction to Table 8 of the Marinescu Report that replaces the key variable with the number of alleged co-conspirator Landlord Defendants within a PUMA, instead of their number of properties. Harrington (2025), the paper on which the Marinescu Report relies to design its tests to infer collusion,[104] frames the core "adoption-rate" prediction at the firm level: the relevant adoption rate is "the fraction of firms using the pricing algorithm," and

---

[103]  Marinescu Report Figure 94 and Backup Materials (YARDI-DUFFY_00913149; U.S. Census Bureau, "Public Use Microdata Areas (PUMAs)", https://www.census.gov/programs-surveys/geography/guidance/geo-areas/pumas.html).

[104]  See, e.g., Marinescu Report, ¶¶ 485–486 ("Harrington (2025) proposes three tests for collusion via a hub-algorithm […]. I therefore implement these tests using Landlord Defendants' lease transaction data and Yardi's own analysis of Revenue IQ users' pricing").

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

the key mechanism is that the supracompetitive markup is larger "when more firms are part of the agreement," such that average prices increase as the adoption rate among firms rises. Consistent with that framing, a measure that counts independent landlords by PUMA aligns more closely with Harrington's framework than the Marinescu Report's measure that counts properties.[105] When the key variable is instead specified as the number of other Landlord Defendants in the PUMA rather than the number of properties, the "alleged co-conspirator effect" that the Marinescu Report characterizes as particularly "important[] […] to the economic analysis of algorithmic collusion" disappears or reverses, further invalidating the claim that Harrington's coordinated-adoption implication is supported by the analysis reported in the Marinescu Report's Table 8.[106]

68.      Under this alternative model, the estimated effect in Model 23 of the Marinescu Report's Table 8 becomes negative, therefore reversing the Marinescu Report's key conclusion that "robust econometric estimation confirms Landlord Defendants achieve higher rents in areas with more alleged co-conspirators."[107] This result suggests that the presence of alleged co-conspirators within a PUMA is negatively correlated with effective rent, which would be consistent with increased competition. Additionally, the estimated effect in specification 25 is reduced by 93 percent[108] and is not statistically significant, implying that there is no statistically meaningful effect on rents of additional co-conspirators in a given area, further invalidating the Marinescu Report's econometric findings. Together, these results provide additional evidence that the Marinescu Report's flawed methodology results in unreliable estimates that after appropriate adjustments lead to contrary conclusions.

---

[105] See Harrington, Joseph E., "An Economic Test for an Unlawful Agreement to Adopt a Third-Party's Pricing Algorithm," *Economic Policy*, Vol. 40, No. 121, January 2025, pp. 261–295 ("Harrington (2025)"), p. 285 and footnote 30.

[106] Marinescu Report, ¶ 75.

[107] Marinescu Report, Section 9.2.4.

[108] $(0.369 \div 5.280) - 1 = -93\%$.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

**Table 3.B: Marinescu Report's Original Table 8 and Correction That Excludes Outliers According to Her Own Stated Methodology and Uses the Number of Co-Conspirator Landlord Defendants[109]**

| | Monthly Effective Rents | | | |
| --- | --- | --- | --- | --- |
| | (23) | | (25) | |
| | Original | With Correction | Original | With Correction |
| Number of Co-Conspirator Properties | 1.843*** | | 5.280*** | |
| | (0.070) | | (0.164) | |
| Number of Co-Conspirator Landlord Defendants | | -11.553*** | | 0.369 |
| | | (0.165) | | (0.380) |
| Number of Observations | 23,296,808 | 23,295,711 | 23,296,808 | 23,295,711 |
| R2 | 0.961 | 0.961 | 0.959 | 0.959 |
| R2 Adjusted | 0.960 | 0.960 | 0.958 | 0.959 |
| Rent CPI | | | Yes | Yes |
| Fixed Effects | Unit, Month | Unit, Month | Unit | Unit |
| Standard Errors | Newey-West (L=3) | Newey-West (L=3) | Clustered by Unit | Clustered by Unit |

**Notes:**

[1] The Marinescu Report's original sample consists of 2,153,893 leases identified in the Yardi lease data between January 2011 and August 2025 that were associated with Landlord Defendants. Public Use Microdata Areas ("PUMAs") are identified by combining United States Census Bureau data with the property address associated with a lease, identified based on the fields Property Address, Property City, Property State, and Property Zip Code. The Marinescu Report sample is filtered to only keep leases with positive monthly effective rents. In the corrected sample, leases with monthly effective rents less than or equal to $20 are also excluded. This results in the corrected sample consisting of 2,153,785 leases between January 2011 and August 2025. The mean monthly effective rents of the Marinescu Report and corrected samples are 1,434.87 and 1,434.94, respectively.

[2] The Marinescu Report calculates the number of co-conspirator properties in a PUMA-month as the number of unique properties in a given PUMA-month, identified based on the field Revenue IQ Property ID, minus one. This definition is updated to be the number of unique Landlord Defendants, identified based on the field Yardi Client PIN, minus one.

[3] Statistical significance is denoted by *** $p < 0.01$, ** $p < 0.05$, and * $p < 0.10$.

---

[109] Marinescu Report Table 8 and Backup Materials (YARDI-DUFFY_00913149; U.S. Census Bureau, "Public Use Microdata Areas (PUMAs)", https://www.census.gov/programs-surveys/geography/guidance/geo-areas/pumas.html; U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]", March 11, 2026, https://fred.stlouisfed.org/series/CUSR0000SEHA).

