Hon. Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| *In re YARDI REVENUE MANAGEMENT ANTITRUST LITIGATION.* | No. 2:23-cv-01391-RSL |
| MCKENNA DUFFY, individually and on behalf of all others similarly situated, | **DECLARATION OF ABRAHAM A. TABAIE IN SUPPORT OF DEFENDANT YARDI SYSTEMS' REPLY TO MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs. | |
| v. | |
| YARDI SYSTEMS, INC., *et al.*, | (Consolidated with Case Nos. 2:24-cv-01948; 2:24-cv-02053) |
| Defendants. | |

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 1

## TABLE OF CONTENTS

**Page**

I.    Dr. Marinescu's Professional Background and Bases for the Opinions in Her Report ...............................................................................................4

II.   Dr. Marinescu Adopts Mihran Yenikomshian's Analysis of How Revenue IQ and Yardi's Benchmarking Feature Works .........................................7

III.  Dr. Marinescu's Critiques of Mr. Yenikomshian's Analyses ...............................9

IV.   Discussions of Revenue IQ Functionality.................................................11

V.    Discussions of Benchmarking Functionality .........................................20

VI.   The Propriety of Data Cleaning .................................................24

VII.  Data Cleaning for the Yardi Lease Price Index.......................................27

## DECLARATION OF ABRAHAM A. TABAIE

I, Abraham A. Tabaie, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I am a partner at Debevoise & Plimpton LLP, attorneys of record for Defendant Yardi Systems ("Yardi") in the above-captioned case.  I offer this declaration in support of Yardi's Reply to its Motion for Summary Judgment.

2.    Unless otherwise noted, this declaration is based upon my personal knowledge and, if called to testify, I could and would do so competently as to the matters set forth herein.

3.    On March 9, 2026, Yardi deposed Ioana Marinescu, PhD. Attached hereto as **Exhibit F** is a true and correct copy of certain excerpts from the deposition of Dr. Marinescu taken on March 9, 2026 (hereinafter, "Marinescu Tr."), as cited in Yardi's Reply in support of its Motion for Summary Judgment; Yardi's Motion to Exclude Plaintiffs' Expert Ioana Marinescu; the Declaration of Catherine Tucker in Rebuttal of the Report of Ioana Marinescu; Declaration of Michael Mitzenmacher in Rebuttal of the Report of Ioana Marinescu; and Declaration of Mihran Yenikomshian in Rebuttal of the Report of Ioana Marinescu.

4.    Attached hereto as **Exhibit G** is a true and correct copy of Exhibit 6 to the deposition of Dr. Marinescu taken on March 9, 2026, which contains excerpted data from YARDI-DUFFY_00913149.

5.    Attached hereto as **Exhibit H** is a true and correct copy of Exhibit 8 to the deposition of Dr. Marinescu taken on March 9, 2026, which contains an additional data excerpt from YARDI-DUFFY_00913149.

6.    Attached hereto as **Exhibit I** is a true and correct copy of Exhibit 9 to the deposition of Dr. Marinescu taken on March 9, 2026, which contains an additional data excerpt from YARDI-DUFFY_00913149.

7.      Attached hereto as **Exhibit J** is a true and correct copy of certain relevant excerpts from the deposition of Dustin Bradford taken on October 17, 2025.

8.      Solely for ease of the Court's review, I provide some (but not all) of the particularly germane excerpts from Dr. Marinescu's deposition below.

I.    **Dr. Marinescu's Professional Background and Bases for the Opinions in Her Report**

9.      At her deposition, Dr. Marinescu was asked questions regarding her education and professional background.  She testified as follows:

Q. Is it correct that you don't hold any degrees in computer science or software engineering or similar disciplines?

A. Yes.

. . .

Q. Okay. Professor, have you ever held a position in a computer science department?

A. I have not.

. . .

Q. Have you ever taught any classes on how pricing algorithms work?

A. I have not.

Q. Have you ever reviewed or analyzed enterprise level source code of complex systems in either a professional or academic setting?

A. So, I have not directly reviewed it myself, but I worked for two years as the principal economist at the DOJ and, during that time, one of the cases that we were working on was RealPage. And so, as part of that, I have, you know, read memos and summaries, including of code analysis that have been done, so I'm familiar with this type of software from that, from that work.

Q. Okay. But in that work you weren't doing the source code analysis yourself. Correct? You were reviewing the summary of other data scientists who were doing that work?

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 4

A. Correct, I was reviewing the summary of data scientists.

Ex. F, Marinescu Tr. at 19:10-25; 20:1-21:1.

10.    Dr. Marinescu testified that she "didn't [herself] review the [Revenue IQ source] code, not being a, you know, an expert in that . . . domain." *Id.* at 49:5–8.

11.    Dr. Marinescu was asked questions regarding the materials she relied upon in forming the opinions in her Expert Report in Support of Plaintiffs' Opposition to Yardi's Motion for Summary Judgment, Dkt. 497-33 (hereinafter "Marinescu Report" or "Report"). She testified as follows:

> Q. Sure. You agree that you did not list the actual source code for Revenue IQ among the materials you relied on. Is that right?
>
> A. Still looking. Just making sure what we listed here exactly. Yes, I did not list the source code in the materials relied on.
>
> Q. And, similarly, you would agree that you do not list the source code for Yardi's benchmarking feature. Is that right?
>
> A. There is no source code that's listed in Section E, so, yes.
>
> Q. And you also did not list, in the materials relied upon, any source code that governs the interface that Revenue IQ clients used to interact with Yardi. Correct?
>
> A. Yes, correct.
>
> . . .
>
> Q. Okay. But you're not relying on your own review of the source code. Correct?
>
> A. I am not relying on my own review of the source code in [the Report].
>
> . . .
>
> Q. Okay. So, I'm asking about the 600 TAM pricing call notes that were produced prior to November 2025.
>
> A. I don't recall hearing of those.

