# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE          **ORIGINAL**

- - -

-----------------------------x

In re YARDI REVENUE                : NO. 2:23-cv-01391-RSL
MANAGEMENT ANTITRUST               :
LITIGATION.                        :
                                   :
McKENNA DUFFY, individually        :
and on behalf of all others        :
similarly situated,                : (Consolidated with
        Plaintiff(s),              :  Case Nos.
                                   :  2:24-cv-01948;
        v.                         :  2:24-cv-02053)
                                   :
YARDI SYSTEMS, INC., et al.,       :
        Defendant(s).              :
-----------------------------x

**CONFIDENTIAL ATTORNEY'S EYES ONLY**

- - -

March 9, 2026

- - -

Videotaped/Video-Teleconferenced Deposition of IOANA MARINESCU, Ph.D., held at the law offices of Holland & Knight, Suite 3300, 1650 Market Street, Philadelphia, PA 19103, beginning at 9:37 a.m., ending at 5:41 p.m., on the above date, before Denise D. Bach, a Registered Professional Reporter, Certified Court Reporter, Certified Real-Time Reporter, License No. XI0003990, and Notary Public, PA, NJ, DE & NY.

BLUEBEAR SOLUTIONS JOB NO.: 3185

THE VIDEOGRAPHER:  Stand by.  We are now on the record.  The time is 8:37 -- I'm sorry, I've got to go off the record.

(Pause.)

THE VIDEOGRAPHER:  We are now on the record.  The time is 9:37 a.m.  The date today is March 9th, 2026, and this begins the video-recorded deposition of Ioana Marinescu in the matter of McKenna Duffy versus Yardi Systems, Inc. et al.

My name is Aleisha Catts and I am the videographer.  I am with BlueBear Solutions.  Our court reporter today is Denise Bach.

All counsel will be noted on the stenographic record.  Will our court reporter please swear in the witness.

- - -

IOANA MARINESCU, Ph.D., having been first duly sworn or affirmed, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY ATTORNEY SCHAPER:

Q.     Okay.  Throughout the deposition, I'm going to refer to your report.

Do you understand that I'll be referring to this document that's Exhibit 1?

A.     Understood.

Q.     Professor, is this your first time offering an opinion as an expert in a litigation?

A.     Yes.

Q.     Have you ever been deposed before?

A.     I have never been deposed before.

Q.     Are you currently retained as an expert for any other ongoing antitrust litigation?

A.     I am not.

Q.     Professor, as a general matter, would you agree that, in applied economics, a certain amount of work goes into reviewing the data available to identify potential issues with the data?

A.     Absolutely.  Whenever I do a paper, and this goes as well for the expert's report, it's really important to get the facts straight, and that starts with looking at the

data and, you know, understanding what's in the data and what might be missing from the data so that we can come to robust conclusions.

Q.    And you agree that economists typically refer to this process as data cleaning?

A.    Yes, data cleaning is part of the process that we engage in and sort of data quality assessment to understand, you know, based on whatever we're looking for, do we have the kind of data that we need to answer the questions that we're interested in.

Q.    And am I correct that economists would typically do this data cleaning process prior to conducting their statistical analyses?

A.    There is an order to it.  So, you have a question, you want to collect or, you know, collect or assemble the correct data that would hopefully help you answer the question, and then you do the cleaning, you look at the quality of the data and then you do the analysis and, you know, attempt to answer the question that you're asking.

Q.    Okay.  So, the data cleaning comes prior to doing the statistical analyses?

A.    Sometimes it does happen that, as you do the analysis, for example, you might find out that, you know, the results you're getting, you know, sometimes you get an alert from the software or something like that and then you might want to go back and double check the data; because, for example, you might have missing values, things of that nature.  You want it to control for a variable.

So, let me give you an example. You might have a bunch of data and you do one regression, then you add the control variable in this regression, then the number of observations might have dropped a lot.  So, one of the reasons might be that the variable you just added is missing for a bunch of them. And then you might go back and say, oh, why is this missing, you know, and they understand what's going on.

Q.    Okay.  So, you may do data cleaning before you start your analyses, but then, while your analyses is ongoing, if you

see some anomalies in the data or the results, you may do additional data cleaning?

A.      Exactly; just investigate further the quality of the data.

Q.      And does part of the data cleaning include checking for implausible or outlier values in the data?

A.      That's part of the data cleaning. We look at, you know, potential outliers since that can, you know, influence the results of analysis.

Q.      And when you say that outliers can influence the results of analysis, would that include affecting averages that are calculated in the analysis?

A.      Outliers would affect averages because they tend to skew the average wherever; if it's a negative one, it will make it look smaller, if it's a positive one, it will make it like look bigger otherwise without that outlier.

Q.      Okay.  And would outlier values also impact indexes that are calculated as part of the statistical analyses?

A.      Well, when it comes to indexes,

it can be different depending on the formula.

And so, for example, it's really important that to know that in statistics the average is affected by outliers, but depending on how it's calculated, for example, if it's based on median, so median is an outlier robust statistical measurement, so, so it depends how exactly the index in question is calculated.

If you're asking me about the average, then, yes, it's affected by outliers, but, you know, it depends on the details of the calculation.

Q.    So, outlier values that are not removed during data cleaning could affect the indexes, depending on how they're calculated?

A.    Depending on how it's calculated.

Q.    And outlier valuables that -- outlier values that are not removed during data cleaning can also affect the magnitude of reported estimates.

Is that right?

A.    The outliers can affect estimates, depending on how we do the estimation, because there are certain types of

estimation, like logit, et cetera, where it's less problematic.  So, it really depends on what sort of; but for ordinary least square regressions, usually outliers will have some influence on the results.

Q.    And outlier values that aren't removed during data cleaning can also affect the direction of reported changes in the data.

Is that fair?

A.    I would say that, you know, these things could happen, but, again, the question is, in practice, in a particular analysis, depending on what the actual model we're running, the influence might be more or less, you know, pronounced.

Also, for example, it depends on how much data there is.  If we have a ton of data in one outlier, it tends to not make much difference.

Q.    Okay.  Because of these data cleaning issues we've just been talking about with outliers, am I correct that it's common practice to remove outliers from data?

A.    That's something that can be done, but, again, there is some judgment that

is involved in terms of whether something is an outlier or is an interesting observation point that is just different from others.

But, you know, certainly often it's part of the -- what would happen without these observations, what would happen with these observations, part of the, you know, regular process that you might want to do.

Q.    Okay.  So, you would identify an outlier and at least you would investigate it?

A.    Right.

Q.    I believe you mentioned this earlier, but data cleaning also includes checking for missing observations.

Is that right?

A.    You can also check for missing observations, yes.

Q.    And depending on how one handles missing observations, that can lead to different results in analyses.

Is that fair?

A.    It can lead to different results, because, for example, like I was explaining, if it's missing, it will reduce the sample to whichever observations have non-missing values

and, therefore, it will exclude those with missing and that can influence the analysis, depending on whether the excluded values are similar or not to the ones that are included.

So, it doesn't always produce values results, it depends again on sort of the structure of the data.

Q.    Okay.  So, is that another instance where, if there's missing data, you would investigate that and then determine how to proceed?

A.    Yes.

Q.    Am I right that sensitivity checks are one way to test whether a result is being driven by implausible or outlier values?

A.    Again, depending on the analysis at hand, you would do appropriate sensitivity checks for, you know, that type of analysis, which can differ a little bit depending on what analysis you're running.

Q.    Is one way to identify outliers and missing observations to closely examine the data?

A.    Well, it depends what you mean with examine.  We run, we run things like

BlueBear Reporting LLC

summary statistics and, you know, that would give you the minimum, the maximum, you know, median average and things like that.

So, that's, that's, you know, a typical way to go about it.

Q.    And is another way to go about that to use plots to review the data?

A.    Plots would also be a tool of the trade.

Q.    And you mentioned summary statistics.  Would that involve looking at the top and bottom values within the data?

A.    Minimum and maximum, yes.

Q.    And that would be another way to assess the quality of the data that you're working with?

A.    Right.  But remembering that, you know, sometimes the seemingly weird values might be real.  Like, for example, if you have a very large company and most others in your data are very small, well, you know, it comes to reason that this company's employment level, you know, is incredibly huge compared to everybody else.

Q.    So, that's another example of

what we talked about where you would

investigate the data point and then determine

how to proceed?

        A.      Right.

        Q.      Professor Marinescu, your

postgraduate and doctoral degrees are in

economics.

                Is that right?

        A.      Yes.

        Q.      Is it correct that you don't hold

any degrees in computer science or software

engineering or similar disciplines?

        A.      Yes.

        Q.      And your current appointment is

at the School of Social Policy and Practice at

the University of Pennsylvania?

        A.      Correct.

                I also have a secondary

appointment in the Department of Economics, as

well as the Wharton School of Business in the

Business Economics and Public Policy Unit.

        Q.      Okay.  Professor, have you ever

held a position in a computer science

department?

        A.      I have not.

Q. Have you ever taught any classes on how pricing algorithms work?

A. I have not.

Q. Have you ever reviewed or analyzed enterprise level source code of complex systems in either a professional or academic setting?

A. So, I have not directly reviewed it myself, but I worked for two years as the principal economist at the DOJ and, during that time, one of the cases that we were working on was RealPage.

And so, as part of that, I have, you know, read memos and summaries, including of code analysis that have been done, so I'm familiar with this type of software from that, from that work.

Q. Okay. But in that work you weren't doing the source code analysis yourself.

Correct?

You were reviewing the summary of other data scientists who were doing that work?

A. Correct, I was reviewing the

summary of data scientists.

Q.    Professor, if you would turn in your report to your CV, which is at Page 281 and, not surprising, we're going to go to your report quite a bit today, so whatever is easy for you in terms of you keeping it binder-clipped or not --

A.    Yes.

Q.    -- I just don't want --

A.    I'll do my best.

Q.    -- pages, pages to get lost.

A.    Lost, yes.

Q.    So, if you would turn to Page 281.

      And is this a copy of your CV, Professor?

A.    Yes.

Q.    And this -- does this contain a full and complete list of your publications, presentations, testimony and policy talks?

A.    Yes.

Q.    Your published work does not involve the analysis of software source code or the implementation of revenue management software.

Is that correct?

A.    It does not.

Q.    And you have not published any work on price fixing cartels.

Is that right?

A.    Correct.

Q.    Is it, is it accurate that your work to date has focused predominantly on labor economics?

A.    I'd say labor and antitrust.  You know, a lot of -- as you can see, in fact, the second, if you go to the referred articles on Page 1 of my CV, Number 2 is actually a paper that I wrote on my work at the antitrust division, with economists at the antitrust division.

Q.    Even within economics, is it fair to say that the large majority of your publishing has been on labor issues -- strike that.

Even within antitrust, is it fair to say that the large majority of your publishing has been on labor issues within antitrust?

A.    I would think that that's, you

involves.

Q.    Did you come up with the term "pricing suite" or was that Hagens Berman's language?

A.    I do not recall.

Q.    You don't know one way or the other who drafted that language?

A.    Oh, you know, pricing suite makes a lot of sense and that's how I think about it done in the report, but I don't recall who said the word first.

Q.    Okay.  Do you recall who first used the phrase "pricing rule book," you or your team, or Hagens Berman?

A.    That was --

Q.    Or Hagens Berman?

A.    That was definitely me.

Q.    There's a subsection on information exchange.

A.    Um-hmm.

Q.    And in that, there's a reference to "non-public or commercially sensitive information."

Do you see that?

A.    Oh, you mean, still on Page 13?

looking for exactly.

Q.      Sure.

You agree that you did not list the actual source code for Revenue IQ among the materials you relied on.

Is that right?

A.      Still looking.   Just making sure what we listed here exactly.

Yes, I did not list the source code in the materials relied on.

Q.      And, similarly, you would agree that you do not list the source code for Yardi's benchmarking feature.

Is that right?

A.      There is no source code that's listed in Section E, so, yes.

Q.      And you also did not list, in the materials relied upon, any source code that governs the interface that Revenue IQ clients used to interact with Yardi.

Correct?

A.      Yes, correct.

Q.      You would agree, then, that none of the opinions in your report rely on a review of the actual source code for Revenue

IQ or benchmarking.

Correct?

ATTORNEY PIERCE: Objection, argumentative. Calls for a legal conclusion.

THE WITNESS: So, here, what we did is that we relied on Yardi's own, you know, experts and descriptions of what their source code is doing in order -- as an economist, I'm really -- I'm trying to understand, I want to understand how the software works, what's its effect on the market.

And so, in this case, I have relied on, you know, Yardi's representations of how this code works to understand how it works. And then, you know, I have done additional things that we can talk about to understand its effects as an economic matter.

BY ATTORNEY SCHAPER:

Q. Okay. But you're not relying on your own review of the source code.

Correct?

A. I am not relying on my own review of the source code in it.

Q. Do you know who Adam Hastings is?

A.    Adam, yes, Adams Hastings is our software engineer who worked with my team at Fideres to help us figure out what the code is doing.

Q.    Did you speak with him as part of --

ATTORNEY PIERCE:  Objection.

Sorry, finish your question.

BY ATTORNEY SCHAPER:

Q.    Did you speak with Mr. Hastings as part of the assignment in writing your report?

ATTORNEY PIERCE:  Objection.

You can answer whether you spoke to him, but you can't reveal the substance of communications with the consultant.

THE WITNESS:  I did.

BY ATTORNEY SCHAPER:

Q.    Okay.  Did those conversations inform your opinions in this report?

A.    Yes.

Q.    Okay.  Which of the opinions in your report did your conversations with Mr. Hastings relate to?

ATTORNEY PIERCE:  Objection.  I'm

going to instruct the witness not to answer.

That's going to reveal the substance of

communications with the consulting expert.

ATTORNEY SCHAPER:  But if it's

something that she relied on in her report,

which she just testified that she did, then

that is not privileged.

ATTORNEY PIERCE:  I don't think

it's discoverable communications with a

consulting expert.  If you want to ask about

communications with an attorney, then -- I

don't think --

ATTORNEY SCHAPER:  You're saying

if she relied on the input of somebody

informing the opinions that are in her Rule 26

report that that is not discoverable?  That's

your position?

ATTORNEY PIERCE:  All right.  Why

don't you ask the question again and we'll see

what -- we'll try to see if she can answer it

without revealing attorney work product.

BY ATTORNEY SCHAPER:

Q.    Are there particular parts of

your report that reflect input you received

from Mr. Hastings?

A.      Well, the -- so, as I said, I tried to understand, based on Yardi's own documents and experts, as well as Mr. Hastings, you know, having a look at the code, as I said, I didn't myself review the code, not being a, you know, an expert in that, in that domain, and so one of the things I want to do is simply see how it works.

And so there are, for example, some documents that Yardi produced to show the structure of the, of the code.  And so part of it was, like, right now, I'm not sure where we put that, probably in Section 4.  And so part of the goal there was to say, hey, based on the code and based on what they're saying, does that seem right?

And, you know, so we discussed like, you know, is there any major thing that I should be aware of in analyzing the economic effects that maybe is different from, you know, what might appear in, you know, Yardi's representation.

So, that was kind of -- you were talking earlier about checking data, so, similarly, checking code and sort of like

making sure we have a general understanding of how it works.

