The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| *In re* YARDI REVENUE MANAGEMENT ANTITRUST LITIGATION | Case No. 2:23-cv-01391-RSL |
| WYLIE DUFFY and MICHAEL BRETT, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YARDI SYSTEMS, INC., *et al*.,<br><br>Defendants. | **PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT MIHRAN YENIKOMSHIAN**<br><br>**NOTE ON MOTION CALENDAR: June 12, 2026**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>**[REDACTED VERSION]**<br><br>(Consolidated with Case Nos. 2:24-cv-01948; 2:24-cv-02053) |

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ........................................................................................................1

II.   LEGAL STANDARD..................................................................................................2

III.  BACKGROUND—THE CHALLENGED OPINIONS ...........................................3

    A.    Cluster One—Coordination Through Information Exchange.................................3

    B.    Cluster Two—Coordination Through Common Configuration
        Choices.................................................................................................................4

IV.   THE CHALLENGED OPINIONS EXCEED MR. YENIKOMSHIAN'S
    EXPERTISE. ..............................................................................................................5

    A.    The Benchmarking Opinions ................................................................................5

    B.    The Configuration Opinions .................................................................................7

V.    THE TARGETED OPINIONS VIOLATE THE STANDARD MR.
    YENIKOMSHIAN HIMSELF ARTICULATED FOR REBUTTAL
    OPINIONS ...............................................................................................................10

VI.   CONCLUSION..........................................................................................................13

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Engilis v. Monsanto Co.*,
   151 F.4th 1040 (9th Cir. 2025) .......................................................................................2

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
   524 F. Supp. 3d 1007 (S.D. Cal. 2021)...........................................................................13

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)...................................................................................2, 10, 12, 13

*Rearden, LLC v. Walt Disney Pictures*,
   152 F.4th 1058 (9th Cir. 2025) .....................................................................................10

*Rovid v. Graco Children's Prods. Inc.*,
   2018 WL 5906075 (N.D. Cal. Nov. 9, 2018) ...............................................................12, 13

*White v. Ford Motor Co.*,
   312 F.3d 998 (9th Cir. 2002), ....................................................................................2, 7

**Other Authorities**

Fed. R. Evid. 702(a).........................................................................................................2

## I.    INTRODUCTION

In response to Yardi's motion for summary judgment, Plaintiffs offered opinions from Dr. Ioana Marinescu, an economics professor at the University of Pennsylvania. As part of her report, Dr. Marinescu provided detailed analyses of two aspects of Yardi's Revenue IQ system that coordinated economic outcomes among participants: information exchange and common configuration choices. Yardi provided a rebuttal report from Mihran Yenikomshian that offered numerous criticisms of Dr. Marinescu's economic opinions.

Mr. Yenikomshian is not an economist. He testified to that fact directly: he is ███ ████████████████████    ████████████████████████    ███████████ ████████████████████████████████████████████[3] His credentials confirm it. He has no Ph.D. in economics, has never taught economics, and has never held a position as a professor of economics.[4]

He did, however, articulate the professional standard for the rebuttal work he was retained to perform. Mr. Yenikomshian testified that when a rebuttal expert addresses opinions based on specific documents, the expert must ███████████████████████ ████████[5] He confirmed this as reflecting ███████████████████ ████[6]

Dr. Marinescu's analyses cite numerous Yardi-produced documents and the academic economic literature on coordination. Mr. Yenikomshian reviewed none of them. ██████ ███████████████████████████████ ██████████████—no internal emails, no marketing materials, no training documents, no

---

[1] Ex. 3, Deposition of Mihran Yenikomshian dated April 16, 2026 ("Yenikomshian Dep.") 68:13-17. All "Ex." cites are to the declaration of Steve W. Berman, filed concurrently herewith.

[2] *Id.* 68:6-13.

[3] *Id.* 62:14–63:2.

[4] *Id.* 70:11-18.

[5] *Id.* 13:2-9.

[6] *Id.* 18:6-19.

PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S - 1
EXPERT MIHRAN YENIKOMSHIAN                    (No.: 2:23-cv-01391-RSL)
011188-11/3573791 V1

penalty-score reports. He characterized the materials he did not review as ███████████ to his opinions.

