# EXHIBIT 6

# Algorithmic Fairness and Economics[*]

Bo Cowgill
Columbia University

Catherine Tucker
MIT & NBER

September 24, 2020

### Abstract

We develop an economic perspective on algorithmic fairness and the surrounding empirical, theoretical and policy issues. Our perspective draws from clear parallels between algorithms and issues in economics of discrimination, crime, personnel and technological innovation; as well as more subtle connections to environmental economics, product safety regulation, behavioral economics and economics of information. We highlight the distinction between biased algorithmic predictions and biased algorithmic objectives. We conclude by discussing economic issues in policy policy and managerial practices around reducing algorithmic unfairness.

---

[*]Bo Cowgill is an Assistant Professor at the Columbia Business School. Catherine Tucker is the Sloan Distinguished Professor of Management Science at MIT Sloan School of Management and Research Associate at the NBER. This paper updates an earlier version, circulated as *Economics, Fairness and Algorithmic Bias* (Cowgill and Tucker, 2019). The authors thank David Blei, Charlie Brown, Erik Brynjolfsson, Peter Cappelli, Sam Corbett-Davies, Fabrizio Dell'Acqua, Shane Greenstein, Michael Impink, Ray Horton, Daniel Kahneman, Bruce Kogut, Zach Lipton, Enrico Moretti, John Morgan, Alex Miller, Patryk Perkowski, Rob Seamans, Orie Shelef, Olivier Sibony, Megan Stevenson, Sonny Tambe, Tim Taylor, Neil Thompson, Mike Yeomans and Angela Zhou for helpful discussion and feedback and seminar participants in the NBER Economics of Crime working group and *AEA Session on Algorithmic Fairness and Bias*. Cowgill thanks the Kauffman Foundation and the W.E. Upjohn Institute for supporting this research.

1

**Exhibit**

**91**

Electronic copy available at: https://ssrn.com/abstract=3361280

# 1   Introduction

From 2014-2017, computer scientists at Amazon developed powerful new technology to screen resumes. The software used algorithms to examine ten years of Amazon's job candidates. It then assessed new candidates from one to five stars, like an online shopper reviewing a product. Insiders told *Reuters* it was a "holy grail" for the company's recruiting efforts.

However as the technology was tested, executives discovered disturbing results: The algorithm placed a negative coefficient on terms associated with women. The algorithm – which was supposed to help broaden Amazon's recruiting pipeline – appeared to be amplifying and entrenching male dominance in the technology industry.

Amazon's experience illustrates the challenge of *algorithmic fairness.* As more of daily life is digitized, the ethical and distributional effects of algorithms has become more important. Algorithms are often used to guide criminal sentencing, household lending and online advertising. Policymakers ranging from Alexandria Orcasio Cortes to Angela Merkel have reacted with public statements. The European Union has adopted sweeping regulations targeting algorithmic bias.

Amazon's job screening algorithm was shut down, but it raises lingering questions. How bad are these algorithms? How novel are the problems they introduce? What underlying structural and social scientific causes are behind these problems? What are their alternatives? What interventions can policymakers or firms introduce to limit them?

On the surface, algorithmic fairness is new. Research on this topic has only recently blossomed. However, we argue there are deep analogies between algorithms and other phenomena intimately familiar to economics. These include crime, environmental regulation, mechanism design, behavioral bias and innovation. These parallels allow our field to use existing insights into fresh perspectives and research strategies about the social implications of algorithms.

Consider a stylized model of choice. A decision-maker chooses an action $a \in A$ that maximizes utility ($u$) subject to a probability distribution $\hat{p}(x)$ of the states of the world $x \in X$:[1]

$$a^\star = \arg\max_{a \in A} \int_{x \in X} u(a|x)\hat{p}(x)dx \tag{1}$$

This formulation separates '$u$,' or highly subjective preferences about which there are no correct answers, and '$\hat{p}$,' or beliefs about the objective state of the world which could in principle be verified. This preferences/beliefs distinction is itself uncommon in how regulators and computer scientists conceive of algorithmic fairness.

We use Equation 1 to explore the sources of algorithmic unfairness. Section 2 examines biased algorithmic predictions ($\hat{p}$). Section 3 reviews the potential for biased algorithmic objectives ($u$). We discuss the interplay of human and machine in implementing this equation in Section 4. We then turn to measurement issues, policy implications and conclusions in Sections 5-7.

---

[1]This framework for decision-making appears in other papers (DellaVigna, 2009; Agrawal et al., 2018; Cowgill and Stevenson, 2020).

Electronic copy available at: https://ssrn.com/abstract=3361280

## 2    Biased Algorithmic Predictions

Nearly all algorithmic systems use some form of prediction. Hiring algorithms predict job performance. Lending algorithms predict repayment. Criminal sentencing algorithms predict re-arrest. Prediction accuracy is often the rationale for using algorithms. Even "human-in-the-loop" systems, where algorithms perform work with oversight, often provide predictions to human decision-makers. However, algorithms can fail at prediction along racial or gender lines, or in ways that augment and reinforce existing social inequality. Below we discuss theory and empirics for four major reasons why algorithms produce biased predictions.

### 2.1    Unrepresentative training samples

Economists are familiar with non-randomly missing data through the sample-selection literature (Heckman, 1979): Performance outcomes about job candidates who are not hired, or about loans applications that are rejected, could be missing from engineers' training data. Instead, outcomes may be available only for a non-representative selected group. Engineers using this data to train prediction algorithms for the broader population will produce biased predictions.

Unrepresentative training data could come about either for taste-based or statistical discrimination by human decision-makers. Even accurate statistical discrimination by screeners would produce unrepresentative samples. For example, suppose an employer correctly predicts that test scores correlate with employee performance. The firm will hire an unrepresentative workforce that has higher test scores. Its sample of performance data will be unrepresentative of the larger pool of workers, even if all hiring decisions were correct. In most models of sample selection, value of productive signals are suppressed. As Brown (1978) notes, the more recruiters anticipate that educated workers are better, the harder it will be to find evidence of this in the sample of hired workers.

"Unrepresentative training data" also encompasses human efforts to manipulate algorithms. Introducing a screening algorithm may change incentives by rewarding or discouraging certain behavior. This may change the predictiveness of the algorithm, resulting in bias favoring groups more able to manipulate. The training data is thus unrepresentative of the post-algorithm equilibrium environment it is attempting to predict (Choudhury et al., 2019). Björkegren and Blumenstock (2019) introduces methods for manipulation-proof machine learning by explicitly measuring (and accounting for) agents' costs of manipulation.

How big of a problem is unrepresentative data in modern machine learning? The question requires an empirical answer that may vary by application. "Unrepresentative" anything has bad optics from the public's perspective. However, two recent theoretical papers (Cowgill, 2018b; Rambachan and Roth, 2020) show how sample selection bias in training data may not be as bad for algorithmic predictions as it appears, at least not compared to the process that generated the biased data. This is good news; perfectly representative datasets, particularly ones that lacks other issues below, are abstractions that may not exist in reality.

Rambachan and Roth (2020) examine the downstream consequences for algorithms of upstream human discrimination in training data. The authors show how, under plausible assumptions, algo-

3

Electronic copy available at: https://ssrn.com/abstract=3361280

rithms naively trained on biased data could actually *flip* the bias – resulting in favoritism towards the group facing discrimination in the training data. The reason is that firms may discriminate against minorities by raising standards, allowing minority workers *only* if they are performance superstars. The resulting employer dataset would contain overly-positive correlations between minority status and performance (driven by having a higher selection bar).[2]

Cowgill (2018b) endogenizes the problem of unrepresentative data, and then characterizes the space of human decision-making processes under which automated learning technologies reduce or eliminate the underlying human biases (using various machine learning approaches). In the model, human decision-makers generate a historical dataset by making a series of biased decisions (either from taste-based discrimination or poorly-calibrated statistical discrimination) that generates selective data.

The model suggests that machine learning algorithms can remove human biases exhibited in historical training data, but only if the human training decisions are sufficiently *noisy*. The key to this model is that better learning technology is complementary to greater experimentation. From the perspective of machine learning, noisiness in human judgment is effectively experimentation. The noisiness facilitates learning by exploring the space of alternative, less-biased decision-making strategies. Without enough noise, the learning technology will simply codify or exacerbate existing biases.

Given abundant evidence of noisiness in decision-making documented by psychologists and behavioral economists, the model makes optimistic predictions about the effects of machine learning on bias – even in the presence of bias in the humans generating the training data. Only a small amount of noise is required to reduce biases that cause large productivity distortions. As the level of human-related noise increases, machine learning can correct both large and increasingly small productivity distortions. However, the theoretical conditions necessary to eliminate bias completely are extreme, and are unlikely to appear in real datasets.

The model also suggests that the high levels of noise in decisions, a necessary condition for debiasing, harms traditional "goodness of fit" measures often used to measure model quality in practice among software engineers. If engineers and entrepreneurs use these metrics to guide their choice of applications, they will be lead towards applications most likely to codify, rather than relieve, biases.

Taken together, these results have implications for the way that expertise interacts with machine learning. A variety of research suggests that the benefit of expertise is lower noise and/or variance, and that experts are actually *more* biased than non-experts (they are biased towards their area of expertise, Li, 2017). If this is true, then the Cowgill (2018b) model of noise suggests that using expert-provided labels for training data in machine learning will codify bias because experts *experiment too little*. Even if experts are better than nonexperts at performing the job directly (as Li, 2017 finds), training algorithms using experts' historical data may not be as useful if the experts fail to explore alternative decisions.

These papers suggest the popular expression "bias in, bias out" is a useful reminder for technologists to check their assumptions; the phrase may be misleading as a map of reality. Although

---

[2]The authors note that this algorithmic "flipping" may not occur if bias appears both in selection and in the scoring of performance among selected workers.

Electronic copy available at: https://ssrn.com/abstract=3361280

unrepresentative training samples are common, there is evidence that this may not impose an insurmountable problem to reducing bias in practice. Many of the algorithms that appear to perform well (including many listed in Section 5.1) were trained using unrepresentative samples. This may be a direct application of the theoretical mechanisms described above, or another mechanism.

