# EXHIBIT 8


AVI GOLDFARB and CATHERINE TUCKER*

The authors examine whether the growth of the Internet has reduced the effectiveness of government regulation of advertising. They combine nonexperimental variation in local regulation of offline alcohol advertising with data from field tests that randomized exposure to online advertising for 275 different online advertising campaigns to 61,580 people. The results show that people are 8% less likely to say that they will purchase an alcoholic beverage in states that have alcohol advertising bans compared with states that do not. For consumers exposed to online advertising, this gap narrows to 3%. There are similar effects for four changes in local offline alcohol advertising restrictions when advertising effectiveness is observed both before and after the change. The effect of online advertising is disproportionately high for new products and for products with low awareness in places that have bans. This suggests that online advertising could reduce the effectiveness of attempts to regulate offline advertising channels because online advertising substitutes for (rather than complements) offline advertising.

*Keywords*: advertising, regulation, advertising media mix, Internet

# Advertising Bans and the Substitutability of Online and Offline Advertising

**Exhibit**

**92**

Advertising regulation is widespread. There are full or partial bans on marketing communications in many industries, including alcohol, pharmaceuticals, video games, gambling, tobacco, and legal services. The existence and severity of these restrictions varies by country, state, and city. They often date from a time when local restrictions on advertising could be expected to have a binding effect on the types of advertising that the local population encountered. Today, widespread use of the Internet means that a firm's potential customers may encounter advertising content online that a local government has enacted laws to restrict.

This study examines how the effectiveness of online ad campaigns for alcoholic beverages changes when there are restrictions on offline advertising. By examining differences in advertising offline exposure that are not due to firm-level advertising decisions, we can also shed light on whether online advertising substitutes for or complements offline

advertisements. To measure the effectiveness of the online ad campaigns, we use data from a large-scale set of field experiments that randomized exposure to online display advertisements of alcoholic beverages. These field experiments involved asking 61,580 U.S. Web users about purchase intent for alcoholic products, covering 275 campaigns for different products on different Web sites from 2001 to 2008. For each of these campaigns, a mean of 223 people completed the survey; approximately half these respondents were randomly exposed to an advertisement for an alcoholic beverage, and the others were exposed to an alternative placebo advertisement.

We contrast how exposure to online advertising affects purchase intent in locations that place restrictions on out-of-home advertising with locations that do not. We do this in two ways. First, we compare the 17 states that regulate out-of-home advertising such as billboards, storefront signage, and transit advertisements with the 33 states that do not regulate such advertising for alcohol. Table 1 provides descriptive statistics that foreshadow our core findings. Among those who did not see the online ad campaign, the percentage of respondents very likely or likely to purchase is 2.04 percentage points lower, or relatively 8% lower, in states with advertising bans than in those with no advertising ban. The relative difference in purchase intent between states

*Avi Goldfarb is Associate Professor of Marketing, Rotman School of Management, University of Toronto (e-mail: agoldfarb@rotman.utoronto.ca). Catherine Tucker is Assistant Professor of Marketing, MIT Sloan School of Management, Massachusetts Institute of Technology (e-mail: cetucker@mit.edu). The authors thank WPP/Google Marketing Research Awards for providing financial support for this project. Jean-Pierre Dube served as associate editor for this article.

Table 1

PERCENTAGES OF RESPONDENTS WHO SAY THEY ARE LIKELY TO PURCHASE IN STATES WITH AND WITHOUT OUT-OF-HOME ADVERTISING BANS

| | Exposed | |
| --- | --- | --- |
| *Out-of-Home Advertising Ban* | *No* | *Yes* |
| No | 28.88 | 31.01 |
| Yes | 26.84 | 30.18 |

with and without an advertising ban narrows to 3% after advertising exposure. We interpret this to suggest that online advertising reduces the effectiveness of offline advertising bans. This interpretation relies on the assumption that there is no systematic difference in alcohol ad effectiveness between states with and without bans. In this article, we conduct a wide battery of tests to show that the pattern in Table 1 holds with thorough econometric analysis. We check that there were no systematic differences in the kind of advertisements that people saw or in the demographics of people who saw the advertisements across states with and without offline advertising bans. We show that the results are robust to allowing the effect of exposure to advertising to vary with a variety of state characteristics, such as alcohol consumption; alcohol abuse; and alternative state regulations that restrict the sale, consumption, and marketing of alcohol. We also show that there is no similar effect for other consumer packaged goods categories.

The analysis of state-level regulations provides a large-sample understanding of differences between places with regulation and places without them. However, as we suggested previously, there still may be systematic differences in how people in states with advertising bans respond to alcohol advertising that are not related directly to the ban. Therefore, as a second empirical approach, we examine changes in four local regulations that provide a natural experiment on advertising regulation because they were either enacted or rescinded during the period for which we have data. Specifically, we study a 2003 ban on out-of-home alcohol advertising in Philadelphia, a 2004 elimination of a ban on college newspaper alcohol advertising in Pennsylvania, a 2007 increase in enforcement of an alcohol advertising ban on San Francisco public transit, and New York City's 2007 withdrawal of a self-imposed ban on hard liquor advertisements on broadcast television.

The changes in local regulations complement the state-level results by relying on the weaker identification assumption that the changes in online alcohol advertising's effectiveness in a given location are due to changes in offline advertising rather than location-specific changes over time in online alcohol advertising responsiveness. This assumption is particularly plausible because one Pennsylvania regulatory change increased offline advertising regulation and the other decreased regulation, but both show that more regulation of offline advertising translates to more effective online advertising. Our estimates of the effect of offline advertising bans are reasonably similar, despite the much smaller sample sizes and specificity of local regulatory changes.

Crucially, for firms, we also show that the disproportionate effect of online advertising in places with advertising bans is related to levels of product awareness. Online advertising for products that have low levels of awareness is particularly effective in places with out-of-home advertising bans. In contrast, for products that have high levels of awareness, there is little difference in online advertising effectiveness between places with and without bans. This suggests that online display advertising has an informative role for people in places with out-of-home advertising bans. In addition, it provides some support for the results being driven by diminishing marginal effectiveness of advertising goodwill because high-awareness products are already at the point of steep diminishing returns (Dube, Hitsch, and Manchanda 2005; Dube and Manchanda 2005; Hitsch 2006; Nerlove and Arrow 1962).

Also important for firms is the implication that Internet advertising substitutes for offline advertising. Our setting enables us to identify how offline advertising relates to the effectiveness of online advertising. This is valuable because usually it is difficult to separate the effects of offline and online advertising campaigns, given that both are launched at the same time. Silk, Klein, and Berndt (2001, p. 145) emphasize that "[the Internet] looms as a potential substitute or complement for all of the major categories of existing media and appears capable of serving a wide range of communications objectives for a broad array of advertisers." This matters because it is not clear whether the unique capacity of the Internet to target and interact with users means that it extends and enhances existing external advertising campaigns or acts as a substitute for them.

Our finding that online display advertising is a substitute for offline display (primarily billboard) advertising contributes to an increasing literature in marketing that explores the relationship between offline and online environments for customer acquisition (Bell and Choi 2009), brands (Danaher, Wilson, and Davis 2003), word of mouth (Bell and Song 2007; Forman, Ghose, and Wiesenfeld 2008), purchases (Brynjolfsson, Hu, and Rahman 2009; Forman, Ghose, and Goldfarb 2009), customized promotions (Zhang and Wedel 2009), ad pricing (Goldfarb and Tucker 2009), search behavior (Lambert and Pregibon 2008), and price sensitivity (Chu, Chintagunta, and Cebollada 2008). We believe ours is the first study to empirically investigate consumer substitution between online and offline advertising.

More generally, our results provide an expanded framework with which to understand the effectiveness of online advertising. Most of the literature (e.g., Chatterjee, Hoffman, and Novak 2003; Manchanda et al. 2006) has focused on measuring the effect of advertising exposure and clicks. We contribute to this literature by emphasizing that the effectiveness of online advertising cannot be considered independently from the availability and feasibility of offline media.

Previous research has discussed the difficulties of tailoring local regulations to the Internet era in the areas of gambling (Clarke and Dempsey 2001), tobacco (Cohen, Sarabia, and Ashley 2001), and prescription drugs (Fox and Ward 2005). However, there has been little systematic empirical work on the Internet's influence on the effectiveness of existing local regulation outside tax policy (Ellison and Ellison 2009; Goolsbee 2000; Goolsbee, Lovenheim, and Slemrod 2010). This dearth of empirical research extends to marketing regulations. Our results suggest that

advertising restrictions are less effective when locals are able to access the Internet. Prior research has used aggregate nonexperimental data to show that partial advertising bans have negligible effects on total alcohol consumption, arguing that advertisers' substitution between advertising channels plays a role (Nelson 2003; Young 1993).[1] Frank (2008) also suggests that advertisers may substitute print, television, and radio advertising channels for one another. Our research provides evidence of a related mechanism that renders advertising bans less effective: When one channel is blocked, the alternative channels become more effective. In the case of an out-of-home advertising ban, there may be little effect on overall customer consumption because the ban makes advertising in the nonregulated media outlets more effective. With the advent of the Internet, Web sites whose servers lie outside the ban's jurisdictional boundary provide a persistent alternative advertising outlet, and therefore, it seems likely that this mechanism for rendering partial advertising bans ineffective will persist.

Our findings suggest that the Internet reduces the ability of local authorities to restrict the effect of advertising on the local population. Although the type of substitution we document has been possible previously, never before has there been a media channel that is so pervasive and that has the ability to reach a local population outside its political borders. As Castells (2001, p. 168) notes, "The Internet decisively undermined national sovereignty and state control" of the flow of information to the state's residents. Not only are governments unable to regulate access to online advertising, but our results indicate that the absence of offline advertising actually increases the effectiveness of online advertising.

### DATA ON DISPLAY ADVERTISING

We use data from a large database of surveys collected by a media metrics agency to measure the effectiveness of 275 different online alcohol ad campaigns. The data span campaigns that were run from 2001 to 2008. The mean campaign lasted 73 days—the shortest was 14 days, and the longest was 200 days. There were 57 separate products advertised in total, and each had an advertisement that ran on either three or four Web sites. (Here, we use the term "campaign" to describe an advertising campaign for a single product run on a single Web site category.)

There were a variety of creative formats used for these banner advertisements: 58% of advertisements were "skyscrapers" (tall advertisements that extend down the Web page), 19% were medium-sized or large rectangles, and 8% were "super banners" that spanned the width of the page. With regard to where advertisements were displayed, 24% were on portals, 14% were on sports Web sites, and 8% were on entertainment Web sites. In our main specifications, we include fixed effects for each campaign to control for such potential heterogeneity in the deployment of creative format.

These 275 campaigns were reasonably evenly distributed across years, though there were slightly more in 2004 and

2007. Of the campaigns, 34% were for beer, 8% were for wine, and the rest were for spirits and other liquor. Consumers browsing the Web site on which the campaign ran were either exposed to the advertisements or not, based on a randomized numerical algorithm placed on the ad server. Those who were not randomly selected to see the advertisement saw a dummy advertisement for a neutral organization. We recruited both exposed and not exposed (control) respondents using an online survey invitation typically issued by a pop-up window. In each case, respondents were not aware they were being monitored, because the survey invitation was neutral and did not make explicit that it would be asking questions about banner advertisement's effectiveness.

Because advertisements were randomized, both exposed and control groups had the same likelihood of seeing offline advertisements, if they were permitted by law, as well as other online advertisements. Furthermore, because respondents were browsing the same Web site over the course of only a few weeks, the advertisements were similar in terms of unobserved dimensions. Thus, randomization implies that they had the same underlying purchase probability. The only variable of difference between the two groups was the randomized presence of the ad campaign being measured; therefore, differences in consumer attitudes toward the advertiser's brand can be attributed to the online campaign.

The online questionnaire was displayed as the Web site visitors navigated away from the Web page on which the focal or dummy advertisement is served. This means that the questions measured the immediate effect of seeing the advertisement. The online questionnaire prompted respondents to indicate the extent to which they were likely to purchase a variety of products (including the one studied) on a five-point scale. In our main specification, the dependent variable is whether the respondent said they were likely or very likely to purchase the product. To discretize our scale into a single dependent measure, we follow the arguments in familiar marketing research textbooks. Malhotra (2007) and Aaker, Kumar, and Day (2004) suggest that discretizing an ordinal scale reduces the issues surrounding the treatment of an interval scale as continuous. However, we recognize that whether such scales should be treated as discrete or continuous is a gray area in marketing practice (Fink 2009; Kline 2005). Therefore, in Appendix A (Table A2) and elsewhere, we replicate all our results with the full scale as our dependent measure in a linear regression. Consistent with Bentler and Chou (1987) and Johnson and Creech (1983), we find no qualitative difference between the specifications.

