# EXHIBIT A

# EXHIBIT 1

# FILED UNDER SEAL

FILED UNDER SEAL

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| *In re Yardi Revenue Management Antitrust Litigation*<br><br>WYLIE DUFFY and MICHAEL BRETT, individually and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>Yardi Systems, Inc. *et al.*,<br><br>        Defendants. | No. 2:23-cv-01391-RSL |

**Reply of Ioana Marinescu, PhD**

**In Support of**

**Plaintiffs' Opposition to Yardi's Motion for Summary Judgment**

**May 22, 2026**

i

FILED UNDER SEAL

# Table of Contents

**1. Assignment and Summary of Conclusions** ........................................................................ **1**

   1.1   Yardi's Experts Reach Unreliable Conclusions By Ignoring Evidence Relevant to How Revenue IQ Uses Non-Public Data ......................................................................................2

   1.2   Yardi's Experts' Revised Price Index Conclusions Are Driven by a Single Unjustified Methodological Choice ...............................................................................................3

   1.3   Dr. Tucker's Panel Regression Critique Rests on Misunderstandings of My Methodology, Introduces Attenuation Bias, and Is Contradicted by Regressions She Omits10

   1.4   Mr. Yenikomshian's Rebuttal Opinions Based on his Source Code Analysis Reaches Unfounded Economic Conclusions ...............................................................................13

   1.5   Dr. Mitzenmacher's Opinions Ignore the Facts and the Relevant Economic Literature 15

**2. My Analysis of How Revenue IQ Uses Non-Public Data Is Generally Unaddressed by Yardi's Experts** ...................................................................................................................... **16**

**3. Yardi's Experts' Revised YLPI Lacks Any Methodological Support and is Inconsistent with the Record** ...................................................................................................................... **19**

   3.1   A Reliable Price Index Must Be Constructed To Reflect All Relevant Price Movements 24

   3.2   Yardi's Internal Pricing Analysis Showed Revenue IQ Users "Beat the Market" by Pricing Above Non-RM Users and Growing Rents Faster than Yardi's Experts Suggest ...28

**4. Yardi's Experts Introduce Vacancy Selection Bias to the YLPI** ..................................... **35**

   4.1   Yardi's Experts Misread My Deposition Testimony and Opening Report to Justify a Flawed Assumption in their Revised YLPI ...........................................................................36

   4.2   Yardi's Experts Ignore All Price Increases Across Non-Adjacent Months - Disregarding 161,008 Price Increases Across Vacancies As Short as 29 Days ........................................39

   4.3   Ignoring These Vacancies Introduces a Form of Selection Bias That BLS Calls "Vacancy Bias" .............................................................................................................44

       4.3.1   Discarding Missing Data Introduces Bias When the Data is Not Randomly Missing 45

       4.3.2   BLS and Yardi Both Impute Missing Rent Data Rather Than Discard It ............... 47

       4.3.3   Yardi's Experts Introduce This Vacancy Bias to Their Revised YLPI.................... 51

   4.4   Vacancy Bias Single-Handedly Eliminates The Yardi Index Premium and Drives Yardi's Experts' Conclusions .......................................................................................................55

**5. My Core Conclusions Are Robust to Yardi's Experts' Proposed Outlier Screening, Which Rests On Inconsistency Across Their Analyses and Misunderstandings of My Testimony** ...................................................................................................................... **59**

FILED UNDER SEAL

5.1    Even Adopting Yardi's Experts' Most Stringent Outlier Cleaning Confirms My Core Conclusions ..............................................................................................................60

5.2    My Original Outlier Cleaning Followed Mr. Yenikomshian's Original Approach and Was Reliable ...............................................................................................................62

    5.2.1    Rent CPI Includes Outliers ...................................................................... 62

    5.2.2    Yardi's Experts are Inconsistent Regarding What Constitutes a "Plausible" Rent and Valid Observation.............................................................................. 63

5.3    Yardi's Experts Appear to Have Misread My Opening Report and Backup Materials When Justifying Their Revised $20 Effective Rent Threshold ...........................................66

    5.3.1    My Opening Report Explained That Some Recommended/Gross Rent Observations Were Implausible When Juxtaposed Against their Associated Effective Rent ..................... 67

    5.3.2    Applying The Cleaning Truthfully Discussed in Yardi's Experts' Sole Citation Produces Almost Exactly the Same Index as in My Opening Report.................................. 69

    5.3.3    Yardi's Experts Applied their $20 Threshold To the Variable That Reduces the YLPI Most, Not the One Their Sole Citation Uses ............................................... 71

**6.    My Panel Regressions Conservatively Measure How Revenue IQ Adoption Affects Local Rents - and Dr. Tucker's Omitted Results Support This ............................................. 74**

6.1    My Panel Regressions Measure Revenue IQ's Effect on Local Rents and Dr. Tucker's Assertion to the Contrary Relies on Significant Misunderstandings ...................................77

    6.1.1    My Regression Need Not Assume Landlords Conspire with Themselves ............. 78

    6.1.2    Dr. Tucker's "Selection Bias" Concerns Reveal a Foundational Misunderstanding of My Panel Regressions ...................................................................... 83

    6.1.3    Dr. Tucker's Revision Narrows an Already Conservative Analysis ...................... 85

6.2    Dr. Tucker Biases Her Revised Regressions By Inconsistently Treating Properties That Do Add to Revenue IQ's Pricing Power ...........................................................86

    6.2.1    Dr. Tucker Inconsistently Classifies Many Observations with High Revenue IQ Adoption as Having Low Revenue IQ Adoption............................................... 87

    6.2.2    Peer-Reviewed Literature Understands That Misclassifying "Treated" Observations as "Untreated" Biases Treatment Effects Estimates Toward Zero........................................ 89

6.3    Dr. Tucker's Own Methodology Confirms My Results in 15 Regressions Her Report Omits 90

    6.3.1    Dr. Tucker Copied My Panel Regression Backup Materials, Implemented Her Revisions, and Failed to Reproduce 15 First-Difference Regressions ................................. 92

    6.3.2    Every Omitted Regression Confirms My Conclusions Using Dr. Tucker's Own Methodology ...................................................................................... 95

FILED UNDER SEAL

6.3.3    The Inconsistency Between Dr. Tucker's Levels and First-Difference Results Undermines Her Conclusions ................................................................................. 100

**7.    Dr. Tucker's Enforcement Opinions are Disconnected From Both Canonical Cartel Theory and Record Evidence.................................................................................... 102**

**8.    Mr. Yenikomshian's Source Code Analysis Does Not Alter My Economic Analysis and Admittedly Identifies Nothing Inconsistent with A Conspiracy ........................................... 104**

8.1    Mr. Yenikomshian Offers Unfounded Economic Conclusions ............................... 105

8.1.1    Mr. Yenikomshian Contradicts Himself by Offering Economic Conclusions On My "Theory" While Admitting He Has Not Analyzed What Is Consistent or Inconsistent with a Conspiracy ................................................................................................ 106

8.1.2    Mr. Yenikomshian Admitted He Has Reviewed No Documents or Literature, And Therefore Has No Reliable Basis to Conclude What Contradicts My Economic "Theory" 107

8.2    Mr. Yenikomshian's Analysis of Clients' Reference Rents Is Consistent with the Economics of Coordinated Pricing ....................................................................................... 108

8.2.1    Client Reference Rent Changes Were Small and Infrequent ................................ 110

8.2.2    Client Configuration Changes May Be Driven By Revenue IQ's Non-Public Information Exchange - And Contribute To The Structural Break Identified in My Opening Report   114

8.3    Mr. Yenikomshian Does Not Reasonably Dispute That the Comp Trend Rule Incentivizes Landlords To Increase Rents .......................................................................... 116

8.3.1    Mr. Yenikomshian Attributes Assumptions and Thresholds To My Analysis That Neither I Nor the Literature I Cite Endorse ...................................................................... 116

8.3.2    Neither Myself Nor Mr. Yenikomshian Can Reliably Estimate How Often Revenue IQ Users Have Other Revenue IQ Users in Their Comp Sets Because the Current Record Is Insufficient .................................................................................................... 120

8.3.3    Economists Understand That Price Movements Propagate Across Interconnected Geographic Rental Markets, Even Without Direct Comp Set Overlap ............................. 121

8.4    Clients' Additional Configurations Do Not Override The Trend Rules And Are Consistent with the Economics of Coordinated Pricing ....................................................... 125

8.4.1    Mr. Yenikomshian Admitted that Clients' Additional Configurations Rarely, If Ever, Overrule the Comp Trend Rule or Combined Trend Rule Signal ............................. 127

8.4.2    Firms Can Collude On the Price Level While Retaining Flexibility Within the Price Structure ................................................................................................................... 131

**9.    Dr. Mitzenmacher's Opinions are Disconnected from the Economic Literature and the Factual Record in this Case ................................................................................................. 134**

FILED UNDER SEAL

9.1     Dr. Mitzenmacher's Comp Trend Rule Simulation Contradicts Observed Pricing Behavior For Reasons Explained In My Opening Report .................................................. 134

9.2     Dr. Mitzenmacher's Benchmarking Opinions Ignore the Relevant Literature and Factual Record ................................................................................................................... 138

**10.     Conclusion ............................................................................................................ 140**

**Appendices .................................................................................................................... 141**

**A.     Parameter Estimates From My Panel Regressions Are Not Statistically Significantly Different When Removing Outliers .......................................................................... 141**

**B.     Client Acceptance Analysis, Including Recommended Rent Outliers ...................... 146**

**C.     Outlier Sensitivity Analyses ................................................................................... 149**

C.1.     $20 Effective Rent Threshold .......................................................................... 150

**C.1.1.**     TAM Analysis ................................................................................... 150

**C.1.2.**     Index Comparison ............................................................................ 156

**C.1.3.**     Panel Regressions ............................................................................ 163

**C.1.4.**     Structural Break Test ....................................................................... 166

C.2.     $20 - $100,000 Recommended Rent Threshold ................................................ 167

**C.2.1.**     TAM Analysis ................................................................................... 167

**C.2.2.**     Index Comparison ............................................................................ 173

**C.2.3.**     Panel Regressions ............................................................................ 180

**C.2.4.**     Structural Break Test ....................................................................... 183

C.3.     $20 Gross Rent Threshold ............................................................................... 184

**C.3.1.**     TAM Analysis ................................................................................... 184

**C.3.2.**     Index Comparison ............................................................................ 190

**C.3.3.**     Panel Regressions ............................................................................ 197

**C.3.4.**     Structural Break Test ....................................................................... 200

C.4.     BLS Outlier Capping ....................................................................................... 201

**C.4.1.**     TAM Analysis ................................................................................... 201

**C.4.2.**     Index Comparison ............................................................................ 207

**C.4.3.**     Structural Break Test ....................................................................... 213

C.5.     BLS Outlier Capping and Data Gap Imputation ............................................... 214

**D.     Materials Relied Upon ........................................................................................... 215**

D.1.     Academic Articles .......................................................................................... 215

FILED UNDER SEAL

D.2.    Depositions ................................................................................................. 217

D.3.    Declarations & Reports ............................................................................... 217

D.4.    Public Documents ....................................................................................... 218

D.5.    Bates Stamped Documents .......................................................................... 218

**Table of Figures:**

Figure 1: Figure 86 Of My Opening Report: Revenue IQ Users Charge Similar Rents to RealPage Users & Higher Rents than Non-RM Users ................................................................ 5

Figure 2: Figure 1.A in Dr. Tucker's Rebuttal Report: Marinescu Report's Original Figure 88 and Correction That Excludes Outliers According to Her Own Stated Methodology .......................... 6

Figure 3: Figure 1.B in Dr. Tucker's Rebuttal Report: Marinescu Report's Original Figure 88 and Correction That Excludes Outliers and Updates the Calculation of the Price Index to Reflect Missing Rents According to Her Own Stated Methodology ......................................................... 20

Figure 4: Figure 2.B in Dr. Tucker's Rebuttal Report: Marinescu Report's Original Figure 89 and Correction That Excludes Outliers and Updates the Calculation of the Price Index to Reflect Missing Rents According to Her Own Stated Methodology ......................................................... 21

Figure 5: Figure 86 Of My Opening Report: Revenue IQ Users Charge Similar Rents to RealPage Users & Higher Rents than Non-RM Users ................................................................ 29

Figure 6: Figure 87 Of My Opening Report: Revenue IQ Achieves a Great New Lease Rent Change Percentage than Non-RM Users Across Metro-Areas, July 2021 - June 2022 ................ 30

Figure 7: Figure 1.B in Dr. Tucker's Rebuttal Report: Marinescu Report's Original Figure 88 and Correction That Excludes Outliers and Updates the Calculation of the Price Index to Reflect Missing Rents According to Her Own Stated Methodology ......................................................... 31

Figure 8: Yardi's Experts' Revised YLPI Is Inconsistent With Yardi's Internal Analysis of Revenue IQ Pricing ................................................................................................................ 33

Figure 9: Yardi's Internally-Recorded Pricing Shows A Period Of Convergence With My Original YLPI ........................................................................................................................... 34

Figure 10: Dr. Tucker's Removal of Price Changes From Her Revised YLPI ............................ 40

Figure 11: Yardi's Experts Primarily Excludes Price Movements Occurring 3-Months or Less . 42

Figure 12: BLS Has Two Methods for Imputing Periods of Missing Data - Not Discarding It ... 48

Figure 13: Yardi's Experts' Treatment of Temporal Gaps Removes Predominantly Above-Index Price Increases ....................................................................................................................... 52

Figure 14: Price Movements Discarded By Dr. Tucker And Her Index Corroborate The Presence Of A Vacancy Bias ................................................................................................................. 53

Figure 15: Figures 1.A and 1.B From Tucker Report ................................................................ 56

Figure 16: Vacancy Bias Drives Yardi's Experts' Erasure of the Yardi Index Premium .............. 56

Figure 17: The Yardi Index Premium Is Robust Under Two Reasonable Approaches To Treat Vacancies ................................................................................................................................ 57

Figure 18: Recreation of Figure D1.A Of Tucker Report .......................................................... 61

FILED UNDER SEAL

Figure 19: Cleaning Of Recommended Rents From The Override Analysis Of My Opening Report...................................................................................................................... 69

Figure 20: The Outlier Cleaning Truthfully Described in fn. 268 Of My Opening Report Essentially Recreates My Original YLPI.......................................................................... 70

Figure 21: My Core Conclusions Are Robust to Multiple Possible Implementations of the $20 Screening Threshold ................................................................................................. 72

Figure 22: Comparison Of My Original Panel Regressions Code (Left) And Dr. Tucker's Panel Regression Code, Revised To Account for Properties Managed by the Same Landlord Defendant (Right) .................................................................................................................. 93

Figure 23: Comparison Of My Original Panel Regressions Code (Left) And Dr. Tucker's Panel Regression Code, Revised To Account for Properties Managed by the Same Landlord Defendant (Right) .................................................................................................................. 94

Figure 24: More Than 70% of Mr. Yenikomshian's Reference Rent Changes Are Within 5% Of The Previous Reference Rent Value .............................................................................112

Figure 25:Frequency Of ████████████████ Configuration Setting........................... 129

Figure 26: Frequency Of ████████████ Configuration Setting.............................. 130

Figure 27: Revised Figure 75 of My Opening Report: Across All Landlord Defendant Active Leases, Transaction Prices Only Deviate 1.4% From Revenue IQ's Recommended List Price, On Average ................................................................................................................ 146

Figure 28: Revised Figure 76 of My Opening Report: Across Only Overridden Landlord Defendant Active Lease, Transaction Prices Only Deviate 6.95% From Revenue IQ's Recommended List Price, On Average ................................................................... 147

Figure 29: Revised Figure 77 of My Opening Report: Over 90% of Landlord Defendant Active Leases Transact Within 5% of Revenue IQ's List Price Recommendation ............................... 147

Figure 30: Revised Figure 78 of My Opening Report: 95% of Landlord Defendants Active Leases Were Within 10% of Revenue IQ List Price ................................................................. 148

Figure 31: <= $20 Effective Rent Filter: Revised Figure 59 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "████████ Reversed a Downward Price Cycle and Increased Rents .................................................................................................... 150

Figure 32: <= $20 Effective Rent Filter: Revised Figure 60 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "███████ Reversed a Downward Price Cycle and Increase Rents .................................................................................................... 151

Figure 33: <= $20 Effective Rent Filter: Revised Figure 61 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "████████" Increased The Growth Rate Of Rents ...................................................................................................................... 152

Figure 34: <= $20 Effective Rent Filter: Revised Figure 62 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing ............................................................................................................................ 153

Figure 35: <= $20 Effective Rent Filter: Revised Figure 99 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing ............................................................................................................................ 155

FILED UNDER SEAL

Figure 36: <= $20 Effective Rent Filter: Revised Figure 88 of My Opening Report: Landlord Defendants Increase Rents Faster Than A Rent-Specific CPI ...................................................... 156

Figure 37: <= $20 Effective Rent Filter: Revised Figure 89 of My Opening Report: Yardi's Index Premium Relative to Rent CPI Increased With the Number of Participating Landlord Defendant Units ...................................................................................................................................... 157

Figure 38: <= $20 Effective Rent Filter: Revised Figure 95 of My Opening Report: The Growth Rate of the Yardi Index Premium Increased Notably Around 2021/22 ..................................... 160

Figure 39: <= $20 Effective Rent Filter: Revised Figure 101 of My Opening Report: Yardi Rent Index vs. Rent CPI & Yardi Approx. Unit Count.................................................................... 161

Figure 40:  <= $20 Effective Rent Filter: Revised Figure 102 of My Opening Report: Yardi Index Premium as a Function of Approx. Unit Count .......................................................... 162

Figure 41: <= $20 Effective Rent Filter: Revised Figure 94 of My Opening Report: Landlord Defendants Increase Rent Prices Faster In Areas With More Fellow Revenue IQ Users........... 163

Figure 42: <= $20 Effective Rent Filter: Revised Figure 96 of My Opening Report: Chow Tests Show Significant Structural Breaks in Landlord Defendants' Pricing In 2021/2022 ................. 166

Figure 43: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 59 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, ███████████" Reversed a Downward Price Cycle and Increased Rents .............................................................................. 167

Figure 44: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 60 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "████████" Reversed a Downward Price Cycle and Increase Rents ................................................................................ 168

Figure 45: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 61 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "███████████" Increased The Growth Rate Of Rents ...................................................................................................... 169

Figure 46: <= $20 & > =$100,000 Recommended Rent Filter: Revised Figure 62 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing .......................................................................................................... 170

Figure 47: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 99 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing .......................................................................................................... 172

Figure 48: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 88 of My Opening Report: Landlord Defendants Increase Rents Faster Than A Rent-Specific CPI........................ 173

Figure 49: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 89 of My Opening Report: Yardi's Index Premium Relative to Rent CPI Increased With the Number of Participating Landlord Defendant Units................................................................................... 174

Figure 50: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 95 of My Opening Report: The Growth Rate of the Yardi Index Premium Increased Notably Around 2021/22 ..... 177

Figure 51: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 101 of My Opening Report: Yardi Rent Index vs. Rent CPI & Yardi Approx. Unit Count......................... 178

Figure 52: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 102 of My Opening Report: Yardi Index Premium as a Function of Approx. Unit Count........................... 179

FILED UNDER SEAL

Figure 53: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 94 of My Opening Report: Landlord Defendants Increase Rent Prices Faster In Areas With More Fellow Revenue IQ Users ................................................................................................................ 180

Figure 54: <= $20 & >= $100,000 Recommended Rent Filter: Revised Table 8 of My Opening Report: Robust Econometric Estimation Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants ................................................................................................................ 181

Figure 55: <= $20 & >= $100,000 Recommended Rent Filter: Revised Table 12 of My Opening Report: Robust Econometric Estimation - on First-Differences - Further Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants ................................................................ 182

Figure 56: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 96 of My Opening Report: Chow Tests Show Significant Structural Breaks in Landlord Defendants' Pricing In 2021/2022 ................................................................................................................ 183

Figure 57: <= $20 Gross Rent Filter: Revised Figure 59 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "███████████" Reversed a Downward Price Cycle and Increased Rents ................................................................................................................ 184

Figure 58: <= $20 Gross Rent Filter: Revised Figure 60 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, ██████████" Reversed a Downward Price Cycle and Increase Rents ................................................................................................................ 185

Figure 59: <= $20 Gross Rent Filter: Revised Figure 61 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "███████████" Increased The Growth Rate Of Rents ................................................................................................................ 186

Figure 60: <= $20 Gross Rent Filter: Revised Figure 62 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing ................................................................................................................ 187

Figure 61: <= $20 Gross Rent Filter: Revised Figure 99 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing ................................................................................................................ 189

Figure 62: <= $20 Gross Rent Filter: Revised Figure 88 of My Opening Report: Landlord Defendants Increase Rents Faster Than A Rent-Specific CPI ................................................ 190

Figure 63: <= $20 Gross Rent Filter: Revised Figure 89 of My Opening Report: Yardi's Index Premium Relative to Rent CPI Increased With the Number of Participating Landlord Defendant Units ................................................................................................................ 191

Figure 64: <= $20 Gross Rent Filter: Revised Figure 47 of My Opening Report: The Growth Rate of the Yardi Index Premium Increased Notably Around 2021/22 ................................ 194

Figure 65: <= $20 Gross Rent Filter: Revised Figure 48 of My Opening Report: Yardi Rent Index vs. Rent CPI & Yardi Approx. Unit Count ................................................................ 195

Figure 66: <= $20 Gross Rent Filter: Revised Figure 102 of My Opening Report: Yardi Index Premium as a Function of Approx. Unit Count ................................................................ 196

Figure 67: <= $20 Gross Rent Filter: Revised Figure 94 of My Opening Report: Landlord Defendants Increase Rent Prices Faster In Areas With More Fellow Revenue IQ Users........... 197

FILED UNDER SEAL

Figure 68: <= $20 Gross Rent Filter: Revised Figure 96 of My Opening Report: Chow Tests Show Significant Structural Breaks in Landlord Defendants' Pricing In 2021/2022 ................. 200

Figure 69: BLS Outlier Capping: Revised Figure 59 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "███████████" Reversed a Downward Price Cycle and Increased Rents ...................................................................................................................... 201

Figure 70: BLS Outlier Capping: Revised Figure 60 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "████████" Reversed a Downward Price Cycle and Increase Rents ......................................................................................................................... 202

Figure 71: BLS Outlier Capping: Revised Figure 61 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "█████████████" Increased The Growth Rate Of Rents ................................................................................................................................................ 203

Figure 72: BLS Outlier Capping: Revised Figure 62 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing ................................................................................................................................................ 204

Figure 73: BLS Outlier Capping: Revised Figure 99 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing ................................................................................................................................................ 206

Figure 74: BLS Outlier Capping: Revised Figure 88 of My Opening Report: Landlord Defendants Increase Rents Faster Than A Rent-Specific CPI ..................................................... 207

Figure 75: BLS Outlier Capping: Revised Figure 89 of My Opening Report: Yardi's Index Premium Relative to Rent CPI Increased With the Number of Participating Landlord Defendant Units .................................................................................................................................. 208

Figure 76: BLS Outlier Capping: Revised Figure 95 of My Opening Report: The Growth Rate of the Yardi Index Premium Increased Notably Around 2021/22 .................................................... 211

Figure 77: BLS Outlier Capping: Revised Figure 101 of My Opening Report: Yardi Rent Index vs. Rent CPI & Yardi Approx. Unit Count ............................................................................... 212

Figure 78: BLS Outlier Capping: Revised Figure 102 of My Opening Report: Yardi Index Premium as a Function of Approx. Unit Count ........................................................................ 213

Figure 79: BLS Outlier Capping: Revised Figure 96 of My Opening Report: Chow Tests Show Significant Structural Breaks in Landlord Defendants' Pricing In 2021/2022 .......................... 213

Figure 80: BLS Outlier Capping and Temporal Gap Imputation................................................ 214

FILED UNDER SEAL

**Table of Tables**

Table 1: Tabulation of Data Gaps Dr. Tucker Removes From her YLPI, Split by Length of Temporal Gap Between Rent Observations .................................................................................. 8

Table 2: Comparison of Methodological Elements Between CPI-U, R-CPI-ATR, and R-CPI-NTR .................................................................................................................................................. 25

Table 3: Examples Of Observations Removed by Dr. Tucker With Temporal Gaps Of Less Than 31 Days ........................................................................................................................................ 41

Table 4: Tabulation of Data Gaps Dr. Tucker Removes From her YLPI, Split by Length of Temporal Gap Between Rent Observations ............................................................................... 43

Table 5: Removing Exclusively Intra-Client PUMAs: Revised Table 8 Of My Opening Report: Robust Econometric Estimation Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants .. 79

Table 6: Removing Exclusively Intra-Client PUMAs: Revised Table 12 Of My Opening Report: Robust Econometric Estimation - on First-Differences - Further Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co Conspirators, Even Relative to Other Landlord Defendants ............................................................................. 80

Table 7: First-Differences - Tucker's Table D3.A: Correction to Marinescu Report's Table 8 That Excludes Outliers According to Her Own Stated Methodology and Accounts for Properties Managed by the Same Landlord Defendant .................................................................................. 96

Table 8: First-Differences - Table D3.B: Correction to Marinescu Report's Table 8 That Excludes Outliers According to Her Own Stated Methodology and Uses the Number of Co-Conspirator Landlord Defendants .................................................................................................................. 97

Table 9: First-Differences - Table E2: Correction to Marinescu Report's Table 8 That Excludes Outliers According to Her Own Stated Methodology, Accounts for Properties Managed by the Same Landlord Defendant, and Controls for the Number of Properties Managed by the Landlord Defendant .................................................................................................................................... 98

Table 10: Table 8 of My Opening Report: Robust Econometric Estimation Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants ................................................................................ 141

Table 11: Table 12 of My Opening Report: Robust Econometric Estimation - on First-Differences - Further Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants .................................. 142

Table 12: <= $20 Effective Rent Filter: Table 8 of My Opening Report: Robust Econometric Estimation Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants .................................. 143

Table 13: <= $20 Effective Rent Filter: Table 12 of My Opening Report: Robust Econometric Estimation - on First-Differences - Further Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants ................................................................................................................................ 144

Table 14: Z-score Tests On Parameter Estimates From Level Regressions in Table 8 Of My Opening Report, Considering My Treatment Of Outliers vs. Tucker's Treatment .................... 145

xi

Table 15: Z-score Tests On Parameter Estimates From First Difference Regressions In Table 12 Of My Opening Report, Considering My Treatment Of Outliers vs. Tucker's Treatment ........ 145
Table 16: <= $20 Effective Rent Filter: Revised Table 2 of My Opening Report: An Interrupted Time Series Analysis Shows That TAM Oversight Is Associated with Landlord Defendant Price Increases.................................................................................................................................. 154
Table 17: <= $20 Effective Rent Filter: Revised Table 5 of My Opening Report: The Yardi Index Premium Increased With Landlord Defendant Adoption of Revenue IQ ................................... 158
Table 18: <= $20 Effective Rent Filter: Revised Table 6 of My Opening Report: Revenue IQ Adoption by Landlord Defendants Led To Economically & Statistically Significant Increases In the Yardi Index Premium Relative to Rent CPI ..................................................................... 159
Table 19: <= $20 Effective Rent Filter: Revised Table 8 of My Opening Report: Robust Econometric Estimation Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants 164
Table 20: <= $20 Effective Rent Filter: Revised Table 12 of My Opening Report: Robust Econometric Estimation - on First-Differences - Further Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants.................................................................................................... 165
Table 21: <= $20 & >= $100,000 Recommended Rent Filter: Revised Table 2 of My Opening Report: An Interrupted Time Series Analysis Shows That TAM Oversight Is Associated with Landlord Defendant Price Increases ........................................................................................ 171
Table 22: <= $20 & >= $100,000 Recommended Rent Filter: Revised Table 5 of My Opening Report: The Yardi Index Premium Increased With Landlord Defendant Adoption of Revenue IQ ................................................................................................................................................... 175
Table 23: <= $20 & >= $100,000 Recommended Rent Filter: Revised Table 6 of My Opening Report: Revenue IQ Adoption by Landlord Defendants Led To Economically & Statistically Significant Increases In the Yardi Index Premium Relative to Rent CPI ................................... 176
Table 24: <= $20 Gross Rent Filter: Revised Table 2 of My Opening Report: An Interrupted Time Series Analysis Shows That TAM Oversight Is Associated with Landlord Defendant Price Increases.................................................................................................................................. 188
Table 25: <= $20 Gross Rent Filter: Revised Table 5 of My Opening Report: The Yardi Index Premium Increased With Landlord Defendant Adoption of Revenue IQ ................................... 192
Table 26: <= $20 Gross Rent Filter: Revised Table 6 of My Opening Report: Revenue IQ Adoption by Landlord Defendants Led To Economically & Statistically Significant Increases In the Yardi Index Premium Relative to Rent CPI ..................................................................... 193
Table 27: <= $20 Gross Rent Filter: Revised Table 8 of My Opening Report: Robust Econometric Estimation Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants 198
Table 28: <= $20 Gross Rent Filter: Revised Table 12 of My Opening Report: Robust Econometric Estimation - on First-Differences - Further Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants.................................................................................................... 199

FILED UNDER SEAL

Table 29: BLS Outlier Capping: Revised Table 2 of My Opening Report: An Interrupted Time Series Analysis Shows That TAM Oversight Is Associated with Landlord Defendant Price Increases.................................................................................................................. 205
Table 30: BLS Outlier Capping: Revised Table 5 of My Opening Report: The Yardi Index Premium Increased With Landlord Defendant Adoption of Revenue IQ ................................... 209
Table 31: BLS Outlier Capping: Revised Table 6 of My Opening Report: Revenue IQ Adoption by Landlord Defendants Led To Economically & Statistically Significant Increases In the Yardi Index Premium Relative to Rent CPI........................................................................................ 210

FILED UNDER SEAL

# 1. Assignment and Summary of Conclusions

1. In this reply report, I respond to the criticisms of my opening report raised in the three rebuttal reports submitted by Yardi's Experts: Dr. Catherine Tucker, Dr. Michael Mitzenmacher, and Mr. Mihran Yenikomshian.[1] Points I do not specifically address in this reply should not be construed as admissions.

2. Yardi's Experts take issue with several conclusions in my opening report, but do not dispute many of its most economically significant findings. For example, none of Yardi's Experts dispute that:

   - Yardi's Technical Account Managers ("TAMs") use non-public, cross-client data to oversee Revenue IQ clients' pricing. Indeed, each has not reviewed the documents or depositions that would be necessary to dispute this finding.

   - Both Yardi and its clients have described using non-public benchmarking data to increase prices to "what the market may bear," in spite of that data's aggregation and anonymization.

   - Clients ultimately transact within 5% of Revenue IQ's list price in more than 91% of leases. Across all transactions, the average deviation is just 1.41% of Revenue IQ's recommendation.

   - Most clients adopt the same configurations of Revenue IQ's core Trend and Health Rules.

   - Participation in the Revenue IQ system is associated with demonstrably parallel upward price movements across properties. To the extent clients do uniquely configure Revenue IQ's additional settings, this is not manifest in disparate price movements.

   - Yardi itself advertised Revenue IQ's ability to "beat the market," and found internally that users charge similar rents to RealPage users and higher rents than non-RM users. This means these parallel price co-movements are primarily above market price increases.

3. These undisputed findings are significant because, as I explained in my opening report, they are the observable economic hallmarks of a pricing system that coordinates landlords'

---

[1] Throughout this report, I will use the phrase "Yardi's Experts" to collectively refer to Dr. Mitzenmacher, Mr. Yenikomshian, and Dr. Tucker. I do so because Yardi's Experts collectively fail to address several important findings presented in my opening report, as I will proceed to explain below, and because their YLPI criticisms are largely overlapping.

FILED UNDER SEAL

rents upward rather than helping them implement unilateral pricing strategies.[2] Yardi's Experts do not offer an alternative interpretation of these findings and do not engage with large portions of the factual record and my opening report's analysis that support them. Instead, Yardi's Experts selectively engage with individual components of Revenue IQ without considering how those components interact with each other.

## 1.1   Yardi's Experts Reach Unreliable Conclusions By Ignoring Evidence Relevant to How Revenue IQ Uses Non-Public Data

4.      The most conspicuous gap in Yardi's Experts' analyses is documentary. Across five reports, their materials relied upon consist almost entirely of source code, datasets, and technical documentation. The only internal Yardi business documents any of Yardi's Experts cite are four TAM call notes in Mr. Yenikomshian's rebuttal, which he testified were "absolutely irrelevant to [his] opinions and [his] analysis."[3] Dr. Tucker's materials identify a single item from Yardi's production, a data excerpt; she testified that she never requested access to the document database in this case.[4]

5.      In my opening report, I devoted substantial analysis to the pathways through which Revenue IQ uses non-public information to shape pricing across competing landlords, including Yardi's mandatory data-use clause, benchmarking reports, penalty scores, TAM enforcement, the Predicted 30-Day Availability health rule, and Matrix phone surveys. Yardi's Experts engage with only two, and only to challenge how effectively they transmit competitor information, not to dispute that they operate. None addresses Yardi's data-use clause, penalty scores, Matrix surveys, or client-to-client call-arounds. And none has offered a direct or plain explanation of why TAMs' use of non-public cross-client data to oversee clients' pricing should not raise coordination concerns. (see Section 2).

6.      Yardi's Experts consistently examine Revenue IQ component by component, without considering how those components interact as part of the integrated coordination system I describe in my opening report.[5] This compartmentalization consistently undermines their most important conclusions: Mr. Yenikomshian tabulates configuration changes without considering whether any were prompted by TAM oversight or benchmarking.[6] Dr. Mitzenmacher simulates the Comp Trend Rule and predicts downward price wars without considering how Yardi's enforcement mechanisms typically prevent those price wars.[7] And

[2] February 9, 2026, Expert Report of Ioana Marinescu, PhD In Support of Plaintiffs' Opposition to Yardi's Motion for Summary Judgment (hereinafter, "Marinescu Opening Report").

[3] April 16, 2026, Deposition of Mihran Yenikomshian, deposed by Rio Pierce (for Plaintiffs) and by Abraham Tabaie (for Defendants) (hereinafter, "April 16, 2026, Yenikomshian Deposition"), 115:20-117:13

[4] April 28, 2026, Deposition of Catherine Tucker, deposed by Rio Pierce (for Plaintiffs) and by Michael Schaper (for Defendants) (hereinafter, "April 28, 2026, Tucker Deposition"), 130:8-130:14.

[5] Marinescu Opening Report, Section 4.5.

[6] *See* Section 8.

[7] *See* Section 9.1.

FILED UNDER SEAL

Dr. Tucker evaluates enforcement mechanisms individually without evaluating their combined effect, the documents showing TAMs are trained to prevent downward price cycles, or the undisputed adherence data showing 91.3% of leases transacting within 5% of Revenue IQ's list price.[8]

7.      Methodologically, trying to understand Revenue IQ in compartmentalized boxes while ignoring how it functions as an integrated coordination system is akin to trying to understand water by separately describing hydrogen and oxygen and ignoring how they combine. This approach is not responsive to the "integrated coordination system" I described in my opening report, and it leads to meaningful flaws in their conclusions, as I explain below.

8.      The challenges Yardi's Experts do present are narrow and unsupported. Yardi's Experts revise my YLPI by deleting 240,194 price observations. This revision lacks any methodological basis and is at odds with Yardi's own internal data. Dr. Tucker redefines my panel regression variable in a way that transforms it from a measure of Revenue IQ adoption into a measure of ownership structure - and her conclusions are contradicted by 15 regressions her team omitted. Mr. Yenikomshian analyzes Revenue IQ's source code and draws economic conclusions about coordination without reviewing the economic literature, the internal documents, or the depositions necessary to support them. Dr. Mitzenmacher simulates the Comp Trend Rule in isolation and predicts downward pricing inconsistent with Yardi's own data, and offers opinions on benchmarking anonymization without engaging with the economic literature on information exchange or explaining why Yardi provides benchmarking data if it lacks economic utility. Below I provide a summary of my responses on each of these issues.

## 1.2  Yardi's Experts' Revised Price Index Conclusions Are Driven by a Single Unjustified Methodological Choice

9.      In my opening report, I constructed the Yardi Lease Price Index ("YLPI") to measure whether Revenue IQ users, as a group, priced above a national rental benchmark and whether that premium grew as Revenue IQ adoption spread.[9] The YLPI showed that Revenue IQ users' rents typically exceeded the Bureau of Labor Statistics' (BLS) Rent CPI, with the gap widening as Revenue IQ adoption increased.

10.     From this, I reached two core conclusions that I will refer to throughout this report: 1) that Revenue IQ clients price above the market (the Yardi Index Premium), and 2) that their ability to do so increased with Revenue IQ adoption (the adoption premium). This is the

---

[8] *See* Section 7.
[9] Marinescu Opening Report, Section 9.2.2.

pattern economic theory predicts when a shared pricing algorithm ("hub-algorithm") facilitates coordination rather than independent competition.

11.    In response, Yardi's Experts have presented a revised YLPI.[10] Each of Yardi's Experts makes the same two changes:

- First, each excludes all rent changes that occur when a unit has a gap of even a single month between lease observations. These gaps predominantly (approximately 60%) reflect short vacancies of one to three months between tenants. Yardi's Experts discard them entirely, removing 240,194 observations from the analysis, of which 67% 161,008 are rent increases.

- Second, each removes any lease observation where the tenant's effective rent falls below $20. My opening report removed only zero and negative rents, adopting the same threshold Mr. Yenikomshian applied in his opening report.[11]

12.    In this reply, I show three things:

- First, Yardi's Experts offer no methodological basis for their revisions: their revised index lacks support in BLS practice, peer-reviewed literature, or even Yardi's own internal pricing data (see Section 3).

- Second, the reversal of my core conclusions is driven by a single methodological choice - discarding rent changes that occur across short vacancies - which BLS and peer-reviewed literature specifically warn against (see Section 4). I have not endorsed this approach, and there is no support in the literature for entirely discarding price changes that follow a vacancy. I present sensitivity analyses showing the YLPI premium persists when applying other recognized approaches for allocating price changes across vacancies.

- Third, Yardi's Experts' treatment of outliers is internally inconsistent and misstates my original approach. Correctly applied, my original approach reproduces an almost identical YLPI to what was presented in my opening report, while dropping more outlier observations than Yardi's Experts' version (see Section 5). I expand on each below.

13.    **First**, the purpose of a price index is to measure price changes. (see Section 3.1). When a tenant moves out and a new tenant moves in at a different rent, that is a price change. To

---

[10] Yardi's three rebuttal experts each challenge this finding by presenting a revised version of the YLPI that they claim corrects errors in my opening report. Their revised indices are virtually identical to one another: they share conceptually the same methodology, and in some cases the same underlying code.
[11] November 24, 2025, Declaration Of Mihran Yenikomshian In Support Of Yardi Systems, Inc.'S Motion For Summary Judgment, (hereinafter, "November 24, 2025, Yenikomshian Declaration"), footnotes 191, 194, 196. Also see November 24, 2025, Yenikomshian Declaration Backup Materials:
"Intermediate_Data\Executed_Lease_Data\Scripts\02_grouping_and_tagging.py."

FILED UNDER SEAL

be accurate, a price index should generally include those kinds of price changes - not discard them. Yardi's Experts removed 240,194 such price changes from my index. Yet none cites any published literature, BLS practice, or peer-reviewed methodology supporting the decision to discard them. Dr. Tucker went so far as to admit that her revised index may not more accurately track price movements than my original.[12]

14.    The resulting index is inconsistent with Yardi's own data. Since at least 2019, Yardi prepared quarterly internal analyses comparing Revenue IQ users' pricing against non-revenue-management users, and these analyses consistently showed Revenue IQ users charging approximately $40 per month more, with the gap widening over time.

**Figure 1: Figure 86 Of My Opening Report: Revenue IQ Users Charge Similar Rents to RealPage Users & Higher Rents than Non-RM Users**



15.    Yardi's analyses for the period from July 2021 to June 2022 further showed that Revenue IQ users' rent growth exceeded non-RM users in 93% of the metropolitan areas Yardi studied.[13] None of Yardi's Experts reviewed these documents or explained how an index

---

[12] April 28, 2026, Tucker Deposition, 265:17 - 266:17.
[13] Marinescu Opening Report, ¶ 498.

FILED UNDER SEAL

implying Revenue IQ users priced below national rent inflation for more than 15 years can be reconciled with Yardi's own contemporaneous findings.

16.    **Second**, Yardi's Experts reversal of both my original findings and Yardi's own data analysis is driven by the second of two changes to my YLPI. The changes are as follows: (i) they remove 108 lease observations with effective rents below $20, and (ii) they discard every rent change that occurs across any gap in the data: 240,194 observations.

17.    Their resulting conclusions rely primarily on the latter as Dr. Tucker's own report illustrates. Her Figure 1.A applies only the outlier correction and shows it meaningfully narrows the Yardi Index Premium, but that the premium persists. Revenue IQ users continue to price above Rent CPI, and the premium grows with adoption. It is only when she adds the vacancy exclusion that the premium disappears and the index falls below Rent CPI. The outlier correction affects the magnitude of the Yardi Index Premium. But their ultimate result reversing my original conclusions depends on the vacancy exclusion.

**Figure 2: Figure 1.A in Dr. Tucker's Rebuttal Report: Marinescu Report's Original Figure 88 and Correction That Excludes Outliers According to Her Own Stated Methodology**



18.    This vacancy exclusion is unsound and unjustified. I constructed the YLPI using chain-indexing: I tracked each unit's effective rent over time and recorded the change whenever a new rent observation appeared. When a tenant moves out and a new tenant moves in at a different rent, the index records that price change at the time it occurs.[14] I then aggregate those price movements across all rental units in the produced lease transaction data and across time.

---

[14] Marinescu Opening Report ¶504.

FILED UNDER SEAL

19.     To illustrate: if an apartment is rented at $1,500, the tenant moves out, and a new tenant signs six weeks later at $1,800, my index records a $300 (20%) rent increase in the month the new lease begins. That is a real price increase between two real lease transactions in the data Yardi produced, and it is an important mechanism by which rents grow in multifamily housing: a tenant departs, the landlord reprices the unit upward, it sits vacant temporarily, and ultimately re-leases at a higher price. Yardi's Experts would drop the $300 increase from the index because the two leases are not in consecutive months. Applied across the dataset, this rule removes 240,194 observations, of which 161,008 are rent increases.

20.     My original methodology attributes the full rent change to the month the new lease begins. This is a simplification: the repricing may reflect market conditions that evolved during the vacancy period, and a more granular approach could distribute the change over the gap. But the methodological question this raises is how to allocate the price change across the vacancy, not whether to discard it. Yardi's Experts chose to discard it entirely. BLS, faced with the same question, chose to include it through imputation. When I apply BLS-style imputation as a sensitivity analysis, the Yardi Index Premium is preserved. In other words, the methodological choice that matters is not whether my index attributes the change to one month or several. It is whether the change is counted at all.

21.     Similar to my original methodology, BLS assumes that rents evolve at a steady rate during tenancy but "jump" at the time of tenant turnover, and that these jumps are systematically larger than within-lease rent changes. Rather than distribute the price change evenly across the vacancy period, BLS's vacancy imputation method estimates the magnitude of the turnover jump from comparable units that have recently experienced a change in occupancy. BLS puts this "jump" at the beginning of the vacancy period through imputation, while my original method puts it at the end of the vacancy period. This distinction is not consequential for the ultimate conclusions of the YLPI analysis.

22.     The critical point is that there is no principled reason to discard these price movements altogether. When I apply BLS-style imputation as a sensitivity analysis, the Yardi Index Premium is preserved. Yardi's Experts chose instead to discard these price movements, meaning their version of the price index does not capture hundreds of thousands of price observations that are likely to feature significant price changes.

23.     Yardi's Experts argue my own deposition testimony supports this exclusion. The testimony they cite involved a unit with a nine-year gap between lease observations.[15] What they actually discarded was predominantly one-to-three-month vacancies. The underlying data

---

[15] I do not and would not have endorsed an approach of removing all observations with vacancies across non-adjacent calendar months because it introduces a well understood bias I explain in Section 4.3. The "rule" Yardi's Experts apply therefore does not implement my testimony - it transforms a comment about an extreme case into a sweeping exclusion that overwhelmingly targets routine tenant turnovers and the rent increases associated with them.

FILED UNDER SEAL

illustrate this. When I analyze the observations Yardi's Experts actually exclude, I find these are overwhelmingly short vacancies, 60% involve gaps of three months or fewer, and nearly a third involve gaps of just one month, often as short as 29 days. Gaps of five years or longer, the kind discussed at my deposition, account for just 0.15% of the total:

**Table 1: Tabulation of Data Gaps Dr. Tucker Removes From her YLPI, Split by Length of Temporal Gap Between Rent Observations**

| Length of Gap, Months | Share of Observations (%) |
|---|---|
| 1 | 32.18% |
| 2 or less | 49.68% |
| 3 or less | 60.03% |
| 6 or less | 74.55% |
| 12 or less | 89.21% |
| 13-23 | 7.59% |
| 24-35 | 2.01% |
| 36-47 | 0.74% |
| 48-59 | 0.29% |
| 60 or more | 0.15% |

24.    These excluded price changes are also not randomly distributed. On average, 60.5% exceeded the corresponding index movement over the same time period, meaning they were systematically above-average rent increases. This peaked at 71.9% in 2021, during the period of most rapid Revenue IQ adoption. The economic logic is straightforward: when a tenant departs, the landlord typically re-leases at a higher rent. Units with the largest increases may also be more likely to stay vacant, because the higher price reduces demand. Vacancies are therefore systematically associated with above-average rent increases. An index that excludes them will systematically understate rent growth by omitting the transactions where rents rise most. BLS recognizes this problem and gives it a name: vacancy bias.

25.    Rather than discard vacancy-associated observations, BLS estimates rent changes across vacancies using comparable units, a process called imputation. Yardi itself does the same in its internal pricing analyses. When I apply BLS-style imputation as a sensitivity analysis, the Yardi Index Premium is preserved. Excluding only gaps of 12 months or longer also preserves it. Removing outliers without removing vacancy-associated observations again preserves it. Only Yardi's Experts' specific combination produces the reversal, and they

FILED UNDER SEAL

offer no independent methodological basis for it, nor any sensitivity analyses testing its robustness.

26.    **Third**, in my opening report, I addressed outliers by removing zero and negative effective rents, adopting the same threshold Mr. Yenikomshian applied in his opening declaration so that both sides' analyses would work from a common understanding.[16] Yardi's Experts now raise that threshold to $20, removing an additional 108 observations. Mr. Yenikomshian's own analyses are inconsistent on this point: of the 562,115 reference rent configurations Mr. Yenikomshian discusses, 1,921 contain a configuration between $0 (excluded) and $20 in either the old or new value. His configuration analysis treats these reference rent configurations between $0 and $20 as valid evidence of real client choices, while his YLPI analysis excludes effective rents in the same range as implausible. If rents in this range reflect real client behavior in one analysis, there is no principled reason to exclude them from the other.

27.    Yardi's Experts justify the $20 threshold by citing footnote 268 of my opening report, which explains additional cleaning in my analysis of client's adherence to Revenue IQ's recommendation. But footnote 268 applies a $20 screen to recommended rents - Revenue IQ's algorithmic output - not to effective rents, and only when a client overrides the recommendation. These are different variables serving different analytical purposes.[17]

28.    When I correct this misreading and apply the cleaning footnote 268 actually describes, the resulting index almost perfectly replicates my original YLPI. This cleaning removes 9,775 observations, approximately 90 times more than Yardi's Experts' approach, and fully corroborates my opening report. In other words, far more aggressive outlier cleaning, properly targeted at the variable that footnote 268 actually discusses, confirms my original conclusions.

29.    As alluded to above, the inconsistency in Yardi's Experts' treatment of these observations is also notable. Mr. Yenikomshian's reference rent configuration analysis in his rebuttal declaration includes 1,921 configurations where either the old or new value is between $0 and $20. He treats these as valid evidence of client activity, testifying that they reflect real client "choices." Yet in his YLPI analysis, he excludes effective rents in the same range as implausible. If rents between $0 and $20 are real client "choices" that belong in Mr. Yenikomshian's configuration analysis, there is no principled reason to exclude them from the YLPI.

---

[16] November 24, 2025, Yenikomshian Declaration, footnotes 191, 194, 196. Also see November 24, 2025, Yenikomshian Declaration Backup Materials:
"Intermediate_Data\Executed_Lease_Data\Scripts\02_grouping_and_tagging.py."

[17] A recommended rent of $10 on a unit leasing at an effective rent of $3,476 may be an error and my opening report removed cases like this from my acceptance analysis. In this sense, my original cleaning assumes that any lease transaction recorded as an acceptance of the Revenue IQ recommendation was accurate - even if it was unusually low. The backup code I produced to Yardi's Experts makes this distinction unambiguous.

9

FILED UNDER SEAL

## 1.3  Dr. Tucker's Panel Regression Critique Rests on Misunderstandings of My Methodology, Introduces Attenuation Bias, and Is Contradicted by Regressions She Omits

30.  My opening report tested the relationship between Revenue IQ adoption and pricing through two independent econometric approaches: the YLPI analysis discussed above and panel regressions comparing rent changes across specific geographic areas (PUMAs) with varying levels of Revenue IQ adoption.[18] While the YLPI measures the aggregate nationwide relationship between adoption and pricing, my panel regressions test whether that relationship holds in local geographic areas, with fixed effects controlling for unit-level and time-varying factors that could confound a nationwide comparison.

31.  Both approaches produced the same answer. Across every specification in my opening report, the panel regressions found a positive and statistically significant relationship between the number of Revenue IQ properties in a PUMA and the rents charged at those properties: markets with more Revenue IQ properties had higher rents, and rents grew faster when Revenue IQ properties were added even compared to other Revenue IQ users. Importantly, the panel regressions test this hypothesis through a framework that is comparatively insensitive to the data-cleaning choices at issue in Yardi's Experts' YLPI revisions. This is a local test of the framework Harrington (2025) proposes for distinguishing coordination from independent algorithm use.

32.  None of Yardi's Experts challenges these regressions as technically incorrect. Mr. Yenikomshian and Dr. Mitzenmacher do not address them at all. Dr. Tucker's sole response is to redefine the co-conspirator variable: she subtracts all Revenue IQ properties owned by the same landlord as the property being observed. Under her redefinition, the result reverses.

33.  I respond in three ways. First, when I restrict the analysis to PUMAs with two or more Revenue IQ landlords, the results are directionally unchanged, showing that intra-firm effects do not drive my findings (see Section 6.1). Second, Dr. Tucker's redefinition transforms the co-conspirator variable from a measure of Revenue IQ adoption into a measure of ownership structure, introducing a bias I illustrate below (see Section 6.2). Third, Dr. Tucker's team omitted 15 first-difference regressions from my source code. When I re-add them using her own data and corrections, every specification confirms my original conclusion, and the largest price effect yet estimated in this case comes from her own revised variable (see Section 6.3). I expand on each in sequence below.

---

[18] Marinescu Opening Report, Section 9.

FILED UNDER SEAL

34.   **First**, Dr. Tucker's argues that my regression "assumes potential collusion" by treating landlords as conspiring with themselves.[19] My regression counts properties, not landlords, because Revenue IQ's coordination capacity depends on how many properties are priced through it. But the empirical answer is simpler than the conceptual debate: as a sensitivity check, when I restrict the analysis to PUMAs that contain two or more Revenue IQ landlords, the results are unchanged: Revenue IQ adoption is still associated with higher rents, and the relationship remains statistically significant. (See Section 7.1.)[20] Intra-landlord effects therefore do not drive my results in the way Dr. Tucker suggests.

35.   **Second**, my panel regression asks a straightforward question: what happens to rents as more properties in an area adopt Revenue IQ?  Dr. Tucker's revision to my regression changes the question that is being asked to something like: what happens to rents if some Revenue IQ clients have more properties than others?

36.   Consider two PUMAs, A and B. Each contains ten Revenue IQ properties feeding the same data into Yardi's system and exerting the same pricing pressure on local rents. The only difference is ownership. In PUMA A, five landlords each own two properties. In PUMA B, two landlords own all ten: one with eight, the other with two. Under Dr. Tucker's redefinition,[21] every property in PUMA A has eight co-conspirators (the count of Revenue IQ properties not owned by the same landlord). In PUMA B, the count splits. Each of the larger landlord's eight properties has two co-conspirators (the rival's holdings). Each of the smaller landlord's two properties has eight (the larger landlord's holdings). Same PUMA, same Revenue IQ adoption, but a co-conspirator count that ranges from two to eight depending only on who happens to own/manage which building.

37.   Because of the design of the panel regressions, they can register a positive co-conspirator effect within PUMA B only if rents at the small landlord's two properties are higher than rents at the big landlord's eight - even though all ten sit in the same neighborhood and use Revenue IQ. That does not test whether Revenue IQ adoption pushes rents up across the alleged conspiracy. It tests whether Revenue IQ landlords with fewer properties see higher rent levels than landlords with more properties within the same PUMA, all else equal.

38.   **Third**, my opening report tested the co-conspirator relationship using both "levels" regressions and "first-difference" regressions.[22] The levels regressions asks: are rents higher in PUMAs with more co-conspirator properties? The first-difference regressions ask a related but distinct question: do rents grow faster when co-conspirators are added, with

---

[19] March 23, 2026, Expert Report of Catherine Tucker, Ph.D. in Rebuttal of the Report of Ioana Marinescu, Ph.D. (hereinafter, "Tucker Rebuttal Report"), ¶ 63.

[20] There are also conceptual reasons why same-owner Revenue IQ properties contribute to higher prices - Revenue IQ's algorithm, data pooling, benchmarking, and TAM oversight operate across PUMAs, not solely within them. I explain this mechanism in Section 8.3.3.

[21] This discussion is an intuitive illustration of what happens in regressions without unit fixed effects. A similar but more technically complex issue arises in regressions with unit fixed effects, as discussed below in Section 6.2.

[22] Marinescu Opening Report, ¶ 549.

11

FILED UNDER SEAL

fixed effects stripping out each unit's baseline rent-growth trend and isolating the price response to changes in local Revenue IQ adoption? I ran the first-difference specification specifically to address the concern, which Dr. Tucker later raised in her rebuttal, that some units may have "faster rent growth" for reasons unrelated to Revenue IQ - though she never acknowledges this.[23] Both specifications produced the same result in my opening report: a positive and statistically significant co-conspirator effect.

39.    I produced the source code that runs these regressions in my backup materials to Dr. Tucker. In her rebuttal, her team appears to have copied significant portions of that code, then made revisions to implement their revised methodology - including redefining the first-difference dependent variable to adopt Dr. Tucker's data gap method - and cosmetic changes on figure formatting. But Dr. Tucker and her team then omit the portion of code that runs the first-difference regressions.

40.    When I run first differences using Dr. Tucker's own data and corrections, every specification confirms my original conclusion: Revenue IQ adoption is associated with higher rent growth. The largest estimated price effect across all regressions in this case - mine and Dr. Tucker's - comes from applying one of the first-difference specifications to Dr. Tucker's own revised co-conspirator variable. (See Section 6.3.)

41.    This omission is difficult to square with Dr. Tucker's own criticisms. Elsewhere in her report, she raises the concern that some units may simply grow rents faster for reasons unrelated to Revenue IQ. That is exactly the concern first-difference regressions with unit fixed effects are designed to address: where a levels regression compares rent levels across observations within a unit, a first-difference regression strips out baseline time trends and isolates what happens to rent growth when Revenue IQ adoption changes. Dr. Tucker raised the concern. She did not run the test designed to answer it.

42.    Combining this panel regression analysis with my findings regarding Yardi's Experts revised YLPI analysis, I conclude that Yardi's Experts present a consistently distorted view of Revenue IQ client's pricing that relies on well understood data biases and unsound methodologies to deny what Yardi's own data and analysis makes clear: Revenue IQ clients typically price above the market, and their ability to do so increases with Revenue IQ adoption. I therefore next turn my attention to the mechanisms behind the observed pricing behavior, beginning with Mr. Yenikomshian's source-code analysis.[24]

---

[23] Marinescu Opening Report, ¶ 548.
[25] *See* Section 8.2.2

FILED UNDER SEAL

## 1.4 Mr. Yenikomshian's Rebuttal Opinions Based on his Source Code Analysis Reaches Unfounded Economic Conclusions

43. Mr. Yenikomshian analyzes Revenue IQ's source code without considering how it interacts with TAM oversight, benchmarking, or the broader system I described in my opening report. He offers repeated conclusions about what my economic "theory" assumes and requires, while admitting he is "not an economist in that sense," has reviewed none of the academic literature I cite, and has reviewed none of the internal documents or depositions underpinning my analysis. (see Section 8.1).

44. His most prominent new analysis tabulates approximately 562,000 client reference rent changes and concludes these demonstrate independent pricing. The numbers are less impressive than they appear. More than 70% of these changes are within 5% of the prior reference rent, with an average change of $5.60, and therefore do not constitute an economically meaningful departure. Coordination does not require that every participant charge the same price or refrain from making adjustments. It requires that the mechanism through which firms respond to each other's pricing remains operative. A client that adjusts a reference rent has shifted a starting point. The system still determines the direction and pace of price changes from there, and reference rent changes do not alter that. Mr. Yenikomshian has also not considered whether any of these changes were prompted by the very TAM oversight and benchmarking this case challenges.[25] (See Section 8.2.)

45. Mr. Yenikomshian separately argues that, even when clients do follow Revenue IQ's pricing without active adjustments, my economic analysis of the Comp Trend Rule relies on four assumptions that are not met in this case: 1) that comp sets are composed of other Revenue IQ clients, 2) that the Comp Trend operates in isolation, 3) that the Comp Trend can instantaneously recommend uncapped price changes of "arbitrary magnitude," and 4) that the Comp Trend allows contemporaneous transmission.[26] These assumptions are not squarely grounded in the economics, and several are extreme, such as instantaneous price transmission of arbitrarily large price increases.

46. None of the assumptions Mr. Yenikomshian suggests appear in my opening report or in the economic literature I cite, which Mr. Yenikomshian admittedly did not review. He appears to have suggested these assumptions without any underlying basis. The underlying mechanism is simpler than he suggests: if firms know their competitors will respond to a price increase with a price increase and vice-versa for price decreases, each firm is incentivized to raise prices. This insight, which is grounded in well-established literature,

---

[25] *See* Section 8.2.2

[26] March 23, 2026, Declaration Of Mihran Yenikomshian In Rebuttal Of The Report Of Ioana Marinescu, Ph.D. (hereinafter, "March 23, 2026, Yenikomshian Declaration"), ¶ 42.

13

FILED UNDER SEAL

does not require all comp sets to contain Revenue IQ users, unlimited price responses, or instantaneous transmission. (See Section 8.3.)

47.	Finally, Mr. Yenikomshian suggests that, even where common configuration of the Trend Rules might lead to common pricing among adopters, clients' additional configurations in Revenue IQ undermine this. Specifically, he argues my opening report's configuration analysis "creates a false appearance of commonality" because I focused on 9 of 195 configuration settings and excluded the remaining 186.[27] But not all settings are equal. The 9 I analyzed are the core Trend and Health Rules at the center of Yardi's system. These are the settings that initiate the direction of the pricing signal. A key question for coordination is whether any of the remaining 186 settings can override that direction. At deposition, Mr. Yenikomshian could not identify any single configuration among those 186 that could change whether the Comp Trend Rule generates a positive or negative trend signal.[28] He identified only two settings that might affect any of Step 1's Trend Rules, and for both, more than 80% of clients use the same configuration.

48.	The data confirms these configurations do not prevent parallel pricing outcomes. In my opening report, I found that rents at nearly 3,500 pairs of competing Defendant properties track in near-perfect synchronization, with a median correlation of 0.72 and the most common correlation at 0.99.[29] If the configurability Mr. Yenikomshian describes were producing genuinely independent pricing, Landlord Defendants' prices would diverge. They do not. None of Yardi's Experts has responded to this analysis or offered an alternative explanation.

49.	Parallel pricing can occur even when the pricing structure differs among co-conspirators due to e.g. different product characteristics. Mr. Yenikomshian glosses over the important economic distinction between the level of prices and the structure of prices. Many industries are characterized by a price structure where any individual transaction can have a different price depending on its specific characteristics. Such industries are not immune from collusion. In this case, transaction characteristics (such as lease term or the time of year a lease is agreed) may affect where a transaction falls within the price structure, without affecting the overall level of prices. If the configurability Mr. Yenikomshian describes were producing genuinely independent pricing, those prices would diverge. They do not. Mr. Yenikomshian presents 186 dials. He does not show how turning any of them changes the price level. (See Section 8.4.)

50.	In short, the configurations Mr. Yenikomshian identifies may affect where an individual transaction falls in the price structure but does not change that Revenue IQ coordinates the level of prices upward. This is the key economic finding in my opening report which Mr.

---

[27] March 23, 2026, Yenikomshian Declaration, Section V.
[28] April 16, 2026, Yenikomshian Deposition, 179:20 - 180:1.
[29] Marinescu Opening Report, ¶ 337.

FILED UNDER SEAL

Yenikomshian's configuration analysis continues to leave unaddressed. And Dr. Mitzenmacher repeats several of Mr. Yenikomshian's mistakes.

## 1.5  Dr. Mitzenmacher's Opinions Ignore the Facts and the Relevant Economic Literature

51.    Dr. Mitzenmacher simulates the Comp Trend Rule in isolation from other components of the Yardi Pricing Suite and predicts downward price cycles. He makes no discernible attempt to reconcile this finding with Yardi's own data showing Revenue IQ users consistently pricing above non-users, or with the undisputed upward parallel pricing I documented in my opening report. His simulation also does not consider how other components of the Yardi Pricing Suite (including enforcement/commitment mechanisms described in my opening report and explicitly linked to the Comp Trend Rule) can prevent the price wars he predicts from occurring in practice. (see Section 9)

52.    Dr. Mitzenmacher similarly offers opinions on the anonymization of Yardi's benchmarking data and the noise it contains, but does not engage with the economic literature on information exchange or demonstrate that anonymization immunizes the benchmarking data's coordinating effects. This is important, because the economic literature I discuss only requires the non-public information exchange give directionally informative signals to set supracompetitive prices. Further, this is the actual use of benchmarking data that Yardi and its clients describe in documents discussed in my opening report, documents Dr. Mitzenmacher did not review and does not engage with. Dr. Mitzenmacher's technical descriptions of the benchmarking data are therefore unresponsive to the coordination concerns raised in my opening report. Most intuitively: if the benchmarking data Yardi provides lacks economic utility in the way Dr. Mitzenmacher implies, it is unclear why Yardi provides it and clients pay for it. (see Section 9.2)

53.    Having summarized these conclusions and explained that the core findings of my opening report - that the Yardi Pricing Suite appears to function as an integrated coordination system that results in pricing economists associate with algorithmic collusion - remain intact, I proceed to explain each conclusion in further detail, with specific reference to flaws in Yardi's Experts rebuttal methodology. I begin by discussing relevant omissions in their reports.

FILED UNDER SEAL

## 2. My Analysis of How Revenue IQ Uses Non-Public Data Is Generally Unaddressed by Yardi's Experts

54.    In my opening report, I analyzed the pathways through which Revenue IQ uses non-public information to shape pricing across competing landlords. Drawing on Yardi's internal documents, deposition testimony, and produced data, I identified several such pathways:

- The mandatory data-use clause requiring all Voyager clients to contribute non-public transaction data to Yardi's Central Property Database ("CPD").

- Benchmarking reports that convert competitors' non-public CPD data into performance indicators showing whether a property is pricing above or below its peers.

- Penalty scores developed in 2021 that rank Revenue IQ properties against CPD-derived benchmarks, assigning penalty "points" only when properties price below competitors.

- TAM oversight that draws on this CPD-based analysis to identify properties lagging benchmarks and press clients to raise rents.

- The P30A pricing rule, which uses logistic regression models trained on pooled CPD data to predict occupancy and ultimately inform how aggressively rents should be moved.

55.    I also analyzed how Revenue IQ incorporates competitor pricing data collected through Yardi's Matrix phone surveys into the algorithm's comp trend rule. Yardi conducts hundreds of thousands of these surveys annually, in which call-center staff contact competing properties to collect current rents, concessions, and availability data. The DOJ challenged analogous conduct by RealPage, adopting a definition of "Public Data" that would exclude information obtained through such surveys. Under that definition, the competitor data Yardi collects through Matrix and channels into Revenue IQ's pricing recommendations is non-public. I further noted that Yardi encourages clients to conduct their own "call-around" surveys of competitors and input the results directly into Revenue IQ.

56.    These findings, which I ground in extensive analysis of the record evidence, form a substantial part of the basis for my conclusion that Revenue IQ facilitates coordinated pricing among Landlord Defendants: the system collects non-public competitor data, converts it into pricing signals and enforcement tools, and deploys those tools to push rents upward across the platform. Yardi's three rebuttal experts do not meaningfully engage with these non-public information exchange mechanisms. Across five reports, their materials relied upon consist almost entirely of source code, datasets, and technical documentation. The only internal Yardi business documents any of Yardi's Experts cite are four TAM call

16

FILED UNDER SEAL

notes in Mr. Yenikomshian's rebuttal, which he testified were "absolutely irrelevant to [his] opinions and [his] analysis."[30]

57.    Of the pathways I analyzed, Yardi's Experts engage with only two - but only to challenge how effectively they transmit competitor information, not to dispute that they operate. Dr. Tucker challenges my Fazio call-note analysis on methodological grounds but does not dispute that TAMs use non-public, cross-client data to press clients to raise rents. Mr. Yenikomshian and Dr. Mitzenmacher argue that benchmarking data is aggregated at a level that prevents clients from identifying individual competitors' rents - but my opinion does not require or in any way depend on de-anonymization.

58.    In fact, my opening report acknowledges how Yardi aggregates and anonymizes benchmarking data and then explains how that information exchange still raises anticompetitive concerns.[31] I did so with reference to documentary evidence in this case - where Yardi and its clients described using benchmarking to charge "what the market may bear" - which neither Mr. Yenikomshian nor Dr. Mitzenmacher have reviewed. Simply re-stating that the benchmarking data is anonymized, while ignoring the substantial record evidence that both Yardi and clients use it to anticompetitive ends, is conclusory. What matters is that benchmarking converts competitors' non-public CPD data into directional signals showing whether a client is pricing above or below its peers, and neither expert disputes this. And none of Yardi's Experts addresses Yardi's data-use clause, penalty scores, Matrix surveys, or client-to-client call-arounds.[32]

59.    Yardi's Experts admit these shortcomings, but do nothing to rectify them. Each has not reviewed the documents or depositions necessary to evaluate how Revenue IQ uses non-public cross-client data to shape pricing.

60.    Mr. Yenikomshian testified that Yardi's internal documents were "absolutely irrelevant to [his] opinions and [his] analysis," and that he had not considered TAM "interaction" in his description of how Revenue IQ operates.[33] He admitted he had offered no opinion on the

---

[30] April 16, 2026, Yenikomshian Deposition, 117:10-13 (*"Q: Do you think your opinion should be excluded in this matter because you didn't review those documents? A: No. Because it's absolutely irrelevant to my opinions and my analysis"*).

[31] Marinescu Opening Report, Section 3 and Section 7.

[32] Mr. Yenikomshian describes the P30A models but focuses on the level of aggregation at which CPD data enters the logistic regressions, not on the fact that the models are trained on pooled, non-public data from competing properties nationwide.

[33] April 16, 2026, Yenikomshian Deposition, 117:10-13 (*"Q: Do you think your opinion should be excluded in this matter because you didn't review those documents? A: No. Because it's absolutely irrelevant to my opinions and my analysis."*); April 16, 2026, Yenikomshian Deposition, 42:17-22 (*"Q: And so you don't consider that relevant to your analys- -- that -- those kind of interactions to be 19 relevant to your understanding of how the system operates? A: For purposes of a source code system review and how it operates, no."*).

FILED UNDER SEAL

"economic value" of benchmarking data because that "is an opinion for an economist"[34] - yet dedicates Section VII of his rebuttal to arguing my economic opinions about that data are wrong. He did not review how Yardi markets its benchmarking products to clients, did not review the documents in which on landlord described using benchmarking to understand "what the market may bear," and did not review the client testimonial describing how benchmarking data prompted rent increases.[35] Each was discussed in my opening report.

61.    Dr. Tucker admitted that her opinion that TAMs simply help clients implement "[their] own strategy"[36] had no citation and was based on her "knowledge as someone who teaches pricing," not any facts in this case.[37]  She had not reviewed any of the more than 600 TAM pricing call notes, any TAM depositions, or the training materials instructing TAMs to "discourage lowering price" and evaluate whether clients can "push" their rents "a bit more based" on the performance of comparable properties."[38]

62.    Similarly, Dr. Mitzenmacher described the documents concerning Yardi TAMs as not relevant to his analysis, confining his review to those merely excerpted in my opening report. Indeed, these documents do not appear in his materials relied upon.[39]

---

[34] April 16, 2026, Yenikomshian Deposition, 62:14-23 (*"Q: Would you agree with the fact that you can - that a benchmarking -- is it your opinion that if a benchmarking dataset provides incomplete economic information, that it's not providing any economic information of value? A: I'm not providing opinions on whether or not something's economic value.  What I'm providing opinions on, what the values are that are being returned in the system.  And what is being returned is an aggregated, anonymized, noisy, and lagged measure."*); April 16, 2026, Yenikomshian Deposition, 62:24 - 65:2 (*"Q: What do you mean you're "not providing opinions on whether or not something's economic value"? A: That is an opinion for an economist. I'm providing opinions on the system itself."*)

[35] April 16, 2026, Yenikomshian Deposition, 64:2-5 (*"Q: In reaching these opinions here in paragraphs 58 through 61, did you review any documents showing how Yardi markets its benchmarking products to clients? A: I did not."*); April 16, 2026, Yenikomshian Deposition, 64:19-23 ("*Q: Did you review documents in which Landlord Defendant Grubb [phonetic] explained at a Yardi-sponsored forum that benchmarking helped it understand what the market may bear? A: I did not."*); April 16, 2026, Yenikomshian Deposition, 64:24 - 65:4 ("*Q: Did you review the presentation describing a client who reviewed benchmarking data found they were way below market and put a plan in place to raise new leases and renewals? A: I did not. It's irrelevant to my opinions."*)

[36] Tucker Rebuttal Report, ¶ 90.

[37] April 28, 2026, Tucker Deposition, 177:13 - 19 (*"Q: What authority do you cite for that statement? A: So, I do not have a footnote for that statement. That reflects my knowledge as someone who teaches pricing and the use of pricing tools in business-to-business contexts."*)

[38] April 28, 2026, Tucker Deposition, 146:9-17 ("*Q: Okay. Apart from whatever ended up in her report, did you personally review any of the more than 600 pricing call notes between TAMs and Revenue IQ clients that were produced by Yardi in 2025? A: Beyond reading the ones in her report, which seem to be unsupported with her own opinion, no, I did not review any of this"*); April 28, 2026, Tucker Deposition, 179:23 - 180:5 (*"Q: Did you independently review any of those documents? A: So no, I did not review these documents, because my point is about her paragraph 204, is that none of this is supportive of the idea of an enforcement mechanism. There is no punishment in - mechanism explained in this paragraph."*).

[39] May 19, 2026, Deposition of Michael Mitzenmacher, deposed by Rio Pierce (for Plaintiffs) and by Abraham Tabaie (for Defendants) (hereinafter, "May 19, 2026, Mitzenmacher Deposition"), 109:9-13 (*"Q: Did you review any documents in this case about what Yardi technical account managers did? A: I believe I may have seen some particularly in conjunction with Dr. Marinescu's report, but they weren't really relevant to my analyses."*)

18

FILED UNDER SEAL

63.    In sum, each of Yardi's Experts reaches conclusions about how Revenue IQ operates in practice without having reviewed the documents that show how it operates in practice.

## 3. Yardi's Experts' Revised YLPI Lacks Any Methodological Support and is Inconsistent with the Record

64.    In my opening report, I constructed the Yardi Lease Price Index ("YLPI") to measure (1) whether Revenue IQ users, as a group, priced above a national rental benchmark ("Rent CPI," or "CPI") and (2) whether that premium grew as Revenue IQ adoption spread.[40] The YLPI showed that Revenue IQ users' rents consistently exceeded Rent CPI, with the gap widening as adoption increased. This is the pattern economic theory predicts when a shared pricing algorithm facilitates coordination rather than independent competition.[41]

65.    This finding matters because it speaks to the test economic theory proposes for distinguishing coordination from independent use of a shared pricing algorithm. As I explained in my opening report, Harrington (2025) provides the seminal framework: if firms independently adopt a common non-collusive algorithm, the average price of adopters should be unaffected by the adoption rate; if adoption is coordinated, prices should rise as adoption rises.[42] The positive and statistically significant relationship between Revenue IQ adoption and above-market pricing is the pattern Harrington associates with coordination; whether that relationship holds is an important empirical question.

66.    Yardi's three rebuttal experts - Dr. Tucker, Mr. Yenikomshian, and Dr. Mitzenmacher - each challenge this finding by presenting a revised version of the Yardi Lease Price Index ("YLPI") that they claim corrects errors in my opening report. Their revised indices are virtually identical to one another: they share conceptually the same methodology, and in some cases the same underlying code. Each makes two changes to my original YLPI:

▪    **First**, each excludes all rent changes that occur when a unit has a gap of even a single month between lease observations; these gaps predominantly short vacancies of one to three months between tenants. My opening report included these rent changes because they typically reflect real repricing events: a tenant leaves, the unit sits vacant, and a new tenant signs at a different, often higher, rent. Yardi's Experts discard these rent movements entirely, removing more than 240,194 observations from the analysis, of which 67% (161,008) are rent increases.

▪    **Second**, each removes any lease observation where the tenant's effective rent - the amount actually paid after concessions - falls below $20. My opening report removed only zero and negative rents, adopting the same threshold Mr.

---

[40] Marinescu Opening Report, Section 9.2.2.
[41] Marinescu Opening Report, Section 3.1.2.
[42] Marinescu Opening Report, ¶ 104.

FILED UNDER SEAL

Yenikomshian applied in his opening report so that both sides' analyses would work from a common understanding.[43] Some of these sub-$20 effective rents Yardi's Experts now exclude appear to correspond to units with normal gross rents and large offsetting concessions, suggesting real transactions, not data errors.

67.     The combined effect of these two changes is an index showing that Revenue IQ users priced below Rent CPI throughout the entire class period. In Dr. Tucker's Figure 1.B, the revised YLPI (orange) tracks at or below CPI (dotted line) from 2011 through 2025. This means that, according to Yardi's Experts, Revenue IQ users' rents grew more slowly than national rental inflation across nearly 15 years:

**Figure 3: Figure 1.B in Dr. Tucker's Rebuttal Report: Marinescu Report's Original Figure 88 and Correction That Excludes Outliers and Updates the Calculation of the Price Index to Reflect Missing Rents According to Her Own Stated Methodology[44]**



68.     Dr. Tucker's Figure 2.B makes the implication more stark. My opening report's Figure 89 plotted the Yardi Index Premium against Revenue IQ adoption and showed the two moving together: as adoption grew, the premium widened. Under Dr. Tucker's corrections, this relationship reverses: Figure 2.B shows the premium declining as adoption increases, with each additional landlord adopting Revenue IQ associated with incrementally lower pricing:

---

[43] November 24, 2025, Yenikomshian Declaration, footnotes 191, 194, 196. Also see November 24, 2025, Yenikomshian Declaration Backup Materials:
"Intermediate_Data\Executed_Lease_Data\Scripts\02_grouping_and_tagging.py."
[44] Tucker Rebuttal Report, ¶55.

FILED UNDER SEAL

**Figure 4: Figure 2.B in Dr. Tucker's Rebuttal Report: Marinescu Report's Original Figure 89 and Correction That Excludes Outliers and Updates the Calculation of the Price Index to Reflect Missing Rents According to Her Own Stated Methodology[45]**



69. Under her revised specifications, Dr. Tucker reports "a statistically significant negative relationship between the Yardi Index Premium and Landlord Defendant adoption of Revenue IQ," and finds that her co-conspirator variable "becomes negatively correlated with effective rent."[46] In plain terms, Dr. Tucker's analysis predicts that the more landlords adopted Revenue IQ, the *lower* their rents fell relative to the market, i.e., that Yardi built, marketed, and sold a pricing product that systematically made its customers' prices lag behind market prices.

70. Dr. Tucker's work implies that during the same years Yardi was marketing Revenue IQ's ability to help clients "beat the market," and preparing quarterly internal analyses showing Revenue IQ users charging approximately $40 per month more than non-revenue-management users (with the gap widening), the software was in fact dragging its users' pricing below the Rent CPI. It implies that the more landlords adopted Revenue IQ, the less they could "beat the market" - a conclusion none of Yardi's three rebuttal reports attempts to reconcile with Yardi's own pre-litigation data and marketing.

71. Yardi's Experts offer no independent methodological basis for their revised YLPI. Instead, at deposition, each confirmed that they are not offering their own affirmative opinion on the correct way to calculate the YLPI - and that none of have consulted any published

---

[45] Tucker Rebuttal Report, ¶56.
[46] Tucker Rebuttal Report, ¶¶ 57, 65.

21

literature, BLS practice, or peer-reviewed methodology to motivate their revisions.[47] Indeed, Dr. Tucker went so far as to admit that her revised index may not more accurately track price movements than my original.[48] Mr. Yenikomshian similarly opined on what he called my "intended" methodology:

> "For lease-gaps, **Dr. Marinescu testified that she intended to treat gaps as 'some string of missing data,'** meaning that her index should not be calculated in months during the lease-gap or in the first month of a lease following a gap."[49] (emphasis added)

72.     Statements attributing a specific intent to my testimony appear repeatedly in Yardi's Experts' testimony.[50] The problem with this approach is that Yardi's Experts are poorly placed to opine on my intentions, and their misreading of both my testimony and opening report exacerbates this problem. If Yardi's Experts' opinions regarding my "intended methodology" are wrong - as I demonstrate in the following sections - they have no alternative authority to support their revisions. Rigor requires economists, like Dr. Tucker,

---

[47]April 28, 2026, Tucker Deposition, 245:21 - 246:18 (*"**Q:   Does your report contain any independent separate methodological justifications for the corrections that you make separate and apart from your opinion that you are correcting Dr. Marinescu's errors in her own methodology? A: So I'm not sure what she may have in mind. The only -- as I say, all my corrections are completely consistent with what Dr. Marinescu says in her own report. The only new variable I introduce is one which more closely matches the Harrington paper that Dr. Marinescu cites. And if you remember, the Harrington paper suggests you should look at the number of conspirators and so -- and that is the methodology she says she has employed in her report, so I do that. That's my one of the tables we were just talking about, that everything I have done is just consistent with what she wrote in her report."*); April 16, 2026, Yenikomshian Deposition, 212:16 - 213:12 (*"**Q: Sir, I am asking -- I am asking your opinion as a testifying expert in this case who is presenting work. So I would please ask you to answer the question that I am asking. Starting as a blank slate, when you go to construct a price index, is it your opinion that it would be erroneous to consider the price increase that incurs for a rental unit that sits vacant from December 31st of one year to February 2nd of the next year? A: So in my analysis, I've done analysis of the system, of what the client's own input does into that system, what -- the client choices that they make, the client's -- and how that stacks and how that works together and the deviations. I -- I'm not giving an opinion on the appropriate methods to construct a price index. What I'm giving an opinion on is rebutting Dr. Marinescu's implementation of what she said and what she did and the data issues that go with that as well as the time series issue that Dr. Marinescu had."*)

[48] April 28, 2026, Tucker Deposition, 265:17 - 266:17 (*"**Q:   Are you offering the opinion that the price index -- the corrected price index you present in your report is more accurately measuring the price of units leased using the Yardi Revenue IQ because it makes the various exclusions that you -- you implement to your corrections? A:   I don't think I can answer your question in a different way. No, it's not the case that I have evaluated any alternative index performed by Dr. Marinescu and evaluated whether or not it is more accurate or less accurate. Instead, all I can do is look at the index that she presented in her report in paragraph 502 and 503 and make sure that her empirical work reflects her own definition."*)

[49] March 23, 2026, Yenikomshian Declaration, ¶ 74.

[50] April 28, 2026, Tucker Deposition, 63:3 - 66:9 (*"A: [...] She clarified in her deposition that **she intended to drop** those observations because they were not defined [...]"*); April 28, 2026, Tucker Deposition, 266:10 - 267:10 (*"A: [...] what she says **she intended to do** in 501 or 502 [...]"*); April 28, 2026, Tucker Deposition, 271: 8-23 (*"A: [...] how **she intended to construct** her price index [...]"*); April 28, 2026, Tucker Deposition, 225:14 - 226:5 (*"A: [...] her appendix table I think speaks for itself **as to her intention** [...]"*); March 23, 2026, Tucker Rebuttal Report, ¶ 49 (*"[...] Dr. Marinescu clarified in her deposition that **the intended methodology involves** imputing monthly rents [...]"*); Tucker Rebuttal Report, ¶ 51 (*"[...] **the methodology intended to be used** in her report should have been to assume [...]"*); March 23, 2026, Yenikomshian Declaration, ¶ 68 (*"[...] Dr. Marinescu also conducts an analysis of rental prices **intended to show** [...]"*) (emphasis added).

FILED UNDER SEAL

and non-economists, like Yardi's other experts, to ground their methodology in established practices, rather than speculation about another expert's intentions.

73.    To be clear, the analyses I present in this report are not new affirmative opinions. They are methodological responses demonstrating that Yardi's Experts' revisions to my YLPI are unreliable. Yardi's Experts justify those revisions solely by reference to what they describe as my "intended methodology" - not by any published literature, BLS practice, or independent methodological basis. Their characterization of my methodology is wrong, and I explain why in this report. If Yardi's Experts later offer an independent methodological justification for their revisions, that would be a truly new opinion, and one that contradicts their current testimony that they have not evaluated whether their revisions produce a more accurate index.

74.    The absence of methodological grounding is particularly concerning given the magnitude of Yardi's Experts' data-cleaning changes and their effect on the results. Generally, significant changes to data cleaning (including the treatment of extreme values or missing data) are capable of significantly changing results coming from the data. When methods are chosen to produce certain desired results, the practice is referred to as "data mining" or "p-hacking."[51] In that light, Yardi's Experts' ability to contradict the results in my opening report through extensive changes to the data cleaning is unsurprising.[52] The real question, which I address below, is: which methodology makes more sense given the relevant context?

75.    In the following sections, I examine Yardi's Experts' revised YLPI. I begin with the purpose of a price index and a comparison of their revised index against Yardi's own contemporaneous data. I then address their two revisions in turn: their exclusion of vacancy-associated rent changes - which drives their result and introduces a well-documented form of bias - and their outlier cleaning, which does not change my conclusions and rests on a misreading of my opening report. I further conclude that Yardi's

---

[51] Herman Aguinis, Ryan K. Gottfredson, and Harry Joo, "Best-Practice Recommendations for Defining, Identifying, and Handling Outliers," *Organizational Research Methods*, 2013, available at https://hermanaguinis.com/pdf/ORMoutliers.pdf (accessed April 9, 2026), *"We provide evidence that different ways of defining, identifying, and handling outliers alter substantive research conclusions,"* p. 271; *"The impact of outliers on substantive conclusions is perhaps most evident in situations where an article is first published, and then a subsequent rebuttal is published by a different team of researchers demonstrating that the original findings should be put into question specifically because of the way outliers were dealt with in the original study, For example, Hollenbeck, DeRue, and Mannor (2006) demonstrated the influence that one data point can have on substantive conclusions."* p. 272; *"In summary, the decisions that researchers make about how to define, identify, and handle outliers have important implications. Specifically, such decisions change substantive conclusions including the presence or absence, direction, and size of an effect or relationship,"* p. 272; Megan L. Head, Luke Holman, Rob Lanfear, Andrew T. Kahn, and Michael D. Jennions, "The Extent and Consequences of P-Hacking in Science," *PLOS Biology*, March 13, 2015, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC4359000/ (accessed April 10, 2026), *"A focus on novel, confirmatory, and statistically significant results leads to substantial bias in the scientific literature. One type of bias, known as "p-hacking," occurs when researchers collect or select data or statistical analyses until nonsignificant results become significant,"* p. 1.

[53] Jeffrey M. Perloff, "Microeconomics," Seventh Edition, *Pearson Education, Inc.*, 2015,

FILED UNDER SEAL

Experts' revisions are not the product of reliable methodology: they lack any independent methodological basis, contradict Yardi's own contemporaneous data, and depend entirely on an exclusion that BLS explicitly warns against.

## 3.1 A Reliable Price Index Must Be Constructed To Reflect All Relevant Price Movements

76.    A price index is a statistical construct designed to measure price changes of a defined basket of goods and services across a period of time. It compares the spending necessary to purchase a specified basket of goods and services at different points in time in reference to a base period, where the index equals 100.[53] Price indices average price changes, rather than price levels; this means that an index will only change when the price of a given good changes, rather than reflecting changes in the composition of the basket of goods. To achieve this in practice, economists and statistical agencies often employ "chain-linking," where period-on-period indices are linked together to allow new goods and services to flexibly enter/exit the basket.

77.    The operative point is that a well-designed price index displays how the price of its inputs changes at each point in time. Data processing that selectively removes price changes from a price index should therefore be closely scrutinized because it risks missing the price movements the index exists to measure.

78.    Here, the YLPI tracks a basket of rental units, and the key question is how their prices change over time. If some units start with unusually low prices and then increase significantly, the index needs to capture that change to accurately reflect movements in the overall basket. Likewise, if units are vacant for a period or their prices are unobserved, any price change recorded when data becomes available again still represents a real shift in the basket's value. To remain representative, the index must account for these changes. Excluding them - as Yardi's Experts do - risks undermining that representativeness, unless Yardi's Experts believe none of these price movements reflect "true" changes in a rental unit's price. Dr. Tucker carefully avoided claiming as such when asked at deposition.

79.    The Bureau of Labor Statistics ("BLS") confronts these issues when constructing the Rent CPI. In its published methodology for the CPI-U Rent of Primary Residence - the same

---

[53] Jeffrey M. Perloff, "Microeconomics," Seventh Edition, *Pearson Education, Inc.*, 2015, available at https://unitimesofficial.wordpress.com/wp-content/uploads/2021/03/microeconomics-seventh-edition-by-jeffrey-m.-perloff.pdf  (hereinafter, "Perloff") (accessed February 6, 2026), *see* Subsection "Inflation Indexes," *"How do we adjust for inflation to calculate the real price? Governments measure the cost of a standard bundle of goods for use in comparing prices over time using the Consumer Price Index (CPI). Each month, the government reports how much it costs to buy the bundle of goods that an average consumer purchased in a base year (with the base year changing every few years),"* p. 127

24

FILED UNDER SEAL

CPI measure both I and Yardi's Experts use as a benchmark - BLS documents multiple accepted approaches to missing data, vacancy bias, and outliers:[54]

**Table 2: Comparison of Methodological Elements Between CPI-U, R-CPI-ATR, and R-CPI-NTR[55]**

| Topic | CPI-U Rent of Primary Residence Index | All Tenant Regressed Rent Index | New Tenant Rent Index |
|---|---|---|---|
| Estimation method | Uses a weighted average of the sixth root of the changes in the economic rent | Uses the repeat rent methodology as described in Case-Shiller (1989) | Uses the repeat rent methodology as described in Case-Shiller (1989) |
| Coverage Scope | Incorporates new and continuing tenants | Incorporates new and continuing tenants | Includes new tenants only |
| Observation Dates | Assigns observations to date survey was conducted | Assigns observations to the date of move-in or the closest six month multiple after the move-in | Assigns observations to date of move-in |
| Revisions | Never revised (unless correction policy invoked) | Perpetually revised, with recent periods being prone to large revisions | Perpetually revised, with recent periods being prone to large revisions |
| Frequency | Monthly | Quarterly | Quarterly |
| Nonresponse | Imputes rents to account for nonresponses | Excludes nonresponse observations | Excludes nonresponse observations |
| Vacancy | Imputes rents to correct for vacancy bias | If a housing unit is no longer sampled, drops all observations after the last time a new tenant moved in | N/A |
| Outliers | Caps extreme monthly rent changes at 2000% or -95% | Excludes top and bottom 1% of rent changes for each geographic area | Excludes top and bottom 1% of rent changes for each geographic area |
| Quality change | Adjusts rents for changes in the certain unit characteristics | Excludes any housing units with field messages indicating remodeling or renovations | Excludes any housing units with field messages indicating remodeling or renovations |

80.     This table, which I return to in later sections, makes an important point: there are several accepted methods to deal with missing data and outliers when calculating a price index, and which is more appropriate is a context-specific question. Yardi's Experts do not claim their methodology is independently correct. They claim only that it faithfully implements the methodology I described in my testimony and opening report. As I explain in Sections 4 and 5 below, that characterization is wrong, and Yardi's Experts offer no other authority for the data-cleaning rules they applied.

---

[54] "Research Consumer Price Index for new tenant rent (R-CPI-NTR) and research Consumer Price Index for all tenant regressed rent (R-CPI-ATR)," U.S. Bureau of Labor Statistics,  available at https://www.bls.gov/cpi/research-series/r-cpi-ntr.htm (hereinafter, "R-CPI-NTR and R-CPI-ATR") (accessed April 10, 2026).
[55] R-CPI-NTR and R-CPI-ATR.

FILED UNDER SEAL

81.    My opening report took the direct approach of faithfully presenting the data as it was produced to me:

- On outliers - that is, lease observations with low effective rents - I adopted the same cleaning threshold Mr. Yenikomshian applied in his opening report: removing only zero and negative rents. I did this so that both sides' analyses would work from a common understanding.[56]

- On periods of missing observations - that is, months in which a unit has no active lease, typically because it is vacant between tenants - I included price changes at the time they appeared in the data rather than discarding them because a unit was unobserved for one or more intervening months.

82.    While Yardi's Experts characterize my YLPI as containing "mechanical errors," they have identified no instance in which my code records a price change not present in the lease transaction data Yardi produced. The disagreement is not about whether my index accurately measures what is in the data, but about which observations in the data should be included in the analysis. That is a dispute about data cleaning, not a coding error, and should be evaluated as such.

83.    Because the purpose of a price index is to show how the price of its underlying basket evolves over time, data cleaning that removes observations because of the types of price changes they show must be examined closely. In particular, when economists use a new data cleaning method and get results that are inconsistent with known facts, this should typically prompt a re-examination of the data cleaning methods. Yardi's own contemporaneous internal pricing analyses and pre-litigation marketing showed Revenue IQ users pricing above non-RM peers, with the gap widening as adoption spread. Yardi's Experts could have asked themselves why their results were in tension with these facts. But they do not report testing the robustness of their analysis to alternative cleaning methods, despite these cleaning methods removing hundreds of thousands of price movements from their revised YLPI analysis. This lack of thoroughness is at odds with their approach to data cleaning in their published work.

84.    In Goldfarb & Tucker (2015), Dr. Tucker confronted missing demographic data - respondents who did not report income or age - and addressed it by assigning placeholder values, then verifying that her results were robust to alternative specifications, including

---

[56] November 24, 2025, Yenikomshian Declaration, footnotes 191, 194, 196. Also see November 24, 2025, Yenikomshian Declaration Backup Materials:
"Intermediate_Data\Executed_Lease_Data\Scripts\02_grouping_and_tagging.py." I note that Mr. Yenikomshian repeated this inclusion of rent outliers in his analysis of reference rent configurations - maintaining at deposition that even outliers below $20 represented true client configurations and therefore belonged in his analysis (see Section 5.2.2). Yardi's Experts' inconsistent treatment of these observations may therefore not be grounded in unified and robust methodological principles.

26

the omission of those controls entirely.[57] In Goldfarb & Tucker (2011), Dr. Tucker applied the same approach to a different dataset with the same problem: missing income data was assigned a value of zero, and the authors again confirmed robustness through sensitivity analyses.[58]

85.    The methodological pattern is consistent across both papers: confronted with missing data, Dr. Tucker handled it explicitly, considered whether her chosen treatment could affect the result, and tested sensitivity to alternative specifications. Here, she did not.

86.    Dr. Tucker testified at deposition that the missing data in these papers concerned control variables, not the outcome variables her analyses sought to measure.[59] That distinction does not change the methodological principle. The principle is that an economist confronting missing data must consider whether the missingness is random, recognize that non-random missingness can bias estimates, and verify that the chosen treatment does not drive the result, especially when the result is at odds with known facts. That principle applies to all forms of missing data, not only to controls

87.    The need for such sensitivity analyses is heightened here because Yardi's Experts do not ground their chosen methodology in published literature on sample selection, index estimation, or BLS practice. Instead, as I explain in Sections 4.1 and 5.3 below, their primary justification is a combination of misreading of my opening report and deposition testimony and unqualified opinions on my "intended" methodology - from which they extract data-cleaning rules I neither proposed nor endorsed.

---

[57] Avi Goldfarb and Catherine E. Tucker, "Standardization and the Effectiveness of Online Advertising," *Management Science,* November, 2015, available at https://www.jstor.org/stable/24551554 (accessed April 27, 2026), *"The survey also asked respondents about their gender, income, and age. We use these variables as controls in our regressions, after converting the income and age responses to zero-mean-standardized measures. We assigned a value of 0 to individuals who did not provide income or age data. We do not view the missing data on the demographic controls to be a concern, because the results are robust to a nonparametric specification of the controls that adds missing data fixed effects and to the omission of these controls entirely,"* p. 2711.
[58] Avi Goldfarb and Catherine E. Tucker, "Advertising Bans and the Substitutability of Online and Offline Advertising," *Journal of Marketing Research*, April, 2011, available at https://www.jstor.org/stable/23033426 (accessed April 27, 2026), *"We converted the responses to zero-mean-standardized measures and used these variables as controls in our regressions. We assigned the missing data a value of 0. The results are robust to a nonparametric specification of the controls that adds missing data fixed effects and to the omission of these controls entirely,"* p. 210.
[59] April 28, 2026, Tucker Deposition, 99:21 - 25 (*"A: Yes. So remember here that we -- that the missing data is not to do with the dependent variable as it is in this case. Instead it is when you have got missing data for the control variable."*)

FILED UNDER SEAL

88.    This leaves two substantial gaps in each of their reports:

- **First**, their reports lack methodological grounding to justify their chosen implementation.

- **Second**, their reports lack sensitivity analyses to evaluate the robustness of their chosen implementation.

89.    I fill both gaps. I re-explain the methodological basis for my original price index and also identify the methodological choices underpinning Yardi's Experts' revisions - choices that they do not make clear in their reports. I then present several sensitivity analyses demonstrating that my directional conclusions are robust to reasonable alternative implementations.

90.    None of these sensitivity analyses are conceptually new or represent a different model than in my opening report. Instead, I simply reapply the same analysis from my opening report to different cuts of the data. The purpose is to illustrate that Yardi's Experts rely on a specific combination of data cleaning to achieve their stark reversal of my results. Different approaches to this data cleaning issue, which comport with peer-reviewed literature and BLS methodology, once again confirm my core conclusion: that the Harrington test for algorithmic collusion is satisfied, in the sense that rents rise with Revenue IQ adoption.

91.    I begin by asking the question: do Yardi's Experts' methods - and ensuing results - make sense when compared against Yardi's contemporaneous data and pre-litigation documents?

## 3.2   Yardi's Internal Pricing Analysis Showed Revenue IQ Users "Beat the Market" by Pricing Above Non-RM Users and Growing Rents Faster than Yardi's Experts Suggest

92.    In Section 9.2.1 of my opening report, I collected Yardi documents and data tracking Revenue IQ's pricing performance throughout the class period. Since at least 2019, Yardi prepared quarterly analyses comparing Revenue IQ users' pricing against both RealPage users and non-revenue-management ("non-RM") users across multiple metrics.

93.    By compiling these quarterly performance analyses, I created and displayed Figure 86 in my report. This displays Yardi's own analysis of Revenue IQ pricing against both RealPage and non-RM users. It shows Revenue IQ users pricing above non-RM users and in line with RealPage users, and indeed shows a widening gap between Revenue IQ and non-RM users during the relevant period:

FILED UNDER SEAL

**Figure 5: Figure 86 Of My Opening Report: Revenue IQ Users Charge Similar Rents to RealPage Users & Higher Rents than Non-RM Users**[60]



94.    Yardi's own data tells the same story at the metropolitan level. In my opening report, I also compiled Yardi's analyses for the period from July 2021 to June 2022 and found that that Revenue IQ users' rent growth exceeded that of non-RM users in 93% of the metropolitan areas Yardi studied. This is particularly relevant to the YLPI, which measures how rents change over time, because Yardi's own data confirms that Revenue IQ users' rents were growing faster than non-adopters' in nearly every market Yardi tracked - at a key moment of rising Revenue IQ adoption. I re-paste Figure 87 of my opening report below to once again visualize this point:

---

[60] Marinescu Opening Report, footnote 289.

**Figure 6: Figure 87 Of My Opening Report: Revenue IQ Achieves a Great New Lease Rent Change Percentage than Non-RM Users Across Metro-Areas, July 2021 - June 2022[61]**



95.     Because of this price elevation, Yardi advertised to prospective clients that Revenue IQ helped them "beat the market."[62] Yardi also used the results of these analyses to prepare internal and marketing presentations, including marketing materials claiming that

---

[61] Marinescu Opening Report, footnote 290.

[62] "Yardi Multifamily Suite," Yardi, 2019, originally available at https://resources.yardi.com/documents/multifamily-suite-brochure/ (accessed March 5, 2025. The document was originally preserved while Plaintiffs' prepared their Consolidated Class Action Complaint and is no longer publicly online), *"Key Benefits Helps you consistently beat the market to gain maximum revenue and optimize your assets,"* p. 24.

FILED UNDER SEAL

"properties using revenue management, regardless of provider, experience on average 7.4% higher rental income per unit."[63]

96.     Yardi's Experts each presents a revised YLPI that, they claim, shows Revenue IQ users pricing below Rent CPI throughout the class period. Figure 7 reproduces Dr. Tucker's revised index alongside my original YLPI and BLS's Rent CPI:

**Figure 7: Figure 1.B in Dr. Tucker's Rebuttal Report: Marinescu Report's Original Figure 88 and Correction That Excludes Outliers and Updates the Calculation of the Price Index to Reflect Missing Rents According to Her Own Stated Methodology[64]**



97.     If correct, this would mean that Revenue IQ users' rents grew more slowly than the national rental inflation benchmark - in other words, that the software failed to deliver on its promise to "beat the market."

98.     Each expert treats this result as confirmation that the pricing premium I identified in my opening report was an artifact of data errors rather than a feature of the underlying data:

▪    Dr. Tucker states: "The comparison shows that the Yardi Lease Price Index is below the rental CPI over the entire period from January 2011 to August 2025, meaning that it grew more slowly than the rental CPI over that period."[65]

---

[63] Marinescu Opening Report, ¶ 495.
[64] Tucker Rebuttal Report, ¶55.
[65] Tucker Rebuttal Report, ¶ 55.

FILED UNDER SEAL

- Mr. Yenikomshian states: "In Figure 88, after correcting her errors, the Yardi Lease Price Index remains below the Rent CPI for almost the entire period she examined."[66]

- Dr. Mitzenmacher states: "The spikes and sustained divergence from CPI that Dr. Marinescu highlights in her report are artifacts of the incorrect way that her index was implemented rather than features of the underlying data. When the index is constructed consistent with the methodology she describes and with standard data-cleaning procedures, the apparent pattern disappears."[67]

99. Dr. Tucker's regression analysis furthers this contradiction. Under her revised specifications, which test the relationship between the Yardi Index Premium relative to Rent CPI and Revenue IQ adoption, she finds "a statistically significant *negative* relationship between the Yardi Index Premium and Landlord Defendant adoption of Revenue IQ." Similarly, her co-conspirator variable in the panel regressions "becomes negatively correlated with effective rent."[68] In short, Dr. Tucker's regression analysis predicts that the more landlords adopted Revenue IQ, the more they lagged behind the market price.

100. If credited, Yardi's Experts revised findings require that Yardi built, marketed, and sold a product that failed to deliver on its promise to help clients "beat the market." As I showed in my opening report, Yardi's own contemporaneous data, marketing, and internal analyses are at odds with this finding.

101. None of Yardi's Experts engaged with the documentary evidence from Section 9.2.1 of my opening report, and their materials-relied-upon confirm that they did not review these documents: indeed, Dr. Tucker testified that she did not have log-in to the document database in this case.[69] As a consequence, Yardi's Experts have also not provided an explanation of how their revised YLPI's conclusion - that Revenue IQ users priced below Rent CPI throughout the class period, and in fact priced *lower* the more adoption grew - can be reconciled with Yardi's own contemporaneous data and documents showing the opposite, including marketing that Revenue IQ users "beat the market."

---

[66] March 23, 2026, Yenikomshian Declaration, ¶ 79.

[67] March 23, 2026, Declaration Of Michael Mitzenmacher In Rebuttal Of The Report Of Ioana Marinescu, Ph.D. (hereinafter, "March 23, 2026, Mitzenmacher Declaration"), ¶ 97.

[68] Tucker Rebuttal Report, ¶¶ 57, 65.

[69] April 28, 2026, Tucker Deposition, 129: 9-13 (*"A: So, I wouldn't be able to tell you that. But I did not have a Relativity account for this case. As I say, I was focused on Dr. Marinescu's report and backup."*) As is standard practice, my backup materials did not re-produce bates stamped discovery documents - as opposing economic experts typically have direct access to the database themselves and can use the bates stamp to review evidence.

FILED UNDER SEAL

102.    To visually juxtapose Yardi's Experts' revised YLPI with Yardi's contemporaneous pricing analysis, I overlay Dr. Tucker's revised index (grey line) on Figure 86 of my opening report below:

**Figure 8: Yardi's Experts' Revised YLPI Is Inconsistent With Yardi's Internal Analysis of Revenue IQ Pricing[70]**



103.    Between 2018 and 2021, Dr. Tucker's revised YLPI grows moderately, in line with Yardi's internal analysis of Revenue IQ pricing. Beginning in 2021, however, the two diverge

---

[70] Sources: Quarterly Performance Analyses (YARDI-DUFFY_00023860; YARDI-DUFFY_00024130; YARDI-DUFFY_00024718; YARDI-DUFFY_00024800; YARDI-DUFFY_00031612; YARDI-DUFFY_00113657; YARDI-DUFFY_00113943; YARDI-DUFFY_00114125; YARDI-DUFFY_00115308; YARDI-DUFFY_00116563; YARDI-DUFFY_00118394; YARDI-DUFFY_00118560; YARDI-DUFFY_00227565; YARDI-DUFFY_00227897; YARDI-DUFFY_00227898; YARDI-DUFFY_00227899; YARDI-DUFFY_00582522; YARDI-DUFFY_00585450; YARDI-DUFFY_00585471; YARDI-DUFFY_00623392); Expanded Lease Data (*see* Appendix F.1 of Marinescu Opening Report). Notes: [1] The left y-axis represents the In Place Rent Per Unit as reported by Yardi in its internal analyses. The 20 spreadsheets I locate span a period from January 2018 to September 2024, and missing months from February to June 2019. Each spreadsheet contains monthly averages for a specific period of twelve months. I collect data on "In Place Rent Per Unit" under the tab named "Monthly by Vendor," where data is provided for Yardi and non-RM users. Starting in July 2021, I find spreadsheets that exclude landlord ███████████████" from the analysis, and, after an overlapping period from July 2021 until March 2022, I can only locate analyses that exclude the landlord from the calculations. Accordingly, starting in July 2021, this chart presents the data that excludes ██████████. Whenever multiple performance analyses workbooks contain data on the same variable for the same months, and data differs slightly, I consider the average of those values. [2] The right y-axis represents the YLPI, as revised by Yardi's Experts, i.e., excluding monthly effective rents less than or equal to $20, and only calculating the

FILED UNDER SEAL

sharply: Yardi's own data shows Revenue IQ rents accelerating sharply while Dr. Tucker's revised YLPI flattens. By 2022, this divergence is stark: Dr. Tucker's revised index falls below the non-RM users line, while Yardi's own data continues to show Revenue IQ users pricing above those same non-RM peers.

104.    To further illustrate this point, I visually compare: (1) my original YLPI (orange); (2) Yardi's Experts' Revised YLPI (blue); (3) Rent CPI; and (4) Yardi's internal analysis of Revenue IQ users' in-place rent per unit. This visualization shows Yardi's own internal data indicated Revenue IQ users increased rents faster than Rent CPI, most notably during a period of increased adoption around 2021, as I show below in Figure 9.

**Figure 9: Yardi's Internally-Recorded Pricing Shows A Period Of Convergence With My Original YLPI[71]**



105.    Moreover, between 2021 and 2023, Yardi's internal analysis shows Revenue IQ users increasing prices more rapidly than my original YLPI to the point they almost perfectly converge in 2022.

---

month-over-month change in the price of a unit if months are consecutive. [3] The left y-axis is rescaled so that a value of 100 of the index corresponds to a value of $1,000 of In Place Rent Per Unit.

[71] Sources: Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average (CUUR0000SEHA) available at: https://fred.stlouisfed.org/series/CUUR0000SEHA# (hereinafter, "Rent CPI") (accessed February 5, 2026); Quarterly Performance Analyses (YARDI-DUFFY_00023860; YARDI-DUFFY_00024130; YARDI-DUFFY_00024718; YARDI-DUFFY_00024800; YARDI-DUFFY_00031612; YARDI-DUFFY_00113657; YARDI-DUFFY_00113943; YARDI-DUFFY_00114125; YARDI-DUFFY_00115308; YARDI-DUFFY_00116563; YARDI-DUFFY_00118394; YARDI-DUFFY_00118560; YARDI-DUFFY_00227565; YARDI-DUFFY_00227897; YARDI-DUFFY_00227898; YARDI-DUFFY_00227899; YARDI-DUFFY_00582522; YARDI-

FILED UNDER SEAL

106. The methodological adjustments in Yardi's Experts' revised YLPI reduced the price index not just below my original YLPI, but also below Yardi's contemporaneous analysis. This downward revision is so strong it reverses Yardi's own directional conclusion that Revenue IQ users were pricing above the market. Yardi's Experts' revised YLPI is difficult to reconcile with Yardi's own contemporaneous analysis and marketing materials, and suggests Yardi's Experts introduce a downward bias. We should therefore examine the methodological justifications for these revisions closely.

107. As I show in the proceeding section, Yardi's Experts provide no such justifications. Instead, their core revision rests on a mischaracterization of my deposition testimony that leads them to introduce a form of selection bias known as "vacancy bias" to their price indices. That choice single-handedly drives their conclusion that Revenue IQ users were underpricing the market.

# 4. Yardi's Experts Introduce Vacancy Selection Bias to the YLPI

108. In this section, I examine Yardi's Experts' treatment of gaps in the lease observation data. I show that this methodological choice drives their elimination of the Yardi Index Premium above the Rent CPI. Yardi's Experts justify this choice by citing my deposition testimony, in which I was asked about a single unit with a gap of nearly nine years between lease observations. From that exchange, they extract a rule requiring the exclusion of all price changes across any gap of even a single month. This is a rule I neither stated nor endorsed. In practice, this removes 240,194 price observations from the analysis, of which more than 67% (161,008) are rent increases. The multi-year gaps discussed at my deposition account for 0.15% of the observations Yardi's Experts exclude; the vast majority of which are short vacancies of three months or fewer, often as short as 29 days.

109. This matters because excluding price changes associated with vacancies introduces a well-documented form of selection bias that BLS calls "vacancy bias." Units that sit vacant

DUFFY_00585450; YARDI-DUFFY_00585471; YARDI-DUFFY_00623392); Expanded Lease Data (*see* Appendix F.1 of Marinescu Opening Report). Notes: [1] The left y-axis represents the values CPI Rent, and Yardi's Index, both the version I present in my Opening Report, and Yardi's Experts Revised YLPI, i.e. excluding monthly effective rents less than or equal to $20 and only calculating the month-over-month change in the price of a unit if months are consecutive. [2] The right y-axis represents the In Place Rent Per Unit as reported by Yardi in its internal analyses. The 20 spreadsheets I locate span a period from January 2018 to September 2024, and missing months from February to June 2019. Each spreadsheet contains monthly averages for a specific period of twelve months. I collect data on "In Place Rent Per Unit" under the tab named "Monthly by Vendor," where data is provided for Yardi. Starting in July 2021, I find spreadsheets that exclude landlord ██████████████ from the analysis, and, after an overlapping period from July 2021 until March 2022, I can only locate analyses that exclude the landlord from the calculations. Accordingly, starting in July 2021, this chart presents the data that excludes ██████████. Whenever multiple performance analyses workbooks contain data on the same variable for the same months, and data differs slightly, I consider the average of those values. [3] The right y-axis is rescaled so that a value of 100 of the index corresponds to a value of $1,000 of In Place Rent Per Unit..

FILED UNDER SEAL

between tenants tend to reprice upward when re-leased, meaning that systematically dropping these observations suppresses rent increases (as opposed to rent decreases), leading to downward bias in the index. Both BLS and Yardi itself recognize this problem and address it through a process called "imputation" rather than exclusion. Yardi's Experts do the opposite: they discard every observation BLS would impute, then compare their scrubbed index against a Rent CPI that BLS constructed to include vacancy-associated rent changes.

110.    Based on these findings, I conclude that Yardi's Experts' revised YLPI does not reliably measure how Revenue IQ users' pricing changed as adoption grew, which is a core question the YLPI analysis in my opening report was designed to evaluate. Their elimination of the Yardi Index Premium is driven by an unjustified methodological choice that is at odds with BLS methods to calculate CPI-U, contradicts Yardi's own approach to missing data, and I do not actually endorse or "intend" in the way they suggest.

## 4.1 Yardi's Experts Misread My Deposition Testimony and Opening Report to Justify a Flawed Assumption in their Revised YLPI

111.    In my opening report, I constructed the YLPI by tracking each unit's effective rent over time and recording the change whenever a new rent observation appeared. While a lease is in effect, the unit's rent is held constant in the index. When a new lease begins - whether immediately following the prior lease or after a period of vacancy - the index records the price change relative to the last observed rent. For example, if a unit is leased at $1,200 through June, sits vacant in July, and re-leases at $1,300 in August, the index records a $100 increase in August. This is how apartment rents work: a lease ends, a unit may sit empty for weeks or months, and a new tenant signs at a different price. My index captures that repricing when it occurs.

112.    Yardi's Experts argue that my "own stated methodology" requires discarding every rent change that occurs when a unit has no active lease for even a single intervening month. Generally speaking, economists designing an accurate and representative index to measure rent growth would not discard observations showing truthful and important price movements. Their suggestion to ignore true price increases associated with a vacancy should therefore raise concern.

113.    Yardi's Experts base this claim on two sources. First, they point to paragraph 503 of my opening report, which describes the YLPI's arithmetic. There, I "calculate each unit's change in effective rent relative to the prior month."[72] Dr. Tucker reads that language - together with my paragraph 595 statement that effective rent is held constant during the term of a lease[73] - as a methodology under which any period between two leases is treated

---

[72] Marinescu Opening Report, ¶ 503.
[73] Marinescu Opening Report, ¶ 595.

36

FILED UNDER SEAL

as missing data, with the consequence that the price change at re-leasing must be discarded.[74] Yardi's Experts reading conflates how the index calculates change with which observations the index includes. My statement "relative to the prior month" was intended to describe the arithmetic of a chain index. In practice, it means "relative to when the last observed month-level rent was observed" - which, most frequently, is the prior calendar month, but need not always be. A unit leased at $1,200 in June and re-leased at $1,300 in August has changed its rent "relative to the prior month" in the only sense that matters for a chain index: relative to the last price the index observed. The same principle applies to the "t" and "t-1" notation in my equations. Paragraph 503 of my opening report therefore explains how a rent change is calculated; not which observations to exclude. It is a significant stretch to suggest this language clearly requires, or indicates it was my intent to ignore price movements across short vacancies. Further, if Dr. Tucker was unclear about how the YLPI was constructed, she could have consulted the code used to construct it rather than speculating based on a possible misreading of my report.

114. At my deposition, when counsel asked whether my formula uses "T minus one or prior month as the time period in all cases," I specifically directed counsel to Paragraph 504 of my opening report, which describes the core design of my index. I explained there that my methodology "only show[s] a change in the index when the price of an individual unit changes," using a "chain indexing" approach that is "widely used by national statistical agencies to calculate CPI." A unit that leases at $1,200 in April, sits vacant, and re-leases at $1,300 in July has had its price change by $100 - and therefore has a change I went to reflect in the YLPI. Under the methodology I described in Paragraph 504 - and cited at deposition - that change belongs in the index, because the index "only show[s] a change … when the price of an individual unit changes," and the price of this unit has changed. Excluding vacancy-spanning price changes would be inconsistent with the driving motivation of the methodology I described in my opening report and re-explained at deposition.

115. Second, Dr. Tucker asserts that I "clarified" at deposition that my "intended methodology … would not impute rents for a given unit if there were a gap of more than a month between when one observed lease ends and the next observed lease begins."[75] But what I was actually asked about was a single unit with a 109-month gap - nearly nine years - between a $1,045 rent in 2016 and a $1,382 rent in 2025:

> **Q:** Okay. And so if you look at Revenue IQ Unit ID 1623904, the first entry point has a lease start date of June 1st, 2015. Correct?
>
> **A:** Yes.

[74] Tucker Rebuttal Report, ¶ 49.
[75] Tucker Rebuttal Report, ¶ 49.

FILED UNDER SEAL

**Q:** And the next lease observation for that unit is July 1st, 2025, over ten years later. Do you see that?

**A:** Yes.

**Q:** And so that's a gap, after the initial 12 months, from June 2016 to July 2025, or 109 months. Correct?

**A:** Yes.

**Q:** And then at the end of that, when you get to July 1st, 2025, the rent increase is shown as from $1,045 to $1,382. Correct?

**A:** No. My understanding is that the way that my staff processed the data, based on our discussion, is that we only imputed rent as long as it was the same contract. So, here, you know, the data point would be missing in June 2025. So -- and then in July 2025, it would still be missing, because we don't know, like, relative to what, since there was no data before. And then starting in August 2025, so one month after this first, you know, new data point, then you would start to see a ratio of one or no price increase for the next 12 months, you know, until the end of this, of this lease.

**Q:** You would agree that it would not be appropriate to attribute the entire difference between $1,045 and $1,382 to a change that happened in one month. Correct?

**A:** So, as I said, given the procedure that we have discussed, there would be missing data in the middle and, therefore, there would not -- this property would not contribute to the index since it would have missing data, it would not contribute to the index until August of 2025, because that's the first time that we see the rent not changing since it's been propagated from the July 2025 new rent.[76]

116. In this passage, I was asked about a unit with a very long 109-month (9 year) gap in observations. I explained that, based on my understanding, the unit would not contribute to the index when data was missing and there was no contract continuity. This was true - when there is no observation for a given unit it does not contribute to the index in either my original index or in Yardi's Experts revised YLPI. In my original YLPI, it resumes contributing to the index when there is a new observation. More broadly, this testimony about a specific unit with an extraordinary long gap does not establish a general rule that price changes following a gap in observations or a vacancy of more than 28 days should be excluded from the price index. Indeed, Dr. Tucker's interpretation is incompatible with Paragraph 504 of my opening report - which I directed counsel to in the same deposition session. As explained above, paragraph 504 describes a chain index that "only show[s] a change in the index when the price of an individual unit changes." A rule that excludes every observation following a vacancy of more than one month does the opposite: it

---

[76] March 9, 2026, Ioana Marinescu Deposition, deposed by Rio Pierce (for Plaintiffs) and by Michael Schaper (for Defendants) (hereinafter, "March 9, 2026, Marinescu Deposition"), 279:18 - 281:18.

FILED UNDER SEAL

ensures the index does *not* show a change precisely when the price of an individual unit *has* changed. Dr. Tucker does not address Paragraph 504 in her report.

117. The interpretation Yardi's Experts advance is a significant overreading of my testimony and produces a methodology for dealing with short-run vacancies that is inconsistent with principles endorsed by both BLS and Yardi. I was never asked what my methodology requires for a two-month or three-month vacancy, which is the kind of routine turnover that accounts for the vast majority of what Yardi's Experts' rule actually removes. I never endorsed a one-month threshold, and never was never asked to address short vacancies at all.

118. Nevertheless, Yardi's Experts rely on my testimony to create - and apply - a uniform rule that treats a 32-day gap between tenants identically to a nine-year gap in the data, removing 240,194 observations without distinguishing between the two. In the following sections, I show that this approach introduces a form of selection bias that systematically understates rent growth, is inconsistent with methods BLS and Yardi itself adopt to address missing observations in rental data, and is the single methodological choice responsible for eliminating the Yardi Index Premium over Rent CPI.

## 4.2 Yardi's Experts Ignore All Price Increases Across Non-Adjacent Months - Disregarding 161,008 Price Increases Across Vacancies As Short as 29 Days

119. To implement the rule that Yardi's Experts' misleadingly ascribe to my deposition testimony, they introduce a conditional logic to the index calculation. This logic only calculates a price movement for a property if it has observations in two adjacent months - e.g., January to February, or April to May. Mr. Yenkimomshian and Dr. Mitzenmacher have the same implementation of this logic, while Dr. Tucker uses slightly different coding that is functionally similar.

FILED UNDER SEAL

120.    I examine Dr. Tucker's code below in Figure 10:

**Figure 10: Dr. Tucker's Removal of Price Changes From Her Revised YLPI[77]**

```
yardi_index_no_out_na_gap.R

    Source on Save

dr_ext <- readRDS(file.path(input, "lease_data_extended_no_outliers.rds"))

# Compute Yardi index -----------------------------------------------------
# order dataset
dr_ext = dr_ext[order(revenue.iq.unit.id,month)]
# calculate change from previous month by unit
dr_ext[, gap_months :=
        (year(month) - year(shift(month))) * 12 +
        (month(month) - month(shift(month))),
      by = revenue.iq.unit.id]

dr_ext[, ratio := ifelse(
  gap_months == 1,
  monthly.effective.rent / shift(monthly.effective.rent, type = "lag"),
  NA_real_
), by = revenue.iq.unit.id]

# average changes across units by month
extagg = dr_ext[,.(chain = mean(ratio,na.rm = T)),.(month)]
# take cumulative product of month-on-month changes
extagg = extagg[order(month)]
extagg[!is.na(chain),index := cumprod(chain)]
extagg[, index := index*100]
```

121.    Dr. Tucker creates a variable in the data called "gap_months" which counts how many months occur between two observations, after assigning each observation to a month value (e.g., all observations in January become coded to January 1st). A "gap_month" value of 1 indicates two observations are in adjacent months, rather than there being an empty month between them. Dr. Tucker then calculates price ratios to include in the index when, and only when, "gap_months" takes the value 1 - otherwise she coerces all price movements to NA.

122.    With this implementation, some of the "missing data" Dr. Tucker removes from her price index can actually occur across gaps shorter than 1 month. Taken to its extreme, her logic removes gaps between observations as short as 29 days. For example, Dr. Tucker coerces the following price increases to NA using this code:

---

[77] Tucker Yardi Backup Materials, lines 41-50 of script "2. Analysis\Yardi Index\Scripts\yardi_index_no_out_na_gap.R".

FILED UNDER SEAL

**Table 3: Examples Of Observations Removed by Dr. Tucker With Temporal Gaps Of Less Than 31 Days[78]**

| Revenue IQ Unit ID | Date | Days Gap | Monthly Effective Rent | Original Ratio |
|---|---|---|---|---|
| 12566728 | 2018-01-31 | 29 days | $ 627.00 | 1.35 |
| 12566728 | 2018-03-01 | 29 days | $ 846.50 | |

| Revenue IQ Unit ID | Date | Days Gap | Monthly Effective Rent | Original Ratio |
|---|---|---|---|---|
| 47490837 | 2025-01-31 | 29 days | $ 1,256.04 | 1.35 |
| 47490837 | 2025-03-01 | 29 days | $ 1,690.00 | |

| Revenue IQ Unit ID | Date | Days Gap | Monthly Effective Rent | Original Ratio |
|---|---|---|---|---|
| 4981750 | 2022-01-31 | 29 days | $ 877.00 | 1.32 |
| 4981750 | 2022-03-01 | 29 days | $ 1,158.31 | |

| Revenue IQ Unit ID | Date | Days Gap | Monthly Effective Rent | Original Ratio |
|---|---|---|---|---|
| 12046385 | 2024-01-31 | 30 days | $ 694.94 | 1.57 |
| 12046385 | 2024-03-01 | 30 days | $ 1,089.00 | |

| Revenue IQ Unit ID | Date | Days Gap | Monthly Effective Rent | Original Ratio |
|---|---|---|---|---|
| 40853416 | 2022-01-30 | 30 days | $ 1,049.00 | 1.4 |
| 40853416 | 2022-03-01 | 30 days | $ 1,468.00 | |

| Revenue IQ Unit ID | Date | Days Gap | Monthly Effective Rent | Original Ratio |
|---|---|---|---|---|
| 16022020 | 2021-01-30 | 30 days | $ 1,203.08 | 1.33 |
| 16022020 | 2021-03-01 | 30 days | $ 1,603.00 | |

| Revenue IQ Unit ID | Date | Days Gap | Monthly Effective Rent | Original Ratio |
|---|---|---|---|---|
| 45043184 | 2022-08-31 | 31 days | $ 1,095.00 | 1.6 |
| 45043184 | 2022-10-01 | 31 days | $ 1,747.00 | |

| Revenue IQ Unit ID | Date | Days Gap | Monthly Effective Rent | Original Ratio |
|---|---|---|---|---|
| 35385916 | 2022-01-29 | 31 days | $ 1,036.00 | 1.53 |
| 35385916 | 2022-03-01 | 31 days | $ 1,587.00 | |

---

[78] Sources: Expanded Lease Data (*see* Appendix F.1 of Marinescu Opening Report). Notes: [1] I filter the lease data according to Dr. Tucker's cleaning, i.e., excluding monthly effective rents less than or equal to $20. [2] In the "Days Gap" column, I compute the difference in days between the last date of a lease and the start of another contract. The "Original Ratio" column reports the change in Monthly Effective Rent between the two values. [2] I focus on observations for which Dr. Tucker computed a gap of 2 months (i.e., her "gap_months" variable equals 2), and present three examples for each value of "Days Gap" between 29 and 31 days..

41

FILED UNDER SEAL

| Revenue IQ Unit ID | Date | Days Gap | Monthly Effective Rent | Original Ratio |
|---|---|---|---|---|
| 6928488 | 2025-05-31 | 31 days | $ 2,033.57 | 1.45 |
| 6928488 | 2025-07-01 | 31 days | $ 2,954.00 | |

123.    Each of these examples shows a true price increase between 32% and 60% across a "missing gap" of only 29-31 days. This occurs because the data shows an observation at the end of one month, with a gap of 1 month, and then a new price observation very early in the following month (e.g., January 31 to March 1). In each example, Dr. Tucker coerces the price movement to NA (Not Available) because one calendar month separates the two observations, even though the actual gap is 31 days or less and very likely reflects a routine vacancy between tenants. As I will explain in Section 4.3, this is not a standard approach to indexing rental prices.

124.    In practice, these short data gaps - which often appear to be vacancies - are the significant majority of what Yardi's Experts' remove from their revised YLPI. In Figure 11, below, I plot how many price movements Dr. Tucker coerces to NA based on the number of months between observations. 77,289 of the price movements Dr. Tucker coerces to NA have only 1 month of missing data.

**Figure 11: Yardi's Experts Primarily Excludes Price Movements Occurring 3-Months or Less[79]**



[79] Sources: Expanded Lease Data (*see* Appendix F.1 of Marinescu Opening Report). Notes: [1] I filter the lease data according to Dr. Tucker's cleaning, i.e., excluding monthly effective rents less than or equal to $20. [2] On the x-

FILED UNDER SEAL

125. In total, Dr. Tucker removes 240,194 price movements from her analysis, of which more than 67% (161,008) were price increases. Of these price movements, approximately one third had only 1 month of missing data. More than 60% had only up to 3 months of missing data. Long gaps of the nature discussed in my deposition (e.g., 5+ years) account for just 0.15% of all the data gap price movements Yardi's Experts remove from their revised YLPI, as I summarize below in Table 4:

**Table 4: Tabulation of Data Gaps Dr. Tucker Removes From her YLPI, Split by Length of Temporal Gap Between Rent Observations[80]**

| Length of Gap, Months | Share of Observations (%) |
|---|---|
| 1 | 32.18% |
| 2 or less | 49.68% |
| 3 or less | 60.03% |
| 6 or less | 74.55% |
| 12 or less | 89.21% |
| 13-23 | 7.59% |
| 24-35 | 2.01% |
| 36-47 | 0.74% |
| 48-59 | 0.29% |
| 60 or more | 0.15% |

126. The transaction data further confirms what the gap lengths suggest. For more than 90% of the one-, two-, and three-month gaps Yardi's Experts exclude, the tenant ID changes between the two lease observations. This suggests that one tenant moved out, the unit sat vacant, and a different tenant moved in at a new rental price. These observations are not "missing" data in a meaningful sense because the lease transaction data records exactly what happened: a tenant departure, a vacancy, and a repricing event upon re-leasing.

127. This is significant because Yardi's Experts cite my deposition testimony about a nine-year gap as their sole justification for removing these observations. Yet 60% of what they

---

axis, I report Missing Months as the actual amount of months with missing lease data. E.g., if the last month of a lease is December 2017, and a new lease starts in March 2018, I count two months of missing lease data (i.e., January and February 2018), while Dr. Tucker's counts three months in her "gap_months" variable.

[80] Sources: Expanded Lease Data (*see* Appendix F.1 of Marinescu Opening Report). Notes: [1] I filter the lease data according to Dr. Tucker's cleaning, i.e., excluding monthly effective rents less than or equal to $20. [2] I report the "Length of Gap, Months" as the actual amount of months with missing lease data. E.g., if the last month of a lease is December 2017, and a new lease starts in March 2018, I count two months of missing lease data (i.e., January and February 2018), while Dr. Tucker's counts three months in her "gap_months" variable.

FILED UNDER SEAL

remove involves gaps of three months or less, and 0.15% involves gaps of the length actually discussed at my deposition. The rule they apply therefore does not implement my testimony; instead, it extends a comment about an extreme case into a sweeping exclusion that predominantly removes routine tenant turnovers and the rent increases associated with them.

128.   In the following section, I explain why this exclusion is not merely unsupported but affirmatively harmful to the reliability of the index: it introduces a well-documented form of selection bias that BLS specifically accounts for when constructing the Rent CPI.

## 4.3  Ignoring These Vacancies Introduces a Form of Selection Bias That BLS Calls "Vacancy Bias"

129.   There is an important economic reason that price movements across vacancies should be included in a rental price index: rental vacancies may occur precisely because a unit has become more expensive. When a tenant moves out, the landlord often re-leases the unit at a higher rent. Units that experience the largest rent increases are also more likely to experience a vacancy of more than one month, because the higher price reduces demand. This means that vacancies in the data are likely not randomly distributed: they may be systematically associated with above-average rent increases. I empirically evaluate this below in Section 4.3. Ignoring a price increase because it is associated with a vacancy may therefore bias the index downward by omitting many true price increases that occur across short periods of time.

130.   This is a form of selection bias. Selection bias arises when the sample used for analysis is not representative of the target population because of how observations are selected, included, or retained - for example, when the likelihood that an observation is included in an analysis is correlated with the value being measured. Here, the variable being measured is rent growth, and the observations being excluded - units that sat vacant between tenants - are the units most likely to show large rent increases. In this case, selection bias occurs when the price changes of rental units that are excluded from the price index are different from the price changes of rental units that are included in the index. Excluding units with systematically lower or higher price changes biases the price index.

131.   BLS recognizes this problem and gives it a name: "vacancy bias." As BLS explains, ignoring unrented units biases a rent index downwards because vacant units tend to reprice upward upon re-leasing. Rather than delete these observations, BLS addresses vacancy bias through a process called imputation, which involves estimating a missing rent change from comparable units. Yardi itself does the same in its own internal pricing analysis. Yardi's Experts do something very different: they discard every observation that BLS and Yardi would include by imputation.

FILED UNDER SEAL

132.  The economic implications here are straightforward. If Revenue IQ facilitates supracompetitive pricing, one would expect exactly the pattern the data shows: above-market rent increases followed by temporary vacancies as units take longer to lease (i.e., output reduction) at elevated prices. Evaluating supracompetitive pricing while disregarding observations associated with reduced output is inherently unreliable: it omits relevant price increases and makes a finding of supracompetitive pricing systematically less likely.

133.  In the following sections, I first review the published literature on missing data and selection bias, including Dr. Tucker's own work on the consequences of ignoring non-randomly missing observations, and explain how BLS and Yardi itself address vacancy bias through imputation rather than exclusion. I then empirically demonstrate that the observations Yardi's Experts removed are systematically associated with above-average rent increases, that this bias peaks during the 2021-2022 period when Revenue IQ adoption was accelerating most rapidly, and that it single-handedly accounts for the elimination of the Yardi Index Premium over the rent CPI.

### 4.3.1  Discarding Missing Data Introduces Bias When the Data is Not Randomly Missing

134.  Whether Yardi's Experts' approach to missing data is reasonable depends on why the data is missing. If observations are absent for reasons related to rent changes - as the evidence in Section 4.3.1 shows - discarding them will systematically distort the index. The literature on missing data distinguishes among three categories: data missing completely at random (MCAR), missing at random (MAR), and missing not at random (MNAR):[81]

135.  Data that is MCAR is missing for no systematic reason, as the missingness is unrelated to either observed or unobserved characteristics.[82] Data that is MAR is missing for reasons related to observed characteristics in the data, but not related to the missing value itself after conditioning on these characteristics.[83] Data that is MNAR is missing for reasons related to the missing value itself, even after observed characteristics are accounted for - for example, when units with higher rent increases are more likely to have gaps in the

---

[81] Anna Sikov, "A Brief Review of Approaches to Non-ignorable Non-response," *International Statistical Review*, December, 2018, available at https://www.jstor.org/stable/pdf/48554507.pdf (hereinafter, "Non-ignorable Non-response") (accessed  April 15, 2026).

[82] Non-ignorable Non-response, *"MCAR is the simplest and most restrictive non-response mechanism. It assumes that the non-response is unrelated to any variable in the data. This implies that the non-respondents can be viewed as a simple random sample from the original sample. MCAR is rarely satisfied in practice,"* p. 415.

[83] Non-ignorable Non-response, *"A more common situation for the structure of missing data is MAR. This assumption is less restrictive and more realistic than MCAR, because it allows the response probabilities to depend on the observed data. Formally, the MAR condition states that if covariates are observed for all sample units, responding and non-responding, and if missingness occurs only in the outcome variable, then under this assumption, the probability to respond depends only on the covariates,"* pp. 415, 416.

FILED UNDER SEAL

data.[84] This distinction matters because the appropriate treatment of missing data differs in each case, and the consequences of choosing different approaches are well understood.

136.    The published literature identifies several approaches to missing data:[85]

- Discarding incomplete observations (sometimes called "complete-case analysis"), which simply discards observations with missing values.[86]

- Reweighting observed data, which assign weights to not missing units to compensate for absent ones.[87]

- Estimating values from available data (or "imputation"), which replaces missing values with values coming from statistical analysis performed on observed data, ultimately obtaining a complete dataset.[88]

- Modelling this missing data directly ("model-based procedures"), which use regression techniques to handle the missing observations.[89]

137.    In their revised YLPI, Yardi's Experts' methodology would most closely align with "complete-case analysis" because they discard price changes that occur across periods of unknown pricing. In other words, if we know a unit was priced at $1,000 in January and $1,250 in March, but do not know its price in February, Yardi's Experts omit this 25% price increase from their analysis because they do not have a complete case.

138.    Complete-case analysis is known to produce biased results when data is non-randomly missing. Sikov (2018) and Zahmatkesh & Zech (2026) state that MNAR data cannot be ignored, as is required in complete-case analysis.[90] Indeed, methods based on completely

---

[84] Non-ignorable Non-response, *"If probability to respond depends on the unobserved data after conditioning on the observed data, then the non-response is NMAR. For example, if missingness occurs only in the outcome variable and the probability to respond depends on this variable after conditioning on the covariates, then the non-response is NMAR. It is important to emphasise that dependence of the probabilities to respond on the outcome variable given the covariates is not a necessary condition for NMAR,"* p. 416.

[85] Non-ignorable Non-response, *"In this section, we review the common approaches used to handle non-response. Little & Rubin (2002) classify the approaches dealing with missing data into four different categories,"* p. 417.

[86] Non-ignorable Non-response, ***"Methods based on completely recorded units only, complete-case analysis and available-case analysis.*** *These methods discard observations that contain missing values,"* p. 417.

[87] Non-ignorable Non-response, *"**Weighting procedures.** These procedures adjust for non-response by assigning weights to the responding units,"* p. 417.

[88] Non-ignorable Non-response, "***Imputation-based procedures.*** *The basic idea of this approach is to create a complete data set by filling in plausible values for the missing values using observed data for other variables for the same unit (when available) and data observed for other sampled units. This allows subsequent analysis using complete data methods,"* p. 417.

[89] Non-ignorable Non-response, "***Model-based procedures.*** *In this group of methods, the inference is carried out based on the likelihood or Bayesian analysis, requiring a specification of models for the observed data,"* p. 417.

[90] Non-ignorable Non-response, *"In this article, we review the main approaches to imputation for missing data and to parameter estimation in the presence of missing data. We focus almost exclusively on the methods applicable to situations where non-response is not missing at random, such that the probability to respond depends on the variables*

46

FILED UNDER SEAL

recorded units lead to biased results, unless they are applied to MCAR data.[91] Wooldridge (2012) explains that non-randomly missing data can be "problematic."[92]

139.    As I previously explained in Section 3.1, Dr. Tucker has confronted similar issues in her published work. In those cases, she imputed values and ran sensitivity analysis rather than discarding observations - recognizing that doing so could bias her results. In this case, she chooses a different approach. In the following Section, I explain why discarding price movements associated with a vacancy is particularly problematic.

## 4.3.2  BLS and Yardi Both Impute Missing Rent Data Rather Than Discard It

140.    When rent data cannot be collected or is unavailable for a given period, BLS does not discard observations. Instead, it imputes rent price changes by assuming that missing observations follow the same movement as comparable observed units during the gap. Any additional price change is incorporated once data collection resumes, so that the index continues to measure price dynamics without losing the variation that occurred while the unit was unobserved.[93]

---

*that are missing. In this case, the non-response cannot be ignored,"* p. 415; Samira Zahmatkesh and Philipp Zech, "Spatio-Temporal Missing Data Imputation: A Systematic Literature Review with a Focus on Statistical and Machine Learning-Based Approaches," *ACM Computing Survey*, April, 2026, available at https://dl.acm.org/doi/pdf/10.1145/3797903 (accessed April 20, 2026), *"the case MNAR is called non-ignorable. Non-ignorability means that we need to model the missing data mechanism to get good estimates of the parameters of interest, and this requires quite specialized methods. On the contrary, ignorability basically means that we do not need to model the missing data mechanism as part of the estimation process,"* p. 276:6.

[91] Non-ignorable Non-response, *"Methods based solely on completely recorded units could be attractive due to their simplicity; however, as noted by Little & Rubin (2002), their disadvantage is the potential loss of information, which results in loss of precision, and 'bias when the missing-data mechanism is not MCAR, and the complete cases are not a random sample of all the cases,"* p. 417.

[92] Jeffrey M. Wooldridge, "Introductory Econometrics: A Modern Approach," Fifth Edition, *South-Western Cengage Learning*, 2012, available at https://cbpbu.ac.in/userfiles/file/2020/STUDY_MAT/ECO/2.pdf (accessed May 18, 2026) (hereinafter, "Wooldridge (2012)"), *"Missing data are more problematic when it results in a nonrandom sample from the population,"* p. 324.

[93] "Measuring Price Change in the CPI: Rent and Rental Equivalence," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/cpi/factsheets/owners-equivalent-rent-and-rent.htm (accessed April 10, 2026).

FILED UNDER SEAL

141.    BLS has two methods for this imputation, called "vacancy imputation" and "non-interview imputation," that distinguish between two types of missing data:

**Figure 12: BLS Has Two Methods for Imputing Periods of Missing Data - Not Discarding It[94]**

**Vacancy imputation**

Vacant units that were previously occupied by renters are used in the calculation of relatives. The vacancy imputation process incorporates several assumptions about the unobserved rents of vacant units. It is presumed that rents tend to change at a different rate for units that become vacant (in the process of changing tenants) than for other units. The vacancy imputation model assumes that, after an initial lease period, expected rents change at a steady rate until the old tenant moves out of the unit. When there is a change in occupants or a unit becomes vacant, the rent is assumed to jump at some rate. In markets with generally rising rents, this jump rate is usually greater than the average rate of change for occupied units. BLS estimates the jump rate based on nonvacant sample units in the PSU which have had a change in tenant during the 6-month period between $t{-}6$ and $t$. Rent changes for nonvacant units without a tenant change are used to calculate the average continuous rate of change. These values are used to impute rents for vacant units in period $t$ from their rent in period $t{-}6$.[1]

$r_{i,t} = r_{i,t-1} \times J$ if the unit was not vacant in $t{-}6$, or

$r_{i,t} = r_{i,t-1} \times C^6$ if the unit was vacant in $t{-}6$,

where

$r_{i,t} =$ imputed rent of vacant rental unit $i$ in period $t$,

$J =$ the 6-month jump rate calculated for the PSU, and

$C =$ the 1-month steady rate of change.

The imputation of vacant rents ensures that the unobserved rent change that occurs when a unit becomes vacant is reflected in the final index for rent. The 6-month rent-change estimates capture these changes once the units become occupied.

**Non-interview imputations**

Housing units that were previously responding but not currently responding and not vacant are also imputed and used in the calculation of the 1-month and 6-month relatives. All units within a PSU are broken up into high, medium, and low rent categories based on their rent level in $t{-}6$. The rents of nonresponding, nonvacant units are imputed forward into $t$ by using the average rent change of other housing units in their respective category.

142.    As the figure explains, "vacancy imputation" addresses units that are vacant and therefore have no active lease. "Non-interview imputation" addresses units for which BLS simply has not received information in the current period (also called a "non-response"). BLS applies distinct methods for these different types of missing data, recognizing that failure to include these data gaps can bias the price index.

143.    BLS is explicit about why imputation is necessary. Simply ignoring unrented units (as Yardi's Experts suggests we must) introduces what it calls "vacancy bias" - a downward bias that arises because units that sit vacant tend to reprice upward. Intuitively, this bias exists because unrented units may be vacant precisely because they are more expensive

---

[94] "Consumer Price Index: Calculation," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/opub/hom/cpi/calculation.htm (hereinafter, "Consumer Price Index: Calculation") (accessed April 16, 2026). *See* the "Estimation of price change for shelter" section.

FILED UNDER SEAL

than other units.[95] Ignoring them would therefore show misleadingly low Rent CPI. To address vacancy bias, BLS imputes rents for vacant units with a method specifically designed to account for the larger price increase associated with vacant units.[96] BLS documentation cites research recognizing this vacancy bias dating back to 1983. It is not a recent concept.[97]

144.    Critically, BLS' methodology assumes that rents evolve at a steady rate during tenancy but "jump" at the time of tenant turnover, and that these jumps are systematically larger than within-lease rent changes. BLS estimates the magnitude of this jump from comparable units that have recently experienced tenant turnover.[98] As BLS explains:[99]

> "For the Housing Survey, if a housing unit in the sample is observed as recently **vacant**, rent is imputed by the average change in rent for units within the same location with a recent change in occupancy. Long-term vacant units are imputed using the average rent change of non-vacant units occupied for at least 6 months."

145.    Yardi itself performs a conceptually similar analysis. For example, paragraph 16 of the Wong-Schwab declaration explains:

> "For all asking rent data, where up to date publicly available asking rent information is unavailable, Matrix employs statistical procedures to formulate a rent using only publicly available asking rent information from previously conducted Matrix surveys and/or the RentCafe Database. In a current benchmark or stratified rent survey, the Yardi Matrix employee survey team members will run a series of processes in which we essentially utilize the rate of change of other properties' publicly available rental rents and apply it to the subject property's most recent stored rent to formulate a new rent. In the case where a new benchmark survey is complete and more updated survey data for a property exists, we will update historic formulated data, accordingly."[100]

---

[95] Joshua Gallin, Lara Loewenstein, Hugh Montag, Randal Verbrugge, "Sticky Continuing-Tenant Rents," *U.S. Bureau of Labor Statistics*, September 16, 2024, available at https://www.bls.gov/pir/journal/mh01.pdf (accessed April 16, 2026), *"Higher new-tenant rents (and rent gaps) are correlated with the frequency and size of continuing-tenant rent changes and the probability of a tenant moving out,"* p. 1.

[96] R-CPI-NTR and R-CPI-ATR.

[97] "Consumer Price Index: Calculation," U.S. Bureau of Labor Statistics, September 6, 2023, available at https://www.bls.gov/opub/hom/cpi/archive/20230906/calculation.htm#ednref1 (accessed May 20, 2026), *see* footnote 1 (*"For more information on vacancy imputation, see J.P. Sommers and J.D. Rivers, "Vacancy imputation methodology for rents in the CPI," Proceedings of the American Statistical Association, Business and Economic Statistics Section (Alexandria, VA: American Statistical Association, 1983)."*

[98] Consumer Price Index: Calculation. See the "Estimation of price change for shelter" section.

[99] "Consumer Price Index: Imputation," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/cpi/tables/imputation.htm (accessed April 15, 2026).

[100] November 20, 2025, Declaration Of Carissa Wong-Schwab In Support Of Defendant's Motion For Summary Judgment, ¶ 16.

FILED UNDER SEAL

146.  This is imputation: Yardi estimates missing values from comparable data rather than discard that unit's pricing. Indeed, Mr. Yenikomshian relied on this testimony in his own description of how Revenue IQ operates.[101] Further (as previously explained), Dr. Tucker has herself used imputation to address missing data in her own published work, opting to estimate missing contract years from available data rather than discard incomplete observations.[102] Yet in their rebuttal reports, Yardi's Experts adopt the opposite approach, discarding observations that both BLS and Yardi's own system would impute.

147.  In short, neither BLS, Yardi's Expert published work, nor Yardi itself endorse the approach Yardi's Experts adopted in their rebuttal reports. Instead, BLS adopts an approach designed to include price movements across periods of missing data, just as I did in my opening report. As BLS explains, this is methodologically appropriate because ignoring price movements associated with vacancies creates "vacancy bias" in a price index. Yardi's Experts offer no justification for departing from this principle beyond a misreading of my deposition testimony. In the following section, I empirically demonstrate how Yardi's Experts introduce this bias to their revised YLPI.

---

[101] November 24, 2025, Yenikomshian Declaration, ¶ 61, citing Wong-Schwab ("*For all asking rent data, where up to date publicly available asking rent information is unavailable, Matrix employs statistical procedures to formulate a rent using only publicly available asking rent information from previously conducted Matrix surveys and/or the RentCafe Database. In a current benchmark or stratified rent survey, the Yardi Matrix employee survey team members will run a series of processes in which we essentially utilize the rate of change of other properties' publicly available rental rents and apply it to the subject property's most recent stored rent to formulate a new rent. In the case where a new benchmark survey is complete and more updated survey data for a property exists, we will update historic formulated data, accordingly.*").

[102] Amalia R. Miller and Catherine E. Tucker, "Can Health Care Information Technology Save Babies?" *Journal of Political Economy*, 2011, available at https://www.jstor.org/stable/10.1086/660083 (accessed April 27, 2026), the authors investigate the effects of Electronic Medical Records (EMRs) on neonatal mortality (*"We explore empirically whether EMRs improve neonatal outcomes in a panel setting. [....] Our panel estimates suggest that a 10 percent increase in the adoption of basic EMRs can reduce infant mortality by 16 deaths per 100,000 live births. We also find that the drop in neonatal deaths is driven by a reduction in deaths from diseases originating in the perinatal period,"* pp. 320-321). They use a panel dataset, with data retrieved from administrative records, surveys, and a database on hospital technology adoption (*"A. Childbirth and Infant Mortality Data. Our primary health data are derived from administrative records of births and deaths in the United States during the period 1995-2006,"* p. 293; *"We also supplement this individual information with data from the annual American Hospital Association (AHA) surveys that provide information on hospital resources, including size and neotatal intensive care unit (NICU) status, as well as patient insurance coverage, that is lacking in Vital Statistics birth certificate data,"* p. 294; *"B. Health Care IT Data. We use technology data from the 2007 release of the Healthcare Information and Management Systems Society's Analytics Database (HADB). This database describes hospital technology adoption decisions up to 2006, which is the year the survey was conducted,"* p. 294). The authors specify that some hospitals reported multiple in place health care IT systems, but with missing data on contract year for one component (*"For hospitals that report having multiple health care IT systems in place but with missing data on the contract year for one component,"* p. 295). To deal with that, the authors opted for an imputation technique: for the missing component the contract year was matched with the most recent contract year in the data (*"we assigned the contract year for the missing component to match the most recent contract year in the data,"* p. 295).

50

FILED UNDER SEAL

### 4.3.3 Yardi's Experts Introduce This Vacancy Bias to Their Revised YLPI

148. To test whether the observations Yardi's Experts exclude are systematically associated with above-average price increases, I compare each excluded price change to the change in Dr. Tucker's revised YLPI over the same months. For example, for a unit observed in January and again in March (with February missing), I compare the unit's January-to-March price change against Dr. Tucker's YLPI's January-to-March change. If the excluded changes simply reflect ordinary market repricing, they should track the YLPI's movement on average. If instead the excluded changes are systematically larger, as the vacancy-bias hypothesis predicts, they will exceed it.

149. The logic behind this test is straightforward: if the observations Yardi's Experts drop correspond to true above-market repricing events associated with tenant turnover, they should consistently show larger rent increases than the index, because that is what vacancy bias predicts.

150. I then categorize these price movements as "above index" or "below index" depending on whether they are larger or smaller than Dr. Tucker's revised YLPI for the corresponding period. If data gaps are random and not systematically associated with price increases, then we should expect roughly half to fall above index and half below index. By contrast, a consistent skew in one direction is evidence that the data is not randomly missing and that excluding it biases the index.

151. In Figure 13, below, I plot the share of data gap price movements that are above vs. below index from 2011 to 2025 to evaluate this question:

51

FILED UNDER SEAL

**Figure 13: Yardi's Experts' Treatment of Temporal Gaps Removes Predominantly Above-Index Price Increases[103]**



Excludes monthly effective rents <= $20 as per Dr. Tucker's outlier cleaning.
The vacant rent movement and Tucker's index are computed across the same period and duration of time.

152.     The skew above is clear and consistent. Throughout the relevant period, consistently more than half of the data gap price movements were above index - on average 60.5% of data gap price movements were above index. In 2021, this peaked at an average of 71.9%, with the spike in above index data gap price movements continuing into 2022 before returning to the longer-run average in 2023. Tellingly, this is the same time that Yardi's Experts' revised YLPI flattens relative to Yardi's contemporaneous pricing analysis, as I explained previously in Section 3.2.

153.     The previous analysis shows that excluded observations are more likely to fall above the index than below it. But frequency is only part of the picture, because the magnitude of the skew also matters. I therefore further evaluate the relationship between data gaps and above index price movements by examining the scale of divergence from Dr. Tucker's revised YLPI - separately for above vs. below index price movements. I plot this below in Figure

---

[103] Sources: Expanded Lease Data (*see* Appendix F.1 of Marinescu Opening Report). Notes: [1] I filter the lease data according to Dr. Tucker's cleaning, i.e., excluding monthly effective rents less than or equal to $20, and focus on observations associated with a temporal gap, as defined by Dr. Tucker. [2] I compute the shares on a quarterly basis.

FILED UNDER SEAL

14, showing the mean difference between the data gap price movement and corresponding index movement:

**Figure 14: Price Movements Discarded By Dr. Tucker And Her Index Corroborate The Presence Of A Vacancy Bias[104]**



Excludes monthly effective rents <= $20 as per Dr. Tucker's outlier cleaning.
The vacant rent movement and Tucker's index are computed across the same period and duration of time.

154.    The asymmetry is visibly clear. The typical above-index data gap price movement was on average 0.13 greater than the corresponding YLPI movement. At the same time, the below index data gap price movement was only on average -0.08 less than the corresponding YLPI movement. This means that not only are data gap price movements more likely to be above than below index, but that the extent to which they were above index exceeded the extent to which they were below index.

155.    In short, the gaps Yardi's Experts exclude are consistently associated with above-trend price increases. That is the pattern expected when gaps reflect vacancies followed by repricing, which indicates the missing data is not random. Discarding these price movements removes many actual above-average rent increases from the index, producing

---

[104] Sources: Expanded Lease Data (*see* Appendix F.1 of Marinescu Opening Report). Notes: [1] I filter the lease data according to Dr. Tucker's cleaning, i.e., excluding monthly effective rents less than or equal to $20, and focus on observations associated to a temporal gap, as defined by Dr. Tucker. [2] I compute the mean values on a quarterly basis.

the downward bias BLS's imputation methodology calls vacancy bias. Yardi's Experts have systematically removed many above-average rent increases from the index and thereby biased it downwards. This is the distortion the BLS designed its imputation methodology to prevent.

156.    The timing of this bias is also significant. As Figure 14 makes clear, the vacancy bias I identify above is not evenly distributed across the data period: it spikes in 2021/2022, the same period in which Yardi's Experts' revised YLPI diverges most dramatically from Yardi's own contemporaneous pricing analysis, as I showed previously in Section 3.2. In other words, Yardi's Experts' data cleaning removes large rent increases in 2021/2022, which helps explain why the revised YLPI departs furthest from what Yardi's own data shows during that period.

157.    These price increases in 2021/2022 are also important to understanding the relationship between Revenue IQ adoption and prices. As I showed in Figure 88 of my opening report, Revenue IQ adoption approximately doubled between 2020 and 2023, growing from approximately 146,000 to over 280,000 active leases  before plateauing. At the same time, the Yardi Index Premium widened from 8.25 to over 23 by 2023. Ignoring meaningful price increases, often across short vacancies, during these critical years of growing adoption is an effective - and misleading - way to break the link between Revenue IQ adoption and prices.

158.    The 2021/2022 period is when the relationship between further Revenue IQ adoption and above-market pricing was strongest in the data. Removing many above-average rent increases during these years of adoption growth does not correct the index but does misleadingly remove evidence of the positive relationship between adoption and pricing.

159.    Moreover, as I explained in Section 9.3 of my opening report, Landlord Defendants' ability to set these collusive prices seems to have markedly improved in 2021/2022.[105] I also explained why this was the case: in the period between 2021 and 2022, Yardi made two significant changes: it (i) began calculating "penalty" scores and (ii) it began using CPD data in its TAM pricing oversight.[106] This means that Yardi's Experts' decision to ignore all price movements across non-adjacent months had the consequence of removing many price increases that coincided with core components of the challenged conduct.

160.    Yardi's Experts did not examine whether the observations they removed were systematically associated with larger rent increases, whether they were concentrated in a particular period, or whether their removal would misleadingly affect the adoption-pricing relationship. As I have shown, the answer to each of these questions is yes. Without any analysis of these consequences, or any sensitivity testing of alternative approaches, there

[105] Marinescu Opening Report, ¶550.
[106] Marinescu Opening Report, ¶551.

FILED UNDER SEAL

is no reliable basis to conclude that their revised YLPI is an accurate measure of Revenue IQ's effect on pricing.

161. These findings are consistent with the output effect economists associate with supracompetitive pricing and anticompetitive conduct. Rental units with greater price increases take longer to rent after going on the market, because they have greater price increases - thereby producing the vacancies that appear as gaps in the data. By ignoring price increases associated with reduced output (e.g., vacancies), Yardi's Experts assume away the very effect we are trying to measure.

## 4.4 Vacancy Bias Single-Handedly Eliminates The Yardi Index Premium and Drives Yardi's Experts' Conclusions

162. In the preceding section, I established that Yardi's Experts' treatment of data gaps introduces vacancy bias to their revised YLPI. In this section, I explore how important this bias is to Yardi's Experts' conclusions. In particular, I ask whether this single methodological choice is what drives their elimination of the Yardi Index Premium. I find that it is.

163. As I demonstrate below, vacancy bias alone accounts for the elimination the Yardi Index Premium relative to rent CPI that I established in my opening report. I also present sensitivity analyses showing that reasonable alternative approaches to handling periods of missing data, including BLS' own imputation methodology, corroborate my original conclusions.

164. Dr. Tucker's own report illustrates this point. Her Figure 1.A applies only the outlier filtering - removing the 108 lease observations with effective rents below $20 - and presents the result alongside my original YLPI. Under this correction alone, the Yardi Index Premium narrows but persists: the index remains above Rent CPI throughout much of the class period and maintains a statistically significant and positive relationship with Revenue IQ adoption. It is only when Dr. Tucker adds the gap cleaning in her Figure 1.B - discarding the 240,194 typically short vacancy-associated observations discussed above - that the premium disappears and the index falls below CPI. Dr. Tucker presents Figure 1.B as the "corrected" index.

165. Below, I reproduce the "corrected" panels of Dr. Tucker's Figures 1.A and 1.B side by side to make this contrast visible. The left panel shows the effect of outlier removal alone; the right panel shows the effect of both corrections combined. The difference between the two is the gap cleaning - which alone is what eliminates the premium:

FILED UNDER SEAL

**Figure 15: Figures 1.A and 1.B From Tucker Report[107]**



166.    My own decomposition confirms what Dr. Tucker's figures show - excluding data gaps singlehandedly eliminates the Yardi Index Premium. In Figure 16, I present three panels. In each, I present my original YLPI (solid orange) and Rent CPI (dashed orange). I then present three different versions of Dr. Tucker's revised YLPI in blue. On the left, I only apply her outlier cleaning. In the middle, I only apply her temporal data gap screening. On the right, I combine both:

**Figure 16: Vacancy Bias Drives Yardi's Experts' Erasure of the Yardi Index Premium[108]**



167.    Figure 16 clearly illustrates that Yardi's Experts' exclusion of vacancy-associated rent changes - not the removal of outliers - is what ultimately eliminates the Yardi Index Premium. This means that Yardi's Experts' headline result is driven by a form of selection bias that BLS designed its methodology to prevent. I discuss outliers further in Section 5.

---

[107] Tucker Rebuttal Report, Figures 1.A and 1.B.
[108] Sources: Expanded Lease Data (*see* Appendix F.1 of Marinescu Opening Report); Rent CPI. Notes: [1] The "Original Index" line follows the Lease Data cleaning of my Opening Report, i.e., filtering for
leases with a positive effective rent. [2] In the "Transformed Index" of the panels "Removing Outliers," I filter the lease data according to Dr. Tucker's cleaning, i.e., excluding monthly effective rents less than or equal to $20. In the panels "Excluding Data Gaps" I follow Dr. Tucker's exclusion of rent movements when those occur more than one month apart of each other.

FILED UNDER SEAL

168.    To further evaluate the robustness of this conclusion, I apply two additional sensitivity analyses:

- First, I use Dr. Tucker's code that removes 1-month gaps in the data, but modify it to only remove gaps longer than 12-months.

- Second, I apply BLS-style imputation. I split this imputation in two. When the tenant ID is unchanged before vs after the data gap, I use the BLS non-response method. When the tenant ID does change before vs after the data gap, I use the vacancy method.

169.    Figure 17 presents my original YLPI alongside these two sensitivity analyses representing two different approaches to temporal gaps (this analysis focuses on temporal gaps alone and does not remove outliers). The solid orange line reproduces my original index. The dashed orange line is BLS's Rent CPI benchmark. I present my sensitivity analyses in the red and yellow lines, where the red line is applying Dr. Tucker's gap screening with a 12- rather than 1-month threshold. The Yellow line uses the BLS-style imputation method:

**Figure 17: The Yardi Index Premium Is Robust Under Two Reasonable Approaches To Treat Vacancies[109]**



---

[109] Sources: Expanded Lease Data (*see* Appendix F.1 of Marinescu Opening Report); Rent CPI. Notes: [1] All three indices in the figure filter for monthly effective rents above $0. [2] The "BLS - Imputation only" line follows the

FILED UNDER SEAL

170. I find that, adopting Yardi experts' gap-cleaning logic but raising the threshold to 12 months (i.e., removing all observations with a gap longer than 12 months), the Yardi Index Premium remains significant and broadly consistent with the analysis in my opening report, as shown above in Figure 17 in the red line: the yellow line tells the same story through a different lens, and the red line sits right on top of the yellow line, showing the two are almost indistinguishable. When adopting a BLS-style imputation method, the resulting index again remains well above Rent CPI.

171. In short, Yardi's Experts' elimination of the Yardi Index Premium is almost entirely driven by their decision to exclude price increases associated with short vacancies of typically 3 months or less. There is no reasonable basis to infer such extreme data cleaning from my deposition, and they offer no other authority to justify it. Established authorities have rejected this approach: both BLS and Yardi impute across vacancies rather than exclude them, because excluding them introduces a known downward bias. Yardi's Experts have not considered whether distinguishing between short vacancies and long data gaps would change their conclusions. And when I test alternative approaches - limiting exclusions to long gaps, imputing through vacancies as BLS does, or removing outliers while retaining vacancy-associated price changes - every method preserves the Yardi Index Premium.

172. Yardi's Experts' characterization of my original index as containing a "mechanical error" is therefore unsupported. There are multiple accepted methods for dealing with outliers and missing data, and every methodology for handling missing rent data I implemented as a sensitivity analysis preserves the Yardi Index Premium in a way that contradicts their conclusions

173. Yardi's Experts appear to have selected precisely a method of data cleaning that eliminates the Yardi Index Premium, but they did not test whether their conclusion was robust to other thresholds or methodologies. When I do so, I show that alternative thresholds (which allow us to include price increases associated with short vacancies) and imputation methods (like those adopted by BLS and Yardi) all show that Revenue IQ users' prices remained above CPI and further grew with Revenue IQ adoption, as I have shown in my opening report.

---

BLS non-response method when the tenant ID is unchanged before and after the data gap, and the BLS vacancy method when the tenant ID changes after the data gap. The BLS non-response method uses the average growth in rental units observed in each month for each unique CBSA, calculated only for units with continuous observations in the corresponding area and period. The BLS vacancy imputation method, on the other hand, uses two different growth rates. The 'jump rate' reflects the average observed rental increase across all designated tenancy renewals in the same CBSA and month pair for which I am imputing data. I apply the 'jump rate' to impute the first observation of a gap. The 'steady rate' is the average observed rental increase across all designated non-renewals (e.g. contiguous observations that do not correspond to the first period of a tenancy), in the same CBSA and month pair for which I am imputing data. The BLS applies a 6-month steady rate, but given the granularity of the data, I calculate this rate down to the monthly level. I apply the 'steady rate' to impute all subsequent observations after the first observation of a gap. [3] For the "Tucker - Gaps up to 12 months" line, I exclude effective rent movements if there's a gap of more than 12 months between subsequent leases.

FILED UNDER SEAL

174.    The purpose of this section has been to show that Yardi's Experts only offer one cleaning change that disputes the existence of the Yardi Index Premium - and this cleaning choice introduces vacancy bias in their revised index. The other cleaning revisions Yadi's Experts suggest speak to the magnitude of the Yardi Index Premium. In the next section, I therefore turn to Yardi's Experts outlier cleaning.

# 5. My Core Conclusions Are Robust to Yardi's Experts' Proposed Outlier Screening, Which Rests On Inconsistency Across Their Analyses and Misunderstandings of My Testimony

175.    In my opening report, I removed all effective rent observations at or below $0 from the data. This is the same threshold Mr. Yenikomshian applied in his opening report when calculating clients' acceptance of Revenue IQ pricing recommendations.[110] Yardi's Experts now argue that this threshold should have been $20, removing 108 additional lease observations they treat as outliers. As I demonstrated in Section 4.4, this change does not drive Yardi's Experts' elimination of the Yardi Index Premium; their gap cleaning does. In this section, I evaluate their outlier claims with this in mind.

176.    Below, I summarize my three core findings on the exclusion of outliers:

177.    **First**, even adopting Yardi's Experts' $20 threshold, the Yardi Index Premium persists, reaching 9.8% above Rent CPI and growing with Revenue IQ adoption. This means that Yardi's Experts' outlier cleaning at most affects the magnitude of the premium, not its existence or direction. Further, their outlier cleaning has almost no effect on my most robust panel regressions.

178.    **Second**, the data cleaning in my opening report was reasonable and methodologically grounded: I adopted the same threshold Mr. Yenikomshian applied in his opening report so that both sides' analyses would work from a common understanding, consistent with BLS's practice of including outlier observations in Rent CPI. Yardi's Experts now argue this threshold should be $20.[111] Given that Mr. Yenikomshian includes rents between $0 and $20 in his reference rent configuration analysis, he admits these could reasonably reflect client choices, and by this logic it is also reasonable to include them in the YLPI.

---

[110] November 24, 2025, Yenikomshian Declaration, footnotes 191, 194, 196. Also see November 24, 2025, Yenikomshian Declaration Backup Materials:
"Intermediate_Data\Executed_Lease_Data\Scripts\02_grouping_and_tagging.py."
[111] November 24, 2025, Yenikomshian Declaration, footnotes 191, 194, 196. Also see November 24, 2025, Yenikomshian Declaration Backup Materials:
"Intermediate_Data\Executed_Lease_Data\Scripts\02_grouping_and_tagging.py."

FILED UNDER SEAL

179. **Third**, Yardi's Experts' $20 outlier threshold rests on a second misreading of my opening report - this time, a confusion between two different variables. Yardi's Experts cite footnote 268 as the sole authority for the threshold, claiming it establishes $20 as the appropriate floor for plausible rent observations. But footnote 268 applies the $20 threshold to recommended rents (Revenue IQ's algorithmic price output) not to effective rent (the actual lease-transaction prices that go into the YLPI) and even then only when the recommended and effective rent are not equivalent (i.e., there is a client override).

180. Those are different inputs serving different purposes. A $20 recommended rent on a unit leasing at an effective rent of $1,950 appears to be an error. A $20 effective rent, by contrast, can reflect a real transaction in which a landlord offered a substantial concession against a normal gross rent. The backup code I produced to Yardi's Experts makes this distinction unambiguous. Yardi's Experts adopted the same numerical threshold but applied it to a variable footnote 268 never addressed, without considering nuance that my opening report purposefully made clear.

181. When I correct this misreading and apply the cleaning footnote 268 describes to the correct variable, I once again corroborate the results of the YLPI analysis in my opening report. As with their data gap screening, this is the kind of analysis Yardi's Experts could have implemented given their reliance on my testimony as the sole authority justifying their revised methodology.

182. I explain each conclusion sequentially in the following sections.

## 5.1 Even Adopting Yardi's Experts' Most Stringent Outlier Cleaning Confirms My Core Conclusions

183. The Yardi Index Premium analysis asks whether Revenue IQ users (A) priced above a national benchmark and (B) whether that premium grew as adoption spread, which is the pattern economic theory predicts if a shared pricing algorithm facilitates coordination rather than independent competition. If the Yardi Index Premium persists under Yardi's Experts' proposed corrections and grows with Revenue IQ adoption, so do many of the core empirical findings of my opening report. As I will explain in this section, I find evidence supporting both facts.

184. As explained above, Dr. Tucker's own report already demonstrates this: her Figure 1.A applies the $20 outlier cleaning threshold without her gap cleaning. These charts show that the premium persists, with Revenue IQ users' pricing diverging above Rent CPI starting around 2021/2022 - coinciding with increased Revenue IQ adoption and updates to TAM pricing oversight. This finding is a key conclusion in my opening report and remains true when adopting Yardi's Experts' revised outlier cleaning.

FILED UNDER SEAL

185.  In Figure 18 below, I re-create Dr. Tucker's chart with my original formatting and present the results:

**Figure 18: Recreation of Figure D1.A Of Tucker Report[112]**



186.  Even adopting Yardi's Experts' $20 threshold, there is still a significant Yardi Index Premium of up to 9.8% relative to Rent CPI. A premium of this magnitude is economically meaningful: applied across Revenue IQ units, it could cost tenants many millions of dollars each year.

187.  The panel regressions related to adoption rates for Revenue IQ confirm the same conclusion. When I rerun every regression from my opening report using Yardi's Experts' $20 effective rent threshold (*see* Appendix C.1.3), the results are not meaningfully different - and in some specifications the estimated effect of Revenue IQ adoption on rents actually increases. In other words, the panel regression sometimes find that rents rise yet faster in markets with denser Revenue IQ adoption when excluding these 108 low-value lease observations, and otherwise that removing outliers does not make the estimates statistically different (see Appendix A). In this sense, outlier exclusion is not material to the panel regressions in my opening report.

---

[112] Tucker Rebuttal Report, p. D-2.

61

FILED UNDER SEAL

188.   Yardi's Experts' revised data cleaning therefore at most affects the precise quantification of harm from the challenged conduct - something I have not yet been asked to measure - it does not affect tests assessing whether the conduct has anticompetitive effects. And even then, their outlier cleaning has almost no discernible effect on my most robust panel regressions, occasionally increasing the estimated co-conspirator effect.

## 5.2   My Original Outlier Cleaning Followed Mr. Yenikomshian's Original Approach and Was Reliable

189.   In my opening report and original YLPI analysis, I removed only zero and negative effective rents, which is the same threshold Mr. Yenikomshian applied in his opening report. This was also consistent with BLS's default practice of including outlier observations in its Rent CPI.[113] In this section, I explain why this remains a principled approach, why Yardi's Experts' proposed $20 alternative lacks methodological grounding, and why their treatment of the same observations is internally inconsistent.

### 5.2.1   Rent CPI Includes Outliers

190.   There is a general risk in removing outliers from a price index. If an observation starts low and subsequently increases into a standard range, removing it flattens the index by erasing a real price increase.Therefore, removing these price increases may not be a principled approach to index estimation. Further, an alleged cartel is likely to have the biggest pricing effect on conspirators who were already pricing the lowest - especially given the role of Yardi's TAMs, who specifically target underpricing. Cutting the lowest prices from an index is therefore likely to understate true price increases and obscure the effect the analysis is designed to measure.

191.   This concern must be balanced against the need to remove potential "bad data." BLS recognizes this: its published methodology explains that "outlier price changes, if accurate, are generally included in the calculation of price relatives."[114] Moreover, a BLS working paper focusing on rent indices indicates that "the CPI uses all rental observations in its microdata."[115]

192.   Rather than exclude outliers, BLS caps extreme monthly rent changes at 2000% on the upside and -95% on the downside in the Rent CPI-U, which is the BLS index both myself

---

[113] November 24, 2025, Yenikomshian Declaration, footnotes 191, 194, 196. Also see November 24, 2025, Yenikomshian Declaration Backup Materials:
"Intermediate_Data\Executed_Lease_Data\Scripts\02_grouping_and_tagging.py."
[114] Consumer Price Index: Calculation. See the "Imputation" section.
[115] Brian Adams, Lara Loewenstein, Hugh Montag, and Randal Verbrugge, "Disentangling Rent Index Differences: Data, Methods, and Scope," *U.S. Bureau of Labor Statistics*, October 6, 2022, available at https://www.bls.gov/osmr/research-papers/2022/pdf/ec220100.pdf (accessed April 17, 2026).

FILED UNDER SEAL

and Yardi's Experts use in our reports.[116] In Appendix C.4, I apply the BLS capping method and again show my directional conclusions are robust to capping all outlier price changes, not just applying a $20 threshold.

193.    This underscores a more fundamental point: we should only remove rent observations from the index if we consistently treat them as unreliable data. Simply being an outlier is insufficient, taken in isolation, to motivate removing data from a price index. As I explained at my deposition, "there is some judgment that is involved in terms of whether something is an outlier or is an interesting observation point that is just different from others."[117]

194.    As I show in the following section, Yardi's Experts do not apply data cleaning decisions consistently: Mr. Yenikomshian includes rent values less than $20 in his other analysis when it serves a different argument.

## 5.2.2  Yardi's Experts are Inconsistent Regarding What Constitutes a "Plausible" Rent and Valid Observation

195.    In Mr. Yenikomshian's opening report, he included the outliers he now excludes from the YLPI, using them to calculate how frequently clients accept Revenue IQ's pricing recommendation.[118] This is why I included the same observations in my opening report's analysis: to work from a common dataset. Mr. Yenikomshian now characterizes these observations as "implausible" in his YLPI analysis while continuing to rely on them elsewhere. This inconsistency raises questions about Yardi's Experts revised outlier cleaning.

196.    Moreover, Mr. Yenikomshian repeats and continues this inconsistency in his reply report. There, he counts 562,115 reference rent changes to argue that clients frequently exercise independent pricing judgment; his count includes 1,921 configurations where either the old or new value is between $0 (excluded) and $20.[119] Mr. Yenikomshian treats these as valid evidence of client activity. Yet in his YLPI analysis, he excludes effective rents in the same range as implausible.[120]

---

[116] R-CPI-NTR and R-CPI-ATR.

[117] March 9, 2026, Marinescu Deposition, 15:25 - 16:3.

[118] November 24, 2025, Yenikomshian Declaration, footnotes 191, 194, 196. Also see November 24, 2025, Yenikomshian Declaration Backup Materials: "Intermediate_Data\Executed_Lease_Data\Scripts\02_grouping_and_tagging.py."

[119] March 23, 2026, Yenikomshian Declaration, ¶ 48. Starting from Mr. Yenikomshian's analysis of reference rent changes.

[120] These outliers actually constitute a larger portion of his reference rent analysis than they do of the lease transaction data. Outliers between $0 and $20 account for 0.34% of the 562,115 changes Mr. Yenikomshian counts in his reference rent configuration analysis, while the disputed effective rents account for 0.005% of the raw lease transaction data (108 out of nearly 2,160,000).

63

FILED UNDER SEAL

197.    When confronted with this at deposition, Mr. Yenikomshian argued that these outliers reflected real client "choices" and therefore belonged in his analysis:

> **Q:**   You did not exclude rents under $20 in the
>
> █████████████ field from your reference rent analysis.
> Is that correct, sir?
>
> **A:  That's correct.  Because I'm looking at**
> **choices**.  I'm looking at interactions with the system.
> **What goes in that auto log table is interactions with the**
> **Revenue IQ system**. In the executed lease data, when
> you're looking at prices, prices are very sensitive to
> the -- the rent. **I'm looking at choices.  Choices, yeah**,
> I can look at whether or not it goes up or down including
> the 20 or whatever values. **It doesn't matter.  I'm**
> **looking at the interactions with that system**.[121] (emphasis added)

198.    Mr. Yenikomshian's inconsistent definition of a "plausible" observation and real client "choice" speaks to an important point: there is no principled reason to prefer a $20 threshold to a $0 threshold. If rents between $0 and $20 are real client "choices" that belong in Mr. Yenikomshian's configuration analysis, there is no principled reason to exclude them from the YLPI. And if there were such a reason, one would expect Mr. Yenikomshian to apply the $20 threshold consistently, or (at a minimum) to acknowledge the inconsistency when pressed at deposition. He did neither, which suggests that the $20 threshold is not grounded in any clear methodological rationale.[122]

199.    These reference rent configurations are also important because they may explain why some clients truthfully had a rental price below $20 which later increased substantially. If, as Mr. Yenikomshian argues, clients set real reference rent configurations between $0 and $20 as a "choice," this could then translate into an executed transaction in that range.[123] And if such outliers are valid observations because of client configurations, Yardi's Experts have

---

[121] April 16, 2026, Yenikomshian Deposition, 251:10-21.

[122] Mr. Yenikomshian attempted to argue that this is what I advocate for in a footnote of my opening report. In Section 5.3, I explain that Mr. Yenikomshian is mistaken and appears to have missed important details in that footnote. When correcting his mistake, I confirm the results in my opening report.

[123] March 23, 2026, Yenikomshian Declaration, ¶ 46, ("*The Comp Trend's limited effect on pricing outputs is also impacted by independently set configuration variables, in particular, the "Reference Rent." As I explained in my Opening Report, the configuration of the Reference Rent is the starting point for the Revenue IQ pricing process, or as Dr. Marinescu calls it, it is the "departure point." All subsequent Trend Rules, Health Rules, and other adjustments are applied to that Reference Rent.*")

FILED UNDER SEAL

offered no principled or reliable reason to include them in their configuration analysis but exclude them from their price analysis.

200.    To more intuitively link inconsistencies in Mr. Yenikomshian's configuration analysis with outliers in the transaction data - he has already explained how some of these transaction outlier values could be real observations that are explained by client configuration "choices." Mr. Yenikomshian opined that 1) Clients make real "choices" to set reference rent configurations below $20, 2) those reference rents can then inform their Revenue IQ recommendation, and 3) if the lease transaction data does not record an override and does not contain a concession, that transaction is an acceptance of the Revenue IQ recommendation, which can be below $20 due to points 1 and 2. Combined, these three opinions that Mr. Yenikomshian offers can explain how a real effective rent in the transaction data falls below $20 based on his own configuration analysis.[124]

201.    This logical sequence is significant because 65 of the 108 outliers Yardi's Experts now remove are recorded in the lease transaction data as an acceptance of the Revenue IQ recommended price - and may therefore be explained by clients' Revenue IQ configurations. This occurs because the recorded observations show neither a concession nor an override from Revenue IQ's recommendation but nonetheless indicates an effective rent below $20. In Mr. Yenikomshian's override analysis in his opening report, he classified these observations as an "acceptance" of the Revenue IQ recommendation, not bad data. In my YLPI analysis, it was therefore reasonable to include these observations. I discuss this further below in Section 5.3.2 and show that re-adding the effective rent outliers that appear to be acceptances of the Revenue IQ recommendation produces a nearly identical index to my original.

202.    As I explained in my opening report, due to limitations in the produced data - specifically, the absence of a unit type group identifier linking configuration records to lease transactions and temporal holes in the configuration data - it is not currently possible to know which of these outlier observations can readily be explained by a specific client configuration. However, most (60%) of the 108 outliers Yardi's Experts now challenge are reflected in the lease transaction data as an acceptance of the Revenue IQ recommendation - even by Mr. Yenikomshian's own logic. These are therefore not isolated anomalies: the appearance of sub-$20 rent values across both datasets suggests that at least some of these outliers are valid data that is appropriately included in this analysis.

203.    In sum, filtering for "bad data" purely using a $20 threshold is not a principled way to calculate the Yardi Price Index, because it has an unknown error rate and we have no specific reason to believe this is a more reliable threshold than the $0 threshold Mr. Yenikomshian originally suggested and inconsistently still uses.  Yardi's Experts' do not

---

[124] The cleaning I described in footnote 268 of my opening report keeps such observations because, consistent with Mr. Yenikomshian's analysis, they are not recorded as an override of the Revenue IQ recommendation - as I discuss further below in Section 5.3.

FILED UNDER SEAL

take a consistent position on this: are these outliers client "choices" or are they "implausible" bad data? Given these inconsistencies, I present results both including and excluding these outliers and show that it does not change my core conclusions.

204. Ideally, subsequent discovery from Landlord Defendants would help evaluate the accuracy of these observations. For example, outliers could be compared between the data Yardi produced and any data Landlord Defendants separately maintain. But that is not possible at this stage of the litigation. The purpose of this analysis is not to establish that including these outliers is definitively the best approach, but instead to show that there are principled reasons to include them in the way both myself and Mr. Yenikomshian did originally, and continue to, in several of our analyses.

205. In any event, it is not necessary for me to reach a final determination on these outliers to answer the economic questions currently before me. As I have already explained in Section 5.1, my core conclusions for my current assignment are robust to different outlier exclusion sensitivity analyses, including the cleaning suggested by Yardi's Experts in response to my opening report. In the following section, I further corroborate this by applying an additional sensitivity analysis that corrects a misreading of my opening report in Yardi Experts' revised YLPI.

## 5.3 Yardi's Experts Appear to Have Misread My Opening Report and Backup Materials When Justifying Their Revised $20 Effective Rent Threshold

206. Yardi's Experts each identify the $20 outlier threshold in my opening report as their only authority for the $20 threshold they apply in their own analyses. In implementing that threshold, however, each applied it to a different rent variable in the data than the one I identified. In footnote 268 of my opening report, I wrote:

> I also filter for positive values of the recommended rents (variables "Renewal Proposal Original Rent" and values stored in the "New Lease Rent Override Notes"). For the recommended rents, I observe that some values are implausibly low or high. E.g., suggested rent of $10 when the effective rent is $3,476.00, or suggested rent of $ 1,149,024 vs. effective of $1,975. I therefore filter out observations of variables that are lower than $20 and higher than $100,000. […].

207. The core insight of footnote 268 was not that certain observations were implausible simply because they were low, but instead that some recommended rents - the algorithmic output Revenue IQ generates for each unit - were implausibly low relative to the effective rents tenants actually paid and may skew our analysis of clients' acceptance of Revenue IQ recommendations. A recommended rent of $10 on a unit with an effective rent of $3,476 may be an error rather than a real pricing recommendation. It is the effective rent, not the

FILED UNDER SEAL

recommended rent, that enters the YLPI - and footnote 268's $20 threshold was applied to recommended rents, not effective rents. In Appendix B, I show how my original acceptance analysis would differ without this additional layer of cleaning.

208.    When I correct Yardi's Experts' misreading and apply the cleaning footnote 268 actually describes, the resulting Yardi Price Index and Yardi Index Premium almost identically track those in my opening report and are visibly higher than the index in Yardi's Experts' reports. I explain this in further detail in the following subsections.

### 5.3.1    My Opening Report Explained That Some Recommended/Gross Rent Observations Were Implausible When Juxtaposed Against their Associated Effective Rent

209.    To illustrate the distinction I am drawing, I start with some fundamentals I explain in Appendix A of my opening report. The produced lease transaction data records three distinct measures of rental prices: (1) the recommended rent, which is the rent Revenue IQ generated as its output for the unit; (2) the gross rent, which is the face rent on the lease; and (3) the effective rent, which is the rent actually paid, equal to gross rent less any concessions (i.e., discounts, such as one month free) offered to the tenant.

210.    Not every low rent in the data is necessarily "bad" data. How to interpret outlier rental prices may depend on how these three rent values combine:

- **First**, a recommended rent below $20 with a higher effective rent requires clients pricing significantly above the Revenue IQ recommendation.

- **Second**, an effective rent below $20 with a normal gross rent and corresponding concession may be a real transaction. The landlord may have charged a normal face rent and then offered the tenant a large concession, bringing the net rent down. For sub-$20 monthly effective rents, the produced data records concessions as high as $1,761 per month, explaining several such observations.

- **Third**, if all three (recommended, gross, and effective rent) are below $20, this may indicate client configurations of Revenue IQ produce a sub-$20 recommendation, which the client then adheres to (i.e., accepts, or does not override). While such behavior may be unusual, Mr. Yenikomshian includes it in his analysis of reference rent configurations. It is therefore inconsistent to treat these observations as "bad data" in the transaction data but real client "choices" in the configuration data.

211.    The second and third cases listed above are not necessarily data errors; instead, they may reflect actual landlord pricing "choices" as Mr. Yenikomshian calls them. If these are client "choices," then they are the kind of decisions a price index is supposed to measure, as I discussed at the start of this report in Section 3.1. Excluding them may remove real pricing events from the analysis.

FILED UNDER SEAL

212.    Yardi's Experts do not consider how recommended and effective rents fit together and instead apply the $20 threshold to effective rents without further discussion. The effect is to exclude the observations in the second and third category while keeping many observations in the first category. This is significantly different from the logic I described in footnote 268, which is important because footnote 268 is, again, Yardi's Experts sole citation for this cleaning. To the extent some low outlier effective rents are real and explained by large concessions or client configuration "choices" - and later adjust to higher rent levels - Yardi's Experts' logic will remove actual price increases from their revised YLPI. This will bias the price index downward, and is why Yardi's Experts should have more closely considered the nuance of footnote 268 and implemented what it truthfully suggests, given their reliance on it.

213.    At deposition, Mr. Yenikomshian made clear he had no other basis to apply the $20 effective rent threshold to his YLPI analysis.[125] At deposition, Dr. Tucker also admitted that she had no other basis for the revised $20 outlier cleaning.[126]

214.    In other words, Yardi's Experts admit that they have no basis for their $20 effective rent cleaning except a footnote in my opening report. Yet each had an identical misreading of this footnote. Even setting aside the footnote's text, the backup code I produced to each of Yardi's Experts removes any ambiguity.[127] Figure 19 is a screenshot of the backup materials associated with footnote 268 to which each of Yardi's Experts' had access:

---

[125] April 16, 2026, Yenikomshian Deposition, 198:14 - 199:10 (*"**Q:** How did you choose these thresholds to remove? **A:** I was implementing it based on Dr. Marinescu's footnotes 268 and 270. **Q:** Could you explain more the basis of how you applied that footnote to -- to make that outlier removal. **A:** I'll read you footnote 268. "Forces expanded lease data notes. I filter out implausible values of the Revenue IQ list price considered, in particular, filtering for positive values of monthly effective rent, part of the standard lease data cleaning. I also fill" -- "filter for positive values of the recommended rents variable renewal proposal original rent and values stored in new lease rent override notes. For the recommended rents, I observed that some values are implausibly low or high, for example, suggested rent of $10 when the effective rent is $3,476 or a suggested rent of $1,149.24 versus effective of 1,925. I therefore filter out observation on variables that are lower than $20 and higher than $100,000. Here I present new lease" -- "new leases and renewals." That is how I set these thresholds."*)

[126] April 28, 2026, Tucker Deposition, 122:16 - 124:5 (*"**Q:** Was it your decision about how to tackle those corrections? **A:** So in terms of how to tackle the corrections, my approach was to look at Dr. Marinescu's report and follow the methodology that she outlines. And so say, for example, on the outlier question, when she was looking and doing her analysis of the suggested -- of what she was calling the reference price of an output from the Yardi system, she noted that some values were implausible and said anything -- I'm going to ignore anything over a hundred thousand or anything under $20. Given that she has labeled those observations as implausible, I then went and followed her own assignment of implausibility and ensured that was correctly applied to the Yardi index [...]"*)

[127] This misreading is most surprising coming from Mr. Yenikomshian, Yardi's "source code" expert.

FILED UNDER SEAL

**Figure 19: Cleaning Of Recommended Rents From The Override Analysis Of My Opening Report[128]**

```
# for recommended rents, filter out values that are lower than $20 and higher than $100,000
dr_ext[, drop := F]
dr_ext[                              <= 20 |                       >= 100000, drop := T]
dr_ext[            <= 20 | changed_from >= 100000, drop := T]
dr_ext[            <= 20 |              >= 100000, drop := T]
dr_ext[drop == T, .N]/dr_ext_copy[, .N]
dr_ext = dr_ext[drop == F]
```

215.    This code filters recommended rents, not effective rents. Yardi's Experts' revised YLPI does not implement this cleaning. More specifically, this logic excludes only leases with a recommended rent below $20 that the client overrides. The code's logic includes all observations without an override - i.e., an acceptance - of Revenue IQ's recommendation, even if the final rent is below $20. In this sense, it assumes as accurate any transaction that the produced lease transaction data records as an acceptance of the Revenue IQ recommendation, consistent with Mr. Yenikomshian's testimony regarding the configuration data and client "choices" (see above). Further, this cleaning drops 9,775 observations, i.e., 9,667 more observations than the 108 observations Yardi Experts dispute.

## 5.3.2    Applying The Cleaning Truthfully Discussed in Yardi's Experts' Sole Citation Produces Almost Exactly the Same Index as in My Opening Report

216.    To underscore the importance of this seemingly small but ultimately impactful distinction, I correct Yardi's Experts' analysis to perform the outlier cleaning that is described in footnote 268 (and associated backup materials) of my opening report. I do this removing only transactions with a *recommended* rent below $20 and which reflect an override. To do so, I copy verbatim the cleaning shown above in Figure 19 and apply it to my YLPI analysis.

217.    I present the results below in Figure 20. When the cleaning that footnote 268 actually describes is applied to the YLPI analysis, the resulting index is almost identical to the original in my opening report:

---

[128] Sources: Marinescu Report Backup, lines 22-27 of script in "03. Analysis\05. Lease Overrides\override_analysis_ext_filt.R". Notes: █████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████ ███████████████████████████

FILED UNDER SEAL

**Figure 20: The Outlier Cleaning Truthfully Described in fn. 268 Of My Opening Report Essentially Recreates My Original YLPI[129]**



Note: The lines are slightly offset vertically for visibility.

218.  Indeed, my original index and the sensitivity analysis dropping recommended rent outliers are so perfectly overlapping that I had to graphically "nudge" the sensitivity analysis to ensure it was visibly discernible in Figure 20. Because of how little these outlier observations affect the YLPI, it makes no difference to remove them from that analysis in my opening report.

219.  When I correct Yardi's Experts' implementation and apply the cleaning footnote 268 actually describes, I once again find a Yardi Index Premium of up to 31%, with a statistically significant and positive relationship with Revenue IQ adoption. Indeed, the magnitude of the relationship between Revenue IQ adoption and the Yardi Index Premium actually increases when applying this outlier cleaning. This means that *not* applying this additional cleaning to the YLPI analysis in my opening report was actually conservative in terms of the impact it has on the magnitude of the relationship between Revenue IQ adoption and the Yardi Index Premium. I demonstrate this in Appendix C.2, alongside a complete recreation of the econometric analysis in my opening report using this revised data cleaning.

---

[129] Sources: Expanded Lease Data (*see* Appendix F.1 of Marinescu Opening Report). Notes: The "RIQ Recommendation > $20" line follows the filtering as reported in my Opening Report, i.e., filtering for suggested rents above $20 and below $100,000. I report only the above $20 filtering in the exhibit's legend for readability.

FILED UNDER SEAL

220.    In sum, the outlier cleaning that footnote 268 actually describes, applied to the variable it actually addresses, removes approximately 90 times more observations than Yardi's Experts' approach and fully corroborates my opening report. This is the cleaning Yardi's Experts should have implemented given their reliance on footnote 268 as their sole authority and their repeated testimony on my "stated" and "intended" methodology. Instead, as I explain below, Yardi's Experts applied their $20 cleaning threshold to a different variable, in the manner that most significantly reduced the YLPI, without any principled basis for that choice.

### 5.3.3  Yardi's Experts Applied their $20 Threshold To the Variable That Reduces the YLPI Most, Not the One Their Sole Citation Uses

221.    Cleaning outlier rents using a specific dollar threshold can be done in at least three different ways: filtering recommended, gross, or effective rents.[130] Yardi's Experts have selected the option that lowers the Yardi index the most, and supported this choice not based on accepted principles, but by mistakenly claiming to use methods from my opening report.

222.    To visualize this point, I implement three sensitivity analyses for each of the rent metrics in the produced lease transaction data, cleaning sub-$20 rents from recommended (green line), gross (yellow), and effective (red) and comparing these against my original YLPI (orange) and Rent CPI (blue). I present this below in Figure 21:

---

[130] As explained above, Yardi's data records three rent figures: the recommended rent (Revenue IQ's algorithmic output), the gross rent (the face rent on the lease), and the effective rent (the rent actually paid after concessions). Footnote 268 of my opening report applies the $20 threshold to recommended rents. Yardi's Experts apply it to effective rents.

71

FILED UNDER SEAL

**Figure 21: My Core Conclusions Are Robust to Multiple Possible Implementations of the $20 Screening Threshold[131]**



Note: 'Original' and 'RIQ Recommendation > $20' lines are slightly offset vertically for visibility.

223.    Figure 21 again shows that applying the cleaning described in footnote 268 of my opening essentially reproduces my original YLPI (the green line). Applying the same threshold to gross rents (yellow line) modestly reduces the YLPI but still produces a significant Yardi Index Premium that grows with Revenue IQ adoption (see Appendix C.3). Applying this threshold to effective rents (red line) produces the most significant reduction. The three lines make visible what the preceding analysis demonstrates: Yardi's Experts chose the one implementation of the $20 threshold, among at least three available options, that most reduces the YLPI. This is not the implementation that their sole citation to footnote 268 discusses, and it lacks any other basis.

224.    In Appendix C, I present a more complete recreation of the YLPI analysis in my opening report across several different outlier cleaning sensitivity analyses. Unless otherwise specified, each sub-appendix in C includes data gaps (for the reasons I explained above in

---

[131]    Sources: Expanded Lease Data (*see* Appendix F.1 of Marinescu Opening Report); Rent CPI. Notes: [1] The "Effective Rent > $20" line filters out monthly effective rents less than or equal to $20. [2] The "Gross Rent > $20" line filters out monthly gross rents less than or equal to $20. [3] The "Original" line filters out monthly effective rents less than or equal to $0 [4] The "RIQ Recommendation > $20" line follows the filtering as reported in my opening Report, i.e., filtering for suggested rents above $20 and below $100,000 if there is an override. I report only the above $20 filtering in the exhibit's legend for readability. [5] "Original" and "RIQ Recommendation > $20" lines are slightly offset vertically for visibility..

FILED UNDER SEAL

Section 4). In those appendices, I also recreate the analysis from my opening report that showed TAM oversight was associated with above-trend rent increases.

225.    In those appendices, I show that (when only removing outliers), TAM oversight is associated with a statistically significant increase in prices above property's pre-existing trend across all sensitivity analyses (including Yardi's Experts' $20 effective rent cleaning). When further controlling for Rent CPI, this effect remains statistically significant in 9 of 12 regressions. In some sensitivity analyses, some charts do not show the visible jump in prices associated with TAM call notes I originally presented, but nonetheless show the same TAM intervention story I explained for "████████" and "███████" properties: clients began decreasing prices, TAM interventions appear to be associated with a reversal of this downward trend, and prices ultimately visibly depart above CPI. This is consistent with the TAM enforcement narrative in my opening report, and is largely unaddressed by Yardi's Experts. Moreover - using the cleaning footnote 268 of my opening report describes again essentially recreates my original analysis of TAM's effect on prices.

226.    Similar to my conclusions in Section 4.4 and building on my analysis in this Section, these findings indicate that Yardi's Experts' reversed finding that TAM oversight had no effect on prices is also driven by their removal of temporal gaps in the data, rather than outlier removal. This is relevant to Yardi's Experts broader conclusion regarding TAMs because Yardi's Experts only engage with my TAM analysis by claiming to correct these analyses, and do not otherwise engage with the documentary record that TAMs used non-public data, or my evidence that TAMs asymmetrically note below-market pricing. I touched on this issue previously in Section 2 and return to it again below in Section 8.

227.    Returning to the data cleaning originally at-hand - even accepting that a $20 threshold is appropriate, Yardi's Experts would therefore need to explain why they applied it to effective rather than gross or recommended rents, a choice that is non-trivial and produces materially different results that speak directly to their responses to my opening report. They offer no such explanation. Instead, they rely only on a misreading of my report: their sole cited authority - footnote 268 - unambiguously applies the threshold to recommended rents, and the backup code I produced confirms this. In doing so, they happen to have selected the implementation of this threshold that most reduces in the YLPI. It is therefore demonstrably false for Yardi's Experts to claim that they simply implemented my "stated methodology."

228.    As with the preceding sections, the purpose of this sensitivity analysis is not to say that applying a $20 recommended, rather than gross or effective, rent threshold is "the" correct way to deal with outliers. The purpose is instead twofold:

   ▪ **First**, Yardi's Experts justified their cleaning by citing my opening report, then implemented a different cleaning than it describes - one that, coincidentally, also

FILED UNDER SEAL

has the greatest downward effect on the YLPI of the available options. Their repeated claims to have implemented my stated methodology are simply untrue.

- **Second**, Yardi's Experts have not cited any authority - in my report or elsewhere - that supports the specific cleaning they implemented.

229.    Given Yardi's Experts' reliance on a footnote of my opening report to justify their revised YLPI, they should have implemented and reported what it truly discusses (and what my backup materials make unambiguous), rather than a different cleaning altogether. Otherwise, they should have offered another basis to justify their cleaning.

230.    Having considered Yardi's Experts' revisions to my YLPI - and having shown that these revisions lack grounding in peer-reviewed literature, contradict BLS methodology, rely on speculation on my "intent," and are undermined by the sensitivity analysis I present - I next turn to Yardi's Experts assessment of my panel regressions. As I explain below, these regressions provide independent confirmation that Yardi's Experts' revised YLPI produces implausible results, and none of Yardi's Experts challenge my original regressions as technically incorrect.

# 6. My Panel Regressions Conservatively Measure How Revenue IQ Adoption Affects Local Rents - and Dr. Tucker's Omitted Results Support This

231.    My opening report tested the relationship between Revenue IQ adoption and pricing through two independent econometric approaches: my YLPI analysis and my panel regressions.[132] My YLPI analysis, addressed in the preceding sections, asks whether Revenue IQ users priced above a national benchmark and whether that premium grew with adoption. By contrast, my panel regressions compared clients' own rent changes across specific geographic areas (PUMAs) with varying levels of Revenue IQ adoption to test whether rents rose faster in areas where more properties used Revenue IQ. If the YLPI measures the aggregate relationship between adoption and pricing, the panel regressions test whether that relationship holds in localized areas, controlling for unit-level and time-varying factors that could confound a national comparison. As I explained in my opening report and reiterate in Section 6.1, it does so conservatively.

232.    Both the YLPI analysis and the panel regressions produced the same answer. Across every specification in my opening report, the panel regressions found a positive and statistically significant relationship between the number of Revenue IQ properties in a PUMA and the rents charged at those properties: areas with more Revenue IQ properties had higher rents, and rents grew faster when Revenue IQ properties were added. This is the local-area

---

[132] *See* Marinescu Opening Report, Sections 9.2.2 (YLPI), 9.2.4 (panel regressions).

74

FILED UNDER SEAL

confirmation of the pattern the YLPI identifies at the national level. Importantly, the panel regressions test this hypothesis through a framework that is comparatively insensitive to the data-cleaning choices at issue in Sections 4 and 5 - and when Yardi's Experts' outlier cleaning is applied to the panel regressions, some co-conspirator effects actually modestly increase (see Appendix A).

233.    None of Yardi's Experts challenge these regressions as technically incorrect. Mr. Yenikomshian and Dr. Mitzenmacher do not address them at all. Dr. Tucker's sole response is conceptual: she argues that my co-conspirator variable is mismeasured because it counts all Revenue IQ properties in a PUMA, including properties managed by the same Landlord Defendant. To illustrate her concern: if a single Landlord Defendant manages five properties in a PUMA, my regression counts each of those properties as a co-conspirator for every other property in the PUMA, including the landlord's own. Dr. Tucker argues this treats the landlord as conspiring with itself, and that the correct measure should count only properties managed by other Landlord Defendants.

234.    When Dr. Tucker reruns my regressions with this redefined variable - counting only properties managed by other Landlord Defendants rather than all Revenue IQ properties in the PUMA  - the result reverses. This means that, under Dr. Tucker's approach, having more Revenue IQ properties in a PUMA is associated with lower rents.

235.    Dr. Tucker's redefinition of the co-conspirator count is her only substantive challenge to my panel regressions. She does not argue that the econometric framework is unsound, that the data contains errors, or that the regressions fail to control for any specific relevant variables. Her argument is only that the co-conspirator variable should be defined differently.[133] As I demonstrate below, that redefinition misunderstands what the regression is designed to measure, introduces well understood forms of statistical bias, and the conclusions of her analysis are contradicted by omitted regression results that use Dr. Tucker's own definition of the co-conspirator count.

---

[133] She additionally offers vague selection bias concerns that are untethered to my econometric methodology, as I explain in Section 6.1.2.

FILED UNDER SEAL

236.   In the following subsections, I therefore show four things:

- **First**, Dr. Tucker's suggestion that my analysis requires me to "assume potential" intra-firm "collusion" itself mistakenly assumes that Revenue IQ's coordinating pricing effects can only operate within a given PUMA and, in any case, my results are robust to ignoring single-client PUMAs. When I remove PUMAs that only ever have one client from the regression analysis, I continue to estimate a positive and statistically significant co-conspirator effect. (see Section 6.1.1).

- **Second,** Dr. Tucker's separate selection bias concerns reveal a foundational misunderstanding of how these panel regressions estimate price effects (see Section 6.1.2). As a result of which, she measures a much narrower effect than she describes in her opening report. (see Section 6.1.3).

- **Third**, Dr. Tucker misclassifies many observations that truthfully show high Revenue IQ adoption as having low Revenue IQ adoption. This contaminates her regression estimates and biases them towards 0. (see Section 6.2).

- **Fourth**, Dr. Tucker copied my original panel regression code, made adjustments to implement her revisions, but omitted 15 regressions from this replication process (see Section 6.3.1). When I re-add these 15 regressions, I show that each identifies a positive and statistically significant co-conspirator effect - even accepting Dr. Tucker's revisions to the co-conspirator variables (see Section 6.3.2). These regressions further speak to conceptual flaws in Dr. Tucker's redefinition and should have been presented in her report to thoroughly respond to my original analysis. (see Section 6.3.3).

237.   I address each conclusion in turn in the following sections.

FILED UNDER SEAL

## 6.1 My Panel Regressions Measure Revenue IQ's Effect on Local Rents and Dr. Tucker's Assertion to the Contrary Relies on Significant Misunderstandings

238.    Dr. Tucker claims there are two flaws in my panel regressions. The first, and the one on which her correction rests, is that my regression improperly "treats all properties within a PUMA as alleged co-conspirators, even those that are managed by the same Landlord Defendant" - i.e., that it treats landlords as conspiring with themselves.[134] The second is a generic selection bias concern - that Revenue IQ adoption may correlated with "buildings of higher quality or more professionally and efficiently managed,"[135] biasing the results. I address each in turn.

239.    My opening report's panel regressions ask whether rents in a local area rise when more properties in that area use Revenue IQ - conservatively isolating "the relationship between local Revenue IQ adoption intensity and pricing outcomes."[136] My regressions count properties rather than landlords because Revenue IQ's coordinating capacity depends on the number of properties priced through it: two landlords pricing five properties can coordinate more effectively through the system than two landlords pricing two.

240.    To address Dr. Tucker's first criticism, I test how my results change if I remove from the analysis every PUMA that had only ever contained one client. This is the more appropriate version of her concern: if single-client PUMAs are driving my results, then dropping them entirely should make the co-conspirator effect disappear. As I show in Section 6.1.1, this is not the case. The co-conspirator effect remains positive and statistically significant in nine of ten specifications. The exception is the levels regression with month/year fixed effects, a specification I noted in my opening report as inherently conservative, because month/year fixed effects may absorb the co-conspirator effect itself.[137] Therefore, single-client PUMAs do not drive the relationship my opening report identifies in the way Dr. Tucker suggests.

241.    In the subsections that follow, I show three things. First, that this robustness - combined with the fact that Dr. Tucker's "more than 25 percent" figure overstates the relevant share (the correct figure is 17.35%) - answers her first criticism (see Section 6.1.1). Second, that her selection bias concern misunderstands what my panel regressions measure: comparisons within Revenue IQ users rather than between users and non-users, even then controlling for unit and time effects (see Section 6.1.2). Third, that Dr. Tucker's revised regressions further narrow what my opening report already designed as a conservative

---

[134] Tucker Rebuttal Report, ¶ 63.
[135] Tucker Rebuttal Report, ¶ 80.
[136] Marinescu Opening Report, ¶ 535.
[137] Marinescu Opening Report, ¶ 546.

FILED UNDER SEAL

measurement, ultimately introducing well-understood forms of statistical bias (see Section 6.1.3).

### 6.1.1 My Regression Need Not Assume Landlords Conspire with Themselves

242.   Dr. Tucker's first criticism is that my panel regressions assume "potential collusion" within PUMAs that contain only one Landlord Defendant. She writes: "More than 25 percent of observed PUMA-month combinations in the data have only one Landlord Defendant managing multiple properties. The Marinescu Report's flawed methodology assumes potential collusion there as well, even though there are no other Landlord Defendants present."[138]

243.   To test the robustness of my opening report's findings to Dr. Tucker's hypothesis, I conduct a sensitivity analysis.[139] I take the panel regressions presented in my opening report and re-estimate them on a subset of the data that excludes every PUMA in which there was only ever one Landlord Defendant. If single-landlord PUMAs are responsible for the co-conspirator effect, then removing them entirely should eliminate that effect. This is the more appropriate way to test Dr. Tucker's concerns than her revised methodology, for reasons I explain below in Section 6.2. The analysis below is a sensitivity check on the regressions in my opening report, not a new affirmative specification, because it applies the same exact methodology as I originally employed, but to a narrow subset of the data.

244.   Tables 5 and 6 present the sensitivity analysis. Table 5 reproduces the five level-regression specifications from Table 8 of my opening report on the restricted sample. Table 6 reproduces the five first-difference specifications from Table 12 of my opening report on the same restricted sample.

---

[138] Tucker Rebuttal Report, ¶ 63.

[139] There are also conceptual reasons why same-owner Revenue IQ properties contribute to higher prices - Revenue IQ's algorithm, data pooling, benchmarking, and TAM oversight operate across PUMAs, not solely within them. I explain part of this mechanism in Section 8.3.3. The purpose of my panel regressions was explicitly never to suggest they capture the full coordinating effect of Revenue IQ. Dr. Tucker's criticism does not acknowledge this and implicitly requires the additional assumption that those coordinating effects occur only within PUMAs, but that is not my opinion or one she affirmatively offers.

FILED UNDER SEAL

**Table 5: Removing Exclusively Intra-Client PUMAs: Revised Table 8 Of My Opening Report: Robust Econometric Estimation Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants[140]**

|  | (21) | (22) | (23) | (24) | (25) |
|---|---|---|---|---|---|
| Intercept | 1355.850*** |  |  | -193.456*** |  |
|  | (0.211) |  |  | (1.204) |  |
| Number of Co-Conspirator Properties | 24.291*** | 32.381*** | -1.494*** | 13.362*** | 1.932*** |
|  | (0.053) | (0.290) | (0.078) | (0.053) | (0.172) |
| Rent CPI |  |  |  | 10.902*** | 10.193*** |
|  |  |  |  | (0.009) | (0.019) |
| Num.Obs. | 12942065 | 12937826 | 12937826 | 12942065 | 12937826 |
| R2 | 0.020 | 0.911 | 0.957 | 0.128 | 0.955 |
| R2 Adj. | 0.020 | 0.909 | 0.956 | 0.128 | 0.954 |
| R2 Within |  | 0.035 | 0.000 |  | 0.517 |
| R2 Within Adj. |  | 0.035 | 0.000 |  | 0.517 |
| FE: revenue.iq.unit.id |  | X | X |  | X |
| FE: month |  |  | X |  |  |
| + p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001 | | | | | |

[140] Sources: Expanded and Geocoded Lease Data (*see* Appendix F.1 of Marinescu Opening Report); Rent CPI. Notes: [1] The underlying lease data is filtered for positive monthly effective rents. [2] I also filter out leases where there is only a unique Yardi client ever (based on the "Yardi Client PIN" variable of the Lease Data. [3] Model 23 uses Newey-West (HAC) standard errors, correcting for potential heteroskedasticity and autocorrelation. The lag length is set to 3, meaning that the correction takes into account autocorrelation of the errors up to three periods back.

FILED UNDER SEAL

**Table 6: Removing Exclusively Intra-Client PUMAs: Revised Table 12 Of My Opening Report: Robust Econometric Estimation - on First-Differences - Further Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co Conspirators, Even Relative to Other Landlord Defendants[141]**

|  | (27) | (28) | (29) | (30) | (31) |
|---|---|---|---|---|---|
| Intercept | 61.500*** |  |  | 172.219*** |  |
|  | (0.678) |  |  | (3.791) |  |
| Co-Conspirator Count Per PUMA | 2.799*** | 10.740*** | 2.286** | 3.787*** | 14.543*** |
|  | (0.169) | (0.670) | (0.750) | (0.176) | (0.716) |
| Rent CPI |  |  |  | -0.782*** | -1.042*** |
|  |  |  |  | (0.028) | (0.057) |
| Num.Obs. | 243298 | 160993 | 160992 | 243298 | 160993 |
| R2 | 0.001 | 0.258 | 0.353 | 0.004 | 0.260 |
| R2 Adj. | 0.001 | -0.182 | -0.032 | 0.004 | -0.178 |
| R2 Within |  | 0.002 | 0.000 |  | 0.005 |
| R2 Within Adj. |  | 0.002 | 0.000 |  | 0.005 |
| FE: revenue.iq.unit.id |  | X | X |  | X |
| FE: month |  |  | X |  |  |
| + p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001 | | | | | |

245.    Across the ten specifications in the sensitivity analysis, nine retain a positive and statistically significant co-conspirator effect. All five first-difference specifications retain a positive and statistically significant co-conspirator effect. Four of the level specifications retain a positive and statistically significant co-conspirator effect, including the

---

[141] Sources: Expanded and Geocoded Lease Data (*see* Appendix F.1 of Marinescu Opening Report); Rent CPI. Notes: [1] The underlying lease data is filtered for positive monthly effective rents. [2] I also filter out leases where there is only a unique Yardi client ever (based on the "Yardi Client PIN" variable of the Lease Data. [3] Model 29 uses Newey-West (HAC) standard errors, correcting for potential heteroskedasticity and autocorrelation. The lag length is set to 3, meaning that the correction takes into account autocorrelation of the errors up to three periods back.

FILED UNDER SEAL

specification that handles time variation through a rent CPI control rather than month/year fixed effects (column 25).

246.    The exception is the levels regression with month/year fixed effects (column 23 in Table 5). As I noted in my opening report, that specification is inherently conservative because month/year fixed effects are colinear with Revenue IQ adoption and may therefore absorb the co-conspirator effect itself. More intuitively, Revenue IQ adoption trended upward over the panel, and the month/year fixed effects absorb much of the time-correlated portion of the co-conspirator variable along with it.[142] The remaining four level specifications retain a positive and statistically significant co-conspirator effect, including the specification that handles time variation through a Rent CPI control rather than month/year fixed effects (column 25).

247.    The remaining 9 specifications, including those that handle time variation through rent CPI controls rather than month/year fixed effects (and the first-difference regressions with month/year fixed effects), all retain positive and statistically significant co-conspirator effects. Single-client PUMAs therefore demonstrably are not driving the relationship my opening report identifies.

248.    Importantly, even when using month/year fixed effects, the first difference regression shows a positive and statistically significant co-conspirator effect.

249.    This sensitivity analysis answers Dr. Tucker's first criticism. It does not require resolving the conceptual question of how to treat single-landlord PUMAs, because even under the more appropriate response to Dr. Tucker's concern - dropping those PUMAs entirely - the co-conspirator effect persists in my opening report's regressions.

250.    Dr. Tucker's "more than 25 percent" figure also overstates the share of observations relevant to her concern. The figure describes the data: more than 25 percent of PUMA-months in the regression data are observations in which the PUMA contained only one Landlord Defendant at that month. But the relevant question for a regression is not how many PUMA-month combinations contained only one landlord at a moment in time. It is how many PUMAs only ever had one client across the panel.

251.    Consider what the regression is actually doing in this case. To estimate how prices respond to additional Landlord Defendants, the regression needs to compare prices in across observations with different numbers of Landlord Defendant properties. With unit fixed effects, the comparison is made within each PUMA over time. The regression compares a PUMA's prices when it had one Landlord Defendant to that same PUMA's prices when it had two, all else equal.

---

[142] Marinescu Opening Report, ¶ 546.

FILED UNDER SEAL

252. Now imagine a PUMA that contained only one Landlord Defendant for twelve months, and then contained two for the next twelve months. The first twelve months of that PUMA are not "intra-firm coordination" observations. They are the comparison observations, or "control group." They are the very observations the regression uses to estimate the effect of moving from one Landlord Defendant property to two. Without them, the regression would have nothing to compare the two-Landlord-Defendant period against and - in some instances - would simply not run.

253. This is what Dr. Tucker's "more than 25 percent" figure overlooks. The PUMA-month combinations with only one Landlord Defendant property serve as the baseline against which PUMA-month combinations with multiple Landlord Defendants properties are compared against to estimate price effects. The regression therefore rightfully includes such PUMA-months, and Dr. Tuckers invocation of this 25% figure indicates a misunderstanding of the sources of variation in the data.

254. Looking to the more appropriate figure - how many PUMAs only ever had one client - I observe that: across the 1,043 PUMAs in the regression data, 181 only ever had one Landlord Defendant during the entire period. That is 17.35 percent. The "more than 25 percent" figure reflects Dr. Tucker's broader count of PUMA-months; the relevant share for the regression is 17.35 percent.

255. Setting these practical points aside, I do not agree with the premise of Dr. Tucker's conceptual point that single-landlord PUMAs should be excluded from the analysis. Setting aside the aforementioned point that Dr. Tucker wrongly assumes Revenue IQ's coordinating effects are constrained to any individual PUMA, while price effects can spread across PUMAs. Further, Dr. Tucker's classification also treats every Landlord Defendant as a single actor, but some Landlord Defendants in this case are property management companies that operate separate buildings on behalf of separate owners.[143] So two properties in the same PUMA may share a Landlord Defendant as their manager while being owned by different - and potentially competing - owners. Whether such properties belong to the same actor for purposes of conspiracy analysis raises both factual and legal questions. There is a factual question about ownership structure that the current data cannot answer. There is a legal question about what counts as a single actor for purposes of conspiracy analysis that is neither mine nor Dr. Tucker's to make. The empirical robustness in Tables 5 and 6 is sufficient to answer Dr. Tucker's first criticism on its own. But this is a separate, independent reason that the criticism does not undermine my opening report's conclusions.

---

[143] For example, FPI.

FILED UNDER SEAL

## 6.1.2 Dr. Tucker's "Selection Bias" Concerns Reveal a Foundational Misunderstanding of My Panel Regressions

256.    Relatedly, Dr. Tucker raises a generic selection bias concern that does not apply to how my regressions are designed. Dr. Tucker alludes to potential "selection bias" issues in my regressions, giving the example that "Revenue IQ adoption is not random and is potentially correlated with buildings of higher quality or more professionally and efficiently managed."[144] Dr. Tucker later re-iterates:

> "Revenue IQ adoption is not random: Landlord Defendants self-select into the service. If Landlord Defendants tend to have stronger management expertise, own higher quality buildings, or operate in denser or faster-growing markets, and if these characteristics are associated with higher rent levels or faster rent growth, then adoption of Revenue IQ will be correlated with higher and upward-trending prices even absent any coordination. In this case, the sample selection effect could lead to biased estimates and could falsely attribute competitive pricing patterns to collusive conduct."[145]

257.    I was aware of these concerns in my opening report and designed my methodology to address them in ways that Dr. Tucker did not engage with.[146] These quotes from Dr. Tucker's report therefore indicate a misunderstanding of what my panel regressions measure and control for. The selection concern Dr. Tucker raises is pertains to differences between Revenue IQ users and non-users: users may have better buildings, stronger management, faster-growing markets, and a comparison between users and non-users would mistake that difference for an effect of Revenue IQ. My panel regressions do not make that comparison. They compare Revenue IQ users to other Revenue IQ users. A regression that never contrasts a user with a non-user cannot be biased by the ways in which users differ from non-users. My regressions cannot be biased by Revenue IQ users being more sophisticated than non-users, because they do not measure (or claim to measure) a price difference between users and non-users. Dr. Tucker's selection bias concerns therefore appear to indicate a substantial misunderstanding of my opening report's panel regressions.

---

[144] Tucker Rebuttal Report, ¶ 80.

[145] Tucker Rebuttal Report, ¶ 85.

[146] Marinescu Opening Report, ¶ 535 (*"To evaluate whether this pattern generalizes beyond any single location, is robust to controlling for pandemic-specific shocks, and to account explicitly for any other time varying shocks common to all units, I next turn to panel regressions with unit and time fixed effects. These models absorb macroeconomic trends - including COVID-era demand shifts - as well all time-invariant unit characteristics (such as size and location) with the ultimate purpose of isolating the relationship between local Revenue IQ adoption intensity and pricing outcomes."*); Tucker Rebuttal Report, ¶ 548 (*"To address concerns that these results reflect the propensity for some units to systematically increase prices rather than coordinated behavior, I re-estimate the same five specifications using first differences - examining changes in rents at the time leases are signed rather than rent levels, and in some specifications controlling via fixed effects representing each unit's average rent increase over the period."*)

FILED UNDER SEAL

258.  As I explained in my opening report, the sample selection in my panel regressions is conservative.[147] My panel regressions do not measure the effect of adopting Revenue IQ. They measure something narrower: the effect, on a property that already uses Revenue IQ, of additional adoption by other properties. Consider the difference - a firm that is not part of a cartel and then joins one would expect a substantial change in its pricing (the adoption effect). A firm that is already in the cartel, and then sees the cartel grow by one more member, would expect a smaller, incremental change (the marginal effect). My panel regressions measure only the second. They are designed that way because the available data support a within-user comparison, and this within-user comparison is conservative. Even so, my regressions find a positive and statistically significant marginal effect across more than 70 regressions spanning my opening report, Dr. Tucker's rebuttal, and this reply.[148] Two further insights follow from this design.

259.  First, the concern that Revenue IQ users may be more sophisticated than other Revenue IQ users - not only more sophisticated than non-users - is addressed by the unit fixed effects in my panel regressions, which absorb time-invariant differences between properties and units, including differences in management quality and building characteristics.

260.  Second, the concern that some units have faster underlying rent growth than others is the precise concern my first-difference regressions were designed to address, as I stated explicitly in my opening report.[149] Dr. Tucker raises that concern in her rebuttal but omits the first-difference regressions that speak to it (see Section 6.3), without acknowledging the explicitly stated reason I originally provided them.

261.  In this context, Dr. Tucker's report contains a series of statements that suggest a misunderstanding of how these panel regressions measure pricing effects.[150] As I will proceed to explain, this misunderstanding underpins Dr. Tucker's conclusions.

---

[147] Marinescu Opening Report, ¶ 544 (*"Before proceeding to summarize my econometric findings, I note that all of these models are conservative estimates in that they compare effective rents across Landlord Defendants, rather than against a non-RM control group. In that sense, they do not measure the total effect of an alleged conspiracy, but rather how much more effective the alleged conspiracy is in local areas with more co-conspirators."*).

[148] I count 73 regressions in total: 10 in my opening report, 9 in Dr. Tucker's appendices (see her tables D3.A, D3.B, and E2), 15 when running Dr. Tucker's specifications on first-differences, (see Section 6.3), 10 removing effective rent outliers (see Appendix C.1), 10 removing recommended rent outliers (see Appendix C.2), 10 removing gross rent outliers (see Appendix C.3), and 9 when removing single-client PUMAs (see Section 6.1.1).

[149] Marinescu Opening Report, ¶ 548 (*"To address concerns that these results reflect the propensity for some units to systematically increase prices rather than coordinated behavior, I re-estimate the same five specifications using first differences - examining changes in rents at the time leases are signed rather than rent levels, and in some specifications controlling via fixed effects representing each unit's average rent increase over the period."*)

[150] Note, the same issues apply in section V.A.4 of her rebuttal. Her argument about limitations of the Harrington test in this context are therefore equally misplaced and indicate a similar misunderstanding of my panel regressions.

84

FILED UNDER SEAL

### 6.1.3 Dr. Tucker's Revision Narrows an Already Conservative Analysis

262.    Dr. Tucker's "correction" further narrows a regression that is already highly conservative. My original design excludes several of Revenue IQ's most significant pricing effects to be conservative and avail itself of the presently available data. When a new property signs up for Revenue IQ, the price effects operate through at least three channels.

   ▪ First, the property may itself charge higher rents than it would without Revenue IQ - the *adoption price effect*.

   ▪ Second, the property may spread price increases across interconnected markets and propagate effects that are not confined to any single PUMA - the *systemic price effect*.

   ▪ Third, pre-existing Revenue IQ properties in the same PUMA may see their rents increase as local adoption intensifies - the *marginal price effect*.

263.    My panel regressions measure only the third effect: the marginal local effect of additional adoption on existing users' prices. They do not claim to capture the first two - which is why my original regressions were conservative. They provide a lower bound of Revenue IQ's actual pricing impact, and they still find a positive and statistically significant effect across more than 70 regressions.

264.    Dr. Tucker's correction further narrows this already narrow analysis. By counting only properties managed by other Landlord Defendants, her revised regression asks an even more restrictive question: do rents rise more when an additional property is added by a different landlord, as opposed to adding no property or adding one managed by the same landlord? This is not capable of measuring the full localized effect of Revenue IQ adoption across different clients, because it further splits that effect and measures only if it is larger on some properties than others.

265.    This creates a meaningful risk of false negative results. Dr. Tucker's claim that I make a "measurement error" because my regression "treats all properties within a PUMA as alleged co-conspirators, even those that are managed by the same Landlord Defendant"[151] is therefore neither conceptually nor econometrically reasonable. My regressions have already excluded the adoption and systemic pricing effects, neither of which can be explained by intra-firm coordination. Starting from that conservative baseline, further narrowing the count of adopting properties strips out real variation in Revenue IQ's local intensity and makes it harder to detect genuine pricing effects. That is precisely the problem Dr. Tucker's analysis suffers from.

---

[151] Tucker Rebuttal Report, ¶ 63.

FILED UNDER SEAL

266.   To see the practical consequence, consider a PUMA with two Landlord Defendants, each operating two properties through Revenue IQ. One landlord adds a third property. Revenue IQ's local intensity has increased for both - more data flows through the system, one more property is priced algorithmically - and my regression captures this: the property count in the PUMA rose from four to five. Under Dr. Tucker's redefinition, however, the picture splits. For the landlord who did not add a property, the co-conspirator count increased from two to three, and the regression registers the change. For the landlord who did add the property, the co-conspirator count remains at two, i.e. is unchanged. The regression then compares rent growth across the two landlords, even though both have seen the same increase in local Revenue IQ adoption. If Revenue IQ raised rents at both landlords' properties equally (which would be consistent with collusion), Dr. Tucker's regression registers the increase only in the first and treats the identical increase at the second as the "control" for the regression. The true marginal price effect is therefore systematically underestimated, and may erroneously fall to 0.

267.   The example above shows how Dr. Tucker's redefinition creates asymmetric co-conspirator counts within a single PUMA. The consequence for the regression as a whole is significant, because the co-conspirator estimate depends on comparing how rents responded in observations where Revenue IQ adoption changed by different amounts. If the co-conspirator count no longer reflects actual differences in adoption, that comparison is distorted, and can be systematically biased.

268.   In the subsections that follow, I therefore show two things. First, that Dr. Tucker's redefinition systematically reclassifies observations with high Revenue IQ adoption as having low adoption, contaminating the comparison group and biasing her estimates toward zero (see Section 6.2.1). Second, that this form of misclassification is a well-documented source of attenuation bias in peer-reviewed literature (see Section 6.2.2).

## 6.2   Dr. Tucker Biases Her Revised Regressions By Inconsistently Treating Properties That Do Add to Revenue IQ's Pricing Power

269.   Dr. Tucker's redefinition of co-conspirator count does not correct a measurement error in my regression. Instead, it changes what the regression measures. In doing so, Dr. Tucker produces results that are driven by differences in ownership structure rather than true differences in Revenue IQ's effect on pricing.

270.   As explained above, my regression counts the total number of Revenue IQ properties in a PUMA (minus the property the unit of interest belongs to), which is a straightforward measure of how much of the local area is priced through Yardi's system. Dr. Tucker redefines this count by subtracting all properties managed by the same Landlord Defendant as the unit of interest (among additional tests she provides). The effect is that two local

FILED UNDER SEAL

areas (and even properties within the same PUMA) with identical Revenue IQ intensity - identical data flowing through CPD, identical TAM coverage, identical pricing pressure on rents - receive different co-conspirator counts based on how ownership is distributed among landlords. This creates meaningful econometric limitations in her regressions that her discussion does not acknowledge.

### 6.2.1 Dr. Tucker Inconsistently Classifies Many Observations with High Revenue IQ Adoption as Having Low Revenue IQ Adoption

271.    The purpose of these panel regressions is to compare observations with many Revenue IQ properties against observations with few Revenue IQ properties. Dr. Tucker's redefinition reclassifies many of the former as the latter.[152] Within a single PUMA, it assigns different co-conspirator counts to properties that experienced precisely the same change in Revenue IQ adoption, based on which landlord manages them. Across PUMAs, it makes areas with identical Revenue IQ intensity look different based on ownership structure. Both effects bias her estimates toward zero, and I illustrate each in turn.

272.    Consider two PUMAs, each starting with 5 Revenue IQ properties and each growing to 10 - identical data flowing to Yardi's system, identical pricing pressure on local rents. In PUMA A, the properties are managed by five different landlords, each of which adds one property. In PUMA B, the properties are split between two landlords - one managing four, the other one - and each doubles its count. Under my specification, every property in both PUMAs sees the same co-conspirator count increase. Under Dr. Tucker's redefinition, the picture fragments: in PUMA A, each property's co-conspirator count increases by 4; in PUMA B, some properties see an increase of 4 while others see an increase of only 1.

273.    To see why this matters, consider what the regression does in PUMA B in the specifications with two-way unit and month fixed effects. The unit fixed effects hold constant everything about each property that does not change over time - its size, location, and baseline rent level - performing a "within" unit analysis. The month fixed effects hold constant everything about a given month that is common to all properties - inflation, seasonal demand, macroeconomic conditions. What the regression measures, after these controls, is - how did price growth differ for properties whose co-conspirator counts increased by more. In PUMA B, Dr. Tucker's redefinition gives one landlord's properties a count increase of 4 and the other's a count increase of 1 - not because they face different Revenue IQ environments, but because they have different landlords. The regression treats this as a real

---

[152] As I noted in Section 6.1.1, Dr. Tucker's redefinition also rests on the premise that each Landlord Defendant corresponds to a single economic actor. Some Landlord Defendants are property management companies that manage properties on behalf of multiple, potentially competing owners. Under Dr. Tucker's redefinition, properties owned by different competing landlords but managed by the same company are subtracted from each other's co-conspirator counts. The current record does not establish that these Landlord Defendants are in fact single economic actors, and the data needed to resolve the question has not been produced.

FILED UNDER SEAL

difference in Revenue IQ exposure and asks whether rents rose faster at the properties with the higher count increase.

274.  Therefore, in the specifications with two-way month and unit fixed effects, the regression can only show a positive co-conspirator effect if rents rise faster for the properties with a count increase of 4 than for those with a count increase of 1 - despite all properties existing in identical PUMAs with identical changes in Revenue IQ adoption. This biases her results toward zero - especially if Revenue IQ is effective at commonly raising prices across all participants. That conclusion is very intuitively wrong: the reason the rent increases look similar is not that Revenue IQ has no effect, but that it has the *same* effect in both, and Tucker's method cannot detect an effect that operates equally across her "treated" and "control" groups.

275.  The distortion also operates across PUMAs. Assume there are two PUMAs - A and B - and, at time t, a new Revenue IQ property is added in both PUMAs. In PUMA A, the new property is under the same manager as the subject property, while in PUMA B, it is under a different manager. Dr. Tucker does not increase the property count in PUMA A at t, and only increases the count in PUMA B. PUMA A therefore acts as the control - the untreated comparison - against which PUMA B is measured. If rents rose in both PUMAs - because Revenue IQ raises rents regardless of who owns the new property - the comparison shows little difference between them, and the regression erroneously concludes that adding a competitor's property had no effect.

276.  In other words, using these examples, Dr. Tucker's revised regression does not test whether Revenue IQ raises rents. Instead, it tests whether Revenue IQ raises rents *more* when the additional properties are managed or owned by someone else. When analyzing an alleged conspiracy, this method risks assuming its conclusion. If the addition of a property to a cartel causes some conspirators to increase prices, this price increase would then spread to all conspirators, including the conspirator who originally added the new property.

277.  Proposing a methodology that is most sensitive to collusion when some conspirators increase prices more than other conspirators is therefore increasingly likely to commit Type II (false negative) errors the better the conspiracy is at achieving widespread price increases. In other words, Dr. Tucker's methodology becomes less likely to identify a coordination effect the better clients are at coordinating via Revenue IQ. This is not a reliable methodology to apply when the task at-hand is analyzing an alleged conspiracy.

FILED UNDER SEAL

## 6.2.2 Peer-Reviewed Literature Understands That Misclassifying "Treated" Observations as "Untreated" Biases Treatment Effects Estimates Toward Zero

278.    This is also a recognized form of statistical bias called attenuation bias.[153] The concept is simple: many studies measure the difference between a treated group and a control group. As more treated observations are misclassified into the control group, the control group begins to look like the treated group and the measured difference between them shrinks toward zero, even if the treatment has a real effect. In some cases, misclassification of treated units as controls can even reverse the sign of the estimated effect. This issue is well-documented in peer-reviewed literature.

279.    For example, Lewbel (2007) summarizes relevant literature and analyses the effects of misclassifying a binary variable, for example, a treatment indicator. That occurs when some untreated observations are incorrectly reported as treated, while some treated observations are incorrectly excluded.[154] The author concludes that misclassification causes attenuation bias in the estimated treatment effects, and that it is equivalent to attenuation bias of classically mismeasured variables in linear regression models.[155]

280.    To make this point more intuitive: imagine testing a vaccine's effectiveness but mistakenly classifying many vaccinated patients as unvaccinated. The "unvaccinated" group now includes people who received the vaccine and are protected by it. When you compare the two groups, you find little difference in outcomes - not because the vaccine does not work, but because your control group is contaminated with people who were treated. That is what Dr. Tucker's redefinition does to my original regressions: she takes observations where Revenue IQ is actively shaping rents and relabels them as observations with low or zero Revenue IQ presence, making the "low adoption" group look more like the "high adoption" group and suppressing the measured effect.

---

[153] Wooldridge (2012), *"**Attenuation Bias:** Bias in an estimator that is always toward zero; , the expected value of an estimator with attenuation bias is less in magnitude than the absolute value of the parameter,"* p. 844.

[154] Arthur Lewbel, "Estimation of Average Treatment Effects with Misclassification," *Econometrica*, March 2007, available at https://www.jstor.org/stable/4501999 (hereinafter, "Misclassification") (accessed April 21, 2026), *"Misclassification occurs when a binary variable (the treatment indicator) is measured with error, that is, some units are reported to have received treatment when they actually have not, and vice versa. For example, in a returns to schooling analysis the outcome could be wages, the binary variable could be attaining a college degree, and misclassification could arise from school transcript reporting errors. See, e.g., Kane and Rouse (1995) and Kane, Rouse, and Staiger (1999). Bollinger (1996) considers misclassification of union status in wage equations. If treatment is a job training program, misclassification may arise if individuals assigned to the program fail to attend or if those not assigned obtain training elsewhere. Similarly, for medical treatment, individuals assigned a drug might fail to take it and those assigned a placebo might obtain treatment from another source. More generally, misclassification describes any binary variable that is sometimes mismeasured,"* p. 537.

[155] Misclassification, *"This paper first shows that misclassification causes attenuation bias in estimated treatment effects, analogous to the attenuation bias of classically mismeasured variables in linear regression models,"* p. 537.

FILED UNDER SEAL

281.    In sum, each issue with Dr. Tucker's redefinition points in the same direction. It systematically understates Revenue IQ's effect on local rents, treats identical observations differently based on ownership structure, labels local areas with active algorithmic pricing as if Revenue IQ were absent, and excludes coordination between competing owners who share a property manager. These issues help explain why Dr. Tucker's regressions give the surprising conclusion that further Revenue IQ adoption makes pre-existing Revenue IQ properties reduce prices. In the following section, I further show that Dr. Tucker's conclusions using her own co-conspirator count are not robust to the first difference specification I included in my opening report, but which she omitted in her rebuttal.

## 6.3  Dr. Tucker's Own Methodology Confirms My Results in 15 Regressions Her Report Omits

282.    In my opening report, I tested the co-conspirator relationship using two complementary regression approaches. First, I presented what are sometimes called "levels" regressions. These ask a straightforward question: are rents higher in PUMAs with more co-conspirator properties?[156] The answer was yes, with statistical significance, across every specification.

283.    But - as Dr. Tucker expressed concern over and I already addressed in my opening report - some rental units may have "faster rent growth" than others for reasons unrelated to Revenue IQ.[157,158] This can bias levels regressions. Therefore, to confirm that the levels result in my opening report was not simply capturing this background propensity, I also ran what economists sometimes call "first-difference" regressions.[159]

284.    Rather than asking whether rents are higher in high-adoption PUMAs, a first-difference regression asks whether rents grow faster when co-conspirators are added - with fixed effects removing each unit's baseline rent trend and isolating the price growth response to changes in local Revenue IQ adoption. As I explained at paragraph 548 of my opening report, I ran this specification specifically "[t]o address concerns that these results reflect the propensity for some units to systematically increase prices rather than coordinated behavior" - exactly the kind of confounding effect Dr. Tucker hypothesizes about in her selection bias concerns.

285.    As I explained in my opening report, these first-difference regressions produced "essentially the same (and indeed stronger) conclusion" as my original level regressions, showing that Landlord Defendants increase monthly rents by a statistically significant

---

[156] *See* Marinescu Opening Report, Section 9.2.4; Marinescu Opening Report, ¶¶ 539-45.
[157] Marinescu Opening Report, Section 9.2.2.
[158] Dr. Tucker specifically raised her concern in the context of Revenue IQ users having "faster rent growth" than non-adopters, but the same econometric and methodological concern stands in a comparison of some Revenue IQ users against other Revenue IQ - as I made clear in my opening report.
[159] Marinescu Opening Report, ¶¶ 548-49, 586-88.

FILED UNDER SEAL

$4.3-$15 more than their long-run average rent increase with every additional co-conspirator in their PUMA.[160]

286.    I presented both results because they are complementary and reinforce the robustness of the other. As I explained, "[t]aken together, these results provide consistent econometric evidence that Landlord Defendants' pricing responds systematically to the presence of additional co-conspirators in their local markets," and "the robustness of these findings indicates that the observed price increases are unlikely to be driven solely by common trends or local demand shocks."[161] In other words, no matter how the question is asked - whether rents rise when adoption increases, or whether rents rise *faster* when adoption increases - the answer is the same: more Revenue IQ properties is associated with higher rents.

287.    As discussed above, Dr. Tucker reports that when she redefines the co-conspirator variable and re-runs my panel regressions, the result reverses: more Revenue IQ properties in a PUMA become associated with lower rents. But Dr. Tucker does not present the complete picture in her rebuttal report. When Dr. Tucker presents her "corrected" regressions, she only produces the levels specifications, i.e., the ones that ask whether rents are higher when adoption increases. She does not report what happens when her corrections are applied to the first-difference regressions, i.e., the ones that ask whether rents grow faster when co-conspirators are added. In total, this means her report omits 15 regressions that bear directly on her conclusions. In doing so, she therefore fails to adopt a method that can address the kind of heterogeneous growth rate concerns she separately criticizes my opening report for not addressing.

288.    This omission matters. If Dr. Tucker's correction produces a negative result in the levels specification but a positive result in the first-difference specification, the two results point in opposite directions. In my opening report, the two specifications agreed. They diverge only after Dr. Tucker applies her redefinition. That divergence warrants examination - particularly because the first-difference specification is designed to address the very confounders Dr. Tucker identifies in her selection-bias discussion. Presenting the levels result without the first-difference result leaves the reader with an incomplete picture of what Dr. Tucker's own corrections show.

289.    In the following subsections, I will therefore evaluate how important this omission was by:

▪ First, showing what code Dr. Tucker omitted when "correcting" my original panel regressions.

▪ Second, presenting what the omitted code shows when it is re-incorporated.

---

[160] Marinescu Opening Report, ¶ 548.
[161] Marinescu Opening Report, ¶ 549.

FILED UNDER SEAL

▪ Third, explaining what economic implications that has for Dr. Tucker's conclusions and my own.

290. Each of the 15 regressions Dr. Tucker omits from her revised panel regression analysis estimates a positive and statistically significant co-conspirator effect, even fully adopting Dr. Tucker's "corrected" definitions of co-conspirators. The strongest single result across all regressions run by either expert in this case (including my opening report, Dr. Tucker's rebuttal, and this reply) is among these omitted specifications: under Dr. Tucker's own methodology, each additional Revenue IQ client increases the growth rate of rents by $32.81, significant at the 99.9% level (see Table 8, column 31). Dr. Tucker did not run this regression. Her team had the code to do so.

## 6.3.1 Dr. Tucker Copied My Panel Regression Backup Materials, Implemented Her Revisions, and Failed to Reproduce 15 First-Difference Regressions

291. The regression analyses in my opening report were generated using source code: step-by-step computer instructions that take the underlying data as input and produce the regression results as output. As is standard practice, I produced this source code to Yardi's Experts as part of my backup materials, allowing them to verify my work by re-running the same instructions on the same data. The source code I produced contained the instructions for both the levels regressions and the first-difference regressions in a single file, one set of instructions immediately following the other. Dr. Tucker's team received this code and appears to have used it as the starting point for her own analysis.[162]

292. At deposition, Dr. Tucker testified that she could not "recollect looking at [my] first differences code" and that she did not "recall having any discussion about the first-differences code" with her staff.[163] Her explanation was that she was "correcting [my] primary results, which [I] presented clearly as [my] primary results [as] part of the body of [my] report in Table 8."[164]

---

[162] Dr. Tucker's scripts bear the same name as my original, but with a suffix according to the adjustment being made, (e.g., "_adj_prop" when accounting for properties managed by the same Landlord Defendant) and significant portions of the code itself are identical to my opening report's backup materials.

[163] April 28, 2026, Tucker Deposition, 220:18 - 221:2 (*"Q: Okay. Dr. Tucker, did you identify any coding error in Dr. Marinescu's first differences regression code? A: So as I said before, I focused on correcting her Table 8. I can't recollect looking at her first differences code. And instead I looked at the evidence that she put forward as her primary empirical analysis in her report and corrected that."*); April 28, 2026, Tucker Deposition, 219: 12-18 (*"Q: Did you direct her staff at any point to analyze her first differences code? A: No, I don't recall having any discussion about the first differences code. Instead my focus was on showing the flaws in Table 8, which is the table she presented in the body of her report as evidence for her opinions."*).

[164] April 28, 2026, Tucker Deposition, 219: 5-11 (*"Q: Okay. Why didn't you include her first differences code in your source code? A: Well, because I was correcting her primary results, which she presented clearly as her primary results part of the body of her report in Table 8."*).

FILED UNDER SEAL

293. A side-by-side comparison of my original source code and Dr. Tucker's modified version shows that her team copied my regression code and made modifications throughout to implement her proposed corrections, including her redefined co-conspirator variable, outlier cleaning - and even the first-difference variable ("fd") used as the dependent variable in the first-difference regression (adopting her data gap methodology to only include first-differences across adjacent months - see Section 4).

294. The following figures show my panel regression script on the left, and Dr. Tucker's backup code on the right. In particular, I show Dr. Tucker's code producing her adjusted regressions accounting for properties managed by the same Landlord Defendant. The portions highlighted in red on the left are omitted in Dr. Tucker's code, while portions in green on the right are new edits and additions in Dr. Tucker's code:

**Figure 22: Comparison Of My Original Panel Regressions Code (Left) And Dr. Tucker's Panel Regression Code, Revised To Account for Properties Managed by the Same Landlord Defendant (Right)[165]**

```
# load CPI -------------------------------
-------------------------------

cpi_rent_raw <- fread("01. Data/02.
Public/01. FRED/CPI -
Rent/CUUR0000SEHA.csv")
# rebase at beginning of lease data index
(Feb 2011)
```

```
dr_ext[, gap_months :=

       (year(month) -
year(shift(month))) * 12 +
       (month(month) -
month(shift(month))),

       by = revenue.iq.unit.id]

dr_ext[, fd := ifelse(
  gap_months == 1,
  monthly.effective.rent -
shift(monthly.effective.rent),
  NA_real_
), by = revenue.iq.unit.id]
```

295. This shows Dr. Tucker redefining the "fd" variable which is used as the dependent variable (or "y" variable) in the first-difference regressions.

296. Dr. Tucker and her team then retained the levels regression code that produced the tables Dr. Tucker reported. However, the first-difference code, which appeared immediately after the levels code in my original source file, was omitted.

---

[165] Marinescu Opening Report Backup Materials, "03. Analysis\10. Panel Co-Conspirators\harrington_panel.R"; Tucker Yardi Backup Materials, "2. Analysis\Panel Co-Conspirators\Scripts\harrington_panel_adj_prop.R."

93

FILED UNDER SEAL

**Figure 23: Comparison Of My Original Panel Regressions Code (Left) And Dr. Tucker's Panel Regression Code, Revised To Account for Properties Managed by the Same Landlord Defendant (Right)[166]**



---

[166] Marinescu Opening Report Backup Materials, "03. Analysis\10. Panel Co-Conspirators\harrington_panel.R"; Tucker Yardi Backup Materials, "2. Analysis\Panel Co-Conspirators\Scripts\harrington_panel_adj_prop.R."

FILED UNDER SEAL

297.    The "yellow" area shows cosmetic changes Dr. Tucker's team made to the regression table formatting. Dr. Tucker also retained the plotting code that immediately followed the first-difference regressions.

298.    In total, Dr. Tucker (A) modified the dependent variable input to the first-difference regressions, (B) included the code that immediately preceded the first-difference regressions with cosmetic adjustments, and (C) included the code following the first-difference regressions verbatim, but omitted the first-difference regressions themselves.

299.    When shown the side-by-side comparison at deposition, Dr. Tucker did not challenge the accuracy of the comparison.[167]

300.    In other words, Dr. Tucker's team took my code, implemented her revisions, and ran the levels regressions. The first-difference regressions were not included, and their results were not reported.

301.    Dr. Tucker's report does not explain why she did not include first-difference regressions. Instead, the justification she offered at deposition rested on the premise that the levels regression was my "primary" specification and my first-difference regression was merely a "robustness check" placed in an appendix - and that she was therefore justified in correcting only the former.

## 6.3.2  Every Omitted Regression Confirms My Conclusions Using Dr. Tucker's Own Methodology

302.    I take Dr. Tucker's "corrected" source code, but re-add the first-difference regressions. This adopts her proposed revisions, and applies them to the first-difference specification in addition to the levels regressions. I present these results across three tables responding to Dr. Tucker's three "corrected" specifications:

▪    In Table 7, I show the first-difference specification of Dr. Tucker's regression only counting properties owned by other clients in the same PUMA.

▪    In Table 8, I show the first-difference specification of Dr. Tucker's regression that counts the number of clients (rather than properties) in the same PUMA.

▪    In Table 9, I show the first-difference specification of Dr. Tucker's regression only counting properties owned by other clients in the same PUMA , and adding an additional control variable for how many properties in the PUMA that client owns.

---

[167] April 28, 2026, Tucker Deposition, 217:23 - 218:5 (*"**Q:** Okay.  Do you see that that code is -- is marked in red? **A:** So, the code is marked in red, as I state clearly in my report.  What I did was I took the Table 8, which was in her report and presented as her primary results, and then I went through it.  You see the corrections which are outputted as my tables in D17 and 18."*).

FILED UNDER SEAL

303. In total, this yields 15 regressions that Dr. Tucker could have presented in her rebuttal, but omitted. In all of these 15 regressions, the estimated co-conspirator effect is once again positive and statistically significant, fully consistent with the findings in my opening report.[168]

**Table 7: First-Differences - Tucker's Table D3.A: Correction to Marinescu Report's Table 8 That Excludes Outliers According to Her Own Stated Methodology and Accounts for Properties Managed by the Same Landlord Defendant[169]**

| | (27) | (28) | (29) | (30) | (31) |
|---|---|---|---|---|---|
| Intercept | 70.812*** | | | 125.951*** | |
| | (0.510) | | | (3.231) | |
| Co-Conspirator Count Per PUMA | 1.872*** | 7.385*** | 2.144+ | 2.338*** | 12.086*** |
| | (0.306) | (1.162) | (1.210) | (0.308) | (1.206) |
| Rent CPI | | | | -0.382*** | -1.091*** |
| | | | | (0.023) | (0.059) |
| Num.Obs. | 196116 | 89749 | 89748 | 196116 | 89749 |
| R2 | 0.000 | 0.346 | 0.425 | 0.001 | 0.350 |
| R2 Adj. | 0.000 | -0.118 | 0.014 | 0.001 | -0.111 |
| R2 Within | | 0.001 | 0.000 | | 0.007 |
| R2 Within Adj. | | 0.001 | 0.000 | | 0.007 |
| Std.Errors | Heteroskedasticity-robust | by: revenue.iq.unit.id | Newey-West (L=3) | Heteroskedasticity-robust | by: revenue.iq.unit.id |
| FE: revenue.iq.unit.id | | X | X | | X |
| FE: month | | | X | | |

+ p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001

304. Moreover, Table 8 presents the strongest co-conspirator effect found across all regressions yet presented in this litigation. Counting the number of Revenue IQ clients per PUMA and running a first-difference regression under Dr. Tucker's own methodology, each additional Revenue IQ client increases the growth rate of rents by $13.19 in the specification with month/year fixed effects, and by $32.81 in the specification with Rent CPI controls

---

[168] Some regressions are significant to the 10% confidence level. I still consider this informative.

[169] Sources: Expanded and Geocoded Lease Data (*see* Appendix F.1 of Marinescu Opening Report); Rent CPI; Tucker Report Backup. Notes: [1] I repeat here the first-difference regressions I presented in My Opening Report (See Table 12 and Equations 28-31), and using Dr. Tucker's approach to: outliers, i.e., excluding leases with monthly effective rents less than or equal to $20; and data gaps, i.e., disregarding the first-differences of monthly effective rents if they are associated to a month interval greater than 1, as defined by Dr. Tucker. [2] Model 29 uses Newey-West (HAC) standard errors, correcting for potential heteroskedasticity and autocorrelation. The lag length is set to 3, meaning that the correction takes into account autocorrelation of the errors up to three periods back.

FILED UNDER SEAL

(column 31) - statistically significant at the 99.9% level. These results are not only positive but stronger than the results from any specification in my opening report.

**Table 8: First-Differences - Table D3.B: Correction to Marinescu Report's Table 8 That Excludes Outliers According to Her Own Stated Methodology and Uses the Number of Co-Conspirator Landlord Defendants[170]**

| | (27) | (28) | (29) | (30) | (31) |
|---|---|---|---|---|---|
| Intercept | 69.976*** | | | 125.358*** | |
| | (0.536) | | | (3.225) | |
| Number of Co-Conspirator Landlords | 5.027*** | 23.252*** | 13.193*** | 6.016*** | 32.809*** |
| | (0.675) | (2.288) | (2.354) | (0.676) | (2.383) |
| Rent CPI | | | | -0.384*** | -1.149*** |
| | | | | (0.023) | (0.059) |
| Num.Obs. | 196116 | 89749 | 89748 | 196116 | 89749 |
| R2 | 0.000 | 0.347 | 0.425 | 0.001 | 0.351 |
| R2 Adj. | 0.000 | -0.116 | 0.015 | 0.001 | -0.109 |
| R2 Within | | 0.002 | 0.001 | | 0.009 |
| R2 Within Adj. | | 0.002 | 0.001 | | 0.009 |
| Std.Errors | Heteroskedasticity-robust | by: revenue.iq.unit.id | Newey-West (L=3) | Heteroskedasticity-robust | by: revenue.iq.unit.id |
| FE: revenue.iq.unit.id | | X | X | | X |
| FE: month | | | X | | |

+ p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001

305.    Table 9 reaches a similar, but more nuanced, conclusion. Revenue IQ adoption (measured by number of properties) increases the growth rate of rents, while the number of properties owned/managed by the same Revenue IQ client has no statistically significant impact on

---

[170] Sources: Expanded and Geocoded Lease Data (*see* Appendix F.1 of Marinescu Opening Report); Rent CPI; Tucker Report Backup. Notes: [1] I repeat here the first-difference regressions I presented in My Opening Report (See Table 12 and Equations 28-31), and using Dr. Tucker's approach to: outliers, i.e., excluding leases with monthly effective rents less than or equal to $20; and data gaps, i.e., disregarding the first-differences of monthly effective rents if they are associated to a month interval greater than 1, as defined by Dr. Tucker. [2] I re-compute first-differences of effective rent consistently with the other two corrections by Dr. Tucker (in Tables D3.A and E2 of her report), i.e., excluding data gaps. In particular, Dr. Tucker's analysis script creating Table D3.B of her Report (using the number of co-conspirator Landlord Defendants) computes the first-differences of monthly effective rents including data gaps. Dr. Tucker computes first-differences excluding data gaps for her other two corrections, i.e., those in Tables D3.A (accounting for properties managed by the same Landlord Defendant) and Table E2 (accounting for properties managed by the same Landlord Defendant, and controls for the number of properties managed by the Landlord Defendant). [3] Model 29 uses Newey-West (HAC) standard errors, correcting for potential heteroskedasticity and autocorrelation. The lag length is set to 3, meaning that the correction takes into account autocorrelation of the errors up to three periods back.

FILED UNDER SEAL

rents in some specifications, but not others. This indicates the ownerships structure effect is not consistent across specifications, and supports my prior conclusion that precise controls for ownership structure would require discovery from Landlord Defendants.

**Table 9: First-Differences - Table E2: Correction to Marinescu Report's Table 8 That Excludes Outliers According to Her Own Stated Methodology, Accounts for Properties Managed by the Same Landlord Defendant, and Controls for the Number of Properties Managed by the Landlord Defendant[171]**

| | (27) | (28) | (29) | (30) | (31) |
|---|---|---|---|---|---|
| Intercept | 61.768*** | | | 125.744*** | |
| | (0.692) | | | (3.222) | |
| Number of Co-Conspirator Properties | 2.014*** | 7.318*** | 2.228+ | 2.584*** | 12.282*** |
| | (0.306) | (1.163) | (1.209) | (0.307) | (1.205) |
| Number of Properties Owned by Landlord | 3.065*** | 4.672** | 2.021 | 3.482*** | 10.112*** |
| | (0.190) | (1.576) | (1.592) | (0.191) | (1.626) |
| Rent CPI | | | | -0.452*** | -1.170*** |
| | | | | (0.023) | (0.060) |
| Num.Obs. | 196116 | 89749 | 89748 | 196116 | 89749 |
| R2 | 0.002 | 0.346 | 0.425 | 0.003 | 0.350 |
| R2 Adj. | 0.002 | -0.118 | 0.014 | 0.003 | -0.110 |
| R2 Within | | 0.001 | 0.000 | | 0.008 |
| R2 Within Adj. | | 0.001 | 0.000 | | 0.008 |
| Std.Errors | Heteroskedasticity-robust | by: revenue.iq.unit.id | Newey-West (L=3) | Heteroskedasticity-robust | by: revenue.iq.unit.id |
| FE: revenue.iq.unit.id | | X | X | | X |
| FE: month | | | X | | |

+ p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001

306.    To justify excluding these 15 regressions from her report, Dr. Tucker's only defense is that I intended the level regressions to be my primary specification. As she explained at deposition:

> **Q:** Okay. Apart from the fact that she presents Table 8 in the report and presents Table 12 in an appendix, is there any other evidence that you can

---

[171] Sources: Expanded and Geocoded Lease Data (*see* Appendix F.1 of Marinescu Opening Report); Rent CPI; Tucker Report Backup. Notes: I repeat here the first-difference regressions I presented in My Opening Report (See Table 12 and Equations 28-31), and using Dr. Tucker's approach to: outliers, i.e., excluding leases with monthly effective rents less than or equal to $20; and data gaps, i.e., disregarding the first-differences of monthly effective rents if they are associated to a month interval greater than 1, as defined by Dr. Tucker..

cite to from Dr. Marinescu's own description of her analysis that Table 8 is her primary analysis, and Table 12 is simply a robustness check?

**A:** I really do think Dr. Marinescu's report speaks to itself, and the way she describes per her appendix table **I think speaks for itself as to her intention** [...] (emphasis added)[172]

307. Dr. Tucker is correct that my report speaks for itself: in my opening report, I expressly explained why considering both the levels and first-difference regressions was necessary to thorough analysis in this context:

> "**To address concerns that these results reflect the propensity for some units to systematically increase prices rather than coordinated behavior, I re-estimate the same five specifications using first differences** - examining changes in rents at the time leases are signed rather than rent levels, and in some specifications controlling via fixed effects representing each unit's average rent increase over the period. (see Appendix D.4). When I do this, **I reach essentially the same (and indeed stronger) conclusion**: Landlord Defendants increase monthly rents by a statistically significant \$4.3-\$15 more than their long-run average rent increase with every additional co-conspirator in their PUMA.
>
> **Taken together**, these results provide **consistent** econometric evidence that Landlord Defendants' pricing responds systematically to the presence of additional co-conspirators in their local markets. The estimated effects appear across multiple specifications and persists when controlling for unit-level fixed effects and macroeconomic conditions, **and when accounting for different units' average propensity to increase prices**. From an economic perspective, **the robustness of these findings indicates that the observed price increases are unlikely to be driven solely by common trends or local demand shocks**. Instead, the results are consistent with a pricing process in which Revenue IQ links competitors' pricing decisions and facilitates coordinated price movements across properties." (emphasis added)[173]

308. At deposition, Dr. Tucker was directed to this portion of my opening report, but offered no further explanation for her decision to omit the first-difference regressions.[174]

---

[172] April 28, 2026, Tucker Deposition, 225:14 - 226:5.
[173] Marinescu Opening Report, ¶¶ 548, 549.
[174] April 28, 2026, Tucker Deposition, 220:5 - 17 (*"**Q:** Why did you not include a first differences approach as a robustness check to your findings? **A:** Well, because the systemic I -- approach I took in my report is that throughout her report Dr. Marinescu made choices about what table she would -- where she presented in the body of her report and which she emphasized. In the body of her report she put Table 8, and so it is Table 8 in the primary specifications that she relied on and presented as her primary evidence that I corrected."*); April 28, 2026, Tucker Deposition, 223:6 - 224:1 (*"**Q:** Do you see the paragraph 529 where she says, Taken together these results provide*

FILED UNDER SEAL

309.    My opening report explained why it was important to evaluate this question on both levels and first-differences, then showed that both gave the same conclusion, and that this consistency further bolstered my conclusions. By omitting these first-difference regressions, Dr. Tucker did not adequately respond to my opening report's analysis. Running these regressions is not computationally difficult; I provided Dr. Tucker the code to do so, her team evidently was able to run the level regressions, and had even redefined the first-difference dependent variable that goes into these regressions to adopt her separate data gap arguments (see Section 6.3.1). There is no compelling justification for Dr. Tucker's omission of these first-difference regressions.

### 6.3.3    The Inconsistency Between Dr. Tucker's Levels and First-Difference Results Undermines Her Conclusions

310.    Beyond the methodological concerns raised by this omission, the fact that these regressions produce directionally opposite conclusions to Dr. Tucker's level regressions is important and cannot be ignored. Dr. Tucker herself testified that when "there is a robustness check and you start to get inconsistent estimates which vary from specification to specification, that calls into question the empirical endeavor."[175] In my opening report, the levels and first-difference specifications agreed: both showed a positive and statistically significant co-conspirator effect. They only diverge once Dr. Tucker applies her redefinition. According to her own testimony, this would suggest that the "correction" may have introduced a problem, not that it fixed one.

311.    Recall from Section 6.1 that Dr. Tucker raises selection bias concerns in my panel regressions - specifically, that some units might "grow rents faster" than others. Dealing with the issue of differential rent growth across rental units is the stated purpose of the first-difference regressions in my opening report.[176] If Dr. Tucker thought this was an important enough issue to flag in her rebuttal, it is unclear why she omitted the regressions whose purpose it was to address this issue.

---

consistent econometric evidence that landlord defendants pricing responds systematically to the presence of additional co-conspirators in their local markets? *A: Yes. I mean, she says that taken together -- because Table 12 in her report is, as she says, consistent with her Table 8. I don't know what else to say, but she decided to present Table 8 as her main specification. Q: Where does she say that it's her main specification? Does she use that word anywhere in her report? A: The reason I'm saying it's her main specification is, your main specification is what you put in the body of your report for your academic paper. Supplementary secondary specifications are what you put in your appendix."*)

[175]April 28, 2026, Tucker Deposition, 44:6 - 22 (*"Q: Dr. Tucker, when you served as an editor overseeing approximately a hundred articles a year, have you ever recommended to an author that they delete a robustness check because the result contradicted their main finding? A: So, no, I can't recommend -- I mean, usually what happens is, if there is a robustness check -- there is a robustness check and you start to get inconsistent estimates which vary from specification to specification, that calls into question the empirical endeavor. And so at that point I would usually go back to the authors and say, Look, these robustness checks are getting inconsistent coefficients. Let's see, why don't you go back and try and work out what's going on."*)

[176] Marinescu Opening Report, ¶ 548.

100

FILED UNDER SEAL

312.    Further, if Dr. Tucker's opinion is that reversing my level regressions is sufficient to undermine my conclusions, it would have been more methodologically rigorous to present these first-difference regressions, then explain why their contradictory results should be discarded. She has not done so. This is significant because, as I have explained, the first-difference regressions serve an important conceptual purpose in implementing the Harrington test: they measure whether rent growth responds to changes in co-conspirator density, even accounting for the fact that some units have higher rent growth independently of the number of co-conspirators. Results from this specification cannot simply be set aside as irrelevant.

313.    In short, my opening report asked the same question two ways and got the same answer both times. Dr. Tucker "corrected" only one of those two tests, reported the reversed result, and omitted the other. When the deleted tests are re-run using her own data, they confirm my original conclusion that rents rise faster when more properties adopt Revenue IQ. This omission is particularly notable because it is contrary to Dr. Tucker's stated approach to robustness tests and would have addressed misplaced criticisms she separately raises in her rebuttal.

314.    Combined with my analysis of Yardi's Experts' revised YLPI analysis, I conclude that Yardi's Experts' characterization of Revenue IQ clients' pricing does not withstand scrutiny. Their methodological choices introduce documented forms of statistical bias that consistently work against detecting what Yardi's own data shows: Revenue IQ clients price above the market, and their ability to do so increases with Revenue IQ adoption.  I dedicate the remainder of this reply to re-explaining how that observed pricing occurred, based on my opening reports' previously stated conclusions.

FILED UNDER SEAL

# 7. Dr. Tucker's Enforcement Opinions are Disconnected From Both Canonical Cartel Theory and Record Evidence

315.    In Section V.C of her rebuttal report, Dr. Tucker argues that the structural barriers to deviation I identify - auto-populated pricing, override barriers, TAM oversight, and executive audit tools - are "consistent with tools that a landlord can use unilaterally to manage employee discretion and ensure consistent execution of their own individual pricing strategy, rather than a means of punishment imposed by rival landlords, or a hub acting on their behalf, for any deviations from a shared, collusive pricing scheme."[177] She frames sustaining collusion as requiring two elements: that deviations be "detectable (monitoring) and followed by a credible punishment that makes deviations unprofitable (enforcement)."[178] She concludes neither element is present in the Yardi Pricing Suite.

316.    The monitoring element is present. Yardi's TAMs use non-public, client- and property-specific performance data - including occupancy, net rental income, and rents relative to benchmark - to identify properties priced below their comparison sets.[179] Mr. Fazio, the TAM director, prepared monthly client-by-client analyses from this data and shared them with Yardi's TAMs.[180] Ms. Rao, the Yardi executive who developed the penalty scoring framework, calculated penalty scores against cross-client benchmarks each month and distributed them to Mr. Fazio and the individual TAMs.[181] These features do not simply help an individual landlord monitor its own employees against its own pricing standard. They have the structure of a hub monitoring cross-client pricing against cross-client benchmarks calculated from non-public data that the participating landlords supply.

317.    The credible-punishment element is also present. In a textbook cartel, the traditional "enforcement mechanism" is a credible threat of retaliation if any cartelist defects, often through a price war that makes short-term defection from the cartel less profitable than long-run participation.[182] As I explained in my opening report, enforcement does not require that defection be impossible or unprofitable in isolation; it requires that the expected consequences of defection, including the risk of triggering retaliation, make it less attractive than continued adherence.[183]

---

[177] Tucker Rebuttal Report, Section V.C.
[178] Tucker Rebuttal Report, Section V.C.
[179] Marinescu Opening Report, Section 6.2, ¶¶ 353-356.
[180] Marinescu Opening Report, ¶ 209
[181] Marinescu Opening Report, ¶¶ 208, 356.
[182] Perloff, *see* Section "Maintaining Cartels," *"To keep firms from violating the cartel agreement, the cartel must be able to detect cheating and punish violators,"* p. 432.
[183] *See* Marinescu Opening Report ¶¶ 437-438 *("[T]hese frictions fall short of uniformly prohibiting deviation, which economic theory explains could actually undermine a conspiracy because it discourages firms from joining and risking being undercut without a recourse option.")*.

FILED UNDER SEAL

318. The Comp Trend Rule provides a credible disincentive element. When a participating client's price moves - whether generated by the algorithm or imposed by manual override - the rule transmits that movement to other participating clients. The economic implication I described in my opening report is straightforward: a price cut that would normally win renters away from rivals in unstructured competition will, under the Comp Trend Rule, instead trigger cuts at competing properties that can leave the original cutter with no relative price advantage. As I explained in my opening report, this disincentivizes clients to reduce prices.[184]

319. The integrated system also imposes asymmetric costs on deviation in one direction specifically. As I explained in my opening report and Yardi's Experts do not dispute, Yardi's TAMs are 5.7 times more likely to flag a property as pricing below benchmark than as pricing above.[185] Penalty scores are calibrated to penalize underpricing only: properties whose rental-income growth lags benchmark receive a positive penalty score, while properties whose income growth exceeds benchmark receive a zero.[186] Ms. Rao stated the underlying principle: "A subject property is doing well if its RIPU grows faster than benchmark properties."[187]

320. Other components of the Yardi Pricing Suite make defection unlikely. As I explained in Section 8.1 of my opening report, Revenue IQ appears to limit pricing deviations by (1) auto-populating Revenue IQ's recommended rent to listings without client pre-approval; (2) having TAMs intervene when a participant does undercut benchmarks, and (3) giving clients' executives tool to minimize their staff's deviations from the Revenue IQ price. In sum, firms can theoretically deviate, but they are further dissuaded by these additional system features. These are the sorts of costs that economic theory associates with sustainable collusion - and which I explained in my opening report (see Section 3). These commitment mechanisms could therefore be understood as a set of stability measures that prevent defection from supracompetitive pricing.

321. Dr. Tucker appears to reason that because firms can deviate from the Revenue IQ price if other firms defect, there is no enforcement mechanism in this case. But this runs contrary to traditional cartel theory and inverts the relationship between deviation and enforcement: some ability to deviate is necessary for enforcement to function, because without it, firms cannot threaten to retaliate, and the threat of retaliation is itself an enforcement mechanism. For that threat of retaliation to be credible, it is useful for firms to have some ability to set their own prices (independent from the hub) in response to defection by a co-conspirator. Some cost of deviation is therefore necessary to sustain collusion, but if that cost is too

---

[184] Marinescu Opening Report, ¶ 305.
[185] Marinescu Opening Report, ¶ 326.
[186] Marinescu Opening Report, ¶ 354, citing  November 14, 2025, Deposition of Liana Rao, deposed by Rio Pierce (for Plaintiffs) and by David Sarratt (for Defendants) (hereinafter, "November 14, 2025, Rao Deposition"), 241:8 - 242:18.
[187] Marinescu Opening Report, ¶ 355, citing November 14, 2025, Rao Deposition, 247:15 - 248:23.

high then firms will not join a cartel in the first instance.[188] In other words, the ideal cartel has a high enough cost of deviation that I do not expect my co-conspirators to defect, but not so high that I am helpless if they do.

322. In short, Dr. Tucker's framework - monitoring plus credible punishment that makes deviation unprofitable - is satisfied by the features my opening report describes; her contrary conclusion requires one to misrepresent standard cartel theory and ignore meaningful parts of both the record and my opening report's findings.

## 8. Mr. Yenikomshian's Source Code Analysis Does Not Alter My Economic Analysis and Admittedly Identifies Nothing Inconsistent with A Conspiracy

323. In his opening declaration, Mr. Yenikomshian offers a factual description of the Revenue IQ source code, which I cite in my opening report. In his rebuttal declaration, Mr. Yenikomshian takes a different stance by offering several opinions beyond the factual operations of Revenue IQ that speak to its economic evaluation. The core problem with this approach is that Mr. Yenikomshian has not engaged in sufficient economic research to reliably reach the sort of economic conclusions he provides. He conceded at deposition that he has not reviewed any of the documents or peer-reviewed literature that underpin my economic conclusions.

324. This leads to demonstrable shortcomings in Mr. Yenikomshian's analysis. For example:

- Mr. Yenikomshian does not consider whether some client configuration changes may be caused by other components of the challenged conduct - such as TAM oversight or benchmark reporting causing clients to adjust their reference rents upward.

- Mr. Yenikomshian suggests my analysis of the Comp Trend Rule requires extreme assumptions that it either does not require (often for reasons explained in my opening report) or are met in this case when applying more reasonable economic thresholds.

- Mr. Yenikomshian treats all configurations alike - with no consideration for which affect upward coordination of the price level and which simply modify where any given transaction lands in the price structure.

---

[188] *See* Marinescu Opening Report ¶ 437 *("[T]he cost of defecting from an agreement must be sufficiently high to induce compliance, but not so high as to prevent firms from joining the collusive agreement in the first instance.").*

FILED UNDER SEAL

325.    I explain each issue in further detail in the following section, beginning with a foundational discussion of the economic research Mr. Yenikomshian has not undertaken.

## 8.1  Mr. Yenikomshian Offers Unfounded Economic Conclusions

326.    In his rebuttal report, Mr. Yenikomshian offers conclusions about what my economic "theory" "requires," which "assumptions" are "central" to it, and which of his source code findings undermine it.[189] These appear to be judgments about the economic analysis of coordination via a hub algorithm. Yet Mr. Yenikomshian admitted he has not analyzed which configurations are consistent or inconsistent with a conspiracy,[190] did not review the Fazio deposition, any TAM call notes, or any of the academic literature I cite in my opening report,[191] and characterized these materials as "absolutely irrelevant" to his opinions.[192]

327.    Without engaging with these materials, Mr. Yenikomshian cannot reliably opine on what my economic theory requires because those materials are the foundation on which the theory rests. For purposes of this report, the relevant point is that Mr. Yenikomshian's source code analysis, conducted without reference to Yardi's documents or the economic

---

[189] March 23, 2026, Yenikomshian Declaration, *"Dr. Marinescu's false theory about the Comp Trend systematically ratchet[ing] prices upward" would also require the absence of countervailing signals from other Health and Trend Rules as well as from any other configurations that may impact the pricing output of Revenue IQ,"* ¶ 45; *"As with the Trend Rules in Step One, Dr. Marinescu's claims about the Comp Trend Rule depend on the assumption that clients do not modify the Reference Rent after it is established. During her deposition, she acknowledged that her conclusions apply only under this condition, stating that "thereafter, **[…] if [the clients] don't do anything**, then the reference rent […] is set by Yardi." This assumption is central to her theory,"* ¶ 47; *"There is therefore no mechanism within the Comp Trend to match, whether instantly or with delay, the magnitude of competitors' pricing changes as required by Dr. Marinescu's theory,"* ¶ 56.[190] March 23, 2026, Yenikomshian Declaration, ¶ 19, footnote 33 (*"The extent to which configuration changes reflect changes that "undermine a conspiracy" is not an analysis I provided in my Opening Report,")*; April 16, 2026, Yenikomshian Deposition, 154:7 - 13 (*"**Q:** Did you do an analysis of whether those different choices that clients make is consistent or inconsistent with coordinating pricing outputs? **A:** As I just said, that I did an analysis of the system, the inputs that go into that system, as well as the choices that clients make that would affect the calculation of the pricing output."*)

[190] March 23, 2026, Yenikomshian Declaration, ¶ 19, footnote 33 (*"The extent to which configuration changes reflect changes that "undermine a conspiracy" is not an analysis I provided in my Opening Report,")*; April 16, 2026, Yenikomshian Deposition, 154:7 - 13 (*"**Q:** Did you do an analysis of whether those different choices that clients make is consistent or inconsistent with coordinating pricing outputs? **A:** As I just said, that I did an analysis of the system, the inputs that go into that system, as well as the choices that clients make that would affect the calculation of the pricing output."*)

[191] April 16, 2026, Yenikomshian Deposition, 26:7-10 (*"**Q:** Okay. Did you review in any way the deposition of Anthony Fazio in formulating your opinions in this report? **A:** No."*); April 16, 2026, Yenikomshian Deposition, 27:25 - 28:5 (*"**Q:** Did you review any of those meeting notes in the course of formulating your opinions in this rebuttal report? **A:** No.  Because I was responding to Dr. Marinescu's analysis, so it's not necessary to review those."*); April 16, 2026, Yenikomshian Deposition, 28:22-25 (*"**Q:** Did you make any attempt to review any of the academic articles that Dr. Marinescu cited to in her report? **A:** No. It wasn't necessary for my opinions."*).

[192] April 16, 2026, Yenikomshian Deposition, 117:10-13  (*"**Q:** Do you think your opinion should be excluded in this matter because you didn't review those documents? **A:** No. Because it's absolutely irrelevant to my opinions and my analysis."*)

FILED UNDER SEAL

literature, does not alter my economic conclusions. I explain why in the sections that follow, beginning with his analysis of clients' reference rent configurations.

### 8.1.1 Mr. Yenikomshian Contradicts Himself by Offering Economic Conclusions On My "Theory" While Admitting He Has Not Analyzed What Is Consistent or Inconsistent with a Conspiracy

328.    Recall from my opening report that my "theory" is that Revenue IQ constitutes a multi-pronged pricing suite with the ultimate effect of coordinating adopters' prices upward. By stating which features of his source code review undermine my "theory," Mr. Yenikomshian is implicitly offering an economic opinion on coordination via hub algorithm. Yet Mr. Yenikomshian states elsewhere he offers no analysis of what is consistent or inconsistent with collusion.

329.    Footnote 33 of Mr. Yenikomshian's Rebuttal Declaration states that he did not "provide" "an analysis" of "which configuration changes" may "undermine a conspiracy." When asked about this at deposition, he once again confirmed that neither his opening report nor his rebuttal report offered an opinion on which configurations were consistent or inconsistent with a conspiracy.[193]

330.    This admission is important because it makes clear an unreconciled tension in Mr. Yenikomshian's report: he invites the reader to dismiss my "theory" based on his configuration analysis, while also admitting he has not analyzed which configurations are inconsistent with a conspiracy. His repeated statements about what my economic theory "requires" are therefore not grounded in any economic analysis.  This tension arises, in large part, because Mr. Yenikomshian has not engaged with enough of the factual record to reliably offer an opinion on my "theory" - as he admitted at deposition and I explain in the following section.

---

[193] April 16, 2026, Yenikomshian Deposition, 152: 2-12 (*"**Q:** So it's correct that whether configuration changes reflect changes that undermine a conspiracy is not an analysis you provided in your opening report; correct? **A:** I think, again, what I wrote in this rebuttal is, "The extent to which configuration changes reflect changes that 'undermine a conspiracy' is not an analysis I provide in my Opening Report."  **Q:** Do you provide that analysis in your rebuttal report? **A:** No."*)

FILED UNDER SEAL

### 8.1.2    Mr. Yenikomshian Admitted He Has Reviewed No Documents or Literature, And Therefore Has No Reliable Basis to Conclude What Contradicts My Economic "Theory"

331.    At deposition, Mr. Yenikomshian admitted he had not reviewed at least three important groups of evidence:

- Mr. Fazio's deposition.

- Any of the TAM call notes produced in this matter.

- Any of the academic literature I cite in my opening report.

    I expand on each below with reference to Mr. Yenikomshian's deposition.

332.    Despite "[having] an opinion on" my opening report's "analysis of Mr. Fazio's TAM call notes," Mr. Yenikomshian did not review the deposition of Mr. Fazio.[194] Similarly, Mr. Yenikomshian explained he had not reviewed any of the TAM call notes I rely upon in my opening report, arguing it was "not necessary."[195] And Mr. Yenikomshian admitted he made no attempt "to review any of the academic articles" I cited in my opening report, including those pertinent to algorithmic collusion, because "it wasn't necessary for [his] opinions."[196]

333.    Each of these categories of evidence was available to him, each was cited in my opening report to explain my theory, and each points to flaws in how Mr. Yenikomshian rebuts my opening report. These groupings of evidence are significant because they help explain how the Revenue IQ system works in practice, and how that fits with the economic analysis of collusion. Without analyzing, it is not possible to reliably opine on the coordinating effects of Revenue IQ.

334.    This leaves a hole in Yardi's Experts' rebuttals to my opening report. Dr. Tucker has offered generic opinions on the formation of cartels. And Mr. Yenikomshian has offered factual opinions on Revenue IQ's source code. But none of Yardi's Experts have examined how the totality of the Revenue IQ system works in practice, nor have they attempted to marry the operations of Revenue IQ with the economic analysis of collusion via a hub-algorithm.

---

[194] April 16, 2026, Yenikomshian Deposition, 26: 7-17 (*"**Q:** Okay. Did you review in any way the deposition of Anthony Fazio in formulating your opinions in this report? **A:** No. **Q:** Are you aware that Professor Marinescu cited to Anthony Fazio's deposition? **A:** I do recall that. **Q:** Okay. And are you aware that you offer opinions in this report about Dr. Marinescu's analysis of Mr. Fazio's TAM call notes? **A:** Yes. I have an opinion on that."*)

[195] April 16, 2026, Yenikomshian Deposition, 27:25 - 28:5 (*"**Q:** Did you review any of those meeting notes in the course of formulating your opinions in this rebuttal report? **A:** No. Because I was responding to Dr. Marinescu's analysis so it's not necessary to review those."*)

[196] April 16, 2026, Yenikomshian Deposition, 28:22-25 (*"**Q:** Did you make any attempt to review any of the academic articles that Dr. Marinescu cited to in her report? **A:** No. It wasn't necessary for my opinions."*)

107

FILED UNDER SEAL

That is the key juncture I sought to analyze in my opening report, and which remains substantively unaddressed by Yardi's Experts.

335.   In the following sections, I therefore explain again how my analysis of Yardi's documents - combined with my review of peer-reviewed literature and Mr. Yenikomshian's analysis of client configurations - shows that many client configurations may actually be a result of their broader engagement with the Yardi Pricing Suite. This exemplifies why a review of the source code in isolation from the documentary evidence or peer-reviewed literature cannot reliably reach any conclusions on "my theory" or a conspiracy. I begin with the clearest example: Mr. Yenikomshian's new analysis of clients' reference rent configurations.

## 8.2   Mr. Yenikomshian's Analysis of Clients' Reference Rents Is Consistent with the Economics of Coordinated Pricing

336.   To supplement his opening declaration, Mr. Yenikomshian presents a new opinion not presented in his opening declaration: he tabulates the number of changes clients made to their reference rents according to the produced configuration data. He asserts that "Landlord Defendants adjusted their Reference Rents over 560,000 times between January 2, 2019 to March 24, 2025."[197] From this, he concludes "[my] claims about the Comp Trend Rule depend on the assumption that clients do not modify the Reference Rent after it is established" and that "this assumption is central to [my] theory."[198] In making this claim, Mr. Yenikomshian makes his own assumption: that any modification to the reference rent "[reflects] client-driven adjustments based on their own individual choices."[199]

337.   Before proceeding to more detailed analysis, I note that this logic is economically flawed. As I explained in my opening report, successful collusion does not require perfect adherence or uniform pricing. It requires overall adherence to an agreed set of pricing rules. Even when clients update their reference rent configurations, the Revenue IQ algorithm continues to operate daily and applies its standard rules. It still incorporates the Comp Trend Rule, which links that client's recommended price to competitors'. It still applies the other Trend and Health Rules the client has configured. And it still generates a recommended price that the client follows in the overwhelming majority of cases: as I document in Section 8.2.1 of my Opening Report, 91% of leases transact within 5% of Revenue IQ's recommended price, and taking all observations together, the average deviation is just 1.4%.

338.   A client who makes small adjustments to their reference rent and thereafter continues to follow Revenue IQ's recommendation has not opted out of coordinated pricing. Revenue

---

[197] March 23, 2026, Yenikomshian Declaration, ¶ 48.
[198] March 23, 2026, Yenikomshian Declaration, ¶ 47.
[199] March 23, 2026, Yenikomshian Declaration, ¶ 47.

IQ still determines the direction and pace of price changes in response to competitor behavior. Compared to a "manual" price fixing conspiracy, this is analogous to a participant in a price-fixing arrangement making small adjustments to their base price while continuing to follow the arrangement's overall pricing protocol.

339.    This distinction is well understood in the economic literature on cartels. Coordinated pricing does not require that every participant charge the same price at all times or refrain from making individual adjustments. It requires that the mechanism through which participants respond to each other's pricing remains operative.[200] Here, that mechanism is the Comp Trend Rule, the shared Trend and Health Rule configurations, and the daily algorithmic recommendations that 91% of leases track. Reference rent adjustments do not disable any of these and can operate within them. My theory does not assume, and has never assumed, that clients never modify their reference rents. Instead, it assumes that the algorithm continues to coordinate the direction and pace of pricing adjustments regardless of any individual client's starting point.

340.    Mr. Yenikomshian's analysis does not engage with this distinction. He counts reference rent changes without asking whether those changes resulted in clients pricing independently of the algorithm's recommendations. The adherence data I present in Section 8.2.1 shows they did not. The 562,115 changes tell us clients occasionally adjusted a starting point. They do not tell us clients stopped following the algorithm, and the data indeed shows parallel pricing.

341.    Moreover, the 562,115 figure overstates the extent of independent client activity even on its own terms. It is necessary to contextualize these reference rent changes in several ways. For example:

   ▪   A reference change of less than 1% may not be economically meaningful.

---

[200] Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?," *Journal of Economic Literature*, March, 2006, available at https://www.jstor.org/stable/30032296 (accessed May 19, 2026), *"Cartels break up occasionally because of cheating or lack of effective monitoring, but the biggest challenges cartels face are entry and adjustment of the collusive agreement in response to changing economic conditions. Cartels that develop organizational structures that allow them the flexibility to respond to these changing conditions are more likely to survive,"* p. 43; *"They describe how weekly meetings of sugar refiners allowed them to "complete the contract" by adjusting the agreement to changing external conditions, such as fluctuations in demand, and by addressing issues originally left ambiguous. Cartel members also developed new restrictions as participants responded to the agreement by finding new dimensions on which to cheat (pp. 386-87). These modifications of the original agreement provided principles, analogous to legal principles, to guide firm actions and further modifications of the cartel agreement,"* p. 71; Nicolas de Roos and Vladimir Smirnov, "Collusion with intertemporal price dispersion," *The RAND Journal of Economics*, 2020, available at https://www.jstor.org/stable/45380646 (accessed May 19, 2026), *"In this article, we develop a theory of coordinated price dispersion that provides an intuitive explanation. Our theory rationalizes commonly observed pricing patterns including sales, price cycles, and fixed prices,"* p. 159; *"Our most fundamental result is that symmetric collusive equilibria exist for a greater range of discount factors with an intertemporally dispersed price path than with a fixed price. [...] for lower values of the discount factor, intertemporally dispersed prices are required to dampen the market share benefits for potential deviators,"* p. 160.

FILED UNDER SEAL

- More importantly, *why* a client updates their reference rent may be important to understanding allegations of a conspiracy.

342. Critically, if a reference rent update is itself motivated by a separate prong of Yardi's Pricing suite - say a non-public information exchange allowing clients to target price increases (Yardi's benchmarking) or TAM oversight asymmetrically pushing higher prices - this configuration change would actually be evidence of, not contrary, plaintiffs' allegations. This would, in turn, undermine Mr. Yenikomshian's assumption that any change to reference rents "[reflects] client-driven adjustments based on their own individual choices." Some configuration adjustments may instead be a consequence of how clients anticompetitively engage with Yardi's broader Pricing Suite in practice.

343. In other words, Mr. Yenikomshian implicitly offers economic opinions that rest on an assumption about why clients update their configurations. Documentary evidence available in this case (and analyzed in my opening report) allows us to, at least partially, test his assumption. Mr. Yenikomshian did not review such evidence or evaluate if it supports his assumption. Doing so, I find that it does not.

344. In his rebuttal declaration, Mr. Yenikomshian does not consider this nuance and treats any client change to reference rents as contrary to my "theory." For example:

- Mr. Yenikomshian did not analyze the magnitude of clients' reference rent changes.

- Mr. Yenikomshian did not analyze the relative frequency of clients' reference rent changes.

- Mr. Yenikomshian did not consider if any reference rent changes were instigated by the non-public information exchange in Yardi's Pricing Suite.

345. When I ask each of these questions, I find substantial evidence that reference rent charges are either not economically significant or may be caused by Yardi's non-public information exchange through TAMs and benchmarking.

## 8.2.1 Client Reference Rent Changes Were Small and Infrequent

346. At deposition, Mr. Yenikomshian explained that he had not evaluated the "magnitude" of client reference rent configurations because that was "irrelevant" to his analysis.[201]

347. This means that Mr. Yenikomshian's analysis treats a reference rent change of 0.5% as equivalent to a reference rent change of 50%. As an economist, I disagree with this

---

[201] April 16, 2026, Yenikomshian Deposition, 255:5-24 (*"**Q:** Did you calculate the average dollar magnitude of these reference rent changes? **A:** No.  Because my analysis of the source code of the Revenue IQ system, I was looking at how it operates and how these choices are made in the client's decision.  Reference rent is an input to*

FILED UNDER SEAL

approach and believe that the magnitude of changes is relevant. If clients make primarily small adjustments to their reference rents, that is not necessarily an indication of a true departure from the Revenue IQ system or its recommendation.

348.    To evaluate the question Mr. Yenikomshian did not, I analyze the data and find that over 18% of the 562,115 changes computed by Mr. Yenikomshian are within as little as 1% of the previous reference rent. Moreover, more than 70% of changes are within 5% of the previously-set reference rent, and only 2.6% reflect a change greater than 25%. I visualize this distribution below in Figure 24:

---

*that. When I show in my rebuttal report the reference rent changes, I'm talking about client configuration changes, the interactions people are making with that input that does affect the pricing output. I'm not looking at specific magnitudes, but I see that they go up and down, that the reference rent changes go up and down. And so that's what my analysis shows.* **Q:** *Do you know what percentage of the 562,000 changes exceed a magnitude 1 percent of the prior reference rent?* **A:** *No. And it's irrelevant to my analysis of it, as I explained a number of times, that the reference rent is one of those inputs that affect the pricing calculation."*)

FILED UNDER SEAL

**Figure 24: More Than 70% of Mr. Yenikomshian's Reference Rent Changes Are Within 5% Of The Previous Reference Rent Value[202]**



349.    Many reference rent changes less than 5% may simply be rounding. For example, if a client increases reference rent from $1,060 to $1,100, this would scarcely be evidence of deviation from a conspiracy, but would still be a 3.8% change to the client's reference rent. Grouping this with a 50% change reference rent, then relying on all such changes to conclude that any reference rent reconfigurations undermine my economic theory, is not an economically sound methodology. However, it is precisely the analysis Mr. Yenikomshian offers. This is significant, because more than 70% of the reference rent changes Mr. Yenikomshian tabulates move less than 5% from the client's original reference

---

[202] Sources: Configuration Data (*see* Appendix F.2 of Marinescu Opening Report); Lease Data (*see* Appendix F.1 of Marinescu Opening Report); YARDI-DUFFY_01275908 (file path: "Revenue IQ Client History Data/2025-10-15 - COR - Duffy - List Of All Revenue IQ Properties Since Nov 2010 As Of 2025-10-15.xlsx"); Yenikomshian Surrebuttal Backup Calculations at "Analyses\config_base_rent_analysis". Notes: [1] I source the dataset of 562,115 reference rent changes created by Mr. Yenikomshian (object "merged_subset_duffy_df_valid" in script "Analyses\config_base_rent_analysis\Script\monthly_reference_rent.py" of the Yenikomshian Surrebuttal Backup). [2] Mr. Yenikomshian identifies reference rents filtering the Configuration Data for Field Name " ███████████ " and Table Name ██████████████████ ." [3] For each change identified in the dataset, I compute their magnitude as the absolute value of the difference between the "NewValue" and the "OldValue" of the reference rent, expressed as a percentage of the old value. [4] For 1,673 changes, the old value is equal to zero, and therefore gives an infinite percentage change to the new value. I categorize those records in the ">100%" bucket.

FILED UNDER SEAL

rent. Indeed, the average reference rent change in Mr. Yenikomshian's analysis is just $5.6.[203]

350.    Clients' reference rent configuration changes are therefore typically small in magnitude and do not appear to reflect meaningful economic deviation from what Revenue IQ suggested. Some may simply be due to clients' rounding the Revenue IQ output. Moreover, these changes are infrequent given the frequency of Revenue IQ's pricing recommendations.

351.    As Mr. Gaeta explained in his opening declaration, Revenue IQ runs daily to create a new pricing recommendation for each unit.[204] Across the 5,935 properties and unit type groups in Mr. Yenikomshian's reference rent analysis, that is 8,152,190 daily price recommendations.[205] Each gives the client a new opportunity to e.g. round their pricing or decide to increase their prices in response to non-public data they receive from Revenue IQ.

352.    Mr. Yenikomshian does not contextualize how significant the 562,115 reference rent changes he tabulates are relative to the 8,152,190 daily recommendations.[206] I find that these reference rent changes constitute just 6.9% of the total Revenue IQ pricing outputs from January 2nd 2019 to March 24th 2025 for these properties and unit type groups. Given more than 70% are changes of less than 5%, this means less than 2% of the daily Revenue IQ price recommendations were overridden with a substantial change to clients' reference rent. This is consistent with my undisputed analysis that - even in spite of this reference rent changes - Landlord Defendants exhibited demonstrably parallel pricing.

353.    More generally, changes to clients' reference rents do not necessarily indicate deviation from a conspiracy. Mr. Yenikomshian's analysis also fails to distinguish between reference rent changes reflecting independent client judgment and those reflecting the very conduct Plaintiffs challenge. As I documented in my opening report, Yardi's TAM compensation structure rewards TAMs when clients increase their "reference rent+amenities" - the same

---

[203] I obtain $5.6 by averaging across the complete dataset of reference rent changes created by Mr. Yenikomshian. The average change for increases only is $117.6 while the average change for decreases is $-95.1.

[204] November 24, 2025, Declaration Of Michael Gaeta In Support Of Defendant Yardi Systems, Inc.'S Motion For Summary Judgment (hereinafter, "November 24, 2025, Gaeta Declaration"), ¶ 30 (*"Revenue IQ automatically generates a pricing output grid based on a client's configurations on a daily basis, but a client can also reconfigure their settings and recalculate their pricing whenever they would like."*)

[205] I compute these following Mr. Yenikomshian's approach, i.e., I define a property's first active date as the latest between: the first date in the Configuration Data and the minimum live date on Revenue IQ; and the last active date as the earliest between the Configuration Data last date and the last date when a property was priced on Revenue IQ (consistently with the "Revenue IQ Pricing Start Date", "Revenue IQ Pricing Live Date" and the "Last Revenue IQ Date Priced" variables of YARDI-DUFFY_01275908 ("2025-10-15 - COR - Duffy - List Of All Revenue IQ Properties Since Nov 2010 As Of 2025-10-15.xlsx"). Since the minimum and maximum dates of activity on Revenue IQ are available at the property level, I assume that each unit type of the same property is active for the same amount of days.

[207] Marinescu Opening Report, ¶371; Marinescu Opening Report, Sections 6.1-6.2.

FILED UNDER SEAL

metric Mr. Yenikomshian counts, and the Fazio-TAM call notes I analyzed document TAMs directing clients to increase rents when they fall below benchmark.[207] Mr. Yenikomshian's count does not separate TAM-initiated changes from client-initiated ones, and he testified he did not consider whether any reference rent changes were prompted by TAM oversight or benchmarking.[208]

354.    A reference rent increase made in response to a TAM recommendation informed by competitors' non-public CPD data is not a client exercising independent pricing judgment. Instead, it is a configuration change driven by the same non-public information I analyze in my opening report but which Yardi's Experts ignore the documentary basis of. [209]

355.    In the next section, in response to Mr. Yenikomshian's analysis, I therefore further elaborate on a discussion in my opening report about how some of these changes may be a result of other prongs of the challenged conduct - specifically TAM oversight and non-public benchmark reporting that prompt clients to manually adjust prices upward.

## 8.2.2    Client Configuration Changes May Be Driven By Revenue IQ's Non-Public Information Exchange - And Contribute To The Structural Break Identified in My Opening Report

356.    Yardi and its clients have described using non-public data to increase prices. Practically speaking, how did they implement these prices increases within the Revenue IQ system? As I explain in my opening report, at least one Landlord Defendant - Grubb - described making "adjustments to [their] revenue management system" to more or less aggressively increase prices at Yardi Marketing Forum presentation to other Yardi clients:[210]

> "[M]ake adjustments to [their] revenue management system" - i.e., change their Revenue IQ configurations to more or less aggressively increase prices.[211]

357.    An obvious candidate for such "revenue management" "adjustments" is a reference rent reconfiguration.

358.    It is important to recall that Mr. Yenikomshian's analysis is limited to how the source code operates and that he has not reviewed any documentary evidence regarding how clients use the system in practice or how TAMs may oversee clients' pricing (see Section 8.1). The conclusion that follows is that Mr. Yenikomshian has also not considered if any changes

---

[207] Marinescu Opening Report, ¶371; Marinescu Opening Report, Sections 6.1-6.2.
[208] April 16, 2026, Yenikomshian Deposition, 256:16-257:20.
[209] *See* Section 2.
[210] YARDI-DUFFY_00185213, at -15.
[211] Marinescu Opening Report, ¶ 418.

FILED UNDER SEAL

clients made to their configurations were motivated by the same TAM oversight and benchmarking reports this case challenges.

359.    This insight is particularly important in the context of Mr. Yenikomshian's reference rent analysis. If, as a result of TAM oversight or non-public benchmark reporting, clients chose to increase their rental prices, they can do so by simply increasing their reference rent, as Mr. Yenikomshian himself explains.[212] The fact that some clients update reference rents may therefore be evidence of the conduct plaintiffs are challenging, rather than contrary evidence that clients do not abide by Revenue IQ's pricing.

360.    In other words, the mechanism by which non-public data exchanges (through TAMs and benchmarking) increase clients' rents may be Revenue IQ configuration changes - including reference rent changes. This is significant because my opening report specifically identified TAM oversight as a driver of meaningful rent increases. There I explained in detail that:

- Around 2021/2022, Yardi made meaningful changes to how its TAMs used non-public CPD data to oversee clients pricing and calculate "penalty scores" - which asymmetrically punished clients underpricing their benchmark set.[213]

- Coinciding with this period when Yardi began calculating "penalty scores" and using CPD data in its TAM pricing oversight, Landlord Defendants' pricing showed a marked increase relative the Rent CPI.[214]

- This increase in prices was also associated with a structural break in the YLPI in March 2021, where rents began rising increasingly faster in response to further Revenue IQ adoption.[215]

361.    I observe a similar fact pattern in Mr. Yenikomshian's reference rent configuration data. In April 2021, clients changed their reference rents by an average increase of $265 compared to their prior reference rent. Additionally, the frequency with which Landlord Defendants adjusted their reference rent upward also starkly increased from March 2021 to April 2021, from 4,639 to 9,259 upward reconfigurations, roughly doubling in one month.

362.    This spike in large reference rent increases in April 2021 is interesting because it coincides both with updates to TAM oversight and with a structural break in the YLPI my opening report identified. There are consequently several economic indicators that at least some of these reference rent changes may be linked to TAM pricing oversight informed by non-

---

[212] November 24, 2025, Yenikomshian Declaration, ¶ D.60. (*"The client can also manually adjust a Unit Type's current base rent used in the Revenue IQ calculation, by updating the "reference rent" on the "Asking Rents" page of the UI."*)
[213] Marinescu Opening Report, Section 6.
[214] Marinescu Opening Report, Section 9.3.
[215] Marinescu Opening Report, Section 9.3.

FILED UNDER SEAL

public CPD data. It would be economically wrong to argue that such reconfigurations are evidence of heterogenous Revenue IQ usage that is inconsistent with plaintiffs' allegations.

## 8.3 Mr. Yenikomshian Does Not Reasonably Dispute That the Comp Trend Rule Incentivizes Landlords To Increase Rents

363.   To criticize my economic "theory" that the Comp Trend rule distorts competitive incentives and encourages firms to increase prices, Mr. Yenikomshian argues that it has four assumptions that are not met in this case:

> "Dr. Marinescu's ratcheting theory falsely assumes that Comp Sets are composed of other Revenue IQ clients, that the Comp Trend operates in isolation, can recommend instantaneous rental changes of arbitrary magnitude (i.e., is uncapped), and that the Comp Trend allows for contemporaneous transmission of price changes."[216]

364.   Here Mr. Yenikomshian repeats the same problematic move as before - he offers an economic conclusion on what my theory "assumes" - but he has not reviewed any of the documents or literature underpinning that theory. As a result, he misunderstands its assumptions in ways I explain in the following section.

### 8.3.1 Mr. Yenikomshian Attributes Assumptions and Thresholds To My Analysis That Neither I Nor the Literature I Cite Endorse

365.   In my opening report, I analyzed whether common adoption of the Comp Trend Rule alters competitive incentives among participating landlords. The Comp Trend Rule compares each unit's rent against its competitors' rents, and recommends price increases when the unit is becoming cheaper relative to comps and decreases when it is becoming more expensive.[217] Drawing on Maskin & Tirole (1988), I explained that when firms know competitors will respond to price changes in this manner, each firm is disincentivized from lowering prices because competitors will follow, and incentivized to raise them for the same reason.[218]

366.   I applied this framework through a simplified example to isolate the core mechanism, and then showed that additional features of Yardi's Pricing Suite, including TAM oversight and non-public information exchange, reinforce rather than counteract these incentives, and that common Comp Trend adoption dampens the effect of clients' other Health and Trend Rules by suppressing the competitive signals on which those rules rely.[219]

---

[216] March 23, 2026, Yenikomshian Declaration, ¶ 42.
[217] Marinescu Opening Report, Section 5.2; ¶321.
[218] Marinescu Opening Report, ¶¶322-24.
[219] March 23, 2026, Yenikomshian Declaration, ¶¶ 326-328.

FILED UNDER SEAL

367.    Mr. Yenikomshian suggests that my economic analysis of the Comp Trend rule relies on four improper assumptions. I address each below and explain why either (A) my economic analysis does not require this assumption, (B) that assumption is met in this case, or (C) both:

368.    **Assumption 1:** "*that Comp Sets are composed of other Revenue IQ clients*."[220] As I explained in my opening report, peer-reviewed economic literature expects algorithmic collusion to increase prices for both adopting and non-adopting firms.[221] As I explain below, economists also understand that price increases tend to spread across interconnected geographic rental markets. This means that anticompetitive price increases caused by Revenue IQ can quickly spread across Comp Sets, even when Revenue IQ users do not have other clients in their Comp Set. (see Section 8.3.3).

369.    **Assumption 2:** "*that the Comp Trend operates in isolation*."[222] As I explain in my opening report, my core conclusion is that Revenue IQ "economically operate[s] as an integrated coordination system." Two paragraphs later, I expanded on this, explaining that "Yardi's Pricing Suite contains three interlocking components." And as I explained in bullet points to that paragraph, those interlocking components include a "common pricing rule book" "including, in particular, its incorporation of competitor prices." I then explained this was reinforced by "monitoring [to] ensure that clients' transaction prices keep up with a common benchmark."[223] In Section 5.1.4 of my Opening Report, I examined additional client configurations to explain why they did not alter this description of an integrated and interlocking pricing suite that coordinates prices.

370.    When explaining economic incentives, it is common practice for economists to begin with a simplified example to illustrate the principle, then layer in complexity. Consistent with this common practice, in Section 5.2.2 I began with a simplified "toy example" of the Comp Trend Rule. I then made explicit that "Additional features of Yardi's Pricing Suite (which rely on non-public information from Yardi clients) further exacerbate these incentives."[224] And I further explained that "common adoption of the Comp Trend Rule alters the informational environment on which Revenue IQ's other Trend and Health rules rely." As a direct consequence, "it generally dampens the effect of the other Trend and Health Rules."[225] Neither Mr. Yenikomshian nor Dr. Tucker address this analysis, but Mr. Yenikomshian nonetheless claims my economic "theory" requires the Comp Trend rule to operate in isolation.

---

[220] March 23, 2026, Yenikomshian Declaration, ¶ 42.
[221] Marinescu Opening Report, Section 3.1.2.
[222] March 23, 2026, Yenikomshian Declaration, ¶ 42.
[223] Marinescu Opening Report ¶ 12.
[224] Marinescu Opening Report ¶ 326.
[225] Marinescu Opening Report ¶ 328.

117

FILED UNDER SEAL

371.    Mr. Yenikomshian's argument that my theory "assumes" and "requires" the Comp Trend rule "operates in isolation" is therefore not a reasonable reading of my opening report or its methods, and requires the reader to ignore several of my most important conclusions.

372.    Further, even accepting Mr. Yenikomshian's suggested assumption, he admitted at deposition that he "did not" "identify any configuration setting … that could change whether the Comp Trend Rule in step one will generate a positive or negative trend signal." (see Section 8.4.1). This matters because even on Mr. Yenikomshian's own terms - analyzing the Comp Trend in isolation from the rest of the system - the directional pricing signal it generates is not one clients can configure away, and, in fact, clients use the Comp Trend setting in almost all instances.

373.    **Assumption 3:** *that the comp trend "can recommend instantaneous rental changes of arbitrary magnitude (i.e., is uncapped)."*[226] As I explained in my opening report, if firms expect their competitors to respond to a price increase with another price increase (or, conversely, respond to a decrease with a decrease), each firm is incentivized to increase prices and disincentivized to decrease prices. To substantiate this claim, I cite well-established literature from Maskin & Tirole.[227] Their model does not require "uncapped" price responses "of arbitrary magnitude."

374.    Mr. Yenikomshian's extreme claim that my theory requires "arbitrary" and "uncapped" price increases is not founded in any testimony I offer or in any of the economic literature I cite; it has no clear basis I have been able to identify. To reliably offer his opinion, Mr. Yenikomshian should have first reviewed the economic literature I cite. He did not.

375.    **Assumption 4:** *"that the Comp Trend allows for contemporaneous transmission of price changes."*[228] As I, Mr. Yenikomshian, and Mr. Gaeta all explain in our opening submissions, Revenue IQ updates its price recommendations daily, using surveys of comp rents from RentCafe and Matrix.[229] Mr. Yenikomshian's actual point is narrower than his framing suggests: he notes that "the data that the Comp Trend calculation relies on is averaged over a historical lookback window … most frequently set to 14 days."[230]

376.    But this does not mean that price changes are delayed by two weeks. Instead, it means that that the comp rents Revenue IQ uses are updated can feed into overnight price movements - and that their effect is averaged across a period of typically 2 weeks. In practice, then, a competitor's price increase is reflected in the very next daily run of Revenue IQ - initially at a 1/14th weighting - and then comprises an increasingly larger share of the average each

---

[226] March 23, 2026, Yenikomshian Declaration, ¶ 42.
[227] Marinescu Opening Report, ¶ 323..
[228] March 23, 2026, Yenikomshian Declaration, ¶ 42.
[229] Marinescu Opening Report, ¶ 173; November 24, 2025, Gaeta Declaration, ¶ 43;  November 24, 2025, Yenikomshian Declaration, ¶¶ 59, 61.
[230] March 23, 2026, Yenikomshian Declaration, ¶ 54.

day until it fully predominates after 14 days. The effect starts quickly and grows over two weeks. This is fully consistent with the "near-real time" dynamic I describe in my opening report.

377.    In short, Mr. Yenikomshian is, by his own admission, not an economist and has not reviewed any of the literature upon which I base my theory, yet attributes to my "theory" four stringent assumptions that neither my report nor the literature requires.[231] The cumulative result of these unwarranted assumptions is that Mr. Yenikomshian sidesteps the core point of my Comp Trend analysis: that rising adoption of the Comp Trend Rule incentivizes landlords and property managers to increase prices. As he explained at deposition, he is "not opining on other aspects like coordinated pricing."[232]

378.    In other words, Mr. Yenikomshian has (A) relied on an unwarranted set of (sometimes extreme) assumptions that my theory does not require and never suggests, and (B) incorrectly argued these assumptions are not satisfied by applying unreasonable standards and ignoring serious data limitations - all while evading the core point of my theory: that the Comp Trend rule incentivizes clients to increase prices.

379.    Dr. Mitzenmacher raises a related concern about my benchmarking analysis. In his rebuttal declaration, he argues that my report inconsistently recognizes that the benchmarking reports that Yardi produces are aggregated and anonymized.[233] He appears to misunderstand my testimony. My opening report's reference to "lease level rents" referred to the distinction between public list prices and non-public final lease prices. Yardi's benchmarking gives visibility into the latter that clients cannot recreate with public information. This creates a "funnel" as clients can assess multiple rent metrics (from list to final transaction prices) in a way they could not without non-public data.[234] Dr. Mitzenmacher does not debate this point.

380.    I do not dispute that this data has added "noise." Noise does not systemically skew the benchmark in any given direction. As a result, the added noise does not undermine the benchmarking data's directional price signals, as Dr. Mitzenmacher admitted at

---

[231] April 16, 2026, Yenikomshian Deposition, 68:11 - 13. (*"**Q:** Do you consider yourself qualified to testify in a federal court as an economist? **A:** I'm not an economist in that sense."*
[232] April 16, 2026, Yenikomshian Deposition, 139:5 - 20. (*"**Q:** Is whether the comp trend rule from an economic perspective incentivizing participants to set supracompetitive prices relevant for determining whether the Revenue IQ system produces coordinated pricing outcomes? **A:** I am also, in my analysis, analyzing the software system itself and how it creates pricing outputs. I'm not opining on other aspects like coordinated pricing. I'm tell -- I'm analyzing the system. I'm looking at the inputs that are client-provided inputs, the pricing outputs that - or how it generates pricing outputs, the client settings that are used in generating those outputs, as well as how clients change or how they -- how -- what they do with those outputs."*)
[233] March 23, 2026, Mitzenmacher Declaration, ¶ 34.
[234] Marinescu Opening Report, ¶ 405.

FILED UNDER SEAL

deposition.[235] If clients use benchmarking information to determine if their comps are deviating from the collusive scheme (which is what the model in Harrington (2022) discusses and which I explain in my opening report),[236] directionally accurate price signals from the benchmark data is generally sufficient. Dr. Mitzenmacher did not review this literature.

381. This is the use I observe in Yardi's documents and explained in my opening report: Yardi and its clients describe using the benchmarking data to identify opportunities to price more aggressively, i.e., price up to "what the market may bear." Dr. Mitzenmacher also has not reviewed these documents and therefore has an incomplete basis to opine on how Yardi's benchmarking data can be used by defendants. Further, If Dr. Mitzenmacher's noise argument were taken to its logical conclusion, it would imply that Yardi's benchmarking product has no commercial value, a claim contradicted by these documents. I expand on these issues below in Section 9.2.

382. In the following subsections, I expand on these points to demonstrate how Mr. Yenikomshian's opinions on my Comp Trend Rule analysis are not well supported.

### 8.3.2 Neither Myself Nor Mr. Yenikomshian Can Reliably Estimate How Often Revenue IQ Users Have Other Revenue IQ Users in Their Comp Sets Because the Current Record Is Insufficient

383. Mr. Yenikomshian claims that my theory assumes "*that Comp Sets are composed of other Revenue IQ clients,*" and that this assumption is not met in this case. To evidence this claim, he purports to quantify how often Revenue IQ users have other Revenue IQ users in their comp set (using limited data Yardi produced in this matter). This data has significant flaws that call into question Mr. Yenikomshian's conclusions.

384. Yardi has produced a single static snapshot of Revenue IQ client comp sets as of August 19th 2025. Therefore, neither myself nor Mr. Yenikomshian have visibility on:

- Historic client comp sets for the vast majority of the relevant period.

- Client comp sets for Revenue IQ users who were not active when the snapshot was taken.

---

[235] May 19, 2026, Mitzenmacher Deposition, 106:16 - 107:3 ( *"**Q:** And you weren't attempting, in this analysis, to show or analyze the frequency with which the noise would cause the benchmarking price to be incorrectly shown as above the landlord's rent when it was below the landlord's rent or vice versa; correct? **A:** I don't think the purpose of this figure was to discuss the specific frequency with which someone would attain a result above or below a particular landlord's rent dependent on the noise as that would depend on a number of factors in a situation. What it shows is that given the range of possibilities from the sample averages, including with the noise, that that is clearly an -- an inherent possibility."*)
[236] Marinescu Opening Report, Section 7.2.

FILED UNDER SEAL

385. Combined, these two issues mean the current record provides insufficient visibility on Revenue IQ comp sets to reach any definitive conclusions about their composition. Both myself and Mr. Yenikomshian would require further production from Yardi to reach more reliable estimates.

### 8.3.3 Economists Understand That Price Movements Propagate Across Interconnected Geographic Rental Markets, Even Without Direct Comp Set Overlap

386. As noted above, Mr. Yenikomshian argues that my Comp Trend analysis "falsely assumes that Comp Sets are composed of other Revenue IQ clients," and points to data suggesting that a majority of Landlord Defendants' comp sets do not include other Revenue IQ users.[237] But this argument misses a more fundamental point: my theory does not require direct comp set overlap for Revenue IQ to affect pricing. Revenue IQ's anticompetitive effects can spread across clients' comp sets, even when those comp sets do not point at each other. This occurs through widely understood economic transmission mechanisms that are recognized in peer-reviewed literature.

387. As I explained previously in Section 8.3.1 and in my opening report, peer-reviewed economic literature expects algorithmic collusion to increase prices for both adopting and non-adopting firms.[238] As I explain below, economists also understand that price increases tend to spread across interconnected geographic rental markets. This means that anticompetitive price increases caused by Revenue IQ can spread across Comp Sets, even when Revenue IQ users do not have other clients in their Comp Set. In this section, I further explain the academic basis for these arguments.

388. In my opening report I cited Harrington (2025) and explained that coordination by a hub algorithm is expected to increase the average price of both adopters and non-adopters alike (but to have a greater effect on adopters):[239]

> "Under coordinated adoptions: i) the average price of adopters and non-adopters are increasing in the adoption rate; and ii) on average, the price of adopters exceeds the price of non-adopters"[240]

---

[237] March 23, 2026, Yenikomshian Declaration, ¶ 42.
[238] Marinescu Opening Report, Section 3.1.2.
[239] Marinescu Opening Report, ¶ 109.
[240] Joseph E. Harrington, "An economic test for an unlawful agreement to adopt a third-party's pricing algorithm," *Economic Policy*, January, 2025, available at https://academic.oup.com/economicpolicy/article-abstract/40/121/261/7772481 (accessed January 13, 2026), p. 275.

389.    This implies that coordinated algorithmic adoption generates "umbrella effects" on non-adopters.[241] Such umbrella effects in turn create a transmission mechanism across distinct geographic markets and comp sets. The intuition is simple: if a cartel causes prices to increase, that alleviates competitive pressure on non-cartelists, allowing them to also increase prices.

390.    Such umbrella effects in turn create a transmission mechanism across distinct geographic markets and comp sets. Even if two properties have no direct contact with each other or exist in separate markets, their markets may overlap at the borders, creating a bridge that transmits economic effects between them. That bridge can even be non-adopting firms who also increase prices in response to rising Revenue IQ adoption.

391.    When asked about this at deposition, I explained this reasoning:

> **Q:** But if a landlord defendant's Revenue IQ comp set did not include other Revenue IQ users, then that landlord's comps would not be informed by any other Revenue IQ user. Correct?
>
> **A:** It would still be informed in an indirect fashion through the market, because when this hub algorithm, as I, as I describe it in my report, leads to price increases for the group of alleged conspirators, other landlords in the market typically would also see price increases for other landlords in the market and, therefore, in that way, you know, it's like a chain whereby, you know, I influence the price of somebody who maybe isn't using Revenue IQ, but that price is influencing some other Revenue IQ user, like, right there on two sides. So, like, imagine A, B, C. So, B is a non-user. A and C are users. If B is in the same market, then, you know, if we're both looking at B, we're essentially coordinating our prices through B. But this is a hypothetical. I'm just explaining that there is an indirect effect."[242]

392.    This intuition is backed by a wide range of peer-reviewed literature. Broadly speaking, economists understand that separate markets frequently exhibit what are called "cascade effects" - where economic movements spread through an interconnected network of individual markets - almost like a spiderweb. More simply put, if prices go up in one geographic market, that tends to ripple throughout nearby markets, ultimately affecting geographic markets that have no direct connection with the original location of the price increase.

---

[241] Kone AG and others v. OBB-Infrastructur, ECLI:EU: C 2014:1317, available at https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:62012CJ0557 (accessed May 19, 2026), *"a person not party to the cartel who, benefiting from the protection of the increased market prices, raises his own prices for his products more than he would have done without the cartel (umbrella pricing)," ¶ 17.*
[242] March 9, 2026, Marinescu Deposition, 126:16 - 127:19.

FILED UNDER SEAL

393.    Acemoglu et al (2012) define cascade effects as originating from a specific source and then propagating to the rest of the economy.[243] Connections between firms spread economic shocks through the economy like a chain, so a shock originating with firm A can spread to firm C through firm B, even with no direct contact between A and C.[244]

394.    In housing specifically, there is a significant literature that U.S. housing markets are not isolated, but rather geographically interconnected systems in which price movements and demand shocks spread quickly. Roy Chowdhury et al. (2023) examine spillover effects and interdependencies in U.S. housing markets. The authors identify roles of MSAs within the house price transmission network, where regions act either as net transmitters or as net receivers of housing market shocks.[245] Similarly, Cotter et al. (2011) document a highly integrated set of U.S. metropolitan housing markets.[246] Their findings reveal elevated and increasing levels of housing market integration over the 2000s, suggesting that shocks propagate through a large number of metropolitan housing markets.[247]

395.    Importantly for this case, these interconnections also exist in rental markets, and can occur across different properties in narrow geographic areas. Autor et al. (2014) show that, within Cambridge, the end of rent control increased prices not only for decontrolled units (units that had previously been rent controlled), but also for nearby never-controlled properties

---

[243] Daron Acemoglu, Vasco M. Carvalho, Asuman Ozdaglar, and Alireza Tahbaz-Salehi, "The network origins of aggregate fluctuations," *Econometrica*, September, 2012, available at https://economics.mit.edu/sites/default/files/publications/The%20Network%20Origins%20of%20Aggregate%20Fluctuations.pdf (hereinafter, "Cascade Effects" ) (accessed May 11, 2026), *"Our main results provide a characterization of this relationship in terms of the importance of different sectors as suppliers to their immediate customers, as well as their role as indirect suppliers to chains of downstream sectors. Such higher-order interconnections capture the possibility of "cascade effects" whereby productivity shocks to a sector propagate not only to its immediate downstream customers, but also to the rest of the economy,"* p. 1977; *"This paper shows that the types of interconnections emphasized by Mulally indeed imply that the effects of microeconomic shocks may not remain confined to where they originate. Rather, microeconomic shocks may propagate throughout the economy, affect the output of other sectors, and generate sizable aggregate effects,"* p. 1978.

[244] Cascade Effects*, "the presence of interconnections between different firms and sectors, functioning as a potential propagation mechanism of idiosyncratic shocks throughout the economy,"* p. 1978.

[245] Sahana Roy Chowdhury, Kirti Gupta and Panayiotis Tzeremes, "US housing prices and the transmission mechanism of connectednes," *Finance Research Letters*, 2023, available at https://www.sciencedirect.com/science/article/abs/pii/S1544612323010085 (accessed May 12, 2026), *"This research examines the connectedness effects of US house prices across different metropolitan areas, utilizing a quantile connectedness model. We identify MSAs that could play a significant role in the transmission of house prices, either as net contributors or recipients of these effects."*

[246] John Cotter, Stuart Gabriel, and Richard Roll, "Integration and Contagion in US Housing Markets," *Munich Personal RePEc Archive*, 2011, available at https://mpra.ub.uni-muenchen.de/34591/1/MPRA_paper_34591.pdf (hereinafter, "Integration and Contagion") (accessed May 12, 2026), *"This paper explores integration and contagion among US metropolitan housing markets. The analysis applies Federal Housing Finance Agency (FHFA) house price repeat sales indexes from 384 metropolitan areas to estimate a multi-factor model of U.S. housing market integration,"* p.1.

[247] Integration and Contagion, *"Research findings reveal a highly integrated set of US metropolitan housing markets. Furthermore, the susceptibility of MSA housing markets to national economic and policy shocks trended up over time and was especially evident in the decade of the 2000s,"* p. 15.

FILED UNDER SEAL

(units that had never been rent controlled).[248] In other words, when rent control goes away on some properties, all properties become more expensive because the competitive environment has changed. This then ripples throughout nearby areas. This is a conceptually similar mechanism to that described in Harrington (discussed above) and exemplifies the chain reaction I described in my deposition.

396.    These umbrella and cascade effects mean that anticompetitive effects of the Comp Trend Rule (and other features of the Yardi Pricing Suite) can spread across interconnected geographic markets, even when Revenue IQ users do not have other Revenue IQ users in their comp set.

397.    Yardi argues that these claims are currently untested. As a starting point, my opening report cited peer-reviewed literature - Harrington (2025) - which explains the theoretical basis for this opinion. In other words, published economic research has identified the "indirect" effect Yardi claims is untested. I expand on that finding with a further literature review here - including empirical research - and reach the same conclusion. To the extent Yardi believes it is necessary to further test this effect in a case-specific analysis, I would require further data production - such as more granular pricing data for non-RM users, which itself would require significant production (potentially from Landlord Defendants) on which properties do not use RM software (e.g., also considering which properties use RealPage).

398.    In sum, Mr. Yenikomshian offers no economically reasonable argument that common Comp Trend Rule adoption does not incentivize firms to increase prices. The four assumptions he attributes to my theory are not found in my opening report or in any of the literature it relies upon (which Mr. Yenikomshian did not review). And he ignores my analysis of how the Comp Trend rule works in concert with Yardi's non-public information exchange, thereby dampening the effect of clients' other configurations. Even setting these flaws aside, most of the assumptions he suggests are nonetheless satisfied in this case when applying more economically reasonable standards.

399.    In the following section, I explain that the anticompetitive effects of common adoption of the Comp Trend Rule are not ameliorated by clients' other Revenue IQ configurations.

---

[248] David H. Autor, Christopher J. Palmer, Parag A. Pathak, "Housing Market Spillovers: Evidence from the End of Rent Control in Cambridge, Massachusetts," *Journal of Political Economy*, 2014, available at https://economics.mit.edu/sites/default/files/publications/housing%20market%202014.pdf (accessed May 12, 2026), *"Pooling data on the universe of assessed values and transacted prices of Cambridge residential properties between 1988 and 2005, we find that rent decontrol generated substantial, robust price appreciation at decontrolled units and nearby never-controlled units, accounting for a quarter of the $7.8 billion in Cambridge residential property appreciation during this period,"* p. 661.

FILED UNDER SEAL

## 8.4  Clients' Additional Configurations Do Not Override The Trend Rules And Are Consistent with the Economics of Coordinated Pricing

400.  Mr. Yenikomshian argues that my configuration analysis "creates a false appearance of commonality" because I focused on 9 of 195 configuration settings and "arbitrarily" excluded the remaining 186.[249] His rebuttal identifies three categories of settings he says I improperly ignored: (1) first, Health Rule multipliers in Step 2, which he says can produce "materially different […] pricing outputs" from the same Step 1 signal; (2) second, Step 3 adjustments (e.g., lease-term premiums, vacancy discounts, and turn costs), which he says "can change the direction of the final pricing output;"[250] and (3) third, the step size setting, which controls the magnitude of rent changes.[251] From these, Mr. Yenikomshian concludes that my analysis presents a "materially incomplete basis for assessing similarity across properties."[252]

401.  But Mr. Yenikomshian's deposition testimony strongly qualifies these conclusions. He clarified that:

- He had not evaluated the "impact" of these additional configurations on "final prices.

- He could not identify any configurations that reversed the signal from the Comp Trend Rule.

- He could identify only two configurations that might change the signal from the remaining three Trend Rules.

- He had not evaluated if any of these configurations "have ever actually reversed the direction of the pricing change recommendation."

- And he made no "attempt to analyze how often step three … will actually reverse the pricing direction that's set by step one."[253]

402.  In other words, Mr. Yenikomshian's assertion that the additional configurations I exclude undermine commonality is based on conjecture about what they might do, not any

---

[249] March 23, 2026, Yenikomshian Declaration, Section V.
[250] March 23, 2026, Yenikomshian Declaration,  ¶¶ 27, 31.
[251] March 23, 2026, Yenikomshian Declaration, Section VI.A.3.
[252] March 23, 2026, Yenikomshian Declaration,  ¶ 29.
[253] April 16, 2026, Yenikomshian Deposition, 184:21 - 185:2 (*"**Q:** Did you make any attempt to analyze how often step three -- differences in step three configurations will actually reverse the pricing direction that's set by step one of the system? **A:** No. Because I know how the code works and I know the clients configure the settings in certain ways, so it's not necessary."*)

empirical analysis of what they actually do. My opening report provided exactly that empirical analysis, and none of Yardi's Experts has engaged with it.

403. Specifically, at paragraph 339 of my opening report, I explained that if the configurability Mr. Yenikomshian describes were producing genuinely independent pricing, Landlord Defendants' prices would likely diverge, and Yardi's Experts "could validate [Yardi's] contention by showing low pricing correlations among Landlord Defendants." I found the opposite: rents at nearly 3,500 pairs of competing Defendant properties track in near-perfect synchronization, with a median correlation of 0.72 and the most common correlation at 0.99.[254] This finding is, as I explained, "in tension with Mr. Yenikomshian's conclusion that collusion is implausible due to the variability in configurations and affirms my prior conclusion that he includes many extraneous configurations which do not materially affect the co-movement of Revenue IQ's clients' list prices."[255]

404. None of Yardi's Experts has responded to this analysis or offered an alternative explanation for these correlations. Mr. Yenikomshian claims my configuration analysis creates a "false appearance of commonality," but when the data provide a straightforward way to test that claim (specifically, by asking: "do Landlord Defendants' prices actually diverge?") he does not perform that analysis or acknowledge my own.

405. This speaks to a broader economic misunderstanding in Mr. Yenikomshian's rebuttal that I explained in my opening report: not every configuration that affects a client's final price is also relevant to the economic analysis of collusion. Intuitively, if a client offers a discount on longer lease terms, that affects their final price but is neither evidence of deviation from a conspiracy, nor evidence that pricing is too heterogenous to be susceptible to collusion. Instead, it is simply a generic description of the price structure, which is common in many markets that may be cartelized. A gas station in a price-fixing conspiracy still charges different prices for regular and premium; that does not make the conspiracy any less effective.

406. Mr. Yenikomshian's critique often amounts to observing that landlords make different individual business decisions about lease terms, vacancy adjustments, and rent ceilings, and treating that as evidence against coordination. It is not. The more important question is whether defendants adopted the same rules for responding to each other's prices. It is those rules I focused on in my initial report.

407. It is therefore unsurprising that my "exclusion of configuration data fields [was] … unsupported by the Revenue IQ Source Code" - because it was not based on the Revenue IQ source. But it also was not "arbitrary" as Mr. Yenikomshian suggests. It was based on

---

[254] Marinescu Opening Report, ¶¶337-38.
[255] Marinescu Opening Report, ¶340.

FILED UNDER SEAL

my economic analysis of what pricing decisions are most likely to matter when analyzing an alleged conspiracy. And I explained this in my opening report, where I wrote that I had:

> "holistically evaluated the types of configurations in his analysis, whether they appear relevant to the directional logic of Revenue IQ's price recommendation … In doing so, I observe that many are not clearly related to whether or not landlords coordinate via Revenue IQ … Mr. Yenikomshian's analysis is not particularly informative for the economic analysis of coordination and therefore does not alter my conclusions."[256]

408.  Mr. Yenikomshian simply repeating the same analysis he has already offered with respect to additional configurations does not respond to the economic logic I explained in my opening report.

409.  That some configurations impact pricing decisions in a way that is irrelevant to a conspiracy is neither surprising nor relevant to my analysis, and Mr. Yenikomshian admits he has not performed adequate research to reliably opine to the contrary. And Yardi's economic expert, Dr. Tucker, has refrained from opining on this subject. By restating his prior conclusion that some configurations affect a final pricing outputs, neither Mr. Yenikomshian nor any of Yardi's other experts have meaningfully engaged with this opinion or offered any compelling alternative lens through which to consider clients' configurations.

410.  In the following subsections, I show that Mr. Yenikomshian's deposition qualifications confirm this distinction: the configurations he identifies affect the price structure but do not override the directional pricing signal that matters for coordination.

### 8.4.1 Mr. Yenikomshian Admitted that Clients' Additional Configurations Rarely, If Ever, Overrule the Comp Trend Rule or Combined Trend Rule Signal

411.  At deposition, Mr. Yenikomshian was asked whether the additional configurations he discusses could reverse the Comp Trend Rule's directional signal or the signals of the other three Trend Rules. This question goes to the heart of my analysis. My concern has never been that Revenue IQ produces perfectly uniform pricing - some variation across unit types, lease terms, and local conditions is expected and entirely consistent with coordination. The concern is that Revenue IQ causes directional upward pricing pressure that increases as more properties adopt it. The Trend Rules signal whether to raise or lower prices, and if that directional signal is uniform across clients, the coordination mechanism I describe is operative regardless of differences in magnitude. The key question is therefore

---

[256] Marinescu Opening Report, ¶ 296.

FILED UNDER SEAL

whether Mr. Yenikomshian's 186 additional configurations can change that directional signal, not whether they affect how much prices move.

412.    To that end, Mr. Yenikomshian admitted he had not evaluated the "ultimate" price impact of these additional configurations:

> **Q:** Did you do any analysis of the impact of this false appearance of commonality on the ultimate prices that Revenue IQ users charge clients?
>
> **A:** In my opening report and in my -- in my rebuttal report, I have provided calculations of how these different pricing impacts could change both the magnitude and the size of a pricing output.[257]
>
> …
>
> **Q:** I'm asking whether it was needed for your illustrative example.  I'm asking did you make any empirical attempt to link changes in configuration settings to the executed lease data.
>
> **A:** And I answered that it's not needed for my analysis of how the system works and how the clients make choices. I know how the system works from the code review, and I know there's choices in it because I looked at the configuration data. These are the rules. These are the types of configurations that people make when they set up Revenue IQ.[258]

413.    Mr. Yenikomshian was also unable, based on his analysis of the source code, to identify a single configuration in Revenue IQ that would revise the signal from the Comp Trend Rule:

> **Q:** Did you identify any configuration setting among the 186 that you state Dr. Marinescu did not consider that could change whether the comp trend rule in step one will generate a positive or negative trend signal for a unit type?
>
> **A:** I did not.[259]

414.    For the other three Trend Rules (Availability, New Leases, and Traffic), Mr. Yenikomshian similarly could identify only 2 out of 186 configurations that might reverse the Trend Rule signal. [260]

---

[257] April 16, 2026, Yenikomshian Deposition, 162: 13-19.
[258] April 16, 2026, Yenikomshian Deposition, 164: 9-19.
[259] April 16, 2026, Yenikomshian Deposition, 179:20 - 180:1.
[260] April 16, 2026, Yenikomshian Deposition, 180:2 - 17 ████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████

FILED UNDER SEAL

415.    In other words, of the 186 configurations that Mr. Yenikomshian claims undermine the visage of commonality my opening report presented, he could identify only two configurations (“▮▮▮▮▮▮▮▮▮▮▮” and “▮▮▮▮▮▮▮▮▮”) that might reverse the signal from stage one of Revenue IQ (the Trend Rules). This means that across virtually all clients and configurations, when the Step 1 signals “raise prices,” that signal survives Steps 2 and 3 intact. The 186 settings Mr. Yenikomshian faults me for excluding may affect how much prices move, but they do not change the fact that prices move in the same direction, which is what coordination predicts. To address Mr. Yenikomshian's criticisms, I further evaluate how heterogenous clients' settings of these two configurations were.

416.    I present this analysis below in Figure 25 and Figure 26. I find that over 95% of clients' configurations of “▮▮▮▮▮▮▮▮▮▮▮” were “0:”

**Figure 25:Frequency Of** ▮▮▮▮▮▮▮▮▮▮▮ **Configuration Setting**[261]

Monthly Calculations.
*A configuration is a unique combination of Property and Unit Type Group.

[261] Sources: Configuration Data (*see* Appendix F.2 of Marinescu Opening Report), Lease Data (*see* Appendix F.1 of Marinescu Opening Report). Notes: I filter the Configuration Data to include only Landlord Defendant properties, and for Field Name value “▮▮▮▮▮▮▮▮▮.”

129

417.    When analyzing "█████████████████████" I similarly find that over 80% of clients' configurations were "3:"

**Figure 26: Frequency Of █████████████████ Configuration Setting[262]**



Monthly Calculations.
*A configuration is a unique combination of Property and Unit Type Group.

418.    Therefore, even if these two configurations do change the final pricing output of Revenue IQ in a way that may matter to a cartel analysis, we should expect their effect to be substantially similar across clients. This does not undermine the "appearance of commonality" my opening report identified.

419.    Consistent with this expectation, Mr. Yenikomshian also confirmed he did not "check" if these configurations ever actually reversed the signal from the Trend Rules.

> **Q:** And you never checked, sir, in the executed lease data whether configuration in settings in step three have ever actually reversed the direction of the pricing change recommendation produced by step one. Is that correct?

---

[262] Sources: Configuration Data (*see* Appendix F.2 of Marinescu Opening Report), Lease Data (*see* Appendix F.1 of Marinescu Opening Report). Notes: I filter the Configuration Data to include only Landlord Defendant properties, and for Field Name value █████████████████"

FILED UNDER SEAL

> **A:** As I said earlier, I did not link the configuration data to the executed lease data.[263]

420.    While I have explained that it is not possible to evaluate this using the lease data, Mr. Yenikomshian also had not made "any attempt to analyze how often" the additional configurations reverse stage one (the Trend Rules) based on his knowledge of "how the code works:"

> **Q:** Did you make any attempt to analyze how often step three -- differences in step three configurations will actually reverse the pricing direction that's set by step one of the system?
>
> **A**: No. Because I know how the code works and I know the clients configure the settings in certain ways, so it's not necessary.[264]

421.    The purpose of this analysis is not to dispute that some additional configurations may have an effect on clients' pricing. I take Mr. Yenikomshian at his word when he states this is what the source code does. But not all changes are relevant to understanding the long-term impact of a coordination structure on the level of prices. A configuration that affects a client's price is not always the same as a configuration that undermines coordination. I explain this further in the following section.

## 8.4.2 Firms Can Collude On the Price Level While Retaining Flexibility Within the Price Structure

422.    In Section 8.2, I explained that Mr. Yenikomshian errs in his analysis of reference rent configurations by failing to consider the magnitude of clients' reconfigurations and the underlying motivation driving them. Mr. Yenikomshian commits the same oversight with Step 3 configurations - including lease term premiums, vacancy discounts, and turn costs - as with reference rents: he shows these settings affect the pricing output without analyzing whether the effect is economically meaningful or relevant to coordination. At deposition, he confirmed as much:

> **Q:**   Are you testifying that it -- if clients enable configuration settings in step three, it will affect pricing output? Is that your testimony?
>
> **A:**   If clients enable options in step three, mathematically, it will affect the pricing output.
>
> **Q:**   Did you make any attempt to study the magnitude of the effect?
>
> **A:**   No.  I know that it will affect the pricing calculation.[265]

---

[263] April 16, 2026, Yenikomshian Deposition, 185:25 - 186:6.
[264] April 16, 2026, Yenikomshian Deposition, 183:19 - 185:2.
[265] April 16, 2026, Yenikomshian Deposition, 185:13-21.

131

FILED UNDER SEAL

423.    It is difficult to square Mr. Yenikomshian's claim that setting these additional configurations to the side "create[s] a false appearance of commonality" with his separate admission that he had not made "any attempt to study the magnitude of [their price] effect." The sort of commonality I seek to understand and opine on is the one that is relevant to long-run price co-movements associated with coordination, not adjustments for individual transaction characteristics that could occur whether or not there is coordination. This is the logic I attempted to explain in Section 5.3 of my opening report.

424.    To reiterate this point another way: there is an important economic distinction between price structure and price level. In industries with a multi-faceted price structure (e.g., some heterogeneity in pricing which depends on transaction characteristics), a successful conspiracy need not achieve perfectly uniform pricing. Indeed doing so may be suboptimal.[266] In the economic background section of my Opening Report, I explained that "such markets may still see collusion, often by fixing list prices which then directly impact final transaction prices."[267] Increasing the price level, while allowing flexibility within the price structure, can still achieve collusive pricing. In such instances, an algorithm may be the optimal way to coordinate, as it can handle the complexity of the price structure while still coordinating the general level of prices upward.

425.    Let's take the example of lease length: it is true that a 2-year lease may have a different price than a 1-year lease. And it is also true that the price of a lease may depend on what month of the year it is executed. Does this mean there can never be successful coordination to inflate rental prices? Does this mean firms can only collude if they decide that 1- and 2-year leases will have the same collusive price?

---

[266] Marinescu Opening Report, *"Even under collusion, each property and unit can have a different price level (and therefore floor) due to differences in characteristics like square footage and location. Indeed, if a conspiracy is effective at increasing rents over time, economists can expect the floor price to rise and therefore be "updated,"" ¶ 284; "In economic terms, coordinated conduct does not require firms to set identical prices. Rather, collusion exists when competing firms constrain their independent pricing decisions and increase prices in a way they would not absent concerted conduct. [...] That coordination need not eliminate pre-existing price differences across properties or units. To the contrary, the price of any given unit or property at the time of Revenue IQ adoption already reflects substantial, persistent heterogeneity relative to rival units and properties - differences in location, amenities, quality, and tenant mix. As Yardi itself explains at length, properties and units are differentiated and therefore require distinct price levels. Economic coordination operates on top of this heterogeneity: landlords can increase prices together, preserving relative price differences while nonetheless raising the overall level of rents in parallel. The relevant economic question is therefore not whether Revenue IQ users charge identical prices, but whether their pricing decisions are structured in a way that produces coordinated price increases relative to the competitive counterfactual," ¶ 300; "the object of Yardi's Pricing Suite is not to set the same price level across Landlord Defendants - their properties and units are heterogenous, making such a policy irrational - but rather to move prices upward in parallel. Indeed, Yardi explains to clients that the purpose of the x"Rent Ratio" is "measuring the gap not necessarily matching rates,"" ¶ 334.*
[267] Marinescu Opening Report, Section 3.2.2.

426.    From an economist's perspective, the answer is a clear no. Firms can retain discretion over the price structure while coordinating on the price level.[268] Such a pricing structure can be executed either through manual pricing or through an algorithm. Indeed, a multifaceted pricing structure may be precisely why firms coordinate via an algorithm rather than manually, because the algorithm can handle the complexity of the price structure while still pushing the price level up in a coordinated fashion.[269]

427.    More broadly, to analyze an alleged cartel, it is not typically necessary to evaluate and classify every single input to a client's price in the way Mr. Yenikomshian appears to suggest is necessary here. There is a simpler way that economists typically prefer: study the ultimate effect of the cartel on the price level. That is what my opening report's analysis did - and as discussed above, none of Yardi's Experts have engaged with it or offered an alternative explanation for the parallel pricing outcomes I found.

428.    Similarly, in non-algorithmic collusion cases, it would not typically be necessary to analyze in detail every consideration that a pricing committee may discuss before increasing prices. But Mr. Yenikomshian appears to suggest that the equivalent method should be applied here.

429.    The concrete application of this logic is that Mr. Yenikomshian conflates configurations that impact where a transaction falls in the price structure with configurations that impact upward coordination on the price level. This speaks to the core shortcoming in Mr. Yenikomshian's rebuttal analysis. While he can speak to what the source code does and how clients configure it, he cannot reliably speak to its economic meaning.

430.    In Section IV.B of his rebuttal declaration, Dr. Mitzenmacher commits similar oversights. There, he looks at a different set of configurations but similarly does not consider which would affect where a transaction falls in the price structure vs which are relevant to analyzing coordination. This is why I prefer to analyze what Yardi itself described as the core Trend and Health Rules (see Section 5 of my opening report) and then assess parallelism and coordination in observed outcomes from those core rules (in addition to the broader Yardi Pricing Suite). His broader testimony that "a software application can run many different functions conflates" the programmatic concept of "executable logic" with my economic analysis of what determines the overall level of rental prices. I next turn to other flaws in Dr. Mitzenmacher's analysis.

---

[268] Thomas W. Ross, "Cartel stability and product differentiation," *International Journal of Industrial Organization*, 1992, available at https://www.sciencedirect.com/science/article/abs/pii/016771879290043X (accessed May 15, 2026) *"In this paper I have presented two models in which cartels supply differentiated products. The results of the supergame analysis indicate that differentiation need not hamper cartel stability when finding an agreement is not problematic,"* p.11.

[270] March 23, 2026, Mitzenmacher Declaration, ¶ 62.

FILED UNDER SEAL

# 9. Dr. Mitzenmacher's Opinions are Disconnected from the Economic Literature and the Factual Record in this Case

431.    As just explained, Dr. Mitzenmacher repeats several of the same conceptual mistakes as Mr. Yenikomshian. Both when reaching new opinions and when reiterating prior conclusions I disagreed with in my opening report, he presents a technical analysis of how Revenue IQ operates, from which he suggests economic conclusions. For example:

- His rebuttal declaration offers a new affirmative opinion on subjects he did not previously address - specifically Revenue IQ's Comp Trend Rule. Using a computer simulation, he argues it should lead to downward price wars among adopters. He does not compare this prediction against undisputed empirical findings in my report, or consider how it fits into the broader Revenue IQ system - which contains safeguards (or enforcement mechanisms) to prevent such pricing.

- He repeats previous opinions regarding the benchmarking data's aggregation and anonymization to rebut my opening report's conclusion that the benchmarking can - and demonstrably is - used to anticompetitive ends. In doing so, he does not consider the economic theory I discuss which explains how such aggregation and anonymization can sometimes serve a cartel better than complete information disclosure. And he does not consider the documentary evidence regarding how clients use the benchmarking data in practice.

432.    As a result, the same thematic mistakes that run through Mr. Yenikomshian's rebuttal also flow through Dr. Mitzenmacher's. Based on his source code analysis (which cannot consider the influence of other portions of Yardi's Pricing Suite, such as TAM oversight), he makes essentially economic predictions about how Revenue IQ may be used in an alleged conspiracy, without testing those predictions against the relevant data or documents. In this section, I explain how this undermines his conclusions, beginning with his new affirmative opinion regarding the Comp Trend Rule.

## 9.1  Dr. Mitzenmacher's Comp Trend Rule Simulation Contradicts Observed Pricing Behavior For Reasons Explained In My Opening Report

433.    In Section VI of his rebuttal report, Dr. Mitzenmacher challenges my opinion that the Comp Trend Rule, embedded within the integrated Yardi Pricing Suite, creates incentives for clients to increase prices and disincentives for them to reduce prices. To do so, he offers a computer program simulating the Comp Trend Rule in isolation. This program adopts assumptions he added to the two-property example at paragraphs 322 through 326 of my

134

FILED UNDER SEAL

opening report.[270] It then produces oscillatory downward pricing. In creating this simulation, he states that my example was "incompletely specified" and that he supplied his own initial conditions and parameters to run it - including, by his enumeration, asymmetric starting prices, a 1.5% Reference Rent Change Amount, a 14-day Trend Comparison Period, and a 6-day Automated Survey Frequency.[271]

434.    Dr. Mitzenmacher's Comp Trend Rule simulation yields misleading conclusions for at least four reasons:

- Dr. Mitzenmacher mistakes mechanical simulation with economic incentives that rational agents update based on expected responses.

- Dr. Mitzenmacher does not consider how the commitment/enforcement mechanisms I describe in Section 7 impact the Comp Trend Rule - despite my explanation of this interaction in my opening report.

- Dr. Mitzenmacher's simulation is based on a specific set of assumptions, and he does not check for robustness to alternative assumptions. He claims to have run thousands of simulations on other assumptions, though these are not clearly documented.

- Dr. Mitzenmacher's simulation is at odds with the facts of the case - the produced transaction data in this case demonstrably exhibits upward parallel pricing across clients, as I explained in my opening report and is presently undisputed.

    I address each conclusion in further detail below in the following paragraphs.

435.    **First**, as a matter of economics and game theory, Dr. Mitzenmacher's simulation is distinct from the theory presented in my opening report and therefore uninformative. He attempts to answer a question of dynamic incentives with a mechanical simulation where actors do not form expectations about how their rival will respond to a pricing decision. Those expectations matter - if I expect my rival to respond to a price increase with their own price increase, I have an incentive to increase my price. By removing these expectations from his simulation, he also removes the economic mechanism that causes Revenue IQ users to elevate, rather than reduce, their prices. This is why microeconomists (particularly those specialized in industrial organization) typically prefer to use game theory over mechanical computer simulations like the one Dr. Mitzenmacher offered.

436.    Even then, his results are consistent with portions of the economic theory I describe. The oscillating downward pattern in Dr. Mitzenmacher's simulation is consistent with the Edgeworth Cycle. Maskin and Tirole (1988) describe Edgeworth Cycles as a dynamic in which "firms undercut each other successively to increase their market share (price war

---

[270] March 23, 2026, Mitzenmacher Declaration, ¶ 62.
[271] March 23, 2026, Mitzenmacher Declaration, ¶ 62.

FILED UNDER SEAL

phase) until the war becomes too costly, at which point some firm increases its price. The other firms then follow suit (relenting phase), after which price cutting begins again."[272] My opening report cited the same paper for the proposition that "prices are above the competitive level when rivals react via simple rules to the other's immediate past price (Markov)."[273] And as I previously explained, "if both firms are pricing "high" and know their competitor uses Revenue IQ, they are disincentivized to reduce prices because the Comp Trend Rule will make their competitor automatically follow with their own rent decrease. This limits willingness set a lower rent, including by overriding Revenue IQ."[274] Dr. Mitzenmacher's simulation illustrates this possible outcome from parallel pricing - but does not engage with the economic explanation I provided in my opening report of why such downward price wars are rare and instead parallel pricing is predominantly upward.

437.    **Second**, Dr. Mitzenmacher's simulation also excludes the mechanism - which I explained in my opening report - that reduces the probability of downward price wars. He confirmed at deposition that his simulation included only the Comp Trend Rule, no other Trend Rules, no Health Rules, and - most importantly - "no impact from Yardi's Technical Account Managers."[275] When asked if he reviewed any documents regarding Yardi's TAMs, he answered that he "may have seen some particularly in conjunction with Dr. Marinescu's report but they weren't really relevant to [his] analyses."[276] This is an important omission from his analysis. My opening report identifies TAM oversight as a separate and reinforcing source of ongoing disincentives to reduce rents that interact with the Comp Trend Rule. I explained that TAMs are "5.7x more likely to tell a client that they are pricing below benchmark than to tell them that they are pricing above benchmark," and that this asymmetric oversight "exacerbate[s] upward pricing cycles" while "limit[ing] downward cycles."[277] Dr. Mitzenmacher's simulation model does not acknowledge or otherwise engage with this analysis. The strategic incentives my opening report describes do not arise from the Comp Trend Rule operating in a vacuum. They arise from its operation within the integrated Yardi Pricing Suite that I consistently described throughout my opening report and which Dr. Mitzenmacher does not fully consider.

438.    **Third**, Dr. Mitzenmacher's presented result reflects a specific parameter configuration that he selected. Specifically, he adopts a 1.5% Reference Rent Change Amount and a particular combination of timing settings. Dr. Mitzenmacher did not anchor these settings in historical

---

[272] Eric Maskin and Jean Tirole, "A Theory of Dynamic Oligopoly, II: Price Competition, Kinked Demand Curves, and Edgeworth Cycles," *Econometrica*, May, 1988, available at https://www.jstor.org/stable/1911701 (accessed February 3, 2026), p. 571.
[273] Marinescu Opening Report, ¶ 323.
[274] Marinescu Opening Report, ¶ 322.
[275] May 19, 2026, Mitzenmacher Deposition, 109:5-8
[276] May 19, 2026, Mitzenmacher Deposition, 109:9-13
[277] Marinescu Opening Report, ¶ 326.

client configuration data produced in this matter.[278] His footnote 108 reports that he "tested the long-run dynamics of the Comp Trend system for thousands of commonly used variations of the settings affecting Comp Trend" and that "all combinations of values produced similar results."[279] His report does not present those variations, and at deposition he could not confirm that they are documented in his backup materials; I have not been able to identify them in the materials produced to me.[280] The narrow point is that the result he presents reflects one specific configuration, with the broader claim of robustness resting on an assertion that he has not clearly documented.

439.    **Fourth**, the empirical question Dr. Mitzenmacher's simulation seeks to illuminate can be answered without simulation. The Yardi Pricing Suite has been in operation across many years for which myself and Yardi's Experts have observed pricing data. That pricing data is inconsistent with the predictions of Dr. Mitzenmacher's simulation produces - as I showed in my opening report in an empirical analysis that has not been challenged by any of Yardi's Experts.

440.    In Section 5.3 of my opening report, I tested whether Landlord Defendants using Revenue IQ move their prices upward together in parallel. The purpose was to empirically test the prediction from my analysis of client configurations - that they were sufficiently standardized so as to lead to parallel pricing.[281] I plotted price indices across the eight largest Landlord Defendants and showed they tracked one another visibly across the analysis period.[282] After removing persistent property-level price differences through a standard demeaning transformation, I showed that monthly rents moved in visible synchrony for over five years, with the speed of parallel price increases accelerating in 2021/2022.[283] To corroborate the visual pattern statistically, I calculated 3,498 Pearson correlation coefficients between Landlord Defendant properties in the same PUMA, excluding pairs owned by the same landlord.[284] I found that 76.8% of the correlations were positive, the median correlation was 0.72, 29% of correlations exceeded 0.9, and the most common correlation was 0.99 - where 1 indicates perfect correlation.[285] At paragraph 338, I explained the implication: "month-to-month rent movements across different properties are not just broadly similar but nearly synchronized," with prices "steered in the same

---

[278] For example, Mr. Yenikomshian's opening declaration identifies the median Reference Rent Change Amount in the historical client configuration data produced in this matter as 0.25%, and Mr. Yenikomshian anchored his own illustrative example to that median (selecting 0.3%). November 24, 2025, Yenikomshian Declaration, ¶ 65, and footnote 107 (citing YARDI-DUFFY_00106927). Dr. Mitzenmacher's rebuttal uses 1.5% - six times the median - does not disclose the median, and at deposition Dr. Mitzenmacher could not recall whether he was aware of it, and could not say whether any of his unreported "thousands of commonly used variations" tested values at or below the median. March 23, 2026, Mitzenmacher Declaration, ¶ 62; May 19, 2026, Mitzenmacher Deposition, 113:10 - 114:6.
[279] March 23, 2026, Mitzenmacher Declaration, footnote 108.
[280] May 19, 2026, Mitzenmacher Deposition, 110:24 - 111:8.
[281] Marinescu Opening Report, Section 5.3.
[282] Marinescu Opening Report, ¶ 332, and Figure 45.
[283] Marinescu Opening Report, ¶¶ 335-336, and Figure 47.
[284] Marinescu Opening Report, ¶ 337.
[285] Marinescu Opening Report, ¶¶ 36, 337, and Figure 48.

137

direction at the same time, rather than each property's rents evolving individually in response to its own competitive conditions." [286] Yardi's Experts do not dispute this analysis - and it does not rely on the YLPI they separately challenge.

441.   In sum, Dr. Mitzenmacher's simulation tests the Comp Trend Rule without the strategic incentives that game theory relies on, isolated from other components of the Yardi Pricing Suite that prevent downward cycles, and with specific assumptions whose robustness is poorly documented. The cumulative result of which is that his simulation contradicts observed pricing. Dr. Mitzenmacher similarly diverges from record evidence in his benchmarking opinions.

## 9.2 Dr. Mitzenmacher's Benchmarking Opinions Ignore the Relevant Literature and Factual Record

442.   Peer reviewed economic literature recognizes that, whether aggregated and anonymized or granular and personally identifiable, non-public price information exchanges can support coordinated pricing among rival firms. The references Dr. Mitzenmacher relies on draw on an unrelated literature: textbooks in probability and statistics, including his own *Probability and Computing*; Casella & Berger's *Statistical Inference*; Wasserman's *All of Statistics*; and Grinstead & Snell's *Introduction to Probability*.[287] He cites no published work in industrial organization or antitrust economics and nothing specifically relevant to information exchanges or third-party pricing algorithms. His rebuttal declaration nonetheless emphasizes the necessity of disaggregation and deanonymization, writing that "if Benchmarking outputs cannot be deanonymized, then they do not provide competitor-specific list prices, transaction prices, or concession values."[288]

443.   As I purposefully I explain at length in Section 3 of my opening report, the economic literature on non-public information exchanges does not require deanonymization. The starting point of that review is Harrington (2022) - which describes a simple model in which firms choose to set competitive vs supracompetitive prices, and use a non-public information exchange to observe each other's pricing. In that model, firms need only directionally observe if their rival sets a competitive or supracompetitive price. The other literature I cite there - including Sugaya & Wolitzky (2018, 2025), and Ortner, Sugaya & Wolitzky (2024) - establishes that some degree of aggregation or anonymization through a centralized intermediary (like Yardi) can support upward parallel pricing even where complete and granular pricing data is not exchanged.[289] In several of those models, the

---

[286] Marinescu Opening Report, ¶ 338.
[287] March 23, 2026, Mitzenmacher Declaration, ¶ 42, footnote 71.
[288] March 23, 2026, Mitzenmacher Declaration, ¶ 12.
[289] *See* Marinescu Opening Report, Section 3.1.3 (discussing Sugaya & Wolitzky (2018), Sugaya & Wolitzky (2025), and Ortner, Sugaya & Wolitzky (2024)); Section 3.2.3 (discussing Harrington (2022)); Marinescu Opening Report, ¶ 124 ("*Yardi's argument that its information is aggregated and/or anonymized does not imply that it cannot sustain collusive outcomes, since less precise information can better serve collusive outcomes.*").

138

FILED UNDER SEAL

cartel is actually better served when the intermediary discloses *less* precise information, because more granular disclosure makes profitable deviations easier to identify.[290] The economic question is therefore whether the benchmarking framework conveys signals that influence interdependent pricing decisions among rivals - not whether one can back out a particular property's contribution to an aggregated output. This is the mechanism described in Harrington (2022) - where firms use the non-public information exchange to evaluate if their rivals have tried to undercut them.

444.    Dr. Mitzenmacher indirectly rebuts this point with another unresponsive simulation. In paragraph 43 of his rebuttal, he draws random samples from a normal distribution with mean $1,000 and standard deviation $100 and observes that, at small sample sizes, the sample average can deviate from the mean by tens of dollars. From this he concludes that the reported benchmark output does not recover a "true" population value. Dr. Mitzenmacher has not, however, measured how often the noise actually flips the direction of the signal in reality - i.e. how often a client sees a KPI suggesting they are pricing below the market, but are actually pricing above the market (or vice versa). He has therefore not shown how often Revenue IQ's benchmarking data cannot fulfill the anticompetitive use-case my literature review identified, or even if this ever happens in practice.

445.    Most importantly, Dr. Mitzenmacher does not acknowledge or engage with the evidence showing Revenue IQ clients use benchmarking to anticompetitive ends - and Yardi advertised this to prospective clients. Yardi's marketing materials describe a client who, on reviewing benchmarking outputs, "found they were way below market" and then "put a plan in place to raise new leases and renewals."[291] Yardi executives explained internally that clients "like to see their rent higher than market" on benchmarking displays.[292] And a Landlord Defendant, Grubb, told other Yardi clients at a Marketing Forum that it used benchmarking to "understand what the market may bear in the way of rents."[293]

446.    Dr. Mitzenmacher does not address any of this evidence, and his rebuttal offers no explanation for why Revenue IQ clients pay for and continue to use a product he characterizes as too noisy to convey meaningful information about competitor pricing. The documentary evidence I reviewed, and Dr. Mitzenmacher ignored, clearly indicates benchmark outputs convey enough directional information about competitor and pricing to be actionable - which is what the economic literature I rely upon (and Dr. Mitzenmacher also ignores) predicts will have coordinating effects.

---

[290] Takuo Sugaya and Alexander Wolitzky, "Maintaining Privacy in Cartels," *Journal of Political Economy*, December, 2018, available at https://www.jstor.org/stable/26550551
(accessed January 14, 2026), *"cartels can sometimes sustain higher profits when actions and outcomes are observed only privately, because better information can hinder collusion by helping firms devise more profitable deviations from the collusive agreement,"* p. 2569; *see also* Marinescu Opening Report, ¶¶ 123-126.
[291] Marinescu Opening Report, ¶ 411, and Figure 63.
[292] Marinescu Opening Report, ¶ 413, and Figure 64.
[293] Marinescu Opening Report, ¶¶ 415, 418, and Figures 65, 67.

FILED UNDER SEAL

# 10.  Conclusion

447.  In the preceding reply report, I provide a detailed response to criticisms Yardi's Experts levied against my opening report. I conclude by recalling that these disputes do not touch upon many of my most important findings, including the fact that:

- Yardi's TAMs use non-public cross-client data to oversee clients' pricing.

- Yardi and its clients described using non-public benchmarking data to "more aggressively" price up to "what the market may bear."

- Clients transact within 5% of Revenue IQ's recommendation in more than 90% of leases and, across all transactions, only deviate by 1.41% on average.

- Clients adopt broadly similar configurations of Revenue IQ's core Trend and Health Rules.

- Client exhibit parallel pricing.

- Yardi identified and marketed Revenue IQ's ability to "beat the market."

448.  These undisputed facts alone provide substantial evidence toward the core conclusion of my original assignment: that the Yardi Pricing Suite appears to act as an integrated coordination system, with demonstrable effects on clients' pricing.

449.  To cast doubt on this conclusion, Yardi's Experts do not employ reliable methodologies. Instead, they mischaracterize my report and deposition testimony to justify introducing several well understood forms of bias to their analyses. They do not otherwise substantiate their methodologies with reference to peer-reviewed literature or textbooks. And they have admittedly not reviewed several categories of evidence that underpin my conclusions.

450.  Their analyses, and therefore do not alter my core conclusions. To illustrate this, I provide sensitivity analyses - which adopt reasonable approaches to addressing issues Yardi's Expert raise - to show that all drive to the same fundamental conclusion: Revenue IQ users do charge above-market rents, and the premium has grown with the adoption of Revenue IQ. All reasonable disputes speak only to the precise quantification of the price impact of coordination, not to the existence of coordination.

*I. Marinescu*

May 22, 2026

FILED UNDER SEAL

# Appendices

## A.   Parameter Estimates From My Panel Regressions Are Not Statistically Significantly Different When Removing Outliers

451.    In Table 8 and Table 12 of my opening report I reported regression estimates for the co-conspirator effect on Landlord Defendants' pricing, in levels and first differences, respectively. Each table presented five specifications, and each was implemented considering my treatment of outliers.

**Table 10: Table 8 of My Opening Report: Robust Econometric Estimation Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants[294]**

|  | (21) | (22) | (23) | (24) | (25) |
|---|---|---|---|---|---|
| Intercept | 1292.239*** |  |  | -25.609*** |  |
|  | (0.156) |  |  | (0.961) |  |
| Number of Co-Conspirator Properties | 47.661*** | 39.257*** | 1.843*** | 41.167*** | 5.280*** |
|  | (0.046) | (0.287) | (0.070) | (0.044) | (0.164) |
| Rent CPI |  |  |  | 9.124*** | 10.264*** |
|  |  |  |  | (0.007) | (0.014) |
| Num.Obs. | 23302150 | 23296808 | 23296808 | 23302150 | 23296808 |
| R2 | 0.062 | 0.917 | 0.961 | 0.128 | 0.959 |
| R2 Adj. | 0.062 | 0.915 | 0.960 | 0.128 | 0.958 |
| R2 Within |  | 0.037 | 0.000 |  | 0.528 |
| R2 Within Adj. |  | 0.037 | 0.000 |  | 0.528 |
| FE: revenue.iq.unit.id |  | X | X |  | X |
| FE: month |  |  | X |  |  |
| + p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001 | | | | | |

---

[294] Marinescu Opening Report, footnote 308.

FILED UNDER SEAL

**Table 11: Table 12 of My Opening Report: Robust Econometric Estimation - on First-Differences - Further Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants[295]**

| | (27) | (28) | (29) | (30) | (31) |
|---|---|---|---|---|---|
| Intercept | 60.585*** | | | 127.825*** | |
| | (0.462) | | | (2.583) | |
| Co-Conspirator Count Per PUMA | 4.333*** | 11.495*** | 4.288*** | 4.867*** | 15.674*** |
| | (0.125) | (0.591) | (0.643) | (0.127) | (0.630) |
| Rent CPI | | | | -0.470*** | -0.999*** |
| | | | | (0.019) | (0.040) |
| Num.Obs. | 436334 | 294851 | 294850 | 436334 | 294851 |
| R2 | 0.003 | 0.257 | 0.345 | 0.004 | 0.259 |
| R2 Adj. | 0.003 | -0.173 | -0.035 | 0.004 | -0.170 |
| R2 Within | | 0.002 | 0.000 | | 0.005 |
| R2 Within Adj. | | 0.002 | 0.000 | | 0.005 |
| FE: revenue.iq.unit.id | | X | X | | X |
| FE: month | | | X | | |

$+ p < 0.1$, $* p < 0.05$, $** p < 0.01$, $*** p < 0.001$

452. To test whether those estimates are statistically different when implementing, Yardi's Experts' treatment of outliers (that is when excluding observations with a rent lower or equal to $20). I re-run these regressions on the narrowed data. I keep the definition of co-conspirators the same as in my opening report.

---

[295] Marinescu Opening Report, footnote 308.

FILED UNDER SEAL

**Table 12: <= $20 Effective Rent Filter: Table 8 of My Opening Report: Robust Econometric Estimation Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants[296]**

|  | (21 no out) | (22 no out) | (23 no out) | (24 no out) | (25 no out) |
|---|---|---|---|---|---|
| Intercept | 1292.324*** |  |  | -25.436*** |  |
|  | (0.156) |  |  | (0.961) |  |
| Number of Co-Conspirator Properties | 47.655*** | 39.258*** | 1.843*** | 41.163*** | 5.282*** |
|  | (0.046) | (0.287) | (0.070) | (0.044) | (0.164) |
| Rent CPI |  |  |  | 9.124*** | 10.264*** |
|  |  |  |  | (0.007) | (0.014) |
| Num.Obs. | 23301054 | 23295711 | 23295711 | 23301054 | 23295711 |
| R2 | 0.062 | 0.917 | 0.961 | 0.128 | 0.959 |
| R2 Adj. | 0.062 | 0.915 | 0.960 | 0.128 | 0.959 |
| R2 Within |  | 0.037 | 0.000 |  | 0.528 |
| R2 Within Adj. |  | 0.037 | 0.000 |  | 0.528 |
| FE: revenue.iq.unit.id |  | X | X |  | X |
| FE: month |  |  | X |  |  |

+ p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001

[296] Sources: Expanded and Geocoded Lease Data (*see* Appendix F.1 of Marinescu Opening Report); Rent CPI. Notes: [1] I filter the Lease Data according to Dr. Tucker's treatment of outliers, i.e., excluding monthly effective rents below or equal to $20. [2] Model 23 uses Newey-West (HAC) standard errors, correcting for potential heteroskedasticity and autocorrelation. The lag length is set to 3, meaning that the correction takes into account autocorrelation of the errors up to three periods back.

FILED UNDER SEAL

**Table 13: <= \$20 Effective Rent Filter: Table 12 of My Opening Report: Robust Econometric Estimation - on First-Differences - Further Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants[297]**

|  | (27 no out) | (28 no out) | (29 no out) | (30 no out) | (31 no out) |
|---|---|---|---|---|---|
| Intercept | 60.553*** |  |  | 127.963*** |  |
|  | (0.462) |  |  | (2.578) |  |
| Co-Conspirator Count Per PUMA | 4.342*** | 11.518*** | 4.297*** | 4.876*** | 15.699*** |
|  | (0.124) | (0.590) | (0.642) | (0.127) | (0.630) |
| Rent CPI |  |  |  | -0.472*** | -1.000*** |
|  |  |  |  | (0.019) | (0.040) |
| Num.Obs. | 436310 | 294826 | 294825 | 436310 | 294826 |
| R2 | 0.003 | 0.257 | 0.345 | 0.004 | 0.259 |
| R2 Adj. | 0.003 | -0.173 | -0.034 | 0.004 | -0.169 |
| R2 Within |  | 0.002 | 0.000 |  | 0.005 |
| R2 Within Adj. |  | 0.002 | 0.000 |  | 0.005 |
| FE: revenue.iq.unit.id |  | X | X |  | X |
| FE: month |  |  | X |  |  |
| + p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001 |  |  |  |  |  |

453.   I perform ten Z-score Tests for the difference between coefficients obtained with my treatment of outliers and with Yardi's Experts' treatment. I consider each of the five regression specifications, in level and first differences. I apply the following formula:

$$Z = \frac{b_1 - b_2}{\sqrt{SE_1^2 + SE_2^2}}$$

---

[297] Sources: Expanded and Geocoded Lease Data (*see* Appendix F.1 of Marinescu Opening Report); Rent CPI. Notes: [1] I filter the Lease Data according to Dr. Tucker's treatment of outliers, i.e., excluding monthly effective rents below or equal to \$20. [2] Model 29 uses Newey-West (HAC)
standard errors, correcting for potential heteroskedasticity and autocorrelation. The lag length is set to 3, meaning that the correction takes into account autocorrelation of the errors up to three periods back.

144

FILED UNDER SEAL

454.    Where:

- $b_1$ is the coefficient of the Number of Co-Conspirator Properties with my treatment of outliers.

- $SE_1$ is its associated standard error.

- $b_2$ is the coefficient of the Number of Co-Conspirator Properties with Tucker's treatment of outliers.

- $SE_2$ is its associated standard error.

455.    The absolute value of the Z-score obtained is never greater than 1.96, suggesting that the difference is never significant at the 5% level.

456.    Table 14 below reports the Z-score Tests for the difference between coefficients obtained with my treatment of outliers and with Tucker's treatment, for the five specifications in level, reported in Table 8 of my opening report:

**Table 14: Z-score Tests On Parameter Estimates From Level Regressions in Table 8 Of My Opening Report, Considering My Treatment Of Outliers vs. Tucker's Treatment [298]**

| (21) | (22) | (23) | (24) | (25) |
|---|---|---|---|---|
| 0.092010062 | -0.001315151 | -0.000489999 | 0.071649101 | -0.007472644 |

457.    Table 15 below reports the Z-score Tests for the difference between coefficients obtained with my treatment of outliers and with Tucker's treatment, for the five specifications in first differences, reported in Table 12 of my opening report:

**Table 15: Z-score Tests On Parameter Estimates From First Difference Regressions In Table 12 Of My Opening Report, Considering My Treatment Of Outliers vs. Tucker's Treatment [299]**

| (27) | (28) | (29) | (30) | (31) |
|---|---|---|---|---|
| -0.046335141 | -0.027631221 | -0.009769617 | -0.052800223 | -0.027671103 |

---

[298] Sources: Expanded and Geocoded Lease Data (*see* Appendix F.1 of Marinescu Opening Report); Rent CPI. Notes: Z-scores are reported for tests of differences in coefficients for equivalent models, e.g., model 21 as estimated on the data using my treatment of outliers against the same model as estimated on the data using Tucker's treatment

[299] Sources: Expanded and Geocoded Lease Data (*see* Appendix F.1 of Marinescu Opening Report); Rent CPI.

FILED UNDER SEAL

## B.    Client Acceptance Analysis, Including Recommended Rent Outliers

458.    In this section, I present a revised version of the client acceptance analysis from Section 8.2.1 of my Opening Report. I repeat the same analysis without applying any additional filtering to the recommended rent variables of the lease data.

459.    Figure 27 below compares the average Revenue IQ recommended rent (in orange) against the average Landlord Defendants final effective rent (in dark blue) for new leases and renewals, regardless of whether the landlord accepted or overrode the recommendation.

**Figure 27: Revised Figure 75 of My Opening Report: Across All Landlord Defendant Active Leases, Transaction Prices Only Deviate 1.4% From Revenue IQ's Recommended List Price, On Average**



FILED UNDER SEAL

**Figure 28: Revised Figure 76 of My Opening Report: Across Only Overridden Landlord Defendant Active Lease, Transaction Prices Only Deviate 6.95% From Revenue IQ's Recommended List Price, On Average**



**Figure 29: Revised Figure 77 of My Opening Report: Over 90% of Landlord Defendant Active Leases Transact Within 5% of Revenue IQ's List Price Recommendation**



147

FILED UNDER SEAL

**Figure 30: Revised Figure 78 of My Opening Report: 95% of Landlord Defendants Active Leases Were Within 10% of Revenue IQ List Price**



FILED UNDER SEAL

## C.   Outlier Sensitivity Analyses

460.   In the sections below, I test the robustness of my analysis by examining how it varies when different sensitivities and filters are applied to the Yardi lease data. I focus on three broad results: the TAM analysis, the Yardi price index, and the panel regressions I run. I show how my results vary when I apply three different outlier cleaning as sensitivity checks.

461.   These checks include, as a baseline, Yardi's Experts' proposed filter for rents below or equal to $20. I subsequently apply two variations of this filter. First, I apply an equivalent filter, this time focusing on Yardi's Recommended Rent to remove outlier entries from my data as described in a footnote of my opening report and backup materials. Second, I check whether applying Yardi's Experts' filter to gross rents (as opposed to effective) delivers significantly different results. Finally, I implement a further sensitivity check on some parts of my analysis whereby I apply the rent price capping approach suggested by the Bureau of Labor Statistics for vacancies.

FILED UNDER SEAL

## C.1.    $20 Effective Rent Threshold

462.    In this sensitivity check, I apply Yardi's Experts' standard filter for low rents. In their analysis, they drop entries with a monthly effective rents smaller or equal to $20 in the data. I first show how this filter affects my core results for the TAM analysis, Yardi Index and Panel Regressions I present in my Opening Report.

### C.1.1.    TAM Analysis

**Figure 31: <= $20 Effective Rent Filter: Revised Figure 59 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "██████████" Reversed a Downward Price Cycle and Increased Rents[300]**



---

[300] Marinescu Opening Report, footnote 239.

FILED UNDER SEAL

**Figure 32: <= $20 Effective Rent Filter: Revised Figure 60 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "███████ Reversed a Downward Price Cycle and Increase Rents**[301]



---

[301] Marinescu Opening Report, footnote 240.

151

**Figure 33: <= $20 Effective Rent Filter: Revised Figure 61 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "▮▮▮▮▮▮▮▮" Increased The Growth Rate Of Rents[302]**



---

[302] Marinescu Opening Report, footnote 241.

FILED UNDER SEAL

**Figure 34: <= $20 Effective Rent Filter: Revised Figure 62 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing[303]**



---

[303] Marinescu Opening Report, footnote 242.

FILED UNDER SEAL

**Table 16: <= \$20 Effective Rent Filter: Revised Table 2 of My Opening Report: An Interrupted Time Series Analysis Shows That TAM Oversight Is Associated with Landlord Defendant Price Increases[304]**

| | (10) | (11) | (12) | (13) |
|---|---|---|---|---|
| After First TAM Call | 30.278*** | 6.336* | 2.422 | -2.511 |
| | (2.121) | (3.110) | (3.181) | (3.388) |
| Months From First Call | | 0.547*** | 0.421*** | -0.189 |
| | | (0.034) | (0.033) | (0.136) |
| After First TAM Call X Months From First Call | | | 0.447*** | -0.054 |
| | | | (0.101) | (0.075) |
| Rent CPI | | | | 1.662*** |
| | | | | (0.329) |
| Num.Obs. | 10434 | 10434 | 10434 | 10434 |
| R2 | 0.554 | 0.570 | 0.572 | 0.575 |
| R2 Adj. | 0.549 | 0.564 | 0.566 | 0.569 |
| R2 Within | 0.061 | 0.094 | 0.099 | 0.104 |
| R2 Within Adj. | 0.061 | 0.094 | 0.098 | 0.103 |
| RMSE | 54.25 | 53.29 | 53.16 | 53.01 |
| Std.Errors | Newey-West (L=3) | Newey-West (L=3) | Newey-West (L=3) | Newey-West (L=3) |
| FE: revenueiq.property.id | X | X | X | X |

+ p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001

---

[304] Marinescu Opening Report, footnote 243. For methodology discussion, see Marinescu Opening Report, ¶¶ 386-389.

FILED UNDER SEAL

**Figure 35: <= $20 Effective Rent Filter: Revised Figure 99 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing[305]**



---

[305] Marinescu Opening Report, Appendix C.4.

155

FILED UNDER SEAL

**C.1.2.**   Index Comparison

**Figure 36: <= $20 Effective Rent Filter: Revised Figure 88 of My Opening Report: Landlord Defendants Increase Rents Faster Than A Rent-Specific CPI[306]**



---

[306] Marinescu Opening Report, footnote 293.

FILED UNDER SEAL

**Figure 37: <= $20 Effective Rent Filter: Revised Figure 89 of My Opening Report: Yardi's Index Premium Relative to Rent CPI Increased With the Number of Participating Landlord Defendant Units[307]**



---

[307] Marinescu Opening Report, footnote 294.

157

FILED UNDER SEAL

**Table 17: <= $20 Effective Rent Filter: Revised Table 5 of My Opening Report: The Yardi Index Premium Increased With Landlord Defendant Adoption of Revenue IQ[308]**

| Year | Units | Yardi Index | Rent CPI | Yardi Premium |
|---|---|---|---|---|
| 1/1/2011 | 10 | 100 | 100 | 0 |
| 1/1/2012 | 3219 | 99.76 | 102.34 | -2.58 |
| 1/1/2013 | 7144 | 101.56 | 105.11 | -3.55 |
| 1/1/2014 | 18646 | 105.06 | 108.14 | -3.07 |
| 1/1/2015 | 30735 | 108.7 | 111.81 | -3.11 |
| 1/1/2016 | 51431 | 114.13 | 115.95 | -1.82 |
| 1/1/2017 | 68270 | 119.55 | 120.51 | -0.96 |
| 1/1/2018 | 85505 | 124.95 | 125 | -0.05 |
| 1/1/2019 | 113601 | 129.89 | 129.29 | 0.6 |
| 1/1/2020 | 145974 | 135.34 | 134.15 | 1.19 |
| 1/1/2021 | 242171 | 137.94 | 136.9 | 1.04 |
| 1/1/2022 | 279320 | 147.51 | 142.06 | 5.45 |
| 1/1/2023 | 280943 | 163.41 | 154.22 | 9.19 |
| 1/1/2024 | 280926 | 172.42 | 163.61 | 8.81 |
| 1/1/2025 | 287972 | 178.54 | 170.55 | 7.98 |

---

[308] Marinescu Opening Report, footnote 295.

FILED UNDER SEAL

**Table 18: <= $20 Effective Rent Filter: Revised Table 6 of My Opening Report: Revenue IQ Adoption by Landlord Defendants Led To Economically & Statistically Significant Increases In the Yardi Index Premium Relative to Rent CPI[309]**

| | Yardi Index Premium | |
| --- | --- | --- |
| | Model 1 | Model 2 |
| Intercept | -3.366152*** | -3.372810*** |
| | (0.137670) | (0.138592) |
| **Active Lease Count, per 10k Leases** | 0.366029*** | |
| | (0.013000) | |
| **Approx. Unit Count, per 10k Units** | | 0.293983*** |
| | | (0.010622) |
| Num.Obs. | 175 | 175 |
| R2 | 0.854 | 0.840 |
| R2 Adj. | 0.853 | 0.839 |
| RMSE | 1.69 | 1.77 |

Active Lease Count and Approx. Unit Count are each scaled back by 10,000.

$+ p < 0.1$, $* p < 0.05$, $** p < 0.01$, $*** p < 0.001$

---

[309] Marinescu Opening Report, footnote 296. For methodology discussion, see Marinescu Opening Report, ¶¶ 512-513.

FILED UNDER SEAL

**Figure 38: <= $20 Effective Rent Filter: Revised Figure 95 of My Opening Report: The Growth Rate of the Yardi Index Premium Increased Notably Around 2021/22[310]**



---

[310] Marinescu Opening Report, footnote 309.

160

FILED UNDER SEAL

**Figure 39: <= $20 Effective Rent Filter: Revised Figure 101 of My Opening Report: Yardi Rent Index vs. Rent CPI & Yardi Approx. Unit Count[311]**



---

[311] Marinescu Opening Report, Appendix D.2 and footnote 339.

FILED UNDER SEAL

**Figure 40:  <= \$20 Effective Rent Filter: Revised Figure 102 of My Opening Report: Yardi Index Premium as a Function of Approx. Unit Count[312]**



[312] Marinescu Opening Report, Appendix D.2 and footnote 340.

162

FILED UNDER SEAL

**C.1.3.**  Panel Regressions

**Figure 41: <= $20 Effective Rent Filter: Revised Figure 94 of My Opening Report: Landlord Defendants Increase Rent Prices Faster In Areas With More Fellow Revenue IQ Users[313]**



---

[313] Marinescu Opening Report, ¶¶ 535-539 and footnote 307.

FILED UNDER SEAL

**Table 19: <= $20 Effective Rent Filter: Revised Table 8 of My Opening Report: Robust Econometric Estimation Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants**[314]

| | (21) | (22) | (23) | (24) | (25) |
|---|---|---|---|---|---|
| Intercept | 1292.324*** | | | -25.436*** | |
| | (0.156) | | | (0.961) | |
| Number of Co-Conspirator Properties | 47.655*** | 39.258*** | 1.843*** | 41.163*** | 5.282*** |
| | (0.046) | (0.287) | (0.070) | (0.044) | (0.164) |
| Rent CPI | | | | 9.124*** | 10.264*** |
| | | | | (0.007) | (0.014) |
| Num.Obs. | 23301054 | 23295711 | 23295711 | 23301054 | 23295711 |
| R2 | 0.062 | 0.917 | 0.961 | 0.128 | 0.959 |
| R2 Adj. | 0.062 | 0.915 | 0.960 | 0.128 | 0.959 |
| R2 Within | | 0.037 | 0.000 | | 0.528 |
| R2 Within Adj. | | 0.037 | 0.000 | | 0.528 |
| Std.Errors | Heteroskedasticity-robust | by: revenue.iq.unit.id | Newey-West (L=3) | Heteroskedasticity-robust | by: revenue.iq.unit.id |
| FE: revenue.iq.unit.id | | X | X | | X |
| FE: month | | | X | | |

+ p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001

---

[314] Marinescu Opening Report, footnote 308. For methodology discussion, see Marinescu Opening Report, ¶¶ 541-544.

164

FILED UNDER SEAL

**Table 20: <= $20 Effective Rent Filter: Revised Table 12 of My Opening Report: Robust Econometric Estimation - on First-Differences - Further Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants[315]**

| | (27) | (28) | (29) | (30) | (31) |
|---|---|---|---|---|---|
| Intercept | 60.553*** | | | 127.963*** | |
| | (0.462) | | | (2.578) | |
| Co-Conspirator Count Per PUMA | 4.342*** | 11.518*** | 4.297*** | 4.876*** | 15.699*** |
| | (0.124) | (0.590) | (0.642) | (0.127) | (0.630) |
| Rent CPI | | | | -0.472*** | -1.000*** |
| | | | | (0.019) | (0.040) |
| Num.Obs. | 436310 | 294826 | 294825 | 436310 | 294826 |
| R2 | 0.003 | 0.257 | 0.345 | 0.004 | 0.259 |
| R2 Adj. | 0.003 | -0.173 | -0.034 | 0.004 | -0.169 |
| R2 Within | | 0.002 | 0.000 | | 0.005 |
| R2 Within Adj. | | 0.002 | 0.000 | | 0.005 |
| Std.Errors | Heteroskedasticity-robust | by: revenue.iq.unit.id | Newey-West (L=3) | Heteroskedasticity-robust | by: revenue.iq.unit.id |
| FE: revenue.iq.unit.id | | X | X | | X |
| FE: month | | | X | | |

$+ p < 0.1,$ * $p < 0.05,$ ** $p < 0.01,$ *** $p < 0.001$

---

[315] Marinescu Opening Report, footnote 345. For methodology discussion, see Marinescu Opening Report, Appendix D.4.

FILED UNDER SEAL

**C.1.4.**   Structural Break Test

**Figure 42: <= $20 Effective Rent Filter: Revised Figure 96 of My Opening Report: Chow Tests Show Significant Structural Breaks in Landlord Defendants' Pricing In 2021/2022**[316]



---

[316] Marinescu Opening Report, footnote 310. For methodology discussion, see Marinescu Opening Report , ¶¶ 554-555.

FILED UNDER SEAL

## C.2. $20 - $100,000 Recommended Rent Threshold

463.   In this sensitivity analysis, I remove effective rent outliers according to the methodology discussed in footnote 268 of my opening report.

### C.2.1. TAM Analysis

**Figure 43: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 59 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "▮▮▮▮▮▮▮" Reversed a Downward Price Cycle and Increased Rents[317]**



---

[317] Marinescu Opening Report, footnote 239.

FILED UNDER SEAL

**Figure 44: <= \$20 & >= \$100,000 Recommended Rent Filter: Revised Figure 60 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "▬▬▬▬▬" Reversed a Downward Price Cycle and Increase Rents**[318]



---

[318] Marinescu Opening Report, footnote 240.

FILED UNDER SEAL

**Figure 45: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 61 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "▇▇▇▇▇▇▇▇▇▇▇" Increased The Growth Rate Of Rents[319]**



---

[319] Marinescu Opening Report, footnote 241.

FILED UNDER SEAL

**Figure 46: <= $20 & > =$100,000 Recommended Rent Filter: Revised Figure 62 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing[320]**



---

[320] Marinescu Opening Report, footnote 242.

FILED UNDER SEAL

**Table 21: <= \$20 & >= \$100,000 Recommended Rent Filter: Revised Table 2 of My Opening Report: An Interrupted Time Series Analysis Shows That TAM Oversight Is Associated with Landlord Defendant Price Increases[321]**

|  | (10) | (11) | (12) | (13) |
|---|---|---|---|---|
| After First TAM Call | 43.956*** | 13.398* | 3.423 | 1.516 |
|  | (4.668) | (5.803) | (7.094) | (8.200) |
| Months From First Call |  | 0.698*** | 0.377*** | 0.141 |
|  |  | (0.080) | (0.056) | (0.314) |
| After First TAM Call X Months From First Call |  |  | 1.139*** | 0.945** |
|  |  |  | (0.334) | (0.343) |
| Rent CPI |  |  |  | 0.643 |
|  |  |  |  | (0.786) |
| Num.Obs. | 10434 | 10434 | 10434 | 10434 |
| R2 | 0.336 | 0.342 | 0.346 | 0.346 |
| R2 Adj. | 0.327 | 0.333 | 0.337 | 0.337 |
| R2 Within | 0.024 | 0.033 | 0.039 | 0.039 |
| R2 Within Adj. | 0.023 | 0.033 | 0.038 | 0.038 |
| RMSE | 129.63 | 128.98 | 128.63 | 128.62 |
| Std.Errors | Newey-West (L=3) | Newey-West (L=3) | Newey-West (L=3) | Newey-West (L=3) |
| FE: revenueiq.property.id | X | X | X | X |

+ p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001

---

[321] Marinescu Opening Report, footnote 243. For methodology discussion, see Marinescu Opening Report, ¶¶ 386-389.

FILED UNDER SEAL

**Figure 47: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 99 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing[322]**



---

[322] Marinescu Opening Report, Appendix C.4.

172

FILED UNDER SEAL

**C.2.2.**   Index Comparison

**Figure 48: <= \$20 & >= \$100,000 Recommended Rent Filter: Revised Figure 88 of My Opening Report: Landlord Defendants Increase Rents Faster Than A Rent-Specific CPI[323]**



---

[323] Marinescu Opening Report, footnote 293.

FILED UNDER SEAL

**Figure 49: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 89 of My Opening Report: Yardi's Index Premium Relative to Rent CPI Increased With the Number of Participating Landlord Defendant Units[324]**



---

[324] Marinescu Opening Report, footnote 294.

FILED UNDER SEAL

**Table 22: <= $20 & >= $100,000 Recommended Rent Filter: Revised Table 5 of My Opening Report: The Yardi Index Premium Increased With Landlord Defendant Adoption of Revenue IQ[325]**

| Year | Units | Yardi Index | Rent CPI | Yardi Premium |
|---|---|---|---|---|
| 1/1/2011 | 10 | 100 | 100 | 0 |
| 1/1/2012 | 3219 | 99.76 | 102.34 | -2.58 |
| 1/1/2013 | 7144 | 101.54 | 105.11 | -3.57 |
| 1/1/2014 | 18573 | 104.98 | 108.14 | -3.15 |
| 1/1/2015 | 30629 | 111.03 | 111.81 | -0.78 |
| 1/1/2016 | 51176 | 117.21 | 115.95 | 1.26 |
| 1/1/2017 | 66890 | 123.21 | 120.51 | 2.7 |
| 1/1/2018 | 83915 | 129.81 | 125 | 4.81 |
| 1/1/2019 | 112321 | 136.45 | 129.29 | 7.16 |
| 1/1/2020 | 144906 | 142.5 | 134.15 | 8.35 |
| 1/1/2021 | 241619 | 148.67 | 136.9 | 11.77 |
| 1/1/2022 | 278785 | 159.46 | 142.06 | 17.41 |
| 1/1/2023 | 280654 | 177.46 | 154.22 | 23.24 |
| 1/1/2024 | 280649 | 189.9 | 163.61 | 26.29 |
| 1/1/2025 | 287702 | 200.02 | 170.55 | 29.46 |

---

[325] Marinescu Opening Report, footnote 295.

175

FILED UNDER SEAL

**Table 23: <= $20 & >= $100,000 Recommended Rent Filter: Revised Table 6 of My Opening Report: Revenue IQ Adoption by Landlord Defendants Led To Economically & Statistically Significant Increases In the Yardi Index Premium Relative to Rent CPI[326]**

|  | Yardi Index Premium | |
|  | Model 1 | Model 2 |
| --- | --- | --- |
| Intercept | -3.587261*** | -3.668680*** |
|  | (0.183502) | (0.190868) |
| **Active Lease Count, per 10k Leases** | 0.935259*** |  |
|  | (0.026897) |  |
| **Approx. Unit Count, per 10k Units** |  | 0.752075*** |
|  |  | (0.021794) |
| Num.Obs. | 175 | 175 |
| R2 | 0.911 | 0.898 |
| R2 Adj. | 0.910 | 0.898 |
| RMSE | 3.28 | 3.50 |

Active Lease Count and Approx. Unit Count are each scaled back by 10,000.

$+ p < 0.1$, $* p < 0.05$, $** p < 0.01$, $*** p < 0.001$

---

[326] Marinescu Opening Report, footnote 296. For methodology discussion, see Marinescu Opening Report, ¶¶ 512-513.

FILED UNDER SEAL

**Figure 50: <= \$20 & >= \$100,000 Recommended Rent Filter: Revised Figure 95 of My Opening Report: The Growth Rate of the Yardi Index Premium Increased Notably Around 2021/22[327]**



---

[327] Marinescu Opening Report, footnote 309.

FILED UNDER SEAL

**Figure 51: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 101 of My Opening Report: Yardi Rent Index vs. Rent CPI & Yardi Approx. Unit Count[328]**



---

[328] Marinescu Opening Report, Appendix D.2 and footnote 339.

178

FILED UNDER SEAL

**Figure 52: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 102 of My Opening Report: Yardi Index Premium as a Function of Approx. Unit Count[329]**



---

[329] Marinescu Opening Report, Appendix D.2 and footnote 340.

179

FILED UNDER SEAL

### C.2.3.   Panel Regressions

**Figure 53: <= \$20 & >= \$100,000 Recommended Rent Filter: Revised Figure 94 of My Opening Report: Landlord Defendants Increase Rent Prices Faster In Areas With More Fellow Revenue IQ Users[330]**



---

[330] Marinescu Opening Report, ¶¶ 535-539 and footnote 307.

FILED UNDER SEAL

**Figure 54: <= $20 & >= $100,000 Recommended Rent Filter: Revised Table 8 of My Opening Report: Robust Econometric Estimation Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants[331]**

| | (21) | (22) | (23) | (24) | (25) |
|---|---|---|---|---|---|
| Intercept | 1292.676*** | | | -27.740*** | |
| | (0.157) | | | (0.963) | |
| Number of Co-Conspirator Properties | 47.547*** | 39.180*** | 1.860*** | 41.130*** | 5.326*** |
| | (0.046) | (0.287) | (0.070) | (0.044) | (0.164) |
| Rent CPI | | | | 9.137*** | 10.264*** |
| | | | | (0.007) | (0.014) |
| Num.Obs. | 23207707 | 23202367 | 23202367 | 23207707 | 23202367 |
| R2 | 0.062 | 0.917 | 0.961 | 0.128 | 0.959 |
| R2 Adj. | 0.062 | 0.915 | 0.960 | 0.128 | 0.959 |
| R2 Within | | 0.037 | 0.000 | | 0.528 |
| R2 Within Adj. | | 0.037 | 0.000 | | 0.528 |
| Std.Errors | Heteroskedasticity-robust | by: revenue.iq.unit.id | Newey-West (L=3) | Heteroskedasticity-robust | by: revenue.iq.unit.id |
| FE: revenue.iq.unit.id | | X | X | | X |
| FE: month | | | X | | |
| + p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001 | | | | | |

---

[331] Marinescu Opening Report, footnote 308. For methodology discussion, see Marinescu Opening Report, ¶¶ 541-544.

FILED UNDER SEAL

**Figure 55: <= \$20 & >= \$100,000 Recommended Rent Filter: Revised Table 12 of My Opening Report: Robust Econometric Estimation - on First-Differences - Further Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants[332]**

| | (27) | (28) | (29) | (30) | (31) |
|---|---|---|---|---|---|
| Intercept | 61.540*** | | | 132.300*** | |
| | (0.464) | | | (2.585) | |
| Co-Conspirator Count Per PUMA | 4.250*** | 11.464*** | 4.371*** | 4.806*** | 15.721*** |
| | (0.125) | (0.591) | (0.642) | (0.127) | (0.629) |
| Rent CPI | | | | -0.495*** | -1.021*** |
| | | | | (0.019) | (0.040) |
| Num.Obs. | 435304 | 293816 | 293815 | 435304 | 293816 |
| R2 | 0.003 | 0.257 | 0.345 | 0.004 | 0.259 |
| R2 Adj. | 0.003 | -0.175 | -0.036 | 0.004 | -0.171 |
| R2 Within | | 0.002 | 0.000 | | 0.005 |
| R2 Within Adj. | | 0.002 | 0.000 | | 0.005 |
| Std.Errors | Heteroskedasticity-robust | by: revenue.iq.unit.id | Newey-West (L=3) | Heteroskedasticity-robust | by: revenue.iq.unit.id |
| FE: revenue.iq.unit.id | | X | X | | X |
| FE: month | | | X | | |

+ p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001

---

[332] Marinescu Opening Report, footnote 345. For methodology discussion, see Marinescu Opening Report, Appendix D.4.

FILED UNDER SEAL

**C.2.4.** Structural Break Test

**Figure 56: <= $20 & >= $100,000 Recommended Rent Filter: Revised Figure 96 of My Opening Report: Chow Tests Show Significant Structural Breaks in Landlord Defendants' Pricing In 2021/2022[333]**



---

[333] Marinescu Opening Report, footnote 310. For methodology discussion, see Marinescu Opening Report , ¶¶ 554-555.

FILED UNDER SEAL

## C.3.  $20 Gross Rent Threshold

464.  For this sensitivity check, I filter the lease data for observations with a "Monthly Gross Rent" above $20.

### C.3.1.  TAM Analysis

**Figure 57: <= $20 Gross Rent Filter: Revised Figure 59 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, ▓▓▓▓▓▓▓▓▓" Reversed a Downward Price Cycle and Increased Rents[334]**



---

[334] Marinescu Opening Report, footnote 239.

FILED UNDER SEAL

**Figure 58: <= $20 Gross Rent Filter: Revised Figure 60 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "█████████" Reversed a Downward Price Cycle and Increase Rents[335]**



---

[335] Marinescu Opening Report, footnote 240.

185

FILED UNDER SEAL

**Figure 59: <= $20 Gross Rent Filter: Revised Figure 61 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "▮▮▮▮▮▮▮▮▮▮" Increased The Growth Rate Of Rents[336]**



---

[336] Marinescu Opening Report, footnote 241.

FILED UNDER SEAL

**Figure 60: <= $20 Gross Rent Filter: Revised Figure 62 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing[337]**



---

[337] Marinescu Opening Report, footnote 242.

187

FILED UNDER SEAL

**Table 24: <= \$20 Gross Rent Filter: Revised Table 2 of My Opening Report: An Interrupted Time Series Analysis Shows That TAM Oversight Is Associated with Landlord Defendant Price Increases[338]**

|  | (10) | (11) | (12) | (13) |
|---|---|---|---|---|
| After First TAM Call | 36.721*** | 13.329** | 10.760* | 9.491 |
|  | (3.425) | (4.555) | (5.193) | (6.804) |
| Months From First Call |  | 0.534*** | 0.451*** | 0.295 |
|  |  | (0.039) | (0.040) | (0.277) |
| After First TAM Call X Months From First Call |  |  | 0.293* | 0.164 |
|  |  |  | (0.138) | (0.135) |
| Rent CPI |  |  |  | 0.428 |
|  |  |  |  | (0.706) |
| Num.Obs. | 10434 | 10434 | 10434 | 10434 |
| R2 | 0.467 | 0.478 | 0.479 | 0.479 |
| R2 Adj. | 0.459 | 0.471 | 0.472 | 0.472 |
| R2 Within | 0.058 | 0.078 | 0.080 | 0.080 |
| R2 Within Adj. | 0.058 | 0.078 | 0.079 | 0.080 |
| RMSE | 67.68 | 66.95 | 66.90 | 66.90 |
| FE: revenueiq.property.id | X | X | X | X |

+ $p < 0.1$, * $p < 0.05$, ** $p < 0.01$, *** $p < 0.001$

---

[338] Marinescu Opening Report, footnote 243. For methodology discussion, see Marinescu Opening Report, ¶¶ 386-389.

FILED UNDER SEAL

**Figure 61: <= $20 Gross Rent Filter: Revised Figure 99 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing[339]**



---

[339] Marinescu Opening Report, Appendix C.4.

189

FILED UNDER SEAL

**C.3.2.**  Index Comparison

**Figure 62: <= \$20 Gross Rent Filter: Revised Figure 88 of My Opening Report: Landlord Defendants Increase Rents Faster Than A Rent-Specific CPI[340]**



---

[340] Marinescu Opening Report, footnote 293.

FILED UNDER SEAL

**Figure 63: <= \$20 Gross Rent Filter: Revised Figure 89 of My Opening Report: Yardi's Index Premium Relative to Rent CPI Increased With the Number of Participating Landlord Defendant Units[341]**



---

[341] Marinescu Opening Report, footnote 294.

FILED UNDER SEAL

**Table 25: <= $20 Gross Rent Filter: Revised Table 5 of My Opening Report: The Yardi Index Premium Increased With Landlord Defendant Adoption of Revenue IQ[342]**

| Year | Units | Yardi Index | Rent CPI | Yardi Premium |
|---|---|---|---|---|
| 1/1/2011 | 10 | 100 | 100 | 0 |
| 1/1/2012 | 3219 | 99.76 | 102.34 | -2.58 |
| 1/1/2013 | 7144 | 101.56 | 105.11 | -3.55 |
| 1/1/2014 | 18647 | 105.06 | 108.14 | -3.07 |
| 1/1/2015 | 30735 | 109.69 | 111.81 | -2.12 |
| 1/1/2016 | 51431 | 115.58 | 115.95 | -0.38 |
| 1/1/2017 | 68271 | 121.06 | 120.51 | 0.56 |
| 1/1/2018 | 85505 | 127.3 | 125 | 2.3 |
| 1/1/2019 | 113601 | 132.33 | 129.29 | 3.04 |
| 1/1/2020 | 145978 | 137.98 | 134.15 | 3.84 |
| 1/1/2021 | 242173 | 143.54 | 136.9 | 6.64 |
| 1/1/2022 | 279323 | 153.55 | 142.06 | 11.49 |
| 1/1/2023 | 280944 | 170.63 | 154.22 | 16.41 |
| 1/1/2024 | 280928 | 180.49 | 163.61 | 16.88 |
| 1/1/2025 | 287972 | 188.14 | 170.55 | 17.59 |

---

[342] Marinescu Opening Report, footnote 295.

192

FILED UNDER SEAL

**Table 26: <= \$20 Gross Rent Filter: Revised Table 6 of My Opening Report: Revenue IQ Adoption by Landlord Defendants Led To Economically & Statistically Significant Increases In the Yardi Index Premium Relative to Rent CPI**[343]

|  | Yardi Index Premium | |
| --- | --- | --- |
|  | Model 1 | Model 2 |
| Intercept | -3.642425*** | -3.653039*** |
|  | (0.157065) | (0.157465) |
| **Active Lease Count, per 10k Leases** | 0.643264*** | |
|  | (0.017495) | |
| **Approx. Unit Count, per 10k Units** | | **0.516587*** |
|  | | (0.014414) |
| Num.Obs. | 175 | 175 |
| R2 | 0.911 | 0.896 |
| R2 Adj. | 0.911 | 0.896 |
| RMSE | 2.25 | 2.43 |

Active Lease Count and Approx. Unit Count are each scaled back by 10,000.

$+ p < 0.1$, $* p < 0.05$, $** p < 0.01$, $*** p < 0.001$

---

[343] Marinescu Opening Report, footnote 296. For methodology discussion, see Marinescu Opening Report, ¶¶ 512-513.

**Figure 64: <= $20 Gross Rent Filter: Revised Figure 47 of My Opening Report: The Growth Rate of the Yardi Index Premium Increased Notably Around 2021/22**[344]



Yardi Index Premium (Yardi Index - Rent CPI)

---

[344] Marinescu Opening Report, footnote 309.

FILED UNDER SEAL

**Figure 65: <= \$20 Gross Rent Filter: Revised Figure 48 of My Opening Report: Yardi Rent Index vs. Rent CPI & Yardi Approx. Unit Count[345]**



---

[345] Marinescu Opening Report, Appendix D.2 and footnote 339.

195

FILED UNDER SEAL

**Figure 66: <= $20 Gross Rent Filter: Revised Figure 102 of My Opening Report: Yardi Index Premium as a Function of Approx. Unit Count[346]**



---

[346] Marinescu Opening Report, Appendix D.2 and footnote 340.

FILED UNDER SEAL

**C.3.3.**   Panel Regressions

**Figure 67: <= $20 Gross Rent Filter: Revised Figure 94 of My Opening Report: Landlord Defendants Increase Rent Prices Faster In Areas With More Fellow Revenue IQ Users**[347]



FILED UNDER SEAL

**Table 27: <= $20 Gross Rent Filter: Revised Table 8 of My Opening Report: Robust Econometric Estimation Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants[348]**

| | (21) | (22) | (23) | (24) | (25) |
|---|---|---|---|---|---|
| Intercept | 1292.309*** | | | -25.492*** | |
| | (0.156) | | | (0.961) | |
| Number of Co-Conspirator Properties | 47.656*** | 39.255*** | 1.839*** | 41.163*** | 5.278*** |
| | (0.046) | (0.287) | (0.070) | (0.044) | (0.164) |
| Rent CPI | | | | 9.124*** | 10.264*** |
| | | | | (0.007) | (0.014) |
| Num.Obs. | 23301233 | 23295890 | 23295890 | 23301233 | 23295890 |
| R2 | 0.062 | 0.917 | 0.961 | 0.128 | 0.959 |
| R2 Adj. | 0.062 | 0.915 | 0.960 | 0.128 | 0.959 |
| R2 Within | | 0.037 | 0.000 | | 0.528 |
| R2 Within Adj. | | 0.037 | 0.000 | | 0.528 |
| FE: revenue.iq.unit.id | | X | X | | X |
| FE: month | | | X | | |
| + p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001 | | | | | |

---

[348] Marinescu Opening Report, footnote 308. For methodology discussion, see Marinescu Opening Report, ¶¶ 541-544.

FILED UNDER SEAL

**Table 28: <= $20 Gross Rent Filter: Revised Table 12 of My Opening Report: Robust Econometric Estimation - on First-Differences - Further Confirms that Landlord Defendants Charge Higher Rents When Surrounded By More Alleged Co-Conspirators, Even Relative to Other Landlord Defendants[349]**

|  | (27) | (28) | (29) | (30) | (31) |
|---|---|---|---|---|---|
| Intercept | 60.569*** |  |  | 127.928*** |  |
|  | (0.462) |  |  | (2.580) |  |
| Co-Conspirator Count Per PUMA | 4.338*** | 11.502*** | 4.293*** | 4.872*** | 15.686*** |
|  | (0.125) | (0.591) | (0.643) | (0.127) | (0.630) |
| Rent CPI |  |  |  | -0.471*** | -1.000*** |
|  |  |  |  | (0.019) | (0.040) |
| Num.Obs. | 436316 | 294829 | 294828 | 436316 | 294829 |
| R2 | 0.003 | 0.257 | 0.345 | 0.004 | 0.259 |
| R2 Adj. | 0.003 | -0.173 | -0.035 | 0.004 | -0.170 |
| R2 Within |  | 0.002 | 0.000 |  | 0.005 |
| R2 Within Adj. |  | 0.002 | 0.000 |  | 0.005 |
| FE: revenue.iq.unit.id |  | X | X |  | X |
| FE: month |  |  | X |  |  |
| + p < 0.1, * p < 0.05, ** p < 0.01, *** p < 0.001 |  |  |  |  |  |

---

[349] Marinescu Opening Report, footnote 345. For methodology discussion, see Marinescu Opening Report, Appendix D.4.

FILED UNDER SEAL

**C.3.4.**   Structural Break Test

**Figure 68: <= $20 Gross Rent Filter: Revised Figure 96 of My Opening Report: Chow Tests Show Significant Structural Breaks in Landlord Defendants' Pricing In 2021/2022[350]**



---

[350] Marinescu Opening Report, footnote 310. For methodology discussion, see Marinescu Opening Report , ¶¶ 554-555.

## C.4.   BLS Outlier Capping

465.   Finally, I implement a further check on the sensitivity of my results to different ways of dealing with outliers in the data. In this case, instead of filtering out observations with rent values below a particular threshold, I apply the Bureau of Labor Statistics' methodology for dealing with outliers in their computation of the CPI-U Rent of Primary Residence Index. This method consists of capping extreme monthly rent changes at no less than -95% and no more than 2000%.[351]

### C.4.1.   TAM Analysis

**Figure 69: BLS Outlier Capping: Revised Figure 59 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "███████" Reversed a Downward Price Cycle and Increased Rents[352]**



---

[351] R-CPI-NTR and R-CPI-ATR.
[352] Marinescu Opening Report, footnote 239.

FILED UNDER SEAL

**Figure 70: BLS Outlier Capping: Revised Figure 60 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "▮▮▮▮▮▮" Reversed a Downward Price Cycle and Increase Rents[353]**



FILED UNDER SEAL

**Figure 71: BLS Outlier Capping: Revised Figure 61 of My Opening Report: Following TAM Calls Noting Below Benchmark Pricing, "███████████" Increased The Growth Rate Of Rents[354]**



---

[354] Marinescu Opening Report, footnote 241.

FILED UNDER SEAL

**Figure 72: BLS Outlier Capping: Revised Figure 62 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing[355]**



---

[355] Marinescu Opening Report, footnote 242.

204

FILED UNDER SEAL

**Table 29: BLS Outlier Capping: Revised Table 2 of My Opening Report: An Interrupted Time Series Analysis Shows That TAM Oversight Is Associated with Landlord Defendant Price Increases[356]**

|  | (10) | (11) | (12) | (13) |
|---|---|---|---|---|
| After First TAM Call | 29.755*** | 5.931+ | 2.133 | -2.734 |
|  | (2.088) | (3.097) | (3.158) | (3.370) |
| Months From First Call |  | 0.544*** | 0.422*** | -0.179 |
|  |  | (0.034) | (0.033) | (0.135) |
| After First TAM Call X Months From First Call |  |  | 0.434*** | -0.060 |
|  |  |  | (0.096) | (0.067) |
| Rent CPI |  |  |  | 1.640*** |
|  |  |  |  | (0.327) |
| Num.Obs. | 10434 | 10434 | 10434 | 10434 |
| R2 | 0.558 | 0.574 | 0.576 | 0.578 |
| R2 Adj. | 0.552 | 0.568 | 0.570 | 0.573 |
| R2 Within | 0.061 | 0.095 | 0.099 | 0.104 |
| R2 Within Adj. | 0.061 | 0.095 | 0.099 | 0.104 |
| RMSE | 53.36 | 52.39 | 52.27 | 52.12 |
| FE: revenueiq.property.id | X | X | X | X |

$+ p < 0.1$, $* p < 0.05$, $** p < 0.01$, $*** p < 0.001$

---

[356] Marinescu Opening Report, footnote 243. For methodology discussion, see Marinescu Opening Report, ¶¶ 386-389.

205

FILED UNDER SEAL

**Figure 73: BLS Outlier Capping: Revised Figure 99 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing[357]**



---

[357] Marinescu Opening Report, Appendix C.4.

206

FILED UNDER SEAL

**C.4.2.**   Index Comparison

**Figure 74: BLS Outlier Capping: Revised Figure 88 of My Opening Report: Landlord Defendants Increase Rents Faster Than A Rent-Specific CPI[358]**



---

[358] Marinescu Opening Report, footnote 293.

FILED UNDER SEAL

**Figure 75: BLS Outlier Capping: Revised Figure 89 of My Opening Report: Yardi's Index Premium Relative to Rent CPI Increased With the Number of Participating Landlord Defendant Units[359]**



---

[359] Marinescu Opening Report, footnote 294.

208

FILED UNDER SEAL

**Table 30: BLS Outlier Capping: Revised Table 5 of My Opening Report: The Yardi Index Premium Increased With Landlord Defendant Adoption of Revenue IQ[360]**

| Year | Units | Yardi Index | Rent CPI | Yardi Premium |
|------|-------|-------------|----------|---------------|
| 1/1/2011 | 10 | 100 | 100 | 0 |
| 1/1/2012 | 3219 | 99.76 | 102.34 | -2.58 |
| 1/1/2013 | 7146 | 101.47 | 105.11 | -3.64 |
| 1/1/2014 | 18649 | 105.06 | 108.14 | -3.08 |
| 1/1/2015 | 30736 | 108.84 | 111.81 | -2.97 |
| 1/1/2016 | 51432 | 114.39 | 115.95 | -1.56 |
| 1/1/2017 | 68275 | 119.8 | 120.51 | -0.7 |
| 1/1/2018 | 85514 | 125.29 | 125 | 0.29 |
| 1/1/2019 | 113609 | 130.19 | 129.29 | 0.89 |
| 1/1/2020 | 145985 | 135.49 | 134.15 | 1.34 |
| 1/1/2021 | 242181 | 138.11 | 136.9 | 1.21 |
| 1/1/2022 | 279334 | 147.6 | 142.06 | 5.54 |
| 1/1/2023 | 280956 | 163.32 | 154.22 | 9.1 |
| 1/1/2024 | 280933 | 172.23 | 163.61 | 8.62 |
| 1/1/2025 | 287981 | 178.11 | 170.55 | 7.55 |

---

[360] Marinescu Opening Report, footnote 295.

209

FILED UNDER SEAL

**Table 31: BLS Outlier Capping: Revised Table 6 of My Opening Report: Revenue IQ Adoption by Landlord Defendants Led To Economically & Statistically Significant Increases In the Yardi Index Premium Relative to Rent CPI[361]**

|  | Yardi Index Premium | |
|---|---|---|
|  | Model 1 | Model 2 |
| Intercept | -3.188703*** | -3.192441*** |
|  | (0.132000) | (0.134737) |
| **Active Lease Count, per 10k Leases** | 0.357266*** |  |
|  | (0.012304) |  |
| **Approx. Unit Count, per 10k Units** |  | 0.286792*** |
|  |  | (0.010082) |
| Num.Obs. | 175 | 175 |
| R2 | 0.860 | 0.845 |
| R2 Adj. | 0.859 | 0.844 |
| RMSE | 1.61 | 1.70 |

Active Lease Count and Approx. Unit Count are each scaled back by 10,000.

+ $p < 0.1$, * $p < 0.05$, ** $p < 0.01$, *** $p < 0.001$

---

[361] Marinescu Opening Report, footnote 296. For methodology discussion, see Marinescu Opening Report, ¶¶ 512-513.

210

FILED UNDER SEAL

**Figure 76: BLS Outlier Capping: Revised Figure 95 of My Opening Report: The Growth Rate of the Yardi Index Premium Increased Notably Around 2021/22[362]**



_____

[362] Marinescu Opening Report, footnote 309.

**Figure 77: BLS Outlier Capping: Revised Figure 101 of My Opening Report: Yardi Rent Index vs. Rent CPI & Yardi Approx. Unit Count[363]**



---

[363] Marinescu Opening Report, Appendix D.2 and footnote 339.

FILED UNDER SEAL

**Figure 78: BLS Outlier Capping: Revised Figure 102 of My Opening Report: Yardi Index Premium as a Function of Approx. Unit Count[364]**



### C.4.3.   Structural Break Test

**Figure 79: BLS Outlier Capping: Revised Figure 96 of My Opening Report: Chow Tests Show Significant Structural Breaks in Landlord Defendants' Pricing In 2021/2022[365]**



---

[364] Marinescu Opening Report, Appendix D.2 and footnote 340.

[365] Marinescu Opening Report, footnote 310. For methodology discussion, see Marinescu Opening Report , ¶¶ 554-555.

FILED UNDER SEAL

## C.5.    BLS Outlier Capping and Data Gap Imputation

466.    Figure 80 presents my original YLPI alongside a sensitivity analysis in which I simultaneously implement the BLS-style imputation methodology as well as BLS-style treatment of outlier rent changes. The dashed orange line is BLS's Rent CPI benchmark. The green line shows the results of my sensitivity analysis; in it, I use the same hybrid imputation methodology as I do in Figure 17, and cap rent changes following the approach discussed by the BLS:

**Figure 80: BLS Outlier Capping and Temporal Gap Imputation[366]**



---

[366] Source: Expanded Lease Data (*see* Appendix F.1 of Marinescu Opening Report); Rent CPI. Notes: [1] The two indices in the figure ("BLS-Style Imputation + Capping" and "Original" lines) filter for monthly effective rents above $0. [2] The "BLS-Style Imputation + Capping" line follows the BLS non-response method when the tenant ID is unchanged before and after the data gap, and the BLS vacancy method when the tenant ID changes after the data gap. The BLS non-response method uses the average growth in rental units observed in each month for each unique CBSA, calculated only for units with continuous observations in the corresponding area and period. The BLS vacancy imputation method, on the other hand, uses two different growth rates: the "jump rate" and the "steady rate". The 'jump rate' reflects the average observed rental increase across all designated tenancy renewals in the same CBSA and month pair for which I am imputing data. I apply the "jump rate" to impute the first observation of a gap. The "steady rate" is the average observed rental increase across all designated non-renewals (e.g. contiguous observations that do not correspond to the first period of a tenancy), in the same CBSA and month pair for which I am imputing data. The BLS applies a 6-month steady rate, but given the granularity of the lease (monthly) data, I calculate this rate down to the monthly level. I apply the "steady rate" to impute all subsequent observations after

214

FILED UNDER SEAL

467.    This specification is conservative as it caps many outlier observations which Yardi's Experts have not disputed as inaccurate price movements. I present this to directionally show that - even under this most conservative methodology - a Yardi Index Premium emerges around 2021/2022 during a key period of rising Revenue IQ adoption, consistent with my conclusion that the Harrington test for coordination via a hub-algorithm is satisfied in this case.

## D.    Materials Relied Upon

### D.1.    Academic Articles

| |
|---|
| Amalia R. Miller and Catherine E. Tucker, "Can Health Care Information Technology Save Babies?," Journal of Political Economy, 2011, available at https://www.jstor.org/stable/10.1086/660083 (accessed April 27, 2026). |
| Anna Sikov, "A Brief Review of Approaches to Non-ignorable Non-response," International Statistical Review, December, 2018, available at https://www.jstor.org/stable/pdf/48554507.pdf (accessed April 15, 2026). |
| Arthur Lewbel, "Estimation of Average Treatment Effects with Misclassification," Econometrica, March 2007, available at https://www.jstor.org/stable/4501999 (accessed April 21, 2026). |
| Avi Goldfarb and Catherine E. Tucker, "Advertising Bans and the Substitutability of Online and Offline Advertising," Journal of Marketing Research, April, 2011, available at https://www.jstor.org/stable/23033426 (accessed April 27, 2026). |
| Avi Goldfarb and Catherine E. Tucker, "Standardization and the Effectiveness of Online Advertising," Management Science, November, 2015, available at https://www.jstor.org/stable/24551554 (accessed April 27, 2026). |
| Daron Acemoglu, Vasco M. Carvalho, Asuman Ozdaglar, and Alireza Tahbaz-Salehi, "The network origins of aggregate fluctuations," Econometrica, September, 2012, available at https://economics.mit.edu/sites/default/files/publications/The%20Network%20Origins%20of%20Aggregate%20Fluctuations.pdf (accessed May 11, 2026). |
| David H. Autor, Christopher J. Palmer, Parag A. Pathak, ''Housing Market Spillovers: Evidence from the End of Rent Control in Cambridge, Massachusetts,'' Journal of Political Economy, 2014, available at https://economics.mit.edu/sites/default/files/publications/housing%20market%202014.pdf (accessed May 12, 2026). |

---

the first observation of a gap. Furthermore, this line also features the BLS capping for outlier rent values (see R-CPI-NTR and R-CPI-ATR). Rent changes are capped at between -95% and +2000% period-on-period, according to the BLS methodology discussed in.

FILED UNDER SEAL

Herman Aguinis, Ryan K. Gottfredson, and Harry Joo, "Best-Practice Recommendations for Defining, Identifying, and Handling Outliers," Organizational Research Methods, 2013, available at https://hermanaguinis.com/pdf/ORMoutliers.pdf (accessed April 9, 2026).

Eric Maskin and Jean Tirole, "A Theory of Dynamic Oligopoly, II: Price Competition, Kinked Demand Curves, and Edgeworth Cycles," Econometrica, May, 1988, available at https://www.jstor.org/stable/1911701 (accessed February 3, 2026).

Jeffrey M. Perloff, "Microeconomics," Seventh Edition, Pearson Education, Inc., 2015, available at https://unitimesofficial.wordpress.com/wp-content/uploads/2021/03/microeconomics-seventh-edition-by-jeffrey-m.-perloff.pdf  (hereinafter, "Perloff") (accessed February 6, 2026).

Jeffrey M. Wooldridge, "Introductory Econometrics: A Modern Approach," Fifth Edition, South-Western Cengage Learning, 2012, available at https://cbpbu.ac.in/userfiles/file/2020/STUDY_MAT/ECO/2.pdf (accessed May 18, 2026).

Joseph E. Harrington, "An economic test for an unlawful agreement to adopt a third-party's pricing algorithm," Economic Policy, January, 2025, available at https://academic.oup.com/economicpolicy/article-abstract/40/121/261/7772481 (accessed January 13, 2026).

Joshua Gallin, Lara Loewenstein, Hugh Montag, Randal Verbrugge, ''Sticky Continuing-Tenant Rents,'' U.S. Bureau of Labor Statistics, September 16, 2024, available at https://www.bls.gov/pir/journal/mh01.pdf (accessed April 16, 2026).

Margaret C. Levenstein and Valerie Y. Suslow, "What Determines Cartel Success?," Journal of Economic Literature, March, 2006, available at https://www.jstor.org/stable/30032296 (accessed May 19, 2026).

Megan L. Head, Luke Holman, Rob Lanfear, Andrew T. Kahn, and Michael D. Jennions, "The Extent and Consequences of P-Hacking in Science," PLOS Biology, March 13, 2015, available at https://pmc.ncbi.nlm.nih.gov/articles/PMC4359000/ (accessed April 10, 2026).

Nicolas de Roos and Vladimir Smirnov, "Collusion with intertemporal price dispersion," The RAND Journal of Economics, 2020, available at https://www.jstor.org/stable/45380646 (accessed May 19, 2026).

Sahana Roy Chowdhury, Kirti Gupta and Panayiotis Tzeremes, ''US housing prices and the transmission mechanism of connectednes,'' Finance Research Letters, 2023, available at https://www.sciencedirect.com/science/article/abs/pii/S1544612323010085 (accessed May 12, 2026).

Samira Zahmatkesh and Philipp Zech, "Spatio-Temporal Missing Data Imputation: A Systematic Literature Review with a Focus on Statistical and Machine Learning-Based Approaches," ACM Computing Survey, April, 2026, available at https://dl.acm.org/doi/pdf/10.1145/3797903 (accessed April 20, 2026).

FILED UNDER SEAL

| |
|---|
| Takuo Sugaya and Alexander Wolitzky, "Maintaining Privacy in Cartels," Journal of Political Economy, December, 2018, available at https://www.jstor.org/stable/26550551 (accessed January 14, 2026). |
| Thomas W. Ross, ''Cartel stability and product differentiation,'' International Journal of Industrial Organization, 1992, available at https://www.sciencedirect.com/science/article/abs/pii/016771879290043X (accessed May 15, 2026). |

## D.2.　Depositions

| |
|---|
| April 16, 2026, Deposition of Mihran Yenikomshian, deposed by Rio Pierce (for Plaintiffs) and by Abraham Tabaie (for Defendants) |
| April 28, 2026, Deposition of Catherine Tucker, deposed by Rio Pierce (for Plaintiffs) and by Michael Schaper (for Defendants) |
| March 9, 2026, Deposition of Ioana Marinescu, deposed by Rio Pierce (for Plaintiffs) and Michael Schaper (for Defendants) |
| May 19, 2026, Deposition of Michael Mitzenmacher, deposed by Rio Pierce (for Plaintiffs) and by Abraham Tabaie (for Defendants) |
| November 14, 2025, Deposition of Liana Rao, deposed by Rio Pierce (for Plaintiffs) and by David Sarratt (for Defendants) |

## D.3.　Declarations & Reports

| |
|---|
| February 9, 2026, Expert Report of Ioana Marinescu, PhD In Support of Plaintiffs' Opposition to Yardi's Motion for Summary Judgment and Backup Materials |
| March 23, 2026, Declaration Of Michael Mitzenmacher In Rebuttal Of The Report Of Ioana Marinescu, Ph.D. and Backup Materials |
| March 23, 2026, Declaration Of Mihran Yenikomshian In Rebuttal Of The Report Of Ioana Marinescu, Ph.D. and Backup Materials |
| March 23, 2026, Expert Report of Catherine Tucker, Ph.D. in Rebuttal of the Report of Ioana Marinescu, Ph.D. and Backup Materials |
| November 20, 2025, Declaration Of Carissa Wong-Schwab In Support Of Defendant's Motion For Summary Judgment |
| November 24, 2025, Declaration Of Michael Gaeta In Support Of Defendant Yardi Systems, Inc.'S Motion For Summary Judgment |

FILED UNDER SEAL

| November 24, 2025, Declaration Of Mihran Yenikomshian In Support Of Yardi Systems, Inc.'S Motion For Summary Judgment and Backup Materials |
| --- |

## D.4. Public Documents

| Brian Adams, Lara Loewenstein, Hugh Montag, and Randal Verbrugge, "Disentangling Rent Index Differences: Data, Methods, and Scope," U.S. Bureau of Labor Statistics, October 6, 2022, available at https://www.bls.gov/osmr/research-papers/2022/pdf/ec220100.pdf (accessed April 17, 2026). |
| --- |
| "Consumer Price Index: Calculation," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/opub/hom/cpi/calculation.htm (accessed April 16, 2026). |
| "Consumer Price Index: Calculation," U.S. Bureau of Labor Statistics, September 6, 2023, available at https://www.bls.gov/opub/hom/cpi/archive/20230906/calculation.htm#ednref1 (accessed May 20, 2026). |
| "Consumer Price Index: Imputation," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/cpi/tables/imputation.htm (accessed April 15, 2026). |
| Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average (CUUR0000SEHA) available at: https://fred.stlouisfed.org/series/CUUR0000SEHA# (accessed February 5, 2026). |
| John Cotter, Stuart Gabriel, and Richard Roll, "Integration and Contagion in US Housing Markets," Munich Personal RePEc ArchiveUniversity College Dublin and UCLA, 2011, available at https://mpra.ub.uni-muenchen.de/34591/1/MPRA_paper_34591.pdf (accessed May 12, 2026). |
| Kone AG and others v. OBB-Infrastructur, ECLI:EU: C 2014:1317, available at https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:62012CJ0557 (accessed May 19, 2026). |
| "Measuring Price Change in the CPI: Rent and Rental Equivalence," U.S. Bureau of Labor Statistics, available at https://www.bls.gov/cpi/factsheets/owners-equivalent-rent-and-rent.htm (accessed April 10, 2026). |
| "Research Consumer Price Index for new tenant rent (R-CPI-NTR) and research Consumer Price Index for all tenant regressed rent (R-CPI-ATR)," U.S. Bureau of Labor Statistics,  available at https://www.bls.gov/cpi/research-series/r-cpi-ntr.htm (accessed April 10, 2026). |
| "Yardi Multifamily Suite," Yardi, 2019, originally available at https://resources.yardi.com/documents/multifamily-suite-brochure/ (accessed March 5, 2025). |

## D.5. Bates Stamped Documents

| YARDI-DUFFY_00023860 |
| --- |
| YARDI-DUFFY_00024130 |

FILED UNDER SEAL

| |
|---|
| YARDI-DUFFY_00024718 |
| YARDI-DUFFY_00024800 |
| YARDI-DUFFY_00031612 |
| YARDI-DUFFY_00113657 |
| YARDI-DUFFY_00113943 |
| YARDI-DUFFY_00114125 |
| YARDI-DUFFY_00115308 |
| YARDI-DUFFY_00116563 |
| YARDI-DUFFY_00118394 |
| YARDI-DUFFY_00118560 |
| YARDI-DUFFY_00185213 |
| YARDI-DUFFY_00227565 |
| YARDI-DUFFY_00227897 |
| YARDI-DUFFY_00227898 |
| YARDI-DUFFY_00227899 |
| YARDI-DUFFY_00582522 |
| YARDI-DUFFY_00585450 |
| YARDI-DUFFY_00585471 |
| YARDI-DUFFY_00623392 |
| YARDI-DUFFY_00913148 |
| YARDI-DUFFY_01275908 |