# EXHIBIT B

# EXHIBIT 3

# FILED UNDER SEAL

Attorneys' Eyes Only

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

**COPY**

CASE NO.:  2:23-cv-01391-RSL

In Re YARDI REVENUE MANAGEMENT ANTITRUST LITIGATION

----------------------------------------

WYLIE DUFFY, et al., individually and on behalf of all

others similarly situated,

            Plaintiffs,

v.

YARDI SYSTEMS, INC., et al.,

            Defendants.


REMOTE VIDEOCONFERENCE VIDEOTAPED

DEPOSITION TESTIMONY OF:

MIHRAN YENIKOMSHIAN

April 16, 2026

*HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY*

BlueBear Reporting LLC

analysis, and so I had done a similar analysis.

Q.    Oh, so in order to respond to the plaintiff's expert in that case, you needed to look at the qualitative documents?  Is that right?

A.    Those are the documents the plaintiff's expert were relying on.

Q.    Okay.  And in order to do a rebuttal report in that case, you thought it was important to look at the same kinds of documents that plaintiff's expert had looked at and respond accordingly?

A.    I was responding to the plaintiff's expert in that case, and that's the material that they relied upon.

Q.    Okay.  So, do you think it's standard when you do a rebuttal report to review in detail the same kind of documents that the person you're responding to has reviewed in the course of offering your rebuttal opinions?

A.    Can you say that one more time?

Q.    Do you think it's standard expert practice when you do a rebuttal report to review in detail the same kind of documents that the person you're responding to has reviewed in the course of offering your rebuttal opinions?

A.    It depends on what rebuttal opinions you're offering.

Q.    Can you explain what you mean by that?

A.    If the expert is offering an opinion and it's based on certain documents and then you're rebutting that opinion but not looking at what the expert relied upon to make their decisions, you would need to look at the same documents.

Q.    Why would you need to look at the same documents?

A.    To understand the basis of their analysis.

Q.    Okay.  So you think it would be appropriate when you do a rebuttal opinion to look at the same documents that the expert you're responding to looked at in order to understand the basis of their analysis.  Is that correct, sir?

         MR. TABAIE:  Objection, asked and answered.

A.    Can you -- can you restate that one more time?

Q.    So you think it would be appropriate when you do a rebuttal opinion to look at the same documents or same types of documents that the expert you're responding to looked at in order to understand the basis of their analysis.  Is that correct, sir?

A.    Depending on the rebuttal opinions you're giving, then it would be appropriate.

Q.    Could you explain what you mean by that?

A.    That's quite a long statement.  Could you say it one more time.

Q.    Sure.  And I'm genuinely curious how I'm mischaracterizing testimony that was literally just reading the transcript.

But in any case, do you remember, sir, a few moments ago when you testified, "If the expert is offering an opinion and it's based on certain documents and then you're rebutting that opinion but not looking at what the expert relied upon to make their decisions, you would need to look at the same documents"?  Do you remember that testimony?

A.    I do remember giving a statement that's similar to that.

Q.    Was that truthful testimony, sir?

MR. TABAIE:  Objection, argumentative.

A.    Yes, it was truthful testimony.

Q.    Was that testimony limited to just the Thomson Reuters case, or was that about what an expert should do more generally?

A.    That testimony was a general statement.

Q.    That testimony was a general statement but what you think an expert should do; correct?

A.    That is a general statement of what an expert would do, but it's going to be depending on the analysis

and the context of the case.

Q.    Do you remember a few moments ago, sir, when you testified:  "If the expert is not giving an opinion on a certain area, it wouldn't be necessary to look at all those different documents.  If they are giving an opinion on an issue, then it would be appropriate to at least consider those documents"?  Do you remember that testimony, sir?

A.    I believe I was talking in the context of a rebuttal analysis.

Q.    Okay.  Fair enough.

Do you remember that testimony you gave about what an expert should do when they do a rebuttal report?

A.    I do.

Q.    Okay.  Was that truthful testimony?

MR. TABAIE:  Objection, argumentative and also vague.  Whatever Mr. Yenikomshian said, I think it's unclear when you're quoting it back.

A.    Yes, it was truthful.

Q.    Okay.  And that testimony was a statement by you about what you think an expert should do; correct?  When they do a rebuttal report.

MR. TABAIE:  Objection, mischaracterizes the testimony.

A.    My statement was based on my experience of

A.    I have no idea.  I've been doing this for 20 years.  And so I do, you know, 20 to 30 cases a year. It's tons.

Q.    Okay.

A.    I don't --

Q.    So it would be fair to say that you've done supporting work on hundreds of cases.  Is that fair to say, sir?

A.    Yes.  At least hundreds of cases.

Q.    Okay.  And I would assume a number of those cases involve rebuttal reports.  Right?

A.    Yes.

Q.    Okay.  And so when you gave those statements just now about what an expert should do when they do a rebuttal report, you were drawing on your experience working on rebuttal reports in tens, perhaps hundreds of cases; correct?

A.    Yes.  I was drawing on my experience of what I see in the industry.

Q.    Okay.  And what you've seen in the industry is based in large part, I would assume, on your firsthand experience as a supporting -- doing supporting work on hundreds of different cases.  Correct?

A.    I'm drawing on my experience of both supporting work and testifying work.

Q.    Could you turn to Appendix G, Materials Relied Upon.

A.    Yes.

Q.    Is this a complete list of the materials you relied upon in formulating your rebuttal opinions in this case?

(Witness reviews document.)

A.    One more second.

(Witness reviews document.)

