Hon. Robert S. Lasnik

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| *In re YARDI REVENUE MANAGEMENT ANTITRUST LITIGATION.* | No. 2:23-cv-01391-RSL |
| MCKENNA DUFFY, individually and on behalf of all others similarly situated, | **DEFENDANT YARDI SYSTEMS' MOTION TO STRIKE IOANA MARINESCU'S SECOND REPORT AND FOR ATTORNEY'S FEES UNDER RULE 37** |
| Plaintiffs. | |
| v. | **Filed Contemporaneously With:** |
| YARDI SYSTEMS, INC., *et al.*, | **(1) DECLARATION OF ABRAHAM A. TABAIE;** |
| Defendants. | **(2) DECLARATION OF MIHRAN YENIKOMSHIAN; AND** |
| | **(3) [PROPOSED] ORDER** |
| | **NOTE ON MOTION CALENDAR: June 29, 2026** |
| | **ORAL ARGUMENT REQUESTED** |
| | (Consolidated with Case Nos. 2:24-cv-01948; 2:24-cv-02053) |

YARDI SYSTEMS' MOTION TO STRIKE IOANA MARINESCU'S
SECOND REPORT AND FOR ATTORNEY'S FEES UNDER RULE
37 (No. 2:23-cv-01391-RSL)

## TABLE OF CONTENTS

GLOSSARY OF DEFINED TERMS ............................................................................................ iv

PRELIMINARY STATEMENT ...............................................................................................1

BACKGROUND .......................................................................................................................2

    I.   Marinescu's New YLPI Opinions Are Post Hoc Rationalizations for Mistakes ......3

        A.     Marinescu Intended to Exclude Rent Ratios Outside Lease Contracts.........3

        B.     Marinescu Inadvertently Left Outliers in Her Original YLPI, and Now Wants to Change Her Methodologies ..........................................................7

    II.  Marinescu Misapplied Harrington's Collusion Theory and Now Abandons It ........8

        A.     First Report Tracked Price Levels and Firm Adoption..............................8

        B.     Second Report Abandons Price Levels and Firm Adoption ........................9

    III. Marinescu's RIQ Pricing Methodology Theories Pivot .........................................10

    IV. Marinescu Dilutes Benchmarking Opinions..........................................................10

ARGUMENT............................................................................................................................11

    I.   Marinescu's Second Report Violates Rule 26, this Court's Order, and Ninth Circuit Law By Offering New and Contradictory Opinions..................................11

        A.     Marinescu's Second Report is Not a Proper Rebuttal ...............................11

        B.     Marinescu's Second Report Is Not a Proper Supplement.........................12

    II.  Yardi Is Unduly Prejudiced by Marinescu's Second Report ..................................14

    III. Marinescu's Second Report Should Be Excluded and Yardi Should Be Granted Fees and Costs........................................................................................................14

**TABLE OF AUTHORITIES**

**Cases**                                                                                     **Pages**

*Avila v. Ford Motor Co.*,
   796 F. Supp. 3d 593 (N.D. Cal. 2025) ...................................................................12

*Breaking Code Silence v. McNamara*,
   No. 2:22-cv-02052-MAA,
   2024 WL 6847883 (C.D. Cal. July 25, 2024) ...........................................................15

*City and Cnty. Of San Francisco v. Purdue Pharma L.P.*,
   No. 18-cv-07591-CRB,
   2022 WL 1203075 (N.D. Cal. Apr. 22, 2022) ...........................................................12

*Clear-View Techs., Inc. v. Rasnick*,
   No. 13–cv–02744–BLF,
   2015 WL 3509384 (N.D. Cal. June 3, 2015) .............................................................12

*Collinge v. IntelliQuick Delivery, Inc.*,
   No. 2:12-cv-00824 JWS,
   2017 WL 3887337 (D. Ariz. Sep. 6, 2017) ..........................................................13, 15

*Est. of Cape v. United States*,
   No. 11–C–0357,
   2013 WL 4522933 (E.D. Wis. Aug. 27, 2013) .........................................................14

*Everett v. Bankers Life & Cas. Co.*,
   No. C13–2246JLR,
   2015 WL 135775 (W.D. Wash. Jan. 9, 2025) ...........................................................14

*Fed. Deposit Ins. Corp. v. Van Dellen*,
   No. CV 10-4915 DSF (SHx),
   2012 WL 12886825 (C.D. Cal. Nov. 6, 2012) ..........................................................13

*Goodman v. Staples The Off. Superstore, LLC*,
   644 F.3d 817 (9th Cir. 2011) ....................................................................................11

*Gramercy Grp., Inc. v. D.A. Builders, LLC*,
   No. 16-00114 JMS-KSC,
   2017 WL 11676796 (D. Haw. Dec. 5, 2017) ............................................................15

*In re Ready–Mixed Concrete Antitrust Litig.*,
   261 F.R.D. 154 (S.D. Ind. 2009) ...............................................................................14

