**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| *In Re YARDI REVENUE MANAGEMENT ANTITRUST LITIGATION* | Case No.: 2:23-cv-01391-RSL |
| MCKENNA DUFFY, individually and on behalf of all others similarly situated, | **YARDI SYSTEMS' OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE CATHERINE TUCKER'S REBUTTAL REPORT** |
| Plaintiffs, | **Filed Contemporaneously With:** |
| v. | **(1) DECLARATION OF CLAIRE MARTIROSIAN;** |
| YARDI SYSTEMS, INC., *et al.*, | **(2) DECLARATION OF CATHERINE TUCKER IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.** |
| Defendants. | **NOTE ON MOTION CALENDAR: June 26, 2026** |
| | **ORAL ARGUMENT REQUESTED** |
| | (Consolidated with Case Nos. 2:24-cv-01948; 2:24-cv-02053) |

## **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT.................................................................................................... 1

LEGAL STANDARD ................................................................................................................. 3

ARGUMENT ............................................................................................................................... 3

I.    **Tucker's Handling of Missing Rents Reliably Responded to Marinescu's Stated YLPI Methodology** ....................................................................................... 3

    A.    Tucker Implemented Marinescu's Intended "Gap Screen" ........................... 3

    B.    Plaintiffs' Critiques of Tucker's "Methodology" Undermine Marinescu, Not Tucker ..................................................................................................... 5

    C.    Professor Tucker's Scholarship Does Not Require The Approach Plaintiffs Demand .......................................................................................... 7

    D.    The Mitzenmacher and Yenikomshian YLPI Analyses are Independently Admissible ............................................................................ 8

II.   **Tucker Properly Rebutted Marinescu's Opinion that Rents Rise with RIQ Adoption**................................................................................................................ 9

    A.    Marinescu's Core Findings Relied on Rental Rate Levels ........................... 9

    B.    Marinescu's Rate of Change Analysis Was (And Is) Irrelevant ................. 10

III.  **Tucker's Enforcement Mechanism Opinions Are Proper Rebuttal** ........................... 11

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page**

*Baker v. SeaWorld Ent., Inc.*,
    423 F. Supp. 3d 878 (S.D. Cal. 2019) ...................................................................... 5

*Brown v. Burlington N. Santa Fe Ry. Co.*,
    765 F.3d 765 (7th Cir. 2014) ................................................................................... 7

*Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*,
    55 F. Supp. 2d 1024 (N.D. Cal. 1999) .................................................................. 10

*Century Indem. Co. v. Marine Grp., LLC*,
    No. 2:13-cv-1745-GMN-VCF,
    2015 WL 5521986 (D. Or. Sept. 16, 2015) ............................................................. 3

*Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC*,
    80 F. Supp. 3d 1180 (E.D. Wash. 2015) ................................................................. 7

*Does 1-4 v. Red Roof Inns, Inc.*,
    688 F. Supp. 3d 1364 (N.D. Ga. 2023) ................................................................... 8

*EEOC v. Mattress Firm, Inc.*, 2
    No. 2:13-cv-1745-GMN-VCF,
    2016 WL 589667 (D. Nev. 2016) ...................................................................... 9, 12

*Engilis v. Monsanto Co.*,
    151 F.4th 1040 (9th Cir. 2025) .............................................................................. 12

*Freteluco v. Smith's Food and Drug Ctrs., Inc.*,
    336 F.R.D. 198 (D. Nev. 2020) ............................................................................... 2

*In re Generic Pharmaceuticals Pricing Antitrust Litigation*,
    No. 272416-md-2724,
    2024 WL 4980784 (E.D. Pa. Dec. 3, 2024) ............................................................ 5

*In re Toyota Motor Corp. Unintended Acceleration Mktg.,*
    *Sales Pracs., & Prods. Liab. Litig.*,
    978 F. Supp. 2d 1053 (C.D. Cal. 2013) ............................................................. 5, 12

*Klein v. Meta Platforms, Inc.*,
    766 F. Supp. 3d 956 (N.D. Cal. 2025) .................................................................... 7

*Ringcentral, Inc. v. Nextiva, Inc.*,
    No. 19-cv-02626-NC,
    2021 WL 12171869 (N.D. Cal. June 25, 2021) ....................................................... 7

