**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| *In Re YARDI REVENUE MANAGEMENT ANTITRUST LITIGATION* | Case No.: 2:23-cv-01391-RSL |
| _____ | **DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.** |
| MCKENNA DUFFY, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| YARDI SYSTEMS, INC., et al., | |
| Defendants. | |

-1-

**TABLE OF CONTENTS**

I.    INTRODUCTION ............................................................................................................. 6

    A.    Assignment............................................................................................................ 6

    B.    Summary of Conclusions ...................................................................................... 7

II.   THE MARINESCU SECOND REPORT FURTHER SHOWS THAT THE YARDI LEASE PRICE INDEX IS INSUFFICIENT AND UNRELIABLE AND ITS DISCUSSIONS AND NEW ANALYSES OF MISSING DATA AND OUTLIERS ARE MISLEADING................................................................... 10

    A.    The Marinescu Second Report's New Findings Based on Its New and Different YLPI Are Insufficient to Support Her Conclusion and Are Unreliable ............................................................................................................ 10

        1.    The Marinescu Second Report's New Findings Are Insufficient to Support Her Conclusion of Allegedly Collusive Pricing................................................................................... 10

        2.    The Marinescu Second Report Further Demonstrates the YLPI Is Unreliable ................................................................... 14

    B.    The Marinescu Second Report's Discussion and Analysis of Missing Data Are Misleading ........................................................................................ 17

        1.    The Marinescu Second Report's Revised Methodology for Handling Missing Rents Conflicts with Her Original Report and Deposition Testimony ................................................... 18

        2.    The Marinescu Second Report Ignores that in My Published Research I Ensure that Missing Data Do Not Drive My Results................................................................................ 37

        3.    The Marinescu Second Report's BLS-Style Imputation Approach Is Flawed and Is Not a Reliable Basis for Causal Inference................................................................................ 40

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                                    CASE NO.: 2:23-CV-01391-RSL

C.   The Marinescu Second Report's Discussion and Analysis of Outliers Are Misleading ..................................................................................... 41

    1.   The Marinescu Reports' YLPI Is Highly Sensitive to Outliers ........................................................................................ 42

    2.   The Marinescu Reports' Approach to Outliers Is Inconsistent with Standard Practices and Her Deposition Testimony ................................................................................... 50

    3.   The Marinescu Second Report's New Outlier Analyses Do Not Negate the Sensitivity of Her Findings to Outliers ........................... 55

III.   THE MARINESCU ORIGINAL REPORT'S CORE CONCLUSION THAT RENTS RISE WITH REVENUE IQ ADOPTION CONTINUES TO LACK RELIABLE SUPPORT ...................................................................................... 61

A.   The Marinescu Original Report Used Panel Regressions Focused on Price Levels to Support Its Core Conclusion .............................................. 62

    1.   The Marinescu Original Report's Econometric Framework Is Founded on the Harrington Test for Collusion in Price Levels, Not Price Changes ..................................................... 64

    2.   The Marinescu Original Report's Misapplied First-Differences Panel Regressions Represent a Separate Model that, on its Own, Cannot Support Harrington's Test of Collusion ................................................................................ 67

    3.   The Marinescu Original Report's Panel Regressions in First Differences Do Not Implement a First-Difference Estimator .................. 69

B.   The Marinescu Second Report Fails to Address the Methodological Flaws with the Co-Conspirator Panel Regressions Identified in My First Rebuttal Report ..................................................................................... 72

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND)
REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

1.  The Marinescu Second Report's Claims Regarding a Redefinition of Co-Conspirator Counts Ignore the Fact I Am Using Her Original Report's Stated Definition ........................................ 73

2.  The Marinescu Second Report's Claims Regarding Attenuation Bias Reflect a Misunderstanding of Attenuation Bias .......................................................................... 74

3.  The Marinescu Second Report Ignores Key Evidence Showing that the Estimated "Conspiracy" Effect is Driven by a Confounding Effect, Not the Presence of Additional Alleged Co-Conspirators ................................................. 75

IV.  THE MARINESCU SECOND REPORT STILL DOES NOT IDENTIFY CREDIBLE MEANS OF ENFORCEMENT ................................................. 78

A.  The Marinescu Second Report Fails to Establish a Credible Enforcement Mechanism .......................................................... 78

B.  The Marinescu Second Report Fails to Defend Its Application of Fazio-TAM Call Notes ............................................................... 81

V.  THE MARINESCU SECOND REPORT'S NEW EMPHASIS ON INTERNAL YARDI PRICING ANALYSES DOES NOT VALIDATE ITS EMPIRICAL CONCLUSIONS ........................................................... 83

A.  Yardi's Internal Pricing Analyses Do Not Provide an Economic Test of the At-Issue Conduct and Do Not Show What the Marinescu Second Report Claims ............................................. 84

B.  The YLPI Is a Different Measure to Those Used in the Internal Yardi Analyses ....................................................................... 86

VI.  THE MARINESCU SECOND REPORT DOES NOT ADDRESS SEVERAL FLAWS IDENTIFIED IN MY FIRST REBUTTAL REPORT ...................... 87

-4-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

A.  The Marinescu Second Report Fails to Establish Whether the Alleged Revenue IQ Conspiracy Is Consistent with the Economic Theory of Collusion ............................................................................................... 88

    1.  The Marinescu Second Report Continues to Ignore Whether Revenue IQ's Market Shares Are Sufficient to Sustain Supracompetitive Pricing ........................................................................ 88

    2.  The Marinescu Second Report Does Not Address My Critiques Regarding the Marinescu Original Report's Mischaracterizations of the Academic Literature .................................... 89

B.  The Marinescu Second Report Does Not Challenge My First Rebuttal Report's Critique that the At-Issue Outcomes Can Be Consistent with Unilateral Behavior ...................................................................... 90

    1.  Disentangling Collusive Conduct from Competitive Outcomes Requires Using a Competitive Yardstick or Comparator Group ................................................................................ 91

    2.  The Marinescu Second Report Continues to Ignore the Need to Distinguish Collusion From Unilateral Behavior ................................ 92

C.  The Marinescu Second Report Continues to Ignore the Unilateral Incentives Firms Have to Adopt Revenue Management Systems .......................... 102

-5-

## I.     INTRODUCTION

### A.     Assignment

1.     I issued a rebuttal report in this matter ("Tucker First Rebuttal Report" or "my First Rebuttal Report") on March 23, 2026.[1] My First Rebuttal Report identifies issues with Dr. Ioana Marinescu's original report ("Marinescu Original Report").[2] My First Rebuttal Report includes my qualifications and compensation. An updated version of my curriculum vitae is attached as **Appendix A**. **Appendix B** is an updated list of all the cases in which I have testified as an expert at deposition or trial during the previous four years.

2.     Dr. Ioana Marinescu submitted a second report ("Marinescu Second Report") responding to certain critiques in my First Rebuttal Report on May 22, 2026.[3] The Marinescu Second Report concludes that I and other Yardi experts "do not employ reliable methodologies," that our analyses "mischaracterize" her report and deposition testimony to justify introducing "well understood forms of bias," and that all "reasonable approaches" to disputed methodological questions support the conclusions in the Marinescu Original Report that Revenue IQ users charge above-market rents and that the premium has grown with Revenue IQ adoption.[4]

3.     I have been asked by counsel for Yardi Systems ("Yardi") to evaluate from an economic perspective the opinions, arguments, and data in the Marinescu Second Report to the extent it relates to opinions addressed in my First Rebuttal Report.

---

[1]  Expert Report of Catherine Tucker, Ph.D. in Rebuttal of the Report of Ioana Marinescu, Ph.D., *In re Yardi Revenue Management Antitrust Litigation McKenna Duffy, individually and on behalf of all others similarly situated, v. Yardi Systems, Inc. et al.*, No. 2:23-cv-01391-RSL, March 23, 2026.

[2]  Expert Report of Ioana Marinescu, Ph.D., in Support of Plaintiffs' Opposition to Yardi's Motion for Summary Judgment, *In re Yardi Revenue Management Antitrust Litigation Wylie Duffy and Michael Brett, individually and on behalf of all others similarly situated, v. Yardi Systems, Inc. et al.*, No. 2:23-cv-01391-RSL, February 9, 2026.

[3]  Reply of Ioana Marinescu, Ph.D., in Support of Plaintiffs' Opposition to Yardi's Motion for Summary Judgment, *In re Yardi Revenue Management Antitrust Litigation Wylie Duffy and Michael Brett, individually and on behalf of all others similarly situated, v. Yardi Systems, Inc. et al.*, No. 2:23-cv-01391-RSL, May 22, 2026. I refer to the Marinescu Original Report and Marinescu Second Report together as the "Marinescu Reports."

[4]  Marinescu Second Report, ¶¶ 449–450.

**B.    Summary of Conclusions**

4.    Based on my review of documents and testimony associated with this case, and my expertise in competition economics, digital platforms, and algorithmic pricing, I have reached the following conclusions:

    a.    My First Rebuttal Report showed that the Marinescu Original Report's calculation of the Yardi Lease Price Index ("YLPI") suffered from two grave implementation errors related to outliers and missing data. Once corrected, I showed its key empirical findings disappeared, invalidating the empirical conclusion that Landlord Defendants' prices increase with the adoption of Revenue IQ and that internal calls with Yardi Technical Account Managers ("TAMs") functioned as an enforcement mechanism and led to supracompetitive pricing. The Marinescu Second Report introduces a new and different YLPI, with new methods for handling missing data and outliers. Those methods, and the different results they produce, are insufficient to support the Marinescu Reports' conclusions and are unreliable, as the YLPI conclusions depend on implementation choices rather than a robust empirical relationship. Additionally, the related discussions and new analyses related to missing data and outliers are misleading. The new methods also conflict with the Marinescu Original Report, her deposition testimony, and standard econometric practices. Therefore, the YLPI findings in either of the Marinescu Reports do not sufficiently or reliably support the conclusion of allegedly collusive pricing. See **Section II**.

    b.    My First Rebuttal Report showed that the Marinescu Original Report's panel regressions in levels were flawed because its key variable measuring Revenue IQ adoption by alleged co-conspirators in the same PUMA includes properties managed by the same Landlord Defendant, and, when corrected according to her own stated methodology of excluding those properties because "a landlord cannot

use Revenue IQ to collude with itself,"[5] its regression results did not support its core conclusion that rental prices rose as more Landlord Defendants in a geographic area adopted Revenue IQ. In response, the Marinescu Second Report pivots to assert that a different analysis, which examines rent changes rather than the actual rental price, "serve[s] an important conceptual purpose in implementing the Harrington test[.]"[6] However, this model does not support its conclusions. The model itself does not reflect the Harrington test of conspiracy, and, therefore, is not a test of the theory described in the literature that the Marinescu Original Report relies on to support its core conclusion. It is a separate model that, on its own, cannot support Harrington's test of collusion. The Marinescu Second Report also misapplies the econometric model it claims to apply. Additionally, the Marinescu Second Report fails to address the methodological flaws with the co-conspirator panel regressions identified in my First Rebuttal Report.[7] See **Section III**.

c.   In response to my First Rebuttal Report, which explained that the Marinescu Original Report failed to describe an enforcement/punishment mechanism, the Marinescu Second Report recharacterizes several features of the Yardi platform previously described as monitoring mechanisms as punishment mechanisms. None of these platform features is a credible enforcement mechanism. The Marinescu Second Report also does not explain why the internal Fazio-TAM call notes are meaningful evidence of enforcement. See **Section IV**.

d.   The Marinescu Second Report places new emphasis on internal Yardi pricing analyses. However, these pricing analyses do not validate the Marinescu Reports' conclusions. First, Yardi's internal pricing analyses do not provide an independent economic test of the at-issue conduct, and do not show what is claimed in the

---

[5]   Marinescu Original Report, ¶ 517.
[6]   Marinescu Second Report, ¶ 312.
[7]   I provide an explanation of the difference between a panel regression in levels and a panel regression in first differences in **Section III.A** below.

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND)
REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

Marinescu Second Report. Second, the Marinescu Reports' YLPI is a different measure to those studied in Yardi's internal analysis. See **Section V**.

    e.    My First Rebuttal Report identifies several other flaws in the Marinescu Original Report that undermine the reliability of its conclusions. These critiques go to the foundation of the Marinescu Reports' theory of coordination: whether observed pricing patterns are reliably attributable to collusion rather than competitive explanations, and whether firms have unilateral incentives to adopt revenue management systems.[8] The Marinescu Second Report does not address several flaws identified in my First Rebuttal Report. It fails to establish that Revenue IQ's alleged conspiracy is consistent with the economic theory of collusion, including failing to establish that Revenue IQ's market shares are sufficient to sustain supracompetitive pricing and failing to address my critiques regarding the mischaracterizations of the academic literature cited in her Original Report. The Marinescu Second Report also does not challenge the critique in my First Rebuttal Report that the at-issue outcomes can be consistent with unilateral behavior and that firms have unilateral incentives to adopt revenue management systems. See **Section VI**.

5.    This summary is presented with the aim of making it easier for the reader of this report. The full context and support for these opinions are found in the full report. The fact that I do not reply to all points made in the Marinescu Reports does not mean that I agree with those points. As I noted in my First Rebuttal Report, analyses that I represent as "corrected" versions of the Marinescu Reports' findings, which use methods that Dr. Marinescu testified in deposition were appropriate, should not be interpreted as an endorsement of those methods.[9]

---

[8]   Tucker First Rebuttal Report, Sections III–V.

[9]   Tucker First Rebuttal Report, ¶ 18 ("Analyses that I represent as 'corrected' versions of the Marinescu Report's findings, which use methods that Dr. Marinescu testified were appropriate, should not be interpreted as an endorsement of those methods.").

-9-

## II. THE MARINESCU SECOND REPORT FURTHER SHOWS THAT THE YARDI LEASE PRICE INDEX IS INSUFFICIENT AND UNRELIABLE AND ITS DISCUSSIONS AND NEW ANALYSES OF MISSING DATA AND OUTLIERS ARE MISLEADING

6.      My First Rebuttal Report showed that the Marinescu Original Report's calculation of the Yardi Lease Price Index ("YLPI") suffered from two grave implementation errors related to outliers and missing data. Once corrected, I showed its key empirical findings disappeared, invalidating the empirical conclusion that Landlord Defendants' prices increase with the adoption of Revenue IQ and that internal calls with Yardi TAMs functioned as an enforcement mechanism and led to supracompetitive pricing. This section explains that the Marinescu Second Report introduces a new and different YLPI, with new methods for handling missing data and outliers. Those methods, and the different results they produce, are insufficient to support the Marinescu Reports' conclusions and are unreliable, as the YLPI conclusions depend on implementation choices rather than a robust empirical relationship. Additionally, the related discussion and new analyses related to missing data and outliers are misleading. The new methods also conflict with the Marinescu Original Report, her deposition testimony, and standard econometric practices. Therefore, the YLPI findings in either of the Marinescu Reports do not sufficiently or reliably support the conclusion of allegedly collusive pricing.

### A. The Marinescu Second Report's New Findings Based on Its New and Different YLPI Are Insufficient to Support Her Conclusion and Are Unreliable

#### 1. The Marinescu Second Report's New Findings Are Insufficient to Support Her Conclusion of Allegedly Collusive Pricing

7.      The Marinescu Second Report contends that:

TAM oversight is associated with a statistically significant increase in prices above property's pre-existing trend across all sensitivity analyses (including Yardi's Experts' $20 effective rent cleaning). When further controlling for Rent CPI, this effect remains statistically significant in 9 of 12 regressions. In some sensitivity analyses, some charts do not show the visible jump in prices

-10-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                                   CASE NO.: 2:23-CV-01391-RSL

associated with TAM call notes I originally presented, but nonetheless show the same TAM intervention story: […] TAM interventions appear to be associated with a reversal of this downward trend, and prices ultimately visibly depart above CPI.[10]

8.      As explained in my First Rebuttal Report, "[a] core requirement for any sustained collusion among competitors is not just that firms observe each other's prices and behavior, but that the arrangement is self-enforcing: deviations must be detectable (monitoring) and followed by a credible punishment that makes deviations unprofitable (enforcement)."[11] Economists agree that punishment must impose a cost on firms sufficient to incentivize compliance with collusive behavior, meaning that enforcement is necessary to maintain a collusive agreement.[12]

9.      The only analysis of enforcement presented in the Marinescu Original Report to support the claim that "TAM oversight is associated with a statistically significant increase in prices" is Table 2.[13] However, the Marinescu Reports' finding that TAM oversight enforces higher rents is unreliable because it is based on a flawed methodology.

10.     Table 2 in the Marinescu Original Report examines rent changes for the subset of properties she "identified as underpricing in […] Mr. Fazio's call notes."[14] As explained in greater detail in **Section II.C.1**, the Marinescu Original Report's finding of a statistically significant increase in prices associated with TAM oversight is fragile, because it rests on a small number of extreme rent observations. Two extreme leases with monthly rental prices of $0.40 and $1.00 correspond to price changes of 300,000 percent and 255,000 percent, and disproportionately influence the Marinescu Original Report's findings. **Table 1**, copied from my First Rebuttal Report, shows that removing these extreme lease observations completely reverses the Marinescu Original

---

[10]  Marinescu Second Report, ¶ 225.
[11]  Tucker First Rebuttal Report, ¶ 86.
[12]  See Calvano, Emilio et al., "Artificial Intelligence, Algorithmic Pricing, and Collusion," *The American Economic Review*, Vol. 110, No. 10, October 2020, pp. 3267–3297 at p. 3269 ("To us economists, collusion is not simply a synonym of high prices but crucially involves 'a reward-punishment scheme designed to provide the incentives for firms to consistently price above the competitive level[.]'").
[13]  Marinescu Second Report, ¶ 225.
[14]  Marinescu Original Report, ¶ 390.

-11-

Report's findings, resulting in a negative and not statistically significant association between TAM oversight and rental prices when controlling for Rent CPI.[15]

**Table 1**
**Copy of the Tucker First Rebuttal Report's Table 2.A: Marinescu Original Report's Original Table 2 and Correction That Excludes Outliers According to Her Own Stated Methodology**

| | Property-Level Price Index | | | |
|---|---|---|---|---|
| | (12) | | (13) | |
| | Original | With Correction | Original | With Correction |
| After First TAM Call × Months From First Call | 1.131*** | 0.447*** | 0.939*** | -0.054 |
| | (0.331) | (0.101) | (0.340) | (0.075) |
| Number of Observations | 10,434 | 10,434 | 10,434 | 10,434 |
| R2 | 0.347 | 0.572 | 0.347 | 0.575 |
| R2 Adjusted | 0.338 | 0.566 | 0.338 | 0.569 |
| Rent CPI | | | Yes | Yes |
| Fixed Effects | Property | Property | Property | Property |
| Standard Errors | Newey-West (L=3) | Newey-West (L=3) | Newey-West (L=3) | Newey-West (L=3) |

**Notes:**

[1] The sample consists of 184 properties identified in the Yardi lease data between April 2011 and August 2025 that were flagged in Mr. Fazio's TAM call notes as priced below benchmark. The Marinescu Original Report sample is filtered to only keep leases with positive monthly effective rents. In the corrected sample, leases with monthly effective rents less than or equal to $20 are also excluded. The mean property-level indexes of the Marinescu Original Report and corrected samples are 130.73 and 121.97, respectively.

[2] This analysis regresses the average property-level price index across units in each month on an indicator variable set to one after the first Fazio-TAM call occurred. For Yardi, the property-level price index is calculated, per the Marinescu Original Report, by averaging the monthly effective rent changes across units within each property-month, then taking the cumulative product of these average changes since May 2011. The Marinescu Original Report incorrectly calculates the change in the price of a unit between non-consecutive months, which is not corrected in these tables. For the rent CPI, the index is calculated by rebasing the national rental CPI to May 2011.

[3] Statistical significance is denoted by *** $p < 0.01$, ** $p < 0.05$, and * $p < 0.10$.

11.    The Marinescu Second Report presents several "sensitivity analys[e]s" of its original Table 2.[16] As described in **Section II.C.3**, rather than bolster its conclusions, these new analyses further demonstrate that the results are inconsistent and consequently unreliable. The Marinescu Reports' conclusion that there is a link between TAM calls and price increases therefore

---

[15]    Tucker First Rebuttal Report, Section IV.A.1 and Table 2.A. See also **Section II.C** and **Figures 5.A-5.C**.

[16]    Marinescu Second Report, ¶ 450 and Tables 16, 21, 24, and 29.

-12-

lacks sufficient support, as the basis of those conclusions collapses following the removal of a small number of outlier observations.[17]

12. The analyses and conclusions in the Marinescu Second Report are narrower than in the Marinescu Original Report. The Marinescu Original Report's conclusions rested, among others, on its YLPI analyses, which it claims support that "TAMs rel[y] on non-public client data to reinforce adherence to Revenue IQ's recommended list price and apply asymmetric upward pricing pressure against underpricing" and that "Landlord Defendants' lease prices increase with the adoption of Revenue IQ and exceed a market yardstick;"[18] its panel regression analysis, which she claims finds that the "coordinating price effect of Yardi's Pricing Suite grows with the number of alleged co-conspirators in a given area;"[19] and its understanding that Yardi's system provided "Landlord Defendants with uniquely comprehensive visibility into their competitors' pricing structure[.]"[20] The Marinescu Second Report does not mention several conclusions from her Original Report and narrows its empirical analyses – for example, no longer raising the claimed "uniquely comprehensive visibility" into rivals' prices – and without reliable empirical evidence of enforcement, an essential element to sustain collusion,[21] the Marinescu Second Report's empirical support for allegedly collusive pricing is limited to 1) its YLPI trending above the national Rent CPI; 2) its PUMA-level regression in first-differences showing that "Revenue IQ adoption is associated with higher rent growth;"[22] and 3) reported directional trends that Landlord Defendants increase prices in parallel. However, 1) its YLPI does not always trend above the national Rent CPI, depending on the treatment of missing rents and outliers, which represent only approximately 1 percent of the underlying data; 2) its PUMA-level regressions in first-differences are testing

---

[17] Marinescu Second Report, ¶¶ 66, 180, and 210.
[18] Marinescu Original Report, ¶¶ 52, 71.
[19] Marinescu Original Report, ¶ 73.
[20] Marinescu Original Report, ¶ 405.
[21] Calvano, Emilio et al., "Artificial Intelligence, Algorithmic Pricing, and Collusion," *The American Economic Review*, Vol. 110, No. 10, October 2020, pp. 3267–3297 at p. 3269 ("To us economists, collusion is not simply a synonym of high prices but crucially involves 'a reward-punishment scheme designed to provide the incentives for firms to consistently price above the competitive level[.]'").
[22] Marinescu Second Report, ¶ 40.

-13-

something different from the formal test it claims to be conducting; and 3) directional trends for Landlord Defendants' average rents are consistent with general trends of non-Revenue IQ properties. The Marinescu Reports' findings are unreliable and insufficient to support the conclusion that "the Yardi Pricing Suite […] results in pricing economists associate with algorithmic collusion."[23]

### 2. The Marinescu Second Report Further Demonstrates the YLPI Is Unreliable

13. The Marinescu Second Report asserts that its new methodologies for handling missing data and outliers support the original report's YLPI analysis:

> There are multiple accepted methods for dealing with outliers and missing data, and every methodology for handling missing rent data I implemented as a sensitivity analysis preserves the Yardi Index Premium in a way that contradicts [Yardi's Experts'] conclusions.[24]

14. In my First Rebuttal Report, I corrected methodological errors in the Marinescu Original Report according to her own stated methodologies and deposition testimony.[25] These corrections revealed that the key conclusions in the Marinescu Original Report are unreliable because they are either unsupported or contradicted when her chosen methodologies are implemented as stated. I also explained that Revenue IQ-adopting properties may be different than others, potentially having higher costs, being in buildings of higher quality or more professionally and efficiently managed, or operating in denser or faster-growing markets than the average.[26]

15. The Marinescu Second Report now offers new opinions and methodologies. However, these new opinions suffer from their own flaws, rendering them unreliable. Additionally,

---

[23] Marinescu Second Report, ¶ 53.
[24] Marinescu Second Report, ¶ 172.
[25] Tucker First Rebuttal Report, ¶ 31 ("The Marinescu Report's analyses contain grave errors that, once corrected according to her own stated methodology, are not supportive of a conspiracy.").
[26] Tucker First Rebuttal Report, ¶ 85 ("If Landlord Defendants tend to have stronger management expertise, own higher quality buildings, or operate in denser or faster-growing markets, and if these characteristics are associated with higher rent levels or faster rent growth, then adoption of Revenue IQ will be correlated with higher and upward-trending prices even absent any coordination").

-14-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

these new methodologies yield different results, which further demonstrate the lack of reliability of the YLPI analyses and the fragility of the Marinescu Reports' conclusions. They also do not attempt to control for Revenue IQ-adopting properties potentially being different than others and would therefore not be adequately controlled for by the national Rent CPI.

16.     Econometrics textbooks explain that sensitivity analysis tests whether results from a main model are robust to small changes in data or specifications, rather than the result of a particular implementation choice.[27] Accordingly, to make an inference from empirical work, results should be reasonably robust and consistent across sensitivity analyses. If results change under a reasonable alternative method, economists would consider them to be assumption-driven rather than reliable evidence of the hypothesized statistical relationship.

17.     Assessing robustness is important for establishing the reliability of the Marinescu Original Report's YLPI analysis, which attempts to infer "whether Revenue IQ users, as a group, priced above a national rental benchmark and whether that premium grew as Revenue IQ adoption spread."[28] The YLPI changes substantially when it is recalculated using the alternative treatments of low effective-rent observations and missing rent values specified or implemented in the Marinescu Reports. Some analyses result in its YLPI falling below the Rent CPI, including when

---

[27] Studenmund, A.H., *Using Econometrics: A Practical Guide*, 7th Ed., Pearson, 2017 ("Studenmund (2017)") at p. 174 ("**Sensitivity analysis** consists of purposely running a number of alternative specifications to determine whether particular results are *robust* (not statistical flukes). In essence, we're trying to determine how sensitive a potential 'best' equation is to a change in specification because the true specification isn't known. Researchers who use sensitivity analysis run (and report on) a number of different reasonable specifications and tend to discount a result that appears significant in some specifications and insignificant in others. Indeed, the whole purpose of sensitivity analysis is to gain confidence that a particular result is significant in a variety of alternative specifications, functional forms, variable definitions, and/or subsets of the data.") (emphasis in original). See also Kennedy, Peter, *A Guide to Econometrics*, 6th Ed., Blackwell, 2008 ("Kennedy (2008)") at p. 366 ("This is the purpose of a 'sensitivity analysis,' indicating to what extent the substantive results of the research are affected by adopting different specifications about which reasonable people might disagree"); Davis, Peter and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, 2010 ("Davis & Garcés (2010)") at p. 118 ("If the results are not robust to particular departures from the favored model presented, then good practice means that that fact should be reported […]").

[28] Marinescu Second Report, ¶ 9.

-15-

implementing its own stated methodology as I showed in my First Rebuttal Report, effectively reversing its conclusion that "Landlord Defendants increase rents faster than a rent-specific CPI."[29] The difference in YLPI following small changes in treatments of low effective rents and missing rent values shows that its YLPI analyses are unreliable and the resulting conclusions fragile.

18.    The new YLPI analyses in the Marinescu Second Report do not resolve the robustness problem. Viewed alongside the Marinescu Original Report, they show that its conclusions depend on how missing rent values and low effective rents are handled. Because the resulting YLPI estimates "substantively change with reasonable alternative choices of specification or of data," and produce a range of outcomes, some favorable to her original conclusions and some not, they are not robust, and therefore cannot reliably support a causal conclusion that rents of Revenue IQ users moved in a manner that is consistent with collusion.[30]

19.    The Marinescu Second Report applies an asymmetric interpretation of its YLPI evidence. If the YLPI lies above the Rent CPI, then that result is treated as evidence that Revenue

---

[29]   Marinescu Original Report, Figure 88 (lowercase added), Marinescu Second Report, Figure 17 and Figure 74 and Backup Materials (YARDI-DUFFY_00913149).

[30]   See ABA Section of Antitrust Law, *Econometrics: Legal, Practical, and Technical Issues*, American Bar Association, 2005 ("ABA (2005)") at p. 169 ("A critical part of damage model estimation and testing is showing that the results do not substantively change with reasonable alternative choices of specification or of data used to estimate the model […] A result which is not robust can in some ways be worse than no result at all, for it has a high potential to be misleading."). See also National Academies of Sciences, Engineering, and Medicine & Federal Judicial Center, *Reference Manual on Scientific Evidence*, 4th Ed., National Academies Press, 2025 at p. 616 ("to determine to what extent the estimated parameter changes as each data point in the regression analysis is dropped from the sample. An influential data point—a point that causes the estimated parameter to change substantially—should be studied further to determine whether mistakes were made in the use of the data or whether important explanatory variables were omitted."); Studenmund (2017) at p. 174 ("**Sensitivity analysis** consists of purposely running a number of alternative specifications to determine whether particular results are *robust* (not statistical flukes). […] Researchers who use sensitivity analysis run (and report on) a number of different reasonable specifications and tend to discount a result that appears significant in some specifications and insignificant in others.") (emphasis in original); Wooldridge, Jeffrey M., *Introductory Econometrics: A Modern Approach*, 6th Ed., Cengage Learning, 2016 ("Wooldridge (2016)") at p. 296 ("[I]f the estimates change by a practically large amount when we slightly modify our sample, we should be concerned." and "OLS results should probably be reported with and without outlying observations in cases where one or several data points substantially change the results.").

-16-

IQ users are conspiring to raise rents. But if the YLPI falls below the Rent CPI, then the result is dismissed because it would suggest that Revenue IQ would have "failed to deliver on its promise to 'beat the market.'"[31] This empirical framework is not reliable: econometric analysis cannot credit only results that align with the underlying hypothesis and ignore results that disprove it.

20.    Accordingly, rather than addressing the flaws identified in my First Rebuttal Report,[32] the new analysis and opinions provided in the Marinescu Second Report reinforce my conclusion that the Marinescu Reports' YLPI analyses lack the reliability necessary to support causal conclusions regarding the allegedly collusive impact of Revenue IQ on rental prices.

**B.    The Marinescu Second Report's Discussion and Analysis of Missing Data Are Misleading**

21.    The Marinescu Second Report states:

> I show that [Yardi's Experts' treatment of gaps in the lease observation data] drives their elimination of the Yardi Index Premium above the Rent CPI. Yardi's Experts justify this choice by citing my deposition testimony, in which I was asked about a single unit with a gap of nearly nine years between lease observations. From that exchange, they extract a rule requiring the exclusion of all price changes across any gap of even a single month. This is a rule I neither stated nor endorsed. In practice, this removes 240,194 price observations from the analysis, of which more than 67% (161,008) are rent increases.[33]

---

[31]    Marinescu Second Report, ¶¶ 96–97 ("Yardi's Experts each presents a revised YLPI that, they claim, shows Revenue IQ users pricing below Rent CPI throughout the class period […] If correct, this would mean that Revenue IQ users' rents grew more slowly than the national rental inflation benchmark - in other words, that the software failed to deliver on its promise to 'beat the market.'").

[32]    Tucker First Rebuttal Report, ¶ 31 ("One error is that it includes outliers, that is lease records with implausibly low effective rents. […] Another error is that the Marinescu Report calculates the change in rent for a given month relative to the last recorded rent regardless of the number of months between those two values, despite many months of missing rent data between leases for certain units.") and ¶ 32 ("Another category of grave empirical error in the Marinescu Report is that when testing whether increases in rents are correlated with the presence of more Landlord Defendants within a local geographic area, the Marinescu Report treats each additional property in a geographic area as an additional co-conspirator, including properties managed by the same Landlord Defendant.").

[33]    Marinescu Second Report, ¶ 108.

-17-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND)
REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

22.   The Marinescu Second Report also claims that:

> [Yardi's Experts] do not report testing the robustness of their analysis to alternative cleaning methods, despite these cleaning methods removing hundreds of thousands of price movements from their revised YLPI analysis. This lack of thoroughness is at odds with their approach to data cleaning in their published work.[34]

23.   This discussion and analysis of missing data in the Marinescu Second Report are misleading in several ways. First, the Marinescu Second Report attempts to revise the stated methodology in the Marinescu Original Report for handling missing rents by implementing new methodologies inconsistent with her Original Report and deposition testimony. Second, the Marinescu Second Report mischaracterizes my scholarship and ignores that in my published research I ensure that missing data do not drive my results, unlike in the Marinescu Reports. Finally, the Marinescu Second Report's BLS-style imputation approach is flawed and is not reliable.

**1.   The Marinescu Second Report's Revised Methodology for Handling Missing Rents Conflicts with Her Original Report and Deposition Testimony**

**a.   The Marinescu Second Report Changes Her Original Stated Methodology**

24.   The Marinescu Second Report claims that I "misread" her deposition testimony and Original Report regarding the handling of missing rents in the construction of its YLPI, and suggests that the analyses in the Marinescu Original Report correctly implemented her stated methodology because I should have looked at the code rather than the report itself.[35] For example, the Marinescu Second Report claims:

> Yardi's Experts are poorly placed to opine on my intentions, and their misreading of both my testimony and opening report exacerbates this problem.[36]

---

[34]   Marinescu Second Report, ¶ 83.
[35]   Marinescu Second Report, at title to Section 4.1 (capitalization omitted) ("Yardi's Experts Misread My Deposition Testimony and Opening Report to Justify a Flawed Assumption in their Revised YLPI").
[36]   Marinescu Second Report, ¶ 72.

-18-

> Yardi's Experts' revisions to my YLPI are unreliable. […] Their characterization of my methodology is wrong, and I explain why in this report.[37]

> Further, if Dr. Tucker was unclear about how the YLPI was constructed, she could have consulted the code used to construct it rather than speculating based on a possible misreading of my report.[38]

> The interpretation Yardi's Experts advance is a significant overreading of my testimony and produces a methodology for dealing with short-run vacancies that is inconsistent with principles endorsed by both BLS and Yardi. I was never asked what my methodology requires for a two-month or three-month vacancy, which is the kind of routine turnover that accounts for the vast majority of what Yardi's Experts' rule actually removes. I never endorsed a one-month threshold, and never was never asked to address short vacancies at all.[39]

> Yardi's Experts argue that my 'own stated methodology' requires discarding every rent change that occurs when a unit has no active lease for even a single intervening month.[40]

> Yardi's Experts reading conflates how the index calculates change with which observations the index includes.[41]

25.     This new explanation of her intended methodology differs from the methodology articulated in the Marinescu Original Report and at her deposition.

26.     The Marinescu Original Report and deposition testimony put forward a methodology for calculating price changes in constructing her YLPI, including between monthly observations separated by a period of missing data. The specific formula presented by the Marinescu Original Report is shown in **Figure 1**. It describes calculating changes in effective rents within a given unit as a ratio of "effective rent for a given unit $u$ in month $t$" to "that same unit's effective rent in the prior month."[42] If the rent in the month immediately preceding a given month

---

[37] Marinescu Second Report, ¶ 73.
[38] Marinescu Second Report, ¶ 113.
[39] Marinescu Second Report, ¶ 117.
[40] Marinescu Second Report, ¶ 112.
[41] Marinescu Second Report, ¶ 113.
[42] Marinescu Original Report, ¶¶ 501–502 and equation 16.

-19-

is missing, the price change for that month cannot be calculated according to the Marinescu Original Report's own formula.

**Figure 1**
**Equation for Estimating YLPI as Described in Marinescu Original Report[43]**

$$Index_{Effective\ Rent,\ Landlord\ Defendants} = \prod_t \overline{\left(\frac{r_{u,t}}{r_{u,t-1}}\right)}$$

502.  Where:

- $Index_{Effective\ Rent,\ Landlord\ Defendants}$ is the Yardi Rent Index I calculate across Landlord Defendant properties.
- $r_{u,t}$ is the effective rent for unit $u$ in month $t$.
- $r_{u,t-1}$ is that same unit's effective rent in the prior month.

27.  Dr. Marinescu confirmed the same methodology at her deposition. When asked how her methodology would treat Revenue IQ Unit ID 1623904, which has no lease observed between July 2016 and June 2025, Dr. Marinescu explained:

> My understanding is that the way that my staff processed the data, based on our discussion, is that we only imputed rent as long as it was the same contract. So, here, you know, the data point would be missing in June 2025. So -- and then in July 2025, it would still be missing, because we don't know, like, relative to what, since there was no data before. […] So, as I said, given the procedure that we have discussed, there would be missing data in the middle and, therefore, there would not -- this property would not contribute to the index since it would have missing data, it would not contribute to the index until August of 2025, because that's the first time that we see the rent not changing since it's being propagated from the July 2025 new rent.[44]

---

[43]  Marinescu Original Report, ¶¶ 501–502 and equation 16.

[44]  Deposition of Ioana Marinescu, In re Yardi Revenue Management Antitrust Litigation. McKenna Duffy, individually and on behalf of all others similarly situated v. Yardi Systems, Inc., et al., No. 2:23-cv-01391-RSL, March 9, 2026 ("Marinescu Deposition"), pp. 279:18–281:18 ("Q. Okay. And so if you would look at Revenue IQ Unit ID 1623904, the first entry point has a lease start date of June 1st, 2015. Correct? A. Yes. Q. And the next lease observation for that unit is July 1st, 2025, over ten years later. Do you see that? A. Yes. Q. And then at the end of that, when you get to July 1, 2025, the rent increase is shown as from $1,045 to $1,382. Correct? A. No. My understanding is that the way that my staff processed the data, based on

-20-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND)
REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

28. Dr. Marinescu therefore testified that her explanation for this unit was consistent with "the procedure that we have discussed" and she was unambiguous that the unit would not contribute to the index until August 2025, because the July 2025 index value could not be computed given missing data for June 2025.[45] When asked whether it would be appropriate to calculate the price change in July 2025 relative to the last-observed rent in June 2016, Dr. Marinescu testified "[t]here is no reason, based on the methodology, to do that […] when there's missing data, there's missing data. We don't know what happened in the meantime here."[46] This explanation is entirely consistent with the notation of the YLPI formula in the Marinescu Original Report, and the explanation for the notations provided in the paragraph just below, Paragraph 502, also shown in **Figure 1** above.

