Hon. Robert S. Lasnik

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

*In Re YARDI REVENUE MANAGEMENT ANTITRUST LITIGATION*

Case No.: 2:23-cv-01391-RSL

**YARDI SYSTEMS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE MIHRAN YENIKOMSHIAN'S REBUTTAL REPORT**

MCKENNA DUFFY, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

YARDI SYSTEMS, INC., *et al.*,

Defendants.

**Filed Contemporaneously With:**

**(1) DECLARATION OF CLAIRE MARTIROSIAN;**

**(2) DECLARATION OF MIHRAN YENIKOMSHIAN IN REBUTTAL TO THE MAY 22, 2026 (SECOND) REPORT OF IOANA MARINESCU, PH.D.**

**NOTE ON MOTION CALENDAR: June 26, 2026**

**ORAL ARGUMENT REQUESTED**

(Consolidated with Case Nos. 2:24-cv-01948; 2:24-cv-02053)

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................. 1

LEGAL STANDARD ......................................................................................................... 4

ARGUMENT ...................................................................................................................... 5

I.    Yenikomshian's Rebuttal Reliably Opined that RIQ Does Not Operate as a Common Function ............................................................................................... 5

    A.    Yenikomshian Rebutted Marinescu's Original Common Function Theory ...................................................................................................... 5

    B.    Marinescu Abandoning Her Common Function Theory Is No Basis to Exclude Yenikomshian's Rebuttal ................................................................. 7

II.    Yenikomshian's Rebuttal Reliably Opined that Yardi's Benchmark Reporting Does Not Offer Comprehensive Visibility Into Rivals' Pricing Decisions ............................................................................................................ 8

    A.    Yenikomshian Rebutted Marinescu's Original Theory that Benchmarking Offers Comprehensive Pricing Visibility and Automatically Aligns with Comps ............................................................... 8

    B.    Marinescu Abandoning Her Comprehensive Visibility and Comp Alignment Theory Is No Basis to Exclude Yenikomshian's Rebuttal ........................ 10

III.    Yenikomshian's Rebuttal Reliably Opined on Marinescu's TAM Analyses ...................... 10

# TABLE OF AUTHORITIES

**Cases**                                                                                                          **Page**

*Bluetooth SIG, Inc. v. FCA US LLC,*
    468 F.Supp.3d 1342 (W.D. Wash. 2020) ................................................................... 4

*EEOC v. Mattress Firm, Inc.,*
    No.  2:13-cv-1745-GMN-VCF,
    2016 WL 589667 (D. Nev. 2016) ...................................................................... 11, 12

*Freteluco v. Smith's Food and Drug Ctrs., Inc.,*
    336 F.R.D. 198 (D. Nev. 2020)............................................................................... 4

*Iconix, Inc. v. Tokuda,*
    457 F. Supp. 2d 969 (N.D. Cal. 2006) .................................................................... 4

*In re Incretin-Based Therapies Prods. Liab. Litig.,*
    524 F. Supp. 3d 1007 (S.D. Cal. 2021) ................................................................. 12

*In re Toyota Motor Corp. Unintended Acceleration Mktg.,*
    *Sales Pracs., & Prods. Liab. Litig.,*
    978 F. Supp. 2d 1053 (C.D. Cal. 2013)............................................................. 4, 11

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999) ................................................................................................ 4

*Mach v. Yardi Systems, Inc.,*
    No. 24-CV-063117 (Cal. Super. Ct. Oct 6, 2025) .................................................. 1

*Oracle USA, Inc. v. Rimini Street, Inc.,*
    No. 2:10-cv-00106-LRH-VCF,
    2021 WL 1224904 (D. Nev. March 31, 2021) ........................................................ 4

*Portillo v. CoStar Grp., Inc.,*
    No. C24-229RSL,
    2025 WL 2495053 (W.D. Wash. Aug. 29, 2025) (Lasnik, J.) ................................ 10

*Rearden, LLC v. Walt Disney Pictures,*
    152 F. 4th 1058 (9th Cir. 2025)............................................................................... 2

*Rovid v. Graco Children's Prods. Inc.,*
    No. 17-cv-01506-PJH,
    2018 WL 5906075 (N.D. Cal. Nov. 9, 2018)......................................................... 12

