# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE    ORIGINAL

- - -

-------------------------------x

In re YARDI REVENUE         : NO. 2:23-cv-01391-RSL
MANAGEMENT ANTITRUST        :
LITIGATION.                 :
                            :
McKENNA DUFFY, individually :
and on behalf of all others :
similarly situated,         : (Consolidated with
        Plaintiff(s),       : Case Nos.
                            : 2:24-cv-01948;
        v.                  : 2:24-cv-02053)
                            :
YARDI SYSTEMS, INC., et al., :
        Defendant(s).       :
-------------------------------x

**CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

- - -

March 9, 2026

- - -

Videotaped/Video-Teleconferenced Deposition of IOANA MARINESCU, Ph.D., held at the law offices of Holland & Knight, Suite 3300, 1650 Market Street, Philadelphia, PA 19103, beginning at 9:37 a.m., ending at 5:41 p.m., on the above date, before Denise D. Bach, a Registered Professional Reporter, Certified Court Reporter, Certified Real-Time Reporter, License No. XI0003990, and Notary Public, PA, NJ, DE & NY.

BLUEBEAR SOLUTIONS JOB NO.: 3185

THE VIDEOGRAPHER:  Stand by.  We are now on the record.  The time is 8:37 -- I'm sorry, I've got to go off the record.

(Pause.)

THE VIDEOGRAPHER:  We are now on the record.  The time is 9:37 a.m.  The date today is March 9th, 2026, and this begins the video-recorded deposition of Ioana Marinescu in the matter of McKenna Duffy versus Yardi Systems, Inc. et al.

My name is Aleisha Catts and I am the videographer.  I am with BlueBear Solutions.  Our court reporter today is Denise Bach.

All counsel will be noted on the stenographic record.  Will our court reporter please swear in the witness.

- - -

IOANA MARINESCU, Ph.D., having been first duly sworn or affirmed, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY ATTORNEY SCHAPER:

Ioana Marinescu, Ph.D.                    Confidential                                    45

looking for exactly.

          Q.      Sure.

                  You agree that you did not list the actual source code for Revenue IQ among the materials you relied on.

                  Is that right?

          A.      Still looking.  Just making sure what we listed here exactly.

                  Yes, I did not list the source code in the materials relied on.

          Q.      And, similarly, you would agree that you do not list the source code for Yardi's benchmarking feature.

                  Is that right?

          A.      There is no source code that's listed in Section E, so, yes.

          Q.      And you also did not list, in the materials relied upon, any source code that governs the interface that Revenue IQ clients used to interact with Yardi.

                  Correct?

          A.      Yes, correct.

          Q.      You would agree, then, that none of the opinions in your report rely on a review of the actual source code for Revenue

IQ or benchmarking.

Correct?

ATTORNEY PIERCE:  Objection, argumentative.  Calls for a legal conclusion.

THE WITNESS:  So, here, what we did is that we relied on Yardi's own, you know, experts and descriptions of what their source code is doing in order -- as an economist, I'm really -- I'm trying to understand, I want to understand how the software works, what's its effect on the market.

And so, in this case, I have relied on, you know, Yardi's representations of how this code works to understand how it works.  And then, you know, I have done additional things that we can talk about to understand its effects as an economic matter.

BY ATTORNEY SCHAPER:

Q.    Okay.  But you're not relying on your own review of the source code.

Correct?

A.    I am not relying on my own review of the source code in it.

Q.    Do you know who Adam Hastings is?

going to instruct the witness not to answer.

That's going to reveal the substance of

communications with the consulting expert.

ATTORNEY SCHAPER:  But if it's

something that she relied on in her report,

which she just testified that she did, then

that is not privileged.

ATTORNEY PIERCE:  I don't think

it's discoverable communications with a

consulting expert.  If you want to ask about

communications with an attorney, then -- I

don't think --

ATTORNEY SCHAPER:  You're saying

if she relied on the input of somebody

informing the opinions that are in her Rule 26

report that that is not discoverable?  That's

your position?

ATTORNEY PIERCE:  All right.  Why

don't you ask the question again and we'll see

what -- we'll try to see if she can answer it

without revealing attorney work product.

