# EXHIBIT B

4/16/2026
Mihran Yenikomshian

Case 2:23-cv-01391-RSL     Document 569-2     Filed 06/15/26     Page 2 of 7

Highly Confidential
Attorneys' Eyes Only

Page: 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

**ORIGINAL**

CASE NO.:  2:23-cv-01391-RSL

In Re YARDI REVENUE MANAGEMENT ANTITRUST LITIGATION

------------------------------------------

WYLIE DUFFY, et al., individually and on behalf of all

others similarly situated,

      Plaintiffs,

v.

YARDI SYSTEMS, INC., et al.,

      Defendants.

REMOTE VIDEOCONFERENCE VIDEOTAPED

DEPOSITION TESTIMONY OF:

MIHRAN YENIKOMSHIAN

April 16, 2026

*HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY*

from either party?

MR. PIERCE:  None from me.

MR. TABAIE:  None from me.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.


MIHRAN YENIKOMSHIAN,

having first been duly sworn,

was examined and testified as follows:


EXAMINATION BY MR. PIERCE:

Q.    Good morning.  Could you state your name for the record.

A.    My name is Mihran Yenikomshian.

Q.    How many times have you been retained as a testifying expert in a litigation matter before this one?

A.    About five to seven times.

Q.    How many times have you been deposed?

A.    I've been deposed once as a testifying expert and once in a -- in a matter where I saw someone get hit by a car.

Q.    Okay.  Have you ever been retained as a testifying expert in an antitrust case before?

A.    Yes.

Q.    Which one?

pricing output.  I'm not making a -- an analysis of the TAMs.

Q.     Did you do any analysis of the training materials that Yardi provides to clients about how to use the Revenue IQ software?

A.     I didn't do an analysis of the training materials of -- of that.  I did analysis of the source code and how that operates in generating pricing outputs with respect to the clients' choices and how the clients ultimately made those choices through the executed lease data.

Q.     And you were --

THE COURT REPORTER:   "Made those choices through"?

THE WITNESS:   Executed lease data.

Q.     Did you do any analysis of training materials that Yardi provides to TAMs about how to help clients use the Revenue IQ software?

A.     As I've just said, I did analysis of the source code, how that takes in clients' inputs, how clients make choices with their configurations, and what they ultimately do with the pricing output -- pricing outputs and the executed lease data.  I did not do an analysis of what TAMs do in training.

Q.     You're aware, aren't you, sir, that Yardi

methodologies that she employed specifically on this matter.

Q.    Are you offering the opinion that the Yardi's benchmarking information that's included in Revenue IQ provides no competitive visibility for landlord defendants into rivals' list prices, final transaction prices, discounts, and concessions?

A.    What I'm providing the opinion on is that the benchmarking function provides a noisy, aggregated, anonymized, and lagged measure that doesn't give you visibility into specific properties and it is unknown to the client whether or not -- what properties are included in that measure.

Q.    Did you review any academic papers on the competitive effects -- in the course of formulating your opinions here, did you review any ec- -- academic papers on the competitive effects of sharing aggregated market data?

A.    No.  It wasn't necessary for my assignment.

Q.    Was it not necessary for your assignment because you're not offering any economic opinions as part of your rebuttal in this case?

A.    As I've said before, I'm providing opinions on Dr. Marinescu's report that are not supported by the system and the error -- and the errors that she made in

data processing.

Q.    Okay.  And by "system," you just mean the source code; right?

A.    The source code and the choices that people make on configuring that source code.

Q.    Did you make any attempt in -- in preparing your rebuttal report to familiarize yourself with the economic literature addressing whether aggregated, anonymized data exchanges among competitors can facilitate coordination?

A.    Sorry.  You trailed off at the end there.  I didn't hear those words.

Q.    Did you make any attempt in preparing your rebuttal report to familiarize yourself with the economic literature addressing whether aggregated, anonymized data exchanges among competitors can facilitate coordination?

A.    No, I did not.  It's not relevant for my opinions.

Q.    Did you review any of the academic papers that Dr. Marinescu cited in her report in the course of formulating your opinions in this rebuttal report?

A.    No, I did not.

Q.    Okay.  So you don't think that was relevant for your opinions, right, to look at the ec- -- economic literature on these questions?

C E R T I F I C A T E

STATE OF ALABAMA      )

COUNTY OF JEFFERSON )

I hereby certify that the above and foregoing proceeding was taken down by me by stenographic means, and that the content herein was produced in transcript form by computer aid under my supervision, and that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings occurring on said date at said time.

I further certify that I am neither of counsel nor of kin to the parties to the action; nor am I in anywise interested in the result of said case.

LANE C. BUTLER, RPR, CRR, CCR

CCR# 418 -- Expires 9/30/26

Commissioner, State of Alabama

My Commission Expires:  2/11/29