The Honorable Robert S. Lasnik

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| *In re* YARDI REVENUE MANAGEMENT ANTITRUST LITIGATION | Case No. 2:23-cv-01391-RSL |
| WYLIE DUFFY and MICHAEL BRETT, individually and on behalf of all others similarly situated, | **REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE DEFENDANT'S EXPERT MIHRAN YENIKOMSHIAN** |
| Plaintiffs, | **NOTE ON MOTION CALENDAR:** **June 26, 2026** |
| v. | **ORAL ARGUMENT REQUESTED** |
| YARDI SYSTEMS, INC., *et al*., | (Consolidated with Case Nos. 2:24-cv-01948; 2:24-cv-02053) |
| Defendants. | |

**TABLE OF CONTENTS**

I.    INTRODUCTION ..................................................................................................1

II.   ARGUMENT ........................................................................................................1

      A.    The challenged opinions exceed Yenikomshian's expertise. ...................1

      B.    The challenged opinions rest on incomplete review of the system
            Marinescu analyzed. ................................................................................5

III.  CONCLUSION ....................................................................................................6

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Broiler Chicken Grower Antitrust Litigation*,
   2024 WL 2194349 (E.D. Okla. May 15, 2024) .......................................................................4, 5

*Kumho Tire Co., Ltd. v. Carmichael*,
   526 U.S. 137 (1999)...........................................................................................................................6

*LifeWise Master Funding v. Telebank*,
   374 F.3d 917 (10th Cir. 2004) .........................................................................................................5

*Rearden, LLC v. Walt Disney Pictures*,
   152 F.4th 1058 (9th Cir. 2025) .........................................................................................................5

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods.
   Liab. Litig.*,
   978 F. Supp. 2d 1053 (C.D. Cal. 2013) ...........................................................................................6

*U.S. Equal Emp. Opportunity Comm'n v. Mattress Firm, Inc.*,
   2016 WL 589667 (D. Nev. Feb. 11, 2016) .......................................................................................6

## I.   INTRODUCTION

Yardi's opposition ends where this reply begins. Defending Yenikomshian's failure to review any deposition, any TAM call note, or any academic article, Yardi tells the Court: "Whether he read depositions of Yardi employees, internal call notes, or certain academic articles in preparing his Rebuttal means nothing *because his opinions are not based on those materials.*" Opp. 12-13 (emphasis in original).

That is the whole point. This case is about how Revenue IQ operates in the real world—how the algorithm, the benchmarking system, and the TAM enforcement network work together to produce coordinated pricing outcomes for participating landlords. Yardi chose to make Yenikomshian its primary affirmative expert at summary judgment. Yenikomshian reviewed the source code. He did not review the depositions of the executives who ran the system. He did not review the call notes documenting how TAMs flagged underpricing and directed rent increases. He did not review the economic literature on information exchanges and coordination.

It was Yardi's choice to move for summary judgment on the basis of an expert who examined only one piece of the Revenue IQ system. That was not Plaintiffs' choice in opposing summary judgment. Plaintiffs offered an economist's analysis of how Revenue IQ operates in practice. Marinescu did not stop at the source code. She explained how coordinated pricing outcomes are produced by the components of the system working together.

In his rebuttal, Yenikomshian went further than the source code. He called Marinescu's economic methodology "unsupported," "speculative," "conceptually flawed," and "untethered to any reliable principles and method." Those are economic reliability judgments. He is not an economist. He reviewed neither the literature nor the factual record. Yardi concedes both. Neither ground for exclusion is rebutted.

## II.   ARGUMENT

### A.   The challenged opinions exceed Yenikomshian's expertise.

Yardi acknowledges that Yenikomshian is not an economist. Opp. 2. Yenikomshian confirms as much: "I did not offer, and have never purported to offer, independent economic opinions." Dkt.

PLAINTIFFS' REPLY ISO MOTION TO EXCLUDE DEFENDANT'S - 1
EXPERT MIHRAN YENIKOMSHIAN                                (No.: 2:23-cv-01391-RSL)
011188-11/3573791 V1

568 ("Second Rebuttal") ¶19. He describes his benchmarking work as "technical corrections, not economic disagreements." *Id.* ¶34.

