# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE       **ORIGINAL**

- - -

------------------------------x

In re YARDI REVENUE            : NO. 2:23-cv-01391-RSL

MANAGEMENT ANTITRUST           :

LITIGATION.                    :

                               :

McKENNA DUFFY, individually    :

and on behalf of all others    :

similarly situated,            : (Consolidated with

        Plaintiff(s),          :  Case Nos.

                               :  2:24-cv-01948;

    v.                         :  2:24-cv-02053)

                               :

YARDI SYSTEMS, INC., et al.,   :

        Defendant(s).          :

------------------------------x

  **CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER**

- - -

March 9, 2026

- - -

Videotaped/Video-Teleconferenced Deposition of IOANA MARINESCU, Ph.D., held at the law offices of Holland & Knight, Suite 3300, 1650 Market Street, Philadelphia, PA 19103, beginning at 9:37 a.m., ending at 5:41 p.m., on the above date, before Denise D. Bach, a Registered Professional Reporter, Certified Court Reporter, Certified Real-Time Reporter, License No. XI0003990, and Notary Public, PA, NJ, DE & NY.

BLUEBEAR SOLUTIONS JOB NO.: 3185

THE VIDEOGRAPHER:  Stand by.  We are now on the record.  The time is 8:37 -- I'm sorry, I've got to go off the record.

(Pause.)

THE VIDEOGRAPHER:  We are now on the record.  The time is 9:37 a.m.  The date today is March 9th, 2026, and this begins the video-recorded deposition of Ioana Marinescu in the matter of McKenna Duffy versus Yardi Systems, Inc. et al.

My name is Aleisha Catts and I am the videographer.  I am with BlueBear Solutions.  Our court reporter today is Denise Bach.

All counsel will be noted on the stenographic record.  Will our court reporter please swear in the witness.

- - -

IOANA MARINESCU, Ph.D., having been first duly sworn or affirmed, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY ATTORNEY SCHAPER:

of, you know, the first step of the Revenue IQ algorithm, the software suggests something and clients can just let it be, they can change it, but in practice would show that, overwhelmingly, you know, 89 percent of clients, for example, stick with the default 25 percent for these core rules.

Q.    We just talked about reference rents for a bit.  And you indicated that different landlords are picking their own reference rents.

Is that correct?

A.    Yes.  Understanding, though, that once they picked it, it gets set by Revenue IQ unless they decide to change it again.

Q.    But those reference rents can't be characterized as shared, correct, because they're chosen by each individual landlord.

Is that right?

A.    Well, the first time that the landlord will set the reference rent, you know, that's their -- something that they decide based on their strategic objectives and what they know of the market structure.

But, thereafter, again, if they

don't do anything, then the reference rent is shared by Yardi and, in that sense, it's -- sorry, not shared.   I meant is set by Yardi. And is shared in the sense that all of the landlords who don't change their reference rent are moving forward with the Revenue IQ set reference rent.

And it's shared in the sense that it has -- used the same recipe to arrive at the reference rent, broadly the same recipe, to arrive at the reference rent.

Q.   Let's talk about that.

You note in your report that "The outcome of Step" -- "of the Step 1 trends analysis is a provisional recommendation to either increase, decrease or hold steady the price of a unit."

Correct?

A.   Yes.

Q.   And how is it determined by how much, if at all, a provisional change should be adopted?

A.   So, then we also have, you know, additional potential health rules that could come into play, and the majority of landlords

pricing decision becomes an input into the other's subsequent recommendation."

Correct?

A.    Yes.

Q.    And this is part of your opinion that when Revenue IQ clients are all using each other as their comp set that, in your words, that systematically ratchets up prices?

A.    That element, yes.

Q.    And this analysis assumes that Revenue IQ users' comp sets consist of other Revenue IQ users.

Correct?

ATTORNEY PIERCE:  Objection, mischaracterizes testimony.  Mischaracterizes the report.

THE WITNESS:  They, in fact, do include other Revenue IQ clients and -- but the -- it's useful to have the other Revenue IQ clients there in order to -- if this were to lead to, indeed, coordinated pricing.

BY ATTORNEY SCHAPER:

Q.    So, the mechanism you're talking about here is the landlord defendants using -- having a comp set made up of other Revenue IQ

propagate, including to -- if there are users

of a hub algorithm, a higher pricing that's

due to the hub algorithm, can propagate to

other competitors who don't use the hub

algorithm.

BY ATTORNEY SCHAPER:

      Q.     Professor, just so we're clear, if a Revenue IQ user uses the software for a long time, never has any other Revenue IQ user in its comp set, and its comp set is made up of companies that don't even use revenue management software, is it your position that that, in that set of facts, there can be an anticompetitive effect?

      ATTORNEY PIERCE:  Objection, incomplete hypothetical.

      THE WITNESS:  That's a hypothetical I have not examined.

BY ATTORNEY SCHAPER:

      Q.     Okay.  But your counsel probably explained to you that, as an expert witness, it's permissible for me to ask you hypotheticals, so I'll ask you to consider this one now.

