# EXHIBIT B

Confidential
Attorneys' Eyes Only

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

**ORIGINAL**

CASE NO.:  2:23-cv-01391-RSL

In Re YARDI REVENUE MANAGEMENT ANTITRUST

LITIGATION

------------------------------------------

WYLIE DUFFY, et al., individually and on

behalf of all others similarly situated,

Plaintiffs,

v.

YARDI SYSTEMS, INC., et al.,

Defendants.

REMOTE VIDEOCONFERENCE VIDEOTAPED

DEPOSITION TESTIMONY OF:

LIANA RAO

November 14, 2025

*CONFIDENTIAL - ATTORNEYS EYES ONLY*

I, Lane C. Butler, a Court Reporter and Notary Public, State of Alabama at Large, acting as Notary, certify that on this date, pursuant to the Federal Rules of Civil Procedure, there came before me via remote videoconference, commencing at approximately 10:00 a.m. Eastern, on the 14th day of November, 2025, LIANA RAO, witness in the above cause, for oral examination, whereupon the following proceedings were had:

THE VIDEOGRAPHER:  Good morning. We are now on the record.  The time is 10:6 a.m. Eastern Standard Time.  Today's date is November 14th, 2025.  This begins the remote videorecorded deposition of Liana Rao in the matter of McKenna Duffy v. Yardi Systems, Inc., et al. filed in the United States District Court for the Western District of Washington at Seattle.  I will be recording this deposition remotely, and the reporter will swear in the witness remotely

pursuant to Federal Rules of Civil Procedure and the stipulated deposition protocol in this case.  My name is Allyson Salud, and I am the videographer with BlueBear Solutions.  Our court reporter is Lane Butler.

          Counsel, please identify yourselves and state whom you represent.

          THE COURT REPORTER:  I think we've been just doing that on the stenographic record, Allyson.

          THE VIDEOGRAPHER:  Understood.

          Are there any stipulations or announce -- announcements from either party?

          MR. PIERCE:  I don't think so.

          MR. SARRATT:  Not from us.  Thank you.

          THE VIDEOGRAPHER:  All right. Court Reporter, please swear in the witness.


                    LIANA RAO,
          having first been duly sworn, was examined and testified as follows:

Algorithm" where there's some text and you track changes?

A.    Yes.

Q.    And this was an addition that you made; right?

A.    I did write this.

Q.    And this was either shortly before or right around the time that you became the -- the leader of Revenue IQ; correct?

A.    It was shortly before.

Q.    Okay.  And do you see where you write, "The basic concept is that Rental Income Per Unit is the ultimate metric, which incorporates all other (measures rent and occupancy)"?

A.    I see that sentence.

Q.    And you wrote, "A subject property is doing well if its RIPU grows faster than benchmark properties."  Correct?

A.    That's what this sentence says, yes.

Q.    Okay.  What did you mean by "doing well"?

Confidential
Attorneys' Eyes Only

A.    So I think it's important to understand the context of creating this. The -- the -- and the -- or the -- the set of data that Anthony Fazio was looking at each month was an attempt to try to help the technical account managers know which properties might be more or less happy with their overall performance.  We didn't have the benefit of knowing what each property's goals were, which are very different property by property.  Some properties might have occupanc- -- specific occupancy goals. Other properties might have goals around renewal retention.  Other properties might have rent goals.  And without having those goals, we were trying to figure out whether we could give Anthony and the technical account managers some sort of summary to help them understand which properties might be more likely to not be meeting their goals, in addition to the detailed data about each individual subject property that was in Anthony's -- the spreadsheet that Anthony

would use.

Q.    So you were doing -- sorry.  Go ahead.

A.    Just to answer your question, in that context, we decided to look at rental income per unit and the growth of rental income per unit as it relates to benchmarks because rental income per unit underneath it has many different factors, including rents, whether those rents are going up, down, or stable; again, occupancy.  In addition to that, it -- you know, rental income per unit is dependent on how fast a property is able to turn a unit from a maintenance perspective.  So when one tenant moves out, how quickly can they get the -- the unit ready to be marketed for a new tenant.  It also includes renewal rates, so what percentage of tenants are happy at a property and opt to stay and renew their lease after it expires.  And so in that context, the best data that we had available to us in the absence of the client's own goals for each property was

capacity at that time based on their level of seniority and what we think the total capacity is that they can handle.

Q.    Are technical account managers assigned to any particular geographic markets?

A.    No.

Q.    So the assignments don't relate to any particular geography at all?

A.    No.

Q.    Can you just explain very briefly how you assess the performance of the technical account manager role?

A.    Sure.  The -- what I talk about when I talk about being a good technical account manager is, one, being responsive to clients.  So when clients have questions about the product and need help, getting back to them quickly and answering their questions clearly.  And the second part of it, which is very much tied to the first, is knowing the product well, so being able to explain how every setting works and how the math of Revenue IQ works.  If a client has a question and

if they don't know the answer, you know, telling the client, "I don't know," figuring the answer out, and getting back to them quickly.

Q.   Do the TAMS direct or -- I'll -- I'll just leave it there.

Do clients direct -- or excuse me.

Do TAMS direct or set clients' goals for them?

A.   Not at all.  In my experience, clients have very clear goals in their mind in general and for their pricing, and so those goals kind of vary dramatically across clients.  And even within a client, they will have individual properties with individual goals.  A client would own a property in Austin that's really different than the goals that they have for their property that's in Boston, and our job is just to ask and understand what those goals are.

Q.   You were asked some questions about an internal -- a scoring system metric earlier.  Do you recall those

questions?

A. I do.

Q. And that scoring system in some instances was labeled as a penalty. Is that right?

A. Yes.

Q. Were clients ever penalized in any way based on that metric?

A. No, not at all. They had no visibility into that metric.

Q. Was any technical account manager ever penalized in any way based on that metric?

A. No, not at all.

Q. Is this a purely internal metric?

A. Yes. It was purely internal.

Q. Are teams directed, in your -- in your experience, do they restrict client choices about Revenue IQ configurations in any way?

A. Not at all. In fact, we encourage clients to feel comfortable enough with the system that they make as many changes as they want as often as they want, including being able to rerun

                        C E R T I F I C A T E

STATE OF ALABAMA        )

COUNTY OF JEFFERSON )

          I hereby certify that the above and foregoing proceeding was taken down by me by stenographic means, and that the content herein was produced in transcript form by computer aid under my supervision, and that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings occurring on said date at said time.

          I further certify that I am neither of counsel nor of kin to the parties to the action; nor am I in anywise interested in the result of said case.


                    *Lane C. Butler*

                    LANE C. BUTLER, RPR, CRR, CCR
                    CCR# 418 -- Expires 9/30/26
                    Commissioner, State of Alabama
                    My Commission Expires:  2/11/29