**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

| | |
|---|---|
| *In Re YARDI REVENUE MANAGEMENT ANTITRUST LITIGATION* <hr> MCKENNA DUFFY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YARDI SYSTEMS, INC., *et al.*,<br><br>Defendants. | Case No.: 2:23-cv-01391-RSL<br><br>**DEFENDANT YARDI SYSTEMS' REPLY IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' EXPERT IOANA MARINESCU (Dkt. 530)**<br><br>**Filed Contemporaneously With:**<br><br>**(1) DECLARATION OF ABRAHAM A. TABAIE**<br><br>**NOTE ON MOTION CALENDAR: July 6, 2026**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>(Consolidated with Case Nos. 2:24-cv-01948; 2:24-cv-02053) |

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

ARGUMENT ............................................................................................................................... 1

I.    Plaintiffs Do Not Defend Marinescu's Original Unreliable Theories
      About How RIQ and Benchmarking Work ................................................................... 1

      A.    RIQ Pricing Mechanism ....................................................................................... 1

            1.    Marinescu Abandons Her Unreliable "Common Formula"
                  Framework .................................................................................................. 1

            2.    Marinescu's New Directional Signals Theory Is Also
                  Unreliable ................................................................................................... 3

                  a.    Directional Signals ........................................................................... 3

                  b.    Pricing Outcomes .............................................................................. 5

      B.    Plaintiffs Concede Marinescu's Original Benchmarking Opinions Are
            Unreliable ............................................................................................................. 6

      C.    Plaintiffs Concede Marinescu's Enforcement Theory Ignored Relevant
            Client Communications ........................................................................................ 6

II.   Plaintifffs Do Not Challenge That Outliers and Lease Gaps Drive
      Marinescu's Unreliable YLPI ....................................................................................... 7

      A.    Plaintiffs Fail to Justify Marinescu's Inclusion of Outliers .............................. 7

            1.    No Empirical Basis to Include Outliers ..................................................... 7

            2.    Outliers Drive TAM Enforcement Theory ................................................. 8

      B.    Plaintiffs Concede Gap-Based Ratios Drive Marinescu's Results ..................... 10

III.  Plaintiffs Abandon Marinescu's Panel Regression Test for Firm
      Independence ................................................................................................................ 12

      A.    Marinescu Concedes the Importance of Controlling for Common
            Management .......................................................................................................... 12

      B.    Marinescu Abandoned Prior Test for Firm Independence and Replaces
            it with a New, Flawed Theory ............................................................................. 13

            1.    No Common Management Controls ............................................................ 13

            2.    First Differences ........................................................................................ 14

IV.   Marinescu's Remaining Opinions Are Not Helpful to Any Factfinder
      and Must Be Excluded ................................................................................................. 15

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Antoine L. Garabet, M.D., Inc v. Autonomous Techs. Corp.*,
   116 F. Supp. 2d 1159 (C.D. Cal. 2000) ...................................................................... 4

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993) ...................................................................................................... 2

*Celador Int'l, Ltd. v. Walt Disney Co.*,
   No. CV 04–3541–FMC,
   2008 WL 11342595 (C.D. Cal. Dec. 17, 2008) ............................................................. 7

*Crescenta Valley Water Dist. v. Exxon Mobile Corp.*,
   No. CV 07-2630-JST,
   2013 WL 12116333 (C.D. Cal. Jan. 8, 2013) ............................................................... 7

*Engilis v. Monsanto Co.*,
   151 F.4th 1040 (9th Cir. 2025) ............................................................................... 1, 14

*Gibson v. Cendyn Grp., LLC*,
   148 F.4th 1069 (9th Cir. 2025) ................................................................................... 16

*In re Apple iPhone Antitrust Litig.*,
   No. 4:11-cv-6714-YGR,
   2025 WL 3124160 (N.D. Cal. Oct. 27, 2025) ......................................................... 8, 10

*In re Baby Food Prods. Liab. Litig.*,
   No. 24-md-03101-JSC,
   2026 WL 559857 (N.D. Cal. Feb. 27, 2026) ............................................................... 3

*In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*,
   691 F.2d 1335 (9th Cir. 1982) ..................................................................................... 4

*In re Generic Pharms. Pricing Antitrust Litig.*,
   No. 16-md-2724,
   2024 WL 4980784 (E.D. Pa. Dec. 3, 2024) ................................................................ 11

*In re Graphics Processing Units Antitrust Litig.*,
   253 F.R.D. 478 (N.D. Cal. 2008) ................................................................................. 5

*In re Live Concert Antitrust Litig.*,
   863 F. Supp. 2d 966 (C.D. Cal. Mar. 23, 2012) ................................................ 5, 13, 14

*In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*,
   341 F. Supp. 3d 213 (S.D.N.Y. 2018) .................................................................. 2, 6, 11

*In re REMEC Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010)...................................................................................... 12

*Klein v. Meta Platforms, Inc.*,
    766 F. Supp. 3d 956 (N.D. Cal. Feb. 13, 2025)....................................................................11, 13

