# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE    **ORIGINAL**

- - -

------------------------------x

In re YARDI REVENUE            : NO. 2:23-cv-01391-RSL

MANAGEMENT ANTITRUST           :

LITIGATION.                    :

                              :

McKENNA DUFFY, individually    :

and on behalf of all others   :

similarly situated,           : (Consolidated with

     Plaintiff(s),            :  Case Nos.

                              :  2:24-cv-01948;

     v.                       :  2:24-cv-02053)

                              :

YARDI SYSTEMS, INC., et al., :

     Defendant(s).            :

------------------------------x

\*\*CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER\*\*

- - -

March 9, 2026

- - -

Videotaped/Video-Teleconferenced Deposition of IOANA MARINESCU, Ph.D., held at the law offices of Holland & Knight, Suite 3300, 1650 Market Street, Philadelphia, PA 19103, beginning at 9:37 a.m., ending at 5:41 p.m., on the above date, before Denise D. Bach, a Registered Professional Reporter, Certified Court Reporter, Certified Real-Time Reporter, License No. XI0003990, and Notary Public, PA, NJ, DE & NY.

BLUEBEAR SOLUTIONS JOB NO.: 3185

THE VIDEOGRAPHER:  Stand by.  We are now on the record.  The time is 8:37 -- I'm sorry, I've got to go off the record.

(Pause.)

THE VIDEOGRAPHER:  We are now on the record.  The time is 9:37 a.m.  The date today is March 9th, 2026, and this begins the video-recorded deposition of Ioana Marinescu in the matter of McKenna Duffy versus Yardi Systems, Inc. et al.

My name is Aleisha Catts and I am the videographer.  I am with BlueBear Solutions.  Our court reporter today is Denise Bach.

All counsel will be noted on the stenographic record.  Will our court reporter please swear in the witness.

- - -

IOANA MARINESCU, Ph.D., having been first duly sworn or affirmed, was examined and testified as follows:

- - -

EXAMINATION

- - -

BY ATTORNEY SCHAPER:

Q.    Okay.  So, even if Step 1 and Step 2 indicate an increase, the final output from Revenue IQ depends on the magnitude of the adjustments that the client selects in Step 3.

Correct?

A.    Taking this, you know, description as given, I can see that, you know, if the first term is what Revenue IQ recommended and we have these additional terms, then if these additional terms are not zero, you know, it's going to affect the final rent.

Q.    And if the output of Step 1 and Step 2, for example, say a $10 increase, and Step 3 includes a negative $25 adjustment for, say, turn costs, the final result would be a net decrease.

Is that correct?

A.    So, in the case that these additional terms would be negative, and if they are big enough, it could outweigh the positive increase in that hypothetical.

Q.    If you look at Paragraph 169 of your report --

set; because, as Professor Harrington's work shows, when a group of landlords is using the same hub algorithm, that raises prices not only for them, but also for the non-users of the algorithm.

So, in that sense, even if the comp set, hypothetically, and, again, like, this is a hypothetical, didn't include Revenue IQ clients, you could still see an indirect effect, assuming that there is, in fact, price coordination with a hub algorithm, which is the allegation here, because it's a market. So, you know, we all influence each other's prices.

BY ATTORNEY SCHAPER:

Q.    But if a landlord defendant's Revenue IQ comp set did not include other Revenue IQ users, then that landlord's comps would not be informed by any other Revenue IQ user.

Correct?

ATTORNEY PIERCE:  Objection, asked and answered.

THE WITNESS:  It would still be informed in an indirect fashion through the

market, because when this hub algorithm, as I, as I describe it in my report, leads to price increases for the group of alleged conspirators, other landlords in the market typically would also see price increases for other landlords in the market and, therefore, in that way, you know, it's like a chain whereby, you know, I influence the price of somebody who maybe isn't using Revenue IQ, but that price is influencing some other Revenue IQ user, like, right there on two sides.

So, like, imagine A, B, C.  So, B is a non-user.  A and C are users.  If B is in the same market, then, you know, if we're both looking at B, we're essentially coordinating our prices through B.

But this is a hypothetical.  I'm just explaining that there is an indirect effect.

BY ATTORNEY SCHAPER:

    Q.    If you would look at Paragraphs 191 and 92 which are on Page 72.

    A.    Yes.

    Q.    So, in Paragraph 191, you're talking about two ways in which landlords can

of clients' agreement to share structured data on their pricing and unit characteristics."

Do you see that?

A.    Yes.

Q.    And do you see in the next bullet, "Yardi makes efforts to make this pricing logic clear to clients, and client-facing materials and testimonials describe Revenue IQ as transparent and effective at increasing rents."

Do you see that?

A.    Yes.

Q.    And so you are referring to Revenue IQ clients throughout this usage of clients.

Correct?

A.    Not necessarily.  It could be other Yardi clients since all clients signed the, you know, data sharing agreements.  And so on the basis of the data, there's a lot more data in the CPD than just Revenue IQ users.

Q.    If I'm a Revenue IQ user, Professor, and I don't know if in my Comp Trends group, there are other Revenue IQ

users, I don't know whether, if I raise my price, it will automatically raise my competitors' price.

Isn't that the case?

ATTORNEY PIERCE:  Objection, vague.

THE WITNESS:  So, as I was explaining earlier, in the comp set -- sorry. Let me rephrase.

If we're in the market, there can be indirect -- in fact, there typically will be, economic theory says there will be indirect effects even if somebody has Comp Trend set that isn't entirely made of Revenue IQ clients.

The point is that other landlords' prices are also going to increase if Revenue IQ manages to increase prices in this market.  So, prices are all connecting -- connected within the market and, therefore, prices tend to increase.