## V.    THE MARINESCU REPORT FAILS TO RELIABLY ESTABLISH ANY BASIS FOR THE ALLEGED CONSPIRACY

69.    The Marinescu Report fails to reliably establish any basis for the alleged conspiracy. In addition to the errors described in **Section IV** that render the quantitative analyses and conclusions in the Marinescu Report unreliable, the Marinescu Report also suffers from additional conceptual flaws that further undermine the reliability of its conclusions. First, the Marinescu Report misstates and mischaracterizes the literature it cites to support its conclusion. An examination establishes that the cited literature is much narrower than the Marinescu Report's discussion suggests, that its characterizations are incomplete, overstated, or inapplicable to the setting here, and that it failed to adequately account for heterogeneity across rental units as well as the very small share of Yardi's Revenue IQ properties in the multifamily rental housing sector. Second, the Marinescu Report also fails to consider that collusive and unilateral conduct can generate observationally similar pricing patterns. Third, the Marinescu Report fails, both conceptually and empirically, to establish any valid mechanism of enforcement to maintain the alleged collusive agreement. The claimed "structural and economic barriers to deviation" described in the Marinescu Report are not enforcement mechanisms, and its analysis of internal Yardi call notes is flawed and fails to establish that Yardi technical account manager oversight was an enforcement mechanism.

### A.    The Marinescu Report Misstates and Mischaracterizes the Academic Literature in Its Attempt to Establish a Conspiracy

70.    The Marinescu Report discusses "research specifically considering coordination via algorithmic price setting and horizontal information exchanges" to evaluate the question of "whether [Yardi's] uncontested conduct constitutes collusion, or sufficient evidence thereof."[110] However, the cited literature is much narrower than the Marinescu Report's discussion suggests. First, the empirical studies cited are market-specific and find effects only under widespread

---

[110] Marinescu Report, ¶ 92.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

adoption of the algorithmic pricing tool and in settings that differ from multifamily rentals. Second, the theoretical papers cited in the Marinescu Report often assume the existence of a cartel, or subscription of all market participants to a common pricing agent, and then analyze how that cartel would manage information. Below, I address the main papers the Marinescu Report relies on and explain why the Marinescu Report's characterizations are incomplete, overstated, or inapplicable to the setting here.

### 1.    Assad et al. (2024)

71.    The Marinescu Report cites Assad et al. (2024) for the finding that "gas station profit margins increase by 38% post-adoption in oligopoly markets where all adopt vs. none adopt the hub-algorithm" and that "hub-algorithm adoption had no effect on margins in monopoly markets," which the authors use to infer that "the mechanism through which the pricing algorithm increased margins was coordination across gas stations that had previously been competing."[111] However, the Marinescu Report makes no attempt to establish that the conclusions from that paper would generalize to the materially different setting in which Yardi operates. Assad et al. (2024) study algorithm adoption in the German retail gasoline market, a homogeneous product with frequent price updates, which differs meaningfully from the multifamily rental housing sector.

72.    Economic theory and empirical research both support that collusion is more easily achieved and sustained when firms sell homogeneous products, such as gasoline, as they can readily observe a common price, coordinate on a price target without needing to negotiate a high-dimensional contract, and detect price deviations. When products are heterogeneous, coordination becomes more complex. The existence of multiple prices and differences in product characteristics makes mutual monitoring noisier, and differences in quality across products increase the scope for strategic cheating among coordinating firms.[112] The rental housing sector is

---

[111] Marinescu Report, ¶ 100; Assad, Stephanie et al., "Algorithmic Pricing and Competition: Empirical Evidence from the German Retail Gasoline Market," *Journal of Political Economy*, Vol. 132, No. 3, March 2024, pp. 723–771 ("Assad et al. (2024)").

[112] See, e.g., Ivaldi, Marc et al., "Chapter 8 - the Economics of Tacit Collusion: Implications for Merger Control," *Contributions to Economic Analysis*, Vol. 282, 2007, pp. 217–239 ("Ivaldi et al. (2007)") at p. 225; Tirole, Jean, *The Theory of Industrial Organization*, The MIT Press, 1988

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

characterized by multidimensional heterogeneity, as units can differ across numerous observable and unobservable characteristics that directly affect rental prices.[113] This multidimensional heterogeneity implies that collusion is more difficult to achieve and sustain in the sector Yardi operates in than in markets with homogeneous products, such as the one studied by Assad et al. (2024).

73.    Assad et al. (2024) also find evidence of a price/margin effect only in local markets where all stations adopt the same algorithm, and no effect in local markets where only a subset of stations adopt.[114] In contrast, as described below in this section, Revenue IQ users account for a very small share of rental housing units nationwide.[115] The Marinescu Report does not analyze and does not appear to contend that all landlords in any studied local geography have adopted Revenue IQ.

74.    Finally, Assad et al. (2024) specifically note that algorithmic pricing "can increase margins and prices through a reduction in competition and increased market power, but there can be other reasons for such changes. An algorithm could better understand underlying fluctuations in

---

("Tirole (1988)"), Chapter 6, "Dynamic Price Competition and Tacit Collusion," Chapter 6.1.3, "Asymmetries"; Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, 4 Ed., 2005 ("Carlton and Perloff (2005)") ("Carlton and Perloff (2005)") at p. 135.

[113] Zhao, Wen et al., "Influencing Factors and Spatial Differentiation of Rental Housing in a Smart City: A GWR Model Analysis " *Measurement: Sensors*, Vol. 33, June 2024 ("Most scholars divide the characteristic variables into three categories, i.e., location characteristic, building characteristic and neighborhood characteristic[.]"); Sirmans, G. Stacy et al., "Determining Apartment Rent: The Value of Amenities, Services and External Factors," *Journal of Real Estate Research*, Vol. 4, No. 2, 1989, pp. 33–43 ("Sirmans et al. (1989)") at p. 33 ("A number of factors may affect the rent charged by landlords of multifamily residential properties. Physical characteristics such as the number of bedrooms and the age and size of the complex as well as various amenities and services such as a swimming pool, all utilities paid, maid service and a modern kitchen may help determine the market value for landlords as they set rental rates. In addition, occupancy restrictions such as no children or pets allowed and external factors such as traffic congestion, proximity to work, and access to public transportation may have significant impacts on rent.").