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 5

Q. You didn't review those TAM call notes?

A. I don't recall hearing of those specific call notes, if you're talking about TAM calls with clients, because --

Q. That is what I'm talking about.

A. Yeah, I've been looking at the calls of Mr. Fazio with the TAMs.

. . .

Q. Okay. Are you aware that, prior to November 2025, Yardi produced over 10,000 email communications between Yardi personnel and Revenue IQ clients?

A. I haven't looked at those emails.

Q. Okay. So, you didn't review -- let me correct that. The 10,000 email communications I referenced were between Yardi and the landlord defendants. You haven't looked at those, you just testified?

A. I have not.

. . .

Q. Do you know who Katrina Ivinskas is?

A. No, I don't.

Q. Do you know who Dustin Bradford is?

A. I do not.

Q. As part of your work on this matter, did you ask counsel for any deposition transcripts of depositions that were taken of TAMs or former TAMs at Yardi?

A. I do not recall looking at this.

Ex. F, Marinescu Tr. at 45:3-47:21; 63:21-64:7; 65:15-66:2; 67:8-18.

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 6

**II.     Dr. Marinescu Adopts Mihran Yenikomshian's Analysis of How Revenue IQ and Yardi's Benchmarking Feature Works**

12.     Dr. Marinescu testified that she "relied on Yardi's own, you know, experts and descriptions of what their source code is doing in order -- as an economist, I'm really -- I'm trying to understand, I want to understand how the software works, what's its effect on the market. And so, in this case, I have relied on, you know, Yardi's representations of how this code works to understand how it works." *Id.* at 46:6-16.

13.     Dr. Marinescu was asked questions regarding her opinion of Mr. Yenikomshian's analysis of the source code for Revenue IQ and the benchmarking feature. She testified as follows:

> Q. And you also take issue, through parts of your report, with his analysis and description of the import of different trends and health rules in Yardi's Revenue IQ software?
>
> A. Yes. But I want to clarify what I mean with take issue. It's, you know, it's a matter of, you know, reasonable disagreement and what I think is relevant for the economics. You know, I'm not saying that, you know, they did something that was plainly incorrect; however, it could still be misleading based on what I'm looking at in terms of, well, what does this mean for the economics. And that's where I am focusing my critique in terms of, you know, the contextualization interpretation in regard to the facts that matter for the interpretation of the case.
>
> . . .
>
> Q. You don't take any issue with -- you don't, in your report, say that Mr. Yenikomshian's analysis of the source code itself is incorrect?
>
> A. I did not use the term incorrect in the report, if that's your question. That is correct, I did not say that this is incorrect. I said this is misleading.
>
> Q. But you don't have a basis to dispute Mr. Yenikomshian's review of the source code itself. Is that right?
>
> A. I did not review the source code.

*Id.* at 52:6-25; 58:6-60:21.

Q. Mr. Yenikomshian says, "I conducted this analysis on all new lease rent per unit benchmarking KPI outputs contained in the CPD, KPI data, and then applied the fourth step to select the median MAPD value. The median average absolute deviation between the underlying KPI inputs and the corresponding benchmarking KPI outputs was $205.85 or 11.9 percent." Do you see that?

A. Yes.

. . .

Q. Okay. Sorry, but just before you get to that, can you just answer my question of -- to confirm that you don't dispute the actual figure in your report?

A. I have not independently recalculated this figure and I have, in that sense, no basis to confirm or disconfirm. But I am happy to take it for what it is and explain what – my analysis of what it means.

Q. And in this same line of analysis of Mr. Yenikomshian, Paragraphs 172 to 174, and 173, I'll direct you to that specifically, the bottom half, he states, "The range between the minimum and maximum KPI inputs is on average 62.5 percent, median, 39.2 percent of the benchmarking KPI output." And am I correct that you didn't independently evaluate that or dispute that in your report?

A. I did not independently evaluate this.

. . .

Q. Do you recall Mr. Yenikomshian's analysis that the average number of properties in the requested benchmarked sets of Revenue IQ users is about 29?

A. Yes, I see that. It says, "I found the benchmark sets requested by clients obtained an average of 29.2 properties."

Q. And, again, that's not something that you independently are disputing. Correct?

A. I have not re-analyzed this.

*Id.* at 205:24-207:16; 208:22-209:14.

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 8

### III.    Dr. Marinescu's Critiques of Mr. Yenikomshian's Analyses

14.    **Configuration Analysis**. In her Report, Dr. Marinescu states that "Mr. Yenikomshian's data analysis[1] is flawed because it overestimates the number of relevant observations. . . . Specifically, Mr. Yenikomshian says that Yardi's configuration data contains 4,000,000 configuration-change events. But this significantly overstates the degree of active re-configuration – that is, active changes – by clients because it includes 'insertions' and 'deletions' as 'changes.'" Marinescu Report ¶276.

15.    Dr. Marinescu was asked questions regarding this opinion during her deposition. She testified as follows:

> Q. And you explain that these -- that insertions and deletions capture new or deleted properties. Is that part of that analysis?
>
> A. Yes.
>
> Q. Isn't it the case that insertions and deletions also capture changes made for existing properties when a particular configuration was previously turned off or set to zero and the client then turns it on?
>
> A. That, that could also be the case, but, based on this data, we don't know which is which. So, it includes, you know, all of these cases of whether a new property came on or off or potentially other situations, which is why, you know, if we want to have a clean -- definitely it's a change in an ongoing process of use, you know, I removed these insertions and deletions.
>
> Q. Would you agree that insertions and deletions also can capture where the client turns off a previously active setting?
>
> A. I am not sure.

Ex. F, Marinescu Tr. at 111:23-112:20.

---

[1] *See* Declaration of Mihran Yenikomshian, Dkt 479 (hereinafter, "Yenikomshian Report") ¶¶96-103.