Q.    Did, as part of forming the opinions in your report, did Mr. Hastings ever tell you that the descriptions of how the code works in Mr. Yenikomshian's report are incorrect?

A.    So, as part of our review, you know, I looked at Mr. Yenikomshian's report and, you know, we -- the representations about the code are one thing.

But, as an economist, I'm really interested in the impact of the code on market outcomes.  And so this is, this is really what I -- taking -- my understanding of the code as given, based on the report as well as, you know, my staff who examined the code, I took it from there to look at the economic effects of the, of the code on pricing, so that was really my assignment.

Q.    Okay.  So, we'll come back to some of the economic analysis, but just to make sure that the record's clear, when you were forming the opinions in your report, did Mr. Hastings ever tell you that the

Q.      In parts of your report, you take issue with the configuration analysis that Mr. Yenikomshian performs.

Does that ring a bell?

A.      Yes.

Q.      And you also take issue, through parts of your report, with his analysis and description of the import of different trends and health rules in Yardi's Revenue IQ software?

A.      Yes.  But I want to clarify what I mean with take issue.  It's, you know, it's a matter of, you know, reasonable disagreement and what I think is relevant for the economics.  You know, I'm not saying that, you know, they did something that was plainly incorrect; however, it could still be misleading based on what I'm looking at in terms of, well, what does this mean for the economics.

And that's where I am focusing my critique in terms of, you know, the contextualization interpretation in regard to the facts that matter for the interpretation of the case.

number of issues; you know, I don't need to reveal the details of that.  And, you know, as I said, my work focused on the configurations analysis, which is what's in the report.

BY ATTORNEY SCHAPER:

Q.    All right.  Professor, respectfully, I think if I'm asking questions, I'm entitled to ask them, I'm entitled to get answers.  We'll talk about your actual analysis later, but if you would just answer the simple question, did Mr. Hastings ever tell you that Mr. Yenikomshian's analysis of the Revenue IQ source code itself was incorrect?

ATTORNEY PIERCE:  Objection, asked and answered.  How is this -- how have you established the foundation for this?  What opinion is she offering?

ATTORNEY SCHAPER:  I already have.

BY ATTORNEY SCHAPER:

Q.    Can you answer the question?

A.    You know, there are -- like with everything, there might have been some, you know, nuances in there, but, you know,

ultimately, the source code is not something that I analyzed or really focused on, you know, in its, in its detail.

I looked at the consequences of the -- the economic consequences as an economist.  So, you know, that's, that's what this is all about.

Q.    You don't take any issue with -- you don't, in your report, say that Mr. Yenikomshian's analysis of the source code itself is incorrect?

ATTORNEY PIERCE:  Objection. Asked and answered.  Mischaracterizes testimony in a number of ways.

ATTORNEY SCHAPER:  Okay.  Can you keep the long speaking objections to a minimum, please?  I think we've done that in your -- when you're taking depositions.

ATTORNEY PIERCE:  I think that was like two sentences, but...

BY ATTORNEY SCHAPER:

Q.    Can you answer the question?

ATTORNEY PIERCE:  Objection, asked and answered, mischaracterizes testimony.

THE WITNESS:   I did not use the term incorrect in the report, if that's your question.  That is correct, I did not say that this is incorrect.  I said this is misleading.

BY ATTORNEY SCHAPER:

Q.    But you don't have a basis to dispute Mr. Yenikomshian's review of the source code itself.

Is that right?

A.    I did not review the source code.

Q.    And you don't have a basis to dispute his review of the source code and the conclusions from that?

ATTORNEY PIERCE:  Objection. Asked and answered.  Assumes -- mischaracterizes testimony.  Vague as to conclusions.

BY ATTORNEY SCHAPER:

Q.    You can answer.

A.    I did not analyze the source code, so --

Q.    So, you can't dispute his analysis of it.

Is that fair?

ATTORNEY PIERCE:  Objection,

things, and at that point we weren't able to -- I had to look and, you know, I talk about it in the report a little bit, but we were unable to do a thorough analysis of that.

Instead, we focused on the calls between Mr. Fazio, the TAM manager, and the TAMs.

Q.    Okay.  I just want to make sure we're clear.  I think that you discuss in your report some TAM call notes that were produced in January of 2026.

Does that ring a bell?

A.    Oh, yes, I think maybe, maybe that that was con -- yes, those are the TAM calls that I'm talking about.

Q.    Okay.

A.    Which were a lot.  There was a lot of data that I would have loved to look into.  But given timing, there were other things to wrap up in the report.

Q.    Okay.  So, I'm asking about the 600 TAM pricing call notes that were produced prior to November 2025.

A.    I don't recall hearing of those.

Q.    You didn't review those TAM call

notes?

A.   I don't recall hearing of those specific call notes, if you're talking about TAM calls with clients, because --

Q.   That is what I'm talking about.

A.   Yeah, I've been looking at the calls of Mr. Fazio with the TAMs.

Q.   During your work on the report in 2025 -- strike that.

Am I correct that -- strike that.

When did you start doing the analysis and drafting of your report?

A.   It was -- you know, I started after I got, you know, assigned to this case. So, must be late 2024, beginning 2025.

And, of course, this takes a lot of time.  There are, like, many stages in that.  And I think, early on, we probably did more like literature reviews, you know, we looked at the appendix, there are many papers cited, to understand what we should be looking for as far as the economics.

Q.   As part of your work in 2025, did you ask counsel to provide copies of all of the call notes between TAMs and Revenue IQ

clients?

A.   I asked counsel about the Fazio calls and those are the ones that I base my analysis on.  And then, you know, we wanted to get these TAM calls -- and, as I said, I don't recall this specific November one, so, you know, I guess we were waiting for more data which came in January.  And at that point it was, you know, kind of late in the game for me to be able to look at them thoroughly.

Q.   But, during 2025, I think your testimony was that you were not aware that there was a set of 600 TAM pricing call notes?

A.   I was not aware of that.

Q.   Okay.  Are you aware that, prior to November 2025, Yardi produced over 10,000 email communications between Yardi personnel and Revenue IQ clients?

A.   I haven't looked at those emails.

Q.   Okay.  So, you didn't review -- let me correct that.

The 10,000 email communications I referenced were between Yardi and the landlord defendants.

You haven't looked at those, you

just testified?

A.     I have not.

Q.     Did you ask counsel for all the communications that had been produced between Yardi and the landlord defendants?

A.     You know, this -- I asked counsel for, you know, relevant data that we could use, you know, to analyze it, and I don't recall, you know, hearing about those emails.

Q.     Okay. Do you recall whether you specifically said to counsel, I'm interested in how TAMs communicate directly with clients, I'd like to see all those documents? Did you make that request?

A.     I don't recall making that explicit request just the way you phrased it, but, certainly, you know, we discussed my analysis of the role of TAMs and, as such, you know, it's always helpful to get more information about, you know, what TAMs did.

And I have some analysis in my report that I hope we can get to, but, you know, this is, this is the data that I have used, which is the -- Mr. Fazio's calls with TAMs.

And I also want to add that this is, while, you know, it's not the whole of the data, this is important data because Mr. Fazio being the TAMs manager was presumably conveying to TAMs important messages about what they should be doing as, you know, his -- the manager.

Q.    Do you know who Katrina Ivinskas is?

A.    No, I don't.

Q.    Do you know who Dustin Bradford is?

A.    I do not.

Q.    As part of your work on this matter, did you ask counsel for any deposition transcripts of depositions that were taken of TAMs or former TAMs at Yardi?

A.    I do not recall looking at this.

Q.    Do you recall asking counsel whether any such deposition transcripts existed?

A.    I don't recall.

Q.    How did it come about that -- you do cite some deposition transcripts.

How were those deposition

of your analysis about the role of TAMs, is it fair to say that had you known that there were deposition transcripts of TAMs, that would have been something you would have been interested in reviewing as you did your work?

A.    Obviously more data is always better, but, again, this may not change my conclusions.

Q.    It may have changed your conclusions, it may not have, but you didn't review the transcripts?

A.    I did not review the transcripts.

Q.    Professor Marinescu, what does the term "reference rent" refer to within Revenue IQ?

A.    Reference rent is the rent, as I recall, that the -- that was there, you know, in the prior, prior period.  And then, based on that, the Revenue IQ decides to hold, increase, decrease that, you know, reference rent.

Q.    Do you have an understanding of how a reference rent is initially chosen when a Revenue IQ user starts up with the system?

A.    So, the reference rent, as I

understand, is chosen by the landlord who's using the system.  And, you know, this is a market that has many different characteristics, so, naturally, for example, a bigger apartment is going to have a higher rent than a smaller apartment.

And, of course, you know, the landlord starts with their own, you know, reference rent and then hoping to get advice moving forward from Revenue IQ.

Q.      You just started to describe how there could be many differences across landlord defendants in terms of what kinds of apartments they have.

Is the economic term for that heterogeneity?

A.      Sure, you could call it heterogeneity.  The characteristics of the apartments, to be clear, are different, and that's something that a landlord will be interested in knowing because they need to understand what their competition looks like, and typically more similar units are closer competitors than less similar units.

Q.      Do you have an understanding that

reference rents are set by unit type group within Revenue IQ?

A.    Yes.

Q.    And what's your understanding of what unit type group refers to?

A.    As I understand it, unit type group is a grouping of certain, you know, floor plans and sizes, so that we can make units more comparable like we were saying earlier.  The landlord, of course, they want to be able to compare their pricing with similar units.

Q.    And is it correct that all the steps in Revenue IQ that take place are based off of each client's individually selected reference rent?

A.    That's the departure point from -- you know, the reference rent is in the departure point.  And then it applies the trend rules and then the health rules.  And so, indeed, the departure point is the reference rent.

But, importantly, you know, this reference rent itself, as an economist, we understand that it's determined in

equilibrium, meaning depending on market conditions and, you know, whatever objectives the landlord is trying to achieve and whatever their understanding is as well of software that they might be using.

So, it's set by the landlord, but not in a vacuum, you know, it's based on their strategy.

Q.    What significance, if any, does your report place on the fact that each Yardi client individually selects its own reference rents?

A.    So, as I was explaining, this is part of a multi-step process.  And what's important to know is that that's -- the reference rent is something that the landlord first sets.  They could also change it later.  And, in fact, some of the changes that Mr. Yenikomshian analyzes are such changes in the reference rent, and so this, again, is the input.

Now, if this reference rent is then processed through Revenue IQ and, importantly, one of the Comp Trends -- one of the trends that it's using to decide whether

memory, focuses on trend rules and the

additional options that are being used to

generate price recommendation with Revenue IQ.

And the reference rent is where it starts.

So, that's the departure point.

And then the Revenue IQ is being applied to

this reference rent.

BY ATTORNEY SCHAPER:

Q.      Okay.  You testified a second ago

that you observed instances where you saw

configuration changes where Revenue IQ clients

were changing their reference rents.

Is that correct?

A.      Actually, I stand corrected.  I

was, you know, confusing in my mind the price,

the minimum price --

Q.      Okay.

A.      -- and the reference rent.  But,

you know, these two economically play similar

roles, but I actually realize now that I was

confused and sort of, again, like, took the

minimum price and the reference rent to be the

same thing in my memory, but, actually, I

talked about the minimum price.

Q.      Okay.  So, then, I'll just start

fresh.

You would agree that clients are able to manually adjust the reference rent within Revenue IQ at any time?

A.    My understanding is that they can, indeed, adjust the reference rent; however, the -- it's important to know that, you know, if they don't proactively go in and do anything, then the Revenue IQ system automatically populates, you know, the next price in a completely automatic way without requiring any approval.

Now, if you want to go in there and change, you can.  But the relevant economic question is what happens in practice with the amount of change that they are making.  And what we see is that, you know, in the end, the -- more even by Mr. Yenikomshian's own analysis, more than 70 percent of the time, the price is the Revenue IQ recommended price.  And then when we look more broadly, the price is within about 1.4 percent of the Revenue IQ price.

So, while, indeed, there is a possibility for clients to change the

reference rent and other, you know, configurations, what matters is what they do in practice.  And what they do in practice is that they tend to follow overwhelmingly the recommendations from Revenue IQ.

And I want to add one more thing, which is that we, to have coordinated pricing, we don't need to be a hundred percent adherent.  And in my review of the literature in the report, so, you know, I explain that, in fact, it can be, you know, in the best interest of a conspiracy to allow some wiggle room.

And, fundamentally, let me explain the economic intrusion, this is because if you are tying people too strongly, then they become vulnerable to one potential defector who might, for example, price lower, and then you're losing clients if you have no ability whatsoever to respond.

So, it's part of our understanding of the economic analysis of coordinated pricing that it can actually be helpful to leave some leeway to firms that are involved in such coordinated pricing to adjust

their price, you know, however specific.

Additionally, like we discussed earlier, every unit has a certain floor plan, et cetera, so, obviously, you know, there's other reasons that just have to do with more mechanical stuff around the differences in the type of unit that it is that, you know, a certain landlord would want to set it a certain way.

ATTORNEY SCHAPER:  I'm going to move to strike that answer as nonresponsive.

BY ATTORNEY SCHAPER:

Q.    Professor, I know you haven't been deposed before, so I'll explain what I mean.

So, my question was, you would agree that clients are able to manually adjust the reference rent within Revenue IQ at any time, and you gave an answer that captured a whole lot of other points in addition to that that covers a significant part of your analysis in the report.

I will get to your additional opinions and analysis, but I'd ask that if you would just answer the question I'm asking.

ATTORNEY PIERCE:  I would say that the witness is entitled, as an expert, to answer your question with the full context that she thinks is necessary.  You are an attorney, you're not a judge.  Any motion to strike you want to bring is your prerogative, but it is not dispositive and it will ultimately be ruled upon by a judge.

So that the witness should answer your questions as -- how she thinks is best.

BY ATTORNEY SCHAPER:

Q.    Professor, are you aware of how often Revenue IQ clients make manual adjustments to reference rents?

A.    I do not recall having looked at specifically the adjustment to the reference rent.  However, you know, what matters is the end result in terms of, you know, how we see prices occur and, in particular, for example, the fact that overwhelmingly clients tend to follow the recommendation of Revenue IQ.

Q.    Okay.  But just to be clear, the frequency with which Revenue IQ clients manually adjust the reference rents is not something you investigated in your report.

analysis, the extent to which Revenue IQ

clients make manual adjustments to reference

rents?

That's the only question.

ATTORNEY PIERCE:  Objection,

argumentative.  The witness can answer how she

wants.

THE WITNESS:  I looked at

changes, following Mr. Yenikomshian's

analysis, I looked at the number of changes

that clients made and analyzed them in terms

of their relevance to the economics of the

case.

BY ATTORNEY SCHAPER:

Q.    Among the changes you looked at,

were reference rents among those?

ATTORNEY PIERCE:  Were you done

answering the question?  Did you have anything

else to add?

THE WITNESS:  Yes.  I was going

to say that the -- what is important is not

whether clients can make a change.  And I am

saying they can make a change to reference

rents and many other configurations, they are

able to.

However, first of all, it is -- it can be difficult to make that change.  So, when it's away from Revenue IQ's recommendation, there are multiple steps involved, as I describe in my report.  And, secondly, also in practice, when we look at the data, the end result, we see prices that tend to be moving in parallel.