Nonetheless, his rebuttal report characterizes Dr. Marinescu's economic conclusions as ████████ ████████ ████████████ █████████████████████████ ████████ [10]

Each is a reliability judgment about economic methodology—offered by a witness who is not an economist, about evidence he did not review. Plaintiffs move to exclude these specific opinions under Federal Rule of Evidence 702 because they exceed Mr. Yenikomshian's expertise and are unsupported by any review of the record.

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 allows admission of expert testimony where the court determines that (1) the witness is qualified as an expert and (2) the opinion provided is, more likely than not, relevant and reliable.[11] An opinion is relevant if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."[12] An opinion is reliable if it is "based on sufficient facts or data," "the product of reliable principles and methods," and "reflects a reliable application of the principles and methods to the facts of the case."[13] Under Rule 702, experts may only offer opinions within the area of expertise for which they were qualified.[14] Opinions that fail to meet any of Rule 702's requirements should be excluded.[15]

---

[7] Decl. of Mihran Yenikomshian in Rebuttal of the Report of Ioana Marinescu, Ph.D., Dkt. 524 ("Yenikomshian Rebuttal Report") at ¶ 10.

[8] *Id.* ¶ 61.

[9] *Id.* ¶ 21.

[10] *Id.* § V.

[11] *See* Fed. R. Evid. 702; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

[12] Fed. R. Evid. 702(a).

[13] *Id.* (b)-(d).

[14] *White v. Ford Motor Co.*, 312 F.3d 998, 1008 (9th Cir. 2002) (noting that other opinions are treated as lay opinions under Rule 701), *opinion amended on denial of reh'g*, 335 F.3d 833 (9th Cir. 2003).

[15] *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1050 (9th Cir. 2025).

### III.    BACKGROUND—THE CHALLENGED OPINIONS

Mihran Yenikomshian served a rebuttal expert report on March 23, 2026, responding to the opening report of Plaintiffs' affirmative economic expert, Dr. Ioana Marinescu.[16] Plaintiffs move to exclude four discrete opinions of Mr. Yenikomshian. These opinions fall into two clusters.

### A.    Cluster One—Coordination Through Information Exchange

Dr. Marinescu offered an economic analysis of Yardi's Benchmarking system, concluding that the system provides Landlord Defendants with "comprehensive visibility on rivals' pricing" that "allows [clients] to strategically increase prices."[17] Dr. Marinescu's benchmarking analysis does not depend on whether a client can reverse-engineer a rival's individual rent from an aggregated output. Her analysis, grounded in the academic economic literature on information exchange and coordination, addresses a different question: whether Yardi's Benchmarking system reduces pricing uncertainty among competitors and provides focal points that facilitate coordinated outcomes.[18] ███████████████████████████████████████

████████████████████████████████████████████████████████████

███[19] Yardi calls these outputs the Key Performance Indicators ("KPIs"). Dr. Marinescu found that these KPIs do facilitate coordinated pricing—and that the mechanism operates not through the KPI outputs alone, but through Yardi's operationalization of benchmarking data via its Technical Account Managers. Her analysis drew on TAM communications, Yardi's internal penalty-score methodology, the Fazio deposition, and the academic literature on how information exchanges sustain coordination even when the exchanged data is aggregated.[20]

---

[16] Yenikomshian Rebuttal Report.

[17] Expert Report of Ioana Marinescu, Ph.D., Dkt. 497-111 ("Marinescu Report") ¶ 395; Yenikomshian Rebuttal Report ¶ 58 (quoting Marinescu Report).

[18] Marinescu Report ¶¶ 103-148, 395-430.

[19] Decl. of Mihran Yenikomshian in Support of Yardi Systems, Inc.'s Mot. for Summary Judgment, Dkt. 479, ¶¶ 125, 161.

[20] Marinescu Report §§ 3.2, 4.3-4.4, 6-7.