One field experiment was directly motivated by questions around unrepresentative data (Cowgill and Dell'Acqua, 2014). In the experiment, a diverse group of $\approx$400 Artificial Intelligence (AI) engineers was assigned to predict performance on a standardized math test for a representative sample of OECD residents. The engineers are secretly given different test data as randomized treatments; some are given highly representative test data, and others are randomly assigned to a "convenience sample" consisting of workers employed in math-intensive jobs (this simulates companies' tendency to build models using data of existing employees or customers). Programmers using the representative data were more accurate and less biased. *However*, a simple reminder about the unrepresentativeness of training data enabled engineers to lower bias and perform approximately 60% as well using unrepresentative training sample.

## 2.2   Mislabeling Outcomes in Training Samples

Some outcomes in training data may be labeled incorrectly. A worker facing discrimination by a supervisor may be wrongly labeled as low-performing. Algorithms trained on this corpus would associate the worker's characteristics with low performance rather than discrimination. As with "biased training samples," mislabeling outcomes may come about either for taste-based or statistical reasons by earlier humans.

"Mislabeled outcomes" encompasses themes of the multitasking literature in contracting, often summarized as "you get what you pay for." In this same spirit, in supervised machine learning "you get what you trained for." Excellent employee performance often requires a combination of easily measurable objectives and abstract behaviors that are difficult to quantify. The difficulty of quantifying these goals creates problems both for incentive contracts and for algorithms. If employers offer contracts that pay only on easily measurable outcomes, they will substitute effort away from abstract goals. The same is true in supervised machine learning. If algorithms are trained only to predict outcomes that are easily measured, they will optimize these predictions at the expense of other objectives. This exhibits one of several parallels between machine learning and mechanism design.

As with the sample selection problem, "mislabeled outcomes" can be modeled theoretically. The presence of some bias in the outcome labels does not guarantee that an algorithm will fully inherit the bias; under mild assumptions it could nonetheless reduce bias below the levels in the training data (Cowgill, 2018b). As with earlier, noise in sample selection is useful for de-biasing. However, it is possible for outcome mislabeling to be so severe that no amount of noise can prevent the algorithm from inheriting (and amplifying) bias.

Obermeyer et al. (2019) contains a recent example of mislabeled outcomes in a widely-used algorithm in health care. At a given risk score, black patients are considerably sicker than White patients, as evidenced by signs of uncontrolled illnesses. The bias arises because the algorithm predicts health care costs rather than illness. This is clearly a potential case of mislabeled outcomes driving biased predictions; the training data mislabels low-cost patients as healthy, but in

5

Electronic copy available at: https://ssrn.com/abstract=3361280

reality some are "low-cost" because of inequality in access to health care (rather than need). However, as discussed in Section 3, the algorithm may exhibit biased objectives. Optimizing around cost, rather than need, may serve organizational objectives besides serving needs.

Biases originating in mislabeling could be reduced with statistical approaches. For example, an algorithm used for predicting worker performance could incorporate sensitive demographic variables (along with non-sensitive ones) during learning and estimation of coefficients. Including the sensitive variables allows better estimation of non-sensitive variables, particularly when these are correlated.

However, when this algorithm is used for assessments (predictions) on new candidates, each new candidate would be evaluated only using non-demographic characteristics. The non-demographic weights for this evaluation would come from the learning process above, holding sensitive variables constant across all candidates (Pope and Sydnor, 2011). Yang and Dobbie (2018) incorporate these and related ideas into a legal framework.

### 2.3   Biased Programmers

According to the Bureau of Labor Statistics in 2018, software engineers are more white, male, well-educated and better-paid than America as a whole. These engineers may not be consciously biased, but their life experiences may influence their approach to developing an algorithm.[3]

"Biased programmers" could create both unrepresentative training samples as well as mislabeling outcomes. In many practical settings, software engineers are responsible for assembling training data, formulating the computational problem, as well as developing and implementing software. Programmers pay disproportionate attention to particular training examples, measures of accuracy, or empirical applications during development.

Diversity is a major part of groups' thinking about algorithmic bias. A policy report by the AI Now Institute writes that "[T]he challenges of bias within technical systems requires addressing workforce diversity." A recent NSF-backed consortium of computer science departments listed programmer diversity as an input to biased algorithms (Parkes et al., 2019) and called for greater research. An early review of digital economics lists programmer bias as a key area for further research (Tucker et al., 2018).

Anecdotal evidence about the biased programmers hypothesis suggests that it is not driven by deliberate animus but by programmers failing to consider their diverse audience. One alleged example of this may have taken place in 2015, when Google released a photo product that offensively mislabeled some racial groups as animals.[4] Had Google's product developers been more diverse, the problem may have been noticed before release. Separately, Blodgett and O'Connor (2017) find that machine translation tools by Google, IBM, Microsoft, Twitter and others translate text and speech by African-Americans and women more inaccurately than speech by white males. The authors highlight that blacks and women are a much larger portion of the American population (and of Internet users) than they are of the engineering teams of these firms.

---

[3]This could come about on account of either taste-based or statistical discrimination in the developer.
[4]Forbes.com, 2015.

6

Electronic copy available at: https://ssrn.com/abstract=3361280

Several papers give reason for hope regarding biased programmers. Research in psychology and behavioral economics suggest that bias is stronger in low-attention decisions (Schwartzstein, 2014; Hanna et al., 2014; Bartoš et al., 2016). The Bordalo et al. (2016) model suggests that stereotypes come about partly because of human misunderstanding of the prediction problem – humans provide diagnostic variables when they are asked to make predictions.

Algorithmic systems work by delegating learning to a computer, which effectively has more "attention" (memory and computing power) and a better understanding of the prediction problem. These enable a less crude prediction model. Of course, delegating to a computer requires direction from a human programmer and thus does not entirely avoid the potential for human bias. However, programming is a highly deliberative task requiring humans' focused attention. Subconscious bias may be less likely in this deliberate process than in low-attention, 16-second resume reviews.

Several other reasons are less optimistic. Programmers often face incentives to create algorithms that confirm prior beliefs. Many computer science papers validate models by showing results that agree with the programmer's prior intuition. A famous example of this occurred at US News and World Report, whose early managers re-adjusted college rankings until the results conformed to their prior images of great universities (Thompson, 2000).

Statistical evidence that links a programmer's identity to algorithmic behavior is rare. In a recent paper, Silberzahn et al. (2018) give twenty-nine research teams (61 individuals) an identical dataset about soccer. Each researcher was asked the question: "Are referees are more likely to give red cards to dark-skin players than light-skin players?" Answers varied widely across the researchers, and nearly all teams used a unique combinations of covariates. The authors did not report differences by the researcher's demographics, but the results show that programmers may reach widely different conclusions using the same data.

The Cowgill and Dell'Acqua (2014) experiment on AI development ($\approx 400$ programmers predicting math scores) also examines the biased programmers hypothesis. The experiment included a resume-audit -like manipulation of algorithmic inputs, revealing which programmers wrote code directly conditioning predictions on gender and gender proxies. At the end of the experiment each engineer completed an implicit association test ("IAT," Greenwald et al., 1998) measuring automatic associations between gender and math. The authors found few relationships between the gender-bias of an engineers' predictions, whether it directly used gender variables or proxies, and the programmers' own characteristics including the IAT.

These results fail to show support for the "biased programmers" hypothesis, although the test was somewhat narrowly defined. Had programmers become involved in shaping product specifications for tech products – rather than implementing a prediction algorithm – demographic differences may have mattered more. Similarly, the experimentused demographic variation within the recent engineering talent pool. The variation necessary to reduce algorithmic bias may reside entirely beyond the current talent pipeline. Finally, the results also come with a significant caveat: Although overall levels of bias and accuracy were not correlated with demographics, prediction errors *were* demographically correlated. This raises the possibility of accuracy improvements and bias reductions from cross-demographic averaging.

Electronic copy available at: https://ssrn.com/abstract=3361280

## 2.4   Algorithmic Feedback Loops

Feedback loops generate biased predictions by contaminating the training data. Feedback loops occur when the act of predicting causally affect the outcomes they are supposed to "predict." The use of predictions thus affects whether these predictions are correct. Arrow's 1973 classic work about "self-fulfilling prophecies" shows that similar feedback loops may happen even if statistical discrimination is accurate and unbiased. Algorithmic feedback loops instantiate such processes in code. Not only are outcomes affected by predictions, but also these tainted outcomes are then codified as "ground truth." This contaminated "truth" is then used in future algorithms, which may reinforce biases from the original predictions.

Causal inferences about "algorithmic feedback loops" are inherently difficult. In many cases, job applicants labeled "high expected performance" by an algorithm may be more likely to be hired anyway, even without algorithmic labeling. Attributing a hire to an algorithm requires a quasi-experimental intervention. Identifying a feedback loop requires a researcher not only locate such an intervention, but also trace the intervention as it propagates into codified outcomes as well as future actions and conclusions drawn from contaminated data.

To our knowledge, Cowgill (2019) presents the only well-identified causal evidence of the "algorithmic feedback loop" phenomena. The setting is Broward County, Florida, where bail judges are provided predictions about defendants' recidivism using an algorithm derived from historical data. The output of the prediction algorithm, called "COMPAS," was continuous, but the scores were shared with judges in rounded buckets of low, medium and high. Using the underlying continuous score, the paper examines judicial decisions close to the thresholds using a regression discontinuity design.

Defendants slightly above the thresholds spend additional time in jail before trial, suggesting that judges incorporated the signal into decisions. When bail is linked to outcomes, the extra pre-trial detention given to defendants above the thresholds corresponds to a small increase in re-arrest within two years. This was the outcome the algorithm was originally designed to predict. Black defendants' outcomes more sensitive to the thresholds than white defendants'. These results suggest that algorithmic suggestions have a causal impact on criminal proceedings and recidivism. Showing this label to judges affects whether or not the original assessment was "correct" by traditional predictive-accuracy measures.

However, algorithmic labels not only affected defendant outcomes. They also affect future training datasets, and thus future research conclusions and future algorithms. The COMPAS dataset has been extensively used in computer science. Many papers featuring this data use re-arrest outcomes as "ground-truth" for new methods. They do *not* use the rearrest data as if it were contaminated by upstream interventions by judges. These papers instead use re-arrest outcomes as if they were fair measures of criminality, untainted by judges' utilization of the same algorithm (COMPAS) that these papers criticize.