The survey included three additional questions, which we use in our analysis: First, we use respondent ratings on whether they had a favorable opinion of the product as a robustness check on our purchase intent results; second, we use whether the respondent recalled seeing the advertisement in question (presented alongside some decoy advertisements) to inform our understanding of the effect; and third, we use respondent statements about general awareness of the product to distinguish between products for which there is likely already media saturation and ones for which there is not. Table 2 shows summary statistics for these survey data.

The survey also prompted respondents to indicate their gender, income, age, and the number of hours they spent on

---

[1]Although Saffer (1991) finds that advertising bans suppress aggregate demand internationally, Young (1993) and Nelson and Young (2001) argue that this negative effect reflects a failure to control sufficiently for differences in cultural attitudes to alcohol consumption.

Table 2
SUMMARY STATISTICS FOR FULL SAMPLE

|                        | M        | SD       | Min   | Max     | Observations |
|------------------------|----------|----------|-------|---------|--------------|
| Purchase intent        | .30      | .46      | 0     | 1       | 61,580       |
| Intent scale           | 2.51     | 1.49     | 1     | 5       | 61,580       |
| Favorable opinion      | .36      | .48      | 0     | 1       | 59,686       |
| Opinion scale          | 3.28     | 1.14     | 1     | 5       | 59,686       |
| Ad recall              | .23      | .42      | 0     | 1       | 51,923       |
| Exposed                | .54      | .50      | 0     | 1       | 61,580       |
| Advertising ban        | .30      | .46      | 0     | 1       | 61,580       |
| Income                 | 70,603.1 | 55,799.0 | 5,000 | 250,000 | 52,839       |
| Female                 | .40      | .49      | 0     | 1       | 61,580       |
| Age                    | 43.7     | 14.0     | 21    | 99      | 61,562       |
| Weekly Internet hours  | 9.42     | 10.5     | 0     | 31      | 61,580       |
| Observations           | 61,580   |          |       |         |              |

the Internet. Table 2 displays summary statistics for these demographic variables. On average, the survey respondents were disproportionately male, which may reflect the fact that 35% of the alcohol advertisements were shown on Web sites devoted to gaming, sports, and other specifically "male" topics. The average age was higher than the general population, because we excluded respondents under 21 years of age. The 9.4 hours per week that people claimed to spend on the Internet is slightly higher than recent data that suggest that, on average, people spend 32.2 hours a month on the Internet.[2] A mean income of $72,603 is not too different from the average mean household income in the United States ($77,634). We converted the responses to zero-mean-standardized measures and used these variables as controls in our regressions. We assigned the missing data a value of 0. The results are robust to a nonparametric specification of the controls that adds missing data fixed effects and to the omission of these controls entirely. We consider the answers of respondents who were identified as being in the target market for the product. The survey respondents' zip codes enabled us to match them to a location (county or state).

If a respondent was in the exposed condition and returned to that particular Web page or refreshed that page before exiting the Web site, we counted the respondent as having seen the advertisement again. The median exposure was to have seen the advertisement one time (56% of respondents who were in the exposed condition). We checked the robustness of our results by excluding people who saw the advertisements multiple times (see Table A1) and found that their exclusion actually increases the relative magnitude of our point estimates for the incremental effects of out-of-home advertising bans on the effectiveness of banner advertisements.

Survey-based measures offer the advantages of having a large number of respondents and being able to be collected consistently at different locations and times (Clark, Doraszelski, and Draganska 2009). In addition, Web sites are often unable to sell alcohol directly because of states' extensive bans on the direct shipping of alcohol to consumers; therefore, we could not use Web site purchase measures such as those that Manchanda et al. (2006) use.[3] Survey responses are weaker measures of advertising success than purchasing

or profitability (as Reiley and Lewis [2009] use), because many users may claim that they intend to purchase but never do so. Still, as long as people reporting higher purchase intent are actually more likely to purchase within the range of the treatment effect (and the group exposed to advertisements is truly random), the direction of results holds. In other words, the direction of our core results depends only on whether our survey measures are positively correlated with actual purchase outcomes within the range of the observed data. Bemmaor (1995) and others have established this positive correlation between stated purchase intent and purchase outcomes in many product categories. In particular, Morwitz, Steckel, and Gupta (2007) find this correlation to be particularly strong for product-specific surveys such as the ones conducted to generate our data.

## STATE-LEVEL RESULTS

We explore how offline advertising restrictions affected these survey measures in two ways. First, this section uses a straightforward specification that reflects both the variation in state laws governing outdoor alcohol advertising and the randomized nature of exposure to advertising in our data, and second, we examine changes in local laws.

### Discussion of State-Level Regulations

The Twenty-First Amendment grants states broad legal powers over the distribution and sale of alcohol and some power to regulate advertising for alcoholic beverages. Some limitations on this power stem from First Amendment free speech guarantees. For example, the 44Liquormart decision (517 U.S. 484 [1996]) struck down a Rhode Island state law that banned price advertising for alcoholic beverages (Milyo and Waldfogel 1999). However, the Schmoke decision (101 F.3d 325 [4th Cir.1996]) upheld an alcohol billboard advertising ban in Baltimore.

We gathered information on laws restricting the advertising of alcoholic beverages out of home using two main sources of regulations: "State Alcohol Advertising Laws," a report in conjunction with Georgetown University published by the Center on Alcohol Marketing and Youth in 2003; and "Out-of-Home Alcohol Advertising: A 21st Century Guide to Effective Regulation," published by the Marin Institute in 2009. Then, we verified the current status of laws and whether they imposed offline advertising bans by visiting each state's liquor control Web site. Appendix B gives the sources and histories of each law.

---

[2]See comScore Networks 2009 (http://www.comscore.com) data.
[3]For details on the full set of laws, see http://freethegrapes.org.

Figure 1 reflects the geographical distribution of the 17 states that had alcohol advertising laws in effect during our study. In Maryland and Pennsylvania, the laws were municipal (Baltimore and Philadelphia) rather than statewide, so we included only households that fall within those city limits as being subject to the law. There has been little change to state laws since the widespread adoption of the Internet. Philadelphia's ban started in 2003, after the beginning of our data set. We later exploit this time variation along with three other changes in municipal alcohol advertising regulation.

The state-level ad restrictions largely affected billboards and signage. In our specifications, we treat all out-of-home advertising bans as a binary variable, whether they relate to storefront signage, billboards, transit advertising, or a blanket ban on advertising. Three of the bans forbid all billboard advertising (Maine, Alaska, and Hawaii), and Vermont restricts all billboard advertising with extra provisions for alcohol advertising. In Appendix A, Table A1, we show that our results are robust to excluding these states. To prevent challenges on grounds of free speech, the legal language in the alcohol bans typically emphasizes that the measures are designed to prevent underage drinkers from being exposed to advertising.[4]

---

[4]This is a real risk. The Lorillard case [533 U.S. 525 [2001]) in Massachusetts struck down a billboard advertising ban for cigarettes that was believed to have overreached the aim of protecting schoolchildren from cigarette advertising.

Despite various restrictions on advertising, both externally and internally imposed, alcohol manufacturers and distributors still spend a relatively large amount on advertising in general and on out-of-home advertising in particular. They spend an average of 15.2% of revenue on advertisements for liquor, 11.5% for wine, and 8.6% for beer, compared with a mean of 7.1% for nonalcoholic beverages (Tremblay and Tremblay 2005). According to Frank (2008), spirit manufacturers spent an average of $348.6 million in 2004 on out-of-home advertising. Tremblay and Tremblay (2005) find that Anheuser-Busch spent 20% of its advertising expenditure on out-of-home advertising. Although not the dominant advertising channel, out-of-home advertising seems to be an important channel in this industry. Out-of-home advertising may be a particularly important channel for alcohol because, as Frank (2008) discusses, major television networks do not typically carry advertisements for spirits. (We use a short-term exception to this policy in New York City when we examine changes in local regulations.) Similarly, the display advertisements we study are particularly important for online alcohol advertising because Google and other search engines do not accept advertisements for spirits.

Recall that Table 1 summarizes our key empirical insights. In states that have out-of-home advertising bans, the likelihood of consumers reporting that they are likely to purchase a product is 8% lower for the group that is not exposed to the online advertisement. There are many things that could drive this lower purchase intent in states with advertising

Figure 1

DISTRIBUTION OF STATES WITH ADVERTISING BANS DURING THE SAMPLE PERIOD



Out-of-Home Advertising Ban   ☐ No   ▨ Yes

ban besides the actual advertising ban (e.g., antialcohol attitudes), which is why we focus on the effect of randomized exposure on these different groups, why we conduct considerable additional analysis, and why we also show an alternative set of results for local regulation changes. The raw statistics suggest that in states with an advertising ban, underlying purchase intent is 3% lower after randomized exposure to Internet advertising. In other words, exposure to Internet advertising has a larger effect on people who live in states with an advertising ban. Figure 2 displays how the mean differences in purchase intent between participants who were exposed and not exposed to the advertisements varies across the states with and the states without bans on out-of-home advertising. Each square captures the effect for a different state. The lines capture one standard deviation from the mean for the size of the aggregate effect for any one state. Although the average difference between states with advertising bans and states without advertising bans is similar to Table 1, there is considerable heterogeneity within the grouping of states that have advertising bans or those that do not. This motivates our robustness analysis, in which we control for different observable sources of heterogeneity at the state level in alcohol attitudes and regulations.

*Specification and Main Results*

For person i who was exposed to advertising campaign j in state s, the following equation reflects their purchase intent:

$$(1) \quad \text{Intent}^s_{ij} = I(\alpha \text{Exposure}_{ij} + \beta \text{Exposure}_{ij} \times \text{AdBan}^s_i + \theta X_{ij}$$
$$+ \gamma^s + \delta_j + \varepsilon_{ij} > 0).$$

Therefore, $\alpha$ captures the main effect of being exposed to an advertisement on purchase intent; $\beta$ captures the core coefficient of interest for the current study—namely, whether exposure is more or less influential in places with an advertising ban; $X_{ij}$ is a vector of controls for gender, age, income, and time online; $\gamma^s$ is a series of state fixed effects that control for heterogeneity in baseline purchase intent at the state level and includes the main effect of the offline advertising ban ($\text{AdBan}^s_i$), which is why we do not include this lower-order interaction in our specification; and $\delta_j$ controls for heterogeneity in baseline purchase intent for the different campaigns. In these regressions, we assume that the $\varepsilon_{ij}$ has a Type 2 extreme value distribution, implying a logit specification. Standard errors are clustered at the state level in accordance with the simulation results Bertrand, Duflo, and Mullainathan (2004) present, suggesting that state-level clustering in respondent-level panel data, in which policy variation occurs at the state level, is an appropriate technique to address potential downward bias for standard errors.[5] This represents a conservative empirical approach because our setting involves randomization at the respondent level as well.

Table 3 reports the results. Columns 1–5 use a logit specification. Column 1 simply measures the effect of exposure to the respondent's stated purchase intent. Column 2 presents the basic differences-in-differences specification, and Column 3 presents results for the core specification

---

[5]Qualitative results are robust to clustering at the state treatment level, clustering at the campaign level, and simply using robust standard errors without clustering.

that includes the product-level fixed effects ($\delta_j$). Column 4 presents results when we used nonparametric controls for customer characteristics within our parametric logit framework. The results are reasonably similar across specifications, though adding product-level controls makes our estimates more precise.

The main result from Table 3 is that the effect of exposure to an online advertisement in states that ban out-of-home advertising is larger than in states that do not ban out-of-home advertising. A comparison of the predicted probabilities implied by our logit model suggests that if there was an out-of-home advertising ban in effect, exposure to an advertisement would increase purchase intent by 6% compared with an increase of 2% in states where there was no ban.