A.    Yes.

Q.    You list the depositions of two Yardi employees.  Do you see that?

A.    I see that.

Q.    Had you read those?  Did you read those entire depositions?  Personally?

A.    I skimmed -- I skimmed them.

Q.    Do you have any estimate of the amount of time that you spent skimming those depositions?

A.    No.  Because there were certain things that I -- that I cited to in my report.

Q.    What do you mean by there were certain things you cited to in your report?

A.    I had cited to these depositions in my report.

Q.    Where do you cite to the -- to the deposition

Q.    Okay.  And I believe the deposition of Michael Thompson is cited to just once in footnote 55 and doesn't appear anywhere else in your report.  Does that sound right to you as well?

(Witness reviews document.)

A.    Yes.

Q.    Okay.  Did you review in any way the deposition of Anthony Fazio in formulating your opinions in this report?

A.    No.

Q.    Are you aware that Professor Marinescu cited to Anthony Fazio's deposition?

A.    I do recall that.

Q.    Okay.  And are you aware that you offer opinions in this report about Dr. Marinescu's analysis of Mr. Fazio's TAM call notes?

A.    Yes.  I have an opinion on that.

THE COURT REPORTER:  I'm sorry.  I didn't understand your answer.

THE WITNESS:  Yes.  I have an opinion on that.

Q.    Okay.  Why didn't you review his deposition?

A.    It wasn't necessary for responding to Dr. Marinescu's -- issues with her TAM analysis.

Q.    Why not?

Q.    But what you wrote in your report is something, I think, broader than that.  You wrote her claims are "untethered to any reliable principles and method."  Correct?

A.    Yes.

Q.    That's a judgment about whether Professor Marinescu's methodology is reliable; correct?

A.    My analysis points out the errors that she made in this section with respect to the benchmarks providing comprehensive visibility.

Q.    Okay.  And you wrote specifically that her analysis was untethered; correct?

A.    Yes.

Q.    And when you say "benchmarking system," you mean the benchmarking source code; correct?

A.    The benchmarking source code and how it operates.

Q.    Do you consider to be how it operates -- do you consider the calls that Mr. Fazio had with TAMs where he went over properties that were priced below the benchmark to be part of how it operates?

A.    When I see how the benchmarking system operates, I'm talking about how the benchmarking system returns KPI values and that Dr. Marinescu's analysis is wrong in how it -- how it operates and what KPI values

come back.

Q.    Okay.  So, do you consider the interactions that Mr. Fazio had with TAMs when he went over benchmarking data to be part of how the benchmarking at Revenue IQ operates?

A.    No, I didn't.  It's irrelevant to how -- to my opinion.

Q.    Okay.  So when you say, Dr. Marinescu's "claims are unsupported, speculative, and untethered to any reliable principles and method," you think the interactions between Mr. Fazio and TAMs are irrelevant to that opinion?

A.    They are irrelevant to that opinion because I'm responding to claims that Dr. Marinescu made about how it actually operates.

Q.    Dr. Marinescu made various claims about how the benchmarking that Yardi provides leads to higher prices; correct?

A.    Can you say that one more time?

Q.    Dr. Marinescu made various claims about how the benchmarking that Yardi provides leads to higher prices; correct?

A.    She did make a claim like that.

Q.    Are you responding to that claim?

A.    I'm responding specifically to claims of what

A.    What is "that claim"?

Q.    Dr. Marinescu's claim that benchmarking that Yardi provides leads to higher prices.

(Witness reviews document.)

A.    What I'm responding to is where Dr. Marinescu says that the benchmarking provides comprehensive visibility on rivals' prices.  That's what I'm responding to.

Q.    Do you offer any opinion in the report anywhere that Dr. Marinescu's claim that benchmarking leads to higher prices as unsupported, speculative, or untethered to any reliable principles and method?

A.    Sorry.  Can you say that one more time.  I'm not following.

Q.    Do you offer any opinion anywhere in the report that Dr. Marinescu's claim that benchmarking leads to higher prices is unsupported -- unsupported, speculative, or untethered to any reliable principles and method?

A.    What I describe with respect to benchmarking is that it does not provide comprehensive visibility.

Q.    Is that the only opinion that you're offering in your rebuttal with respect to Dr. Marinescu's opinions about benchmarking?

A.    No.

Highly Confidential
Attorneys' Eyes Only

Q.   Okay.  You said, "As a result, her claims are unsupported."  "Claims" pluralized.  That seems to indicate there's additional claims you're calling "unsupported, speculative, and untethered" besides just that clients have comprehensive visibility.  What are the other claims that you're referring to in this sentence?

A.   In paragraph 58a and b.  There's two claims there.  I could read them if you'd like.

Q.   Okay.  So you're saying that it's unsupported and -- I don't know why I'm struggling with that so much.

So you're say -- saying that it's unsupported, speculative, and untethered to any reliable principles and method, Dr. Marinescu's claim that "Landlord Defendants gain visibility into their rivals' list prices, final transaction prices, discounts, and concessions"?

A.   Yes.  What I'm saying, when Dr. Marinescu -- her statements which are in a and b here, so "Landlord Defendants gain visibility into their rivals'" --

MR. TABAIE:  Slow down.

A.   -- " list prices, final transaction prices, discounts, and concessions, among other KPIs" and that "This non-public information gives clients comprehensive visibility on rivals' pricing and allows them to strategically increase prices."  That's what I'm

referring to.

Q.    Those are the two claims that you're saying are unsupported and speculative and untethered?

A.    Yes.

Q.    What is your basis specifically for the first one, the one you listed in 58a about landlord defendants gaining visibility as being unsupported and untethered?

A.    So there's two points here.  The first is that the benchmarking KPIs are noisy, aggregated, anonymized values and that they're -- they use a weighting function as well.  There's also that what -- the requested benchmarks that a person -- a client uses.  So let's say they take 30 properties, what comes back as an effective benchmark set.  So not everything comes back, so you don't have that visibility that she's talking about, that Dr. Marinescu is talking about there.