*K&N Eng'g, Inc. v. Spectre Performance*,
No. EDCV 09-1900VAP (DTBx),
2011 WL 13131157 (C.D. Cal. May 12, 2011) ........................................................13, 14

*Luke v. Fam. Care & Urgent Med. Clinics*,
323 F. App'x 496 (9th Cir. 2009) .................................................................................13

*Matthew Enterprise, Inc. v. Chrysler Grp., LLC*,
No. 13-cv-04236-BLF,
2016 WL 4272430 (N.D. Cal. Aug. 15, 2016) ............................................................12

*Providence Piers, LLC v. SMM New England, Inc.*,
No. 12–532S,
2016 WL 705259 (D.R.I. Feb. 2, 2016).......................................................................13

*United States ex rel. Brown v. Celgene Corp.*,
No. CV 10-3165 GHK (SS),
2016 WL 6562065 (C.D. Cal. Aug. 23, 2016)...................................................13, 14, 15

*United States v. 14.3 Acres of Land*,
No. 07cv886–AJB (NLS),
2011 WL 2414348 (S.D. Cal. June 10, 2011)...............................................................14

*Yeager v. Bowlin*,
693 F.3d 1076 (9th Cir. 2012) ....................................................................................14

*Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,
259 F.3d 1101 (9th Cir. 2001) ........................................................................11, 12, 15

**Other Authorities**

A.H. Studenmund, *Using Econometrics: A Practical Guide*
(7th ed. 2016) ..............................................................................................................4

Stock, James H., and Mark W. Watson, *Introduction to Econometrics*
(Boston: Addison-Wesley, 3rd ed. 2011) .....................................................................4

## GLOSSARY OF DEFINED TERMS

| Term | Definition |
|---|---|
| CPI | Consumer Price Index, as provided by the U.S. Bureau of Labor Statistics |
| First Report | The February 9, 2026 Expert Report of Ioana Marinescu, PhD In Support of Plaintiffs' Opposition to Yardi's Motion for Summary Judgment (Dkt. No. 497-33) |
| Marinescu Tr. | March 9, 2026 Deposition of Ioana Marinescu Transcript, attached as Exhibit B to the Tabaie Declaration |
| Mitzenmacher Rebuttal | The March 23, 2026 Declaration of Michael Mitzenmacher in Rebuttal of the Report of Ioana Marinescu, Ph.D (Dkt. No. 527) |
| MSJ Opp. | Plaintiffs' Opposition to Yardi Systems' Motion for Summary Judgment (Dkt. No. 492) |
| PUMA | Public Use Microdata Area, as defined by the U.S. Census Bureau |
| RIQ | Yardi's Revenue IQ software |
| Second Report | The May 22, 2026 Reply of Ioana Marinescu, PhD In Support of Plaintiffs' Opposition to Yardi's Motion for Summary Judgment (Dkt. No. 555-1) |
| Tabaie Decl. | June 8, 2026 Declaration of Abraham Tabaie In Support of Yardi Systems' Motion to Strike and for Attorney's Fees, filed contemporaneously herewith |
| Tucker Rebuttal | The March 23, 2026 Expert Report of Catherine Tucker, Ph.D in Rebuttal of the Report of Ioana Marinescu (Dkt. No. 528) |
| Yenikomshian Decl. | June 8, 2026 Declaration of Mihran Yenikomshian In Support of Yardi Systems' Motion to Strike and for Attorney's Fees, filed contemporaneously herewith |
| Yenikomshian Rebuttal | The March 23, 2026 Rebuttal Declaration of Mihran Yenikomshian in Rebuttal of the Report of Ioana Marinescu (Dkt. No. 526) |
| YLPI | Dr. Marinescu's Yardi Lease Price Index |

## **PRELIMINARY STATEMENT**

Plaintiffs have retained a single expert—Dr. Ioana Marinescu. Marinescu's First Report, a 295-page tome submitted alongside Plaintiffs' summary judgment opposition, fell apart on cross-examination and rebuttal expert analysis. Marinescu then submitted a 219-page so-called "Reply" (her "Second Report") that repudiates her original methodology and offers a slew of new analyses and opinions.

*First*, Marinescu's First Report opined, and her testimony confirmed, that Marinescu limited her YLPI to calculating change occurring from one month to the next, excluding months without lease data. But Marinescu's analyses failed to follow her methodology and calculated changes even when data was missing, attributing changes occurring over months (or years) to a single month. After excluding these change ratios, Marinescu's YLPI no longer tracked above the CPI, negating her conclusions. Marinescu now argues that she intentionally included ratios with missing data, contradicting her prior methodology.