*Rovid v. Graco Children's Prods., Inc.*,
    No. 17-cv-01506-PJH,
    2018 WL 5906075 (N.D. Cal. Nov. 9, 2018) ........................................................................... 7

*SiteLock LLC v. GoDaddy.com LLC*,
    562 F. Supp. 3d 283 (D. Ariz. 2022) ................................................................................ 5, 11

*TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*,
    No. SACV 14-00341 JVS,
    2016 WL 7042085 (C.D. Cal. Aug. 17, 2016) ........................................................................ 5

**PRELIMINARY STATEMENT**

Plaintiffs' Motion to Exclude Professor Catherine Tucker ("Motion")[1] is meant to distract from the fatal errors Yardi's experts identified in the Expert Report of Dr. Ioana Marinescu ("Marinescu First Report")[2] and further the (false) narrative that they misunderstood Marinescu's opinions.[3] But as Yardi demonstrated in moving to exclude the Reply of Ioana Marinescu ("Marinescu Second Report"),[4] Yardi's experts properly evaluated Marinescu's First Report, established that Marinescu's results arose from her failure to follow her *own* repeatedly stated methodologies, and showed that when Marinescu's methodologies are implemented as stated, Marinescu's results disappear, rendering her conclusions and opinions unreliable. The Expert Report of Catherine Tucker, Ph.D. ("Tucker Rebuttal")[5] thus did precisely what a rebuttal should— it identified grave errors in Marinescu's First Report that went to admissibility under Federal Rule of Civil Procedure ("Rule") 702 and demonstrated that correcting those errors overturned Marinescu's results. Yardi thus moved to exclude Marinescu's unreliable opinions.[6]

In response, Plaintiffs improperly submitted Marinescu's Second Report,[7] containing new, flawed opinions labeled as clarifications that actually repudiate Marinescu's original opinions. Rule 37 Mot. 3-11. Plaintiffs' Motion seeks to further this rebranding effort by pushing *Marinescu's* mistakes onto *Tucker*. That is not what Rule 702 is for, and none of Plaintiffs' cited authority suggests otherwise. Plaintiffs and Marinescu are desperate for a do-over by any possible means, but that is no basis for excluding Tucker's Rebuttal.

***First,*** Plaintiffs argue Tucker's correction of Marinescu's handling of missing rents "rests on no independent methodology." Mot. 3. But Tucker did not propose an independent

---

[1] Dkt. 550.

[2] Dkt. 497-33.

[3] It is also part of Plaintiffs' last-ditch effort to resuscitate their meritless, ever-shifting claims against Yardi.

[4] Motion to Strike Ioana Marinescu's Second Report and for Attorney's Fees Under Rule 37 ("Rule 37 Mot."), Dkt. 560.

[5] Dkt. 528.

[6] Dkt. 530.

[7] Dkt. 555-1.

YARDI'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE CATHERINE TUCKER'S REBUTTAL
REPORT                                                    CASE NO.: 2:23-CV-01391-RSL

methodology—she implemented Marinescu's own sworn methodology, which Marinescu failed to implement correctly. A rebuttal expert need not reinvent the wheel; she need only show that the opposing expert's wheel does not turn as advertised (or at all).

***Second***, Plaintiffs fault Tucker's Rebuttal for failing to address one of Marinescu's First Report's backup analyses ("Table 12"), which was buried in an Appendix and not mentioned in Plaintiffs' summary judgment briefing. But Marinescu's principal analysis, which Plaintiffs' summary judgment briefing relied on ***exclusively***, was Marinescu's "regression in price levels" ("Table 8"), where Marinescu purported to show that as more properties adopted Revenue IQ ("RIQ") in an area, the higher the rents in that market were. Tucker pointed out a basic problem with this methodology, which Marinescu herself acknowledged: a landlord cannot conspire with itself, and Marinescu failed to account for landlords who managed multiple properties. Tucker's correction of Table 8 disproved Marinescu's collusion theory because it shows that rents are ***not higher*** in areas with more Landlord Defendants' properties (when properly accounting for properties managed by the same Landlord Defendant). Having shown Marinescu's principal conclusion was fundamentally flawed, Tucker was not obligated to ***also*** show why all of Marinescu's subsidiary analyses were wrong. Marinescu's Table 12 is unrelated to Marinescu's Table 8 analysis (and the underlying theory) and offers no support for an opinion that RIQ adoption indicates collusion.