29. The Marinescu Second Report now claims that her intended methodology was not what was originally written and then confirmed during her deposition. It now argues that:

> My statement "relative to the prior month" was intended to describe the arithmetic of a chain index. In practice, it means 'relative to when the last observed month-level rent was observed' - which, most frequently, is the prior calendar month, but need not always be. […] The same principle applies to the 't' and 't-1' notation in my equations.[47]

---

our discussion, is that we only imputed rent as long as it was the same contract. So, here, you know, the data point would be missing in June 2025. So -- and then in July 2025, it would still be missing, because we don't know, like, relative to what, since there was no data before. […] Q. You would agree that it would not be appropriate to attribute the entire difference between 1,045 and 1,382 to a change that happened in one month. Correct? […] THE WITNESS: So, as I said, given the procedure that we have discussed, there would be missing data in the middle and, therefore, there would not -- this property would not contribute to the index since it would have missing data, it would not contribute to the index until August of 2025, because that's the first time that we see the rent not changing since it's being propagated from the July 2025 new rent.").

[45] Marinescu Deposition, pp. 280:13–281:18; see also Tucker First Rebuttal Report ¶¶ 49–52.

[46] Marinescu Deposition, pp. 281:20–282:7 ("Q. If you assume for a second that this property did contribute to the data, do you agree with me that it would not be appropriate for that contribution to be based on a ratio comparing 1,382 to 1,045? […] THE WITNESS: There is no reason, based on the methodology, to do that. Like, again, like, there is -- when there's missing data, there's missing data. We don't know what happened in the meantime here.").

[47] Marinescu Second Report, ¶ 113.

-21-

30. The Marinescu Second Report therefore suggests that "in practice" "t-1" should be interpreted to mean the last observed month, regardless of whether that "prior month" was 1 month, 2 months, or 100 months prior. By doing so, she suggests that "in practice" "t-1" should be understood to mean t-1, t-2, or t-100, depending on the specific observation. This new interpretation is inconsistent with the notation of t-1 in the Marinescu Original Report and is directly contradicted by the formula and explanation that were presented in that report and by Dr. Marinescu in her deposition, where she clearly testified that missing months would not contribute to her YLPI index. Suggesting now that the month prior to June 2023 should be December 2022 instead of May 2023, for example, is akin to suggesting that, mathematically, 6-1 might equal 0 instead of 5; that is, no gap instead of a gap of 5 months. The Marinescu Second Report provides no corrected formula that explains this interpretation.

31. In econometrics, $t$ is a commonly accepted notation for an index of time. The term $t$-1, also referred to as a one-period "lag," refers to the time period immediately preceding the index $t$. Similarly, the term $t$-2 refers to a two-period lag with a value corresponding to the time period preceding $t$-1. In the context of a panel dataset of monthly rental prices, if $t$ refers to June 2024, then $t$-1 refers to May 2024 and $t$-2 refers to April 2024. The interpretation of such notation is unambiguous, and is widely adopted in econometrics, including in reference manuals and the BLS. Several examples include:

    a.    Stock and Watson's textbook *Introduction to Econometrics* (2011): "Special terminology and notation are used to indicate future and past values of $Y$. The value of Y in the previous period is called its *first lagged value* or, more simply, its **first lag,** and is denoted $Y_{t-1}$. Its $j$th *lagged value* (or simply its **$j$th lag**) is its value $j$ periods ago, which is $Y_{t-j}$."[48]

    b. Studenmund's textbook *Using Econometrics, A Practical Guide* (2017): "Many econometric equations include one or more lagged independent variables like $X_{1t-1}$, where

---

[48] Stock, James H. and Mark W. Watson, *Introduction to Econometrics*, 3rd Ed., Addison-Wesley, 2011 ("Stock & Watson (2011)") at p. 520.

-22-

the subscript t – 1 indicates that the observation $X_1$ is from the time period previous to time period t"[49]

   c.  Hill, Griffiths, and Lim's textbook *Principles of Econometrics* (2011): "We can think of $(y_t, x_t)$ as denoting the values for *y* and *x* in the current period; $x_{t-1}$ means the value of *x* in the previous period; $x_{t-2}$ is the value of *x* two periods ago, and so on."[50]

   d.  BLS: "To use the item in index calculation for period *t*, it is necessary to have an estimate of $P_{j,t}^v$, which is the price of the earlier version *v* in the current period *t*. If there is no accepted way of estimating either $P_{j,t-1}^{v+1}$ or $P_{j,t}^v$, the observation for item *j* is left out of the index calculation for period *t*, meaning that the observation is treated as a nonresponse handled by imputation."[51]

32.    Outside of the universal understanding of econometric specifications, the phrase that immediately followed this equation, "$r_{u,t-1}$ is that same unit's effective rent in the prior month," is not ambiguous in the slightest that this index is to be calculated using the prior month's data.[52]

33.    Revenue IQ Unit ID 1623904 illustrates the problem with the Marinescu Second Report's implementation of *t*-1. If "t-1" in her Original Report meant the last observed month-level rent, regardless of how much time had passed, then Dr. Marinescu's testimony in deposition that the July 2025 price ratio for Unit ID 1623904 should be missing "since there was no data before" and "[w]e don't know what happened in the meantime" between the two leases would not make any sense.[53] Dr. Marinescu's testimony at her deposition and her Second Report on this point cannot

---

[49] Studenmund (2017) at p. 202.
[50] Hill, R. Carter, et al., *Principles of Econometrics*, John Wiley & Sons, 2011 at p. 337.
[51] U.S. Bureau of Labor Statistics, "Consumer Price Index: Calculation," January 30, 2025, https://www.bls.gov/opub/hom/cpi/calculation.htm.
[52] Marinescu Original Report, ¶ 502.
[53] Marinescu Deposition, pp. 281:20–282:7 ("Q. If you assume for a second that this property did contribute to the data, do you agree with me that it would not be appropriate for that contribution to be based on a ratio comparing 1,382 to 1,045? […] THE WITNESS: There is no reason, based on the methodology, to do that. Like, again, like, there is --when there's missing data, there's missing data. We don't know what happened in the meantime here.") and 283:3–21 ("Q. Yes. Professor, I'm -- I understand what you're saying. I guess what I'm asking you is to assume that the way that this data point was dealt with was comparing $1,382 to $1,045 and calculating

-23-

both be true. According to the Marinescu Second Report, and in contrast with the Marinescu Original Report, July 2025 should have been compared to the last observed rent from June 2016.[54] In that case, the "t-1" value would effectively be the rent from 109 months earlier, or "*t*-109." But Dr. Marinescu testified that the July 2025 price ratio should be missing and not contribute to the index precisely because there was no prior data point to compare it to.[55] That testimony confirms the correction in my First Rebuttal Report: where there is no immediately preceding month-level rent for a unit because the prior lease ended and there is a gap before the next observed lease, the month-to-month rent change is not defined for the first month of the new lease based on the Marinescu Original Report's stated methodology.[56] The Marinescu Second Report's new position therefore does not clarify her original stated methodology; it changes it and introduces new methodologies.

---

a ratio on that basis. I'm just confirming that you agree that that would be an inappropriate way to deal with the data for Revenue IQ Unit 162390? […] THE WITNESS: Yeah, I don't know exactly how this was dealt with. I think I told you about the missing value and the fact that it would be missing, you know, in the intervening month with no continuation of contract.").

[54] Marinescu Second Report, ¶ 113 ("My statement "relative to the prior month" was intended to describe the arithmetic of a chain index. In practice, it means "relative to when the last observed month-level rent was observed" - which, most frequently, is the prior calendar month, but need not always be.").

[55] Marinescu Deposition, pp. 281:20–282: 7 ("Q. If you assume for a second that this property did contribute to the data, do you agree with me that it would not be appropriate for that contribution to be based on a ratio comparing 1,382 to 1,045? […] THE WITNESS: There is no reason, based on the methodology, to do that. Like, again, like, there is --when there's missing data, there's missing data. We don't know what happened in the meantime here.") and 283:3–21 ("Q. Yes. Professor, I'm -- I understand what you're saying. I guess what I'm asking you is to assume that the way that this data point was dealt with was comparing $1,382 to $1,045 and calculating a ratio on that basis. I'm just confirming that you agree that that would be an inappropriate way to deal with the data for Revenue IQ Unit 162390? […] THE WITNESS: Yeah, I don't know exactly how this was dealt with. I think I told you about the missing value and the fact that it would be missing, you know, in the intervening month with no continuation of contract.").

[56] Tucker First Rebuttal Report, ¶¶ 49–50 ("For example, if the data reflect two leases for a given unit, one for a 12-month lease term from January 1, 2022 through December 31, 2022, and another lease term from June 1, 2023 through May 31, 2024, the Marinescu Report's stated methodology would not impute monthly rents for that unit between January 1, 2023 and May 31, 2023. No change in the Yardi Lease Price Index would be calculated for that unit between these two lease terms. However, my examination of the Marinescu Report's computer scripts and backup data from the Marinescu Report reveals that Dr. Marinescu did not follow her stated methodology.").

-24-

**b.**     **The Marinescu Original Report's Discussion of Chain Indexing**

**Does Not Justify the Marinescu Second Report's Revision**

34.     The Marinescu Second Report next claims that the "chain indexing" discussion presented in paragraph 504 of her Original Report supports her new interpretation of her original stated methodology.[57] But referencing "chain indexing" is extraneous to reconciling the methodology stated in her Original Report and the new interpretation advanced in the Marinescu Second Report.[58] The Marinescu Original Report described its YLPI as a chain index because this method allows new housing units to be added to the index as new data points.[59] Paragraph 504 does not address how to treat months for which an existing unit has no observed rent.

35.     In the reference cited by the Marinescu Original Report related to chain indexing, the BLS states that its chained monthly index is constructed "by chaining together indexes of one-month price change."[60] If a monthly index is intended to measure month-to-month rent changes, comparing a rent in July 2025 to a rent observed in June 2016 does not measure a July 2025 one-month price change; it measures a multi-year change and assigns that change to a single month. So the citation itself actually undermines the methodology. Indeed, the Marinescu Original Report itself describes its YLPI as calculating "each unit's change in effective rent relative to the prior month" and constructing the index as the cumulative product of those changes. This new description is inconsistent with her Original Report's methodology, which treated a multi-year gap as a single month-to-month price change.[61]

36.     Other authoritative sources describe chain indexing in the same way. The U.S. Bureau of Economic Analysis defines chain-type indexes as "[q]uantity and price indexes that are

---

[57]  Marinescu Second Report, ¶ 114.
[58]  Marinescu Second Report, ¶ 114.
[59]  Marinescu Original Report, ¶ 504 ("This adopts the 'chain indexing' approach widely used by national statistical agencies to calculate CPI – the appeal of which is that it allows new housing units to enter the 'basket' of goods, which is not possible when taking a fixed base time period.").
[60]  Cage, Robert, et al., "Introducing the Chained Consumer Price Index," U.S. Bureau of Labor Statistics, May 2003, https://www.bls.gov/cpi/additional-resources/chained-cpi-introduction.pdf.
[61]  Marinescu Original Report, ¶¶ 501–503 and Equation 16.

-25-

based on the linking (chaining) of indexes for ***consecutive*** [emphasis added] periods to form time series."[62] The International Labour Organization's *Resolution concerning consumer price indices* likewise describes linking as "joining together two ***consecutive*** [emphasis added] sequences of price observations, or price indices, that overlap in one or more periods, by rescaling one of them so that the value in the overlap period is the same in both sequences, thus combining them into a single continuous series."[63] None of these sources suggests that chain indexing permits or justifies treating a multi-year gap as a single-period price change. The Marinescu Reports have not cited anything to the contrary.

37.     Consistent with these sources, the Marinescu Original Report explains chain indexing as a way of "allowing new housing units to enter" into the index,[64] not a method for treating a missing sequence of monthly rents as though nothing happened between the last observed lease and the next observed lease. The label "chain indexing" does not supply the missing monthly rent values, and it does not justify redefining "*t*-1" to mean whatever rent was last observed, no matter how remote in time. If she wanted to construct an index that imputes rents during vacancy periods, or otherwise treats missing rents as different from missing, that would require an explicit imputation rule and assumptions about the timing and path of rent changes during the gap. Specifying an explicit imputation rule is what the Marinescu Second Report now attempts to do through its purported BLS-style exercise. But that is a new methodology, and not what is described in the Marinescu Original Report or by Dr. Marinescu at her deposition.

38.     In sum, chain indexing is a method for allowing new goods or services – here, rental units – to enter an index, not a method for handling missing data. As such, the Marinescu Second Report's new chain-indexing explanation cannot justify the Marinescu Original Report's original

---

[62]   U.S. Bureau of Economic Analysis, "Glossary: Chain-type indexes," April 25, 2018, https://www.bea.gov/help/glossary/chain-type-indexes.

[63]   International Labour Organization, "Resolution concerning consumer price indices," 2003, https://www.ilo.org/sites/default/files/wcmsp5/groups/public/%40dgreports/%40stat/documents/normativeinstrument/wcms_087521.pdf.

[64]   Marinescu Original Report, ¶ 504.

implementation nor support the causal inferences she draws from the application of her chosen methodology.

### c. The Marinescu Second Report's Claim That Her Intended Methodology Should Be Interpreted from Her Code Rather Than the Methodology Outlined in the Original Report Is Inconsistent with Standards of Academic Integrity as Well as the Code Itself

39.    The Marinescu Second Report next argues that my First Rebuttal Report should have "consulted the code used to construct [her YLPI] rather than speculating based on a possible misreading of [the Marinescu Original Report]."[65] First, this assertion is inconsistent with academic practice whereby peer reviewers and other researchers attempting to replicate an author's findings evaluate a methodology based on the author's description, not their underlying code.[66] A clear and careful description of the methodology is a core principle of reproducibility.[67] Discrepancies between an author's stated methodology and their implementation are often referred to as an "implementation error" or "coding error," because it is assumed that the source of the problem lies

---

[65]    Marinescu Second Report, ¶ 113.

[66]    Elsevier, "What is peer review," https://www.elsevier.com/reviewer/what-is-peer-review ("Reviewers play a pivotal role in scholarly publishing. The peer review system exists to validate academic work, helps to improve the quality of published research, and increases networking possibilities within research communities.").

[67]    Chakravorti, Tatiana, et al., "Reproducibility and replicability in research: What 452 professors think in Universities across the USA and India," *PLOS ONE*, 2025, at p. 14 ("I typically pay extremely close attention to the detail with which the data and analysis are described. When authors are not careful in how they describe what they did, this is a major red flag. Obviously, careful description can mask uncareful data collection, design and analysis, but it is still a signal of credibility that I look to. -respondent from USA, political science.").

-27-

in the author's computer code.[68] Such errors have led papers to be retracted as unreliable.[69] It is because of implementation errors that making available the accompanying computer programs

---

[68] See Econometric Society, "FAQs, Scope of the reproducibility checks," ES Data Editor Website, https://www.econometricsociety.org/publications/es-data-editor-website/FAQs ("[…] coding errors, discrepancies between the code's intended functionality and its actual implementation […]"). See also Davis & Garcés (2010) at p. 119 ("Sharing computer code, discussion of regression specifications, and even the use of data rooms (where confidential data can be seen by the professional economic advisors to merging parties) all help drive up quality and avoid the risk of programming or other mistakes surviving long in an investigation.").

[69] See, for example, Karraker, Amelia and Kenzie Latham, "Authors' Explanation of the Retraction," *Journal of Health and Social Behavior*, Vol. 56, No. 3, 2015, pp. 417–419 at p. 417 ("There is an important error in the coding of the dependent variable (marital status: continuously married, divorced, widowed) that yields a divorce risk estimate (6%) that differs substantially from that (32%) reported in the previously published paper (Karraker and Latham 2015). [….] This error was brought to our attention following queries from Drs. I-Fen Lin and Susan Brown at Bowling Green State University regarding the paper's estimate of the percentage of marriages that ended via divorce. After reviewing the Stata .do file that we supplied to them, Drs. Lin and Brown identified an error in one line of code in which marriages lost to attrition (due to attrition of either spouse) were erroneously coded as divorced."). See also Boissel, Charles and Adrien Matray, "Dividend Taxes and the Allocation of Capital," *American Economic Review*, Vol. 112, No. 9, 2022, pp. 2884–2920, retracted by Adrien Matray & Charles Boissel, "Retraction of 'Dividend Taxes and the Allocation of Capital,'" *American Economic Review*, Vol. 113, No. 7, July 2023, pp. 2053–2054 at p. 2053 ("The errors described in this notice, which are responsible for the retraction, are visible in that code and were brought to the authors' attention by Bach et al. (2023)."); Bach, Laurent, et al., "Dividend Taxes and the Allocation of Capital: Comment," *American Economic Review*, Vol. 113, No. 7, July 2023, pp. 2048–2052 at p. 2048 ("We identify an alteration in the code plotting the event study of the effect of this reform on investment. Using identical data and removing this alteration, we find differential pre-trends between treated and control firms." […] "Removing such controls attenuates differential pre-trends but leaves no clear event study evidence of a positive effect of dividend taxation on investment."); Mandhane, Piush J., "Notice of Retraction: Hahn LM, et al. Post–COVID-19 Condition in Children. JAMA Pediatrics. 2023;177(11):1226–1228," *JAMA Pediatrics*, Vol. 178, No. 10, 2024, pp. 1085–1086 at p. 1085 ("We identified a coding error whereby children with missing symptoms data were coded as having no symptoms." […] "We identified participants with COVID-19 [cases] who were recruited between one and 7.49 years and 14.5 and 19 years of age." "We apologize to the readers and editors of JAMA Pediatrics for these errors."); Herzog, Rubénet al., "A Mechanistic Model of the Neural Entropy Increase Elicited by Psychedelic Drugs," *Scientific Reports*, Vol. 10, Article No. 17725, 2020, retracted by Rubén Herzog et al., "Retraction Note: A Mechanistic Model of the Neural Entropy Increase Elicited by Psychedelic Drugs," *Scientific Reports*, Vol. 12, Article No. 15500, 2022 ("After publication, it was brought to the Author's attention that there was a typo in the script used to calculate the differential entropy. Therefore, the reported entropy estimations are invalid and do not produce the expected increase in entropy when using the neural mass model presented in this Article."); Malley, Sara, et al., "U.S. EPA Enforcement of

-28-

along with their papers is now encouraged for authors.[70] As explained in my First Rebuttal Report, the Marinescu Original Report did not follow her stated methodology as laid out in the computer codes and backup data.[71] Indeed, Dr. Marinescu testified that "the way that my staff processed the data" was that "we only imputed rent as long as it was the same contract."[72] That is the scenario of an implementation error: a methodology is set but the codes implement it incorrectly.

---

Environmental Regulations in Tennessee: 2005–2008," *Society & Natural Resources*, Vol. 25, No. 1, 2012, pp. 87–96, retracted by Taylor & Francis, as reported in Retraction Watch, Jan. 4, 2013 ("It was brought to our attention that a variable was incorrectly coded, voiding the analysis, findings, and conclusions." […] "We had a bunch of zeros that should have been coded ones and the ones should have been coded zeroes.").

[70] See, e.g., Pastrana, Erika, "Supporting open science practices: Why sharing your code matters," *Springer Nature*, July 17, 2025, https://www.springernature.com/gp/researchers/the-researchers-source/open-science-blogpost/open-science-sharing-code/27793060 ("It's an inherent principle that researchers should be able to replicate and build on an authors' published claims (including their own work). Where code or mathematical algorithms have been a central part of the results described in a research article, it's important to make these available in trusted repositories.").

[71] Tucker First Rebuttal Report, ¶ 50 ("However, my examination of the Marinescu Report's computer scripts and backup data from the Marinescu Report reveals that Dr. Marinescu did not follow her stated methodology. Instead, the calculation behind the index shown in the Marinescu Report includes the change in rent for a given month relative to the last recorded rent regardless of the number of months between those two values.").

[72] Marinescu Deposition, pp. 280:13–16 ("My understanding is that the way that my staff processed the data, based on our discussion, is that we only imputed rent as long as it was the same contract."); 281:9–18 ("THE WITNESS: So, as I said, given the procedure that we have discussed, there would be missing data in the middle and, therefore, there would not -- this property would not contribute to the index since it would have missing data, it would not contribute to the index until August of 2025, because that's the first time that we see the rent not changing since it's being propagated from the July 2025 new rent."); 282:3–7 ("THE WITNESS: There is no reason, based on the methodology, to do that. Like, again, like, there is -- when there's missing data, there's missing data. We don't know what happened in the meantime here."); 282:20–283:1 ("THE WITNESS: As I said, you know, it seems to me that, in this situation, there would be missing data for the index for this property. And so, so, you know, it just wouldn't contribute for the intervening, you know, time where we didn't have data for it to impute what the rent was."); 283:16–21 ("THE WITNESS: Yeah, I don't know exactly how this was dealt with. I think I told you about the missing value and the fact that it would be missing, you know, in the intervening month with no continuation of contract."); 284:17–285:1 ("THE WITNESS: I mean, I don't know that's -- you know, as I said, the description indicates that this ratio was not used because there would be missing data in the, in the middle. So, unless, unless there was reason to believe that the contract for some reason continued all the way to June 2025, you know, then there would be missing data and this ratio would not be calculated.").

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND)
REPORT OF IOANA MARINESCU, PH.D.                                    CASE NO.: 2:23-CV-01391-RSL

40.     Second, the exact code that the Marinescu Second Report now claims I should have "consulted" "rather than speculating based on a possible misreading" of the Marinescu Original Report has a comment, consistent with her Original Report and deposition testimony, noting "# calculate changes from previous month by unit" just above its calculation of the individual ratios used in the calculation of the YLPI.[73] However, the calculation just below does not in fact consider the "previous month" when there is a gap. The Marinescu Second Report does not address that its own code referred to the "previous month" or how it thinks I should have interpreted this comment in the code.

41.     In the Marinescu Second Report, this comment in the exact same code in the exact same place in the code file was changed to "# calculate change from previous observation by unit," modifying its earlier use of "previous month."[74] **Figure 2** shows the relevant excerpts of these two codes, both called "yardi_index.R" in the backups to the Marinescu Original Report and Marinescu Second Report, where it is contained in a subfolder labelled "Original" although it is not consistent with the actual original, side-by-side.

**Figure 2**
**Side-by-Side Comparison of the Marinescu Original Report's Code for Calculating Price Changes (Left) and the Marinescu Second Report's Code for Calculating Price Changes (Right)[75]**

```
30  # Compute Yardi index ---------------------------
31
32  # order dataset
33  dr_ext = dr_ext[order(revenue.iq.unit.id,month)]
34- # calculate change from previous month by unit
35  dr_ext[, ratio := monthly.effective.rent/
36       shift(monthly.effective.rent, type = "lag"), revenue.iq.unit.id]
37  # average changes across units by month
38  extagg = dr_ext[,.(chain = mean(ratio,na.rm = T)),.(month)]
39- # take cumulative product of month-on-month changes
40  extagg = extagg[order(month)]
41  extagg[!is.na(chain),index := cumprod(chain)]
42  extagg[, index := index*100]
```

```
30  # Compute Yardi index ---------------------------
31
32  # order dataset
33  dr_ext = dr_ext[order(revenue.iq.unit.id,month)]
34+ # calculate change from previous observation by unit
35  dr_ext[, ratio := monthly.effective.rent/
36       shift(monthly.effective.rent, type = "lag"), revenue.iq.unit.id]
37  # average changes across units by month
38  extagg = dr_ext[,.(chain = mean(ratio,na.rm = T)),.(month)]
39+ # take cumulative product of changes
40  extagg = extagg[order(month)]
41  extagg[!is.na(chain),index := cumprod(chain)]
42  extagg[, index := index*100]
```

---

[73] Marinescu Second Report, ¶ 113 ("Further, if Dr. Tucker was unclear about how the YLPI was constructed, she could have consulted the code used to construct it rather than speculating based on a possible misreading of my report."); Marinescu Original Report Backup, script "yardi_index.R".

[74] Marinescu Second Report Backup, script "yardi_index.R".

[75] Marinescu Original Report Backup, yardi_index.R, lines 30–41; Marinescu Second Report Backup, yardi_index.R, lines 30–41. For readability purposes, line 35 in both codes was split into two lines.

-30-

42.     Therefore, my First Rebuttal Report correctly implemented not only the methodology described in the Marinescu Original Report and at her deposition but also the methodology described in the original code used to construct the YLPI. As shown in the figures and tables of my First Rebuttal Report, correctly implementing the stated methodology overturns the results in the Marinescu Original Report.[76]

43.     Moreover, the Marinescu Second Report claims that her intended methodology should be interpreted from the code in the backup rather than the text or description within the report. That claim is inconsistent with the critique that "some of the 'missing data' [I] remove[] from [her YLPI] can actually occur across gaps shorter than 1 month," which is a direct result of following her own code and data processing decisions as closely as possible apart from correcting implementation errors.[77] The Marinescu Second Report presents examples of gaps in the data between 29 and 31 days, claiming, "[i]n each example, Dr. Tucker coerces the price movement to NA (Not Available) because one calendar month separates the two observations, even though the actual gap is 31 days or less."[78] The Marinescu Second Report's critique ignores two important aspects of the missing rent analyses presented in my First Rebuttal Report: 1) the analysis is based on the Marinescu Original Report's own construction of its YLPI and underlying data; 2) the construction of these data transforms individual lease records into a monthly dataset consisting of over 23 million observations, where every unit-lease combination has a monthly rent observation based on the calendar month in which the lease starts and ends, without accounting for the specific start or end date within that month. As such, by design, the Marinescu Original Report's primary dataset ignores the exact number of days between leases. For example, if a lease ends on the 5th of one month and the next lease does not start until the 20th of the following month, the Marinescu Original Report would not consider a gap of a month between leases, despite the period between leases being more than 31 days. My analyses do the same, as I rely on the Marinescu Original

---

[76]   Tucker First Rebuttal Report, ¶ 31 ("The Marinescu Report's analyses contain grave errors that, once corrected according to her own stated methodology, are not supportive of a conspiracy.").
[77]   Marinescu Second Report, ¶ 122.
[78]   Marinescu Second Report, ¶ 123.

-31-

Report's monthly dataset. Conversely, if a lease ends at the end of January and the next lease starts on the first of March, there will be fewer than 31 days between leases, but the Marinescu Original Report's data construction will consider a gap of a month between those two leases, as do I. As a result of this data processing choice made by the Marinescu Original Report, observations that are less than 31 days apart can be separated by one calendar month. The monthly structure of these data is laid out explicitly in the Marinescu Original Report:

> I "expand" the Lease Data by converting each lease into multiple monthly observations. Specifically, for each lease, I create one row for each month in which the lease is active, from the lease start month to the lease end month (estimated by adding the number of months indicated in the "Lease Term" variable to the "Lease Start Date"). I repeat the relevant lease-level variables for each monthly row. I then restrict the expanded data to observations up to the last available lease date, i.e., August 2025, since no information on new leases is available after that point. I refer to this dataset as the "Expanded Lease Data" throughout the report. [79]

44.    Given this structure, the term "$t$-1," which is applied to estimate rent changes, necessarily refers to the previous calendar month and ignores the exact number of days between observed leases, undermining the Marinescu Second Report's critique that my analysis "removes" price changes as short as 29 days.

45.    In sum, the Marinescu Second Report's assertion that I should have relied on her code rather than the description of her methodology as she originally presented in her Original Report and confirmed in deposition is inconsistent with standard economic practice. In academia, researchers evaluate a methodology based on the author's description of the intended methodology, not their underlying code. When the code does not match the stated description, a paper may be retracted, reflecting the seriousness of such coding errors. The Marinescu Original Report's own code contained a comment noting the calculation was meant to "calculate changes from previous month by unit," but the code did not actually implement that when there was a gap. My approach to correcting the Marinescu Original Report's methodology is consistent with the methodology detailed in that report, the comments found in its underlying code, and her deposition testimony.

---

[79]    Marinescu Original Report, ¶ 595.

-32-

**d.      The Marinescu Second Report's New Methodologies Are**

**Inconsistent with Her Previous Methodology**

46.      The Marinescu Second Report presents new methodologies for handling missing rents that depart from what is stated in the Marinescu Original Report and at her deposition.

47.      The Marinescu Second Report presents the results of "two additional sensitivity analyses" to "evaluate the robustness" of her YLPI calculations.[80] The first analysis "only remove[s] gaps longer than 12 months."[81] The second analysis applies, according to the Marinescu Second Report, a "BLS-style imputation," which involves applying the BLS's "non-response method" to impute missing rent values "when the tenant ID is unchanged before vs after the data gap" and applying the BLS's "vacancy method" to impute missing rent values "[w]hen the tenant ID does change before vs after the data gap."[82] The Marinescu Second Report claims that "[n]one of these sensitivity analyses are conceptually new or represent a different model than my opening report. Instead, I simply reapply the same analysis from my opening report to different cuts of the data."[83] That claim is not accurate. The Marinescu Second Report's analyses represent two new methodologies that are inconsistent with the methodology stated and implemented in the computer codes underlying her Original Report's analysis.

48.      First, the Marinescu Second Report's new "12-month gap" approach treats missing data gaps differently depending on their length: price changes after gaps of less than 12 months are calculated relative to the last observed rent, whereas price changes after gaps of 12 months or longer are treated as missing.[84] **Figure 3** below compares the code underlying the Marinescu Original Report's analysis and the code underlying the Marinescu Second Report's new "12-month gap" analysis. As shown, the Marinescu Original Report's code simply calculates the price change

---

[80]   Marinescu Second Report, ¶ 168.
[81]   Marinescu Second Report, ¶ 168. The Marinescu Second Report is inconsistent as to whether gaps of 12 months are excluded or included under this analysis. For example, it also describes this approach as "excluding gaps of 12 months or longer." Marinescu Second Report, ¶ 25.
[82]   Marinescu Second Report, ¶ 168.
[83]   Marinescu Second Report, ¶ 90.
[84]   Marinescu Second Report, ¶ 168.

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND)
REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

relative to the previous row in the data, which is the last observed rent value for that unit – and which may or may not correspond to the previous month. In comparison, the Marinescu Second Report's code adds new lines of code that apply an "if-else" statement that specifies that "if" the gap between two observations is less than 12 months then the price change is calculated relative to the last observed rent, "else" the price change is set to "NA" or not available.[85] These differences are depicted in **Figure 3** below.

**Figure 3**
**Side-by-Side Comparison of the Marinescu Original Report's Code for Calculating Price Changes (Left) and the Marinescu Second Report's Code for Calculating Price Changes Under the "12-Month Gap" Approach (Right)[86]**

49.      Dr. Marinescu did not distinguish between gaps of different lengths in her Original Report, its backup, or her deposition testimony. Further, nowhere did she justify why 12 months should be the relevant cutoff to consider missing months of data as true gaps. The Marinescu Second Report's methodology for handling gaps of less than 12 months, as I explain in **Section II.B.1.a**, is inconsistent with the methodology explained in the Marinescu Original Report, the notation in its original code, and her deposition testimony.

50.      Second, the Marinescu Second Report's new "BLS-style imputation" approach calculates price changes relative to the previous calendar month by imputing values for all missing months between leases in the data.[87] To implement this approach, the code underlying the

[85] Marinescu Second Report Backup, yardi_index_comp_out_combined.R, lines 60–68. The variable "gap_months" is defined as the number of calendar months between two observations, such that a "gap_months" value of 1 indicates that two observations are consecutive. A "gap_months" value of 12 therefore indicates that two observations are separated by 11 calendar months of missing data.

[86] Marinescu Original Report Backup, yardi_index.R, line 35; Marinescu Second Report Backup, yardi_index_comp_out_combined.R, lines 64–68. For readability purposes, line 35 from the Marinescu Original Report's code (left) was split into two lines.

[87] Marinescu Second Report, ¶¶ 141–142 ("BLS has two methods for this imputation, called 'vacancy imputation' and 'non-interview imputation' […] '[V]acancy imputation' addresses units that are vacant and therefore have no active lease. 'Non-interview imputation' addresses

-34-

Marinescu Second Report includes approximately 200 new lines.[88] **Figure 4** below compares the code underlying the Marinescu Original Report's analysis and the code underlying the Marinescu Second Report's new "BLS-style imputation" analysis, focusing on the portion of the code that performs the imputation. As shown, the BLS-style imputation analysis has many more steps, including separate imputation treatment for units that are considered vacant, or between renters, compared to those for which the renter is the same before and after the period of missing data.

units for which BLS simply has not received information in the current period (also called a "non-response"). BLS applies distinct methods for these different types of missing data, recognizing that failure to include these data gaps can bias the price index."), 168 ("To further evaluate the robustness of this conclusion, I apply two additional sensitivity analyses: First, I use Dr. Tucker's code that removes 1-month gaps in the data, but modify it to only remove gaps longer than 12-months. Second, I apply BLS-style imputation. I split this imputation in two. When the tenant ID is unchanged before vs after the data gap, I use the BLS non-response method. When the tenant ID does change before vs after the data gap, I use the vacancy method."), and Figure 12.

[88] Marinescu Second Report Backup, yardi_index_comp_out_combined.R, lines 77–275.

-35-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

**Figure 4**
**Side-by-Side Comparison of the Marinescu Original Report's Code for Calculating Price Changes (Left) and a Portion of the Marinescu Second Report's Code for Calculating Price Changes Under the "BLS Imputation" Approach (Right)[89]**

```
35-  dr_ext[, ratio := monthly.effective.rent/
36-      shift(monthly.effective.rent, type = "lag"), revenue.iq.unit.id]
```

```
230+  impute_rent <- function(dt, cutoff) {
232+    dt[, imputed.rent := {
234+      p <- monthly.effective.rent
236+      # Derive position within each gap
238+      is_imputed <- imputed_price == TRUE
239+      gap_start <- is_imputed & !shift(is_imputed, fill = FALSE)
240+      gap_pos <- cumsum(gap_start)
241+      pos_in_gap <- rowid(gap_pos) * is_imputed
243+      for (i in seq_along(p)) {
244+        if (is_imputed[i]) {
245+          if (constant_tenant[i] == FALSE) {
246+            # VACANCY IMPUTATION
247+            if (pos_in_gap[i] == 1) {
248+              p[i] <- p[i - 1] * (1+avg_growth_jump[i])
249+            } else {
250+              p[i] <- p[i - 1] * (1+avg_growth_steady[i])
251+            }
252+          } else {
253+            # NONRESPONSE IMPUTATION
254+            p[i] <- p[i - 1] * (1+avg_growth_nr[i])
255+          }
256+        }
257+      }
258+      p
259+    }, by = revenue.iq.unit.id]
260+  }
261+  impute_rent(final_data)
263+  final_data[, monthly.effective.rent := fifelse(!is.na(monthly.effective.rent),
264+    monthly.effective.rent, imputed.rent)]
266+  final_data[order(month), `:=`
267+    (ratio = monthly.effective.rent/shift(monthly.effective.rent),
268+      rent_lag = shift(monthly.effective.rent)), by = revenue.iq.unit.id]
```

51.     This imputation approach effectively creates data that did not exist and were not used in the Marinescu Original Report, which affects the calculated price change for a given unit and the resulting YLPI not only for the first month of the next-observed lease for that unit, but also for all the months in between. Nowhere in the Marinescu Original Report, the backup to that report, or her deposition did she describe imputing missing rent values between observed leases. In fact, in her deposition, she explicitly testified that her methodology did not impute values between leases, explaining that "[m]y understanding is that the way my staff processed the data […] is that we only imputed rent as long as it was the same contract."[90] She further testified that, if there was

---

[89]   Marinescu Original Report Backup, yardi_index.R, lines 35; Marinescu Second Report Backup, yardi_index_comp_out_combined.R, lines 230–266. For readability purposes, line 35 from the Marinescu Original Report's code (left) and lines 263 and 265 from the Marinescu Second Report's code (right) were split into two lines each.

[90]   Marinescu Deposition, p. 280:9–16 ("Q. And then at the end of that, when you get to July 1, 2025, the rent increase is shown as from $1,045 to $1,382. Correct? 13 A. No. My

-36-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                                      CASE NO.: 2:23-CV-01391-RSL

a gap between when one lease ended and the next lease began, a unit "just wouldn't contribute for the intervening […] time where we didn't have data for it to impute what the rent was."[91]

52.     Finally, the Marinescu Second Report repeatedly claims that I "removed 240,194 […] price changes from [her] index." These price changes were, however, removed by implementing the methodology specified in her Original Report and confirmed in her deposition.[92] These 240,194 data points also represent 1.0 percent of the over 23 million observations in her Expanded Lease Data, which are used as the basis for her YLPI.[93] Despite these price changes representing such a small proportion of the data, they have a large effect on her YLPI, as discussed in **Section II.C.3**, which further demonstrates the fragility and unreliability of her YLPI.

53.     In sum, my First Rebuttal Report correctly implemented the methodology as stated in the Marinescu Original Report and as confirmed in her deposition. When correctly implemented, her own stated methodology overturns her original conclusions. The Marinescu Second Report's alternative approaches to handling missing data represent new methodologies. The results of these new analyses further demonstrate that the Marinescu Reports' conclusions are fragile and highly dependent on which assumptions are adopted for handling missing rents, making them unreliable.

**2.     The Marinescu Second Report Ignores that in My Published Research I Ensure that Missing Data Do Not Drive My Results**

54.     The Marinescu Second Report claims that my implementation of her stated methodology for handling missing rents is inconsistent with the approach I have taken in my academic research. Specifically, the Marinescu Second Report claims:

---

understanding is that the way that my staff processed the data, based on our discussion, is that we only imputed rent as long as it was the same contract.").

[91] Marinescu Deposition, pp. 282:8–283:1 ("Q. Okay. But I'm just -- if you assumed, let's say if you assumed that somebody dealt with this issue identified for property 1623904 by treating the entire change from 1,045 to 1,382 as having occurred in one month, that would not be an appropriate methodology. Correct? […] THE WITNESS: As I said, you know, it seems to me that, in this situation, there would be missing data for the index for this property. And so, so, you know, it just wouldn't contribute for the intervening, you know, time where we didn't have data for it to impute what the rent was.").