*United States v. Adams,*
    444 F. Supp. 3d 1248 (D. Or. 2020) ..................................................................... 12

**PRELIMINARY STATEMENT**

Plaintiffs alleged an algorithmic price-fixing case with Yardi's Revenue IQ ("RIQ") software at the center.[1] This Court's phased discovery order recognized that the critical first question before it was how RIQ works in the real world.[2] Yenikomshian's opening report answered, establishing that RIQ does not function as Plaintiffs alleged.[3] Plaintiffs' Motion to Exclude Mihran Yenikomshian ("Motion") does not challenge any of Yenikomshian's opening opinions. Mot. 13. Indeed, Plaintiffs' expert, Dr. Ioana Marinescu ("Marinescu"), testified repeatedly that she had no basis to (and did not) dispute Yenikomshian's analysis of Yardi's source code or data. Nor could she, because she did not review RIQ's source code.[4] As explained in the Declaration of Mihran Yenikomshian in Rebuttal to the Report of Marinescu (Dkt. 524) ("Yenikomshian Rebuttal"), Marinescu nevertheless offered opinions in her First Report[5] based on false assumptions about how RIQ operates, ignoring significant, undisputed aspects of how RIQ actually functions. Yenikomshian Rebuttal ¶¶8-10.

The Yenikomshian Rebuttal applied well-recognized principles and methods— Yenikomshian analyzed (1) the source code, which, as *Mach v. Yardi Systems, Inc.*, No. 24-CV-063117 (Cal. Super. Ct. Oct 6, 2025)[6] recognized, is the irrefutable source of truth regarding how the software operates, and (2) structured data showing how clients use the software. Yenikomshian's Rebuttal confirmed through this analysis that RIQ does not function as Marinescu described.[7] Marinescu's First Report failed to account for how RIQ operates in the real world and

---

[1] Consolidated Class Action Complaint ¶¶34, 169, 228-33.

[2] Dkt. 278 at 1 ("[P]laintiffs' antitrust claims depend largely on the allegations that Yardi utilizes its clients' confidential and commercially sensitive data to recommend pricing, leasing, and renewal strategies and that its clients generally adopt those recommendations.").

[3] Declaration of Mihran Yenikomshian (Dkt. 478) ("Yenikomshian Report").

[4] June 15, 2026 Declaration of Claire Martirosian ("Martirosian Decl."), Ex. A, Marinescu Deposition Transcript (hereinafter "Marinescu Tr.") 49:5–8 (Marinescu testified that she "didn't [herself] review the [Revenue IQ source] code, not being a, you know, an expert in that . . . domain.").

[5] Expert Report of Dr. Ioana Marinescu (Dkt. 497-33) ("Marinescu First Report").

[6] Dkt. 475-1.

[7] As did Professor Michael Mitzenmacher, Professor of Computer Science at Harvard University, whose rebuttal is not at issue.

-1-

thus failed to reliably apply the methods she invoked to the facts of the case. *See* Motion to Exclude Marinescu (Dkt. 530). Yenikomshian's Rebuttal is admissible and directly responsive to a critical question the Court itself sought to have answered.

Plaintiffs acknowledge Yenikomshian's expertise as a computer scientist. Mot. 5.  Instead, Plaintiffs argue Yenikomshian cannot opine that Marinescu's methods are unreliable because he is not an economist. But Yenikomshian does not offer any economic opinions:

> Marinescu's conclusions must be anchored in an accurate understanding of the software and the associated data. Otherwise, her analysis applies economic theory to something other than Revenue IQ as it actually operates and the Benchmarking system as it actually operates. This distinction matters because Dr. Marinescu's economic opinions depend on factual claims about what these systems do technically, what specific information they use and provide, and how clients interact with each of the software systems. Plaintiffs concede I am undisputedly qualified to opine on each of these three issues.

Declaration of Mihran Yenikomshian in Rebuttal to the May 22, 2026 (Second) Report of Ioana Marinescu, Ph.D. ("Yenikomshian Response") ¶15.[8] Each of the conclusions in Yenikomshian's Rebuttal Report that Plaintiffs challenge is well-supported and reliable.