BY ATTORNEY SCHAPER:

Q.    Are there particular parts of

your report that reflect input you received

from Mr. Hastings?

A.      Well, the -- so, as I said, I tried to understand, based on Yardi's own documents and experts, as well as Mr. Hastings, you know, having a look at the code, as I said, I didn't myself review the code, not being a, you know, an expert in that, in that domain, and so one of the things I want to do is simply see how it works.

And so there are, for example, some documents that Yardi produced to show the structure of the, of the code.  And so part of it was, like, right now, I'm not sure where we put that, probably in Section 4.  And so part of the goal there was to say, hey, based on the code and based on what they're saying, does that seem right?

And, you know, so we discussed like, you know, is there any major thing that I should be aware of in analyzing the economic effects that maybe is different from, you know, what might appear in, you know, Yardi's representation.

So, that was kind of -- you were talking earlier about checking data, so, similarly, checking code and sort of like

foundation, counsel.

She can answer.

ATTORNEY PIERCE:  Can you read the question back?  I want to hear it one more time.

BY ATTORNEY SCHAPER:

Q.    As part of forming the opinions in your report, did Mr. Hastings ever tell you that the descriptions in Mr. Yenikomshian's report of how the Revenue IQ code works are incorrect?

ATTORNEY PIERCE:  Objection. Calls for speculation.

You may answer.

THE WITNESS:  As I said, the issue at hand is the economic impact of this software and, in many cases, as you noted, I cited Mr. Yenikomshian's analysis because it contains facts that I believe to be relevant.

When I'm disagreeing with it is about sort of the interpretation and representation, like, just to give you an example, like earlier we were discussing different matter, but, you know, sometimes outliers are real data.  And it's a matter of

in your report, did Mr. Hastings ever tell you that the descriptions of Mr. Yenikomshian of how the Revenue IQ source code works are incorrect?

ATTORNEY PIERCE:  Objection, asked and answered.  Objection, calls for speculation.

You're not tying your question to any specific opinion in her report, so I don't know how she can answer that question.  But go ahead.

BY ATTORNEY SCHAPER:

Q.    It's a straightforward question.

Did he ever tell you that Mr. Yenikomshian's source code analysis was wrong?

A.    Depends what you mean with wrong. You know, we discussed this before.  It's -- you know, there are ways that he analyzed the configurations that I would have done it differently and it's discussed in the report, you know, this is what I've been looking at. Not the source code as we discussed, you know, I haven't myself looked at the source code.

Q.    Okay.  So, I think I'm understanding correctly that the answer to

Q.      And if you look at Paragraph 12 of your report, let me know when you're there.

A.      Yes, I'm there.

Q.      Okay.  In the paragraph that starts "Second," you say, "Yardi assigns account managers, or TAMs, to participating landlords.  These TAMs conduct recurring pricing calls."

Do you see that?

A.      Yes.

Q.      And the pricing calls that you're referencing there are between a TAM and a Revenue IQ client.

Is that correct?

A.      Yes.

Q.      And are you aware that Yardi produced more than 600 TAM pricing call notes prior to the close of discovery in November 2025?

A.      This -- yes, I am.  And I discuss it somewhere in the report, though, I don't -- elsewhere than here.

So, yes, we did, we did get that data, but this was towards the, you know, end of the kind of time that we were analyzing

Ioana Marinescu, Ph.D.                    Confidential                    63

things, and at that point we weren't able to -- I had to look and, you know, I talk about it in the report a little bit, but we were unable to do a thorough analysis of that.

Instead, we focused on the calls between Mr. Fazio, the TAM manager, and the TAMs.

Q.    Okay.  I just want to make sure we're clear.  I think that you discuss in your report some TAM call notes that were produced in January of 2026.

Does that ring a bell?

A.    Oh, yes, I think maybe, maybe that that was con -- yes, those are the TAM calls that I'm talking about.

Q.    Okay.

A.    Which were a lot.  There was a lot of data that I would have loved to look into.  But given timing, there were other things to wrap up in the report.

Q.    Okay.  So, I'm asking about the 600 TAM pricing call notes that were produced prior to November 2025.

A.    I don't recall hearing of those.

Q.    You didn't review those TAM call

notes?