The portions of his rebuttal report that Plaintiffs moved to exclude go farther than that. It calls Marinescu's methodology "unsupported," "speculative," "conceptually flawed," and "untethered to any reliable principles and method." Dkt. 524 ("First Rebuttal") ¶¶8, 10, 21, 61. Those are not technical observations about source code. They are reliability judgments about an economist's work.

Yardi's defense is that Yenikomshian "did not offer an economic opinion about coordination; he offered a technical opinion about how RIQ operates." Opp. 2. That position requires Marinescu's economic theory to be a technical claim a source code review could falsify. Yardi is direct about the move: "Yenikomshian's Rebuttal proved the technical premises in Marinescu's First Report false, and Plaintiffs now seek to recast Marinescu's First Report after the fact." Opp. 3.

But Marinescu is offering economic opinions, not technical claims about software architecture. The first paragraph of Marinescu's summary of conclusions explains that Revenue IQ "appears to economically operate as an integrated coordination system that produces coordinated pricing behavior among competing landlords rather than independent, demand-responsive pricing decisions." Dkt. 497-33 ("Marinescu Report") ¶10.

To defend Yenikomshian's characterizations, Yardi attributes to the First Report technical claims Marinescu did not make, touts Yenikomshian's rebuttal as disproving those claims, then treats the Second Report's restatement of what the First Report actually said as a retreat from positions Yenikomshian disproved. Yardi makes this move twice.

*Configurations.* Yardi argues Marinescu's Second Report "abandons the First Report's claims that RIQ 'operates as a single pricing formula applied uniformly across clients.'" Opp. 7. That quoted phrase is not in Marinescu's first report. Instead, it comes from a characterization of Marinescu's report in Yenikomshian's rebuttal. But in order to abandon a position, Marinescu must have first held it.

She did not. Marinescu has never claimed that Revenue IQ applies a single formula uniformly. Her First Report measures empirically where configurations converge and where they

PLAINTIFFS' REPLY ISO MOTION TO EXCLUDE DEFENDANT'S - 2
EXPERT MIHRAN YENIKOMSHIAN                                                    (No.: 2:23-cv-01391-RSL)
011188-11/3573791 V1

diverge: 89% of Landlord Defendants set all four trend weights to the same default; more than 99% configured the Comp Trend Rule to trigger on any change in the rent ratio; approximately 83% of all configurations consisted of the default weights plus one of three Health Rule combinations. Marinescu Report ¶¶258–59, 262, 269. Reporting that 89% share the same core weightings is not asserting that all of them do. None of these numbers have been disputed by Yardi.

Nevertheless, Yardi characterizes Marinescu as offering a "common function" theory: "because RIQ employs a common function, it could facilitate a conspiracy." Opp. 6. The phrase "common function" appears nine times in Yardi's brief.

Marinescu uses the phrase "common function" in her first report once. It is the name she uses to describe the formula in a simplified economic model of how Revenue IQ generates a list price. *Id.* ¶¶235–43. The function is "common" because the algorithm is "used across all landlord defendants." *Id.* ¶237. The model does not assume uniformity of settings. Customizable client-level weights are an identified variable in the function itself. *Id.* ¶237. Marinescu explains that there are deviations from the recommended price because "not allowing for any deviation at all would often make collusion unsustainable." *Id.* ¶242. Coordination results from what landlords do with the algorithm: Marinescu makes clear that pricing aligns when "competing landlords adopt substantially similar rule configurations and rely on the same comp-linked outputs." *Id.* ¶244.

Yardi's "common function" theory is a strawman—built from a phrase Marinescu used once, as mathematical notation, in a single paragraph. Yardi recast it as a claim about uniform code execution. Yenikomshian knocked down the scarecrow. And Yardi now cites Marinescu's failure to play along as evidence she abandoned her theory. She did not abandon it. It was never hers.

*Benchmarking.* What Yenikomshian does with Marinescu's benchmarking analysis is not exaggeration. It is fabrication. Plaintiffs do not say this lightly. Expert disputes routinely involve competing readings or interpretations. That is not what happened here.

Yenikomshian states that the benchmarking theory in Marinescu's First Report "described a system disclosing competitors' actual transaction prices at the property and lease level." Second Rebuttal ¶87. Yenikomshian provides no citation for this statement. The First Report repeatedly says the exact opposite.