      If a Revenue IQ user never has

any other Revenue IQ user in its comp set, and its comp set is made up of companies that don't even use revenue management software, is it your position that, in that set of facts, there can be an anticompetitive effect?

ATTORNEY PIERCE:  Objection, vague.

THE WITNESS:  This is a hypothetical and I cannot speculate.  I don't have the data on that situation to distinguish it from what we see here.

BY ATTORNEY SCHAPER:

Q.    Is it your position that any time competitors are setting their price, at least in part, on the publicly available information of other competitors, that that has an anticompetitive effect?

A.    I would be careful not to over-generalize with any time.  However, the economic literature that I describe in my Section 3 shows that you can have collusion that is based on public information.

So, it is not necessary to a collusive scheme to use non-public information.  You can -- and, in fact,

Ioana Marinescu, Ph.D.                Confidential                         152

of clients' agreement to share structured data

on their pricing and unit characteristics."

        Do you see that?

    A.    Yes.

    Q.    And do you see in the next

bullet, "Yardi makes efforts to make this

pricing logic clear to clients, and

client-facing materials and testimonials

describe Revenue IQ as transparent and

effective at increasing rents."

        Do you see that?

    A.    Yes.

    Q.    And so you are referring to

Revenue IQ clients throughout this usage of

clients.

        Correct?

    A.    Not necessarily.  It could be

other Yardi clients since all clients signed

the, you know, data sharing agreements.  And

so on the basis of the data, there's a lot

more data in the CPD than just Revenue IQ

users.

    Q.    If I'm a Revenue IQ user,

Professor, and I don't know if in my Comp

Trends group, there are other Revenue IQ

users, I don't know whether, if I raise my price, it will automatically raise my competitors' price.

Isn't that the case?

ATTORNEY PIERCE:  Objection, vague.

THE WITNESS:  So, as I was explaining earlier, in the comp set -- sorry. Let me rephrase.

If we're in the market, there can be indirect -- in fact, there typically will be, economic theory says there will be indirect effects even if somebody has Comp Trend set that isn't entirely made of Revenue IQ clients.

The point is that other landlords' prices are also going to increase if Revenue IQ manages to increase prices in this market.  So, prices are all connecting -- connected within the market and, therefore, prices tend to increase.

And I think this is really relevant here in terms of my concern about raising price, because if others increase price in my same market, my potential adverse

Ioana Marinescu, Ph.D.                      Confidential                                    154

consequences of raising the price are lesser

because they are -- there's less availability

of other lower-priced units.

BY ATTORNEY SCHAPER:

Q.    Okay.  So, in the analysis that

you just described, isn't market share a

relevant factor in whether Yardi and the

landlord defendants would be able to effect

the collusive scheme that is alleged by

plaintiffs?

A.    It matters what sort of

substitution exists between different

landlords, because the renters are going to

compare, like, the prices of different units

in the market.  However, for this report, I

wasn't asked to define a relevant market and,

you know, I would do so in the next stage of

the analysis, but here I cannot talk about

market share.  And that would depend on

defining a relevant market.

Q.    Just in terms of the economic

literature, would you agree that, to raise

market-wide rents in a sustained manner,

economic theory indicates that the allegedly

coordinating group must have sufficiently high

combined market share?

A.      You know, as I just explained, they are indirect effects on pricing.  And so, you know, there is no, like, threshold of market share within economics.  It's a, it's a, it's a continuous variable whereby, you know, market share matters, but there isn't like a threshold below which, you know, there will be no effect.

And, besides, we have to define the relevant market before we can start talking about the specific market share.

Q.      Okay.  So, you said that market share matters.  Is there a share below which you think that it's not plausible that a conspiracy would be able to be durable because the share was so low?

A.      I just said there isn't such a threshold share.

Q.      Okay.  But you do agree -- do you know who Dennis Carlton and Jeffrey Perloff are?

A.      I know Dennis Carlton.  I do not know Jeffrey Perloff.

Q.      Are you familiar with their

Modern Industrial Organization text?

A.      Sure, that's a textbook in the literature.

Q.      And are you familiar with the part of that text that says that if cartel members have a small share, then firms outside the cartel can lower the price to undercut the cartel?

A.      It really depends on the specifics of the market.  But I don't disagree that market share matters and that it's easier to raise prices to a greater degree in most models typically in theory when you have a higher market share.

Q.      But that's not something you tested in your report?

A.      It is not, because I wasn't asked to define a relevant market here.

Q.      Did you communicate to counsel that market share is a relevant factor in the ability of a collusive scheme to be durable?

A.      Again, I wasn't asked to define a market and, therefore, I couldn't calculate a market share, you know, since I didn't define markets.

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

_Denise D. Bach_
_____

DENISE D. BACH,

Registered Professional Reporter

Certified Court Reporter

Notary Public/Expiration: March 2030

Dated:  March 12, 2026

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)