*Marion Healthcare, LLC v. S. Illinois Healthcare*,
    No. 3:12-CV-871-MAB,
    2020 WL 1527771 (S.D. Ill. Mar. 31, 2020)........................................................................8, 11

*Moussouris v. Microsoft Corp.*,
    311 F. Supp. 3d 1223 (W.D. Wash. 2018) ................................................................................ 7

*Portillo v. Costar Grp., Inc.*,
    No. C24-229RSL,
    2025 WL 2495053 (W.D. Wash. Aug. 29, 2025) .................................................................6, 15

*Williamson Oil Co. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003)................................................................................................. 4

**GLOSSARY OF DEFINED TERMS**

| Term | Definition |
|---|---|
| CPI | Consumer Price Index, as provided by the U.S. Bureau of Labor Statistics ("BLS") |
| CCAC | Consolidated Class Action Complaint (Dkt. 226) |
| First Report | February 9, 2026 Expert Report of Ioana Marinescu, PhD In Support of Plaintiffs' Opposition to Yardi's Motion for Summary Judgment (Dkt. No. 497-33) |
| FRE 702 | Federal Rule of Evidence 702 |
| Marinescu Tr. | March 9, 2026 Ioana Marinescu Deposition Transcript, attached as Exhibit A to the Declaration of Abraham Tabaie, filed contemporaneously herewith |
| MSJ Opp. | Plaintiffs' Opposition to Yardi Systems' Motion for Summary Judgment (Dkt. 492) |
| MSJ Reply | Yardi's Reply in Support of Motion for Summary Judgment (Dkt. 521) |
| MTD Order | Order Denying Defendant's Joint Motion to Dismiss (Dkt. 187) |
| RIQ | Yardi's Revenue IQ software |
| Rule 37 Mot. | Yardi's Motion to Strike Ioana Marinescu's Second Report and For Attorney's Fees Under Rule 37 (Dkt. 560) |
| Rule 37 Reply | Yardi's Reply in Support of Motion to Strike Ioana Marinescu's Second Report and For Attorney's Fees Under Rule 37 (Dkt. 574) |
| Second Report | May 22, 2026 Reply of Ioana Marinescu, PhD in Support of Plaintiffs' Opposition to Yardi's Motion for Summary Judgment (Dkt. 555-1) |
| Tucker Daubert Opp. | Yardi's Opposition to Plaintiffs' Motion to Exclude Catherine Tucker's Rebuttal Report (Dkt. 565) |
| Tucker Rebuttal | March 23, 2026 Expert Report of Catherine Tucker, Ph.D in Rebuttal of the Report of Ioana Marinescu (Dkt. 528) |
| Tucker Response | June 15, 2026 Rebuttal Report of Catherine Tucker, Ph.D in Rebuttal of the Second Report of Ioana Marinescu (Dkt. 566) |
| Yenikomshian Daubert Reply | Plaintiffs' Reply in Support of Motion to Exclude Defendant's Expert Mihran Yenikomshian (Dkt. 573) |
| Yenikomshian Rebuttal | March 23, 2026 Rebuttal Declaration of Mihran Yenikomshian in Rebuttal of the Report of Ioana Marinescu (Dkt. 526) |
| Yenikomshian Report | November 24, 2025 Declaration of Mihran Yenikomshian in Support of Yardi's Motion for Summary Judgment (Dkt. 478) |
| Yenikomshian Response | June 15, 2026 Rebuttal Declaration of Mihran Yenikomshian in Rebuttal of the Second Report of Ioana Marinescu (Dkt. 568) |
| YLPI | Dr. Marinescu's Yardi Lease Price Index |

**PRELIMINARY STATEMENT**

Following FRE 702's 2023 amendments, Ninth Circuit litigants must demonstrate that their expert "more likely than not" satisfies the four *Daubert* requirements. *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025) (finding this bar necessary because "many courts had erroneously held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility"). Marinescu, in both reports, fails to "stay within the bounds of what can be concluded from a reliable application of [her] basis and methodology" to the facts of the case, and she must be excluded. *Id*.

As Plaintiffs' Opposition and Marinescu's Second Report confirm, Marinescu continues to ignore how RIQ works and asserts new, untested facts and methodologies, in attempting to preserve her First Report's conclusions. For example, Marinescu's new "directional signals" theory opines that individualized client choices are irrelevant—ignoring how RIQ works entirely—citing "synchronized prices" that ***track prices from non-revenue management users***. Trying to save her TAM enforcement theory, Marinescu also now opines it is empirically sound for .005% of observations to drive her results because implausibly low rents of 40 cents or $1 could reflect concessions untethered to any market conditions or RIQ functionality. Marinescu's do-over is riddled with these reliability problems, requiring this Court to exercise its gatekeeping function and exclude her.