And I think this is really relevant here in terms of my concern about raising price, because if others increase price in my same market, my potential adverse

consequences of raising the price are lesser because they are -- there's less availability of other lower-priced units.

BY ATTORNEY SCHAPER:

Q. Okay. So, in the analysis that you just described, isn't market share a relevant factor in whether Yardi and the landlord defendants would be able to effect the collusive scheme that is alleged by plaintiffs?

A. It matters what sort of substitution exists between different landlords, because the renters are going to compare, like, the prices of different units in the market. However, for this report, I wasn't asked to define a relevant market and, you know, I would do so in the next stage of the analysis, but here I cannot talk about market share. And that would depend on defining a relevant market.

Q. Just in terms of the economic literature, would you agree that, to raise market-wide rents in a sustained manner, economic theory indicates that the allegedly coordinating group must have sufficiently high

combined market share?

A.    You know, as I just explained, they are indirect effects on pricing.  And so, you know, there is no, like, threshold of market share within economics.  It's a, it's a, it's a continuous variable whereby, you know, market share matters, but there isn't like a threshold below which, you know, there will be no effect.

And, besides, we have to define the relevant market before we can start talking about the specific market share.

Q.    Okay.  So, you said that market share matters.  Is there a share below which you think that it's not plausible that a conspiracy would be able to be durable because the share was so low?

A.    I just said there isn't such a threshold share.

Q.    Okay.  But you do agree -- do you know who Dennis Carlton and Jeffrey Perloff are?

A.    I know Dennis Carlton.  I do not know Jeffrey Perloff.

Q.    Are you familiar with their

Ioana Marinescu, Ph.D.                                    Confidential                                              156

Modern Industrial Organization text?

A.        Sure, that's a textbook in the literature.

Q.        And are you familiar with the part of that text that says that if cartel members have a small share, then firms outside the cartel can lower the price to undercut the cartel?

A.        It really depends on the specifics of the market.    But I don't disagree that market share matters and that it's easier to raise prices to a greater degree in most models typically in theory when you have a higher market share.

Q.        But that's not something you tested in your report?

A.        It is not, because I wasn't asked to define a relevant market here.

Q.        Did you communicate to counsel that market share is a relevant factor in the ability of a collusive scheme to be durable?

A.        Again, I wasn't asked to define a market and, therefore, I couldn't calculate a market share, you know, since I didn't define markets.

were reversed in time.

Q.    In downward movements in rent, isn't it the case that decreases are bounded by zero?

A.    Right.  So, de -- you're right. Decreases I guess -- although -- wait a second, because I think the -- didn't I use this equation?  I think it's ratio, not a percent decrease.  And so I believe I used the ratio of the rent, the prior rents.

Q.    Even if you used a ratio, wouldn't there still be an asymmetry between the possibility of such a large increased ratio being measured versus a decreased ratio?

A.    Not --

ATTORNEY PIERCE:  Objection, assumes facts not in evidence.  Calls for speculation.

THE WITNESS:  So, assuming I used a ratio, you know, hypothetically, again, not looking at the data, if it's a ratio, then, you know, you could see, if you take the inverse or the ratio, et cetera, it could also be very influential, so, you know.

And, also, I would like to add

that it depends on how many occurrences there might be of the large increases versus large, potentially, you know, rare decreases.

So, really, to get to the bottom of this, one would have to, you know, examine the sensitivity of the analysis to this alternative, you know, exclusions of certain points and, you know, that's something that, you know, probably would be useful to do.

BY ATTORNEY SCHAPER:

Q.      But it's not something that you investigated as part of preparing your report.

Correct?

A.      Not in these ones.  There are some analyses where I excluded some outliers, which right now I cannot find them again.  But there are some analyses where I did exclude outliers, I believe in Section 8, outliers in Section 8.

Q.      Okay.  We can come, we can come back to that.

A.      Yeah.

Q.      But staying with Exhibit 6, if you look at the second property, Revenue IQ Unit 8692688, do you see that the first lease

know, until the end of this, of this lease.

Q.    You would agree that it would not be appropriate to attribute the entire difference between 1,045 and 1,382 to a change that happened in one month.

Correct?

ATTORNEY PIERCE:  Objection, vague.

THE WITNESS:  So, as I said, given the procedure that we have discussed, there would be missing data in the middle and, therefore, there would not -- this property would not contribute to the index since it would have missing data, it would not contribute to the index until August of 2025, because that's the first time that we see the rent not changing since it's being propagated from the July 2025 new rent.

BY ATTORNEY SCHAPER:

Q.    If you assume for a second that this property did contribute to the data, do you agree with me that it would not be appropriate for that contribution to be based on a ratio comparing 1,382 to 1,045?

ATTORNEY PIERCE:  Objection,

assumes facts not in evidence.  Calls for speculation.  Vague.

THE WITNESS:  There is no reason, based on the methodology, to do that.  Like, again, like, there is -- when there's missing data, there's missing data.  We don't know what happened in the meantime here.

BY ATTORNEY SCHAPER:

Q.    Okay.  But I'm just -- if you assumed, let's say if you assumed that somebody dealt with this issue identified for property 1623904 by treating the entire change from 1,045 to 1,382 as having occurred in one month, that would not be an appropriate methodology.

Correct?

ATTORNEY PIERCE:  Objection, vague, calls for speculation, assumes facts not in evidence.

THE WITNESS:  As I said, you know, it seems to me that, in this situation, there would be missing data for the index for this property.  And so, so, you know, it just wouldn't contribute for the intervening, you know, time where we didn't have data for it to

CERTIFICATE

I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

_Denise D. Bach_
_____

DENISE D. BACH,

Registered Professional Reporter

Certified Court Reporter

Notary Public/Expiration: March 2030

Dated:  March 12, 2026

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)