[114] Marinescu Report, ¶¶ 99–100; Assad et al. (2024) at p. 727 ("Markets where only a subset of stations adopts see no change.").

[115] Calder-Wang, Sophie and Gi Heung Kim, "Algorithmic Pricing in Multifamily Rentals: Efficiency Gains or Price Coordination?," *The Wharton School, University of Pennsylvania Research Paper Series*, August 16, 2024 ("Calder-Wang and Kim (2024)"), Figure 3, Table 4, and Table 5.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

wholesale prices or identify how demand elasticity changes over time and adjust prices accordingly."[116] As such, the authors recognize the need to isolate the effects of adoption on competition from other potential explanations and attempt to do so by comparing outcomes for monopoly markets, in which there are no nearby competitors with which to coordinate, versus non-monopoly markets.[117] In contrast, as described in **Section V.B**, the Marinescu Report does not consider that collusive conduct can generate observationally similar pricing patterns to unilateral decision-making and fails to compare the observed pricing outcomes to an appropriate competitive benchmark.

### 2.    Calder-Wang and Kim (2024)

75.    The Marinescu Report cites Calder-Wang and Kim (2024), which focuses on multifamily rentals, for the observation that "market segments with higher algorithmic penetration experienced higher average rents and lower occupancies" in the period following the Great Recession.[118] The paper's framework considers two channels through which algorithmic adoption can influence prices: 1) a demand-responsive channel, which reflects better forecasting and faster reactions, and 2) a coordinated channel, which may reflect collusion between participants.[119] Importantly, in a high-demand state, which the Marinescu Report acknowledges applies to the period examined here,[120] the authors find that both channels can generate the same directional

---

[116] Assad et al. (2024) at pp. 752–753.

[117] Assad et al. (2024) at p. 753 ("To test whether any observed changes in prices and/or margins come from a reduction in competition and increased market power or from a better understanding of underlying fluctuations in wholesale prices and consumers' demand elasticity, we look separately at stations that are monopolists and stations that are not. […] If adoption affects only competition, we should expect to see zero effects for monopolist stations and nonzero effects for nonmonopolists.").

[118] Marinescu Report, ¶ 102; Calder-Wang and Kim (2024).

[119] Calder-Wang and Kim (2024) at p. 2 ("Before we dive into the empirical analysis, to help interpret patterns in the data, we begin with a stylized model on how a hypothetical algorithm can influence pricing through two possible channels. (i) Algorithmic pricing can help adopters set prices optimally by overcoming existing information or pricing frictions, an example of which can be to help adopters set prices that are more responsive to changing market conditions. We call it the 'responsive pricing' channel. (ii) Algorithmic pricing can also recommend adopters prices that maximize their profits jointly as opposed to individually, as though adopters were coordinating. We call it the 'algorithmic coordination' channel.").

[120] Marinescu Report, ¶ 566.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

pattern of higher rents and lower occupancy, meaning that the observation that algorithmic penetration is associated with higher prices is not diagnostic of collusion on its own.[121] In fact, my own research finds that better forecasting can make collusive outcomes harder to sustain in periods of high demand.[122] The Marinescu Report claims that its findings that Landlord Defendants' lease prices increase faster in areas with greater Revenue IQ adoption "are broadly consistent with Calder-Wang & Kim's analysis of RealPage, where they found rents were 4% higher in segments with the most hub-algorithm penetration,"[123] but does not engage with the authors' conclusion that this pattern cannot distinguish between the two mechanisms through which algorithmic adoption can influence pricing and therefore does not provide evidence of collusion.

76.     Calder-Wang and Kim (2024) also provide relevant information as to the adoption of Yardi, showing that users of Yardi's pricing algorithm accounted for less than 1 percent of buildings in 2019, as illustrated in **Figure 5**.[124] This share is very small. Economic theory holds that collusion among firms cannot be effective at raising prices when the colluding firms control only a small share of the relevant market because other non-colluding firms can discipline prices.[125] Consistent with this theory, Dr. Marinescu agreed in her deposition that "it's easier to raise prices

---

[121] Calder-Wang and Kim (2024) at p. 2 ("However, because these two channels produces directionally the same prediction during a boom, it is more challenging to isolate the coordination channel by running such regressions of price and quantity on adoption status."), p. 15 ("However, during an economic boom, if adopters charge higher prices and produce lower quantities than nonadopters in the same market (or if prices increase and quantities decrease in algorithmic penetration), it does not isolate the coordination channel, and therefore is not evidence of coordinated pricing.").

[122] Miklós-Thal, Jeanine and Catherine Tucker, "Collusion by Algorithm: Does Better Demand Prediction Facilitate Coordination between Sellers?," *Management Science*, Vol. 65, No. 4, April 2019, pp. 1552–1561 at p. 1553 ("[B]etter prediction also affects the firms' incentives to deviate from a collusive strategy because it increases each firm's temptation to undercut price in periods when consumers are predicted to be willing to pay high prices.").

[123] Marinescu Report, ¶¶ 487–488 ("Controlling for Rent CPI and unit-level fixed-effects, Landlord Defendants increase rents $5.3 per month for every additional alleged co-conspirator in their local area. (see Section 9.2.4). These results are broadly consistent with Calder-Wang & Kim's analysis of RealPage, where they found rents were 4% higher in segments with the most hub-algorithm penetration. See Section 3.1.1.").