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 9

16.   **Deviation Analysis**. Dr. Marinescu was asked questions regarding her opinion of Mr. Yenikomshian's deviation analysis[2] during her deposition. She testified as follows:

Q. If you look back at Paragraph 459 on Page 172 of your report, you express some disagreement with Mr. Yenikomshian's figure of 27.8 percent of lease transactions have an override –

A. Um-hmm.

Q. -- and you say it's more like 22 percent. Is that right?

A. Yes.

Q. And I think you observed that the difference between his 27.8 percent and your 22 percent is that Mr. Yenikomshian takes into account rental concessions. Is that right?

A. Yes.

Q. And in Mr. Yenikomshian's report, he identifies, when he classifies deviations, he says, "Deviations include both overrides and concessions." Do you recall that?

A. I don't recall that, but -- that seems coherent with the discussion here.

Q. And you would agree that a rental concession is a form of deviation from the Revenue IQ pricing output. Correct?

A. What my analysis is looking at here is the total all-in-all price including the concession. And the point is that, you know, that total all-in-all price, you know, is more likely to be consistent with the recommended Revenue IQ price than just the pre-concession price. And I think, you know, I think that that's a better way of looking at it. But, you know, different people might disagree. I do feel like, you know, the final price is really -- I mean, we're talking about what matters to the renter, whether it's concession or whatever it is. In the end, the final price is important. And so that's -- the adjustment is to look at the final price. And it seems like there's even less deviation there, but, you know, even if you take Mr. Yenikomshian's number at face value, deviations are fairly limited.

---

[2] *See* Yenikomshian Report ¶¶114-24.

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 10

*Id.* at 229:21-232:4.

## IV.    Discussions of Revenue IQ Functionality

17.    **Reference Rent**. Dr. Marinescu testified that "[r]eference rent is the rent, as I recall, that the -- that was there, you know, in the prior, prior period. And then, based on that, the Revenue IQ decides to hold, increase, decrease that, you know, reference rent." *Id.* at 69:13–21.

18.    Dr. Marinescu was asked questions regarding reference rent at her deposition. She testified as follows:

> Q. Do you have an understanding of how a reference rent is initially chosen when a Revenue IQ user starts up with the system?
>
> A. So, the reference rent, as I understand, is chosen by the landlord who's using the system. And, you know, this is a market that has many different characteristics, so, naturally, for example, a bigger apartment is going to have a higher rent than a smaller apartment. And, of course, you know, the landlord starts with their own, you know, reference rent and then hoping to get advice moving forward from Revenue IQ.
>
> . . .
>
> Q. And is it correct that all the steps in Revenue IQ that take place are based off of each client's individually selected reference rent?
>
> A. That's the departure point from -- you know, the reference rent is in the departure point. And then it applies the trend rules and then the health rules. And so, indeed, the departure point is the reference rent. But, importantly, you know, this reference rent itself, as an economist, we understand that it's determined in equilibrium, meaning depending on market conditions and, you know, whatever objectives the landlord is trying to achieve and whatever their understanding is as well of software that they might be using. So, it's set by the landlord, but not in a vacuum, you know, it's based on their strategy.
>
> . . .
>
> Q. Professor, are you aware of how often Revenue IQ clients make manual adjustments to reference rents?

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 11

A. I do not recall having looked at specifically the adjustment to the reference rent. However, you know, what matters is the end result in terms of, you know, how we see prices occur and, in particular, for example, the fact that overwhelmingly clients tend to follow the recommendation of Revenue IQ.

. . .

Q. And what does your analysis show in terms of how frequently they actually do change the reference rents?

A. I focused my analysis not on the changes in the reference rent, but on understanding what rules they are setting up as far as the trend rules, which is the first step of Yardi's -- sorry, of Revenue IQ's pricing system.

*Id.* at 69:22-72:8; 81:12-21; 86:16-24; *see also id.* at 78:2-6; 83:20-25; 88:8-24.

19.    **Reference Rent Change Amount/Step Size**. Dr. Marinescu was asked questions regarding reference rent change amount/step size at her deposition. She testified as follows:

Q. You testified that there needs to be a decision about how much of any recommended increase or decrease is actually going to be adopted. Right?

A. Um-hmm.

Q. Is it correct that it's each individual client who is making a decision about how much of any provisional increase or decrease to take?

A. I do not recall how exactly that, like, step increment is being set right now. However, I think, importantly, the -- it's important to note that, in the end, you know, however that thing is set, once it's set, it just moves forward, and overwhelmingly the clients accept the recommendation of Revenue IQ. And we also see, like, this parallel pricing that, you know, I show empirical evidence on.

. . .

Q. But it's the clients who are, if there are adjustments to these step changes as you just said, it's the clients who are making those individually. Correct?

A. It looks like the clients can change it based on that. But, as I said, it would be important to know, and I do not have the evidence on that, if there is and what is the default reference rent change amount, which is that increment

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 12

that I was discussing earlier, but I didn't remember exactly how, you know, what the increment was.

*Id.* at 90:18-91:14; 93:4-19.

20.    **Composition of Comp Sets**. Dr. Marinescu was asked questions regarding her understanding of the composition of Revenue IQ clients' Comp Sets at her deposition. She testified as follows:

> Q. And then in Paragraph 321, you state, the second sentence, "When multiple landlord defendants include each other in their Revenue IQ comp sets, each landlord's pricing decision becomes an input into the other's subsequent recommendation." Correct?
>
> A. Yes.
>
> Q. And this is part of your opinion that when Revenue IQ clients are all using each other as their comp set that, in your words, that systematically ratchets up prices?
>
> A. That element, yes.
>
> Q. And this analysis assumes that Revenue IQ users' comp sets consist of other Revenue IQ users. Correct?
>
> A. They, in fact, do include other Revenue IQ clients and – but the -- it's useful to have the other Revenue IQ clients there in order to -- if this were to lead to, indeed, coordinated pricing.
>
> . . .
>
> Q. And then you're saying, in that situation, each landlord's pricing decision becomes an input into the other subsequent recommendations. Correct?
>
> A. Yes.
>
> . . .
>
> Q. If a landlord defendant's comp set does not include other Revenue IQ users, then am I correct that it follows that that landlord defendant's pricing decisions are not going to be influenced by other Revenue IQ users?
>
> A. So, each – the economic -- so, the influence is direct when another landlord is in the comp set. And it can be indirect also if it's not in the

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 13

comp set; because, as Professor Harrington's work shows, when a group of landlords is using the same hub algorithm, that raises prices not only for them, but also for the non-users of the algorithm. So, in that sense, even if the comp set, hypothetically, and, again, like, this is a hypothetical, didn't include Revenue IQ clients, you could still see an indirect effect, assuming that there is, in fact, price coordination with a hub algorithm, which is the allegation here, because it's a market. So, you know, we all influence each other's prices.