So, therefore, yes, they can make a change; however, the practical result that we see in the data is that they tend to price in parallel.

BY ATTORNEY SCHAPER:

Q.    Okay.  Can you point me in your report to where the statistics are that reflect you having investigated the extent to which Revenue IQ clients make manual adjustments to reference rent?  Where is that in your report?

ATTORNEY PIERCE:  Objection. Mischaracterizes testimony, argumentative.

THE WITNESS:  I have analyzed specifically, let's see, in Section 5, I focus on --

BY ATTORNEY SCHAPER:

inject, which I think is relevant to the economics, I already said it, but I think it's important to clarify, is that if the landlord doesn't go in and actively takes a step to change the reference, which they can, you know, so they can change the reference, but if they don't do anything about it, then every period, the price that Revenue IQ set at the next period becomes the reference rent and is -- now it's propagated forward.

So, it sort of goes forward automatically unless they change, which I don't disagree with you that they can change the reference rents.

BY ATTORNEY SCHAPER:

Q.    And what does your analysis show in terms of how frequently they actually do change the reference rents?

A.    I focused my analysis not on the changes in the reference rent, but on understanding what rules they are setting up as far as the trend rules, which is the first step of Yardi's -- sorry, of Revenue IQ's pricing system.

Q.    If you would please turn to

of, you know, the first step of the Revenue IQ algorithm, the software suggests something and clients can just let it be, they can change it, but in practice would show that, overwhelmingly, you know, 89 percent of clients, for example, stick with the default 25 percent for these core rules.

Q.    We just talked about reference rents for a bit.  And you indicated that different landlords are picking their own reference rents.

Is that correct?

A.    Yes.  Understanding, though, that once they picked it, it gets set by Revenue IQ unless they decide to change it again.

Q.    But those reference rents can't be characterized as shared, correct, because they're chosen by each individual landlord.

Is that right?

A.    Well, the first time that the landlord will set the reference rent, you know, that's their -- something that they decide based on their strategic objectives and what they know of the market structure.

But, thereafter, again, if they

don't do anything, then the reference rent is shared by Yardi and, in that sense, it's -- sorry, not shared.  I meant is set by Yardi. And is shared in the sense that all of the landlords who don't change their reference rent are moving forward with the Revenue IQ set reference rent.

And it's shared in the sense that it has -- used the same recipe to arrive at the reference rent, broadly the same recipe, to arrive at the reference rent.

Q.    Let's talk about that.

You note in your report that "The outcome of Step" -- "of the Step 1 trends analysis is a provisional recommendation to either increase, decrease or hold steady the price of a unit."

Correct?

A.    Yes.

Q.    And how is it determined by how much, if at all, a provisional change should be adopted?

A.    So, then we also have, you know, additional potential health rules that could come into play, and the majority of landlords

also use the same configuration for that.  And then, ultimately, these together lead to the first understanding whether you should increase, decrease, et cetera.

And this together leads to a recommendation to increase the rent by a certain increment if, say, if it's increased, then, you know, you increase from the reference rent by certain increments.

Q.    And who chooses what the increment is?

A.    So, the -- as I understand it, there is a -- so, right now, I cannot recall if I described that in my report.  Let's see.

I think -- sorry, tell me again what you were asking because as I was searching.

Q.    You testified that there needs to be a decision about how much of any recommended increase or decrease is actually going to be adopted.

Right?

A.    Um-hmm.

Q.    Is it correct that it's each individual client who is making a decision

about how much of any provisional increase or decrease to take?

ATTORNEY PIERCE:  Objection, assumes facts not in evidence.

THE WITNESS:  I do not recall how exactly that, like, step increment is being set right now.  However, I think, importantly, the -- it's important to note that, in the end, you know, however that thing is set, once it's set, it just moves forward, and overwhelmingly the clients accept the recommendation of Revenue IQ.  And we also see, like, this parallel pricing that, you know, I show empirical evidence on.

BY ATTORNEY SCHAPER:

Q.    Okay.  So, I know you said you didn't remember how this worked, so why don't we mark an exhibit and see if that is helpful.

(Exhibit No. 2, Revenue IQ User Interface, Two Pages, Bates YARDI-DUFFY_ 01274345, was marked for identification.)

BY ATTORNEY SCHAPER:

Q.    So, we're going to mark as Exhibit 2 --

But it does appear like they can change.  However, there might be a default that shapes landlords' behavior here.

Q.    But it's the clients who are, if there are adjustments to these step changes as you just said, it's the clients who are making those individually.

Correct?

ATTORNEY PIERCE:  Objection, assumes facts not in evidence, mischaracterizes testimony.

THE WITNESS:  It looks like the clients can change it based on that.  But, as I said, it would be important to know, and I do not have the evidence on that, if there is and what is the default reference rent change amount, which is that increment that I was discussing earlier, but I didn't remember exactly how, you know, what the increment was.

BY ATTORNEY SCHAPER:

Q.    Okay.  You can put that aside.

A.    Um-hmm.

Q.    If you look back at Paragraph 24 of your report.

A.    Um-hmm.

Q.    And let me know when you're there.

A.    Yes.

Q.    Do you see at the end of Paragraph 24, you talked about -- and this paragraph is about the steps in Revenue IQ?

A.    Um-hmm.  Yes.

Q.    Thank you.

And then you end by, you say, "Third is a series of additional settings or options."

Correct?

A.    Yes, I say that.

Q.    And then in Paragraph 169 --

A.    Sorry.  Just going back.  169.

Yes.

Q.    So, you say, "After applying the Trend and Health Rules, Revenue IQ permits clients to select additional configuration options that affect how the recommendations are implemented or to make limited, rule-governed adjustments in specific circumstances."

Do you see that?

A.    Yes.

Q.    And this, again, this is Step 3 of the process?

A.    Yes.

Q.    And you note that it's clients who would be making these changes in Step 3.

Is that correct?

ATTORNEY PIERCE:  Objection. Assumes facts not in evidence.

THE WITNESS:  I mean, the title of 4.1.3 states, "Clients May Apply Additional Settings & Options," so that's what it says.

I would like to add an additional element here, which is that with regard to the increment specifically that we were discussing in the prior question, the increment, you know, plays a role in the mechanics of the algorithm.

And there is a recent paper by Harrington that I discuss in my report that gives an example of a collusive algorithm, and it works in a similar way in that there is an increment and then we all increase prices together by the increment and then, if profits start to decline, then we stop.

that.

You see that after that first value, which is coming out of Step 2, then it says "Plus LEM surcharge, plus turn cost, plus new lease term premium amount," et cetera?

A.    Yes, I see there's a number of other terms in there, um-hmm.

Q.    And do you understand that those are terms that can be added or subtracted, depending on the value, as part of Step 3 of Revenue IQ's output?

A.    That does seem right.

Again, I want to clarify that I am not familiar with the names, the exact names of those, you know, components.

Q.    I'll represent to you, for example, that term cost is the amount that a landlord is going to charge a tenant for turning over the apartment.

A.    Um-hmm, okay.

Q.    Do you see that?

A.    Yes.

Q.    And does that make sense to you, having rented apartments, I assume?

A.    Yes.

Q.    Okay.   So, even if Step 1 and Step 2 indicate an increase, the final output from Revenue IQ depends on the magnitude of the adjustments that the client selects in Step 3.

Correct?

A.    Taking this, you know, description as given, I can see that, you know, if the first term is what Revenue IQ recommended and we have these additional terms, then if these additional terms are not zero, you know, it's going to affect the final rent.

Q.    And if the output of Step 1 and Step 2, for example, say a $10 increase, and Step 3 includes a negative $25 adjustment for, say, turn costs, the final result would be a net decrease.

Is that correct?

A.    So, in the case that these additional terms would be negative, and if they are big enough, it could outweigh the positive increase in that hypothetical.

Q.    If you look at Paragraph 169 of your report --

BlueBear Reporting LLC

that if that was the case --

A.    If that was the case is what I was saying; because, as I, as I was mentioning, you know, we didn't analyze the effect of each of these adjustments on pricing.

Q.    If you would please turn back to the Yenikomshian report, in the appendix again, to D-167.

Do you see that Figure D.69 is a screenshot of the Revenue IQ user interface showing unit pricing output grids generated by Revenue IQ based on start dates and term lengths.

Do you see that?

A.    Yes.

Q.    And you're aware that each day Revenue IQ calculates a range of asking rents for every unit based on a client's configurations of the software?

A.    Each day they calculate a new rent based on the configuration and on the prior reference rent which often will have been set by Revenue IQ.

Q.    And if you look at the upper

left-hand corner, you see the date of

March 14th, 2025?

     A.    I see.

     Q.    Okay.  So, just for sake of example, based on this pricing grid of a 15-month lease, that starts in the next two weeks, has a calculated asking rent of $1,836 a month.

          Is that right?

     A.    Yes, I see that.

     Q.    And then on the bottom right of the grid, it's the same grid, a six-month lease that starts a little less than two months later has a calculated asking rent of $2,186.

          Correct?

     A.    Yes.

     Q.    That's a difference of $350.

          Is that right?

     A.    Yes.

     Q.    And so you would agree that there are differences in lease prices depending on lease terms, and that's reflected in that Step 3 of the Revenue IQ process.

          Is that right?

A. Yes. As I was explaining earlier, typically, for landlords, it's better to have a longer lease term. And, actually, we can see, like, within the first column that the price goes up as the renter would seek a shorter lease term.

Q. Is your position that a rate differential of $350 a month is not economically relevant?

ATTORNEY PIERCE: Objection, vague.

THE WITNESS: So, the question isn't whether the rent differential in question, for example, is going to matter to the renter. It probably does. The question is whether this specific structure, what does it tell us about the ability of firms, of landlords, to coordinate pricing using Revenue IQ.

And so my judgment is that this particular feature, the fact that prices vary, for example, with term length is -- does not prevent landlords from coordinating pricing through Revenue IQ.

BY ATTORNEY SCHAPER:

Q.    Okay.

A.    So, this is the specific meaning that I mean to -- economically meaningful for the question at hand.  I'm not saying that it doesn't matter to the renter, the $300 difference.

Q.    But for purposes of your analysis, that difference was not relevant?

A.    It is not relevant to the ability of landlords to coordinate pricing, yes.

Q.    If you would look at Paragraph 274 of your report, please, Professor.

A.    Um-hmm.  Yes.

Q.    And you say here that "Over 95 percent of the configurations Dr. Yenikomshian analyzes are, even by his own description, optional first or second-layer configurations that do not speak to Revenue IQ's core pricing logic."

Do you see that?

A.    Yes.

Q.    And you explain that these -- that insertions and deletions capture new or deleted properties.

Is that part of that analysis?

A.    Yes.

Q.    Isn't it the case that insertions and deletions also capture changes made for existing properties when a particular configuration was previously turned off or set to zero and the client then turns it on?

A.    That, that could also be the case, but, based on this data, we don't know which is which.  So, it includes, you know, all of these cases of whether a new property came on or off or potentially other situations, which is why, you know, if we want to have a clean -- definitely it's a change in an ongoing process of use, you know, I removed these insertions and deletions.

Q.    Would you agree that insertions and deletions also can capture where the client turns off a previously active setting?

A.    I am not sure.

Q.    Okay.  If you would turn in your report to Paragraph 279.

A.    Um-hmm.

Q.    Looking at the last sentence, it states, "Presenting the entire 4 million event

clients' information to move clients' prices in parallel, and that Comp Trends link a client's recommended list price changes to their rivals' prices."

Is that what you're capturing in 31?

A.    Yes.

Q.    And then if we turn to, later in your report, you provide a mathematical formula related to this.

Is that right, in Paragraphs 316 and 317?

A.    Yes.

Q.    Can you just read Paragraph 317 starting with "Where"?

A.    "Where Rho u,t and Rho u,t minus 1 are my list price divided by my competitors' list price today and yesterday, respectively."

And then I give the formula for Rho u,t, which is for tiny t.  And that's base price divided by the average competitor price.

Q.    And then in Paragraph 321, you state, the second sentence, "When multiple landlord defendants include each other in their Revenue IQ comp sets, each landlord's

pricing decision becomes an input into the other's subsequent recommendation."

Correct?

A.      Yes.

Q.      And this is part of your opinion that when Revenue IQ clients are all using each other as their comp set that, in your words, that systematically ratchets up prices?

A.      That element, yes.

Q.      And this analysis assumes that Revenue IQ users' comp sets consist of other Revenue IQ users.

Correct?

ATTORNEY PIERCE:  Objection, mischaracterizes testimony.  Mischaracterizes the report.

THE WITNESS:  They, in fact, do include other Revenue IQ clients and -- but the -- it's useful to have the other Revenue IQ clients there in order to -- if this were to lead to, indeed, coordinated pricing.

BY ATTORNEY SCHAPER:

Q.      So, the mechanism you're talking about here is the landlord defendants using -- having a comp set made up of other Revenue IQ

mischaracterizes the report.  It says "When

multiple landlord defendants."

            THE WITNESS:  I did not state

that.  I said when they do.

BY ATTORNEY SCHAPER:

        Q.    Yes.  Okay.

            And then you're saying, in that

situation, each landlord's pricing decision

becomes an input into the other subsequent

recommendations.

            Correct?

        A.    Yes.

        Q.    And if a landlord defendant does

not include other Revenue IQ users in a comp

set, then that doesn't happen.

            Correct?

            ATTORNEY PIERCE:  Objection,

mischaracterizes testimony.

            THE WITNESS:  What doesn't

happen?

BY ATTORNEY SCHAPER:

        Q.    The -- if a landlord defendant

does not include other Revenue IQ users in

their comp set, then that landlord's pricing

decision is not going to be an input into the

other subsequent recommendations?

Strike that, strike that.  Let me ask that again.

If a landlord defendant's comp set does not include other Revenue IQ users, then am I correct that it follows that that landlord defendant's pricing decisions are not going to be influenced by other Revenue IQ users?

ATTORNEY PIERCE:  Objection, mischaracterizes testimony, incomplete hypothetical.

ATTORNEY SCHAPER:  Counsel, that question didn't characterize testimony one way or the other.  I didn't say you just testified that.  All right?  So, if you would just be thoughtful about your objections so they're not so long and interrupting.

ATTORNEY PIERCE:  I believe that objection was about five words, but I will try and be concise.

THE WITNESS:  So, each -- the economic -- so, the influence is direct when another landlord is in the comp set.  And it can be indirect also if it's not in the comp

set; because, as Professor Harrington's work shows, when a group of landlords is using the same hub algorithm, that raises prices not only for them, but also for the non-users of the algorithm.

So, in that sense, even if the comp set, hypothetically, and, again, like, this is a hypothetical, didn't include Revenue IQ clients, you could still see an indirect effect, assuming that there is, in fact, price coordination with a hub algorithm, which is the allegation here, because it's a market. So, you know, we all influence each other's prices.

BY ATTORNEY SCHAPER:

Q. But if a landlord defendant's Revenue IQ comp set did not include other Revenue IQ users, then that landlord's comps would not be informed by any other Revenue IQ user.

Correct?

ATTORNEY PIERCE: Objection, asked and answered.