Mr. Yenikomshian characterized that analysis as ███████████████ ████████ █ ████████████████████████████████ ████ [22]

## B.      Cluster Two—Coordination Through Common Configuration Choices

The economic literature on hub-and-spoke coordination asks a specific question about common pricing algorithms: do competitors using the same software adopt similar enough settings that the algorithm produces coordinated outcomes?[23] Dr. Marinescu addressed that question by analyzing the Revenue IQ configurations that control the system's directional pricing logic.[24] Direction matters because Revenue IQ generates a pricing recommendation in stages. In Step One, the system weighs four market signals—comp trend, traffic trend, availability trend, and new lease trend—and produces a directional call: raise rents or lower them. If two landlords in the same market have the same trend weights, the system applies the same formula to their market signals—weighting the four trends in the same proportions. Dr. Marinescu concluded that Landlord Defendants' configurations are broadly uniform across these directional settings in ways consistent with coordination.[25]

Mr. Yenikomshian responded with two reliability characterizations of that economic analysis. ████████████████████████████ ████████████████████████████ ████████████████████ █ ████████████████████ ████████ █ ████████████████████████████████ ████████████████████ █

---

[21] Yenikomshian Rebuttal Report ¶ 10.

[22] *Id.* ¶ 61.

[23] Marinescu Report ¶¶ 103-27, 246.

[24] *Id.* ¶¶ 234, 283, 296, 302; § 5.1.2.

[25] *Id.* ¶¶ 28, § 5.1.

[26] Yenikomshian Rebuttal Report ¶ 8.

[27] *Id.* § V.

[28] *Id.* ¶¶ 20-21.

## IV.    THE CHALLENGED OPINIONS EXCEED MR. YENIKOMSHIAN'S EXPERTISE.

Mr. Yenikomshian's technical qualifications are undisputed. The question is whether those qualifications extend to his opinions that Dr. Marinescu's economic methodology is "unreliable" and "conceptually flawed." Under Rule 702(a), they do not.

### A.    The Benchmarking Opinions

The economic literature on information exchange and coordination is well developed. When competitors in a market gain visibility into each other's pricing, occupancy, and performance metrics, that visibility can reduce the uncertainty that ordinarily disciplines competitive behavior. Competitors who know where they stand relative to peers can identify when they are pricing below the market and adjust accordingly. The question is not whether any individual landlord can reverse-engineer a rival's specific rent from an aggregated output. It is whether the exchange, taken as a whole, provides the kind of competitive intelligence that allows participants to coordinate pricing without explicit agreement.[29]

That is the question Dr. Marinescu's benchmarking analysis addresses. To answer it, she reviewed the factual record. Yardi assigns each Revenue IQ client a dedicated Technical Account Manager ("TAM") to provide ongoing pricing support.[30] Anthony Fazio is the Yardi executive whose duties included partially supervising the Revenue IQ TAMs; the Fazio-TAM call notes — documents Yardi produced in discovery—memorialize Mr. Fazio's monthly internal meetings with TAMs, in which he reviewed individual clients' performance and flagged specific properties as underpricing their benchmarks.[31] Dr. Marinescu's empirical analysis of those call notes showed that Mr. Fazio flagged Revenue IQ clients as underpricing their benchmarks nearly six times as often as he flagged them as overpricing.[32] Dr. Marinescu concluded that the Benchmarking system gives landlords "comprehensive visibility on rivals' pricing" through aggregated performance

---

[29] Marinescu Report ¶¶ 88, 430-31; §§ 3.1.3, 3.2.

[30] *Id.* ¶¶ 12, 233; § 4.3.

[31] *Id.* ¶¶ 47, 209; §§ 4.3, 6.2.

[32] *Id.* ¶¶ 362-63.

metrics and that this visibility "allows them to strategically increase prices," particularly when reinforced by TAM enforcement.[33]

Mr. Yenikomshian characterized both conclusions as ███████████████████ ████████████████████████████████[34] At deposition, ████████████████████ ███████████████████████████ █ ██████████████████████████████████ ████████████████████████████████.[36] But Dr. Marinescu's theory does not turn on whether clients can see individual prices. It turns on whether the exchange of aggregated competitor performance data reduces pricing uncertainty and creates focal points that facilitate coordination. That is the question the economic literature on information exchange addresses, and Dr. Marinescu grounded her analysis in it.[37] Whether her application of that literature to this factual record is "untethered to any reliable principles and method" is a question about the principles of information-exchange economics. It is not a question about what a KPI output displays.

Mr. Yenikomshian acknowledged as much. ██████████████████████ ██████████████████████████████████████ ████ █ ████████████████████████████████████ ████████████████████████████████ █ ████ ███████████████████████████ ████████████████████████████████████ ███████████████████████████████████[40]

Rule 702(a) does not permit that. An expert testifying outside his qualified field is, in the Ninth Circuit's phrase, "a layman . . . anointed with ersatz authority as a court-approved expert

---

[33] *Id.* ¶¶ 395, 405.