Cowgill (2019) re-examines several highly cited CS papers utilizing this data. In all cases, it appears that the researchers baked the regression discontinuity into the newly proposed algorithm. As a result, it appears the algorithms in these papers overstate risk for high-risk defendants, particularly high-risk black defendants. This completes the algorithmic feedback loop: The original COMPAS intervention affected judges' decisions, which affects re-arrest probabilities, which af-

Electronic copy available at: https://ssrn.com/abstract=3361280

fects the training data used by researchers for future algorithmic development. This example shows algorithmic feedback loops in an empirical setting. It also shows how experiments (or quasi-experiments like regression discontinuities) can be useful to quantify feedback loops and de-contaminate data.

## 3   Biased Algorithmic Objectives

Many algorithmic problems are caused by prediction bias. This can arise from training data, feedback loops or biased programmers. However, in order to make or recommend action, algorithms must also exhibit an objective function (explicitly or implicitly). Unfairness may arise from these objectives, even if predictions are perfectly accurate. Algorithmic objectives are particularly salient when decisions are fully automated. Such applications necessarily exhibit preferences that are chosen, consciously or otherwise, by the owners of the algorithmic application. By contrast, in "human-in-the-loop" systems, algorithmic objectives may interact with humans' in ways we explore later.

In algorithmic decision-making, software is often responsible for searching the action space for a maximum.[5] Optimization is a traditional strength of algorithms. However, the greater ability to optimize highlights a recurring issue: Modern optimizers are very effective at discovering the edge-cases that maximize the stated objective, possibly at the expense of values that designers left implicit and forgot to make explicit. Society's need to make implicit objectives more explicit drives much of the social turmoil around bias, algorithms and AI.

The issues that arise in this section can but do not always, involve deliberate taste-based animus against a group. More often, the problem is that an algorithm pursues a defensible goal, but in a way that does not prioritize equality (at least in some observers' view). An algorithm's proper objectives may simply be a matter of taste. Objectives differ from predictions in that they cannot be empirically validated; there is no "ground truth" about correct tastes.

Some of the debates about "algorithmic fairness" are simply value differences between these broader societal or organizational goals. Other algorithmic fairness debates are simply power struggles about whose subjective tastes should be represented in algorithmic decision-making. These issues are fundamentally non-technical, and would probably arise in the absence of digitization. They are digital only insofar as technology makes it possible to measure objectives with more granularity.

Bias in algorithmic objectives can arise for similar reasons as algorithmic predictions. Biased programmers could influence algorithmic objectives. Similarly, proxy variables may be problematic. A criminal sentencing algorithm might aim to maximize public safety. Lacking a good measure of public safety, the algorithm may instead minimize re-arrest as a proxy. This may skew outcomes along racial lines if police are more likely to investigate (say) in black neighborhoods. We discuss four areas where distinct issues around algorithmic objectives arise.

---

[5]Shortcomings of this search technology are responsible for unexpected human behavior in other domains. For example, in behavioral economics, framing, menu effects and limited attention are instances of suboptimal search (DellaVigna, 2009).

Electronic copy available at: https://ssrn.com/abstract=3361280

## 3.1   Race- and Gender- Specific Thresholds

The first is whether engineers should set different decision thresholds by race, ethnicity or gender. This typically arises in the face of explicit preferences for diversity or for redistributive affirmative action.

Like the other issues discussed in this section, the merits of race- or gender- specific thresholds are at least partially about tastes. Flawless prediction technology might not entirely resolve differences about the merits of diversity and affirmative action. The merits of race- and gender-specific thresholds are also not entirely algorithmic issues. A literature in economics and social science has examined the effects of pro-diversity and affirmative action selection processes. The core issues are about incentives for investment, the efficacy of "blind" affirmative action, the avoidability of quotas and the lifecycle timing of affirmative action, none of which are algorithmic (see Fryer Jr and Loury, 2005 for a review).

We raise this issue because it arises so frequently in practice, and appears to be an animating issue in the computer science literature about algorithmic fairness. Practitioners are often drawn to the idea that race- or gender- specific standards are "unfair," but so is an algorithm that overselects single group.

Several CS papers appear motivated to find a principled way of resolving this tension without sacrificing prediction accuracy, introducing group-specific treatments, or naming explicit tastes for diversity; however, theorists have shown such a resolution may be impossible (Kleinberg et al., 2016). These problems highlight the limits of regulations (and social ethos) of making decisions "blind" to demographics. Using demographic data can be useful for increasing diversity.

## 3.2   Spillovers

Many economic designers aim to maximize a group-level variable, such as efficiency or maximizing cost-savings. Group outcomes are the product of interdependence between players' choices. Issues around spillovers are particularly salient in digital economics. Group-level outcomes can exhibit bias even if each actor's predictions are all individually unbiased.

An example appears in Lambrecht and Tucker (2016), which studies how online advertising for STEM jobs are displayed differently to men and women. This paper highlights the tensions between various notions of fairness. The authors examine 190 online ad campaigns targeted at both genders run in every country in the world. The authors find that the STEM ads are shown to men more often, and the difference is largest between younger men and women.

At first glance, the culprit appears to be inaccurate predictions or algorithms that unfairly associate engineering jobs with masculinity for historical reasons. However, the drivers of the effect are countries such as Canada, rather than countries that rank poorly on promoting female workforce participation. The authors' closer analysis reveals a different explanation. Women are less likely to see these ads for STEM jobs because of competition from other advertisers, particularly those selling consumer-packaged goods ("CPG"). Ad auctions for female eyeballs contain more bidders and thus have higher clearing prices. The phenomenon of "Female eyeballs are more expensive for advertisers" is a broader phenomenon that appears in advertising settings beyond the platform

10

Electronic copy available at: https://ssrn.com/abstract=3361280

they study.

The result is that STEM ads targeted to women are crowded out because of spillovers between industrial sectors. This happens less frequently in the markets for male eyeballs. As a consequence, otherwise identical campaigns reach fewer women because there is more competition for female attention. Demand for female attention coming from CPG (and other sources) spills over to affect prices and quantities for STEM ads, effectively crowding them out.

This is an issue of objectives. The auction-based allocation system attempts to save advertisers money in their ad targeting; this is a worthwhile goal in their own right, but places no value on gender equality. Other allocation methods could produce the same outcome, so long as they also respond to advertisers' preferences.

The proper tradeoff between these competing goals is a question of tastes. Importantly, inequality arises in this setting even though all bidders appear to be correct about their predictions. Clarifying information or improving predictions would not solve this tension. Instead, the issue arises from spillovers arising through the price system.

Gender targeting may be necessary to achieve balance. Without gender targeting, an employer could not increase bids for women in order to out-bid CPG advertisers and reach male and female STEM candidates equally. But this too, creates other fairness issues: Recruitment strategy would feature unequal resources to recruit men and women. For this reason, Facebook and the EEOC explicitly forbid using gender to target employment.

## 3.3   Explore and Exploit

An ideal decision rule would optimize not only today's choices, but also a sequence of choices over a longer horizon. Optimizing this *stream* of choices may require the decision-maker to use their early decisions to gather information, rather than pursue short-term payoffs. This is the famous tension between "exploring" new knowledge and "exploiting" existing information. Bias can thus arise from algorithmic objectives favoring excessive exploration or excessive short-term exploitation. Resolving this tension is one area where algorithms have been developed, but relatively few empirical applications have evaluated the effects of adjusting this tradeoff.

Even when algorithms engage in a learning phase, bias may arise if the arrival rate of new information differs by group. Lambrecht and Tucker (2020) examine search results for traditionally black names. Because these names are less common, learning best responses to these queries is slower. A learning algorithm therefore might delay judgements on how to respond to these queries, which would lead to differential treatment of search results for black and white names.

## 3.4   Increasing Value or Lowering Costs?

Algorithms and prediction are often used by someone to maximize their own surplus in transactions. This can have several unintended consequences worth exploring. First, an algorithmic prediction can maximize surplus through two levers. The algorithm can first select candidates who deliver more value at the same price. Alternatively it can choose candidates who deliver the same value, but at lower prices. For example, it could find candidates willing to accept job offers

Electronic copy available at: https://ssrn.com/abstract=3361280

without negotiating.

This issue arose empirically in Cowgill (2017), which found that the introduction of machine learning into hiring decisions led to more offers to non-traditional candidates. Despite being overlooked by the firm's human recruiters, these candidates performed slightly better in interviews and on-the-job performance. However, these non-traditional candidates were also 15 percentage points more likely to accept job offers when extended, and were 12 percentage points *less* likely to show evidence of a competing offer in negotiations surrounding offers.

The jobs in question were mostly fixed-wage jobs, so this did not result in lower wages. However, some employers would engage in such bargaining, which would increase inequality between traditional and non-traditional workers at the same company. This presents clear tradeoffs. The introduction of AI and deployment of algorithms appears to increase inequality within firms. However, it may *decrease* inequality among candidates as a whole by expanding the group who offers at all.

More generally, algorithms are often used by a market designer to improve targeting for buyers and sellers. For example, algorithms can help segment marketplaces into categories, or provide signals used for buyers and sellers to condition payments. Maximizing targeting may raise buyers' valuations. However, this again creates issues around bargaining power. Excess targeting could fragment markets into smaller, segmented pools of demand. These segments may contain higher match quality, but suffer from "thinness" as the quantity of participants (per segment) decreases (Hummel and McAfee, 2015; Fu et al., 2012).

However, theory and empirical papers suggest the better targeting also changes the composition of transactions, particularly by allowing previously-unsold ad inventory (Athey and Gans, 2010; Cowgill and Dorobantu, 2019). This unsold inventory is the equivalent of the "non-traditional candidates" granted jobs by hiring algorithms in the example above.

These examples raise an additional market design issue. Over time the benefits of any firm using AI for hiring could potentially decrease, as other firms similarly adopt and bid up the wages of useful "non-traditional" candidates. Such a marketplace could widen inequality as it became clear which workers were useful to all firms (and thus received competing offers) and which were less productive (and deserving no competing offers).

However, this argument assumes a common-value labor market, in which the value of a worker is the same in multiple firms. In a market where firms value workers differently – for example, because of differences in production processes, cultural fit or other match-specific questions – the benefits of AI for firms are less likely to be competed away. The AI could also improve outcomes for workers by expanding the group of workers receiving an offer. To our knowledge, Agan et al. (2019) contains the only empirical estimate of how correlated firms' demands for workers are. The paper finds moderate sized correlations, showing a large role for heterogeneous preferences between employers in the same industry.