One explanation for this result is that offline advertising bans mean that firms are advertising to consumers who are at a less steep part of their goodwill response function for advertising. The theory proposed in Nerlove and Arrow (1962) suggests that all forms of advertising contribute to a goodwill stock for the product and that the marginal effectiveness of advertising goodwill has diminishing returns. Recent advertising literature (Dube, Hitsch, and Manchanda 2005; Dube and Manchanda 2005; Hitsch 2006) has empirically documented this. Theoretically, an advertising ban could limit the amount of goodwill accumulated by residents of states with advertising bans, meaning that the marginal effect of an exposure would be higher in states with bans than in states with no bans.

We recognize that there are many identification assumptions that must hold to draw such a conclusion. Therefore, we devote the following sections to exploring the identification assumptions that are inherent in this result by allowing the effect of exposure to vary with pertinent state characteristics and showing that the difference in advertising responsiveness across states is specific to alcohol advertising and does not apply to closely related categories.

In Table 3, Columns 1–3, the standardized measures of our demographic variables indicate a weakly positive effect from income and Internet hours and a negative effect from age. Column 4 reports the results of a nonparametric specification for the controls (within our parametric logit framework), in which we included fixed effects for every age, income, and Internet usage group. This has the advantage of letting us control nonparametrically for missing observations. The main effect we estimated for the interaction between outdoor advertising and exposure was similar to our previous estimates. Column 5 provides an alternative specification in which we included no demographic controls. The main results are statistically similar to Column 4, though excluding the demographic controls is reflected in a more negative log-likelihood, suggesting that the controls help with efficiency. This is to be expected given the randomized nature of our data.

Another econometric concern is the interpretation of the interaction terms in Table 3. Ai and Norton (2003) suggest that the interaction in a nonlinear model may not capture the true cross-derivative. However, Puhani's (2008) recent work suggests that the treatment effect in differences-in-differences specifications have the same sign as the logit interaction. To ensure that our results are not a function of the nonlinearity of the estimation function, we performed the Ai–Norton specification check for each of our specifications. The

Figure 2

DISTRIBUTION OF DIFFERENCE IN EXPOSED AND CONTROL CONDITIONS FOR LIKELY PURCHASE INTENT ACROSS STATES
WITH AND WITHOUT AN ADVERTISING BAN



results were similar in size and relative magnitude and significant at the 95% level. We also focus on the implied changes in marginal probabilities, which take into account the potential for nonlinearities in the logit model, when discussing the economic significance of our results. In Appendix A (Table A1, Column 1), we show that a linear probability model gives qualitatively similar results, which provides reassurance that the nonlinear functional form does not drive our results.

Column 6 of Table 3 replicates our results for a linear model when the dependent variable is the full five-point scale that we assume to be continuous. The similar results suggest

Table 3

PEOPLE WHO ARE EXPOSED LESS TO OFFLINE ADVERTISING REACT MORE TO ONLINE ADVERTISING

| | 1. Purchase Intent | 2. Purchase Intent | 3. Purchase Intent | 4. Purchase Intent | 5. Purchase Intent | 6. Intent Scale, Linear | 7. Intent Scale, Ordered Logit | 8. Favorable Opinion | 9. Ad Recall |
|---|---|---|---|---|---|---|---|---|---|
| Exposed × advertising ban | | .0596* (.0293) | .0673* (.0268) | .0676* (.0270) | .0698** (.0263) | .0460** (.0160) | .0589** (.0207) | .0539 (.0351) | −.0143 (.0384) |
| Exposed | .0997** (.0155) | .0823** (.0130) | .0684** (.0161) | .0613** (.0161) | .0734** (.0162) | .0459** (.0104) | .0600** (.0124) | .0925** (.0217) | .550** (.0299) |
| Female | .0851** (.0164) | .0848** (.0164) | .0900** (.0183) | .0880** (.0190) | | .0293* (.0135) | .0270 (.0171) | −.0976** (.0231) | −.196** (.0219) |
| Standardized Internet hours | .0515** (.0105) | .0514** (.0105) | .0476** (.0123) | | | .0315** (.00843) | .0381** (.0106) | .0636** (.0104) | .0870** (.0125) |
| Standardized income | −.000264 (.0100) | −.000158 (.0100) | −.0198* (.00994) | | | −.0272** (.00646) | −.0319** (.00810) | .0279** (.00729) | −.0331** (.00969) |
| Standardized age | −0.135** (.0108) | −.135** (.0108) | −.167** (.0155) | | | −.146** (.0102) | −.189** (.0143) | −.143** (.0128) | −.239** (.0150) |
| State fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Campaign fixed effects | No | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Demographics fixed effects | No | No | No | Yes | No | No | No | No | No |
| Observations | 61,580 | 61,580 | 61,580 | 61,566 | 61,580 | 61,580 | 61,580 | 58,585 | 51,923 |
| Log-likelihood | −37,191.6 | −37,190.3 | −35,940.3 | −35,770.9 | −36,099.2 | −110,305.7 | −90,026.4 | −36,802.6 | −26,108.4 |
| R-square | N.A. | N.A. | N.A. | N.A. | N.A. | .0519 | N.A. | N.A. | N.A. |

$*p < .05.$
$**p < .01.$
Notes: Logit regression coefficients shown. Dependent variable is an indicator variable for whether the person was likely or very likely to purchase in Columns 1–5. Dependent variable is purchase intent scale from 1 to 5 in Columns 6–7. Dependent variable is an indicator variable for whether the person was likely or very likely to have a favorable opinion in Column 8. Dependent variable is an indicator variable for whether the person was able to recall the advertisement in Column 9. Dependent variable is discrete unless labeled "scale." Robust standard errors are clustered at the state level. Advertising ban is collinear with state fixed effects and omitted (for details, see the section "State-Level Results"). N.A. = not applicable.

that our discretization of the scale is not driving our results, though as discussed previously, treating an ordinal scale as continuous is not without problems. Column 7 presents results from an ordered logit that also uses this scale as its dependent variable with similar results. Column 8 presents results for whether the respondent reported that he or she had a favorable opinion of the product as the dependent variable.

Column 9 presents results for ad recall as the dependent variable. Not surprisingly, the main effect of exposure on ad recall is larger. Notably, the advertising bans are unrelated to ad recall. Recalling the advertisement on the Web site is not related to whether offline alcohol advertisements are allowed. It suggests that the difference we observe in purchase intent is not a result of advertisements being more unusual and therefore more noticeable to inhabitants of states in which there are advertising bans. Instead, there is a difference in how effective the message of such advertisements is between the populations of regulated and nonregulated states.

*Controlling for Systematic Differences Between States With and Without Advertising Bans*

The random assignment of advertising exposure means that we have a clean measure of advertising effectiveness; therefore, the core remaining identification assumption that underlies Table 3 is that online alcohol advertising is not systematically more effective in states that have an advertising ban compared with those without such a ban for reasons other than the ban.

We received the data after people who had not completed the survey were removed. A potential concern is that if there are different survey attrition or recruitment rates for survey respondents exposed to the advertisement in states that had bans compared with states that did not have bans, it could influence our results. For example, it would be problematic for our interpretation if states that had advertising bans also had inhabitants who were more likely to be motivated to complete surveys enthusiastically if they had seen an alcohol advertisement. A two-sided t-test comparing the relative proportion of respondents who were exposed to the advertisement in states that had advertising bans and states that did not have advertising bans strongly rejected the notion that the proportions were different ($p$-value = .77). We also checked for systematic differences in recruitment ability in states that had advertising bans by comparing the proportion of survey respondents with the population of each state. A two-sided t-test ($p$-value = .97) provided strong evidence that there was no difference in the proportion of the state population recruited. This suggests that there was no difference in the marketing research firm's ability to generate the appropriate sample size from states that had advertising bans and states that did not.

An alternative explanation could be that alcoholic beverage companies designed the advertisements that appeared in states with advertising bans to be more effective. Such geographical targeting could take place if there were regional differences in the viewership of sites in the experiment or if the Web site matched advertisements to viewers by the geographical location of their IP (Internet protocol) addresses. However, we found no difference in the proportion of viewers exposed to different campaigns in states with advertising bans and those without advertising bans. Furthermore, as we show in Table 4, there is little difference in the cre-

ative formats used across states. As might be expected given the sample size, there are some statistically significant differences across the 20 categories. However, for the 6 categories in which there was a statistically significant difference, the differences tend not to be economically significant. Furthermore, the differences tend to cut in the wrong direction to provide an alternative explanation of our result. For example, the largest difference across states with bans and those without bans is that people in states with advertising bans tend to have seen more medium rectangle advertisements. However, medium rectangles are one of the smaller and less visible ad formats.

Another explanation is that the viewers in states with advertising bans and states without advertising bans have different demographic profiles. For example, if states with advertising bans had a younger population, who might be more likely to be influenced by alcohol advertising, this could explain why online alcohol advertising was more effective in such states. However, as Table 5 shows, there is no statistically significant difference in states with and without advertising bans in terms of average age, gender, income, or Internet usage for survey respondents who were exposed to advertisements and those who were not.[6] If we use buckets for these demographic variables rather than a continuous measure, the difference remains statistically insignificant. For example, the average number of people under the age of 35 years (who buy the majority of alcohol) is the same across states with and without advertising bans.

Another set of concerns lies with the potential for the effects of online advertising exposure to vary in systematic ways connected with the state's characteristics, which are in

---

[6]Analysis at the state level is similar.

### Table 4
RELATIVE PROPORTION OF DIFFERENT ADVERTISING FORMATS FOR STATES WITH AND WITHOUT ADVERTISING BANS

|  | *Mean no Ban* | *Mean with Ban* | *T-Test* |
|---|---|---|---|
| Banner (468 × 60) | .0284 | .0253 | 1.99 |
| Button (120 × 90) | .0055 | .0047 | 1.14 |
| Large rectangle/square (336 × 280) | .0372 | .0384 | −.70 |
| Skyscraper (120 × 600) | .0267 | .0229 | 2.56 |
| Vertical rectangle (240 × 400) | .0001 | .0001 | −.13 |
| Half banner (234 × 60) | .0008 | .0006 | .94 |
| Full page | .0039 | .0035 | .62 |
| Unknown | .0180 | .0212 | −2.43 |
| Interstitial | .0003 | .0004 | −.48 |
| Super banner (728 × 90) | .0604 | .0557 | 2.12 |
| Floating | .0060 | .0067 | −1.05 |
| Pop-up (250 × 250) | .0012 | .0012 | −.05 |
| Rectangle (180 × 150) | .0026 | .0031 | −.88 |
| Medium rectangle (300 × 250) | .1675 | .1915 | −6.70 |
| Wide skyscraper (160 × 600) | .6158 | .5986 | 3.74 |
| Half-page advertisement (300 × 600) | .0050 | .0049 | .24 |
| Vertical banner (120 × 240) | .0162 | .0166 | −.37 |
| Square button (125 × 125) | .0002 | .0001 | .31 |
| Other | .0019 | .0026 | −1.53 |
| Unknown | .0023 | .0018 | 1.12 |
| Rectangle (300 × 100) | .0001 | .0002 | −.74 |
| Observations | 61,580 | | |

turn correlated with the ability of alcohol advertising to persuade. Because respondents are randomly assigned to whether they are exposed to the advertising but are not randomly assigned to whether they live in a state with offline advertising bans, there may be other reasons for the systematic difference we observe in the effect of exposure in states that have bans and those that do not. This problem is apparent in our data: Respondents who are not exposed to alcohol advertising were 8% less likely to express positive purchase intent in states that had billboard bans, suggesting that there is an underlying systematic difference. In this section, we address this problem by controlling for the effect of multiple state characteristics on exposure. Next, we take on this identification issue directly by examining locations that experienced changes in advertising bans.

Table 6 summarizes the rich set of observables that we explore. The first seven variables capture different aspects of alcohol consumption and abuse. The idea is to control for consumer-side heterogeneity that may be driving our results. For example, people who live in states in which people consume more alcohol may be more likely to respond to alcohol advertisements; moreover, their states are more likely to have an alcohol advertising ban. The last five variables reflect different states' attempts to restrict advertising content and the consumption and the sale of alcohol. This helps control for the possibility that we may be picking up something more general about states that take a tough line on alcohol sales and the likelihood of their population to respond to alcohol advertising.