Second, you know, since this is -- the effective benchmark set is un- -- it's hidden from the client themselves, they have no the idea what actually comes back in that data.  Just it's a noisy, anonymized, and aggregated data that's lagged.

THE COURT REPORTER:  Was the last word you said "lagged"?

THE WITNESS:  Lagged.

Q.    Are you offering the opinion that landlord

Q.    Do you have --

MR. TABAIE:  Why don't you -- this is a -- this is a -- I would say this is a -- a waste of time, and I would just ask him about the claim -- the claim that he said he rejects.

MR. PIERCE:  Okay.  That is a speaking objection.  I was told by your colleague at the deposition of Dr. Marinescu that that's an ethical violation.  Whether or not I agree with that characterization, I would ask you not to make speaking objections.  I'm entitled to ask the questions that I want to ask.  He used the word "visibility" in his report.  I want to understand what he means by that.

Q.    Would you agree with the fact that you can -- that a benchmarking -- is it your opinion that if a benchmarking dataset provides incomplete economic information, that it's not providing any economic information of value?

A.    I'm not providing opinions on whether or not something's economic value.  What I'm providing opinions on, what the values are that are being returned in the system.  And what is being returned is an aggregated, anonymized, noisy, and lagged measure.

Q.    What do you mean you're "not providing opinions on whether or not something's economic value"?

A.    That is an opinion for an economist.  I'm providing opinions on the system itself.

Q.    Do you understand Dr. Marinescu to be offering opinions in this report that are opinions as an economist?

A.    Yes, I understand that.

Q.    Okay.  And you are not offering opinions as an economist.  Is that your testimony?

A.    I just said that, that I'm not offering economic opinions.  I'm offering opinions on the system itself.

Q.    Okay.  So when you say that Dr. Marinescu's claims are unsupported, speculative, and untethered to any reliable principles and method, that's not referring to any opinions that Dr. Marinescu is offering as an economist about the economic value or usability of the benchmarking information?

A.    What that statement is is I'm making -- Dr. Marinescu has made some errors in how she characterizes the system.  As someone who's looked at the system and looked at the measures that come out of that system, I am pointing out the errors, and that's why I'm saying that the -- that "As a result, her claims are unsupported, speculative, and untethered to any reliable principle or method."  That's why, because it's not supported by the

A.   In terms of relied upon, that would be the set.

Q.   Okay.  So you didn't rely upon in any way any Yardi -- based on this list of materials relied upon, you didn't rely upon in any way in formulating any opinion in this report any Yardi internal documents besides these four TAM call notes and the various data and code bases you cite?

A.   That's right.  I was responding to Dr. Marinescu's report and the errors that Dr. Marinescu made.  It wasn't necessary to look at all these other documents to make my points.

Q.   It wasn't necessary to make -- look at the Yardi internal documents that Dr. Marinescu relied upon in reaching various economic opinions about the Yardi product; correct?

A.   As I've said, I'm pointing out mistakes that Dr. Marinescu made and responding to those.  I did not need to look at the documents such as economic -- I'm not sure exactly how you described them, but I don't need to do that.

Q.   So just to make sure I understand, you are not offering economic opinions.  Dr. Marinescu is offering economic opinions.  Your conclusion that her claims are "untethered to any reliable principles and

method" is a response to two of her statements that you describe in paragraph 58 and is based on your review of the Yardi benchmarking source code; correct?

          MR. TABAIE:  Objection, compound question.

     A.    Could you -- could you break that up?

     Q.    Sure.  You testified earlier that you are not offering econ- -- economic opinions in this case; correct?

     A.    I testified earlier that I'm not offering economic opinions in this case.

     Q.    Do you consider yourself qualified to testify in a federal court as an economist?

     A.    I'm not an economist in that sense.  My expertise is in systems analysis, data science, data analysis.  And so in this case, I'm providing opinions about the system itself, and I'm rebutting Dr. Marinescu when her opinions are not supported by the system.

     Q.    Okay.  When you say you are "not an economist in that sense," you mean that you do not consider yourself qualified to testify in federal court as an economist; correct?

          MR. TABAIE:  Objection, vague.

     A.    I didn't understand your question.

     Q.    Yeah.  I just want to clear up the record because I asked do you consider yourself qualified to

A.    That would be correct.

Q.    You testified just now there are lots of different types of economists; correct?

A.    Yes, I did.

Q.    Are you any type of economist?

A.    Yes.

Q.    What type of economist are you?

A.    So I've been published -- I lost track, but I've done a lot of health economics publications, so I could consider myself a health econom- -- economist.

Q.    Do you have a Ph.D. in economics?

A.    I do not.

Q.    Have you ever been hired as a professor of economics at any academic institution?

A.    No, I have not.

Q.    Have you ever taught a course on economics at any econom- -- academic institution?

A.    No, I have not.

Q.    Did you evaluate in your rebuttal report generally whether Dr. Marinescu's economic methodology as opposed to her characterization of the source code is supported by any reliable principles and method?

A.    My analysis of Dr. Marinescu's opinions had to do with the source code as well as implementation mistakes that she made.  I did not evaluate the economic

data processing.

Q.    Okay.  And by "system," you just mean the source code; right?

A.    The source code and the choices that people make on configuring that source code.

Q.    Did you make any attempt in -- in preparing your rebuttal report to familiarize yourself with the economic literature addressing whether aggregated, anonymized data exchanges among competitors can facilitate coordination?

A.    Sorry.  You trailed off at the end there.  I didn't hear those words.

Q.    Did you make any attempt in preparing your rebuttal report to familiarize yourself with the economic literature addressing whether aggregated, anonymized data exchanges among competitors can facilitate coordination?

A.    No, I did not.  It's not relevant for my opinions.

Q.    Did you review any of the academic papers that Dr. Marinescu cited in her report in the course of formulating your opinions in this rebuttal report?