Marinescu goes beyond acceptable expert advocacy or ethics here. The analytical code supporting her Second Report purportedly contains Marinescu's "Original" YLPI scripts—which Marinescu directs Yardi to inspect as evidence of intent[1]—but ***Marinescu manipulated the code***, changing "calculate change from *previous month*" in her (actual) original script to "calculate change from *previous observation*" in her new "Original" script and deleting a reference to "*month-on-month*" change. Marinescu's tampering proves that she knows her prior methodology does not support her conclusions. Federal Rule of Civil Procedure ("Rule") 37 redresses precisely this type of gamesmanship.

*Second*, Marinescu's First Report opined that rents below $20 were implausible, and she testified to the importance of investigating implausible values as "outliers," conceding that $0.40 or $1.00 rents were likely implausible. Marinescu failed to remove

---

[1] Second Report ¶113.

these implausible rents from her analysis, and once excluded, her conclusions collapsed. Her Second Report now claims that rents below $20 might be credible market indicators, citing concessions her First Report rejected as irrelevant.

*Third*, Marinescu's First Report cited an article by a Professor Joseph Harrington to opine that when more RIQ clients are present in a market, market prices rise, concluding that each new client choosing to adopt RIQ chose to join a cartel. Despite acknowledging that landlords cannot collude with themselves, Marinescu failed to account for RIQ clients managing multiple properties—and included markets with a single RIQ client—distorting her results. Searching for links between RIQ clients and increased rents, Marinescu's Second Report departs from Harrington, relying on RIQ property numbers alone (even for the same landlord) coupled with a method of assessing rents unlike anything Harrington contemplated.

*Fourth*, Marinescu's First Report assumed that RIQ clients collude by using *other RIQ clients'* (1) contemporaneous lease transaction data via separate benchmark reporting, and (2) asking rent information for the RIQ Comp Trend. Marinescu neither analyzed the RIQ code nor disputed Yardi's source code analysis, which proved both assumptions false. Her conclusions disappeared, and her Second Report now opines that overlap between a client's RIQ Comp and Benchmark Sets is "irrelevant" and suggests that RIQ somehow facilitates collusion through "directional signals" via RIQ Trends and benchmarking.

In sum, Marinescu's Second Report takes a different methodological path to reach watered-down conclusions, even editing her analytical script to obscure her mistakes. Marinescu's Second Report violates Rule 26 and the Court's April 1 Order. It should be stricken under Rule 37 and Yardi should be granted fees stemming from this misconduct.

## BACKGROUND

In February, Plaintiffs filed Marinescu's First Report to support their summary judgment opposition. That report detailed Marinescu's methodologies, which she

repeatedly confirmed in her March deposition. On rebuttal, Yardi's experts relied on Marinescu's First Report and testimony to replicate her analyses, concluding that Marinescu (1) failed to apply her stated methodologies and skewed her results, rendering them unreliable, and (2) misstated how Yardi's RIQ and separate benchmarking software work.[2] Yardi filed a Motion to Exclude Marinescu. Dkt. 530.

Concerned that Plaintiffs would improperly offer new opinions, Yardi demanded that Plaintiffs play by the rules. Plaintiffs warranted that Marinescu would "comply with FRCP 26(a)(2)(D)(ii) and be limited to opinions that contradict or rebut evidence on the subject matters identified in Defendants' rebuttal reports, ***and will not introduce new affirmative opinions***."[3] Dkt. 536 ¶5. This Court ordered same. Dkt. 537. Plaintiffs nevertheless filed Marinescu's Second Report, advancing new opinions, methodologies, and analyses.[4]

## I.    Marinescu's New YLPI Opinions Are Post Hoc Rationalizations for Mistakes

### A.    Marinescu Intended to Exclude Rent Ratios Outside Lease Contracts

#### 1.    First Report Calculated Monthly Change Against Preceding Month, Excluded Months Without Data

**First Report.** Because Marinescu's YLPI relies on monthly observations, Marinescu "expand[ed]" Yardi's "Lease Data...[to] create one row for each month in which the lease is active." First Report ¶595. Using this expanded dataset, Marinescu first calculated unit-level rental rate changes "***relative to the <u>prior</u> month***," next "calculate[d] an average ***month-on-month*** change," and then took "the cumulative product of these ***<u>month-on-month</u> changes***" to show rates of change over time. *Id.* ¶¶502-03 (explaining that in her equation, "$r_{u,t}$ is the effective rent for unit $u$ in month $t$," and "$r_{u,t-1}$ ***is that same unit's***

---

[2] Mitzenmacher Rebuttal, Sections V, VII; Yenikomshian Rebuttal, Sections VII, IX; Tucker Rebuttal, Section IV.

[3] Unless noted, all emphasis is added.

[4] Tabaie Decl., Ex. A (Second Report, annotated to identify new opinions).