<u>Third</u>, Plaintiffs argue with respect to enforcement mechanisms that Tucker "opines on the record without examining it." Mot. 12. But Tucker did not offer an affirmative opinion about what Yardi's Technical Account Managers ("TAMs") do in practice. Rather, Tucker examined whether the evidence ***Marinescu relied on*** was sufficient indicia of monitoring and enforcement, concluding that none of it supported Marinescu's conclusion. This is precisely what Rule 26 permits on rebuttal.

The Court should deny Plaintiffs' Motion in its entirety.

YARDI'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE CATHERINE TUCKER'S REBUTTAL REPORT                                                    CASE NO.: 2:23-CV-01391-RSL

**LEGAL STANDARD**

Under Rule 702, expert testimony must rest on "sufficient facts or data," be "the product of reliable principles and methods," and must reflect "reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). Rule 26 rebuttal experts must "solely [] contradict or rebut evidence on the same subject matter identified" by an opposing party. Fed. R. Civ. P. 26(a)(2)(D)(ii). A rebuttal's function is to respond to, criticize, or attempt to disprove the methodology and conclusions of the opposing expert. *Freteluco v. Smith's Food and Drug Ctrs., Inc.*, 336 F.R.D. 198, 205 (D. Nev. 2020). A rebuttal expert need only identify what the opposing expert did wrong and show why it matters. *See Century Indem. Co. v. Marine Grp., LLC*, 2015 WL 5521986, at *3 (D. Or. Sept. 16, 2015) ("Rebuttal expert reports are proper if they contradict or rebut the subject matter of the affirmative expert report…[t]hey are not, however, the proper place for presenting new arguments.").

**ARGUMENT**

**I.      Tucker's Handling of Missing Rents Reliably Responded to Marinescu's Stated YLPI Methodology**

        A.      Tucker Implemented Marinescu's Intended "Gap Screen"

Contrary to Plaintiffs' framing (Mot. 3-6), Tucker did not construct an alternative price index using her own judgment on best practices for missing data. Rather, Tucker faithfully implemented Marinescu's sworn-to Yardi Lease Price Index ("YLPI") methodology. Marinescu's First Report described that her YLPI "calculate[s] each unit's change in effective rent relative to the prior month, including no changes when a unit is still under the same contract and therefore has the same effective rent," and then "average[s] these changes across units…in each month, meaning [it] calculates an average month-on-month change in Landlord Defendants' effective rents." Marinescu First Report ¶503. Tucker implemented this methodology, calculating "month-to-month" change ratios for each unit by comparing the unit's rent in one month to the rent in the preceding month. Tucker Rebuttal §IV.A.2, ¶¶50-54. In doing so, Tucker discovered that Marinescu's analytical script was not constructed as Marinescu described (and testified)—it

calculated monthly growth ratios even where a unit had no lease data for the prior month. Marinescu Tr. 272:12-20; Tucker Rebuttal ¶¶49-50. Specifically, Marinescu's script looked to the last known lease data for the unit, even if it was *multiple months or years earlier*, and calculated a single ratio purporting to represent the *one-month rental growth rate*, even though it occurred over a longer time period. Tucker Rebuttal ¶¶51-53.

Tucker illustrated the critical impact of Marinescu's error. For example, Unit ID 339629 shows a 12-month lease beginning in November 2017 with the next observed lease beginning June 2024, but Marinescu's First Report attributes the observed $292 rent increase (37.9%) to *a single month* despite actually occurring *across nearly seven years*. *Id.* ¶53. Unit ID 99076 similarly attributes a $314.18 increase (34.2%) to one month rather than the 58 months it actually spanned. *Id*. Tucker concluded that Marinescu's treatment of rent changes that occurred across multi-year or multi-month data gaps as if they reflected a single month-to-month rent change skewed Marinescu's results. *Id*. §IV.A.2.