[92] See, e.g., Marinescu Second Report, ¶ 13.

[93] Tucker First Rebuttal Report, ¶ 54.

-37-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

> But [Yardi's Experts] do not report testing the robustness of their analysis to alternative cleaning methods, despite these cleaning methods removing hundreds of thousands of price movements from their revised YLPI analysis. This lack of thoroughness is at odds with their approach to data cleaning in their published work [….] The methodological pattern is consistent across both [Goldfarb & Tucker (2015) and Goldfarb & Tucker (2011)]: confronted with missing data, Dr. Tucker handled it explicitly, considered whether her chosen treatment could affect the result, and tested sensitivity to alternative specifications. Here, she did not.[94]

55.    These claims are based on a misunderstanding of the methodology in my published papers and the analysis in my First Rebuttal Report, and are incorrect.

56.    In Goldfarb & Tucker (2015) and Goldfarb & Tucker (2011), the sensitivity analyses for missing data showed that the results were robust across multiple different approaches to handling missing data, and were not driven by specific assumptions about missing values. For example, in Goldfarb & Tucker (2015), my coauthor and I tested three different approaches to handling missing values in our control variables for gender, income, and age: 1) we assigned the value of zero to control variables when missing; 2) we added missing data fixed effects; and 3) we omitted the controls entirely.[95] After considering the results for all three approaches, we determined our initial findings to be robust.[96] In contrast, the analyses in my First Rebuttal Report demonstrate that the results of the Marinescu Original Report's analyses change dramatically when her own stated methodology is applied instead of the way her backup computer code was implemented, indicating that the Marinescu Original Report's approach for handling missing rents substantially

---

[94]    Marinescu Second Report, ¶¶ 83, 85.

[95]    Goldfarb, Avi and Catherine Tucker, "Standardization and the Effectiveness of Online Advertising," *Management Science*, Vol. 61, No. 11, 2015, pp. 2707–2719 ("Goldfarb & Tucker (2015)") at p. 2711.

[96]    Goldfarb & Tucker (2015), at p. 2711 ("We use these variables as controls in our regressions, after converting the income and age responses to zero-mean-standardized measures. We assigned a value of 0 to individuals who did not provide income or age data. We do not view the missing data on the demographic controls to be a concern, because the results are robust to a nonparametric specification of the controls that adds missing data fixed effects and to the omission of these controls entirely.").

-38-

affects the calculation of her YLPI.[97] These results demonstrate a lack of robustness to the handling of missing values according to the Marinescu Original Report's own stated methodology, making it unnecessary to test further alternative specifications.[98] Consistent with my approach in my academic research, I "considered whether [Dr. Marinescu's] chosen treatment could affect the result" by "test[ing] sensitivity to alternative specifications" and demonstrated that the results are, in fact, sensitive to assumptions regarding missing values, undermining the reliability of the Marinescu Original Report's conclusions.[99]

57.    The Marinescu Second Report also notes that "Dr. Tucker herself has used imputation to address missing data in her own published work" and attempts to use this fact as justification for her newly introduced imputation methods.[100] That is wrong. The Marinescu Second Report ignores that, as noted in the previous paragraph, imputation by assigning placeholder values to missing observations was only one of several ways in which we handled missing data in Goldfarb & Tucker (2011) and Goldfarb & Tucker (2015). In addition to imputation, we also omitted the affected controls entirely and showed that the results were robust across different approaches for missing values. Further, as the Marinescu Second Report itself notes, I testified that the missing-data issues in the Goldfarb & Tucker papers concerned control variables, not the dependent variable.[101] A control variable is a variable that is used to explain variation in an outcome of

---

[97] Tucker First Rebuttal Report, ¶ 56 ("Adjusting for these two implementation errors in the manner offered by Dr. Marinescu results in a negative relationship between the Yardi Index Premium and Revenue IQ adoption, effectively reversing the Marinescu Report's conclusion that 'the Yardi Index Premium is correlated with the adoption of Yardi by Landlord Defendants, increasing with the number of Landlord Defendant leases.'").

[98] See, for example, Lu, Xun and Halbert White, "Robustness Checks and Robustness Tests in Applied Economics," *Journal of Econometrics*, Vol. 178, No. 1, 2014, pp. 194–206 at pp. 195 ("Robustness is necessary for valid causal inference […]") and 203 ("[T]here is no necessary virtue in proliferating comparison regressions, as a single comparison regression can signal structural misspecification.").

[99] Marinescu Second Report, ¶ 85 ("The methodological pattern is consistent across both papers: confronted with missing data, Dr. Tucker handled it explicitly, considered whether her chosen treatment could affect the result, and tested sensitivity to alternative specifications.").

[100] Marinescu Second Report, ¶ 146.

[101] Deposition of Catherine Tucker, *In re Yardi Revenue Management Antitrust Litigation. McKenna Duffy, individually and on behalf of all others similarly situated v. Yardi Systems,*

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

interest.[102] A dependent variable is the variable measuring the outcome of interest in a regression analysis.[103] When a control variable is missing, the researcher can assign a placeholder value and verify that the treatment coefficient is unaffected. When the outcome, or dependent, variable is missing, as is the case here, there is no analogous check, because the imputed value feeds directly into the estimate the analysis is designed to produce. As described further in **Section II.B.3**, this difference renders imputation less appropriate in the context of constructing her YLPI, and unreliable for the purposes of making causal inferences as she has done.

### 3. The Marinescu Second Report's BLS-Style Imputation Approach Is Flawed and Is Not a Reliable Basis for Causal Inference

58.    The Marinescu Second Report's new purported BLS-style exercise does not merely allocate an observed rent change across time. It fills in unobserved or nonexistent monthly effective-rent values for periods in which no lease is observed by looking to other Landlord Defendant units in the same core-based statistical area (CBSA) with recent changes in occupancy, and then uses those generated values to construct her YLPI and support causal conclusions about Revenue IQ adoption.[104] Filling in missing rents is a consequential methodological choice when attempting to reach causal conclusions, because it depends on model-generated values rather than solely on observed rents. Timing is central to the causal interpretation that higher rents or rent increases are due to the alleged collusion as described in the Marinescu Reports.

59.    Filling in missing values requires making an assumption about when a rent increase (or decrease) across a vacancy is treated as having occurred. The Marinescu Second Report explains that the new approach places the rent jump at the beginning of the vacancy period, while the

---

*Inc., et al.*, No. 2:23-cv-01391-RSL, April 28, 2026 ("Tucker Deposition"), 99:17–25 ("Q. And Columns 3, 4, and 5 of Table 3 each report the results of the analysis under one of the three treatments of the missing demographic data we just walked through? A. Yes. So remember here that we – that the missing data is not to do with the dependent variable as it is in this case. Instead it is when you have got missing data for the control variable."). See also Marinescu Second Report, ¶ 86 ("Dr. Tucker testified at deposition that the missing data in these papers concerned control variables, not the outcome variables her analyses sought to measure.").

[102] See Wooldridge (2016) at pp. 758 and 760.
[103] See Wooldridge (2016) at p. 758.
[104] Marinescu Second Report, ¶ 169 and Figure 17.

-40-

Marinescu Original Report's approach effectively placed the full change at the end of the vacancy period, when the next observed lease begins.[105] Those assumptions are not equivalent in this setting and are both unsupported. The Marinescu Second Report uses the resulting index values to draw causal conclusions about the effect of Yardi's software in allegedly driving rents to supracompetitive levels. However, as demonstrated by the various methodologies stated and implemented in both Marinescu Reports, these guesses produce different results, such that they lack the necessary reliability from which to draw causal conclusions.

60.     The timing problem is clearest in analyses that try to link rent increases to TAM calls.[106] Suppose that a unit is leased at $1,000, then has no observed lease for two months, and then is next observed at $1,200. If a TAM call occurs during the gap, assigning the full $200 increase to the new-lease month may make the increase appear to follow the TAM call. An approach that places the jump at the beginning of the vacancy period may instead make the same increase appear to precede the TAM call. A method that spreads the increase across the gap would imply still another timing and magnitude. The underlying lease data do not reveal which of those paths occurred. They show only the rent before the gap and the rent after the gap. An imputation method that determines the timing of the outcome variable cannot provide a reliable basis for concluding that the timing was caused by the alleged coordination mechanism.

**C.     The Marinescu Second Report's Discussion and Analysis of Outliers Are Misleading**

61.     The Marinescu Second Report claims that its new methodologies for handling outliers confirm her original YLPI findings from the Marinescu Original Report:

> I present a more complete recreation of the YLPI analysis in my opening report across several different outlier cleaning sensitivity analyses. […] I show that (when only removing outliers), TAM oversight is associated with a statistically significant increase in

---

[105] Marinescu Second Report, ¶¶ 168–170 & Figure 17.
[106] Marinescu Original Report, Table 2 and Figures 59–62; Marinescu Second Report, Appendix C.4.1.

-41-

prices above property's pre-existing trend across all sensitivity analyses (including Yardi's Experts' $20 effective rent cleaning).[107]

62.     This claim is misleading. First, my First Rebuttal Report showed that the Marinescu Original Report's YLPI analyses are highly sensitive to outliers and that its approach to outliers is inconsistent with standard practices and her deposition testimony. The new outlier analyses in the Marinescu Second Report do not fix that sensitivity.

### 1.     The Marinescu Reports' YLPI Is Highly Sensitive to Outliers

63.     The analyses in my First Rebuttal Report demonstrate that the Marinescu Original Report's YLPI analyses are sensitive to how outlier prices are treated, which renders her conclusions regarding collusion unreliable.[108] The Marinescu Second Report's assertion that her conclusions "are robust to different outlier exclusion sensitivity analyses, including the cleaning suggested by [me]" is both unsupported and incorrect.[109]

64.     As I demonstrated in my First Rebuttal Report, applying a $20 outlier filter results in different conclusions, demonstrating the lack of reliability of the Marinescu Reports' findings

---

[107] Marinescu Second Report, ¶¶ 224–225.

[108] ABA (2005) at p. 169 ("A critical part of damage model estimation and testing is showing that the results do not substantively change with reasonable alternative choices of specification or of data used to estimate the model. […] A result which is not robust can in some ways be worse than no result at all, for it has a high potential to be misleading."); Studenmund (2017) at p. 174 ("**Sensitivity analysis** consists of purposely running a number of alternative specifications to determine whether particular results are robust (not statistical flukes)" . . . "researchers who use sensitivity analysis run (and report on) a number of different reasonable specifications and tend to discount a result that appears significant in some specifications and insignificant in others.") (emphasis in original); Wooldridge (2016) at p. 296 ("[I]f the estimates change by a practically large amount when we slightly modify our sample, we should be concerned." and "OLS results should probably be reported with and without outlying observations in cases where one or several data points substantially change the results."); Stock & Watson (2011) at p. 125 ("Large outliers can make OLS regression results misleading."); Davis & Garcés (2010) at p. 118 ("If an analyst decides to keep extreme values in the sample, it is better to show that those values are not drastically affecting the regression estimates. If the regression is affected by the inclusion of the extreme values, the analyst must be ready to argue why it makes sense to give weight to these observations."); Verardi, Vincenzo and Christophe Croux, "Robust Regression in Stata," *The Stata Journal*, Vol. 9, No. 3, 2009, pp. 439–453 ("Verardi & Croux (2009)") at p. 439 ("In regression analysis, the presence of outliers in the dataset can strongly distort the classical least-squares estimator and lead to unreliable results.").

[109] Marinescu Second Report, ¶ 205.

-42-

regarding her YLPI.[110] Removing these 108 leases, representing 1,096 monthly observations, or just 0.005 percent of total monthly observations in the expanded lease data, substantially reduces the magnitude of the estimated effect of Landlord Defendants' adoption of Revenue IQ on the Yardi Index Premium.[111] For Model 1, the magnitude is reduced by about 60 percent, from 0.925 to 0.366.[112] The fact that such a small fraction of the data can produce a 60 percent reduction in the estimated coefficient demonstrates that the Marinescu Original Report's results depend on a limited proportion of extreme observations rather than on a robust pattern in the data, a concern because "the presence of outliers in the dataset can strongly distort the classical least-squares estimator and lead to unreliable results."[113]

65.     As described in my First Rebuttal Report, the reason that very low effective rent values can have such a disproportionate impact on her YLPI is mathematical.[114] The Marinescu Original Report's YLPI is calculated based on the ratio of a unit's rent in month $t$ to its rent in month $t$-1 as discussed in **Section II.B.1**.[115] When the denominator of that ratio is a very small number – for example, an effective rent of $0.40 – any subsequent reasonable rent for that unit produces a large ratio. Revenue IQ Unit ID 8692688, for example, is associated with a lease starting

---

[110] Tucker First Rebuttal Report, ¶¶ 39–41. The 0.005 percent of lease observations was calculated as 108 leases with positive rents less than or equal to $20 divided by 2,153,893 leases with positive rents used in the Marinescu Original Report's analysis. See Tucker First Rebuttal Report Backup Materials.

[111] The 0.005 percent of lease-month observations was calculated as 1,096 leases with positive rents less than or equal to $20 divided by 23,302,150 lease-month observations with positive rents used in the Marinescu Original Report's analysis. See Tucker First Rebuttal Report Backup Materials.

[112] Tucker First Rebuttal Report, Table 1.A; Calculated as $(0.366 \div 0.925) - 1 = -60.4\%$. See also Tucker First Rebuttal Report, Table D1.A.

[113] Verardi & Croux (2009) at p. 439, ("In regression analysis, the presence of outliers in the dataset can strongly distort the classical least-squares estimator and lead to unreliable results."). See also footnote 109.

[114] Tucker First Rebuttal Report, ¶ 39 ("Extremely low rent values have a substantial impact on the Marinescu Report's calculated Yardi Lease Price Index because the index is calculated based on the change in effective rent relative to the effective rent for that unit in the prior month.").

[115] Tucker First Rebuttal Report, ¶ 39; Marinescu Original Report, ¶¶ 497–501 (describing YLPI methodology as the cumulative product of rent changes for each unit).

-43-

in April 2019 with a monthly effective rent of $0.40, which Dr. Marinescu testified "seems very low" and would be a "rare event."[116] The next observed lease for that unit is associated with a monthly effective rent of $1,241.54, representing more than a 300,000 percent increase relative to the prior rent value and contributing to a large jump in the calculated YLPI in the month in which the price change occurs.[117] Unlike what Dr. Marinescu claimed in her deposition,[118] very small outlier values are not offset by very large outlier values in this context, because her YLPI is a ratio-based measure. A $0.40 rent followed by a $1,241.54 rent creates a ratio exceeding 3,000; an unusually high rent followed by an unusually low rent creates a ratio of less than 1 but is bounded below by zero. The asymmetric effect of extremely low values on the ratio means that the influence of low outliers far exceeds the influence of high outliers in a ratio-based index such as the Marinescu Reports' YLPI.

66.     The influence of these extremely low values is readily observable in the Marinescu Original Report's charts comparing its YLPI to the BLS Rent CPI. For example, Figure 4 of the Marinescu Original Report, copied below as **Figure 5.A**, shows two nearly vertical lines around May 2020 and August 2024. These patterns signal large changes in the underlying data that merit investigation.

---

[116] Tucker First Rebuttal Report, ¶ 39 ("Extremely low rent values have a substantial impact on the Marinescu Report's calculated Yardi Lease Price Index because the index is calculated based on the change in effective rent relative to the effective rent for that unit in the prior month."); Marinescu Deposition, p. 255:4-13 ("Q. And you don't actually have reason to believe that this unit actually rented for 40 cents in April '19. Do you? […] THE WITNESS: Similarly to the prior example, the same idea applies. This seems very low and, therefore, it would be, I would think, a rare event.").

[117] Tucker First Rebuttal Report, ¶ 39; Calculated as ($1,241.54 ÷ $0.40) – 1 = 310,285%.

[118] Marinescu Deposition, pp. 253:11–254:9 ("Q. Even if you used a ratio, wouldn't there still be an asymmetry between the possibility of such a large increased ratio being measured versus a decreased ratio? […] THE WITNESS. So, assuming I used a ratio, you know, hypothetically, again, not looking at the data, if it's a ratio, then, you know, you could see, if you take the inverse or the ratio, et cetera, it could also be very influential, so, you know. And, also, I would like to add that it depends on how many occurrences there might be of the large increases versus large, potentially, you know, rare decreases. So, really, to get to the bottom of this, one would have to, you know, examine the sensitivity of the analysis to this alternative, you know, exclusions of certain points and, you know, that's something that, you know, probably would be useful to do.").

-44-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

**Figure 5.A**
**Copy of Marinescu Original Report Figure 62 Entitled "Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing"[119]**



67.    As I described in my First Rebuttal Report, the underlying YLPI data show that these large spikes are driven primarily by just two observations: Revenue IQ Unit ID 8692688 (Property ID 697697) with a monthly effective rent of $0.40 ending May 2020 and a subsequent lease with a monthly effective rent of $1,241.54 in June 2020 (a 300,000 percent increase), and Revenue IQ Unit ID 38687674 (Property ID 1910051) with a monthly effective rent of $1.00 ending August 2024 and a subsequent lease with a monthly effective rent of $2,554.58 in September 2024 (a 255,000 percent increase).[120] As I explained in my deposition, these influential records can be individually identified in the Marinescu Original Report Figure 99,[121] copied below as **Figure 5.B**. The Marinescu Original Report Figure 99 uses a non-linear scale, which obfuscates the extent to which a small number of units have price changes that deviate from the median unit. To more

---

[119]  Marinescu Original Report, Figure 62. Text box, arrows, and highlighting added for clarity.
[120]  Tucker First Rebuttal Report, ¶ 45.
[121]  Tucker Deposition, 65:21-66:1 ("In my opinion, these are three grievous errors. They -- you only have to look at Figure 99 of her report to realize that they are truly leading to outlandish mistakes in her data work, and that once I correct them, her results disappear.") and 121:19-25 ("But if you're asking me was it my decision to try and deal with some of the obvious[…] issues, which you can see if you look at Figure 99 of her report. Yes, looking at Figure 99 of her report, it was clear there were grievous data errors, and it was my decision to tackle them.").

-45-

accurately represent the true influence of these few records, I present a second panel with a version of the Marinescu Original Report Figure 99 using a linear y-axis scale instead. This figure shows two nearly vertical lines after the first TAM call, stretching the y-axis scale and reflecting her YLPI values from between 100 and 200, where the vast majority of unit YLPI values reside, to over 3,000.

-46-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND)
REPORT OF IOANA MARINESCU, PH.D.                                    CASE NO.: 2:23-CV-01391-RSL

**Figure 5.B**
**Copy of Marinescu Original Report Figure 99 Entitled "Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing"[122]**

**Original**



**Linear Y-Axis Scale**



68.     The relative impact of just the outlier observations with prices less than or equal to $20 on the Marinescu Original Report's analyses is revealed in my First Rebuttal Report Figure

-47-

3.A and the Marinescu Second Report Figure 34, copied below as **Figure 5.C**. This figure shows that her YLPI shrinks dramatically after removing these outliers, from a high of nearly 250 to 180. Further, the large changes in June 2020 and September 2024 are compressed, and the gap between her YLPI and the BLS Rent CPI reduces substantially.

**Figure 5.C**

**Copy of Marinescu Second Report Figure 34 Entitled "<= $20 Effective Rent Filter: Revised Figure 62 of My Opening Report: Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing"[123]**



69.     The sensitivity of her YLPI to a tiny fraction of extreme rent values further demonstrates that the Marinescu Original Report's conclusions are not robust. Indeed, both Marinescu Reports' results are fragile and should not be viewed as a reliable basis for determining the impact of Revenue IQ adoption either alone or in combination with TAM calls on rental prices.

70.     Sensitivity to extreme values is an issue that the BLS methodology for constructing the nationwide Rent CPI is designed to mitigate. Unlike the Marinescu Original Report's methodology for constructing her YLPI, which calculates the month-to-month ratios of rents for

---

[122]  Marinescu Original Report, Figure 99 and Backup Materials (YARDI-DUFFY_00913149; U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]", March 11, 2026, https://fred.stlouisfed.org/series/CUSR0000SEHA).

[123]  Marinescu Second Report, Figure 34.

-48-

each unit and then averages those ratios, the BLS calculates rent changes first by calculating average rents for a given month, and then calculating the month-to-month ratio.[124] This distinction in the order of operations is important because aggregating rents before calculating the rent ratio reduces the effect of extreme rent observations on the index. By averaging unit-level rent ratios instead, the Marinescu Original Report's methodology is vulnerable to extreme rent changes. For this reason, economists recommend against using this methodology for constructing indices, referred to as a "Carli" index or formula.[125]

71.    To illustrate this point, suppose three units are observed in two consecutive months. The rent of Unit 1 increases from $2,000 to $2,200, the rent of Unit 2 stays constant at $2,000, and the rent of Unit 3 increases from $20 to $3,000. The BLS methodology would entail first calculating the average rents in both periods, that is $1,340 and $2,400. It would then calculate the ratio of those average rents, that is, approximately 1.8 or 80 percent rent growth. Dr. Marinescu's methodology for constructing her YLPI would entail calculating the rent ratios at the unit level first, that is, 1.1, 1, and 150. It would then calculate the average, that is 50.7 or 4,970 percent rent growth. The large discrepancy between the two methods demonstrates that the Marinescu Reports' methodology is highly sensitive to extreme rent changes.

72.    The Marinescu Reports' YLPI also represents a substantial departure from the BLS's Rent CPI in terms of data requirements and index construction. The Rent CPI is constructed from a structured housing survey sample and incorporates sampling weights and unit-level quality adjustments.[126] The Marinescu Reports' YLPI does not replicate that methodology. Instead, her YLPI is constructed from an unbalanced lease-level dataset limited to Landlord Defendant

[124] See U.S. Bureau of Labor Statistics, "Measuring Price Change in the CPI: Rent and Rental Equivalence," February 13, 2026, https://www.bls.gov/cpi/factsheets/owners-equivalent-rent-and-rent.htm.

[125] See, e.g., International Monetary Fund, *Consumer Price Index Manual: Concepts and Methods,* 2020, at p. 178 ("the Carli index [is] defined as the unweighted arithmetic mean of the price relatives, or price ratios. […] The chained Carli should be avoided because it has a known, and potentially substantial, upward bias.").

[126] See U.S. Bureau of Labor Statistics, "Measuring Price Change in the CPI: Rent and Rental Equivalence," February 13, 2026, https://www.bls.gov/cpi/factsheets/owners-equivalent-rent-and-rent.htm.

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND)
REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

properties and does not incorporate the BLS's sampling-weight framework or unit-level quality adjustments.

73.     The Marinescu Second Report's reliance on the BLS is selective, adopting certain BLS methods while ignoring others. In the Marinescu Second Report, BLS-related methods are introduced to address the sensitivity of results to the treatment of outliers and missing rent values. The Marinescu Second Report explores the "BLS Outlier Capping" approach to handling outliers, which caps "extreme monthly rent changes at no less than -95% and no more than 2000%."[127] However, the Marinescu Second Report adopts a different methodology than the BLS for constructing the index itself. As a result, even under BLS's approach to handling outliers and missing rent values, the Marinescu Reports' YLPI remains sensitive to extreme rent values, as it relies on unit-level ratios that can imply a monthly growth rate of up to 2,000 percent. This sensitivity to extreme values is the very problem the BLS's methodology for constructing an index is designed to mitigate.

**2.      The Marinescu Reports' Approach to Outliers Is Inconsistent with Standard Practices and Her Deposition Testimony**

74.     Economists routinely test the sensitivity of regression results and other economic analyses to outliers and influential observations. Such tests are important when drawing causal inferences, because even valid observations with extreme values can exert disproportionate influence on estimated coefficients, potentially causing results to reflect a small number of atypical observations rather than the underlying relationship in the data.[128] Evaluating the effect of outliers is intended not only to catch data errors, but also to ensure that the estimated average effect is not

---

[127] Marinescu Second Report, ¶ 465 ("[The BLS Outlier Capping] method consists of capping extreme monthly rent changes at no less than -95% and no more than 2000%.").

[128] Wooldridge (2016) at p. 296 ("OLS results should probably be reported with and without outlying observations in cases where one or several data points substantially change the results.").

driven by extreme values, even if those values are accurate. Indeed, economists agree that causal inferences should generally not depend heavily on a small number of observations.[129]

75.    The Marinescu Second Report recognizes that the treatment of outliers requires careful consideration.[130] In general, researchers must examine and report whether their findings are robust to outlier observations. These commonly accepted practices are supported by the materials the Marinescu Second Report purported to rely upon. For example, in describing "Outlier Handling Techniques," Aguinis et al. (2013) list "[r]eporting substantive results with and without the outliers—which also includes providing an explanation for any difference in the results."[131] The paper also states that a first step when evaluating model fit outliers in regression analyses is to identify "via multiple construct techniques but not deemed error or interesting outliers […] are potential model fit outliers" and the final step is to "[r]eport findings with and without either of the following approaches: Respecify model, Remove outlier, Robust approaches."[132] Indeed, the econometric literature clearly establishes that regression analyses, such as those conducted by Dr. Marinescu, are "susceptible to outlying observations" and "[i]f estimates change by a practically large amount when we slightly modify our sample, we should be concerned."[133] Outlier filters do not have to completely reverse one's findings to raise issues of reliability. A large change in estimated magnitude is itself informative about the stability of the underlying relationship, because

---

[129] Dehon, Catherine, et al., "Beware of '"Good' Outliers and Overoptimistic Conclusions," *Oxford Bulletin of Economics and Statistics*, 2009, pp. 437–452 ("The main goal of this paper is to warn practitioners of the danger of neglecting outliers in regression analysis . . . ." and "their effect on inference is far from negligible."); Verardi & Croux (2009) at p. 439 ("In regression analysis, the presence of outliers in the dataset can strongly distort the classical least-squares estimator and lead to unreliable results."); Aguinis, Herman, et al., "Best-Practice Recommendations for Defining, Identifying, and Handling Outliers," Organizational Research Methods, Vol. 16, No. 2, April 2013, pp. 270–301. ("Aguinis et al. (2013)") at p. 297 ("Outliers, or observations that deviate markedly from the rest, often cause important changes in substantive conclusions.") and p. 272 (outlier treatment "can lead us to false acceptance or rejection of hypotheses").

[130] Marinescu Second Report, ¶ 74 ("Generally, significant changes to data cleaning (including the treatment of extreme values or missing data) are capable of significantly changing results coming from the data.").

[131] Aguinis et al. (2013), Table 3.

[132] Aguinis et al. (2013), Figure 2.

[133] Wooldridge (2016) at p. 296.

-51-

it signals that the result depends heavily on a small subset of observations rather than reflecting a broad, consistent pattern in the data.[134]

76.    Dr. Marinescu's deposition testimony confirms the importance of applying outlier cleaning to the fields relevant to a given analysis. Dr. Marinescu acknowledged that outliers can skew averages, testifying that "[o]utliers would affect averages because they tend to skew the average wherever; if it's a negative one, it will make it look smaller, if it's a positive one, it will make it like look bigger otherwise without that outlier."[135] She further acknowledged that outlier values "can also affect the magnitude of reported estimates" and that "for ordinary least square regressions, usually outliers will have some influence on the results."[136] She further agreed that sensitivity checks are one way to test whether results are being driven by implausible values and that examining minimum and maximum values through summary statistics is "a typical way to go

[134]  Davis & Garcés (2010) at p. 118 ("If an analyst decides to keep extreme values in the sample, it is better to show that those values are not drastically affecting the regression estimates. If the regression is affected by the inclusion of the extreme values, the analyst must be ready to argue why it makes sense to give weight to these observations. […] Since the regression on the whole sample gives us an average of the effect over the sample population, we want to make sure that this average is representative of the effect and is not the average of widely different magnitudes. If excluding a group (such as a country or a firm) or a time period drastically affects the results, this fact should be reported. Particularly, this type of robustness check will help detect whether the results are driven by one small part of the sample as opposed to by the whole sample."); Kennedy (2008) at p. 346 ("a large error when squared becomes very large, so when minimizing the sum of squared errors OLS gives a high weight to this observation, causing the OLS estimating line to swing towards this observation" . . . "The rationale for looking for outliers is that they may have a strong influence on the estimates produced by OLS, an influence that may not be desirable."); Stock & Watson (2011) at p. 125 ("Large outliers can make OLS regression results misleading.").

[135]  Marinescu Deposition, p. 13:12–21 ("Q. And when you say that outliers can influence the results of analysis, would that include affecting averages that are calculated in the analysis? A. Outliers would affect averages because they tend to skew the average wherever; if it's a negative one, it will make it look smaller, if it's a positive one, it will make it like look bigger otherwise without that outlier.").

[136]  Marinescu Deposition, pp. 14:18–15:5 ("Q. And outlier valuables that -- outlier values that are not removed during data cleaning can also affect the magnitude of reported estimates. Is that right? A. The outliers can affect estimates, depending on how we do the estimation, because there are certain types of estimation, like logit, et cetera, where it's less problematic. So, it really depends on what sort of; but for ordinary least square regressions, usually outliers will have some influence on the results.").

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                                CASE NO.: 2:23-CV-01391-RSL

about" assessing data quality, acknowledging that examining "what would happen without these observations" is part of the "regular process."[137]

77.    The Marinescu Original Report failed to adhere to standard practices economists rely on to obtain reliable results by evaluating and reporting whether its results were sensitive to extreme prices. The Marinescu Original Report applied a single price condition to the variable that is used to calculate its YLPI, restricting the data to only positive values of monthly effective rent.[138] The Marinescu Original Report did not provide any discussion of the distribution of effective rents,[139] nor did it consider other potentially "implausible" values for effective rents. However, in a different analysis, the Marinescu Original Report applied an alternative outlier filter of values between $20 and $100,000 for "recommended" rents, on the basis that these values were "implausibly low or high."[140] The Marinescu Original Report did not explain why a $20 rent constitutes an "implausible" recommended rent, but a plausible effective rent.

---

[137] Marinescu Deposition, pp. 15:20-16:8 ("Q. Okay. Because of these data cleaning issues we've just been talking about with outliers, am I correct that it's common practice to remove outliers from data? A. That's something that can be done, but, again, there is some judgment that is involved in terms of whether something is an outlier or is an interesting observation point that is just different from others. But, you know, certainly often it's part of the -- what would happen without these observations, what would happen with these observations, part of the, you know, regular process that you might want to do."); 17:13–18:17 (Q. Am I right that sensitivity checks are one way to test whether a result is being driven by implausible or outlier values? A. Again, depending on the analysis at hand, you would do appropriate sensitivity checks for, you know, that type of analysis, which can differ a little bit depending on what analysis you're running. Q. Is one way to identify outliers and missing observations to closely examine the data? A. Well, it depends what you mean with examine. We run, we run things like summary statistics and, you know, that would give you the minimum, the maximum, you know, median average and things like that. So, that's, that's, you know, a typical way to go about it. Q. And is another way to go about that to use plots to review the data? A. Plots would also be a tool of the trade. Q. And you mentioned summary statistics. Would that involve looking at the top and bottom values within the data? A. Minimum and maximum, yes."); 18:1–5 ("that would give you the minimum, the maximum, you know, median average and things like that. So, that's, that's, you know, a typical way to go about it.").

[138] Marinescu Original Report, footnote 268.

[139] Table 13 of the Marinescu Original Report provides some summary statistics of variables in the underlying lease transaction data; however, this table is not referenced in the body of the report or the appendices.

[140] Marinescu Original Report, footnote 268.

-53-

78.    The Marinescu Second Report now claims that this differential treatment between these two fields is justified because effective rent and recommended rent "are different inputs serving different purposes," and while "[a] $20 recommended rent on a unit leasing at an effective rent of $1,950 appears to be an error […] [a] $20 effective rent, by contrast, can reflect a real transaction in which a landlord offered a substantial concession against a normal gross rent."[141] Examining the distribution of rents can confirm whether these effective rents are extreme, and reliable economic practices dictate that researchers explore and report the degree to which their results are sensitive to such values.[142] Neither of the Marinescu Reports presents any discussion of rent distributions to examine whether these values are extreme. Further, Dr. Marinescu confirmed at deposition that she had not investigated the specific extreme rent observations identified in Exhibit 6 or examined how excluding those observations would affect the YLPI analyses.[143] As

[141] Marinescu Second Report, ¶ 180.
[142] Wooldridge (2016) at p. 613 ("Good papers in the empirical social sciences contain **sensitivity analysis**. Broadly, this means you estimate your original model and modify it in ways that seem reasonable. Hopefully, the important conclusions do not change.") (emphasis in original); Davis & Garcés (2010) at p. 118 ("If the results are not robust to particular departures from the favored model presented, then good practice means that that fact should be reported in the description of the results.") and p. 119 ("It is good practice to carefully study the raw data to detect outliers; to evaluate correlations between the explanatory variables; to assess the extent of relevant variation in the explanatory variables; and to examine any relationships that emerge between the error term and the explanatory variables."); Kennedy (2008) at p. 76 ("Bounds on the range of results corresponding to different reasonable specifications should be reported (a 'sensitivity' analysis), rather than just providing the results of the specification eventually adopted, and the path taken to the selection of this specification should be fully reported.") at p. 366 ("it is important to check if the empirical results are sensitive to the assumptions upon which the estimation has been based. This is the purpose of a 'sensitivity analysis,' indicating to what extent the substantive results of the research are affected by adopting different specifications about which reasonable people might disagree."), and p. 367 ("When reporting a sensitivity analysis, researchers should explain fully their specification search so that readers can judge for themselves how the results may have been affected."); National Academies of Sciences, Engineering, and Medicine & Federal Judicial Center, *Reference Manual on Scientific Evidence: Fourth Edition*, National Academies Press, 2025 at p. 604 ("Robustness checks are applied once a model specification has been selected. The expert applies these checks to report the sensitivity of the reported results to alternative specifications.").
[143] Marinescu Deposition, pp. 249:22–250:10 ("Q. So, when you performed your data analysis that led to your report, including the Yardi price index, what did you do to investigate what was behind this $1 effective rent figure? […] THE WITNESS: I don't recall specifically

-54-
DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                                    CASE NO.: 2:23-CV-01391-RSL

explained above in **Section II.C.1**, my First Rebuttal Report demonstrated that, regardless of whether these values represent "real transactions" or data errors, they exert disproportionate influence on her YLPI analyses and make the Marinescu Reports' conclusions on the effects of Revenue IQ unreliable as they are driven by only 108 leases, or 0.005 percent of lease observations.[144]

### 3.    The Marinescu Second Report's New Outlier Analyses Do Not Negate the Sensitivity of Her Findings to Outliers

79.    The Marinescu Second Report introduces new outlier analyses that were not conducted in her Original Report. These new analyses, combined with the analyses in her Original Report and my First Rebuttal Report, demonstrate that the treatment of outliers has a sizable impact on results.[145] For example, Table 29 of the Marinescu Second Report, which applies the BLS "outlier capping" methodology, shows that different outlier treatments produce substantially different estimated coefficients, including estimates that are not statistically significant, confirming that her conclusion that "TAM calls are associated with a statistically significant trend break in subject property's pricing" is unreliable.[146]

---

investigating this specific data point."); 254:4–14 ("to get to the bottom of this, one would have to, you know, examine the sensitivity of the analysis to this alternative, you know, exclusions of certain points" and "Q. But it's not something that you investigated as part of preparing your report. Correct? A. Not in these ones."); 256:12–18 ("Q. As part of preparing your report, you did not investigate what was behind this 40 cents per month rental entry in the data you relied on. Correct? A. I did not look at this specific unit."); 266:4–10 ("Q. Okay. But whatever was done did not identify the data points that we've been discussing in Deposition Exhibit 6. Correct? A. We have not -- I have not investigated this particular -- these particular properties."); 289:25–290:11 ("Q. All right. But the impact of outliers on this Figure 89 is not something that you investigated as part of preparing your report. Correct? […] THE WITNESS: I have -- we already established that I have not looked at those specific, you know, observations in, like, Exhibit 6, for example.").

[144] Tucker First Rebuttal Report, ¶ 41.

[145] See, e.g., Tucker First Rebuttal Report, ¶ 42 ("As the figure shows, removing these outliers substantially reduces the Yardi Lease Price Index, and the difference in rental price growth is either negligible or much smaller than in the Marinescu Report's original analysis").

[146] Marinescu Second Report, Table 29; Marinescu Second Report, ¶ 465 (describing BLS capping methodology of capping extreme monthly rent changes at no less than –95% and no more than 2000%); Marinescu Original Report, ¶ 390.

80.   The reliability of a regression depends on both the statistical significance and the magnitude of its estimates. The headline finding from the TAM analysis in the Marinescu Original Report, looking at specification (12) in Table 2, is that the upward time trend in Landlord Defendants' effective rents:

> increased by a statistically significant 1.13% per month compared to their pre-call trend.[147]

81.   As the Marinescu Original Report claims, this change translates to roughly $20–$30 more per month for an apartment renting at $2,500.[148] Under the BLS's outlier capping, however, the same coefficient in specification (12) of the Marinescu Second Report Table 29 drops to 0.434 percent, a reduction of approximately 62 percent, which would imply about an $11 rent increase per month for the same apartment.[149] The fragility of the Marinescu Original Report's findings is even more pronounced when considering specification (13), which controls for Rent CPI. The coefficient of 0.939 reported in the Marinescu Original Report reverses sign and becomes -0.060 under the BLS's outlier capping and is no longer statistically significant.[150] These comparisons are presented in **Table 2**.

---

[147]   Marinescu Original Report, ¶ 390.

[148]   Marinescu Original Report, ¶¶ 390–391. Dr. Marinescu explains that "for an apartment renting at $2,500 per month, a 0.94%–1.13% faster monthly growth rate corresponds to roughly $20–$30 more per month ($280–$340 per year) within a year than would have occurred absent the trend break."