*First*, Yenikomshian grounds his rebuttal to Marinescu's opinion that RIQ provides clients with a "common function" in his technical expertise. Marinescu offered opinions based on the premise that clients use RIQ in the same way to adopt a coordinated approach to pricing. Yenikomshian's Rebuttal Report proves that premise wrong: Marinescu's analysis omitted client-specific configurations, client-specific inputs, and source-code mechanisms that affect pricing outputs. Yenikomshian thus did not offer an economic opinion about coordination; he offered a technical opinion about how RIQ operates, confirming the opinions in his (unchallenged) opening report that the RIQ system does not employ a common function. In doing so, he exposed the faulty technical premises underlying Marinescu's opinions, which were thus not the product of a reliable application of any principles and methods to the actual functionality of the software.

*Second*, Yenikomshian likewise grounds his rebuttal of Marinescu's benchmarking opinions in his technical expertise. Marinescu claimed that Yardi's benchmarking provides

---

[8] Plaintiffs' reliance on *Rearden, LLC v. Walt Disney Pictures*, 152 F. 4th 1058 (9th Cir. 2025), and Yenikomshian's testimony disclaiming that he offered economic opinions is thus irrelevant.

-2-

"comprehensive" visibility into rivals' pricing. Marinescu First Report ¶¶395, 405. Yenikomshian explained it does not:  benchmark reports are historical, anonymized, aggregated, and noisy, and clients cannot see the individual properties or values contributing to a KPI. Marinescu also claimed that Yardi "aligns" RIQ Comp (one of four Step One Trends) and Benchmark properties, assuming that each RIQ client's Comps—which Marinescu assumed were made up of other RIQ clients— are automatically integrated into their Effective Benchmark Set. Yenikomshian Rebuttal ¶¶62-63. Yenikomshian's Rebuttal proved that this is not true as a matter of how the source code operates either. *Id.* ¶¶64-65. These technical opinions based on a review of Yardi's benchmarking software fall squarely within Yenikomshian's expertise as a computer scientist and expose why Marinescu's opinions rely on false assumptions about how RIQ and benchmarking function.

*Third*, Yenikomshian's critiques of Marinescu's analyses of internal Yardi communications are empirical. Yenikomshian first opined that one of Marinescu's analyses relied on a dataset that was undefined and described only as being requested from Plaintiffs' counsel, and it therefore could not be reproduced, violating basic empirical principles. *Id.* ¶68. Yenikomshian additionally opined that Marinescu purported to opine on TAM enforcement, but the datasets in question included exclusively internal Yardi calls, not any record of Yardi's interactions with its clients. These critiques depend on principles of data analysis and reproducibility, both within Yenikomshian's expertise.

Yenikomshian's Rebuttal proved the technical premises in Marinescu's First Report false, and Plaintiffs now seek to recast Marinescu's First Report after the fact (via her Second Report), criticizing Yenikomshian for failing to rebut Marinescu's *new* opinions.[9] But the law forbids this type of sandbagging. It is not the role of a rebuttal expert to anticipate arguments or analyses the opposing expert did not offer. Nevertheless, as the Yenikomshian Response to Marinescu's Second Report details, Marinescu's Second Report does not hold up either. It too depends on false assumptions about RIQ functionality and use.[10]

---

[9] Reply of Ioana Marinescu (Dkt. 555-1) ("Marinescu Second Report").

[10] Marinescu's Second Report goes so far as to manipulate the analytical script behind her code to hide her original shortcomings.

YARDI SYSTEMS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE MIHRAN YENIKOMSHIAN'S
REBUTTAL REPORT                                                  CASE NO.: 2:23-CV-01391-RSL

Nor was Yenikomshian required to consider and opine on every piece of evidence Marinescu cited in support of her flawed opinions, given that her technical predicates were defective. Marinescu shifted from a purported conspiracy furthered by a common algorithmic formula and real-time benchmark reporting with comprehensive, granular visibility (according to her First Report) to a theory that RIQ's pricing calculations and Yardi's benchmark reporting provide vague directional signals that could potentially support collusion (in her Second Report). By offering new, generic theories about competition concerns and abandoning her old ones, Marinescu's Second Report confirms that Yenikomshian was right, and her own opinions about the software were wrong.

Plaintiffs cannot show that Yenikomshian, an unquestionably qualified software and data science expert, exceeded his expertise, and their Motion should be denied.