A.      I don't recall hearing of those specific call notes, if you're talking about TAM calls with clients, because --

Q.      That is what I'm talking about.

A.      Yeah, I've been looking at the calls of Mr. Fazio with the TAMs.

Q.      During your work on the report in 2025 -- strike that.

Am I correct that -- strike that.

When did you start doing the analysis and drafting of your report?

A.      It was -- you know, I started after I got, you know, assigned to this case. So, must be late 2024, beginning 2025.

And, of course, this takes a lot of time.  There are, like, many stages in that.  And I think, early on, we probably did more like literature reviews, you know, we looked at the appendix, there are many papers cited, to understand what we should be looking for as far as the economics.

Q.      As part of your work in 2025, did you ask counsel to provide copies of all of the call notes between TAMs and Revenue IQ

Ioana Marinescu, Ph.D.                    Confidential                              65

clients?

A.     I asked counsel about the Fazio calls and those are the ones that I base my analysis on.  And then, you know, we wanted to get these TAM calls -- and, as I said, I don't recall this specific November one, so, you know, I guess we were waiting for more data which came in January.  And at that point it was, you know, kind of late in the game for me to be able to look at them thoroughly.

Q.     But, during 2025, I think your testimony was that you were not aware that there was a set of 600 TAM pricing call notes?

A.     I was not aware of that.

Q.     Okay.  Are you aware that, prior to November 2025, Yardi produced over 10,000 email communications between Yardi personnel and Revenue IQ clients?

A.     I haven't looked at those emails.

Q.     Okay.  So, you didn't review -- let me correct that.

The 10,000 email communications I referenced were between Yardi and the landlord defendants.

You haven't looked at those, you

Ioana Marinescu, Ph.D.                Confidential                                    66

just testified?

A.       I have not.

Q.       Did you ask counsel for all the communications that had been produced between Yardi and the landlord defendants?

A.       You know, this -- I asked counsel for, you know, relevant data that we could use, you know, to analyze it, and I don't recall, you know, hearing about those emails.

Q.       Okay.  Do you recall whether you specifically said to counsel, I'm interested in how TAMs communicate directly with clients, I'd like to see all those documents?  Did you make that request?

A.       I don't recall making that explicit request just the way you phrased it, but, certainly, you know, we discussed my analysis of the role of TAMs and, as such, you know, it's always helpful to get more information about, you know, what TAMs did.

And I have some analysis in my report that I hope we can get to, but, you know, this is, this is the data that I have used, which is the -- Mr. Fazio's calls with TAMs.

And I also want to add that this is, while, you know, it's not the whole of the data, this is important data because Mr. Fazio being the TAMs manager was presumably conveying to TAMs important messages about what they should be doing as, you know, his -- the manager.

Q.    Do you know who Katrina Ivinskas is?

A.    No, I don't.

Q.    Do you know who Dustin Bradford is?

A.    I do not.

Q.    As part of your work on this matter, did you ask counsel for any deposition transcripts of depositions that were taken of TAMs or former TAMs at Yardi?

A.    I do not recall looking at this.

Q.    Do you recall asking counsel whether any such deposition transcripts existed?

A.    I don't recall.

Q.    How did it come about that -- you do cite some deposition transcripts.

How were those deposition

ATTORNEY PIERCE:  Objection.

BY ATTORNEY SCHAPER:

Q.    Is that correct?

ATTORNEY PIERCE:  Objection.
Mischaracterizes testimony.

THE WITNESS:  Again, I have focused on understanding how Revenue IQ leads to a number of economic effects, including parallel pricing.

And so I think that is relevant, because -- to your question that you're asking, because if you -- if where we're trying to go with this is that, oh, everybody sets their own price, you know, therefore, everybody does whatever they want and it's independent, you know, decision-making, then we wouldn't see the sorts of patterns that we see in the data in terms of, for example, you know, parallel pricing.

So, I think that that is relevant to the question you're asking.

BY ATTORNEY SCHAPER:

Q.    Okay.  But I'm just asking for a yes or a no.

Did you investigate, in your

analysis, the extent to which Revenue IQ clients make manual adjustments to reference rents?