PLAINTIFFS' REPLY ISO MOTION TO EXCLUDE DEFENDANT'S - 3
EXPERT MIHRAN YENIKOMSHIAN                                    (No.: 2:23-cv-01391-RSL)
011188-11/3573791 V1

- Benchmarking "does not allow Landlord Defendants to monitor individual deviations." Marinescu Report ¶407.
- Benchmarking serves anticompetitive ends "even though the KPIs shown are aggregated and anonymized." *Id.* ¶408.
- "[T]he appropriate economic question is not whether benchmarking outputs permit exact inference of individual competitors' prices, but whether they provide actionable signals about relative performance." *Id.* ¶425.

Marinescu then devotes a section titled "Yardi's Aggregation and Perturbations to its Benchmark Reports Do Not Undermine or Contradict Their Usefulness to an Anticompetitive Agreement" to explaining why the aggregated and anonymized benchmarking data contributes to coordinated pricing. *Id.* §7.3.

Yardi claims the motion's benchmarking argument is premised on "Marinescu's new opinions in her Second Report." Opp. 10. The motion's benchmarking section is two pages long. Its twelve footnotes exclusively come from Marinescu's First Report and Yenikomshian's report and deposition. Mot. 5-6. Not one cites the Second Report. The theory Yardi calls new comes only from the report Yardi claims was abandoned.

Yenikomshian's own basis for calling the benchmarking analysis "unsupported" is that KPI outputs are aggregated and anonymized. Dkt. 555-3 ("Yenikomshian Dep.") 59:5-24. But Marinescu's benchmarking analysis relies on the economic literature on information exchanges and the extensive factual record showing how Yardi used benchmarking data to flag underpricing and direct rent increases. Marinescu Report §§3.1.3, 3.2; ¶¶47, 209, 362-63. Yenikomshian did not read the literature. Mot. 11. Yenikomshian dismissed the types of internal Yardi documents that Marinescu relied on as "absolutely irrelevant" to his opinions. Mot. 11. But an opinion that an economist's methodology is "unsupported" must itself have support.

Plaintiffs do not argue that only an economist can rebut an economist. *See* Opp. 5 n.11. Rather, courts exclude non-economist experts who offer economic opinions that they admit are outside their expertise. In *In re Broiler Chicken Grower Antitrust Litigation*, the expert testified that evaluating the economist's regressions was "not my expertise" and that "the influence of and the

PLAINTIFFS' REPLY ISO MOTION TO EXCLUDE DEFENDANT'S - 4
EXPERT MIHRAN YENIKOMSHIAN                                    (No.: 2:23-cv-01391-RSL)

importance of variables in [the] regression model are beyond my area of expertise." 2024 WL 2194349, at *7 (E.D. Okla. May 15, 2024). The court excluded his opinions criticizing those regressions as outside his domain. *Id.* at *8. In *LifeWise Master Funding v. Telebank*, the Tenth Circuit affirmed exclusion of an expert who conceded "I am not a [damages] modeler" and "I'm not an expert on regression analysis" from testifying on a damages model because he was "not a trained economist." 374 F.3d 917, 928 (10th Cir. 2004) (collecting cases). Likewise here, Yenikomshian acknowledged that Marinescu "is offering opinions in this report that are opinions as an economist." Yenikomshian Dep. 63:3-6. Asked whether he was doing the same: "I'm not offering economic opinions." *Id.* 63:9-11.

Yardi's cases establish that source code experts may opine on how software functions. Opp. 4 (collecting cases). That does not bridge the gap between Yenikomshian's source code expertise and his economic criticisms. Yardi also dismisses *Rearden, LLC v. Walt Disney Pictures* on the ground that Yenikomshian "disclaim[ed] that he offered economic opinions." Opp. 2 n.8. That reasoning is circular. *Rearden* excluded the expert because his deposition concessions revealed a gap between his expertise and his conclusions. 152 F.4th 1058, 1078 (9th Cir. 2025). The same problem exists here.

**B.    The challenged opinions rest on incomplete review of the system Marinescu analyzed.**

Marinescu's analysis addresses a system: not software in isolation, but the integrated operation of an algorithm, a benchmarking apparatus, and a TAM network that together produce coordinated pricing outcomes for competing landlords. Marinescu Report §§3–7. The coordination Marinescu identifies does not reside in any one component. It resides in how the components work together.