**ARGUMENT**

**I.    PLAINTIFFS DO NOT DEFEND MARINESCU'S ORIGINAL UNRELIABLE THEORIES ABOUT HOW RIQ AND BENCHMARKING WORK**

**A.    RIQ Pricing Mechanism**

**1.    Marinescu Abandons Her Unreliable "Common Formula" Framework**

Plaintiffs argue that Marinescu always relied on directional signals, never opined that RIQ employed a common function, and Marinescu's "common formula" equation was not intended literally. Yenikomshian Daubert Reply 2-3. But Marinescu's First Report hooked directionality to two additional components: (1) an imagined asking-rent-"feedback loop" that purportedly allowed

YARDI'S REPLY IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' EXPERT IOANA MARINESCU
CASE NO.: 2:23-CV-01391-RSL

RIQ clients to instantaneously match competitors' prices via the Comp Trend; (2) an incorrect assumption that because 62% of clients selected the Availability Health Rule (Step Two), clients necessarily made uniform decisions about how much of the Step One provisional increase or decrease to take. First Report ¶¶267-70, 321-25. Critically, these two components underpinned Marinescu's original conclusion that clients make uniform decisions about **whether and how much** to adjust their rents. *Id*. ¶244.

Marinescu repeatedly described these components as a "common pricing algorithm" (or "common pricing rule book"). First Report ¶¶12, 15, 34, 237, 244, 246-48, 270, 315, 468, 475, 577. Plaintiffs relied on Marinescu's three-part framework—their MSJ opposition dedicated a four-page section to "common rule logic" premised on Marinescu's initial opinions. MSJ Opp. 32-35; *id.* 1 ("shared pricing formula"); 9 ("common ruleset"); 11 ("common decision framework"); 37-38 ("common engine (shared rule logic)" and "common baselines (standardized configurations and 'best practices' used by most)"); CCAC ¶123.

**But Marinescu's technical predicates were false**. She fundamentally erred in understanding the system, offering opinions in her First Report about RIQ that were "not supported by sufficient facts to validate [them] in the eyes of the law" and the "indisputable record facts…render[ed] [her] opinion[s] unreasonable." *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993). Yardi proved that Marinescu ignored all magnitude configurations, the impact of individualized inputs, and that RIQ clients do not choose one another as Comps as she assumed. Mot. 13-14. Marinescu's mistakes were the inevitable result of her reliance on a keyword search of the configuration data, rather than analyzing the code to understand the individual pieces and **how they fit together**. Yenikomshian Response ¶27. Marinescu's Second Report abandons her common formula opinions (Second Report ¶ 411), acknowledging that they are unreliable. *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II) ("Mirena")*, 341 F. Supp. 3d 213, 268 (S.D.N.Y. 2018) (excluding expert who retracted central methodology).

### 2. Marinescu's New Directional Signals Theory Is Also Unreliable

Marinescu now opines that (1) the Trends' "directional signal" to raise or lower prices is consistent among clients and is the only part of the pricing mechanism that matters, theorizing that it (2) causes synchronistic pricing outcomes because clients typically weight the four Trends equally. Second Report ¶411. Even if this brand-new opinion was not procedurally improper, it is unreliable under FRE 702.

#### a. Directional Signals

Plaintiffs attempt to justify Marinescu's new directional signals theory by claiming that Yardi's experts fail to prove "configurability defeats coordination." Opp. 18. But clients must, and do, make individualized decisions that change their own pricing (altering their configurations and baseline (reference) rents regularly), proving they do not mutually agree to delegate their decision-making to Yardi. Yenikomshian Rebuttal ¶¶18, 36, 47-49; Mot. 2, 13.[1]

Regardless, Marinescu's directional signals theory is further untethered from how RIQ works than her original common formula (Yenikomshian Response ¶¶119-123), and "functions as an ex-post analysis to justify its plausibility." *In re Baby Food Prods. Liab. Litig.*, 2026 WL 559857, at *11 (N.D. Cal. Feb. 27, 2026) (excluding "unduly results-driven" opinion). Marinescu assumes that the Trends point all clients in the same "direction," but they demonstrably do not.

***First***, Marinescu ignores the Trends' reliance on individualized client data and selections. Mot. 2, 13-14. Three of the Trends (Traffic, Availability, New Leases) assess supply and demand only for a unit type group ***at a client's own property***. Yenikomshian Response §IV.D. The Comp Trend measures whether asking rents for that client's unit type group are increasing or decreasing at the same rate as the ***publicly available*** asking rents for ***that client's individually selected Comps***, only 5% of which are other RIQ properties on average. Yenikomshian Rebuttal ¶44. A client's provisional Trend directional signal thus depends on a client's own data and Comps. Yenikomshian Response ¶¶116-23.

---

[1] Plaintiffs' rebukes of Yardi's deviation and reference rent analyses (Opp. 16), similarly quibble over the size of clients' manual adjustments (but not their frequency), ignoring that each change reflects a client ***choice***.

YARDI'S REPLY IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' EXPERT IOANA MARINESCU
CASE NO.: 2:23-CV-01391-RSL

***Second***, Marinescu opines that none of the magnitude configurations in RIQ can flip the Trends' signal and are thus irrelevant to assessing coordination. Second Report ¶¶410-15. But clients can and do set Health Rule multipliers and/or "step size" (*i.e.*, how much the unit's price may change each day) to zero, each negating the provisional Trend calculation. Yenikomshian Response ¶26. Clients can also reverse the provisional calculation through Step Three configurations (*id.* ¶27), which Marinescu conceded. Marinescu Tr. 100:14-23.