[124] Calder-Wang and Kim (2024), Figure 3, Table 4, and Table 5.

[125] See Carlton and Perloff (2005) at p. 131 ("If the cartel controls only a small share of the relevant market, which includes all close substitutes, firms not in the cartel undercut the cartel and prevent it from raising the market price[.]").

-58-

to a greater degree in most models typically in theory when you have a higher market share."[126] Therefore, a critical question in evaluating whether supracompetitive prices can be maintained as a result of a collusive scheme is whether the alleged coordinating group has enough presence in the relevant local competitive set for coordination to increase prices in a sustained way. The Marinescu Report does not consider the market share of Revenue IQ users in its analyses, and does not address the question of whether Revenue IQ users have enough market share to increase and sustain higher prices in any given area and for any unit type.[127]

**Figure 5: Calder-Wang and Kim (2024)'s Figure 3**
**Share of Algorithmic Pricing Adoption By Software[128]**



---

[126] Marinescu Deposition, p. 156:4–14 ("Q. And are you familiar with the part of that text that says that if cartel members have a small share, then firms outside the cartel can lower the price to undercut the cartel? A. It really depends on the specifics of the market. But I don't disagree that market share matters and that it's easier to raise prices to a greater degree in most models typically in theory when you have a higher market share.").

[127] Marinescu Deposition, p. 154:5–20 ("Q. Okay. So, in the analysis that you just described, isn't market share a relevant factor in whether Yardi and the landlord defendants would be able to effect the collusive scheme that is alleged by plaintiffs? A. […] However, for this report, I wasn't asked to define a relevant market and, you know, I would do so in the next stage of the analysis, but here I cannot talk about market share. And that would depend on defining a relevant market.").

[128] Calder-Wang, Sophie and Gi Heung Kim, "Coordinated Vs Efficient Prices: The Impact of Algorithmic Pricing on Multifamily Rental Markets," *The Wharton School, University of Pennsylvania Research Paper Series*, February 26, 2024, Figure 3.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

### 3.    Sugaya and Wolitzky (2018) and Sugaya and Wolitzky (2025)

77.    The Marinescu Report relies on Sugaya and Wolitzky (2018) and Sugaya and Wolitzky (2025) for the "key takeaway that effective collusion does not always involve disclosing the most detailed information about the state of the market,"[129] which the Marinescu Report claims is "relevant to evaluating Yardi's claim that the benchmarking data Landlord Defendants receive is 'anonymized and aggregated.'"[130] However, the Marinescu Report overlooks critical limitations in Sugaya and Wolitzky (2018) and Sugaya and Wolitzky (2025) that narrow when their results apply. Specifically, Sugaya and Wolitzky (2018) develop a theoretical model to show that reduced transparency can facilitate collusion only under specific structural conditions that do not apply to the context in which Yardi operates. For example, the authors' model assumes that firms operate in clearly segmented markets under a home-market principle, where each firm has a cost advantage in its own territory and refrains from entering rivals' markets.[131] This condition does not characterize the rental housing market, in which multiple landlords operate in a local geographic area and compete in overlapping rather than clearly segmented territories. Similarly, Sugaya and Wolitzky (2025) develop a theoretical model in which a third-party intermediary observes demand or cost conditions and optimally chooses what information to disclose to competing firms to maximize collusive profits. However, this model assumes that the intermediary is designed to "maximize firms' collusive profit" and that firms do not observe market conditions themselves.[132] These conditions do not apply to Revenue IQ or the rental housing market. In fact, the authors caution that the model "is intended as a benchmark and does not attempt to fully capture the complex industries mentioned above," which includes rental housing, and note that "in practice the objective of an intermediary like RealPage may or may not be maximizing collusive profit."[133]

---

[129]  Marinescu Report, ¶ 123; Sugaya, Takuo and Alexander Wolitzky, "Maintaining Privacy in Cartels," *Journal of Political Economy*, Vol. 126, No. 6, December 2018, pp. 2569–2607 ("Sugaya and Wolitzky (2018)"); Sugaya, Takuo and Alexander Wolitzky, "Collusion with Optimal Information Disclosure," *MIT Economics Working Papers*, January 17, 2025 ("Sugaya and Wolitzky (2025)").

[130]   Marinescu Report, ¶ 124.

[131]  Sugaya and Wolitzky (2018) at p. 2572.

[132]  Sugaya and Wolitzky (2025) at pp. 1–2.

[133]  Sugaya and Wolitzky (2025), footnote 1.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

#### 4.    Harrington (2025)

78.    The Marinescu Report's quantitative analyses rely heavily on Harrington (2025), which it characterizes as "provid[ing] a model and tests to infer whether firms' decisions on the adoption of a common pricing algorithm are coordinated (thereby inferring the presence of an unlawful agreement among adopters) based on the effect that the number of adopting firms has on prices."[134] However, the Marinescu Report not only misunderstands the purpose of the tests outlined in Harrington (2025), it also ignores the limitations of those analyses.

79.    Harrington (2025) cautions that the proposed empirical framework "may not be robust to firm asymmetries" such as "firms hav[ing] different marginal costs."[135] Observed pricing dynamics could be wrongly attributed to collusion while the true source of price variation is driven by marginal cost pricing, because we would expect that "[a firm] with a lower cost sets a lower price than [a firm] with a higher cost."[136] The Marinescu Report's claim that Revenue IQ-adopting properties "charge higher rents than landlords who do not adopt Revenue IQ" may be driven by such asymmetries, if, for example, Revenue IQ-adopting properties incur higher costs on average because they provide better and costlier amenities.[137] The Marinescu Report makes no attempt to analyze marginal costs for Revenue IQ adopters compared to non-adopters, and therefore has no basis to assume that these differences would not bias its conclusions.