Q. But if a landlord defendant's Revenue IQ comp set did not include other Revenue IQ users, then that landlord's comps would not be informed by any other Revenue IQ user. Correct?

A. It would still be informed in an indirect fashion through the market, because when this hub algorithm, as I, as I describe it in my report, leads to price increases for the group of alleged conspirators, other landlords in the market typically would also see price increases for other landlords in the market and, therefore, in that way, you know, it's like a chain whereby, you know, I influence the price of somebody who maybe isn't using Revenue IQ, but that price is influencing some other Revenue IQ user, like, right there on two sides. So, like, imagine A, B, C. So, B is a non-user. A and C are users. If B is in the same market, then, you know, if we're both looking at B, we're essentially coordinating our prices through B. But this is a hypothetical. I'm just explaining that there is an indirect effect.

*Id.* at 121:22-122:21; 124:7-12; 125:4-127:19.

Q. But you would agree with me that, as depicted in this Figure 3 in this article that you cite in your report, that Yardi's share of algorithmic pricing adoption by software is in the low single digits. Is that correct?

A. I'm reading here that the Y axis is the share of buildings. And in this Figure 3, in this document, the share of buildings that is priced by Yardi is in the low single digits.

. . .

Q. But it's your view that with a market share as low as two percent in a relevant market, it's still possible that there would be a plausible collusion scheme among Revenue IQ users in Yardi. Is that your testimony?

A. Under the relevant circumstances, the relevant sort of market structure, this could happen. Whether it does happen, you know, that's something that, you know, we want to look at the data a little bit more. Now, in my report I already show data that's consistent with such coordinated price outcomes. But if we want to link it to market share, then I need to define

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 14

the relevant market, calculate that market share, and understand the structure of the market, including other players like RealPage in particular.

*Id.* at 161:6-18; 164:23-165:16.

21.    **Operation of the Comp Trend.** In Dr. Marinescu's Report, she states, "[t]o understand how [the Comp Trend] distorts and undermines normal competitive forces, consider a toy example with two competitors using Revenue IQ and focusing on the impact of the Comp Trend Rule alone (all other things equal). If both firms are pricing 'high' and know their competitor uses Revenue IQ, they are disincentivized to reduce prices because the Comp Trend Rule will make their competitor automatically follow with their own rent decrease." Marinescu Report ¶322.

22.    Dr. Marinescu was asked questions regarding this example in her Report at her deposition. She testified as follows:

Q. In your same toy example, am I correct that you focus on the impact of the Comp Trend while assuming that the other three trends do not affect the pricing logic?

A. Yes, in order to isolate the mechanics of how that one works, I considered it in isolation. So, all other things being equal, as we like to say in economics.

. . .

Q. Are you aware that a Revenue IQ client actually must use at least two trends in Step 1?

A. I don't recall that specific fact, but, in practice, they actually use four, most of them, the overwhelming majority.

. . .

Q. But if it is a -- if a Revenue IQ user has no other Revenue IQ properties in its Comp Trend, then there's no horizontal information exchanged among Revenue IQ users in that instance. Isn't there -- is that correct?

A. But the information exchange is not tied to the Comp Trend Rule, rather, the information exchange is the basis for the availability of the data that's needed to calculate the Comp Trend Rule. The Comp Trend Rule

itself isn't an information exchange, it's a feature of the Revenue IQ algorithm.

Ex. F, Marinescu Tr. at 140:7-14; 141:13-18; 144:2-15.

23. **Health Rules**. Marinescu was asked questions regarding Revenue IQ clients' configuration of Health Rules at her deposition. She testified as follows:

Q. Okay. You see that this is a screenshot of the Revenue IQ user interface showing configuration for individual health rules?

A. Yes.

. . .

Q. Okay. So, what -- what's your understanding of what each of these rows represent?

A. So, there seems to -- so, we can see here some minimum/maximum percent and the rent change multiplier, which we've encountered before in another exhibit that you showed me, and, you know, this is something that I knew about. So, you know, clearly there's a minimum and maximum there as well.

. . .

Q. And then do you agree that [choosing to enable a Health Rule] is not the end of the choices a Revenue IQ user makes, they also need to make choices beyond that as to unit percent min, unit percent max, rent change multiplier and active status?

A. So, first of all, I would want to know, and I don't know this fact, whether, just like with the, with the trend rules, there are some default settings on that, in which case you could change it, but you don't have to. But, otherwise, certainly it looks like they would be able to change it. I don't know that they have to change it, especially once you set it once, I suppose you could just leave it the way it is.

. . .

Q. Okay. I think in your report, you provide the statistics -- the statistic that 62 percent of Revenue IQ users have the availability health rule enabled. Is that right?

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 16

A. Yes, that's in Figure 40, Page 103.

Q. Okay. So, 62 percent are using that rule and 38 percent are not. Is that right?

A. Yes.

. . .

Q. And then for the 62 percent who are [choosing the Availability Health Rule], they need to make decisions as to these other variables that are in what we're looking 9 at, Figure D.44 in [Yenikomshian's Report]. Is that right?

A. As I said, if there's a default, then they can leave it there, if there is. And, otherwise, you know, they can set it as they decide to do so. But I think that it's important to note that there are, you know -- Mr. Yenikomshian shows many configuration changes, as we discussed earlier, and this is, this is, you know, one of the configurations that people use. The question is, you know, what does that do to ultimately the ability – the economic question is what does that do to the ability to coordinate prices down the road.