THE WITNESS: It would still be informed in an indirect fashion through the

market, because when this hub algorithm, as I, as I describe it in my report, leads to price increases for the group of alleged conspirators, other landlords in the market typically would also see price increases for other landlords in the market and, therefore, in that way, you know, it's like a chain whereby, you know, I influence the price of somebody who maybe isn't using Revenue IQ, but that price is influencing some other Revenue IQ user, like, right there on two sides.

So, like, imagine A, B, C.  So, B is a non-user.  A and C are users.  If B is in the same market, then, you know, if we're both looking at B, we're essentially coordinating our prices through B.

But this is a hypothetical.  I'm just explaining that there is an indirect effect.

BY ATTORNEY SCHAPER:

Q.    If you would look at Paragraphs 191 and 92 which are on Page 72.

A.    Yes.

Q.    So, in Paragraph 191, you're talking about two ways in which landlords can

opinions about conspiracy, but rather I am

outlining a well-known market mechanism

whereby, when we are all competing in a given

market, if some of us raise price, typically,

that allows others to raise price as well.

BY ATTORNEY SCHAPER:

Q.      In your same toy example, am I correct that you focus on the impact of the Comp Trend while assuming that the other three trends do not affect the pricing logic?

A.      Yes, in order to isolate the mechanics of how that one works, I considered it in isolation.  So, all other things being equal, as we like to say in economics.

Q.      Okay.  But you're aware that Revenue IQ clients in reality are required to choose at least two steps -- two trends in Step 1.

ATTORNEY PIERCE:  Objection, assumes facts not in evidence.

THE WITNESS:  So, if we look at -- so, in the Figure 37 on Page 99, we were -- I was looking here at the statistics with respect to the weights placed on the different rules, and Comp Trend Rule is one of

those four core rules in Step 1.  Sorry.

BY ATTORNEY SCHAPER:

Q.      Yeah, the question was more basic.

It's just, are you aware that Revenue IQ clients are required to choose at least two trends in Step 1?

A.      Well, actually, almost all of them choose the four, like 25 -- like, you know, they have 25 percent.  So, in fact, most of them use all four.  So, Comp Trend will as well as the three others.

Q.      Are you aware that a Revenue IQ client actually must use at least two trends in Step 1?

A.      I don't recall that specific fact, but, in practice, they actually use four, most of them, the overwhelming majority.

Q.      Okay.  And for that overwhelming majority of landlords, did you evaluate whether the trends, other than the Comp Trend, have an impact on the Revenue IQ pricing calculation?

A.      So, because of data limitations, I wasn't able to match the prices with the

configurations.  So, I wasn't able to examine the specific impact of the Comp Trend Rule.

However, there is an interaction from -- based on economic theory between the different rules.  So, in particular, with the Comp Trend Rule, as I describe it, having that rule by itself, independently of others, disproportionately tends to raise prices based on the Maskin and Tirole model.

And these other trend rules, for example, the traffic and availability and also, to some extent, the new leases, they represent demand from renters.  And so if we raise the rent, all other things equal, for example, you would expect the traffic to go down, because people, you know, aren't as interested to come to visit because your price is higher.

But with the Comp Trend Rule, if we all raise price at the same time, hypothetically, then, you know, the renters see prices everywhere being higher, so they are not as dissuaded to come to me.  So, therefore, it allows me to keep raising the price, because we're all doing it together.

BY ATTORNEY SCHAPER:

Q.    But if it is a -- if a Revenue IQ user has no other Revenue IQ properties in its Comp Trend, then there's no horizontal information exchanged among Revenue IQ users in that instance.

Isn't there -- is that correct?

A.    But the information exchange is not tied to the Comp Trend Rule, rather, the information exchange is the basis for the availability of the data that's needed to calculate the Comp Trend Rule.

The Comp Trend Rule itself isn't an information exchange, it's a feature of the Revenue IQ algorithm.

Q.    And is it your position that non-Revenue IQ users are part of that agreement to exchange information?

ATTORNEY PIERCE:  Objection, calls for a legal conclusion.

THE WITNESS:  Yeah, I'm an economist, I cannot speak to legal issues around agreement.

What I was saying earlier are characteristics of how prices in the market

consequences of raising the price are lesser because they are -- there's less availability of other lower-priced units.

BY ATTORNEY SCHAPER:

Q.    Okay.  So, in the analysis that you just described, isn't market share a relevant factor in whether Yardi and the landlord defendants would be able to effect the collusive scheme that is alleged by plaintiffs?

A.    It matters what sort of substitution exists between different landlords, because the renters are going to compare, like, the prices of different units in the market.  However, for this report, I wasn't asked to define a relevant market and, you know, I would do so in the next stage of the analysis, but here I cannot talk about market share.  And that would depend on defining a relevant market.

Q.    Just in terms of the economic literature, would you agree that, to raise market-wide rents in a sustained manner, economic theory indicates that the allegedly coordinating group must have sufficiently high

Modern Industrial Organization text?

A.        Sure, that's a textbook in the literature.

Q.        And are you familiar with the part of that text that says that if cartel members have a small share, then firms outside the cartel can lower the price to undercut the cartel?

A.        It really depends on the specifics of the market.  But I don't disagree that market share matters and that it's easier to raise prices to a greater degree in most models typically in theory when you have a higher market share.

Q.        But that's not something you tested in your report?

A.        It is not, because I wasn't asked to define a relevant market here.

Q.        Did you communicate to counsel that market share is a relevant factor in the ability of a collusive scheme to be durable?

A.        Again, I wasn't asked to define a market and, therefore, I couldn't calculate a market share, you know, since I didn't define markets.

buildings, for example, you know, that just

says national share of buildings.  We would

want to know is something about relevant

market share.

BY ATTORNEY SCHAPER:

    Q.    But you would agree with me that,
as depicted in this Figure 3 in this article
that you cite in your report, that Yardi's
share of algorithmic pricing adoption by
software is in the low single digits.

    Is that correct?

    ATTORNEY PIERCE:  Objection,
document speaks for itself.

    THE WITNESS:  I'm reading here
that the Y axis is the share of buildings.
And in this Figure 3, in this document, the
share of buildings that is priced by Yardi is
in the low single digits.

BY ATTORNEY SCHAPER:

    Q.    And if you look at the same
article, if you look at Page 11, Professor, if
you look about two-thirds of the way down the
page, you see the paragraph that starts
"Figure 3"?

    A.    Yes, Figure 3, yes.

Q.    So, if you looked at Yardi's market share within a relevant geographic market and it was in the one to two percent level that this paper finds, then you would agree that, with such a small market share, it would be difficult or near impossible for the alleged collusive group to raise market-wide rents?

A.    That's a hypothetical.

As I was saying earlier, there is no, you know, minimum threshold that is a bright line in economics regarding such collusive schemes and, in particular, it really depends on market structure.  And I cannot speculate further, but I want to note that when RealPage is also present in the market, that has an effect on the pricing scheme and potentially the ability to coordinate pricing.

But this is an analysis I would perform, you know, in a next step should we get there.

Q.    But it's your view that with a market share as low as two percent in a relevant market, it's still possible that

there would be a plausible collusion scheme among Revenue IQ users in Yardi.

Is that your testimony?

A.    Under the relevant circumstances, the relevant sort of market structure, this could happen.  Whether it does happen, you know, that's something that, you know, we want to look at the data a little bit more.

Now, in my report I already show data that's consistent with such coordinated price outcomes.  But if we want to link it to market share, then I need to define the relevant market, calculate that market share, and understand the structure of the market, including other players like RealPage in particular.

Q.    Besides the presence or absence of RealPage, are there other elements of the structure of the market that would be relevant to the question of whether a market participant with a two percent share could plausibly and durably have an anticompetitive conspiracy with its customers?

A.    There is probably a number of elements.  Having, having not yet done the

BlueBear Reporting LLC

assessment?

A.     I am using his work, you know, and my analysis is based on his work, which, you know, is a peer-reviewed article.  I have no reason to, you know, mistrust it.

Q.     Okay.  Professor, I'd like to talk a little bit about some of the health rules in Revenue IQ.

A.     Um-hmm.

Q.     One of those is availability.

Correct?

A.     Yes.

Q.     And I'd ask you to look back if you still have the Yenikomshian material.

A.     Yes, I do.

Q.     If you could reference back to that at Figure D.44 at Page D-118.

A.     One moment.

I also want to look back in my report to where I talk about this thing to make sure I give a coherent answer.  So, Page 102 in my report.

Okay.  Yes, Figure D.44.

Q.     Okay.  You see that this is a screenshot of the Revenue IQ user interface

showing configuration for individual health rules?

A.    Yes.

Q.    And in preparing your report, did you review the Revenue IQ user interfaces?

A.    I have looked at the number of screenshots that resemble this one.  In fact, I included some in my own report.

Q.    Okay.  So, what -- what's your understanding of what each of these rows represent?

A.    So, there seems to -- so, we can see here some minimum/maximum percent and the rent change multiplier, which we've encountered before in another exhibit that you showed me, and, you know, this is something that I knew about.

So, you know, clearly there's a minimum and maximum there as well.

Q.    And so if, in the far left-hand column, a user is choosing whether to enable -- a user is choosing whether to enable one of the health rules, correct?

That's the left-hand drop-down menu?

A.    Right.  It looks like it there, picking each one of them.

Q.    And then do you agree that that is not the end of the choices a Revenue IQ user makes, they also need to make choices beyond that as to unit percent min, unit percent max, rent change multiplier and active status?

A.    So, first of all, I would want to know, and I don't know this fact, whether, just like with the, with the trend rules, there are some default settings on that, in which case you could change it, but you don't have to.

But, otherwise, certainly it looks like they would be able to change it.  I don't know that they have to change it, especially once you set it once, I suppose you could just leave it the way it is.

Q.    Okay.  I think in your report, you provide the statistics -- the statistic that 62 percent of Revenue IQ users have the availability health rule enabled.

Is that right?

A.    Yes, that's in Figure 40, Page

103.

Q.    Okay.  So, 62 percent are using that rule and 38 percent are not.

Is that right?

A.    Yes.

Q.    And then for the 62 percent who are, they need to make decisions as to these other variables that are in what we're looking at, Figure D.44 in Deposition Exhibit 3.

Is that right?

A.    As I said, if there's a default, then they can leave it there, if there is. And, otherwise, you know, they can set it as they decide to do so.

But I think that it's important to note that there are, you know -- Mr. Yenikomshian shows many configuration changes, as we discussed earlier, and this is, this is, you know, one of the configurations that people use.

The question is, you know, what does that do to ultimately the ability -- the economic question is what does that do to the ability to coordinate prices down the road.

Q.    Do you know what unit percent min

BlueBear Reporting LLC

and unit percent max do?

A.    Actually, I'm not sure.

Q.    Do you know what rent change multiplier does?

A.    Yes.  I think that one is a multiplier, I believe, without hundred percent certainty, that is a multiplier, like once we decided, like, from first step, if we, let's say, raise rent, then there's a certain percent step of that.  And then the multiplier, I believe, makes it even bigger than that multiplied by this multiplier.

I'm not a hundred percent sure, but that's what I recall that that's the way it works, as I recall.

Q.    Do you have an understanding of whether a client can configure more than one health rule at the same time?

A.    Yes, they can.  But most of them only -- by my Figure 40, Page 103, most of them only use the availability rule.  There is some usage of some of the others, and they can certainly use all of these rules.

Q.    So, going back to D.44, and as you pointed out, availability is the most

commonly used health rule, would you agree that if two Revenue IQ users each are enabling the availability health rule, that how that rule is implemented will depend on what figures the clients enter in the other parts of this chart, namely, min percent -- unit percent min and unit percent max and rent change multiplier and active status?

A.      So, the ultimate result for those who enable it, which is about 60 percent, as we said, will depend on these numbers which might be fixed to a default rule, I have no information one way or the other, but it's certainly possible.

And then it will also depend on, you know, all the other configurations.  But what matters is sort of what's the end result in terms of how that affects prices and whether -- so, basically, each -- while each client might choose their own configurations, in the end, does that lead to independent pricing is the economically relevant question.

And that's what I don't -- I find that the evidence and the data is consistent with parallel pricing rather than independent

pricing whereby each landlord might respond to their own idiosyncratic tastes and change in demand conditions and so on and so forth.

So, I think, economically, again, while there are many knobs one could turn, first of all, we show that many landlords use the same ones and, furthermore, the end result is that we have parallel pricing.  And so I think that's the economically relevant fact for the question at hand.

Q.    Did you analyze, staying with this Figure D.44, did you analyze the extent to which Revenue IQ users are using the same values for unit percent min and unit percent max and rate change multiplier?  Did you investigate that?

A.    While I did not investigate if they used the same value, I looked at the final pricing and analyzed the impact of the algorithm used and its rules on final pricing.

Q.    In your view, Professor, does the availability health rule, does that measure supply and demand?

A.    The availability health rule seems to be related to supply and demand

that we see is, for example, documents like Figure 57, which is on Page 141, where a change, a positive change relative to benchmark is green and a negative change is red, so, you know, that's usually per usual color coding, green is good.  So, that means that increasing the rate relative to benchmark is viewed as a good thing.

And, you know, I could cite other evidence that is consistent with this general position taken by Yardi that, generally speaking, rents above benchmark are a positive thing and rents below benchmark are no good.

ATTORNEY PIERCE:  Go off the record.

THE VIDEOGRAPHER:  Time is 2:13 p.m., we are going off the record.

(Recess is taken from 2:13 p.m. until 2:30 p.m.)

THE VIDEOGRAPHER:  Time is now 2:30 p.m.  We're back on the record.

ATTORNEY SCHAPER:  Just for the record, move to strike the last answer.

BY ATTORNEY SCHAPER:

Q.      Professor Marinescu, are you

familiar with the concept of effective versus requested benchmark sets?

        A.      Yes.

        Q.      And you understand that requested benchmark -- well, strike that.

                What's your understanding of how those terms are used?

        A.      The requested benchmark set is what the client wanted to have in their benchmark set.  And sometimes there is no data, for example, on some of the properties that the client wanted and so the effective benchmark set is, you know, a set of data that Yardi actually uses where there is data, and also that there are enough properties to aggregate, you know, so that they can get the benchmark.

                So, there's a -- there can be a difference, depending on data availability, between what the client requests and what is actually in the benchmark set.

        Q.      If you would look at Page 152 of your report, do you see that the header for Section 7 -- strike that.

                You say in the second bullet of

Paragraph 395, "Yardi structurally requires that clients' benchmarking comp set include the properties' Revenue IQ uses for the Comp Trend Rule."

Do you see that?

A.    Yes.

Q.    Is it your view that including comp properties in the benchmark set is part of the mechanism that allows alleged monitoring of Revenue IQ pricing output adherence?

ATTORNEY PIERCE:   Objection calls -- objection to the extent it calls for a legal conclusion.

THE WITNESS:   The benchmarking plays a role within the system in terms of the output of Revenue IQ, and so the benchmarking does contribute to Revenue IQ's ability to raise prices.

BY ATTORNEY SCHAPER:

Q.    But I'm just trying to understand the mechanism by which you're suggesting that that happens.

It says that it's requiring clients' benchmarking comp set include the

properties' Revenue IQ uses for the Comp Trend Rule.

Is that right?