[34] Yenikomshian Rebuttal Report ¶ 61.

[35] Ex. 3, Yenikomshian Dep. 57:9-59:4.

[36] *Id.* 59:5-24, 78:2-79:9, 88:16-89:8.

[37] Marinescu Report ¶¶ 88, 430-31; §§ 3.1.3, 3.2.

[38] Ex. 3, Yenikomshian Dep. 81:8-16.

[39] *Id.* 54:6-55:15.

[40] *Id.* 62:14-63:2.

PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S - 6
EXPERT MIHRAN YENIKOMSHIAN                                    (No.: 2:23-cv-01391-RSL)
011188-11/3573791 V1

witness for what is essentially a lay opinion."[41] Mr. Yenikomshian's benchmarking opinions are economic reliability judgments offered by a witness who is not an economist, about an analysis he engaged with only at the level of KPI outputs. They should be excluded.

## B.     The Configuration Opinions

Dr. Marinescu focused on nine configuration choices across Steps One and Two of the pricing calculation: the four trend weights that determine how the system weighs market signals, four settings within the Comp Trend Rule that govern how the system responds to competitor pricing, and the Health Rule that can override or modify the system's output.[42] These are the settings that control whether Revenue IQ tells a landlord to raise, hold, or lower rents.[43] That selection tracks how Yardi describes its own system. Yardi markets Revenue IQ as an "intuitive, rules-based solution."[44] Liana Rao, the executive previously responsible for its implementation,

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███[45]

Dr. Marinescu's coordination theory asks whether competitors align on pricing direction, not on every parameter, because directional alignment is what produces parallel pricing behavior across competitors.[46] She found broad uniformity across Landlord Defendants on precisely these settings: 89% set all four trend weights to the same default, more than 99% configured the comp trend rule to trigger on any change in the rent ratio relative to competitors, and approximately 83% of all configurations consisted of the default trend weights plus one of three Health Rule combinations.[47] Mr. Yenikomshian did not dispute those numbers.[48]

---

[41] *White*, 312 F.3d at 1008-09.

[42] Marinescu Report §§ 5.1.1-5.1.3.

[43] *Id.* ¶¶ 25, 302.

[44] *Id.* ¶¶ 159, 232 & Fig. 35.

[45] *Id.* ¶ 155 (quoting Rao Dep. 207:22-209:24).

[46] *Id.* ¶¶ 105-19, 302, 305.

[47] *Id.* ¶¶ 29, 258-59, 262, 269.

[48] Ex. 3, Yenikomshian Dep. 175:12-23.

PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S - 7
EXPERT MIHRAN YENIKOMSHIAN                                    (No.: 2:23-cv-01391-RSL)
011188-11/3573791 V1



[49] Yenikomshian Rebuttal Report § V.

[50] Id. §, V.

[51] Marinescu Report ¶¶ 31, 296-302, 303-05.

[52] Ex. 3, Yenikomshian Dep. 179:20-180:1.

[53] Id. 180:2-17, 181:2-7.

[54] Id. 181:8-22.



[57] Each is a judgment about whether Dr. Marinescu selected the right variables to measure coordination among competitors. That is an economic question. Whether focusing on directional settings rather than all 195 variables is "conceptually flawed" depends on whether the economic theory of coordination concerns alignment of direction or alignment of every parameter. Dr. Marinescu's answer, grounded in the academic literature, is that coordination operates through directional alignment.[58] Evaluating that answer requires economic expertise.

There is a distinct line between a technical observation and an economic opinion. Describing which variables an expert selected is a technical observation. Declaring the result a "false appearance of commonality" is a judgment about whether observed uniformity among competitors reflects coordination.

Mr. Yenikomshian is not equipped to make that judgment.

He can count configuration settings. He cannot determine which ones matter for producing coordinated pricing outcomes—and he made no attempt to do so.

---

[55] *Id.* 172:4-11.

[56] *Id.* 172:12-20.

[57] Yenikomshian Rebuttal Report ¶¶ 8, 20-21 § V.

[58] Marinescu Report ¶¶ 105-19, 302-05.