This suggests that multiple firms could simultaneously benefit from using hiring algorithms. It also suggests that hiring AI may not widen inequality between workers, as firms have distinct preferences and would not use the AI to compete for the same candidates. Finally, the heterogeneity suggests that hiring algorithms could connect employers who workers who lack competing offers, since employer preferences are heterogeneous. This improve outcomes for both the em-

12

Electronic copy available at: https://ssrn.com/abstract=3361280

ployer and the worker, although these AI-targeted workers may have have less bargaining power than a typical worker.

# 4    "Human-in-the-Loop" Applications

Many high stakes applications of algorithms are not fully automated; they instead feature human oversight or manual review. This creates issues familiar to organizational economics, some of which have implications for policy.

Humans sometimes consult algorithms as they would an expert. If the expert has different objectives than the human, this may create strategic communication problems (Crawford and Sobel, 1982). Misalignment creates temptation for the expert to exaggerate reports in order to trick the client into serving the expert's private objective. The potential for strategic misreporting and exaggeration leads clients to ignore and de-value expert advice.

This is relevant to popular policy responses to algorithmic unfairness. In many settings, an algorithm plays the role of an expert offering advice to a human decision-maker. For example in criminal courts, judges in many jurisdictions receive algorithmic predictions about each defendant's re-arrest risk. Activists have blamed these algorithms for inequality in sentencing, and have proposed a variety of "fairness constraints" on these algorithms.[6] A judge could reasonably infer that the goal of these constraints is *not* to provide the judge with more accurate information, but to encourage particular judicial behavior. Empirical and theoretical evidence shows these constraints actually would reduce prediction accuracy.

The "fairness constraint" policy thus resembles the expert above, aiming to trick their client by exaggerating guilt or innocence (Cowgill and Stevenson, 2020). Some measures of fairness may be higher if judges fully incorporate accurate predictions into decisions, rather than face politically-manipulated predictions that they would rationally ignore. The key constraint in "algorithmic expertise"' applications is the client's objective. It is unclear how manipulating unverifiable messages or cheap talk can change a judge's objectives.

These issues raise contracting questions around the allocation of authority between humans and AI. A key consideration is the need for human effort, for example to avoid humans falling asleep at the wheel, and how to design AI and human interaction to maintain these incentives. Athey et al. (2020) examines the division of authority between humans and algorithms, finding that deliberately bad AI – including biased AI – may be useful as a form of eliciting oversight effort from humans.

# 5    Measuring Algorithmic Fairness

A long tradition in economics emphasizes measuring discrimination "on the margin." This means that discrimination is measured by examining outcomes of candidates who are on the cusp of being accepted or rejected for a decision (Becker, 1993). *Marginal* hires are studied rather than

---

[6]One such constraint, "demographic parity," would essentially require algorithms to claim that all demographic groups are on average equally at risk of re-arrest.

Electronic copy available at: https://ssrn.com/abstract=3361280

*average* hires because there may be large differences in the outcomes of *average* hires that are not the result of bias (Ayres, 2002).

Measuring marginal candidates is difficult in non-algorithmic settings. Hiring decisions by human recruiters typically label who is hired or who is not, but do not create a rank order that would allow a researcher to isolate candidates near thresholds. This has inspired a variety of creative research strategies for identifying marginal applicants, ranging from structural assumptions to random assignment of judges or examiners.

By contrast, a hiring algorithm enable not only binary decisions, but rank ordering (and distances between) all candidates' scores. This enables marginal candidates to be examined using regression discontinuity-style procedures that examine candidates close to a threshold. Berk (2017) , Stevenson and Doleac (2018) and Cowgill (2019) use regression discontinuities in various ways to examine algorithmic fairness questions.

The availability of a full range of scores may also allow measurement of bias at multiple thresholds, or even at all possible thresholds. Obermeyer et al. (2019) examines bias in algorithmic health care prediction throughout the distribution of risk. This is one example of the many ways that bias in algorithms is more easily measured than bias in humans, a theme that has implications for who adopts algorithms and how they are regulated (discussed in Sections 5.1 and 6).

## 5.1    Benchmarking vs Human Judgment

Beyond measuring the presence and magnitude of bias, economists are often interested in comparing bias between multiple approaches. If decisions are not made by algorithms, they will be made some other way. Whatever the shortcomings of a particular algorithm, a human judge could plausibly perform worse.

This orientation is common throughout economics. However, the premise of human benchmarks is controversial among algorithmic fairness researchers. These critics interpret human benchmarks as implicitly stating that AI engineers should narrowly improve the *status quo*, stop, be congratulated for that achievement and fail to undertake additional fairness improvements. Others have suggested that flattering comparisons to human bias is a tactic for avoiding government regulation or accountability.

The premise of this argument is that incentives for reducing bias disappear after current levels are eclipsed. However, any amount of prediction bias is already illegal and punishable. It's also unprofitable and unpopular. Under the current legal framework, incentives remain until bias is completely eliminated. "We're doing better than before" is currently not a viable legal defense.

In addition, implementing machine learning involves large fixed costs of capital, labor and complementary organizational practices. Once these fixed costs have been paid, marginal costs of improvements dramatically lower. This makes it easier for firms to reduce bias and productivity even further in future iterations. Once decisions are made digitally, they should be easier to diagnose and address.

The problem with reducing bias is that it is hard to detect and correct. In this respect, algorithmic decision-making greatly aids the discovery and correction of bias. Compared with humans,

14

Electronic copy available at: https://ssrn.com/abstract=3361280

algorithms are far more easily audited by examining the underlying code, or manipulating inputs and examining outcome differences. Many human choices are not recorded at all, which makes detection impossible. Although humans can offer "explanations" for decisions, these human explanations may deviate from the truth in self-serving ways.

Premature stoppage may be most tempting *before*, the large fixed cost of digitization are paid, not afterwards. Firms already face many non-digital ways to "narrowly improve the status quo, then stop prematurely and be congratulated," for example, through diversity training programs that appear to have little impact (Chang et al., 2019). Software is easier to upgrade than obstinate human habits. Remaining pre-digital is particularly tempting for employers because firms can easily evade detection when processes are not codified.

A few papers measure algorithmic bias compared with counterfactual institutions. These papers tend to focus on biased predictions rather than biased objectives, insofar as they pertain to verifiable outcomes. The papers generally show greater accuracy and lower bias, leading to lower disparities across groups (although some show increases).

Kleinberg et al. (2017) develop an algorithm for predicting recidivism. To compare their algorithms' performance against human judges, they construct a simulation by exploiting the random assignment of judges to cases. The simulation models judges perfectly complying with the algorithm's guidance and making decisions to minimize re-arrest. Although the counterfactual is simulated, their results suggest large welfare gains from reduced crime (up to 24.8%) with no change in incarceration rates. The authors also show that "the algorithm is a force for racial equity," allowing judges to incarcerate 40.8% fewer minorities without increasing the crime rate.

Similarly, Cowgill (2017) contains a field experiment in overriding human discretion with algorithmic judgment about employers' decisions about whom to interview. The experiment follows candidates into productivity realizations in their next jobs. Although the algorithm was trained on historical data, it *increased* hiring for several historically underrepresented groups at the firm.

Dobbie et al. (2018) measure bias in lending using random variation in the assignment of loan examiners to applicants. The authors find significant bias against both immigrant and older loan applicants. Using simulations similar to Kleinberg et al. (2017), they find that a decision rule using machine learning can simultaneously eliminate bias and increase profits.

Fuster et al. (2017) examine the effects of better statistical technology on lending using a structural model of both loan rates as well as decisions on loan applications in equilibrium. The authors find that the machine learning models are more effective at predicting default, and extend credit to a slightly larger fraction of mortgage borrowers. This slightly reduces cross-group dispersion in positive decisions on loan applications. However, they also find increases in the differences in interest rates across groups, particularly by widening the interest rate gap between white and non-white borrowers. These may be driven by actual differences in the underlying probabilities of default and thus not the result of *bias* by the models. However, these differences may be troubling for other reasons (i.e., the widening of the racial interest rate gap). In a related paper, Bartlett et al. (2019) find that FinTech lending algorithms discriminate 40% less than face-to-face lenders.

A related set of papers studies the effect of interventions to guide human judgement with algorithms, rather than allowing human judgement operate alone. The resulting changes in behavior are described below, but cannot be evaluated in terms of accuracy insofar as the behaviors are not

15

Electronic copy available at: https://ssrn.com/abstract=3361280

predictions. Stevenson (2017) examines how judges are influenced by algorithmic guidance in pretrial release decisions, using sharp pre/post variation around Kentucky's adoption of algorithmic scoring in 2011. Stevenson and Doleac (2019) uses a difference-in-differences strategy for Virginia's adoption, exploiting before/after and eligible/ineligible variation. Both papers find little or no effects on racial disparities or re-arrest rates. The judges in both papers appeared to broadly ignore the algorithmic interventions, except near thresholds in the score.

## 5.2   Experiments

Throughout most of empirical economics, high quality evidence comes from field experiments. However, there are few field experiments examining algorithmic bias. Opening a "FDA for Algorithms" is a commonly-suggested policy solution for algorithmic fairness (Tutt, 2017). Randomized controlled trials are a key component of FDA regulation, but few commentators have specified how this aspect of pharma policy would apply to algorithms. Field experiments could be useful either in examining the effect of new algorithms, or in examining interventions designed to change the behavior of software developers and companies. A full discussion of experimental design is beyond the scope of this essay, but Cowgill (2018a) contains a practical guide to designing and executing field experiments motivated at identifying bias in machine learning.

As an example of experimental approach, consider Cecere et al. (2020). In this paper, they run three different versions of the same set of ad campaigns to measure how Facebook distributed photos in ads for teenagers to attend a technical college. The authors show that the algorithm highlighted a picture of a woman without a head, and a man with a head more than any other picture. However, the cause in each case was different. One driver was the algorithm's reflection of Paris' preferences more than other regions, because that is where the most data originated. Second, the algorithm learned excessively from what happened in the early hours of the morning when there was little data available. Third, the algorithm did not correct from information it learned early on in the experiment due to its reliance on a short learning phase.

Three aspects of randomized experiments are particularly undervalued. First, experiments allow easy comparisons between algorithmic and non-algorithmic decision-making processes. Part of the value of an experiment is from seeing outcomes. Part is about seeing what decisions change, even before outcomes are realized. Without an experiment, a company, regulator or researcher could not know how much algorithm-identified candidates would be admitted anyway by an alternative or pre-existing process. Through randomization, this is possible without having access to the underlying code (because experiments are entirely outcomes-based).