For each potential source of observable heterogeneity, $Observable^{st}_i$, we reran the specification in Equation 1 with an additional term, $Exposure_{ij} \times Observable^{st}_i$, which captured how this moderated the main effect of being exposed to the advertisement. Because there was time variation in these measures, we also included the main effect, $Observable^{st}_i$. Table 7 reports the results. The final column presents results from a combined regression in which we include interactions for each of these observables in the same specification. As we expected, it is apparent that some of these sources of state variation affect the effect of exposure on advertising. People from states with large populations of nondrinkers were less likely to be influenced by an online alcohol advertisement, people from states with more heavy drinkers and youth drinkers were more likely to be influ-

enced by an online alcohol advertisement, and people in states with strict restrictions on Sunday alcohol sales were less likely to be influenced by advertisements.

However, it is crucial that in all cases, the key effect of interest $Exposure_{ij} \times AdBan^s_i$ remains positive and significant. Although not conclusive, these results help rule out the most obvious alternative explanations of our results occasioned by the lack of orthogonality of the state offline advertising ban to state characteristics pertaining to alcohol consumption.

*Falsification Checks*

As the previous section demonstrates, observable differences in the ad campaigns, characteristics of respondents, and characteristics of the states with advertising bans do not provide an alternative explanation of our results. To explore whether there are unobserved differences in general advertising responsiveness, we examined other types of closely related advertising that are not subject to the ban to determine whether we observe similar results that may be suggestive of unobserved heterogeneity. Specifically, we reran our main specification on similar data for placebo categories. First, we reran data on high-sugar/high-salt snacks and candies. As with alcoholic beverages, these have been targeted by the U.S. Surgeon General's office as an area of excessive consumption with potential negative side effects. Column 1 in Table 8 reports the results for these snacks. As we expected, there is an effect of exposure to an advertisement. However, alcohol advertising bans do not change this relationship: The interaction term is negative and insignificant. Column 2 repeats this falsification exercise for nonalcoholic beverages, and again we find no significant effect from out-of-home advertising bans on the effect of exposure. Column 3 repeats the falsification exercise for all food items, again indicating no increase in the effect in states with bans. This supports our interpretation that the effect we are measuring is specific to the alcohol category and, therefore, is more likely to be related to the presence or absence of an advertising ban.

*CHANGES IN LOCAL ADVERTISING REGULATIONS*

The second way we show the impact of offline advertising bans on online advertising effectiveness is by examining four changes in local alcohol advertising regulations. These help overcome worries that, despite the previously mentioned checks for underlying state-level heterogeneity and the falsification test, there still may be unobserved heterogeneity in advertising responsiveness that is specific to the alcohol sector. We focus on several instances in which, during the period of our data, states or municipalities enacted or rescinded alcohol advertising bans. We believe that such changes can help us identify precisely the causal effect of the law on responses to online advertising because we can compare (for people living in the same place) the reactions to online advertisements before and after there is a law prohibiting forms of alcohol advertising. There are four such cases for which we have observations in our data: (1) Philadelphia's enactment of a law prohibiting alcohol advertising from public property; (2) Pennsylvania's repeal of a law restricting the ability of student newspapers to publish alcohol advertising; (3) San Francisco public transit authority's toughening of regulations, according to which alcohol

Table 5
DEMOGRAPHIC PROFILES FOR STATES WITH AND WITHOUT ADVERTISING BANS BY EXPOSURE TO ADVERTISEMENTS

|  | Mean no Ban | Mean with Ban | T-Test |
|---|---|---|---|
| *Exposed to Advertisement* |  |  |  |
| Age | 43.57 | 43.55 | .16 |
| Female | .41 | .42 | −1.33 |
| Income | 70,820 | 70,800 | .03 |
| Weekly Internet hours | 9.59 | 9.62 | −.25 |
| Observations | 33,322 |  |  |
| *Not Exposed to Advertisement* |  |  |  |
| Age | 43.94 | 43.96 | −.15 |
| Female | .40 | .39 | .71 |
| Income | 70,034 | 71,067 | −1.31 |
| Weekly Internet hours | 9.29 | 9.08 | 1.56 |
| Observations | 28,258 |  |  |

Table 6

STATE-LEVEL VARIABLES

| Variable | M | SD | Description | Source |
|---|---|---|---|---|
| BeerDrunk | 21.6 | 3.27 | Gallons (in thousands) of beer drunk per capita in state each year | Alcohol Epidemiologic Data System: LaVallee, R.A., G.D. Williams, and H. Yi (2009), "Apparent Per Capita Alcohol Consumption: National, State, and Regional Trends, 1970–2007," Surveillance Report No. 87 (September). Bethesda, MD: National Institute on Alcohol Abuse and Alcoholism, Division of Epidemiology and Prevention Research |
| WineDrunk | 2.31 | .90 | Gallons (in thousands) of wine drunk per capita in state each year | Alcohol Epidemiologic Data System: LaVallee, R.A., G.D. Williams, and H. Yi (2009), "Apparent Per Capita Alcohol Consumption: National, State, and Regional Trends, 1970–2007," Surveillance Report No. 87 (September). Bethesda, MD: National Institute on Alcohol Abuse and Alcoholism, Division of Epidemiology and Prevention Research |
| SpiritsDrunk | 1.40 | .37 | Gallons (in thousands) of spirits drunk per capita in state each year | Alcohol Epidemiologic Data System: LaVallee, R.A., G.D. Williams, and H. Yi (2009), "Apparent Per Capita Alcohol Consumption: National, State, and Regional Trends, 1970–2007," Surveillance Report No. 87 (September). Bethesda, MD: National Institute on Alcohol Abuse and Alcoholism, Division of Epidemiology and Prevention Research |
| BingeDrinkers | 15.4 | 2.65 | Percentage of binge drinkers (men who have five or more drinks on one occasion and women who have four or more drinks on one occasion) | Behavioral Risk Factor Surveillance System annual survey data (2001–2008) |
| HeavyDrinkers | 5.28 | 1.04 | Percentage of heavy drinkers (adult men who have more than two drinks per day and adult women who have more than one drink per day) | Youth Risk Behavior Survey, Centers for Disease Control and Prevention (an in-school survey of students in grades 9–12) |
| YouthDrinkDrive | 2.34 | .74 | Percentage of students who, during the past 30 days, drove a vehicle one or more times when they had been drinking alcohol | Youth Risk Behavior Survey, Centers for Disease Control and Prevention (an in-school survey of students in grades 9–12) |
| YouthDrinking | 43.2 | 3.73 | Percentage of students who at least had one drink of alcohol on 1 or more of the past 30 days | Youth Risk Behavior Survey, Centers for Disease Control and Prevention (an in-school survey of students in grades 9–12) |
| Teetotalers | 45.3 | 7.70 | Percentage of adults who have not had alcohol in the last 30 days | Behavioral Risk Factor Surveillance System annual survey data (2001–2008) |
| NoKidsAds | .38 | .79 | State bans alcohol advertisements that depict children. For example, Connecticut's law reads "[No alcohol advertisement shall include] any scene in which is portrayed a child or objects, such as toys, suggestive of the presence of a child or which in any manner portrays the likeness of a child or contains the use of figures or symbols which are customarily associated with children." [CT Reg. 30-6-A31(a)(6)] | State Advertising Laws: Current Status and Model Policies, Center on Alcohol Marketing and Youth, Georgetown University |
| NoAthleticAds | .28 | .69 | State bans alcohol advertisements that associate alcohol with athletic achievement | State Advertising Laws: Current Status and Model Policies, Center on Alcohol Marketing and Youth, Georgetown University |
| NoSundayTrading | .25 | .44 | State bans majority of Sunday off-premises alcohol sales | Alcohol Policy Information System, National Institutes of Health |
| NoOpenBeverages | .92 | .27 | State prohibits open containers of alcohol in the passenger compartments of noncommercial motor vehicles | Alcohol Policy Information System, National Institutes of Health |
| StateLiquorStores | .28 | .45 | State-run retail distribution system for hard liquor | Alcohol Policy Information System, National Institutes of Health |

Table 7

ALLOWING EFFECT OF EXPOSURE TO VARY WITH OBSERVABLE STATE CHARACTERISTICS

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Exposed × advertising ban | .0695*** | .0691** | .0783*** | .0685*** | .0620** | .0667** | .0712*** | .0762*** | .0671** | .0588** | .0554** | .0699** | .0679*** | .0758** |
| | (.0257) | (.0268) | (.0291) | (.0253) | (.0267) | (.0268) | (.0230) | (.0251) | (.0264) | (.0280) | (.0253) | (.0277) | (.0252) | (.0385) |
| Exposed | −.00382 | .0344 | .000463 | −.0338 | −.0842 | .0590 | −.396* | .242*** | .0691*** | .0784*** | .0932*** | .0941*** | .0797*** | .323 |
| | (.111) | (.0398) | (.0737) | (.0819) | (.0686) | (.0479) | (.207) | (.0823) | (.0152) | (.0185) | (.0201) | (.0325) | (.0185) | (.516) |
| Exposed × BeerDrunk | .00330 | | | | | | | | | | | | | .00142 |
| | (.00525) | | | | | | | | | | | | | (.00847) |
| Exposed × WineDrunk | | .0145 | | | | | | | | | | | | −.0319 |
| | | (.0160) | | | | | | | | | | | | (.0334) |
| Exposed × SpiritsDrunk | | | .0463 | | | | | | | | | | | .0338 |
| | | | (.0525) | | | | | | | | | | | (.0873) |
| Exposed × BingeDrinkers | | | | .00660 | | | | | | | | | | −.0152 |
| | | | | (.00565) | | | | | | | | | | (.0177) |
| Exposed × HeavyDrinkers | | | | | .0292** | | | | | | | | | .0183 |
| | | | | | (.0136) | | | | | | | | | (.0308) |
| Exposed × YouthDrinkDrive | | | | | | .00414 | | | | | | | | −.0338 |
| | | | | | | (.0218) | | | | | | | | (.0347) |
| Exposed × YouthDrinking | | | | | | | .0107** | | | | | | | .00730 |
| | | | | | | | (.00476) | | | | | | | (.00580) |
| Exposed × Teetotalers | | | | | | | | −.00390** | | | | | | −.00611 |
| | | | | | | | | (.00175) | | | | | | (.00490) |
| Exposed × NoKidsAds | | | | | | | | | −.00177 | | | | | .0122 |
| | | | | | | | | | (.0183) | | | | | (.0211) |
| Exposed × NoAthleticAds | | | | | | | | | | −.0269 | | | | −.0366 |
| | | | | | | | | | | (.0210) | | | | (.0224) |
| Exposed × NoSundayTrading | | | | | | | | | | | −.0833*** | | | −.0755** |
| | | | | | | | | | | | (.0245) | | | (.0320) |
| Exposed × NoOpenBeverages | | | | | | | | | | | | −.0288 | | −.0549 |
| | | | | | | | | | | | | (.0368) | | (.0452) |
| Exposed × StateLiquorStores | | | | | | | | | | | | | −.0411 | −.0277 |
| | | | | | | | | | | | | | (.0259) | (.0415) |
| Female | .0902*** | .0907*** | .0901*** | .0899*** | .0905*** | .0901*** | .0900*** | .0887*** | .0900*** | .0900*** | .0902*** | .0900*** | .0900*** | .0908*** |
| | (.0183) | (.0184) | (.0183) | (.0184) | (.0184) | (.0183) | (.0184) | (.0184) | (.0183) | (.0183) | (.0184) | (.0183) | (.0183) | (.0184) |
| Standardized Internet hours | .0478*** | .0515*** | .0480*** | .0478*** | .0476*** | .0474*** | .0472*** | .0509*** | .0476*** | .0475*** | .0480*** | .0475*** | .0477*** | .0518*** |
| | (.0124) | (.0126) | (.0121) | (.0124) | (.0123) | (.0123) | (.0122) | (.0124) | (.0123) | (.0123) | (.0123) | (.0123) | (.0123) | (.0124) |
| Standardized income | −.0199** | −.0193* | −.0198** | −.0198** | −.0198** | −.0199** | −.0198** | −.0195** | −.0198** | −.0198** | −.0199** | −.0198** | −.0199** | −.0194* |
| | (.00993) | (.00998) | (.00992) | (.00994) | (.00993) | (.00995) | (.00994) | (.00992) | (.00993) | (.00993) | (.00993) | (.00994) | (.00994) | (.00993) |
| Standardized age | −.167*** | −.166*** | −.167*** | −.167*** | −.167*** | −.167*** | −.167*** | −.166*** | −.167*** | −.167*** | −.167*** | −.167*** | −.167*** | −.165*** |
| | (.0154) | (.0155) | (.0155) | (.0155) | (.0155) | (.0154) | (.0154) | (.0155) | (.0155) | (.0155) | (.0155) | (.0155) | (.0155) | (.0155) |
| State fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Campaign fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observable main effect | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 61,580 | 61,580 | 61,580 | 61,580 | 61,580 | 61,580 | 61,580 | 61,580 | 61,580 | 61,580 | 61,580 | 61,580 | 61,580 | 61,580 |
| Log-likelihood | −35,936.2 | −35,934.6 | −35,939.8 | −35,939.6 | −35,938.9 | −35,940.2 | −35,937.5 | −35,932.9 | −35940.3 | −35,939.8 | −35,938.0 | −35,940.1 | −35,939.8 | −35,922.2 |

*p < .10.
**p < .05.
***p < .01.
Notes: Dependent variable is an indicator variable for whether the person was likely or very likely to purchase. Logit coefficients are shown. Robust standard errors are clustered at the survey level.