A.    No, I did not.

Q.    Okay.  So you don't think that was relevant for your opinions, right, to look at the ec- -- economic literature on these questions?

question?

Q.    Well, you keep talking, sir, don't you, about how the da- -- the benchmarking data is noisy, anonymized, aggregated, and lagged; correct?

A.    Yes, I do say that.

Q.    Okay.  Well, I'm asking, did you do any analysis of how often the fact that the benchmarking data is noisy, anonymized, aggregated, and lagged flips the direction of the signal such that, for instance, these processes that add noise and lag cause a client to see that their benchmarking -- their rent is lower than a benchmarking KPI but, in fact, the benchmarking KPI is -- that their -- in fact, their rent is higher than a benchmarking KPI?

MR. TABAIE:  Objection, vague and ambiguous, compound.

A.    I'm not -- I'm not sure what you're asking.

Q.    Did you do any empirical analysis whatsoever of whether the -- of the impact on the benchmarking data being noisy, anonymized, aggregated, and lagged flips the direction of the signal for users of the benchmarking data?

MR. TABAIE:  Objec- -- objection, assumes facts.

A.    I -- I've done an analysis in my opening

report that talks about how noisy the data are and that there's quite a bit of range on that from the -- from the reported value versus what the input values are.

Q.   Did you make any attempt to quantify how often the noise of the data is such that it flips the directional signal so that a client who is priced below their benchmark appears, for example, to be above their benchmark?

A.   No, I did not.

Q.   So you concluded that benchmarking provides no useful competitive information without testing whether Yardi's benchmarking information reliably tells the client the one thing that antitrust theory says matters, whether it's priced above or below its competitors?

MR. TABAIE:   Okay.   I'm going to object as calls for a legal conclusion, I'm going to object as compound, and I'm going to object as misstates Mr. Yenikomshian's expert opinions.

A.   And I also don't understand the question.

Q.   Are you offering the opinion that benchmarking provides no useful competitive information for Yardi users?

MR. TABAIE:   Objection, calls for a legal conclusion the way you framed it.

A.   I'm offering the opinion that the

on is the benchmarking function provides a noisy, anonymized, aggregated, and lagged measure and you -- and it is impossible to tell what the effective set is from the client's perspective.

THE COURT REPORTER:  I'm sorry.  From a what perspective?

THE WITNESS:  Client -- client perspective.

Q.    Are you offering an opinion on whether the benchmarking information that Revenue IQ provides to users has anticompetitive effects or may have anticompetitive effects in a relevant market?

A.    I'm not providing that opinion.  I'm providing the opinion that the benchmark set is a noisy, anonymized, aggregated measure that's lagged and that you cannot tell what the effective set is that contributes to that value.

Q.    In paragraph 59, you state that "Benchmarking KPI outputs do not provide visibility into the actual prices or discounts offered by other properties."  Do you see that?

A.    I see that.

Q.    What do you mean by "visibility" in that sentence?

(Witness reviews document.)

A.    It's -- it's what I wrote on the page, "do

Q.   So you concluded Dr. Marinescu's benchmarking claims were untethered, but you never empirically tested whether benchmarking reliably delivers a directional signal showing a client whether it's priced above or below the competitors in the benchmark set; correct?

MR. TABAIE:  Objection, compound.

A.   What I did was look at how the benchmarking system operates, and that's where I found that it is noisy, anonymized, aggregated, lagged and you cannot tell whether the effective set that contributes to the measure -- what those properties are.  In my report, specifically what I say is that Dr. Marinescu's wrong because benchmarking KPI outputs do not provide visibility into the actual prices or discounts offered by other properties.  That's what I clearly state.

Q.   What is your definition of the word "visibility" as you use it in your report in paragraph 59?

A.   I think the sentence is very clear.  It says, "Benchmarking KPI outputs do not provide visibility into the actual prices or discounts offered by other properties."  Visibility -- you cannot see the actual prices or discounts offered.

Q.   So by "visibility," you mean you cannot see -- you cannot see individual prices of competitors

from the benchmarking set; correct?

A.    As I said, it says, "do not provide visibility into the actual prices or discounts offered by other properties."  What you see in the benchmarking KPI output is an anonymized, aggregated, noisy measure that's lagged, does not list individual properties, those values, and you do not even know what value -- what properties are contributing to that value.

Q.    Are you offering an opinion on whether benchmarking provides competitively useful information for Revenue IQ users in their business operations?

A.    No.  I'm providing an opinion that benchmarking KPI measures are noisy, aggregated, anonymized, lagged, and that the -- the values that you see in the KPI are not -- are -- it's unknown what the properties that contributed to that value are.

Q.    Okay.  Just so the record is clear, you just testified that you are not offering an opinion on whether benchmarking provides competitively useful information for Revenue IQ users in their business operations; correct?

A.    Can you say that one more time.

Q.    Just so the record is clear, you just testified that you are not offering an opinion on whether benchmarking provides competitively useful information

for Revenue IQ users in their business operations;
correct?

A.    I'm not providing that opinion.

Q.    Are you aware that Yardi developed a penalty
score system that ranks Revenue IQ properties based on
benchmarking data?

A.    I am aware of that.

Q.    Are you aware that Ms. Rao testified at her
deposition that properties received a positive penalty
score if they lag -- lagged benchmarks but zero if they
exceeded them?

A.    I do not recall the specifics of Ms. Rao's
testimony on this subject.

Q.    Okay.  So you may -- in -- in offering your
opinions here about the flaws in Dr. Marinescu's opinions
about benchmarking, you didn't make any effort to
understand how Yardi's penalty score system worked?

A.    With respect to my opinion on Dr. Marinescu's
flaws, I did not need to do that.  I'm looking at the
benchmarking system and the claims that Dr. Marinescu
made about what it is and rebutted those.