*effective rent in the prior month*"). Econometrics universally defines the subscript $t$-1 as the immediately preceding period.[5]

**Testimony.** Marinescu testified that her methodology constructed a series of monthly observations within a single lease (Marinescu Tr. 271:5-272:20), and calculated rate increases by comparing to the preceding month:

> Q: And that reflects over 4,000 percent growth in a single observation. Correct?
>
> A: Right. Again, I want to note *that is over multiple months, but…all your examples are over several months. My index was month to month*.
>
> …
>
> Q: And so your index was comparing the rent paid in a particular month *versus the month before it*?
>
> A: Yes.
>
> Q: So, here it would be calculating a ratio of 1266 against $30 as the previous rent?
>
> **A: *Well, this is not the previous month though …this was August and then we have November. So, you know, you're showing me data with a gap.***

*Id.* 263:17-264:13. Marinescu testified that the "gap" between leases produced "missing" observations. *Id.* 277:12, 280:13-21, 283:21, 274:10-275:14.

Marinescu testified that her methodology removed ratios for months between leases in calculating monthly change:

> [T]here would be missing data in the middle and, therefore, …this property **would not contribute to the index** since it would have missing data, it **would not contribute to the index** until August of 2025, because that's the first time that we see the rent not changing since it's being propagated from the July 2025 new rent.

*Id.* 281:11-18, 282:20-283:1 (missing values "wouldn't contribute"); 283:17-25 (missing values for an "intervening month with no continuation of contract…would not be included"); 284:22-285:1 ("[T]here would be missing data and this ratio would not be

---

[5] Tabaie Decl., Ex. C, Stock, James H., and Mark W. Watson, *Introduction to Econometrics* 520 (Boston: Addison-Wesley, 3rd ed. 2011) ("$t$-1" denotes a single time-period lag, and "$t$-$j$" more generally describes the value "$j$" periods ago, where "$j$" is equal to or greater than 1); Ex. D, A.H. Studenmund, *Using Econometrics: A Practical Guide*, 202-03 (7th ed. 2016) ("$t$-1" denotes a one time-period lag, as opposed to a lag of two or more time periods).

YARDI SYSTEMS' MOTION TO STRIKE IOANA MARINESCU'S SECOND
REPORT AND FOR ATTORNEY'S FEES UNDER RULE 37
(No. 2:23-cv-01391-RSL) – Page 4

calculated."). Marinescu testified that "[t]here is no reason, based on the methodology, to [include a missing value]…when there's missing data, there's missing data. We don't know what happened in the meantime here." *Id.* 282:3-7. But those ratios ***contributed to Marinescu's index and account for the entire price effect she purports to show***.[6]

### 2.    New Opinions Now Include Months with Missing Data, Impute Missing Rents

***First***, Marinescu's Second Report claims the words "relative to the ***prior*** month" mean "when the last month-level rent was observed" (Second Report ¶113)—even if months or years ago—and her testimony was only about long gaps versus "short-run vacancies." *Id.* ¶¶114-118. Marinescu now opines that gaps—of any length—between leases should be (1) treated as <u>not</u> missing data (*id.* ¶¶22-25, 125-26), and (2) calculated against the "prior month" ***with a lease***. *Id.* ¶113. Marinescu does not propose changes to her formula, thus treating the change occurring from one lease to the next—whether the gap is three months or nine years—as ***a single month of growth***. Marinescu neither explains how this new approach aligns with her methodology purporting to calculate ***monthly*** change, nor why she testified that she would not calculate change for months without lease data. Marinescu's analytical scripts illustrate this contradiction:

---

[6] Mitzenmacher Rebuttal, Section VII; Yenikomshian Rebuttal, Section IX; Tucker Rebuttal, Section IV.

| "yardi_index.R" from the Marinescu First Report | "yardi_index.R" from the Marinescu Second Report |
|---|---|

```
32  # order dataset
33  dr_ext =
    dr_ext[order(revenue.iq.unit.id,month)]
⇨ 34  # calculate change from previous month by
   └ unit
35  dr_ext[, ratio :=
    monthly.effective.rent/shift(monthly.effective
    .rent, type = "lag"), revenue.iq.unit.id]
36  # average changes across units by month
37  extagg = dr_ext[,.(chain = mean(ratio,na.rm =
    T)),.(month)]
⇨ 38  # take cumulative product of month-on-month
   └ changes
39  extagg = extagg[order(month)]
40  extagg[!is.na(chain),index := cumprod(chain)]
41  extagg[, index := index*100]
```

```
32  # order dataset
33  dr_ext = dr_ext[order(revenue.iq.unit.id,month)]
⇦ 34  # calculate change from previous observation by
   └ unit
35  dr_ext[, ratio :=
    monthly.effective.rent/shift(monthly.effective.re
    nt, type = "lag"), revenue.iq.unit.id]
36  # average changes across units by month
37  extagg = dr_ext[,.(chain = mean(ratio,na.rm =
    T)),.(month)]
⇦ 38  # take cumulative product of changes
39  extagg = extagg[order(month)]
40  extagg[!is.na(chain),index := cumprod(chain)]
41  extagg[, index := index*100]
```

Yenikomshian Decl. ¶¶16-19, Figure 5; *id.*, Ex. F, 1. Compare (1) line 34: "calculate change from *previous month* by unit" versus "calculate change from ***previous observation*** by unit"; and (2) line 38: "take cumulative product of ***month-on-month*** changes" versus "take cumulative product of changes." *Id.* Marinescu's scripts produced in support of Marinescu's Second Report ***hold out this revised language as her "Original" analysis, when in fact it is not***. *Id.* Marinescu thus ***manipulated her script*** to further her claim that she did not make a mistake.