Only after Tucker identified the error in Marinescu's analytical script did Marinescu claim in her Second Report that "prior month" meant the last month with data available and that her formula should not have been interpreted literally. Marinescu Second Report ¶113. Despite her formula explicitly referring to the rent in "month $t$" as compared to "month $t$-1" (Marinescu First Report ¶502), Marinescu now opines "$t$-1" should be interpreted to mean the last observed month, regardless of whether that month was $t$-1, $t$-2, or $t$-100. Marinescu Second Report ¶113; Expert Report of Catherine Tucker, Ph.D. in Response to the Second Report of Ioana Marinescu, Ph.D. ("Tucker Response") ¶30. In short, Marinescu now claims that the error identified by Tucker is a feature, not a bug. This post hoc interpretation contradicts Marinescu's own formula, her testimony, her code notes, and the basic laws of econometrics.[8] Tucker Response ¶¶24-32.

---

[8] In econometrics, the subscript $t$-1 denotes the immediately preceding period. Tucker Response ¶31. If Marinescu intended a different definition—the last available observation regardless of how temporally remote—she would have explicitly stated so, as it changes the nature of the dependent variable from a month-to-month change to a multi-period cumulative change attributed to a single month. *Id.* ¶¶30-32. Marinescu even manipulated her own analytical scripts to perpetuate the fiction that her mistakes were intentional choices. Rule 37 Mot. 5-6.

YARDI'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE CATHERINE TUCKER'S REBUTTAL
REPORT                                                                  CASE NO.: 2:23-CV-01391-RSL

Tucker's Rebuttal excluded growth ratios based on missing lease data because it was empirically improper to calculate *monthly* growth when the period between rents is larger than a month, and because Marinescu opined and testified that her YLPI *would only calculate rate changes relative to the immediately preceding month*. Marinescu First Report ¶503; Marinescu Tr. 272:12-20. Marinescu testified that her methodology would not calculate any price change for a month if the prior month's data was missing. *Id.* 280:4-283:25; Declaration of Abraham Tabaie in Support of Summary Judgment, Dkt. 529 ¶40 (collecting testimony). Identifying an error in the opposing expert's methodology and correcting it according to the opposing expert's own stated parameters is quintessential rebuttal. *SiteLock LLC v. GoDaddy.com LLC*, 562 F. Supp. 3d 283, 332 (D. Ariz. 2022) (holding that "challenging [] assumptions[,] …questioning methodology, and opining on methods and facts [the initial] experts did not consider" are what courts expect from rebuttals); *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 917-18 (S.D. Cal. 2019); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1069 (C.D. Cal. 2013); *TCL Commc'ns Tech. Holdings Ltd. v. Telefonaktenbologet LM Ericsson*, 2016 WL 7042085, at *5 (C.D. Cal. Aug. 17, 2016).

### B.   Plaintiffs' Critiques of Tucker's "Methodology" Undermine Marinescu, Not Tucker

Tucker did not offer a "textual[ist] justification" in place of a methodology (Mot. 4)—Tucker's role as a rebuttal expert was to point out that Marinescu erred in implementing *Marinescu's* methodology, not to affirmatively devise her own. *Supra* I.A.[9] Plaintiffs thus ironically critique Marinescu's methodology as stated in Marinescu's First Report, not "Tucker's" methodology. Their critiques confirm that *Marinescu* must be excluded but are irrelevant to Tucker's reliability.

*First,* Plaintiffs argue that Tucker's treatment of missing rents is "arbitrar[y]" because two identical 29-day vacancies could be treated differently depending on which calendar months they

---

[9] Plaintiffs' reliance on *In re Generic Pharmaceuticals Pricing Antitrust Litigation* is inapposite, as the expert there proposed an *affirmative alternative model* without "conducting his own sound assessment to test his opinions." 2024 WL 4980784, at *15 (E.D. Pa. Dec. 3, 2024).

YARDI'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE CATHERINE TUCKER'S REBUTTAL REPORT                                                CASE NO.: 2:23-CV-01391-RSL

span. Mot. 3. This is a problem of Marinescu's own creation, not Tucker's. In designing her YLPI, Marinescu took Yardi's executed lease data and expanded each lease into monthly observations—one for each month of the lease. Marinescu Tr. 271:5-272:20. Marinescu—not Tucker—assigned each monthly observation to the first of the month, creating a data set that did not account for leases that started or ended mid-month. Tucker Response ¶43. Marinescu then repeatedly testified, before realizing her staff had not actually done so, that months "missing" lease data would be excluded from her YLPI calculations. Marinescu Tr. 281:2-18; 282:9-283:1; 284:1-285:5. Tucker merely did as Marinescu instructed by excluding ratios where the prior calendar month's data was missing. Any inconsistency in the treatment of edge cases like Marinescu's 29-day example arises from Marinescu's construction of her index.