[149]   Calculated as (0.434 ÷ 1.131) – 1 = –61.6% and $2,500 × 0.434% = $10.85. See Marinescu Second Report, Table 29, specification (12).

[150]   Marinescu Original Report, Table 2, specification (13) (coefficient of 0.939); Marinescu Second Report, Table 29, specification (13) (coefficient of –0.060, not statistically significant).

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND)
REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

**Table 2**
**Comparison Between Marinescu Original Report's Table 2 Estimates and Marinescu Second Report's Table 29 BLS Outlier Capping Estimates[151]**

| | Property-Level Price Index | | | |
| | (12) | | (13) | |
| | Original | BLS Outlier Capping | Original | BLS Outlier Capping |
|---|---|---|---|---|
| After First TAM Call × Months From First Call | 1.131*** | 0.434*** | 0.939*** | -0.060 |
| | (0.331) | (0.096) | (0.340) | (0.067) |
| Number of Observations | 10,434 | 10,434 | 10,434 | 10,434 |
| R2 | 0.347 | 0.576 | 0.347 | 0.578 |
| R2 Adjusted | 0.338 | 0.570 | 0.338 | 0.573 |
| Rent CPI | | | Yes | Yes |
| Fixed Effects | Property | Property | Property | Property |
| Standard Errors | Newey-West (L=3) | Newey-West (L=3) | Newey-West (L=3) | Newey-West (L=3) |

**Notes:**
[1] The sample consists of 184 properties identified in the Yardi lease data between April 2011 and August 2025 that were flagged in Mr. Fazio's TAM call notes as priced below benchmark. The Marinescu Original Report sample is filtered to only keep leases with positive monthly effective rents.
[2] Dr. Marinescu's BLS Outlier Capping methodology caps extreme monthly rent changes at no less than -95% and no more than 2000%, resulting in 371 observations being capped.

82.    A finding that reverses sign from positive to negative and loses statistical significance under a BLS-endorsed methodology for treating outliers cannot be characterized as robust; it is unreliable. The analysis in the Marinescu Second Report shows that the TAM-oversight conclusions depend on how extreme observations are handled, and therefore means that both her methods and conclusions are unreliable.

83.    The Marinescu Second Report claims, "When further controlling for Rent CPI, [the TAM oversight] effect remains statistically significant in 9 of 12 regressions" reported in its Appendix C with revised versions of Table 2 of the Marinescu Original Report.[152] First, the lack of statistical significance in a quarter of the regressions suggests a lack of robustness of the results. Second, this statistic is misleading, as it inflates the number of new methodologies wrongly described as "sensitivities" without considering which are reasonable by counting specifications that do not control for the Rent CPI. The only specification in Table 2 of the Marinescu Original

---

[151] Marinescu Original Report, Table 2, Marinescu Second Report, Table 29, and Backup Materials (YARDI-DUFFY_00913149; U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]," March 11, 2026, https://fred.stlouisfed.org/series/CUSR0000SEHA).
[152] Marinescu Second Report, ¶ 225.

Report that controls for Rent CPI is specification (13). The Marinescu Second Report presents four versions of the original Table 2 specification (13), and only one of the four of these regressions shows a positive and statistically significant coefficient on the variable of interest, therefore reflecting the lack of robustness of her results.[153] As recognized in the Marinescu Original Report, including Rent CPI in those regressions is important to control for time trends.[154]

84.    The Marinescu Second Report's sensitivity tests are misleading because several of them apply outlier cleaning to variables other than effective rent, such as recommended rent or gross rent, which are not variables used in its YLPI calculation.[155] A sensitivity analysis is informative only if it tests a reasonable alternative treatment of the data actually used in the analysis.[156] This is why researchers, including myself and Dr. Marinescu in her published work, typically focus on the fields used in an analysis when evaluating outliers, and do not drop

---

[153] See Marinescu Second Report, Table 16 ($20 effective rent filter) reporting a coefficient of -0.054 for the variable "After First TAM Call X Months From First Call;" Marinescu Second Report, Table 21 ($20 and $100,000 recommended rent filter) reporting a statistically significant coefficient of 0.945 for the variable "After First TAM Call X Months From First Call;" Marinescu Second Report, Table 24 ($20 gross rent filter) reporting a coefficient of 0.164 for the variable "After First TAM Call X Months From First Call;" Marinescu Second Report, Table 29 ($20 and $100,000 recommended rent filter) reporting a coefficient of -0.060 for the variable "After First TAM Call X Months From First Call."

[154] Marinescu Original Report, ¶ 546.

[155] Marinescu Second Report, ¶¶ 221–223, Figure 21, Appendix C.2 (recommended rent filter) and Appendix C.3 (gross rent filter).

[156] See Davis & Garcés (2010) at p. 255 ("Results should not be crucially dependent on the exact composition of the sample, except perhaps in deliberate or well-understood ways. They should also not depend on a particular way of measuring the explanatory variables unless we know for sure that it is exactly the correct way to measure them. In general, good results are robust and show up to a higher or lesser extent across many sensible regression specifications."). See also Kennedy (2008) at p. 366 (defining sensitivity analysis as testing "to what extent the substantive results of the research are affected by adopting different specifications about which reasonable people might disagree," such as "the functional form, the set of explanatory variables, or measurement of or proxies for the variables"); Studenmund (2017) at p. 174 ("Indeed, the whole purpose of sensitivity analysis is to gain confidence that a particular result is significant in a variety of alternative specifications, functional forms, variable definitions, and/or subsets of the data").

-58-

observations due to fields that are not part of the analysis.[157] More reliable sensitivities that are directly relevant to the variable of interest include applying the 0.5 percent threshold that Dr. Marinescu herself used in her published academic research to "reduce the impact of outliers and errors,"[158] or the BLS's approach of dropping the top and bottom 1 percent of rent changes used for its other two rent-related indices, as shown in Marinescu Second Report Table 2.[159]

85.    **Figure 6** plots Dr. Marinescu's YLPI using the various outlier and missing data methodologies described and applied in the Marinescu Reports, as well as the approach for handling outliers that involves dropping the top and bottom 0.5 percent of observations, consistent with Dr. Marinescu's approach in her academic research.[160] The figure shows that her YLPI changes substantially when it is recalculated using the alternative treatments of low effective-rent observations and missing rent values specified or implemented in the Marinescu Reports. It also

---

[157] Marinescu, Ioana and Ronald Wolthoff, "Opening the Black Box of the Matching Function: The Power of Words," *Journal of Labor Economics*, Vol. 38, No. 2, April 2020, pp. 535–568 at p. 546 ("To reduce the impact of outliers and errors, we clean the wage data by removing the bottom and top 0.5%."); Marinescu Deposition, p. 234:1–12 (confirming the data-cleaning approach described at page 546 of Marinescu and Wolthoff (2020), "Q. And if you turn to Page 546, starting in the middle of the page, there's a discussion on, quote, Cleaning, closed quote. Correct? A. Um-hmm, yes. Q. And it says, the last sentence of that first paragraph says, 'To reduce the impact of outliers and errors, we cleaned the wage data by removing the bottom and top 0.5 percent.' Do you see that? A. Yes."). See also Davis & Garcés (2010) at pp. 115–118 ("It is advisable to always present a table with the averages and data range of the variables used in a regression. […] Plotting graphs of the relationships between the dependent and the main independent variables will usually save time and trouble further along in the exercise. […] Plotting the data and their fitted values will help identify outliers which may have a disproportionate impact on the coefficients. […] If an analyst decides to keep extreme values in the sample, it is better to show that those values are not drastically affecting the regression estimates. If the regression is affected by the inclusion of the extreme values, the analyst must be ready to argue why it makes sense to give weight to these observations.").

[158] Marinescu, Ioana and Ronald Wolthoff, "Opening the Black Box of the Matching Function," *Journal of Labor Economics*, Vol. 38, No. 2, April 2020, pp. 535–568 at p. 546 ("To reduce the impact of outliers and errors, we clean the wage data by removing the bottom and top 0.5%."). See also Marinescu Deposition, p. 234:1–12.

[159] See Marinescu Second Report, Table 2 (comparing methodological elements between CPI-U, R-CPI-ATR, and R-CPI-NTR).

[160] Marinescu, Ioana and Ronald Wolthoff, "Opening the Black Box of the Matching Function," *Journal of Labor Economics*, Vol. 38, No. 2, April 2020, pp. 535–568 at p. 546 ("To reduce the impact of outliers and errors, we clean the wage data by removing the bottom and top 0.5%."). See also Marinescu Deposition, p. 234:1–12.

-59-

shows that applying Dr. Marinescu's previously adopted academic approach to outliers – an approach that is more reliable than several presented in the Marinescu Second Report, as it applies to the variable of interest as opposed to other variables – produces versions of her YLPI that are below the Rent CPI, reversing her original conclusions.

**Figure 6**
**The Marinescu Reports' YLPI is Not Robust Across Her Methodologies for Excluding Outliers and Handling Missing Rents, Including Her Approach to Excluding Outliers in Her Academic Research[161]**



**Notes:**
[1] The Marinescu Original Report sample consists of 2,153,893 leases identified in the Yardi lease data between January 2011 and August 2025 that were associated with Landlord Defendants.
[2] The y-axis represents the Rent Price Index, showing Rent CPI and 16 alternative Yardi rent indexes generated from all combinations of four outlier-treatment methodologies and four gap-treatment methodologies, including the YLPI presented in the Marinescu Original Report. For Yardi, the index is calculated as the cumulative product of rent changes for each unit since February 2011. For the rent CPI, the index is calculated by rebasing the national rental CPI to February 2011.

---

[161] Marinescu Original Report, Figure 88, Marinescu Second Report, Figure 17 and Figure 74, and Backup Materials (YARDI-DUFFY_00913149; U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]," March 11, 2026, https://fred.stlouisfed.org/series/CUSR0000SEHA).

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

[3] The outlier-treatment methodologies are: (i) exclusion of leases with monthly effective rents less than or equal to $0 according to the Marinescu Original Report; (ii) exclusion of leases with monthly effective rents less than or equal to $20 according to Dr. Marinescu's own stated methodology; (iii) application of BLS capping to leases with monthly effective rents greater than $0 according to the Marinescu Second Report; and (iv) exclusion of leases with monthly effective rents outside the 0.5th and 99.5th percentiles of the unit-month level rent distribution according to Marinescu's own academic research.

[4] The gap-treatment methodologies are: (i) calculation of month-over-month rent changes ignoring gaps between non-consecutive observations according to the Marinescu Original Report; (ii) calculation of month-over-month rent changes only when observations occur in consecutive months according to Dr. Marinescu's own stated methodology; (iii) exclusion of rent changes associated with gaps greater than or equal to 12 months according to the Marinescu Second Report; and (iv) BLS imputation of missing observations according to the Marinescu Second Report.

86.     Cleaning variables that do not enter Dr. Marinescu's YLPI is not a meaningful test of whether the results of analyses relying on her YLPI are robust to the treatment of outliers. As **Figure 6** shows, despite only a small proportion of the overall data being affected, the Marinescu Second Report is incorrect that the "Yardi Index Premium is robust."[162]

87.     In sum, assessing robustness is important for establishing the reliability of causal inferences. If the removal of a small number of outlier records drives substantial changes in analytical findings, then the findings are not a reliable basis for drawing causal conclusions. The fragility of the Marinescu Reports' analyses, as demonstrated by the sensitivity of their results to the specific handling of outlier observations, including some treatments that yield opposite results, rendering their conclusions unreliable.

## III.     THE MARINESCU ORIGINAL REPORT'S CORE CONCLUSION THAT RENTS RISE WITH REVENUE IQ ADOPTION CONTINUES TO LACK RELIABLE SUPPORT

88.     My First Rebuttal Report showed that the Marinescu Original Report's panel regressions in levels were flawed because its key variable measuring Revenue IQ adoption by alleged co-conspirators in the same PUMA includes properties managed by the same Landlord Defendant, and, when corrected according to its own stated methodology of excluding those properties because "a landlord cannot use Revenue IQ to collude with itself,"[163] its regression

---

[162] Marinescu Second Report, Figure 17 title.
[163] Marinescu Original Report, ¶ 517.

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

results did not support her core conclusion that rental prices rose as more Landlord Defendants in a geographic area adopted Revenue IQ.[164] In response, the Marinescu Second Report pivots to assert that a different analysis, which examines rent changes rather than the actual rental price, "serve[s] an important conceptual purpose in implementing the Harrington test."[165] However, as explained in this section, this model does not support its conclusions, and therefore is not a test of the theory described in the literature that the Marinescu Original Report relies on to support its core conclusion. It is a separate model that, on its own, cannot support Harrington's test of collusion. The Marinescu Second Report also misapplies the econometric model it claims to apply. Additionally, the Marinescu Second Report fails to address the methodological flaws with the co-conspirator panel regressions identified in my First Rebuttal Report.

### A. The Marinescu Original Report Used Panel Regressions Focused on Price Levels to Support Its Core Conclusion

89.     A panel refers to a dataset that follows the same people, firms, products, or other variables across multiple periods.[166] A regression in levels estimates the relationship between variables measured in their original units of measurement, such as a price. For example, the Marinescu Reports' panel regressions in levels are based on a dataset that follows the rents of different apartment units over time and analyze effective rents, expressed in dollars. A regression in first differences is a different type of analysis that changes the dependent variable from its

---

[164] Tucker First Rebuttal Report, ¶ 32 ("Another category of grave empirical error in the Marinescu Report is that when testing whether increases in rents are correlated with the presence of more Landlord Defendants within a local geographic area, the Marinescu Report treats each additional property in a geographic area as an additional co-conspirator, including properties managed by the same Landlord Defendant.") and ¶ 65 ("The table shows that once the variable of interest is corrected, the estimated effect becomes negative in both instances, changing from 1.843 to -7.341 in Model 23 and from 5.280 to -2.091 in Model 25. These results mean that the number of co-conspirator properties within a PUMA becomes negatively correlated with effective rent for the Marinescu Report's two preferred specifications in Table 8, effectively reversing the findings that the Marinescu Report characterizes as particularly 'importan[t] […] finding[s] to the economic analysis of algorithmic coordination.'").

[165] Marinescu Second Report, ¶ 312.

[166] Davis & Garcés (2010) at p. 249 ("Data that track a particular sample (of firms, individuals, or stores) over time are referred to as panel data.").

-62-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

original unit of measurement to the difference in value compared to the previous time period, which here is a month. For instance, Dr. Marinescu's first-difference regressions express the dependent variable as the dollar change in rent between lease observations. Performing panel regressions requires considering, at each unit of time, the value of the variables used in that regression.

90.     The Marinescu Second Report claims that her first-difference panel regressions bear directly on my conclusions, and that by only correcting the panel regressions in levels, I did not present a "complete picture":

> Dr. Tucker does not present the complete picture in her rebuttal report. When Dr. Tucker presents her "corrected" regressions, she only produces the levels specifications, i.e., the ones that ask whether rents are higher when adoption increases. She does not report what happens when her corrections are applied to the first-difference regressions, i.e., the ones that ask whether rents grow faster when co-conspirators are added. In total, this means her report omits 15 regressions that bear directly on her conclusions.[167]

91.     This claim is inconsistent with the central role her panel regressions in levels play in the Marinescu Original Report's econometric framework. The Marinescu Second Report asserts that the "core conclusion" of the empirical analyses in her Original Report is "that the Harrington test for algorithmic collusion is satisfied, in the sense that rents rise with Revenue IQ adoption."[168] To support this core conclusion, the Marinescu Original Report relies on the panel regressions in levels, which are founded on the Harrington test for algorithmic collusion she references, and claims to use "widely accepted econometric techniques to estimate how Landlord Defendant effective rents respond to the number of co-conspirators in a local area."[169] Based on the results of those regressions, particularly those controlling for Rent CPI and unit-level fixed effects, the Marinescu Original Report concludes that "Landlord Defendants achieve higher rents in areas with more alleged co-conspirators."[170]

---

[167] Marinescu Second Report, ¶ 287.
[168] Marinescu Second Report, ¶ 90.
[169] Marinescu Original Report, ¶ 536.
[170] Marinescu Original Report, Section 9.2.4.

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND)
REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

92.     Because the panel regressions in levels are central to the Marinescu Original Report's framework and conclusions, it is misleading to claim that my First Rebuttal Report "omits 15 regressions that bear directly on [my] conclusions,"[171] referring to the 5 first-difference regressions that only appear in the appendix of that report, plus additional sensitivities of those regressions. The Marinescu Original Report does not present the level regressions and first-difference regressions as equally important approaches for testing the alleged co-conspiracy. Instead, as reflected in the Summary of Conclusions and Section 9.2.4 of the Marinescu Original Report, Dr. Marinescu's own deposition testimony, and the Marinescu Original Report's repeated headline reliance on the $5.3 estimate from her preferred specification of the regression in levels, the main empirical support for the Marinescu Original Report's core conclusion comes from the panel regressions in levels. Furthermore, each of the Harrington tests analyzes actual prices, not price changes. I therefore did not need to address the first-difference regressions in the appendix of the Marinescu Original Report to evaluate the price-level test on which Harrington relies.

### 1.     The Marinescu Original Report's Econometric Framework Is Founded on the Harrington Test for Collusion in Price Levels, Not Price Changes

93.     The Marinescu Original Report's econometric framework is directly motivated by Harrington's first test for algorithmic collusion, which it describes as the "most general and robust" of the three.[172] Harrington's first test is a price-level prediction that involves estimating the relationship between the adoption rate of an algorithm and actual prices: as described in Harrington's 2025 article, "[i]f firms are independently deciding whether to adopt the pricing algorithm, the average price of adopting firms is predicted to be independent of the number of firms that adopt. If instead firms are coordinating their adoption decisions then the average price of adopting firms is predicted to be increasing in the number of firms that adopt."[173] Each of

---

[171] Marinescu Second Report, ¶ 287.
[172] Marinescu Original Report, ¶ 111.
[173] Harrington Jr., Joseph E., "An Economic Test for an Unlawful Agreement to Adopt a Third-Party's Pricing Algorithm," *Economic Policy*, Vol. 40, No. 121, January 2025, pp. 261-295 ("Harrington (2025)") at p. 292.

-64-

Harrington's other two tests is also premised on actual prices;[174] none are premised on price changes.

94.    The Marinescu Original Report confirms that the main econometric framework she relies on is founded on the Harrington (2025) article's proposed test for algorithmic collusion and involves examining the relationship between the adoption of Revenue IQ and the actual price of a rental. In Section 9.2.2, the Marinescu Original Report asserts that its goal is to look at "whether the price of adopters (i.e., colluding firms) increases with adoption of the hub-algorithm (i.e., as the cartel gets bigger)."[175] At her deposition, Dr. Marinescu similarly confirmed that the theoretical foundation on which her econometric framework relies involves examining the actual price of a rental, consistent with the Harrington test:

> Q: You rely on Professor Harrington throughout your report. Correct?
>
> A: Yes. […] [Harrington] says that […] [i]f the adoption of the algorithm is coordinated, then we expect that the more firms adopt, the higher the price is. And that's the, you know, empirical prediction that I test and find evidence for that in the data that I analyzed.[176]

95.    Consistently, the Marinescu Original Report's conclusions reference only the results of its panel regressions in levels and not those of the separate panel regressions in first differences. The Marinescu Original Report's main headline result is that "[c]ontrolling for Rent CPI and unit-level fixed-effects, Landlord Defendants increase rents $5.3 per month for every additional alleged co-conspirator in their local area."[177] This headline dollar figure refers directly to model (25) of the

---

[174] Harrington (2025) at p. 285 ("Test #1: The average price of adopters is increasing in the adoption rate. Test #2: The average price of non-adopters is increasing in the adoption rate. Test #3: The average price of adopters exceeds the average price of non-adopters.").

[175] Marinescu Original Report, ¶ 500.

[176] Marinescu Deposition, p. 167:3–19 ("Q. You rely on Professor Harrington throughout your report. Correct? A. Yes. Q. And isn't it correct that his coordinated adoption results depend on the adoption rate, because there are fewer non-adopting firms to undercut the supracompetitive price? A. So, he, he says that the more firms adopt, if it's -- if it's coordinated algorithm -- sorry. If the adoption of the algorithm is coordinated, then we expect that the more firms adopt, the higher the price is. And that's the, you know, empirical prediction that I test and find evidence for that in the data that I analyzed.").

[177] See, e.g., Marinescu Original Report, ¶ 76.

Marinescu Original Report's Table 8, and captures the estimated coefficient of a panel regression of effective rent in levels, or actual price of a rental, on the number of co-conspirators in a PUMA, controlling for Rent CPI and unit-level fixed effects. This headline dollar figure appears four separate times throughout the Marinescu Original Report, including in the summary of conclusions:

> Controlling for Rent CPI and unit-level fixed-effects, Landlord Defendants increase rents $5.3 per month for every additional alleged co-conspirator in their local area.[178]

> In this Section, I […] test for pricing indicators economists associate with collusion via a hub-algorithm. Doing so, I conclude that: […] **Higher Pricing linked to Participation**: Controlling for Rent CPI and unit-level fixed-effects, Landlord Defendants increase rents $5.3 per month for every additional alleged co-conspirator in their local area.[179]

> Applying [Harrington's tests for collusion via a hub-algorithm], I conclude that: […] Controlling for Rent CPI and unit-level fixed-effects, Landlord Defendants increase rents $5.3 per month for every additional alleged co-conspirator in their local area.[180]

> Model 25 estimates that Landlord Defendant prices increase by $5.3 per month on average for every additional co-conspirator in their PUMA, after accounting for the rent CPI control. With 5 co-conspirators, this would increase to $26.5 per month. This model, which controls for co-conspirator count, rent CPI, and unit fixed-effects, explains approximately 96% of variation in Landlord Defendants' pricing, and 53% of pricing variation within units.[181]

96.    In contrast, the estimated coefficients of the panel regressions in first differences, reported in Table 12 of the Marinescu Original Report, are referenced only a single time in the body of the Marinescu Original Report, in paragraph 548.[182] The results do not appear in the Marinescu Original Report's summary of conclusions.

---

[178] Marinescu Original Report, ¶ 76.
[179] Marinescu Original Report, ¶ 479 (emphasis in original).
[180] Marinescu Original Report, ¶ 487.
[181] Marinescu Original Report, ¶ 547.
[182] Marinescu Original Report, ¶ 548 ("To address concerns that these results reflect the propensity for some units to systematically increase prices rather than coordinated behavior, I re-estimate the same five specifications using first differences – examining changes in rents at the time leases are signed rather than rent levels, and in some specifications controlling via fixed effects

-66-

**2.    The Marinescu Original Report's Misapplied First-Differences Panel Regressions Represent a Separate Model that, on its Own, Cannot Support Harrington's Test of Collusion**

97.    In my First Rebuttal Report, I corrected the panel regressions in levels and showed that the corrected results did not support the Marinescu Original Report's core conclusion that rents rise with additional clients adopting Revenue IQ.[183] In response to this correction, the Marinescu Second Report now emphasizes separate panel regressions in first differences, claiming that "the first-difference regressions serve an important conceptual purpose in implementing the Harrington test"[184] and that "no matter how the question is asked - whether rents rise when adoption increases, or whether rents rise *faster* when adoption increases - the answer is the same: more Revenue IQ properties is associated with higher rents."[185] However, the two frameworks are different and their findings may not be the same. The first difference framework lacks the theoretical foundation to serve as a standalone test for collusion based on Harrington's framework. As a result, the first difference analyses are irrelevant given the corrected results for the panel regressions in levels. This is why, in my First Rebuttal Report, there was no need to address the panel regressions in first differences. It also explains why, even though the Marinescu Original Report called these regressions "first-differences," I did not explain that they were an incorrect econometric specification and not what econometricians refer to as "first-differences" as I explain in **Section III.A.3**.

98.    The first-difference specification introduced in the appendix to Section 9.2.4 of the Marinescu Original Report relies on "changes in rents at the time leases are signed rather than rent levels" to estimate the effect of additional Landlord Defendants within a PUMA on rent changes.[186]

_____

representing each unit's average rent increase over the period. (see Appendix D.4). When I do this, I reach essentially the same (and indeed stronger) conclusion: Landlord Defendants increase monthly rents by a statistically significant $4.3-$15 more than their long-run average rent increase with every additional co-conspirator in their PUMA.").

[183] Tucker First Rebuttal Report, Section IV.B and Tables 3.A, 3.B, D3, D3.A, D3.B, and E2.
[184] Marinescu Second Report, ¶ 312.
[185] Marinescu Second Report, ¶ 286 (emphasis in original).
[186] Marinescu Original Report, ¶ 548.

-67-

While the panel regressions in levels test whether rents are higher when more alleged co-conspirators are in a PUMA, all else equal, the first-difference panel regressions instead test whether rent changes, both positive and negative, at the time of lease signing are larger when more alleged co-conspirators are in a PUMA, all else equal.[187] These regressions are not the same: rent changes being larger when there are more alleged co-conspirators does not imply that rents are higher when there are more alleged co-conspirators. Larger rent changes are consistent with both larger rent increases and smaller rent decreases.

99.     As an illustration, consider a unit for which the actual rental price increased from $500 to $1,500, to $2,000, and to $2,250 over four lease terms. Expressed in first differences, the corresponding rent changes are $1,000, $500, and $250. Suppose that the number of alleged co-conspirators within the PUMA fell from 15, to 12, to 10, and to 8 during that time period. The Marinescu Original Report's panel regressions in levels would predict a negative relationship between the actual rental price and the number of alleged co-conspirators, because as the number of alleged co-conspirators falls, the price of the rental is rising. However, while prices are rising, they are rising at a decreasing rate, meaning that price changes are decreasing over time. Because these decreasing price changes coincide with a decrease in the number of alleged co-conspirators, the panel regressions in first differences would predict a positive relationship between price changes and the number of alleged co-conspirators. This illustration demonstrates that the two approaches can support opposite conclusions: the panel regressions in levels may provide no evidence of collusion according to the Harrington test, while the panel regressions in first differences may nevertheless capture a positive relationship between rent changes and the number of alleged co-conspirators.

100.     Finally, the first-differences panel regressions are not the kind of causal before-and-after analysis economists would use to test whether additional alleged co-conspirators caused rents to increase. A standard framework, called difference-in-differences, would be estimated using the actual rental prices and would compare changes in rent before and after the alleged co-conspirator

---

[187] See equation (21) (¶ 541) and equation (27) (¶ 587) in the Marinescu Original Report.

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND)
REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

exposure relative to an appropriate comparison group.[188] The panel regressions in first differences may control for general rent inflation, but they do not use an appropriate control group. Controlling for Rent CPI is not the same as comparing Revenue IQ properties to similar non-Revenue IQ properties. As I mentioned in my First Rebuttal Report, Revenue IQ adoption is not random, and may be correlated with factors such as stronger management expertise or higher quality buildings.[189] As a result, the average property reflected in the Rent CPI is unlikely to provide an appropriate control group for Landlord Defendant properties.

### 3. The Marinescu Original Report's Panel Regressions in First Differences Do Not Implement a First-Difference Estimator

101. The Marinescu Second Report claims that the Marinescu Original Report's panel regressions in first differences constitute "what economists sometimes call 'first-difference' regressions."[190] This claim is incorrect. The Marinescu Original Report's panel regressions in first differences are not simply the levels regressions restated in first differences. In particular, the levels regressions are estimated on approximately 23 million observations, while the panel regressions in first differences are estimated on only approximately 300,000 to 400,000 observations, depending on the specification.[191]

102. In a standard first-difference model, both the dependent variable and the set of explanatory variables are first-differenced, meaning that they are expressed as changes from the

---

[188] Baker, Andrew, et al., "Difference-in-Differences Designs: A Practitioner's Guide," *Journal of Economic Literature*, Vol. 64, No. 2, June 2026, 498-557 at p. 498 ("Difference-in-differences (DiD) is arguably the most popular quasi-experimental research design."); Roth, Jonathan, et al., "What's Trending in Difference-in-Differences? A Synthesis of the Recent Econometrics Literature," *Journal of Econometrics*, Vol. 235, No. 2, August 2023, 2218-2244 at p. 2218 ("Differences-in-differences (DiD) is one of the most popular methods in the social sciences for estimating causal effects in non-experimental settings.").

[189] Tucker First Rebuttal Report, ¶ 85.

[190] Marinescu Second Report, ¶ 283 ("But - as Dr. Tucker expressed concern over and I already addressed in my opening report - some rental units may have 'faster rent growth' than others for reasons unrelated to Revenue IQ. This can bias levels regressions. Therefore, to confirm that the levels result in my opening report was not simply capturing this background propensity, I also ran what economists sometimes call 'first-difference' regressions.").

[191] Marinescu Original Report, Tables 8 and 12.

-69-

previous period, resulting in a regression equation that expresses all variables in first differences.[192] For instance, in my illustration above, the change in the number of co-conspirators in the PUMA would be -3, -2, and -2. The first-difference model then asks how the original explanatory variables relate to the original dependent variable.

103.    The Marinescu Original Report's first-difference framework instead expresses only the dependent variable in first differences, while continuing to express the explanatory variables in their original units. That is, the Marinescu Original Report's dependent variable is defined as changes in rents, but the other variables such as the number of alleged co-conspirators and Rent CPI are not expressed in changes. Had the Marinescu Original Report applied a standard first-difference model to the panel regressions in levels, my corrections would have invalidated the

---

[192] Harvey, A.C., "On Comparing Regression Models in Levels and First Differences," *International Economic Review*, Vol. 21, No. 3, 1980, pp. 707-720 ("Harvey (1980)") at p. 708 ("The classical linear regression model in levels is
$$(2.1)\ y_t = \alpha + x_t'\beta + \varepsilon_t, \qquad t = 1, \ldots, T,$$
where $y_t$ is the $t$-th observation on the dependent variable, $x_t$ is a $k \times 1$ vector of explanatory variables at time $t$, $\beta$ is a $k \times 1$ vector of unknown parameters, and $\alpha$ is an unknown scalar parameter. The disturbance term $\varepsilon_t$ is independently and normally distributed with mean zero and variance $\sigma^2$, i.e., $\varepsilon_t \sim NID(0, \sigma^2)$. Model (2.1) is often contrasted with the classical first-difference form,
$$(2.2)\ \Delta y_t = (\Delta x_t)'\gamma + \eta_t, \qquad t = 2, \ldots, T$$
Where $\Delta y_t = y_t - y_{t-1}$, $\Delta x_t$ is a $k \times 1$ vector of first differences, $\gamma$ is a $k \times 1$ vector of unknown parameters, and $\eta_t \sim NID(0, \sigma_1^2)$. Model (2.2) does not include a constant term since this would imply a linear time trend in (2.1).") and p. 707 ("However, if the choice is between an equation in levels and a corresponding equation with the same variables in first differences, the relative merits of the two formulations should, in the absence of any a priori guidelines, be assessed on statistical ground."); Wooldridge (2016) at p. 364 ("An alternative to using the levels is to use the first differences of the variables. For most highly persistent economic time series, the first difference is weakly dependent. Using first differences changes the nature of the model, but this method is often as informative as a model in levels. When data are highly persistent, we usually have more faith in first-difference results."); Wooldridge (2016) at p. 414 ("[T]he first-differenced equation $[\Delta y_i = \delta_0 + \beta_1 \Delta x_1 + \Delta u_i]$ [...] is just a single cross-sectional equation, but each variable is differenced over time."); Wooldridge, Jeffrey M., *Econometric Analysis of Cross Section and Panel Data*, 2001, The MIT Press at p. 283 ("In applying first differencing, we should difference all variables appearing in the structural equation to obtain the estimating equation, including any binary indicators indicating participation in the program. The estimates should be interpreted in the original equation because it allows us to think of comparing different units in the cross section at any point in time, where one unit receives the treatment and the other does not.").

econometric findings, consistent with my corrections to the Marinescu Original Report's Table 8. **Table 3** illustrates these corrections, showing that the coefficient on the number of alleged co-conspirators is not statistically significant and, therefore, negating the findings from the Marinescu Original Report.

**Table 3**
**Standard First-Difference Model Applied to the Marinescu Original Report's Panel Regressions in Levels, and Correction That Excludes Outliers and Treats Missing Rents According to Dr. Marinescu's Own Stated Methodology and Accounts for Properties Managed by the Same Landlord Defendant[193]**

| | (23) | | (25) | |
|---|---|---|---|---|
| | Full First-Difference Model | Full First-Difference Model With Correction | Full First-Difference Model | Full First-Difference Model With Correction |
| Number of Co-Conspirator Properties | 0.117** | 0.030 | 0.255*** | 0.005 |
| | (0.045) | (0.026) | (0.045) | (0.026) |
| | | | | |
| Rent CPI | | | 14.258*** | 7.893*** |
| | | | (0.102) | (0.035) |
| Number of Observations | 22675317 | 22437073 | 22675317 | 22437073 |
| R2 | 0.018 | 0.017 | 0.044 | 0.016 |
| R2 Adjusted | -0.004 | -0.004 | 0.024 | -0.006 |
| Rent CPI | | | Yes | Yes |
| Fixed Effects | Unit, Month | Unit, Month | Unit | Unit |
| Standard Errors | Newey-West (L=3) | Newey-West (L=3) | Clustered by Unit | Clustered by Unit |

**Notes**:

[1] The Marinescu Original Report sample consists of 2,153,893 leases identified in the Yardi lease data between January 2011 and August 2025 that were associated with Landlord Defendants. Public Use Microdata Areas ("PUMAs") are identified by combining United States Census Bureau data with the property address associated with a lease, identified based on the fields Property Address, Property City, Property State, and Property Zip Code. The Marinescu Original Report sample is filtered to only keep leases with positive monthly effective rents. In the Corrected Sample, leases with monthly effective rents less than or equal to $20 are also excluded. This results in the corrected sample consisting of 2,153,785 leases between January 2011 and August 2025.

---

[193] Marinescu Original Report, Table 8and Table 12, and Backup Materials (YARDI-DUFFY_00913149; U.S. Census Bureau, "Public Use Microdata Areas (PUMAs)," https://www.census.gov/programs surveys/geography/guidance/geo-areas/pumas.html; U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]," March 11, 2026, https://fred.stlouisfed.org/series/CUSR0000SEHA). Applying the standard first-difference model to the lease-level data confirms these conclusions, and in fact yields a negative relationship between monthly effective rents and the number of co-conspirator properties

-71-

[2] The Full First-Difference Model applies a standard first-difference specification in which both the dependent variable and the independent variables are first-differenced, while everything else in the model is the same as in the Marinescu Original Report.

[3] The Full First-Difference Model with Correction applies the same specification but incorporates the corrections according to Dr. Marinescu's own stated methodology. Specifically, leases with monthly effective rents less than or equal to $20 are excluded, and month-over-month price differences are calculated only for units with consecutive monthly observations. Moreover, the Marinescu Original Report calculates the number of co-conspirator properties in a PUMA-month as the number of unique properties in a given PUMA-month, identified based on the field Revenue IQ Property Id, minus one. This definition is corrected by taking the difference between the number of properties in a given PUMA-month and the number of properties managed by the unit's Landlord Defendant, identified based on the field Yardi Client PIN, in the same PUMA-month.

### B. The Marinescu Second Report Fails to Address the Methodological Flaws with the Co-Conspirator Panel Regressions Identified in My First Rebuttal Report

104.    The Marinescu Second Report does not adequately address the measurement problem with the co-conspirator variable that I identified in my First Rebuttal Report.[194] The Marinescu Original Report purports to test the relationship between the actual rental price and the number of alleged co-conspirators within a PUMA. According to the Marinescu Original Report's own definition, properties managed by the same Landlord Defendant should not be counted as additional alleged co-conspirators in the same way as properties managed by other Landlord Defendants.[195] As I show in my First Rebuttal Report, the Marinescu Original Report's core conclusion is driven by this confounding effect: on average, prices increase with the number of properties managed by Landlord Defendants within a PUMA, regardless of the presence of other alleged co-conspirators in the area. This is neither acknowledged nor addressed in the Marinescu Second Report.

---

under the specifications that are corrected according to Dr. Marinescu's own stated methodology.

[194] Tucker First Rebuttal Report, Section IV.B.

[195] Marinescu Original Report, ¶¶ 517, 536–537 and footnote 307 (defining number of co-conspirators as "the number of co-conspirator properties […] that are in the same PUMA of the unit (excluding the property the unit of interest belongs to)" and stating "[t]he logic is simple: a landlord cannot use Revenue IQ to collude with itself").

-72-

**1.      The Marinescu Second Report's Claims Regarding a Redefinition of Co-Conspirator Counts Ignore the Fact I Am Using Her Original Report's Stated Definition**

105.    The Marinescu Second Report claims that the corrected co-conspirator count presented in my First Rebuttal Report is a redefinition and that the relevant measure of co-conspiracy within a PUMA is the total number of properties, regardless of management structure:

> Dr. Tucker's redefinition of co-conspirator count does not correct a measurement error in my regression. Instead, it changes what the regression measures. In doing so, Dr. Tucker produces results that are driven by differences in ownership structure rather than true differences in Revenue IQ's effect on pricing.[196]

106.    However, this ignores that in the Marinescu Original Report, she presented precisely this definition that I used in my First Rebuttal Report, which ensured that a firm could not conspire with itself, and indeed appeared to ridicule the idea that a firm could conspire with itself.

107.    The Marinescu Second Report's claim ignores that the corrected co-conspirator count presented in my First Rebuttal Report is simply an application of the Marinescu Original Report's own econometric framework. As the Marinescu Original Report clearly explains in Section 9.2.3:

> The logic is simple: a landlord cannot use Revenue IQ to collude with itself.[197]

108.    This logic applies directly to the Marinescu Original Report's econometric framework, which defines the key variable as "the number of alleged co-conspirators available to each Landlord Defendant property."[198] It therefore follows from the Marinescu Original Report's own stated methodology that same-landlord properties should not be treated as separate co-conspirators.

109.    The Marinescu Original Report's correlation analysis in Section 5.3 further demonstrates this point. Paragraph 337 clearly describes that the correlation analysis:

---

[196] Marinescu Second Report, ¶ 269.
[197] Marinescu Original Report, ¶ 517.
[198] Marinescu Original Report, ¶ 537.