## LEGAL STANDARD

Proper expert rebuttal under Federal Rules of Civil Procedure 26 "explains, repels, counteracts or disproves evidence of the adverse party." *Freteluco v. Smith's Food and Drug Ctrs., Inc.*, 336 F.R.D. 198, 205 (D. Nev. 2020). Qualified rebuttal experts possess "sufficient specialized knowledge to assist the [finder of fact] in deciding the particular issues in the case." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999); *Bluetooth SIG, Inc. v. FCA US LLC*, 468 F.Supp.3d 1342, 1348-49 (W.D. Wash. 2020) (finding expert with different specialized expertise than affirmative expert qualified to offer testimony based on experience and review of facts and data). Source code experts are, unremarkably, routinely permitted to opine on how software functions. *Oracle USA, Inc. v. Rimini Street, Inc.*, 2021 WL 1224904, at *8-9 (D. Nev. Mar. 31, 2021); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053 (C.D. Cal. 2013); *Iconix, Inc. v. Tokuda*, 457 F. Supp. 2d 969, n. 10 (N.D. Cal. 2006).

Rule 702 requires that admissible rebuttal testimony be "based on sufficient facts or data," be "the product of reliable principles and methods," and reflect a "reliable application of the

-4-

principles and methods to the facts of the case." Fed. R. Evid. 702(b)-(d). There is no rule that only an economist can rebut an economist.[11]

## ARGUMENT

### I.    YENIKOMSHIAN'S REBUTTAL RELIABLY OPINED THAT RIQ DOES NOT OPERATE AS A COMMON FUNCTION

#### A.    Yenikomshian Rebutted Marinescu's Original Common Function Theory

Neither Marinescu nor Plaintiffs challenge the admissibility of Yenikomshian's opening report. In fact, Marinescu did not dispute any of Yenikomshian's technical findings. Marinescu Tr. 46:20-24, 56:13-23. Yenikomshian concluded that RIQ's pricing methodology is individually configured by each client, with hundreds of thousands of possible combinations. Yenikomshian Report ¶¶51-52, 96. He further opined that a client's pricing calculation relied on that client's *own* data—which RIQ does not share with any other client—and (optionally) publicly-available asking rent data from Comp properties, also individually selected by the client. *Id.* ¶¶19, 22, 26.

Marinescu's First Report refuted none of these facts, but she nevertheless opined that RIQ clients delegate pricing decision-making to Yardi by using "***essentially the same*** pricing rule[s]," asserting that "***virtually all*** Landlord Defendants" adopt the same trend weights and the same health rules, which—when combined with the Comp Trend's purported instantaneous matching—culminated in a theory that RIQ clients employ a "common function" rather than independent decision-making. Marinescu First Report ¶¶237, 244, 246-48; MSJ Opp. 11 (claiming RIQ's "common decision framework" is a combination of both the Trends and the magnitude of change via Health Rules).[12] Marinescu's opinions rely on a combination of her mischaracterization of Yenikomshian's analysis of the source code (Marinescu Tr. 45:23-46:24, 54:7-19), and her analysis of Yardi's configuration data (showing how RIQ clients configure the system), which she

---

[11] Of course, Yardi **has** offered an economist to do exactly that in response to Marinescu's failure to reliably apply economic principles.

[12] *See* MSJ Opp. 37-38 (referring to RIQ's pricing methodology as a "common engine (shared rule logic)" and "standardized configurations and 'best practices' used by most).

-5-

performed using nothing more than a keyword search rather than actually analyzing the system as Yenikomshian did. *Id.* 82:23-83:13; Marinescu First Report ¶¶286-94.

Yenikomshian's Rebuttal observed that Marinescu's extrapolations about how RIQ operates were factually inconsistent with the system architecture. Yenikomshian's technical and empirical analyses on rebuttal demonstrated Marinescu's failure to consider the full scope of RIQ's functionality and how clients use it. Yenikomshian Rebuttal §V. Yenikomshian's analyses demonstrated that Marinescu: (1) failed to consider any configuration that determined the magnitude of change in the calculation (including step size, Health Rule configurations, and Step Three)[13]; (2) ignored that the calculation depends on a client's *own* data and (optionally) publicly-available asking rent data, meaning that even two hypothetical clients with identical configurations would have individualized pricing outputs[14]; (3) erroneously opined that RIQ clients typically select one another as Comps, and because they do not,  there is no "feedback loop" via the Comp Trend[15]; and (4) erroneously opined that the Comp trend, which considers lagged, backward-looking asking rent growth ratios, permits "instantaneous price matching" when it does not.[16]