That's the only question.

ATTORNEY PIERCE:  Objection, argumentative.  The witness can answer how she wants.

THE WITNESS:   I looked at changes, following Mr. Yenikomshian's analysis, I looked at the number of changes that clients made and analyzed them in terms of their relevance to the economics of the case.

BY ATTORNEY SCHAPER:

Q.    Among the changes you looked at, were reference rents among those?

ATTORNEY PIERCE:  Were you done answering the question?  Did you have anything else to add?

THE WITNESS:  Yes.  I was going to say that the -- what is important is not whether clients can make a change.  And I am saying they can make a change to reference rents and many other configurations, they are able to.

Q.      Okay.  So, even if Step 1 and Step 2 indicate an increase, the final output from Revenue IQ depends on the magnitude of the adjustments that the client selects in Step 3.

Correct?

A.      Taking this, you know, description as given, I can see that, you know, if the first term is what Revenue IQ recommended and we have these additional terms, then if these additional terms are not zero, you know, it's going to affect the final rent.

Q.      And if the output of Step 1 and Step 2, for example, say a $10 increase, and Step 3 includes a negative $25 adjustment for, say, turn costs, the final result would be a net decrease.

Is that correct?

A.      So, in the case that these additional terms would be negative, and if they are big enough, it could outweigh the positive increase in that hypothetical.

Q.      If you look at Paragraph 169 of your report --

market share analysis, you know, I can't speculate on an exhaustive list of those elements, but, surely, you know, as we know, I know in an industrial organization, market analysis very much depends on the structure of that particular market.

And so once we get into, you know, defining the relevant market, you know, I would look more into the literature and sort of the aspects that would be relevant. I don't want to speculate at this stage about, you know, an exhaustive list.

We talked about the fact that market share is important, that local competition matters, so some -- and, you know, the presence of RealPage might be important.

So, this is a non-exhaustive list of considerations that could play a role in our understanding of a, you know, price coordination scheme.

Q.     Isn't it correct that Harrington's coordinated adoption results depend on adoption rate within the market because there are fewer non-adopting firms to undercut the supracompetitive price?

A.      Sorry, say that, say that again? I'm not sure I understood.

Q.      You rely on Professor Harrington throughout your report.

Correct?

A.      Yes.

Q.      And isn't it correct that his coordinated adoption results depend on the adoption rate, because there are fewer non-adopting firms to undercut the supracompetitive price?

A.      So, he, he says that the more firms adopt, if it's -- if it's coordinated algorithm -- sorry.  If the adoption of the algorithm is coordinated, then we expect that the more firms adopt, the higher the price is.

And that's the, you know, empirical prediction that I test and find evidence for that in the data that I analyzed.

Q.      And do you recall, in terms of adoption percentages, what thresholds Professor Harrington uses?

A.      He doesn't use a threshold, he says that the more they adopt, the more the price goes up.  So, it's a continuous

Correct?

A.        Um-hmm.

Q.        What do you mean by substantial visibility?

A.        So, as this paragraph says, the property in the comp set are always included in, 99 percent in the benchmark.  And because I see the average price of the benchmark and other details about pricing for these benchmarks, I can tell on average what my competitors are doing because they're included in the benchmark.

Q.        But you don't mean visibility into any specific competitor's price.

Correct?

A.        I mean visibility on the average of competitors.

Q.        Okay.  So, just to be clear, you do not mean visibility into any specific competitor's price.

Correct?

ATTORNEY PIERCE:  Objection, asked and answered.

THE WITNESS:  I, I mean average of competitors.  And I would like to add that

Q.      You make a reference that describes comp sets and benchmark sets as purposefully aligned.

Is that right?

A.      Yes.

Q.      Have you analyzed what percentage of Revenue IQ clients' benchmark sets are made up of other Revenue IQ clients?

A.      I have not, but I seem to recall that this was somewhere in Mr. Yenikomshian's analysis and that maybe we cite it, but I don't recall for sure.