Yardi is candid about the scope of Yenikomshian's review in response: "whether he read depositions of Yardi employees, internal call notes, or certain academic articles in preparing his Rebuttal means nothing because his opinions are not based on those materials." Opp. 12-13. Yardi thus confirms that Yenikomshian's opinions are not based on the factual record showing how Revenue IQ operated in practice—yet he still characterizes Marinescu's analysis of the entire system

as "unsupported," "speculative," and "untethered to any reliable principles and method." First Rebuttal ¶¶10, 61.[1]

Yardi's cases do not help. *U.S. Equal Emp. Opportunity Comm'n v. Mattress Firm, Inc.* admitted a rebuttal expert who relied on an alternative dataset. 2016 WL 589667, at *4 (D. Nev. Feb. 11, 2016). Yenikomshian did not consult alternative evidence about TAMs or benchmarking. He examined the source code and configuration data. Yardi argues that an expert need not review "every square inch of the factual record." Opp. 11-12 (*quoting In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1069 (C.D. Cal. 2013)). The problem is that Yenikomshian examined virtually none of the factual record showing how benchmarking data and TAM enforcement operated in practice. Mot. 10-11.

Marinescu's analysis is built on those materials. *Id.* Yenikomshian did not review them. By his own standard, he should have. He testified that when a rebuttal expert addresses opinions based on specific documents, the expert must "look at the same documents . . . [t]o understand the basis of their analysis." Yenikomshian Dep. 13:2-9. He confirmed this as reflecting "what I see in the industry" across "hundreds of cases." *Id.* 18:6-19. Yardi, which does not address this testimony, says Yenikomshian "correctly testified" that the unreviewed materials were irrelevant. Opp. 12. His own sworn description of professional practice says the opposite. Yenikomshian did not apply "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999).

### III.    CONCLUSION

What the source code does is not what Revenue IQ is. Marinescu analyzed a system — the algorithm, the benchmarking apparatus, and the TAM enforcement network operating together. Yenikomshian reviewed a component. An expert who analyzes one input to a system and then calls the examination of the whole system "unsupported" and "untethered to any reliable principles and

---

[1] Yardi spends several pages defending Yenikomshian's replicability observations at ¶¶66–68. Opp. 11-13. But Plaintiffs did not move to exclude those paragraphs. The challenged paragraphs are ¶¶8, 10, 21, and 61. The replicability critique is also less than it appears: Yenikomshian identifies no call note improperly included or excluded and does not claim the data is inaccurate.

method" has not applied the intellectual rigor Rule 702 requires. His analysis does not support his characterizations of hers.

Dated this 26th day of June 2026.                Respectfully submitted,

                                                **HAGENS BERMAN SOBOL SHAPIRO LLP**

                                                */s/ Steve W. Berman*
                                                Steve W. Berman (WSBA No. 12536)
                                                */s/ Theodore Wojcik*
                                                Theodore Wojcik (WSBA No. 55553)
                                                */s/ Stephanie A. Verdoia*
                                                Stephanie A. Verdoia (WSBA No. 58636)
                                                */s/ Xiaoyi Fan*
                                                Xiaoyi Fan (WSBA No. 56703)
                                                1301 Second Avenue, Suite 2000
                                                Seattle, WA 98101
                                                Telephone: (206) 623-7292
                                                Facsimile: (206) 623-0594
                                                steve@hbsslaw.com
                                                tedw@hbsslaw.com
                                                stephaniev@hbsslaw.com
                                                kellyf@hbsslaw.com

                                                Rio S. Pierce (*pro hac vice*)
                                                **HAGENS BERMAN SOBOL SHAPIRO LLP**
                                                715 Hearst Avenue, Suite 300
                                                Berkeley, CA 94710
                                                Telephone: (510) 725-3000
                                                Facsimile: (510) 725-3001
                                                riop@hbsslaw.com

                                                *Attorneys for Plaintiffs*

PLAINTIFFS' REPLY ISO MOTION TO EXCLUDE DEFENDANT'S - 7
EXPERT MIHRAN YENIKOMSHIAN                                (No.: 2:23-cv-01391-RSL)
011188-11/3573791 V1

## CERTIFICATE OF COMPLIANCE

I certify that this memorandum contains 2,095 words, in compliance with Local Civil Rule 7(d)(3).

/s/ *Steve W. Berman*
Steve W. Berman

PLAINTIFFS' REPLY ISO MOTION TO EXCLUDE DEFENDANT'S - 8
EXPERT MIHRAN YENIKOMSHIAN                                    (No.: 2:23-cv-01391-RSL)
011188-11/3573791 V1