Marinescu abandons her original Comp theory, premised on a direct feedback loop, now speculating the Comp Trend ***could*** facilitate coordination through an indirect "umbrella effect" across non-RIQ clients and markets. Opp. 15-16; Second Report §8.3.3. This theory is baseless. ***First***, courts routinely reject umbrella liability (on which Marinescu predicates her theory) as too attenuated, including within this circuit. *See, e.g.*, *In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 691 F.2d 1335, 1341 (9th Cir. 1982) (claims premised on umbrella liability were "unacceptably speculative and complex"); *Antoine L. Garabet, M.D., Inc v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1166 (C.D. Cal. 2000) (same). ***Second***, there can be no liability because Comps rely on only public data. Mot. 14-15. ***Third***, Marinescu offers only conjecture, never having tested her theory. First Report ¶¶395, 405; Marinescu Tr. 126:16-127:19, 152:23-156:18. ***Fourth***, Marinescu's new theory is inconsistent with a conspiracy ***amongst RIQ clients***. *Mach* Order (Dkt. 475-1) at 7 ("The owners/managers are not giving anything to their competitors through Yardi, and they are not getting a price recommendation that is based on pricing data provided to Yardi by their competitors."); *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1322 (11th Cir. 2003) (affirming exclusion where expert's failure to differentiate between lawful and unlawful conduct rendered his conclusions "absolutely no use to a fact finder").

Marinescu cannot reliably justify her decision to ignore massive swaths of RIQ's configurations.

-4-

### b.    Pricing Outcomes

Plaintiffs argue that "configurability [does not] defeat[] coordination," because RIQ prices "track in near-perfect synchronization." Opp. 18. But Marinescu's parallel pricing analyses (on which Plaintiffs rely) fail to consider whether the phenomenon being observed simply reflects market conditions, making her synchronization opinions unreliable. *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, 980 (C.D. Cal. Mar. 23, 2012) (excluding analyses that failed to account for "marketplace dynamics"). Tucker illustrates that when compared against non-revenue-management-using landlords, RIQ prices unremarkably moved in tandem with the overall market, even reflecting the same 2021-2022 acceleration that Marinescu wrongly attributes to TAM enforcement:



**Figure 7**
**Upward Price Movements and "Visible Synchrony" Are Not Specific to Revenue IQ Properties**[277]

Tucker Response ¶¶145, 155-59.[2]

---

[2] Plaintiffs cannot rely on internal Yardi's analyses tracking RIQ prices against other non-revenue and revenue management users. Opp. 3. *In re Graphics Processing Units Antitrust Litig.*, 253 F.R.D. 478, 505-06 (N.D. Cal. 2008) (internal business analysis was neither a substitute for nor confirmation of expert's

YARDI'S REPLY IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' EXPERT IOANA MARINESCU
CASE NO.: 2:23-CV-01391-RSL

**B.    Plaintiffs Concede Marinescu's Original Benchmarking Opinions Are Unreliable**

Marinescu abandons her original claim that Benchmarking provides "comprehensive visibility" into rivals' current prices and structurally aligns Comp and Benchmark sets, demonstrating that this theory was unreliable. *Mirena*, 341 F. Supp. 3d at 268. Marinescu did so because she had no response to proof that (1) Benchmarking provides only broad, historical information about market trends; (2) Benchmark sets exclude ~65% of Comp sets, and include *zero* other RIQ properties ~88% of the time; and (3) clients individually select their own Benchmark sets (resulting in unique sets for 98% of Landlord Defendants) and have no visibility into what properties are included in their outputs. Mot. 15.

All Marinescu is left with is that this aggregated, anonymized, noisy and time-lagged reporting information can be compared by clients or Yardi TAMs against a client's own average price levels, a wholly unremarkable observation universally true of any benchmarking capability, and which this Court has found cannot create antitrust liability. *Portillo v. Costar Grp., Inc.*, 2025 WL 2495053, at *4-5 (W.D. Wash. Aug. 29, 2025).

**C.    Plaintiffs Concede Marinescu's Enforcement Theory Ignored Relevant Client Communications**

Marinescu relied on internal Yardi communications about lawful Benchmarking in speculating that TAMs push RIQ clients to raise rents. Mot. 17. Plaintiffs concede that Marinescu ignored all but four client communications across 600 early-produced client call notes, 10,000-plus client emails, and 14,500 later-produced client call notes.[3] Marinescu cites those four communications as evidence that Yardi discussed Benchmarking with clients. Opp. 21. It is not an antitrust violation to help a client understand their reports (it is product support),[4] and the notes

---

econometric regression analysis). Yardi's analyses also removed at least one large (defendant) RIQ client. First Report ¶192 n.289.

[3] Marinescu had these notes for months and includes none in her Second Report, proving they show nothing improper.