80.    Harrington (2025) also notes that his "empirical approach is [subject to] possible endogeneity of the adoption rate."[138] If the algorithm adoption decision is correlated with firm characteristics and these firm characteristics affect "the prices set by the pricing algorithm," then "the estimated coefficient on the adoption rate will be biased."[139] The Marinescu Report's analyses are subject to this selection bias. Revenue IQ adoption is not random and is potentially correlated

---

[134]  Marinescu Report, ¶ 104.
[135]  Harrington (2025) at p. 285.
[136]  Harrington (2025) at p. 285.
[137]  Marinescu Report, ¶ 13.
[138]  Harrington (2025) at p. 287.
[139]  Harrington (2025) at p. 287.

-61-

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

with buildings of higher quality or more professionally and efficiently managed. However, the Marinescu Report makes no attempt to account for these endogeneity concerns.

81.     Finally, Harrington (2025) notes that the sample period used in the estimation should be "a representative sample of the demand states used in designing the pricing algorithm."[140] If demand during the sample period is above the average demand state used in designing the pricing algorithm, then "average price will be increasing in the adoption rate even with independent adoptions."[141] The Marinescu Report's analyses overlap with the post COVID-19 period, a period during which, as explained in the Marinescu Report, "multifamily rentals in the US [were], generally speaking, [in] a high demand state" and "rents increased rapidly across many metropolitan areas, driven by sustained demand and structural constraints on housing supply."[142] Therefore, without explicitly controlling for this high-demand period, it is difficult to disentangle the effects of the economic boom on prices from those attributable to Revenue IQ adoption.

**B.     The Marinescu Report Fails to Consider that Collusive and Unilateral Conduct Can Generate Observationally Similar Pricing Patterns**

82.     When evaluating alleged collusion, it is important to recognize that collusion and competition can generate observationally similar pricing patterns. Competing firms set their own prices by relying on common market factors and publicly available rival prices, resulting in interdependent and positively correlated outcomes even in the absence of an agreement or a "hub algorithm."[143] Therefore, when an economist cannot analyze the underlying pricing mechanism, such as Revenue IQ source code, and instead relies solely on analyzing outcomes such as observed price levels as the Marinescu Report did, the relevant economic question is not whether these outcomes are consistent with collusion, but whether they are more consistent with collusion than with plausible unilateral explanations.

---

[140] Harrington (2025) at p. 287.
[141] Harrington (2025) at p. 287.
[142] Marinescu Report, ¶ 124 and ¶ 566.
[143] See Harrington (2025) at p. 283, footnote 29 ("When the demand state is stronger, a firm's profit-maximizing price is higher. Given firms' prices are strategic complements, a firm optimally raises price more when other firms also raise their prices.").

83.    For instance, consider a manufacturer of lightbulbs who wants to launch a new, energy efficient, lightbulb that is more environmentally friendly and lasts longer than a traditional lightbulb. If a consumer values the extra benefits of the new lightbulb at $2 more than a traditional lightbulb, then the firm can potentially charge up to $2 above the price that competing firms charge for traditional lightbulbs. The price of a good is therefore determined by both a competitor's price of the next best alternative in the consumers' eyes, and the differentiation value the good enjoys relative to this next alternative.[144] Market trends that affect the price of the next best alternative good will also affect the price of the good of interest. For example, if the price of traditional lightbulbs increases due to higher manufacturing costs, the price of the energy efficient lightbulb could also increase.

84.    The Marinescu Report treats visible synchrony and high correlations in prices as indicative of collusive conduct.[145] However, it does not compare the observed pricing outcomes, measured as monthly average effective rents, to an appropriate competitive benchmark and therefore does not provide an economic explanation for why such co-movement would be unlikely under competitive, unilateral pricing. Literature surrounding economic screening methods for collusion emphasizes the need for such competitive benchmarks. For instance, Abrantes-Metz and Bajari (2012) provide empirical examples of screening methods that rely on control groups to assess whether observed pricing patterns are comparable to prices in reasonably competitive markets.[146] Similarly, Conley and Decarolis (2016) investigate the presence of alleged bid coordination in procurement auctions by testing whether observed participation and bids differ significantly from

---

[144] Nagle, Thomas T. and Georg Müller, *The Strategy and Tactics of Pricing: A Guide to Growing More Profitably*, 6 Ed., Routledge, 2018 ("Nagle and Müller (2018)") at p. 20 ("The potential market value of a product or service is composed of two parts: Value that is the same as that offered by the competitive alternatives *(Reference Value)* and value that differentiates it from competitive alternatives *(Differentiating Value)*.")

[145] Marinescu Report, ¶¶ 333–339 and Figures 46–48.

[146] Abrantes-Metz, Rosa and Patrick Bajari, "Screens for Conspiracies and Their Multiple Applications," *Competition Policy International*, Vol. 8, No. 1, 2012, pp. 177–193 at p. 178 ("One set of collusive screens generalizes this idea by looking for events that are improbable unless firms in the industry have coordinated their actions. The second type of screen uses the concept of a control group. […] Prices that are anomalous compared to other markets suggest a competition problem.").

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

those of a reference group.[147] Therefore, without an appropriate competitive benchmark, the Marinescu Report's descriptive evidence cannot reliably disentangle collusive conduct from competitive outcomes.