. . .

Q. Did you analyze, staying with this Figure D.44, did you analyze the extent to which Revenue IQ users are using the same values for unit percent min and unit percent max and rate change multiplier? Did you investigate that?

A. While I did not investigate if they used the same value, I looked at the final pricing and analyzed the impact of the algorithm used and its rules on final pricing.

*Id.* at 169:24-175:20.

24.     **Step Three.** Dr. Marinescu was asked questions regarding Step Three of Revenue IQ's pricing process at her deposition. She testified as follows:

Q. Do you see at the end of Paragraph 24, you talked about -- and this paragraph is about the steps in Revenue IQ?

A. Um-hmm. Yes.

Q. Thank you. And then you end by, you say, "Third is a series of additional settings or options." Correct?

A. Yes, I say that.

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 17

Q. And then in Paragraph 169 –

A. Sorry. Just going back. 169. Yes.

Q. So, you say, "After applying the Trend and Health Rules, Revenue IQ permits clients to select additional configuration options that affect how the recommendations are implemented or to make limited, rule-governed adjustments in specific circumstances." Do you see that?

A. Yes.

Q. And this, again, this is Step 3 of the process?

A. Yes.

*Id.* at 94:4-95:3.

Q. You see that after that first value, which is coming out of Step 2, then it says "Plus LEM surcharge, plus turn cost, plus new lease term premium amount," et cetera?

A. Yes, I see there's a number of other terms in there, um-hmm.

Q. And do you understand that those are terms that can be added or subtracted, depending on the value, as part of Step 3 of Revenue IQ's output?

A. That does seem right. Again, I want to clarify that I am not familiar with the names, the exact names of those, you know, components.

. . .

Q. Okay. So, even if Step 1 and Step 2 indicate an increase, the final output from Revenue IQ depends on the magnitude of the adjustments that the client selects in Step 3. Correct?

A. Taking this, you know, description as given, I can see that, you know, if the first term is what Revenue IQ recommended and we have these additional terms, then if these additional terms are not zero, you know, it's going to affect the final rent.

Q. And if the output of Step 1 and Step 2, for example, say a $10 increase, and Step 3 includes a negative $25 adjustment for, say, turn costs, the final result would be a net decrease. Is that correct?

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 18

A. So, in the case that these additional terms would be negative, and if they are big enough, it could outweigh the positive increase in that hypothetical.

*Id.* at 99:2-100:23.

Q. And you're aware that each day Revenue IQ calculates a range of asking rents for every unit based on a client's configurations of the software?

A. Each day they calculate a new rent based on the configuration and on the prior reference rent which often will have been set by Revenue IQ.

. . .

Q. And so you would agree that there are differences in lease prices depending on lease terms, and that's reflected in that Step 3 of the Revenue IQ process. Is that right?

A. Yes. As I was explaining earlier, typically, for landlords, it's better to have a longer lease term. And, actually, we can see, like, within the first column that the price goes up as the renter would seek a shorter lease term.

Q. Is your position that a rate differential of $350 a month is not economically relevant?

A. So, the question isn't whether the rent differential in question, for example, is going to matter to the renter. It probably does. The question is whether this specific structure, what does it tell us about the ability of firms, of landlords, to coordinate pricing using Revenue IQ. And so my judgment is that this particular feature, the fact that prices vary, for example, with term length is -- does not prevent landlords from coordinating pricing through Revenue IQ.

Q. Okay.

A. So, this is the specific meaning that I mean to -- economically meaningful for the question at hand. I'm not saying that it doesn't matter to the renter, the $300 difference.

Q. But for purposes of your analysis, that difference was not relevant?

A. It is not relevant to the ability of landlords to coordinate pricing, yes.

*Id.* at 108:17-24; 109:21-111:10.

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 19

## V.    Discussions of Benchmarking Functionality

25.    **Requested Benchmark Set versus Effective Benchmark Sets**. Dr. Marinescu was asked questions regarding a Revenue IQ client's requested Benchmark Set versus their Effective Benchmark Set at her deposition.[34] She testified as follows:

> Q. Professor Marinescu, are you familiar with the concept of effective versus requested benchmark sets?
>
> A. Yes.
>
> Q. What's your understanding of how those terms are used?
>
> A. The requested benchmark set is what the client wanted to have in their benchmark set. And sometimes there is no data, for example, on some of the properties that the client wanted and so the effective benchmark set is, you know, a set of data that Yardi actually uses where there is data, and also that there are enough properties to aggregate, you know, so that they can get the benchmark. So, there's a -- there can be a difference, depending on data availability, between what the client requests and what is actually in the benchmark set.
>
> Q. You say in the second bullet of Paragraph 395, "Yardi structurally requires that clients' benchmarking comp set include the properties' Revenue IQ uses for the Comp Trend Rule." Do you see that?
>
> A. Yes.
>
> . . .

---

[3] "To initiate a Benchmarking request, the client configures a benchmark set, which is a group of properties they would like to use as the basis for comparison. These properties may be selected manually or recommended by the system based on characteristics specific to the client's property, such as location or property type. [] I refer to the benchmark properties specified in the client's Benchmarking request as the 'Requested Benchmark Set.'" Declaration of Michael Mitzenmacher, Dkt. 481 (hereinafter, "Mitzenmacher Report") ¶29.

[4] "Once a client has submitted a Benchmarking request, Yardi's Benchmarking system undertakes a series of processing steps to generate the requested outputs. From the client's Requested Benchmark Set, only properties with valid KPI data relevant to the client's request are included in the aggregation process that produces the Benchmarking system's aggregated and anonymized outputs. The subset of properties that meet these data-availability requirements proceeds to aggregation, forming what I refer to in this report as the Effective Benchmark Set." Mitzenmacher Report ¶32.

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 20

Q. You mentioned earlier that if data is missing for a particular benchmark property, then that benchmark property won't contribute data to a KPI. Is that right?