A.    Yes.

Q.    So, just so I understand the mechanism that you're suggesting, part of it is that there are comp -- Revenue IQ comp properties that are included in a benchmark set.

Is that accurate?

A.    My understanding is that all of the properties that are in the comp, in the comp for the Comp Trend Rule are also included in the benchmark set for a particular landlord.  I think there are some minor exceptions that I address somewhere in the report, but it's like essentially all of them.

Q.    Okay.  And can you explain how inclusion of comp properties in the benchmark set allows a client to monitor Revenue IQ price adherence?

A.    So, the -- when -- so, we have to look back at the role of TAMs and benchmarking.  So, the -- we talked about the Comp Trend Rule already today.  So, that, by

itself, pushes landlord to follow along with the pricing of the comps.

And so we -- the TAMs overwhelmingly point out when the landlords are pricing below benchmarking and thereby implying that prices should presumably be increased.  But now the landlord might think, well, you know, I'm being told that my price is below benchmark.  Who knows if that's the case?

So, now they can see with their own eyes that, in fact, their price is below benchmark and, therefore, have more confidence in following the advice of TAMs to increase prices.

And after -- let's say, they increase prices, which I show is likely to happen after TAM call.  So, then they increase prices, and remember the comp set rules means that whatever I do, my competitors tend to follow, all other things being equal.

So, then, if I increase my price, looking at my benchmarks and below, I increase my price, then all the people in my comp set are going to increase their price through the

Comp Trend Rule.

So, it propagates the price increase to others.  Again, if you only consider Comp Trend rule.  This might not be an absolute depending on how other rules play, but through the Comp Trend Rule, it would propagate the price increase.

Q.    You mentioned earlier that if data is missing for a particular benchmark property, then that benchmark property won't contribute data to a KPI.

Is that right?

A.    Yes.

Q.    And that would be true for Revenue IQ comp properties that are part of a benchmark set, that if there wasn't a particular data point available, then that comp property wouldn't be contributing any data to that KPI.

Is that right?

A.    Yeah, if we don't have the data, it can't be in the benchmark.

Q.    Did you analyze the extent to which comp property -- strike that.

Did you analyze the extent to

which Revenue IQ comp properties actually contributed data to the benchmarking KPI outputs that you reviewed?

A.    Sorry, say that again?

Q.    Did you analyze the extent to which Revenue IQ comp properties actually contributed data to the benchmarking KPI outputs that you reviewed?

ATTORNEY PIERCE:  Objection, vague.

THE WITNESS:  As I said by what you just read, the -- all the properties that are in the comp are also in the benchmark. So, therefore, they contribute data to the benchmark kind of by definition of them being in that benchmark.

BY ATTORNEY SCHAPER:

Q.    Yes.

And I'm asking whether you analyzed the extent to which Revenue IQ comp properties contributed data to benchmarking KPIs you looked at?

ATTORNEY PIERCE:  Objection, vague.

BY ATTORNEY SCHAPER:

Q.      Not just whether they did, but the extent to which they did.

A.      Let me refresh my memory. I believe we said something about that, but what the analysis showed there.

So, I cannot recall right now where that is in the report or hundred percent sure that is in the report, but I believe I've seen evidence that the comps are significant part of the benchmark. You know, there, as I said, there could be other properties beyond the comps. I think I said that. So, you know, but the comps appear to be typically a significant part of the benchmark.

Now, I will say I don't remember where I wrote that, so, apologies, because it was not in an exhibit, so it's kind of hard to figure out in context.

Q.      Professor, in -- on Page 154 of your report, if you look at Paragraph 402.

A.      Um-hmm.

Q.      You state that benchmarking reports, quote, "give clients substantial visibility into their rivals' pricing and price structure."

Correct?

A.    Um-hmm.

Q.    What do you mean by substantial visibility?

A.    So, as this paragraph says, the property in the comp set are always included in, 99 percent in the benchmark.  And because I see the average price of the benchmark and other details about pricing for these benchmarks, I can tell on average what my competitors are doing because they're included in the benchmark.

Q.    But you don't mean visibility into any specific competitor's price.

Correct?

A.    I mean visibility on the average of competitors.

Q.    Okay.  So, just to be clear, you do not mean visibility into any specific competitor's price.

Correct?

ATTORNEY PIERCE:  Objection, asked and answered.

THE WITNESS:  I, I mean average of competitors.  And I would like to add that

economic theory that I discuss in Section 3 says that when we are dealing with a mediated collusion structure, as is alleged here, it is often in the best interest of colluding firms not to reveal the full information about others.

And the reason is that if you told me the full information about some other competitor's prices, I could be tempted to undercut them. And so it's shown in a number of models that it can be more advantageous to only communicate with the full detail with the mediator and then the mediator can communicate, perhaps aggregates or, you know, less information back to the conspirators and that that's the best structure in many cases to sustain a conspiracy.

BY ATTORNEY SCHAPER:

Q.    Does benchmarking information at Yardi provide information at the unit type level?

A.    So, I'm looking at Figure 66, Page 157, which shows an example of benchmarking. And we see that it is defined that the property level is what I'm reading

from; because it says, "property KPI summary," and we have a number of different benchmarks that we see here.

And, you know, we can see that some are marked as positive green, yay, for example, does that increase rent more, and some of them are negative here in the sense that, for this particular property, the renewal rent growth was lower than benchmarks. So, that was not good, according to this exhibit.

Q.    So, when you're talking about property level, that would mean, for example, all those studios, one-bedrooms, two-bedrooms, whatever layouts a property has, all combined into one?

A.    That, it's my understanding, that they take it at the property level, based on this document.

Q.    Do you dispute Mr. Yenikomshian's conclusion that, for new lease rent benchmarking, the median average deviation between the underlying KPI inputs and the corresponding KPI outputs was nearly 12 percent, or $205.85?

A.    I have not looked at that number, but, you know, I -- I'm not quite sure what the relevance of this is.

Q.    Okay.  Well, I'll just -- you did, you say, review Mr. Yenikomshian's report?

A.    Um-hmm.

Q.    So, if you would look at that, if you still have it handy.

A.    Yes.

Q.    If you would look at, starting at Paragraph 166.

ATTORNEY PIERCE:  I think it's Page 198.

THE WITNESS:  I got it.  Let me read it.

(Pause.)

Okay.  Yes.

BY ATTORNEY SCHAPER:

Q.    I guess maybe looking more specifically, that's where it starts, but at Paragraph 169 on Page 100 of this Exhibit 3 --

A.    Yes.

Q.    -- Mr. Yenikomshian says, "I conducted this analysis on all new lease rent

per unit benchmarking KPI outputs contained in the CPD, KPI data, and then applied the fourth step to select the median MAPD value. The median average absolute deviation between the underlying KPI inputs and the corresponding benchmarking KPI outputs was $205.85 or 11.9 percent."

Do you see that?

A.   Yes.

Q.   You don't dispute that figure in your report.

Correct?

A.   I would like to speak to the economic relevance of this figure.

Q.   Okay.  Sorry, but just before you get to that, can you just answer my question of -- to confirm that you don't dispute the actual figure in your report?

A.   I have not --

ATTORNEY PIERCE:  She was answering your question.  She can answer your last question.

BY ATTORNEY SCHAPER:

Q.   Go ahead.

A.   I have not independently

recalculated this figure and I have, in that sense, no basis to confirm or disconfirm. But I am happy to take it for what it is and explain what -- my analysis of what it means.

Q. And in this same line of analysis of Mr. Yenikomshian, Paragraphs 172 to 174, and 173, I'll direct you to that specifically, the bottom half, he states, "The range between the minimum and maximum KPI inputs is on average 62.5 percent, median, 39.2 percent of the benchmarking KPI output."

And am I correct that you didn't independently evaluate that or dispute that in your report?

A. I did not independently evaluate this.

Q. Going back to your report, in Paragraph 395, in this section, you say that benchmarking helps clients identify, quote, "what the market may bear in the way of rents," closed quote, and, quote, "allows them to strategically increase prices," closed quote.

Is that part of this analysis of yours?

A.      Yes.

Q.      Okay.   Benchmarking reports do not identify which specific properties out of a client's total benchmark set contribute to a particular KPI.

Correct?

A.      It does not.   But we do know that it includes the comp of that particular property when the property uses Revenue IQ.

And, also, I want to point out that this benchmarking data averages over a number of properties and, as Mr. Yenikomshian has shown, these other properties might have a range of KPIs, but that is still really useful market information for the landlord when they're looking to raise prices.   If they see that they're below benchmark, they can raise prices with more confidence to raise the benchmark, especially when indicated by TAMs or told by TAMs that they are pricing below benchmark.

Q.      Do you recall Mr. Yenikomshian's analysis that the average number of properties in the requested benchmarked sets of Revenue IQ users is about 29?

A. Where is that?

Q. Paragraph 147. I think the figure might be in Note 265.

ATTORNEY PIERCE: I believe it's going to be Page 89.

THE WITNESS: Thank you.

Yes, I see that. It says, "I found the benchmark sets requested by clients obtained an average of 29.2 properties."

BY ATTORNEY SCHAPER:

Q. And, again, that's not something that you independently are disputing.

Correct?

A. I have not re-analyzed this.

Q. So, it's correct that when a client receives a benchmarking report, it has no way to know which of those average of 29 properties actually contribute information to the benchmarking report.

Correct?

A. I think you mean they don't know which specific properties contribute to the benchmarking report.

Q. Correct.

A. So, if there's a number of

A.     Market, I meant comps; you know, whatever the client considers to be, you know, useful comparisons in the market.

Q.     And you mean the benchmark set, you're not referring to just comps from Revenue IQ.

Are you?

ATTORNEY PIERCE:  Objection, form, vague.

THE WITNESS:  So, I think we established that in the benchmark set, we have all the comps plus potentially some other properties, and these are meant to be relevant, informative properties for the clients to be able to determine their pricing strategy.

BY ATTORNEY SCHAPER:

Q.     You agree that these benchmark figures are aggregated and anonymized.

Correct?

A.     The benchmark, the benchmark KPIs are aggregated and anonymized; however, there is no necessity to get de-anonymized data in order to be able to increase prices, because, as I was explaining, the fact that we're able

to check that, I am saying we, imagine I were the landlord, that we're able to check that we are below the benchmark is very useful for me as a landlord to know that I could go higher.

And, you know, given that I'm being told by the TAM that, you know, you're below benchmark and, therefore, presumably there might be an opportunity to increase price, and given the way that the logit goes, you know, with the benchmarking, we send a thumbs-up if your price grows more, you know, that's sort of the mechanism through which I am feeling more comfortable raising prices as a landlord.

Q. If you would look at Paragraph 397, you write that landlord defendants would only share their data for benchmarking if they expect, quote, "participating firms will use it to their benefit and, in particular, to collectively increase prices."

Correct?

A. Yes.

Q. Okay. And when you say "participating firms," what firms are you

referring to?

A.    So, here, because we are talking about benchmarking, this could include, you know, any firm that participates in benchmarking.  But, strictly speaking, you know, given that I'm referring here to the economic theory, so there is a distinction between the theory which really talks about one, you know, collusive group and sort of analyzing the strategy of that collusive group in the theory.

And here we have landlords in benchmarking who, you know, use, some use Revenue IQ, some may not, so it's mixed in there.  However, the theory directly speaks to the element of it that talks about co-conspirators.

And so here, therefore, I am sort of abstracting and I'm talking abstractedly about purported, you know, collusive pricing scheme and how, you know, these participants to this pricing scheme in the theory, and sort of that helps us understand what's going on in the data, might think about whether they'd want to share their data.  And that, you know,

generally, you wouldn't want to share your data if you would expect your competitor to use it to undercut you.

So, you know, you must have a reason to share it and, in particular, the expectation that we'll all use it to collectively increase prices.

Q.    And here the alleged co-conspirators in the Plaintiff's Complaint are other landlords who are using Revenue IQ.

Correct?

A.    Yes.

Q.    Have you -- strike that.

If you would look at Page 53 of your report.

A.    Um-hmm.

Q.    Paragraph 53 of your report.

A.    Not Page 53?

Q.    Sorry, that's my error.

ATTORNEY SCHAPER:  Thank you, Ms. Monaghan.

ATTORNEY PIERCE:  It's on Page 25.

THE WITNESS:  Yes.

BY ATTORNEY SCHAPER:

Q.      You make a reference that describes comp sets and benchmark sets as purposefully aligned.

Is that right?

A.      Yes.

Q.      Have you analyzed what percentage of Revenue IQ clients' benchmark sets are made up of other Revenue IQ clients?

A.      I have not, but I seem to recall that this was somewhere in Mr. Yenikomshian's analysis and that maybe we cite it, but I don't recall for sure.

Q.      You haven't done your -- an independent analysis of that question?

A.      I, I don't think so.

In fact, I would like to add that if you look at Mr. Yenikomshian's report, Paragraph 150 --

Q.      Sorry, where are you looking, Professor?

A.      Yes, Paragraph 150, Page 90.

So, we can see there that the effective benchmark set contained an average of nine properties.  So, earlier we were discussing that originally there were 23 --

29, sorry, it says in the same paragraph, selected, but in the end, the average is over a relatively small number of properties. And we know that all of the ones in the comp set are going to be in there.

So, in that sense --

Q.    But we don't know that all of the ones in the comp set have data to contribute KPI -- data to contribute to a particular KPI.

Correct?

A.    So, you know, I believe that if they are in Revenue IQ, if they are in the comp set and they are in Revenue IQ, then they must be contributing data to the KPI.  So, I think that's something that probably we can say.

So, if there's a property in my comp set that uses Revenue IQ, then it surely has that.  So, at least for those, I believe, that for those that do use Revenue IQ, then they are in the data.  And there's a relatively small number of properties, so it's certainly possible.  I'm not saying that you can't de-anonymize, I want to be clear about that.

However, the benchmark does speak to, you know, to the extent that I have other Revenue IQ users in the comp set, it, you know, quite directly speaks to what they are pricing right now.

I am not saying you can't de-anonymize, just that, you know, it's an average of a small number.  And, in that sense, should my comp set include many Revenue IQ users, then, you know, the pricing I'm seeing in the KPI would be highly influenced by those users.

Q.    This part of your opinions, in terms of how a benchmarking set might be used for an anticompetitive scheme because it includes the information of other Revenue IQ users in the benchmark set, that would depend on what the actual data show as to the percentage of any particular benchmarking effective set that is made up of other Revenue IQ users.

Correct?

ATTORNEY PIERCE:  Objection, mischaracterizes testimony.

THE WITNESS:  No, I did not say

that.  In fact, as we've had this prior conversation earlier today about this issue, you know, we have an integrated system here, and a key role of the benchmarking is to give clients confidence in raising prices when they are below benchmark.

And, in that sense, you know, if the benchmark includes other properties that don't use Revenue IQ, as I argued earlier, if they are all in the same market and competing with each other, then their pricing is also indirectly influenced by Revenue IQ.  And this is how the benchmarking can help clients raise prices when they are below benchmark.

BY ATTORNEY SCHAPER:

Q.    Is it your position that benchmarking can be used in an anticompetitive way even when it cannot be disaggregated and de-anonymized to reveal the actual prices charged by a landlord on any given day?

A.    It can --

ATTORNEY PIERCE:  Objection, calls -- to the extent it calls for a legal conclusion.