[59] Ex. 3, Yenikomshian Dep. 68:6-13.

[60] *Id.* 68:9-10.

[61] *Id.* 72:19-22.

PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S - 9
EXPERT MIHRAN YENIKOMSHIAN                                (No.: 2:23-cv-01391-RSL)
011188-11/3573791 V1

The Ninth Circuit recently affirmed exclusion under analogous circumstances in *Rearden, LLC v. Walt Disney Pictures*, where the court upheld exclusion because the expert's deposition testimony revealed he "repeatedly conceded that he lacked knowledge" in the relevant field.[62] Mr. Yenikomshian's reliability judgments about Dr. Marinescu's economic opinions regarding the configuration settings should be excluded on the same basis.

## V.    THE TARGETED OPINIONS VIOLATE THE STANDARD MR. YENIKOMSHIAN HIMSELF ARTICULATED FOR REBUTTAL OPINIONS

*Kumho Tire* instructs courts to ensure that an expert applies in the courtroom the same intellectual rigor that characterizes practice in his field.[63]  Mr. Yenikomshian supplied the Court with both the standard and the evidence of its violation.

Early in his deposition, he articulated what rebuttal experts are supposed to do:



[67] Mr. Yenikomshian has worked full time at Analysis Group, a consulting firm specializing in litigation support, for more than a decade. This is not a standard he learned in the abstract. It is the standard of his professional practice.

He did not follow it.  Dr. Marinescu's benchmarking and configuration analyses rest on Yardi's internal emails, marketing materials, training documents, and penalty-score reports, depositions of Yardi employees, and the academic economic literature on information exchange and coordination.

---

[62] 152 F.4th 1058, 1078 (9th Cir. 2025).

[63] *Kumho Tire*, 526 U.S. at 152.

[64] Ex. 3, Yenikomshian Dep. 13:2-9.

[65] *Id.* 15:15-17.

[66] *Id.* 15:18–16:10.

[67] *Id.* 18:13-19.

Mr. Yenikomshian reviewed virtually none of it. ████████████████████

████████████████████████████████████████████████████████████████ and

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████ and

████████████████████████████████████████████████████████████████ and

███████████████████████████████

██████████████████████████████████████████████████████████████ and

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████ █ █

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████ and

██ █ ████████████████████████████████████████████ █ ████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████ █ ████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████ █

  █████████████████████████████████████████████████████████████

███████████████████████████████████ █ ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ █

The materials are not irrelevant. They are the foundation of the opinions Mr. Yenikomshian purports to rebut. His benchmarking opinions declare Dr. Marinescu's analysis "unsupported" and

---

[68] *Id.* 67:3-9.

[69] *Id.* 72:19-22.

[70] Yenikomshian Rebuttal ¶ 34 n.55 (Thompson), ¶ 67 n.123 (Rao).

[71] Ex. 3, Yenikomshian Dep. 24:11-16.

[72] *Id.* 26:7-10.

[73] Ex. 3, Yenikomshian Dep. 104:19-105:9.

[74] *Id.* 117:10-13.

[75] *Id.* 117:14-18.

"untethered to any reliable principles and method."[76] But that analysis rests on the TAM communications documenting how Yardi operationalized benchmarking data, on the Fazio deposition describing the monthly review process, and on the academic literature establishing when aggregated data exchanges facilitate coordination. Mr. Yenikomshian reviewed none of those materials before he declared the conclusions they support unsupported.

Similarly, Mr. Yenikomshian's configuration opinions declare Dr. Marinescu's framework

███████████████████████████████████████████████████████████ ██
███████████████████████████████████████████████████████
██████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████████ ███████████████████████████████████
██████████████████████████████████████████████████
███████████████████████
       ██████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████ [79] Even on that hedged version, the standard applies here. He chose to address Dr. Marinescu's benchmarking and configuration conclusions. Those conclusions rest on the unreviewed materials. The hedge does not excuse him from reviewing the foundation of the opinions he chose to rebut. In each instance, Mr. Yenikomshian pronounced the analysis unreliable without examining the evidence on which it rests. A rebuttal opinion that does not engage with the materials underlying the opinion it rebuts is not the product of reliable methodology. It is the product of incomplete review.