Second, estimates from experiments also offer some of the benefits of interpretability. In many settings, decisionmakers seeking an "interpretation" of an algorithm simply want an explanation of what decisions it would change and what outcome this would produce. Experiments are much better at answering these questions than attempts to interpret coefficients.

Lastly, experiments allow feedback loops to be controlled for and removed. We discuss feedback loops in Section 2.4. An algorithm's label may cause a negative outcome, which could then be used as training data and to reinforce labels. However, these negative outcomes may have happened anyway. Experimental variation would use a control group of randomly selected subjects with similar covariates who are not subject to an algorithm's intervention. This would not stop the

Electronic copy available at: https://ssrn.com/abstract=3361280

feedback loop for the treatment group, but would allow researchers to measure the true extent of the loop so that an intervention can be justified.

# 6    Policy Implications

Policies for regulating algorithms overlap with other forms of policing discrimination, but also require some novel considerations. Below, we discuss three central issues in regulating algorithmic fairness: The prediction/objective distinction, the role of incentives to evade detection and the form of regulation (algorithmic inputs or outputs). Our goal in this section is less about advocating a particular approach, and more about describing the tradeoffs of various regulatory strategies emphasizing incentives and dynamic considerations.

## 6.1    Predictions and Objectives in Regulation

This essay is organized around the separation of biased predictions from biased objectives. As we show, these have different underlying causes. They also have different practical solutions. Biased predictions may have a technical fix through obtaining better data or adopting technical anti-bias statistical methods. Biased objectives lack clear technical solutions. They instead require leaders and groups to formulate and assert their subjective values. "Fixing" biased objectives may require social or leadership change, possibly through non-technical social structures overseeing algorithms (Cowgill and Stevenson, 2020).

The predictions/objectives distinction may be worth explicitly incorporating into practice and public policy. Some algorithmic behavior may be more acceptable as part of prediction function, rather than a utility function (or vice versa). For example: A government should rightfully object to algorithmic utility function that prioritizes certain ethnicities or races in its objectives. However, the use of a race or ethnicity variable could be more acceptable in the context of predicting where poverty (or other problems needing attention) appear empirically if these problems were associated with historic patterns of discrimination.

Modularizing software into separate prediction and objective functions would help observers isolate the source of problems. This may be useful for both outsiders, as well as firms' developing their own algorithms. The prediction module can be assessed based on its empirical accuracy, and the objectives function could be assessed using ethical norms and subjective values of governing parties.

Modularization also helps prescribe an effective policy response. The effectiveness of different strategies depend critically on the objectives/predictions distinction. Strategies based on punishments are a better fit for addressing biased objectives. If predictions are unbiased – and the problem with the algorithm is only about its preferences – punishments could induce better decisions by aligning decisionmakers' objectives with equality.

However, punishments may be less effective addressing biased predictions. Firms already face incentives to make accurate predictions; whatever decision-makers preferences, they can profit by predicting more accurately. Interventions for "biased predictions" need to teach or compel new

Electronic copy available at: https://ssrn.com/abstract=3361280

learning, possibly by creating data or content to improve predictions. However, implementing this may be impractical: How can a policy-maker establish that bias in prediction accuracy exists at all? If data exists to verify predictions, why didn't firms use this data to de-bias their algorithms in the first place? Without good verification, how can a third party teach or compel more learning?

Software that modularizes predictions and objectives helps identify the source of problems and their solution. This may be useful not only for outsiders, but also for firms' developing their own algorithms. Such diagnosis between objectives and predictions is much harder with humans, because these predictions and objectives cannot be cleanly separated inside the human mind. However, they could be separated in software; these blocks of code could be managed by entirely separate teams and incentives systems (Cowgill and Stevenson, 2020).

## 6.2   Detection and Incentives to Evade

Regulation of bias must consider evasion and detection. When multiple forms of bias exist (human and machine), policy must grapple with the incentives to substitute between decision-making methods. Two issues are particularly salient. The first is about how easily problems can be detected, and the second is about how easily regulators can hold firms liable in the legal system.

Policies that do not grapple with substitution incentives will fail to reduce unfairness, and will instead compel firms to hide bias behind less transparent processes. There, it will be harder for everyone to inspect and correct (both regulators and the firm itself). Punitive policies may actually increase bias, even if the intent was to reduce it, by compelling evasion activity.

**Relative Measurability**   One of the key benefits of algorithms is the ease with which fairness problems can be probed. Even if algorithms reduce bias, they could make the remainder more visible. This has implications for regulator's detection and deterrence strategies. Faced with excessive punishment, firms may prefer to *lower* their risk of accusation by adopting less transparent forms of decision-making, for example, by adopting human decision-making.

This is evident already. Faced with ethical criticism about its resume screening algorithm, Amazon abandoned the project in favor of human screeners. A survey of business decision-makers by Cowgill et al. (2020) shows managers abandoning AI for manual review by humans when shown algorithmic fairness critiques. These decisions were accompanied by greater beliefs about lawsuits and negative PR. The effect persists even when AI lowers gender and racial disparities. Managers shown algorithmic fairness critiques were also less likely to believe that algorithmic fairness could be fixed in response to focused engineering efforts.

The "greater measurability" of algorithms also brings the risks of false accusations. Skeptics of algorithms express concern that advocates for algorithms can use data to apply a "scientific veneer" to opinions written in code (O'Neil, 2017). However, critics of algorithms can similarly exploit the measurability of algorithms in favor of *negative* arguments, potentially in misleading ways.

A widely read *ProPublica* article in 2015 (Larson et al., 2016) contained quantitative analysis containing barplots, logistic regressions, survival plots and statistical significance stars . These quantitative aids were presented as smoking-gun evidence. However, later analysis of ProPublica's data

18

Electronic copy available at: https://ssrn.com/abstract=3361280

by independent academic researchers has called the original conclusions into question (Doleac and Stevenson, 2016; Kleinberg et al., 2016; Flores et al., 2016; Chouldechova, 2017).

As we show later, criticism of Amazon's algorithm also involved misleading quantitative analysis presented as unmistakable evidence. An experiment in Cowgill et al. (2020) experimentally adds scientific veneer (i.e., content-free symbols of scientific authority) to arguments about AI. The scientific veneer influenced managerial behavior, but does not asymmetrically benefit favorable (vs critical) AI assessments.

Similar issues have affected the adoption of electronic medical records ("EMRs"). If EMRs improve the quality of care, then they lower the likelihood of malpractice claims (Studdert et al., 2006). However, EMRs may increase the probability of allegations. According to the industry press, "lawyers smell blood in electronic medical records" (Mearian, 2015). Miller and Tucker (2012) examined the impact of state rules facilitating the use of electronic records in court, concluding that hospitals are one-third less likely to adopt EMRs after these rules are enacted.

These examples exhibit how the transparency of algorithms elevate the risk of being accused of bias – potentially beyond the true level of risk. They are reminiscent of Kaplan's 1964 "streetlight effect," in which a man searches for lost keys only near a streetlight ("that's where the light is"). Digital systems may be where fairness is more observable, not necessarily where it is most lacking. Overzealous prosecution may compel firms *not* to fix the algorithms, but to substitute towards less transparent processes.

**Centralized Liability**  Law also creates incentives to substitute away from algorithms. In *Wal-Mart vs Dukes*, the U.S. Supreme Court ruled against 1.6 million female workers claiming gender discrimination. The resulting precedent created higher liability standards for algorithms than for humans, even if these bias cause the same harm.

The Court ruled in Wal-Mart's favor, claiming that the women could not be certified for a class-action lawsuit because they were not subject to a common injustice. At Wal-Mart, personnel decisions were delegated to local managers who enjoyed discretion. As Justice Scalia wrote in his opinion, "The whole point of permitting discretionary decision-making is to avoid evaluating employees under a common standard." As a result, plaintiffs were not subject to a "common injustice" necessary to certify a class action lawsuit.

Although the case had nothing to do with algorithms on its surface, the Court's decision created higher liability standards for algorithmic bias, even when the practical effects are the same as humans'. Through the lens of *Dukes* (and related laws and precedents), algorithmic decision-making is a form of centralization that increases vulnerability to class action lawsuits. In settings ranging from employment to insurance claims, legal scholars and practitioners have cited *Dukes* as a reason *not* to deploy machine learning, irrespective of the quality of machine decisions (or their impact on vulnerable groups). The tradeoff implicit in policies such as *Dukes* is not necessarily *less* bias, but a shift of bias towards less prosecutable formats.

19

Electronic copy available at: https://ssrn.com/abstract=3361280

### 6.3 Regulating Inputs and Algorithm Architecture

We now turn to the form of regulation for algorithms. Across a variety of fields, economists often prefer to regulate firms' outputs rather than directly regulate technology. "Output regulation" is the policy equivalent of bosses telling workers, "Work however you like, as long as you finish your work on time." Without this flexibility, many firms claim they have special circumstances and therefore lobby for exceptions and loopholes that complicate the rules. Environmental solutions such as carbon taxes, cap-and-trade and vehicle emission standards assume this approach.

By contrast, input regulations, sometimes called "command and control" regulations, require firms to adopt specific technologies. As one textbook summarizes, "The simplest kind of regulation is to just tell people what to do." Analyzing inputs may be practically useful in diagnosing algorithms; our discussion here is only about whether government policy should directly regulate technological methods (rather than outcomes).

Command-and-control policies raise the possibility of firms complying with the letter of regulatory requirements while failing to make a difference or even a serious effort. Firms may also implement regulators' commands in good faith, but with mistakes. Both issues arose in the experiment on prediction math ability (Cowgill and Dell'Acqua, 2014). Engineers who received technical advice reported feeling pressure to adopt the advice, even if it would not affect performance. Some implemented it incorrectly.

Output regulation outsources the details of compliance to the private sector. This creates incentives for entrepreneurs to invest in technology for meeting standards. These investments may create technology to go beyond the limits set by the government. With command and control, there are no incentives for an individual firm to ever go beyond what the government has asked.

Discrimination policy for algorithms could focus on outputs. For example, watchdogs could perform audit-style input manipulations that examine outputs when inputs are perturbed. Alternatively, they could verify outcomes and performance for admitted and near-miss candidates.