Table 8

FALSIFICATION CHECKS

|  | 1. High-Sugar Foods | 2. Nonalcoholic Beverages | 3. All Food |
|---|---|---|---|
| Exposed × advertising ban | −.00493 | −.00268 | −.00467 |
|  | (.0372) | (.0549) | (.0173) |
| Exposed | .0712** | .0835* | .0758** |
|  | (.0263) | (.0340) | (.0104) |
| Female | .164** | .300** | .266** |
|  | (.0269) | (.0364) | (.0120) |
| Standardized Internet hours | .0514** | .0646** | .0465** |
|  | (.0136) | (.0168) | (.00616) |
| Standardized income | −.0653** | −.0106 | −.0465** |
|  | (.0145) | (.0181) | (.00710) |
| Standardized age | −.0688** | −.129** | −.0338** |
|  | (.0150) | (.0155) | (.00818) |
| State fixed effects | Yes | Yes | Yes |
| Campaign fixed effects | Yes | Yes | Yes |
| Observations | 45,310 | 23,983 | 194,351 |
| Log-likelihood | −28,468.6 | −13,875.9 | −117,830.4 |

*$p < .05$.

**$p < .01$.

Notes: Dependent variable is an indicator variable for whether the person was likely or very likely to purchase. Logit coefficients are shown. Robust standard errors are clustered at the survey level.

advertising would be fined at $5,000 a day; and (4) New York's loosening of a self-imposed policy, in which one New York broadcast television affiliate began showing liquor advertisements.

Even when a change in a law is used to identify the effect of advertising bans, a lingering concern is that the change in law may be connected with an unobserved change in behavior over time that is also systematically connected with how people respond to advertising. To control for this possibility, in each instance of a law change, we included data on a control group of people who should display a similar time trend because they lived in a similar place and reasonably nearby one another. This enables us to use a triple difference specification to difference out changes in advertising responsiveness caused by location and changes due to changing time trends. In equation form, this means that for person i exposed to advertising campaign j in location $l$ at time t, our specification in Equation 1 becomes the following:

$$(2) \quad \text{Intent}_{ijt}^{l} = I(\alpha \text{Exposure}_{ij} + \beta_1 \text{Exposure}_{ij} \times \text{AffectedGroup}_{i}^{l}$$

$$\times \text{AdBanPeriod}_{it}^{l} + \beta_2 \text{Exposure}_{ij} \times \text{AffectedGroup}_{i}^{l}$$

$$+ \beta_3 \text{Exposure}_{ij} \times \text{AdBanPeriod}_{it}^{l} + \lambda \text{AdBanPeriod}_{it}$$

$$+ \eta \text{AffectedGroup}_{i}^{l} \times \text{AdBanPeriod}_{it}^{l} + \theta X_{ij} + \gamma^{l}$$

$$+ \delta_j + \varepsilon_{ij} > 0).$$

Reflecting the switch from the state level to a more local analysis, $\gamma^l$ is now a series of county fixed effects that control for heterogeneity in baseline purchase intent at the county level. Again, these effects substitute for the main effect of AffectedGroup$_i^l$. Because we are no longer observing state-level variation in policy but rather within-state variation, we clustered standard errors at the campaign level rather than the state level.[7]

Table 9 displays our case study results. In all cases, the sample size is relatively low, and as a result, our results are sometimes only marginally significant. However, taken together, they suggest that offline advertising bans positively influence the effectiveness of online advertisements.

Column 1 indicates a change in law that occurred in 2003, when the Philadelphia city government decided to ban alcohol advertisements from all city property. Haas and Sherman (2003) discuss this change in policy in detail, indicating that it seems to have been motivated by policy advocates highlighting the issue of alcohol advertisements on bus shelters that were commonly used by students going to school. As our control group, we use people who lived in the same combined metropolitan statistical area but over the border, either in Camden, N.J., or Wilmington–Newark, Del. The results in Column 1 suggest that people who live in Philadelphia became incrementally more responsive to online alcohol advertising after the ban, compared with both their previous responsiveness and people in neighboring states in that period.

Column 2 shows a change in law in the opposite direction, also in Pennsylvania. In *Pitt News v. Attorney General of Pennsylvania* (No. 03-1725) (3rd Cir., July 29, 2004), the federal court struck down a Pennsylvania law banning alcoholic beverage advertising in college newspapers. Although this law, which pertains to print media rather than out-of-home advertising, is different from the ones we have studied so far, it should have similar effects if the behavior we observe is due to awareness of the product. To study this law, we examined the behavior of consumers in college towns such as Waynesburg, Penn., which is home to Waynesburg University and the *Yellow Jacket* student newspaper. We defined a "college town" as one in which more than 20% of the population are students. We compared responsiveness to online alcohol advertising in these college towns with similarly sized towns in surrounding areas that did not have such a newspaper. This focus on college towns and their counterparts meant that our analysis excluded the Philadelphia metropolitan area we studied in Column 1. This is attractive from an identification point of view because it means that we are studying two types of populations within the same state who experienced a change in exposure to offline alcohol advertising during a similar time frame but in different directions. If state-level heterogeneity explained our results, we would not expect to find different directions of effects in these two cases. Consistent with our prior findings, Column 2 indicates that in the period before the advertising ban was struck down, these college-town populations were more responsive to online alcohol advertising than they were afterward, relative to the population in noncollege towns.

Column 3 demonstrates the San Francisco transit authority's change in policy regarding alcohol advertising. As Simon (2008) describes, the Marin Institute, a public pressure group, presented evidence that despite a contract prohibiting alcohol advertising, in at least 15 cases CBS Outdoor had erected alcohol advertisements on transit authority property that violated their contract. In response to public outcry, at the end of 2007 the San Francisco transit authority issued a new contract that promised to fine advertising companies $5,000 per day if an advertising company violated their contract and displayed alcohol advertisements. Our goal is to study how this toughening of regulatory

[7]Results are robust to not clustering. Unsurprisingly, we lose significance if errors are clustered at the location level or the location-treatment level.

JOURNAL OF MARKETING RESEARCH, APRIL 2011

Table 9

CASE STUDIES OF INSTANCES IN WHICH ALCOHOL ADVERTISING BANS CHANGED IN THE SAMPLE PERIOD

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| *Purchase Intent* | | | | | |
| Exposed × advertising ban × affected group | .881* (.489) | 1.791*** (.666) | 2.310** (.943) | 1.005* (.581) | .563*** (.215) |
| Exposed | .646 (.447) | .0958 (.139) | .0958 (.0948) | .909*** (.302) | .134 (.0838) |
| Exposed × advertising ban | −.662 (.508) | −.0978 (.253) | −.469* (.284) | −.940*** (.326) | −.219* (.131) |
| Exposed × affected group | −.678* (.411) | −.657 (.434) | −.0740 (.483) | −.886 (.541) | −.287 (.187) |
| Advertising ban | −.572 (.552) | .822** (.365) | .115 (.269) | .712*** (.218) | .0573 (.0956) |
| Advertising ban × affected group | −.445 (.430) | −.412 (.590) | −.439 (.885) | −.256 (.351) | −.178 (.156) |
| Campaign fixed effects | Yes | Yes | Yes | Yes | Yes |
| Demographics | Yes | Yes | Yes | Yes | Yes |
| County fixed effects | Yes | Yes | Yes | Yes | Yes |
| Observations | 1429 | 1957 | 2524 | 1991 | 7927 |
| Log-likelihood | −781.5 | −1063.0 | −1430.0 | −1172.0 | −4552.4 |
| Date of Change | December 2003 | End July 2004 | December 2007 | November 2007 | Combined |
| Change in regulation | Ban of alcohol advertising on Philadelphia public property | Law banning alcohol advertisements in student newspapers struck down | Stiff fines for alcohol advertising on San Francisco public transportation | NBC affiliate in New York rescinds self-imposed ban on airing hard liquor advertisements | Combined |
| Affected sample | Respondents in Philadelphia | Respondents in college towns of Pennsylvania | Respondents in San Francisco | New York respondents asked about liquor campaigns | Combined |
| Control group | Respondents in Camden, N.J. and Wilmington–Newark, Del. | Respondents outside Philadelphia in non–college towns in Pennsylvania | Respondents in Los Angeles and San Jose, Calif. | New York respondents asked about beer campaigns | Combined |

*$p < .10$.
**$p < .05$.
***$p < .01$.

Notes: Dependent variable is an indicator variable for whether the person was likely or very likely to purchase. Logit coefficients are shown. Robust standard errors are clustered at the survey level.

enforcement affected online ad responsiveness. Therefore, our estimates in this case should be interpreted as comparing the effect of an official ban of the kind that already existed in California with increased and improved enforcement of that ban. As a control group, we used respondents in Los Angeles and San Jose, which, though geographically distant, are large metropolitan communities within the state; again, if a systematic change in state-specific behavior is driving our results, we would expect to observe similar time trends in how effective online exposure to advertising is across each city. However, the results of Column 3 suggest that, again, there was an incrementally positive effect of the advertising ban for San Francisco survey respondents relative to their previous behavior and relative to survey respondents in Los Angeles and San Jose in the same period.

Column 4 focuses on television advertising, extending our previous focus on outdoor and print advertising. As Elliot (2007) describes, at the end of November 2007, the executives at WNBC-TV, NBC's flagship New York network affiliate, decided to start showing hard liquor advertisements on its broadcasts. Liquor advertisements had been shown on cable in the past, but it was the first network airing of spirit advertisements in six years. What is attractive about this change in policy is that it represents a change in advertising practices within the alcoholic beverage category. Broadcast television regularly advertises beer, but spirits have been subject to self-regulation. Therefore, we can evaluate whether people living in the same place responded differently to online spirits advertisements compared with how they responded previously, while controlling for general changes in the effectiveness of online campaigns for alcohol using beer. The results again suggest that before the ban was rescinded, there was a relative incremental advantage in terms of effectiveness for spirits relative to beer. However, after the ban was rescinded, this incremental advantage decreased. It is informative that we obtain similar results for changes in regulation governing print media and also television media because it suggests that our results pertaining to the effect of restrictions on out-of-home advertising campaigns can be applied cautiously to other media.

Column 5 presents the results of a specification that combines data from Columns 1–4. The results are similar, though our estimate of the coefficient of interest Exposure × AdBan × AffectedGroup is more precise. The aim of these

case studies is to provide evidence for the robustness of our results in Table 9; therefore, we checked how the economic size of the effects they suggested compared with our previous estimates. Again, we used a logit framework with interaction terms; thus, to get reliable estimates of marginal effects, we calculated the population average predicted probabilities and compared them for our different treatment and control groups. The estimates in Table 3 suggest that in states with advertising bans, the effect of advertising exposure is approximately 1.2 percentage points higher. In two of our case studies, our results were similar. Our estimates for Philadelphia residents suggested that after the advertising ban, there was a 2.2 percentage point increase in the effect of exposure to advertising on purchase intent. Our estimates for New York residents suggest that before the spirits advertising ban was repealed, there was a 1.8 percentage point greater effect of exposure to online spirits advertising on purchase intent relative to other alcohol. However, in two case studies, the estimates of the incremental advantage of online advertising when offline advertising bans were in place were far higher. For respondents in San Francisco, there was an incremental lift of 14 percentage points. For respondents in college towns, it was 24 points higher. It is possible that these are unusual populations of people who are easily motivated by stimuli to drink alcohol. However, because these estimates of the marginal effects have large confidence intervals and are statistically indistinguishable from 2.2 percentage points, it is more likely that these high point estimates reflect the relative imprecision of our estimates due to the smaller sample size used in these case studies. In Column 5, in which we combine data from all five case studies, we find evidence of an approximately 4.1 percentage point increase in the likelihood of a respondent stating "likely" or "very likely" purchase intent.