Q.    The penalty score -- do you understand that
the penalty score system uses the same benchmarking data
that you've described as noisy, aggregated, anonymized,
and lagged?

· · · · · · MR. TABAIE:· Should we have a name for the two analyses just for a clear record?

· · · · · · MR. PIERCE:· Sure.· That's a good idea.

Q.· · We can call the first analysis the asymmetry analysis and the second analysis the pricing effect analysis.· Are you with me, sir?

A.· · Yes.· The first analysis, we'll call it asymmetry.

Q.· · Okay.

A.· · The second analysis price --

Q.· · Go ahead.· Okay.· So we're on the same page that the -- the asymmetry analysis refers to this analysis Dr. Marinescu did about the frequency with which Mr. Fazio identified overpricing versus underpricing; correct?

A.· · That refers to the first analysis.

Q.· · Okay.

A.· · Asymmetry analysis.

Q.· · Are you offering the opinion that that analysis was not reproducible?

A.· · Not the first analysis, not the asymmetry analysis.

Q.· · Okay.· Are you offering any critiques of that analysis?

A.· · No.· I'm not opining on that analysis.

Q.   Okay.   So you're not saying -- so you have no opinions on that analysis.   Is that your testimony?

A.   I have no opinions on that analysis.

Q.   Did you, in the course of preparing your report, make any effort to check the reliability of that analysis?

A.   No.

Q.   Why not?

A.   It wasn't relevant to my opinions.

Q.   All right.   So no one at your staff looked and saw whether or not Dr. Marinescu had made any misclassifications?

MR. TABAIE:   Objection to the extent those were not part of your opinions, I object on the basis of attorney work product and instruct you not to answer.   To the extent it is the basis of your opinions, you can answer.

Q.   Okay.   And so you --

A.   I did not have --

Q.   Okay.   Sorry.   Go ahead.

A.   I did not have an opinion on -- on the -- that analysis, the asymmetry analysis.

Q.   Okay.   So you are not offering, just to make sure the record is clear, any opinion on the reliability of that analysis.   Is that correct?

A.    Yes.  I point that out.

Q.    Now, you had access to approximately 14,000 communications between TAMs and Yardi clients that were produced in January of 2026.  Is that correct?

A.    I'm not sure about the specific dates, but there would be access.

Q.    Okay.  Did you conduct any empirical analysis of those TAM call notes?

A.    No, I did not.

Q.    Did you present any finding from those communications showing that TAMs did not use benchmark data to push clients towards higher prices?

A.    Can you say that again?

Q.    So, did you present any finding or make any effort to investigate whether those call notes showed whether TAMs used benchmark data to push clients toward higher prices?

A.    As I said before, I did not do an analysis of those notes.

Q.    Now, you're aware, are you, that Yardi's motion to exclude Dr. Marinescu criticizes her for not being aware of more than 600 TAM client call notes and over 10,000 client communications produced during discovery?

A.    I'm aware that that is in the motion.

Q.    Okay.   How many of those documents did you review?

A.    As I said before, my analysis is responding to Dr. Marinescu's analysis and the flaws in it.  My opening report --

THE COURT REPORTER:  I'm sorry to interrupt. I couldn't understand your answer.  I apologize.

THE WITNESS:  Okay.  Sorry.

Can we -- can you ask the question again, please.

THE COURT REPORTER:  Sorry, Rio.

Q.    How many of those documents did you review, sir?

A.    My analysis of Dr. Marinescu's work, I'm in a rebuttal context.  I am looking at the flaws of what Dr. Marinescu did, and I'm responding to those flaws.  I -- in my opening report, I was looking at the Revenue IQ and benchmarking systems to describe how clients used them. These call notes are not relevant to my analysis.

Q.    Okay.  You didn't answer my question, sir.

How many of those 10,000 client communications did you review in the course of authoring your opening and rebuttal reports?

A.    As I was saying before, my analysis is about the systems, how they operate, and the choices that

BlueBear Reporting LLC

clients make with them.  And my rebuttal analysis of Dr. Marinescu is about the errors that she -- that Dr. Marinescu made.  I did not look at any of those documents for that purpose of rebutting Dr. Marinescu.

Q.    Did you look at any of those documents in the course of formulating your opening report?

A.    No.

MR. TABAIE:  Objection, asked and answered, what he said in the -- earlier.

Q.    Do you think your opinion should be excluded in this matter because you didn't review those documents?

A.    No.  Because it's absolutely irrelevant to my opinions and my analysis.

Q.    So Yardi's communications and -- to clients and their internal e-mails about Revenue IQ are absolutely irrelevant to your opinions and analysis in this case?

A.    I -- I just said that.

MR. PIERCE:  I don't think we've been going a full hour, but I don't know if you all have a lunch cooling on the counter or something that you want to eat or if you want to press through.

MR. TABAIE:  Are you moving to another subject matter?  Is this a good time --

MR. PIERCE:  Yeah.

The time is 3:17 p.m.

Q.    (By Mr. Pierce) Could you turn to -- could you, in your rebuttal report, please -- do you see footnote 33?  It's on page 12.

A.    I see that.

Q.    Okay.  Do you see where -- where you wrote: "Dr. Marinescu also claims that I make arguments I do not.  For example, she states that Mr." -- that my "suggestion that these disparate [price] floors undermine a conspiracy is simply not an economically plausible argument.  The extent to which configuration changes reflect changes that 'undermine a conspiracy'" -- excuse me -- "is not an analysis I provided in my Opening Report"?

A.    I see that.

Q.    Is it correct that your opening report did not analyze whether configuration differences among Revenue IQ clients undermine or support a theory of coordination?

A.    My analysis of the configuration is with respect to the system and the client choices that are made.  And so specifics -- what I mean in this footnote is exactly what is written.  To the extent to which configurat- -- configuration changes reflect changes that undermine a conspiracy is not an analysis I provided in

my opening report.