**Second,** Marinescu's Second Report introduces opinions predicated on "vacancy bias" and "vacancy exclusions," Second Report §§1.2, 3, 4.3, 4.4, 5.1-3, and offers related analyses implementing "vacancy imputation" for missing data outside of a lease. *Id.* ¶¶141-44, 466-67. This methodology estimates rental changes based on "comparable units that have recently experienced a change in occupancy," something her "original methodology" never did. *Id.* ¶21. Marinescu neither explains how she applies "comparable units" in her new analyses nor squares this new approach with her testimony that imputation should be limited to constructing monthly observations within a single lease contract. Marinescu Tr. 279:18-280:16 ("[W]e only imputed rent as long as it was the same contract").

Marinescu offers 33 new files containing 5,574 lines of code for analyses that attempt to legitimize the flawed implementation of her prior methodology (Yenikomshian Decl. ¶5), but Marinescu's plain words contradict her explanations.

### B.    Marinescu Inadvertently Left Outliers in Her Original YLPI, and Now Wants to Change Her Methodologies

#### 1.    First Report Recognizes Need to Scrutinize Implausible Rents

Marinescu acknowledged the need to inspect data and exclude implausible values, testifying that one aspect of such "data cleaning" is "look[ing] at…potential outliers since that can…influence the results of the analysis" because "[o]utliers would affect averages because they tend to skew the average[.]" Marinescu Tr. 13:5-21, 287:5-16. Marinescu testified that outliers could be "very influential" for ratios (used in the YLPI). *Id.* 253:19-24. Marinescu's opinions regarding how RIQ clients deviate from the calculated pricing output (relying on the same executed leases dataset) indeed "filter[ed] out implausible values," defined as rents "lower than $20 and higher than $100,000." First Report ¶462 n.268. Marinescu did not remove such "implausible" rents when calculating her YLPI.

Marinescu did not investigate whether outliers contributed to her YLPI but conceded that certain outliers "would have possibly been removed" under data cleaning procedures her academic work utilized. Marinescu Tr. 250:12-21. When asked to opine whether these low values represented market rents, Marinescu testified that it "[s]eems unlikely" that a $1 rent is plausible and likewise that a 40-cent rent "seems very low and, therefore, it would be…a rare event." *Id.* 245:2-11, 255:4-15.

#### 2.    Second Report Disclaims Scrutinizing "Effective Rents"

Marinescu's Second Report now opines that she *intended* to include sub-$20 rents in her YLPI, claiming they did not drive her results. *Id.* ¶¶187-88, 218. Marinescu opines that "a $20 *recommended* rent…appears to be an error" while a "sub-$20 *effective* rent *can* reflect a real transaction." *Id.* ¶¶66, 180, 210. To justify this new distinction, Marinescu opines that these rents could reflect "large offsetting concessions" (*id.* ¶66), despite

dismissing concessions in her First Report as irrelevant to list price collusion.[7] Marinescu offers dozens of new analyses that work backward from her desired results. Second Report §5.2-3, Appx. A, C.[8]

Despite Marinescu's efforts to retroactively rationalize her errors, not one new analysis challenges Yardi's conclusion that if you exclude outlier values and "missing" months from Marinescu's original YLPI ratio calculations, her results vanish.

## II.    Marinescu Misapplied Harrington's Collusion Theory and Now Abandons It

### A.    First Report Tracked Price Levels and Firm Adoption

Marinescu claimed that Landlord Defendants charge higher rents when surrounded by more Landlord Defendants, relying on a 2025 paper by Professor Harrington. First Report ¶¶104, 111. Per Marinescu, the "key result is that if *firms* decide whether or not to use the algorithm independently, then the average price of adopting *firms* is not affected by the adoption rate." *Id.* ¶104. Marinescu cites Harrington's theory that "[i]f instead *firms* are coordinating their adoption decisions then the average price of adopting firms is predicted to be increasing in the *number of firms* that adopt." *Id.* n.14. As Marinescu opined, "[t]he logic is simple: a landlord cannot use Revenue IQ to collude with itself." *Id.* ¶¶517, 487, 533, 535-49 (assessing the addition of "co-conspirators" to a market).[9] This test draws a causal inference about a Landlord Defendant's decision to adopt RIQ based on the prices for all Landlord Defendant units in a market (the "pricing level") after the firm decides to adopt. *Id.* ¶¶546-49.