*Second*, Plaintiffs argue that Tucker's removal of missing rents "discard[ed] 240,000 price changes." Mot. 2. Tucker, however, followed *Marinescu's* methodology, which called for excluding those ratios. Additionally, these ratios represent just 1% of more than 23 million observations in Marinescu's Expanded Lease Data (the basis for Marinescu's YLPI). Tucker Response ¶52. That such a small fraction of the data drives Marinescu's conclusion is powerful evidence that her analysis is unreliable.

*Third*, Plaintiffs attempt to bolster their critique of Tucker by proffering two new alternative methods to deal with missing data, neither of which Marinescu's First Report offered. Mot. 4 (detailing 12-month gap rule and "BLS-style imputation"); Marinescu Second Report ¶¶141-44, 168-70. Both are materially different methodologies, not defenses of the one originally disclosed. Rule 37 Mot. 5-7. The 12-month gap approach calculates price changes after gaps of 12 months or less relative to the last observed rent, but treats longer gaps as missing (Second Report ¶168), while the BLS-style imputation fills in missing rental data using data from nearby "comparable [Landlord Defendant] units." *Id.* ¶140. Yet Marinescu testified that her original methodology did not impute values between leases and that missing data "would not contribute to the index," explaining that "[w]e don't know what happened in the meantime here." Marinescu Tr. 280:4-283:25. Neither method credibly counters Tucker, nor can Tucker be faulted for failing to rebut a methodology

-6-

Marinescu had not presented. Tucker Response ¶¶14-20, 46-53. Marinescu's Second Report fails to defend Marinescu's conclusions and show that Tucker misapplied Marinescu's methodology—it instead abandons Marinescu's original methodology and substitutes new theories after the fact.

### C. Professor Tucker's Scholarship Does Not Require The Approach Plaintiffs Demand

Plaintiffs fail to create any issue of reliability from Tucker's scholarship.

*First*, Tucker did not offer an affirmative methodology of her own to track lease prices of landlords using RIQ against the CPI—she merely applied and evaluated Marinescu's stated methodology. A rebuttal expert who tests an opposing expert's methodology need not develop alternative affirmative opinions or independently justify the methodology being critiqued. *See Cmty. Ass'n for Restoration of the Env't, Inc. v. Cow Palace, LLC*, 80 F. Supp. 3d 1180, 1215 (E.D. Wash. 2015); *Ringcentral, Inc. v. Nextiva, Inc.*, 2021 WL 12171869, at *4 (N.D. Cal. June 25, 2021). Marinescu bears the burden to justify her methodological choices, not Tucker. *Compare Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 963-64 (N.D. Cal. 2025) (excluding **affirmative** expert who "did not identify reliable and validated economic literature to support his specific conclusion," left a "necessary link" in his theory unsupported, and rested on "guesswork"), *with Ringcentral*, 2021 WL 12171869, at *4 (finding rebuttal expert "entitled to rest his rebuttal on [affirmative expert's] assumptions and [was] not required to conduct independent alternative opinions or investigations").

Plaintiffs' cited authorities do not suggest otherwise. *Rovid v. Graco Children's Prods., Inc.*, involved an affirmative expert whose methodology was excluded as unreliable because he could not demonstrate that his results were reproducible. 2018 WL 5906075, at *5-6 (N.D. Cal. Nov. 9, 2018)*. Brown v. Burlington N. Santa Fe Ry. Co.* is equally unavailing because Tucker did not "deviate[] from [her] own stated description" of the analysis or apply "faulty methods" (though Marinescu did). 765 F.3d 765, 773 (7th Cir. 2014). Instead, Tucker evaluated Marinescu's stated methodology and identified fatal flaws.

-7-

***Second***, in any event, as Tucker testified, the missing data in the Goldfarb & Tucker article implicated ***control variables***, not the ***dependent variable***. Tucker Tr. 104:5-111:8. A researcher can assign placeholder values for missing control variables and test whether the coefficient of interest changes. Tucker Response ¶57. But when the outcome (dependent) variable is missing, as is the case with Marinescu's methodology, there is no analogous check because the imputed value ***feeds directly into the estimate the analysis seeks to test***. *Id*. Using imputation in constructing Marinescu's YLPI and drawing causal inferences from it (Marinescu does) is thus "unreliable." *Id*.