-73-

calculate[s] correlations between properties in the same PUMA – as these properties are plausibly competing with each other – and exclude[s] correlations between properties owned by the same landlord[.][199]

110. The accompanying footnote confirms that the analysis does "not consider within-landlord coefficients, i.e., correlation coefficients between properties managed by the same Landlord Defendant."[200]

111. In the Tucker First Rebuttal Report, I fix this error in the co-conspirator panel regressions and find that the Marinescu Original Report's conclusion no longer holds.

**2.    The Marinescu Second Report's Claims Regarding Attenuation Bias Reflect a Misunderstanding of Attenuation Bias**

112. The Marinescu Second Report claims that the corrected co-conspirator count presented in my First Rebuttal Report[201] reflects attenuation bias:

> Dr. Tucker's methodology becomes less likely to identify a coordination effect the better clients are at coordinating via Revenue IQ. This is not a reliable methodology to apply when the task at-hand is analyzing an alleged conspiracy. […] This is also a recognized form of statistical bias called attenuation bias.[202]

113. However, this claim appears to misunderstand the nature of attenuation bias. Attenuation bias occurs when a variable is measured with noise.[203] Instead, all I am doing is using her stated definition of what the variable should be and applying that definition.

---

[199] Marinescu Original Report, ¶ 337.

[200] Marinescu Original Report, footnote 212.

[201] Tucker First Rebuttal Report, ¶ 65 ("To account for properties managed by the same Landlord Defendant present in 'the number of co-conspirator properties,' I redefine the Marinescu Report's variable as the total number of properties within a PUMA minus the number of properties managed by a given Landlord Defendant.").

[202] Marinescu Second Report, ¶¶ 277–278.

[203] Wooldridge (2016) at pp. 290–291 ("The **classical errors-in-variables (CEV)** assumption is that the measurement error is uncorrelated with the *unobserved explanatory* variable: […] [I]n the CEV case, the OLS regression of $y$ on $x_1$ gives a biased and inconsistent estimator. […] This is called the **attenuation bias** in OLS due to CEV: on average (or in large samples), the estimated OLS effect will be *attenuated*.") (emphasis in original).

-74-

**3.**     **The Marinescu Second Report Ignores Key Evidence Showing that the Estimated "Conspiracy" Effect is Driven by a Confounding Effect, Not the Presence of Additional Alleged Co-Conspirators**

114.    The Marinescu Second Report newly asserts that the number of properties owned or managed by the same Revenue IQ client does not have a clear statistically significant impact on rents:

> Revenue IQ adoption (measured by number of properties) increases the growth rate of rents, while the number of properties owned/managed by the same Revenue IQ client has no statistically significant impact on rents in some specifications, but not others. This indicates the ownerships structure effect is not consistent across specifications[.][204]

115.    In Table E2 of my First Rebuttal Report, I presented an analysis that preserves the measure of adoption that the Marinescu Original Report claims is relevant – the total number of Landlord Defendant properties within a PUMA – and addresses the confounding effect of same-landlord properties directly. My regressions in Table E2 separated properties managed by the same Landlord Defendant and those managed by other Landlord Defendants. The purpose of my model was to decompose the Marinescu Original Report's alleged conspiracy effect into a within-landlord effect and an across-landlord effect.

116.    The results of my Table E2, reproduced below as **Table 4**, showed that the Marinescu Original Report's alleged conspiracy effect is driven by the within-landlord component. Indeed, after controlling separately for the number of properties managed by the same Landlord Defendant, the coefficient on properties managed by other Landlord Defendants becomes negative and statistically significant in the two specifications that the Marinescu Original Report characterizes as her "most robust," specifications (23) and (25).[205]

---

[204] Marinescu Second Report, ¶ 305.
[205] Marinescu Original Report, ¶ 546.

-75-

**Table 4**

**Copy of the Tucker First Rebuttal Report's Table E2: Correction to Marinescu Original Report's Table 8 That Excludes Outliers According to Her Own Stated Methodology, Accounts for Properties Managed by the Same Landlord Defendant, and Controls for the Number of Properties Managed by the Landlord Defendant**

| | Monthly Effective Rents | | | | |
|---|---|---|---|---|---|
| | (21) | (22) | (23) | (24) | (25) |
| Number of Co-Conspirator Properties | 22.670*** | 32.208*** | -6.697*** | 12.955*** | -1.827*** |
| | (0.083) | (0.347) | (0.089) | (0.082) | (0.215) |
| Number of Properties Managed by Landlord Defendant | 57.328*** | 48.771*** | 13.232*** | 51.953*** | 14.872*** |
| | (0.052) | (0.479) | (0.111) | (0.050) | (0.274) |
| Rent CPI | | | | 9.255*** | 10.264*** |
| | | | | (0.007) | (0.014) |
| Intercept | 1238.538*** | | | -92.393*** | |
| | (0.188) | | | (0.963) | |
| Number of Observations | 23,301,054 | 23,295,711 | 23,295,711 | 23,301,054 | 23,295,711 |
| R2 | 0.069 | 0.917 | 0.961 | 0.137 | 0.960 |
| R2 Adjusted | 0.069 | 0.916 | 0.960 | 0.137 | 0.959 |
| Fixed Effects | | Unit | Unit, Month | | Unit |
| Standard Errors | Robust | Clustered by Unit | Newey-West (L=3) | Robust | Clustered by Unit |

**Notes:**

[1] The sample consists of 2,153,785 leases identified in the Yardi lease data between January 2011 and August 2025 that were associated with Landlord Defendants. Public Use Microdata Areas ("PUMAs") are identified by combining United States Census Bureau data with the property address associated with a lease, identified based on the fields Property Address, Property City, Property State, and Property Zip Code. Leases with monthly effective rents less than or equal to $20 are excluded. The mean monthly effective rent of the sample is 1,434.94.

[2] The Marinescu Original Report calculates the number of co-conspirator properties in a PUMA-month as the number of unique properties in a given PUMA-month, identified based on the field Revenue IQ Property Id, minus one. This definition is corrected by taking the difference between the number of properties in a given PUMA-month and the number of properties managed by the unit's Landlord Defendant, identified based on the field Yardi Client PIN, in the same PUMA-month.

[3] Statistical significance is denoted by *** $p < 0.01$, ** $p < 0.05$, and * $p < 0.10$.

117. The Marinescu Second Report does not directly address this result. Instead, it presents a new sensitivity analysis that first-differences the dependent variable of my Table E2, and claims that this new transformed specification shows that "Revenue IQ adoption (measured by number of properties) increases the growth rate of rents, while the number of properties owned/managed by the same Revenue IQ client has no statistically significant impact on rents in some specifications, but not others."[206] However, the Marinescu Original Report's first-difference sensitivity analysis does not address the fact that Table E2 in my First Rebuttal Report showed that the alleged conspiracy effect from its panel regressions in levels is driven by within-landlord variation rather than exposure to alleged co-conspirators.

118. The Marinescu Second Report's analysis that removes PUMAs that only ever had one Landlord Defendant is also insufficient to isolate the effect coming from changes in the number of properties managed by the same Landlord Defendant versus properties managed by other Landlord Defendants. For instance, in an area with two Landlord Defendants, if the total number of properties managed by all Landlord Defendants increases from 10 to 11, it could be because one Landlord Defendant manages one additional property and the other stays the same; because one Landlord Defendant manages two additional properties, and the other manages one less; or because one Landlord Defendant manages the same number of properties, but the other manages one more.

119. In sum, the Marinescu Second Report never addresses my finding that its results are driven by Landlord Defendants with multiple properties tending to price higher than those with a single property in a given area. Once I take this confounding effect into account, its conclusion that Landlord Defendants increase their prices as the number of additional co-conspirators increases no longer holds. The removal of PUMAs that only ever had one Landlord Defendant does not fix this issue.

---

[206] Marinescu Second Report, ¶ 305.

## IV.    THE MARINESCU SECOND REPORT STILL DOES NOT IDENTIFY CREDIBLE MEANS OF ENFORCEMENT

120.    In response to my First Rebuttal Report, which explained that the Marinescu Original Report failed to describe an enforcement/punishment mechanism,[207] the Marinescu Second Report recharacterizes several features of the Yardi platform previously described as monitoring mechanisms as punishment mechanisms. However, as described in this section, none of these platform features is a credible enforcement mechanism. The Marinescu Second Report also does not explain why the internal Fazio-TAM call notes are meaningful evidence of enforcement.

### A.    The Marinescu Second Report Fails to Establish a Credible Enforcement Mechanism

121.    The Marinescu Second Report contends that:

> Dr. Tucker's framework - monitoring plus credible punishment that makes deviation unprofitable - is satisfied by the features my opening report describes; her contrary conclusion requires one to misrepresent standard cartel theory and ignore meaningful parts of both the record and my opening report's findings.[208]

122.    Both Marinescu Reports fail to identify a mechanism by which TAM oversight can discipline client prices. As explained in my First Rebuttal Report and above in Section **II.A.1**, punishment must impose a cost on firms sufficient to incentivize compliance with collusive behavior.[209] Despite the centrality of punishment in maintaining collusive behavior, the Marinescu Original Report focuses its discussion of enforcement "on the role of structural barriers, audit

---

[207] Tucker First Rebuttal Report, ¶ 69 ("[T]he Marinescu Report fails, both conceptually and empirically, to establish any valid mechanism of enforcement to maintain the alleged collusive agreement.").

[208] Marinescu Second Report, ¶ 322.

[209] Tucker First Rebuttal Report, ¶ 86 ("A core requirement for any sustained collusion among competitors is not just that firms observe each other's prices and behavior, but that the arrangement is self-enforcing: deviations must be detectable (monitoring) and followed by a credible punishment that makes deviations unprofitable (enforcement)."). See also Calvano, Emilio, et al., "Artificial Intelligence, Algorithmic Pricing, and Collusion," *The American Economic Review*, Vol. 110, No. 10, October 2020, pp. 3267–3297 at p. 3269 ("To us economists, collusion is not simply a synonym of high prices but crucially involves 'a reward-punishment scheme designed to provide the incentives for firms to consistently price above the competitive level[.]'").

-78-

reporting, benchmarking, and TAM oversight in committing clients to Revenue IQ's list price."[210] None of the features of the Yardi platform as described in the Marinescu Original Report or raised again in the Marinescu Second Report can credibly be considered punishment (enforcement) based on standard economic principles.

123.    The Marinescu Second Report argues that penalty scores impose "asymmetric costs on deviation" because they are "calibrated to penalize underpricing only," such that "properties whose rental-income growth lags benchmark receive a positive penalty score."[211] Penalty scores do not impose a credible punishment for deviation. According to the Marinescu Original Report and Marinescu Second Report, penalty scores are an "internal Yardi measure" designed to "rank Revenue IQ properties against CPD-derived benchmarks" and assign "penalty 'points' only when properties price below competitors."[212] First, having assumed the penalty scores were communicated to Yardi clients without any evidence, both Marinescu Reports offer no evidence that a Yardi client is worse off with a higher penalty score. Second, both Marinescu Reports provide no evidence that this internal Yardi metric is communicated to Yardi clients at all.

124.    The Marinescu Second Report also reiterates three "[o]ther components of the Yardi Pricing Suite" that "make defection unlikely," which were discussed in the Marinescu Original Report and addressed in my First Rebuttal Report: 1) "auto-populating Revenue IQ's recommended rent to listings without client pre-approval," 2) "having TAMs intervene when a participant does undercut benchmarks," and 3) "giving clients' executives tool[s] to minimize their staff's deviation from the Revenue IQ price."[213] Either alone or together, none provides enforcement or punishment. With regard to the auto-population of "Revenue IQ's recommended rent," I previously explained

---

[210] Marinescu Original Report, ¶ 440.
[211] Marinescu Second Report, ¶ 319.
[212] Marinescu Original Report, ¶ 42; Marinescu Second Report, ¶ 54.
[213] Marinescu Second Report, ¶ 320; Tucker First Rebuttal Report, ¶ 87 ("Contrary to the Marinescu Report's characterization, however, the identified mechanisms are consistent with tools that a landlord can use unilaterally to manage employee discretion and ensure consistent execution of their own individual pricing strategy, rather than a means of punishment imposed by rival landlords, or a hub acting on their behalf, for any deviations from a shared, collusive pricing scheme.").

-79-

that this feature does not constitute a monitoring or punishment mechanism, and instead "streamlines a landlord's implementation of their own unilateral strategy."[214] That is because the Revenue IQ software can be configured in a variety of ways and the recommended list prices reflect each landlord's own pricing strategy as defined by their chosen settings, not a market-wide price target.[215] With regard to the "TAM interventions," I explained that the Marinescu Original Report "does not identify or provide evidence of any costs to landlords of ignoring pricing advice from TAMs and, therefore, fails to explain how TAM actions could reflect an enforcement mechanism."[216] Regarding tools to minimize staff deviation, the Marinescu Original Report describes a "nine-step" override process and a "Lease Audit" tool as two such components.[217] As I explained in my First Rebuttal Report, neither of these components enables competitors to monitor or punish other landlords for deviation.[218] Instead, those features merely ensure that any one Landlord Defendant's executives get to decide their own pricing strategy. The Marinescu Second Report offers no new evidence or opinions to refute my conclusion that these mechanisms do not constitute credible enforcement mechanisms.

---

[214] Tucker First Rebuttal Report, ¶ 88.

[215] Tucker First Rebuttal Report, ¶ 88. See also Declaration of Mihran Yenikomshian in Support of Yardi Systems, Inc.'s Motion for Summary Judgment, *In Re Yardi Revenue Management Antitrust Litigation McKenna Duffy, individually and on behalf of all others similarly situated v. Yardi Systems, Inc. et al.*, Case No. 2:23-cv-01391-RSL, November 24, 2025, ¶ 71 ("Step Two incorporates additional client-configured settings to adjust the Step One provisional pricing output. These client-configured settings are referred to as 'Health Rules,' as they provide a mechanism to tailor the provisional pricing output based on the relative 'health' of the property as determined by the client's individual settings and preferences."), ¶ 73 (provides examples of Health Rules, including rules based on availability, occupancy, number of leased units, number of expiring units, and estimated percentage of units available in 30 days), ¶ 77 ("In Step Three, Revenue IQ allows clients to adjust further for a variety of circumstances."), and ¶ 78 (lists examples of "client-selected pricing adjustments available in Revenue IQ," such as "Rent Concession Recovery," "Stale Unit Discounting," "Notice Premiums," "Seasonal Vacancy," "Turn Costs," "Lease Expiration Management," "Term Premiums," and "Unit Hold Costs.").

[216] Tucker First Rebuttal Report, ¶ 91.

[217] Marinescu Original Report, ¶¶ 442 and 446–447.

[218] Tucker First Rebuttal Report, ¶¶ 89 and 92.

-80-

125.    Last, while the Marinescu Second Report states that my "enforcement opinions are disconnected from […] canonical cartel theory," the only literature cited to support this characterization confirms my opinion.[219] The Marinescu Second Report cites to a microeconomic textbook that states, "To keep firms from violating the cartel agreement, the cartel must be able to detect cheating and punish violators."[220] This is exactly the point I made in the Tucker First Rebuttal Report: deviations must be detectable (monitoring) and followed by a credible punishment that makes deviations unprofitable (enforcement).[221] As explained in this section and my First Rebuttal Report, no credible enforcement mechanism exists. Therefore, the Marinescu Second Report's contention that my opinions are disconnected from economic theory is incorrect.

**B.    The Marinescu Second Report Fails to Defend Its Application of Fazio-TAM Call Notes**

126.    The Marinescu Second Report also suggests that my opinions lack support because I did not review TAM call notes and deposition testimony when forming my opinions.[222] In my First Rebuttal Report, I explain that the Marinescu Original Report's reliance on Fazio-TAM call notes is an unreliable basis for evaluating enforcement.[223] Rather than address that argument, the Marinescu Second Report critiques my description of TAMs, and suggests my opinions are flawed because I did not review TAM pricing call notes, depositions, or training materials.[224] The Marinescu Second Report asserts:

> Dr. Tucker admitted that her opinion that TAMs simply help clients implement "[their] own strategy" had no citation and was based on

---

[219] Marinescu Second Report, Section 7 heading (lowercase added) ("Dr. Tucker's Enforcement Opinions are Disconnected From Both Canonical Cartel Theory and Record Evidence").

[220] Perloff, Jeffrey M., *Microeconomics*, 7th Ed., Pearson, 2015 ("Perloff (2015)") at p. 432. See also Marinescu Second Report, footnote 182.

[221] Tucker First Rebuttal Report, ¶ 86.

[222] Marinescu Second Report, ¶ 61.

[223] Tucker First Rebuttal Report, ¶ 95 ("[T]he Marinescu Report's analyses rely only on the notes of Mr. Anthony Fazio, a Yardi employee, from his internal communications with Yardi TAMs. Using this indirect measure of communications between TAMs and Landlord Defendants introduces substantial uncertainty into the analysis and can result in misleading assessments of the effect of TAM interactions with clients on prices charged by Landlord Defendants.").

[224] Marinescu Second Report, ¶ 61.

-81-

her "knowledge as someone who teaches pricing," not any facts in this case. She had not reviewed any of the more than 600 TAM pricing call notes, any TAM depositions, or the training materials instructing TAMs to "discourage lowering price" and evaluate whether clients can "push" their rents "a bit more based" on the performance of comparable properties.[225]

127. The Marinescu Second Report's response does not rebut my opinion that the Fazio-TAM call-note analysis is flawed and does not establish TAM oversight as a credible enforcement mechanism.

128. First, my characterization of TAMs is consistent with the Marinescu Original Report's characterization. In my First Rebuttal Report, I describe the role of TAMs as "provid[ing] account management services, technical support, and guidance to Revenue IQ clients, including through periodic calls with clients."[226] This description is consistent with the Marinescu Original Report's characterization of TAMs as "client-facing personnel who support implementation and ongoing use of Revenue IQ, including assisting clients with property setup and configuration. TAMs conduct recurring review calls and periodic performance reviews with clients."[227] Indeed, my First Rebuttal Report cites to the Marinescu Original Report as support for this characterization.[228]

129. Second, my opinion that the Marinescu Original Report fails to establish that TAM oversight is an enforcement mechanism remains. Notes from Mr. Fazio and the TAMs are all between Yardi employees. These are not communications between TAMs and landlords. The basis of my opinion rests not on the content of the call notes, but on the fact that the Marinescu Original Report's analysis does not rely on direct communications between TAMs and Landlord Defendants in any systematic way,[229] and therefore cannot establish that TAMs put pressure on Yardi clients

---

[225] Marinescu Second Report, ¶ 61.
[226] Tucker First Rebuttal Report, ¶ 90.
[227] Marinescu Original Report, ¶ 204.
[228] Tucker First Rebuttal Report, footnote 161.
[229] Marinescu Deposition, pp. 62:11-64:7 ("Q. And the pricing calls that you're referencing there are between a TAM and a Revenue IQ client. Is that correct? A. Yes. Q. And are you aware that Yardi produced more than 600 TAM pricing call notes prior to the close of discovery in

-82-

to raise prices. The Marinescu Second Report fails to justify its reliance on Fazio-TAM notes rather than the more directly informative TAM-to-client communications, and it fails to address my criticism that the selective focus on below-benchmark properties is a source of bias.

130.    Neither of the Marinescu Reports' analyses substantiates the idea that Mr. Fazio's calls to TAM coordinators effectively raised prices above market trends. As shown in **Section II** and in Tables 2.A and 2.B of my First Rebuttal Report, the Marinescu Original Report's conclusion that TAM oversight is associated with Landlord Defendant price increases is not robust. The Marinescu Second Report's new methodology relying on BLS-style imputation further demonstrates the unreliability of her conclusions regarding TAM oversight, in particular by yielding results that overturn the Marinescu Original Report's conclusion that "TAM calls are associated with a statistically significant trend break in subject property's pricing, with prices increasing faster after the first TAM call."[230]

**V.    THE MARINESCU SECOND REPORT'S NEW EMPHASIS ON INTERNAL YARDI PRICING ANALYSES DOES NOT VALIDATE ITS EMPIRICAL CONCLUSIONS**

131.    The Marinescu Second Report places new emphasis on internal Yardi pricing analyses. However, as explained in this section, these pricing analyses do not validate the Marinescu Reports' conclusions. First, Yardi's internal pricing analyses do not provide an independent economic test of the at-issue conduct, and do not show what is claimed in the Marinescu Second Report. Second, the Marinescu Reports' YLPI is a different measure to those studied in Yardi's internal analysis.

November 2025? A. […] So, yes, we did, we did get that data […] but we were unable to do a thorough analysis of that. Instead, we focused on the calls between Mr. Fazio, the TAM manager, and the TAMs […]. Q. Okay. So, I'm asking about the 600 TAM pricing call notes that were produced prior to November 2025. A. I don't recall hearing of those. Q. You didn't review those TAM call notes? A. I don't recall hearing of those specific call notes, if you're talking about TAM calls with clients, because -- Q. That is what I'm talking about. A. Yeah, I've been looking at the calls of Mr. Fazio with the TAMs.").

[230] Marinescu Second Report, Table 29; Marinescu Original Report, ¶ 390.

-83-

A.      **Yardi's Internal Pricing Analyses Do Not Provide an Economic Test of the At-Issue Conduct and Do Not Show What the Marinescu Second Report Claims**

132.    The Marinescu Second Report states:

> Since at least 2019, Yardi prepared quarterly internal analyses comparing Revenue IQ users' pricing against non-revenue-management users, and these analyses consistently showed Revenue IQ users charging approximately $40 per month more, with the gap widening over time.[231] […] Because of this price elevation, Yardi advertised to prospective clients that Revenue IQ helped them "beat the market."[232]

133.    The Marinescu Second Report's emphasis on the gap between Revenue IQ users' pricing and non-revenue-management users' pricing widening over time is new relative to the discussion of the same figure in the Marinescu Original Report.[233] The Marinescu Second Report uses this internal analysis and other internal materials to argue that the corrected YLPI results presented by Yardi's experts in this litigation are inconsistent with Yardi's own internal view of Revenue IQ's pricing performance.[234] The Marinescu Second Report states:

---

[231]  Marinescu Second Report, ¶ 14.

[232]  Marinescu Second Report, ¶ 95.

[233]  Marinescu Original Report, ¶¶ 496–497 ("Yardi internally circulated excel spreadsheets containing the underlying, but aggregated, data that created this analysis. I have directed my staff to collect this for each quarter for which there is data. With this data, I present the average rent for Revenue IQ users compared to the average rent of RealPage users (Yieldstar and LRO) and non-RM users below in Figure 86, spanning 2018 through 2024 […] For every month of Yardi's analysis, Yardi users charged higher rents non-RM users, on average by about $40 during the putative class period. Further, in many months, Yardi users also charged either higher rents than RealPage users, or the difference between Yardi and RealPage pricing was visually imperceptible").

[234]  Marinescu Second Report, ¶¶ 96–106 ("The methodological adjustments in Yardi's Experts' revised YLPI reduced the price index not just below my original YLPI, but also below Yardi's contemporaneous analysis. This downward revision is so strong it reverses Yardi's own directional conclusion that Revenue IQ users were pricing above the market. Yardi's Experts' revised YLPI is difficult to reconcile with Yardi's own contemporaneous analysis and marketing materials, and suggests Yardi's Experts introduce a downward bias.").

-84-

> Yardi's Experts each presents a revised YLPI that, they claim, shows Revenue IQ users pricing below Rent CPI throughout the class period.[235] […] If correct, this would mean that Revenue IQ users' rents grew more slowly than the national rental inflation benchmark -– in other words, that the software failed to deliver on its promise to "beat the market."[236]

134. The internal Yardi analyses and documents referenced in the Marinescu Reports do not provide an independent economic test of the challenged conduct. They are business or marketing analyses prepared by Yardi for internal or commercial purposes, not econometric studies designed to distinguish collusion from unilateral revenue optimization. As the Marinescu Original Report describes them, the analyses compare Revenue IQ performance to RealPage and non-revenue-management users on metrics "including rental income per unit, rental income per occupied unit, occupied percent, in place rent per unit, new lease rent per unit, […] renewal lease rent per unit, expiring lease renewal percent, new lease rent change percent, and renewal lease rent change percent."[237] Those metrics may be useful for marketing or other commercial purposes, but they do not establish, without further economic analysis, that any rent difference was caused by coordinated pricing.

135. Figure 1 of the Marinescu Second Report, based on Yardi's quarterly performance analyses, compares average "In Place Rent Per Unit" for Revenue IQ users, RealPage users, and non-revenue-management users.[238] As the Marinescu Original Report acknowledges, this analysis

---

[235] Marinescu Second Report, ¶ 96.

[236] Marinescu Second Report, ¶ 97.

[237] Marinescu Original Report, ¶¶ 493–498 ("These analyses contrast Yardi's performance with RealPage and non-RM users' performance on several metrics, including rental income per unit, rental income per occupied unit, occupied percent, in place rent per unit, new lease rent per unit, new lease rent per unit, renewal lease rent per unit, expiring lease renewal percent, new lease rent change percent, and renewal lease rent change percent."), Figure 86 ("Revenue IQ Users Charge Similar Rents to RealPage Users & Higher Rents than Non-RM Users"); Marinescu Second Report, ¶¶ 92–94 ("By compiling these quarterly performance analyses, I created and displayed Figure 86 in my report. This displays Yardi's own analysis of Revenue IQ pricing against both RealPage and non-RM users. It shows Revenue IQ users pricing above non-RM users and in line with RealPage users, and indeed shows a widening gap between Revenue IQ and non-RM users during the relevant period").

[238] Marinescu Second Report, Figure 1. See also Marinescu Second Report, footnote 70.

-85-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

is based on a nationwide average and therefore may "muddl[e] geographic pricing differences."[239] Moreover, it does not control for differences in property quality, unit mix, management practices, or selection into Revenue IQ, all of which can affect the level and trend of an average rent series for reasons unrelated to any alleged collusion.

136.    The Marinescu Second Report also claims, based on a visual reading of Figure 1, that the gap between Revenue IQ users' prices and non-revenue-management users' prices in Figure 1 appears to be "widening over time" and "as adoption spread."[240] However, the examination of Figure 1's underlying data contradicts that claim, and instead shows that the gap has remained relatively stable overall, with a 2.8 percent gap in both 2018 and 2024. Therefore, Figure 1 does not establish that Revenue IQ users experienced a growing price premium relative to non-revenue-management properties when properly compared in percentage terms. This finding is consistent with my corrected versions of the Marinescu Original Report's panel regressions discussed in **Section III**, which do not find, for the most robust specifications, increased rents from an increase in Revenue IQ adoption by other Landlord Defendants in a given area.

**B.      The YLPI Is a Different Measure to Those Used in the Internal Yardi Analyses**

137.    The Marinescu Second Report also relies on the internal Yardi analyses to corroborate its YLPI analysis, claiming that:

> Yardi's Experts have also not provided an explanation of how their revised YLPI's conclusion - that Revenue IQ users priced below Rent CPI throughout the class period, and in fact priced *lower* the more adoption grew - can be reconciled with Yardi's own contemporaneous data and documents showing the opposite, including marketing that Revenue IQ users "beat the market."[241]

[239] Marinescu Original Report, ¶ 498 ("The limitation of this analysis is that it is a nationwide average, potentially muddling geographic pricing differences.").

[240] Marinescu Second Report, ¶¶ 14 ("Since at least 2019, Yardi prepared quarterly internal analyses comparing Revenue IQ users' pricing against non-revenue-management users, and these analyses consistently showed Revenue IQ users charging approximately $40 per month more, with the gap widening over time."), 83 ("Yardi's own contemporaneous internal pricing analyses and pre-litigation marketing showed Revenue IQ users pricing above non-RM peers, with the gap widening as adoption spread.").

[241] Marinescu Second Report, ¶ 101.

-86-

138.    That comparison is flawed. Dr. Marinescu's YLPI and BLS Rent CPI are indices, which measure relative growth from a base period. They do not show whether one group charged higher absolute rents than another at a point in time. Dr. Marinescu's YLPI being above Rent CPI means only that the Yardi index grew faster than the CPI from the base period; her YLPI being below CPI means only that it grew more slowly. Yardi's internal rent-level comparisons therefore do not validate Dr. Marinescu's YLPI and do not undermine the revised YLPI calculations in my First Rebuttal Report.

## VI.    THE MARINESCU SECOND REPORT DOES NOT ADDRESS SEVERAL FLAWS IDENTIFIED IN MY FIRST REBUTTAL REPORT

139.    My First Rebuttal Report identifies several other flaws in the Marinescu Original Report that undermine the reliability of its conclusions. These critiques go to the foundation of the Marinescu Reports' theory of coordination: whether observed pricing patterns are reliably attributable to collusion rather than competitive explanations, and whether firms have unilateral incentives to adopt revenue management systems.[242] This section explains that the Marinescu Second Report does not address several flaws identified in my First Rebuttal Report. It fails to establish that Revenue IQ's alleged conspiracy is consistent with the economic theory of collusion, including failing to establish that Revenue IQ's market shares are sufficient to sustain supracompetitive pricing and failing to address my critiques regarding the mischaracterizations of the academic literature cited in her Original Report. The Marinescu Second Report also does not challenge the critique in my First Rebuttal Report that the at-issue outcomes can be consistent with unilateral behavior and that firms have unilateral incentives to adopt revenue management systems.[243]

---

[242] Tucker First Rebuttal Report, Section III–V.

[243] Tucker First Rebuttal Report, ¶ 84 ("The Marinescu Report treats visible synchrony and high correlations in prices as indicative of collusive conduct. However, it does not compare the observed pricing outcomes, measured as monthly average effective rents, to an appropriate competitive benchmark and therefore does not provide an economic explanation for why such co-movement would be unlikely under competitive, unilateral pricing.").

**A.** **The Marinescu Second Report Fails to Establish Whether the Alleged Revenue IQ Conspiracy Is Consistent with the Economic Theory of Collusion**

**1.** **The Marinescu Second Report Continues to Ignore Whether Revenue IQ's Market Shares Are Sufficient to Sustain Supracompetitive Pricing**

140. My First Rebuttal Report explained that a theory of coordinated pricing must address the ability of alleged participants to sustain supracompetitive pricing in a market.[244] Economic theory holds that collusion among firms cannot be effective at raising prices when the colluding firms control only a small share of the relevant market, because other non-colluding firms can discipline prices.[245] Consistent with that principle, my First Rebuttal Report noted that Calder-Wang & Kim (2024), a paper the Marinescu Original Report itself cites, reports that Yardi pricing-algorithm users accounted for less than one percent of buildings in 2019.[246] This led to the key economic question of whether Revenue IQ users had sufficient local presence to increase and sustain higher prices in any given area and for any unit type.[247]

141. Neither the Marinescu Original Report nor the Marinescu Second Report analyzes the market share of Revenue IQ users in any local market, although Dr. Marinescu herself acknowledged in her deposition that "it's easier to raise prices to a greater degree in most models […] when you have a higher market share."[248] Neither the Marinescu Original Report nor the Marinescu Second Report addresses whether Revenue IQ users collectively have sufficient market

---

[244] Tucker First Rebuttal Report, ¶ 76.
[245] Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th Ed., Pearson, 2005 at p. 131 ("If the cartel controls only a small share of the relevant market, which includes all close substitutes, firms not in the cartel undercut the cartel and prevent it from raising the market price […]")
[246] Tucker First Rebuttal Report, ¶ 76; Calder-Wang, Sophie and Gi Heung Kim, "Algorithmic Pricing in Multifamily Rentals: Efficiency Gains or Price Coordination?," *The Wharton School*, 2024 ("Calder-Wang & Kim (2024)") at Figure 3, Table 4, and Table 5.
[247] Tucker First Rebuttal Report, ¶ 76.
[248] Marinescu Deposition, p. 156:4–14 ("Q. And are you familiar with the part of that text that says that if cartel members have a small share, then firms outside the cartel can lower the price to undercut the cartel? A. It really depends on the specifics of the market. But I don't disagree that market share matters and that it's easier to raise prices to a greater degree in most models typically in theory when you have a higher market share.").

-88-

share to sustain supracompetitive pricing without being disciplined by landlords who do not use Revenue IQ.

### 2. The Marinescu Second Report Does Not Address My Critiques Regarding the Marinescu Original Report's Mischaracterizations of the Academic Literature

142.    In my First Rebuttal Report, I explained that the Marinescu Original Report mischaracterized the academic literature in its attempt to establish a theory of conspiracy.[249] The Marinescu Second Report ignores these critiques, and therefore fails to address the mischaracterizations of the academic literature in the Marinescu Original Report in its attempt to establish a theory of conspiracy.

143.    First, I described that the German retail gasoline market studied in Assad et al. (2024), a study the Marinescu Original Report relies on, constitutes an empirical setting that differs meaningfully from the multifamily rental housing sector.[250] Second, I explained that because the period examined by the Marinescu Original Report overlaps with "a high-demand state," consistent with the conclusions from Calder-Wang & Kim (2024), the observation that algorithmic penetration is associated with higher prices is not diagnostic of collusion on its own.[251] Third, I critiqued the Marinescu Original Report's reliance on Sugaya and Wolitzky (2018) and Sugaya and Wolitzky (2025), explaining that those papers consist of theoretical models involving specific structural

---

[249] Tucker First Rebuttal Report, Section V.A.

[250] Tucker First Rebuttal Report, ¶ 71 ("Assad et al. (2024) study algorithm adoption in the German retail gasoline market, a homogeneous product with frequent price updates, which differs meaningfully from the multifamily rental housing sector."); Assad, Stephanie et al., "Algorithmic Pricing and Competition: Empirical Evidence from the German Retail Gasoline Market," *Journal of Political Economy*, Vol. 132, No. 3, 2024, pp. 723–771.

[251] Tucker First Rebuttal Report, ¶ 75 ("Importantly, in a high-demand state, which the Marinescu Report acknowledges applies to the period examined here, the authors find that both channels can generate the same directional pattern of higher rents and lower occupancy, meaning that the observation that algorithmic penetration is associated with higher prices is not diagnostic of collusion on its own."); Calder-Wang & Kim (2024) at p. 2 ("However, because these two channels produces [sic] directionally the same prediction during a boom, it is more challenging to isolate the coordination channel by running such regressions of price and quantity on adoption status.").

-89-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND)
REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

conditions that do not apply to the context in which Yardi operates.[252] Finally, I explained that the Marinescu Original Report not only misunderstands the purpose of the tests outlined in Harrington (2025), it also ignores the limitations of those analyses.[253] Harrington cautions that his framework "may not be robust to firm asymmetries,"[254] is subject to "possible endogeneity of the adoption rate,"[255] and can find increasing prices when adoption rates increase "even with independent adoptions" during a high-demand state.[256]

### B. The Marinescu Second Report Does Not Challenge My First Rebuttal Report's Critique that the At-Issue Outcomes Can Be Consistent with Unilateral Behavior

144.    In my First Rebuttal Report, I explained that the Marinescu Original Report's descriptive evidence cannot reliably disentangle collusive conduct from competitive outcomes because it does not use an appropriate competitive yardstick or comparator group. It failed to test alternative unilateral and competitive explanations for the observed pricing patterns, including macroeconomic conditions.[257] Despite my critiques, the Marinescu Second Report again raises

---

[252] Tucker First Rebuttal Report, ¶ 77 ("Sugaya and Wolitzky (2018) develop a theoretical model to show that reduced transparency can facilitate collusion only under specific structural conditions that do not apply to the context in which Yardi operates. […] Similarly, Sugaya and Wolitzky (2025) develop a theoretical model in which a third-party intermediary observes demand or cost conditions and optimally chooses what information to disclose to competing firms to maximize collusive profits"); Sugaya, Takuo and Alexander Wolitzky, "Maintaining Privacy in Cartels," *Journal of Political Economy*, Vol. 126, No. 6, 2018, pp. 2569–2607; Sugaya, Takuo and Alexander Wolitzky, "Collusion with Optimal Information Disclosure," *MIT Economics Working Papers*, 2025.

[253] Tucker First Rebuttal Report, ¶ 78.

[254] Tucker First Rebuttal Report, ¶ 79; Harrington (2025) at p. 285 ("A possible concern with Test #3 is that it may not be robust to firm asymmetries. For example, suppose firms have different marginal costs and the pricing algorithm allows a firm to program in its marginal cost.").

[255] Tucker First Rebuttal Report, ¶ 80; Harrington (2025) at p. 287 ("A concern with this empirical approach is the possible endogeneity of the adoption rate. If firms are heterogeneous and that heterogeneity affects both their adoption decisions and the prices set by the pricing algorithm then the estimated coefficient on the adoption rate will be biased.").

[256] Tucker First Rebuttal Report, ¶ 81; Harrington (2025) at p. 283, footnote 29 ("When the demand state is stronger, a firm's profit-maximizing price is higher. Given firms' prices are strategic complements, a firm optimally raises price more when other firms also raise their prices.").

[257] Tucker First Rebuttal Report, ¶¶ 82–85.

-90-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

many of its original findings without demonstrating that these observations distinguish collusion from unilateral behavior.

### 1.    Disentangling Collusive Conduct from Competitive Outcomes Requires Using a Competitive Yardstick or Comparator Group

145.    In my First Rebuttal Report, I explained that when evaluating alleged collusion, it is important to recognize that collusion and competition can generate observationally similar pricing patterns. Competing firms set their own prices by relying on common market factors and publicly available rival prices, resulting in interdependent and positively correlated outcomes even in the absence of an agreement or a hub algorithm. Therefore, the relevant economic question is whether these outcomes are consistent with collusion rather than plausible unilateral explanations.[258]

146.    The collusion-screening literature consistently emphasizes the need to compare observed pricing patterns to an appropriate competitive yardstick or comparator group. Abrantes-Metz and Bajari (2012) explain that screens for conspiracy must compare observed prices to control groups: "prices that are anomalous compared to other markets suggest a competition problem," while prices that track other markets are consistent with competition.[259] Calder-Wang & Kim (2024), for instance, uses as a comparison group non-adopters in the same market segment, defined as a geographical submarket and building quality.[260]

147.    Harrington (2025), a paper that the Marinescu Original Report described as "seminal," also warns that when demand during the sample period exceeds the average demand state used in designing the pricing algorithm, "average price will be increasing in the adoption rate

---

[258] Tucker First Rebuttal Report, ¶ 82.