In short, Marinescu's First Report opined that *because* RIQ employs a common function, it could facilitate a conspiracy. Yenikomshian, building off his unchallenged opening report, opined in response that the technical foundation (*i.e.*, whether RIQ employs a common function) for Marinescu's conclusion was erroneous. Yenikomshian's Rebuttal relied on specific facts about how the software works, not economic theory.

---

[13] *See* Yenikomshian Rebuttal ¶¶25-29 (disregarding how Health Rules are configured fails to capture how RIQ works in practice); *id.* ¶¶30-33 (Marinescu disregarded Stepp Three even though it "can alter, and in some cases, reverse, the direction of the final pricing output."); *id.* ¶55 n.102 (discussing Marinescu's failure to consider Reference Rent Change Amount or step size); Yenikomshian Response ¶¶11, 26 n.59.

[14] Yenikomshian Rebuttal §III.

[15] *Id.* ¶¶39-44.

[16] *Id.* ¶¶52-56.

YARDI SYSTEMS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE MIHRAN YENIKOMSHIAN'S
REBUTTAL REPORT                                              CASE NO.: 2:23-CV-01391-RSL

**B.    Marinescu Abandoning Her Common Function Theory Is No Basis to Exclude Yenikomshian's Rebuttal**

Marinescu's Second Report abandons the First Report's claims that RIQ "operates as a single pricing formula applied uniformly across clients" (Yenikomshian Response ¶108),[17] and that RIQ's "common function" ensures pricing synchronization across RIQ clients in both direction and magnitude. Marinescu's Second Report opines that the magnitude of any pricing change is irrelevant to "pricing outcomes," and the crux of her new opinions is merely that the RIQ Trends and their "directional signal" to raise or lower prices "causes directional upward pricing pressure." Yenikomshian Response ¶¶106-09; *see* Marinescu Second Report ¶411. These new diluted theories were, of course, not what Yenikomshian rebutted, because Marinescu submitted her Second Report *after* Yenikomshian's Rebuttal. That Plaintiffs argue for exclusion on that basis is nonsensical and not remotely grounded in Rule 702's reliability considerations.

Marinescu's new theory still cannot escape its flawed technical predicates. *First*, Marinescu is incorrect—the Health Rules and Step Three *can* negate or reverse the Trends' provisional calculation regarding whether the rent should be raised or lowered. Yenikomshian Response ¶¶29, 111. *Second*—and relatedly—ignoring all configurations that go to magnitude (step size, Health Rules, and Step Three) ignores the majority of the system *and the choices clients make when using it* (*id.* ¶¶11, 24-29, 109-11), which directly bears on *whether RIQ clients agreed to conspire with one another* to fix rents. *Third*, Marinescu still ignores that the Trends rely on a *client's own data* (and potentially client-selected publicly-available asking rents). *Id.* ¶114.

In sum, Marinescu's new theories remain divorced from the source code that governs RIQ's pricing methodology, shifting to such a degree of legally insufficient abstraction that Marinescu is simply "pointing to common use of the same software." *Id.* ¶110. But Marinescu's First Report (and Plaintiffs' characterization of it on summary judgment) opined about the RIQ source code, how it implements its algorithms, and how clients configured those algorithms. *Id.* ¶¶22-23. Yenikomshian's Rebuttal tested Marinescu's claims against the source code and configuration data

---

[17] *See also id.* §§V-VII.

YARDI SYSTEMS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE MIHRAN YENIKOMSHIAN'S
REBUTTAL REPORT                                                    CASE NO.: 2:23-CV-01391-RSL

to prove that Marinescu assumed a system that operates differently than RIQ does, both theoretically and practically. This is precisely what a rebuttal is supposed to do, and it is directly responsive to the Court's threshold phased discovery question about how RIQ works in the real world. Yenikomshian's technical opinions on rebuttal simply highlight the fundamental disconnect between Marinescu's economic conjecture and RIQ's operation.