Q.      You haven't done your -- an independent analysis of that question?

A.      I, I don't think so.

In fact, I would like to add that if you look at Mr. Yenikomshian's report, Paragraph 150 --

Q.      Sorry, where are you looking, Professor?

A.      Yes, Paragraph 150, Page 90.

So, we can see there that the effective benchmark set contained an average of nine properties.  So, earlier we were discussing that originally there were 23 --

Ioana Marinescu, Ph.D.                    Confidential                    216

29, sorry, it says in the same paragraph, selected, but in the end, the average is over a relatively small number of properties. And we know that all of the ones in the comp set are going to be in there.

So, in that sense --

Q.       But we don't know that all of the ones in the comp set have data to contribute KPI -- data to contribute to a particular KPI.

Correct?

A.       So, you know, I believe that if they are in Revenue IQ, if they are in the comp set and they are in Revenue IQ, then they must be contributing data to the KPI.  So, I think that's something that probably we can say.

So, if there's a property in my comp set that uses Revenue IQ, then it surely has that.  So, at least for those, I believe, that for those that do use Revenue IQ, then they are in the data.  And there's a relatively small number of properties, so it's certainly possible.  I'm not saying that you can't de-anonymize, I want to be clear about that.

However, the benchmark does speak to, you know, to the extent that I have other Revenue IQ users in the comp set, it, you know, quite directly speaks to what they are pricing right now.

I am not saying you can't de-anonymize, just that, you know, it's an average of a small number.  And, in that sense, should my comp set include many Revenue IQ users, then, you know, the pricing I'm seeing in the KPI would be highly influenced by those users.

Q.    This part of your opinions, in terms of how a benchmarking set might be used for an anticompetitive scheme because it includes the information of other Revenue IQ users in the benchmark set, that would depend on what the actual data show as to the percentage of any particular benchmarking effective set that is made up of other Revenue IQ users.

Correct?

ATTORNEY PIERCE:  Objection, mischaracterizes testimony.

THE WITNESS:  No, I did not say

Ioana Marinescu, Ph.D.                    Confidential                    271

could be reflected, for example, in time gaps
between data points.

Is that right?

A.      Yes.

Q.      And you crafted a formula that
assumed that every lease observation in your
data was one month away from the next lease
observation.

Is that correct?   And I can point
you to --

A.      Yeah, tell me.

Q.      -- Page 195, Paragraphs 502 and
503.

A.      Yes.   What about this?   Go ahead.

Q.      So, the question was that your
formula assumes that every lease observation
in the data was one month away from the next
lease observation.

Is that right?

A.      So, as you can see, Paragraph 503
right after, I calculate each unit change and
effective --

(Court Reporter Clarification.)

I calculate each unit's change
and effective rent relative to the prior

month, including no changes when a unit is still under the same contract and, therefore, has the same effective rent.

So, therefore, as long as it's under the same contract, we assume that, you know, it's still the same rent until we observe a different rent.  And, actually, by the way, this assumption that it's still the same rent will, in all of those months, will, like, produce a no rent month to month, like, rent increase.

Q.      So, in terms of your mathematical formula, the fact you're observing month-to-month data, you use the T minus one or prior month as the time period in all cases?

A.      Yes.  By the way, this is the approach that the CPI uses, so we mirrored the approach of the CPI to make it more comparable, as I explain in Paragraph 504.

Q.      Isn't it the case that there are a number of instances where it was demonstrably not accurate that the data points were actually following month to month?

ATTORNEY PIERCE:  Objection,

Ioana Marinescu, Ph.D.                    Confidential                    274

Q.      If we can look at Revenue IQ Unit ID 339629, do you see that as the first lease start date is November 1, 2017.

Correct?

A.      Yes.

Q.      And then you put a lease term of 12, but that is carried forward until June 1, 2024, as the next observation.

Do you see that?

A.      I don't think so.  I think because we said that we only impute if it's still under the same contract, so, in that case, you know, the -- you would have a gap because, you know, it says 12 months.

So, if there's no other data, you see 12 months, we'd stop imputing the 770, you know, 12 months after 2017.  So, like by October 2018, that would be the last 770, and then it would start to be missing thereafter.