[4] Plaintiffs do not challenge that only TAMs have access to the same Benchmarking information clients have. Any internal Yardi analyses compare a client to its own aggregated, anonymized benchmarks, and

-6-

show that property-specific needs dictated client pricing. MSJ Reply 19-20. Rule 702 does not permit experts to justify conclusions by choosing willful blindness of record facts. *Moussouris v. Microsoft Corp.*, 311 F. Supp. 3d 1223, 1244 (W.D. Wash. 2018).

## II.    PLAINTIFFS DO NOT CHALLENGE THAT OUTLIERS AND LEASE GAPS DRIVE MARINESCU'S UNRELIABLE YLPI

### A.    Plaintiffs Fail to Justify Marinescu's Inclusion of Outliers

Plaintiffs concede (1) it is important to investigate the impact of outlier data, particularly for ratio-based calculations (Marinescu Tr. 253:19-24); (2) Marinescu's First Report failed to investigate the impact of outliers on her YLPI; and (3) implausibly low rental values ***are the sole driver*** of her attempt to tie TAM calls to rent increases.

#### 1.    No Empirical Basis to Include Outliers

Relabeling outliers as concessions provides "no basis, empirical or otherwise" for including such implausible rents in Marinescu's invented YLPI. *Celador Int'l, Ltd. v. Walt Disney Co.*, 2008 WL 11342595, at *10 (C.D. Cal. Dec. 17, 2008); *Crescenta Valley Water Dist. v. Exxon Mobile Corp.*, 2013 WL 12116333, at *1 (C.D. Cal. Jan. 8, 2013) (excluding opinions where expert introduced errors to model and methodology thus did not replicate real world data). Marinescu's Second Report illogically contends that sub-$20 effective rents are plausible because "some…appear to" reflect dramatic concessions (Second Report ¶66), but it is facially absurd to suggest that any landlord would, in response to market conditions, offer an apartment for 40 cents or $1 a month for an entire lease. Yenikomshian Rebuttal ¶46; Tucker Rebuttal ¶65. Plaintiffs do not argue otherwise, and Marinescu offers no explanation for her outcome-driven claim that this data reflects "real transactions" (Second Report ¶66), justifying Marinescu's exclusion.

Nor would including such sub-$20 rents prove collusion anyway. ***First***, landlords deciding in a few instances to charge absurdly ultra-low rents for an entire lease and then subsequently bringing those rates back up would reflect idiosyncratic client decisionmaking ***entirely divorced***

---

"penalty" scoring was thus not connected to any enforcement scheme. MSJ Reply 18 n.47.  Plaintiffs claim that Yardi "rewards" TAMs for reference rent increases (Opp. 17), but offer only oblique references and no actual evidence of this (because there is none). Rule 37 Reply 7.

YARDI'S REPLY IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' EXPERT IOANA MARINESCU
CASE NO.: 2:23-CV-01391-RSL

*from RIQ's pricing mechanism* (Yenikomshian Response ¶¶60-61), and *could not evidence collusion based on RIQ use*. A landlord charging net 40 cents or $1 for rent does not reflect Trends driving prices upward or landlords conspiring with one another to facilitate a conspiracy through RIQ. Marinescu fails to understand RIQ and the data on which she opines, making her opinions unreliable. *In re Apple iPhone Antitrust Litig.*, 2025 WL 3124160, at *11 (N.D. Cal. Oct. 27, 2025) (excluding expert who did not clean data "such that it could reliably be used in the model").

**Second**, including concessions conflicts with Marinescu's methodology for testing collusion, further justifying exclusion. *See Marion Healthcare, LLC v. S. Illinois Healthcare*, 2020 WL 1527771, at *6-7 (S.D. Ill. Mar. 31, 2020). Marinescu excludes concessions from her deviation analysis and dismisses all Step Three concessions and discounts, claiming they are irrelevant to assessing list price collusion. Rule 702 does not permit Marinescu to have it both ways—either concessions are relevant (making her "directional signals" theory and deviation analysis unreliable) or they are not (making her inclusion of outliers unreliable).

### 2.    Outliers Drive TAM Enforcement Theory

Plaintiffs wrongly argue that outliers do not drive Marinescu's results. Opp. 8. Marinescu's First Report (and Plaintiffs' MSJ Opposition) touted *that Landlord Defendant price increases coincide with TAM calls "identifying underpricing.*" First Report, Figure 62; MSJ Opp. 3. Just 108 sub-$20 leases (.005% of observations) drive these results (Tucker Response ¶78), with *just two lease pairs* (40 cents and $1) doing most of the work:

YARDI'S REPLY IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' EXPERT IOANA MARINESCU
CASE NO.: 2:23-CV-01391-RSL



**Figure 5.B**
**Copy of Marinescu Original Report Figure 99 Entitled "Landlord Defendants Visibly Increased Prices Coinciding With TAM Call Notes Identifying Underpricing"[122]**

Tucker Response ¶67; Yenikomshian Response ¶45 (producing growth ratios of 310,000% and 255,000%).