85.     Given these limitations, the Marinescu Report fails to test alternative unilateral and competitive explanations for the observed pricing patterns. One such explanation is sample selection. Revenue IQ adoption is not random: Landlord Defendants self-select into the service. If Landlord Defendants tend to have stronger management expertise, own higher quality buildings, or operate in denser or faster-growing markets, and if these characteristics are associated with higher rent levels or faster rent growth, then adoption of Revenue IQ will be correlated with higher and upward-trending prices even absent any coordination. In this case, the sample selection effect could lead to biased estimates and could falsely attribute competitive pricing patterns to collusive conduct. More broadly, the Marinescu Report fails to test whether the observed parallel price increases simply reflect shared macroeconomic conditions across landlords and properties. For instance, a nationwide housing shortage or the loosening of COVID-19 restrictions are potential factors that would cause upward pressure on rents across properties simultaneously.[148] Failing to control for these common macroeconomic trends could falsely attribute the observed parallel price increases to collusive conduct.

---

[147] Conley, Timothy G. and Francesco Decarolis, "Detecting Bidders Groups in Collusive Auctions," *American Economic Journal: Microeconomics*, Vol. 8, No. 2, May 2016, pp. 1–38 at pp. 36–37 ("We propose two statistical tests to investigate bidder coordination and show that they work well in Validation data where eight cartels have been identified by a court. These are tests for whether groups of firms participate or bid differently than other comparable groups of firms.").

[148] Betancourt, Kim and Tim Komosa, "Multifamily Economic and Market Commentary," Fannie Mae, July 14, 2021, https://www.fanniemae.com/media/40566/display.

-64-

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

**C.    The Marinescu Report Fails to Establish Any Valid Enforcement Mechanism to Maintain the Alleged Collusive Agreement**

**1.    The Marinescu Report's Claimed "Structural and Economic Barriers to Deviation" Are Not Enforcement Mechanisms**

86.    A core requirement for any sustained collusion among competitors is not just that firms observe each other's prices and behavior, but that the arrangement is self-enforcing: deviations must be detectable (monitoring) and followed by a credible punishment that makes deviations unprofitable (enforcement).[149] As the Marinescu Report recognizes, "an important theme in the economic analysis of collusion is that the cost of defecting from an agreement must be sufficiently high to induce compliance."[150]

87.    The Marinescu Report claims that Yardi "commits clients to coordination through" several "structural and economic barriers to deviation," including: 1) "[a]utomatically updating Revenue IQ's list price on a unit's public listing," 2) "[i]mposing a multi-step process to enable rent overrides," 3) "[e]nsuring frequent TAM oversight of client pricing," and 4) "[p]roviding executives at client landlords" with benchmark reports and other audit tools to track pricing adjustments from Revenue IQ's list price.[151] According to the Marinescu Report, these mechanisms create "substantial frictions that impose costs on clients' deviations from Revenue IQ's list price and therefore limit these deviations."[152] Contrary to the Marinescu Report's characterization, however, the identified mechanisms are consistent with tools that a landlord can use unilaterally to manage employee discretion and ensure consistent execution of their own individual pricing

---

[149] See Calvano, Emilio et al., "Artificial Intelligence, Algorithmic Pricing, and Collusion," *The American Economic Review*, Vol. 110, No. 10, October 2020, pp. 3267–3297 at p. 3269 ("To us economists, collusion is not simply a synonym of high prices but crucially involves 'a reward-punishment scheme designed to provide the incentives for firms to consistently price above the competitive level[.]'").

[150] Marinescu Report, ¶ 437 ("As I explained in Section 3, an important theme in the economic analysis of collusion is that the cost of defecting from an agreement must be sufficiently high to induce compliance, but not so high as to prevent firms from joining the collusive agreement in the first instance.").

[151] Marinescu Report, ¶ 434.

[152] Marinescu Report, ¶ 438.

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

strategy, rather than a means of punishment imposed by rival landlords, or a hub acting on their behalf, for any deviations from a shared, collusive pricing scheme.

88.    First, the Marinescu Report claims that the Yardi software prevents deviation from Revenue IQ's daily recommended list prices by automatically propagating those prices across Yardi's internal systems, RentCafe, and other public listing sites.[153] Contrary to the Marinescu Report's characterization that this process makes it harder to deviate from an alleged collusive scheme, automatic propagation of recommended prices streamlines a landlord's implementation of their own unilateral strategy. Revenue IQ can be configured in a variety of ways and the recommended list prices reflect each landlord's own pricing strategy as defined by their chosen settings, not a market-wide price target.[154] Automatic propagation of those prices therefore facilitates implementation of a client's own strategy, reducing administrative burdens and ensuring consistency across listing channels, rather than forcing adherence to any uniform target. More generally, the Marinescu Report offers no explanation for how automatic propagation of individualized recommended list prices would enable Yardi or rival landlords to monitor or punish deviations from any alleged collusive agreement.

---

[153] Marinescu Report, ¶¶ 170–172 ("The output of this process is a daily recommended list price for every unit covered by Revenue IQ, including units that are not currently available. These prices are then 'immediately' propagated across Yardi's systems – updating the client's Voyager databases and, if units are listed online, RentCafe, which is a Yardi online listing platform. As Yardi explains it, this automation updates online listings daily so that 'clients don't have to approve pricing.' […] Unless clients actively and frequently intervene, Revenue IQ's algorithmically produced list price will therefore be shown on each unit's public listing overnight each and every day. Indeed, Revenue IQ prices every unit's price every day, even if it is not currently available. Revenue IQ's list price then becomes the starting point, or 'anchor,' of negotiations with every prospective renter for the Landlord Defendants.").