A. Yes.

Q. And that would be true for Revenue IQ comp properties that are part of a benchmark set, that if there wasn't a particular data point available, then that comp property wouldn't be contributing any data to that KPI. Is that right?

A. Yeah, if we don't have the data, it can't be in the benchmark.

. . .

Q. Did you analyze the extent to which Revenue IQ comp properties actually contributed data to the benchmarking KPI outputs that you reviewed?

A. As I said by what you just read, the -- all the properties that are in the comp are also in the benchmark. So, therefore, they contribute data to the benchmark kind of by definition of them being in that benchmark.

*Id.* at 194:25-197:17; 199:8-21; 200:5-16.

26.    **Aggregated and Anonymized Data via Benchmark Reporting**. Dr. Marinescu was asked questions regarding aggregated and anonymized data in Benchmark reporting during her deposition. She testified as follows:

Q. You state that benchmarking reports, quote, "give clients substantial visibility into their rivals' pricing and price structure." Correct?

A. Um-hmm.

. . .

Q. But you don't mean visibility into any specific competitor's price. Correct?

A. I mean visibility on the average of competitors.

*Id.* at 201:22-202:17.

Q. Going back to your report, in Paragraph 395, in this section, you say that benchmarking helps clients identify, quote, "what the market may bear in the

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 21

way of rents," closed quote, and, quote, "allows them to strategically increase prices," closed quote. Is that part of this analysis of yours?

A. Yes.

Q. Okay. Benchmarking reports do not identify which specific properties out of a client's total benchmark set contribute to a particular KPI. Correct?

A. It does not. But we do know that it includes the comp of that particular property when the property uses Revenue IQ. And, also, I want to point out that this benchmarking data averages over a number of properties and, as Mr. Yenikomshian has shown, these other properties might have a range of KPIs, but that is still really useful market information for the landlord when they're looking to raise prices. If they see that they're below benchmark, they can raise prices with more confidence to raise the benchmark, especially when indicated by TAMs or told by TAMs that they are pricing below benchmark.

*Id.* at 207:17-208:21.

27.    Dr. Marinescu similarly testified that "[clients] don't know which specific properties contribute to the benchmarking report." *Id.* at 209:15-23.

28.    Dr. Marinescu testified that "the benchmark KPIs are aggregated and anonymized." *Id.* at 211:18-22.

29.    Dr. Marinescu testified that "[benchmarking information] is defined [at] the property level is what I′m reading from; because it says ′property KPI summary,′ and we have a number of different benchmarks that we see here." *Id.* at 203:19-204:3.

30.    **Composition of Benchmark Sets**. Dr. Marinescu was asked questions regarding the composition of benchmark sets during her deposition. She testified as follows:

Q. If you would look at Paragraph 397, you write that landlord defendants would only share their data for benchmarking if they expect, quote, "participating firms will use it to their benefit and, in particular, to collectively increase prices. Correct?

A. Yes.

Q. Okay. And when you say "participating firms," what firms are you referring to?

A. So, here, because we are talking about benchmarking, this could include, you know, any firm that participates in benchmarking. But, strictly speaking, you know, given that I'm referring here to the economic theory, so there is a distinction between the theory which really talks about one, you know, collusive group and sort of analyzing the strategy of that collusive group in the theory. And here we have landlords in benchmarking who, you know, use, some use Revenue IQ, some may not, so it's mixed in there. However, the theory directly speaks to the element of it that talks about co-conspirators. And so here, therefore, I am sort of abstracting and I'm talking abstractedly about purported, you know, collusive pricing scheme and how, you know, these participants to this pricing scheme in the theory, and sort of that helps us understand what's going on in the data, might think about whether they'd want to share their data. And that, you know, generally, you wouldn't want to share your data if you would expect your competitor to use it to undercut you. So, you know, you must have a reason to share it and, in particular, the expectation that we'll all use it to collectively increase prices.

Q. And here the alleged co-conspirators in the Plaintiff's Complaint are other landlords who are using Revenue IQ. Correct?

A. Yes.

. . .

Q. Have you analyzed what percentage of Revenue IQ clients' benchmark sets are made up of other Revenue IQ clients?

A. I have not, but I seem to recall that this was somewhere in Mr. Yenikomshian's analysis and that maybe we cite it, but I don't recall for sure.

Q. You haven't done your – an independent analysis of that question?

A. I, I don't think so.

*Id.* at 212:15-215:15.

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 23

## VI.   The Propriety of Data Cleaning

31.    At her deposition, Dr. Marinescu explained that "[w]henever [she] do[es] a paper, and this goes as well for the expert's report, it's really important to get the facts straight, and that starts with looking at the data and, you know, understanding what's in the data and what might be missing from the data so that we can come to robust conclusions." *Id.* at 10:17-11:4; *see also id.* at 232:20-234:12.

32.    Dr. Marinescu explained that "data cleaning is part of the process that [economists] engage in and sort of data quality assessment to understand, you know, based on whatever we're looking for, do we have the kind of data that we need to answer the questions that we're interested in." *Id.* at 11:5-13.

33.    Dr. Marinescu was asked questions regarding the data cleaning process at her deposition. She testified as follows:

> Q. And am I correct that economists would typically do this data cleaning process prior to conducting their statistical analyses?
>
> A. There is an order to it. So, you have a question, you want to collect or, you know, collect or assemble the correct data that would hopefully help you answer the question, and then you do the cleaning, you look at the quality of the data and then you do the analysis and, you know, attempt to answer the question that you're asking.
>
> Q. Okay. So, the data cleaning comes prior to doing the statistical analyses?
>
> A. Sometimes it does happen that, as you do the analysis, for example, you might find out that, you know, the results you're getting, you know, sometimes you get an alert from the software or something like that and then you might want to go back and double check the data; because, for example, you might have missing values, things of that nature. You want it to control for a variable. So, let me give you an example. You might have a bunch of data and you do one regression, then you add the control variable in this regression, then the number of observations might have dropped a lot. So, one of the reasons might be that the variable you just added is missing for a bunch of them. And then you might go back and say, oh, why is this missing, you know, and they understand what's going on.