THE WITNESS:  The economic theory

I have analyzed suggests that you can use even public data to collude, so you don't need, you know, the particular data of the competitor in order to instigate a price-raising collusion. And I discuss that in my Section 3 of my report.

And, specifically, in, let's see, Section 3.1.2, Page 39, I explain that pressing algorithm can sustain collusion without non-public data.

So, you know, they can, in fact, all use a certain price, for example, to anchor on.  And that could be the one in the benchmarking set.  Nobody said it has to be private or it has to necessarily include the prices of the exact other colluding firms.

BY ATTORNEY SCHAPER:

Q.    I'd like to turn your attention to Page 148 of your report, Professor.

A.    Um-hmm.

Q.    And in Footnote 242, you cite "Federal Reserve economic data for consumer price index for all urban consumers for rent of primary residents in the U.S. city average."

pandemic?

A.    We -- I have also in my analysis in Section 9, in the econometric analysis, that has the most controls, we also ran a first different specification with both time and unit fixed effects.  So, that controls for differential rent increases that occurred at different points in time, and also for, allows for different units to have their different average rent increase overall.  So, some units, again, might tend to increase prices more than others.

Additionally, we control for growth rate of prices during every year, including COVID-19, and still, in that analysis, we find, which is probably one of the core tables in this whole analysis, that the more landlords are using Revenue IQ, and the higher the prices go.

Q.    Now, looking at Page 242 --

A.    Yes.

Q.    -- and this Figure 101, are you asserting that what this figure reflects shows causal effects?

A.    I am not saying that this simple

descriptive figure shows causal effects.  It is simply consistent with the fact that we see that, you know, the Yardi lease price index tends to roughly follow CPI in the early part of this figure.  And then, as the number of total unit count that Yardi is -- has priced, as this unit count increases, then prices start to diverge from the rent CPI.

And I think this divergence is really important, because if you, if you didn't have the CPI and were just looking at the Yardi index and just with this figure, you know, you could be concerned about something like COVID-19.

But we are comparing, again, the CPI versus Yardi and noticing that the two diverge; so, namely that Yardi is starting to price more and more above CPI as the number of landlords that use Yardi increases.

Q.    If you would turn to Page 175 of your report, please.  Do you see Figure 76, you have the label or the title of the figure, "Across Only Overridden Landlord Defendant Active Lease, Transaction Prices Only Deviate 6.95 Percent from Revenue IQ's Recommended

for the average renter would be economically

significant?

A.      That could be important for the

renter, but we're not analyze -- the focus

here isn't the welfare of one individual

renter, you know, and we've seen that this is

the minority of cases where there is a

deviation.

We are focusing on the overall

ability of Yardi's pricing suites to

coordinate prices.  And so when you look at it

from that perspective, what you see, again, is

that in 70 per -- more than 70 percent of

cases, there is perfect adherence to the

recommendation.  And other analyses that we

mentioned before shows parallel pricing and

increases in pricing that are stronger the

more landlords use Yardi.

Q.      And you've spoken about over

75 percent -- sorry, strike that.

If you look back at Paragraph 459

on Page 172 of your report, you express some

disagreement with Mr. Yenikomshian's figure of

27.8 percent of lease transactions have an

override --

A.      Um-hmm.

Q.      -- and you say it's more like 22 percent.

Is that right?

A.      Yes.

Q.      And I think you observed that the difference between his 27.8 percent and your 22 percent is that Mr. Yenikomshian takes into account rental concessions.

Is that right?

A.      Yes.

Q.      And in Mr. Yenikomshian's report, he identifies, when he classifies deviations, he says, "Deviations include both overrides and concessions."

Do you recall that?

A.      I don't recall that, but --

Q.      Okay.

A.      -- that seems coherent with the discussion here.

Q.      And you would agree that a rental concession is a form of deviation from the Revenue IQ pricing output.

Correct?

A.      What my analysis is looking at

here is the total all-in-all price including the concession.  And the point is that, you know, that total all-in-all price, you know, is more likely to be consistent with the recommended Revenue IQ price than just the pre-concession price.

And I think, you know, I think that that's a better way of looking at it. But, you know, different people might disagree.  I do feel like, you know, the final price is really -- I mean, we're talking about what matters to the renter, whether it's concession or whatever it is.  In the end, the final price is important.

And so that's -- the adjustment is to look at the final price.  And it seems like there's even less deviation there, but, you know, even if you take Mr. Yenikomshian's number at face value, deviations are fairly limited.

Q.    But your analysis does not account for the number of times concessions were given to renters.

Is that correct?

A.    It's not the number of times.

We're looking at the final price concession included.  And this seems to, you know, make it so that the final price is more, is more like the initial Revenue IQ recommendation.

Q.    Are you aware of the extent to which the plaintiffs in this case were given rental concessions?

A.    I am not.

ATTORNEY SCHAPER:  All right. We've been going for a while.  Why don't we take a short ten-minute or so break.

THE WITNESS:  Sounds good.

THE VIDEOGRAPHER:  The time is now 3:16 p.m.  We are going off the record.

(Recess is taken from 3:16 p.m. until 3:31 p.m.)

THE VIDEOGRAPHER:  The time is now 3:31 p.m.  We are back on the record.

BY ATTORNEY SCHAPER:

Q.    Professor Marinescu, in your own academic work, you've written about cleaning data to reduce the impact of outliers and errors.

Correct?

A.    Probably.

ATTORNEY SCHAPER:   Let's mark this document as Exhibit 5.

(Exhibit No. 5, "Opening the Black Box of the Matching Function: The Power of Words," by Marinescu and Wolthoff, was marked for identification.)

BY ATTORNEY SCHAPER:

Q.     And Exhibit 5, Professor, do you recognize that as an article titled "Opening the Black Box of the Matching Function:  The Power of Words," that's co-authored by yourself and Ronald Wolthoff?

A.     Yes.

Q.     And this was written in 2020.

Is that right?

A.     Published in 2020, yes.

Q.     Okay.  Was part of the work that went into publishing this article that you were working with data?

A.     Yes.

Q.     If you could turn to Page 544, Section 3 is about the data that you used in this, in this analysis.

Is that right?

A.     Yes.

Q.      And if you turn to Page 546, starting in the middle of the page, there's a discussion on, quote, Cleaning, closed quote.

Correct?

A.      Um-hmm, yes.

Q.      And it says, the last sentence of that first paragraph says, "To reduce the impact of outliers and errors, we cleaned the wage data by removing the bottom and top 0.5 percent."

Do you see that?

A.      Yes.

Q.      If you turn back to your report, I'd just like to look at some of your figures and tables starting with Figure 4.

A.      What page?   I guess you're getting it.

Q.      Figure 4 is on Page 24.

A.      Thank you.

Q.      And I'm going to ask you a series of questions about some of your analyses --

A.      Um-hmm.

Q.      -- and confirm that, starting with Figure 4, that this figure and analysis depends on the Yardi lease price index.

Is that correct?

A.    Yes.   The Yardi lease price index is in it.

Q.    And if you look at Figure 7, which is on Page 31 of your report --

A.    Yes.

Q.    -- is it correct that Figure 7 also relies on the Yardi lease price index?

A.    Yes.

Q.    If you jump ahead to, quite a ways to Figure 62, on Page 148 --

A.    Yes.

Q.    -- am I correct that this Figure 62 also relies on the Yardi lease price index?

A.    Yes.   This is actually I believe the same figure that's reproduced in the beginning that we were looking at.

Q.    Okay.   And if you look at Figure 88, jumping ahead further, and that is on Page 196, Figure 88 also relies on the Yardi lease price index.

Is that right?

A.    Figure -- what page did you say?

Q.    I'm sorry, Figure 88, Page 196.

A.      196.

Yes, these are the figures that were copied in the beginning, so, actually, if you don't mind, let's look at those, because it has a footnote that explains, you know, more about the data.

Q.      Okay.  I'm just -- I just want to cover at a high level to make sure --

A.      Yes.

Q.      -- we're on the same page.

This Figure 88 relies on the Yardi lease price index.

Is that right?

A.      Yes.

Q.      And on the next page, Page 197, Figure 89 in your report also relies on the Yardi lease price index.

Is that right?

A.      Yes, it looks -- I mean, this is the Yardi -- yes, it relies on it, it's the difference between the Yardi index and the rent CPI, yes.

Q.      And then Figure 95 on Page 216 --

ATTORNEY PIERCE:  Do you want to go off the record?

THE VIDEOGRAPHER:  Off the record, the time is now 3:36 p.m.  We are going off the record.

(Pause.)

THE VIDEOGRAPHER:  The time is now 3:38 p.m.  We're back on the record.

BY ATTORNEY SCHAPER:

Q.    Okay.  Professor, I think we were up to Page 216 and your Figure 195.

Do you see that?

A.    Yes.

Q.    Does your analysis in Figure 95 depend on the Yardi lease price index?

A.    It does use the Yardi index.

Q.    And then if we look at your Table 2 on Page 150 --

A.    Yes, I see that.

Q.    -- does Table 2 depend on the Yardi lease price index?

A.    So, I think -- let me look.  I believe Table 2 is not an index, but is looking at the effective price for landlord defendants.  Let me see.

It does seem like this is also an index, but now it's property level.  Yes.

Q.    Okay.  But this includes information that was calculated using the Yardi price index.

Correct?

A.    Well, it's for each property, the index for that specific property.

Q.    Okay.  And if you look at Table 5 on Page 199.

A.    I'm trying to keep it all together here.

Yes.

Q.    This Table 5 depends on the Yardi lease price index methodology.

Correct?

A.    Yes, the Yardi index premium, so, yes.

Q.    And then if you look at the next page, Table 6, this analysis also depends on the Yardi lease price index methodology.

Correct?

A.    Yes.

Q.    So, the reliability of your Yardi lease price index is important to several of your central opinions in your report.

Is that correct?

A.    I've used it multiple times, yes.

Q.    And if your Yardi lease price index is materially affected by unaddressed, implausible or outlier rent values, conclusions based on your Yardi lease price index could be materially affected.

Correct?

ATTORNEY PIERCE:  Objection, assumes facts not in evidence.

THE WITNESS:  The conclusions could be affected, but without looking at the specifics of those values and, as I discussed earlier, it really depends on how many observations there are relative to those outlier values.  We cannot say exactly what the direction or the size of the impact would be.

BY ATTORNEY SCHAPER:

Q.    Okay.  But you said that the conclusions could be affected?

A.    Could be affected.

Q.    And that would include your TAM oversight opinion drawn from Figures 4 and Figure 62.

Is that correct?

A.      Well, so to the, to the extent that there are outliers that affect these numbers, analysis could be affected; however, I would like to look at specific analyses because, in some cases, some of the ways that the analysis is performed is more robust to outliers than others.

And so, you know, again, the extent of the effect depends on the specific analysis.

Q.      Okay.  Just, similarly, if your Yardi lease price index is materially affected by unaddressed gaps in rent observations over time for the same unit, then conclusions based on your Yardi lease price index could be materially affected.

Correct?

ATTORNEY PIERCE:  Objection, assumes facts not in evidence.

THE WITNESS:  So, in general, if you had changed the data that we used to do any analysis, the conclusions could be affected, but that doesn't mean that they are affected.

And in order to know that, we'd

BlueBear Reporting LLC

have to rerun the analysis in a number of different ways to double check robustness.

BY ATTORNEY SCHAPER:

Q.    Okay.  But among the analyses that could be affected, that would include your TAM oversight opinion in Figures 4 and 62.

Is that right?

A.    To the extent that those figures include the Yardi index and the Yardi index, you know, could take different values, then those conclusions might be affected.  But, again, we cannot say without reanalysis the direction or size of those effects.

Q.    Going back to Figure 89 in your report on Page 197.

ATTORNEY PIERCE:  You said Page 197?

ATTORNEY SCHAPER:  Yes.

THE WITNESS:   Yes.

BY ATTORNEY SCHAPER:

Q.    We talked about this a minute ago as a figure that could be affected by your Yardi price index.

Just to be clear, the title of

this figure starts "Yardi's Index Premium"?

A.    Um-hmm.

Q.    And is it correct that that Yardi index premium depends directly on your Yardi lease price index?

A.    Yes, because it's Yardi index minus rent CPI, so depends on the rent CPI and the Yardi index.

Q.    Okay.  And as we've been talking about for other figures, if your Yardi lease price index is materially affected by unaddressed outliers or missing values, the conclusions based on your Yardi index premium could be materially affected.

Correct?

ATTORNEY PIERCE:  Objection, asked and answered.  Assumes facts not in evidence.

THE WITNESS:  Any change in data could affect conclusions, but, again, conclusions don't have to be changed.  And, oftentimes, you see a change in magnitude, but it doesn't change the substance of the conclusion.

And, again, also as I explained,

I think in the very first round of questioning, whether some outliers should or should not be included is a matter of, you know, analysis and sort of relevance.  And so we have to understand more about those outliers before we make a judgment about whether or not they should be included.

BY ATTORNEY SCHAPER:

Q.      So, I want to look at some examples of records from the executed lease data set that you used to construct your Yardi lease pricing index.

Okay?

ATTORNEY SCHAPER:  If we could mark this as Exhibit 6.

(Exhibit No. 6, Excerpted Data from YARDI-DUFFY_00913149, was marked for identification.)

BY ATTORNEY SCHAPER:

Q.      So, Professor, I just handed you or you were just handed a document that's been marked as Exhibit 6, which I will represent contains data excerpted from YARDI-DUFFY_ 00913149, which is the data set that you cite in your report and that your backup code uses

to generate your Yardi lease price index that we've been discussing.

A.     Um-hmm.

Q.     For ease of presentation, columns not related to the calculation of your index have been omitted, just, for example, tenant ID, month grossly rent, concession amount and some others, just so we can fit text on a page.

You used lease data in YARDI-DUFFY_00913149 to compute your Yardi lease price index.

Correct?

A.     Yes.

Q.     Do you see that Exhibit 6 contains lease records for three separate units?

A.     Um-hmm, yes.

Q.     And for each of these units on Exhibit 6, it shows two lease records.

Correct?

A.     Yes.

Q.     And it corresponds to two different lease dates.

Do you see that?

BlueBear Reporting LLC

A.    Yes.

Q.    So, if we -- let's look at the first unit, which is Revenue IQ Unit ID 38687674.

Do you see that the first lease for this unit has a monthly effective rent of $1 as of November 1, 2023?

A.    Um-hmm, yes.

Q.    That's not a plausible rent.

Is it?

A.    Seems unlikely.

Q.    You've never seen an apartment rent for $1 a month.

Right?

A.    You never know.  There might be some special arrangement, but that, you know, again, but that seems unlikely.

Q.    So, even if that had been an actually charged rent, that would be an extreme outlier in rental price data.

Correct?

A.    It would be un --

ATTORNEY PIERCE:  Objection, vague.

THE WITNESS:  It would be

unusual, but we cannot completely rule out some special, you know, deal that happened for that month.

BY ATTORNEY SCHAPER:

Q.      Am I right that identifying this kind of outlier is what data cleaning is meant to remove from datasets?

A.      Well, you know, you would have to try to better understand where, you know, this outlier is, is coming from.  So, I would like to look at that.  And so, you know, that's, that's something that should be further investigated.