Courts have excluded experts on precisely this basis. In *Rovid v. Graco Children's Products*, the court applied *Kumho Tire* to exclude testimony where the expert admitted at

---

[76] Yenikomshian Rebuttal Report ¶¶ 10, 61.

[77] *Id.* § V, ¶¶ 8, 21.

[78] Ex. 3, Yenikomshian Dep. 72:19-22.

[79] *Id.* 12:19-25.

deposition that he applied "a different kind[] of rigor . . . when preparing a report for litigation purposes than he does for academic purposes." [80] The analogy here is stronger: in *Rovid*, the standard came from the expert's academic field; here, the standard comes from Mr. Yenikomshian's own sworn testimony about what rebuttal experts do. And in *In re Incretin-Based Therapies*, the court excluded an expert under Rule 702(d) where the expert articulated his methodology at deposition—"review[ing] the paper[s] and look[ing] at the biases"—and then failed to follow it, holding that the expert's "failure to completely read and review the materials he relied upon reveals that he failed to reliably apply his chosen methodology[.]"[81] Mr. Yenikomshian articulated the standard, and admitted he did not follow it. The challenged opinions should be excluded on this independent ground.

## VI.    CONCLUSION

Yardi offered no economist when it first moved for summary judgment. Instead, it primarily relied on the expert opinions of Mr. Yenikomshian. The weight the Court gives Mr. Yenikomshian's technical opinions in his opening report is not before the Court on this motion. What is before the Court are opinions that go further. An expert who disclaims economic expertise may not pronounce an economist's methodology "unreliable"[82] and "conceptually flawed."[83] An expert who dismisses the underlying documentary record as irrelevant may not declare the analysis built on that record "unsupported."[84] The opinions expressed in ¶¶ 8, 10, 21, and 61 and the Section V heading of Mr. Yenikomshian's rebuttal report do both. The Court should exclude them.

---

[80] *Rovid v. Graco Children's Prods. Inc.*, 2018 WL 5906075, at *6 (N.D. Cal. Nov. 9, 2018) (brackets in original) (applying *Kumho*).

[81] *In re Incretin-Based Therapies Prods. Liab. Litig.*, 524 F. Supp. 3d 1007, 1048 (S.D. Cal. 2021) (brackets in original) (citing Fed. R. Evid. 702(d)), *aff'd*, 2022 WL 898595 (9th Cir. Mar. 28, 2022).

[82] Yenikomshian Rebuttal Report ¶ 10.

[83] *Id.* ¶ 21.

[84] *E.g.*, *id.* ¶ 61.

Dated this 22nd day of May 2026.          Respectfully submitted,

                                          **HAGENS BERMAN SOBOL SHAPIRO LLP**

                                          */s/ Steve W. Berman*
                                          Steve W. Berman (WSBA No. 12536)
                                          */s/ Theodore Wojcik*
                                          Theodore Wojcik (WSBA No. 55553)
                                          */s/ Stephanie A. Verdoia*
                                          Stephanie A. Verdoia (WSBA No. 58636)
                                          */s/ Xiaoyi Fan*
                                          Xiaoyi Fan (WSBA No. 56703)
                                          1301 Second Avenue, Suite 2000
                                          Seattle, WA 98101
                                          Telephone: (206) 623-7292
                                          Facsimile: (206) 623-0594
                                          steve@hbsslaw.com
                                          tedw@hbsslaw.com
                                          stephaniev@hbsslaw.com
                                          kellyf@hbsslaw.com

                                          Rio S. Pierce (*pro hac vice*)
                                          **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                          715 Hearst Avenue, Suite 300
                                          Berkeley, CA 94710
                                          Telephone: (510) 725-3000
                                          Facsimile: (510) 725-3001
                                          riop@hbsslaw.com

                                          *Attorneys for Plaintiffs*

PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S - 14
EXPERT MIHRAN YENIKOMSHIAN                              (No.: 2:23-cv-01391-RSL)
011188-11/3573791 V1

## **CERTIFICATE OF COMPLIANCE**

I certify that this memorandum contains 4,045 words, in compliance with Local Civil Rule 7(d)(3).

/s/ *Steve W. Berman*
Steve W. Berman

PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S - 15
EXPERT MIHRAN YENIKOMSHIAN                              (No.: 2:23-cv-01391-RSL)
011188-11/3573791 V1