However, the most popular ideas for regulating algorithms are input regulations. We conclude this section by dissecting the three most popular forms of algorithmic input regulation: Excluding sensitive variables (6.4), interpreting coefficients (6.5 and 6.6) and promoting transparency (6.7).

### 6.4 Excluding Sensitive Variables

Among the most common suggestions is to make decisions "blind" to sensitive variables by excluding them. Regulating how human brains process input variables could be impossible, however it is much more feasible in algorithms. Statistical discrimination theory shows how this direct regulation may be ineffective, even when technologically feasible (Phelps, 1972; Arrow, 1973; Aigner and Cain, 1977; Fang and Moro, 2011). If regulators could force decision-makers to ignore demographic labels, algorithms optimized to predict the same outcomes would likely shift weights to other variables. The shift may not affect the demographic composition of hires, only superficial appearances about how decisions were arrived.

Agan and Starr (2017) and Doleac and Hansen (2020) provides empirical evidence of how statistical discriminators shift in response to omitting variables. Their evidence comes from "ban the

20

Electronic copy available at: https://ssrn.com/abstract=3361280

box" policies forbidding employers from using criminal history variables in hiring decisions. The authors show that employers responded to the ban by discriminating on other variables that were correlated with criminal history – including race. Removing information about the presence or absence of criminal history made hiring more race-sensitive.

## 6.5   Interpreting Coefficients

Requests for transparency require developers to publish an algorithm's functional form, input variables and numeric weights. The most frequent goal is to attempt to interpret coefficients. For example, someone may view a negative coefficient attached to "UCLA," and infer the algorithm disfavors Bruin graduates.

However, this is not necessarily true. Statisticians have long known that outside of a few specific settings – for example, well-identified regressions – the coefficients, weights and other internal properties of algorithms do not have clear interpretations. Algorithms are not "black boxes" because we do not know their weights; they are black boxes because their weights have no clear meaning even when they are completely transparent.

Coefficients and internal structure of algorithms are similar to the molecular structure of pharmaceuticals. Opening an "FDA for Algorithms" is a commonly-suggested policy solution for algorithmic fairness (Tutt, 2017). However, even if pharmaceutical companies were forced to disclose molecular structures to patients, it is not clear that it would be helpful. What is important for understanding the efficacy of a drug is concrete data on how the drug interacts with its human environment. The FDA evaluates this using randomized controlled trials, described above. For many popular drugs, the exact molecular mechanisms are still unknown (Lewis, 2016). "Explanations" of the mechanism of the drugs are lacking, even to pharmaceutical researchers. Nonetheless, the FDA has gained confidence in the drugs through experimental trials.

There are countless ways the UCLA inference could be false. We present only one example for its familiarity to economists. Fixed effects estimators require that one fixed effect be dropped. The choice of the omitted fixed effect affects the numeric values and interpretations of all other fixed effects. If MIT were the omitted school, possibly all school coefficients would be negative, including some of the very best non-MIT schools.[7] This is essentially an aesthetic characteristic of an algorithm, *not* a substantive one.

Regulators and other watchdogs must be mindful of this distinction; not only to avoid false alarms, but also to avoid false acquiescence. Guilty actors can exploit this fallacy: "We have such a progressive algorithm, just look at our code. It puts a positive weight on factors such as ... " This is not a clean bill of algorithmic health.

These issues arose in *Reuters*' 2018 allegations about Amazon's sexist resume screening algorithm.[8] As evidence, *Reuters* presented problematic coefficient interpretations. The Amazon hiring algorithm "[D]owngraded graduates of two all-women's colleges, according to people familiar

---

[7]The choice of omitted school is not important for scoring. If fixed effects were used to score or rank job candidates, the choice would not affect relative comparisons.

[8]"Amazon scraps secret AI recruiting tool that showed bias against women," https://www.reuters.com/article/us-amazon-com-jobs-automation-insight/amazon-scraps-secret-ai-recruiting-tool-that-showed-bias-against-women-idUSKCN1MK08G.

21

Electronic copy available at: https://ssrn.com/abstract=3361280

with the matter." This is misleading for many reasons; among them, the article did not report how the algorithm scored other colleges, including the other 45 women's colleges.[9] However, all colleges may have received negative weight, depending on which college was omitted.

Amazon also allegedly "penalized resumes that included the word *women's*, as in *women's chess club captain*." This appears to be a coefficient interpretation. Even if chess leadership were correlated with programming skill,[10] the question is not whether "women's chess captain" was penalized. It's arguably whether "women's chess captain" is penalized more than "men's chess captain." Plausibly, both might be penalized compared to the gender-neutral "chess captain," which may indicate leadership over larger, gender-inclusive group. These comparisons were not included in the reporting.

Nothing in economic theory suggests that the content of screening algorithms should be easily interpretable. Theory suggests that valuable signals should be correlated with positive (or negative) outcomes and *costly* to produce in a way that separates good from bad types. Variables that may pass these criteria can (at first glance) be head-scratching: Why should baristas be required to demonstrate trigonometry skills? Coffee jobs often require high-school (or even university) diplomas with geometry prerequisites.

Thanks to educational research, we know that employers do not interpret degrees for their literal educational content, but for their signals about latent characteristics such as persistence or organization. AI could plausibly uncover many valuable signals of this type; their discovery could help both workers and firms find productive matches. For skeptical watchdogs, there are many better ways of auditing these algorithms than human interpretation.

### 6.6  Coefficients and Alternative Decision Methods

*Reuters* coefficient interpretations are not the smoking gun they appear to be. Nonetheless, it is possible that Amazon's algorithm was truly gender biased. However, even it were, it may have been less biased than Amazon's human screeners (whose choices algorithm was trained on). As we review in Section 5.1, empirical tests from several settings containing a clean counterfactual comparison show an increase in diversity, including one in hiring (Cowgill, 2017). The system may have thus been worth saving, if only to upgrade. However, the reporting around Amazon's algorithm contained no relative comparisons to the sexism of human screeners.

The details about an algorithm's internal characteristics reveal nothing about the algorithm's *relative* performance against other methods (like other algorithms or human judges). This is formally derived in Cowgill (2018b) although the intuition is simple. Suppose an algorithm places a negative coefficient on being a woman. This may appear to be a bad algorithm that discriminates against being female. But the algorithm could lead to increased female hires if it replaces human recruiters who are even more sexist. The same effect works in the opposite direction. An algorithm

---

[9] According to *Women's College Coalition*, an association of women's colleges and universities, there were 47 all-female colleges in the United States and Canada in 2014 around the time of the development of Amazon's application: https://www.womenscolleges.org/history, accessed February 14, 2020.

[10] Research about chess players suggests chess skill is not as correlated with other analytic skills as intuition suggests. Studies of chess players suggest that even among grand masters, chess skill is *not* easily portable to other domains; this is true even in settings closely resembling chess (Palacios-Huerta and Volij, 2009; Levitt et al., 2011). Evidence on the "portability of expertise" (Green et al., 2019) is limited more generally.

Electronic copy available at: https://ssrn.com/abstract=3361280

that appears to *help* a certain group (based on its numeric weights) might actually have a negative effect on that group compared with the existing system.

Cowgill (2017) contains a real-world empirical example: The resume screening algorithm in the paper appeared to give negative weight to candidates from non-elite schools. However, the candidates *benefiting* from the algorithm included disproportionately *non-elite graduates*. Human evaluators assessed these credentials even more negatively.

Together with the previous section, these examples demonstrate how interpreting coefficients provides misleading intuition about the effects of an algorithm. Watchdogs should be mindful about giving undeserved rhetorical heft to "variables receiving weight in an algorithm." Bias issues in algorithms may not be detectable from code and numeric weights. Lambrecht and Tucker (2016) showed that gender-neutral ad campaigns for science jobs reach fewer women. The culprit was competition from consumer packaged goods businesses, who bid up prices for female-targeted ads. This would have been unclear from making the code transparent.

## 6.7 Transparency

Aside from the misleading temptation of coefficient interpretation, algorithmic transparency has additional downsides that resemble problems in other settings. Some of these downsides may not be be binding; we mention these mainly to highlight the fact that transparency does involve tradeoffs.

Transparency may help competitors tacitly collude (Albæk et al., 1997; Luco, 2018; Thomas et al., 2018). Some economists suggests that machine-learning algorithms may achieve collusion more easily than humans even *without* the advantage of transparency because of the machines' faster ability to learn through trial and error (Ezrachi and Stucke, 2016; Calvano et al., 2018). Other suggest that better prediction implied by algorithms actually make collusion harder to sustain (Miklós-Thal and Tucker, 2019).

Legally-mandated transparency is particularly useful for collusion. Competitor firms may perceive voluntary disclosures by rivals as manipulative "cheap talk" whose intent is to mislead (Baliga and Morris, 2002). By contrast, legally-mandated transparency compels truthful revelation. It could therefore offer a more credible focus for collusion.

Transparency also has consequences for innovation. If innovations can be copied by competitors, the incentives decline (Bhattacharya and Ritter, 1983). The intellectual property system is intended to protect against such copying, but some firms find that secrecy offers better protection (Cohen et al., 2000; Arundel, 2001). Insofar as machine learning is a productive area of private-sector innovation, transparency may depress incentives.

Finally, transparency and explanations have security implications. Ederer et al. (2018) formally show that deliberate opacity reduces incentives for gaming. A recent computer science paper shows that explanations can be used to reconstruct the underlying model, thus enabling hacking (Milli et al., 2018).

Electronic copy available at: https://ssrn.com/abstract=3361280

# 7   Conclusions

Algorithmic fairness concerns have come to prominence in the last decade with the growth of information technology. However, many of the underlying issues are familiar to economists studying analogous or parallel topics. Our essay highlights ten key themes about the role of economics in algorithmic fairness issues.

First, focusing on internal algorithmic characteristics in isolation of the economic context in which they operate is misleading. The properties of algorithms – what data was used in training them, how certain variables are weighed – may mislead observers about the practical effects of new algorithms on pre-existing social systems.

Second, effective policy for algorithms should arguably regulate outputs, not inputs. Regulating inputs – for example, by requiring certain engineering practices or technologies – exhibit the "command-and-control" approach economists have long opposed in arenas such as environmental policy (Stavins, 1997). Regulations focusing on outcomes exhibit more flexibility, fewer loopholes, greater efficiency and stronger incentives for innovation.