To ensure the robustness of our results, we checked that the timing of the ad effect happened at the same time as the change in regulation. Table 10 shows that our results are robust to using a shorter window of a year before and after to evaluate the policy change. Although, as we expected, the smaller sample size meant we estimated the coefficients with less precision, the results are all directionally consistent, and in some cases, the point estimates are larger. This

## Table 10

CASE STUDIES OF INSTANCES IN WHICH ALCOHOL ADVERTISING BANS CHANGED IN THE SAMPLE PERIOD: SHORT WINDOWS OF A YEAR BEFORE AND AFTER THE POLICY CHANGE

| | 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|---|
| *Purchase Intent* | | | | | |
| Exposed × advertising ban × affected group | .527 (.974) | 3.034** (1.434) | 3.957*** (1.245) | 2.362* (1.330) | 1.126*** (.412) |
| Exposed | .332 (1.101) | .528** (.226) | .106 (.105) | .884*** (.298) | .279** (.129) |
| Exposed × advertising ban | −.243 (1.172) | .347 (.365) | −.495* (.286) | −.924*** (.316) | −.275* (.145) |
| Exposed × affected group | −.426 (.893) | −1.827** (.805) | −1.597* (.970) | −.846 (.554) | −.485 (.334) |
| Advertising ban | −.923 (1.787) | .390 (.410) | .230 (.452) | .763*** (.214) | .192* (.103) |
| Advertising ban × affected group | −.142 (.572) | −2.344* (1.386) | −.640 (.919) | −2.974*** (1.054) | −.854** (.411) |
| Campaign fixed effects | Yes | Yes | Yes | Yes | Yes |
| Demographics | Yes | Yes | Yes | Yes | Yes |
| County fixed effects | Yes | Yes | Yes | Yes | Yes |
| Observations | 484 | 440 | 958 | 827 | 2731 |
| Log-likelihood | −285.5 | −240.0 | −527.5 | −471.5 | −1567.5 |
| Date of Change | December 2003 | End July 2004 | December 2007 | November 2007 | Combined |
| Change in regulation | Ban of alcohol advertising on Philadelphia public property | Law banning alcohol advertisements in student newspapers struck down | Stiff fines for alcohol advertising on San Francisco public transportation | NBC affiliate in New York rescinds self-imposed ban on airing hard liquor advertisements | Combined |
| Affected sample | Respondents in Philadelphia | Respondents in college towns of Pennsylvania | Respondents in San Francisco | New York respondents asked about liquor campaigns | Combined |
| Control group | Respondents in Camden, N.J. and Wilmington–Newark, Del. | Respondents outside Philadelphia in non–college towns in Pennsylvania | Respondents in Los Angeles and San Jose, Calif. | New York respondents asked about beer campaigns | Combined |

*$p < .10$.
**$p < .05$.
***$p < .01$.
Notes: Dependent variable is an indicator variable for whether the person was likely or very likely to purchase. Logit coefficients are shown. Robust standard errors are clustered at the survey level.

suggests that the results are not a function of differences between the periods long before the change and the periods long after the change. Rather, there was an immediate change in ad effectiveness coincident with the change in the ban.

Table 11 shows the robustness of the combined results from Column 5 to a similar sequence of robustness checks to those presented in Table 3. Column 1 shows that our results are robust to the exclusion of the controls. Column 2 shows our results are robust to a linear ordinary least squares regression for the full intent scale. Column 3 shows our results are robust to an ordered logit specification for the scale. Column 4 shows the results when we use favorable opinion as the dependent variable. Notably, compared with Table 3, the point estimate for the coefficient of interest is more precisely estimated in Table 11, suggesting that offline advertising bans can affect attitudes toward the product and purchase intent. Column 5 again shows little effect of the offline advertising ban on ad recall. Columns 6–8 repeat the falsification checks presented in Table 8 for the combined data from our four case studies. In all cases, we do not find any significant effect of offline alcohol advertising bans on the purchase intent for categories that are not alcohol.

### AWARENESS

In this section, we explore a potential mechanism for the result that online advertising is more effective in places where out-of-home advertising is banned. Specifically, we examine the possibility that media bans reduce the likelihood that consumers are saturated with media images, therefore rendering online advertising more effective in these places. As Ackerberg (2001) points out, the effective-ness of advertising may differ depending on whether consumers are aware of the products. To understand the role of awareness, we divided the products advertised in our sample in two ways: on the basis of stated awareness of people in our sample who had not seen the advertisements and on the basis of whether the product is a new product. As might be expected, mean awareness levels are lower in states with advertising bans: 70% of respondents reported that they knew about the product in states that had no advertising ban, and 67% of respondents reported that they knew about the product in states that had bans. (The difference is statistically significant at the $p < .001$ level.) We split the sample at average awareness levels for the products.

Table 12 presents the results for the state-level variation in regulation. The effect is far stronger for new products and those that had below-average awareness levels. For products that had above-average awareness levels, there was no significant effect of advertising bans or even for advertising exposure.

Table 13 presents similar results for the combined data for locations where there was a change in regulation during our data. Again, the results suggest that the effect of the advertising ban is stronger for low-awareness products. It is significant that we do not observe such a strong effect for new products (or at least the estimates are statistically identical for the effect of the ban). This may be because these were markets in which new products gained high awareness levels swiftly. As a robustness check, in Appendix A, we repeated the estimation in Table 12 for the placebo categories of junk food, consumer packaged goods, and other beverages that we examined in Table 8. The results for the key coefficients were either insignificant or of the wrong sign.

### Table 11
CASE STUDIES OF INSTANCES IN WHICH ALCOHOL ADVERTISING BANS CHANGED IN THE SAMPLE PERIOD: ROBUSTNESS AND FALSIFICATION CHECK

| | 1. No Controls | 2. Ordinary Least Squares | 3. Ordered Logit | 4. Favorable Opinion | 5. Ad Recall | 6. Junk Food | 7. Beverages | 8. Consumer Packaged Goods Category |
|---|---|---|---|---|---|---|---|---|
| *Main* | | | | | | | | |
| Exposed × advertising ban × affected group | .579*** (.210) | .297** (.136) | .372** (.174) | .677*** (.216) | .188 (.298) | .102 (.0840) | .0236 (.125) | .0200 (.0421) |
| Exposed | .150* (.0831) | .117** (.0562) | .162** (.0685) | .184** (.0737) | .638*** (.111) | .0493** (.0193) | .0158 (.0260) | .0290*** (.0100) |
| Exposed × advertising ban | −.216 (.132) | −.181** (.0790) | −.228** (.0963) | −.319*** (.0932) | −.313* (.169) | −.0724** (.0324) | −.0474 (.0413) | −.0396** (.0159) |
| Exposed × affected group | −.305* (.183) | −.148 (.128) | −.198 (.163) | −.342* (.207) | −.0254 (.180) | −.0668 (.0662) | .0759 (.0967) | .0102 (.0338) |
| Advertising ban | .0586 (.0984) | .0616 (.0627) | .0737 (.0801) | .0671 (.0928) | .163 (.104) | .0198 (.0282) | .0697* (.0373) | .0230 (.0154) |
| Advertising ban × affected group | −.204 (.155) | −.114 (.0954) | −.144 (.135) | −.253 (.162) | .291 (.247) | −.0211 (.0598) | −.166 (.105) | −.0191 (.0320) |
| Survey fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Demographics | No | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| County fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 7927 | 7937 | 7937 | 7480 | 6781 | 5111 | 2895 | 21,791 |
| Log-likelihood | −4582.2 | −14,036.6 | −11,568.9 | −4655.8 | −3386.3 | −3515.8 | −1943.7 | −15,595.3 |

*$p < .10$.
**$p < .05$.
***$p < .01$.
Notes: Columns 1–4 repeat robustness checks from Table 3 for Column 5 of Table 9. Columns 5–7 are falsification checks for alternative categories for Column 5 of Table 9. Unless otherwise stated, these are logit coefficients with "purchase intent" as the dependent variable.

Table 12

AWARENESS INFLUENCES EFFECTIVENESS OF ONLINE ADVERTISING IN STATES WITH AN ADVERTISING BAN

|  | 1. High Awareness | 2. Low Awareness | 3. Old Product | 4. New Product |
|---|---|---|---|---|
| Exposed × advertising ban | .0194 (.0349) | .0974** (.0403) | .0476* (.0288) | .119** (.0470) |
| Exposed | .0330 (.0245) | .107*** (.0293) | .0572*** (.0212) | .0557* (.0338) |
| Female | −.0306 (.0340) | .222*** (.0256) | −.0368 (.0254) | .267*** (.0277) |
| Standardized Internet hours | .0351** (.0152) | .0663*** (.0193) | .0481*** (.0155) | .0816*** (.0221) |
| Standardized income | −.0225** (.0109) | −.0167 (.0177) | −.0201* (.0106) | .00238 (.0190) |
| Standardized age | −.0592*** (.0160) | −.294*** (.0188) | −.106*** (.0156) | −.268*** (.0257) |
| State fixed effects | Yes | Yes | Yes | Yes |
| Campaign fixed effects | Yes | Yes | Yes | Yes |
| Observations | 30,671 | 30,908 | 40,362 | 21,218 |
| Log-likelihood | −19,045.9 | −16,632.3 | −23,403.2 | −12,380.8 |

*$p < .10$.
**$p < .05$.
***$p < .01$.

Notes: Dependent variable is an indicator variable for whether the person was likely or very likely to purchase. Logit coefficients are shown. Robust standard errors clustered at the state level. Advertising ban is collinear with state fixed effects; therefore, we omitted it (for details, see the section "State-Level Results").

One explanation for these results is that media saturation levels through at-home media, such as television and radio, are already high enough for older, high-awareness products so that a ban on offline media makes little difference. Online advertising can only overcome the effects of offline media bans when the media bans have an effect in the first place. This result is consistent with our main result being driven by diminishing marginal effectiveness of advertising goodwill because products with high awareness already have steep diminishing returns to incremental advertising.

*IMPLICATIONS*

We use field experiment data on alcohol advertising to show that online display advertising has the largest impact in locations with restrictions on out-of-home advertising. We interpret this to suggest that the online advertising substitutes for the banned offline advertisements, thereby reducing the effectiveness of local advertising bans. Many authors have argued that the Internet reduces the effectiveness of local regulations, but outside tax policy, there has been little systematic empirical examination of this phenomenon. Our results contribute to this literature, showing how the Internet allows firms and consumers to circumvent offline restrictions. Although the alcohol advertising bans might still achieve their intended purpose of reducing the exposure of school children to offline alcohol advertisements, our results suggest that these bans will be relatively ineffective for regular Internet users.

Our results also have important implications for managers evaluating the merits of combining online and offline campaigns. They can be viewed as an unusual natural experiment that allows empirical analysis to measure the relationship between the presence of offline advertising and the effectiveness of online advertising. Usually such analysis is

Table 13

AWARENESS INFLUENCES EFFECTIVENESS OF ONLINE ADVERTISING IN LOCATIONS WITH CHANGES IN ADVERTISING BANS

|  | 1. High Awareness | 2. Low Awareness | 3. Old Product | 4. New Product |
|---|---|---|---|---|
| *Purchase Intent* |  |  |  |  |
| Exposed × advertising ban × affected group | .284 (.339) | 1.123** (.338) | .747** (.269) | .542 (.391) |
| Exposed × advertising ban | −.102 (.178) | −.499* (.220) | −.246 (.164) | −.483* (.241) |
| Exposed × affected group | −.130 (.281) | −.713** (.260) | −.340 (.224) | −.418 (.380) |
| Exposed × advertising ban | −.197 (.161) | −.188 (.181) | −.135 (.128) | −.235 (.269) |
| Exposed | .0873 (.159) | .449** (.174) | .159 (.135) | .449* (.208) |
| Advertising ban | −.0707 (.143) | .381* (.169) | −.0392 (.119) | .562** (.184) |
| Advertising ban × affected group | .0405 (.347) | −.617* (.295) | −.113 (.227) | −.426 (.317) |
| Campaign fixed effects | Yes | Yes | Yes | Yes |
| Demographics | Yes | Yes | Yes | Yes |
| County fixed effects | Yes | Yes | Yes | Yes |
| Observations | 3649 | 4155 | 5486 | 2371 |
| Log-likelihood | −2170.7 | −2289.9 | −3117.9 | −1376.6 |

*$p < .05$.
**$p < .01$.