Q. So it's correct that whether configuration changes reflect changes that undermine a conspiracy is not an analysis you provided in your opening report; correct?

A. I think, again, what I wrote in this rebuttal is, "The extent to which configuration changes reflect changes that 'undermine a conspiracy' is not an analysis I provide in my Opening Report."

Q. Do you provide that analysis in your rebuttal report?

A. No.

Q. Do you agree that, looking at the data, you can observe whether one landlord uses a different rent ceiling than another?

A. What do you mean by "the data"?

Q. The -- the data that you have available about how Yardi clients configure the software.

A. Will you ask the question again.

Q. Is it correct that, as a technical matter, you can look at the data and see whether one landlord uses a different rent ceiling than another?

A. The configuration data would have information on various client-provided inputs.

Q. Is it -- do you think it's true that

one and two, the trends and rules of the Revenue IQ
system, versus the optional settings in step three.  Is
that correct?

     A.    I haven't looked at what Yardi emphasized
relative to others.  That seems to be -- that's outside
of the analysis that I did, which was about the software
system, the client-provided data that goes into that
software system, and how it generates pricing outputs
with all the client choices and configurations that they
make and the decisions they make about what to do with
the pricing output.

     Q.    Are you aware that Liana Rao, who was the --
a senior executive at Revenue IQ for a significant period
of time, described Revenue IQ under oath as a
trends-and-rules-based system with three steps to the
pricing calculation, where the first is a calculation of
trends, the second is health rules, and the third is a
series of additional settings or options?

     A.    I'm not sure.  I didn't memorize that
deposition.

     Q.    Do you disagree with --

          MR. TABAIE:  I'm going to note for the record
that that reading right there shows that the assumption
that you are making earlier was incorrect.  All three
rules seem to be -- three steps seem to be addressed

THE VIDEOGRAPHER:  We are back on the record. The time is 4:01 p.m.

Q.    (By Mr. Pierce) Before we went off the record, I had read you testimony, sir, from Ms. Rao about how Revenue IQ is a trends-and-rules-based system with three steps to the pricing calculation, where the first is the calculation of trends, the second is health rules, and the third is a series of additional settings or options.  Do you agree with that description?

A.    And while I don't know the specifics of the deposition, but that does sound reasonable to me.

Q.    Do you understand that in her report, Dr. Marinescu found approximately 89 percent of landlord defendant configurations had all four trend weights set to the default 25 percent for each?

A.    I do understand that.

Q.    You what?

A.    I said yes.  I do understand that.

Q.    Do you dispute or challenge that number anywhere in your rebuttal report?

(Witness reviews document.)

A.    No.  I -- I cite that number in my rebuttal report.

Q.    Do you agree that -- do you understand that Dr. Marinescu found that over 99 percent of landlord

asked?

Q.   That approximately 83 percent of configurations used by landlord defendants used the default trend rule weightings plus one of three health rule combinations?

A.   Yes, I see that.

Q.   Did you in your rebuttal report dispute that finding in any way?

A.   I did not dispute that statistic.

Q.   Okay.  Let's look at Figure 2 of your rebuttal if we can.

A.   I'm at Figure 2.

Q.   Okay.  Do you see where you -- you discuss -- the last row where you discuss a ████████████████████████ ?

A.   Yes.

Q.   And you say that that -- that setting determines whether client-defined term premiums are applied in step three?

A.   Yes, I see that.

Q.   Okay.  So if a landlord enables term premiums, a six-month lease might be priced differently than a 12-month lease, for example.  Is that correct?

A.   Yeah.  What I say in my report is that when that's enabled, it can adjust the original pricing output by adding or subtracting lease term-specific premiums.

trend rule in step one will generate a positive or negative trend signal for a unit type?

(Witness reviews document.)

A.    None that I listed.

Q.    Did you identify any configuration setting among the 186 that you criticize Dr. Marinescu for not considering that could change whether the comp trend rule in step one will generate a positive or negative trend signal for a unit type?

(Witness reviews document.)

MR. TABAIE:  Objection, lacks foundation, misstates the software.

A.    What I criticized Dr. Marinescu was that she only focused on nine inputs into the -- nine of the 195 inputs into the pricing calculation, and so what's listed in Figure 2 are some that she missed.  And so the comp trend, as I said earlier, does not work in isolation.  It is one of many, many things that happens when the pricing calculation occurs.

Q.    Did you identify any configuration setting among the 186 that you state Dr. Marinescu did not consider that could change whether the comp trend rule in step one will generate a positive or negative trend signal for a unit type?

MR. TABAIE:  Same objection.

A.   I did not.

Q.   Did you identify any configuration setting among the 186 that you state Dr. Marinescu did not consider that could change whether the other three trend rules in step one will generate a positive or negative trend signal for a unit type?

MR. TABAIE:  Same objection.  Also I'm going to object as to relevance.

A.   Well, on this Table 2, I had two, the ██████████████████████, which applies the threshold for a positive traffic signal, and then the ██████████████████████, which is the demand measure for the traffic trend.  But -- so those two could.

Q.   So you identified in Figure 2 two configuration settings that could affect the signal for the traffic trend.  Is that correct?

A.   That is correct.

Q.   Sitting here today, can you think of any other configuration setting that you identified among the 186 that could affect the signal for any of the other three trends?

A.   There's a lot of configurations and a lot of variables.  These are ones that I highlighted because -- to give a sense of, for each step, what are the -- the fields that are missing.  But I can't recall all 100 --

180-plus that are missing.

Q.    Okay.  And sitting here today, you can't think of any other specific configuration setting that you identified among the 186 besides the two that we just discussed that could affect the positive or negative signal for any of the other three trends; correct?