Marinescu purportedly applied Harrington's test through a "panel regression" examining markets in which "Landlord Defendants...transition from having no nearby rivals

---

[7] First Report ¶¶20, 87, 138 n.52; Marinescu Tr. 245:2-11, 255:4-15.

[8] Yenikomshian Decl. ¶¶5-7 (identifying 33 new files with 5,574 lines of analytical code supporting Marinescu's Second Report).

[9] Marinescu's analysis uses PUMAs to define her relevant geographic areas; Yardi refers these as "markets" for readability.

who use RIQ, to having at least one" (*id.* ¶517), and tracked the (1) rental rates for each unit each month, running regressions on those rent levels, and compared them to the (2) "Number of Landlord Defendant Comps" in the market. *Id.* ¶¶517-47. Plaintiffs never argued "growth rate of rents" (first differences) (Second Report ¶304), in their summary judgment briefing, and Marinescu mentions it only in passing in her First Report (First Report ¶548), tucking the analysis in the back of an appendix. *Id.* Appx. D.4. Assessing how quickly rental rates grow based on lease turnover applies an entirely different test from measuring rental rates for every unit with a lease in place, which is what Harrington assessed.

### B.      Second Report Abandons Price Levels and Firm Adoption

*First*, Marinescu now opines that her analyses "count properties rather than landlords because RIQ's coordinating capacity depends on the number of properties priced through it." Second Report ¶239. Marinescu does not explain why her First Report explicitly refers to the addition of co-conspirators and firms if only counting properties, *supra* §II.A, nor why she admitted that a landlord cannot collude with itself but now claims that she intentionally included, for example, markets with only a single Landlord Defendant. Second Report ¶255. For all her new analyses,[10] Marinescu fails to explain how counting properties while ignoring whether the new property represents *a new RIQ client* answers Harrington's "key" question—whether a Landlord Defendant is choosing to adopt RIQ independently or, instead, *choosing to join a cartel*.

*Second,* Marinescu's Second Report runs from the Harrington rent level analyses relied on by Plaintiffs (MSJ Opp. 23), now prioritizing "first differences" (*i.e.*, rate of change) analyses never argued in that briefing.[11] Marinescu does not explain why these first difference regressions are newly the crux of her methodology, much less how this squares

---

[10] *Supra* n.7.

[11] The term "first differences" appears once in the First Report and 24 times in the Second Report.

with Harrington's theory. Marinescu minimizes her prior Harrington-rent level analyses, recharacterizing what she previously described as the "most robust" and "recommended," as "conservative." Second Report ¶¶240-41.

### III.   Marinescu's RIQ Pricing Methodology Theories Pivot

*First*, far from her original "common function" theory in her First Report—which Plaintiffs relied on to argue that RIQ clients delegated pricing decisionmaking (MSJ Opp. 31)—Marinescu's Second Report newly opines that RIQ "causes directional upward pricing pressure" through the Trend Rules' "directional signal[s]." Second Report ¶411. Marinescu does not explain how these "directional signals" apply upward pricing pressure given RIQ's reliance on a client's own data (for example, is traffic at that client's own property increasing or decreasing) and publicly-available (largely non-RIQ clients) asking rents.

*Second*, Marinescu's First Report opined that RIQ clients conspire to fix prices through, *inter alia*, picking one another for their Comps. First Report §5.2.2. Now, Marinescu's Second Report opines that such overlap is irrelevant, theorizing instead the presence of a cartel in one market can create an "umbrella" permitting non-cartel members—even across markets—to raise prices. Second Report §8.3.3.

*Third*, Marinescu newly opines that reference rent changes are alternatively set by TAMs or are too small to matter. *Id.* §8.2.

### IV.   Marinescu Dilutes Benchmarking Opinions

Marinescu's First Report opined that (1) Yardi's benchmarking offers "comprehensive visibility on rivals' pricing" regarding "list prices, final transaction prices, discounts, and concessions," (2) Yardi automatically incorporates Comp Sets into benchmark report results, and (3) RIQ clients include each other as benchmarks. First Report ¶¶321, 395, 405; Marinescu Tr. 216:7-217:12 (Benchmarking "quite directly speaks to what they are pricing right now."). The RIQ source code proved that false.

Marinescu retreats significantly in her Second Report, now opining that (1) overlap between a client's Comp and Benchmark sets is irrelevant (Second Report ¶386), and (2) rather than complete visibility into competitor pricing through benchmark reports, RIQ clients receive "directional signal[s]" based on an average of many competitors that show only whether a client is above or below its benchmarks, which Marinescu concedes are anonymous, noisy, weighted historical averages. *Id.* ¶¶380, 443. Marinescu's new opinions would render all benchmarking illegal, which is not the law.