Indeed, Tucker's analysis in her Rebuttal Report aligns with this principle. In Goldfarb & Tucker (2011) and Goldfarb & Tucker (2015), sensitivity analyses showed that the results were robust to all tested methods for handling missing values, indicating that the findings were not driven by any specific assumptions regarding missing values. *Id*. ¶56. Here, if Marinescu's stated methodology is implemented, her conclusions change dramatically because they are driven by mischaracterizing rent changes that occurred over long periods of time as occurring in a single month. *Id*.

D.    The Mitzenmacher and Yenikomshian YLPI Analyses are Independently Admissible

Plaintiffs argue, without basis, that the YLPI analyses of Dr. Michael Mitzenmacher and Mr. Mihran Yenikomshian should be excluded as "duplicative" of Tucker's. Mot. 7. Plaintiffs misunderstand the distinct roles of these experts and the significance of their reaching the same conclusion. Each expert approached Marinescu's YLPI from a different area of expertise: Tucker is an economist, Mitzenmacher is a computer scientist with expertise in data protection, and Yenikomshian is a computer scientist and data analyst who analyzed RIQ's source code. Each identified the errors in Marinescu's implementation of her own analysis. Tucker Rebuttal §IV.A; Mitzenmacher Rebuttal §VII; Yenikomshian Rebuttal §IX. All three experts identified the same implementation issue in Marinescu's YLPI and concluded that it materially affected her results. *Does 1-4 v. Red Roof Inns, Inc*., 688 F. Supp. 3d 1364, 1371 (N.D. Ga. 2023) ("[T]estimony on the

-8-

same topic by different experts…is not needlessly cumulative where the experts will testify from different professional perspectives.").

## II.    Tucker Properly Rebutted Marinescu's Opinion that Rents Rise with RIQ Adoption

### A.    Marinescu's Core Findings Relied on Rental Rate Levels

Plaintiffs attack Tucker's decision not to rebut Marinescu's first-differences regressions (Table 12) when assessing Marinescu's reliability. Mot. 8-12. But Marinescu's First Report and Plaintiffs' summary judgment opposition relied on Marinescu's levels regressions (Table 8), which purported to show that the more alleged co-conspirators used RIQ in a market, the higher the rents in that market were. Marinescu First Report ¶13, §9.2.4; MSJ Opp. 4, 23.

Marinescu relied on a 2025 paper by Harrington that theorized rising price levels could indicate collusion: if *firms*—not properties—"independently decid[e] whether to adopt the pricing algorithm, the *average price* of adopting firms" will be independent from the number of adopting firms, but if "firms are coordinating their adoption decisions, then the *average price* of adopting firms" will increase with the number of adopting firms. Marinescu First Report n.14. Marinescu's First Report theorized that "the *average price* of adopters increas[ing] with the adoption rate" would imply collusion. *Id.* ¶485. Marinescu similarly testified that "if the adoption of the algorithm is coordinated, then we expect that the more firms adopt, the *higher the price is*." Marinescu Tr. 166:21-167:19. Assessing the average price in a market requires considering—at any given point in time—the current rental rate in "levels" for every leased unit in that market. Tucker Response ¶¶87-90, 97. A levels analysis thus asks, "what factors are impacting what current renters are paying in this market right now?"

Marinescu's First Report boasted that "Landlord Defendants increase rents $5.3 per month for every additional alleged co-conspirator in their local area." Marinescu First Report ¶¶547, 76, 479, 487 (citing model (25) of Marinescu's Table 8 pricing levels regression); MSJ Opp. 23 ("A premium that grows with adoption and local concentration is difficult to square with independent pricing."). Tucker identified, and Marinescu acknowledged, a basic problem with Marinescu's

methodology: a landlord "cannot use Revenue IQ to collude with itself,"[10] and Marinescu failed to account for landlords that managed multiple properties. Tucker Rebuttal §IV.B. Marinescu even included markets with only *one* RIQ landlord in her analysis. *Id.* ¶63. Those landlords may adjust pricing simultaneously across multiple properties, which is no more an indicator of collusion than if a grocer with two stores sells apples at the same price at both locations. When Tucker applied Marinescu's stated methodology (consistent with Harrington) by accounting properly for the number of properties from the same Landlord Defendant, Marinescu's conclusion collapsed because the association with higher rents became both negative and statistically insignificant. Tucker Rebuttal Report §IV.B.