[259] Abrantes-Metz, Rosa and Patrick Bajari, "Screens for Conspiracies and Their Multiple Applications," *Competition Policy International*, Vol. 8, No. 1, 2012, pp. 177–193 at p. 178; Tucker First Rebuttal Report, ¶¶ 84–85.

[260] Calder-Wang & Kim (2024), at pp. 1-2 ("[W]e estimate building-level differences between adopters and non-adopters to identify possible evidence of responsive pricing. Our main specification estimates the time-varying treatment effects of algorithmic pricing by comparing adopters and non-adopters in the same market segment, defined by a pair of submarket and building quality class (Class A vs. B/C).").

-91-

even with independent adoptions."[261] Harrington (2025) also notes that when demand is stronger, a firm's profit-maximizing price is higher, and where firms' prices are strategic complements, a firm may optimally raise price more when other firms also raise their prices.[262] This mechanism can generate an upward co-movement of prices without any coordination.

## 2. The Marinescu Second Report Continues to Ignore the Need to Distinguish Collusion From Unilateral Behavior

148.    Despite my critiques, the Marinescu Second Report again raises several of its original points on the common use of benchmarking, certain similar configurations, high adherence to Revenue IQ "recommendations," and parallel price movements, without demonstrating that these observations distinguish collusion from unilateral behavior.[263] Many of the Marinescu Reports' findings are also consistent with unilateral use of a common revenue-optimization platform. These findings are therefore uninformative, as the Marinescu Second Report continues to fail to test any alternative unilateral or competitive explanation.

149.    For example, the Marinescu Second Report emphasizes the adherence to Revenue IQ's pricing outputs, with clients transacting within five percent of Revenue IQ's list price in more than 91 percent of leases.[264] However, this pattern is equally consistent with clients who find the algorithm's pricing outputs useful and adopt them unilaterally as it is with a collusive scheme. A rational landlord who configures and then uses a revenue optimization tool and finds its pricing

---

[261] Harrington (2025) at p. 287. Marinescu Original Report, ¶ 104 ("To date, the seminal economic theory tackling these questions is Harrington (2025).").

[262] See Harrington (2025) at p. 283, footnote 29 ("The reason that a cartel manager would make price more sensitive to the demand state is as follows. When the demand state is stronger, a firm's profit-maximizing price is higher. Given firms' prices are strategic complements, a firm optimally raises price more when other firms also raise their prices. A cartel manager will take that effect into account so firms' prices will rise more in response to stronger demand compared to when prices are set independently.").

[263] Marinescu Second Report, ¶¶ 447–448 (reiterating that "undisputed" findings include TAMs' use of non-public data, benchmarking, and clients transacting within 5% of Revenue IQ's recommendation in more than 90% of leases.); Tucker First Rebuttal Report, ¶¶ 27, 82, 85 (explaining that common use of revenue management systems, high adherence to algorithmic recommendations, and parallel price movements are consistent with unilateral, procompetitive behavior and do not distinguish collusion from competitive explanations).

[264] Marinescu Second Report, ¶ 2.

-92-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

outputs effective will follow those pricing outputs most of the time, not because of cartel discipline, but because the pricing outputs – here, based on configurations chosen by each client – are perceived as profit-maximizing on a unilateral basis.[265] Neither of the two Marinescu Reports assesses whether the unilateral explanation is more likely than the collusive one.

150.    The Marinescu Second Report asserts that, if client configurability were producing genuinely independent pricing, prices would diverge.[266] This claim misunderstands competitive pricing. Economic theory does not predict that independently pricing firms facing common demand shocks must have divergent prices. Firms may rationally respond to the same demand, supply, and cost conditions in similar ways.[267] They may also respond to publicly observable rival prices. The resulting prices can be positively correlated in the absence of an agreement or a hub algorithm. Prices moving together therefore does not establish collusion. That is why a competitive yardstick or control group is needed.

151.    The parallel pricing analyses in Figures 45 to 47 of the Marinescu Original Report also suffer from not providing a competitive yardstick or control group. Figure 45 plots price indices across Landlord Defendant properties, and the Marinescu Original Report describes those indices as "visibly correlated."[268] Figure 46 plots monthly average effective rents across Landlord

---

[265] See Tucker First Rebuttal Report, ¶¶ 25–27 (explaining that firms have a unilateral incentive to adopt revenue management systems because "a revenue management system can help automate these processes" and "[i]ndividual firms can benefit […] through an improved ability to set prices optimally," and that "widespread use of such systems across an industry is consistent with unilateral, procompetitive behavior […]"); ¶¶ 87–88 (explaining that mechanisms such as automatic price propagation and internal audit tools "streamline[] a landlord's implementation of their own unilateral strategy" and are "consistent with tools that a landlord can use unilaterally to manage employee discretion and ensure consistent execution of their own individual pricing strategy […]").

[266] Marinescu Second Report, ¶ 48 ("If the configurability Mr. Yenikomshian describes were producing genuinely independent pricing, Landlord Defendants' prices would diverge. They do not.").

[267] Perloff (2015) at p. 23 ("Amazingly, a market equilibrium occurs without any explicit coordination between consumers and firms. In a competitive market such as that for agricultural goods, millions of consumers and thousands of firms make their buying and selling decisions independently […]. If the price is not at the equilibrium level, consumers or firms have an incentive to change their behavior in a way that will drive the price to the equilibrium level[.]")

[268] Marinescu Original Report, ¶¶ 332–334; Figure 45.

Defendant properties, which are described as moving "in [p]arallel."[269] Figure 47 removes property-level fixed effects from average effective rents, and the Marinescu Original Report claims that it shows that "Landlord Defendants […] [m]oved their prices in visible synchrony."[270] Neither figure can distinguish coordination from competition because neither accounts for the common macroeconomic conditions that produce similar patterns under purely unilateral pricing. As such, its analysis is simply capturing that Landlord Defendants' rents generally tended to increase during this period, consistent with non-Revenue IQ properties, yielding the "visible synchrony" it observes.[271]

152.    Observed co-movement in rents can arise from both collusion and unilateral responses to common market conditions, meaning that parallel price movement is not by itself diagnostic of coordinated pricing. The Marinescu Second Report claims that "none of Yardi's Experts have engaged with it or offered an alternative explanation for the parallel pricing outcomes I found."[272] This is, however, not the case. My First Rebuttal Report explained that shared macroeconomic conditions across landlords and properties could explain those "parallel pricing outcomes." I explained that, for example, a nationwide housing shortage or the loosening of COVID-19 restrictions are potential factors that would cause upward pressure on rents across properties simultaneously, producing parallel price increases unrelated to coordination. Failing to control for these common macroeconomic trends could falsely attribute the observed parallel price increases to collusive conduct.[273]

153.    The Marinescu Original Report does acknowledge that during the sample period, "multifamily rentals in the US [were], generally speaking, [in] a high demand state" and "rents increased rapidly across many metropolitan areas, driven by sustained demand and structural constraints on housing supply."[274] However, the analyses in Figures 45 to 47 of the Marinescu

---

[269]  Marinescu Original Report, ¶¶ 332–334; Figure 46.
[270]  Marinescu Original Report, ¶ 336; Figure 47.
[271]  Marinescu Original Report, ¶ 336.
[272]  Marinescu Second Report, ¶ 427.
[273]  Tucker First Rebuttal Report, ¶ 85.
[274]  Marinescu Original Report, ¶¶ 124, 566.

-94-

Original Report do not compare Landlord Defendant properties to an appropriate competitive yardstick or control group. Therefore, these analyses cannot distinguish whether the observed co-movement is attributable to coordination or competition.

154.   The Marinescu Original Report itself acknowledges that high pricing correlations "are not, on their own, determinative."[275] Figures 45 to 47 illustrate why. They show co-movement in rents, but they do not identify the mechanism that produced it. They do not compare Revenue IQ users to an appropriate competitive yardstick or control group, do not evaluate comparable non-users, and do not account for the high-demand period that the Marinescu Original Report elsewhere acknowledges. What remains is descriptive evidence that rents for many Landlord Defendant properties moved upward over time during a period of broad rent growth. Without an empirical test that distinguishes collusion from common market forces and unilateral pricing responses, those figures do not reliably support the Marinescu Reports' coordination inference.

155.   I took the Marinescu Original Report's Figure 47 and overlaid a comparable version of the average rent series for "Non-RM [non-revenue management] Users" from its Figure 86, also Figures 1 and 5 in the Marinescu Second Report. As **Figure 7** shows, the "visible synchrony" characterized as evidence of parallel pricing is reflected in the "Non-RM Users" series she adopts elsewhere as a competitive yardstick, meaning that the observed parallelism is independent of Revenue IQ adoption.[276] As such, the Marinescu Reports' conclusion that parallel price movements

---

[275] Marinescu Original Report, ¶ 341 ("In the economics literature, sustained and unusually high pricing correlations among rivals—particularly when accompanied by price increases relative to broader market benchmarks (*see* Section 9.2) — are commonly interpreted as evidence that pricing decisions may be interdependent rather than independent. Such patterns are not, on their own, determinative, but they are informative when evaluated together with other evidence related to firms' conduct.").

[276] Marinescu Original Report, ¶ 336 ("Adjusting for property-level average rents, Figure 47 shows that Landlord Defendants: Moved their prices in visible synchrony for over 5 years. Increased the speed of their parallel price increases in 2021/2022, a phenomenon potentially linked to Yardi's benchmarking and TAM oversight […]"); Marinescu Second Report, ¶ 440 ("After removing persistent property-level price differences through a standard demeaning transformation, I showed that monthly rents moved in visible synchrony for over five years, with the speed of parallel price increases accelerating in 2021/2022.").

by Revenue IQ users are evidence of coordination lacks a sound basis, as those movements cannot be distinguished from unilateral behavior.

**Figure 7**
**Upward Price Movements and "Visible Synchrony" Are Not Specific to Revenue IQ Properties[277]**



**Notes**:
[1] The Landlord Defendant Property sample consists of 2,153,893 leases identified in the Yardi lease data between January 2011 and August 2025. The Marinescu Original Report sample is filtered to only keep leases with positive monthly effective rents. The non-RM user series is constructed from Yardi performance data for the "In Place Rent Per Unit" measure. For purposes of this figure, both series are restricted to the common sample period from October 2019 through September 2024.

---

[277] Marinescu Original Report, Figure 47, and Figure 86 and Backup Materials (YARDI-DUFFY_00913149; YARDI-DUFFY_00115308.xlsx, YARDI-DUFFY_00116563.xlsx, YARDI-DUFFY_00118394.xlsx, YARDI-DUFFY_00118560.xlsx, YARDI-DUFFY_00227565.xlsx, YARDI-DUFFY_00227897.xlsx, YARDI-DUFFY_00227898.xlsx, YARDI-DUFFY_00227899.xlsx, YARDI-DUFFY_00582522.xlsx, YARDI-DUFFY_00585450.xlsx, YARDI-DUFFY_00585471.xlsx, YARDI-DUFFY_00623392.xlsx, YARDI-DUFFY_00023860.xlsx, YARDI-DUFFY_00024130.xlsx, YARDI-DUFFY_00024718.xlsx, YARDI-DUFFY_00024800.xlsx, YARDI-DUFFY_00031612.xlsx, YARDI-DUFFY_00113657.xlsx, YARDI-DUFFY_00113943.xlsx, and YARDI-DUFFY_00114125.xlsx.).

[2] The blue lines show monthly average effective rents for Landlord Defendant properties, calculated at the property-month level. Property-month observations are included only when observed leases represent more than 50 percent of units in the property or when at least 30 units are observed. The red line shows a demeaned non-RM user series constructed from Yardi performance data according to the Marinescu Original Report.

[3] Each series is demeaned by subtracting its average monthly rent over the sample period from each monthly observation.

[4] Observations with demeaned monthly average rents greater than $1,000 or less than -$1,000 are excluded from the figure consistent with the approach in the Marinescu Original Report.

156.    The Marinescu Reports further claim that Revenue IQ adopters "[i]ncreased the speed of their parallel price increases in 2021/2022,"[278] which she claims is "potentially linked to Yardi's benchmarking and TAM oversight[.]"[279] However, **Figure 7** shows that average rents of "Non-RM Users" also show an uptick around the same time as Revenue IQ users, invalidating the Marinescu Reports' conjecture that such movements resulted from Yardi's benchmarking and TAM oversight.

157.    Finally, the Pearson correlations reported in Figure 48 of the Marinescu Original Report and reiterated in the Marinescu Second Report are equally uninformative.[280] To "corroborate [the] visual inspection" of Figure 47, the Marinescu Original Report calculates pairwise correlations between rents charged over time by same-PUMA properties, while "exclud[ing] correlations between properties owned by the same landlord."[281] The Marinescu Original Report then plots the distribution of the resulting "3,498 Pearson correlation coefficients" in Figure 48 and claims that the high correlation coefficients are evidence of "properties' rents […] being steered in the same direction at the same time, rather than each property's rents evolving

---

[278] Marinescu Original Report, ¶ 336; Marinescu Second Report, ¶ 440.

[279] Marinescu Original Report, ¶ 336.

[280] Marinescu Original Report, ¶ 337 ("To corroborate my visual inspection above, I calculated 3,498 Pearson correlation coefficients between Landlord Defendant properties during the class period, measuring how correlated average rents were across Landlord Defendant properties, where each observation is an average rent for a property and month, filtered for >50% occupancy or at least 30 leases. I calculate correlations between properties in the same PUMA – as these properties are plausibly competing with each other – and exclude correlations between properties owned by the same landlord (identified using the client pin variable)."); Marinescu Original Report, Figure 48; Marinescu Second Report, ¶ 440 ("To corroborate the visual pattern statistically, I calculated 3,498 Pearson correlation coefficients between Landlord Defendant properties in the same PUMA, excluding pairs owned by the same landlord.").

[281] Marinescu Original Report, ¶ 337.

-97-

individually in response to its own competitive conditions."[282] However, this correlation analysis does not support that conclusion, because correlations computed on upwards trending time series are biased upward by construction. For instance, two series that both trend upward will approach a correlation of one regardless of any causal link between them, a well-known problem of spurious correlation in time-series data.[283] The Marinescu Original Report computes correlations on monthly effective rents that rose strongly throughout the sample period.[284] A median correlation of 0.72 among rental properties during a national rent boom shows that rents generally went up together, not that Revenue IQ caused them to do so.[285] The Marinescu Original Report Figure 47's "demeaning" exercise, which removes each property's average price level, does not remove the common time trend. For illustration, imagine a unit rented for $900 with a rent increase of $100 each period over three periods, corresponding to rents of $900, $1,000, and $1,100. The mean of

---

[282] Marinescu Original Report, ¶¶ 337–338 ("Where correlations are close to 1, this means that month-to-month rent movements across different properties are not just broadly similar but nearly synchronized. In practical terms, this looks like properties' rents are being steered in the same direction at the same time, rather than each property's rents evolving individually in response to its own competitive conditions.").

[283] See, for example, Studenmund (2017) at p. 376 ("One problem with time-series data is that independent variables can appear to be more significant than they actually are if they have the same underlying trend as the dependent variable. In a country with rampant inflation, for example, almost any nominal variable will appear to be highly correlated with all other nominal variables. […] This inflationary component will usually outweigh any real causal relationship, making nominal variables appear to be correlated even if they aren't."); Yule, G. Udny, "Why Do We Sometimes Get Nonsense-Correlations Between Time-Series?-- A Study in Sampling and the Nature of Time Series," *Journal of the Royal Statistical Society,* Vol. 89, No. 1, 1926 ("Yule (1926)"), pp. 1–63 at p. 2 ("It is fairly familiar knowledge that we sometimes obtain between quantities varying with the time (time-variables) quite high correlations to which we cannot attach any physical significance whatever, although under the ordinary test the correlation would be held to be certainly 'significant.'").

[284] Marinescu Original Report, ¶¶ 337–338 ("To corroborate my visual inspection above, I calculated 3,498 Pearson correlation coefficients between Landlord Defendant properties during the class period, measuring how correlated average rents were across Landlord Defendant properties, where each observation is an average rent for a property and month, filtered for >50% occupancy or at least 30 leases. I calculate correlations between properties in the same PUMA […]").

[285] Marinescu Original Report, ¶ 337 ("I find over 76% of correlations were positive, the median correlation was 0.72, 29% of correlations were above 0.9, and the most common correlation was 0.99 […]").

-98-

the rents is $1,000, such that the demeaned data would be -$100, $0, and $100 – keeping the trend unchanged. Demeaning therefore leaves the spurious-correlation problem intact.[286] Without detrending or comparison to a competitive benchmark, the reported correlations cannot reliably distinguish coordinated pricing from unilateral pricing responses to shared market conditions.[287]

158.    **Figure 8** illustrates the effect of this spurious correlation by comparing the Marinescu Original Report's Figure 48 distribution with two alternative distributions that control for common macroeconomic conditions. First, I adjust each Landlord Defendant property's monthly demeaned average rent, shown by the blue lines in **Figure 7**, by subtracting the demeaned monthly average rent for non-RM users, shown by the red line in **Figure 7**. I then calculate pairwise correlations using these yardstick-adjusted rent series in the same way as the Marinescu Original Report. Second, given the Marinescu Second Report's new emphasis on first-differences,[288] I

[286] Marinescu Original Report, ¶¶ 335–336 ("One way to further evaluate this data is to remove persistent price differences across properties and focus on how prices move over time *relative to each property's own baseline*, also known as demeaning the prices. This is done by calculating an average price for each property over the relevant period and subtracting that average from the property's price in each month. This transformation places all properties on a common scale, allowing their price movements to be compared directly [….] Adjusting for property-level average rents, Figure 47 shows that Landlord Defendants: Moved their prices in visible synchrony for over 5 years. Increased the speed of their parallel price increases in 2021/2022, a phenomenon potentially linked to Yardi's benchmarking and TAM oversight[.]") (emphasis in original).

[287] Studenmund (2017) at p. 376 ("One problem with time-series data is that independent variables can appear to be more significant than they actually are if they have the same underlying trend as the dependent variable. In a country with rampant inflation, for example, almost any nominal variable will appear to be highly correlated with all other nominal variables. […] This inflationary component will usually outweigh any real causal relationship, making nominal variables appear to be correlated even if they aren't."); Yule (1926) at p. 2 ("It is fairly familiar knowledge that we sometimes obtain between quantities varying with the time (time-variables) quite high correlations to which we cannot attach any physical significance whatever, although under the ordinary test the correlation would be held to be certainly 'significant.'").

[288] Marinescu Second Report, ¶ 312 ("[T]he first-difference regressions serve an important conceptual purpose in implementing the Harrington test: they measure whether rent growth responds to changes in co-conspirator density, even accounting for the fact that some units have higher rent growth independently of the number of co-conspirators. Results from this specification cannot simply be set aside as irrelevant."). See also Marinescu Second Report, ¶ 41 ("[W]here a levels regression compares rent levels across observations within a unit, a first-difference regression strips out baseline time trends and isolates what happens to rent growth when Revenue IQ adoption changes.").

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                                  CASE NO.: 2:23-CV-01391-RSL

detrend the rent series by adjusting each Landlord Defendant property's monthly average rent by subtracting its value from the previous month's value. I then calculate pairwise correlations using this first-differenced rent series in the same way as the Marinescu Original Report. The resulting distributions are denoted as "Yardstick-Adjusted Landlord Defendant Rents," shown in red in **Figure 8**, and "First-Differenced Landlord Defendant Rents," shown in green in **Figure 8**. Both distributions are then overlaid on the distribution of rents from Figure 48 of the Marinescu Original Report for months in which the two series in **Figure 7** overlap, shown in blue in **Figure 8**.

159.    Overall, the figure shows that the distribution of pairwise correlations is substantially flattened once shared macroeconomic conditions are controlled for. Adjusting the Landlord Defendant rents using the non-RM yardstick results in a substantially flattened distribution, with the median correlation approximately halved from 0.74 to 0.37.[289] Detrending the Landlord Defendant rents by expressing the series in first-differences results in a distribution that is approximately centered around zero, with a median correlation of approximately 0.12. These results confirm that the original high correlations reported in Figure 48 of the Marinescu Original Report were largely driven by unilateral pricing responses to shared macroeconomic conditions. However, this analysis does not capture that landlords using revenue management systems may be able to more efficiently respond to demand and supply changes, resulting in similar price movements for reasons independent of any collusion.

---

[289]   The Marinescu Original Report's Figure 48 shows a median correlation of 0.72. The discrepancy with the blue distribution in **Figure 8** is due to restricting the sample to months in which the two series in **Figure 7** overlap.

-100-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

**Figure 8**
**Copy of Marinescu Original Report's Figure 48 and Overlaid Distributions of Pairwise Correlations Between Yardstick-Adjusted Landlord Defendant Rents and Pairwise Correlations Between First-Differenced Landlord Defendant Rents[290]**



**Pearson Correlation Coefficients Across Landlord Defendant Properties**

- Marinescu Original Report Figure 48
- Yardstick-Adjusted Landlord Defendant Rents
- First-Differenced Landlord Defendant Rents

**Notes:**
[1] The Landlord Defendant Property sample consists of 2,153,893 leases identified in the Yardi lease data between January 2011 and August 2025. The Marinescu Original Report sample is filtered to only keep leases with positive monthly effective rents. The non-RM user series is constructed from Yardi performance data for the "In Place Rent Per Unit" measure. For purposes of this figure, the three series are restricted to the common sample period from October 2019 through September 2024.

---

[290] Marinescu Original Report, Figure 47, Figure 48, and 86, and Backup Materials (YARDI-DUFFY_00913149; YARDI-DUFFY_00115308.xlsx, YARDI-DUFFY_00116563.xlsx, YARDI-DUFFY_00118394.xlsx, YARDI-DUFFY_00118560.xlsx, YARDI-DUFFY_00227565.xlsx, YARDI-DUFFY_00227897.xlsx, YARDI-DUFFY_00227898.xlsx, YARDI-DUFFY_00227899.xlsx, YARDI-DUFFY_00582522.xlsx, YARDI-DUFFY_00585450.xlsx, YARDI-DUFFY_00585471.xlsx, YARDI-DUFFY_00623392.xlsx, YARDI-DUFFY_00023860.xlsx, YARDI-DUFFY_00024130.xlsx, YARDI-DUFFY_00024718.xlsx, YARDI-DUFFY_00024800.xlsx, YARDI-DUFFY_00031612.xlsx, YARDI-DUFFY_00113657.xlsx, YARDI-DUFFY_00113943.xlsx, and YARDI-DUFFY_00114125.xlsx.).

[2] The blue density represents the distribution of Pearson correlation coefficients across pairs of Landlord Defendant properties located within the same PUMA, reproduced using the methodology from Figure 48 of the Marinescu Original Report, except that the correlations are calculated using leases restricted to the common sample period from October 2019 through September 2024. Consistent with the Marinescu Original Report's filtering, property-month observations are included only when observed leases represent more than 50 percent of units in the property or when at least 30 units are observed.

[3] The red density represents the distribution of Pearson correlation coefficients across the same set of Landlord Defendant property pairs. Correlations are calculated using the Landlord Defendant property's demeaned average monthly effective rents minus the demeaned average monthly effective rents of non-RM peers and using the same sample restrictions and within-PUMA property-pair comparisons as in Note [2].

[4] The green density represents the distribution of Pearson correlation coefficients across pairs of first-differenced Landlord Defendant average monthly effective rents. First-differenced rents are defined as the change in a Landlord Defendant property's average monthly effective rent relative to the preceding month and are calculated only for consecutive monthly observations. Correlations are calculated using the same sample restrictions and within-PUMA property-pair comparisons as in Note [2].

160.    In sum, the Marinescu Reports provide no reliable method for distinguishing coordination from unilateral pricing responses to common market conditions. The parallel price movements and high correlations they emphasize are equally consistent with landlords independently responding to shared demand shocks during a high-demand period.

C.    **The Marinescu Second Report Continues to Ignore the Unilateral Incentives Firms Have to Adopt Revenue Management Systems**

161.    The Marinescu Second Report does not challenge my critique that firms have unilateral incentives to adopt revenue management systems.[291] Instead, it continues to ignore the existence of those unilateral incentives when claiming that "if [a] directional signal is uniform across clients, the coordination mechanism I describe is operative regardless of differences in magnitude."[292] The Marinescu Second Report's characterization of Yardi's benchmarking tools as providing a "directional signal" departs from her Original Report's characterization that Yardi's benchmarking provides "comprehensive visibility" into rival landlords' pricing.[293] Informing

---

[291]  Tucker First Rebuttal Report, Section III.

[292]  Marinescu Second Report, ¶ 411.

[293]  Marinescu Original Report, ¶ 395 ("Landlord defendants need not blindly trust Yardi's TAM oversight. Yardi also directly shares non-public rival data with clients through its benchmarking reports. This non-public information gives clients comprehensive visibility on rivals' pricing and allows them to strategically increase prices."); Marinescu Second Report, ¶ 58 ("What

-102-

clients that aggregate prices are generally trending upwards or downwards, based on aggregated and anonymized data on market conditions or based on publicly available asking rents, has procompetitive benefits.

162.    Firms typically rely on market information to understand whether demand and supply are increasing or decreasing and whether their own pricing aligns with market trends. As I described in my First Rebuttal Report, competing firms set their own prices by relying on common market factors and publicly available rival prices.[294] For instance, a home seller will consider comparable home prices in their area when determining their sales price. Similarly, in this context, a landlord choosing how to price an apartment will consider competing rents in their area.

163.    Gathering such market information can be costly. Benchmarking reduces search costs that firms would incur to gather information they need for pricing. By providing aggregate market-trend signals, benchmarking helps firms better understand changing demand and supply conditions.

164.    In multifamily housing, for example, benchmarking can be procompetitive when it signals to a property that its units are overpriced relative to competitors. In this context, benchmarks may discipline overpriced units or properties. Benchmarking may also be procompetitive when it signals to a landlord that it should raise prices. As discussed in my First Rebuttal Report, an upward pricing signal may correct inefficiencies by allocating scarce units to renters who value them the most.[295] In this context, a rent increase reflects a competitive, market-clearing price, rather than a supracompetitive price, setting incentives correctly in the long term.

---

matters is that benchmarking converts competitors' non-public CPD data into directional signals showing whether a client is pricing above or below its peers, and neither [Mr. Yenikomshian nor Dr. Mitzenmacher] disputes this.").

[294] Tucker First Rebuttal Report, ¶ 82 ("When evaluating alleged collusion, it is important to recognize that collusion and competition can generate observationally similar pricing patterns. Competing firms set their own prices by relying on common market factors and publicly available rival prices, resulting in interdependent and positively correlated outcomes even in the absence of an agreement or a 'hub algorithm.'").

[295] Tucker First Rebuttal Report, ¶ 24 ("Pricing that more accurately reflects demand in a perishable-capacity and fluctuating-demand setting can improve economic efficiency. When

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

165.    The procompetitive use of benchmarking is not unique to multifamily rentals. In health care, benchmarking is recognized as a method for identifying performance gaps and improving quality of care.[296] For example, the U.S. Centers for Medicare & Medicaid Services ("CMS") oversees the Transparency in Coverage rule, which mandates that healthcare plans and issuers "make price comparison information available with respect to an initial list of 500 identified items and services."[297] Empirical research confirms benefits from benchmarking. For example, Cullen et al. (2022) find that when firms gain access to a salary benchmarking tool, salary dispersion falls by 25 percent through bidirectional compression: firms above the median reduce pay toward it, while firms below the median raise pay toward it, the signature of procompetitive information correction rather than coordinated price elevation.[298]

inventory is fixed in the short run and vacancies are costly, that is, the lost revenue from an empty seat, hotel room, or apartment unit cannot be recovered later, pricing that better reflects current demand conditions helps reduce inefficient vacancies and improves matching between available units and renters. In lower-demand periods, revenue management systems are designed to recommend lower prices and/or concessions to increase utilization; in higher-demand periods, higher prices help allocate scarce units to renters who value them the most without relying on non-price rationing, such as delays, queues, or arbitrary screening.").

[296] Willmington, Claire, et al., "The Contribution of Benchmarking to Quality Improvement in Healthcare: A Systematic Literature Review," *BMC Health Services Research*, Vol. 22, No. 139, 2022 ("Benchmarking has been recognised as a valuable method to help identify strengths and weaknesses at all levels of the healthcare system. […] A total of 17 articles were identified. All studies reported a positive association between the use of benchmarking and quality improvement in terms of processes (N = 10), outcomes (N = 13) or both (N = 7). In the majority of studies (N = 12), at least one intervention, complementary to benchmarking, was undertaken to stimulate quality improvement.").

[297] U.S. Centers for Medicare & Medicaid Services, "Consumers," CMS.gov, updated August 14, 2025, available at https://www.cms.gov/priorities/healthplan-price-transparency/overview/consumers.

[298] Cullen, Zoe B., et al., "What's My Employee Worth? The Effects of Salary Benchmarking," NBER Working Paper No. 30570, *National Bureau of Economic Research*, revised August 2024, p. 34 ("The evidence suggests that salary benchmarking has a significant effect on pay setting, and in a manner consistent with the predictions of the model. For instance, we find that access to the tool compresses salaries towards the market benchmark quite significantly, and especially in low-skill positions. […] First, our model provides a theoretical foundation for what the policy-makers call procompetitive effects. Second, we provide empirical evidence on the effects of salary benchmarking. While our empirical evidence cannot speak to the equilibrium effects, it shows that when one additional firm gains access to the benchmark information, that leads, if anything, to modest salary gains concentrated in low-skill positions.

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND)
REPORT OF IOANA MARINESCU, PH.D.                    CASE NO.: 2:23-CV-01391-RSL

166.    Additionally, the Marinescu Original Report claimed that Yardi's "benchmarking report" gave its Revenue IQ clients "comprehensive visibility on rivals' pricing."[299] However, as I explained in my First Rebuttal Report, the Marinescu Original Report fails to recognize that access to a common revenue management system and benchmarking tool does not imply coordination between market participants.[300] The Marinescu Second Report pivots to suggesting that Yardi's benchmarking provides "directional signals." An aggregated, anonymized benchmark providing "directional signals" is consistent with the procompetitive benefits discussed in this section.

167.    In sum, benchmarking is a common tool with recognized procompetitive benefits. Both Marinescu Reports ignore the potential procompetitive effects of Yardi's "directional signals."

_____

Catherine Tucker, Ph.D.
June 15, 2026

---

And in addition to employees, employers may benefit too, as we find that the salary gains are accompanied by gains in employee retention.").

[299] Marinescu Original Report, ¶ 395 ("Yardi also directly shares non-public rival data with clients through its benchmarking reports. This non-public information gives clients comprehensive visibility on rivals' pricing and allows them to strategically increase prices.").

[300] Tucker First Rebuttal Report, ¶ 27.

-105-

DECLARATION OF CATHERINE TUCKER, PH.D. IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.                CASE NO.: 2:23-CV-01391-RSL

**APPENDIX A**
**CURRICULUM VITAE**

# CATHERINE TUCKER

| | |
|---|---|
| MIT Sloan School of Management | Tel: (617) 252-1499 |
| 100 Main St, E62-536 | cetucker@mit.edu |
| Cambridge MA 02142 | http://mitmgmtfaculty.mit.edu/cetucker/ |

## EDUCATION

Stanford University, Ph.D. in Economics (Advisor: Tim Bresnahan), 2005

Oxford University, BA in Politics, Philosophy and Economics, 1999

## APPOINTMENTS

MIT Sloan, Sloan Distinguished Professor of Management Science and Professor of Marketing, September 2015 –

MIT Sloan, Faculty Chair EMBA Program, July 2022 - July 2026

MIT Sloan, Chair MIT Sloan PhD Program, July 2015 -2022

MIT, Co-Founder of the MIT CryptoEconomics Lab, 2018 -

MIT Sloan, Professor of Management Science, July 2015 –September 2015

National Bureau of Economic Research (NBER), Research Associate, September 2012 –

MIT Sloan, Mark Hyman Jr. Career Development Professor (with tenure), July 2012 – September 2015

MIT Sloan, Associate Professor of Management Science, July 2011 – July 2015

National Bureau of Economic Research (NBER), Faculty Research Fellow, May 2011 – September 2012

MIT Sloan, Douglas Drane Career Development Chair in IT and Management, July 2006 –

MIT Sloan, Assistant Professor of Marketing, July 2005 – June 2011

## PUBLISHED/ACCEPTED PAPERS

1. 'Identifying Formal and Informal Influence in Technology Adoption with Network Externalities', *Management Science*, Vol. 55 No. 12, December 2008, pp. 2024-2039

2. 'Privacy Protection and Technology Diffusion: The Case of Electronic Medical Records' with Amalia Miller, *Management Science (Lead Article)*, Vol. 55 No. 7, July 2009, pp. 1077-1093

   • Republished as part of INFORMS 'Healthcare in the Age of Analytics' series

3. 'How Sales Taxes Affect Customer and Firm Behavior: The Role of Search on the Internet' with Eric Anderson, Nathan Fong and Duncan Simester, *Journal of Marketing Research*, Vol. 47 No. 2, April 2010, pp. 229-239

4. 'Growing Two-sided Networks by Advertising the User Base: A Field Experiment', with Juanjuan Zhang, *Marketing Science*, Vol. 29 No. 5, September-October 2010, pp. 805-814

5. 'Privacy Regulation and Online Advertising' with Avi Goldfarb, *Management Science*, Vol. 57 No. 1, January 2011, pp. 57-71

   • Nominated for Long Term Impact Award 2020

6. 'Search Engine Advertising: Channel Substitution when Pricing Ads to Context', with Avi Goldfarb, *Management Science*, Vol. 57 No 3, March 2011, pp. 458-470

7. 'Stuck in the Adoption Funnel: The Effect of Interruptions in the Adoption Process on Usage' with Anja Lambrecht and Katja Seim, *Marketing Science*, Vol. 30 No. 2, March-April 2011, pp. 355-367

8. 'Advertising Bans and the Substitutability of Online and Offline Advertising', with Avi Goldfarb, *Journal of Marketing Research (Lead Article)*, Vol. 48 No. 2, April 2011, pp. 207-227

9. 'Can Healthcare Information Technology Save Babies?' with Amalia Miller, *Journal of Political Economy*, Vol. 119 No. 2, April 2011, pp. 289-324

10. 'How Does Popularity Information Affect Choices? A Field Experiment' with Juanjuan Zhang, *Management Science*, Vol. 57 No. 5, May 2011, pp. 828-842

11. 'Online Display Advertising: Targeting and Obtrusiveness' with Avi Goldfarb, *Marketing Science (Lead Article and Discussion Paper)*, Vol. 30 No. 3, May-June 2011, pp. 389-404

    • 'Rejoinder-Implications of "Online Display Advertising: Targeting and Obtrusiveness' with Avi Goldfarb, *Marketing Science*, Vol. 30 No. 3, May-June 2011, pp. 413-415.

- Nominated for John D. C. Little Award
- Nominated for Long Term Impact Award 2017
- Long Term Impact Award 2018

12. 'Encryption and Data Security' with Amalia Miller, *Journal of Policy Analysis and Management*, Vol. 30 No. 3, Summer 2011, pp. 534-556

13. 'Paying With Money or With Effort: Pricing When Customers Anticipate Hassle' with Anja Lambrecht, *Journal of Marketing Research*, Vol. 49 No. 1, February 2012, pp. 66-82.

14. 'Heterogeneity and the Dynamics of Technology Adoption' with Stephen Ryan, *Quantitative Marketing and Economics*, Vol 10 No. 1, March 2012, pp 63-109.

15. 'Shifts in Privacy Concerns', *American Economic Review: Papers and Proceedings* with Avi Goldfarb, Vol. 102 No. 3, May 2012, pp. 349-53.

16. 'How does the Use of Trademarks by Intermediaries Affect Online Search?' with Lesley Chiou. *Marketing Science*, Vol 31 No. 5, September 2012, pp 819-837.

17. 'Active Social Media Management: The Case of Health Care' with Amalia Miller. *Information Systems Research*, Vol. 24 No. 1, March 2013, pp. 52-70.

- Republished as part of Informs 'Healthcare in the Age of Analytics' series

18. 'Paywalls and the Demand for News' with Lesley Chiou. *Information Economics and Policy*, Vol. 25 No. 2, June 2013, pp. 61-69.

19. 'Days on Market and Home Sales' with Juanjuan Zhang and Ting Zhu. *RAND Journal of Economics*, Vol. 44 No. 2, Summer 2013, pp. 337-360.

20. 'When Does Retargeting Work? Timing Information Specificity' with Anja Lambrecht. *Journal of Marketing Research (Lead Article)* Vol. 50 No. 5, October 2013, pp. 561-576.

- Paul E. Green Award for the 'Best article in the Journal of Marketing Research that demonstrates the greatest potential to contribute significantly to the practice of marketing research.'
- William O'Dell Award. This award award honors the JMR article published in 2013 that has made the most significant, long-term contribution to marketing theory, methodology, and/or practice

21. 'Health Information Exchange, System Size and Information Silos' with Amalia Miller. *Journal of Health Economics*, Vol. 33 No. 2, January 2014: pp. 28-42

A-3

22. 'Electronic Discovery and the Adoption of Information Technology' with Amalia Miller. *Journal of Law, Economics, & Organization (Lead Article)*, Vol. 30. No. 2, May 2014, pp. 217-243

23. 'Social Networks, Personalized Advertising, and Privacy Controls.', *Journal of Marketing Research*, Vol. 51 No. 5, October 2014, pp. 546-562.