## II.    YENIKOMSHIAN'S REBUTTAL RELIABLY OPINED THAT YARDI'S BENCHMARK REPORTING DOES NOT OFFER COMPREHENSIVE VISIBILITY INTO RIVALS' PRICING DECISIONS

### A.    Yenikomshian Rebutted Marinescu's Original Theory that Benchmarking Offers Comprehensive Pricing Visibility and Automatically Aligns with Comps

Neither Plaintiffs nor Marinescu challenge the Yenikomshian Opening Report's opinions on Yardi's benchmark reporting. They do not dispute that (1) the benchmarking source code is independent from and never feeds into the RIQ pricing methodology[18]; (2) Yardi imposes a multi-step process of aggregation, anonymization, noise injection, and eligibility criteria such that clients have no insight into the KPI inputs for any property[19]; (3) benchmarking is inherently historical and the clients who use it (which is not even all Landlord Defendants) do so to consider historical windows[20]; and (4) the overwhelming majority of properties selected as benchmarks are not RIQ clients.[21]

Marinescu's First Report ignored these facts—but did not challenge them—opining that Yardi's benchmark reporting offers "***comprehensive visibility** on rivals' pricing*" regarding current "list prices, final transaction prices, discounts, and concessions" and that Yardi "structurally requires" Comps and Benchmarking alignment by automatically incorporating a client's Comp Set

[18] Yenikomshian Report ¶¶128-33.

[19] *Id.* ¶¶135, 138, 140-51, 173, Figure 23.

[20] *Id.* ¶¶126, 156, 193-95.

[21] *Id.* ¶183 ("[O]n average, 90% of the properties selected for benchmarking by Revenue IQ properties do not use Revenue IQ.").

into their Benchmark Set. Marinescu First Report ¶¶395, 405; Marinescu Tr. 216:7-217:12 (Benchmarking "quite directly speaks to what they are pricing right now."). Marinescu concluded that this combination of contemporaneous visibility and alignment could support an anticompetitive information exchange. Marinescu First Report ¶¶395, 405.

On rebuttal, Yenikomshian offered an empirical and technical correction of the misstatements in Marinescu's First Report. ***First***, Yenikomshian's Rebuttal opined that Yardi's benchmarking is not only historical,[22] but it introduces significant information loss between inputs and the singular output clients receive by applying noise[23] as well as by weighting the input averages, which are then aggregated. Yenikomshian Rebuttal ¶60. ***Second***, Yenikomshian opined that clients have ***no visibility*** "into the actual prices or discounts offered by other properties for Benchmarking KPI outputs," nor which properties from their Requested Benchmark Set makes it into the Effective Benchmark Set, much less whether any property in either set is an RIQ client. *Id*. ¶59. ***Third***, Yenikomshian opined that RIQ's Comp Sets are not "structurally aligned" with Benchmark Sets, and in fact only 35% of Comp Sets are included in Landlord Defendant Effective Benchmark Sets. *Id.* ¶65.

Yenikomshian thus concluded that Marinescu's claim that benchmarking offered such "comprehensive visibility" was "unsupported and unreliable" because ***the system's actual architecture contradicted it***. *Id.* ¶¶10, 14, 61. He further opined that Marinescu did not accurately describe Benchmarking as it actually operates according to the source code—source code he reviewed and Marinescu did not. *Id.* §VII.[24]

---

[22] Yenikomshian Rebuttal ¶14.

[23] Yenikomshian Rebuttal ¶¶59-60.

[24] Plaintiffs' critique of Yenikomshian for not relying on economic literature is misplaced. Mot. 11. Yenikomshian correctly testified that such information was not relevant to his opinions—he opined on what the system can and cannot do through the source code. Martirosian Decl., Ex. B, Mihan Yenikomshian Deposition Transcript 71:14-72:18; 35:3-25.