So, you -- because, as I just quoted, we only do it within contract.  So, as long as it's the same contract, then, you know, you can propagate the rent.  But here it appears that it would be a different contract.  So, you wouldn't propagate the rent in that

case.

Q.    But then when you computed the ratio between 770 and 1,062, you would assume that that is over one month, correct, that change?

A.    No, because the sort of the -- it would happen that there is a missing data for this prop -- so, like, starting in June of 2024, so there you would have no data for the May.  So, it would be missing for this, for this property; because, as I said, since we don't know that it's the same lease, I wouldn't have imputed the 770 all the way through that.  So, it would be missing.

And then, in July, the ratio would be one because we carry forward, since it's 12 months, you know, it's still the same rent.  So, in July of 2024, it would be one and so on, it would still be the same kind of stable rent until one year later.  So, so, that's how, how it would work.

Q.    So, you're assuming that, after the 12-month lease term, that you then did a calculation based on no data after that until the new lease in 2024.

understanding of how this was dealt with in your data was through having a series of missing observations after the first 12 months of the July 2013 lease?

A.    Yes, to the extent that this was the definition that was operationalized as same contract, then, you know, it would be missing, and then we'd have data again starting May 2019.

Q.    And, in your view, is that methodology appropriate?

A.    Well, if we don't know there's missing data, you know -- and -- so, okay. When there's missing data, in economics, we sometimes do imputation, and so meaning like filling in the missing data. And then the question is, what method do you use for the imputation? You have to make certain assumptions.

And depending on the case at hand, different assumptions might be appropriate. So, here the assumption was, as I said, as long as it's under the same contract, you know, I impute that the rent is still the same.

ATTORNEY SCHAPER:  I'd like to have marked as Deposition 9 another excerpt from the data.

(Exhibit No. 9, Further Excerpt from YARDI-DUFFY_00913149, Data Used in Figure 7 (Figure 88), was marked for identification.)

BY ATTORNEY SCHAPER:

Q.    Do you see this document in front of you?

A.    Yes.

Q.    And do you recognize this as another excerpt from Yardi -- strike that -- another excerpt from the data that you used in calculating your Yardi lease price index?

A.    This looks like similar observations to the one Exhibit 8 that we just looked at.

Q.    Okay.  And so if you would look at Revenue IQ Unit ID 1623904, the first entry point has a lease start date of June 1st, 2015.

Correct?

A.    Yes.

Q.    And the next lease observation for that unit is July 1st, 2025, over ten

BlueBear Reporting LLC

years later.

Do you see that?

A.    Yes.

Q.    And so that's a gap, after the initial 12 months, from June 2016 to July 2025, or 109 months.

Correct?

A.    Yes.

Q.    And then at the end of that, when you get to July 1, 2025, the rent increase is shown as from $1,045 to $1,382.

Correct?

A.    No.  My understanding is that the way that my staff processed the data, based on our discussion, is that we only imputed rent as long as it was the same contract.

So, here, you know, the data point would be missing in June 2025.  So -- and then in July 2025, it would still be missing, because we don't know, like, relative to what, since there was no data before.  And then starting in August 2025, so one month after this first, you know, new data point, then you would start to see a ratio of one or no price increase for the next 12 months, you

know, until the end of this, of this lease.

Q.    You would agree that it would not be appropriate to attribute the entire difference between 1,045 and 1,382 to a change that happened in one month.

Correct?

ATTORNEY PIERCE:  Objection, vague.

THE WITNESS:  So, as I said, given the procedure that we have discussed, there would be missing data in the middle and, therefore, there would not -- this property would not contribute to the index since it would have missing data, it would not contribute to the index until August of 2025, because that's the first time that we see the rent not changing since it's being propagated from the July 2025 new rent.

BY ATTORNEY SCHAPER:

Q.    If you assume for a second that this property did contribute to the data, do you agree with me that it would not be appropriate for that contribution to be based on a ratio comparing 1,382 to 1,045?

ATTORNEY PIERCE:  Objection,

3/9/2026
Ioana Marinescu, Ph.D.                      Confidential                                  282

assumes facts not in evidence.  Calls for

speculation.  Vague.

THE WITNESS:  There is no reason,

based on the methodology, to do that.  Like,

again, like, there is -- when there's missing

data, there's missing data.  We don't know

what happened in the meantime here.