It cannot be that 108 (really, mainly two) outliers out of millions of lease pairs could reliably support a "systematic pattern of directional intervention." Opp. 22. Indeed, Plaintiffs abandon their trumpeting that TAM calls "coincided" with price increases, with Marinescu now burying the

-9-

corresponding outlier sensitivity check in her Second Report's appendices. Second Report, Appx. C.1.1. These implausible rents drive Marinescu's conclusions—comparing her first (flawed) and second (corrected) analyses shows that the outlier correction *reverses* her prior "statistically significant" increase in the rate of rent growth.[5] ***Marinescu's outlier-driven analysis is not reliable evidence of a price response to TAM oversight***.[6]  *In re Apple iPhone Antitrust Litig*., 2025 WL 3124160, at *11.

Marinescu's purported "sensitivity check" based on BLS-outlier controls in the CPI fails to justify her inclusion of outliers. Second Report ¶¶190-94, Appx. C.4. Marinescu's YLPI and the CPI both measure month-on-month change, but Marinescu's method for calculating her ratios fundamentally differs from the CPI, making her YLPI inherently sensitive to outliers in a way the CPI is not. Tucker Response ¶¶70-73. In fact, the BLS (relied on by Marinescu as authoritative) explicitly rejects Marinescu's method of indexing, stating it "should be avoided altogether" given the potential for "known, and potentially substantial, upward bias."[7]

### B.        Plaintiffs Concede Gap-Based Ratios Drive Marinescu's Results

Plaintiffs do not challenge that (1) Marinescu's YLPI includes ratios based on gaps of more than one month between leases; (2) these ratios attribute changes occurring over multiple months or years to a single month; and (3) removing these ratios negates Marinescu's results. Mot. 7-8. A coding error in Marinescu's script, not her methodology, failed to remove these gap ratios, meaning that Marinescu's YLPI does not reliably represent monthly change and must be excluded. *Id*.

Now, Plaintiffs argue that Marinescu intended all along to "leav[e] vacancy-related observations intact." Opp. 4. As Yardi has demonstrated, that attempt to rescue Marinescu's flawed

---

[5] *Compare* First Report ¶¶385-94 (describing .94% increase) *with* Second Report Appx. C.1.1, Table 16 (flipping to -.054%).

[6] Yardi's caselaw where the correction "essentially negate[d]" the results is therefore on point. Opp. 10. None of Plaintiffs' cases implicate an expert whose flawed methodology drove her results. *Id*. at 9. Tellingly, in arguing that these are issues of weight, not admissibility, Plaintiffs fail to cite any post-*Engilis* decisions from within the Ninth Circuit. *Id*. 9-10.

[7] Tucker Response ¶71 n.125 (citing IMF, *Consumer Price Index Manual: Concepts and Methods* (2020)). Even applying BLS outlier capping, Marinescu's .94% increase flips to -.06% when controlling for Rent CPI. *Id*. ¶81.

-10-

implementation of her original methodology cannot be squared with Marinescu's repeated testimony about her month-to-month methodology and intent to remove observations where she had no lease data. Mot. 7-8; Rule 37 Mot. 3-5. Plaintiffs' reliance on ¶¶503-504 in Marinescu's First Report to support an alternative reading fails. Plaintiffs urge the Court to interpret ¶503's reference to the "prior month" into "prior month [of observation]" (Opp. 6), without any basis to read (contradictory) words into Marinescu's opinion. Paragraph 504 discusses recording change "when the price of an individual unit changes" in explaining how her YLPI accommodates units joining and leaving RIQ (First Report ¶504)—it does not indicate any intent to abandon the universal econometric principle that the $t$-1 described in her First Report ¶501 means the immediately preceding time period. Tucker Response ¶¶31-34.

Now aware that her chosen methodology did not produce her desired results, Marinescu's Second Report abandons that methodology,[8] picks a series of new ones, and critiques Yardi's experts for applying *her* testified-to methodology to the actual data. Marinescu, not Yardi, created any theoretical, untested "vacancy bias."[9] Marinescu's "solution" is to fabricate facts with no evidence—Marinescu now assumes that every unit sat vacant between leases and underwent no changes (remodeled, appliances replaced, etc.) that could independently cause re-leasing at a higher price. Second Report ¶¶111-16. Marinescu thus contradicts her testimony that she would remove missing data because "we don't know what happened in the meantime here" (Marinescu Tr. 281:20-282:7), and her failure to test her assumptions (easily disproved by common sense) makes her opinions unreliable. *Klein v. Meta Platforms, Inc.*, 766 F. Supp. 3d 956, 963 (N.D. Cal. Feb. 13, 2025) (excluding economist's opinions who presented an untested theory of antitrust injury based on economic literature that was contrary to "[the] undisputed record about the real world").

---

[8] Proving it is unreliable. *Mirena*, 341 F. Supp. 3d at 247.

[9] Unlike *In re Generic Pharms. Pricing Antitrust Litig.*, 2024 WL 4980784 at *15 (E.D. Pa. Dec. 3, 2024), where the expert affirmatively advanced a methodology predicated on another expert's work, here Yardi's experts critique Marinescu's methodology on rebuttal and do not adopt it as their own.