[154] Yenikomshian Declaration, ¶ 71 ("Step Two incorporates additional client-configured settings to adjust the Step One provisional pricing output. These client-configured settings are referred to as 'Health Rules,' as they provide a mechanism to tailor the provisional pricing output based on the relative 'health' of the property as determined by the client's individual settings and preferences."), ¶ 73 (provides examples of Health Rules, including rules based on availability, occupancy, number of leased units, number of expiring units, and estimated percentage of units available in 30 days), ¶ 77 ("In Step Three, Revenue IQ allows clients to adjust further for a variety of circumstances."), and ¶ 78 (lists examples of "client-selected pricing adjustments available in Revenue IQ," such as "Rent Concession Recovery," "Stale Unit Discounting," "Notice Premiums," "Seasonal Vacancy," "Turn Costs," "Lease Expiration Management," "Term Premiums," and "Unit Hold Costs.").

EXPERT REPORT OF CATHERINE TUCKER, PH.D.    CASE NO.: 2:23-CV-01391-RSL

89.     Second, the Marinescu Report claims that Yardi's software discourages changes from the recommended pricing, referred to as overrides, by implementing a "nine-step process to enable override permissions."[155] However, the Marinescu Report does not identify any evidence that this process prevents landlord clients from overriding recommended rents if they choose to do so, and that it creates "barriers to deviation."[156] First, several of the "nine steps" identified in the Marinescu Report reflect simple logistical actions, including "Click the System Home tab," "Click System Administration," and "Click Save," which cannot be construed as "barriers to deviation."[157] Second, based on Yardi's produced document referenced in the Marinescu Report, this "nine-step process" describes a settings configuration to control which users within the client's organization have "security access to override the Quoted Rent amount within the Rental Options page of the leasing workflow process,"[158] rather than an ongoing process that must be undertaken to implement each override. Implementing such internal processes can help landlords ensure that only the appropriate employees have the ability to update pricing. As Mr. Gaeta, a Senior Director in the Programming Department of the Residential Business Unit who leads the software development of Revenue IQ, explains, clients set and control internal permissions governing which users have authority to change pricing configuration settings and which of the client's properties ("communities") those users can access.[159] Further, there is no explanation as to how such a process would be able to punish landlords for deviating from the recommended pricing.

---

[155]  Marinescu Report, ¶ 442.
[156]  Marinescu Report, ¶ 434.
[157]  Marinescu Report, Figure 70 (citing YARDI-DUFFY_00327241).
[158]  Marinescu Report, Figure 70 (citing YARDI-DUFFY_00327241).
[159]  Gaeta Declaration, ¶ 30 ("Ex. A at 10 (YARDI-DUFFY_01274394) reflects an excerpt of the user interface demonstrating where clients may direct Revenue IQ to recalculate pricing. Yardi does not place any limits on how often a client can manually recalculate their pricing, and, in my experience, clients do so regularly. When accessing Revenue IQ's user interface, a client can only access their own communities. Although clients can set internal permissions specifying which types of users within their property management company have authority to change the pricing configuration settings, these permissions are controlled by the client. Clients can also determine who within their management team has access to particular communities within their portfolio.").

-67-

90.     Third, the Marinescu Report claims that Yardi's TAMs "act as mediators, monitoring each participants' adherence to the benchmark, making sure that landlords do not undercut collusive pricing by pricing meaningfully below benchmarks."[160] This description mischaracterizes the role of TAMs, which is to provide account management services, technical support, and guidance to Revenue IQ clients, including through periodic calls with clients.[161] TAMs reviewing the client's pricing and identifying instances where the client might not be pricing optimally according to its own strategy is consistent with the TAMs' role as account managers and does not provide evidence of collusion.

91.     The Marinescu Report does not identify or provide evidence of any costs to landlords of ignoring pricing advice from TAMs and, therefore, fails to explain how TAM actions could reflect an enforcement mechanism to prevent participants from deviating from an alleged collusive scheme. Further, there is no explanation as to how TAMs, let alone other landlords or other elements of what the Marinescu Report refers to as Yardi's "pricing suite,"[162] would be able to punish landlords for deviating from the recommended pricing.

92.     Fourth, the Marinescu Report claims that Yardi provides landlord clients with a "Lease Audit" tool that tracks variances from Revenue IQ's recommended price, which the Marinescu Report claims increases the accountability of "frontline staff" and "increase[s] the economic friction of unilateral deviations from centrally generated pricing recommendations."[163] The Marinescu Report does not explain how such audit tools, which are internal to a given landlord, would enable rival landlords to detect and retaliate against deviations from an alleged collusive pricing scheme.

---

[160] Marinescu Report, ¶ 351.

[161] Marinescu Report, ¶ 204 ("Yardi's TAMs – previously referred to within Yardi as 'revenue managers' – are client-facing personnel who support implementation and ongoing use of Revenue IQ, including assisting clients with property setup and configuration. TAMs conduct recurring review calls and periodic performance reviews with clients.").

[162] See, e.g., Marinescu Report, ¶ 7.

[163] Marinescu Report, ¶ 446–447 ("[T]he 'Lease Audit' tool enables deviations from recommended pricing to be reviewed and questioned by supervisors, requiring frontline teams to justify departures from algorithmic guidance […] increas[ing] the economic friction of unilateral deviations from centrally generated pricing recommendations.").

-68-

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

93.    The Marinescu Report contends that together these mechanisms create an environment where "deviation is possible, but sufficiently costly that coordinated, higher pricing can be sustained" and cites to an analysis presented in the Yenikomshian Declaration as evidence that "virtually no Landlord Defendant leases meaningfully deviate from Revenue IQ's list prices."[164] However, the analysis in the Yenikomshian Declaration shows that the Landlord Defendants deviated from Revenue IQ's recommended lease amount in 27.8 percent of executed leases, with 90.4 percent of all deviations reflecting a decrease relative to the recommended amount,[165] which is inconsistent with the Marinescu Report's conclusions that there are meaningful enforcement mechanisms to ensure adherence to a collusive pricing scheme. If such enforcement mechanisms existed, these deviations would be expected to trigger adverse consequences, but the Marinescu Report presents no evidence of such outcomes.