Q. Okay. So, you may do data cleaning before you start your analyses, but then while your analyses is ongoing, if you see some anomalies in the data or the results, you may do additional data cleaning?

A. Exactly; just investigate further the quality of the data.

*Id.* at 11:14-13:4.

34.     Dr. Marinescu was asked questions regarding how economists investigate data at her deposition. She testified as follows:

Q. Am I right that sensitivity checks are one way to test whether a result is being driven by implausible or outlier values?

A. Again, depending on the analysis at hand, you would do appropriate sensitivity checks for, you know, that type of analysis, which can differ a little bit depending on what analysis you're running.

Q. Is one way to identify outliers and missing observations to closely examine the data?

A. Well, it depends what you mean with examine. We run, we run things like summary statistics and, you know, that would give you the minimum, the maximum, you know, median average and things like that. So, that's, that's, you know, a typical way to go about it.

Q. And is another way to go about that to use plots to review the data?

A. Plots would also be a tool of the trade.

Q. And you mentioned summary statistics. Would that involve looking at the top and bottom values within the data?

A. Minimum and maximum, yes.

*Id.* at 17:13-18:13.

35.     **Investigating Outliers**. Dr. Marinescu was asked questions regarding investigating data outliers at her deposition. She testified as follows:

Q. And does part of the data cleaning include checking for implausible or outlier values in the data?

A. That's part of the data cleaning. We look at, you know, potential outliers since that can, you know, influence the results of analysis.

Q. And when you say that outliers can influence the results of analysis, would that include affecting averages that are calculated in the analysis?

A. Outliers would affect averages because they tend to skew the average wherever; if it's a negative one, it will make it look smaller, if it's a positive one, it will make it like look bigger otherwise without that outlier.

. . .

Q. And outlier valuables that -- outlier values that are not removed during data cleaning can also affect the magnitude of reported estimates. Is that right?

A. The outliers can affect estimates, depending on how we do the estimation, because there are certain types of estimation, like logit, et cetera, where it's less problematic. So, it really depends on what sort of; but for ordinary least square regressions, usually outliers will have some influence on the results.

Q. And outlier values that aren't removed during data cleaning can also affect the direction of reported changes in the data. Is that fair?

A. I would say that, you know, these things could happen, but, again, the question is, in practice, in a particular analysis, depending on what the actual model we're running, the influence might be more or less, you know, pronounced.

. . .

Q. Okay. So, you would identify an outlier and at least you would investigate it?

A. Right.

*Id.* at 13:5-16:11.

36.    **Investigating Missing Observations**. Dr. Marinescu was asked questions regarding investigating missing observations in data at her deposition. She testified as follows:

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 26

Q. I believe you mentioned this earlier, but data cleaning also includes checking for missing observations. Is that right?

A. You can also check for missing observations, yes.

Q. And depending on how one handles missing observations, that can lead to different results in analyses. Is that fair?

A. It can lead to different results, because, for example, like I was explaining, if it's missing, it will reduce the sample to whichever observations have non-missing values and, therefore, it will exclude those with missing and that can influence the analysis, depending on whether the excluded values are similar or not to the ones that are included. So, it doesn't always produce values results, it depends again on sort of the structure of the data.

Q. Okay. So, is that another instance where, if there's missing data, you would investigate that and then determine how to proceed?

A. Yes.

*Id.* at 16:12-17:2.

**VII.    Data Cleaning for the Yardi Lease Price Index**

37.    **Outlier Data in the Yardi Lease Price Index**. Dr. Marinescu computed a "Yardi Lease Price Index", which she relies upon throughout her Report, to make conclusions about the rate of change of Landlord Defendants' lease prices over time. *See* e.g., *id.* at 234:13-243:7 (confirming figures that rely on the Yardi Lease Price Index in her Report); *see, e.g.*, Marinescu Report at 24, Figure 4.

38.    Dr. Marinescu testified that "inclusion of outliers [] could affect outcomes." *Id.* at 287:5-16.

39.    Dr. Marinescu was asked questions about the presence of certain anomalies in the lease data underlying the Yardi Lease Price Index. She testified as follows:

Q. So, if we – let's look at the first unit, which is Revenue IQ Unit ID 38687674. Do you see that the first lease for this unit has a monthly effective rent of $1 as of November 1, 2023?

A. Um-hmm, yes.

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 27

Q. That's not a plausible rent. Is it?

A. Seems unlikely.

. . .

Q. So, when you performed your data analysis that led to your report, including the Yardi price index, what did you do to investigate what was behind this $1 effective rent figure?

A. I do not recall.

Q. You don't recall that you did anything. Correct?

A. I don't recall specifically investigating this specific data point.

. . .

Q. You agree that if you had applied the 0.5 percent approach that you and your co-author discuss in the paper that is Exhibit 5, that that would have removed this $1 effective rent data point, given how low it is?

A. We don't know that for sure, but at least it's possible, because it's low, so, you know, in the bottom, it would have possibly been removed.

*Id.* at 243:9-254:22.

Q. [I]f you look at the second property, Revenue IQ Unit 8692688, do you see that the first lease shows a monthly effective rent of 40 cents in April '19?

A. Yes.

Q. And you don't actually have reason to believe that this unit actually rented for 40 cents a month. Do you?

A. Similarly to the prior example, the same idea applies. This seems very low and, therefore, it would be, I would think, a rare event. But, you know, we cannot rule this out, you know, it might be a special, you know, deal that the renter had.

. . .

Q. As part of preparing your report, you did not investigate what was behind this 40 cents per month rental entry in the data you relied on. Correct?

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 28

A. I did not look at this specific unit.

Q. And you didn't remove this -- the data point for this Revenue IQ Unit 8692688 from your analysis. Correct?

A. Since this wasn't in the note, I would infer that this wasn't removed.

Q. Okay. And that's even though that the 40 cent per month rental price would be under the .5 percent approach that you discuss in your paper that's Exhibit 5 as a process when outliers should be removed?