I will note that, you know, in some of the analyses -- give me one moment to look at my report here.  So, let's see.  I'm sorry, the report is slightly out of order, but I am managing this.  Okay.

I'm now looking at the Table of Contents because I want to discuss, so, for example, in Figure 86 --

Q.      What page are you on?

A.      Page 192.

Q.      Yes.

A.      -- so, if we look at that data

there, you can see, like, similar sort of time trends.  And so in that, in that data, my understanding is that that analysis relies on data from Yardi as well.

And, let's see, I believe there is some --

Q.    Just, Professor, Figure 86 doesn't relate to the Yardi price index that we've been discussing.

Does it?

A.    It is, however, relevant because the -- you know, if we're going to say that the Yardi price index might be missing something, if we're able to show that other data analysis that is done otherwise which would be a sensitivity test shows similar trends, I would argue that that's relevant to understanding the robustness of the index that we have been using.

Q.    Okay.  Can I, can I just focus your attention back on Exhibit 6, that's what is currently in front of you and the subject of the questioning?

A.    Yes.

Q.    So --

A.    Okay.  Go for it.

Q.    So, again, just focused on the first row of this Exhibit 6, where a property, it says, has a monthly effective rent of $1, you've already agreed that that's not a plausible rent.

ATTORNEY PIERCE:  Objection, mischaracterizes testimony.

THE WITNESS:  I didn't say that.

BY ATTORNEY SCHAPER:

Q.    Just a second.

Professor Marinescu, do you recall that a few minutes ago, I asked you a question focused on that $1 figure, "That's not a plausible rent, is it, question mark," and you gave the answer, "Seems unlikely"?

Do you recall that testimony?

A.    I said it's unlikely.  It's not the same as plausible.  Something could be rare and still a real data point.  That's not the same as implausible.

Q.    Okay.  So, just to be clear, you did not remove this $1 data point when you performed your analyses on -- that led to the Yardi lease price index.

Correct?

A.      Based on the notes to those graphs, I did not.   But I know that there is some other analysis where I did.   And that's what I'm currently trying to find.

But go ahead.

Q.      This kind of data point is the sort of outlier that data cleaning is meant to remove.

Isn't that right?

ATTORNEY PIERCE:   Objection, assumes facts not in evidence.

THE WITNESS:   As I explained during our first round of questioning this morning, whether a particular data point should or should not be removed depends on, you know, an understanding of what that data point refers to.   And so, you know, one would have to, you know, better understand what is behind these numbers before removing them.

BY ATTORNEY SCHAPER:

Q.      So, when you performed your data analysis that led to your report, including the Yardi price index, what did you do to investigate what was behind this $1 effective

rent figure?

A.    I do not recall.

Q.    You don't recall that you did anything.

Correct?

ATTORNEY PIERCE:  Objection, mischaracterizes testimony.

THE WITNESS:  I don't recall specifically investigating this specific data point.

BY ATTORNEY SCHAPER:

Q.    You agree that if you had applied the 0.5 percent approach that you and your co-author discuss in the paper that is Exhibit 5, that that would have removed this $1 effective rent data point, given how low it is?

A.    We don't know that for sure, but at least it's possible, because it's low, so, you know, in the bottom, it would have, possibly have been removed.

Q.    And the next lease for that same property, if you go back to Exhibit 6, the monthly effective rent changes to $2,554.58.

Do you see that?

A.      Yes.

Q.      And under your formula for this particular unit, the rent ratio in the first month of the new lease would be $2,554.58 divided by $1.

Is that correct?

A.      Yes.

Q.      And that produces a ratio of approximately 2,554.58.

Correct?

A.      Yes.

Q.      And that reflects over a 250,000 percent growth in rent in a single month.

Is that correct?

A.      If you take it, that's what the formula would indicate, yes.

Q.      Would a $250,000 -- strike that.

Would a 250,000 percent rent increase in a single month be consistent with ordinary market conditions?

A.      I would like to note that this is not a single month, but over, you know, a course of some, you know, number of months, because we're talking about, in the document,

I'm talking about the exhibit, we're going from November 2023 to 2024. But, you know, certainly the increase is significant.

However, I would like to point out that we are just looking here at a few points and we don't know how much these points would influence it. Also, there might be other points that show an unusual decrease and in that case it would cancel out.

So, so, you know, we don't really -- we can't tell from just looking at that, you know, how much the inclusion of these points affects the index.

Q.     In your, in your data cleaning, if any, for the analysis in your report, did you identify any similar movements that had a downward movement of something like 250,000 percent?

A.     This could happen hypothetically, you know, if it were reversed. Right? So, if you first had the first number and then the second number, you know, you would have a -- it's not exactly equivalent because the percent baseline is different, but basically you'd have a similarly huge decrease if it

were reversed in time.

Q.      In downward movements in rent, isn't it the case that decreases are bounded by zero?

A.      Right.  So, de -- you're right. Decreases I guess -- although -- wait a second, because I think the -- didn't I use this equation?  I think it's ratio, not a percent decrease.  And so I believe I used the ratio of the rent, the prior rents.

Q.      Even if you used a ratio, wouldn't there still be an asymmetry between the possibility of such a large increased ratio being measured versus a decreased ratio?

A.      Not --

ATTORNEY PIERCE:  Objection, assumes facts not in evidence.  Calls for speculation.

THE WITNESS:  So, assuming I used a ratio, you know, hypothetically, again, not looking at the data, if it's a ratio, then, you know, you could see, if you take the inverse or the ratio, et cetera, it could also be very influential, so, you know.

And, also, I would like to add

that it depends on how many occurrences there might be of the large increases versus large, potentially, you know, rare decreases.

So, really, to get to the bottom of this, one would have to, you know, examine the sensitivity of the analysis to this alternative, you know, exclusions of certain points and, you know, that's something that, you know, probably would be useful to do.

BY ATTORNEY SCHAPER:

Q.    But it's not something that you investigated as part of preparing your report.

Correct?

A.    Not in these ones.  There are some analyses where I excluded some outliers, which right now I cannot find them again.  But there are some analyses where I did exclude outliers, I believe in Section 8, outliers in Section 8.

Q.    Okay.  We can come, we can come back to that.

A.    Yeah.

Q.    But staying with Exhibit 6, if you look at the second property, Revenue IQ Unit 8692688, do you see that the first lease

shows a monthly effective rent of 40 cents in April '19?

A.    Yes.

Q.    And you don't actually have reason to believe that this unit actually rented for 40 cents a month.

Do you?

ATTORNEY PIERCE:  Objection, calls for speculation.

THE WITNESS:  Similarly to the prior example, the same idea applies.  This seems very low and, therefore, it would be, I would think, a rare event.  But, you know, we cannot rule this out, you know, it might be a special, you know, deal that the renter had.

BY ATTORNEY SCHAPER:

Q.    Well, even if that rent was actually charged, wouldn't that be an extreme outlier of a data point?

A.    Well, that gets us back to the meaning of outlier.  So, that means, like, is this real data or is this like a data recording mistake.  So, if we really believe that it's a recording mistake, that would be more reason to exclude it.  But right now, you

know, without further information, I couldn't tell for sure, you know, whether this should be included or not.  One would have to kind of further analyze it.

And, furthermore, whether or not we include it or exclude it, you know, I cannot speculate and recalculate, you know, exactly how the index would look like with or without these values, especially considering that there might be other values where we see a large decrease.

Q.    As part of preparing your report, you did not investigate what was behind this 40 cents per month rental entry in the data you relied on.

Correct?

A.    I did not look at this specific unit.

Q.    And the next lease -- strike that.

And you didn't remove this -- the data point for this Revenue IQ Unit 8692688 from your analysis.

Correct?

A.    Since this wasn't in the note, I

would infer that this wasn't removed.

Q.    Okay.   And that's even though that the 40 cent per month rental price would be under the .5 percent approach that you discuss in your paper that's Exhibit 5 as a process when outliers should be removed?

A.    We don't know for sure that it's below the .5 percent.   It might be because it's low, but we don't know for sure without looking at the data, because I don't know how many observations there are and how many of these small values are in there.

Q.    If it, if it, in fact, was below the .5 percent threshold, then under the methodology that you've written about in other work, you would agree that it should have been removed from the analysis.

Correct?

A.    I would not agree with that.   I think if it were below that and one decided to just remove those observations, then it would be removed.   However, it's a judgment about, you know, depending on context and what the data might mean, whether, in practice, you choose to remove those observations.

Q.    And that judgment can only be made after investigating the data point.

Correct?

A.    It would be helpful to further investigate the data points.

Q.    Okay.  And that wasn't something you have done as part of preparing your report.

Correct?

A.    I have not looked at this particular data points in Exhibit 6.

Q.    And then the next lease for that same unit, 8692688, shows a monthly effective rent of $1,241.54.

Do you see that?

A.    Yes.

Q.    And so, under your methodology, to calculate the ratio for this unit, it would be $1,241.54 divided by 40 cents.

Is that correct?

A.    Yes.

Q.    And that produces a ratio of approximately 3,103.85 in the month -- in the first month of the new lease.

Correct?

A.      Yes, I take your calculation as correct.

Q.      And that would reflect an over 310,000 percent growth in a single observed month.

Correct?

A.      I just want to note that this is over several months, we're going from April to November, but, yes, it's a strong growth.

Q.      Does an effective rent value of 40 cents per month reflect anything like a typical market rent for multifamily housing?

A.      This is a low value; but without further investigation of what happened in this case, you know, we can't say.   There might have been some special, you know, temporary deal or anything like that.

Q.      Is an effective rent at 40 cents per month, is that economically meaningful in terms of a representation of rent levels?

ATTORNEY PIERCE:   Objection, vague.

Go ahead.

THE WITNESS:   This rent is very low.   However, without further understanding

how this number came about, and considering it's sort of, you know, in the broader set, it's hard to tell, you know, what to make of it.

BY ATTORNEY SCHAPER:

Q.    Would a 310,000 percent rent increase be consistent with ordinary market conditions?

A.    Well, I mean --

Q.    Sorry, strike that.  I can ask a better question.

Would a 310,000 percent rent increase within a single year be consistent with ordinary market conditions?

A.    Anything can happen.  You know, that's not, per se, like a problem; especially for one particular unit, you know, there are so many life circumstances that might explain this.

Now, I haven't looked at that.  I think we are agreeing that I haven't examined this particular unit, so I don't really know what's going on, but, you know, this is something that I -- you know, would be helpful to better understand.

Q.      And just the last unit on this page is Revenue IQ Unit ID 136505.  And do you see that the first lease shows a monthly effective rent of $30 starting August of 2021?

A.      Yes.

Q.      And, again, $30 for a monthly rental rate is not a plausible lease value.

Is it?

A.      I wouldn't say it's implausible. I'd say that sounds like pretty low and, therefore, you know, relatively rare just like with the other, other values.

Q.      And it's the kind of potential outlier that the data cleaning processes that you described to us this morning would be meant to identify and possibly remove.

Correct?

A.      Possibly remove.  But, again, one would have to, you know, look at it in more detail to decide whether this should or shouldn't be removed.

Q.      And, again, as to this Revenue IQ Unit 136505, you didn't do anything to investigate what is the facts and circumstances of this $30 per month effective

rent as part of preparing your report.

Correct?

A.      I didn't look at this specific unit, but, again, if we were to include it, this -- like, let's say, hypothetically, we include these three observations, I suspect they are a small share of the overall, you know, number, and so it may not make big difference to the overall sort of trends.

I think it's really important to note that, you know, without -- I cannot speculate again without further analysis about the effect.   There's only three of them, so that's a small number, I take it at face value that this exists, it may not make a big difference to the analysis -- to the results, I mean, of the, of the analysis.

Q.      But it might, and that would be something to look at.

Correct?

A.      That would be, you know, good to look at, but I cannot speculate about the exact results that you would get.

Q.      Okay.   So, for that same unit, again, we're on 136505, the following data

point with a lease start date of 11/4/2022 has a monthly effective rent of $1,266.

Do you see that?

A.    Yes.

Q.    And in terms of your methodology to come up with the ratio comparing those rents, you would calculate 1,266 divided by $30.

Is that right?

A.    Um-hmm, yes.

Q.    And that would produce a ratio of approximately 42.2 in the first month of the renewal.

Is that right?

A.    Yes; similarly to the other cases we've seen before.

Q.    And that reflects over 4,000 percent growth in a single observation.

Correct?

A.    Right.  Again, I want to note that this is over multiple months, but it's, you know, it's a large -- my index -- I just want to point out, all your examples are over several months.  My index was month to month. So, you know, that might also be a factor in

how exactly it is affected.  But if you take that literal jump, it is a large jump.

Q.    And so your index was comparing the rent paid in a particular month versus the month before it?

A.    Yes.

Q.    So, here it would be calculating a ratio of 1266 against $30 as the previous rent?

A.    Well, this is not the previous month, though.  I'm saying, like, this was August and then we have November.  So, you know, you're showing me data with a gap.

Q.    If you look at the lease term, the lease term for that unit was 15 months.

How would that have -- how would you have calculated the ratio, given that that is a 15-month lease term followed by a new monthly effective rent of 1266?

A.    All right.  I see what you're saying.

So, like, if -- well, if we don't have any intervening data here, I guess you would impute, you know, that the rent continued in that, in that way.  So, so, you

know, but, again, I don't know exactly what happened between these two data points.

But, you know, if you assume that the $30 rent continues, then, you know, once we get to the month of November, then you would see that large rent increase that we are talking about.

Q.    Okay.  And, Professor, would a 4,000 percent rent increase within a time period of a little over a year be consistent with your understanding of ordinary market conditions?

ATTORNEY PIERCE:  Objection, vague.

THE WITNESS:  Yeah, I'm not sure what that means.  It's certainly very large.

BY ATTORNEY SCHAPER:

Q.    You produced the preprocessing script that you ran on the lease data before the rent ratio underlying your Yardi lease price index was calculated.

Correct?

A.    Yes.  I suppose that's in the, like, supplementary materials.

I'd also like to point out that

in Appendix F, you know, on Page 259, I do describe a whole bunch of data cleaning moves, so we have done some data cleaning here.

Q. Okay. But whatever was done did not identify the data points that we've been discussing in Deposition Exhibit 6.

Correct?

A. We have not -- I have not investigated this particular -- these particular properties.

Q. Okay. I'd like to mark as Deposition Exhibit 7 a document that you'll be handed in a second.

(Exhibit No. 7, Lines 104, 105 and 106 from the Code, was marked for identification.)

BY ATTORNEY SCHAPER:

Q. So, if you look at -- first of all, are you familiar with this document?

A. Yeah, that must be the code that my staff used to calculate this index.

Q. And if you -- you're looking at lines 104 through 106 of the code.

Correct?

A. Um-hmm.

Q.    And there is a comment line in 104 saying, quote, "Hash tag drop implausible values of monthly effective rent."

Correct?

A.    Yes.

Q.    What does implausible values -- strike that.

What implausible values does the code actually drop?

A.    So, as I remember that we dropped rent that were negative, for example, so that's, you know, weird.

Q.    So, a negative rent would have been dropped in your dataset?

A.    Yes.

Q.    Okay.  But -- and it -- but that explains or partially explains why, under your code, the 40-cent-per-month rent that we looked at a few minutes ago would not have been dropped based on the code.