Third, economic theory places very few restrictions on the internal properties inside algorithms. Variables used by algorithms need *not* have a causal interpretation – or any interpretation – in order to have economic value to decision-makers. Algorithms can perpetuate biases (or not) while directly utilizing sensitive variables (or not). Algorithms trained on biased datasets do not inevitably reproduce or amplify bias. "Bias in, bias out" is a misleading guide to the effects of algorithms trained on historical data.

Fourth, economic theory is a useful lens for thinking about the strategic manipulation of algorithms. One of the few restrictions introduced by economic theory is that predictive signals must be costly to acquire in order to yield economic value; if they are not, their value will be diminished through strategic manipulation. The economics literature about "cheap talk" suggests that lack of explanations has little to do with technological shortcomings of the message space (i.e., lack of data visualizations, statistics or examples). Instead, explanations are made possible through better alignment of incentives between the sender of the explanation (the algorithm, its designers and owners) and the receiver (a human client). This alignment must become common knowledge. Otherwise, even the finest visualizations cannot be distinguished from self-serving "cheap talk."

Fifth, behavioral economics allows into insights of behavioral traits which might affect algorithmic adoption in all directions. Several recent economics papers (?Yeomans et al., 2017; Stevenson, 2017) find a *reluctance* to trust algorithms, not a tendency towards blind acceptance. This distrust is even greater when fairness concerns are highlighted. Business people may find "scientific veneer" persuasive, but it does not asymmetrically benefit favorable (vs critical) AI assessments.

Sixth, policies supporting transparency have tradeoffs. Transparency can facilitate collusion. It can permit theft of costly innovations and thereby reduces incentives for innovation. It can weaken security. While the "black box" nature of machine learning is often criticized, it has merits. By accident or design, many existing processes are opaque. In many cases this is a preferable, perhaps essential part of a sustainable equilibrium. The shortcomings of transparency must be weighed against its positive effects.

Electronic copy available at: https://ssrn.com/abstract=3361280

Seventh, economic theory suggests that firms have at least some profit-oriented motives for reducing biased predictions. This is true even without regulatory punishments, fines, lawsuits or bad PR. Impediments to adoption may not arise from profit alignment, but from other frictions such as awareness, uncertainty about techniques, unavailability of expertise necessary to de-bias algorithms.

The profit-maximization value of reducing bias suggests that *public* policies can be advanced through *private* processes. The benefits of de-biasing predictions are partly privatizable. By contrast, other problems at the intersection of business, engineering and public policy feature externalities that distort incentives for socially desirable outcomes. This suggests that a sustainable, for-profit marketplace for bias-reducing technology is viable.

Eighth, some of the allegations about "algorithmic bias" are neither about algorithms nor bias. Negative side-effects and self-fulfilling prophecies may arise from perfectly accurate, unbiased predictions. They are the consequences of prediction in any form, not bias, and they reflect larger underlying social problems. Similarly, arguments about algorithmic objectives are often power struggles about whose subjective tastes should be instantiated in code. Society's need to make implicit objectives more explicit drives much of the social turmoil around bias and AI. Common issues in algorithmic design – as the merits of redistribution or the optimal tradeoff between equality and profit-maximization – are not fundamentally algorithmic. They would probably arise in the absence of digitization, and they are digital only insofar as technology makes it possible to measure objectives more precisely.

Ninth, policies against algorithmic bias must grapple with the potential for evasion. As monitoring and punishment increase, firms may respond by shifting to more opaque forms of decision-making such as human discretion. Policies that do not anticipate evasive behavior will fail to reduce unfairness, and may lead firms to hide bias behind less transparent processes.

Finally, algorithms can improve social outcomes. If decisions aren't made by algorithms, they'll often be made by humans; comparing bias of both sources is practically useful. The fear that firms will reduce bias "slightly below human levels, and then stop" should be examined carefully. Punishments for discrimination do not stop once current levels are surpassed. The cost structure of AI development suggests that beating humans is not a natural stopping point from an economics perspective. Algorithmic bias may be easier to measure and address than human bias.

This essay has highlighted the different roles that predictions and objectives play in algorithmic decision-making. Issues around algorithmic fairness can either arise from biased predictions or objectives. Knowing the role of each is critical for prescribing and effective long-term response. The predictions/objectives distinction is mostly missing from the CS approach to these problems. However, it has implications for managerial practices, public policy, software architecture, regulation and incentive design.

Economic theory has a long tradition in which human decisions are modeled "as if" they are mathematically optimizing (Friedman, 1953). With the advent of algorithms, firms increasingly perform actual mathematical optimization in ways that both mimic economic theory and deviate from it in interesting new ways. Either way, economics is a natural complement to the design and evaluation of algorithmic systems and their ethical and distributional impacts.

25

Electronic copy available at: https://ssrn.com/abstract=3361280

# References

**Agan, Amanda and Sonja Starr**, "Ban the Box, Criminal Records, and Racial Discrimination: A Field Experiment," *The Quarterly Journal of Economics*, 2017, *133* (1), 191–235.

— **, Bo Cowgill, and Laura Gee**, "The Effects of Salary History Bans: Evidence from a Field Experiment," *Working paper*, 2019.

**Agrawal, Ajay, Joshua S Gans, and Avi Goldfarb**, "Prediction, Judgment, and Complexity," in "Economics of Artificial Intelligence," University of Chicago Press, 2018.

**Aigner, Dennis J and Glen G Cain**, "Statistical theories of discrimination in labor markets," *ILR Review*, 1977, *30* (2), 175–187.

**Albæk, Svend, Peter Møllgaard, and Per B Overgaard**, "Government-assisted oligopoly coordination? A concrete case," *The Journal of Industrial Economics*, 1997, *45* (4), 429–443.

**Arrow, Kenneth J.**, *THE THEORY OF DISCRIMINATION*, Princeton University Press,

**Arundel, Anthony**, "The relative effectiveness of patents and secrecy for appropriation," *Research policy*, 2001, *30* (4), 611–624.

**Athey, Susan and Joshua S Gans**, "The impact of targeting technology on advertising markets and media competition," *American Economic Review*, 2010, *100* (2), 608–613.

**Athey, Susan C., Kevin A. Bryan, and Joshua Gans**, "The Allocation of Decision Authority to Human and Artificial Intelligence," in "AEA Papers and Proceedings," Vol. 108 2020, pp. 22–27.

**Ayres, Ian**, "Outcome tests of racial disparities in police practices," *Justice research and Policy*, 2002, *4* (1-2), 131–142.

**Baliga, Sandeep and Stephen Morris**, "Co-ordination, spillovers, and cheap talk," *Journal of Economic Theory*, 2002, *105* (2), 450–468.

**Bartlett, Robert, Adair Morse, Richard Stanton, and Nancy Wallace**, "Consumer-lending discrimination in the FinTech era," Technical Report, National Bureau of Economic Research 2019.

**Bartoš, Vojtěch, Michal Bauer, Julie Chytilová, and Filip Matějka**, "Attention discrimination: Theory and field experiments with monitoring information acquisition," *American Economic Review*, 2016, *106* (6), 1437–75.

**Becker, Gary S**, "Nobel lecture: The economic way of looking at behavior," *Journal of political economy*, 1993, *101* (3), 385–409.

**Berk, Richard**, "An impact assessment of machine learning risk forecasts on parole board decisions and recidivism," *Journal of Experimental Criminology*, 2017, *13* (2), 193–216.

**Bhattacharya, Sudipto and Jay R Ritter**, "Innovation and communication: Signalling with partial disclosure," *The Review of Economic Studies*, 1983, *50* (2), 331–346.

**Björkegren, Daniel and Joshua Blumenstock**, "Manipulation-Proof Machine Learning," *Working paper*, 2019.

26

Electronic copy available at: https://ssrn.com/abstract=3361280

**Blodgett, Su Lin and Brendan O'Connor**, "Racial Disparity in Natural Language Processing: A Case Study of Social Media African-American English," *arXiv preprint arXiv:1707.00061*, 2017.

**Bordalo, Pedro, Katherine Coffman, Nicola Gennaioli, and Andrei Shleifer**, "Stereotypes," *The Quarterly Journal of Economics*, 2016, *131* (4), 1753–1794.

**Brown, Charles**, "Education and Jobs: An Interpretation," *The Journal of Human Resources*, 1978, *13* (3), 416–421.

**Calvano, Emilio, Giacomo Calzolari, Vincenzo Denicolò, and Sergio Pastorello**, "Artificial intelligence, algorithmic pricing and collusion," 2018.

**Cecere, Grazia, Clara Jean, Matthieu Manant, and Catherine Tucker**, "Computer algorithms prefer headless women," *Mimeo, MIT*, 2020.

**Chang, Edward H, Katherine L Milkman, Dena M Gromet, Robert W Rebele, Cade Massey, Angela L Duckworth, and Adam M Grant**, "The mixed effects of online diversity training," *Proceedings of the National Academy of Sciences*, 2019, *116* (16), 7778–7783.

**Choudhury, Prithwiraj, Evan Starr, and Rajshree Agarwal**, "Machine Learning and Human Capital Complementarities: Experimental Evidence on Bias Mitigation," *Available at SSRN 3185022*, 2019.

**Chouldechova, Alexandra**, "Fair prediction with disparate impact: A study of bias in recidivism prediction instruments," *Big data*, 2017, *5* (2), 153–163.

**Cohen, Wesley M, Richard R Nelson, and John P Walsh**, "Protecting their intellectual assets: Appropriability conditions and why US manufacturing firms patent (or not)," Technical Report, National Bureau of Economic Research 2000.

**Cowgill, Bo**, "Bias and Productivity in Humans and Algorithms: Theory and Evidence from Résumé Screening," *Working Paper*, 2017.

_ , "The Econometrics of Gatekeeping Experiments," *Working paper*, 2018.

_ , "Bias and Productivity in Humans and Algorithms," *Working Paper*, 2018.

_ , "The Impact of Algorithms on Judicial Discretion: Evidence from Regression Discontinuities," *Working paper*, 2019.

_ **and Catherine E Tucker**, "Economics, fairness and algorithmic bias," *Working Paper*, 2019.

_ **and Cosmina L Dorobantu**, "Competition and Specificity in Market Design: Evidence from Geotargeted Advertising," *Available at SSRN 3267053*, 2019.

_ **and Fabrizio Dell'Acqua**, "Biased Programmers? Or Biased Data? A Field Experiment about Operationalizing AI Ethics," in "Proceedings of the Twenty-First ACM Conference on Economics and Computation" 2014, pp. 525–525.