Notes: Dependent variable is an indicator variable for whether the person was likely or very likely to purchase. Logit coefficients are shown. Robust standard errors are clustered at the survey level.

problematic because the launch of both types of campaigns is contemporaneous, making it difficult to tease apart the separate effects of either or how they interact. As Silk, Klein, and Berndt (2001) discuss, it has been suggested that online advertising can potentially complement and enhance the effectiveness of offline campaigns. However, our results suggest that instead, offline and online advertising seem to be substitutes. Although the majority of our results focus on the effect of outdoor advertising on banner advertising, the fact that our findings extend to both television and print media in select markets suggests that this result is likely robust across media types.

There are limitations to our study that suggest potential avenues for further research. First, and perhaps most important, our interpretation assumes that the state-level differences in regulation and the city-level regulatory changes over time are not correlated with any systematic differences in advertising effectiveness (conditional on the covariates). Despite numerous controls and checks, we cannot rule out the possibility that there are omitted variables that drive both results—that some omitted variable makes states with bans more responsive to advertisements or that some omitted variable makes cities that change their regulation also change in ad responsiveness. Second, we rely on stated expressions of purchase intent and not on actual purchase data. Although these measures allow us to determine that online advertising is more effective in places with out-of-home advertising bans, the use of these measures means that we are unable to define the precise impact of the Internet on increasing alcohol sales in places with bans relative to places without bans. Third, our results are specific to the

study of state-specific bans on offline media in the United States. We do not study attempts by national governments or international regulatory bodies to enforce bans on advertising on the Internet. Therefore, is not clear the extent to which our results apply more broadly to national bans on all alcohol advertising, such as the ban imposed in Sweden, or how our results would apply to laws such as the European Union's tobacco advertising ban, which are attempts to restrict Internet advertising directly.

A puzzle that we leave for further research is why what appears to be out-of-equilibrium behavior persists. If Internet advertising has greater returns in states with advertising bans, it is an open question whether alcohol advertising campaign managers are aware of this and, if so, why they do not act on it by attempting to advertise on geographically targeted Web sites. A potential explanation is that because alcohol advertising is monitored and tracked by interest groups and governments, alcohol advertising firms have not wanted to court censure by appearing to use the Internet to circumvent local jurisdictions. It would be interesting to explore whether this is indeed the case.

*APPENDIX A: FURTHER ROBUSTNESS CHECKS*

Column 1 of Table A1 presents results of a linear probability model, which are similar to the logit specification Table 3 presents. This provides more evidence that despite the concerns Ai and Norton (2003) express about the interpretation of interaction coefficients in nonlinear models, our results remain robust.

Then, we checked that our results were robust to dropping states in which the laws apply predominantly to dry counties. Because the decision to live in a dry county is endogenous and related to attitudes to the consumption of alcohol, we also reran our regressions excluding these dry counties. Column 2 of Table A1 presents the results, which are similar to previous results.

In our main specifications, we include laws that ban all billboards, not just alcohol advertising, which is the case for Vermont, Maine, Hawaii, and Alaska. We show that our results are robust to excluding these states (Column 3 of Table A1); their exclusion does not seem to affect our results. There is also the potential concern that wine may have a slightly different target market than liquor and beer. Column 4 of Table A1 shows that our results are robust to the exclusion of wine.

Column 5 of Table A1 shows the robustness of our results to the exclusion of people who saw the advertisements multiple times because they either refreshed the Web page or returned to the Web page later after navigating away from it within the site. If anything, our results are stronger (though slightly less precise) when we exclude these multiply treated people. This suggests that out-of-home advertising bans have the largest impact on the effectiveness of advertisements that are only seen once, rather than multiple times. In other words, they make the first impression from an online advertisement more effective.

Table A2 shows that the main results are similar to Tables 8 and 12 when we use purchase intent scale as our dependent measure in a linear regression. As a robustness check, we repeated the estimation in Table 12 for the placebo categories of junk food, consumer packaged goods products, and other beverages that we examined in Table 8 in Table A3. The results for the key coefficients were either insignificant or of the wrong sign.

*APPENDIX B*
*SOURCES OF STATE AND MUNICIPAL LAWS*

•Alabama: Section 28-3-16: Advertising of alcoholic beverages (Acts 1936-37, Ex. Sess., No. 66, p. 40; Code 1940, T. 29, 12; Acts 1978, No. 434, p. 442)
•Alaska: Sec 19.25.075: Blanket ban on billboards on highways
•California: California Business and Professions Code Sections 25612.5(c)(7), 25617

Table A1

ROBUSTNESS CHECKS

| | 1. Linear Probability | 2. Dry State | 3. Excluding No Billboard | 4. Excluding Wine | 5. Exposed Once |
|---|---|---|---|---|---|
| Exposed × advertising ban | .0127** | .0605** | .0674** | .0641** | .0608* |
| | (.00539) | (.0267) | (.0272) | (.0283) | (.0336) |
| Exposed | .0139*** | .0706*** | .0678*** | .0674*** | .0445* |
| | (.00319) | (.0160) | (.0161) | (.0169) | (.0238) |
| Female | .0180*** | .0868*** | .0926*** | .0908*** | .0677*** |
| | (.00366) | (.0185) | (.0184) | (.0190) | (.0205) |
| Standardized Internet hours | .00955*** | .0479*** | .0468*** | .0479*** | .0497*** |
| | (.00251) | (.0125) | (.0125) | (.0128) | (.0127) |
| Standardized income | −.00409** | −.0184* | −.0195* | −.0195* | −.0203* |
| | (.00197) | (.00968) | (.00998) | (.0107) | (.0108) |
| Standardized age | −.0323*** | −.167*** | −.167*** | −.184*** | −.155*** |
| | (.00278) | (.0156) | (.0156) | (.0163) | (.0141) |
| State fixed effects | Yes | Yes | Yes | Yes | Yes |
| Campaign fixed effects | Yes | Yes | Yes | Yes | Yes |
| Observations | 61,580 | 60,526 | 60,672 | 58,981 | 47,026 |
| Log-likelihood | −37,648.5 | −35,316.7 | −35,435.0 | −34,475.3 | −27,084.4 |
| R-square | .0461 | | | | |

*$p < .10$.
**$p < .05$.
***$p < .01$.

Notes: Dependent variable is an indicator variable for whether the person was likely or very likely to purchase. Robust standard errors are clustered at the state level. Advertising ban is collinear with state fixed effects; therefore, we omitted it from the table.

Table A2

REPLICATING RESULTS USING THE FULL PURCHASE INTENT SCALE

| | 1. High-Sugar Foods | 2. Nonalcoholic Beverages | 3. All Food Consumer Packaged Goods | 4. High Awareness | 5. Low Awareness | 6. Old Product | 7. New Product |
|---|---|---|---|---|---|---|---|
| Exposed × advertising ban | .000752 | −.0339 | −.0130 | .0187 | .0577*** | .0319 | .0797** |
| | (.0219) | (.0321) | (.00920) | (.0253) | (.0182) | (.0203) | (.0331) |
| Exposed | .0428*** | .0652*** | .0503*** | .0285 | .0613*** | .0401*** | .0330 |
| | (.0147) | (.0222) | (.00587) | (.0177) | (.0154) | (.0130) | (.0240) |
| Female | .0713*** | .127*** | .129*** | −.0482** | .105*** | −.0647*** | .170*** |
| | (.0177) | (.0213) | (.00827) | (.0226) | (.0171) | (.0170) | (.0239) |
| Standardized Internet hours | .0444*** | .0372*** | .0366*** | .0184* | .0495*** | .0269** | .0604*** |
| | (.00846) | (.0108) | (.00416) | (.0108) | (.0128) | (.0116) | (.0147) |
| Standardized income | −.0711*** | −.0215* | −.0497*** | −.0313*** | −.0225** | −.0260*** | −.0156 |
| | (.0104) | (.0109) | (.00489) | (.00792) | (.00919) | (.00685) | (.0103) |
| Standardized age | −.0595*** | −.105*** | −.0404*** | −.0703*** | −.216*** | −.0962*** | −.230*** |
| | (.00955) | (.0109) | (.00624) | (.0122) | (.00987) | (.00975) | (.0174) |
| State fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Campaign fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 45,310 | 23,983 | 194,351 | 30,671 | 30,909 | 40,362 | 21,218 |
| Log-likelihood | −78,846.0 | −42,109.3 | −34,048.1 | −56,118.7 | −53,820.0 | −72,681.7 | −37,404.7 |
| R-square | .116 | .161 | .171 | .0447 | .0667 | .0446 | .0827 |

*$p < .10$.
**$p < .05$.
***$p < .01$.

Notes: Dependent variable is the stated likelihood of purchasing that alcoholic beverage on a five-point scale. Robust standard errors are clustered at the state level. Advertising ban is collinear with state fixed effects; therefore, we omitted it.

- Baltimore: Enacted 1994, upheld by Fourth Circuit U.S. Court of Appeals: Penn Advertising of Baltimore, Inc. v. Mayor and City Council of Baltimore, No. 94-2141, 63 F.3d 1318 (4th Cir 1995)
- Hawaii: 264-72: Control of outdoor advertising (blanket ban on billboards on highways)
- Idaho: 23-607: Advertising
- Kansas: Signs, advertising, and other promotional activities. The state legislature amended K.S.A. 41-714 in 2005 to remove all of the statutory restrictions on advertising and other promotional activities. Instead, it delegated to the Secretary of Revenue the power to regulate liquor advertising and other promotion activities by administrative regulation. [Subsection (b) of K.S.A. 41-714]
- Kentucky: 244.540: History: Recodified 1942 Ky. Acts ch. 208, sec. 1, effective October 1, 1942, from Ky. Stat. sec. 2554b-208
- Maine: Title 23, Chapter 15: Protection of Highways Subchapter 1: Signs and Markets Article 1 23 S1153 (blanket ban on billboards on highways)
- Mississippi: Section 67-1-85: Regulation of advertising and display of alcoholic beverages. Sources: Codes, 1942, Section 10265-33; Laws, 1966, ch. 540, Section 33; Laws, 1968, ch. 592, Section 1; Laws, 1971, ch. 350, Section 1; Laws, 1982, ch. 419, Section 1; Laws, 1986, ch. 450, Section 1; Laws, 1988, ch. 562, Section 2; Laws, 1990, ch. 569, Section 5, eff. from and after passage (approved April 9, 1990). In addition, Chapter 02 Advertising 100: No person, firm, or corporation shall originate advertisements in dry counties of this State, pursuant to Miss. Code Ann. 67-1-1, 67-1-13, 67-1-15 and 67-5-5.
- New Hampshire: Source. 1990, 255:1; 1991, 355:59; 1992, 195:2; 1996, 275:27, eff. June 10, 1996. 2003, 231:27 28, eff. July 1, 2003.
- Ohio: 4301:1-1-44: Advertising. History: Eff. 7-5-50; 9-20-84; 4-16-88; 1-10-99; 7-1-01; Rescinded and reenacted eff. 6-4-04. Rule promulgated under: RC Chapter 119. Rule authorized by: RC 4301.03(B), 4301.03(E). Rule amplifies: RC 4301.03(B), 4301.03(E), 4301.22, 4301.24. R.C. 119.032 review dates: 04/01/2009
- Oklahoma: Okla. Const. Article XXVIII, Section 5 or 37 O.S. 516 (1981)

- City of Philadelphia: 17-110. Passed by the City Council on December 4, 2003. The Mayor signed the bill on December 18, 2003.
- Texas: Section 108.52. Acts 1977, 65th Leg., p. 521, ch. 194, Section 1, eff. Sept. 1, 1977. Amended by Acts 1979, 66th Leg., p. 501, ch. 231, Section 2, eff. Aug. 27, 1979; Acts 1997, 75th Leg., ch. 62, Section 1, eff. Sept. 1, 1997
- Utah: 32A-12-401.Amended by Chapter 314, 2003 General Session
- Vermont: Sec. 4. 7 V.S.A. Section 666: Approved: June 3, 1994

## REFERENCES

Aaker, David A., V. Kumar, and George S. Day (2004), *Marketing Research*, 8th ed. New York: John Wiley & Sons.