A.    I can't recall.

Q.    Did you make any effort to analyze specifically or in detail whether any of these 186 configuration settings could affect the positive or negative signal for the four trends in step one of the Revenue IQ software?

MR. TABAIE:  Objection, compound.

A.    What do you mean by affect the four trends?

Q.    I mean flip the direction of the signal.

A.    My analysis was of all of the pricing inputs, or all the fields of the pricing inputs, and that's how they impact the pricing calculation.  And so it wasn't relevant for my analysis.  What I was rebutting Dr. Marinescu was that there's -- Dr. Marinescu is missing 95 percent of the fields that a client can make choices about, and that is incomplete.

Q.    Are you offering the opinion that each of the configuration settings among the 195 is equally important in the ultimate pricing output that the system provides?

MR. TABAIE: Objection, vague.

A. What my opinion is, that Dr. Marinescu ignored many, many, many fields that could impact the magnitude and the direction of the pricing output.

Q. Are you offering the opinion that each of the configuration settings among the 195 is equally important in determining the pricing output that the Revenue IQ system ultimately provides?

A. I don't know what you mean by "equally important." These are all inputs into a pricing calculation. And so depending on -- as I said earlier, that this calculation takes in a client's in- -- data inputs. It calculates a lot of formulas based on a client's own choices of them. So depending on the specific configurations, it's going to produce an output.

Q. Did you make any attempt to analyze whether any of the configuration settings -- strike that.

Did you make any attempt to analyze using the executed lease data whether the configuration settings you identified in Figure 2 -- whether differences in the configuration settings that you identified in Figure 2 had effects on the ultimate pricing outputs that the Revenue IQ system generated?

A. I believe I've already said that my analysis of the configuration data are the choices that they made,

and I did not link that to executed lease data.

Q. You have just testified that none of the 186 settings you criticize Dr. Marinescu for not considering can change the direction of the comp trend signal, and you've identified only two that could affect any trend signal at all. Doesn't that indicate that not all 195 settings are equally important for the directional pricing logic of the Revenue IQ system?

MR. TABAIE: Objection, compound and confusing, vague.

A. I'm not sure what you meant with that question.

Q. Do you agree that the Revenue IQ system has a directional pricing logic where it will, under step one, indicate that a client should raise, keep stable, or lower prices?

A. I agree that in step one, there's a directional pricing logic.

Q. Okay. Does the fact that you've been able to identify only two of the 186 configuration settings that have any effect on the four trend signals in step one indicate that not all 195 settings are equally important to the directional pricing logic that occurs in step one?

A. Well, it's not just about configuration choices. A lot of it is going to be the client's own

data.  The three -- I mean, all -- all of this calculation is about -- built upon the client's own data that goes into the system to generate pricing outputs, so -- and then, as I said earlier, that step three can change both the magnitude and the direction.  So focusing on step one's pricing logic and the direction is an incomplete view of how the system works.  It works together.  Taking the client data, it creates calculations, and then what it does is it applies different rules that they select, the choices that they make.  And so just to fixate on the directional logic of step one is an incomplete view of the system.  It needs to be looked at together as a whole.

Q.    Can you explain what you mean by the -- by the significance of the client's own data here?

A.    Well, three of the trends are based on the client's own data, and so to say that a specific configuration is more important than the other doesn't make sense from a technical standpoint because data is driving everything here.

Q.    Did you make any attempt to analyze how often step three -- differences in step three configurations will actually reverse the pricing direction that's set by step one of the system?

A.    No.  Because I know how the code works and I

know the clients configure the settings in certain ways,
so it's not necessary.

Q.    Why is it not necessary?

MR. TABAIE:  Objection, asked and answered.

A.    Because I've done the analysis of the source
code of how the system works.  I know that the client's
data feeds into this pricing calculation and then the
choices that clients make which stack on top of each
other which affect the pricing output.  That's why it's
not necessary.  I know that step three, you know, to the
extent that clients have enabled those decisions, it will
affect the output.

Q.    Are you testifying that it -- if clients
enable configuration settings in step three, it will
affect pricing output?  Is that your testimony?

A.    If clients enable options in step three,
mathematically, it will affect the pricing output.

Q.    Did you make any attempt to study the
magnitude of the effect?

A.    No.  I know that it will affect the pricing
calculation.

THE COURT REPORTER:  You know that it will?

THE WITNESS:  Affect the pricing calculation.

THE COURT REPORTER:  Thank you.

Q.    And you never checked, sir, in the executed

lease data whether configuration in settings in step three have ever actually reversed the direction of the pricing change recommendation produced by step one.  Is that correct?

A.    As I said earlier, I did not link the configuration data to the executed lease data.

Q.    You think that the extent to which Yardi makes the same directional pricing recommendations to users in the same market is relevant to determining whether the Revenue IQ system produces coordinated pricing outcomes among users?

MR. TABAIE:  Objection, misstates the facts, lacks foundation, assumes facts.

A.    I'm not sure I entirely understood your question, but as an initial matter, I would say that Yardi doesn't make price -- pricing recommendations. Revenue IQ generates pricing outputs.

Q.    How is the pricing output that Yardi provides to users not a pricing recommendation?

A.    Revenue IQ is like a calculator.  It takes inputs from the client, and the client has choices they make which stack on top of each other which will set the pricing output.  It's reflective of the client's own choices.

Q.    So you're saying that when a Yardi Revenue IQ

single decision generate a separate entry for each unit

type group in the ████████████████ ?

                    (Witness reviews document.)

     A.     When someone makes a reference rent change in

Revenue IQ, it would create different changes to

different unit types and units.

     Q.     Do you know how many unit types the average

landlord defendant sets up per property?

     A.     I don't -- I don't recall.

     Q.     In this section and for -- do you know if the

d configuration data contains any ████████████   entries

between $0 and $20?