## ARGUMENT

Rule 26 dictates the boundaries for permissible expert disclosures and Rule 37(c)(1) "gives teeth" to those requirements, *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001), precluding a party who "fails to provide information" as Rule 26 requires from "us[ing] that information…to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Rule 37(c)(1). Rule 37 is a "'self-executing,' 'automatic' sanction designed to provide a strong inducement for disclosure." *Goodman v. Staples The Off. Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011). Potential sanctions include striking offending disclosures and requiring the "payment of the reasonable expenses, including attorney's fees, caused by the failure" to disclose. Rule 37(c)(1)(A)-(C). The party facing the sanctions carries the burden to prove substantial justification or harmlessness. *Yeti by Molly*, 259 F.3d at 1107.

### I. Marinescu's Second Report Violates Rule 26, this Court's Order, and Ninth Circuit Law By Offering New and Contradictory Opinions

#### A. Marinescu's Second Report is Not a Proper Rebuttal

Rule 26(a)(2)(D)(ii) disallows new theories and argument on rebuttal. *Avila v. Ford Motor Co.*, 796 F. Supp. 3d 593, 598 (N.D. Cal. 2025); *Clear-View Techs., Inc. v. Rasnick*, 2015 WL 3509384, at *4 (N.D. Cal. June 3, 2015) (prohibiting "backdoor [affirmative expert opinions] under the guise of 'rebuttal' testimony" because it "would render Rule 26's limits generally meaningless"). No matter how Marinescu tries to disguise it, the Second

Report is a repudiation of clear errors in the First Report and an attempt to introduce new opinions and methodologies that support blunted versions of her original conclusions. Background §I.

For example, Marinescu recharacterizes her YLPI monthly growth formula (depicting "month $t$" and "month $t$-1") as a "simplification." Second Report ¶20. But a methodology measuring month-over-month change cannot, per logic and math, attribute rent growth across multiple months to one month. *Supra* n.5. The only plausible inference is that Marinescu did not mean to calculate her change ratios using missing data.

 "[A] rebuttal report is not the time to change methodologies to account for noted deficiencies." *Matthew Enterprise, Inc. v. Chrysler Grp., LLC*, 2016 WL 4272430, at *2, *7 (N.D. Cal. Aug. 15, 2016) (rebuttal "simply bolster[ed] [the expert's] previous opinion using new evidence and analysis, which is improper"); *City and Cnty. Of San Francisco v. Purdue Pharma L.P.*, 2022 WL 1203075, at *1 (N.D. Cal. Apr. 22, 2022) ("Responding to an identified omission with new analysis is not proper rebuttal opinion"). Marinescu's new methodologies and analyses try to paper over mistakes in her original opinions, independently rendering her Second Report an improper rebuttal.

Consider that in claiming she properly applied Harrington's collusion theory, Marinescu now offers analyses trying to show that including single-Landlord Defendant markets did not impact her findings. *Id.* ¶¶3-34, 90, 245-49. But Marinescu's inclusion of single-Landlord Defendant markets in an analysis designed to test ***collusion*** proves she made a methodological mistake, and new analyses should not be permitted to let Marinescu evade those errors.

### B.    Marinescu's Second Report Is Not a Proper Supplement

"Courts distinguish 'true supplementation' [under Rule 26(a)(2)(E)] (e.g., correcting inadvertent errors or omissions) from gamesmanship." *Collinge v. IntelliQuick Delivery, Inc.*, 2017 WL 3887337, at *2 (D. Ariz. Sep. 6, 2017). Marinescu's Second Report is

unequivocally improper gamesmanship. *First,* the Second Report does not rely on information unknown to Marinescu when submitting her First Report. *Luke v. Fam. Care & Urgent Med. Clinics,* 323 F. App'x 496, 500 (9th Cir. 2009) (Rule 26(e) permits only "correcting inaccuracies, or filling the interstices of an incomplete report" based on information not available when first disclosed).[12] *Second*, efforts to "'strengthen' or 'deepen' opinions expressed in the original expert report"—which Marinescu offers in spades, *supra* §I.A—are improper supplementation. *United States ex rel. Brown*, 2016 WL 6562065, at *4.[13] *Third*, even if Marinescu conceded her mistakes, supplementation is not a method "to remedy a deficient expert report or as a means of getting in, in effect, a brand new report." *United States v. 14.3 Acres of Land*, 2011 WL 2414348, at *5 (S.D. Cal. June 10, 2011).[14]

Courts reject the surreptitious behavior Plaintiffs and Marinescu exhibit here.[15] Supplementation is not "a license to amend an expert report to avoid summary judgment." *14.3 Acres of Land*, 2011 WL 2414348, at *5. Nor is it a "license to sandbag one's opponent with claims and issues which should have been included in the [opening] report." *K&N Eng'g, Inc*, 2011 WL 13131157, at *6. Otherwise, there "would be no finality to expert reports" and "new reports and opinions would warrant a new round of consultation with one's own expert and virtually require new rounds of depositions." *Id.*

---

[12] *United States ex rel. Brown v. Celgene Corp.*, 2016 WL 6562065, at *5 (C.D. Cal. Aug. 23, 2016); *Providence Piers, LLC v. SMM New England, Inc*., 2016 WL 705259, at *3 (D.R.I. Feb. 2, 2016).