### B.     Marinescu's Rate of Change Analysis Was (And Is) Irrelevant

Plaintiffs and Marinescu newly tout Marinescu's first-difference regressions (Table 12), which Marinescu buried in her First Report's appendix (Marinescu First Report ¶548), and Plaintiffs never cited in their summary judgment opposition. Plaintiffs, however, cite no authority suggesting that a rebuttal expert must show that every word in an unreliable expert's report is wrong, much less authority suggesting Tucker's opinions should be excluded because they dismantled Marinescu's core analysis, ***but not one Plaintiffs themselves never mentioned***. [11]

Regardless, Table 12's purported conclusion that rents change faster in areas with more RIQ clients does not save Marinescu's deficient Table 8 levels analysis. It is logical that rents in such areas would move up and down faster—the legal, procompetitive purpose of RIQ is to enable landlords to act faster and more efficiently. Yardi's Motion for Summary Judgment (Dkt. 474) 33. By contrast, Tucker's correction to Marinescu's levels analysis is not skewed by *one* landlord repeating *one* pricing decision across multiple units, once properly counting RIQ clients. Tucker Response ¶¶116-17. Harrington therefore only contemplated assessing whether prices were ***higher***

---

[10] Marinescu First Report ¶517. Marinescu's First Report opines that, per Harrington, the critical question here is whether a ***firm*** that adopts RIQ is joining a conspiracy or just adopting revenue management software. *Id.* ¶¶104, 487, 533, 535-49 (assessing the addition of "co-conspirators" to a market).

[11] Plaintiffs' reliance on *Carnegie Mellon Univ. v. Hoffmann-LaRoche, Inc.*, 55 F. Supp. 2d 1024, 1040 (N.D. Cal. 1999), where the expert selectively relied on favorable evidence while ignoring a broader body of contrary scientific literature, is thus inapposite.

-10-

in a market with more adopting firms, not whether prices *move up or down faster*. *Id.* ¶¶93-94. The speed at which rents change says nothing about whether rents themselves are higher, and any diverging results between the two analyses are not "inconsistent"—the two have nothing to do with one another. *Id.* ¶97. Marinescu's Table 12, therefore, lacks the theoretical foundation to serve as a standalone test of collusion,[12] and thus does not support Marinescu's core conclusion or Table 8. *Id.* ¶¶97-99.

### III.    Tucker's Enforcement Mechanism Opinions Are Proper Rebuttal

Tucker did not offer "affirmative characterizations of the defendant's conduct." Mot. 1. Rather, Tucker evaluated whether the evidence *Marinescu* relied upon was sufficient to demonstrate an enforcement mechanism. Tucker Rebuttal §V.C. Tucker identified what economics requires for a valid enforcement mechanism—*i.e.*, that deviations be detectable (monitoring) and followed by credible punishment (enforcement) making deviations unprofitable—requirements acknowledged by Marinescu. Tucker Rebuttal ¶86; Marinescu First Report ¶437. Tucker then examined whether Marinescu's conclusions met these requirements, finding they did not because Marinescu (*i*) relied on *internal* Fazio-TAM calls rather than direct TAM-client communications; (*ii*) identified no enforcement mechanism for a landlord ignoring any theoretical TAM advice; and (*iii*) ignored that 27.8% of executed leases deviated from RIQ's pricing outputs, with 90.4% of deviations reflecting decreases. Tucker Rebuttal §V.C. Evaluating whether an opposing expert's evidence supports her conclusions is textbook rebuttal. *SiteLock*, 562 F. Supp. 3d at 332.

Plaintiffs contend Tucker's characterization of TAMs as providing "account management services, technical support, and guidance" is an unsupported "key assertion." Mot. 13. To the contrary, Tucker's characterization of TAMs as "client-facing personnel who support implementation and ongoing use of Revenue IQ, including assisting clients with property setup and configuration" and who "conduct recurring review calls and periodic performance reviews with clients" merely summarized *Marinescu's* TAM description. Tucker Rebuttal n.161 (citing Marinescu First Report).