    - Citation of Excellence Award Emerald Publishing
    - Nominated for William O'Dell Award (2019)

24. 'Trademarks, Triggers, and Online Search' with Stefan Bechtold. *Journal of Empirical Legal Studies*, Vol. 11 No. 4, December 2014

25. 'The Reach and Persuasiveness of Viral Video Ads' *Marketing Science*, Vol. 34 No. 2, 2015, pp. 281-296

26. 'Privacy Regulation and Market Structure' with James Campbell and Avi Goldfarb. *Journal of Economics & Management Strategy*, Vol 24, No. 1, Spring 2015, pp. 47-73

27. 'Standardization and the Effectiveness of Online Advertising' with Avi Goldfarb. *Management Science*, Vol. 61 No. 11, 2015, pp. 2707-2719

28. 'Harbingers of Failure' with Eric Anderson, Song Lin and Duncan Simester. *Journal of Marketing Research (Lead Article)*, Vol. 52 No. 5, Oct 2015, pp. 580-592

    - William O'Dell Award. This award award honors the JMR article published in 2015 that has made the most significant, long-term contribution to marketing theory, methodology, andor practice

29. 'The Effect of Patent Litigation and Patent Assertion Entities on Entrepreneurial Activity' with Stephen Kiebzak and Greg Rafert. *Research Policy*, Vol. 45 No. 1, February 2016, pp. 218-231

30. 'When early adopters don't adopt' with Christian Catalini. *Science*, Vol. 357, Issue 6347, 2017 pp. 135-136

31. 'Network Stability, Network Externalities, and Technology Adoption' in *Advances in Strategic Management*, Vol. 37, 2017, pp. 151-175

32. 'Digital Content Aggregation Platforms: The Case of the News Media.' with Lesley Chiou, *Journal of Economics & Management Strategy*, Vol. 26 No. 4, 2017, pp. 782-805

33. 'Should You Target Early Trend Propagators? Evidence from Twitter' with Anja Lambrecht and Caroline Wiertz (Lead Article). *Marketing Science*, Vol. 37 No. 2, 2018, pp. 177-199

34. 'Privacy Protection, Personalized Medicine and Genetic Testing' with Amalia Miller. *Management Science*, Vol. 64 No. 10, 2018, pp. 4648-4668.

35. 'Digital Economics' with Avi Goldfarb, *Journal of Economic Literature*, Vol. 57 No. 1, 2019, pp. 3-43

36. Collusion by Algorithm: Does Better Demand Prediction Facilitate Coordination Between Sellers? with Jeanine Miklós-Thal *Management Science*, Vol. 65 No. 4, 2019, pp. 1552-1561

37. 'Algorithmic Bias? An Empirical Study into Apparent Gender-Based Discrimination in the Display of STEM Career Ads ' with Anja Lambrecht. *Management Science* 2019, Vol 65, No 7, pp. 2966-2981

    - ISMS Long Term Impact Award 2026
    - TechSIG-Lazaridis Prize for Best Paper in Innovation, Technology and Interactivity for 2019

38. 'How Effective Is Black-Box Digital Consumer Profiling And Audience Delivery?: Evidence from Field Studies' with Nico Neumann and Tim Whitfield. *Marketing Science*, Dec, 2019, Vol 38, No 6, pp. 918-926 (Lead Article)

39. The Surprising Breadth of 'Harbingers of Failure' with Duncan Simester and Clair Yang. *Journal of Marketing Research* 2019, Vol 56, No. 6, pp 1034-1049

40. 'Consumer privacy and the future of data-based innovation and marketing.' with Alexander Bleier and Avi Goldfarb. *International Journal of Research in Marketing*, Sep 2020, Vol. 37, No 3, pp 466-480

41. 'Informational Challenges in Omnichannel Marketing: Remedies and Future Research' with Tony Cui, Anindya Ghose, Hanna Halaburda, Raghuram Iyengar, Koen Pauwels, S. Sriram, and Sriraman Venkataraman. *Journal of Marketing* 2021, Vol. 85, No. 1, pp. 103-120.

42. 'Product Quality and Performance in the Internet Age: Evidence from Creationist Friendly Curriculum' with Ananya Sen. *Journal of Marketing Research* 2022, Vol 59, No.1, pp 211-29.

43. 'Conducting Research in Marketing with Quasi-Experiments' with Avi Goldfarb and Yanwen Wang, (Lead Article) *Journal of Marketing* 2022, Vol 86, No 3, pp 1-20.

44. 'How Do Restrictions on Advertising Affect Consumer Search?' with Lesley Chiou, *Management Science*, 2022, Vol. 68, No. 2, pp. 866-882.

45. Scaling Smart Contracts via Layer-2 Technologies: Some Empirical Evidence. with Wiliam Cong, Xiang Hui, and Luofeng Zhou, *Management Science*, 2023 Vol. 69, No. 12, pp. 7306–7316.

46. 'Privacy Regulation and Barriers to Public Health' with Joe Buckman and Idris Adjerid. *Management Science*, 2023 Vol 69, No 1, pp. 342–350.

47. ' What Blockchain Can and Can't Do: Applications to Marketing and Privacy' with Alex Marthews. *International Journal of Research in Marketing*, 2023, Vol 40, No. 1, pp. 49-53.

48. 'What Type of Digital Advertising is Most Effective for B2B Prospecting? The Case of IT Decision-Makers' with Nico Neumann, Kumar Subramanyam and John Marshall. *Quantitative Marketing and Economics*, 2023, Vol. 21, pp. 519–571

49. 'Choosing to Discover the Unknown: The Effects of Choice on User Attention to Online Video Advertising' with Cheng Luo, Zhenhui (Jack) Jiang, Xiuping Li, and Cheng Yi,*Management Science*, 2023, Volume 70, No. 10, pp. 6983-7003.

50. 'TV Advertising and Online Sales: The Role of Inter-Temporal Substitution' with Anja Lambrecht and Xu Zhang. *Journal of Marketing Research*, 2024, Vol 61, No. 2, pp. 248-270.

51. 'Data Deserts and Black Boxes: The Impact of Socio-Economic Status on Consumer Profiling' with Nico Neumann, Levi Kaplan, Alan Mislove, and Piotr Sapiezynski. *Management Science*, 2024, Vol 70, No 11, pp.8003-8029.

52. 'Digital Hermits' with Avi Goldfarb, Avery Haviv, Jeanine Miklós-Thaal. *Marketing Science*, 2024, Vol. 43, No. 4, pp. 697-708.

53. 'Apparent algorithmic discrimination and real-time algorithmic learning in digital search advertising.' with Anja Lambrecht. *Quantitative Marketing and Economics*, 2024, Vol. 22, pp. 357–387.

54. 'Combining Ad Targeting Techniques: Evidence from a Field Experiment in the Auto Industry' with Chadwick Miller and Albert Valenti. *Management Science*, 2025, Vol. 71 No 10, pp. 8586-8603

A-6

55. Decentralization, Blockchain, Artificial Intelligence (AI): Challenges and Opportunities with Xiang Hui, *Journal of Product Innovation Management*, 2025, Vol 42, no. 5, pp. 947–957.

56. 'The Intended and Unintended Consequences of Privacy Regulation for Consumer Marketing' with Jean-Pierre Dubé, John G. Lynch, Dirk Bergemann, Mert Demirer, Avi Goldfarb, Garrett Johnson, Anja Lambrecht, Tesary Lin, Anna Tuchman, *Marketing Science* 2025, Volume 44, Issue 5 September-October, pp. 975–984.

57. 'Privacy, Data and Competition: The Case of Apps For Young Children', with Grazia Cecere, Fabrice Le Guel, Pai-Lin Yin, and Vincent Lefrere. Forthcoming at *Academy of Management Perspectives*

58. 'The Digital Privacy Paradox: Small Money, Small Costs, Small Talk' with Susan Athey and Christian Catalini, and Alex Moehring, Forthcoming at *MIS Quarterly*

59. 'Does Mobile Technology Integration Enhance Complaint Resolution Efficiency and Equity? An Empirical Study of How An Omnichannel Approach Affects Speed of Resolution of Government Service Requests' with Shuyi Yu and Yifei Wang. Forthcoming at *Information Systems Research*.

---

CHAPTERS IN EDITED VOLUMES AND SUMMARY PIECES

60. 'Modeling Social Interactions: Identification, Empirical Methods and Policy Implications' with Wes Hartmann, Puneet Manchanda, Harikesh Nair, Matt Bothner, Peter Dodds, David Godes and Karthik Hosanagar, *Marketing Letters*, Vol. 19 No. 3, December 2008, pp. 287-304

61. 'Search Engine Advertising - Examining a profitable side of the long tail of advertising that is not possible under the traditional broadcast advertising model' with Avi Goldfarb, *Communications of the ACM*, Vol. 51 No. 11, November 2008, pp. 22-24

62. 'Online Advertising', with Avi Goldfarb, *Advances in Computers*, Vol. 81, March 2011, Marvin Zelkowitz (Ed), Elsevier

63. 'Substitution between Online and Offline Advertising Markets', with Avi Goldfarb, *Journal of Competition Law and Economics*, Vol. 7 No. 1, March 2011, pp. 37-44

64. 'Online Advertising, Behavioral Targeting, and Privacy', with Avi Goldfarb, *Communications of the ACM*, Vol. 54 No. 5, May 2011, 25-27

65. 'Privacy and Innovation', *Innovation Policy and the Economy*, Vol. 11, 2012, Josh Lerner and Scott Stern (Eds), NBER

66. 'The Economics of Advertising and Privacy', *International Journal of Industrial Organization*, Vol. 30 No. 3, May 2012, pp. 326-329

67. 'Empirical Research on the Economic Effects of Privacy Regulation'. *Journal on Telecommunications and High Technology Law*, Vol. 10 No. 2, Summer 2012, pp. 265-272

68. 'Social Networks, Advertising and Antitrust', with Alex Marthews, *George Mason Law Review*, 2012, Vol 19 No 5., pp. 1211-1227.

69. 'Why Managing Customer Privacy Can Be an Opportunity' with Avi Goldfarb, *Spring 2013, Sloan Management Review*

70. 'The Implications of Improved Attribution and Measurability for Antitrust and Privacy in Online Advertising Markets', *George Mason Law Review*, Vol. 2 No. 2, pp. 1025-1054 (2013).

71. 'Patent Trolls and Technology Diffusion' *Standards, Patents and Innovations*, NBER Books, (2014), Edited by Timothy Simcoe, Ajay K. Agrawal, and Stuart Graham, Chapter 7

72. 'Privacy and the Internet' Chapter 11, *Handbook of Media Economics*, 2016, Edited by Simon Anderson and Joel Waldfogel

73. Frontiers of Health Policy: Digital Data and Personalized Medicine, *Innovation Policy and the Economy*, Vol. 15, 2016, Josh Lerner and Scott Stern (Eds), NBER

74. 'Impacts of Surveillance on Behavior' with Alex Marthews, in Gray, David C. and Henderson, Stephen (Editors), *The Cambridge Handbook of Surveillance Law* (2017).

75. 'On Storks and Babies: Correlation. Causality and Field Experiments, ' with Anja Lambrecht, *GfK Marketing Intelligence Review*, Vol 8. No 2. 2016

76. 'Field Experiments in Marketing,' with Anja Lambrecht, *Handbook of Marketing Analytics*, Edited by Natalie Mizik and Dominique Hanssens, Edward Elgar Publishing, (2018)

77. 'Can Big Data Protect a Firm from Competition?', *CPI Chronicle*, January, 2017 with Anja Lambrecht

78. Network Effects and Market Power: What Have We Learned in the Last Decade? *Antitrust* Vol. 32 No 2., Spring 2018

79. 'Inequality, Privacy and Digital Market Design', with Avi Goldfarb, Chapter in *Fair by Design* edited by Scott Kominers and Alex Teytelboym, 2017, Oxford University Press

80. 'Digital Data, Platforms and the Usual [Antitrust] Suspects: Network Effects, Switching Costs, Essential Facility' *Review of Industrial Organization* Volume 54, pp 683–694 (2019)

81. 'Antitrust and Costless Verification: An optimistic and a pessimistic view of the implications of blockchain technology' with Christian Catalini, *Antitrust Law Journal*, Volume 82 Issue 3, 2019

82. 'Online Advertising and Antitrust: Network Effects, Switching Costs and Data as an Essential Facility.' April 2019, *'Competition Policy International'*

83. 'Blockchain and Identity Persistence', with Alex Marthews, Chapter in *Cryptoassets: Legal, Regulatory, and Monetary Perspective*, edited by Chris Brummer, Oxford University Press, 2019.

84. 'Privacy, Algorithms, and Artificial Intelligence' in *The Economics of Artificial Intelligence: An Agenda*, edited by V Ajay Agrawal, Joshua Gans, and Avi Goldfarb, University of Chicago Press, pp. 423 – 437 (2019)

85. 'Digital Marketing,' with Avi Goldfarb, in the *Handbook of the Economics of Marketing*, Vol 1, edited by JP-Dube and Peter Rossi, pp. 259-290, Elsevier (2019)

86. 'Privacy Policy and Competition', with Alex Marthews. *Brookings Papers* (2019)

87. 'Digital Infrastructure: Does the 'Coring' of Digital Platforms make them part of Digital Infrastructure?." (2020) in *Economic Analysis and Infrastructure Investment* edited by Edward L. Glaeser and James M. Poterba, University of Chicago Press

88. 'Competition in the Digital Advertising Market', *The Global Antitrust Report on the Digital Economy* (2021)

89. 'How Platforms Create Value Through Coring and Implications for Market Definition', *Competition Policy International* (2022)

90. 'Digital Disruption in Schooling and the Pandemic: Documenting the Digital Infrastructure Divide Among School Children' with Ananya Sen, *Societal Experts Action Network* (2022)

91. 'Algorithmic Exclusion', *Brookings Papers*, (2022)

92. 'The Purchase Funnel and Litigation' with Laura O'Laughlin in *Marketing and the Law*, Cambridge University Press: 29 June 2023. Edited by Jacob E. Gersen and Joel H. Steckel

93. 'Economics of Privacy: An Agenda', Chapter 2, *The Economics of Privacy*, University of Chicago Press, (2024)

94. 'How does Competition Policy need to change in a world of Artificial Intelligence?', Oxford Review of Economic Policy, (2024), Vol. 40, Issue 4, Winter 2024, pp. 834–842.

95. 'The Interplay of Consumer Privacy, Competition, and Regulation' Chapter 2 in Handbook on Data, Privacy and Competition Law (2025), Edward Elgar Publishing, pp 35-58, with Olga Kozlova Guglielmi and Philipp Tillmann

96. 'Introduction to the Special Issue on the Human-Algorithm Connection,' Management Science, Vol. 72, No. 1, 2026, pp. 1–13 with Felipe Caro, Jean-Edouard Colliard, Elena Katok, Axel Ockenfels, Nicolas Stier-Moses, and D. J. Wu

97. 'The Economics of Digital Advertising and Advertising Platforms', forthcoming at the Cambridge Handbook on Digital Platforms with Cecilia Caliandro, Emmanuel Frot and Devin Reilly.

---

BOOKS EDITED

98. 'The Political Economy of Artificial Intelligence,', with Ajay Agrawal, Joshua Gans, Avi Goldfarb, University of Chicago Press, 2026

99. 'The Economics of Artificial Intelligence: Health Care Challenges', with Ajay Agrawal, Joshua Gans, Avi Goldfarb, University of Chicago Press, 2024

100. 'The Economics of Privacy', with Avi Goldfarb, University of Chicago Press, 2024

101. 'The Evolution of Antitrust in the Digital Era: Essays on Competition Policy', with David Evans and Alan Fels Ao, Competition Policy International, 2020

102. 'Blockchain: The Insights You Need from Harvard Business Review' (HBR Insights Series), 2019

103. 'Economic Analysis of the Digital Economy', University of Chicago Press, 2015, with Avi Goldfarb and Shane Greenstein

104. 'The Economics of Digitization', with Avi Goldfarb and Shane Greenstein, Edward Elgar Publishing, 2013.

---

POLICY WRITING

105. OECD Roundtable on Privacy, Report on the 'Economic Value of Online Information', December 2010

106. Written Congressional Testimony on 'Internet Privacy: The Impact and Burden of European Regulation,' U.S. House Energy and Commerce Committee, September 2011

107. Written Congressional Testimony on 'Algorithms: How Companies' Decisions About Data and Content Impact Consumers,' U.S. House Energy and Commerce Committee, November 2017

---

PAPERS UNDER REVIEW

108. 'Deplatforming and the Control of Misinformation: Evidence from Parler' with Saharsh Agarwal and Uttara M Ananthakrishnan. Revise and Resubmit at *Information Systems Research*.

109. 'The Chilling Effect of Dobbs: A Study of Mobile Health Apps Usage' with Naveen Basavaraj and Uttara M Ananthakrishnan. Revise and Resubmit at *Information Systems Research*.

110. 'Private Sector Spillovers from a Government-Sponsored Centralized Procurement Platform: A Field Study' with Jingcun Cao and Xiru Pan. Revise and Resubmit at *Management Science*.

111. 'Friend or Foe? Social Media and The Sharing of News' with Nico Neumann and Lesley Chiou. Revise and Resubmit at *International Journal of Research in Marketing*.

112. 'The Effect of Subsidizing Digital Educational Content: Evidence from a Field Experiment with Jingcun Cao, Xiru Pan and Yifei Wang.' Revise and Resubmit at *Manufacturing and Service Operations Management*

113. 'Algorithmic Influence: Empirical Evidence from Microlending' Reject and Resubmit at *Production and Operations Management* with Jianfeng Guo, Xitong Li and Cathy Yang.

A-11

114. 'Promoting Sustainable Choices: A Large Scale Randomized Field Experiment' with Linyi Li and and Rui Yan and Rowan Wang Revise and Resubmit at *Marketing Science*.

115. Does Firm Size Influence the Collection of Sensitive Data?: A Study of Child-Orientated Apps. Revise and Resubmit at *Journal of Marketing Research* with Grazia Cecere and Vincent Lefrere and Pai-Ying Lin

116. 'Social Distancing, Internet Access and Inequality' with Lesley Chiou. Revise and Resubmit at *Management Science*.

117. 'Privacy Regulation and Ad-Tech Consolidation' with Rozhina Ghanavi and Sepideh Hosseini. Revise and Resubmit at *Management Science*.

118. 'Interoperability, Spillovers and Mandates in Governmental IS systems: Evidence from Prescription Drug Monitoring Programs' with Nan Clement and Xiru Pan and Niam Yaraghi. Revise and Resubmit at *Management Science*.

119. 'Using Informational Interventions to Improve Smart-Linear TV Content Engagement: Evidence from a Large-Scale Randomized Field Experiment' with Raveesh Mayya and Siva Viswanathan

120. 'AI, Personalization and Weight Loss' With Linyi Li

121. 'Do Algorithms Help Firms Achieve Their Targeting Objectives?' with Cathy Cao.

122. 'Algorithmic Bias and Historical Injustice: Race and Digital Profiling' with Abigail Matthew and Amalia Miller

123. 'Tradeoffs in Automated Political Advertising Regulation: Evidence from the COVID-19 Pandemic' with Grazia Cecere, Clara Jean, and Vincent Lefrere

   • Best Paper Award Winners at the Digital Transformation Society 2025 Conference

124. 'Computer Algorithms Prefer Headless Women' with Grazia Cecere, Clara Jean, and M. Menant.

125. 'The Shifters and Virality of Hate Speech Online' with Uttara Ananthakrishnan

---

WORK IN PROGRESS

*Data Analysis*

126. 'Mergers and Data: Evidence from Healthcare' With Nan Clement and Amalia Miller

127. 'The Role of Outdoor Advertising in the Reemergence of Banned Products' with Natasha Foutz, Fenrou Wang and Weiguang Wang

128. 'AI and Privacy Regulation: Evidence from the Marketing of Medical Devices' with Nan Clement

129. 'The Effects of Increased Centralization in Matching on Influencer Marketing' with Jingcun Cao and Xiru Pan

130. 'Creativity and AI' with Jens Foerderer and Franziska Vogel

131. 'Algorithmic Copyright Enforcement: A case study?-' with Sverrir Arnorsson and Stefan Bechtold and Christian Peukert

*Data Collection*

132. 'Privacy Regulation and Education IT' with Amalia Miller and Avi Goldfarb

133. 'The Lack of Appeal of Cross-Partisan Appeals: Evidence from an Experiment on Facebook' with Christina LaChapelle

134. 'Measurement and Creativity in Advertising: A Field Study' with Jingcun Cao and Xiru Pan

135. 'The Changing Role of IT in Marketing Jobs with Rozhina Ghanavi and Avi Goldfarb

136. 'How Generative AI Changes Search for Medical Information' with Lesley Chiou

*Manuscripts*

137. 'Rules For a Nascent Domain: Technological Innovation and Regulatory Uncertainty' with Christian Catalini

138. 'Big Bad Data: The Case of For-Profit College Advertising' with Avinash Collis and Avi Goldfarb

139. 'Spillovers from Product Failure' with Amalia Miller

140. 'Social Advertising: How Advertising that Explicitly Promotes Social Influence Can Backfire'.

141. 'Government Surveillance and Internet Search Behavior' with Alex Marthews

A-13

142. 'A New Method of Measuring Online Media Advertising Effectiveness: Prospective Meta-Analysis in Marketing' with Gui Liberali, Glen L. Urban, Benedict G. Dellaert, Yakov C. Bart, and S. Stremersch.

143. 'Patent Trolls and Technology Diffusion: The Case of Medical Imaging'

144. 'Empirically evaluating two-sided network effects: The case of electronic payments'

145. 'Personalizing mental fit for online shopping applications - How the success of recommendations depends on mental categorization and mental budgeting' with Oliver Emrich and Thomas Rudolph.

146. 'Third-Party Certification: The Case of Medical Devices' with Cristina Nistor

147. 'Tensile Promotions in Display Advertising' with Anja Lambrecht

148. 'Guns, Privacy and Crime' with Alessandro Acquisti

149. 'The Role of Delayed Data in the COVID-19 Pandemic', with Yifei Wang

A-14

HONORS AND AWARDS

| | |
|---|---|
| 2026 | ISMS Long Term Impact Award |
| 2024 | Academic Fellow, Marketing Science Institute |
| 2020 | CITI Fellowship (Columbia University Institute of TeleInformation) |
| 2020 | O'Dell Award |
| 2020 | TechSIG-Lazaridis Prize for Best Paper in Innovation, Technology and Interactivity for 2019 |
| 2018 | ISMS Long Term Impact Award |
| 2018 | O'Dell Award |
| 2018 | MSI Scholar |
| 2017 | Congressional Testimony on 'Algorithms: How Companies' Decisions About Data and Content Impact Consumers' |
| 2017 | Nominated for Teacher of the Year award (Also in 2012, 2010 and 2009) |
| 2015 | Erin Anderson Award |
| 2014 | Paul E. Green Award |
| 2013 | Teacher of the Year Award, MIT Sloan |
| 2013 | Jamieson Prize for Excellence in Teaching |
| 2012 | Garfield Economic Impact Award for Best Paper in Health Economics |
| 2011 | WHITE Award for best paper in the Economics of Healthcare IT |
| 2011 | Public Utility Research Prize for the best paper in regulatory economics |
| 2011 | NSF CAREER Award |
| 2011 | MSI Young Scholar |
| 2010 | Management Science Distinguished Service Award |
| 2004 | Koret Foundation Scholar, Stanford Institute for Economic Policy Research Fellowship |
| 2004 | Fourth Annual Claire and Ralph Landau Student Working Paper prize |

---

INVITED SEMINARS

*Universities*

1. April 2026, Business Technologies, Tepper School of Business

2. January 2026, Strategic Management Group, Toronto
3. Dec 2025, The Hamilton Project Brookings
4. May 2025, The Hamilton Project, Brookings
5. April 2025, Chapman University, School of Management
6. March 2025, Notre Dame University, Keynote Speech
7. March 2025, IESE, Barcelona, Keynote
8. March 2025, Bocconi, Italy, Keynote
9. January 2025, Georgetown University, Marketing Group
10. January 2025, University of Miami, Marketing Group
11. November 2024, Federal Trade Commission, Economics Group
12. May 2024, UC Santa Barbara, DEFI Group,
13. February 2024, UC Berkeley, Marketing Group
14. January 2024, Cornell University, Marketing Group
15. August 2023, National University of Singapore
16. August 2023, School of Business, Ewha Womans University, Seoul, Korea
17. May 2023, University of Washington
18. May 2023, TOM Group, Harvard Business School
19. April 2023, Tilburg University
20. April 2023, Yale University
21. March 2023, Emory University
22. March 2023, University of Zurich, Cryptoeconomics group
23. February 2023, CBER Forum
24. February 2023, University of Arizona
25. February 2023, Columbia University, Marketing Group
26. February 2023, New York University, IS Group
27. November 2022, LSE, Marketing Group
28. September 2022, Advertising Research Group Amazon
29. March 2022, Marketing Group, Rotman, University of Toronto
30. March 2022, IT Group, Krannert School, Purdue University
31. November 2021, Tufts University, Economics Department
32. October 2021, McGill University, Marketing Group
33. September 2021, Stockholm Business School
34. May 2021, Safegraph Seminar
35. April 2021, Marketing Science Institute
36. April 2021, George Mason University, Law and Economics Seminar
37. March 2021, Marketing Group, University of Michigan
38. March 2021, BIDT, Bavarian Academy of Sciences and Humanities
39. February 2021, University of Virginia, Law and Economics Seminar
40. January 2021, Marketing Group, Carnegie Mellon University
41. December 2020, Boston University, Boston Digital Leadership Forum
42. December 2020, Toulouse University, France
43. November 2020, Luohan Academy, Platform Economy and Market Dynamics, Virtual Seminar
44. November 2020, John Hopkins University
45. October 2020, Wharton, Marketing Group

46. October 2020, ITAM, Mexico City
47. September 2020, Econ, Stats and ML Team, Etsy
48. June 2020, CMU Seminar
49. April 2020, Virtual Digital Economy Seminar
50. March 2020, IS group, University of Minnesota
51. February 2020, Georgia Institute of Technology, GA
52. December 2019, Harvard Business School Field Experiments Seminar, Cambridge, MA
53. November 2019, Bank of Canada, Ottawa
54. May 2019, Joint-Economics Seminar, Autonomous University of Barcelona) and the IAE (Institute for Economic Analysis)
55. March 2019, LMU Center for Advanced Management Studies in Munich
56. February 2019, Berlin Applied Micro Seminar
57. January 2019, Marketing Group, University of Bologna
58. January 2019, Marketing Group, University College, London
59. January 2019, Marketing Group, London Business School
60. November 2018, Marketing Group, HEC Paris, France
61. November 2018, Management Group, Cass Business School, City University of London, UK
62. November 2018, Marketing Group, SOAS University of London
63. November 2018, All Souls College, Oxford
64. November 2018, Economics Group, Paris Telecom
65. October 2018, Marketing Group, University of Amsterdam, Netherlands
66. October 2018, Marketing Group, King's Business School, King's College, London
67. September 2018, Marketing Group, University of Frankfurt, Germany
68. June 2018, Harbin Institute of Technology, China
69. February 2018, IS/OM Group, New York University, NY
70. November 2017, Marketing Group, Rochester University, NY
71. October 2017, Marketing Group, Maryland University, MD
72. May 2017, Marketing Group, Old Dominion University
73. April 2017, Marketing Group, University of Southern California
74. March 2017, Marketing Group, Arison School of Business, IDC, Israel
75. January 2017, Distinguished Speakers Series, McGill University, Canada
76. September 2016, Technology Group, Harvard Business School, MA
77. August 2016, Southern Jiatong University, Sichuan, China
78. May 2016, Chapman University, Marketing Group
79. April 2016, Carnegie Mellon University, Public Policy Group
80. April 2016, Harvard Business School, Entrepreneurial Management Group
81. March 2016, INSEAD, Marketing Group
82. March 2016, University of Paris-Sud, Privacy Research Group
83. March 2016, Vienna University of Economics and Business, Marketing Group
84. September 2015 University of Maryland, IS Group
85. June 2015, Marketing Group, University of Cambridge, UK
86. May 2015, Marketing Group, University of Texas at Dallas, TX
87. March 2015, Health Policy Group, Georgia State University, GA
88. March 2015, Marketing Group, University of Colorado, CO

A-17

89. February 2015, Strategy Group, University of North Carolina, NC
90. January 2015, Marketing Group, Emory University, GA
91. December 2014, OPIM, Wharton School of Management, PA
92. October 2014, Economics Department, Yale University, CT
93. September 2014, Marketing Group, Boston University, MA
94. March 2014, Technology Group, University of California at Berkeley, CA
95. January 2014, Marketing Department at Texas A&M
96. November 2013, Marketing Group, University of California at Berkeley, CA
97. October 2013, Marketing Group, Tulane University, LA
98. October 2013, Marketing Group, University of Houston, TX
99. May 2013, Tuck School of Management, Dartmouth University, NH
100. March 2013, Economics Department, University of Toulouse
101. March 2013, Marketing Group, Rotterdam University
102. March 2013, Economics Department, University of Zurich
103. March 2013, Marketing group, Georgia Tech
104. January 2013, Anderson School, UCLA
105. January 2013, Marketing Group, CMU
106. October 2012, Marketing Group, Stanford University
107. October 2012, Marketing Group, Columbia University
108. October 2012, Marketing Group, University of Texas at Austin
109. September 2012, Marketing Group, Harvard Business School
110. June 2012, Strategy Group, London Business School
111. March 2012, Marketing Group, Cornell
112. February 2012, IS Group, Indian School of Business
113. February 2012, Marketing Group, Wharton
114. January 2012, Marketing Group, UCLA
115. November 2011, Marketing Group, University of Rochester
116. October 2011, Marketing Group, University of Zurich
117. October 2011, Department of Law and Economics, Swiss Federal Institute of Technology, Zurich
118. May 2011, Marketing Group, National University of Singapore
119. May 2011, IS Group, National University of Singapore
120. May 2011, Strategy Group, LMU Munich
121. May 2011, Marketing Group, New York University
122. March 2011, Marketing Group, Florida University
123. February 2011, IS Group, New York University
124. November 2010, European School of Management and Technology
125. October 2010, Marketing Group, Yale University
126. October 2010, Networked Business Group, Harvard Business School
127. September 2010, TIES Group, MIT Sloan
128. July 2010, Department of Economics, University of Mannheim
129. March 2010, Marketing Group, Wharton School, University of Pennsylvania
130. January 2010, Marketing Group, University of Michigan
131. November 2009, Marketing Group, University of California at Berkeley
132. October 2009, Digital Business Seminar, MIT Sloan

A-18

133. December 2008, Marketing Group, MIT Sloan
134. November 2008, Marketing Group, Rady School of Business, UCSD
135. September 2008, Strategy Group, MIT Sloan
136. May 2008, Digital Strategy Group, Tuck School of Business, Dartmouth University
137. April 2008, Kellogg Management and Strategy Group, Northwestern University
138. March 2008, Marketing Group, Duke University
139. March 2008, Strategy Group, Chicago GSB
140. July 2007, Marketing Group, London Business School, London, UK
141. April 2007, Marketing Group, Chicago GSB
142. March 2007, Marketing Group, Rotman School, University of Toronto
143. November 2005, Economics Department, Harvard University
144. October 2004-February 2005 (Job Market): NYU Stern, University of Michigan, University of Arizona, University of British Columbia, Federal Reserve Board, Federal Reserve Bank of New York, Harvard Business School, Kellogg, MIT Sloan, Federal Reserve Bank of Chicago, Stanford Economics Department


*Other*
145. March 2026, OECD, 'Is AI across the stack competitive or concentrated?' Panel
146. September 2025, International Development Bank
147. July 2025, World Bank
148. October 2023, Federal Reserve Board, DC
149. April 2021, American Enterprise Institute
150. June 2020, EE Times- Privacy and Security during Covid-19
151. May 2020, The Digital Economy & The Coronavirus, Bertelsmann Foundation Seminar
152. April 2020, Technology Policy Institute
153. October 2018, Digital Competition Expert Panel, HM Treasury, UK
154. October 2018, Competition and Markets Authority, UK
155. January 2018, IMF
156. December 2017, Technology Policy Institute
157. October 2016, Federal Communications Commission
158. April 2015, Federal Communications Commission
159. November 2014, Office of Research at the Consumer Financial Protection Bureau
160. April 2014, Big Data Working Group, The White House.
161. February 2014, Main Street Patent Coalition, Panel hosted at the Senate by Senator Orrin Hatch
162. July 2013, Federal Communications Commission
163. August 2012, DG Competition, European Commission, Brussels
164. August 2012, Technology Policy Institute Conference, Aspen
165. December 2011, Havas Digital, New York
166. June 2011, Eneca
167. September 2010, Federal Trade Commission
168. September 2010, Google European Public Policy Unit, Paris
169. July 2009, Information Technology and Innovation Foundation, Washington DC

PRESENTATIONS OF RESEARCH AT CONFERENCES

1. June 2025, Marketing Science, Washington, DC
2. June 2025, ISMS Doctoral Consortium
3. May 2024, Keynote, International IO Conference, Boston, MA
4. March 2024, OxREP editorial seminar, online
5. January 2024, AEA Continuing Education, Digital Economics, San Antonio, TX
6. November 2023, Georgetown and World Bank Artificial Intelligence Conference
7. November 2023, Marketing Science Institute Meetings on Privacy and Policy
8. June 2023, Marketing Science, Miami, FL
9. June 2023, Doctoral Consortium, Miami, FL
10. June 2023, Harvard Business School, Marketing Camp, Boston, MA
11. April 2023, University College London, Competition Law and Policy in a Data-Driven Economy
12. December 2022, Keynote 'Conference on Artificial Intelligence, Machine Learning and Business Analytics, Harvard University, Boston, MA
13. May 2022, Keynote ' AI and Analytics for Social Causes' conference, University of Maryland, College Park
14. December 2021, Keynote, 4th Research on Innovation, Science and Entrepreneurship Workshop, Max Planck Institute
15. November 2021, Keynote, Tokenomics, NYU
16. June 2021, Marketing Science
17. June 2021, OECD workshop on the Value of Data
18. June 2021, Chief Competition Economist ECN working group Annual Meeting
19. May 2021, International Finance Corporation, World Bank IFC Digital Jobs
20. May 2021, G20 Framework Working Group Seminar on Data Access and Availability
21. May 2021, Data and innovation: solutions and business models in the digital economy (Brazil)
22. March 2021, Digital Economics Seminar, Digital Tutorial
23. December 2020, Digital Economics Research Network Conference
24. December 2020, Conference on Artificial Intelligence, Machine Learning, and Business Analytics
25. December 2020, Health Systems Innovation Advisory Board Meeting
26. November 2020, 2nd Luohan Academy Frontier Dialogue - Platform Economy and Market Dynamics
27. October 2020, Policy Toolkit for a Better Europe, European Commission
28. September 2020, ICN Annual conference
29. June 2020, Marketing Science
30. June 2020, International Competition Network, ' Competition law enforcement at the intersection of Competition, Consumer Protection, and Privacy'
31. November 2019, ABA Fall Forum: The Tech Summit, Washington DC.
32. November 2019, Annual Challenges to Antitrust in a Changing Economy, Harvard Law School
33. October 2019, World Bank Platforms Summit, Washington DC.
34. September 2019, Economics of AI Doctoral Consortium, Toronto

35. July 2019, Quantitative Marketing and Structural Econometrics Workshop, Northwestern University
36. June 2019, Marketing Science, Rome
37. June 2019, Keynote Speaker, ZEW Conference on the Economics of Information and Communication Technologies, Mannheim
38. June 2019 Keynote Speaker, Munich Summer Institute, Munich
39. May 2019, Keynote Speaker, 3rd Doctoral Workshop on the Economics of Digitization, Brussels
40. November 2019, FTC Hearings on Big Data, Privacy, and Competition
41. October 2019, FTC Hearings on Platform Economics, George Mason University
42. June 2018, Antitrust and Big Data, Penn Wharton China Center Conference, Beijing
43. June 2018, Marketing Science
44. May 2018, Boston College Digital Innovation Workshop
45. December 2017, Mobile Marketing and Big Data Conference, NYU
46. September 2017, NBER Economics of AI Conference
47. July 2017, BU Platforms Conference
48. July 2017, NBER Digitization Meetings
49. June 2017, Marketing Science
50. June 2017, Regulation of Algorithms, Berlin
51. May 2017, Boston College Digital Innovation Workshop
52. November 2016, ICANN Public Meetings
53. October 2016, Conference on Digital Experimentation, Cambridge, MA
54. September 2016, FTC Consumer Protection Conference, Washington, DC
55. September 2016, George Washington roundtable on Platforms, Washington DC
56. May 2016, Competing with Big Data, Brugel, Brussels, Belgium
57. April 2016, NBER Innovation and Policy, Washington DC
58. April 2016, Financial Services Roundtable, NYC
59. March 2016, Digitization Tutorial, NBER
60. January 2016, PrivacyCon, FTC Conference, Washington, DC
61. July 2015, NBER Law and Economics (co-author presented), Cambridge, MA
62. July 2015, NBER Economics of Digitization, Cambridge, MA
63. June 2015, 'The Future of Research in the Digital Society', French Ministry of Culture and Communication, Toulouse School of Economics, Paris, France
64. June 2015, Marketing Science, Baltimore, MD
65. June 2015, Doctoral Consortium, Baltimore, MD
66. March 2015, IP Leadership Conference, Washington, DC
67. February 2015, Patents in Theory and Practice, Washington, DC
68. June 2014, Marketing Science, Atlanta, GA
69. May 2014, Boston College Social Media Workshop, Boston, MA
70. January 2014, American Economic Association Meetings
71. July 2013, Marketing Science, Istanbul, Turkey
72. June 2013, Searle Center Conference on Internet Search and Innovation, Chicago, IL
73. April 2013, Brown University Mini-Networks Conference
74. February 2013, WSDM 2013 Conference (Keynote Speaker), Rome, Italy
75. January 2013, American Economic Association Meetings, San Diego, CA (Co-author

presented)