YARDI SYSTEMS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE MIHRAN YENIKOMSHIAN'S
REBUTTAL REPORT                                                          CASE NO.: 2:23-CV-01391-RSL

### B.    Marinescu Abandoning Her Comprehensive Visibility and Comp Alignment Theory Is No Basis to Exclude Yenikomshian's Rebuttal

Plaintiffs do not challenge the accuracy of Yenikomshian's technical observations on rebuttal. Instead, Plaintiffs move the target, arguing Yenikomshian could not opine as to whether benchmarking permits the "kind of competitive intelligence" that "reduces pricing uncertainty" and permits pricing coordination.[25] They premise this argument on Marinescu's new opinions in her Second Report, suggesting that Yardi's benchmarking does so by directionally signaling to a client whether they are above or below their benchmark.[26]

But *again*, that is not the theory Yenikomshian rebutted—Plaintiffs and Marinescu pivoted, abandoning arguments that benchmarking offers "current," "granular," and "localized" information. MSJ Opp. 39. Marinescu newly concedes that benchmarking does not "mean visibility into any specific competitor's price" but rather "visibility on the average of competitors"—which Yenikomshian demonstrated are largely not RIQ clients—and abandons her original assertion that Comp properties are guaranteed inclusion in Effective Benchmark Sets. Yenikomshian Response ¶¶86-87. Marinescu's newfound position, pinning everything on an RIQ client's insight into a "binary classification (above or below benchmark) computed from a noisy aggregate over a historical window," does not clarify her prior theory—it contradicts it, representing a "narrower and far different theory adopted after the source code and data contradicted the original one." *Id*.[27]

## III.    YENIKOMSHIAN'S REBUTTAL RELIABLY OPINED ON MARINESCU'S TAM ANALYSES

Yenikomshian's Rebuttal critiqued Marinescu's opinion that internal Yardi calls "asymmetrically" pushed clients to increase rents because Marinescu's analysis was not

---

[25] Mot. 5-6; Marinescu Second Report ¶¶56, 58, 408.

[26] Marinescu Second Report ¶4.

[27] Marinescu's Second Report does not cite a single instance (in a court or academia) where collusion was inferred from such limited historical information. Indeed, that is because Marinescu's new theory effectively advances the policy position that all benchmark reporting should be *per se* illegal, which is not the law. *Cf. Portillo v. CoStar Grp., Inc.*, 2025 WL 2495053, at *5 (W.D. Wash. Aug. 29, 2025) (Lasnik, J.).

reproducible and was therefore unreliable. Yenikomshian Rebuttal ¶¶66-68. His points were simple and empirical. *First*, one of Marinescu's analyses relied on a selection of internal Yardi call notes of purported instances where Yardi flagged clients as pricing below their selected Benchmarks, and Marinescu then looked for correlations against Yardi's lease data. Marinescu First Report ¶¶378-79. As to how this subsection of call notes were gathered, Marinescu stated only that "counsel" prepared the dataset for her. Marinescu Tr. 63:25-67:7. Marinescu does not, in her First Report, appendices, or analytical scripts, explain how counsel assembled this subsection of call notes. Yenikomshian Rebuttal ¶68 n.128. Yenikomshian could not replicate Marinescu's results and thus concluded that Marinescu's opinion violated the fundamental rule that empirical analyses must be replicable to be reliable. Yenikomshian Response ¶¶124-25; Yenikomshian Rebuttal ¶68. *Second*, Yenikomshian observed that Marinescu's analyses, and therefore her theory of TAM enforcement, relied on exclusively internal Yardi communications rather than any actual communications between Yardi and its clients. Yenikomshian Rebuttal ¶67.

Plaintiffs and Marinescu neither challenge Yenikomshian's factual conclusions nor explain how Marinescu's results could have been replicated. Instead, Plaintiffs attempt to sidestep the issue by attacking Yenikomshian for not replicating Marinescu's review of the factual record as a general matter. Mot. 5-6, 10-12. But the substance of those notes does not change the fact that (1) the notes are indeed between internal Yardi personnel, not clients, and (2) Marinescu's analysis contained a basic, empirical flaw by not defining its parameters, and its results could not be tested. Yenikomshian Rebuttal ¶¶67-68. Even so, whether TAMs consider a client's benchmark reports does not change what that benchmark reporting does or does not reveal to clients. *Supra* §II. Rule 702 does not require Yenikomshian to base his opinions on the same materials Marinescu relied on in forming her opinions. *See EEOC v. Mattress Firm, Inc.*, 2016 WL 589667, at *4 (D. Nev. 2016). Yenikomshian's task was to analyze whether Marinescu sufficiently supported her own opinions, which did not require him to review every square inch of the factual record. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. 2d at 1069.