BY ATTORNEY SCHAPER:

Q.     Okay.  But I'm just -- if you

assumed, let's say if you assumed that

somebody dealt with this issue identified for

property 1623904 by treating the entire change

from 1,045 to 1,382 as having occurred in one

month, that would not be an appropriate

methodology.

Correct?

ATTORNEY PIERCE:  Objection,

vague, calls for speculation, assumes facts

not in evidence.

THE WITNESS:  As I said, you

know, it seems to me that, in this situation,

there would be missing data for the index for

this property.  And so, so, you know, it just

wouldn't contribute for the intervening, you

know, time where we didn't have data for it to

Ioana Marinescu, Ph.D.                    Confidential                    283

impute what the rent was.

BY ATTORNEY SCHAPER:

Q.    Yes.

Professor, I'm -- I understand what you're saying.  I guess what I'm asking you is to assume that the way that this data point was dealt with was comparing $1,382 to $1,045 and calculating a ratio on that basis.

I'm just confirming that you agree that that would be an inappropriate way to deal with the data for Revenue IQ Unit 162390?

ATTORNEY PIERCE:  Objection, mischaracterizes testimony, assumes facts not in evidence, calls for speculation, vague.

THE WITNESS:  Yeah, I don't know exactly how this was dealt with.  I think I told you about the missing value and the fact that it would be missing, you know, in the intervening month with no continuation of contract.

BY ATTORNEY SCHAPER:

Q.    Okay.

A.    And, therefore, it would not be included.

Q.      Professor, that's not an answer to my question.   If you would please listen carefully.   I know that that's your testimony as to what you think happened with this data.

I'm asking you to assume, you don't have to accept the assumption, but just assume, you're an expert witness, assume, for purposes of this data that the way that it was handled was a ratio was calculated based on the $1,382 rent against the $1,045 rent and that ratio was used, would you agree with me that that would not be an appropriate way to deal with this data?

ATTORNEY PIERCE:   Objection, calls for speculation, assumes facts not in evidence.

THE WITNESS:   I mean, I don't know that that's -- you know, as I said, the description indicates that this ratio was not used because there would be missing data in the, in the middle.

So, unless, unless there was reason to believe that the contract for some reason continued all the way to June 2025, you know, then there would be missing data and

BlueBear Reporting LLC

this ratio would not be calculated.  If there was reason to believe that this contract continued at the same rate until June 2025, then it would be reasonable to compare those two prices.

BY ATTORNEY SCHAPER:

Q.    Did you do anything to investigate the issue of this time gap as part of preparing the analyses of the Yardi price index in your report?

A.    I did not.

However, I would like to point out, again, like just similarly we were talking about outlier, time gap and so on, when it comes to Figure 62, Page 148, whatever, you know, potential changes are introduced in the data from incorporating some observations that -- whose imputation might be debatable, this would have to exactly be timed in just the way that corresponds to when the first time calls happened.

So, you know, this could make a difference if those were treated a number of different ways.  Whenever we change the underlying data for an analysis, the resulting

figure can change.  But what I think it's important to remember here is that all these different changes to the processing, the outliers, the gaps, the missing, it would have to exactly coincide with the first time calls for us to get the kind of jump in prices that we see in Figure 62.

ATTORNEY SCHAPER:  I move to strike that.

BY ATTORNEY SCHAPER:

Q.    In the instances where there may have been a multi-month gap between the Yardi lease observations, you were still comparing the change in Yardi leases that took place to a one-month change in the CPI.

Is that right?

A.    Yes.  And in the CPI, the units that would have this kind of data would be treated similarly, you know, like if they don't have data on the unit, then it's missing.

So, they're only using the units for which there is continuous known data.

Q.    Did you do any data cleaning with respect to the data that the CPI is based on?

Ioana Marinescu, Ph.D.                      Confidential                                317

CERTIFICATE


I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.


_____

DENISE D. BACH,

Registered Professional Reporter

Certified Court Reporter

Notary Public/Expiration: March 2030

Dated:  March 12, 2026


(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)

BlueBear Reporting LLC