-11-

YARDI'S REPLY IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' EXPERT IOANA MARINESCU
CASE NO.: 2:23-CV-01391-RSL

Plaintiffs argue that Yardi used an axe rather than a scalpel in removing 240,194 gaps regardless of length[10] and proffer a "sensitivity check" excluding only gaps of 12 months or more. Second Report ¶¶168-74. Marinescu does not explain her new 12-month arbitrary cutoff, which, regardless, fails to solve the fundamental problem: *Marinescu designed an index to measure monthly changes, and it did not do so.* Mot. 7-8.

Marinescu next offers a new purported BLS-style imputation methodology that defies the scientific method and must be excluded. *In re REMEC Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1273-74 (S.D. Cal. 2010) (finding "fatally flawed" model assumed its own conclusion by defining dependent variable and working backward to infer causation). Marinescu *uses data from other Landlord Defendants in the area to backfill missing rent values, relying on that to claim that RIQ caused rental prices to simultaneously increase* at a point in time. Tucker Response ¶¶58-60. As Tucker demonstrates, Marinescu has no empirical basis (the BLS does not use imputed data this way) to concoct outcomes and work backward to claim they are proof that RIQ clients and Yardi collude. *Id.*

### III. PLAINTIFFS ABANDON MARINESCU'S PANEL REGRESSION TEST FOR FIRM INDEPENDENCE

#### A. Marinescu Concedes the Importance of Controlling for Common Management

Per Marinescu's First Report, Harrington's test assesses whether a *firm*'s decision to adopt an algorithm is a choice to join a cartel and thus assesses the impact of adding new co-conspirators. First Report ¶¶76, 104, 111, 485-87, 533-49. Marinescu even originally opined that *a landlord "cannot use [RIQ] to collude with itself" (id*. ¶517), and thus "*exclude[d] correlations between properties owned by the same landlord.*" *Id*. ¶337. Marinescu intended to control for common management in her First Report but through implementation error did not; Tucker applied

---

[10] Opp. 5. But this represents *just 1% of more than 23 million observations* in Marinescu's Expanded Lease Data underlying her YLPI. Tucker Response ¶52. That 1% of observations drive Marinescu's results underscores her methodology's unreliability. *Id*.

YARDI'S REPLY IN SUPPORT OF MOTION TO EXCLUDE PLAINTIFFS' EXPERT IOANA MARINESCU
CASE NO.: 2:23-CV-01391-RSL

Marinescu's (and Harrington's) definition and found Marinescu's results did not hold,[11] requiring Marinescu's exclusion. Mot. 9-11.

**B.      Marinescu Abandoned Prior Test for Firm Independence, Replaces it with a New, Flawed Theory**

**1.      No Common Management Controls**

Plaintiffs do not dispute that (1) Marinescu's new theory assumes that each *property* is a unique co-conspirator (whether or not managed by the same Landlord Defendant), which creates a confounding effect that drives Marinescu's conclusions (Tucker Response ¶¶104, 114-19); and (2) Harrington's article, and Marinescu's former characterization of it, assessed whether each new client was, in adopting RIQ, choosing to join a cartel or independently choosing to use the software, *hinging on the number of decisionmakers in the market*.

Now, Marinescu opines—without citing *any* authority—that she may disregard common management because RIQ's "coordinating capacity depends on the number of *properties* priced through it." Second Report ¶239. Marinescu lacks any reliable method to test this new theory—it certainly is not Harrington's—because it is an after-the-fact Marinescu-construct. *Klein*, 766 F. Supp. 3d at 963.

Marinescu opines that her sensitivity analysis isolating single-Landlord Defendant markets produces results consistent with her First Report's findings, thus legitimizing her latest theory. But removing just 25% of the erroneous observations does not test for the full confounding effect of failing to control for common management, and Marinescu does not dispute that controlling for all 40% of impacted markets negates her levels regressions entirely. Tucker Response ¶¶116-19. Marinescu's test does not distinguish collusive from unilateral conduct, as "properties under common management tend to be priced higher than single-managed properties in a given area." Tucker Rebuttal ¶64. For example, properties under common management may be higher value or

---

[11] Tucker applied Marinescu's methodology, not her own, and thus Plaintiffs claim that disagreements about variables go to weight is moot (Opp. 13-14). Plaintiffs attenuation bias argument (Opp. 11-12) is not only moot, but also misapplies the concept of attenuation bias altogether. Tucker Response ¶113.

-13-

common management entities themselves could be more sophisticated. *Id.*[12] Failing to control for common management produces unreliable results because the test no longer controls for ordinary market dynamics, justifying exclusion. *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d at 980.

### 2.   First Differences

Marinescu attempts to swap out Harrington's price levels metric and replace it with a "first differences" analysis that fails to apply a true first differences approach. This is not a reliable methodology. *Engilis*, 151 F.4th at 1045 (excluding expert who substituted a "differential etiology" for a "differential diagnosis" in his report).