**2.    The Marinescu Report's Fazio-TAM Call-Note Analysis Is Flawed and Fails to Establish that TAM Oversight Was an Enforcement Mechanism**

94.    As support for the conclusion that Yardi's TAM function operates as "a monitoring and reinforcement mechanism that can cause and sustain supracompetitive pricing," the Marinescu Report relies on empirical analyses that it claims demonstrate that TAMs are "asymmetrically oriented toward identifying instances in which a property's pricing lags benchmark levels" and that TAM intervention "has observable effects on realized lease prices."[166] As described above in **Section IV.A**, the Marinescu Report's analysis of the effect of Fazio-TAM calls on lease prices contains several implementation errors that, once corrected, invalidate the Marinescu Report's conclusion that TAM intervention "has observable effects on realized lease prices."[167] In addition to these implementation errors, the Fazio-TAM call analyses presented in the Marinescu Report suffer from several conceptual flaws that further undermine the Marinescu Report's conclusions.

95.    First, the Marinescu Report's quantitative analyses of Fazio-TAM call notes are not based on direct communications between TAMs and Landlord Defendants, despite such evidence

---

[164]  Marinescu Report, ¶ 453 and ¶457.
[165]  Yenikomshian Declaration, ¶¶ 120–121, Table 9 and Figure 18.
[166]  Marinescu Report, ¶¶ 373, 376–377.
[167]  Marinescu Report, ¶ 377.

being available in the record. In deposition, Dr. Marinescu testified that she did not recall hearing of or reviewing the more than 600 pricing call notes between TAMs and Revenue IQ clients that were produced by Yardi in 2025, many months prior to the submission of the Marinescu Report.[168] Dr. Marinescu similarly testified that she did not review any of the more than 10,000 produced email communications between Yardi personnel and Landlord Defendants,[169] nor did she review the deposition transcripts of any Yardi TAMs.[170] Instead, the Marinescu Report's analyses rely only on the notes of Mr. Anthony Fazio, a Yardi employee, from his internal communications with Yardi TAMs.[171] Using this indirect measure of communications between TAMs and Landlord Defendants introduces substantial uncertainty into the analysis and can result in misleading assessments of the effect of TAM interactions with clients on prices charged by Landlord Defendants.

96.    Further, the Marinescu Report's conclusion that Fazio-TAM calls effectively enforce upward price changes is biased by its selective focus on properties that were flagged as priced below their benchmarks. The Marinescu Report explains that the analysis of Fazio-TAM

[168] Marinescu Deposition, pp. 63:21–64:7 ("Q. Okay. So, I'm asking about the 600 TAM pricing call notes that were produced prior to November 2025. A. I don't recall hearing of those. Q. You didn't review those TAM call notes? A. I don't recall hearing of those specific call notes, if you're talking about TAM calls with clients, because -- Q. That is what I'm talking about. A. Yeah, I've been looking at the calls of Mr. Fazio with the TAMs.").

[169] Marinescu Deposition, pp. 65:15–66:9 ("Q. Okay. Are you aware that, prior to November 2025, Yardi produced over 10,000 email communications between Yardi personnel and Revenue IQ clients? A. I haven't looked at those emails. Q. Okay. So, you didn't review -- let me correct that. The 10,000 email communications I referenced were between Yardi and the landlord defendants. You haven't looked at those, you just testified? A. I have not. Q. Did you ask counsel for all the communications that had been produced between Yardi and the landlord defendants? A. You know, this -- I asked counsel for, you know, relevant data that we could use, you know, to analyze it, and I don't recall, you know, hearing about those emails.").

[170] Marinescu Deposition, p. 67:14–22 ("Q. As part of your work on this matter, did you ask counsel for any deposition transcripts of depositions that were taken of TAMs or former TAMs at Yardi? A. I do not recall looking at this. Q. Do you recall asking counsel whether any such deposition transcripts existed? A. I don't recall.").

[171] Marinescu Report, ¶ 47 ("To evaluate this empirically, I apply a search algorithm to a set of call notes between Yardi's TAM supervisor, Anthony Fazio, and Yardi's TAMs that were produced in this case. These notes memorialize monthly meetings between Mr. Fazio and Yardi's TAMs in which Mr. Fazio frequently identified individual Revenue IQ clients that were underpricing their benchmarks, then relayed his findings to individual TAMs."); Marinescu Deposition, p. 63:5–7 ("[W]e focused on the calls between Mr. Fazio, the TAM manager, and the TAMs.").

EXPERT REPORT OF CATHERINE TUCKER, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

call notes is "limited to instances in which Mr. Fazio identified a property as priced below its benchmark."[172] The analysis therefore ignores call notes pertaining to properties flagged as priced above their benchmarks, which represent 18.8 percent of all call notes.[173] While some properties might be intentionally priced below their chosen benchmarks due to differences in characteristics not known to Yardi, other properties might be unintentionally priced too low, and it would not be surprising to see subsequent upward price adjustment for those properties following Fazio-TAM calls.

97.    In light of the implementation errors discussed in **Section IV.A** and the conceptual flaws discussed in this section, the analyses in the Marinescu Report ultimately fail to demonstrate that internal Fazio-TAM calls represent a plausible enforcement mechanism or have any effect on prices.

Catherine Tucker, Ph.D.
March 23, 2026

---

[172] Marinescu Report, ¶ 378.
[173] Marinescu Report, ¶ 360 and Figure 53.

-71-