A. We don't know for sure that it's below the .5 percent. It might be because it's low, but we don't know for sure without looking at the data, because I don't know how many observations there are and how many of these small values are in there.

*Id.* at 254:23-260:25.

Q. And just the last unit on this page is Revenue IQ Unit ID 136505. And do you see that the first lease shows a monthly effective rent of $30 starting August of 2021?

A. Yes.

Q. And, again, $30 for a monthly rental rate is not a plausible lease value. Is it?

A. I wouldn't say it's implausible. I'd say that sounds like pretty low and, therefore, you know, relatively rare just like with the other, other values.

. . .

Q. And, again, as to this Revenue IQ Unit 136505, you didn't do anything to investigate what is the facts and circumstances of this $30 per month effective rent as part of preparing your report. Correct?

A. I didn't look at this specific unit, but, again, if we were to include it, this -- like, let's say, hypothetically, we include these three observations, I suspect they are a small share of the overall, you know, number, and so it may not make big difference to the overall sort of trends. I think it's really important to note that, you know, without -- I cannot speculate again without further analysis about the effect. There's only three of them, so that's a small number, I take it at face value that this exists, it may not make a big difference to the analysis -- to the results, I mean, of the analysis.

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 29

. . .

Q. Okay. But whatever was done did not identify the data points that we've been discussing in Deposition Exhibit 6. Correct?

A. We have not -- I have not investigated this particular – these particular properties.

*Id.* at 261:1-266:10; *see also id.* at 266:11-270:18.

40.    **Missing Observations in the Yardi Lease Price Index Data**. Dr. Marinescu was asked questions about missing observations in the lease data underlying the Yardi Lease Price Index. She testified as follows:

Q. If we can look at Revenue IQ Unit ID 339629, do you see that as the first lease start date is November 1, 2017. Correct?

A. Yes.

Q. And then you put a lease term of 12, but that is carried forward until June 1, 2024, as the next observation. Do you see that?

A. I don't think so. I think because we said that we only impute if it's still under the same contract, so, in that case, you know, the -- you would have a gap because, you know, it says 12 months. So, if there's no other data, you see 12 months, we'd stop imputing the 770, you know, 12 months after 2017. So, like by October 2018, that would be the last 770, and then it would start to be missing thereafter. So, you -- because, as I just quoted, we only do it within contract. So, as long as it's the same contract, then, you know, you can propagate the rent. But here it appears that it would be a different contract. So, you wouldn't propagate the rent in that case.

. . .

Q. So, you're assuming that, after the 12-month lease term, that you then did a calculation based on no data after that until the new lease in 2024. Is that right?

A. Yes.

Q. Okay. That's how, in your view, how that should have, that should have been handled on this data point?

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 30

A. That′s my understanding of how this was handled.

. . .

Q. Professor Marinescu, do you recall whether you investigated the time gap as to Revenue IQ Unit 339629 in terms of this data?

A. I haven′t looked at this unit specifically, but based on the description in the report, you know, it says as long as it′s under the same contract, we propagate, which you know, it seems like a reasonable way to impute data.

. . .

Q. Well, let's actually skip one and look at Revenue IQ Unit ID 99076.

A. Yes.

Q. Do you see here that the first lease start date is July 26th, 2013?

A. Yes.

Q. And then the next lease observation noted is May 30th, 2019. Do you see that?

A. Yes.

Q. So, that's a gap of 58 months?

A. Yes.

Q. Is it your testimony that your understanding of how this was dealt with in your data was through having a series of missing observations after the first 12 months of the July 2013 lease?

A. Yes, to the extent that this was the definition that was operationalized as same contract, then, you know, it would be missing, and then we'd have data again starting May 2019.

. . .

Q. Okay. And so if you would look at Revenue IQ Unit ID 1623904, the first entry point has a lease start date of June 1st, 2015. Correct?

A. Yes.

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 31

Q. And the next lease observation for that unit is July 1st, 2025, over ten years later. Do you see that?

A. Yes.

Q. And so that's a gap, after the initial 12 months, from June 2016 to July 2025, or 109 months. Correct?

A. Yes.
. . .

Q. You would agree that it would not be appropriate to attribute the entire difference between 1,045 and 1,382 to a change that happened in one month. Correct?

A. So, as I said, given the procedure that we have discussed, there would be missing data in the middle and, therefore, there would not -- this property would not contribute to the index since it would have missing data, it would not contribute to the index until August of 2025, because that's the first time that we see the rent not changing since it's being propagated from the July 2025 new rent.

. . .

Q. Did you do anything to investigate the issue of this time gap as part of preparing the analyses of the Yardi price index in your report?

A. I did not. However, I would like to point out, again, like just similarly we were talking about outlier, time gap and so on, when it comes to Figure 62, Page 148, whatever, you know, potential changes are introduced in the data from incorporating some observations that -- whose imputation might be debatable, this would have to exactly be timed in just the way that corresponds to when the first time calls happened. So, you know, this could make a difference if those were treated a number of different ways. Whenever we change the underlying data for an analysis, the resulting figure can change. But what I think it's important to remember here is that all these different changes to the processing, the outliers, the gaps, the missing, it would have to exactly coincide with the first time calls for us to get the kind of jump in prices that we see in Figure 62.

Q. In the instances where there may have been a multi-month gap between the Yardi lease observations, you were still comparing the change in Yardi leases that took place to a one-month change in the CPI. Is that right?

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 32

A. Yes. And in the CPI, the units that would have this kind of data would be treated similarly, you know, like if they don't have data on the unit, then it's missing. So, they're only using the units for which there is continuous known data.

*Id.* at 270:20-287:4.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 23rd day of March, 2026, at Menlo Park, California.

/s/ *Abraham A. Tabaie*
Abraham A. Tabaie

DECLARATION OF ABRAHAM A. TABAIE
(No. 2:23-cv-01391-RSL) – Page 33