Correct?

A.    Yes.

Q.    Can you identify any other part of your code where implausibly low but positive effective rents are excluded?

A.    So, there is a part of my analysis where we dropped some of the low and high rents, but not in the figures and tables that you were just showing me.

So, like, you know, you walked me through a number of figures and tables before we got to this analysis of the index and so, in those notes of these figures and tables, it doesn't say that we dropped the very low rents and so like those that are in Exhibit 6 and, therefore, these observations must be in the index.

Q.    And as we've already looked at, those records that are in Exhibit 6, they generate extremely large rent ratios.

Correct?

A.    Yes.

Q.    And if those ratios were not excluded, they would affect the monthly average used in your Yardi lease price index.

Correct?

ATTORNEY PIERCE:  Objection, vague, calls for speculation, incomplete hypothetical.

THE WITNESS:  So, when we take an

average, and so here are those ratios, and we change the data in particular, you know, larger values, other things being equal, will tend to increase that value; again, other things being equal, because maybe there's also smaller values, et cetera. So, you know, that's sensitivity that one would want to check for.

However, I do want to point out that this kind of, you know, potentially rare values would be likely happening, you know, at the somewhat, I would think at the somewhat constant rate, because, again, I don't know exactly why this is happening, but, you know, there might be some reason, some special case.

And so what would have to be the case is that some of the results we are talking about, that, all of a sudden, disproportionately, just at the time that we have reasons to believe, so, for example, in the time call analysis we looked at, you know, I was looking at what happened to prices right after the time call, and you're saying I understand that, hey, like there were some unusual values in some of this, some of this

data.

What I want to say to you is that this incorporation of unusual values, in order to get the sort of result I am showing, that the pricing goes up around the first time call, it would have to just so happen that this unusual values occurred exactly when the time call happened, which seems unlikely.

So, while the exact magnitude might be affected, the analysis in particular relies on specific timing of the time calls in particular and, therefore, you would have to believe that whatever, you know, differences that occur from including these large values, somehow, you know, just by happenstance, happen to correspond to when the first time call happened as an example in that, in that analysis.

BY ATTORNEY SCHAPER:

Q.    Professor Marinescu, we discussed this morning that another aspect of data cleaning is to deal with missing observations.

Correct?

A.    Yes.

Q.    And those missing observations

could be reflected, for example, in time gaps between data points.

Is that right?

A.    Yes.

Q.    And you crafted a formula that assumed that every lease observation in your data was one month away from the next lease observation.

Is that correct?  And I can point you to --

A.    Yeah, tell me.

Q.    -- Page 195, Paragraphs 502 and 503.

A.    Yes.  What about this?  Go ahead.

Q.    So, the question was that your formula assumes that every lease observation in the data was one month away from the next lease observation.

Is that right?

A.    So, as you can see, Paragraph 503 right after, I calculate each unit change and effective --

(Court Reporter Clarification.)

I calculate each unit's change and effective rent relative to the prior

month, including no changes when a unit is still under the same contract and, therefore, has the same effective rent.

So, therefore, as long as it's under the same contract, we assume that, you know, it's still the same rent until we observe a different rent.  And, actually, by the way, this assumption that it's still the same rent will, in all of those months, will, like, produce a no rent month to month, like, rent increase.

Q.     So, in terms of your mathematical formula, the fact you're observing month-to-month data, you use the T minus one or prior month as the time period in all cases?

A.     Yes.  By the way, this is the approach that the CPI uses, so we mirrored the approach of the CPI to make it more comparable, as I explain in Paragraph 504.

Q.     Isn't it the case that there are a number of instances where it was demonstrably not accurate that the data points were actually following month to month?

ATTORNEY PIERCE:  Objection,

assumes facts not in evidence.  Calls for speculation.

THE WITNESS:  What do you mean with that exactly?  I already explained, per Paragraph 503, that as long as there's no contract change, I assume that the rent stays the same until we do assume -- we do see a change.  So, there is an imputation of missing values based on the continuation of the contract.

ATTORNEY SCHAPER:  Okay.  So, I'd like to mark the next document as Exhibit 8.

(Exhibit No. 8, Further Excerpt from YARDI-DUFFY_00913149 Data used in Figure 4 (Figure 62), was marked for identification.)

BY ATTORNEY SCHAPER:

Q.    Professor Marinescu, I'm showing you what's been marked as Exhibit 8, which I'll represent to you consists of further excerpts from YARDI-DUFFY_00913149.  And you testified previously that you used this data in calculating your Yardi lease price index.

Correct?

A.    Yes.

Q.      If we can look at Revenue IQ Unit ID 339629, do you see that as the first lease start date is November 1, 2017.

Correct?

A.      Yes.

Q.      And then you put a lease term of 12, but that is carried forward until June 1, 2024, as the next observation.

Do you see that?

A.      I don't think so.  I think because we said that we only impute if it's still under the same contract, so, in that case, you know, the -- you would have a gap because, you know, it says 12 months.

So, if there's no other data, you see 12 months, we'd stop imputing the 770, you know, 12 months after 2017.  So, like by October 2018, that would be the last 770, and then it would start to be missing thereafter.

So, you -- because, as I just quoted, we only do it within contract.  So, as long as it's the same contract, then, you know, you can propagate the rent.  But here it appears that it would be a different contract.  So, you wouldn't propagate the rent in that

case.

Q.    But then when you computed the ratio between 770 and 1,062, you would assume that that is over one month, correct, that change?

A.    No, because the sort of the -- it would happen that there is a missing data for this prop -- so, like, starting in June of 2024, so there you would have no data for the May.  So, it would be missing for this, for this property; because, as I said, since we don't know that it's the same lease, I wouldn't have imputed the 770 all the way through that.  So, it would be missing.

And then, in July, the ratio would be one because we carry forward, since it's 12 months, you know, it's still the same rent.  So, in July of 2024, it would be one and so on, it would still be the same kind of stable rent until one year later.  So, so, that's how, how it would work.

Q.    So, you're assuming that, after the 12-month lease term, that you then did a calculation based on no data after that until the new lease in 2024.

Is that right?

A.    Yes.

Q.    Okay.  That's how, in your view, how that should have, that should have been handled on this data point?

A.    That's my understanding of how this was handled.

Q.    If you look at the next unit, 4100682, do you see that?

A.    Yes.

Q.    Professor Marinescu, do you recall whether you investigated the time gap as to Revenue IQ Unit 339629 in terms of this data?

A.    I haven't looked at this unit specifically, but based on the description in the report, you know, it says as long as it's under the same contract, we propagate, which, you know, it seems like a reasonable way to impute data.

Q.    Okay.  But just to be clear, for this property, 339629, you would not just divide the two numbers, 1062 and 770, to come up with a ratio.

Correct?

A.    Here, the way this is represented, there is a gap.  And so, you know, unless there's evidence that it's still under the same contract, you wouldn't propagate the 770 forward if we don't think it's still under the same contract.

So, you know, this is something that, as I say in my report, as long as it's under the same contract, one propagates the 770 forward.  If it's not under the same contract, then there would be some string of missing data.

Q.    Well, let's actually skip one and look at Revenue IQ Unit ID 99076.

A.    Yes.

Q.    Do you see here that the first lease start date is July 26th, 2013?

A.    Yes.

Q.    And then the next lease observation noted is May 30th, 2019.

Do you see that?

A.    Yes.

Q.    So, that's a gap of 58 months?

A.    Yes.

Q.    Is it your testimony that your

understanding of how this was dealt with in your data was through having a series of missing observations after the first 12 months of the July 2013 lease?

A.    Yes, to the extent that this was the definition that was operationalized as same contract, then, you know, it would be missing, and then we'd have data again starting May 2019.

Q.    And, in your view, is that methodology appropriate?

A.    Well, if we don't know there's missing data, you know -- and -- so, okay. When there's missing data, in economics, we sometimes do imputation, and so meaning like filling in the missing data. And then the question is, what method do you use for the imputation? You have to make certain assumptions.

And depending on the case at hand, different assumptions might be appropriate. So, here the assumption was, as I said, as long as it's under the same contract, you know, I impute that the rent is still the same.

ATTORNEY SCHAPER:   I'd like to have marked as Deposition 9 another excerpt from the data.

(Exhibit No. 9, Further Excerpt from YARDI-DUFFY_00913149, Data Used in Figure 7 (Figure 88), was marked for identification.)

BY ATTORNEY SCHAPER:

Q.    Do you see this document in front of you?

A.    Yes.

Q.    And do you recognize this as another excerpt from Yardi -- strike that -- another excerpt from the data that you used in calculating your Yardi lease price index?

A.    This looks like similar observations to the one Exhibit 8 that we just looked at.

Q.    Okay.  And so if you would look at Revenue IQ Unit ID 1623904, the first entry point has a lease start date of June 1st, 2015.

Correct?

A.    Yes.

Q.    And the next lease observation for that unit is July 1st, 2025, over ten

years later.

Do you see that?

A.    Yes.

Q.    And so that's a gap, after the initial 12 months, from June 2016 to July 2025, or 109 months.

Correct?

A.    Yes.

Q.    And then at the end of that, when you get to July 1, 2025, the rent increase is shown as from $1,045 to $1,382.

Correct?

A.    No.  My understanding is that the way that my staff processed the data, based on our discussion, is that we only imputed rent as long as it was the same contract.

So, here, you know, the data point would be missing in June 2025.  So -- and then in July 2025, it would still be missing, because we don't know, like, relative to what, since there was no data before.  And then starting in August 2025, so one month after this first, you know, new data point, then you would start to see a ratio of one or no price increase for the next 12 months, you

know, until the end of this, of this lease.

Q.      You would agree that it would not be appropriate to attribute the entire difference between 1,045 and 1,382 to a change that happened in one month.

Correct?

ATTORNEY PIERCE:  Objection, vague.

THE WITNESS:  So, as I said, given the procedure that we have discussed, there would be missing data in the middle and, therefore, there would not -- this property would not contribute to the index since it would have missing data, it would not contribute to the index until August of 2025, because that's the first time that we see the rent not changing since it's being propagated from the July 2025 new rent.

BY ATTORNEY SCHAPER:

Q.      If you assume for a second that this property did contribute to the data, do you agree with me that it would not be appropriate for that contribution to be based on a ratio comparing 1,382 to 1,045?

ATTORNEY PIERCE:  Objection,

assumes facts not in evidence.  Calls for speculation.  Vague.

THE WITNESS:  There is no reason, based on the methodology, to do that.  Like, again, like, there is -- when there's missing data, there's missing data.  We don't know what happened in the meantime here.

BY ATTORNEY SCHAPER:

Q.    Okay.  But I'm just -- if you assumed, let's say if you assumed that somebody dealt with this issue identified for property 1623904 by treating the entire change from 1,045 to 1,382 as having occurred in one month, that would not be an appropriate methodology.

Correct?

ATTORNEY PIERCE:  Objection, vague, calls for speculation, assumes facts not in evidence.

THE WITNESS:  As I said, you know, it seems to me that, in this situation, there would be missing data for the index for this property.  And so, so, you know, it just wouldn't contribute for the intervening, you know, time where we didn't have data for it to

impute what the rent was.

BY ATTORNEY SCHAPER:

Q.    Yes.

Professor, I'm -- I understand what you're saying.  I guess what I'm asking you is to assume that the way that this data point was dealt with was comparing $1,382 to $1,045 and calculating a ratio on that basis.

I'm just confirming that you agree that that would be an inappropriate way to deal with the data for Revenue IQ Unit 162390?

ATTORNEY PIERCE:  Objection, mischaracterizes testimony, assumes facts not in evidence, calls for speculation, vague.

THE WITNESS:  Yeah, I don't know exactly how this was dealt with.  I think I told you about the missing value and the fact that it would be missing, you know, in the intervening month with no continuation of contract.

BY ATTORNEY SCHAPER:

Q.    Okay.

A.    And, therefore, it would not be included.

Q.    Professor, that's not an answer to my question.  If you would please listen carefully.  I know that that's your testimony as to what you think happened with this data.

I'm asking you to assume, you don't have to accept the assumption, but just assume, you're an expert witness, assume, for purposes of this data that the way that it was handled was a ratio was calculated based on the $1,382 rent against the $1,045 rent and that ratio was used, would you agree with me that that would not be an appropriate way to deal with this data?

ATTORNEY PIERCE:  Objection, calls for speculation, assumes facts not in evidence.

THE WITNESS:  I mean, I don't know that that's -- you know, as I said, the description indicates that this ratio was not used because there would be missing data in the, in the middle.

So, unless, unless there was reason to believe that the contract for some reason continued all the way to June 2025, you know, then there would be missing data and

this ratio would not be calculated.  If there was reason to believe that this contract continued at the same rate until June 2025, then it would be reasonable to compare those two prices.

BY ATTORNEY SCHAPER:

Q.    Did you do anything to investigate the issue of this time gap as part of preparing the analyses of the Yardi price index in your report?

A.    I did not.

However, I would like to point out, again, like just similarly we were talking about outlier, time gap and so on, when it comes to Figure 62, Page 148, whatever, you know, potential changes are introduced in the data from incorporating some observations that -- whose imputation might be debatable, this would have to exactly be timed in just the way that corresponds to when the first time calls happened.

So, you know, this could make a difference if those were treated a number of different ways.  Whenever we change the underlying data for an analysis, the resulting

figure can change.  But what I think it's important to remember here is that all these different changes to the processing, the outliers, the gaps, the missing, it would have to exactly coincide with the first time calls for us to get the kind of jump in prices that we see in Figure 62.

ATTORNEY SCHAPER:  I move to strike that.

BY ATTORNEY SCHAPER:

Q.    In the instances where there may have been a multi-month gap between the Yardi lease observations, you were still comparing the change in Yardi leases that took place to a one-month change in the CPI.

Is that right?

A.    Yes.  And in the CPI, the units that would have this kind of data would be treated similarly, you know, like if they don't have data on the unit, then it's missing.

So, they're only using the units for which there is continuous known data.

Q.    Did you do any data cleaning with respect to the data that the CPI is based on?

A.      I did not; but it is my understanding, based on this chain rule approach, that this is the way that it is handled by the CPI.

Q.      I just want to go back to a few other parts of your report that potentially could be materially affected by errors in your Yardi lease price index and the Yardi index premium.

A.      I reject the characterization of errors, but carry on.

Q.      The inclusion of outliers that could materially affect the outcome, is that more consistent with what you said?

A.      Yes, inclusion of outliers that could affect outcomes.

Q.      And this, the opinions that could be affected, include your opinion that landlord defendants' rent rose above the market as adoption increased.

Correct?

That's Figure 89, and it relies on the Yardi price index -- Yardi index premium?  I'm sorry.

A.      Yes, Figure 89, which page?

CERTIFICATE


I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.


_____

DENISE D. BACH,

Registered Professional Reporter

Certified Court Reporter

Notary Public/Expiration: March 2030

Dated:  March 12, 2026


(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

DEPOSITION ERRATA SHEET

Our Assignment No. 3185

Case Caption: Duffy vs. Yardi Systems

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my deposition taken in the above-captioned matter or the same has been read to me and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.  Signed on the _____ day of _____, 2026.

_____

IOANA MARINESCU, Ph.D.

BlueBear Reporting LLC