_ **and Megan T Stevenson**, "Algorithmic social engineering," in "AEA Papers and Proceedings," Vol. 110 2020, pp. 96–100.

27

Electronic copy available at: https://ssrn.com/abstract=3361280

_ , **Fabrizio Dell'Acqua, and Sandra Matz**, "The Managerial Effects of Algorithmic Fairness Activism," in "AEA Papers and Proceedings," Vol. 110 2020, pp. 85–90.

**Crawford, Vincent P and Joel Sobel**, "Strategic information transmission," *Econometrica: Journal of the Econometric Society*, 1982, pp. 1431–1451.

**DellaVigna, Stefano**, "Psychology and Economics: Evidence from the Field," *Journal of Economic Literature*, 2009, *47* (2), 315–72.

**Dobbie, Will, Andres Liberman, Daniel Paravisini, and Vikram Pathania**, "Measuring Bias in Consumer Lending," Technical Report, National Bureau of Economic Research 2018.

**Doleac, Jennifer L and Benjamin Hansen**, "The unintended consequences of "ban the box": Statistical discrimination and employment outcomes when criminal histories are hidden," *Journal of Labor Economics*, 2020, *38* (2), 321–374.

_ **and Megan Stevenson**, "Are Criminal Risk Assessment Scores Racist?," *Brookings, August*, 2016, 22.

**Ederer, Florian, Richard Holden, and Margaret Meyer**, "Gaming and strategic opacity in incentive provision," *The RAND Journal of Economics*, 2018, *49* (4), 819–854.

**Ezrachi, A and ME Stucke**, "Virtual competition," *Journal of European Competition Law and Practice*, 2016, *7* (9).

**Fang, Hanming and Andrea Moro**, "Theories of statistical discrimination and affirmative action: A survey," in "Handbook of social economics," Vol. 1, Elsevier, 2011, pp. 133–200.

**Flores, Anthony W, Kristin Bechtel, and Christopher T Lowenkamp**, "False Positives, False Negatives, and False Analyses: A Rejoinder to Machine Bias: There's Software Used across the Country to Predict Future Criminals. And It's Biased against Blacks," *Fed. Probation*, 2016, *80*, 38.

**Friedman, Milton**, *Essays in positive economics*, University of Chicago Press, 1953.

**Fu, Hu, Patrick Jordan, Mohammad Mahdian, Uri Nadav, Inbal Talgam-Cohen, and Sergei Vassilvitskii**, "Ad auctions with data," in "Algorithmic Game Theory," Springer, 2012, pp. 168–179.

**Fuster, Andreas, Paul Goldsmith-Pinkham, Tarun Ramadorai, and Ansgar Walther**, "Predictably unequal? the effects of machine learning on credit markets," 2017.

**Green, Etan A, Justin M Rao, and David Rothschild**, "A Sharp Test of the Portability of Expertise," *Management Science*, 2019, *65* (6), 2820–2831.

**Greenwald, Anthony G, Debbie E McGhee, and Jordan LK Schwartz**, "Measuring individual differences in implicit cognition: the implicit association test.," *Journal of personality and social psychology*, 1998, *74* (6), 1464.

**Hanna, Rema, Sendhil Mullainathan, and Joshua Schwartzstein**, "Learning through noticing: Theory and evidence from a field experiment," *The Quarterly Journal of Economics*, 2014, *129* (3), 1311–1353.

Electronic copy available at: https://ssrn.com/abstract=3361280

**Heckman, James**, "Sample Selection Bias as a Specification Error.," *Econometrica*, 1979.

**Hummel, Patrick and R Preston McAfee**, "When does improved targeting increase revenue?," in "Proceedings of the 24th International Conference on World Wide Web" International World Wide Web Conferences Steering Committee 2015, pp. 462–472.

**Jr, Roland G Fryer and Glenn C Loury**, "Affirmative action and its mythology," *Journal of Economic Perspectives*, 2005, *19* (3), 147–162.

**Kaplan, A.**, *The conduct of inquiry: methodology for behavioral science* Chandler publications in anthropology and sociology, Chandler Pub. Co., 1964.

**Kleinberg, Jon, Himabindu Lakkaraju, Jure Leskovec, Jens Ludwig, and Sendhil Mullainathan**, "Human decisions and machine predictions," *The quarterly journal of economics*, 2017, *133* (1), 237–293.

__ , **Sendhil Mullainathan, and Manish Raghavan**, "Inherent trade-offs in the fair determination of risk scores," *arXiv preprint arXiv:1609.05807*, 2016.

**Lambrecht, Anja and Catherine E Tucker**, "Algorithmic Bias? An Empirical Study into Apparent Gender-Based Discrimination in the Display of STEM Career Ads," 2016.

__ **and Catherine Tucker**, "Algorithmic Learning and Algorithmic Bias," *Mimeo, MIT*, 2020.

**Larson, Jeff, Surya Mattu, Lauren Kirchner, and Julia Angwin**, "How we analyzed the COMPAS recidivism algorithm," *ProPublica (5 2016)*, 2016.

**Levitt, Steven D, John A List, and Sally E Sadoff**, "Checkmate: Exploring backward induction among chess players," *American Economic Review*, 2011, *101* (2), 975–90.

**Lewis, Tanya**, "Mystery Mechanisms," *The Scientist Magazine*, 2016.

**Li, Danielle**, "Expertise versus Bias in Evaluation: Evidence from the NIH," *American Economic Journal: Applied Economics*, 2017, *9* (2), 60–92.

**Luco, Fernando**, "Who benefits from information disclosure? The case of retail gasoline," 2018.

**Mearian, Lucas**, "Lawyers smell blood in electronic medical records," *Computerworld*, 2015.

**Miklós-Thal, Jeanine and Catherine Tucker**, "Collusion by algorithm: Does better demand prediction facilitate coordination between sellers?," *Management Science*, 2019, *65* (4), 1552–1561.

**Miller, Amalia R and Catherine E Tucker**, "Electronic discovery and the adoption of information technology," *The Journal of Law, Economics, and Organization*, 2012, *30* (2), 217–243.

**Milli, Smitha, Ludwig Schmidt, Anca D Dragan, and Moritz Hardt**, "Model Reconstruction from Model Explanations," *arXiv preprint arXiv:1807.05185*, 2018.

**Obermeyer, Ziad, Brian Powers, Christine Vogeli, and Sendhil Mullainathan**, "Dissecting racial bias in an algorithm used to manage the health of populations," *Science*, 2019, *366* (6464), 447–453.

Electronic copy available at: https://ssrn.com/abstract=3361280

**O'Neil, Cathy**, *Weapons of math destruction: How big data increases inequality and threatens democracy*, Broadway Books, 2017.

**Palacios-Huerta, Ignacio and Oscar Volij**, "Field centipedes," *American Economic Review*, 2009, *99* (4), 1619–35.

**Parkes, David C, Rakesh V Vohra et al.**, "Algorithmic and Economic Perspectives on Fairness," *arXiv preprint arXiv:1909.05282*, 2019.

**Phelps, Edmund S**, "The statistical theory of racism and sexism," *The american economic review*, 1972, pp. 659–661.

**Pope, Devin G and Justin R Sydnor**, "Implementing anti-discrimination policies in statistical profiling models," *American Economic Journal: Economic Policy*, 2011, *3* (3), 206–31.

**Rambachan, Ashesh and Jonathan Roth**, "Bias In, Bias Out? Evaluating the Folk Wisdom," in Aaron Roth, ed., *1st Symposium on Foundations of Responsible Computing*, Vol. 156 of *LIPIcs* 2020, pp. 6:1–6:15.

**Scalia, Justice Antonin**, "Wal-Mart Stores, Inc vs Dukes et al.," *131 Supreme Court*, 2011, *2541*.

**Schwartzstein, Joshua**, "Selective attention and learning," *Journal of the European Economic Association*, 2014, *12* (6), 1423–1452.

**Silberzahn, Raphael, Eric Luis Uhlmann, Dan Martin, Pasquale Anselmi, Frederik Aust, Eli C Awtrey, Štěpán Bahník, Feng Bai, Colin Bannard, Evelina Bonnier et al.**, "Many Analysts, One Data Set: Making Transparent How Variations in Analytic Choices Affect Results," *Advances in Methods and Practices in Psychological Science*, 2018, *1* (3), 337–356.

**Stavins, Robert N**, "Policy instruments for climate change: how can national governments address a global problem," *U. Chi. Legal F.*, 1997, p. 293.

**Stevenson, Megan**, "Assessing Risk Assessment in Action," *George Mason Law & Economics Research Paper*, 2017, (17-36), 4.

__  **and Jennifer Doleac**, "Algorithmic Risk Assessment Tools in the Hands of Humans," 2018.

**Stevenson, Megan T and Jennifer L Doleac**, "Algorithmic Risk Assessment in the Hands of Humans," *Available at SSRN*, 2019.

**Studdert, David M, Michelle M Mello, Atul A Gawande, Tejal K Gandhi, Allen Kachalia, Catherine Yoon, Ann Louise Puopolo, and Troyen A Brennan**, "Claims, errors, and compensation payments in medical malpractice litigation," *New England journal of medicine*, 2006, *354* (19), 2024–2033.

**Thomas, Bourveau, Guoman She, and Alminas Zaldokas**, "Corporate Disclosure as a Tacit Coordination Mechanism: Evidence from Cartel Enforcement Regulations," *Working paper*, 2018.

**Thompson, Nicholas**, "Playing With Numbers.," *Washington Monthly*, 2000, *32* (9), 16–23.

**Tucker, Catherine, AK Agrawal, J Gans, and A Goldfarb**, "Privacy, algorithms, and artificial intelligence," *The Economics of Artificial Intelligence: An Agenda*, 2018, pp. 423–437.

Electronic copy available at: https://ssrn.com/abstract=3361280

**Tutt, Andrew**, "An FDA for algorithms," *Admin. L. Rev.*, 2017, *69*, 83.

**Yang, Crystal and Will Dobbie**, "Equal Protection under Algorithms: A New Statistical and Legal Framework," *Working paper*, 2018.

**Yeomans, Michael, A Shah, Sendhil Mullainathan, and Jon Kleinberg**, "Making sense of recommendations," 2017.

31

Electronic copy available at: https://ssrn.com/abstract=3361280