Ackerberg, Daniel A. (2001), "Empirically Distinguishing Informative and Prestige Effects of Advertising," *RAND Journal of Economics*, 32 (2), 316–33.

Ai, Chunrong and Edward C. Norton (2003), "Interaction Terms in Logit and Probit Models," *Economics Letters*, 80 (1), 123–29.

Bell, David and Jeonghye Choi (2008), "Preference Minorities and the Internet: Why Online Demand Is Greater in Areas Where Target Customers Are in the Minority," Special Report No. 08-212, Cambridge, MA: Marketing Science Institute.

——— and Sangyoung Song (2007), "Neighborhood Effects and Trial on the Internet: Evidence from Online Grocery Retailing," *Quantitative Marketing and Economics*, 5 (4), 361–400.

Bemmaor, Albert C. (1995), "Predicting Behavior from Intention-to-Buy Measures: The Parametric Case," *Journal of Marketing Research*, 32 (May), 176–91.

Bentler, P.M. and Chih-Ping Chou (1987), "Practical Issues in Structural Modeling," *Sociological Methods and Research*, 16 (1), 78–117.

Bertrand, Marianne, Esther Duflo, and Sendhil Mullainathan (2004), "How Much Should We Trust Differences-in-Differences Estimates?" *The Quarterly Journal of Economics*, 119 (1), 249–75.

Brynjolfsson, Erik, Yu Hu, and Mohammad S. Rahman (2009), "Battle of the Retail Channels: How Product Selection and Geography Drive Cross-Channel Competition," *Management Science*, 55 (11), 1755–65.

Table A3

RESULTS WHEN REPEATING SPECIFICATION IN TABLE 13 FOR ALTERNATIVE CATEGORIES

| | Junk Food | | | | Beverages | | | | Consumer Packaged Goods Category | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1. High Awareness | 2. Low Awareness | 3. Old Product | 4. New Product | 5. High Awareness | 6. Low Awareness | 7. Old Product | 8. New Product | 9. High Awareness | 10. Low Awareness | 11. Old Product | 12. New Product |
| Exposed × advertising ban | .00848 | −.0623 | .0305 | −.0762 | .00313 | .0146 | .0962 | −.204* | −.00394 | −.0141 | .0305 | −.122** |
| | (.0534) | (.0776) | (.0484) | (.0930) | (.0829) | (.102) | (.0715) | (.112) | (.0265) | (.0358) | (.0236) | (.0483) |
| Exposed | .0634** | .0593 | .0559* | .112** | .0649 | .101* | .0482 | .145** | .0647*** | .0816*** | .0527*** | .142*** |
| | (.0312) | (.0497) | (.0317) | (.0547) | (.0408) | (.0612) | (.0391) | (.0660) | (.0155) | (.0231) | (.0154) | (.0298) |
| Female | .203*** | .0801 | .198*** | .110* | .223*** | .339*** | .302*** | .265** | .204*** | .325*** | .265*** | .271*** |
| | (.0313) | (.0551) | (.0353) | (.0651) | (.0691) | (.0504) | (.0512) | (.119) | (.0215) | (.0308) | (.0211) | (.0431) |
| Standardized Internet hours | .0533*** | .105*** | .0261 | .101*** | .0337 | .111*** | .0546** | .0853** | .0458*** | .0631*** | .0369*** | .0773*** |
| | (.0166) | (.0239) | (.0210) | (.0357) | (.0237) | (.0309) | (.0219) | (.0402) | (.00870) | (.0110) | (.00955) | (.0193) |
| Standardized income | −.0470*** | −.122*** | −.0574*** | −.0732** | −.00137 | −.0327 | −.00402 | −.0317 | −.0443*** | −.0624*** | −.0450*** | −.0465*** |
| | (.0165) | (.0272) | (.0170) | (.0284) | (.0224) | (.0312) | (.0240) | (.0264) | (.00938) | (.0122) | (.00901) | (.0158) |
| Standardized age | −.0610** | −.0409 | −.0550** | −.0979** | −.124** | −.102*** | −.0735** | −.274*** | −.0176 | −.0549*** | −.0156 | −.101*** |
| | (.0242) | (.0330) | (.0270) | (.0385) | (.0525) | (.0347) | (.0294) | (.0771) | (.0127) | (.0164) | (.0117) | (.0275) |
| State fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Campaign fixed effects | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| Observations | 31,549 | 13,356 | 32,257 | 12,654 | 13,275 | 10,571 | 16,170 | 7676 | 12,0561 | 72,769 | 14,9419 | 43,922 |
| Log-likelihood | −19,481.9 | −8,330.0 | −20,134.8 | −8009.5 | −8537.2 | −5118.1 | −9249.7 | −4488.4 | −74617.1 | −41,066.3 | −90,944.4 | −26,185.0 |

*$p < .10$.
**$p < .05$.
***$p < .01$.
Notes: Robust standard errors are clustered at the state level. Advertising ban is collinear with state fixed effects; therefore, we omitted it.

Castells, Manuel (2001), *The Internet Galaxy: Reflections on the Internet, Business and Society*. London: Oxford University Press.

Chatterjee, Patrali, Donna L. Hoffman, and Thomas P. Novak (2003), "Modeling the Clickstream: Implications for Web-Based Advertising Efforts," *Marketing Science*, 22 (4), 520–41.

Chu, Junhong, Pradeep Chintagunta, and Javier Cebollada (2008), "Research Note: A Comparison of Within-Household Price Sensitivity Across Online and Offline Channels," *Marketing Science*, 27 (2), 283–99.

Clark, C. Robert, Ulrich Doraszelski, and Michaela Draganska (2009), "Information or Persuasion? An Empirical Investigation of the Effect of Advertising on Brand Awareness and Perceived Quality Using Panel Data," *Quantitative Marketing and Economics*, 7 (2), 207–236.

Clarke, Roger and Gillian Dempsey (2001), "The Feasibility of Regulating Gambling on the Internet," *Managerial and Decision Economics*, 22 (1–3), 125–32.

Cohen, Joanna E., Vivian Sarabia, and Mary Jane Ashley (2001), "Tobacco Commerce on the Internet: A Threat to Comprehensive Tobacco Control," *Tobacco Control*, 10 (4), 364–67.

Danaher, Peter J., Isaac W. Wilson, and Robert A. Davis (2003), "A Comparison of Online and Offline Consumer Brand Loyalty," *Marketing Science*, 22 (4), 461–76.

Dube, Jean-Pierre, Günter Hitsch, and Puneet Manchanda (2005), "An Empirical Model of Advertising Dynamics," *Quantitative Marketing and Economics*, 3 (2), 107–144.

——— and Puneet Manchanda (2005), "Differences in Dynamic Brand Competition Across Markets: An Empirical Analysis," *Marketing Science*, 24 (1), 81–95.

Elliot, Stuart (2007), "New York TV Station Takes Chance on Liquor Ads," *The New York Times*, (November 30), [available at http://www.nytimes.com/2007/11/30/business/media/30adco.html].

Ellison, Glenn and Sara Fisher Ellison (2009), "Tax Sensitivity and Home State Preferences in Internet Purchasing," *American Economic Journal: Economic Policy*, 1 (2), 53–71.

Fink, Arlene (2009), *How to Conduct Surveys: A Step-by-Step Guide*, 4th ed. Thousand Oaks, CA: Sage Publications.

Forman, Chris, Anindya Ghose, and Avi Goldfarb (2009), "Competition Between Local and Electronic Markets: How the Benefit of Buying Online Depends on Where You Live," *Management Science*, 55 (1), 47–57.

———, ———, and Batia Wiesenfeld (2008), "Examining the Relationship Between Reviews and Sales: The Role of Reviewer Identity Disclosure in Electronic Markets," *Information Systems Research*, 19 (3), 291–313.

Fox, Nick and Katie Ward (2005), "Global Consumption and the Challenge to Pharmaceutical Governance in the United Kingdom," *British Medical Journal*, 331 (7507), 40–42.

Frank, Mark W. (2008), "Media Substitution in Advertising: A Spirited Case Study," *International Journal of Industrial Organization*, 26 (1), [available at SSRN: http://ssrn.com/abstract=1260968].

Goldfarb, Avi and Catherine Tucker (2009), "Search Engine Advertising: Pricing Ads to Context," NET Institute Working Paper No. 07-23, [available at SSRN: http://ssrn.com/abstract=1021451].

Goolsbee, Austan (2000), "In a World Without Borders: The Impact of Taxes on Internet Commerce," *The Quarterly Journal of Economics*, 115 (2), 561–76.

———, Michael F. Lovenheim, and Joel Slemrod (2010), "Playing with Fire: Cigarettes, Taxes, and Competition from the Internet," *American Economic Journal: Economic Policy*, 2 (1), 131–54.

Haas, Anna and Julia Sherman (2003), "Eliminating Alcohol Advertising on Philadelphia's Public Property: A Case Study," unpublished report, Center on Alcohol Marketing and Youth, Georgetown University.

Hitsch, Günter J. (2006), "An Empirical Model of Optimal Dynamic Product Launch and Exit Under Demand Uncertainty," *Marketing Science*, 25 (1), 25–50.

Johnson, David Richard and James C. Creech (1983), "Ordinal Measures in Multiple Indicator Models: A Simulation Study of Categorization Error," *American Sociological Review*, 48 (3), 398–407.

Kline, Theresa J.B. (2005), *Psychological Testing: A Practical Approach to Design and Evaluation*. Thousand Oaks, CA: Sage Publications.

Lambert, Diane and Daryl Pregibon (2008), "Online Effects of Offline Ads," in *ADKDD '08: Proceedings of the 2nd International Workshop on Data Mining and Audience Intelligence for Advertising*, New York: Association for Computing Machinery, 10–17.

Malhotra, Naresh K. (2007), *Marketing Research: An Applied Orientation*, 5th ed. Upper Saddle River, NJ: Pearson Education.

Manchanda, Puneet, Jean-Pierre Dube, Khim Yong Goh, and Pradeep K. Chintagunta (2006), "The Effect of Banner Advertising on Internet Purchasing," *Journal of Marketing Research*, 43 (February), 98–108.

Milyo, Jeffrey and Joel Waldfogel (1999), "The Effect of Price Advertising on Prices: Evidence in the Wake of 44 Liquormart," *American Economic Review*, 89 (5), 1081–1096.

Morwitz, Vicki G., Joel H. Steckel, and Alok Gupta (2007), "When Do Purchase Intentions Predict Sales?" *International Journal of Forecasting*, 23 (3), 347–64.

Nelson, Jon P. (2003), "Advertising Bans, Monopoly, and Alcohol Demand: Testing for Substitution Effects Using State Panel Data," *Review of Industrial Organization*, 22 (1), 1–25.

——— and Douglas J. Young (2001), "Do Advertising Bans Work? An International Comparison," *International Journal of Advertising*, 20 (3), 273–96.

Nerlove, Marc and Kenneth J. Arrow (1962), "Optimal Advertising Policy Under Dynamic Conditions," *Economica*, 29 (114), 129–42.

Puhani, Patrick A. (2008), "The Treatment Effect, the Cross Difference, and the Interaction Term in Nonlinear 'Difference-in-Differences' Models," IZA Discussion Paper No. 3478, Leibniz University.

Reiley, David and Randall Lewis (2009), "Retail Advertising Works! Measuring the Effects of Advertising on Sales via a Controlled Experiment on Yahoo," working paper, Yahoo! Research.

Saffer, Henry (1991), "Alcohol Advertising Bans and Alcohol Abuse: An International Perspective," *Journal of Health Economics*, 10 (1), 65–79.

Silk, Alvin J., Lisa R. Klein, and Ernst R. Berndt (2001), "The Emerging Position of the Internet as an Advertising Medium," *Netnomics*, 3 (2), 129–48.

Simon, Michele (2008), "Reducing Youth Exposure to Alcohol Ads: Targeting Public Transit," *Journal of Urban Health*, 85 (4), 506–516.

Tremblay, Carol Horton and Victor J. Tremblay (2005), *The U.S. Brewing Industry*. Cambridge, MA: MIT Press.

Young, Douglas J. (1993), "Alcohol Advertising Bans and Alcohol Abuse: Comment," *Journal of Health Economics*, 12 (2), 213–28.

Zhang, Jie and Michel Wedel (2009), "The Effectiveness of Customized Promotions in Online and Offline Stores," *Journal of Marketing Research*, 46 (April), 190–206.