     A.     I can't recall.

     Q.     Did you apply any outlier filter to this

562,000 count to exclude rent entries below $20?

     A.     In this analysis, I'm looking at interactions

of the system.  What I'm talking about here is Revenue IQ

is a software system.  It takes a client's own data with

their own choices in a configuration and what they do

with that.  And so what the audit log actually captures

is the interactions with the clients themselves.  And so

what these counts are are very different than any sort of

other data in terms of executed leases.  It's

representing the interactions that the clients are having

with the system itself.  And so the outlier piece of this

doesn't matter.  I'm talking about changes.  I'm talking about interactions.  I'm seeing the client changing things.  And further, I do consolidate down, as I say in footnote 90, of that rapid succession.  So I'm being conservative here.  I'm eliminating duplications in many instances.  So what I'm looking at is client interactions with the system, and this is what that analysis represents.  It shows lots of client interactions with the system on this one dimension.

My other analysis about configuration really talk about all the other ways that clients interact with this system, you know, the 195 fields that we're talking about.  It's one of these areas where it's -- I'm looking at the source code.  I'm looking at the client-provided input data and seeing the choices that people are making when they set up all of these rules, all of the health rules, the step one, two, and three, that these represented in Figure 4 are that clients are interacting with this reference rent.  It's going up, it's going down over time over this 74-month period.  That's what this is.  That's what the analysis shows, that clients are interacting with the reference rent input.

MR. TABAIE:  Rio, I just want to let you know, I'm going to be having some questions -- I mean, some follow-up questions if you want to save some time

for responding.

MR. PIERCE:  Well, I don't -- I mean, I have seven hours on the record.  I thought he had a hard out at, you know, around 3:30.  If he's going to take questions, I mean, that just seems to indicate it's a more flexible time.  But in any case, I have a few minutes left.  I will wrap up in the next five or ten.  And then if you have questions and I have left some, you know, time, I'll -- I'll -- I'll consider using it.

Q.    The -- the configure -- the reference rent is configurations, that's client data that's stored in the -- in Yardi's system; right?

A.    The reference rents is a client's decision.  It's their own data that they put into the system.

Q.    Okay.  The executed lease data that you analyzed in your YLPI correction, that's also client data generated by client activity in the Yardi system; correct?

A.    The executed lease data is a record of executed leases for these clients.

THE COURT REPORTER:  For these?

THE WITNESS:  These clients.

Q.    And isn't it fair to say that's client data generated by client activity that's stored in the Yardi system?

A.    As I said, the Revenue IQ system is a software system that takes the client data as an input. It does -- it takes the client settings and the choices they make, performs pricing output calculations on it, and then it provides a output to those clients, and they decide what to do with it.  And so the executed lease data is at the end of this chain, and so it's reflective of the decisions that clients have made on their interaction with the Revenue IQ system.

Q.    You did not exclude rents under $20 in the ███████████ field from your reference rent analysis. Is that correct, sir?

A.    That's correct.  Because I'm looking at choices.  I'm looking at interactions with the system. What goes in that auto log table is interactions with the Revenue IQ system.  In the executed lease data, when you're looking at prices, prices are very sensitive to the -- the rent.  I'm looking at choices.  Choices, yeah, I can look at whether or not it goes up or down including the 20 or whatever values.  It doesn't matter.  I'm looking at the interactions with that system.

Q.    You reference rent as an input to Revenue IQ's pricing calculation; correct?

A.    Reference rent is one of the inputs to the pricing calculation.

you anything about whether the change is a minor recalibration or a meaningful repricing decision?

A. The reference rent change is about how the clients input that price with their own data into the Revenue IQ software system and that sometimes it -- it goes up from the last rent, sometimes it goes down, 560,000 times over the course of data that I had. It shows lots of activity in terms of how clients are interacting with the software system, how they're making choices on just that one dimension of how Revenue IQ works.

Q. Do you understand that Yardi TAMs have access to clients' Revenue IQ settings?

A. I don't understand what you mean by have access to their settings.

Q. Do you know whether Yardi's TAMs can make changes to a user's Revenue IQ settings?

A. I understand that a Yardi employee can make setting changes which the client asks for. So the clients can make them themselves or that -- or that someone on behalf of the client can make that setting change for them.

Q. Do you know how many of these 560,000 changes to the reference rent were made by the client directly versus being made by a Yardi TAM at the direction of a

client?

A.    No.    And it's irrelevant to my opinions.    I'm looking at the choices.    Both reflect client choices.

Q.    You think it's irrelevant about the degree of autonomy that the clients possess whether the change was made by an -- a client themselves or by a Yardi employee?

A.    Both of those changes are made because the client has asked for them.    Whether they do it themselves or have someone do it for them, it's still their client choice.

Q.    What's the factual basis for your statement that both of those changes were made because the client asked for them?

A.    I believe I read a document.    It might be Mr. Gaeta's declaration.    I can't recall off the top of my head.

Q.    Okay.  So -- so your source for that statement is a declaration that Yardi provided in this case?

A.    Probably.

MR. PIERCE:    Okay.    No further questions for now.

MR. TABAIE:    Let's take a quick break.    Take a quick break.

THE VIDEOGRAPHER:    The time is 6:34 p.m.    We

C E R T I F I C A T E

STATE OF ALABAMA      )

COUNTY OF JEFFERSON )

          I hereby certify that the above and foregoing proceeding was taken down by me by stenographic means, and that the content herein was produced in transcript form by computer aid under my supervision, and that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings occurring on said date at said time.

          I further certify that I am neither of counsel nor of kin to the parties to the action; nor am I in anywise interested in the result of said case.

          LANE C. BUTLER, RPR, CRR, CCR

          CCR# 418 -- Expires 9/30/26

          Commissioner, State of Alabama

          My Commission Expires:  2/11/29