[13] *Fed. Deposit Ins. Corp. v. Van Dellen*, 2012 WL 12886825, at *1 (C.D. Cal. Nov. 6, 2012); *K&N Eng'g, Inc. v. Spectre Performance*, 2011 WL 13131157, at *7 (C.D. Cal. May 12, 2011).

[14] *Est. of Cape v. United States*, 2013 WL 4522933, at *5 (E.D. Wis. Aug. 27, 2013); *In re Ready–Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 159 (S.D. Ind. 2009).

[15] The "sham affidavit rule" also demands that such "unclear and unambiguous" contradictions in Marinescu's Second Report be stricken. *Yeager v. Bowlin*, 693 F.3d 1076, 1080-81 (9th Cir. 2012); *Everett v. Bankers Life & Cas. Co.*, 2015 WL 135775, at *5 (W.D. Wash. Jan. 9, 2025).

Yardi asks the Court to hold Plaintiffs and Marinescu accountable under Rule 26 and this Court's Order, and keep Yardi from being sandbagged.

## II.   Yardi Is Unduly Prejudiced by Marinescu's Second Report

Marinescu's Second Report is not harmless. Summary judgment briefing is complete, and Yardi spent millions of dollars in establishing that no issue of material fact exists in response to Marinescu's First Report Tabaie Decl. ¶7. Yardi now faces ***a new 219-page report*** against which it must defend itself—which it will, given the new flaws in Marinescu's Second Report—requiring significant resources. *See United States ex rel. Brown*, 2016 WL 6562065, at *7 (requiring defendants to expend additional resources on discovery and develop defense to new theories was prejudicial). Marinescu "cannot simply keep adding theories when she realizes that some will not work." *See id.*

## III.   Marinescu's Second Report Should Be Excluded and Yardi Should Be Granted Fees and Costs

Marinescu's Second Report offers new opinions, theories, methodologies, and analyses that contradict her First Report and testimony in violation of Rule 26, this Court's April 1 Order and the sham affidavit rule. Rule 37 empowers the Court to strike Marinescu's new opinions,[16] and grant Yardi's fees incurred in bringing the instant motion and those it continues to incur for responding to Marinescu's new opinions. *Yeti by Molly, Ltd.,* 259 F.3d at 1106; *Gramercy Grp., Inc. v. D.A. Builders, LLC*, 2017 WL 11676796, at *4 (D. Haw. Dec. 5, 2017); *Collinge*, 2017 WL 3887337, at *2-4.[17] Should the Court find Yardi is entitled to fees, Yardi proposes furnishing a memorandum accounting, as those fees and costs are ongoing and already exceed hundreds of thousands of dollars. Tabaie Decl. ¶8. Because Plaintiffs' counsel's gamesmanship drives Marinescu's Second Report, Plaintiffs' counsel should bear them. Fed. R. Civ. P. 37(c)(1). Yardi requests any other relief deemed proper.

---

[16] *See* Tabaie Decl., Ex. A.

[17] Yardi's harm is ongoing in nature and is "causally connec[ted]" to Plaintiffs' failure to comply. *Breaking Code Silence v. McNamara*, 2024 WL 6847883, at *5 (C.D. Cal. July 25, 2024).

RESPECTFULLY SUBMITTED this 8th day of June, 2026.

**DEBEVOISE & PLIMPTON LLP**

By: /s/ Maura K. Monaghan

Maura K. Monaghan (*pro hac vice*)
Michael Schaper (*pro hac vice*)
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000
mkmonaghan@debevoise.com
mschaper@debevoise.com

Abraham Tabaie (*pro hac vice*)
David Sarratt (*pro hac vice*)
650 California Street
San Francisco, CA 94108
(415) 738-5700
atabaie@debevoise.com
dsarratt@debevoise.com

**McNAUL EBEL NAWROT & HELGREN PLLC**

By: /s/ Claire Martirosian
Claire Martirosian, WSBA No. 49528
Richard W. Redmond, WSBA No. 58835
600 University Street, Suite 2700
Seattle, WA 98101
(206) 467-1816
cmartirosian@mcnaul.com
rredmond@mcnaul.com

*Attorneys for Defendant YARDI SYSTEMS*

## **CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Yardi Systems certifies that this brief contains 4,200 words, in compliance with LCR 7(e)(3).

By: */s/ Claire Martirosian*

Claire Martirosian

## <u>CERTIFICATION OF CONFERRAL</u>

On June 2, 2026, the Parties' counsel conferred about Yardi's position regarding Dr. Marinescu's Second Report and were unable to reach an agreement.

By: */s/ Maura K. Monaghan*

YARDI SYSTEMS' MOTION TO STRIKE IOANA MARINESCU'S SECOND
REPORT AND FOR ATTORNEY'S FEES UNDER RULE 37
(No. 2:23-cv-01391-RSL) – Page 17