---

[12] Marinescu's Second Report does not offer any support for her claim that it could.

YARDI'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE CATHERINE TUCKER'S REBUTTAL
REPORT                                                                    CASE NO.: 2:23-CV-01391-RSL

Furthermore, Tucker's critique rests on the Marinescu's First Report's failure to establish credible costs to clients who deviate from RIQ pricing outputs, and its failure to rely on direct communications between TAMs and Landlord Defendants. These gaps in Marinescu's analysis independently demonstrate the lack of any evidence that TAMs wield an enforcement mechanism to pressure RIQ clients to raise prices. Tucker Rebuttal §V.C. Marinescu's Second Report does not justify its exclusive reliance on internal Yardi call notes and fails to find support in any TAM-to-client communications. It also fails to address Tucker's criticism that the selective focus on below-benchmark properties is a source of bias. Tucker Response ¶¶127-29. The specific content of the call notes between Mr. Fazio and TAMs has no bearing on Tucker's opinion.

Finally, Plaintiffs' argument that Tucker should be excluded because she did not review "any Yardi document or any employee deposition" (Mot. 1), does not comport with Rule 702. *EEOC v. Mattress Firm, Inc.*, 2016 WL 589667, at *4 (D. Nev. 2016) ("A proper rebuttal expert's opinion is not required to be based on the same data as the expert opinion that it is offered to rebut."). Tucker's task was to evaluate the sufficiency of ***Marinescu's*** evidence. A rebuttal expert need not re-investigate every piece of the factual record when her role is to assess whether the opposing expert's analysis reliably supports its conclusions. *See In re Toyota Motor Corp.*, 978 F. Supp. 2d at 1069.

As detailed in Yardi's motion to exclude Marinescu, Marinescu's affirmative report failed to identify supportive evidence. Marinescu's quantitative TAM analysis is based on Fazio-TAM call notes—internal calls between Yardi employees—not TAM-to-client communications. Marinescu Tr. 62:1-66:2. Marinescu did not support her conclusions with any references to the 600 TAM-client notes or the 10,000 client communications Yardi produced. *Id*.

Plaintiffs rely on *Engilis v. Monsanto Co.*, which affirmed exclusion of a testifying expert who failed to offer any support for his conclusions about the plaintiff's medical diagnoses, including even the plaintiff's medical records. 151 F.4th 1040, 1051-52 (9th Cir. 2025). *Engilis*, however, involved an affirmative expert, not a rebuttal expert evaluating the sufficiency of an opposing expert's affirmative opinion. Regardless, Tucker grounds her enforcement mechanism

-12-

opinions in an established economic framework—the monitoring-and-punishment model of cartel enforcement—and specifically assesses Marinescu's evidence against that framework's requirements. Tucker Rebuttal §V.C.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion to exclude Tucker.

RESPECTFULLY SUBMITTED this 15th day of June, 2026.

**DEBEVOISE & PLIMPTON LLP**

By: /s/ Maura K. Monaghan
Maura K. Monaghan (*pro hac vice*)
Michael Schaper (*pro hac vice*)
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000
mkmonaghan@debevoise.com
mschaper@debevoise.com

Abraham Tabaie (*pro hac vice*)
David Sarratt (*pro hac vice*)
650 California Street
San Francisco, CA 94108
(415) 738-5700
atabaie@debevoise.com
dsarratt@debevoise.com

**McNAUL EBEL NAWROT & HELGREN PLLC**

By: /s/ Claire Martirosian
Claire Martirosian, WSBA No. 49528
Richard W. Redmond, WSBA No. 58835
600 University Street, Suite 2700
Seattle, WA 98101
(206) 467-1816
cmartirosian@mcnaul.com
rredmond@mcnaul.com

*Attorneys for Defendant YARDI SYSTEMS*

YARDI'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE CATHERINE TUCKER'S REBUTTAL REPORT
CASE NO.: 2:23-CV-01391-RSL

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Defendant Yardi Systems certifies that this brief contains 4, 164 words, in compliance with LCR 7(e)(3).

By: */s/ Claire Martirosian*

Claire Martirosian

-14-

YARDI'S OPPOSITION TO PLAINTIFFS' MOTION TO EXCLUDE CATHERINE TUCKER'S REBUTTAL
REPORT                                                                CASE NO.: 2:23-CV-01391-RSL