76.  December 2012, New York Computer Science and Economics Day
77.  November 2012, Search and Competition Conference, Melbourne Australia
78.  October 2012, Economics of Personal Data, (Keynote Speaker), Amsterdam
79.  August 2012, Amsterdam Symposium on Behavioral and Experimental Economics
80.  July 2012, Fudan University Marketing Research Symposium, China
81.  June 2012, Searle Center Conference on Internet Search and Innovation, Chicago, IL
82.  June 2012, Innovation, Intellectual Property and Competition Policy Conference, Tilburg, Netherlands
83.  June 2012, Marketing Science, Boston, MA
84.  June 2012, Social Media and Business Transformation, Baltimore, MD
85.  May 2012, The Law and Economics of Search Engines and Online Advertising, George Mason University, Arlington, VA
86.  February 2012, NBER Economics of Digitization (co-author presented), Cambridge, MA
87.  January 2012, Symposium on Antitrust and High-Tech Industries, George Mason University, VA
88.  January 2012, Patents, Standards and Innovation, Tucson, AZ
89.  January 2012, Econometric Society Meetings, Chicago, IL
90.  January 2012, AEA Meetings (2 papers), Chicago, IL
91.  December 2011, Economics of Privacy Workshop, Boulder, CO
92.  November 2011, Economics and Computation Day, Cambridge, MA
93.  November 2011, HBS Strategy Research Conference, Boston, MA
94.  November 2011, The Law and Economics of Internet Search and Online Advertising Roundtable, George Mason University, Arlington, VA
95.  November 2011, Patents Statistics for Decision Makers, Alexandria, VA
96.  October 2011, Workshop on Health IT and Economics, Washington, DC
97.  October 2011, Innovation, Organizations and Society, University of Chicago, IL
98.  October 2011, Direct Marketing Research Summit, Boston, MA
99.  September 2011, Invited Session 'Economics and Marketing', EARIE, Stockholm, Sweden.
100.  July 2011, NBER Economics of Digitization, Cambridge, MA
101.  July 2011, SICS, Berkeley, CA
102.  June 2011, The Law and Economics of Search Engines and Online Advertising, George Mason University, Arlington, VA
103.  June 2011, Workshop on the Economics on Information Security, Washington, DC
104.  June 2011, Marketing Science (3 papers), Houston, TX
105.  June 2011, Searle Center Conference on Internet Search and Innovation, Chicago, IL
106.  May 2011, Boston College Social Media Workshop, Boston, MA
107.  May 2011, Technology Pricing Forum, Boston, MA
108.  April 2011, NBER Innovation Policy and the Economy, Washington, DC
109.  April 2011, International Industrial Organization Conference (3 papers), Boston, MA
110.  March 2011, Technology Policy Institute, Washington, DC
111.  February 2011, NBER Economics of Digitization (co-author presented), Palo Alto, CA
112.  January 2011, Sixth bi-annual Conference on The Economics of Intellectual Property, Software and the Internet (2 papers, plenary speaker), Toulouse, France
113.  January 2011, MSI Young Scholars Conference, Park City, UT

114. December 2010, Workshop on Information Systems and Economics, Washington University of St. Louis (co-author presented), St. Louis, MO
115. December 2010, OECD Economics of Privacy Roundtable, Paris, France
116. November 2010, Net Institute Conference, New York, NY
117. October 2010, Workshop on Media Economics and Public Policy (co-author presented), New York, NY
118. October 2010, Workshop on Health IT and Economics, Washington, DC
119. September 2010, ITIF and CAGW Privacy Working Group Meetings, Washington, DC
120. September 2010, Medical Malpractice Conference, Mohegan, CT
121. September 2010, Search and Web Advertising Strategies and Their Impacts on Consumer Workshop, Paris, France
122. July 2010, NBER Meetings (IT), Cambridge, MA
123. July 2010, NBER Meetings (Healthcare and IT), Cambridge, MA
124. July 2010, SICS, Berkeley, CA
125. July 2010, Keynote Speaker, 8th ZEW Conference on the Economics of Information and Communication Technologies, Mannheim, Germany
126. June 2010, American Society of Health Economists Conference, Cornell, NY
127. June 2010, Marketing Science (2 papers), Koeln, Germany
128. June 2010, Workshop on the Economics of Information Security (2 papers), Harvard, MA
129. January 2010, AEA Meetings, Atlanta, GA
130. December 2009, Workshop on Information Systems and Economics, Scottsdale, AZ
131. November 2009, WPP/Google Marketing Awards, Cambridge, MA
132. July 2009, NBER meetings (IT), Cambridge, MA
133. June 2009, IHIF Debate on Privacy, Washington, DC
134. June 2009, Marketing Science, Ann Arbor, MI
135. April 2009, International Industrial Organization Conference, Boston, MA
136. January 2009, Information Security Best Practices Conference, Philadelphia, PA
137. January 2009, Modeling Social Network Data Conference, Philadelphia, PA
138. July 2008, NBER Meetings (Productivity), Cambridge, MA
139. July 2008, SICS, Berkeley, CA
140. July 2008, Fourth Workshop on Ad Auctions, Chicago, MA
141. June 2008, Marketing Science, Vancouver, BC
142. May 2008, International Industrial Organization Conference, Richmond, VA
143. April 2008, Net Institute Conference, New York, NY
144. November 2007, NBER Health Meetings (Co-author presented), Boston, MA
145. July 2007, SICS, Berkeley, CA
146. June 2007, Workshop on the Economics of Information Security, Pittsburgh
147. June 2007, Choice Symposium, Philadelphia, PA
148. May 2007, eCommerce Research Symposium, Stamford, CT
149. April 2007, Net Institute Conference, New York, NY
150. April 2007, International Industrial Organization Conference, Savannah, GA
151. March 2007, Health Economics Conference, Tucson, AZ
152. February 2007, NBER Winter Meetings, Palo Alto, CA
153. January 2007, Economics of the Software and Internet Industries (2 Papers), Toulouse, France

A-23

154. October 2006, QME Conference, Stanford University, CA
155. June 2006, Marketing Science, Pittsburgh, PA
156. April 2006, International Industrial Organization Conference, Boston, MA
157. October 2005, NEMC Conference, Boston, MA
158. October 2005, TPRC Conference, Washington, DC
159. June 2005, CRES Industrial Organization Conference, Washington University in St. Louis, MO
160. July 2002, Payment Systems Conference, IDEI, Toulouse, France

---

PROFESSIONAL SERVICE

- **Senior Editor**, Marketing Science
- **Director** of the program on Digital Economics and Artificial Intelligence at The National Bureau of Economic Research, 2021-
- Advisory Board Member, Stanford Computational Antitrust Project, 2025-
- **Director** of the program on the Economics of Digitization and Co-Director of the program on the Artificial Intelligence at The National Bureau of Economic Research, 2018-2020
- **Vice President (Education)**, ISMS 2019-2021
- **Associate Editor:** Management Science, Marketing Science, Journal of Marketing Research, International Journal of Research in Marketing
- **Associate Editor:** Information Systems Research, Special Issue on Social Media and Business Transformation
- **Departmental Editor:** Quantitative Marketing and Economics
- **Editor:** The Economics of the Internet, Palgrave Dictionary of Economics
- **Co-Editor:** NBER: The Economics of Digitization - An Agenda
- **Co-Editor:** Information Economics and Policy, Special Issue on Economics of Digital Media Markets
- **Editorial Review Board:** Journal of Marketing, ISR Special Issue on Managing Digital Vulnerabilities, Journal of Economic Literature

- **Conference Program Committees**
  - 2025 Co-organizer, Summer Institute - NBER Conference on Digital Economics and Artificial Intelligence
  - 2025 Co-organizer, Winter Meetings - NBER Conference on Digital Economics and Artificial Intelligence
  - 2025 Co-organizer, NBER The Economics of Artificial Intelligence Tutorial
  - 2024 Co-organizer, NBER Conference on Digital Economics and Artificial Intelligence
  - 2024 Co-organizer, NBER Conference on Political Economy and Artificial Intelligence
  - 2023 Co-organizer, NBER The Economics of Artificial Intelligence Tutorial
  - 2024 Scientific Committee, ZEW Conference on the Economics of Information and Communication Technologies
  - 2023 Co-organizer, Meetings on the Economics of Artificial Intelligence
  - 2023 Co-organizer, NBER Digital Economics Tutorial
  - 2023 Co-organizer, NBER Conference on Digital Economics

– 2023 Scientific Committee, ZEW Conference on the Economics of ICT,
– 2022 Organizaer, NBER Conference on the Economics of Privacy
– 2022 Co-organizer, NBER Conference on Digital Economics
– 2022 Co-organizer, NBER Conference on the Economics of Artificial Intelligence
– 2021 Co-organizer, NBER Conference on Digital Economics
– 2021 Co-organizer, NBER Conference on the Economics of Artificial Intelligence
– 2020 Co-organizer, NBER Conference on the Economics of Artificial Intelligence
– 2020 Organizer, ISMS Doctoral Consortium
– 2019 Co-organizer, NBER Conference on the Economics of Artificial Intelligence
– 2019 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
– 2019 Program Committee: Workshop on the Economics of Information Security
– 2019 Scientific Committee: IP Statistics for Decision Makers
– 2018 Co-organizer, NBER Conference on the Economics of Artificial Intelligence
– 2017 Scientific Committee: IP Statistics for Decision Makers
– 2017 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
– 2017 Program Committee: Workshop on the Economics of Information Security
– 2016 Program Committee: Workshop on the Economics of Information Security
– 2016 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
– 2015 Scientific Committee: Competition, Standardization and Innovation
– 2015 Scientific Committee: Intellectual Property Statistics for Decision Makers
– 2015 Associate Editor: ICIS 2015, Healthcare track
– 2015 Scientific Committee: European Association for Research in Industrial Economics
– 2015 Program Committee: ACM Conference on Economics and Computation
– 2015 Program Committee: Workshop on the Economics of Information Security
– 2015 Chief-Organizer: Quantitative Marketing and Economics Conference
– 2015 Scientific Committee: ZEW Conference on the Economics of Information and Communication Technologies
– 2014 Scientific Committee: European Association for Research in Industrial Economics
– 2014 Scientific Committee: Conference on the Economics of Information and Communication Technologies
– 2014 Program Committee: International Conference on Big Data and Analytics in Healthcare
– 2013 Program Committee: Quantitative Marketing and Economics
– 2013 Scientific Committee: European Association for Research in Industrial Economics Conference
– 2013 Scientific Committee: Conference on the Economics of Information and Communication Technologies
– 2013 Program Committee: Workshop on the Economics of Information Security
– 2013 Associate Editor of Personal Data Markets Track: ECIS 2013
– 2012 Program Committee: European Association for Research in Industrial Economics Conference
– 2012 Program Committee (Conference Organizer) NBER: The Economics of Digitization

Pre-Conference, June 2012
– 2012 Scientific Committee: Conference on the Economics of Information and Communication Technologies
– 2012 Senior Program Committee: 13th ACM Conference on Electronic Commerce
– 2012 Program Committee: Workshop on the Economics of Information Security
– 2011 Scientific Committee: European Association for Research in Industrial Economics Conference
– 2011 Scientific Committee: Conference on the Economics of Information and Communication Technologies
– 2011 Program Committee: Ad Auctions Workshop
– 2011 Program Committee: Workshop on the Economics of Information Security
– 2010 Program Committee: Workshop on IT and Economic Growth
– 2010 Program Committee: Conference on Health IT and Economics
– 2010 Program Committee: Workshop on the Economics of Information Security
– 2009 Program Committee: Workshop on the Economics of Information Security
– 2008 Program Committee: Workshop on the Economics of Information Security
– 2008 Program Committee: Ad Auctions Workshop

**External Affiliations**
- **Advisory Board:** Block Center for Technology and Society
- **Affiliate:** CESifo Research Network
- **Advisory Board:** Future of Privacy Forum
- **Advisory Board:** Academic Advisory Counsel, Brookings Center on Regulation and Markets

---

MIT SERVICE

- 2022-2026 Faculty Director, EMBA program
- 2015-2022 Faculty Chair, PhD program
- 2015- EMBA Committee
- 2015- ASB Committee
- 2014- MIT Sloan Gender Equity Committee
- 2013-2014 Group Head, Marketing Group
- 2013-2014 Chair, Marketing Faculty Search Committee
- 2013-2014 MIT Committee on Undergraduate Admissions and Financial Aid
- 2011 North East Marketing Conference Coordinator
- 2011 MIT Sloan Marketing Conference, Panel Moderator
- 2011 Sloan Women in Management Conference, Panel Moderator
- 2005, 2008, 2012 Marketing Faculty Search Committee

---

ADVISING

- 2025: Egor Kudriavtcev, University of Rochester, PhD Thesis advisor

A-26

- 2024: Nan Clement, UT Dallas, PhD Thesis advisor
- 2024: Alex Moehring, PhD Thesis Supervisor
- 2024: Yifei Wang, PhD Thesis Supervisor
- 2024: Emma Wiles, PhD Thesis Advisor
- 2022: Cathy Yiqun Cao , PhD Thesis advisor
- 2019: Shuyi Yu, PhD Thesis supervisor
- 2018: Shweta Jindal, Masters Thesis
- 2016: Abhishek Nagaraj, PhD Thesis advisor
- 2012: Cristina Nistor, PhD Thesis advisor
- 2010: Katherine Molina, Masters Thesis
- 2008: Dinesh Shenoy, Masters Thesis
- 2007: James Kelm, Masters Thesis

---

## GRANTS AND SUPPORT

*Academic Grants*

| | | |
|---|---|---|
| 2023 | Sloan Foundation Grant (2023-) 'NBER Project on Digital Economics and Artificial Intelligence | |
| 2018 | Sloan Foundation Grant (2018-2021), 'NBER Project on the Economics of Artificial Intelligence' - Grant supporting series of NBER Economics of AI Conferences. (Joint with Ajay Agrawal, Joshua Gans and Avi Goldfarb) | $914,250 |
| 2017 | Net Institute Grant (Joint with Anuj Kapoor) | $3,000 |
| 2016 | Net Institute Grant (Joint with Christian Catalini) | $6,000 |
| 2013 | MSI research Grant 4-1840 (Joint with Anja Lambrecht) | $10,200 |
| 2011 | Tilburg Law and Economics Center (TILEC) IIPC grant | $21,000 |
| 2011 | Google Grant | $50,000 |
| 2011 | Junior Faculty Research Assistance Program | $30,000 |
| 2011 | Net Institute Grant | $6,000 |
| 2011 | NBER Digitization Grant | $20,000 |
| 2011 | NSF CAREER Award | $502,000 |
| 2010 | Time-Warner Research Program on Digital Communications | $20,000 |
| 2010 | Net Institute Grant | $6,000 |
| 2009 | Net Institute Grant | $6,000 |
| 2009 | The James H. Ferry, Jr. Fund for Innovation in Research Education | $50,000 |
| 2009 | Google/WPP Grant (Joint with Avi Goldfarb) | $55,000 |
| 2008 | Net Institute Grant | $15,000 |
| 2007 | Net Institute Grant | $8,000 |
| 2006 | Net Institute Grant (Joint with Stephen Ryan) | $8,000 |

*Industry Research Grants*

A-27

| 2015 | CCIA Research: Research into Sustainable Competitive Advantage and Big Data (Joint with Anja Lambrecht) | $60,000 |
| 2015 | E-Logic: Research into Vertical Mergers and Patent Litigation | $60,000 |
| 2014 | CCIA Research: Research into Patent Litigation and Entrepreneurship | $100,000 |
| 2012 | Google Australia: Research into Measurement and Attribution | $50,000 |

---

## EXPERT CONSULTING

- I have been retained as an expert for Accenture, Amazon, Atlantic Recording Company, ADT, Bausch Health, Broadcast Music Inc, Capitol Records, Change, Context Logic, Google, GoPuff, IAC, Lyft, Marriott, Match Group, Meta, Microsoft, NCAA, Paynerd, Plaintiffs in Blue Cross Blue Shield Antitrust Litigation, Revizer, Reynolds Automotive, RDIC, Samsung, Sony, Sound Exchange, StockX, SK Energy, Verizon (Yahoo and AOL), United Health Group, US Debtors (Nortel Bankrupcy Proceedings), Vitol, Walworth Investments and Warner Brothers.

---

## TEACHING

- 15.7XX, Entrepreneurship for Senior Executives 2025 –
- 15.732, Marketing Management for Senior Executives 2012 –
- 15.726, Pricing (EMBA Elective) 2012-
- 15.818, Pricing (MBA Elective) 2006-2024
- 15.838, Doctoral Seminar, Spring 2006, Fall 2007, Fall 2013, Fall 2024
- Pricing, Asian School of Business, 2017 -2019
- Marketing Management, Asian School of Business, 2016
- Guest Lecturer: HST.936: Health information systems to improve quality of care in resource-poor settings, 2014
- Executive Education: Blockchain Technologies: Business Innovation and Application, 2018-
- Executive Education: Artificial Intelligence 2018-
- Executive Education: Marketing Innovation, 2016-
- Executive Education: Platform Strategy: Building and Thriving in a Vibrant Ecosystem, 2014-
- Executive Education: Pricing 4dX, 2016-
- Executive Education: Entrepreneurship Development Program, 2012-2022
- Executive Education: Systematic Innovation of Products, Processes, and Services, 2013-2022
- Executive Education: Strategic Marketing for the Technical Executive, 2012-2015
- Executive Education: Global Executive Academy (multi-language), 2013, 2014
- Faculty Coach, Takeda Leadership Academy, 2016-18

# APPENDIX B

# PRIOR TESTIMONY

1.  X Corp. and X AI LLC v. Apple Inc.; OpenAI Inc.; OpenAI LLC; and OpenAI OpCo LLC, Case No. 4:25-cv-00914-P, United States District Court, Northern District of Texas, Fort Worth Division. Deposition (2026).

2.  Adam Bensimon, Philip Eliades, Jonathan Swaby, John Boisi, Nathan Obey, Malik Drewey, Antwan Robinson, Robert Currie, and Lewie Lewis, individually and on behalf of all others similarly situated v. Grubhub Inc., Uber Technologies, Inc., and Postmates Inc., Case No. 1:20-cv-03000-LAK, United States District Court, Southern District of New York. Deposition (2026).

3.  Portable Power, Inc., et al., v. Energizer Holdings, Inc., and Wal-Mart, Inc., Case No. 5:23-cv-02091-PCP, United States District Court, Northern District of California; Kimberly Schuman, et al., v. Energizer Holdings, Inc., and Walmart, Inc., Case No. Case No. 5:23-cv-02093-PCP, United States District Court, Northern District of California; Don Copeland, et al., v. Energizer Holdings, Inc., and Walmart, Inc., Case No. 5:23-cv-02087-PCP, United States District Court, Northern District of California. Deposition (2026).

4.  In Re Mosaic LLM Litigation, Master File Case No. 3:24-cv-02653-CRB, United States District Court, Northern District of California, San Francisco Division. Deposition (2026).

5.  McKenna Duffy, individually and on behalf of all others similarly situated, v. Yardi Systems, Inc., et al., Case No. 2:23-cv-01391-RSL, Western District of Washington. Deposition (2026).

6.  Diana Young and Lanae Johnson, individually and on behalf of others similarly situated v. Salesforce, Inc., Case No. 4:22-cv-09067-JST, United States District Court, Northern District of California. Deposition (2026).

7.  Federal Trade Commission v. Meta Platforms, Inc., Case No. 1:20-cv-03590-JEB, United States District Court, District of Columbia. Deposition and Trial (2024, 2025).

8.  Maximilian Klein, et al., on behalf of themselves and all others similarly situated, v. Meta Platforms, Inc., Case No. 3:20-cv-08570-JD, United States District Court, Northern District of California (San Francisco). Deposition (2023, 2024), Concurrent Expert Proceeding (2025).

9.  In Re: Facebook Inc. Derivative Litigation, C.A. No. 2018-0307-JTL, Court of Chancery of the State of Delaware. Deposition (2025).

10.  David Fleury and Alvin Turner individually and on behalf of a class of similarly situated individuals v. Union Pacific Railroad Company, Case No. 20-cv-00390, United States District Court, Northern District of Illinois, Eastern Division. Deposition (2024).

11.  Fin Cap Inc. et al. v. Pay Nerd LLC et al., C. A. No. N21C-12-118 VLM CCLD, In the

B – 1

Superior Court of the State of Delaware. Deposition (2024).

12. In Re: Marriott International Customer Data Security Breach Litigation (MDL No. 19-md-2879), Case No. 9:19-cv-0654, United States District Court, District of Maryland. Deposition (2024).

13. The State of Connecticut, et al. v. Sandoz, Inc., et al., Civil Action No. 3:20-cv-00802, United States District Court, District of Connecticut. Deposition (2024).

14. Andrea Campbell, in her official capacity as Attorney General for the Commonwealth of Massachusetts v. Uber Technologies, Inc., and Lyft, Inc., Civil Action No. 2084CV01519-BLS1, Commonwealth of Massachusetts, Suffolk County Superior Court. Deposition and Trial (2024).

15. Nike, Inc. v. StockX LLC, Case No. 1:22-cv-000983-VEC, United States District Court, Southern District of New York. Deposition (2023).

16. In Re: College Athlete NIL Litigation, Case No. 4:20-cv-03919-CW, United States District Court, Northern District of California. Deposition (2023, 2024).

17. In Re: Lyft Rideshare Cases, Case No. CJC-20-005061, Superior Court of the State of California, County of San Francisco. Deposition (2023).

18. In Re: Google Play Store Antitrust Litigation (MDL No. 2981), Case No. 3:21-md-2981-JD, United States District Court, Northern District of California. Deposition and Trial (2023).

19. United States of America et al. v. UnitedHealth Group Incorporated et al., Case No. 1:22-cv-00481-CJN, In the United States District Court, District of Columbia. Deposition and Trial (2022).

20. United States of America, et al., v. Google LLC, Case No. 1:20-cv-03010-APM, and State of Colorado, et al., v. Google LLC, Case No. 1:20-cv-03715-APM, United States District Court, District of Columbia. Deposition (2022).

21. Atlantic Recording Corporation, LaFace Records LLC, Sony Music Entertainment, UMG Recordings, Inc., Warner Bros. Records Inc., Arista Music, Arista Records LLC, Bad Boy Records LLC, Capitol Records, LLC, Elektra Entertainment Group Inc., Roc-A-Fella Records, LLC, Sony Music Entertainment US Latin LLC, Zomba Recording LLC, v. Spinrilla, LLC and Jeffery Dylan Copeland, Case No. 1:17-cv-00431-AT, United States District Court, Northern District of Georgia (Atlanta). Deposition (2022).

22. Broadcast Music, Inc. v. North American Concert Promoters Association, Case No. 1:18-cv-08749-LLS, Related to United States v. Broadcast Music, Inc., Case No. 1:64-cv-03787-LLS, United States District Court, Southern District of New York. Deposition and Trial (2022).

23. In Re: Marriott International Customer Data Security Breach Litigation (MDL No. 2879),

Case No. 8:19-md-2879, United States District Court, District of Maryland. Deposition (2021) and Hearing (2022).

24. Cox Automotive, Inc.; Autotrader.com, Inc.; Dealer Dot Com, Inc.; Dealertrack, Inc.; Homenet, Inc.; Kelley Blue Book Co., Inc.; Vauto, Inc.; Vinsolutions, Inc.; and Xtime, Inc., v. The Reynolds and Reynolds Company, AAA Case No. 01-19-0000-4548, American Arbitration Association. Deposition (2021).

25. dotStrategy, Co., Individually and On Behalf of All Other Similarly Situated, v. Facebook, Inc., Case No. 3:20-cv-00170-WHA, United States District Court, Northern District of California. Deposition (2021).

26. Deborah Louise Douez, v. Facebook, Inc., Case No. VLC-S-S-122316, Supreme Court of British Columbia. Cross Examination (2021).

27. Sean Rad, Plaintiff/Counterclaim-Defendant, Paul Cafardo, Gareth Johnson, Alexa Mateen, Justin Mateen, and Ryan Ogle, Plaintiffs v. IAC/InteractiveCorp, and Match Group, Inc., Defendants/Counterclaim-Plaintiffs, Match Group, LLC., Additional Counterclaim-Plaintiff, Index No. 654038/2018, Supreme Court of the State of New York, County of New York. Deposition and Trial (2021).

28. TravelPass Group, LLC, Partner Fusion, Inc., Reservation Counter, LLC, v. Caesars Entertainment Corporation, Choice Hotels International, Inc., Hilton Domestic Operating Company Inc., Hyatt Hotels Corporation, Marriott International, Inc., Red Roof Inns, Inc., Six Continents Hotels, Inc., Wyndham Hotel Group, LLC., Case No. 5:18-cv-153-RWS-CMC, United States District Court, Eastern District of Texas (Texarkana). Deposition and Trial (2021).

29. DZ Reserve and Cain Maxwell (d/b/a Max Martialis) individually and on behalf of others similarly situated v. Facebook, Inc., Case No. 3:18-cv-04978, United States District Court, Northern District of California. Deposition (2021).

30. IntegrityMessageBoards.com. LLC, v. Facebook, Inc., Case No. 4:18-cv-05286-PJH, United States District Court, Northern District of California. Deposition (2021).

31. In Re Blue Cross Blue Shield Antitrust Litigation (MDL No. 2406), Master File No. 2:13-CV-20000-RDP, United States District Court, Northern District of Alabama (Southern). Deposition (2021).

# APPENDIX C

# MATERIALS RELIED UPON

**Legal Documents**

Declaration of Mihran Yenikomshian in Support of Yardi Systems, Inc.'s Motion for Summary Judgment, *In Re Yardi Revenue Management Antitrust Litigation McKenna Duffy, individually and on behalf of all others similarly situated v. Yardi Systems, Inc. et al.*, Case No. 2:23-cv-01391-RSL, November 24, 2025.

Deposition of Catherine Tucker, *In re Yardi Revenue Management Antitrust Litigation. McKenna Duffy, individually and on behalf of all others similarly situated v. Yardi Systems, Inc., et al.*, No. 2:23-cv-01391-RSL, April 28, 2026.

Deposition of Ioana Marinescu, *In re Yardi Revenue Management Antitrust Litigation. McKenna Duffy, individually and on behalf of all others similarly situated v. Yardi Systems, Inc., et al.*, No. 2:23-cv-01391-RSL, March 9, 2026.

Expert Report of Catherine Tucker, Ph.D. in Rebuttal of the Report of Ioana Marinescu, Ph.D., *In re Yardi Revenue Management Antitrust Litigation Mckenna Duffy, individually and on behalf of all others similarly situated, v. Yardi Systems, Inc. et al.*, No. 2:23-cv-01391-RSL, March 23, 2026, and all materials produced therewith.

Expert Report of Ioana Marinescu, *In re Yardi Revenue Management Antitrust Litigation Wylie Duffy and Michael Brett, individually and on behalf of all others similarly situated, v. Yardi Systems, Inc. et al.*, No. 2:23-cv-01391-RSL, February 9, 2026, and all materials produced therewith.

Reply of Ioana Marinescu, Ph.D., in Support of Plaintiffs' Opposition to Yardi's Motion for Summary Judgment, *In re Yardi Revenue Management Antitrust Litigation Wylie Duffy and Michael Brett, individually and on behalf of all others similarly situated, v. Yardi Systems, Inc. et al.*, No. 2:23-cv-01391-RSL, May 22, 2026, and all materials produced therewith.

**Bates-Stamped Documents**

YARDI-DUFFY_00023860
YARDI-DUFFY_00024130
YARDI-DUFFY_00024718
YARDI-DUFFY_00024800
YARDI-DUFFY_00031612
YARDI-DUFFY_00113657
YARDI-DUFFY_00113943
YARDI-DUFFY_00114125
YARDI-DUFFY_00115308
YARDI-DUFFY_00116563
YARDI-DUFFY_00118394
YARDI-DUFFY_00118560
YARDI-DUFFY_00227565
YARDI-DUFFY_00227897
YARDI-DUFFY_00227898

YARDI-DUFFY_00227899
YARDI-DUFFY_00582522
YARDI-DUFFY_00585450
YARDI-DUFFY_00585471
YARDI-DUFFY_00623392
YARDI-DUFFY_00913149

**Data**

U.S. Bureau of Labor Statistics, "Consumer Price Index for All Urban Consumers: Rent of Primary Residence in U.S. City Average [CUSR0000SEHA]", March 11, 2026, https://fred.stlouisfed.org/series/CUSR0000SEHA.

U.S. Census Bureau, "Public Use Microdata Areas (PUMAs)", https://www.census.gov/programs-surveys/geography/guidance/geo-areas/pumas.html.

**Academic Articles and Books**

ABA Section of Antitrust Law, "Econometrics: Legal, Practical, and Technical Issues," *American Bar Association*, 2005.

Abrantes-Metz, Rosa and Patrick Bajari, "Screens for Conspiracies and Their Multiple Applications," *Competition Policy International*, Vol. 8, No. 1, 2012, pp. 177–193.

Aguinis, Herman, Ryan K. Gottfredson, and Harry Joo, "Best-Practice Recommendations for Defining, Identifying, and Handling Outliers," *Organizational Research Methods*, Vol. 16, No. 2, April 2013, pp. 270-301.

Assad, Stephanie, Robert Clark, Daniel Ershov, and Lei Xu, "Algorithmic Pricing and Competition: Empirical Evidence from the German Retail Gasoline Market," *Journal of Political Economy*, Vol. 132, No. 3, 2024, pp. 723–771.

Bach, Laurent, Antoine Bozio, Arthur Guillouzouic, and Clément Malgouyres, "Dividend Taxes and the Allocation of Capital: Comment," *American Economic Review*, Vol. 113, No. 7, July 2023, pp. 2048–2052.

Baker, Andrew, Brantly Callaway, Scott Cunningham, Andrew Goodman-Bacon, and Pedro H. C. Sant'Anna, "Difference-in-Differences Designs: A Practitioner's Guide," *Journal of Economic Literature*, Vol. 64, No. 2, June 2026, pp. 498–557.

Boissel, Charles and Adrien Matray, "Dividend Taxes and the Allocation of Capital," *American Economic Review*, Vol. 112, No. 9, 2022, pp. 2884–2920, retracted by Adrien Matray & Charles Boissel, "Retraction of 'Dividend Taxes and the Allocation of Capital,'" American Economic Review, Vol. 113, No. 7, July 2023, pp. 2053–2054.

Calder-Wang, Sophie and Gi Heung Kim, "Algorithmic Pricing in Multifamily Rentals: Efficiency Gains or Price Coordination?," *The Wharton School, University of Pennsylvania Research Paper Series*, 2024.

Calvano, Emilio, Giacomo Calzolari, Vincenzo Denicolò, and Sergio Pastorello, "Artificial Intelligence, Algorithmic Pricing, and Collusion," *The American Economic Review*, Vol. 110, No. 10, October 2020, pp. 3267–3297.

Carlton, Dennis W. and Jeffrey M. Perloff, *Modern Industrial Organization*, 4th Ed., Pearson, 2005.

Chakravorti, Tatiana, Sai Koneru, Sarah Rajtmajer, "Reproducibility and replicability in research: What 452 professors think in Universities across the USA and India," *PLOS ONE*, 2025.

Cullen, Zoe B., Shengwu Li, and Ricardo Perez-Truglia, "What's My Employee Worth? The Effects of Salary Benchmarking," NBER Working Paper No. 30570, *National Bureau of Economic Research*, revised August 2024.

Davis, Peter and Eliana Garcés, *Quantitative Techniques for Competition and Antitrust Analysis*, Princeton University Press, 2010.

Dehon, Catherine, Marjorie Gassner, Vincenzo Verardi, "Beware of '"Good' Outliers and Overoptimistic Conclusions," *Oxford Bulletin of Economics and Statistics*, 2009, pp. 437–452.

Goldfarb, Avi and Catherine Tucker, "Standardization and the Effectiveness of Online Advertising," *Management Science*, Vol. 61, No. 11, 2015, pp. 2707–2719.

Goldfarb, Avi and Catherine Tucker, "Advertising Bans and the Substitutability of Online and Offline Advertising," *Journal of Marketing Research*, Vol. 48, No. 2, 2011, pp. 207–227.

Harrington Jr., Joseph E., "An Economic Test for an Unlawful Agreement to Adopt a Third-Party's Pricing Algorithm," *Economic Policy*, Vol. 40, No. 121, January 2025, pp. 261–295.

Harvey, A.C., "On Comparing Regression Models in Levels and First Differences," *International Economic Review*, Vol. 21, No. 3, 1980, pp. 707–720.

Herzog, Rubénet, Pedro A. M. Mediano, Fernando E. Rosas, Robin Carhart-Harris, Yonatan Sanz Perl, Enzo Tagliazucchi and Rodrigo Cofre., "A Mechanistic Model of the Neural Entropy Increase Elicited by Psychedelic Drugs," *Scientific Reports*, Vol. 10, Article No. 17725, 2020, retracted by Rubén Herzog et al., "Retraction Note: A Mechanistic Model of the Neural Entropy Increase Elicited by Psychedelic Drugs," *Scientific Reports*, Vol. 12, Article No. 15500, 2022.

Hill, R. Carter, William E. Griffiths, and Guay C. Lim, *Principles of Econometrics*, 4th Ed., John Wiley & Sons, 2011.

International Monetary Fund, *Consumer Price Index Manual: Concepts and Methods,* 2020.

Karraker, Amelia and Kenzie Latham, "Authors' Explanation of the Retraction," *Journal of Health and Social Behavior*, Vol. 56, No. 3, 2015, pp. 417–419.

Kennedy, Peter, *A Guide to Econometrics*,  6th Ed., Blackwell, 2008.

Lu, Xun and Halbert White, "Robustness Checks and Robustness Tests in Applied Economics," *Journal of Econometrics*, Vol. 178, No. 1, 2014, pp. 194–206.

Malley, Sara, Jennifer Scroggins, Stephanie A. Bohon, "U.S. EPA Enforcement of Environmental Regulations in Tennessee: 2005–2008," *Society & Natural Resources*, Vol. 25, No. 1, 2012, pp. 87–96, retracted by Taylor & Francis, as reported in Retraction Watch, Jan. 4, 2013.

Mandhane, Piush J., "Notice of Retraction: Hahn LM, et al. Post–COVID-19 Condition in Children. JAMA Pediatrics. 2023;177(11):1226–1228," *JAMA Pediatrics*, Vol. 178, No. 10, 2024, pp. 1085–1086.

Marinescu, Ioana and Ronald Wolthoff, "Opening the Black Box of the Matching Function," *Journal of Labor Economics*, Vol. 38, No. 2, April 2020, pp. 535–568.

National Academies of Sciences, Engineering, and Medicine & Federal Judicial Center, *Reference Manual on Scientific Evidence*, 4th  Ed., National Academies Press, 2025.

Perloff, Jeffrey M., *Microeconomics*, 7th  Ed., Pearson, 2015.

Roth, Jonathan, Pedro H.C. Sant'Anna, Alyssa Bilinski, and John Poe, "What's Trending in Difference-in-Differences? A Synthesis of the Recent Econometrics Literature," *Journal of Econometrics*, Vol. 235, No. 2, August 2023, 2218-2244.

Stock, James H. and Mark W. Watson, *Introduction to Econometrics*, 3rd Ed., Addison-Wesley, 2011.

Studenmund, A.H., *Using Econometrics: A Practical Guide*, 7th Ed., Pearson, 2017.

Sugaya, Takuo and Alexander Wolitzky, "Collusion with Optimal Information Disclosure," *MIT Economics Working Papers*, 2025.

Sugaya, Takuo and Alexander Wolitzky, "Maintaining Privacy in Cartels," *Journal of Political Economy*, Vol. 126, No. 6, 2018, pp. 2569–2607.

Verardi, Vincenzo and Christophe Croux, "Robust Regression in Stata," *The Stata Journal*, Vol. 9, No. 3, 2009, pp. 439–453.

Willmington, Claire, Paolo Belardi, Anna Maria Murante and Milena Vainieri, "The Contribution of Benchmarking to Quality Improvement in Healthcare: A Systematic Literature Review," *BMC Health Services Research*, Vol. 22, No. 139, 2022.

Wooldridge, Jeffrey M., *Econometric Analysis of Cross Section and Panel Data*, The MIT Press, 2001.

Wooldridge, Jeffrey M*., Introductory Econometrics: A Modern Approach*, 6th Ed., Cengage Learning, 2016.

Yule, G. Udny, "Why Do We Sometimes Get Nonsense-Correlations Between Time-Series?-- A Study in Sampling and the Nature of Time Series," *Journal of the Royal Statistical Society*, Vol. 89, No. 1, 1926, pp. 1–63.

**Public Documents**

Cage, Robert, John Greenlees, and Patrick Jackman, "Introducing the Chained Consumer Price Index," U.S. Bureau of Labor Statistics, May 2003, https://www.bls.gov/cpi/additional-resources/chained-cpi-introduction.pdf.

Econometric Society, "FAQs, Scope of the reproducibility checks," ES Data Editor Website, https://www.econometricsociety.org/publications/es-data-editor-website/FAQs.

Elsevier, "What is peer review," https://www.elsevier.com/reviewer/what-is-peer-review.

International Labour Organization, "Resolution concerning consumer price indices," 2003, https://www.ilo.org/sites/default/files/wcmsp5/groups/public/%40dgreports/%40stat/documents/normativeinstrument/wcms_087521.pdf.

Pastrana, Erika, "Supporting open science practices: Why sharing your code matters," Springer Nature, July 17, 2025, https://www.springernature.com/gp/researchers/the-researchers-source/open-science-blogpost/open-science-sharing-code/27793060.

U.S. Bureau of Economic Analysis, "Glossary: Chain-type indexes," April 25, 2018, https://www.bea.gov/help/glossary/chain-type-indexes.

U.S. Bureau of Labor Statistics, "Consumer Price Index: Calculation," January 30, 2025, https://www.bls.gov/opub/hom/cpi/calculation.htm.

U.S. Bureau of Labor Statistics, "Measuring Price Change in the CPI: Rent and Rental Equivalence," February 13, 2026, https://www.bls.gov/cpi/factsheets/owners-equivalent-rent-and-rent.htm.

U.S. Centers for Medicare & Medicaid Services, "Consumers," CMS.gov, updated August 14, 2025, available at https://www.cms.gov/priorities/healthplan-price-transparency/overview/consumers.