YARDI SYSTEMS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE MIHRAN YENIKOMSHIAN'S
REBUTTAL REPORT                                                              CASE NO.: 2:23-CV-01391-RSL

Yenikomshian relied on "appropriate facts [and] data" in reaching his conclusions. *See Daubert*, 43 F.3d at 1318. **First**, he opined about RIQ and Yardi's Benchmarking functionality through the source code and its data—*i.e.*, the objective record of what the system can do and how clients use it. Subjective interpretation of depositions, TAM call notes, or academic articles would not change these facts, and Yenikomshian thus correctly testified that this evidence was neither relevant nor useful to his opinions. *Supra* n.24; *see EEOC*, 2016 WL 589667, at *4 (admitting rebuttal witness who relied on alternative data set that he believed to be "more representative"). **Second**, Yenikomshian did not need to review internal Yardi documents or deposition testimony to reliably opine that Marinescu's opinions are not replicable. *United States v. Adams*, 444 F. Supp. 3d 1248, 1260 (D. Or. 2020) (excluding expert where analysis was "not replicable" and untestable where the expert could not define its key features "that would allow an uninitiated person to perform the same test in the same way as [the expert] did").

*In re Incretin-Based Therapies Prods. Liab. Litig.*, on which Plaintiffs rely, has no bearing on the reliability of Yenikomshian's rebuttal opinions to Marinescu. 524 F. Supp. 3d 1007 (S.D. Cal. 2021). In that case, the challenged expert failed to apply his self-imposed methodology because he failed to review the very sources he relied upon in writing his report, which is not the case here. *Id*. at 1036-37.[28] Similarly, *Rovid v. Graco Children's Prods. Inc.*, found deficient rigor where the expert's decision to "perform[] a test only once [met no] standard of rigor—scientific, courtroom, or otherwise"—a far cry from applying sound judgment regarding which records required review for technical analysis. 2018 WL 5906075 at *6 (N.D. Cal. Nov. 9, 2018).

In sum, Plaintiffs remind the Court of the uncontroversial fact that Yenikomshian's opinions rely on the objective source code and data, both of which Plaintiffs concede Yenikomshian is well-qualified to opine on. Whether he read depositions of Yardi employees, internal call notes, or certain academic articles in preparing his Rebuttal means nothing ***because his opinions are not***

---

[28] Plaintiffs ignore that the court excluded a biostatistician who relied on a "cherry-picked…unduly results-driven" data set, *id.* at 1039, mirroring Marinescu's failure to apply any scientific methodology in selecting Yardi TAM call notes. This approach to the creation of a dataset was "not good science, and therefore inadmissible." *Id.*

-12-

*based on those materials*. The software cannot operate differently than its source code directs or the structural data shows it did. Plaintiffs' objection takes the nonsensical position that an expert must read and consider every source that he ***does not*** rely upon. No authority supports such a requirement, and it is not a basis for exclusion.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion in its entirety.

RESPECTFULLY SUBMITTED this 15th day of June, 2026.

**DEBEVOISE & PLIMPTON LLP**

By: */s/ Maura K. Monaghan*

Maura K. Monaghan (*pro hac vice*)
Michael Schaper (*pro hac vice*)
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000
mkmonaghan@debevoise.com
mschaper@debevoise.com

Abraham Tabaie (*pro hac vice*)
David Sarratt (*pro hac vice*)
650 California Street
San Francisco, CA 94108
(415) 738-5700
atabaie@debevoise.com
dsarratt@debevoise.com

**McNAUL EBEL NAWROT & HELGREN PLLC**

By: */s/ Claire Martirosian*
Claire Martirosian, WSBA No. 49528
Richard W. Redmond, WSBA No. 58835
600 University Street, Suite 2700
Seattle, WA 98101
(206) 467-1816
cmartirosian@mcnaul.com
rredmond@mcnaul.com

*Attorneys for Defendant YARDI SYSTEMS*

-13-

YARDI SYSTEMS' OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE MIHRAN YENIKOMSHIAN'S
REBUTTAL REPORT                                          CASE NO.: 2:23-CV-01391-RSL

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendant Yardi Systems certifies that this brief contains 4,136 words, in compliance with LCR 7(e)(3).


By: */s/ Claire Martirosian*

Claire Martirosian

-14-