Plaintiffs claim that Tucker "omits" analysis of Marinescu's first-difference regressions. Opp. 13. But Marinescu's First Report and Plaintiffs' summary judgment briefing almost exclusively relied on assessing "rent levels" [13] as Harrington considered, which negates Marinescu's original conclusions when applied as intended. *Id.* Marinescu's first differences analysis was buried in her appendix and not contemplated by Harrington. *Id.* With good reason, as (1) first differences measures how quickly rents go up and down, not whether they are high or low, and more frequent changes where there are more alleged co-conspirators *do not imply higher rents*[14]; and (2) a panel regression in first differences alone cannot support Marinescu's causal inference because it fails to compare to any control group. *Id.* ¶100. In fact, Marinescu's first differences analysis fundamentally differs from her levels regression; her levels regressions rely on roughly 23 million observations, while her first differences rely on just 300,000-400,000. *Id.* ¶101.

Even so, Marinescu *failed to implement a true first differences analysis*. Marinescu compares changes in area rents against the number of alleged co-conspirators and the CPI. *Id.*

---

[12] Marinescu claims that her "unit fixed effects" specifications control for this effect (Second Report ¶259), but in her single-landlord sensitivity, when controlling for unit fixed effects (*i.e.*, the impacts of common management (higher value apartments, more sophisticated management, etc.)), and cross-time variation (*i.e.*, that prices tend to increase over time), even removing just the single-landlord markets destroys Marinescu's findings. Second Report ¶246.

[13] Tucker Opp. 9 (collecting references to the "average price" of adopters by Marinescu, Harrington, and Plaintiffs).

[14] Tucker Response ¶¶98-99 (illustrating how larger changes are—unintuitively—consistent with both larger increases and smaller decreases over time).

¶¶102-03. First differences, however, captures change, and thus expresses **both** dependent and explanatory variables in terms of change. *Id*. ¶102. Marinescu **only** considers how rents change, measuring the other variables as she did in her levels regression. *Id*. ¶103. Meaning, if applying first differences, Marinescu should have compared rent changes against **changes** in the number of alleged co-conspirators and **changes** in the CPI. *Id*. ¶¶102-03.

Applying a true first differences model (by measuring change across all variables in the analysis) negates Marinescu's results. *Id*. ¶103.

## IV.    MARINESCU'S REMAINING OPINIONS ARE NOT HELPFUL TO ANY FACTFINDER AND MUST BE EXCLUDED

Plaintiffs claimed that "each [RIQ] client divulges its confidential and commercially sensitive pricing, inventory, and market data, allows Yardi to determine the price of each new and renewal lease, and adopts that price with very little, if any, second guessing." MTD Order 7. Marinescu now disclaims that RIQ operates as a common formula. Her new directional signals theory (relying on a client's own data and public asking rents) shows how far Plaintiffs have strayed from their original premise. Marinescu now abstracts away from how RIQ works so far that she simply "point[s] to common use of the same software." Yenikomshian Response ¶110. Marinescu's theory would make all revenue management software illegal, which is not the law.

On Benchmarking, after being proven wrong using the source code and data, Marinescu narrowly theorizes that the binary ability to see whether one is above or below the average price of an anonymous group of competitors (largely non-RIQ clients) is an anticompetitive information exchange—even if the aggregated, anonymized information is noisy and months (or a year) old. Yenikomshian Response ¶¶86-87. Marinescu's opinion fails to comport with any cognizable theory of collusion, as benchmarking is not *per se* illegal, *Portillo*, 2025 WL 2495053, at *4-5, and Plaintiffs offer no basis to argue that pointing clients to their own lawful Benchmarking reports is or could ever be a viable antitrust violation.

Marinescu has only a collection of ordinary software licenses, and no basis to argue that RIQ facilitates collusion. *Gibson v. Cendyn Grp., LLC*, 148 F.4th 1069, 1087-88 (9th Cir. 2025).

-15-

RESPECTFULLY SUBMITTED this 6th day of July, 2026.

**DEBEVOISE & PLIMPTON LLP**

By: */s/ Maura K. Monaghan*
Maura K. Monaghan (*pro hac vice*)
Michael Schaper (*pro hac vice*)
66 Hudson Boulevard
New York, NY 10001
(212) 909-6000
mkmonaghan@debevoise.com
mschaper@debevoise.com

Abraham Tabaie (*pro hac vice*)
David Sarratt (*pro hac vice*)
650 California Street
San Francisco, CA 94108
(415) 738-5700
atabaie@debevoise.com
dsarratt@debevoise.com

**McNAUL EBEL NAWROT & HELGREN PLLC**

By: */s/ Claire Martirosian*
Claire Martirosian, WSBA No. 49528
Richard W.  Redmond, WSBA No. 58835
600 University Street, Suite 2700
Seattle, WA 98101
(206) 467-1816
cmartirosian@mcnaul.com
rredmond@mcnaul.com

*Attorneys for Defendant YARDI SYSTEMS*

-16-

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendant Yardi Systems certifies that this brief contains 4,553 words, in compliance with Local Civil Rule LCR 7(e)(3) and the Order Granting Stipulated Motion (ECF No. 543) limiting Defendant Yardi's reply to 4,600 words.

By: */s/ Claire Martirosian*

Claire Martirosian

-17-